# United States Bankruptcy Court
## Northern District of Iowa (Mason City)
## Bankruptcy Petition #: 19–00507

*Assigned to:* Thad J. Collins
Chapter 7
Previous chapter 11
Original chapter 11
Voluntary
Asset

*Date filed:* 04/25/2019
*Date converted:* 12/09/2019
*341 meeting:* 01/27/2020
*Deadline for filing claims:* 04/08/2020

---

*Debtor*
**McQuillen Place Company, LLC**
1110 North Grand Ave., Suite 300
Charles City, IA 50616
FLOYD–IA
847–456–1911
Tax ID / EIN: 46–3987825
*aka* **Classic Cleaners**
*aka* **Classic Cleaners of Charles City**

represented by **J D Haas**
J D Haas & Associates, PLLC
1120 E. 80th St.
Suite 200
Bloomington, MN 55420
952–345–1025
Fax : 952–854–1665
Email: jdhaas@jdhaas.com

**Donald H. Molstad**
701 Pierce St., Ste. 305
Sioux City, IA 51101
712–255–8036
Email: judylaw308@yahoo.com

**Charles McQuillen Thomson**
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616
847–456–1911
Fax : 847–495–3488
Email: cthomson@doall.com

---

*Trustee*
**Charles L. Smith**
25 Main Place, Ste 200
P.O. Box 248
Council Bluffs, IA 51502–0248
712–325–9000

represented by **Telpner Peterson Law Firm, LLP**
25 Main Place, Suite 200
Council Bluffs, IA 51503
712–325–9000

---

*U.S. Trustee*
**United States Trustee**
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401–2101
319–364–2211

represented by **L Ashley Zubal**
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309–2108
515–323–2269
Email: Ashley.zubal@usdoj.gov

---

*Cred. Comm. Chair*
**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

| Filing Date | # | Docket Text |
|---|---|---|
| 08/23/2019 | 47 | Objection to Motion to Extend/Limit Exclusivity Period Filed by United States Trustee (related document(s)44 Motion to Extend/Limit Exclusivity Period). (Zubal, L) (Entered: 08/23/2019) |
| 08/30/2019 | 49 | Hearing Continued (related document(s)31 Motion for Relief From Stay (Fee)) Status Conference to be held on 9/13/2019 at 11:30 AM at Telephonic Hearing. (dcri) (Entered: 08/30/2019) |
| 09/13/2019 | 51 | Order Granting Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement (Related Doc # 44) Motion to Extend Exclusivity Period Dated and Entered on 9/13/2019. Dated Extended to: October 4, 2019. (tsta) (Entered: 09/13/2019) |
| 09/13/2019 | 52 | Order Setting Final Hearing Signed on 9/13/2019. (related document(s)31 Motion for Relief From Stay (Fee)) Final Hearing scheduled for 10/8/2019 at 09:45 AM at Mason City Court Room (tsta) (Entered: 09/13/2019) |
| 10/04/2019 | 56 | Chapter 11 Plan . Filed by McQuillen Place Company, LLC (related document(s)1 Voluntary Petition (Chapter 11), 44 Motion to Extend/Limit Exclusivity Period). (Molstad, Donald) (Entered: 10/04/2019) |
| 10/04/2019 | 57 | Disclosure Statement Filed by McQuillen Place Company, LLC (related document(s)1 Voluntary Petition (Chapter 11), 44 Motion to Extend/Limit Exclusivity Period). (Molstad, Donald) (Entered: 10/04/2019) |
| 10/04/2019 | 58 | Notice of Hearing Re: Plan, Disclosure Statement Filed by McQuillen Place Company, LLC (related document(s)56 Plan, 57 Disclosure Statement). Objections due by 11/1/2019. Hearing scheduled for 12/5/2019 at 09:30 AM at Mason City Court Room. (Molstad, Donald) (Entered: 10/04/2019) |
| 10/07/2019 | 59 | Order Continued Hearing Signed on 10/7/2019. (related document(s)31 Motion for Relief From Stay (Fee)) Status Conference to be held on 10/18/2019 at 01:15 PM at Telephonic Hearing. (tsta) (Entered: 10/07/2019) |
| 10/17/2019 | 61 | Motion to Dismiss Case For Other Reason. re: failure to pay taxes, gross mismanagement, and continuing loss to the estate, Motion to Convert Case to Chapter 7 . Fee Amount $15. Filed by First Security Bank & Trust Company (Eide, Larry) (Entered: 10/17/2019) |
| 10/21/2019 | 62 | Order Setting Final Hearing Signed on 10/21/2019. (related document(s)31 Motion for Relief From Stay (Fee)) Final Hearing scheduled for 11/14/2019 at 10:00 AM at Fort Dodge Court Room (tsta) (Entered: 10/21/2019) |
| 10/22/2019 | 64 | Appearance by Brandon James Gray Filed by Creditor Iowa Economic Development Authority. (Gray, Brandon) (Entered: 10/22/2019) |
| 10/22/2019 | 65 | Application to Employ J D Haas as Attorney Filed by McQuillen Place Company, LLC (Molstad, Donald) (Entered: 10/22/2019) |
| 10/22/2019 | 66 | Support Document re: Application to Employ Filed by Debtor McQuillen Place Company, LLC (related document(s)65 Application to Employ). |

| | | | |
|---|---|---|---|
| | | | (Molstad, Donald) (Entered: 10/22/2019) |
| 10/22/2019 | | 67 | Order Re: Application to Employ J D Haas as Attorney (Related Doc # 65) Dated and Entered on 10/22/2019. (sgre) (Entered: 10/22/2019) |
| 10/23/2019 | | 68 | Notice Setting Bar Date for Objections Re: Motion to Dismiss Case/Debtor(s) – 21 Days , Notice of Hearing Re: Motion to Dismiss Case/Debtor(s) Filed by First Security Bank & Trust Company (related document(s)61 Motion to Dismiss Case/Debtor(s)). Objections due by 11/13/2019. (Eide, Larry) (Entered: 10/23/2019) |
| 10/24/2019 | | 70 | Objection to Application to Employ *JD Haas of JD Haas and Associates* Filed by United States Trustee (related document(s)65 Application to Employ). (Zubal, L) (Entered: 10/24/2019) |
| 10/25/2019 | | 71 | Hearing Set Hearing scheduled for 11/15/2019 at 02:30 PM by Telephonic Hearing. (dcri) (Entered: 10/25/2019) |
| 10/25/2019 | | 72 | Motion to Convert Case to Chapter 7 *or Dismiss*. Fee Amount Exempt. Filed by United States Trustee (Zubal, L). (Entered: 10/25/2019) |
| 10/25/2019 | | 73 | Motion to Shorten Time to Object to the United State's Trustee's Motion to Convert or Dismiss Filed by United States Trustee (Zubal, L) (Entered: 10/25/2019) |
| 10/25/2019 | | 74 | Order Granting United States Trustee's Motion to Shorten Bar Date to Object to Motion to Convert to or Dismiss from 21 Days to 19 Days (Related Doc # 73) Dated and Entered on 10/25/2019. (sgre) (Entered: 10/25/2019) |
| 10/28/2019 | | 77 | Notice of Hearing Re: Motion to Convert Case to Chapter 7 *or Dismiss* Filed by United States Trustee (related document(s)72 Motion to Convert Case to Chapter 7). Objections due by 11/13/2019. Hearing scheduled for 11/14/2019 at 10:00 AM at Fort Dodge Court Room. (United States Trustee) (Entered: 10/28/2019) |
| 10/28/2019 | | 78 | Hearing Reset (related document(s)65 Application to Employ 71 Hearing Set) Hearing scheduled for 11/1/2019 at 03:30 PM by Telephonic Hearing. (dcri) Modified on 10/28/2019 (dcri). (Entered: 10/28/2019) |
| 10/31/2019 | | 80 | Objection re: Motion to Dismiss Case/Debtor(s), Motion to Convert Case to Chapter 7 Filed by Debtor McQuillen Place Company, LLC (related document(s)61 Motion to Dismiss Case/Debtor(s), Motion to Convert Case to Chapter 7). (Molstad, Donald) (Entered: 10/31/2019) |
| 10/31/2019 | | 81 | Objection re: Objection *(Resistance to U.S. Trustee's Objection to Debtor's Application to Employ Counsel)* Filed by Debtor McQuillen Place Company, LLC (related document(s)70 Objection). (Molstad, Donald) (Entered: 10/31/2019) |
| 11/01/2019 | | 82 | Objection re: Motion to Convert Case to Chapter 7 Filed by Debtor McQuillen Place Company, LLC (related document(s)72 Motion to Convert Case to Chapter 7). (Molstad, Donald) (Entered: 11/01/2019) |
| 11/01/2019 | | 83 | Objection to Confirmation of Plan *and Disclosure Statement* Filed by United States Trustee (related document(s)56 Plan, 57 Disclosure Statement). (Zubal, L) (Entered: 11/01/2019) |

| | | | |
|---|---|---|---|
| 11/01/2019 | | [84](underline) | Objection re: Plan, Disclosure Statement Filed by Creditor First Security Bank & Trust Company (related document(s)56 Plan, 57 Disclosure Statement). (Eide, Larry) (Entered: 11/01/2019) |
| 11/01/2019 | | [85](underline) | Objection re: Disclosure Statement Filed by Interested Party Cedar Rapids Bank & Trust Company (related document(s)57 Disclosure Statement). (Schmall, Joseph) (Entered: 11/01/2019) |
| 11/05/2019 | | [86](underline) | Proceeding Memo and Order Re: Application to Employ J D Haas as Attorney (related document(s)65 Application to Employ) Final Hearing scheduled for 11/14/2019 at 10:00 AM at Fort Dodge Court Room. (tsta) (Entered: 11/05/2019) |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | CASE NO. 19-00507M |
| McQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | |
| Debtor. | ) | OBJECTION TO MOTION TO |
| | ) | EXTEND EXCLUSIVITY PERIOD |

The Acting United States Trustee, through the undersigned Trial Attorney, objects to Debtor's

Motion to Extend Exclusivity Period to file a plan and disclosure statement, and states as follows:

1. As Debtor's principal, Charles Thomsen, acknowledged at the Section 341 meeting of creditors,

Debtor generates little to no income.  The Monthly Operating Reports reflect Debtor consistently

operates at a loss.

2. The estate primarily consists of one piece of historical real estate, the McQuillen Place, located

on the main thoroughfare of Charles City.  The effort to rehabilitate the property, which began in 2014

and has remained at a standstill since the fall of 2017, left Debtor claiming secured debt alone in excess

of $6.8 million.  Mr. Thomsen testified the property maintains a current value of $500,000 million and if

totally refurbished, a value of somewhere between $2 - $3.5 million.

3. Debtor's only chance at proposing a successful plan in this case involves the ability to secure

financing to complete construction of the property.  Since construction ceased, Debtor has been

unsuccessful in securing financing to complete construction.  At the meeting of creditors, held over two

months ago, Debtor insisted upon the ability to secure financing within weeks of the meeting.

4. Extension of the exclusive period is in the Court's discretion.  *In re Hoffinger Industries, Inc.*,

292 B.R. 639, 642 (8th Cir. B.A.P. 2003).  The exclusive period may only be extended "for cause."  The

burden is on Debtor as the party seeking to extend the exclusive period to establish good cause.  *Id.* at

1

643.

5.   In the Motion, Debtor does not meet the burden for establishing good cause.  The Motion does not specify why Debtor was unable to prepare and file its disclosure statement and plan within the exclusive period.

6.   Nor does the Motion give any indication that Debtor has the ability to file a plan "within 30 to 60 days."  Devoid from the Debtor's Motion is *any* discussion of its ability to secure financing, or to merely identify a willing lender.

7.   While the UST has appointed committee in this case, no committee counsel is employed.  The UST therefore has a heightened role in the protection of the interests of unsecured creditors.

8.   For the reasons set forth herein, Debtor's Motion should be denied.

**James L Snyder**
Acting United States trustee
Region 12

By:/s/ L. Ashley Zubal
**L. Ashley Zubal**
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Ph:(515)323-2269/Fax: 284-4986
Ashley.Zubal@usdoj.gov

2

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that copies of this document were served on the parties listed below by electronic mail or first-class mail, postage prepaid, on August 23, 2019:

Parties receiving electronic service via CM/ECF

- **Larry S. Eide**    eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com
- **Laura Michelle Hyer**    lhyer@bradleyriley.com, dmoses@bradleyriley.com;Docket@bradleyriley.com
- **Donald H. Molstad**    judylaw308@yahoo.com
- **Judith O'Donohoe**    charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com
- **Joseph E. Schmall**    jschmall@bradleyriley.com, cclark@bradleyriley.com;docket@bradleyriley.com
- **Christine B. Skilton**    cbs.csslaw@butler-bremer.com
- **Bradley David Sloter**    brads@nsslaw.net
- **Charles McQuillen Thomson**    cthomson@doall.com
- **United States Trustee**    USTPRegion12.CR.ECF@usdoj.gov

**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658


_/s/ Jennifer L. Cline_
Jennifer L. Cline
Paralegal Specialist

3

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| | CHAPTER 11 |
| In Re: | Bankruptcy No. |
| | |
| McQuillen Place Company, LLC | 19–00507 |
| | |
| Debtor(s) | |

## NOTICE RESETTING TELEPHONIC STATUS CONFERENCE
## ON MOTION FOR RELIEF FROM STAY (DOC. 31)

TO:

| | |
|---|---|
| Charles McQuillen Thomson, Attorney for Debtor(s) | 847–456–1911 |
| United States Trustee | |
| Donald Molstad, Attorney for Debtor | 712–255–8036 |
| Larry Eide, Attorney for First Security Bank & Trust Company/MOVANT | 641–423–4264 |

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

### *September 13, 2019 at 11:30 AM*

***ATTORNEY DONALD MOLSTAD IS TO INITIATE THE TELEPHONE CALL.*** Parties should be ready and available to accept said call. The telephone number for Chambers is 319–286–2230.

***NOTE:*** THIS HEARING WILL BE DIGITALLY RECORDED.

MEGAN R. WEISS
Acting Clerk, Bankruptcy Court
by:

*Danielle Cripe*

Date: August 30, 2019

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | Bankruptcy No. 19-00507 |
| Debtor. | ) | |

Date of Hearing:   September 13, 2019

APPEARANCES:

For Debtor: Don Molstad and Charles Thomson

For Parties-In-Interest: Larry Eide for First Security Bank & Trust Company

NATURE OF PROCEEDING:        ___In Court    _X_ Telephonic

 Debtor's Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement 

IT IS ORDERED THAT:

Debtor's Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement is
GRANTED.   The deadline to file a Chapter 11 Plan and Disclosure Statement is extended to and
including October 4, 2019.

Dated and Entered   September 13, 2019

_____
Thad J. Collins, Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | Bankruptcy No. 19-00507 |
| Debtor. | ) | |

Date of Hearing:   September 13, 2019

APPEARANCES:

For Debtor: Don Molstad and Charles Thomson

For Parties-In-Interest: Larry Eide for First Security Bank & Trust Company

NATURE OF PROCEEDING:          ____In Court    _X_ Telephonic

 Status Conference on Motion for Relief from Stay #31.

IT IS ORDERED THAT:

By agreement of the parties, final hearing on First Security Bank & Trust Company's Motion for Relief from Stay is set for

**October 8, 2019 at 9:45 a.m.**

in the Bankruptcy Court Room, Second Floor, U.S. Post Office, 211 N. Delaware Ave., Mason City, Iowa.

Dated and Entered ____September 13, 2019____

Thad J. Collins, Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa | ) | Case No. 19-00507 |
| limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| Address: | ) | |
| 1110 North Grand Ave., #300 | ) | |
| Charles City, Iowa 50616 | ) | |
| | ) | |
| Employer's Tax Identification No.: 46-3987825 | ) | |

CHAPTER 11 PLAN OF REORGANIZATION OF
McQUILLEN PLACE COMPANY, LLC
DATED OCTOBER 4, 2019

Donald H. Molstad, Esq.
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR THE DEBTOR

1

# TABLE OF CONTENTS

INTRODUCTION...................................................................................3

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME...3

ARTICLE II. CLASSES OF CLAIMS AND TREATMENT OF CREDITORS............................. 6

ARTICLE III. MEANS FOR IMPLEMENTATION OF THE PLAN........................................ 9

ARTICLE IV. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 10

ARTICLE V. PROVISIONS GOVERNING DISTRIBUTIONS........................................... 10

ARTICLE VI. PAYMENT OF FEES AND LIABILITIES NOT ALREADY ADDRESSED............. 11

ARTICLE VII. CRAM DOWN.....................................................................12

ARTICLE VIII. DISCHARGE, INJUNCTION AND SUBORDINATION RIGHTS....................... 12

ARTICLE IX. RETENTION OF JURISDICTION.................................................... 13

ARTICLE X. MISCELLANEOUS PROVISIONS.....................................................13

2

# INTRODUCTION

The Debtor[1] refers creditors and other interested parties to the accompanying Disclosure Statement for a discussion of the Debtor's history, business, and historical information.

The primary purpose of the Plan is to maximize the value of the Debtor's estate for the benefit of its creditors and equity holders by effectuating a sale of the Debtor's Assets, with the net proceeds then distributed to creditors and equity holders in accordance with the provisions of the Plan.

The Plan contemplates the Debtor selling (the "Sale") a portion of the Debtor's Assets which are related to the McQuillen Place Development to a newly formed entity, MPC2, LLC ("MPC2") on the Effective Date. In consideration for the Sale, MPC2 will transfer to the Debtor a series of promissory notes and certificates which will be distributed to various creditors of the Debtor by the Debtor pursuant to this Plan.

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

"Alleged First Security Building Collateral" means that portion of the McQuillen Place Building Assets which would be encumbered as of the Plan Date assuming the validity of the Loan Documents, it being understood that the Alleged First Security Building Collateral does not include any personal property or other forms of property not encumbered by a real estate mortgage under Iowa law.

"Allowed Claim" means a claim that has been allowed or deemed allowed pursuant to the Code.

"Asset" means any tangible or non-tangible thing of value that is owned or controlled by the Debtor.

"Building Consideration" means (a) a promissory note (the "Unsecured Distribution Note"), in the form attached hereto as Exhibit A, in an amount equal to the total dollar amount of all Allowed Claims falling into Classes 7 through 11 of this Plan, payable to the Debtor from MPC2 not later than one calendar year from the Effective Date, but prepayable by MPC2 at any time without penalty, (b) the Secured Claim Payment (as elected by MPC2), (c) the Supplemental Amount in cash, (d) cash in an amount equal to the Allowed Claims of Classes 1 through 3, (e) a promissory note for the amount of the Allowed Claims in Class 4, (f) the Construction Financing Agreement, and (g) the other consideration required to be tendered by MPC2 under this Plan.

"Causes of Action" means any rights, actions, choses in action, or suits, belonging to the Debtor or its estate, including, without limitation, the Litigation.

"CGC" has the meaning ascribed to such term in Paragraph N of Article II of this Plan.

"Chapter 11 Case" means the above-captioned chapter 11 case pending in the Bankruptcy Court for the Northern District of Iowa.

"Claim Determination Escrow" means an escrow account established with any of (a) Chicago Title Insurance Company -- Escrow Services, 10 S. LaSalle Street, Suite 3100, Chicago, IL 60603, (b) Independent Escrow Services Corp., 303 W Madison St., Suite 1300, Chicago, IL 60606, or (c) any attorney currently licensed in Iowa who is acceptable to Debtor and First Security Bank, and who agrees to act as escrow agent hereunder, to hold Distributions pending Resolution of the Litigation.

"Class" means a class of claims or equity interests.

---

[1] Words which are capitalized in this document have the meanings ascribed to them either at the point of their first use or in the section of this document entitled "Defined Terms."

"Committee" means the Official Committee of Unsecured Creditors of the Debtor appointed by the U.S. Trustee on May 20, 2019, and any duly appointed successors.

"Confirmation Date" means the first date on which the Confirmation Order is signed by the Bankruptcy Court and entered on its docket.

"Confirmation Order" means the order of the Bankruptcy Court that confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

"Construction Financing Agreement" means the agreement between MPC2 and its lender pursuant to which MPC2 shall pay the costs of the goods and services for making the Improvements.

"Current Building Value" means either $100,000 or such other value (reckoned as of the Plan Date) as has been assigned by the Court to the McQuillen Place Building Assets.

"Debtor" means McQuillen Place Company, LLC, an Iowa limited liability company.

"Deficiency Claim Asserted by First Security Bank" means the total dollar amount claimed by First Security Bank minus the Current Building Value, provided, however, that (a) if the claim asserted by First Security Bank has not been specifically allowed through the process of a hearing by the Court, the total amount claimed by First Security Bank shall be deemed to equal $2,500,000 for purposes of this Plan, and (b) if the claim asserted by First Security Bank is specifically allowed by the Court, it shall equal the amount so allowed by the Court, and (c) if the claim of the First Security Bank is estimated by the Court under 11 U.S.C. §502(c) (and related provisions in the Code and Rules), the amount so estimated shall be deemed the "total amount claimed" for purposes of this Plan.

"Director Litigation" means the rights of the Debtor as described and/or referenced in the draft complaint attached hereto as Exhibit B.

"Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

"Distribution Account" means an account that will hold funds, notes, certificates or other items of value obtained from the Sale of Debtor's Assets until such time as those funds, notes, certificates or other items of value are distributed to creditors in accordance with the Plan.

"Distribution" means the disbursement of funds, notes, certificates or other items of value under the Plan to holders of Allowed Claims.

"Effective Date" means the date of the Sale, which shall occur not later than three (3) days following the Confirmation Order becoming a final order.

"Equitable Subordination Claims" means the rights of the Debtor as described and/or referenced in the draft complaint attached hereto as Exhibit C.

"Essential Vendor Claims" has the meaning ascribed to such term in Paragraph I of Article II.

"Executory Contracts" means all executory contracts (as defined in the Code) of the Debtor, including, but not limited to, Debtor's rights to assert warranty claims under contracts for the provision of goods and services in the construction of the McQuillen Place Development.

"Fee Claim" means a Claim under sections 328, 330(a), 331, 503, or 1103 of the Bankruptcy Code for compensation of a professional or other entity for services rendered or expenses incurred in the Chapter 11 Case.

"First Floor Improvements" has the meaning ascribed to such term in Paragraph C of Article III of this Plan.

"General Construction Claims" has the meaning ascribed to such term in Paragraph J of Article II of this Plan.

"General Construction Creditors" has the meaning ascribed to such term in Paragraph J of Article II of this Plan.

"General Unsecured Claim" has the meaning ascribed to such term in Paragraph K of Article II of this Plan.

"General Unsecured Claims"

"IEDA Litigation" means the rights of the Debtor against the Iowa Economic Development Authority ("IEDA"), including, but not limited to, the Debtor's claim for damages against the IEDA for

4

damages arising from failure or refusal of the IEDA to tender previously promised tax credits and other financial accommodation to the Debtor.

"Improvements" has the meaning ascribed to such term in Paragraph C of Article III of this Plan.

"Litigation Trust Agreement" means that agreement, described on Exhibit D, pursuant to which the Debtor has deposited, in trust, its rights to the Litigation.

"Litigation Trust Certificate" has the meaning ascribed to the term in Paragraph H of Article II.

"Litigation Trust" means the trust created by the Litigation Trust Agreement pursuant to which the Debtor, not personally, but solely as trustee, shall administer the Litigation Trust.

"Litigation" means all legal claims of the Debtor against any person or entity, including, but not limited to of (a) the Equitable Subordination Claims, (b) the McQuillen Counterclaims, (c) the Non-debtor Counterclaims, (d) the Director Litigation, (e) the Allowance Litigation, and (e) the IEDA Litigation.

"McQuillen Counterclaims" means the Debtor's claims against various parties in Case No. EQCV031170, pending in Iowa District Court in Floyd County, Iowa.

"McQuillen Place Building Assets" means all Assets of the Debtor located at, involved in the operation of, or involved in the construction of the McQuillen Place Development.

"McQuillen Place Development" means that certain real estate development located at 123 North Main Street, Charles City, Iowa.

"McQuillen Place Residential Units" means the 33 residential units planned for the second and third floors of the McQuillen Place Development.

"MPC2" has the meaning ascribed to that term in the Introduction to this Plan.

"Net Proceeds" means the proceeds, if any, remaining following payment of all reasonable expenses (including attorney fees, costs, and reimbursement of funds advanced by various parties to fund the Litigation), provided, however, that no further distribution of Net Proceeds shall be made in respect of any Claim in Classes 7 through 11 once that Claim has received 1200% of its original allowed amount.

"Non-Debtor Counterclaims" means the rights of parties other than the Debtor asserted in Case No. EQCV031170, pending in Iowa District Court in Floyd County, Iowa.

"Petition Date" means April 24, 2019.

"Plan Date" means October 4, 2019.

"Plan" means this plan, and all exhibits attached hereto or referenced herein, as well as any plan supplement, as the same may be amended, modified or supplemented.

"Professional" means any professional employed in the Chapter 11 Case pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503 (b)( 4) of the Bankruptcy Code. Professionals in this case include Molstad Law Firm and any professionals retained by the Debtor.

"Pro-Rata Share" means a share distributed in a proportion equal to the amount of the underlying claim's relationship to the whole of other like claims.

"Resolution of the Litigation" means that date when a final and unappealable order has been entered by court(s) of competent jurisdiction resolving each of (a) the Equitable Subordination Claims, (b) the McQuillen Counterclaims, (c) the Non-debtor Counterclaims, (d) the Director Litigation, (e) the Allowance Litigation, and (e) the IEDA Litigation.

"Sale Agreement" means the agreement, described on Exhibit E, pursuant to which the Sale shall be consummated.

"Schindler Base Amount" means the first $40,000 of the Schindler Claim.

"Schindler Resolution" means the process by which the entirety of the Schindler Claim shall be resolved, to wit, the results of a meeting which shall be set by a representative for Schindler and a representative of the Debtor during which both representatives shall present to a person selected by Schindler and instructed by Schindler to determine, in good faith, the fair amount (not exceeding the amount set forth on the Schindler Proof of Claim herein) that should be paid to Schindler over

5

and above the Schindler Base Amount, bearing in mind the quality of the work performed, the timeliness of the work performed, and the delay in payment experience by Schindler.

"Schindler" has the meaning ascribed to such term in Paragraph H of Article II of this Plan.

"Secured Claim Payment" means either (at the election of MPC2) either (a) an MPC2 Promissory Note with a duration of thirty years having a present value equal to the amount of the Current Building Value, secured by (if so allowed after the Resolution of the Litigation) the Alleged First Security Building Collateral, or (b) a cash payment in the amount of the Current Building Value.

"Supplemental Amount" means $20,000.00.

"Unencumbered McQuillen Place Building Assets" means all McQuillen Place Building Assets which are not Alleged First Security Building Collateral.

"Unsecured Claims Distribution" means the funds distributed by the Debtor from time to time from proceeds from the Unsecured Distribution Note.

"Unsecured Distribution Note" has the meaning ascribed to that term in the definition of "Building Consideration".

"U.S. Trustee" means the Office of the United States Trustee with jurisdiction over the Chapter 11 Case, currently Region 12.

      B.     Rules of Interpretation and Computation of Time

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an entity as a holder of a claim or equity interest includes that entity's successors, assigns and affiliates; (e) all references in the Plan to sections, articles and exhibits are references to sections, articles and exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) the words "includes" or "including" are not limiting; (h) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (i) subject to the provisions of any contract, certificates of incorporation, by-laws, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and G) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply. In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### ARTICLE II.
### CLASSES OF CLAIMS AND TREATMENT OF CREDITORS

      A.     Class 1: Administrative Claims.

Administrative Claims are those claims for attorneys' fees of the Debtor. Those creditors in Class 1 shall be paid their fees in full as allowed by the Court. At this time, Debtor's attorneys' fees are estimated to be $_____$ . Class 1 is not entitled to vote on the Plan.

On the Effective Date, the Debtor shall pay Allowed Administrative Claims in full. Administrative claims that become allowed after the Confirmation Date shall be paid with (i) cash generated from post-confirmation operations; (ii) proceeds of the sale of the Debtor's Assets; (iii) the net proceeds of the sale of the Debtor's unencumbered Assets; and/or (iv) funds of MPC2.

      B.     Class 2: Priority Claims.

Class 2 Claims consist of the Allowed Claims of any person entitled to priority under Section 507(a)(4)(5)(7) of the Code. Class 2 Claims will be paid in full by the Debtor on the Effective Date. Class 2 is not entitled to vote on the Plan.

      C.      Class 3: Priority Tax Claims.  Class 3 Claims consist of all Allowed Claims of governmental units, to the extent such claims are entitled to priority under Section 507(a)(8) of the Code. Class 3 Claims will be paid in full by the Debtor on the Effective Date. Class 3 Claims are not impaired and are not entitled to vote on the Plan.

      D.      Class 4: Tax Claim of Floyd County, Iowa for period real estate taxes, including special assessments, coming due between October 1, 2018 and the Effective Date. Undisputed Class 4 Claims will be paid in full by the Debtor on the Effective Date, provided, however, that certain of the Class 4 Claims may be disputed and/or paid under protest. Class 4 Claims are not impaired.

      E.      Class 5: Secured Claim Asserted by First Security Bank. For purposes of this Plan prior to Resolution of the Litigation, that portion of the First Security Bank secured by the Loan Documents ("Secured Claim Asserted by First Security Bank") shall be deemed to be allowed in the amount of the Current Building Value. The Secured Claim Asserted by First Security Bank shall receive the Secured Claim Payment. Any transfer to or for the benefit of First Security Bank on account of the Secured Claim Asserted by First Security Bank occurring on or prior to the Resolution of the Litigation shall be made to the Claim Determination Escrow to be held, in trust, until the Resolution of the Litigation. For the purposes of the Plan, the Secured Claim Asserted by First Security Bank is impaired.

      F.      Class 6: Deficiency Claim Asserted by First Security Bank. Treatment of the Deficiency Claim Asserted by First Security Bank will be determined by the presence or absence of an 1111(b) election.

      1.      In the event that no lawful election under 11 U.S.C. 1111 is made in connection with the Plan, the Deficiency Claim Asserted by First Security Bank shall receive an MPC2 Promissory Note A (in the form of Exhibit F) in the amount equal to its Pro-Rata Share of the Unsecured Claims Distribution Amount, *provided, however,* that in calculating the allocation of the Deficiency Claim Asserted by First Security Bank within the Pro-Rata Share distribution, the dollar amount of the Deficiency Claim Asserted by First Security Bank shall be multiplied by 1.05, to the detriment of the other Unsecured Creditors.

      2.      In the event that a lawful election under 11 U.S.C. 1111 has been made, the Deficiency Claim Asserted by First Security Bank shall receive, in lieu of any other distribution under the Plan, an MPC2 Promissory Note B (in the form of Exhibit G), payable in 360 equal monthly installments, in the amount of the Deficiency Claim Asserted by First Security Bank. The Deficiency Claim Asserted by First Security Bank is impaired.

      G.      Class 7: Claims of Steve and Sheri Dralle. The claims[2] arising from the January 2018 purchase of certain assets of Steve and Sheri Dralle (the "Dralle Claims") shall receive its Pro-Rata Share of the Unsecured Claims Distribution *plus* (a) fifteen percent (15%) of the net profit, if any, derived from the Debtor's (or its successor's or assign's) operation of the assets comprising the "Classic Cleaners" portion of the Debtor's operations for three (3) years following the Effective Date, and (b) a certificate (substantially in the form attached hereto as Exhibit H) (a "Litigation Trust Certificate") entitling the Dralle Claim to twenty percent (20%) of the Net Proceeds from the Litigation Trust. The Dralle Claims are impaired.

      H.      Class 8: Claims of Non-Insider Creditors Who Have Asserted Priority in Distribution Pursuant to Mechanics Liens. Schindler Elevator Company ("Schindler") has asserted a claim (the "Schindler Claim") in the amount of $53,829.00 for materials and services related to the installation of a passenger elevator at the McQuillen Place Development. Schindler asserts that the Schindler Claim is secured by a mechanic's lien filed December 27, 2017. The Debtor disputes the amount and priority of the Schindler Claim, but the Debtor does not dispute the validity of a claim by Schindler in this Chapter 11 Case.

---

[2] The Schedules and Statements shall be amended to include the Dralle Claim.

7

Treatment of the Schindler Claim will be determined by the presence or absence of an 1111(b) election.

      1.      In the event that no lawful election under 11 U.S.C. 1111(b) is made in connection with the Plan, Schindler will be paid $40,000.00 (the "Schindler Base Amount") on the Effective Date by the Debtor, plus the Schindler Resolution Amount upon the Schindler Resolution.

      2.      In the event that a lawful election under 11 U.S.C. 1111 has been made, Schindler shall receive on the Effective Date from the Debtor the Schindler Base Amount's Pro-Rata Share of the Unsecured Claims Distribution, plus the full dollar amount of the Schindler Resolution Amount upon the Schindler Resolution.

Whether or not an 1111(b) election is made, on the Effective Date Schindler shall receive from the Debtor a Litigation Trust Certificate entitling Schindler to twenty percent (20%) of the Net Proceeds from the Litigation Trust.

The Schindler Claim is impaired and is entitled to vote on the Plan.

      I.      Class 9: Claims of Non-Insider, Building Industry and Construction Unsecured Creditors Designated at Essential Vendors for Plan of Reorganization. Certain of the general unsecured creditors of the Debtor identified on Schedule I (the "Essential Vendors") have been deemed by MPC2 to be essential to planned construction operations on the McQuillen Place Development. The claims of the Essential Vendors (the "Essential Vendor Claims") shall receive (a) the Pro-Rata Share attributable to the allowed amount of each Essential Vendor Claim from the Unsecured Claims Distribution upon the Effective Date, (b) in the event that no 1111(b) election has been made, the Pro-Rata Share (as among the other Essential Vendor Claims) of the Supplemental Amount, and (c) each claim's Pro-Rata Share (as among the other Essential Vendor Claims of rights to a Litigation Trust Certificate issued by the Debtor representing twenty percent (20%) of the Net Proceeds from the Litigation Trust.

The Essential Vendor Claims are impaired and are entitled to vote on the Plan.

      J.      Class 10: Claims of General, Non-Insider Building Industry and Construction Unsecured Creditors. The general unsecured creditors of the Debtor identified on Schedule II (the "General Construction Creditors") whose claims arise from providing pre-Petition building industry or construction goods and services to the Debtor (the "General Construction Claims") shall receive from the Debtor on the Effective Date (a) the Pro-Rata Share attributable to the allowed amount of each General Construction Claim from the Unsecured Claims Distribution, and (b) each claim's Pro-Rata Share (as among the other General Construction Claims of rights to a Litigation Trust Certificate issued by the Debtor representing twenty percent (20%) of the Net Proceeds from the Litigation Trust.

The General Construction Claims are impaired and are entitled to vote on the Plan.

      K.      Class 11: General Unsecured Claims. All claims which are not described or listed in Classes 1 through 10 (the "General Unsecured Claims") shall receive from the Debtor on the Effective Date (a) the Pro-Rata Share attributable to the allowed amount of each General Unsecured Claim from the Unsecured Claims Distribution, and (b) each claim's Pro-Rata Share (as among the other General Unsecured Claims of rights to a Litigation Trust Certificate issued by the Debtor representing twenty percent (20%) of the Net Proceeds from the Litigation Trust.

The General Unsecured Claims are impaired and are entitled to vote on the Plan.

      L.      Class 12. Pre-petition Claims of Insiders. The pre-petition claims of the Insiders (the "Insider Claims") are set forth in the Debtor's schedules. In the event that (a) the Plan has been consummated fully with respect to Classes 1 through 6, and (b) Classes 7 through 11 have received, in respect of their claims, cash distributions of 1200% of their Allowed Claims, the Insider Claims shall receive from the Debtor pro-rata distribution or distributions in an amount up to the amount of the allowed amount of such Insider Claim.

      M.      Class 13. Equity Claims. In the event that (a) the Plan has been consummated fully with respect to Classes 1 through 6, (b) Classes 7 through 11 have received, in respect of their claims, cash distributions of 1200% of their Allowed Claims, (c) the Plan has been consummated fully with respect to Class 12, the Debtor shall distribute any residue of the Debtor's estate or the Litigation Trust the Debtor's

8

equity holders pursuant to an agreement entered into by such equity holders for the division of profits and losses that was entered into prior to the filing of the Chapter 11 Case.

   N.   Class 14.  Claim of Cerro Gordo County.  The claim of Cerro Gordo County ("CGC") arises from a forgivable loan to the Debtor purportedly secured by a mortgage and "restrictions agreement" (the "CGC Mortgage" and the "Restrictions Agreement," respectively) recorded as a lien against the same collateral as the Alleged First Security Bank Collateral, but, by its express terms, subordinate to the priority of First Security Bank. The Confirmation Order shall provide that (a) if CGC and any party represented by CGC or for which CGC has acted as an agent (collectively, the CGC Parties) are found by specific, express and separate order entered by the Bankruptcy Court prior to the Effective Date to have complied timely and fully with all their obligations to the Debtor, including, but not limited to, the disbursal of all funds and/or transfers of any kind to the Debtor as and when due, then Debtor and any party acquiring any rights through Debtor (including, but not limited to, MPC2) in the Alleged First Security Bank Collateral, shall be bound and obligated to abide by the rent limitations expressed in the Restrictions Agreement between Debtor and CGC until July 5, 2023; (b) if no order such as that described in subparagraph (a) of this Paragraph N has been entered prior to the Effective Date, the CGC Mortgage and Restrictions Agreement shall be, as of the Effective Date, (i) null and void and of no further force or effect, (ii) stricken from the land records of Floyd County, Iowa, and (iii) deemed "dealt with" pursuant to 11 U.S.C. §1141(c) by this Plan; and (c) at 12:01 a.m., July 6, 2023, whether or not such order such as that described in subparagraph (a) of this Paragraph N has been entered, both the CGC Mortgage nor the Restrictions Agreement (i) shall cease to be valid (and shall be null and void, and of no further force or effect), (ii) shall be stricken from the land records of Floyd County, Iowa, and (iii) shall be deemed "dealt with" pursuant to 11 U.S.C. §1141(c) by this Plan.

ARTICLE III.
MEANS FOR IMPLEMENTATION OF THE PLAN

A.   Direction to Debtor to Consummate Plan

   The Confirmation Order shall provide for the immediate authorization and direction of the Debtor to (a) oversee the consummation of this Plan, the Sale, and the distributions to be made hereunder, and (b) act as Litigation Trustee for the purpose of administering the Litigation Trust, pursing the Litigation, and distributing the proceeds, if any, from the Litigation pursuant to the Litigation Trust.

B.   Powers and Duties of the Debtor to Consummate the Plan

   On the Effective Date, the Debtor shall sell the McQuillen Building Assets to MPC2 pursuant to the Sale Agreement in exchange for the Building Consideration.  On the Effective Date, the Debtor shall assign all its right, title and interest in and to the Litigation to the Litigation Trust, pursuant to the Litigation Trust Agreement, with the Debtor acting as Trustee for the Litigation Trust.

C.   The Sale

   The McQuillen Place Building Assets shall be conveyed by the Debtor in the Sale to MPC2 free and clear of all liens, claims and encumbrances which may be claimed by First Security Bank & Trust Company ("First Security"); pursuant to 11 U.S.C. §§507 and 1111(b) and this Plan, a portion of the Building Consideration shall be deposited in the Claim Determination Escrow for distribution to First Security in the event that the Bank Disbursement Conditions are met.

   Pursuant to the Construction Agreement, MPC2 shall complete construction of McQuillen Place Residential Units and the First Floor Improvements (collectively, the "Improvements").  Pursuant to the Confirmation Order, MPC2 shall be authorized and directed to execute the Construction Financing Agreement, pursuant to which Unencumbered McQuillen Place Building Assets shall be used as collateral

9

for, or otherwise exchanged for, financing arrangements to purchase goods and services necessary to complete the Improvements.

<div align="center">

ARTICLE IV.
TREATMENT OF EXECUTORY
CONTRACTS

</div>

In accordance with Bankruptcy Code sections 365(a) and 1123(b)(2), the Executory Contracts shall be assumed effective as of the Confirmation Date. There are no cure amounts owed under any of the Executory Contracts.

<div align="center">

ARTICLE V.
PROVISIONS GOVERNING DISTRIBUTIONS

</div>

Provisions in this Article state that the Debtor will carry out the distribution process. The Debtor shall make all contemplated Distributions under this Plan have occurred.

A.    Timing of Distributions

Except as specifically set forth in the Plan, Distributions will be made to holders of Allowed Claims as determined by the Debtor in its business judgment (with the goal of completing Distributions as expeditiously as reasonably practicable) and within the terms of this Plan. Distributions shall be made on dates to be established by the Debtor pursuant to the terms of this Plan, subject to the Debtor's right to defer Distributions if the amount of cash to be distributed on a particular date is, in the Debtor's reasonable discretion, insufficient to justify the costs of effectuating the Distribution or otherwise inadvisable.

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Debtor shall, as appropriate and in lieu of making such Distribution to such holder, delay such Distribution until the disposition thereof shall be determined by final order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

B.    Delivery of Distributions

Distributions to holders of Allowed Claims shall be made by the Debtor (a) at the last known addresses of such holders, (b) at the addresses set forth in any written notices of address changes delivered to the Debtor, or (c) through counsel for such claim holders, if available.

If any Distribution is returned as undeliverable, no further Distributions on account of such Claim shall be made unless and until the Debtor is notified by the claimant in writing of its then current address, in which case all returned Distributions shall be made to such holder without interest. A holder whose Distribution was returned as undeliverable shall have thirty (30) days from when a Distribution is returned to notify the Debtor of any change of address, in writing, or forever forfeits its right to receive Distributions on its Claims.

If a holder of a Claim holds more than one Allowed Claim against the Debtor in anyone Class, all Claims of such holder in that Class will be aggregated into one Claim and one Distribution will be made with respect to the aggregated Claim.

Any Distribution to be made pursuant to the Plan may be made by cash, check, wire transfer or as otherwise required or provided in any relevant agreement or applicable law at the option of the Debtor.

Checks issued with respect to Distributions under the Plan shall be null and void if not negotiated within 60 days after the date of issuance. Any amounts returned to the Debtor due to non-negotiated checks shall be forwarded to and held by the Debtor in the Distribution Account. Requests for reissuance for any such check shall be made directly to the Debtor and must be made no later than one month after the date on which the check is voided or such amounts shall be deemed property of the Debtor's estate and redistributed

<div align="center">10</div>

to other Claim holders. The holder of the claim on which payment was not negotiated waives forever the right to receive payment on such claim if request for reissuance is not made within one month of the check being voided. All holders of Claims in respect of void checks shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtor or its Assets or any purchaser or purchasers of the Assets.

No payment of less than twenty-five ($25.00) dollars shall be made to any holder of an Allowed Claim on account of such Allowed Claim.

C.      Distributions on Account of Equity Interests

After all claim objections have been fully adjudicated and Distributions made to Classes 7 through 11, the Debtor shall make payments to Insiders and equity holders as set out in the Plan and based on agreements among shareholders.

D.      Unclaimed Distributions

All Distributions must be claimed prior to the date on which the Bankruptcy Court enters a final order closing the Chapter 11 Case or, in the case of a Distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Part B of this Article. All unclaimed Distributions will be retained by the estate and will vest in the Distribution Account. Nothing contained in the Plan shall require the Debtor to attempt to locate any holder of an Allowed Claim other than by reviewing the records of the Debtor and any Claims filed in the Chapter 11 Case. Pursuant to section 1143 of the Bankruptcy Code, all Claims in respect to unclaimed Distributions shall be deemed disallowed and the holder of any such Claim will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtor or its Assets, or any purchaser or purchasers of the Assets.

E.      Compliance with Tax Requirements.

In connection with each Distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Debtor shall file such information with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such Distribution or effect any such withholding and deposit all moneys so withheld as required by law. With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Debtor within 30 days from the date of such request, the Debtor, at its option, may make a Distribution to such Person, but each entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other tax obligations.

ARTICLE VI.
PAYMENT OF FEES AND LIABILITIES NOT ALREADY ADDRESSED

A.      Statutory Fees]

On or before the Confirmation Date, cash shall be disbursed on account of Administrative Claims for fees payable pursuant to 28 U.S.C. §1930 in an amount equal to the amount of such Administrative Claims. Notwithstanding any other provisions in this Plan to the contrary, the Debtor shall remain obligated to pay fees pursuant to 28 U.S.C. §1930 until such time as the Chapter 11 Case is closed, dismissed, or converted to a case proceeding under chapter 7 of the Bankruptcy Code.

B.     Ordinary Course Liabilities

Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business, including administrative trade claims, Administrative Claims of governmental units for taxes, and other Administrative Claims shall be satisfied by the Debtor without any further action by the holders of such Administrative Claims or further approval of the Bankruptcy Court.

C.     Bar Dates for Administrative Claims

Requests for payment of Administrative Claims must be filed and served on all Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, but no later than sixty (60) days after the Confirmation Date. Holders of Administrative Claims that do not file and serve such a request by the applicable deadline shall be forever barred from asserting such Administrative Claims against the Debtor or its property and such Administrative Claims shall be deemed discharged as of sixty (60) days after the Confirmation Date. Objections to Administrative Claims must be filed and served on the requesting party within 30 days of the date of each Administrative Claim request.

ARTICLE VII.
CRAM DOWN

This Plan provides for the "cram down" of First Security Bank.  The provisions related to the compulsory distribution to First Security Bank in satisfaction of its alleged liens are set forth in Paragraphs E and F of Article II of this Plan.

ARTICLE VIII.
DISCHARGE, INJUNCTION
AND SUBORDINATION RIGHTS

A.     Discharge of the Debtor

The Debtor will not receive a discharge under the Plan in accordance with Section 1141(d)(3) of the Bankruptcy Code.

B.     Injunctions

Except as otherwise provided in the Plan or the Confirmation Order, all entities that have held, currently hold or may hold a Claim (directly or indirectly) shall be permanently enjoined as of entry of a final order from the Court closing the Chapter 11 Case from: (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Committee, or any purchaser or purchasers, or their respective property, other than to enforce any right pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, any purchaser or purchasers, the Committee, or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtor, any purchaser or purchasers, the Committee, or their respective property; (d) asserting a setoff of any kind against any debt, liability or obligation due to the Debtor, the Committee, or any purchaser or purchasers; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth herein.

12

## ARTICLE IX.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain such exclusive jurisdiction over the Chapter 11 Case and any matter related to the Chapter 11 Case after the Confirmation Order is entered as is legally permissible, including exclusive jurisdiction to:

1.     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;

2.     Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

3.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor;

4.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan;

5.     Resolve any cases, controversies, suits or disputes that may arise in connection with (a) the consummation, interpretation or enforcement of the Plan, any sale, or any document, instrument, or agreement (including any asset purchase agreement) that is entered into or delivered in connection with the Plan or any sale or (b) any entity's rights arising from or relating to the Plan, any sale, or associated documents;

6.     Consider amendments or modifications to this Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

7.     Determine and resolve any and all controversies relating to the rights and obligations of the Debtor in connection with the Chapter 11 Case;

8.     Hear and determine matters and issue and enforce orders concerning the recovery of Assets and property of the Debtor's estate, wherever located, including orders that would expand or modify the powers and duties of the Debtor;

9.     Permit the Debtor or any purchaser or purchasers, to the extent provided for in the Plan or an asset purchase agreement, to recover all assets of the Debtor and property of its estate, wherever located;

10.     Determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any disputes regarding taxes.

11.     Hear and determine any requests by the Debtor to sell the Assets pursuant to Bankruptcy Code section 363 or otherwise;

12.     Hear and determine any objections to administrative expense claims;

13.     Enter a final decree closing the Chapter 11 Case; and

14.     Hear any other matters, including the Litigation, not inconsistent with the Bankruptcy Code.

To the extent that it is not legally permissible for the Bankruptcy Court to have exclusive jurisdiction over any of the foregoing matters, the Bankruptcy Court shall have nonexclusive jurisdiction over such matters to the extent legally permissible.

## ARTICLE X.
## MISCELLANEOUS PROVISIONS

A. Dissolution of the Committee

The Committee shall remain in full force and effect until all distributions have been made by the Debtor.

B. Modification and Revocation of the Plan

The Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, upon conference and agreement, to amend or modify the Plan at any time prior to the entry of the Confirmation Order.

After the Confirmation Date, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies within or among the Plan, the Disclosure Statement, and the Confirmation Order, and to accomplish such matters as may be reasonably necessary to carry out the purposes and intent hereof. A holder of a claim or equity interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment, modification or remedy does not materially and adversely affect the treatment of the claim or equity interest of such holder hereunder.

The Debtor reserves the right, at any time prior to the Confirmation Date, to withdraw the Plan. If the Plan is withdrawn, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

C. Headings

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

D. Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

E. Service of Documents

Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtor, the Committee, or the U.S. Trustee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

The Debtor
Don Molstad
Molstad Law Firm
701 Pierce St., Ste 305
Sioux City, IA 51101
Judylaw308@yahoo.com

Dated: October 4, 2019

Respectfully submitted,

Donald H. Molstad, Esq.
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR THE DEBTOR

14

CERTIFICATE OF SERVICE

I, _David H. Moistal_, an attorney, hereby certify that on _October 4, 2019_, a true and correct copy of this document was served via the Court's CM/ECF system and electronic mail.

15

Exhibit A to Plan of Reorganization
Form of Unsecured Distribution Note

----------

Charles City, Iowa
Dated: _____, 2019

Promissory Note

The undersigned, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby promise to pay [list unsecured claimants (each, a "Payee") and Allowed amounts here], *pro rata* based on the amounts set forth next to each Payee, not later than one year from the date of this Promissory Note, the amount of _____ ($_____), provided, however, that this Promissory Note may be prepaid at any time without penalty, and that this Promissory Note is subject to the provisions and conditions of that certain Plan of Reorganization of McQuillen Place Company, LLC, dated October 4, 2019, and confirmed by the Order of _____, 2019, of the Bankruptcy Court for the Northern District of Iowa.

MPC2, LLC, an Iowa limited liability company


By: _____
Its: Managing Member

16

Exhibit B
Draft Complaint in Director Litigation

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa | ) | Case No. 19-00507 |
| limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Address: | ) | |
| 1110 North Grand Ave., #300 | ) | |
| Charles City, Iowa 50616 | ) | |
| | ) | |
| Employer's Tax Identification No.: 46-3987825 | ) | |
| _____ | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| JON RICHARD ("DICK") HERBRECHTSMEYER, | ) | |
| GENE A. HALL, AND KURT HERBRECHTS- | ) | |
| MEYER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

COMPLAINT AGAINST CERTAIN DIRECTORS
OF FIRST SECURITY BANK & TRUST COMPANY
FOR TORTUOUS INTERFERENCE
WITH CONTRACT AND OTHER RELIEF

Now comes McQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company, debtor,

debtor-in-possession, and plaintiff herein ("MPC," "Debtor" or "Plaintiff"), by and through its attorneys,

as and for its Complaint Against Certain Directors of First Security Bank & Trust Company for Tortuous

Interference with Contract and Other Relief (this "Complaint") respectfully states as follows:

17

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§157 and 1334(b).

2.      Venue for this Adversary Proceeding is proper in this Court pursuant to 28 U.S.C. Section 1409(a).

3.      This Adversary Proceeding and the causes of action herein constitute "related to" proceedings within the meaning of 28 U.S.C. §157(c)(1) and (c)(2), and the Plaintiff consents to the Bankruptcy Court's entry of a final order.

## REFERENCE TO OTHER ACTIONS

4.      The allegations of paragraphs 1 through 201, inclusive, set forth on pages 1 through 27 of the "Complaint Of McQuillen Place Company, LLC for Equitable Subordination of the Lien Of First Security Bank & Trust Co." (collectively, the "Equitable Subordination Adversary Complaint") are, by this reference, restated and reasserted by Debtor as if set forth herein in their entirety, and capitalized terms not otherwise defined in this Petition shall have the meaning ascribed to them in the Equitable Subordination Adversary Complaint.

5.      On February 26, 2019, First Security Bank delivered to Debtor certain excerpts from minutes (the "Excerpted Minutes") of internal First Security Bank meetings involving First Security Bank employees, officers and directors.  The Excerpted Minutes are attached as Exhibit A.

6.      The Excerpted Minutes, among other things, (a) confirm many of the allegations set forth in the Equitable Subordination Adversary Complaint concerning the failure of the Bank Group to adhere to the standard of good faith and fair dealing with respect to the Mortgage Loan, McQuillen Place Company, and the Guarantors, (b) reveal that First Security Bank extracted a monetary settlement from CRB&T for CRB&T's maladministration of, *inter alia*, the EZ Credits, and (c) provide evidentiary support for the claims as set forth below against Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall (the "Director Defendants").

18

## BACKGROUND OF THE DIRECTOR DEFENDANTS
## AND THEIR OBLIGATIONS

7.      Jon Richard ("Dick") Herbrechtsmeyer ("Dick Herbrechtsmeyer") is, and at all relevant times herein has been, an officer and director of First Security Bank.

8.      Gene A. Hall is, and at all relevant times herein has been, a director of First Security Bank.

9.      Kurt Herbrechtsmeyer ("Kurt Herbrechtsmeyer") is, and at all relevant times herein has been, President and director of First Security Bank.

10.     Corporate officers and directors enjoy a qualified privilege in Iowa pursuant to which they are protected from personal liability for actions taken in their capacity as officers or directors.

11.     This privilege is not absolute: A corporate officer or director may be held personally liable if the officer or director fails to act in good faith to protect the interests of the corporation. *Bump v. Stewart, Wimer & Bump, P.C.*, 336 N.W.2d 731, 738 (Iowa 1983), cited by *Jones v. Lake Park Care Center, Inc.*, 569 N.W.2d 369, 376 (Iowa 1997).

12.     A corporate officer or director whose actions are not in good faith or are not in the best interest of the corporation exceeds the scope of the qualified privilege and may be personally liable in tort.

13.     The elements for a claim of intentional interference with a contract are: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Hunter v. Board of Trustees of Broadlawns Medical Center*, 481 N.W.2d 510, 518, cited by *Jones*, 569 N.W.2d at 377.

14.     In determining the impropriety of a putative intentional interference defendant's conduct, the finder of fact considers the following factors: "(a) the nature of the act or conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Jones*, 569 N.W.2d at 377.

19

15.    The questions of whether the officer or director has exceeded the qualified privilege, whether the elements of intentional interference with contract have been shown, and whether the putative intentional interference defendant has acted improperly are all questions of fact to be determined by the trier of fact. *Wolfe v. Graether*, 389 N.W.2d 643, 660 (Iowa 1986), and *Jones*, 569 N.W.2d at 376.

## COUNT ONE:
## INTENTIONAL INTERFERENCE WITH CONTRACT

16.    According to the Excerpted Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on September 14, 2017:

> *Dick Herbrechtsmeyer:*
>
> It is time to talk to Charlie [sic]. ... Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it. *[Exhibit A, at 8]*
>
> *Kurt Herbrechtsmeyer:*
>
> Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. [....] *[Id.]*
>
> *Gene Hall:*
>
> I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done. *[Exhibit A, at 9]*

17.    According to the Excerpted Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on March 8, 2018:

> *Kurt Herbrechtsmeyer:*
>
> They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, the need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. [....]
>
> The most is completing the windows. Windows on the first floor and completing the sidewalk. [W] are putting ourselves in a negotiation position

20

that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff we have to be willing to take it on. [....] We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. [....] *[Exhibit A, at 12]*

*Dick Herbrechtsmeyer:*

[T]here may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio. [....] *[Exhibit A, at 13]*

*Gene Hall:*

I absolutely agree that if the bank finishes the project, [I] agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. *[Id.]*

*Dick Herbrechtsmeyer:*

I can assure you one thing, Directors will pay to have McQuillen removed. [....] *[Id.]*

*Kurt Herbrechtsmeyer:*

[....] The other prospect that pushed me across, other alternative was that we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this. From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. [....] *[Id.]*

*Dick Herbrechtsmeyer:*

[....] PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both. [....] *[Id.]*

*Gene Hall:*

Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better. *[Exhibit A, at 14]*

18.     McQuillen Place Company currently owns, and at all relevant times herein has owned, McQuillen Place and the business prospects, future income, going concern value, and economic advantages deriving from the collection of assets known as "McQuillen Place."

19.     Debtor is, and at all relevant times herein has been, a for-profit limited liability company.

20.     The basic substance of the Mortgage Loan transaction was that the Bank Group would lend money and provide related financial accommodations to Debtor to facilitate the construction of the McQuillen Place.

21.     As long as Debtor owns the assets known as "McQuillen Place," First Security Bank owes Debtor a duty of good faith and fair dealing with regard to the McQuillen Place assets and with regard to the Mortgage Loan.

22.     A secured lender does not, by virtue of a security agreement or a mortgage, gain the right to seize the assets of a borrower outright simply because either (a) the officers of the lender become convinced they can operate the assets more efficiently than their borrower, or (b) become convinced that ownership of the assets might somehow burnish the lender's corporate image.

23.     Lenders continue to owe a duty of good faith and fair dealing to borrowers at all times during the creditor-debtor relationship.

24.     First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced they can operate McQuillen Place more profitably or efficiently than Debtor.

25.     First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced their operation of McQuillen Place might burnish their corporate image.

26.     First Security Bank does not have a perfected lien on any of the personal property of the Debtor, including, but not limited to, the development rights for McQuillen Place.

22

27.     Neither First Security Bank nor its predecessor, CRB&T, filed a UCC-1 financing statement with respect to the Debtor.

28.     First Security Bank and the Director Defendants are, and at all relevant times herein have been, aware of the facts stated in the foregoing paragraphs 16 through 27.

29.     Notwithstanding their knowledge of the ownership of McQuillen Place, and notwithstanding their obligation, as directors, to cause First Security Bank to act in good faith in its contractual relationship with Debtor, the Director Defendants concocted, supported and evangelized on behalf of a scheme for First Security Bank to seize control of McQuillen Place in order to, among other things, advance their own public relations agenda.

30.     The scheme was to make First Security Bank appear as "heroes" rather than "bad" bankers, because it would be the bankers of First Security Bank who "showed up" and finished construction by drawing on their own funds and obtaining additional funds from other banks through new, senior debt on the property.

31.     At no point since September 30, 2017, has First Security Bank offered to McQuillen Place or its principals any proposal (a) to advance additional funds for completion of construction of McQuillen Place, or (b) to permit new, senior financing from another institution to be used to complete construction of McQuillen Place.

32.     At no point in the Excerpted Minutes do the Director Defendants (or any other participant in the meetings) suggest offering any proposal for a neutral third-party agreeable to both the Debtor and the Director Defendants to (a) obtain additional funds for completion of construction of McQuillen Place, or (b) obtain additional funds through new, senior financing from another institution.

33.     Although the Director Defendants knew that First Security Bank was able to advance additional funds to complete construction and/or accept subordination to a new senior lender, the Director Defendants only mentioned this as an option in the context of First Security Bank seizing the property and assuming the role of developer.

34. The plan advocated by the Director Defendants was intended to exclude any other person or entity from coming in as "heroes" to finish construction, because the "hero" role was to be reserved for First Security Bank.

35. This reservation of the "hero" role for First Security Bank was recommended by the Director Defendants without regard for or consideration of the possibility that, in terms of net returns, some other arrangement might have actually been more beneficial for First Security Bank as an institution.

36. The sole option promoted by the Director Defendants involved the bank seizing control of the future business prospects of its borrower so that First Security Bank can exploit its borrower's assets for its own gain.

37. The tenor of the comments of the Director Defendants indicates that they were motivated not by concern for the assets of First Security Bank, but by pique at one of McQuillen Place's principals, by the desire to inflate their own standing in the local community as "heroes," and by an inexplicable (and irrational) desire to change the nameplate on the building.

38. The Director Defendants accordingly intentionally advocated cutting off negotiations immediately and commencing a legal action as quickly as possible.

39. In so doing, the Director Defendants acted in bad faith, intentionally interfered with the contract between the Counterclaimants and First Security Bank, and caused damage to the Debtor.

Now, wherefore, Debtor demand judgment as follows:

    A.    Against each of the Director Defendants and in favor of the Debtor for the amount of damages sustained by the Debtor as a result of Director Defendants' intentional interference with Third-Party Plaintiff's contract with First Security Bank;

    B.    Granting appropriate equitable relief to remedy the Director Defendants' breaches of fiduciary duties and bad faith conduct;

    C.    Awarding to Debtor the costs and disbursements of the action, including reasonable attorney fees, accountants' and experts' fees, costs, and expenses; and

    D.    Granting such other and further relief as the Court deems just and proper.

## COUNT TWO – MALICIOUS INTERFERENCE
## WITH BUSINESS ADVANTAGE

40.     Paragraphs 1 through 39 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

41.     Director Defendants, in urging First Security Bank to seek control of McQuillen Place through the vehicle of foreclosure, acted with malice toward Debtor.

42.     Director Defendants knew, or should have known, that their actions with respect to Mortgage Loan would cause injury to Debtor, specifically with regard to the financial affairs of Debtor.

43.     The Director Defendants' actions in urging First Security Bank to seek control of McQuillen Place were wrongful.

Now, wherefore, Debtor demand judgment as follows:

A.     Against each of the Director Defendants and in favor of the Debtor for the amount of damages sustained by the Debtor as a result of Director Defendants' malicious interference with Third-Party Plaintiff's business prospects;

B.     Granting appropriate equitable relief to remedy the Director Defendants' malicious conduct;

C.     Awarding to Debtor the costs and disbursements of the action, including reasonable attorney fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

**Jury trial demanded on all counts.**

Dated: October ____, 2019

                                        Respectfully submitted,

                                        McQUILLEN PLACE COMPANY, LLC, an Iowa
                                        limited liability company

                                        By: _____
                                                    One of its Attorneys

25

Exhibit A

Meeting Excerpts – Board Loan Committee – McQuillen

**7-17-2014**
Following review and discussion of the following lines of credit, the following were approved unanimously with actions indicated:

**McQuillen Place LLC**
> Requested: Lending Limit and Total Serviced Debt $3,900,000
> Robust Discussion held. Further information needed.
> Motion by Gene A. Hall to table, second by Robert D. Noble

**8-4-2014**
Motion was made by J.R. Herbrechtsmeyer and seconded by Kurt W. Herbrechtsmeyer, and unanimously voted to bring back to the table, McQuillen Place request.

Keith Starr presented the following additional information regarding the McQuillin Place:

> 7-2014 Projected Construction Cost
> Supplemental Information regarding the apartments.
> 7-27-2014 Rent Report
> 7-27-2014 Rent Projection
> 7-27-2014 Square Feet of Building

No action was taken.

**8-8-2014**

Motion was made by J.R. Herbrechtsmeyer, seconded by Kurt W. Herbrechtsmeyer, and voted to approve (Boyd A. Campbell – Voting No), either of the following two loan options:

**Option 1**
**McQuillen Place**
**Guarantor/Co-signers: Charles M. Thomson, Robert Thomson**
**Contingent upon Charles City TIF loan.**

| | |
|---|---|
| Lending Limit | $1.95 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2 million to be repaid over 15 years. Robert Thomson would continue to guaranty $900,000 of this debt with $500,000 of that guaranty being secured. |
| Total Line Commitment | $1.95 million |

Exhibit A
Page 1

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in. Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**Option 2**
**McQuillen Place**
**Guarantor/Co-signers: Charles Thomson, Robert Thomson**

| | |
|---|---|
| Lending Limit | $1.45 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2.5 million to be repaid over 20 years. Robert Thomson would continue to provide an unsecured guaranty of $400,000. |
| Total Line Commitment | $1.45 million |

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in. Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**9-15-2014**

Update was given on the McQuillen Place. Negotiations are still taking place. City has not yet committed to the up-front TIF. Robust discussion was held.

**10-16-2014**

Email, verbal or phone response votes, which are attached as a parts of these minutes, were received from J.R. Herbrechtsmeyer, Kurt W. Herbrechtsmeyer, Boyd A. Campbell, Gene A. Hall and Robert D. Noble and the following was unanimously approved:

**McQuillen Place**

| | |
|---|---|
| Lending Limit | $3,500,000.00 |
| Total Serviced Debt | $3,500,000.00 |

Advisors Keith K. Eastman and Ronald McGregor submitted approvals.

**6-8-2015**

**Mark Miller presented the following line reviews:**

Exhibit A
Page 2

28

McQuillen Place Company LLC, Guarantor/Co-signer: Charles M. Thomson, Robert L. Thomson & Amelia Management LLC – Nothing new to report. This line was approved in January. Cedar Rapids stays involved until the building is up, then the commitment will be between First Security Bank, First Citizens and the City for a take-out commitment. Cedar Rapids Bank and Trust was involved due to the significant amounts of grant money and they are overseeing the draws and overseeing the project going forward. We have Bob Thomson's guarantee in place in the amount of $900 thousand to cover 2 years of payments for the end loan. Discussion was held regarding tenants and disagreements between Dean and Charlie. Mark advised that he is not aware of any tenants lined up at this point. Motion was made by Gene A. Hall and seconded by Robert D. Noble, and unanimously approved:

> **McQuillen Place Company LLC,**
> **Guarantor/Co-signer: Charles M. Thomson, Robert L. Thomson & Amelia**
> **Management LLC**
> Board Approved Lending Limit      $3,500,000.00
> Board Approved Total Serviced Debt    $3,500,000.00

## 6-9-2016

McQuillen Place Company LLC, Guarantor/Co-signer: Charles M. Thomson, Amelia Management LLC, Robert L. Thomson ($900,000 limited guaranty) – This line has a construction note that matures end of June. There is a tour scheduled at 9:30 a.m. Monday, and a meeting with Gary Becker, the lead bank on this. The reason they are the lead, is there are many grants involving FEMA and other entities that have had more experience with this. We are going to be meeting on Monday with Charlie to get a tour of the building and hear what the plans are going forward. Gene – This construction note matures June 30, and what happens if they come up here and take a look at this? Mark M – We are going to have to make a decision. They haven't used all their line of credit and monies are not all gone. We have been matching up the progress in relationship to the project. Bill H – Final note is contingent on completing the building. Mark M – We need some updated financial information. I can talk to Charlie directly, but I feel with them being the lead bank, most of this should be going through the lead bank. We need updated financials, status reports in relation to where the work has been done and advances on LOC's. If we had the loan maturing June 30, what time frame are we looking at for completion? And lastly, what is the status of the first floor as far as tenants are concerned. We think there is none, but have not had any confirmation from reliable sources. Steve – The question I would ask, there was 6 vehicles on site that had workers, how can you finish a project with only 6 men on site? Mark M – The only answer I have gotten, is that it is going to take longer, but we are spending less to get to the end. Steve – When they are this far behind schedule, he will never get ahead. Steve advised he would come out of retirement and finish the project, if needed. Gene – I have a number of concerns with this. He is so far behind schedule, a year behind. Steve – How will you get this done with one plumber and one electrician? Dick – I learned there are 20 furnaces in town to put in. Mark M – One of the things talked about, there is some discussion about being able to rent apartments in one part of that before the whole building

Exhibit A
Page 3

is completed. I believe that is an accurate statement that this can be done. We will see how far along they are. J.R. – The City Manager told a group that information last week, but had some caveats that needed to be done. J.R. Herbrechtsmeyer – I move we approve where we are. Loan Committee will be talking about the renewal once questions are answered. Boyd A. Campbell, seconded, and unanimously approved:

> **McQuillen Place Company LLC,**
> **Guarantor/Co-signer: Charles M. Thomson, Amelia Management LLC,**
> **Robert L. Thomson ($900,000 limited guaranty).**
> Board Approved Lending Limit     $3,500,000.00
> Board Approved Total Serviced Debt    $3,500,000.00

## 2-2-2017

Gene – Any updates on the McQuillen place? Dick – Mark has toured the place. The elevator is built but won't be delivered until MidAmerican gets in. MidAmerican is getting easements from Ralph for the north end trench before McQuillen gets hooked up.

## 4-21-2017

McQuillen Place – Kurt W. Herbrechtsmeyer – I vented frustration at the "haste" that this project is going forward. One other thing, is the argument for their pace, it is cheaper for them to keep their labor costs down than paying us interest. This request is an extension until the end of June, and they need to get this thing done. We will review the rate at that time. Gene – If this is an extension through July 1, so they can finish this, I don't believe them. Kurt – No, this won't get finished then. If they are going to tell us, it is cheaper than to pay us interest, we can change that equation. Gene – There is no cash flow and no leases are signed. Kurt- The argument is, if we get an army in here to finish this up, we would have to pay premiums, and they need to do this to stay on budget. I don't think they factored revenue into this. Very frustrating. We send the message now, this needs to get done, rate will change on July 1 and if they want to talk to a different lender they can, as the rate at that time will be 5.25%. Mark – This is a participation that we purchased form Cedar Rapids Bank and Trust and we got involved on the front end. The biggest chunk is coming from FEMA, which Cedar Rapids Bank and Trust have had experience with this. We thought it was better to have them involved to make sure things were done correctly. In hind sight, their oversight has not been as good on this. We see this daily, they come up infrequently to do inspections. We went through there the last time with representatives from First Citizens and the City. Their oversight has not been what we thought it to be. Gene – Do we have any choice, what is the alternative? Kurt – The rate adjusts. We have not given them any indication we wouldn't, but truthfully, this is the time to tell them what is going to happen next time. I have lost faith in Charlie to get this done. I would like to make it clear to him we are done. We want to see this get done and be a success, but he has to do everything he can to make that happen. If he doesn't have a signed lease by now, we need to get his attention. Mark – We have not increased our loan commitment, they are not coming in at this point in time asking for more money to get this done. We did get information on other sources they have money to draw from. It would be nice to know they could get this done for the amount of money they have left. When done, it needs to generate income. Boyd – We have 90% participation. From the time this is going to be completed, we are going to have a time in between that this is going to be bad. Mark – That is why we have the guarantees we have. At this point, the biggest

Exhibit A
Page 4

guarantor is Bob Thomson. Boyd – He stopped at $900 thousand. If we have a year of nothing in between, is he willing to step in and give us some more? What are we going to do here? Gene – My understanding is it needs to get built. Once built, whoever is the second owner can come in and do something with it. Boyd - If it doesn't get built? He needs an incentive to get this done and get to work on this, and needs to be over there and make sure they are working. Gene – What is the contract language regarding interest rate? Kurt – Default adds 2%. Mark – I would advocate, the right approach is get the extension done, have Gary Becker up here sometime in May, First Citizens, and Charlie, and do another tour and advise it doesn't look like it is going to get done, what is the plan? We did have a meeting in August last year, we were pretty harsh at that point in time, and we got some good dialogue and need to have this dialogue again. There is no signed lease yet. Gene – They are looking at other locations. Kurt – This one is not going to get ready. As we are getting to the finish line, June 30 might be a great opportunity, if there is progress on it and the end is in sight. Now if he doesn't have any leases, he has to put a date out there. Bob - Why does Charlie not feel this urgency to make this happen? Mark – The real issue they continue to bring up, they can't get enough labor, they thought they were going to import people from Chicago, for some reason, they have to have 2 forms of ID and the people don't. That is their argument. Last time they had 12 people working and there was no general contractor. For a while, they had Alex Heinz, they had sub-contractors doing things. Boyd – If we get this done, what is going to be our occupancy rate, do you think? That year after it is done and trying to fill it, cash flow is going to be absolutely bad, that is all on us. Mark – We are looking at the commitment letter from Citizens. Citizens had to have a year's reserve in payments, theirs is $900 thousand, City is $900 thousand and ours is $1.5 million. They have to have a reserve for one year's worth of payments set up, so they have the time to get that building filled. Gene – The dialogue has to be the rate is going way up July 1, so get it done or don't, the rate is still going up. Kurt – We want to create a sense of urgency to finish and get FEMA money. Mark – Cedar Rapids Bank and Trust said it is cheaper than paying a high price for getting a whole bunch of labor in there to get it finished and this was in August and they continue the same dialogue. Gary is not helping us with that participation. Diane – From his perspective, he is in Cedar Rapids and we are looking at it every day. Gene – Did Timko take over that board down there? Steve Crawford told me Timko was going to take over that board and this would help expedite this. Mark – I asked Gary for information and he sent back, well we just kind of trust them. Charlie said, every time we make a request, they know this. Gary was nonchalant. Mark-I told them we are not very happy about a third extension and the non-urgency of getting this completed. This matured March 31. We are looking at this physically every day and we are not happy about it. Gene – I think we have to extend it, but the message has to be loud and clear. Mark –I will line up a meeting with all potential parties involved with final financing and get Gary from Cedar Rapids Bank and Trust and do another tour. We are tired of it. We want it finished, get it done. Kurt- It is time to let Charlie know he needs to go find some help financially, he needs a little push back from somebody, that this might not end well. Mark –If we get another tour lined up, if any of you would like to be included, let me know. Boyd, Gene and Bob advised they would like to be involved in this. We will get a meeting lined up and invite you. Boyd- We need to show up. Mark-We want to have a sit down meeting and tour. Bob – When is the time to discuss rate? Mark-Cedar Rapids Bank and Trust has all their documents ready at 5.25%. I would like to stick with this but clearly communicate that come July 1, if this is not done, that rate is not anywhere close to where it needs to be. Gene A. Hall made motion, Boyd A. Campbell seconded, and it was unanimously

VOTED:     To approve the extension of the construction loan for:

           **McQuillen Place Company LLC**

Exhibit A
Page 5

Charles M. Thomson/Amelia Management LLC/Amelia Trust/Robert Thomson ($900k)

$3,491,993.32 Line of Credit at 5.25% to June 30, 2017, with the provision that if the note is not paid by July 1, the rate defaults to the maximum, will not be extended, and the loan stays at the default rate

and

approve the loan policy exception – Term of construction longer than 12 months.

## 6-8-2017

Schedule of Customer Renewals – This was reviewed. Gene – Question on McQuillen, how did he take the interest rate we presented? Mark – There was interest rate discussion. We are trying to line up another tour this week. The elevator was installed, but they now have a problem with the doors. We asked about certificate of occupancy, he thought maybe he would have that by June 15. We did plant the seed that the interest rate would be higher and there might be some performance based pieces factored into the rate, such as occupancy certificate and occupancy levels. Dick – Is our guarantor aware? Have we had a conversation with Bob, as it is about down to where he will have to subsidize some payments? Mark – Every year, he does a financial statement, this is listed as a contingency liability. As far as having a deep discussion with him, I have not. $900 thousand during construction loan will be $500 thousand once permanent financing. Dick – My fear is he may not be getting the whole story of the concerns and it might be time. I would be willing to be part of that discussion with Bob. Discussion held. Gene – All those properties Charlie has, there is no equity.

## 8-17-2017

J.R. Herbrechtsmeyer advised regarding McQuillen Place. Gene – Since he has everything for sale and even though there may or may not be any net worth there, whatever net worth there is, is supposed to be pledged to the bank. So, if he started piece mealing this off, how concerned are we that we get our share? Kurt – I have seen the Renaissance Revival package and it is $1.2 million or $1.4 million, if he finds someone to buy this. Gene – I don't think this would prohibit him to sell what he can when he can. Dick – The big chunk of the stuff he bought from Brian Crane, we have the first and the kids carried back a second. Brian owned the corner where McQuillen is at, which raises an issue I hadn't thought of, I hope there isn't a second with those folds and there was not a second mortgage ahead of that transfer into the new entity that is building McQuillen, because he bought that from Brian as part of the package. What he did, is add a little line of credit, made payments, but borrowed back on the LOC, which is secured on the first mortgage, so, all of a sudden his 5 years are up and has shown no progress with us. I gather Mark said no, we are not interested in doing this over. As far as net worth, any net worth he thinks he has is nothing, unless he has picked something up. Kurt – It is 12 residences – commercial properties. Dick – He may have improved the value of that property, he put in a lot of storage units back behind there, which you can't see from the street and claims he has them all full. Bill – Did he buy the Brick and Tile Building? Randy – No Jeff Tierney has that. Kurt – His own home is in this package, Mark Melrose is in 206 N Main, the North Grand, the duplex on Harvey, rental on Johnson 15th Ave, and

Exhibit A
Page 6

Riverside Drive, brick building next to the bar, Kellogg and Jackson street. Diane – Mark and I had a conversation with Gary Becker and we are trying to get the package together for the extension of the LOC. One of the things they asked us to do is a walk through because in the cash flow, they are talking about having occupancy as of September. They are closer to this, but that date will not happen. There were only 3-4 doors that were put on the apartments at this point. Dick – The area where he wanted to rent, the doors were done, the rest were not. All the plastering had to be done. Diane – They were going to put windows in yet this week. Kurt – They have to Sheetrock all the common areas. Diane – All major hallways have that and it is painted. They are making progress, but will not hit September 1. Gene – Did Dean Snyder take over that construction? I know he was asked to bid on it and finish it. He did bid. Diane – There were only a couple people working when we were there. Dick – It did not look like activity such as Dean Snyder would have. Gene – Even though he may have taken over, he may not be there yet. Kurt – He has leased one apartment to a school teacher. Robust discussion held. Diane - On Monday, Charlie wasn't here, we walked through with their construction manager. They have pavers now in the area between the two sides of the building. Have several doors on the outside of that area. What is done looks nice.

### 9-14-2017

**McQuillen** – Dick advised of several questions to start. Last time we toured, Charlie was told there were 3 apartments left to be sheet rocked and taped. Two days ago, the one in the corner still appeared to have sheet rock know leaning against the window. Mark – I will schedule a time to get there next week. Dick – The elevator was supposed to be inspected and he has not reported to you. Dick – Both things needs to be done. Mark – The elevator is not required. I think we are just waiting for the state to inspect. Mark – To summarize the request: The new pieces are the construction LOC that matured the end of June and has not been renewed. There is a different on interest rates, and it will be the same thing on both notes, at 6.25% with the lead bank, so net to us will be 6.0%, up from 5% from before. The floor on this loan is 5.75%, and net is 5.5%. There are 100 bp performance objectives on both these loans. When they get certificate of occupancy, the rate drops 50 bp, another 25 bp when the residential units are rented and another 25 bp when they have 3000 feet of retail space rented. They could drop the rate by getting certain things done. There is a second note, which we are not encouraging, for $422,900, we would have 90% of that, which is the request, same interest rate structure on this and the repayment source on the balance of the IEDA funds of about $200 thousand, then the balance will be enterprise tax credits they have to sell to repay that. CRBT would not advance on the LOC unless they had proof that credits will be sold to pay back loans. The total dollar amount proposed will potentially be the same for the second note. Dick – They presently are past due since June 30 and we had a kicker in there, are they paying interest monthly? Mark – The accrued interest on that has been paid fairly recently, but I need to check on that. It is at the default rate. Dick – I think that would be a tremendous incentive. Mark – From Charlie's perspective, not sure if he has been as much the reason it is at this point as the two banks involved. We had asked for detailed information regarding remaining construction costs, that is why we have the second note. Dick – Snyder came in and did this? Mark – No. Dick – So we have not seen Snyder's construction costs? Mark – No. Charlie had brought that up not that long ago and that he thought it would be wise to get a bid from someone else. 1 – What is that amount? and 2-How quickly can you get someone like that that is fairly busy to come in and do the project, but this might be quicker than the route they are taking right now. This is slightly encouraging, has there been someone actually looking at apartments. Dick – Not the most impressive realtor

Exhibit A
Page 7

showing it. It would be nice to see what Snyder says. Charlie seems to say what he needs to, to move on. Gene – What has been factual since the start of this? It was supposed to have been done 2 years ago. Mark M – Original limited construction maturity date was June 30, 2016, so we are over a year past that date and we have extended the construction loan four times. Gene – What happens if we don't approve the extension? Dick – Cedar Rapids could foreclose on it and we own 90% of that note and Citizens is willing to take $1 million when completed and the City has $1 million, so when completed we would have less than we do now. Mark – That is assuming that they will keep their end of the bargain. They have not indicated we are out, but we haven't really put them on the spot. As I think about the permanent financing commitment we had, we could easily say we are out, but that would be short sided on our part. Dick – We are out but we are already in for our commitment, we can't get out. Mark – It would take city and ours and others, based on performance of construction loan, if there are different things we would want to include in the end financing, we have every right to negotiate. For example, have $900 thousand limited guaranty from Bob, with permanent financing to drop to 500 thousand. When we get to the point of permanent financing, we should revisit some of those terms, as they haven't met expectations on the construction loan. We could easily come back out on permanent financing but the bank's perspective, that would be a worst sided process but from the other banks perspective, might be more helpful to raise the bar in those types of things. That isn't what is on the table today, but when we get to that point when we are doing the permanent financing, those things are on the table to be revisited. Gene – if Dean Snyder does not get involved in this other than his estimate, are we confident for extending this for 5.5 months? Are they going to be done in 2.5 months if someone else does not get involved? Kurt – I would say not, probably next spring, if lucky. Mark – I think they will have certificate of occupancy at that time and maybe start renting apartments. One of the groups we have talked a little bit about that are different than some individuals renting an apartment. I believe there is some interest from Midas, Cambrex, Zoetis, that when they bring people into town to work for more than a day or week, they like to put them up in someplace better than the motels in town. They have expressed in each of those maybe having 1 or 2 apartments to have available. That is a pretty good start in getting some rented and cash flow. Dick – Are we wrong to say after 15 months of lip service, we want to see who the tenants are, name, contact information and have Mark from Chicago and obviously Cedar Rapids, we want to see what Snyder said it would take to get it done and what it would cost, and talk to Cedar Rapids and say you either get it done or else. It is time to talk to Charlie. There are only 3 not complete. Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it. Kurt – Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. I don't think he can complete it. Dick – He was hurt when he was asked if his guarantor was aware of this mess. Bob could have been off the hook if Cedar Rapids had not contacted to acknowledge another extension. If we approve this, I don't see we have a choice. We have more in it now if it gets done and we need to make sure it gets done before the middle of winter which may mean to fire current staff and get Snyder in there. Kurt – He doesn't demonstrate that he is paying any attention. Over and over again, he tells us we have this working, going to get things done, etc. We were there in May and he was going to get a certificate and they still don't even have the sheetrock in. He is disconnected from the project. Something June 1, something July 1, he needs to hear we don't have any confidence he is going to complete these things. Dick – Let's get a sit down with him. Cedar Rapids should be more than willing too. Kurt – Give him the message he may need to find another lender on this. Dick – Part of the problem with the public is they are not seeing anything on the first

Exhibit A
Page 8

level. His logic is, he has to get a good tenant there and then finish. Kurt – If he would have gotten apartments and occupancy 9 months ago, there would be no question. Dick – That is the minimal we have to do before we have to approve it? Gene – The thing is Charlie has no skin in the game, if he walks away tomorrow and declares bankruptcy, he is not losing anything. We need to get the project done so we can escape. Dick – We need to have a heart to heart talk with Bob Thomson make him aware of what we are doing to try to save his $900 thousand guarantee. Bob is also over 90.

Charlie did say he signed the deal for $7 thousand-$9 thousand to have the punch list done over the objection of his partner. Gene – I would approve this subject to the meeting such that all parties are apprised of what we are thinking. Discussion held. Mark – Cedar Rapids Bank, Charlie, maybe Bob Thomson in that same meeting. Ron M – Bob with his hearing problem, it is tough to know if he is going to absorb everything out of a meeting. Dick – He needs to be at the talks. Mark – We can try to get something lined up, mid-week next week. Dick – It is worth doing.

Gene – I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done. Dick – We can say if we are going to extend it, we want a week by week schedule of what you are going to get done with your people and if you don't do it, bring Snyder in to finish. Mark – We should have the document showing what it will take to complete it. I don't think we have the ability today to say you have to hire, but if they don't perform and we have an agreement then we would. We would have an attorney write this. Again, we are not the lead bank in this. Dick – Call Gary Becker. Kurt – Encourage him to hire someone to finish the project. Dick – I would Mike to see a Snyder punch list and ask if he had thoughts about hiring Snyder to finish.

Mark – If approved, subject to these things. We will have a meeting with Bob and get estimate from Snyder to finish, agreeable that they could provide an estimate of time table. Dick – He is supposed to have that. Diane – He did say he paid money to Dean Snyder to have it done. Dick – If we have a punch list. Robust Discussion held.

Motion was made by Gene A. Hall, seconded by Robert D. Noble, and unanimously

VOTED:     To approve the following:


McQuillen Place Company LLC

Extend Note #9300025611 in the amount of $3,872,602.92 (Construction Note) to 12/15/2017, with lead bank CRBT and FSBT 90% of the note. The second note is for $422,900 with CRBT as the lead bank on this note as well. FSBT would have 90% of this note as well and it would mature on 12/15/2017. The interest rate on both these notes is 6.75%. After lead bank takes .25% for servicing, the net to FSBT would be 6.5%. There are 3 different performance incentives on this note that could drop the interest rate 1.0% if completed with a floor interest rate of 5.75%.

Guarantor/Co-signer: Charles Thomson.


Exhibit A
Page 9


35

Robert Thomson ($900,000 guaranty)

All the above is subject to the meeting of all parties such that all parties are apprised of this.

Mark – Once a meeting is scheduled, make everyone aware to attend.

**12-22-2017**

Discussion regarding the proposal from Charles M. Thomson and Robert L. Thomson on the funding of the McQuillen project. Robert L. Thomson is willing to inject up to $500,000 cash into the project with the condition that his $900,000 guarantee during the construction phase being reduced by 0.50 for every dollar injected (total of $250,000).

Dick motioned to approve, Gene seconded and it was unanimously

VOTED:      To approve the following:

McQuillen Place Company, LLC
Reducing Robert L. Thomson's guarantee as mentioned above

Subject to the following conditions:
Cedar Rapids Bank & Trust Special Assets group agreeing to the proposal
The City of Charles City agreeing with the proposal
Reviewing the appraisal that was ordered in November 2017
Cedar Rapids Bank & Trust drawing up an agreement with Charles M. Thomson and Robert L. Thomson documenting the expectations of each party.

**2-21-2018**

Boyd Campbell - Any update on McQuillen?  Diane - We are waiting right now to have a meeting set up with the Cedar Rapids Bank, we have contracted an attorney out of Cedar Rapids that is going to spearhead our efforts that we have to do.  We are going to have all the parties involved, bank, other bank, Charlie and Bob, as well as Bob's attorney.  Dick – We decided it was time to have an attorney represent both banks.  Bob feels this is a man who will move it along, looking for a resolution.  Gene - Have they settled on a contractor to finish it up, and if so, how much?  Dick - Bob has come in with his contractor.  There are still some questions.  The workout guy from Cedar Rapids Bank, on a scale of 1-100, he is 80-90, and the loan officer on the same sale of 1-100 is a 4, so we improved ourselves a great deal with this workout deal.  He does this, moves things along.  Psychologically, that Bob is jumping in to get a contractor that he has used in the cities, that means Bob is more committed than just the numbers he has seen, and he wants this done.  It is nice to have someone in that family to understand timeliness is more important.  We will know more after this meeting.  This will be held in Cedar Falls/Waterloo office of the subsidiary bank of Cedar Rapids Bank.  Diane - This hasn't been scheduled yet. Adding to Dick's comments, the original proposal that James and Charlie put together, put us at $428K to complete

Exhibit A
Page 10

36

and the contractor that Bob is involved in, looked at everything. All totaled, it wasn't a lot different than what Charlie and James had put together, about $500K. There are still some outstanding items aside from that, accounts payable, interest and taxes. So, for Loan Loss Reserve, we used a total of $900K to complete the project, and that is a guestimate.

Kurt - So the objective will be to get information from them as to how to move forward. Also Bob's guaranty, whether used or not, it comes to us, making sure if capital is put in, it gets spent well. Charlie just seems to be paying attention to everything about this. Boyd - Is there a question about Bob's guaranty? Kurt - His guaranty is to us, not a cash infusion to the project, so technically, we can ask him for the $900k, he has to pay us. That puts us in the position, do we put it in the completion of the project or come up with Bob to put some money into this? That is what Bob had proposed, put $500K in, reducing the guaranty. We also want to see the $500K get spent well. Hopefully, we can get this thing moving forward. Dick - Didn't Bob's guy have a later completion date? Diane - Yes. Dick - There is very little to be done on the apartments. There are 2-3 apartments that didn't quite get drywall done, some repair, flooring in the hallway. There is still a thing on the first floor with the City on steel structure with the drywall and fire. That is why they changed the goalpost on it and the City said no, you didn't understand the city code. I don't know that he and Charlie are on the same page. Kurt - James is the one that managed us to this point and spent all the money, rather than getting a good contractor. Dick - It doesn't look like it when you drive, by, but we have made good progress. Gene - $500K, is that to complete the entire project? Dick - Not the 1st floor. Original cash flow covered the debt. as you get cash flow on the second floor, you have cash flow to cover finishing the first floor. Kurt - If we can get Bob to commit money directly, he has some ownership and we need to keep him engaged. Boyd - When do you talk to Bob about this to get him moving forward? Dick - He had a CPA. You have $900K from Bob who has the moral to take care of it. Get the $500K, get a decent contractor and go. Cedar Rapids did not want to do that. Diane - When I talked to Dave from CR, when we have this meeting yet to be determined, that is going to be negotiation day, and it may very well be that we end up back at that, but he doesn't want to throw that out now and not have anywhere to go, that is why he is playing hardball. Kurt - Let's not give that up. Dick - I like what this guy is doing, he was calling Charlie every day, sent him a past due notice, what do you have to offer. Next day, he was calling again. He tells us his lawyer is the same sort of guy. Nothing we can talk about on the street. It is frustrating to hear conversations at Aromas. People are just looking for answers. Charlie needs to get it done.

Bob N - So, this meeting will be when? Diane - Probably in the next 2 weeks. Bob - Diane and Dave are moving it along faster than we were. Diane - They have offered to get out. The big thing that I don't want them out, is we had a $500K government deal that went away and I sat here and listened to this man from CR, you contact so and so and he can get it done. We put CR bank into this because of their ability to handle those. I hope we never have to go there, but I feel the CR bank has a lot of stink on their fingers for $500K. Our State Senator got the economic development lawyers and they explained it was allocated but never funded. We were never told.

### 3-8-2018

McQuillen Place Updates – J. R. Herbrechtsmeyer -Credit Committee has been meeting on this, as well as loan committee. Michael had good input on this and then Mike had an idea of a possibility, so I thought this is one that we will be talking about at the Board of Director meeting, and want as many people to think this through. Kurt- Technically, we are still in negotiation, Diane met with Bob's attorney, his accountant, and where we are, basically Bob has taken a step back on the $600K, he said

Exhibit A
Page 11

$900K is his limit of exposure, which is really basically where we already are. We have Bob as a guarantor for $900K on construction, where we still are in that phase, with a verbal agreement to be a $500K guarantor on the permanent financing, giving us something to go back on while getting it leased out. So, first is to get it completed and second is operating. They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, they need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. What we talked about in Credit Committee, how would we approach that foreclosure and what are we willing to do. Mark Miller joined the meeting via teleconference. Their offer as of last Tuesday did not offer anything more than what we already have. Offer is not any better than if we took control and had someone manage and lease. Credit Committee - Take control or they come with a better offer, with the full realization we could end up with the property and some fallout, liquidating assets that we need to be aware of. Best thing for Charles City is to get control and put someone else in charge of it and it will take some of our capital but we will have Bob's $900K. We could find someone else to complete and manage and potentially get it sold.

Dick – A couple of things that were discussed. We now have a joint lawyer, one legal entity. so far, Charlie has shown up representing himself, other than when Judy O'Donahue was involved when the $500K went away. Cedar Rapids bank has offered to take us out and you guys run it. I think they have enough egg on their face, they were paid fees up front to manage this. I sat in this room and listened to their lender say to Charles that the $500K tax credit is past due, but those are extended all the time. That $500k that never happened would have gone a long way toward us not being shut down for 90 days. Secondly, we asked the lawyer to look at the Federal and State money and what has been put into this thing and see what the obligation is, if we were to foreclose or if Charlie were to sell it to another entity. Do those requirements all stay in place or is there any draw back. Gene - How long do you think this will take? Dick - I think we have part of the answer. Diane - The grant money, there is mortgage and second position, if we foreclosed, it would be the same as foreclosing on another entity. Diane - The IDED that the funds came from, but the NIACOG is administering the grant and that's why it's from Cerro Gordo County. Dick - That was my guess, but it is strange that the real estate in Floyd county will have a mortgage from Cerro Gordo. The question is still foggy, he has said over and over, he was required to have 1 more than half of those apartments and he was talking about subsidizing. Kurt - That is a second mortgage, but our understanding is, unless they want to buy us out, we have no obligation. Dick - that is why I wanted to be sure we had all those facts before we start. Kurt - City side - Dick - I hadn't gotten it through my head, Ralph is concerned the City is going to walk away from that, I don't think our City Manager is a bluffer, he wants it done, as they convinced the city to a TIF loan, and it must be completed, and if not, those that are in there, will need to move out. Kurt – The most is completing the windows. Windows on the first floor and completing the sidewalk. we are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff, we have to be willing to take it on. No, Mark, it will not be your project. We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. Dick - One other part on the loans, I had written off that Citizens will have anything to do with it. The Citizens bank loan has the other half of the TIF, so if some entity owned by CVB, Ltd. owns this thing, there still could be TIF grant up front paid back over years and a loan to the City through First

Citizens and whoever owns it pays for it. In our credit meeting we discussed, if Citizens doesn't want to do it, there may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio.

Gene -I haven't had a chance to study all of this, I absolutely agree if the bank finishes the project, i agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. Dick - I can assure you one thing, Directors will pay to have McQuillen removed. It would be nice and I don't know how we get it, the list of people that want to rent, whether there is anyone or not. Gene -I can address this. Coincidentally, I had another conversation with a director yesterday that confirms there is a list of people waiting to rent those apartments. Dick - Will it be a list we can get our hands on? Gene - It is through Larry. Kurt - Obviously, we may realize we will hold this for a long time, we need to get it leased up. Quality of the construction in those apartments concerns me, cabinets, flooring, don't want to say we are going to take it and put $1M into it and sell for a profit. Dick - There is no question, I would never live in this based on what we were saying. Floors were plywood with a little paint on it. Kurt - That is the environmental aspect they were required to meet. Not sure where this came in, maybe goes away with NIACOG. The other prospect that pushed me across, other alternative was we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this? From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. Mark - Have you had any conversations with Dean about that? Mark - I have not. Either he or Connie will work with us on it if they owned it. Dick - Is there a way if they would both work with us. PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both.

Michael came up with a discussion about an entity that might own this. Michael - During the financial crisis, we got a lot of land and properties back. In those cases, certain institutions that did not want to absorb, created an LLC, basically sold real estate to the holding company. In that instance, those asset qualities, OREO if long term, doesn't impact the bank's asset quality and no performance assets. The only time you would see it would be at the audit at the holding company level. You will need to talk with FDIC and the State to get the blessing to do that. I don't see why they wouldn't. What might have to happen, you might have to divvy up capital to get it finished. If the building was owned by the holding company, it would be divvied up by the holding company. Budget around long term issues. Regulators don't like banks holding OREO long term, as we are not real estate development companies. The other things, you mentioned the pharmacy, one big thing from what I have heard, they wanted a drive up-that would be a change in plans and is additional capital if we want that anchor tenant. Charlie doesn't have that. When you start to build out the tenants, there is reduced rent, cash flow out of capitals or concessions on rent, all of which I don't know Charlie can absorb with his current situation. Last thing, I don't want to own this, but at the same time, even if we let Charlie and Bob finish it, I don't think apartments are going to cash flow, so we will still have a non performing asset, which will impact our books for eons, as this will not support any long term financing. We can work through this, but I struggle with giving Charlie the satisfaction of completing this as he has bungled it up and he is trying to get rid of the $500K. Michael - If we allow the $900K to go in, we are giving up our collateral. Kurt – And, we are giving up control. Michael - The appeal of some 50% reduction in whatever Bob was going

Exhibit A
Page 13

to put in. Dick - Steve Durrs said, made me feel better, the redo of the parking is still on the table, if that building gets completed, to add 88 spaces, Kurt - But we have to have the building done by November, so they can put that in there. Dick - Steve Durrs is definitely on our team to get this done. He is not taking sides of one bank over another, simply City Administrator to compete and look good on main street. I am very encouraged after meeting with him. I keep hearing from Ralph, that Delaine was not okay with this going in. Kurt – Delaine's concern was Charlie, no cash, no back up. Michael - The other thing Steve mentioned was the TIF, the agreement has to be rewritten, it doesn't matter if it's to McQuillen LLC or to the bank, it needs to be rewritten anyway, if ownership has changed, the new owner would be written into this. Dick – There is no way we are going to lower our assessed value on it. The other thing I raised briefly is the $500K that went away, at some point, we are going to have to have our own lawyer, because when we start taking some charge offs, we feel we have reason to go after Cedar Rapids bank, they bungled. The notice to the State was sent out a long time ago and going back to the minutes when Cedar Rapids banker said to Charlie, you see so and so, that guy can get that extended, the state had gone away with that program by then and grabbed what little money they could for other projects. Cedar Rapids bank didn't have a clue. Boyd - How feasible is that is what they are saying on the $500K, going after the Cedar Rapids bank? Dick – One, being a good politician, our State Senator has tried to do what he could, got the Economic Development lawyers to sit down with us and explain why we weren't going to get it. No question that Waylon Brown made that happen. But Cedar Rapids bank has offered twice in the last 2-3 weeks, just take us out and you guys run it. They would be happy to write off the same percentage we do, as they are only in it 10%. Kurt - There will be an opportunity for them to take their haircut and walk away. Dick - I would like them to take the haircut and put the big fees back in. They should be as embarrassed as we are that this is not done. Gene - We almost have to be complicit as possible. Dick - We at least raise the issue and try to get them to come up with something other than just losing their percentage. Gene - Is Bob's reputation separate from Charlies? I think if push came to shove, how much is that McQuillen place going to mean to Bob? Kurt - That is what we are trying to find out. Dick - At one point, they offered us $500K with $250K coming off the guaranty, that would commit Bob a whole lot more. The number got bigger. He is going to have to make that decision. Gene - Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

Dick - We have to pay the taxes. I don't think we have to get our interest paid. Cedar Rapids Bank wants this, but they may have to write this off, a lot less than what we would have to write off. Cedar Rapids Bank is not offering to make any concessions. I believe this man wants to get away from this as fast as possible and probably has some perimeters to work with. Gene, how long will it take to force the Thomson's to a decision and moving on? Kurt- We want to show them we are moving forward. In the meantime, the way we have proceeded in the last few years, once we say we are doing it, we do it. Dick - With Boyd on this call, we have 4 out of 9 directors present. When we say to Cedar Rapids bank, the Directors Loan Committee has to approve this. It is all about Bob and are you really walking away from this and it not being called McQuillen Place? Kurt - We will liquidate all. Michael - On that point, that is the forced and bitter foreclosure process. I am throwing out there, in the best interest of that building on the corner of main, we may have to give some concessions to Charlie. He doesn't have any equity, we get all OREOS back, I know that the emotion and the involvement is there, but we have to make good decisions in trying to get possession of the building as soon as we can, whether voluntary or foreclosure, that should be on the table, otherwise, we will stare at this, pay legal fees, discuss at every board meeting and in 15 months when we finally get possession, just thinking long term. Dick and Kurt - Bob does not want this to happen. Dick - Another thing Michael brings to mind, Tommy gave a list of every loan we have with Charlie and what the collateral is, we know what Connie has them listed for, probably 80% more profit. I am told he actually has had an offer on his house, more than assessed, but

Exhibit A
Page 14

40

turned down. Kurt – Amelia Management is the 3 remaining living kids, but that brings Peter into this, you will get the family rallied pretty quickly, and they are all affected by this. Charlie can't fight through this on his own, with Bob involved and everyone, it will be to table pretty quickly. Dick - The first foreclosure will be the farm over by the river, that is a farm that was Jan's and then the 4 kids, foreclose, then partition out. Kurt – They won't want that to happen, undivided 1/4, probably has no debt on it. Then have cousins that are forced to buy out 1/4 of a half. Mark M- Our mortgage on that is either $125k or $150k, what was negotiated as part of it. Our LTV on all those properties, we should be in a pretty strong first mortgage position, but every one of those were financed with seller financing, the equity beyond second is minimal that would be available for a 3rd mortgage that applies to the McQuillen loan. The other thing we have talked about all along, first thing Bob would have to do, is have him write his $900K check. But we speculate the attorney, with a limited guaranty, they are not going to write a $900K check on the front end, but wait to liquidate all, then determine if we are truly $900K. That is why we want to negotiate that up front in a voluntary settlement agreement. I don't think there is much equity in the Amelia properties, as most of those were purchased less than 5 years ago, so not a lot of equity.

Diane - I tossed that question to the attorney in Cedar Rapids, about waiting until all properties were foreclosed on, before we would ask for the $900K, but the attorney said they can't dictate to us how we get the collateral, we can ask for it up front and we can get it up front. Dick - Bob has offered to write the check. Mark - He has offered. Is he still going to offer, once we start the foreclosure, it may change. If he doesn't, we may be a long way from getting a check. Dick - I would rather see the $600K and still have some guaranty on the cash flow. Mark - If Bob is using his contractors that he is using for Pancheros, I believe bob is committed to getting the building finished. Bob has the money. Charlie is not capable. If he puts $900K or $600K and we maintain some of that guaranty, I think we get all that back, then construction loan comes due, if they could get finished using Bob's better scenario for us. Kurt- I don't disagree with you, but I don't want to give up that guaranty. Mark – All we can commit to at this point in time, is the construction loans, when matured and the building is completed. If that is finished, Bob may say at that point in time, the cash flow is there. He won't say that today. Ultimately, this is Bob's legacy. He has a lot of respect for the bank. Dick - You make one comment, Bob's contractor at this point has not given us any concrete numbers. We or Cedar Rapids bank has never seen anything form Bob's contractor. Diane - Charlie had sent a document that shows where they said, you are short on this, need "X" amount of dollars or more, not totaled. Mark - This is something that I had mentioned to you already, we don't know Bob will step forward, we can speculate he will. The way I look at it is, he is kind of stepping/walking away right now regarding the $900K, he has already played his card. Dick - Is that why there has been nothing from Cedar Rapids Bank with Bob's contractor? Diane - They are considering Bob's contractor.

Gene - Hold their feet to the fire. Kurt - Michael is right, we have to sit down to the table and work something out. Dick - This is where Mr. Breitbach will have to give us some guidance. Kurt - I think we do want to force the issue and get to a resolution. Diane - Keep in mind, just getting through the construction is only part of this, then how is it going to turn out? Mark - Getting it completed, increases value and sale ability, maybe not at the levels we want to, but at a level to find a buyer. It is not saleable, as it is not finished. Even if you lost the guaranty completely, if it gets finished and we start getting apartments rented, it increases the value by the amount and maybe more, only reason we are considering this, it gets money up front and he has a contractor that can actually do the work. Kurt - I am only with you as long as there is a guaranty from Bob to the end and not having Charlie in control of this. Michael - One thing to consider, Steve did say that the TIF loans do not go anywhere, until the building is done. He is talking about sidewalks, the doors, when you start adding that up along with real

estate requirements, I don't know if the $900K is enough. If we go the path using Bob and his contractor, he is going to have to put more than that into it. Diane - One thing Steve said, it can't just be a painted piece of plywood, it has to be windows. Kurt - They were not in that scope. Certificate of completion, not occupancy. Bob needs to be on the hook for all of that, that needs to be the agreement, if we are going that route, it has to be completed. Gene - There has to be a deadline on it. Diane - If Charlie is being in charge of it, we already know it won't happen. Dick - With Charlie involved, he still has his Chicago partner. He was so condescending to the City and to us. HIs enforcement has failed at the last 4 he has been involved in, he doesn't know. I don't think the guy in Chicago cares whether or not it gets completed. Bob needs to know Charlie's partner is a detriment. Diane - Steve would be the general contractor and be here 2 times a week, but he has a foreman who would be here every day. Michael - Is it still local contractors? Mike - From what I understood, I think it is still the people building it, but we just have someone overseeing it now. They are not just bringing in a construction crew to complete it. We now have someone overseeing it that knows, but you still have the same 4 guys constructing. Dick - Once Alex left and the clown running the thing, the drywall was incorrectly installed, that is where the big problem is. The architect says it's not a problem. Three more feet of 3 layers of drywall for fire protection to get the initial certificate. He implied when that foreman was there, it appeared they were doing everything right, but when they hired someone off the streets, that is when it went awry. Ron - If you don't go the foreclosure route to maintain control, will you have leverage enough to control it going forward? Dick - I suppose we could have a written agreement with the contractor and when they get behind, we could start the foreclosure process.

Michael - We have reserved $850K, that was for year-end audit current reserve on it. Dick - I put out, we are making a $1M profit this month that will go into AAA, I think that gets offset by McQuillen place. At the very least, $1M charge off before we are done with this project. Michael - It will lose value if the banks name gets placed on it. Kurt - That is why I think you lease the place up and market. Dick - I like the idea of an entity other than FSBT. Next step is to get back to the attorney representing the two banks. We will have to talk to the Board about it next week. Michael - What is the decision? They want to know if we want to move forward with foreclosure? Kurt - Offer is not good enough, moving forward with the foreclosure. I think we will hear back pretty quickly. Dick – The person from Cedar Rapids will have the paperwork ready and file. I am not sure 48 hours is enough for Bob T. Kurt- Communicate quickly. If they come back with something and we are considering it, we are going to have to deal with Cedar Rapids bank. Diane - I think they will say if you aren't foreclosing, we are out. Dick - Do we need to get legal counsel representing just us, to say if you are out, we will take you out on these, pay back fees. Mark - Is it in the file of what their fees are? It should be. Kurt - We need to find out what they have gotten. Dick - If the mortgage is in their name, they can thumb their nose and foreclose. Diane - I suppose they could. Up to this point, they have let us be the decision maker on where we go. Dick – I think it would be safe if they are going to do that, and ask if they have looked at their liability on the other things. Mark – I did mention that to David once, I am sure he has forgotten about that. Diane – What I had conveyed to Dave was Board Loan Committee meets today and at this meeting, is where the decision would be made. I was wrong and it needs to go to the Board of Directors.

Kurt - I am not convinced this committee needs to approve. Diane - It is either we are foreclosing or we are not. Kurt - I don't think there is anything in our policy that says this entity has to approve. Dick - I think if you tell them we are either foreclosing or let us know, Dave will give them 30 minutes and foreclose. I think we need to give them a reasonable time. Mark - I think a week is ample time. Diane - I counter that and say give them until Monday. Mark - The problem you have with that is, you don't have one person in and they are working with a new attorney. Michael - They got back within 24 hours

Exhibit A
Page 16

with the previous.  Diane - I don't think we should wait.  Dick - How about Wednesday?  Kurt - Bob is in a position to make this whole thing easy.  We need him to decide whether he is willing to do this or not.  Diane - That is why it shouldn't take a week to make a decision.  I just think that is too long.  Kurt – A couple days, communicate this.  Diane - Give them until Monday.  They have the weekend to figure it out.  Gene - If I was going to lose over $1M, I would be making a decision real fast.  Diane - They have had time to figure this out.  Michael - If Diane is right, and Bob says, you have heard my offer and it could be today.  Gene - If he doesn't, I would file foreclosure papers this afternoon.  Kur t- Give due notice.  Diane - I will tell Dave we are in agreement to go ahead with foreclosure, give until Monday to counter.  Kurt- Do we want to say that?  Diane – What I am saying, I tell Dave that, so he doesn't file the papers today, giving Bob the time.  Kurt - All we tell Dave is that we understand there is a guarantor that can make this easy, give him the opportunity and then move forward.  Michael - Dave can communicate we are going to file the papers on such and such and they then know the deadline.

## 6-21-2018

McQuillen – Mark M. - Negotiations with Cedar Rapids Bank and Trust - We are dealing with relationships and trying to resolve and get on the same page.  Mediator with Thompson's and the attorney, we are trying to reschedule, as the Thomson's didn't want to meet without the mediator.

Discussions between the banks and Charlie have been evasive.  First Security is more interested in resolving this than Cedar Rapids bank who has less incentive to push.  We will threaten to sue Cedar Rapids Bank for damages for slow movement and lender liability.  First Security Bank has a separate attorney.  We have sent options and if they don't choose either, we will start the lawsuit.  We think it is better to have one bank involved and making the decisions.  Taxes are paid by First Security instead of Cedar Rapids Bank who is the lead bank.  Cedar Rapids Bank and Trust hasn't started foreclosures on any other properties.  Cedar Rapids Bank and Trust never had the actual Enterprise Tax document to show approval with 2 options.  1) Cedar Rapids Bank and Trust has 10% of the loan and they offered to walk away from 5% of this.  First Security Bank presented that Cedar Rapids Bank and Trust pay the bank $1 million and walk away, we don't file a suit.  2) Cedar Rapids Bank and Trust pay 80% of First Security Bank loan amount and real estate taxes and First Security no lawsuit.   We want to get moving toward a resolution.

Exhibit A
Page 17

FSBT Board Meeting – McQuillen Excerpts:

**4-16-2018**
Progress on McQuillen place was discussed.

**5-21-2018**
J.R. Herbrechtsmeyer discussed information regarding McQuillen. Robust discussion was held.

**8-20-2018**
**Credit**
McQuillen Update – Kurt - We have reached an agreement with CRB&T and they are no longer in the equation. We obtained assignment documents and a $50,000 check. Dick - We have also obtained insurance on the building and Larry is pursuing foreclosure. Discussion held.

**9-10-2018**
Diane gave an update on McQuillen. Robust discussion was held.

**10-15-2018**
Diane gave an update on McQuillen. Robust discussion was held.

Exhibit A
Page 18

44

Credit Committee Excerpts – McQuillen

**4-21-2016**
Purchased Loans Report – McQuillen, Mike F – Are we following up on what we need? Mark M – We are getting reports, but I haven't gotten one recently. Not much was done over the winter, but they are working on it now.

**6-28-2016**
Pipeline Report – McQuillen Place – unused and looks like it is going to sit there for a while. Dick – A more optimistic view – the City is saying they could have 12 apartments they could have ready in August, as the plumbing was roughed in. They have 12 on the south side, 2nd and 3rd floors. Mills Helmers has 20 some furnaces they are storing, the sheet rockers was ready to start on those 12. Mark – They are working inside. Dick – The City is not going to give them any ability to rent, they have to have at least the sheetrock on the walls. At the rate they were going, they could have roughed in all the fire suppression. It is conceivable those could have been ready on time. They talked about one lease and building sale at the end of the street that could put a damper on this and is spending some money there. A Bluhm truck was there this morning. We should tell Charlie Thomson we want another walk through to see the finishing on the inside. Mark – The LOC matured June 30, and we have a request going to Officer Loan Committee to extend this to December 1. They have to have certain things done prior to year-end to qualify for some of the grants for this. Robust discussion was held. Michael H – We should add our work outs to this report and add one more column for this. We have another $8 million to $15 million in loans that are still on the book. There are real dollars that are not on this report that are going to roll off.

**10-10-2017**
Diane – Dick had wanted to talk about McQuillen. Kurt – His concern is there might be some urgency with regard to maybe setting the expectation about Bob's involvement, his is a guaranty on the loan which comes in to play when trying to collect. Obviously, it could be an infusion of capital too. Michael – My feeling is, based on what I know, we are on the hook until it is done, because the other participants don't step in until it is complete. My argument is, our goal is to get this done as fast as we can to reduce exposure. Kurt – Dick bought up things that need to be completed. I don't know where the City and Charlie are on that, to get certificate of occupancy. Dick's concern, is pouring concrete when the weather changes, but certainly something we want to be thinking about, is getting those things done and the certificate. The other thing going on, is Department of Economic Development at $700K. Charlie sent an email and asked to make contact there. Mark M – Dick said he talked to Waylon, who knows what their stance is on this, there is what we can do and what we can't do. Mark – Even if you had the money, who is going to do the work? Kurt – What are the options, what should we be thinking of as priorities, can we inch something forward? Mark M – Personally, what I think we need to do, we have the stuff from Dean Snyder construction, there is never going to be funding to support that, $2.5M plus Charlie and James number was over $400K. Second request at Board Loan Committee was supposed to be covered by tax credits. What we need to see, is: 1-You need to get accounts payable of all bills out there. We have one customer, Kamm Excavating that they still owe $7,000. 2-Then an itemized list of what it takes to get to the finish line and provide a timeline of when that finish is. 3-We will come over and do a checklist to follow up and see that you are following through. With this

Exhibit A
Page 19

Case 6:20-cv-02041-CJW-KEM   Document 12-3   Filed 07/07/20   Page 55 of 231

timeline, you will need to meet weekly. 4-Then we will figure out permanent financing at that time. We need to get it finished. The certificate of occupancy, we could depart this, but you still need to get stuff done and who is going to live in there if it is not done, they all need to be finished. Kurt – Or enough to get people to move in. Michael – Where is Cedar Rapids Bank and Trust on this? Mark M – Gary Becker, his rationalization, that I heard more than once and did not agree with, their approach was to keeping the cost low to get the project done. The interest cost was not hurting him. Now I would say, at he has clearly moved on that point. Michael – Do we have any recourse on them in terms as to how they handled this? We brought them in as experts in construction and development. Mark M – Weren't they overseeing the grants and the project, didn't they get the documentation that all of that was in place? I thought they had this, but at it turns out, they didn't have it, we didn't have it, so there was a question about let's look at the participation agreement. We have 3-4 extension agreements and changes each time. I don't think there is going to be anything in the participation agreement but will come back to original plan. We are a participant and not the lead bank, we assume you have that and where is it. Charlie communicated that to me first. Mike F – Has there been any question that Cedar Rapids bank is lead bank? So lien waivers, making sure no money went out? Mark M – How this enterprise tax credit got missed in this question, I don't have the answer to that. I am not sure if we have any leverage there. In the short term, we are at mid-October, there are certain things that can only be done at a certain temperate level and soon to have those behind us. Bob is the guarantor, but that doesn't mean he should have to write a check, but he has the ability to do that. Come up with some money, get the project finished, can then reimburse once you get tax credit. Mike F – What is total debt? Mark - $3.8K and we are in the $3.3M range. Michael – Dean Snyder's was $2.5M to complete. Mark – I think there could have been some coaching in that number. Show us your number and how you got to it to finish the project. Supposedly Cedar Rapids Bank had something to support. Mike F – What kind of documentation have they sent. Diane – Sporadic. Mark M – In discussion, a document was noted, but we had never received or have seen the document. The funding, available source, what had been spent, matching up to completion of the project, we haven't seen this. Mike F – Have we extended? Mark M – They have $100K left of IED grant. Mike F - Does anybody outside of our bank know we are concerned? Does anybody know we think we might suffer a loss on this? Mike F - We are in a position to suffer a loss? Michael – As it is now, if you want to have it completed, it would be discounted to finish it. Kurt – To me, getting that $900K infused, it either has to go to the loan or be put on loan. Michel – I would have them pay down and re-borrow. Mark M – If you brought somebody else in that does these kinds of projects, what would it cost? That is your back up plan if you had to hire someone to finish it? We asked and he went out and got an estimate. Mike F – We are in a position, if the lead bank hasn't shown signs of normal lending due diligence, it is just because they have a small piece of it, doesn't get them out. I think I would probably find somebody in Des Moines and send them the shop list. Kurt – We could certainly have someone looking at that. Mark – We need to set up a meeting again with Charlie and Cedar Rapids Bank in the room. They have breached the contract. Mark – Let's get the building finished and then discuss this. Diane – What if we explore the participation agreement and whether or not they have been negligent. Mike F – How many visits have they made up here? Have they constantly monitored the construction of the building? Mark M – What they wanted to do, they had this Ron Fiscus, a financial guru, and they wanted to use him as an inspector, but he was someone that Charlie had hired to be part of this, and they deemed him unacceptable. They got somebody else. Michael – I would ask them for a complete imaged file. It is ours as much as theirs. That should include everything. Mike F – Did they earn loan fees? Mark M – They collected significant loan fees on the front end. Mike

F – What have they done? Michael – We hired you as an expert, if you can't do it…. Mark M – Until this thing is done, you are in. Diane – The other thing to talk about is, right now, it is a 5, it should be a 6. The other thing, how do you allocate for it, collateral analysis is not going to do anything. Michael – If you are in construction and land development, you are advancing on a completed basis. I don't know the answer to that, but what I don't know is, where did the funds come from? Let's say it's not $2.7M or $400K, probably somewhere in between. Mark M – That is what we need to get from them. Michael – If you can get the completion and get First Citizens and the City to take their part. Mike F – What is the time table, how long can this go on? Mark M – We have had representation from Citizens there, when we toured and they have been part of the meetings, they could have easily said at any point in time, we are just out. Michael – I think they understand there is some reputation on the line. Kurt – I think there is, that is why we want to get to completion. There is a lot of reputation risk. Mark M – That is why we need to get to completion. Kurt- We don't know how to reconcile Charlie and Dean's number. They had a basis for asking, my gut tells me it is closer to their number. Mark M – We have to get James and Charlie. Diane – They have been asked twice to do that. Mark M – Cedar Rapids indicated they had that information, I don't believe I have ever seen that. Mike F – The City signs off on inspections? Do they sign off? Michael – When I did mine, they did. Mike F – Snyder may be concerned, is everything up to code. How would they know inheriting a project like this that they can trust everything that has been done? Michael – My experience with the City, is, they put the gloves on and do everything. Kurt – They were asking for over $400K. Here is a question for you, if you could get Bob's $900K, would you throw the $400K in to get this done. Permanent Financing is $1.5M. Mark – Bob's was supposed to be knocked down. Kurt – I want Bob's. Mike – If we go the whole course, Citizen's is just short of a million and the City's is short of a million. Michael – The cash flow is at what occupancy? Mark – If you had all the apartments rented, you would not need any retail. Michael – I would be surprised if it got 50% leased up on the apartments. Mark M – What we have heard all along is, that you have some of the employers in town that would like to have 1 or 2 of the apartments, Cambrex, Zoetis, Mitas. Kurt – i would think they would do this. But you would still have to get your 50% low to moderate. The sooner we get to that point, the better. Diane – The obstacle I see is, who are we going to get to finish it. Kurt – We need to work with them. Diane – Couldn't we pursue this? Michael – You need the whole file. Mark M – Part of what we are requesting is, we want itemized accounts payable still outstanding, a list of improvements to get to the finish line. We could easily say, give us what you have to this point and we would like to see the whole file as to expenditures, lien waivers, inspections, etc., because we should have that in our file. Mike F – Any reports of any unpaid labor or bills? Mark M – We have one – Kamm Excavating of $7K accounts receivable that hasn't been paid. Mike F – That is my biggest concern. Kurt – I remember when we were all sitting in this room, Dick asked it twice and he said no. Mark M – I want to see an itemized list of accounts payable and what are you going to have to pay to get to the finish line. If they don't have it on there, there may be others out there that concern me. It would be nice to get the list to see if it isn't on there and that would concern me. Michael – I think there is a couple things we could do internally, whether one of you or Tommy, look at our different options, how much did we put into it, look back at the initial plans to cash flow, are we going to have more in it, if it gets to us or Cedar Rapids, are we going to add more money to get it finished. Do you end up with a property you can't lease? I also don't want to wait 6 months and have not thought about those options. Kurt – Quite frankly, if you can convince them that Bob's $900K goes in next, get it complete, that at least gets us closer to the end in sight. I ranted at Charlie when they were in here a few weeks ago, as I wanted Bob to hear this. If I was Charlie, that is where I would want to be. Mike F – I have a feeling that there is

Exhibit A
Page 21

a Credit Committee that been held recently that is very concerned! Michael – Tell the lead bank to put the dollars in to finish this. It was their obligation to see this through and they agreed to that dollar amount. Kurt – We have to figure out what is the best course to get it completed. Mike F – Holding the lead bank accountable is not a bad option. Getting them to the table to participate in what it takes to conclude this. Mark M – We would get their attention if we ask for a complete copy of their file. Michael – One second, before we push forward talking about getting more infusion of capital, at what point are we stepping on the lead banks toes and opening up to a liability. I want to make sure we are not having any meetings without them. Mark M – We are not. From a course of action perspective, what we need to do is go through Cedar Rapids Bank and Trust first and have them contact Charles and James and tell them we are available. I think we need to let them be the lead bank, these are the things we should be getting. Michael – Since we are at the end of the financing, my stance is until we have a plan, we are not taking any more exposure on. Kurt – We certainly want Cedar Rapids Bank and Trust on our side pushing. If they are sitting in the room and we think the $900K is what is necessary and CR sits quietly, that is not as good if we are all on the same page. Charlie is also pretty smart and if he starts doing the math, he may say, here are the keys. Mike F – Their story was, here are the keys buy us out. I can't trust someone who does that. Michael – They want out. I want to see the whole file. Someone has mismanaged it. I don't know why they ever took it on. Mike F – They are a very high growth bank, saw the fee income, someone can do this. Michael – It seemed like a good deal with all the state funding.

## 10-20-2017

Diane – I think we just wanted to touch base on McQuillen before next week. Different conversations have been going on about what the plan is for Monday. Mark – I understand the CR Bank & Trust banker is going to be here. Dick – Should be be having a conversation without the borrower with them, so that we are all a united front of what we are expecting from Charlie and James. Mark M – We should be letting CR Bank & Trust to lead the meeting. We told them what we wanted to see on the agenda. They tweaked it and are adding a few things. They have our items on there, they need to lead the meeting. Dick – Is the city involved? Mark – They are not coming to this one. Dick – We need to be honest with the city as to what we are, as they have the potential of loaning a million dollars on this project. Mark – If the city stays in and if Citizens would stay in, we take our $3M down to $1.5M, but a lot less dollars we are looking at. Honestly, if we get to that point, if it is finished, we have the opportunity to negotiate terms with the guarantors. Bob is going to be guaranteeing $900K. I have already planted the seed in Charlie's mind, that when the construction is done, the terms on the permanent financing will probably be up for debate. Dick – We are not going to have much leverage at that date. They have none of their own money other than Bob's $900K. Mark – We have a farm. Dick – It will cost us a ton of money to get anything out of that, it is better than not having it. Mike F – Are they not doing any work at all? Dick – There are as many as 4 people showing up there on the job, it is pretty limited. Diane – One of the things they are supposed to be bringing to the meeting is their timeline. What if they don't bring us anything? Dick – That is where we have to be set with the CR bank. We need to move next door and talk with Gary. We need to go in and talk about foreclosure. We already have the city ahead of us on taxes. Michael – I don't know if I would put Bobs CD on the table, I would rather have CR Bank take it and finish it out. If they boggled it up along the way and didn't get it completed under the costs that were initially disclosed, I would hold that back in our cap until we have to. Dick – The $900K is actually a guarantee on their loan.

Exhibit A
Page 22

Case 6:20-cv-02041-CJW-KEM   Document 12-3   Filed 07/07/20   Page 58 of 231

**11-14-2017**

Diane – McQuillen – We had a meeting which I will send to Kurt and Dick. We are meeting tomorrow with Charlie and Gary Becker is coming. Mark M – I met with Bob, not relating to this, I had an extension for him to sign on his son Steve's note. Bob Thomson brought up that he is fully behind getting that building built, we are talking $400K at this time, and if takes more than that, he will provide the funds. We need to get that building finished. A week ago, he said that he was working with his accountant to figure out what the transaction between him and McQuillen would be. Tomorrow there is a meeting here with the Iowa Department of economic development, where Charlie is hoping to bend their ear and get his tax credits back. They need to fund this gap and get the building finished. Diane – Michael, you talked to Greg and Randy and they are suggesting we get a new appraisal. Michael – They said given the size of that and the value of the building as it is now or the value to someone from a collateral standpoint, there is no income generating from it, there is going to have to be some type of valuation set up. It is sub-standard. It is not a Charles City appraiser that is going to do this. In order for them to sign off on the allowance and say it is adequate, you have a building supporting a loan. Dick – Let's ask Gary tomorrow if he is getting a new appraisal on this for their reserve. Their initial recommendation is to put it back to Cedar Rapids, they do more of this, that they would know better how to evaluate a cost to complete and a cost as is. I Hope that the reserve in time can reverse itself. Even if we get the building completed, we have a competed building with no income, and it is probably not going to be sufficient to set up an amortize basis, it may be interest only basis, to help get leasing going. All things we are going to have to decide as we move along with this. They said the timing is bad. They come in and have to audit allowance and sign off that our reserves are adequate. What do we have for allocation? Michael - $100K. Diane – What is our allocation for next month? Mark – One of the thing, he would ask Bob to submit his $900K first, take off the top, then the farm and another $150K. I think I would start at those things from the top and then work from there to look at an allocation. Michael – Obviously we are in a position to where we know Bob's financial status, clearly we know Bob is most likely pretty good for the money, so I think you can consider that. So, whether it is the collateral you have, say around $900K, some farm, you have to factor in your cost to get all that and I don't know how much extra value that adds, you can probably consider all that, but again, as you are getting closer to year end, those are things we need to ask them about. Cedar Rapids Bank and Trust provided us with an appraisal, to get one in the time frame, you would almost have to go back to the individual that did the initial appraisal. That same appraiser may be able to come back. Dick – He did it based on plans and now he can walk through it and look at their projections and what it would cost to finish. Mark M – That would be Cedar Rapids Bank and Trust. Michael – Start the conversation and see where it goes. Dick – I would assume that we don't have to point out to Gary that if he were to get that $900K check, we are at least going to prorate that. Mark – At this point in time, I think it makes more sense for Bob, and I think he is on board with this, to put money in to get the project finished. Michael – Bear in mind, that doesn't mean we are out of the woods, we still have a non-performing asset on the building at that point. The city did a new list of what they have to have.

**1-11-2018**

Capitalization of Interest – No Report. Diane - On McQuillen, we were supposed to see the appraisal yesterday. I sent an email and told them I would be contacting the appraiser.

**7-10-2018**

Exhibit A
Page 23

Case 6:20-cv-02041-CJW-KEM   Document 12-3   Filed 07/07/20   Page 59 of 231

Robust discussion held regarding McQuillen.

**8-14-2018**
McQuillen Place, LLC
- Mark updated the group on the following:
  - We received the signed agreement and the $50K check from CRBT
  - Still waiting for the original documents from CRBT, of which the assignments need to be recorded.
  - Question was asked if there was proof of insurance. Discussion held on where things stand.
  - Set up weekly phone conferences with Larry Eide to ensure things keep moving.
- Action item: Diane will follow up on getting the proof of insurance.
- Action item: Diane will contact Larry weekly to updates.

Bob Thompson
- Mark updated the group on the following:
  - Mark met with Bob last week. Bob wants to get this done as quickly as possible but wants Mark to speak with his attorney.
  - Bob may need to borrow some of the money in order to pay the $900K guarantee.
    - Discussion held on who the lender should be for this loan.
    - If we are the lender, Mark stated the only way we would do this is if we take Bob's stock in KGB, Unlimited Spirit and probably an assignment of the remaining $500K life insurance policy.
- Action item: Mark will get loan closed with Bob by the end of August to collect on our guarantee.

Accounting issues related to McQuillen note
- Michael spoke with Eide Bailey on how to account for the $50K we received from CRBT. This will be booked to the Discount on Loans Purchased GL account (similar to the Wessels settlement).
- The McQuillen loan balance was grossed up to include the CRBT ending principal balance.
- Action item: Michael will oversee that the entry runs correctly and the McQuillen balance in Precision is updated.

**9-11-2018**
The committee reviewed the following reports:
- Ag Commercial QC report
- Adjustable Rate Pricing Audit
- Flood Determination Exceptions
- ALLL changes
- IA State past due averages
- Past Due vs State averages
  - Next month will do with and without McQuillen included
- Monthly extensions
- Potential non-accruals

Exhibit A
Page 24

- Monthly single pay loans
- Monthly credit rating updates
- Action item: Past Due report will be completed with and without McQuillen totals.

## 11-29-2018

Discussion Items – Diane - I saw an email sent today from Larry. What Kurt suggested is a group get together, get answers prior to meeting with Larry. A question I have on here, what would we be willing to take as a payoff if offered one? Mike F - Did Ralph ever come up with his buyer in Cedar Falls? He didn't end up talking to him. They are not interested in it if Charlie is involved. Maybe this is a discussion for board and holding company. Mark - I think this is a moot point. Just keep moving forward. Why would we want to wonder what it would take? Kurt- If they did, we want to respond quickly. From a negotiating standpoint, I wouldn't accept it. If they did make us an offer for $2.5 million, I wouldn't immediately say yes, probably counter at $2.5 keeping Bob's $900 thousand guaranty. Mike F - So many moving parts, real estate taxes are due again in March, insurance is paid quarterly. Is the building heated now? To me, some of the ordinary every day quarterly and semiannual things are going to change our number. Are we going to continue to pay taxes? Mark – We are not paying any more until we get to Sheriff's sale in June. September is not paid and we will probably be faced with March taxes. Kurt - I am trying for more; the costs keep piling up. Mike F - What have we written off so far? Kurt -We have allocated $850 thousand. The month of December, should we consider a write down? Michael - Greg will be here. Mike - Bill will say for the benefit of the shareholders, charge some of this off. At some point in time, our overall book value, we need to get down to reasonable to accept an offer. Michael - That is what I think part of this discussion leads us to, if we are going to take $2.5 million, we need to do document what it is. Robust discussion held. Kurt- To Mark's comment, if they had $2.5 million that they were willing to spend on this, they would have shown some sign of life, they are not showing it. Collect or write us a check. Discussion held. Mike F - Any contact with IADA? Michael - No. Foreclosure discussion held. TIFF discussion held. Mark - There is a limited window for the IADA, end of next year, where they have to have the new buyer in. They want it completed by end of 2019.

Exhibit A
Page 25

Exhibit C
Draft Complaint for Equitable Subordination

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re | ) |
| | ) |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company, | ) Case No. 19-00507 ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |
| Address: | ) |
| 1110 North Grand Ave., #300 | ) |
| Charles City, Iowa 50616 | ) |
| | ) |
| Employer's Tax Identification No.: 46-3987825 | ) |
| | ) |
| | ) |
| MCQUILLEN PLACE COMPANY, LLC, | ) |
| | ) Adv. Pro. No. _____ |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FIRST SECURITY BANK & TRUST CO., | ) |
| | ) |
| Defendant. | ) |
| | ) |

COMPLAINT OF McQUILLEN PLACE COMPANY, LLC
FOR EQUITABLE SUBORDINATION OF THE LIEN
OF FIRST SECURITY BANK & TRUST CO.

Now comes McQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company, debtor, debtor-in-possession, and plaintiff herein ("MPC," "Debtor" or "Plaintiff"), by and through its attorneys, as and for its Complaint of the Debtor for Equitable Subordination of the Lien of First Security Bank & Trust Co. (this "Complaint"), pursuant to 11 U.S.C. §510, Rule 7001 of the Federal Rules of Bankruptcy Procedure, and other applicable law, respectfully states as follows:

JURISDICTION AND VENUE

52

1.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§157 and 1334(b).

2.      Venue for this Adversary Proceeding is proper in this Court pursuant to 28 U.S.C. Section 1409(a).

3.      This Adversary Proceeding and the causes of action herein constitute "core" proceedings within the meaning of 28 U.S.C. Section 157(b)(2)(A), (B), (K) and (0), and the Plaintiff consents to the Bankruptcy Court's entry of a final order.

4.      The statutory predicates for the claims brought in this Adversary Proceeding are 11 U.S.C. Section 510(c) and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

OVERVIEW

5.      Bankruptcy law has long permitted the subordination of creditor's claims where the creditor in question has behaved inequitably.  This Court's equitable power to review the conduct of creditors allows the Court to look beyond the technical legal justifications offered for odious conduct by a creditor to see, instead, the injustice that strict adherence to loan documents would mean to the creditor body as a whole, the bankruptcy estate, and the debtor.

6.      In this case, First Security Bank & Trust Co. ("First Security Bank") and Cedar Rapids Bank & Trust Co. ("CRB&T") (First Security Bank and CRB&T are hereinafter referred to collectively as the "Bank Group") have engaged in a pattern of conduct which is odious, over-reaching and abhorrent to the values expressed in the Bankruptcy Code and the law generally.  Justice would not be served by permitting this conduct to stand as a template to be used by aspiring unscrupulous and rapacious lenders in this jurisdiction.

7.      Specifically, the Debtor asserts that the Bank Group has engaged in the following inequitable behavior:

        a.      The Bank Group exploited its market dominance and decades of personal friendships to obtain, impose and exercise an unreasonable level of control of the assets of the Debtor, Charles Thomson ("Charles Thomson"), Amelia Management LLC ("Amelia

Management"), (Amelia Trust, the "Trust"), and Robert L. Thomson ("Robert Thomson") (the Debtor, Charles Thomson, Amelia Management, the Trust, and Robert Thomson are hereinafter referred to collectively as the "McQuillen Investors");

      b.      The Bank Group has abused its power to impose its preferences (which were driven by public relations objectives rather than economic reality) on the Debtor, ultimately forcing the Debtor to seek protection under Chapter 11 of Title 11 of the United States Code;

      c.      The Bank Group has breached its agreements with the Debtor by supplanting economically-based lending decisions with decisions based on personal pique and animus of individual directors toward the Debtor's operating personnel;

      d.      The Bank Group wrongly used its position of power over the Debtor to control the Debtor's construction priorities and the Debtor's choices on key vendors;

      e.      The Bank Group has abused its power and the legal process to convert, to itself, property to which it had no legal or equitable right, *i.e.*, the Debtor's development rights in McQuillen Place;

      f.      Contrary to its obligations under its own loan documents, the Bank Group has refused to negotiate in good faith (or at all) with the Debtor or third parties recruited by the Debtor, including a third-party which presented a letter of intent to the Bank Group offering to pay the full amount previously demanded by the Bank Group for its interests;

      g.      The Bank Group manipulated the trust and friendship of the McQuillen Investors to induce an elderly, infirm insider of McQuillen to settle with the Bank Group on terms that were irrational and wildly favorable to the Bank Group;

      h.      The Bank Group, frustrated at the Debtor's insistence on due process, resorted to the filing of deceptive (and arguably fraudulent) "emergency" motions before an Iowa court of law; these highly questionable filings directly precipitated the Debtor having to seek protection under Chapter 11 of Title 11 of the United States Code;

54

i.        Prior to the financing transaction between the Bank Group and the McQuillen, the Bank Group misrepresented to the McQuillen Investors the Bank Group's level of expertise in financings similar to that contemplated by the Debtor, the Debtor relied on such misrepresentations, and the Debtor later suffered catastrophic losses as a result of the lack of the Bank Group's expertise; and

j.        CRB&T, the member of the Bank Group which had most egregiously misrepresented its lending expertise, subsequently (but tacitly and secretly) acknowledged its errors to its partner in malfeasance, First Security Bank, by transferring $437,499.21 to First Security Bank pursuant to a secret settlement agreement, yet the Bank Group has refused to provide any of the settlement proceeds to the Debtor, the real party injured by the malfeasance.

8.        Through the actions described in the preceding paragraph, and through other actions, the Bank Group has caused significant economic injury to the creditors herein, the bankruptcy estate, and the Debtor. Moreover, these actions by the Bank Group, when taken as a whole, show a systematic pattern of unethical overreach, malfeasance, and obnoxious misconduct meriting subordination of the Bank Group's liens.

## PARTIES AND BACKGROUND

9.        In July 2012, Amelia Management Amelia Management purchased several properties in Charles City from Growth Properties, LLC ("Growth Properties").

10.        Pursuant to the agreement with Growth Properties, Amelia also acquired an option to purchase several parcels (the "Growth Parcels") located at the southwest intersection of Clark and North Main streets in Charles City.

11.        The Growth Parcels had been vacant since a fire destroyed a previous structure in 1987.

12.        Shortly after the purchase, Charles M. Thomson, one of the owners of both Amelia and the Debtor, was contacted by personnel from the local economic development office ("Community Revitalization") to discuss the possibility of applying for an approximately $3 million forgivable loan (the "Forgivable Loan") through the Iowa Economic Development Authority (the "IEDA").

55

13.   The Forgivable Loan was part of a program of the Federal government to provide communities with damage from the 2008 floods with replacement housing for housing units lost in the floods.

14.   The Growth Parcels, together with several city-owned parcels in the same city block but immediately to the south, formed a noticeable and unappealing gap of vacant, undeveloped, desolate land in the center of Charles City's North Main Street business district.

15.   The fact that the Growth Parcels and the adjacent parcels (collectively, the "McQuillen Site") had been vacant for more than 20 years provided a prospective developer with the opportunity to seek significant tax increment financing ("TIF") support for a development at the McQuillen Site.

16.   The personnel from Community Revitalization suggested that development of the McQuillen Site using the Forgivable Loan might both alleviate a shortage of housing in Charles City and eliminate a group of ungainly lots from the business district.

17.   The location of the McQuillen Site also qualified a development for state of Iowa development tax credits under the Enterprise Zone program (the "EZ Program"), which was also administered by the IEDA.

18.   With extensive assistance from personnel from the City of Charles City, Community Revitalization, Ron Fiscus of PlanScape Partners ("Ron Fiscus"), architecture and construction firm Cornice & Rose International ("C&R") and the North Iowa Area Council of Governments, Amelia Management submitted an application (the "Application") for the Forgivable Loan.

19.   The Application proposed a 33-unit, mixed-used development to occupy all of the vacant parcels at the McQuillen Site (the McQuillen Site, together with the improvements thereon, are hereinafter referred to as "McQuillen Place").

20.   On July 5, 2013, the IEDA announced that the McQuillen Place development had been awarded the Forgivable Loan.

21.   The IEDA Forgivable Loan program (the "IEDA Forgivable Loan Program") contained numerous requirements (the "IEDA Requirements") compliance with which was required for obtaining

56

funds. One of the IEDA Requirements mandated a development to rely not only on the funds from Forgivable Loan for constructing the building in question, but to utilize a certain amount of additional capital to provide the required number of dwelling units.

22.     With the assistance of Ron Fiscus, McQuillen Place developed a financial framework to complete the development. This framework included use of the funds from the Forgivable Loan, the EZ Program, TIF benefits, certain in-kind contributions from the McQuillen Place equity owners, and funds to be borrowed from private banks in exchange for the Debtor granting a lender a first mortgage on McQuillen Place (the "Mortgage Loan").

23.     During 2013 and 2014, representatives of the Debtor contacted numerous financial institutions and investors in an effort to place the Mortgage Loan.

24.     By virtue of the IEDA commitment of approximately $3 million through a forgivable loan, plus more than $1.5 million in TIF incentives, the McQuillen Place development had a significant equity cushion that, in most locations, would have made location a mortgage lender relatively straightforward.

25.     In many places, a mortgage loan having the equity cushion provided by the Forgivable Loan and the TIF benefits granted to the Debtor would have been readily made, and often without a private lender demanding collateral beyond the development itself and the "equity cushion."

26.     However, due to (a) uncertainty associated with its location in the rural Midwest, and (b) its location within the area traditionally serviced, for lending purposes, by First Security Bank, all prospective lenders save First Security Bank declined to provide financing for the development.

27.     First Security Bank eventually agreed to consider providing financing under the Mortgage Loan, but only after agreeing with CRB&T to have CRB&T act as "lead bank" on the loan.

28.     According to personnel from CRB&T, CRB&T had acted as lender on numerous projects in the Cedar Rapids area which had, like the Debtor, depended on complex IEDA assistance, much of it in the form of forgivable loans.

57

29.     First Security Bank sought CRB&T's expertise in administering the construction draws of

the Mortgage Loan and in handling the unusual (for most private bankers) government-provided

development assistance (the "Government Assistance") involved in the McQuillen Place development.

30.     The Bank Group agreed to jointly fund the Mortgage Loan, with CRB&T acting as lead

lender but owning a relatively small amount of the credit risk, and First Security Bank owning the vast

majority of the credit risk, but not being the lead lender until construction (and, hence compliance with the

majority of the federal and state development and lending regulations) was complete.  On information and

belief, the amount of the risk owned by First Security Bank is approximately ninety percent.

## FIRST SECURITY BANK'S POWER WITHIN
## THE CHARLES CITY LENDING MARKET

31.     The Debtor and the Bank Group eventually closed the Mortgage Loan on December 30,

2014 (the "Mortgage Loan Closing Date") under terms which gave the Bank Group substantial collateral

beyond McQuillen Place and the Government Assistance.

32.     Section 553.4 of the Iowa Code provides, "A contract, combination, or conspiracy between

two or more persons shall not restrain or monopolize trade or commerce in a relevant market."

33.     Iowa Code Section 553.12 provides, *inter alia*, that

"a person who is injured or threatened with injury by conduct prohibited under this chapter

may bring suit to:

"1.     Prevent or restrain conduct prohibited under this chapter and
remove the conduct's effect by injunction, divestiture,
divorcement, dissolution of domestic enterprises right to do
business in this state, compelling the forfeiture or restraint of the
issuance of a certificate of incorporation, permit to transact
business, license, or franchise, or granting other equitable relief.
[...]

"2.     Recover actual damages resulting from conduct prohibited under
this chapter.

"3.     Recover, at the court's discretion, exemplary damages which do
not exceed twice the actual damages awarded under subsection 2,
from a person other than a city or county or legal entity created by
a city or county, if:
"a. The trier of fact determines that the prohibited conduct is
willful or flagrant; and,
"b. The person bringing suit is not the state.

58

> "4.   Recover the necessary costs of bringing suit, including a reasonable attorney fee."

34.   As of June 30, 2017, First Security Bank had Charles City deposits of $150,109,000, which, according to the Federal Deposit Insurance Corporation, is 40.22% of the Charles City market.

35.   As of June 30, 2017, First Citizens Bank ("First Citizens") had Charles City deposits of $141,048,000, which, according to the Federal Deposit Insurance Corporation, is 37.79% of the Charles City market.

36.   First Security Bank and First Citizens have a combined market share in the Charles City market of 78.01%.

37.   The United States Department of Justice, in determining whether to take action against an alleged monopolist or businesses acting in restraint of trade under, *inter alia,* the Sherman Antitrust Act, 15 U.S.C. §§1–7, uses the Herfindahl-Hirschman Index ("HHI"). The basic process for determining the HHI of a given market is calculating the sum of the squares of the banks' shares of deposits in a given market.

38.   The current Department of Justice guidelines separate HHIs into three categories:

   a.   Less than 1,000 is "not concentrated";

   b.   Greater and 1,000 but less than 1,800 is "moderately concentrated";

   c.   Greater than 1,800 is "highly concentrated."

39.   The HHI in the Charles City market using just the First Security Bank and First Citizens market shares is 3,045.7325. The HHI for all banks in the market is 3,356.178.

40.   The President and Chief Executive Officer of the First Security Bank is Kurt Herbrechtsmeyer.

41.   Kurt Herbrechtsmeyer is also "Chair" of the Iowa Bankers Association.

42.   Kurt Herbrechtsmeyer is a frequent critic of the "unfair" status of credit unions in Iowa, suggesting that they have an unfair tax advantage compared to private banks. On February 19, 2018, the newspaper with the largest circulation in Iowa published an article by Kurt Herbrechtsmeyer entitled

59

"Credit Unions' Free Ride Hurts Iowa's Rural Communities." *See*,
https://www.desmoinesregister.com/story/opinion/columnists/iowa-view/2018/02/19/credit-unions-free-
ride-hurts-iowas-rural-communities/352224002/.

43. The only credit union located in Charles City is the Family Community Credit Union, with deposits of approximately $16,500,000, or approximately 11% of First Security Bank's deposits just in the Charles City (zip code 50616) market. The parent of First Security Bank has deposits exceeding $433,000,000, or 26 times the deposits of the local credit union, which is alleged to unfairly compete against First Security Bank.

44. Both First Security Bank and First Citizens have expanded in recent decades from their original locations in Charles City, expanding from two locations to 22 locations.

45. First Security Bank now has 13 locations throughout north central Iowa.

46. First Citizens now has 9 locations.

47. Aside from their original locations in Charles City, First Security Bank does not have a location in any city or town in which First Citizens has a location, and vice versa.

48. First Security Bank and First Citizens frequently purchase participations in each other's loans.

49. First Security Bank frequently sells loan participations on favorable terms to other banks in Iowa, particularly banks in proximity to the Charles City area.

50. Banks relying on income from favorably priced loan participations might be reluctant to engage in behavior which might decrease or eliminate the flow of future loan participations.

51. At least one bank in the Charles City area is reluctant to open an office in the Charles City market out of fear of retribution by the First Security Bank.

60

THE McQUILLEN PLACE
COLLATERAL PACKAGE

52.      In the course of the negotiations for the Mortgage Loan between the Debtor and First Security Bank, representatives of First Security Bank repeatedly asked for additional collateral from the Debtor or affiliated parties.

53.      In addition to a first lien on McQuillen Place, First Security Bank demanded a personal guaranty by Charles Thomson and Amelia Management, secured by all real estate owned by Charles Thomson or Amelia Management.  First Security Bank also demanded a lien on Charles Thomson's contingent interest in farm land near Cascade, Iowa, and his beneficial interest in a life insurance policy on the life of Charles Thomson's father, Robert L. Thomson ("Robert Thomson").

54.      Personnel from First Security Bank then indicated that "the board" was not satisfied with the collateral, and would not approve the Mortgage Loan without additional collateral in the form of a guaranty from Robert Thomson.

55.      On request of Charles Thomson, Robert Thomson consented to execute a guaranty in favor of First Security Bank for the Mortgage Loan.

56.      By the time the loan was finally closed (the "Mortgage Loan Closing") on Mortgage Loan Closing Date, the collateral (the "Initial Collateral") posted for the Mortgage Loan (of $3.8 million) included:

    a.      the Debtor's rights in the $2.8 million from the Forgivable Loan;

    b.      $800,000 in equity in properties owned by Amelia Management;

    c.      $150,000 in equity in Charles Thomson's personal residence;

    d.      $125,000 in Charles Thomson's beneficial interest in a life insurance policy on Robert Thomson;

    e.      $250,000 in Charles Thomson's contingent interest in a farm near Cascade, Iowa;

    f.      $900,000 in TIF benefits;

    g.      $900,000 in a personal guaranty from Robert Thomson;

61

h.      $500,000 in EZ benefits; and

l.      not less than $100,000 in the value of the lots under McQuillen Place.

57.      Although each item in the collateral package had varying contingencies to collection (and some were rights not vested), the total amount of the face value of the collateral package was $6,520,000.

58.      The maximum loan-to-value ratio in the Charles City market is 80:100, meaning that a bank will not extend credit if the value of the collateral backing an $800,000 is less than $1,000,000.

59.      The loan-to-value (using the face value of the collateral) of the Initial Collateral was approximately 63:100.

60.      By the time the Mortgage Loan closed, the negotiated plan for the financing included a portion of the final loan to be purchased by First Citizens.

61.      First Security Bank, a member of the Bank Group and the majority owner of the Mortgage Loan, has established and maintains a duopoly in restraint of trade in the Charles City, Iowa, banking services market.

62.      This restraint of trade permitted the Bank Group to obtain terms from the Debtor on the Mortgage Loan which would not have been available to the Bank Group had market forces been permitted to operate.

63.      Each loan made by First Security Bank which has terms more favorable to First Security Bank than would be available to First Security Bank in a free market environment sustains and increases First Security Bank's market position in the Charles City market for banking services, and is, accordingly, a contract in furtherance of restraint of trade.

64.      In October 2017, for reasons explained below, the Debtor ceased construction activities on McQuillen Place.

65.      Between October 2017 and the date of the petition herein, the Debtor and related parties have offered numerous options and frameworks to the Bank Group in an attempt to restart construction and complete the building.

66.     At one point during these negotiations, a representative of the Bank Group suggested that
a guarantor, Robert Thomson, should contribute (as an equity investor) cash to finish the construction, with
the Bank Group agreeing to reduce the remaining obligations under the guaranty by one dollar for each
dollar used in construction (hereafter, the "Dollar-for-Dollar Proposal").

67.     Subsequently, the Debtor, after negotiations with Robert Thomson, offered the Dollar-for-
Dollar Proposal (with Robert Thomson investing $900,000 cash into the construction, through a controlled
disbursement account to be held by the Bank Group.)

68.     The Bank Group rejected the Dollar-for-Dollar Proposal on February 13, 2017.

69.     The Debtor has been injured by this restraint of trade by (a) not being able to obtain the
Mortgage Loan from a competing source, which likely would have demanded less collateral from the
Debtor's affiliates; (b) not being able to refinance the Mortgage Loan with a competing source, which
likely would have permitted the Debtor to use funds from Robert Thomson to complete construction of the
building; and (c) not having a lender willing to negotiate in good faith, inasmuch as a reasonable lender
would have permitted (indeed embraced) the Dollar-for-Dollar Proposal.

## FIRST SECURITY BANK'S CLOSE
## RELATIONSHIP TO THE McQUILLEN INVESTORS

70.     Charles Thomson has been a depositor at First Security since approximately 1965. Charles
Thomson's current personal residential mortgage loan is from First Security.

71.     Every automobile purchased by Charles Thomson has been financed by First Security.

72.     Amelia Management acquired the properties from Growth Properties using a loan from the
First Security.

69.     Robert Thomson has been a depositor at First Security since approximate 1953, is a former
member of the Board of Directors of the First Security, and is currently an Emeritus Director.

73.    Robert Thomson has utilized investment advice of persons affiliated with the First Security, and Robert Thomson, from approximately 1970 to 2007, was a business partner with one of the First Security's principal equity security holders.

74.    Charles Thomson's mother, Janan M. Thomson, was a customer of First Security from approximately 1935 until her death in 1993.

75.    Charles Thomson's maternal grandparents, Charles Walsh McQuillen and Ellen Francis Bradley McQuillen, were customers of First Security (or its corporate predecessor(s)) from approximately 1914 to their deaths in 1945 and 1981, respectively.

76.    Each of Charles Thomson's three siblings has been or is a customer of First Security.

77.    The extensive interlocking financial and social connections between the members of the Thomson family and the First Security establish that a "confidential relationship" (as that term is used in Wine, J.C., *Lender Liability Under Iowa Law*, 39 Drake L. Rev., 645, 648-652 (1990)) exists between the First Security, as bank, and the Thomson family, as customers of the bank.

78.    First Security Bank, by virtue of its comparative size in the Charles City, Iowa, lending market, holds a huge advantage in bargaining power over a borrower such as the Debtor.

79.    First Security Bank's position in the market precludes borrowers such as the Debtor from obtaining loans where less collateral is demanded, or where a lower interest rate would be demanded.

80.    The Debtor (together with its affiliated parties) was compelled, as a condition to obtaining the Loan, to grant the Bank Group security interests in more collateral that would have been demanded by a similarly situated borrower in a lending market where robust competition among lenders prevailed.

81.    The Bank Group intentionally exploited First Security's market position and relationship to the Thomson family to obtain, for its own benefit and to the detriment of the Debtor, property interests which Bank Group would not have otherwise obtained.

82.    The compelled transfer of these property interests gave the Bank Group an undue and unconscionable advantage which has, as a proximate and foreseeable result, exposed the Debtor to undue financial harm.

64

83. The provisions of the Mortgage Loan pursuant to which collateral was transferred to the Bank Group from the Debtor and the Affiliated Parties was unconscionable at the time the contract was made.

## THE BANK GROUP'S ALLEGED LENDING EXPERTISE

84. The Bank Group represented to the Debtor that the Bank Group (i.e., CRB&T) had vast experience and expertise in transactions involving economic development assistance from the State of Iowa.

85. The Bank Group knew that the Debtor was relying and would continue to rely on the Bank Group's expertise in in transactions involving economic development assistance from the State of Iowa.

86. Throughout the negotiation of the Mortgage Loan and, following its closing, during its administration, the Bank Group, through CRB&T, repeatedly referenced its familiarity with various state economic development incentives involved in the financing of McQuillen Place. The incentives so referenced included, but were not limited to, the IDEA Forgivable Loan Program and the EZ Program.

87. Following Mortgage Loan Closing, construction progress on McQuillen Place was delayed by a number of factors, including a shortage of skilled tradespersons in the Charles City area, failures of subcontractors to adhere to deadlines, the refusal of a key vendor to work with MidAmerican Energy, and multiple changes in standards and design parameters imposed unilaterally by staff of MidAmerican Energy.

88. The delays resulted in the parties to the Mortgage Loan agreeing to extend the term of the Mortgage Loan in order to complete construction of McQuillen Place.

89. Preceding each renewal and extension of the Mortgage Loan, the Bank Group provided the Debtor with detailed guidance and recommendations on steps to take to maintain the project's compliance with the various state economic incentive programs.

90. This proffering of guidance was consistent with the repeated assurances that CRB&T was intimately familiar with administration of loans in which state economic incentive programs were a key funding component.

91. On September 19, 2013, the Debtor applied for assistance, in the form of development tax credits, from the IEDA under the EZ Program.

92.     On October 23, 2013, the Director of the IEDA signed a letter (the "EZ Award Letter") granting the Debtor's application for credits under the EZ Program.

93.     The application for assistance under the EZ program and the EZ Award Letter were provided by the Debtor to the Bank Group prior to the Mortgage Loan Closing.

94.     In July 2017, the Debtor was asked by CRB&T to make arrangements for the sale of the anticipated EZ credits (the "EZ Credits") as part of what was anticipated by the parties to the Mortgage Loan to be a final renewal and extension prior to completion of the building.

95.     In early August 2017, the Debtor was notified by the IEDA that the original issuance of the EZ Award Letter was to have been accompanied by a "contract" setting forth additional terms and conditions for the EZ Program beyond those referenced in the EZ Award Letter.

96.     One of the additional terms and conditions to have been set forth in the contract was a two-year expiration rule (the "Two-Year Rule"). The IEDA asserted that the Two-Year Rule was applicable to all EZ Programs in general and to the Debtor in particular, notwithstanding absence of notice of the Two-Year rule in the EZ Award Letter.

97.     On information and belief, the EZ Program has been a funding component of numerous loans and construction projects in which the Bank Group and its members have participated.

98.     The approximate amount face amount of the EZ Credits to which the Debtor would be entitled in the absence of the Two-Year Rule was $700,000. The approximate amount of net proceeds from the sale of such credits (the "EZ Benefits") would have been $500,000.

99.     The net increase in availability of funds (through an increase in the collateral package held by the Bank Group) would have been sufficient to obtain a certificate of occupancy for at least some of the residences at McQuillen Place.

100.     Obtaining a certificate of occupancy would have permitted the Debtor to use the cash flow from rented units to fund completion of the remaining units and to start the process of obtaining infusion of the TIF funds into the project.

101.     Following discovery of the Two-Year Rule by the Debtor, the Bank Group refused to extend any additional credit to the Debtor.

102.     The Bank Group knew, or should have known, about the Two-Year Rule.

103.     The Bank Group knew that the Debtor was relying on the EZ Benefits to provide funds for the construction of the building.

104.     The Bank Group had a duty to notify, *inter alia*, the Debtor about the Two-Year Rule prior to the Mortgage Loan Closing.

105.     The Bank Group never notified the Debtor about the Two-Year Rule.

106.     The Debtor has been injured and damaged as a result of the Bank Group's failure to notify the Debtor about the Two-Year Rule.

107.     The Bank Group had a responsibility to the Debtor to take due care to protect the Debtor's financial interest in the EZ Benefits.

108.     The Bank Group not only failed to take due care to protect the Debtor's financial interest in the EZ Benefits, the Bank Group failed to take any level of care to protect such interests.

109.     Any and all default(s) of the Debtor under the Mortgage Loan are the direct and proximate result of the Bank Group to exercise due care over collateral pledged to the Bank Group under the Mortgage Loan, viz. the EZ Credits.

110.     The Bank Group's failure constitutes unclean hands and bars the Bank Group from enforcing the provisions of the Mortgage Loan.

111.     The Bank Group knew, or should have known, that it either lacked detailed knowledge of economic development incentives programs in Iowa, or that it had no capacity to assist borrowers in any meaningful way in transactions involving economic development incentives in the State of Iowa.

112.     The Bank Group knew that the Debtor was relying on the Bank Group's representations of expertise in transactions involving economic development incentives in the State of Iowa.

113.     The Debtor relied to its detriment on the representations of the Bank Group concerning the Bank Group's expertise in transactions involving economic development incentives in the State of Iowa.

67

114.   Among other things, the Debtor would not have entered into the Mortgage Loan if it had been aware of the Bank Group's lack of expertise in or lack of meaningful capacity to administer transactions involving economic development incentives.

115.   The Mortgage Loan was, accordingly, obtained by fraud by the Bank Group.

116.   Four guarantors under the Mortgage Loan, Robert Thomson, Charles Thomson, Amelia Trust and Amelia Management (collectively, the "Guarantors"), have rights of subrogation against the Debtor by virtue of this action.

117.   The Debtor would not have sought or permitted the Guarantors to become involved with, much less guaranty, the Mortgage Loan had the Bank Group disclosed that it would not or could not protect or assist the Debtor in maintaining its interest in the EZ Credits.

118.   The Bank Group's failure to disclose such information to the Debtor resulted in an increase in the Debtor's exposure to subrogation claims, to the detriment of creditors.

## MANIPULATION OF CLOSING DATES FOR FEES

119.   The Mortgage Loan Closing Date was set by the Bank Group.

120.   The sole discernable reason for the Mortgage Loan Closing Date was to permit the Bank Group to book income in 2014, rather than 2015.

121.   The Bank Group had a duty to the Debtor to act in good faith and to deal fairly.

122.   By selecting a closing date to accommodate only the interests of the Bank Group, rather than the interests of the Debtor, the Bank Group engaged in opportunistic and predatory behavior.

123.   The Debtor suffered economic injury as the proximate result of the Bank Group setting the closing date of the Mortgage Loan for the Mortgage Loan Closing Date.

68

FIRST SECURITY BANK SPREADS PRIVATE
INFORMATION (SOMETIMES, FALSE PRIVATE
INFORMATION) ABOUT THE McQUILLEN INVESTORS
TO VARIOUS THIRD PARTIES

124.    First    Security    Bank    publicly    states    in    its    "Privacy    Policy"
(https://www.1stsecuritybank.com/assets/1436904169-Privacy-Policy.pdf) that it uses security measures to
prevent disclosure of confidential information of its customers to the general public.

125.    First Security Bank publicly states that it maintains privacy rules which comply with all
applicable Federal and state laws.

126.    First Security Bank's public representations regarding its privacy policy (the "Privacy
Policy") constitute part of the contractual agreement between First Security Bank and its customers.

127.    The Debtor is a customer of First Security Bank.

128.    The Privacy Policy is part of the contract between First Security Bank and the Debtor.

129.    The provisions of 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq.* restrict the release
of confidential customer information in possession of a bank to third parties.

130.    On information and belief, on March 7, 2014, a member of the board of directors (the
"Board") of the First Security Bank told a third party (a bartender) that the McQuillen Place transaction
was "dead as a doornail" because it had lost its financing.  (The conversation described in this paragraph is
hereinafter referred to as the "March Statement.")

131.    The March Statement was not true.

132.    The March Statement tended to impugn the business prospects of the Debtor.

133.    On information and belief, during the period between August 1, 2014 and September 5,
2014, one or more members of the Board spoke to members of the City Council of the City of Charles City,
Iowa (the "City Council") and made certain statements (the "August Statements") concerning the
McQuillen Place development.

69

134.    At the time of the August Statements, the City Council was considering a proposal by the Debtor for the City of Charles City to provide, *inter alia,* tax increment financing benefits to the proposed McQuillen Place development to make the development economically viable.

135.    On information and belief, the August Statements were extremely negative toward the proposed transaction, criticized the proposed transaction for relying on subsidies from the government, and suggested the long-term prospects for the financing of the project were poor.

136.    The August Statements tended to impugn the business prospects of the Debtor.

137.    On information and belief, during February 2018, a person employed by First Security Bank disclosed to a third party (a) details of an appraisal dated January 12, 2018, and (b) specific details of positions taken by various parties during loan modification negotiations between the Debtor and First Security Bank during the first weeks of February, 2018 (the "February Statements").

138.    The February Statements tended to impugn the business prospects of the Debtor.

139.    The March Statement, the August Statements and the February Statements were presented to the recipients of the information as true and accurate depictions of the status and prospects of the Debtor and its interests.

140.    The information contained in the March Statement, the August Statements, and the February Statements is confidential information the disclosure of which is prohibited by 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq.,* and, by reference, the Privacy Statement.

141.    The utterance of the March Statement, the August Statements, and the February Statements is a breach of the contract between First Security Bank and the Debtor.

142.    The content and context of the March Statement, the August Statements, and the February Statements indicates that the statements were made intentionally and were, moreover, made in a hostile manner and with the intention of injuring the business prospects of the Debtor.

143.    The Debtor has been injured by the breach of contract described in the preceding paragraph.

144.    First Security Bank had a duty to hold private and confidential information pertaining to the Debtor.

70

145.     Personnel from First Security violated this duty by uttering the March Statement, the August Statements, and the February Statements.

146.     The Debtor has been damaged by this breach of duty by First Security Bank.

147.     The Debtor is and was known to First Security Bank to be engaged in a business where good businesses character and conduct are essential to success and well as survival.

148.     The March Statement, the August Statements, and the February Statements were calculated by the persons uttering them to interfere with and diminish the reputation of the Debtor, including, but not limited to, the reputation of the Debtor for good business character and conduct.

<div align="center">THE BANK GROUP HAS REPEATEDLY VIOLATED<br>ITS DUTY OF GOOD FAITH AND FAIR DEALING</div>

149.     The Bank Group had (and has) a duty to negotiate with the Debtor in good faith.

150.     Part of the duty to negotiate in good faith is to consider and accept proposals in a manner consistent with that of a reasonable bank acting under similar circumstances.

151.     The minutes of various meetings of the First Security Bank board and board committees (attached hereto as Exhibit A) (the "Minutes") show that First Security Bank (i) has used criteria other than its obligations under the Loan Documents and economically rational analysis to arrive at positions vis a vis the Debtor, (ii) has attempted to impose the priorities of individual members of the First Security Bank board of directors on the Debtor, (iii) has attempted to interfere with the personnel choices of the Debtor, (iv) has wrongly attempted to control and obtain ownership of assets (specifically, the McQuillen Place development rights) which the Bank Group does not own and on which it does not have a perfected lien.

152.     According to the Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on September 14, 2017:

> *Dick Herbrechtsmeyer:*
>
> It is time to talk to Charlie [sic]. … Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it.
>
> *Kurt Herbrechtsmeyer:*

Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. [....]

*Gene Hall:*

I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done.

153.     According to the Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on March 8, 2018:

*Kurt Herbrechtsmeyer:*

They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, the need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. [....]

The most is completing the windows. Windows on the first floor and completing the sidewalk. [W] are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff we have to be willing to take it on. [....] We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. [....]

*Dick Herbrechtsmeyer:*

[T]here may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio. [....]

*Gene Hall:*

I absolutely agree that if the bank finishes the project, [I] agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has.

*Dick Herbrechtsmeyer:*

I can assure you one thing, Directors will pay to have McQuillen removed.
][….]

*Kurt Herbrechtsmeyer:*

[….] The other prospect that pushed me across, other alternative was that we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this. From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. [….]

*Dick Herbrechtsmeyer:*

[….] PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both. [….]

*Gene Hall:*

Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

154.     The Debtor currently owns, and at all relevant times herein has owned, McQuillen Place and the business prospects, future income, going concern value, and economic advantages deriving from the collection of assets known as "McQuillen Place."

155.     The Debtor is, and at all relevant times herein has been, a for-profit limited liability company.

156.     The basic substance of the Mortgage Loan transaction was that the Bank Group would lend money and provide related financial accommodations to the Debtor to facilitate the construction of the McQuillen Place.

157.     As long as the Debtor owns the assets known as "McQuillen Place," First Security Bank owes McQuillen Place Company a duty of good faith and fair dealing with regard to the McQuillen Place assets and with regard to the Mortgage Loan.

158. The Bank Group does not have a perfected lien on any of the personal property of the Debtor.

159. The Bank Group has not filed a Uniform Commercial Code financing statement to perfect any lien on personal property of the Debtor.

160. The right to develop McQuillen Place, the books and records of McQuillen Place, and the future business expectations of McQuillen Place are all personal property of the Debtor.

161. A secured lender does not, by virtue of a security agreement or a mortgage, gain the right to seize the assets of a borrower outright simply because either (a) the officers of the lender become convinced they can operate the assets more efficiently than their borrower, or (b) become convinced that ownership of the assets might somehow burnish the lender's corporate image.

162. Lenders continue to owe a duty of good faith and fair dealing to borrowers at all times during the creditor-debtor relationship.

163. First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced they can operate McQuillen Place more profitably or efficiently than McQuillen Place Company.

164. First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced their operation of McQuillen Place might burnish their corporate image.

165. First Security Bank, Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall are, and at all relevant times herein have been, aware of the facts stated in the foregoing paragraphs 154 through 164.

166. Notwithstanding their knowledge of the ownership of McQuillen Place, and notwithstanding their obligation, as directors, to cause First Security Bank to act in good faith in its contractual relationship with McQuillen Place Company, Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer,

and Gene Hall concocted, supported and evangelized on behalf of a scheme for First Security Bank to seize control of McQuillen Place in order to, among other things, advance their own public relations agenda.

167. The scheme was to make First Security Bank appear as "heroes" rather than "bad" bankers, because it would be the bankers of First Security Bank who "showed up" and finished construction by drawing on their own funds and obtaining additional funds from other banks through new, senior debt on the property.

168. At no point since September 30, 2017, has First Security Bank offered to McQuillen Place or its principals any proposal (a) to advance additional funds for completion of construction of McQuillen Place, or (b) to permit new, senior financing from another institution to be used to complete construction of McQuillen Place.

169. At no point in the Minutes do the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall (or any other participant in the meetings) suggest offering any proposal for a neutral third-party agreeable to both the Debtor and the Bank Group to (a) obtain additional funds for completion of construction of McQuillen Place, or (b) obtain additional funds through new, senior financing from another institution.

170. Although the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall knew that First Security Bank was able to advance additional funds to complete construction and/or accept subordination to a new senior lender, the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall only mentioned this as an option in the context of First Security Bank seizing the property and assuming the role of developer.

171. The plan advocated by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall was intended to exclude any other person or entity from coming in as "heroes" to finish construction, because the "hero" role was to be reserved for First Security Bank.

172. This reservation of the "hero" role for First Security Bank was recommended by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall without regard or consideration of the possibility

75

that, in terms of net returns, some other arrangement might have actually been more beneficial for First Security Bank as an institution.

173.    The sole option promoted by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall involved the bank seizing control of the future business prospects of its borrower so that First Security Bank can exploit its borrower's assets for its own gain.

174.    The tenor of the comments of the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall indicates that they were motivated not by concern for the assets of First Security Bank, but by pique at one of McQuillen Place's principals, by the desire to inflate their own standing in the local community as "heroes," and by an inexplicable (and irrational) desire to change the nameplate on the building.

175.    Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall accordingly intentionally advocated cutting off negotiations immediately and commencing a legal action as quickly as possible.

176.    In so doing, the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall acted in bad faith, intentionally interfered with the contract between the Counterclaimants and First Security Bank, and caused damage to the Debtor.

177.    No reasonable bank, when offered cash by a guarantor to complete a building held as collateral by the bank, would refuse such an offer solely on the basis of requesting additional security from a guarantor.

178.    The reasonableness of the offer of the Debtor and its Affiliated Parties to contribute $900,000 to complete the construction of McQuillen Place, in exchange for a dollar-for-dollar reduction in guaranty obligations, is demonstrated by the fact that Gary Becker, of CRB&T, initially suggested the proposal.

179.    The Bank Group breached its duty of good faith and fair dealing by refusing the proposal.

180.    The Debtor has been injured by this breach of duty.

CRB&T AND THE IEDA FUNDS

181.    In September 2017, funds from IEDA were deposited with CRB&T.

76

182.     Instead of making these funds available to the Debtor to permit further construction, CRB&T used these funds to pay accumulated interest on the Mortgage Loan.

183.     If these funds had been made available to the Debtor, the Debtor, through its vendors, could have completed sufficient work on McQuillen Place to obtain a temporary certificate of occupancy (the "TCO").

184.     If the Debtor had obtained the TCO, it would have been able to start renting units at McQuillen Place, and could have generated funds with which it could have finished the rest of the building.

185.     The hardship to the Debtor by offsetting these funds greatly outweighed the temporary benefit CRB&T obtained by offsetting interest charges.

186.     CRB&T had a duty to evaluate the relative harm to the parties from its actions and, in this case, to permit the Debtor to use the funds to pursue construction.

187.     CRB&T breached the duty described in the preceding paragraph.

188.     The Debtor has been injured by this breach of duty.

189.     In refusing reasonable offers by the Debtor and its Affiliated Parties to inject cash into the development to finish construction, the Bank Group is attempting to use continuing interest charges and default fees to run up the total amount of the debt.

190.     Since the Bank Group has numerous pieces of collateral, the effect of running up the debt will be to award the Bank Group a windfall.

191.     The Bank Group has a duty to avoid obtaining a windfall when its borrower, the Debtor, has presented a reasonable plan to make the Bank Group whole while avoiding a windfall.

192.     The Bank Group has breached the duty described in the preceding paragraph.

193.     The Debtor has been injured by this breach of duty.

### PAYMENT OF REAL ESTATE TAXES

194.     In late June 2018, the Bank Group elected to pay approximately $230,000 in real estate taxes on McQuillen Place.

195.     The Bank Group did not consult with the Debtor prior to making this payment.

77

196.     Prior to the Bank Group making this tax payment, the Debtor had informed the Bank Group that the Debtor was going to ask the taxing authority to abate the taxes in question.

197.     The taxes in question are based on an assessment of the building being completed and in service.  Since the building, when the taxes were paid, had not yet completed and was not in service, the amount of the assessment (and thus of the taxes) should have been lower.

198.     By paying the taxes, the Bank Group has diminished, if not eliminated, the ability of the Debtor to seek abatement from the relevant taxing authority.

199.     The Bank Group had a duty to not expend funds on the Debtor's behalf in a manner that needlessly increased the Debtor's tax obligations.

200.     The Bank Group has breached the duty described in the preceding paragraph.

201.    The Debtor has been injured by this breach of duty.

Now, wherefore, the Debtor respectfully requests that this Court enter an order:

a.    subordinating all liens, claims and encumbrances of the Bank Group (or any of them) in any asset of the Debtor to a priority in distribution below that of all claim and interest holders in and of the Debtor, including, but not limited to, those of the unsecured creditors and the owners of the Debtor's equity;

b.    in the alternative, disallowing the claims of the Bank Group in the Chapter 11 case of the Debtor in their entirety; and/or

c.    granting the Debtor such other and further relief as may appear to the Court equitable and just under the circumstances.

Respectfully submitted,

McQUILLEN PLACE COMPANY, LLC, an
Iowa limited liability company

By: _____
         One of its Attorneys

79

Exhibit D
Description of Litigation Trust Agreement

The Litigation Trust Agreement will establish a mechanism by which the Litigation can be pursued by appropriate counsel. The proceeds from the Litigation shall be deposited, in trust, for subsequent distribution to creditors pursuant to the Plan.

Exhibit E
Description of Sale Agreement

The Sale shall transfer the Assets from the Debtor to MPC2 in exchange for a series of promissory notes from MPC2 and a commitment by MCP2 to finish the construction of McQuillen Place. MPC2 will be comprised of parties previously unrelated to the McQuillen Place Development who have inspected the building and elected to fund, through their own resources, the completion of the building. Holders of equity in the Debtor may be able to obtain warrants for the purchase of ownership units in MPC2, but only upon the contribution of new value to MCP2. All such transactions shall be submitted for review and approval by the Bankruptcy Court prior to confirmation of the Plan. The Sale Agreement shall contain a number of conditions precedent (such as approval by the Bankruptcy Court, approval of transfer of certain tax benefits, etc.) which will need to be fulfilled prior to the transaction being consummated.

Exhibit F
MPC2 Promissory Note A

Charles City, Iowa
Dated: _____, 2019

Promissory Note

The undersigned, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby promise to pay First Security Bank & Trust Company, on or before the first calendar year anniversary of this Promissory Note, the sum calculated as follows

[Pro-Rata Share of First Security Bank of the Unsecured Claims Distribution Amount][1.05]

provided, however, that this Promissory Note may be prepaid at any time without penalty, and that this Promissory Note is subject to the provisions and conditions of that certain Plan of Reorganization of McQuillen Place Company, LLC, dated October 4, 2019, and confirmed by the Order of _____, 2019, of the Bankruptcy Court for the Northern District of Iowa.

MPC2, LLC, an Iowa limited liability company

By: _____
Its: Managing Member

Exhibit G
MPC2 Promissory Note B

Charles City, Iowa
Dated: _____, 2019

Promissory Note

The undersigned, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby promise to pay First Security Bank & Trust Company, the following amount:

the "Deficiency Claim Asserted by First Security Bank" as
defined in that certain Plan of Reorganization of
McQuillen Place Company, LLC, dated
October 4, 2019, and confirmed by the
Order of _____, 2019, of the Bankruptcy Court
for the Northern District of Iowa (the "Plan")

in three hundred sixty (360) equal monthly installments commencing six (6) months from the date hereof, provided, however, that this Promissory Note may be prepaid at any time without penalty, and that this Promissory Note is subject to the provisions and conditions of the Plan.

MPC2, LLC, an Iowa limited liability company

By: _____
Its: Managing Member

83

Exhibit H
Form of Litigation Trust Certificate

Litigation Trust Certificate

<div style="text-align: right">

Charles City, Iowa
Dated: _____, 2019

</div>

The Trustee (the "Trustee") of the Litigation Trust (the "Trust") created pursuant to the Plan of Reorganization of McQuillen Place Company, LLC, Case No. 19-00507, N.D. Iowa, does hereby promise to pay, and attests that the holder of this certificate may claim, _____ percent (_____%) of the net proceeds of recoveries of the Trustee for the Trust.

<div style="margin-left: 40%">

Trustee (the "Trustee") of the Litigation Trust (the "Trust") created pursuant to the Plan of Reorganization of McQuillen Place Company, LLC, Case No. 19-00507, N.D. Iowa

By: _____
     Trustee, not personally, but solely as Trustee

</div>

84

CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the ___4th___ day of October, 2019.

/s/ Donald H. Molstad
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Label Matrix for local noticing
0862-4
Case 19-00507
Northern District of Iowa
Mason City
Fri Oct  4 11:06:05 CDT 2019

Amelia Management, LLC
1110 N. Grand Avenue, Ste. 300
Charles City, IA 50616-2139

Amelia Trust
c/o Charles M. Thomson, Trustee
1110 North Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Amelia Trust
c/o Judith M. O'Donohoe
PO Box 307
116 N. Main Street
Charles City, IA 50616-2015

Atlas Painting
911 Sycamore Street
Waterloo, Iowa 50703-4815

BRP Bruening
900 Montgomery Street
Decorah, Iowa 52101-2343

Bergan KDV
P.O. Box 2100
Waterloo, IA 50704-2100

Bluhm's Cedar Valley Electric
409 South Johnson Street
Charles City, Iowa 50616-2621

Cedar Rapids Bank & Trust Company
500 First Avenue, NE
PO Box 789
Cedar Rapids, IA 52406-0789

Cedar Rapids Bank & Trust Company
c/o Joseph E. Schmall
PO Box 2804
Cedar Rapids, IA  52406-2804

Cedar Rapids Bank & Trust Company
c/o Laura M. Hyer
PO Box 2804
Cedar Rapids, IA  52406-2804

Cerro Gordo County, Iowa
Carlyle D Dalen
Asst. County Atty.
220 N. Washington Ave.
Mason City, Ia 50401-3220

Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Cincinnati Insurance
Post Office Box 145496
Cincinnati, OH 45250-5496

City of Charles City, IA
c/o Brad Sloter
200 North Johnson Street
Charles City, IA  50616

City of Charles City, Iowa
105 Milwaukee Mall
Suite 2
Charles City, IA 50616-2280

Cornice & Rose International, LLC
804 Roberts Road
Barrington, IL 60010-1142

Cornice & Rose Intl Ltd.
804 W Roberts Road
Barrington, IL 60010-1142

Custom Air
Brett Payton
10443 Osage Rd
Waterloo, IA 50703-9349

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
Cedar Rapids, IA 52401-1110

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
P.O. Box 2877
Cedar Rapids, IA 52406-2877

Dean Snyder Construction
913 N. 14th Street
Clear Lake, Iowa 50428-2138

(p)CEDAR VALLEY STEEL INC
280 50TH AVE SW
CEDAR RAPIDS IA 52404-4933

Donald H Molstad
505 6th St , Suite 308
Sioux City, Ia 51101-1201

Larry S. Eide
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Elwood Law Firm
116 N. Main Street
Charles City, Iowa 50616-2015

Elwood Law Firm
c/o Judith O'Donohoe
116 North Main Street
PO Box 307
Charles City, IA  50616

First Security Bank & Trust Company
809 Clark Street
Charles City, IA 50616-2208

First Security Bank & Trust Company
809 Clark Street
PO Box 577
Charles City, IA 50616-0507

First Security Bank & Trust Company
c/o Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Floyd County Treasurer
101 South Main Street #303
Charles City, Iowa 50616-2792

Hawkeye Alarm
16 Commercial Street
Waterloo, Iowa 50701-1310

Hildreth & Co., LLC
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Laura Michelle Hyer
Bradley & Riley, PC
PO Box 2804
Cedar Rapids, IA 52406-2804

IL Switchboard
125 West Laura Drive
Addison, IL 60101-5178

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Iowa Economic Development Authority
200 East Grand Avenue
Des Moines, Iowa 50309-1834

Jed Construction
102 Grand Street
Elma, Iowa 50628-8189

Jendro Sanitation
108 Prospect Lane
Charles City, Iowa 50616

Judith Mack Odonohoe
P O Box 307
116 N Main St
Charles City, Ia 50616-2015

Kamm Excavating Corp
1301 Hildreth Street
Charles City, IA 50616-3663

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines IA 50309-2108

Larry Steven Eide
103 E. State St., Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Laura Michelle Hyer
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

MAS
41W195 Railroad Street
Pingree Grove, IL 60140-8980

McQuillen Place Company, LLC
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

Mediacom
1 Mediacom Way
Mediacom Park
New York, NY 10918-4810

Mick Gage Plumbing & Heating
511 West Milwaukee Street
New Hampton, Iowa 50659-1105

Mid American Energy
666 Grand Ave.
Des Moines, Iowa 50309-2580

Midwest Engineering
8236 W. 51st Street
Sioux Falls, SD 57106-7861

Midwest Fire Sprinkler
2001 De Wolf Street
Des Moines, Iowa 50316-2761

(p)MILLS INC
1906 GILBERT ST
CHARLES CITY IA 50616-9171

Donald H. Molstad
701 Pierce St., Ste. 305
Sioux City, IA 51101-1037

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616-0307

O'Hara's Son Roofing Corporation
3306 N. Knox Avenue
Chicago, IL 60641-4434

Allen O. Pederson
412 Sample Street
Nashua, IA 50658-9696

Pederson Plumbing
412 Sample Street
Charles City, IA 50616

Pederson Plumbing
Allen O. Pederson
412 Sample Street
Nashua, Iowa 50658-9696

Phillips Modern Ag
2153 S. Linn Ave.
New Hampton, Iowa 50659-9414

Planscape Partners
1200 Nicollet Ave.
Suite 706
Minneapolis, MN 55403-2409

Premier Cleaners
816 First Avenue N
Fort Dodge, IA 50501-3906

Randall Eugene Nielsen
P O Box 1588
103 E State St ,Suite 800
Mason City, IA 50401-3334

Robert Cardell Gainer
505 5th Ave Suite 835
Des Moines, IA 50309-2317

Schindler Elevator Corporation
1530 Timberwolf Drive
Holland, Ohio 43528-9161

Schindler Elevator Corporation
20 Whippany Rd
Morristown, NJ 07960-4524

Schindler Elevator Corporation
c/o NCS, 729 Miner Rd
Highland Hts, OH 44143-2117

Joseph E. Schmall
2007 First Avenue SE
PO Box 2804
Cedar Rapids, IA 52406-2804

Sherri Dralle
1308 Grandview Ave.
Waverly, IA 50677-1038

Christine B. Skilton
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Bradley David Sloter
Noah Smith & Schuknecht PLC
200 North Johnson St.
Charles City, IA 50616-1939

T-J Service, Inc.
221 N. Main St.
Charles City, IA 50616-2016

T-J Service, Inc.
Tom Brock, President
221 North Main Street
Charles City, Iowa 50616-2016

T-J Service, Inc.
c/o Christine B. Skilton
205 Brasher Street, PO Box 39
Nashua, IA 50658-0039

Charles McQuillen Thomson
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

United States Trustee
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2103

Unruh Insulation
2633 450 St.,
Stacyville, Iowa 50476-7549

VanMeter
850 32nd Ave. SW
Cedar Rapids, Iowa 52404-3913

Vernon P Squires
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

L Ashley Zubal
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309-2106

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Design Build Structures
7518 Peosta Industrial Drive
Peosta, Iowa 52068

Mills, Inc.
Kelvin E. Keiffer, President
1906 Gilbert St.
Charles City, Iowa 50616

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u), IA                          (u)Elwood Law Office                    (u)Mills - Inc.
                                 116 N. Main St. PO Box 307
                                 Charles City

End of Label Matrix
Mailable recipients     78
Bypassed recipients      3
Total                   81

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa | ) | Case No. 19-00507 |
| limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| Address: | ) | |
| 1110 North Grand Ave., #300 | ) | |
| Charles City, Iowa 50616 | ) | |
| | ) | |
| Employer's Tax Identification No.: 46-3987825 | ) | |

DISCLOSURE STATEMENT FOR
CHAPTER 11 PLAN OF REORGANIZATION OF
McQUILLEN PLACE COMPANY, LLC
DATED OCTOBER 4, 2019

Donald H. Molstad, Esq.
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR THE DEBTOR

1

COMES NOW McQuillen Place Company, LLC, debtor and debtor in possession herein, by and through its counsel, and submits this document as and for its Disclosure Statement in the above-captioned matter.

Dated: October 4, 2019

Donald H. Molstad, Esq.
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR THE DEBTOR

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN. ACCEPTANCES MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND IS SUBJECT TO AMENDMENT.**

TABLE OF CONTENTS
DISCLAIMER

I. INTRODUCTION .................................................................4
II. BACKGROUND ...............................................................4
III. THE PLAN OF LIQUIDATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ....................................................5
IV. MEANS OF IMPLEMENTING THE PLAN .........................................10
V. CONFIRMATION REQUIREMENTS AND PROCEDURES ...................................11
VI. EFFECT OF CONFIRMATION OF PLAN .............................................13
VII. MODIFICATION OF THE PLAN .................................................14
VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .........14
IX. LIQUIDATION UNDER CHAPTER 7 .................................................14
X. GENERAL PROVISIONS .................................................15

**DISCLAIMERS**

**THIS DISCLOSURE STATEMENT, THE PLAN, EXHIBITS ANNEXED HERETO, ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED TOGETHER HEREWITH ARE BEING FURNISHED TO RECORD HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS KNOWN TO THE DEBTOR, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH SOLICITATION OF VOTES TO ACCEPT THE PLAN AS DESCRIBED HEREIN.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHICH DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHICH ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

2

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ELIGIBLE TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, RELATED DOCUMENTS, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS CONTROL.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE INDICATED, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. THE INFORMATION CONTAINED HEREIN IS ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN OR ANY EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR OTHER DOCUMENT RELATED TO THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. HOLDERS OF CLAIMS AND/OR EQUITY INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

## I. INTRODUCTION

This Disclosure Statement is intended to provide creditors and parties in interest with an overview of the Plan (the "Plan") which has been prepared by the Debtor and filed in the Debtor's chapter 11 case captioned above (the "Chapter 11 Case").

The primary purpose of the Plan is to maximize the value of the Debtor's estate for the benefit of the estate and its creditors by effectuating a sale of the Debtor's Assets[1], with the net proceeds then distributed to creditors and equity holders in accordance with the provisions of the Plan.

The purpose of this Disclosure Statement is to provide "adequate information" to entities that hold Claims and equity interests to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan.

The Plan provides for classification and treatment of various classes of secured claims, unsecured claims, and equity security holders. The Plan also provides for the payment of administrative claims. The treatment of these classes - including the order in which they will receive Distributions - is discussed below.

The Plan also provides detailed information regarding the terms for payment of the Debtor's creditors and other information designed to assist creditors and equity security holders in determining whether to accept the Plan. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

A. Purpose of This Document

This Disclosure Statement describes:

• The Debtor and significant events during the Chapter 11 Case;
• Historical information regarding the Debtor and the events leading to its bankruptcy filing;
• How the Plan proposes to treat Claims or equity interests of the type you hold (i.e., how your Claim or equity interest will be treated if the Plan is confirmed);
• Who can vote on or object to the Plan;
• What factors the Bankruptcy Court will consider when deciding whether to confirm the Plan;
• Why the Plan is in the best interests of creditors; and
• The effect of confirmation of the Plan.

B.       Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan. Objections to confirmation of the Plan must be filed with the Court and served upon the U.S. Trustee's Office, the Debtor, and the Committee, by a date to be determined by the Court.

Should you want any additional information regarding the Plan, contact any of the individuals listed on the first page of this document.

II.       BACKGROUND

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

4

A.       Description and History of the Debtor's Business

The Debtor was formed in 2013 to develop the McQuillen Place Development in Charles City, Iowa. Due to the rural character of the Charles City residential and commercial real estate market, development of the project was contingent on significant state, Federal and local economic assistance.

Ground for the project was broken in late 2014 and construction began in earnest in 2015. The Debtor encountered construction delays, but work was more than 90 percent complete when, in July 2017, the Debtor was informed that a key subsidy previously promised by IEDA would not be forthcoming. Construction ceased in fall 2017. When the Debtor and its lenders were unable to reach an agreement to provide for the completion of construction, a foreclosure action was commenced against the Debtor's interest in McQuillen Place Development in March 2018. See, generally, https://www.desmoinesregister.com/story/money/business/2019/02/06/developer-blames-iowa-pulling-funding-halting-town-housing-project/2524407002/, and the definition of "Litigation" under the Plan.

B.       Events Leading to the Debtor's Chapter 11 Filing

In spring 2019, following a series of attempts (asserted by the Debtor to have been abusive and unfounded) by First Security Bank to place the building into a receivership, the Debtor commenced this Chapter 11 Case.

C.       Plan Overview

The Plan calls for sale of the McQuillen Place Development to a new entity, MPC2, which will complete construction on the building then operate the building for the benefit, *inter alia*, of creditors. The interests of First Security Bank will be "crammed down" through the Plan, permitting both completion of construction and resolution of litigation pending against, among others, First Security Bank. A portion of the proceeds (if any) from this litigation will be directed to creditors of the Debtor. The litigation recoveries will be over and above the anticipated cash payments to creditors.

The Plan divides unsecured creditors into a number of classes in order to allocate distributions to such creditors as fairly as possible, given the varied nature of the claims of the creditors against the Debtor.

III. THE PLAN OF LIQUIDATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS

A. Purpose of the Plan of Liquidation

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize, sell, or liquidate its business for the benefit of its creditors - in other words, chapter 11 provides a debtor with some flexibility, allowing it, subject to oversight, to work to identify the best means of maximizing creditor recoveries. In furtherance of the goals of the Bankruptcy Code, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case. The consummation of a chapter 11 plan is typically the principal objective of a chapter 11 case. A chapter 11 plan sets forth the mechanism that the plan proponent has determined is best suited for satisfying creditor claims. A plan will typically separate creditors into "classes" reflecting the fact that some creditors get paid ahead of others under the Bankruptcy Code, and explains how the debtor or another party will object to claims as needed and ultimately make distributions.

Confirmation of a chapter 11 plan by the Bankruptcy Court makes the plan binding upon the Debtor, any issuer of securities under the plan, any entity acquiring property under the plan, and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity security holder: (i) is impaired under the plan; (ii) has accepted the plan; (iii) voted against the plan, or (iv) receives or retains any property under the plan.

B.      Explanation of Classes of Claims and Equity Interests

1. Classes of Secured Claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate to the extent allowed as secured claims under section 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

2. Classes of Priority Unsecured Claims

Certain priority claims that are referred to in sections 507(a)( 4) and (6) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a claim receive cash on the effective date of the plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

3. Classes of General Unsecured Claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under section 507(a) of the Bankruptcy Code.
4. Class of Equity Interest Holders

Holders of equity interests are parties who hold an ownership interest in the Debtor (i. e., the Debtor's owners). For example, in a corporation or a limited liability company, entities or individuals holding stock or membership interests would be considered to be holders of equity interests.

C. Treatment of Classified Claims and Equity Interests

Class 1: Administrative Claims.

Administrative Claims are those claims for attorneys' fees of the Debtor and attorneys' fees for the Committee. Those creditors in Class 1 shall be paid their fees in full as allowed by the Court. At this time, Debtor's attorneys' fees are estimated to be roughly $10,600. Those claims will be filed with the Court for approval pursuant to 11 U.S.C. §§ 327 and 328. Class 1 is not entitled to vote on the Plan.

On the Effective Date, the Debtor shall pay Allowed Administrative Claims in full. Administrative claims that become allowed after the Confirmation Date shall be paid with (i) cash generated from post-confirmation operations; (ii) proceeds of the sale of the Debtor's Assets; (iii) the net proceeds of the sale of the Debtor's unencumbered Assets; and/or (iv) funds of MPC2.

Class 2: Priority Claims.

6

Class 2 Claims consist of the Allowed Claims of any person entitled to priority under Section 507(a)(4)(5)(7) of the Code. Class 2 Claims will be paid in full by the Debtor on the Effective Date. Class 2 is not entitled to vote on the Plan.

Class 3: Priority Tax Claims.

Class 3 Claims consist of all Allowed Claims of governmental units, to the extent such claims are entitled to priority under Section 507(a)(8) of the Code. Class 3 Claims will be paid in full by the Debtor on the Effective Date. Class 3 Claims are not impaired and are not entitled to vote on the Plan.

Class 4: Tax Claim of Floyd County, Iowa for period real estate taxes, including special assessments, coming due between of October 1, 2018 and the Effective Date.

Undisputed Class 4 Claims will be paid in full by the Debtor on the Effective Date, provided, however, that certain of the Class 4 Claims may be disputed and/or paid under protest. Class 4 Claims are not impaired.

Class 5: Secured Claim Asserted by First Security Bank.

The Debtor and First Security Bank have different views as to the amount, validity and priority of First Security Bank's interests in the Debtor and its Assets. These differences in viewpoints have resulted in litigation between these parties. The provisions of the Plan as they relate to First Security Bank are designed to protect First Security Bank's lawful interests in the Debtor (if any) while the disputes between the parties are adjudicated.

Class 5 is for that portion of First Security Bank's claim against the Debtor which *may* be secured by a security interest. For purposes of this Plan prior to Resolution of the Litigation, that portion of the First Security Bank secured by the Loan Documents ("Secured Claim Asserted by First Security Bank") shall be deemed to be allowed in the amount of the Current Building Value. The Secured Claim Asserted by First Security Bank shall receive the Secured Claim Payment. Any transfer to or for the benefit of First Security Bank on account of the Secured Claim Asserted by First Security Bank occurring on or prior to the Resolution of the Litigation shall be made to the Claim Determination Escrow to be held, in trust, until the Resolution of the Litigation. For the purposes of the Plan, the Secured Claim Asserted by First Security Bank is impaired.

Class 6: Deficiency Claim Asserted by First Security Bank.

The Debtor and First Security Bank have different views as to the amount, validity and priority of First Security Bank's interests in the Debtor and its Assets. These differences in viewpoints have resulted in litigation between these parties. The provisions of the Plan as they relate to First Security Bank are designed to protect First Security Bank's lawful interests in the Debtor (if any) while the disputes between the parties are adjudicated.

First Security Bank and the Debtor agree that the value of that portion of the Debtor's Assets which may be subject to First Security Bank's security interest is less than the total amount of First Security Bank's claim against the Debtor. The Debtor believes the value of the First Security Bank's alleged collateral, as of the date of this Plan, is not more than $500,000. The difference between the value of this collateral and the amount of money (if any) actually owed by the Debtor to First Security Bank is called a "deficiency claim." Class 5 is for that portion of First Security Bank's claim against the Debtor which represents the deficiency claim.

7

The Debtor has asserted that First Security Bank has refused, in bad faith, to negotiate with the Debtor to arrive at a settlement of their differences. First Security Bank denies this, but agrees that the Debtor and First Security Bank do not agree on how to resolve their dispute.

The Bankruptcy Code provides a mechanism under which the Debtor, under certain circumstances and only after following certain procedures, may impose a resolution of certain aspects of the dispute on First Security Bank. This mechanism is generally referred to as a "cram down." This Plan seeks to impose a cram down on the alleged interests of First Security Bank.

Treatment of the Deficiency Claim Asserted by First Security Bank will be determined by the presence or absence of an 1111(b) election.

1.      In the event that no lawful election under 11 U.S.C. 1111 is made in connection with the Plan, the Deficiency Claim Asserted by First Security Bank shall receive an MPC2 Promissory Note in the amount equal to its Pro-Rata Share of the Unsecured Claims Distribution Amount, provided, however, that in calculating the allocation of the Deficiency Claim Asserted by First Security Bank within the Pro-Rata Share distribution, the dollar amount of the Deficiency Claim Asserted by First Security Bank shall be multiplied by 1.05, to the detriment of the other Unsecured Creditors.

2.      In the event that a lawful election under 11 U.S.C. 1111 has been made, the Deficiency Claim Asserted by First Security Bank shall receive, in lieu of any other distribution under the Plan, an MPC2 Promissory Note, payable in 360 equal monthly installments, in the amount of the Deficiency Claim Asserted by First Security Bank.

        The Deficiency Claim Asserted by First Security Bank is impaired and is allowed to vote.

Class 7: Claims of Steve and Sheri Dralle. The claims arising from the January 2018 purchase of certain assets of Steve and Sheri Dralle (the "Dralle Claims") shall receive its Pro-Rata Share of the Unsecured Claims Distribution plus (a) fifteen percent (15%) of the net profit, if any, derived from the Debtor's (or its successor's or assign's) operation of the assets comprising the "Classic Cleaners" portion of the Debtor's operations for three (3) years following the Effective Date, and (b) a Litigation Trust Certificate entitling the Dralle Claim to twenty percent (20%) of the Net Proceeds from the Litigation Trust. The Dralle Claim is impaired and is entitled to vote on the Plan. The allowed amount of the Dralle Claim is $4000. Pursuant to the limitation placed on distributions to Class 7 through 11 Creditors under the Plan, the maximum distribution in respect of the Dralle Claim would be $48,000. The Dralle Claims are impaired.

        H.      Class 8: Claims of Non-Insider Creditors Who Have Asserted Priority in Distribution Pursuant to Mechanics Liens. Schindler Elevator Company ("Schindler") has asserted a claim (the "Schindler Claim") in the amount of $53,829.00 for materials and services related to the installation of a passenger elevator at the McQuillen Place Development. Schindler asserts that the Schindler Claim is secured by a mechanic's lien filed in 2017. The Debtor disputes the amount and priority of the Schindler Claim, but the Debtor does not dispute the validity of a claim by Schindler in this Chapter 11 Case.

        Treatment of the Schindler Claim will be determined by the presence or absence of an 1111(b) election.

1.      In the event that no lawful election under 11 U.S.C. 1111(b) is made in connection with the Plan, Schindler will be paid $40,000 (the "Schindler Base Amount") on the Effective Date by the Debtor, plus the Schindler Resolution Amount upon the Schindler Resolution.

2.      In the event that a lawful election under 11 U.S.C. 1111 has been made, Schindler shall receive on the Effective Date from the Debtor the Schindler Base Amount's Pro-Rata Share of the Unsecured Claims Distribution, plus the full dollar amount of the Schindler Resolution Amount upon the Schindler Resolution.

        Whether or not an 1111(b) election is made, on the Effective Date Schindler shall receive from the Debtor a Litigation Trust Certificate entitling Schindler to twenty percent (20%) of the Net Proceeds from the Litigation Trust. The Schindler Base Amount is $40,000. Pursuant to the limitation placed on

8

distributions to Class 7 through 11 Creditors under the Plan, the maximum distribution in respect of the Schindler Base Amount would be $480,000.

The Schindler Claim is impaired and is entitled to vote on the Plan.

Class 9:  Claims of Non-Insider, Building Industry and Construction Unsecured Creditors Designated at Essential Vendors for Plan of Reorganization.

Certain of the general unsecured creditors of the Debtor (the "Essential Vendors") have been deemed by MPC2 to be essential to planned construction operations on the McQuillen Place Development.  The claims of the Essential Vendors (the "Essential Vendor Claims") shall receive (a) the Pro-Rata Share attributable to the allowed amount of each Essential Vendor Claim from the Unsecured Claims Distribution upon the Effective Date, (b) in the event that no 1111(b) election has been made, the Pro-Rata Share (as among the other Essential Vendor Claims) of the Supplemental Amount, and (c) each claim's Pro-Rata Share (as among the other Essential Vendor Claims of rights to a Litigation Trust Certificate issued by the Debtor representing twenty percent (20%) of the Net Proceeds from the Litigation Trust.  The Allowed amount of the Essential Vendor Claims is $13,500.  Pursuant to the limitation placed on distributions to Class 7 through 11 Creditors under the Plan, the maximum distribution in respect of the Essential Vendor Claims would be $162,000.  The Essential Vendor Claims are impaired and are entitled to vote on the Plan.

Class 10:  Claims of General, Non-Insider Building Industry and Construction Unsecured Creditors.

The general unsecured creditors of the Debtor (the "General Construction Creditors") whose claims arise from providing pre-Petition building industry or construction goods and services to the Debtor (the "General Construction Claims") shall receive from the Debtor on the Effective Date (a) the Pro-Rata Share attributable to the allowed amount of each General Construction Claim from the Unsecured Claims Distribution, and (b) each claim's Pro-Rata Share (as among the other General Construction Claims of rights to a Litigation Trust Certificate issued by the Debtor representing twenty percent (20%) of the Net Proceeds from the Litigation Trust.  The Allowed amount of the Class 10 Claims is $172,536.69.  Pursuant to the limitation placed on distributions to Class 7 through 11 Creditors under the Plan, the maximum distribution in respect of the Class 10 Claims would be $2,070,440.28.

The General Construction Claims are impaired and are entitled to vote on the Plan.

Class 11:  General Unsecured Claims.

All claims which are not described or listed in Classes 1 through 10 (the "General Unsecured Claims") shall receive from the Debtor on the Effective Date (a) the Pro-Rata Share attributable to the allowed amount of each General Unsecured Claim from the Unsecured Claims Distribution, and (b) each claim's Pro-Rata Share (as among the other General Unsecured Claims of rights to a Litigation Trust Certificate issued by the Debtor representing twenty percent (20%) of the Net Proceeds from the Litigation Trust.  The Allowed amount of the Class 11 Claims is $22,111.34.  Pursuant to the limitation placed on distributions to Class 7 through 11 Creditors under the Plan, the maximum distribution in respect of the Class 11 Claims would be $265,336.08.

The General Unsecured Claims are impaired and are entitled to vote on the Plan.

Class 12.  Pre-petition Claims of Insiders.

The pre-petition claims of the Insiders are in the amount of $8,120,597.58 (the "Insider Claims").  In the event that (a) the Plan has been consummated fully with respect to Classes 1 through 6, and (b) Classes 7 through 11 have received, in respect of their claims, cash distributions of 1200% of their Allowed Claims,

<div align="center">9</div>

the Insider Claims shall receive from the Debtor pro-rata distribution or distributions in an amount up to the amount of the allowed amount of such Insider Claim. The Class 12 Claims cannot vote on the Plan.

Class 13. Equity Claims.

In the event that (a) the Plan has been consummated fully with respect to Classes 1 through 6, (b) Classes 7 through 11 have received, in respect of their claims, cash distributions of 1200% of their Allowed Claims, (c) the Plan has been consummated fully with respect to Class 12, the Debtor shall distribute any residue of the Debtor's estate or the Litigation Trust the Debtor's equity holders pursuant to an agreement entered into by such equity holders for the division of profits and losses that was entered into prior to the filing of the Chapter 11 Case. The Class 13 Claims cannot vote on the Plan.

D.      Treatment of Unclassified Claims and Interests

Statutory Fees

On or before the date of Plan confirmation, cash shall be disbursed on account of Administrative Claims for fees payable pursuant to 28 U.S.C. §1930 in an amount equal to the amount of such Administrative Claims. Notwithstanding any other provisions in the Plan to the contrary, the Debtor shall remain obligated to pay fees pursuant to 28 U.S.C. § 1930 until such time as the Chapter 11 Case is closed, dismissed, or converted to a case proceeding under chapter 7 of the Bankruptcy Code.

IV. MEANS OF IMPLEMENTING THE PLAN

A.      Summary of Plan Implementation

The Debtor believes that the most likely mechanism for the creditors of the Debtor to be paid funds from the Chapter 11 Case in the short term is for the McQuillen Place Development to be completed. The Debtor views a transfer of ownership and construction operations to MPC2 as the most likely scenario under which the McQuillen Place Development can be completed and the creditors receive funds from the Chapter 11 Case.

The Debtor believes that the conduct of First Security Bank, certain directors of First Security Bank (specifically Richard Herbrechtsmeyer, Kurt Herbrechtsmeyer, and Gene Hall), Cedar Rapids Bank & Trust Co., and IEDA has resulted in the Debtor having valuable rights Causes of Action against those parties, among others. Inasmuch as the original completed value of the McQuillen Place Development was estimated to be $7,200,000, and the current value of the McQuillen Place Development is between $100,000 and $500,000, the damages which could be charged against First Security Bank, Richard Herbrechtsmeyer, Kurt Herbrechtsmeyer, Gene Hall, Cedar Rapids Bank & Trust Co., and IEDA could easily exceed $6,000,000. The Debtor believes the mechanism most likely to result in a recovery of money from these Causes of Action is for the Debtor to contribute its rights in these Causes of Action to a Litigation Trust for the benefit of creditors, then to charge the trustee of the Litigation Trust with pursuing the Litigation to judgment.

The Debtor notes, however, that resolution of the Litigation may (and likely will) take several, perhaps up to five, years. The trial on the McQuillen Counterclaims will not occur before September 2020. Trials on many of the other claims in the Litigation has not been set. The Debtor believes that the nature and complexity of the Litigation, together with several years of refusal of settlement by First Security Bank, will likely lead to appeals of verdicts or judgments following trial. Accordingly, the Debtor believes that a distribution of proceeds from the Litigation Trust may not occur (if at all) prior to 2024. The Debtor

believes that, rather than allow construction on the McQuillen Place Development to languish until 2024, the creditors would be best served by immediate completion of the project, relatively prompt distribution to creditors from the rents to be generated by the McQuillen Place Development following completion, followed by a later, possibly significantly larger distribution of funds (and possibly a dividend) following resolution of the Litigation.

The Debtor further notes that prompt completion of the McQuillen Place Development is in the best interest of a number of parties (such as the citizens of Charles City) who, while not "creditors" of the Debtor under the Bankruptcy Code, were nevertheless critically important stakeholders in, and the intended beneficiaries of, the original plan for the McQuillen Place Development.

Accordingly, the Confirmation Order shall provide for the immediate appointment of the Debtor to (a) oversee the consummation of this Plan, the Sale, and the distributions to be made hereunder, and (b) act as Litigation Trustee for the purpose of administering the Litigation Trust, pursing the Litigation, and distributing the proceeds, if any, from the Litigation pursuant to the Litigation Trust.

B.      Powers and Duties of the Debtor

On the Effective Date, the Debtor shall sell the McQuillen Building Assets to MPC2 pursuant to the Sale Agreement in exchange for the Building Consideration. On the Effective Date, the Debtor shall assign all its right, title and interest in and to the Litigation to the Litigation Trust, pursuant to the Litigation Trust Agreement, with the Debtor acting as Trustee for the Litigation Trust.

C.      The Sale

The McQuillen Place Building Assets shall be conveyed by the Debtor in the Sale to MPC2 free and clear of all liens, claims and encumbrances which may be claimed by First Security Bank & Trust Company ("First Security"); pursuant to 11 USC §§507 and 1111(b) and this Plan, a portion of the Building Consideration will be deposited in the Claim Determination Escrow for distribution to First Security in the event that the Bank Disbursement Conditions are met.
Pursuant to the Construction Agreement, MPC2 shall complete construction of McQuillen Place Residential Units and the First Floor Improvements (collectively, the "Improvements"). Pursuant to the Confirmation Order, MPC2 shall be authorized and directed to execute the Construction Financing Agreement, pursuant to which Unencumbered McQuillen Place Building Assets shall be used as collateral for, or otherwise exchanged for, financing arrangements to purchase goods and services necessary to complete the Improvements.

D.      Final Decree - Closing the Chapter 11 Case

Once the estate has been fully administered (i.e., the Assets have been monetized, Distributions have been made, the Litigation resolved, and it is not economical to take further actions), as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the Chapter 11 Case. Alternatively, the Court may enter such final decree on its own motion.

V. CONFIRMATION REQUIREMENTS AND PROCEDURES

A.      Overview of Requirements

To be confirmable, the Plan must meet the requirements listed in sections 1129(a) or (b) of the Bankruptcy Code. These include the requirements that: (1) the Plan must be proposed in good faith; (2) at least one

impaired class of claims must accept the plan, without counting votes of insiders; (3) the Plan must distribute to each holder of a Claim or equity interest at least as much as the holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and (4) the Plan must be feasible. These requirements are not the only requirements listed in section 1129 of the Bankruptcy Code, and they are not the only requirements for confirmation.

B.      Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Some parties in interest, however, are not entitled to vote to accept or reject the Plan. A holder of a Claim or equity interest has a right to vote for or against the Plan only if that holder has a Claim or equity interest that is: (1) contemplated to receive property under the Plan (so is not deemed to reject); (2) Allowed or Allowed for voting purposes; and (3) Impaired. Here, only holders of Claims in Classes 2 through 8 may vote on the Plan. Holders in all Classes may file an objection to the Plan if they believe that the requirements for confirmation are not met.

C.      What Is an Allowed Claim or an Allowed Equity Interest?

Only a holder of a Claim or equity interest that constitutes an Allowed Claim or an Allowed equity interest has the right to vote on the Plan. Generally, a Claim or equity interest is Allowed if either (1) the Debtor has scheduled the Claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of Claim or equity interest, unless an objection has been filed to such proof of Claim or equity interest (or to a scheduled Claim or equity interest). When a Claim or equity interest is not allowed, the Creditor or equity interest holder holding the Claim or equity interest cannot vote unless the Court overrules the objection or allows the Claim or equity interest for voting purposes under Rule 3018(a) of the Federal Rules of Bankruptcy Procedure. All claims specifically referenced herein are considered allowed for purposes of the Plan.

D.      What Is an Impaired Claim or Impaired Equity Interest?

As noted above, the holder of an Allowed Claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in section 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

E.      Who Can Vote in More Than One Class?

        A holder of a Claim that has been allowed in part in one Class and in part in another Class or a holder of a Claim who otherwise hold Claims in multiple Classes, is entitled to accept or reject the Plan in each capacity, and should cast one ballot for each Class in which it has a Claim.

F.      Votes Necessary to Confirm the Plan

Since impaired classes exist under the Plan, the Court cannot confirm the Plan unless (1) at least one impaired Class of creditors has accepted the Plan without counting the votes of any insiders within that Class and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes.

        1.      Votes Necessary for a Class to Accept the Plan

12

A Class of Claims accepts the Plan if both of the following occur: (1) the holders of more than one-half of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds in dollar amount of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan.

2.     Treatment of Non-accepting Classes

Even if one or more impaired Classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner prescribed by section 1129(b) of the Bankruptcy Code. A Plan that binds nonaccepting Classes is commonly referred to as a "cram down" plan. The Bankruptcy Code allows the Plan to bind nonaccepting Classes of Claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of section 1129(a)(8) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan.

G.     Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless such liquidation or reorganization is contemplated in the Plan. Here, the Plan contemplates a sale of the Assets and distribution of the net proceeds to the creditors in this case in the priority established under the Plan. The Plan provides for full payment of secured, administrative, and unsecured Claims, with the balance of net proceeds (if any) to equity holders. The Debtor believes that makes the Plan feasible.

H.     Best Interests Test

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or equity interest in any such impaired Class who has not voted to accept the Plan. If an impaired Class does not accept the Plan, the 'best interests' test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or interest that has a value, as of the Confirmation Date at least equal to the value of the distribution that each such member would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

A Liquidation Analysis has been attached as Exhibit A.

The Liquidation Value was prepared solely for use in this Disclosure Statement and does not represent values that are appropriate for any other purpose.

Based on this information, the Debtor believes that a sale and transfer of the Assets contemplated under the Plan is in the best interest of all creditors. The Debtor notes, however, that the Plan is not "in the best interest" of First Security Bank in the sense that First Security Bank, had it been willing to negotiate with the Debtor in good faith, likely would have received a more favorable treatment and outcome that it will received under the Plan. The Debtor believes it can be argued that First Security Bank's "best interests" would have been served under such a negotiated outcome, rather than the "cram down" treatment to be afforded First Security Bank under the Plan. Nevertheless, the Plan remains "in the best interest" of all creditors given the conduct of various creditors, the inability of some creditors to recognize their own best interests, and the resources and legal avenues available to the Debtor and creditors generally.

VI.     EFFECT OF CONFIRMATION OF PLAN

13

A.      Discharge

The Debtor will not receive a discharge under the Plan in accordance with section 1141 of the Bankruptcy Code.

B.      Binding Effect

The provisions of the Plan, the Confirmation Order, and any associated findings of fact or conclusions of law shall bind the Debtor, any entity acquiring property under the Plan, and any creditor of the Debtor, whether or not the Claim of such creditor is Impaired under the Plan and whether or not such creditor has accepted the Plan.

C.      Vesting of Property

Following the Effective Date, subject to the approval of the Bankruptcy Court, the Debtor shall execute all documents necessary for the Sale of the Assets. The sale of Assets by the Debtor shall be free and clear of liens of creditors and said creditors shall release such liens upon receipt of the proceeds of the sale based on their security interest and treatment. Upon liquidation of the Assets and full payment of the administrative, secured and unsecured claims, any remaining funds shall be turned over to the equity holders for distribution pursuant to their agreement.

VII.    MODIFICATION OF THE PLAN

The Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order.

After the entry of the Confirmation Order, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies within or among the Plan, the Disclosure Statement, and the Confirmation Order, and to accomplish such matters as may be reasonably necessary to carry out the purposes and intent hereof. A holder of a Claim or equity interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment, modification or remedy does not materially and adversely affect the treatment of the Claim or equity interest of such holder hereunder.

VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

No Party involved in drafting the Plan sought or obtained rulings from the Internal Revenue Service or any state or local taxing authority with respect to the tax consequences, if any, of the Plan and the transactions contemplated under the Plan.

CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS OF THE CONSUMMATION OF THE PLAN.

The Debtor is an Iowa limited liability company.  The Debtor will file a final report distributing the information regarding sales and losses as required by the Internal Revenue Service Code prior to closing the Chapter 11 Case.

IX. LIQUIDATION UNDER CHAPTER 7

The Debtor believes that the Plan affords creditors the potential for the greatest realization on the Debtor's Assets and, therefore, is in the best interests of such holders. Proceeding under Chapter 7 would impose significant additional monetary and time costs on the Debtor's estate, and would limit the options for achieving an optimal outcome. Under Chapter 7, one or more trustees would be elected or appointed to administer the estate, to resolve pending controversies, and to make distributions to holders of Claims. A Chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in section 326 of the Bankruptcy Code, and the trustee would also incur significant administrative expenses. For these and other nonmonetary reasons, conversion to a Chapter 7 case would significantly decrease the value of the Debtor's Assets.

It is the opinion of the Debtor that the Plan affords substantially greater recovery to creditors than such holders would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. See the attached Liquidation Analysis, marked as Exhibit A.

X. GENERAL PROVISIONS

A. Definitions and Rules of Construction

The definitions and rules of construction stated in sections 101 and 102 of the Bankruptcy Code apply when terms defined or construed in the Bankruptcy Code are used in the Plan.

B. Captions and Headings

The article and section headings used in the Plan and herein are for convenience and reference only, and they do not affect the terms, provisions, or interpretations of the Plan or Disclosure Statement.

C. Severability

Should any term or provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of the Plan; provided, however, that this provision shall not be applied or interpreted so as to defeat the primary purpose of the Plan, which is to restructure the Debtor's obligations to its creditors according to the treatment afforded to their Claims under the Plan.

D. Governing Law

Except to the extent that the Bankruptcy Code or other provisions of federal law are applicable, the rights and obligations arising under the Plan in any documents, agreements, and instruments executed in connection with the Plan (except to the extent such documents, agreements and instruments designate otherwise) shall be governed by, and construed and enforced in accordance with, the laws of the State of Iowa.

E. Successors and Assigns

The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity or individual.


Dated: October 4, 2019

                                        Respectfully submitted,

                                        _____
                                        Donald H. Molstad, Esq.
                                        Molstad Law Firm
                                        701 Pierce St., Ste. 305
                                        Sioux City, IA 51101
                                        (712) 255-8036
                                        ATTORNEY FOR THE DEBTOR

CERTIFICATE OF SERVICE
I, _Donald H. Molstad_, an attorney, hereby certify that on _October 4, 2019_, a true and correct copy of this document was served via the Court's CM/ECF system and electronic mail.

16

EXHIBIT A
Liquidation Analysis

|  | Liquidation | Plan |
|---|---|---|
| Sale of real estate | $0 | $265,976 |
| Sale of personalty (not subject to bank lien) | $5,000 | $0 |
| Sale of lawsuits | $200 | $0 to $7,100,000* |
| Results for all unsecured creditors | $5,200 | $265,976 to $7,365,976 |

* This amount is an estimate based on total diminution in building value, but does not include other areas of possible recovery, such as lost profits, punitive damages (limited in Iowa), etc.

17

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the ____ day of October, 2019.

/s/ Donald H. Molstad
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Label Matrix for local noticing
0862-4
Case 19-00507
Northern District of Iowa
Mason City
Fri Oct  4 11:06:05 CDT 2019

Amelia Management, LLC
1110 N. Grand Avenue, Ste. 300
Charles City, IA 50616-2139

Amelia Trust
c/o Charles M. Thomson, Trustee
1110 North Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Amelia Trust
c/o Judith M. O'Donohoe
PO Box 307
116 N. Main Street
Charles City, IA 50616-2015

Atlas Painting
911 Sycamore Street
Waterloo, Iowa 50703-4815

BRP Bruening
900 Montgomery Street
Decorah, Iowa 52101-2343

Bergan KDV
P.O. Box 2100
Waterloo, IA 50704-2100

Bluhm's Cedar Valley Electric
409 South Johnson Street
Charles City, Iowa 50616-2621

Cedar Rapids Bank & Trust Company
500 First Avenue, NE
PO Box 789
Cedar Rapids, IA 52406-0789

Cedar Rapids Bank & Trust Company
c/o Joseph E. Schmall
PO Box 2804
Cedar Rapids, IA  52406-2804

Cedar Rapids Bank & Trust Company
c/o Laura M. Hyer
PO Box 2804
Cedar Rapids, IA  52406-2804

Cerro Gordo County, Iowa
Carlyle D Dalen
Asst. County Atty.
220 N. Washington Ave.
Mason City, Ia 50401-3220

Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Cincinnati Insurance
Post Office Box 145496
Cincinnati, OH 45250-5496

City of Charles City, IA
c/o Brad Sloter
200 North Johnson Street
Charles City, IA  50616

City of Charles City, Iowa
105 Milwaukee Mall
Suite 2
Charles City, IA 50616-2280

Cornice & Rose International, LLC
804 Roberts Road
Barrington, IL 60010-1142

Cornice & Rose Intl Ltd.
804 W Roberts Road
Barrington, IL 60010-1142

Custom Air
Brett Payton
10443 Osage Rd
Waterloo, IA 50703-9349

Day Rettig Martin, P.C.
150 1st St NE – Suite 415
Cedar Rapids, IA 52401-1110

Day Rettig Martin, P.C.
150 1st St NE – Suite 415
P.O. Box 2877
Cedar Rapids, IA 52406-2877

Dean Snyder Construction
913 N. 14th Street
Clear Lake, Iowa 50428-2138

(p)CEDAR VALLEY STEEL INC
280 50TH AVE SW
CEDAR RAPIDS IA 52404-4933

Donald H Molstad
505 6th St , Suite 308
Sioux City, Ia 51101-1201

Larry S. Eide
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Elwood Law Firm
116 N. Main Street
Charles City, Iowa 50616-2015

Elwood Law Firm
c/o Judith O'Donohoe
116 North Main Street
PO Box 307
Charles City, IA  50616

First Security Bank & Trust Company
809 Clark Street
Charles City, IA 50616-2208

First Security Bank & Trust Company
809 Clark Street
PO Box 577
Charles City, IA 50616-0507

First Security Bank & Trust Company
c/o Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Floyd County Treasurer
101 South Main Street #303
Charles City, Iowa 50616-2792

Hawkeye Alarm
16 Commercial Street
Waterloo, Iowa 50701-1310

Hildreth & Co., LLC
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Laura Michelle Hyer
Bradley & Riley, PC
PO Box 2804
Cedar Rapids, IA 52406-2804

IL Switchboard
125 West Laura Drive
Addison, IL 60101-5178

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Iowa Economic Development Authority
200 East Grand Avenue
Des Moines, Iowa 50309-1834

Jed Construction
102 Grand Street
Elma, Iowa 50628-8189

Jendro Sanitation
108 Prospect Lane
Charles City, Iowa 50616

Judith Mack Odonohoe
P O Box 307
116 N Main St
Charles City, Ia 50616-2015

Kamm Excavating Corp
1301 Hildreth Street
Charles City, IA 50616-3663

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines IA 50309-2108

Larry Steven Eide
103 E. State St., Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Laura Michelle Hyer
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

MAS
41W195 Railroad Street
Pingree Grove, IL 60140-8980

McQuillen Place Company, LLC
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

Mediacom
1 Mediacom Way
Mediacom Park
New York, NY 10918-4810

Mick Gage Plumbing & Heating
511 West Milwaukee Street
New Hampton, Iowa 50659-1105

Mid American Energy
666 Grand Ave.
Des Moines, Iowa 50309-2580

Midwest Engineering
8236 W. 51st Street
Sioux Falls, SD 57106-7861

Midwest Fire Sprinkler
2001 De Wolf Street
Des Moines, Iowa 50316-2761

(p)MILLS INC
1906 GILBERT ST
CHARLES CITY IA 50616-9171

Donald H. Molstad
701 Pierce St., Ste. 305
Sioux City, IA 51101-1037

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616-0307

O'Hara's Son Roofing Corporation
3306 N. Knox Avenue
Chicago, IL 60641-4434

Allen O. Pederson
412 Sample Street
Nashua, IA 50658-9696

Pederson Plumbing
412 Sample Street
Charles City, IA 50616

Pederson Plumbing
Allen O. Pederson
412 Sample Street
Nashua, Iowa 50658-9696

Phillips Modern Ag
2153 S. Linn Ave.
New Hampton, Iowa 50659-9414

Planscape Partners
1200 Nicollet Ave.
Suite 706
Minneapolis, MN 55403-2409

Premier Cleaners
816 First Avenue N
Fort Dodge, IA 50501-3906

Randall Eugene Nielsen
P O Box 1588
103 E State St ,Suite 800
Mason City, IA 50401-3334

Robert Cardell Gainer
505 5th Ave Suite 835
Des Moines, IA 50309-2317

Schindler Elevator Corporation
1530 Timberwolf Drive
Holland, Ohio 43528-9161

Schindler Elevator Corporation
20 Whippany Rd
Morristown, NJ 07960-4524

Schindler Elevator Corporation
c/o NCS, 729 Miner Rd
Highland Hts, OH 44143-2117

Joseph E. Schmall
2007 First Avenue SE
PO Box 2804
Cedar Rapids, IA 52406-2804

Sherri Dralle
1308 Grandview Ave.
Waverly, IA 50677-1038

Christine B. Skilton
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Bradley David Sloter
Noah Smith & Schuknecht PLC
200 North Johnson St.
Charles City, IA 50616-1939

T-J Service, Inc.
221 N. Main St.
Charles City, IA 50616-2016

T-J Service, Inc.
Tom Brock, President
221 North Main Street
Charles City, Iowa 50616-2016

T-J Service, Inc.
c/o Christine B. Skilton
205 Brasher Street, PO Box 39
Nashua, IA  50658-0039

Charles McQuillen Thomson
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

United States Trustee
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2103

Unruh Insulation
2633 450 St.,
Stacyville, Iowa 50476-7549

VanMeter
850 32nd Ave. SW
Cedar Rapids, Iowa 52404-3913

Vernon P Squires
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

L Ashley Zubal
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309-2106

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Design Build Structures
7518 Peosta Industrial Drive
Peosta, Iowa 52068

Mills, Inc.
Kelvin E. Keiffer, President
1906 Gilbert St.
Charles City, Iowa 50616

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u), IA                          (u)Elwood Law Office                    (u)Mills - Inc.
                                 116 N. Main St. PO Box 307
                                 Charles City


End of Label Matrix
Mailable recipients    78
Bypassed recipients     3
Total                  81

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC.,    CHAPTER 11
                                  BANKRUPTCY NO. 19-00507
                Debtor.

NOTICE OF DISCLOSURE STATEMENT
NOTICE SETTING BAR DATE FOR OBJECTIONS AND NOTICE OF HEARING

TO ALL CREDITORS AND PARTIES IN INTEREST:

NOTICE IS HEREBY GIVEN the enclosed Disclosure Statement shown at Docket No. 57 and
Plan of Reorganization shown at Docket No. 56 were filed on behalf of the Debtor, McQuillen
Place Company, LLC.

NOTICE IS FURTHER GIVEN that objections to said Disclosure Statement, if any, should be
filed with the Clerk of Bankruptcy Court, with a copy to the U.S. Trustee and Attorney for
Debtor, addresses below, on or about **November 1, 2019.**

NOTICE IS HEREBY FURTHER GIVEN timely filed objections, if any, will come before the
Court on **December 5, 2019, at 9:30 a.m. in the Bankruptcy Courtroom, Second Floor, U.S.
Post Office, 211 N. Delaware Ave., Mason City, Iowa.**

Dated: 10-4-19

| | |
|---|---|
| Office of U.S. Trustee | /s/ Donald H. Molstad |
| U.S. Federal Courthouse | Donald H. Molstad (3755) |
| 111 7th Ave. SE, Box 17 | MOLSTAD LAW FIRM |
| Cedar Rapids, IA 52401-2101 | 701 Pierce St., Ste. 305 |
| | Sioux City, IA 51101 |
| | (712) 255-8036 |
| | ATTORNEY FOR DEBTOR |

I hereby certify that, pursuant to Order of Court, a copy of the document on which this appears
and all enclosures were mailed the date indicated below to all creditors and parties in interest as
required by the Bankruptcy Code and Rules, by the office of Donald H. Molstad, 701 Pierce St.,
Ste. 305, Sioux City, IA 51101.

Dated: 10-4-19                    Signed /s/ Donald H. Molstad
                                         Donald H. Molstad (3755)

Label Matrix for local noticing
0862-4
Case 19-00507
Northern District of Iowa
Mason City
Fri Oct  4 11:06:05 CDT 2019

Amelia Management, LLC
1110 N. Grand Avenue, Ste. 300
Charles City, IA 50616-2139

Amelia Trust
c/o Charles M. Thomson, Trustee
1110 North Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Amelia Trust
c/o Judith M. O'Donohoe
PO Box 307
116 N. Main Street
Charles City, IA 50616-2015

Atlas Painting
911 Sycamore Street
Waterloo, Iowa 50703-4815

BRP Bruening
900 Montgomery Street
Decorah, Iowa 52101-2343

Bergan KDV
P.O. Box 2100
Waterloo, IA 50704-2100

Bluhm's Cedar Valley Electric
409 South Johnson Street
Charles City, Iowa 50616-2621

Cedar Rapids Bank & Trust Company
500 First Avenue, NE
PO Box 789
Cedar Rapids, IA 52406-0789

Cedar Rapids Bank & Trust Company
c/o Joseph E. Schmall
PO Box 2804
Cedar Rapids, IA  52406-2804

Cedar Rapids Bank & Trust Company
c/o Laura M. Hyer
PO Box 2804
Cedar Rapids, IA  52406-2804

Cerro Gordo County, Iowa
Carlyle D Dalen
Asst. County Atty.
220 N. Washington Ave.
Mason City, Ia 50401-3220

Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Cincinnati Insurance
Post Office Box 145496
Cincinnati, OH 45250-5496

City of Charles City, IA
c/o Brad Sloter
200 North Johnson Street
Charles City, IA  50616

City of Charles City, Iowa
105 Milwaukee Mall
Suite 2
Charles City, IA 50616-2280

Cornice & Rose International, LLC
804 Roberts Road
Barrington, IL 60010-1142

Cornice & Rose Intl Ltd.
804 W Roberts Road
Barrington, IL 60010-1142

Custom Air
Brett Payton
10443 Osage Rd
Waterloo, IA 50703-9349

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
Cedar Rapids, IA 52401-1110

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
P.O. Box 2877
Cedar Rapids, IA 52406-2877

Dean Snyder Construction
913 N. 14th Street
Clear Lake, Iowa 50428-2138

(p)CEDAR VALLEY STEEL INC
280 50TH AVE SW
CEDAR RAPIDS IA 52404-4933

Donald H Molstad
505 6th St , Suite 308
Sioux City, Ia 51101-1201

Larry S. Eide
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Elwood Law Firm
116 N. Main Street
Charles City, Iowa 50616-2015

Elwood Law Firm
c/o Judith O'Donohoe
116 North Main Street
PO Box 307
Charles City, IA  50616

First Security Bank & Trust Company
809 Clark Street
Charles City, IA 50616-2208

First Security Bank & Trust Company
809 Clark Street
PO Box 577
Charles City, IA 50616-0507

First Security Bank & Trust Company
c/o Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Floyd County Treasurer
101 South Main Street #303
Charles City, Iowa 50616-2792

Hawkeye Alarm
16 Commercial Street
Waterloo, Iowa 50701-1310

Hildreth & Co., LLC
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Laura Michelle Hyer
Bradley & Riley, PC
PO Box 2804
Cedar Rapids, IA 52406-2804

IL Switchboard
125 West Laura Drive
Addison, IL 60101-5178

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Iowa Economic Development Authority
200 East Grand Avenue
Des Moines, Iowa 50309-1834

Jed Construction
102 Grand Street
Elma, Iowa 50628-8189

Jendro Sanitation
108 Prospect Lane
Charles City, Iowa 50616

Judith Mack Odonohoe
P O Box 307
116 N Main St
Charles City, Ia 50616-2015

Kamm Excavating Corp
1301 Hildreth Street
Charles City, IA 50616-3663

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines IA 50309-2108

Larry Steven Eide
103 E. State St., Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Laura Michelle Hyer
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

MAS
41W195 Railroad Street
Pingree Grove, IL 60140-8980

McQuillen Place Company, LLC
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

Mediacom
1 Mediacom Way
Mediacom Park
New York, NY 10918-4810

Mick Gage Plumbing & Heating
511 West Milwaukee Street
New Hampton, Iowa 50659-1105

Mid American Energy
666 Grand Ave.
Des Moines, Iowa 50309-2580

Midwest Engineering
8236 W. 51st Street
Sioux Falls, SD 57106-7861

Midwest Fire Sprinkler
2001 De Wolf Street
Des Moines, Iowa 50316-2761

(p)MILLS INC
1906 GILBERT ST
CHARLES CITY IA 50616-9171

Donald H. Molstad
701 Pierce St., Ste. 305
Sioux City, IA 51101-1037

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616-0307

O'Hara's Son Roofing Corporation
3306 N. Knox Avenue
Chicago, IL 60641-4434

Allen O. Pederson
412 Sample Street
Nashua, IA 50658-9696

Pederson Plumbing
412 Sample Street
Charles City, IA 50616

Pederson Plumbing
Allen O. Pederson
412 Sample Street
Nashua, Iowa 50658-9696

Phillips Modern Ag
2153 S. Linn Ave.
New Hampton, Iowa 50659-9414

Planscape Partners
1200 Nicollet Ave.
Suite 706
Minneapolis, MN 55403-2409

Premier Cleaners
816 First Avenue N
Fort Dodge, IA 50501-3906

Randall Eugene Nielsen
P O Box 1588
103 E State St ,Suite 800
Mason City, IA 50401-3334

Robert Cardell Gainer
505 5th Ave Suite 835
Des Moines, IA 50309-2317

Schindler Elevator Corporation
1530 Timberwolf Drive
Holland, Ohio 43528-9161

Schindler Elevator Corporation
20 Whippany Rd
Morristown, NJ 07960-4524

Schindler Elevator Corporation
c/o NCS, 729 Miner Rd
Highland Hts, OH 44143-2117

Joseph E. Schmall
2007 First Avenue SE
PO Box 2804
Cedar Rapids, IA 52406-2804

Sherri Dralle
1308 Grandview Ave.
Waverly, IA 50677-1038

Christine B. Skilton
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Bradley David Sloter
Noah Smith & Schuknecht PLC
200 North Johnson St.
Charles City, IA 50616-1939

T-J Service, Inc.
221 N. Main St.
Charles City, IA 50616-2016

T-J Service, Inc.
Tom Brock, President
221 North Main Street
Charles City, Iowa 50616-2016

T-J Service, Inc.
c/o Christine B. Skilton
205 Brasher Street, PO Box 39
Nashua, IA  50658-0039

Charles McQuillen Thomson
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

United States Trustee
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2103

Unruh Insulation
2633 450 St.,
Stacyville, Iowa 50476-7549

VanMeter
850 32nd Ave. SW
Cedar Rapids, Iowa 52404-3913

Vernon P Squires
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

L Ashley Zubal
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309-2106

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Design Build Structures
7518 Peosta Industrial Drive
Peosta, Iowa 52068

Mills, Inc.
Kelvin E. Keiffer, President
1906 Gilbert St.
Charles City, Iowa 50616

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u), IA

(u)Elwood Law Office
116 N. Main St. PO Box 307
Charles City

(u)Mills - Inc.

**End of Label Matrix**
Mailable recipients   78
Bypassed recipients    3
Total          81

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:                                          )
                                                )    Chapter 11
MCQUILLEN PLACE COMPANY, LLC,    )
                                                )    Bankruptcy No. 19-00507
        Debtor.                                 )

### ORDER SETTING STATUS CONFERENCE

The Final Hearing on First Security Bank and Trust Company's Motion for Relief from Stay is set for October 8, 2019.

**IT IS ORDERED** that this hearing is continued and the matter is set for a Status Conference to determine a new final hearing date on

**October 18, 2019 at 1:15 p.m.**

by telephone conference call.   ATTORNEY FOR DEBTOR IS TO INITIATE THE TELEPHONE CALL.   THIS HEARING WILL BE DIGITALLY RECORDED.

Dated and Entered:

October 7, 2019

THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC,

Debtor(s).

CHAPTER 11
CASE NO. 19-00507M

**MOTION TO CONVERT OR
DISMISS**

_____

COMES NOW, First Security Bank & Trust Company, through its undersigned counsel, and respectfully states:

1.    The Movant is a creditor of the above-captioned Debtor.

2.    McQuillen Place Company, LLC (hereinafter called the "Debtor") filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code circa April 25, 2019.

3.    The Debtor listed in the Schedules filed herein an interest in real property situated in Floyd County, Iowa, locally known as 123 N. Main Street, Charles City, Floyd County, Iowa, and legally described, to wit:

LOTS ONE, TWO, THREE, FOUR AND FIVE (1, 2, 3, 4 AND 5) OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED IN AND AS A PART OF CHARLES CITY, IOWA (also known as McQuillen Place Condominiums, or Condominium Unit A and Condominium Unit B of McQuillen Place Condominiums)

(hereinafter called the "Property").

4.    The Property is listed as a duplex of 33 units, however, the Movant believes that this description is deceptive in that the Property remains under construction with the Debtor's intention for the Property to include 33 residential units on the second and third floors, and commercial rental space on the first floor.

5.    At the commencement of this case, the Property was unfinished and it remains unfinished and unoccupied.

6.    To the knowledge of the Movant, no material construction activity has occurred at the Property for more than 18 months, and no construction activity has occurred since the commencement of this case.

7.    The Movant is the holder of a claim against the Debtor which is secured by a Construction Mortgage dated December 31, 2014 (hereinafter called the "Mortgage"), and a Promissory Note of even date. Copies of the Mortgage and Promissory Note are attached hereto as exhibits to the Petition to Foreclose Mortgage Without Redemption described hereinafter.

8.    The Movant has filed a proof of claim in this case for $4,030,746.28. The promissory note on which the claim is based is delinquent and accrues interest at the rate of 11.75% per annum.

9.    The Mortgage was filed in the Office of the Recorder of Floyd County, Iowa, on January 5, 2015, and recorded in Book 2015 at Page 0014.

10.    The Promissory Note and Mortgage were originally granted to and given to Cedar Rapids Bank and Trust Company (hereinafter called "CRBT") and were subsequently assigned to the Movant. Copies of the assignment documents are attached hereto.

11.    On information and belief, the Movant asserts that the Property has a value less than the amount of amount due the Movant and secured by the Mortgage, and therefore the Debtor has no equity in the Property, and that the Property is not necessary to an effective reorganization.

12.    The Movant does not have and has not been offered adequate protection of its interest in the Property.

- 2 -

13.     The Debtor has made no offer of adequate protection to the Movant.

14.     The Movant has filed a Motion to Lift Stay (Doc. No. 31) and the Debtor has filed a Resistance (Doc. No. 37).

15.     The Debtor continues to resist the Motion to Lift Stay and a final hearing on said Motion is expected to be scheduled shortly.

16.     At the commencement of this case, the final payment date of the Promissory Note had passed and the Promissory Note is due and payable in full.

17.     In June 2018, prior to the commencement of this case, the Movant advanced the payment of real estate taxes and then accrued penalty in the amount of $236,446.00 in order to prevent the tax sale of the Property.

18.     The installments of real estate taxes against the Property that became delinquent when not paid prior to October 1, 2018, and April 1, 2019, remain unpaid in the amounts of $106,250.00 plus penalty of $20,726.00, and $106,250.00 plus penalty of $11,158.00, respectively. Penalty continues to accrue on the unpaid taxes at the rate of 1.5% per month. See Exhibit A attached.

19.     Since the commencement of this case, the Debtor has failed to pay the real estate taxes that became delinquent when not paid prior to October 1, 2019, and there is currently due for said taxes the sum of $108,431.00 plus penalty of $1,626.00. Penalty continues to accrue on the unpaid taxes at the rate of 1.5% per month. See Exhibit A attached.

20.     Since the commencement of this case, the Debtor has failed to pay a special assessment against the Property that became delinquent when not paid prior to October 1, 2019, and there is currently due for said special assessment the sum of $47,063.24 plus

- 3 -

penalty of $706.00. Penalty continues to accrue on the unpaid special assessment at the rate of 1.5% per month. See Exhibit A attached.

21.     Prior to the commencement of this case, a petition to foreclose the Mortgage was filed in the Iowa District Court for Floyd County (hereinafter called the "Mortgage Foreclosure Action") entitled Cedar Rapids Bank and Trust Company, Plaintiff vs. McQuillen Place Company, LLC, et al, and said Action has been designated as Case No. EQCV031170.

22.     The Movant has been substituted as the Plaintiff in the Mortgage Foreclosure Action.

23.     Numerous other persons and entities were joined as defendants to the Mortgage Foreclosure Action as the result of guaranties by them of the Promissory Note, and another party, Schindler Elevator Corporation, was joined as a defendant as the result of a mechanic's lien filed against the Debtor and the Property by said defendant.

24.     Prior to the commencement of this case, the Debtor filed an answer in the Mortgage Foreclosure Action denying the material allegations of the petition and asserting numerous counterclaims against the Movant.

25.     The counterclaims against the Movant have been denied by the Movant.

26.     Prior to the commencement of this case, Schindler Elevator Corporation filed a cross-petition against the Debtor seeking to foreclosure the mechanic's lien.

27.     Prior to the commencement of this case, the Debtor filed a third-party petition against CRBT asserting numerous claims against CRBT as the result of transactions involving the Promissory Note, the Mortgage and the Property.

28.     The third-party claims against CRBT have been denied by CRBT.

- 4 -

29.     Prior to the commencement of this case, the parties to the Mortgage Foreclosure Action had commenced discovery and numerous interrogatories and document production requests had been served by the Debtor, the Movant and CRBT.

30.     The Debtor listed the claims against the Movant and the claims against CRBT as assets in the Schedule A/B filed by the Debtor in this case.

31.     The claims asserted by the Debtor against the Movant and CRBT are presently unliquidated and disputed claims and those claims will need to be liquidated, or estimated by the Court, in order to complete administration of the Debtor's property.

32.     The Debtor has filed a Chapter 11 Plan (hereinafter called the "Plan") and a Disclosure Statement and a hearing on the sufficiency of the Disclosure Statement is scheduled for December 5, 2019.

33.     The Movant believes that the Plan is not confirmable and that the Disclosure Statement is not sufficient and an objection will be filed prior to the November 1, 2019, deadline for filing objections.

34.     The Plan proposes a sale of the Property (i.e. the real estate described above) to MCP2, LLC, an Iowa limited liability company for an undetermined dollar amount. The Plan and Disclosure Statement do not disclose the principals of the buyer and do not provide any information as to the ability of the buyer to perform its obligations under the Plan.

35.     The Iowa Secretary of State shows that no entity by the name of MCP2, LLC exists in the State of Iowa (see Exhibit B attached).

- 5 -

36.     The Iowa Secretary of State does show that an entity by the name of MCP2 Development, LLC was formed by Charles McQuillen Thomson, the principal of the Debtor, on April 24, 2019 (see Exhibit C attached).

37.     The Debtor operates a small dry cleaning business and the monthly reports show that this business operates at a minimal profit but not in an amount sufficient to pay the real estate taxes due with respect to the Real Estate described above.

38.     A "window" that lies as nearly in a horizontal plane and which is located over the courtyard of the Property has been removed or has been otherwise non-existent for at least two months exposing the Property to the outside elements, all of which has been known to the Debtor for that period of time.

39.     The plywood that covers one of the many unfinished openings that someday will be a window or door of the Property opening onto Main Street, Charles City, Iowa, has developed a whole large enough to allow animals and varmints to enter the Property.

40.     The failure of the Debtor to complete the construction of the second and third floor apartments and the first floor commercial spaces, and to preserve and protect the Property constitutes mismanagement of the estate.

41.     The Movant believes that the Plan filed by the Debtor was not proposed by the Debtor in good faith.

42.     The Movant believes that the filing of such Plan and the failure to provide evidence of financial capacity to perform under the Plan constitutes gross mismanagement of the estate by the Debtor.

43.     Cause exists for the conversion or dismissal of this case, including the following, *inter alia*:

- 6 -

a.      substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation,

b.      gross mismanagement of the estate, and,

c.      failure to timely pay taxes owed after the date of the order for relief.

WHEREFORE, the Movant requests the Court to convert of dismiss this Chapter 11 case, and to grant such other and further relief as the Court deems just and equitable in the premises.

 /s/ Larry S. Eide
Larry S. Eide (AT0002317)
PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA  50402-1588
Telephone: (641) 423-4264
Facsimile: (641) 423-3145
Email: eide@pappajohnlaw.com

## CERTIFICATE OF SERVICE

The undersigned, Larry S. Eide, certifies that on October 17, 2019, he served a copy of the foregoing document on the United States Trustee, Debtor(s), attorney for Debtor(s) and other parties having requested notice pursuant to Rule 2002 electronically on all parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing, and by ordinary United States mail, postage prepaid, addressed as follows on all other parties:

James L. Snyder
Acting United States Trustee
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2101

Donald H. Molstad
Molstad Law Firm
701 Pierce Street, Suite 305
Sioux City, IA 51101

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Room 793
Des Moines, IA 50309-2108

Charles M. Thomson
Law Offices of Charles M. Thomson
1110 N. Grand Ave, Suite 300
Charles City, IA 50616

- 7 -

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
PO Box 307
Charles City, IA 50616-0307

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Allen O. Pederson
Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kevin E. Keiffer
Mills, Inc.
1906 Gilbert Street
Charles City, IA 50616

Tom Brock, President
T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
PO Box 39
Nashua, IA 50658-0039

Joseph E. Schmall
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

Laura M. Hyer
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

 /s/ Larry S. Eide
Larry S. Eide (AT0002317)

- 8 -



FLOYD COUNTY PROPERTY TAX PAYMENT SERVICE

# SELECT AMOUNTS TO PAY

## 2019 REAL ESTATE TAX - PARCEL # 000110146700600

McQuillen Place Company, LLC
123 N MAIN CHARLES CITY

MORE DETAILS    COUNTY ASSESSOR PAGE

> **Online Payments Not Allowed for this Tax Record**
> Please contact your county treasurer for more information.

| INSTALLMENT | ADD TO CART |
|---|---|
| **September** | |
| Due On:  9/1/2019 | Not Allowed |
| Late On:  10/1/2019 | |
| Tax:  $108,431.00 | |
| Late Int. & Cost:  $1,626.00 | |
| **March** | |
| Due On:  3/1/2020 | Not Allowed |
| Late On:  4/1/2020 | |
| Tax:  $108,431.00 | |
| Late Int. & Cost:  $0.00 | |

## 2019 SPECIAL ASSESSMENT - PARCEL # 000110146700600

McQuillen Place Company, LLC
123 N MAIN CHARLES CITY

MORE DETAILS    COUNTY ASSESSOR PAGE

> **Online Payments Not Allowed for this Tax Record**
> Please contact your county treasurer for more information.

| INSTALLMENT | ADD TO CART |
|---|---|

EXHIBIT A

INSTALLMENT                    ADD TO CART

**September**

|  |  |  |
|---|---|---|
| Due On: | 9/1/2019 | Not Allowed |
| Late On: | 10/1/2019 | |
| Tax 💲: | $47,063.24 | |
| Late Int. & Cost 💲: | $706.00 | |

## 2018 REAL ESTATE TAX - PARCEL # 000110146700600

McQuillen Place Company, LLC
123 N MAIN CHARLES CITY

MORE DETAILS    COUNTY ASSESSOR PAGE

> **Online Payments Not Allowed for this Tax Record**
> Please contact your county treasurer for more information.

INSTALLMENT                    ADD TO CART

**September**

|  |  |  |
|---|---|---|
| Due On: | 9/1/2018 | Not Allowed |
| Late On: | 10/2/2018 | |
| Tax 💲: | $106,265.00 | |
| Late Int. & Cost 💲: | $20,726.00 | |

**March**

|  |  |  |
|---|---|---|
| Due On: | 3/1/2019 | Not Allowed |
| Late On: | 4/2/2019 | |
| Tax 💲: | $106,265.00 | |
| Late Int. & Cost 💲: | $11,158.00 | |



## IOWA SECRETARY OF STATE
# Paul D. Pate

| Home | Business Services | Search Databases | Online Filing | Elections | Notaries | Nonprofits | Youth |

Home » Search Databases » Business Entities » Results

## Business Entities Results

print

Searched: **MPC2, LLC**                                                                 *Results 0*

| Business No. | Name | Status | Type |
| --- | --- | --- | --- |

*Sorry, no results. Search again*

Screen Help

**FEATURED RESOURCES**

QUICK LINKS | ONLINE SERVICES | SEARCH

- Reinstatement Information
- Find Your Precinct/Polling Place
- Am I Registered to Vote in Iowa?
- Register to Vote
- Request an Absentee Ballot
- Track Your Absentee Ballot
- Business Resources















ADDRESS CONFIDENTIALITY PROGRAM

EXHIBIT B



# IOWA SECRETARY OF STATE
## Paul D. Pate

| Home | Business Services | Search Databases | Online Filing | Elections | Notaries | Nonprofits | Youth |

Home » Search Databases » Business Entities » Results » Summary

## Business Entity Summary

print

Summary    Address    Agent    Filings    Names    Officers    Stock    Search Again

Print Certificate of Existence

Searched: **mpc**

| Business No. | Legal Name | | Status |
|---|---|---|---|
| 599574 | MPC2 DEVELOPMENT, LLC | | Active |
| Type | State of Inc. | | Modified |
| Legal | IA | | No |
| Expiration Date | Effective Date | | Filing Date |
| PERPETUAL | 4/24/2019 | | 4/24/2019 |
| Chapter | | | |
| CODE 489 DOMESTIC LIMITED LIABILITY COMPANY | | | |

## Names (Viewing 1 of 1)

| Type | Status | Modified | Name |
|---|---|---|---|
| Legal | Active | No | MPC2 DEVELOPMENT, LLC |

## Registered Agent or Reserving Party

| Full Name | |
|---|---|
| CHARLES M. THOMSON | |
| Address | Address 2 |
| 1110 NORTH GRAND, #300 | |
| City, State, Zip | |
| CHARLES CITY, IA, 50616 | |

## Home Office

| Full Name | |
|---|---|
| | |
| Address | Address 2 |
| 25 EAST DELAWARE, SUITE 209 | |
| City, State, Zip | |
| CHICAGO, IL, 60611 | |

↑ Back to Top

EXHIBIT C

FEATURED RESOURCES

QUICK LINKS    ONLINE SERVICES    SEARCH

• Reinstatement Information
• Find Your Precinct/Polling Place
• Am I Registered to Vote in Iowa?
• Register to Vote
• Request an Absentee Ballot
• Track Your Absentee Ballot
• Business Resources















ADDRESS CONFIDENTIALITY PROGRAM

Iowa Secretary of State

321 East 12th Street

Des Moines, IA 50319

sos.iowa.gov



**FILED**

Date: **4/24/2019 02:59 PM**

Corp No: **599574**

Cert No: **FT0024662**

## Certificate of Organization - LLC

### Information

CODE 489 DOMESTIC LIMITED LIABILITY COMPANY
Chapter

MPC2 Development, LLC
Entity Name

4/24/2019 3:00:00 PM
Effective Date and Time

Perpetual
Expiration Date

### Registered Agent and Registered Office Address

Charles M. Thomson
Full Name

1110 North Grand, #300
Address1                                          Address2

| Charles City | IA | 50616 | USA |
|---|---|---|---|
| City | State | Zip | Country |

### Principal office

25 East Delaware, Suite 209
Address1                                          Address2

| Chicago | IL | 60611 | USA |
|---|---|---|---|
| City | State | Zip | Country |

### Signature(s)

| Charles McQuillen Thomson | 4/24/2019 2:58:28 PM |
|---|---|
| Organizer | Date |

# CERTIFICATE OF ORGANIZATION
## OF
## MPC2 DEVELOPMENT, LLC

TO THE SECRETARY OF STATE OF THE STATE OF IOWA:

Pursuant to Chapter 489 of the Iowa Limited Liability Company Act, the undersigned, acting as organizer of the Limited Liability Company adopts the following Certificate of Organization for the Limited Liability Company.

1.    The name of the Limited Liability Company is MPC2 Development, LLC.

2.    The street address of the Limited Liability Company's initial registered office is 1110 North Grand Avenue, Suite 300, Charles City, IA 50616, and the name of its initial registered agent at that office is Charles Thomson, whose address is 1110 North Grand Avenue, Suite 300, Charles City, IA 50616.

3.    The street address of the principal office of the Limited Liability Company is 1110 North Grand Avenue, Suite 300, Charles City, 1A 50616.

4.    The period of the Limited Liability Company's duration shall be perpetual from the effective date and time this document is filed with the Secretary of State of the State of Iowa.

Charles Thomson, Organizer

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | Bankruptcy No. 19-00507 |
| Debtor. | ) | |

Date of Hearing:   October 18, 2019

<u>APPEARANCES</u>:

For Debtor: Donald Molstad and Charles McQuillen
For Parties-In-Interest: Larry Eide for First Security Bank & Trust Company

<u>NATURE OF PROCEEDING</u>:        ___In Court    _X_ Telephonic

  Status Conference to Reset Final Hearing on Motion for Relief from Stay #31

<u>IT IS ORDERED THAT</u>:

Final hearing on First Security Bank & Trust Company's Motion for Relief from Stay is reset for:

**November 14, 2019 at 10:00 a.m.**

in the Webster County Courthouse, 701 Central Avenue, Fort Dodge, Iowa.

Dated and Entered   October 21, 2019
_____

_____
Thad J. Collins, Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| IN RE:<br><br>McQuillen Place Company, LLC,<br><br>Debtor. | Case No. 19-00507<br><br>Chapter 11 |
|---|---|

### NOTICE OF APPEARANCE

TO THE CLERK of this Court and all parties of record:

Please enter the appearance of Brandon Gray in the above-captioned case on behalf of the

Iowa Economic Development Authority.

Dated:  October 22, 2019

By:  /s/ Brandon J. Gray – October 22, 2019
BRANDON J. GRAY  AT0010191
Assistant Attorney General
Office of the Attorney General of Iowa
Revenue Division
1305 Walnut Street
Des Moines, Iowa 50319
Phone:  (515) 725-8773
Email:  Brandon.Gray@ag.iowa.gov

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22nd day of October 2019, a true and correct
copy of the foregoing document was filed with the Court's CM/ECF system, which sent notice to
all parties receiving electronic notices, including but not limited to counsel for the Debtors.

Amanda Meals

McQuillen.c369

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC.,        CHAPTER 11
                                       BANKRUPTCY NO. 19-00507

           Debtor.            APPLICATION FOR APPROVAL
                                  OF EMPLOYMENT OF ATTORNEY

---

TO: U.S. TRUSTEE AND THE COURT

    1.  Applicant is the debtor in this case.

    2.  Applicants believe that the employment of Attorney is necessary to represent and assist the debtor with general litigation.

    3.  That J D Haas of J D Haas and Associates, PLLC., as attorney, is qualified by reason of practice and experience to render such representation or assistance.

    4.  The compensation will be as follows:

        JD Haas - $250.00 per hour
        Associate Attorney - $200.00 per hour
        Paralegal - $125.00 per hour

    WHEREFORE, applicant prays that the Court approve such employment of Attorney.

    Dated this _15th_ day of _Oct._, 2019

                           McQUILLEN PLACE COMPANY LLC

                           By: Charles Thomson

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the ꟷꞁꞁꞁꞁꞁ day of October, 2019.

/s/ Donald H. Molstad_____
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

McQuillen.c369

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

</div>

IN RE:

McQUILLEN PLACE COMPANY, LLC.,                    CHAPTER 11
                                                  BANKRUPTCY NO. 19-00507

              Debtor.                    RULE 2014 VERIFICATION

---

       I state under penalty of perjury that to the best of my knowledge that neither I nor the firm of J D Haas and Associates PLLC., have any connection with the bankruptcy, the creditors or any other party in interest and represent no interest adverse to the Trustee or the estate. I and the firm of J D Haas and Associates PLLC., are disinterested persons within the meaning of 11 U.S.C. Section 101(13).

DATED : 10-16-19

J D HAAS AND ASSOCIATES, PLLC

By: _____
     J. D. Haas

CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the ___ day of October, 2019.

/s/ Donald H. Molstad
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

McQuillen.c369

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC.,         CHAPTER 11
                                        BANKRUPTCY NO. 19-00507

            Debtor.                ORDER RE: APPLICATION FOR
                                    APPROVAL OF EMPLOYMENT OF
                                    ATTORNEY

THIS matter comes before the Court on the debtors' application for Approval of Employment of Realtor and the Court being duly advised in the premises, FINDS:

1. That the applicant is the debtor in this case.

2. That J D Haas of J D Haas and Associates, PLLC., as Attorney is qualified by reason of practice experience to render such representation or assistance.

THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the debtor's Application for Approval of Employment of Attorney be and is hereby approved.

Dated and Entered:
October 22, 2019

_____
JUDGE

PREPARED BY:

/s/ Donald H. Molstad
Donald H. Molstad (3755)
ATTORNEY FOR DEBTOR

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| | CASE NO. 19-00507 |
| McQUILLEN PLACE COMPANY, LLC, | |
| Debtor. | |

_____

**NOTICE OF MOTION TO CONVERT OR DISMISS;
AND OF BAR DATE FOR OBJECTIONS**

TO:  ALL CREDITORS AND PARTIES IN INTEREST

NOTICE IS HEREBY GIVEN that a Motion to Convert or Dismiss has been filed by First Security Bank & Trust Company. A copy of said Motion is attached hereto.

NOTICE IS FURTHER GIVEN that objections to said Motion must be filed with the Clerk of this Court, at either of the following addresses:

| | |
|---|---|
| United States Bankruptcy Court | United States Bankruptcy Court |
| Northern District of Iowa | Northern District of Iowa |
| Clerk's Office | Clerk's Office, Federal Building |
| 111 7th Avenue SE, Box 15 | 320 6th Street, Room 126 |
| Cedar Rapids, IA  52401-2101 | Sioux City, IA  51101 |

with a copy to the attorneys for the Movant, attorneys for the Debtor, and the United States Trustee at the addresses shown below, **on or before November 13, 2019.**

NOTICE IS FURTHER GIVEN that the Motion and timely filed objections, if any, will come on before the Court **at 10:00 a.m. on November 14, 2019, in the Courtroom at the Webster County Courthouse, 701 Central Avenue, Fort Dodge, Iowa**.

Dated: October 23, 2019.

 /s/ Larry S. Eide
Larry S. Eide (AT0002317)
PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.
103 E. State Street, Suite 800
PO Box 1588
Mason City, IA  50402-1588
Telephone: (641) 423-4264
Facsimile: (641) 423-3145
Email: eide@pappajohnlaw.com
Attorneys for First Security Bank & Trust Company

United States Trustee:                          Attorneys for Debtor:
James L. Snyder                                 Donald H. Molstad
Acting United States Trustee                    Molstad Law Firm
United States Federal Courthouse                701 Pierce Street, Suite 305
111 7th Avenue SE, Box 17                       Sioux City, IA 51101
Cedar Rapids, IA  52401-2101

                                                J.D. Haas
                                                J.D. Haas & Associates PLLC
                                                1120 E. 80th Street, Suite 200
                                                Minneapolis, MN 55420


        I certify that a copy of the document on which this appears and all enclosures were
served the date indicated below on all creditors and parties-in-interest as required by the
Bankruptcy Code and Rules by the office of Larry S. Eide per the attached list.

DATED:  October 23, 2019                         /s/ Larry S. Eide
                                                Larry S. Eide (AT0002317)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:                                              CHAPTER 11
                                                    CASE NO. 19-00507M
McQUILLEN PLACE COMPANY, LLC,

                    Debtor(s).                      **MOTION TO CONVERT OR
                                                    DISMISS**

                          _____

COMES NOW, First Security Bank & Trust Company, through its undersigned counsel, and respectfully states:

1.      The Movant is a creditor of the above-captioned Debtor.

2.      McQuillen Place Company, LLC (hereinafter called the "Debtor") filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code circa April 25, 2019.

3.      The Debtor listed in the Schedules filed herein an interest in real property situated in Floyd County, Iowa, locally known as 123 N. Main Street, Charles City, Floyd County, Iowa, and legally described, to wit:

> LOTS ONE, TWO, THREE, FOUR AND FIVE (1, 2, 3, 4 AND 5) OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED IN AND AS A PART OF CHARLES CITY, IOWA (also known as McQuillen Place Condominiums, or Condominium Unit A and Condominium Unit B of McQuillen Place Condominiums)

(hereinafter called the "Property").

4.      The Property is listed as a duplex of 33 units, however, the Movant believes that this description is deceptive in that the Property remains under construction with the Debtor's intention for the Property to include 33 residential units on the second and third floors, and commercial rental space on the first floor.

5.      At the commencement of this case, the Property was unfinished and it remains unfinished and unoccupied.

6.      To the knowledge of the Movant, no material construction activity has occurred at the Property for more than 18 months, and no construction activity has occurred since the commencement of this case.

7.      The Movant is the holder of a claim against the Debtor which is secured by a Construction Mortgage dated December 31, 2014 (hereinafter called the "Mortgage"), and a Promissory Note of even date. Copies of the Mortgage and Promissory Note are attached hereto as exhibits to the Petition to Foreclose Mortgage Without Redemption described hereinafter.

8.      The Movant has filed a proof of claim in this case for $4,030,746.28. The promissory note on which the claim is based is delinquent and accrues interest at the rate of 11.75% per annum.

9.      The Mortgage was filed in the Office of the Recorder of Floyd County, Iowa, on January 5, 2015, and recorded in Book 2015 at Page 0014.

10.     The Promissory Note and Mortgage were originally granted to and given to Cedar Rapids Bank and Trust Company (hereinafter called "CRBT") and were subsequently assigned to the Movant. Copies of the assignment documents are attached hereto.

11.     On information and belief, the Movant asserts that the Property has a value less than the amount of amount due the Movant and secured by the Mortgage, and therefore the Debtor has no equity in the Property, and that the Property is not necessary to an effective reorganization.

12.     The Movant does not have and has not been offered adequate protection of its interest in the Property.

- 2 -

13.     The Debtor has made no offer of adequate protection to the Movant.

14.     The Movant has filed a Motion to Lift Stay (Doc. No. 31) and the Debtor has filed a Resistance (Doc. No. 37).

15.     The Debtor continues to resist the Motion to Lift Stay and a final hearing on said Motion is expected to be scheduled shortly.

16.     At the commencement of this case, the final payment date of the Promissory Note had passed and the Promissory Note is due and payable in full.

17.     In June 2018, prior to the commencement of this case, the Movant advanced the payment of real estate taxes and then accrued penalty in the amount of $236,446.00 in order to prevent the tax sale of the Property.

18.     The installments of real estate taxes against the Property that became delinquent when not paid prior to October 1, 2018, and April 1, 2019, remain unpaid in the amounts of $106,250.00 plus penalty of $20,726.00, and $106,250.00 plus penalty of $11,158.00, respectively. Penalty continues to accrue on the unpaid taxes at the rate of 1.5% per month. See Exhibit A attached.

19.     Since the commencement of this case, the Debtor has failed to pay the real estate taxes that became delinquent when not paid prior to October 1, 2019, and there is currently due for said taxes the sum of $108,431.00 plus penalty of $1,626.00. Penalty continues to accrue on the unpaid taxes at the rate of 1.5% per month. See Exhibit A attached.

20.     Since the commencement of this case, the Debtor has failed to pay a special assessment against the Property that became delinquent when not paid prior to October 1, 2019, and there is currently due for said special assessment the sum of $47,063.24 plus

- 3 -

penalty of $706.00. Penalty continues to accrue on the unpaid special assessment at the rate of 1.5% per month. See Exhibit A attached.

21.     Prior to the commencement of this case, a petition to foreclose the Mortgage was filed in the Iowa District Court for Floyd County (hereinafter called the "Mortgage Foreclosure Action") entitled Cedar Rapids Bank and Trust Company, Plaintiff vs. McQuillen Place Company, LLC, et al, and said Action has been designated as Case No. EQCV031170.

22.     The Movant has been substituted as the Plaintiff in the Mortgage Foreclosure Action.

23.     Numerous other persons and entities were joined as defendants to the Mortgage Foreclosure Action as the result of guaranties by them of the Promissory Note, and another party, Schindler Elevator Corporation, was joined as a defendant as the result of a mechanic's lien filed against the Debtor and the Property by said defendant.

24.     Prior to the commencement of this case, the Debtor filed an answer in the Mortgage Foreclosure Action denying the material allegations of the petition and asserting numerous counterclaims against the Movant.

25.     The counterclaims against the Movant have been denied by the Movant.

26.     Prior to the commencement of this case, Schindler Elevator Corporation filed a cross-petition against the Debtor seeking to foreclosure the mechanic's lien.

27.     Prior to the commencement of this case, the Debtor filed a third-party petition against CRBT asserting numerous claims against CRBT as the result of transactions involving the Promissory Note, the Mortgage and the Property.

28.     The third-party claims against CRBT have been denied by CRBT.

- 4 -

29.     Prior to the commencement of this case, the parties to the Mortgage Foreclosure Action had commenced discovery and numerous interrogatories and document production requests had been served by the Debtor, the Movant and CRBT.

30.     The Debtor listed the claims against the Movant and the claims against CRBT as assets in the Schedule A/B filed by the Debtor in this case.

31.     The claims asserted by the Debtor against the Movant and CRBT are presently unliquidated and disputed claims and those claims will need to be liquidated, or estimated by the Court, in order to complete administration of the Debtor's property.

32.     The Debtor has filed a Chapter 11 Plan (hereinafter called the "Plan") and a Disclosure Statement and a hearing on the sufficiency of the Disclosure Statement is scheduled for December 5, 2019.

33.     The Movant believes that the Plan is not confirmable and that the Disclosure Statement is not sufficient and an objection will be filed prior to the November 1, 2019, deadline for filing objections.

34.     The Plan proposes a sale of the Property (i.e. the real estate described above) to MCP2, LLC, an Iowa limited liability company for an undetermined dollar amount. The Plan and Disclosure Statement do not disclose the principals of the buyer and do not provide any information as to the ability of the buyer to perform its obligations under the Plan.

35.     The Iowa Secretary of State shows that no entity by the name of MCP2, LLC exists in the State of Iowa (see Exhibit B attached).

- 5 -

36.     The Iowa Secretary of State does show that an entity by the name of MCP2 Development, LLC was formed by Charles McQuillen Thomson, the principal of the Debtor, on April 24, 2019 (see Exhibit C attached).

37.     The Debtor operates a small dry cleaning business and the monthly reports show that this business operates at a minimal profit but not in an amount sufficient to pay the real estate taxes due with respect to the Real Estate described above.

38.     A "window" that lies as nearly in a horizontal plane and which is located over the courtyard of the Property has been removed or has been otherwise non-existent for at least two months exposing the Property to the outside elements, all of which has been known to the Debtor for that period of time.

39.     The plywood that covers one of the many unfinished openings that someday will be a window or door of the Property opening onto Main Street, Charles City, Iowa, has developed a whole large enough to allow animals and varmints to enter the Property.

40.     The failure of the Debtor to complete the construction of the second and third floor apartments and the first floor commercial spaces, and to preserve and protect the Property constitutes mismanagement of the estate.

41.     The Movant believes that the Plan filed by the Debtor was not proposed by the Debtor in good faith.

42.     The Movant believes that the filing of such Plan and the failure to provide evidence of financial capacity to perform under the Plan constitutes gross mismanagement of the estate by the Debtor.

43.     Cause exists for the conversion or dismissal of this case, including the following, *inter alia*:

- 6 -

a.    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation,

b.    gross mismanagement of the estate, and,

c.    failure to timely pay taxes owed after the date of the order for relief.

WHEREFORE, the Movant requests the Court to convert of dismiss this Chapter 11 case, and to grant such other and further relief as the Court deems just and equitable in the premises.

 /s/ Larry S. Eide
Larry S. Eide (AT0002317)
PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA  50402-1588
Telephone: (641) 423-4264
Facsimile: (641) 423-3145
Email: eide@pappajohnlaw.com

## CERTIFICATE OF SERVICE

The undersigned, Larry S. Eide, certifies that on October 17, 2019, he served a copy of the foregoing document on the United States Trustee, Debtor(s), attorney for Debtor(s) and other parties having requested notice pursuant to Rule 2002 electronically on all parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing, and by ordinary United States mail, postage prepaid, addressed as follows on all other parties:

James L. Snyder
Acting United States Trustee
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2101

Donald H. Molstad
Molstad Law Firm
701 Pierce Street, Suite 305
Sioux City, IA 51101

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Room 793
Des Moines, IA 50309-2108

Charles M. Thomson
Law Offices of Charles M. Thomson
1110 N. Grand Ave, Suite 300
Charles City, IA 50616

- 7 -

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
PO Box 307
Charles City, IA 50616-0307

Joseph E. Schmall
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Laura M. Hyer
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

Allen O. Pederson
Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kevin E. Keiffer
Mills, Inc.
1906 Gilbert Street
Charles City, IA 50616

Tom Brock, President
T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
PO Box 39
Nashua, IA 50658-0039

 /s/ Larry S. Eide
Larry S. Eide (AT0002317)



**IOWA TAX** AND **TAGS**

FLOYD COUNTY PROPERTY TAX PAYMENT SERVICE

# SELECT AMOUNTS TO PAY

## 2019 REAL ESTATE TAX - PARCEL # 000110146700600

McQuillen Place Company, LLC
123 N MAIN CHARLES CITY

MORE DETAILS     COUNTY ASSESSOR PAGE

> **Online Payments Not Allowed for this Tax Record**
> Please contact your county treasurer for more information.

| INSTALLMENT | | ADD TO CART |
|---|---|---|
| **September** | | |
| Due On: | 9/1/2019 | Not Allowed |
| Late On: | 10/1/2019 | |
| Tax 🔁: | $108,431.00 | |
| Late Int. & Cost 🔁: | $1,626.00 | |
| **March** | | |
| Due On: | 3/1/2020 | Not Allowed |
| Late On: | 4/1/2020 | |
| Tax 🔁: | $108,431.00 | |
| Late Int. & Cost 🔁: | $0.00 | |

## 2019 SPECIAL ASSESSMENT - PARCEL # 000110146700600

McQuillen Place Company, LLC
123 N MAIN CHARLES CITY

MORE DETAILS     COUNTY ASSESSOR PAGE

> **Online Payments Not Allowed for this Tax Record**
> Please contact your county treasurer for more information.

INSTALLMENT          ADD TO CART

EXHIBIT A

INSTALLMENT                    ADD TO CART

**September**

|  | Due On: | 9/1/2019 | Not Allowed |
| --- | --- | --- | --- |
|  | Late On: | 10/1/2019 |  |
|  | Tax 🔍: | $47,063.24 |  |
|  | Late Int.<br>& Cost 🔍: | $706.00 |  |

## 2018 REAL ESTATE TAX - PARCEL # 000110146700600

McQuillen Place Company, LLC
123 N MAIN CHARLES CITY

MORE DETAILS      COUNTY ASSESSOR PAGE

> **Online Payments Not Allowed for this Tax Record**
> Please contact your county treasurer for more information.

INSTALLMENT                    ADD TO CART

**September**

|  | Due On: | 9/1/2018 | Not Allowed |
| --- | --- | --- | --- |
|  | Late On: | 10/2/2018 |  |
|  | Tax 🔍: | $106,265.00 |  |
|  | Late Int.<br>& Cost 🔍: | $20,726.00 |  |

**March**

|  | Due On: | 3/1/2019 | Not Allowed |
| --- | --- | --- | --- |
|  | Late On: | 4/2/2019 |  |
|  | Tax 🔍: | $106,265.00 |  |
|  | Late Int.<br>& Cost 🔍: | $11,158.00 |  |



# IOWA SECRETARY OF STATE
## Paul D. Pate

| Home | Business Services | Search Databases | Online Filing | Elections | Notaries | Nonprofits | Youth |

Home » Search Databases » Business Entities » Results

## Business Entities Results                                        print

Searched: **MPC2, LLC**                                          Results 0

| Business No. | Name | Status | Type |
| --- | --- | --- | --- |

*Sorry, no results. Search again*

Screen Help

**FEATURED RESOURCES**

QUICK LINKS    ONLINE SERVICES    SEARCH

- Reinstatement Information
- Find Your Precinct/Polling Place
- Am I Registered to Vote in Iowa?
- Register to Vote
- Request an Absentee Ballot
- Track Your Absentee Ballot
- Business Resources















**ADDRESS CONFIDENTIALITY PROGRAM**

*EXHIBIT B*



# IOWA SECRETARY OF STATE
## Paul D. Pate

| Home | Business Services | Search Databases | Online Filing | Elections | Notaries | Nonprofits | Youth |
|------|------|------|------|------|------|------|------|

Home » Search Databases » Business Entities » Results » Summary

## Business Entity Summary

print

Summary   Address   Agent   Filings   Names   Officers   Stock   Search Again

Print Certificate of Existence

Searched: **mpc**

| Business No. | Legal Name | | Status | |
|---|---|---|---|---|
| 599574 | MPC2 DEVELOPMENT, LLC | | Active | |
| Type | State of Inc. | | Modified | |
| Legal | IA | | No | |
| Expiration Date | Effective Date | | Filing Date | |
| PERPETUAL | 4/24/2019 | | 4/24/2019 | |
| Chapter | | | | |
| CODE 489 DOMESTIC LIMITED LIABILITY COMPANY | | | | |

## Names (Viewing 1 of 1)

| Type | Status | Modified | Name |
|---|---|---|---|
| Legal | Active | No | MPC2 DEVELOPMENT, LLC |

## Registered Agent or Reserving Party

| Full Name | |
|---|---|
| CHARLES M. THOMSON | |
| Address | Address 2 |
| 1110 NORTH GRAND, #300 | |
| City, State, Zip | |
| CHARLES CITY, IA, 50616 | |

## Home Office

| Full Name | |
|---|---|
| | |
| Address | Address 2 |
| 25 EAST DELAWARE, SUITE 209 | |
| City, State, Zip | |
| CHICAGO, IL, 60611 | |

↑ Back to Top

### FEATURED RESOURCES

QUICK LINKS   ONLINE SERVICES   SEARCH

- Reinstatement Information
- Find Your Precinct/Polling Place
- Am I Registered to Vote in Iowa?
- Register to Vote
- Request an Absentee Ballot
- Track Your Absentee Ballot
- Business Resources















ADDRESS CONFIDENTIALITY PROGRAM

*EXHIBIT C*

Iowa Secretary of State

321 East 12th Street

Des Moines, IA 50319

sos.iowa.gov



**FILED**

Date:          **4/24/2019 02:59 PM**

Corp No:                      **599574**

Cert No:               **FT0024662**

## Certificate of Organization - LLC

### Information

CODE 489 DOMESTIC LIMITED LIABILITY COMPANY
Chapter

MPC2 Development, LLC
Entity Name

4/24/2019 3:00:00 PM
Effective Date and Time

Perpetual
Expiration Date

### Registered Agent and Registered Office Address

Charles M. Thomson
Full Name

1110 North Grand, #300
Address1                                          Address2

| Charles City | IA | 50616 | USA |
|---|---|---|---|
| City | State | Zip | Country |

### Principal office

25 East Delaware, Suite 209
Address1                                          Address2

| Chicago | IL | 60611 | USA |
|---|---|---|---|
| City | State | Zip | Country |

### Signature(s)

Charles McQuillen Thomson                    4/24/2019 2:58:28 PM
Organizer                                          Date

# CERTIFICATE OF ORGANIZATION
## OF
## MPC2 DEVELOPMENT, LLC

TO THE SECRETARY OF STATE OF THE STATE OF IOWA:

Pursuant to Chapter 489 of the Iowa Limited Liability Company Act, the undersigned, acting as organizer of the Limited Liability Company adopts the following Certificate of Organization for the Limited Liability Company.

1.    The name of the Limited Liability Company is MPC2 Development, LLC.

2.    The street address of the Limited Liability Company's initial registered office is 1110 North Grand Avenue, Suite 300, Charles City, IA 50616, and the name of its initial registered agent at that office is Charles Thomson, whose address is 1110 North Grand Avenue, Suite 300, Charles City, IA 50616.

3.    The street address of the principal office of the Limited Liability Company is 1110 North Grand Avenue, Suite 300, Charles City, IA 50616.

4.    The period of the Limited Liability Company's duration shall be perpetual from the effective date and time this document is filed with the Secretary of State of the State of Iowa.

Charles Thomson, Organizer

Label Matrix for local noticing
0862-4
Case 19-00507
Northern District of Iowa
Mason City
Wed Oct 23 14:03:37 CDT 2019

Amelia Management, LLC
1110 N. Grand Avenue, Ste. 300
Charles City, IA 50616-2139

Amelia Trust
c/o Charles M. Thomson, Trustee
1110 North Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Amelia Trust
c/o Judith M. O'Donohoe
PO Box 307
116 N. Main Street
Charles City, IA 50616-2015

Atlas Painting
911 Sycamore Street
Waterloo, Iowa 50703-4815

BRP Bruening
900 Montgomery Street
Decorah, Iowa 52101-2343

Bergan KDV
P.O. Box 2100
Waterloo, IA 50704-2100

Bluhm's Cedar Valley Electric
409 South Johnson Street
Charles City, Iowa 50616-2621

Cedar Rapids Bank & Trust Company
500 First Avenue, NE
PO Box 789
Cedar Rapids, IA 52406-0789

Cedar Rapids Bank & Trust Company
c/o Joseph E. Schmall
PO Box 2804
Cedar Rapids, IA  52406-2804

Cedar Rapids Bank & Trust Company
c/o Laura M. Hyer
PO Box 2804
Cedar Rapids, IA  52406-2804

Cerro Gordo County, Iowa
Carlyle D Dalen
Asst. County Atty.
220 N. Washington Ave.
Mason City, Ia 50401-3220

Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Cincinnati Insurance
Post Office Box 145496
Cincinnati, OH 45250-5496

City of Charles City, IA
c/o Brad Sloter
200 North Johnson Street
Charles City, IA  50616

City of Charles City, Iowa
105 Milwaukee Mall
Suite 2
Charles City, IA 50616-2280

Cornice & Rose International, LLC
804 Roberts Road
Barrington, IL 60010-1142

Cornice & Rose Intl Ltd.
804 W Roberts Road
Barrington, IL 60010-1142

Custom Air
Brett Payton
10443 Osage Rd
Waterloo, IA 50703-9349

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
Cedar Rapids, IA 52401-1110

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
P.O. Box 2877
Cedar Rapids, IA 52406-2877

Dean Snyder Construction
913 N. 14th Street
Clear Lake, Iowa 50428-2138

(p)CEDAR VALLEY STEEL INC
280 50TH AVE SW
CEDAR RAPIDS IA 52404-4933

Donald H Molstad
505 6th St , Suite 308
Sioux City, Ia 51101-1201

Larry S. Eide
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Elwood Law Firm
116 N. Main Street
Charles City, Iowa 50616-2015

Elwood Law Firm
c/o Judith O'Donohoe
116 North Main Street
PO Box 307
Charles City, IA  50616

First Security Bank & Trust Company
809 Clark Street
Charles City, IA 50616-2208

First Security Bank & Trust Company
809 Clark Street
PO Box 577
Charles City, IA 50616-0507

First Security Bank & Trust Company
c/o Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Floyd County Treasurer
101 South Main Street Ste 303
Charles City, Iowa 50616-2792

Brandon James Gray
Iowa Attorney General's Office
1305 Walnut
Des Moines, IA 50319-0109

J D Haas
J D Haas & Associates, PLLC
1120 E. 80th St.
Suite 200
Bloomington, MN 55420-1407

Hawkeye Alarm
16 Commercial Street
Waterloo, Iowa 50701-1310

Hildreth & Co., LLC
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Laura Michelle Hyer
Bradley & Riley, PC
PO Box 2804
Cedar Rapids, IA 52406-2804

IL Switchboard
125 West Laura Drive
Addison, IL 60101-5178

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Iowa Economic Development Authority
200 E Grand Avenue
Des Moines, IA 50309-1834

Iowa Economic Development Authority
Office of the Attorney General of Iowa
ATTN: Bankruptcy Unit
1305 E. Walnut Street
Des Moines, IA 50319-0109

Jed Construction
102 Grand Street
Elma, Iowa 50628-8189

Jendro Sanitation
108 Prospect Lane
Charles City, Iowa 50616

Judith Mack Odonohoe
P O Box 307
116 N Main St
Charles City, Ia 50616-2015

Kamm Excavating Corp
1301 Hildreth Street
Charles City, IA 50616-3663

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines IA 50309-2108

Larry Steven Eide
103 E. State St., Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Laura Michelle Hyer
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

MAS
41W195 Railroad Street
Pingree Grove, IL 60140-8980

McQuillen Place Company, LLC
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

Mediacom
1 Mediacom Way
Mediacom Park
New York, NY 10918-4810

Mick Gage Plumbing & Heating
511 West Milwaukee Street
New Hampton, Iowa 50659-1105

Mid American Energy
666 Grand Ave.
Des Moines, Iowa 50309-2580

Midwest Engineering
8236 W. 51st Street
Sioux Falls, SD 57106-7861

Midwest Fire Sprinkler
2001 De Wolf Street
Des Moines, Iowa 50316-2761

(p)MILLS INC
1906 GILBERT ST
CHARLES CITY IA 50616-9171

Donald H. Molstad
701 Pierce St., Ste. 305
Sioux City, IA 51101-1037

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616-0307

O'Hara's Son Roofing Corporation
3306 N. Knox Avenue
Chicago, IL 60641-4434

Allen O. Pederson
412 Sample Street
Nashua, IA 50658-9696

Pederson Plumbing
412 Sample Street
Charles City, IA 50616

Pederson Plumbing
Allen O. Pederson
412 Sample Street
Nashua, Iowa 50658-9696

Phillips Modern Ag
2153 S. Linn Ave.
New Hampton, Iowa 50659-9414

Planscape Partners
1200 Nicollet Ave.
Suite 706
Minneapolis, MN 55403-2409

Premier Cleaners
816 First Avenue N
Fort Dodge, IA 50501-3906

Randall Eugene Nielsen
P O Box 1588
103 E State St ,Suite 800
Mason City, IA 50401-3334

Robert Cardell Gainer
505 5th Ave Suite 835
Des Moines, IA 50309-2317

Schindler Elevator Corporation
1530 Timberwolf Drive
Holland, Ohio 43528-9161

Schindler Elevator Corporation
20 Whippany Rd
Morristown, NJ 07960-4524

Schindler Elevator Corporation
c/o NCS, 729 Miner Rd
Highland Hts, OH 44143-2117

Joseph E. Schmall
2007 First Avenue SE
PO Box 2804
Cedar Rapids, IA 52406-2804

Sherri Dralle
1308 Grandview Ave.
Waverly, IA 50677-1038

Christine B. Skilton
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Bradley David Sloter
Noah Smith & Schuknecht PLC
200 North Johnson St.
Charles City, IA 50616-1939

T-J Service, Inc.
221 N. Main St.
Charles City, IA 50616-2016

T-J Service, Inc.
Tom Brock, President
221 North Main Street
Charles City, Iowa 50616-2016

T-J Service, Inc.
c/o Christine B. Skilton
205 Brasher Street, PO Box 39
Nashua, IA  50658-0039

Charles McQuillen Thomson
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

United States Trustee
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2103

Unruh Insulation
2633 450 St.,
Stacyville, Iowa 50476-7549

VanMeter
850 32nd Ave. SW
Cedar Rapids, Iowa 52404-3913

Vernon P Squires
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

L Ashley Zubal
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309-2106

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Design Build Structures
7518 Peosta Industrial Drive
Peosta, Iowa 52068

Mills, Inc.
Kelvin E. Keiffer, President
1906 Gilbert St.
Charles City, Iowa 50616

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u), IA

(u)Elwood Law Office
116 N. Main St. PO Box 307
Charles City

(u)Mills - Inc.

End of Label Matrix
Mailable recipients    81
Bypassed recipients     3
Total                  84

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | CASE NO. 19-00507M |
| McQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | UST's OBJECTION TO DEBTOR'S |
| Debtor. | ) | APPLICATION TO EMPLOY COUNSEL |

The Acting United States Trustee ("UST"), through the undersigned Trial Attorney, hereby raises the following objections to Debtor's Application to Employ attorney J D Haas of J D Haas and Associates, PLLC (hereafter "Application"). In support of his objection the UST alleges as follows:

1. Debtor filed its Application on October 22, 2019 and the Court approved the application the same day. (docs. 65-67).

2. The Application does not cite under what section of the Bankruptcy Code it seeks employment of the professional. The UST assumes the employment is sought somewhere within Section 327.

3. Federal Rules of Bankruptcy Procedure, Rule 2014(a) states:

(a) Application for an order of employment

An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee. The application shall be filed and, unless the case is a chapter 9 municipality case, a copy of the application shall be transmitted by the applicant to the United States trustee. *The application shall state the specific facts showing the necessity for the employment*, the name of the person to be employed, the reasons for the selection, *the professional services to be rendered*, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

4. Debtor simply states that the purpose of the employment is for "general litigation." The

1

Application falls woefully short of complying with Fed. R. Bankr. P. 2014(a).  Debtor proffers no specific facts for the employment.  Debtor does not explain why the employment is necessary and/or beneficial for the estate.  Debtor does not set forth the nature of the litigation, or the scope of the services to be rendered by Mr. Haas.

5.    In addition to the pleading's procedural shortcomings, the UST objects to employment generally. Debtor is not generating revenue necessary to meet operation and overhead expenses.  Debtor currently does not possess enough capital to pay insurance premiums, reorganization counsel fees, or post-petition tax obligations.  Debtor is administratively insolvent.

6.    As more fully set forth in the UST's motion to dismiss, Debtor has not, within the time afforded under the Code, proposed a Plan in good faith and can reach confirmation.

7.    Allowing employment of counsel is not in the best interest of the estate.  Allowing the estate to accumulate additional administrative expense fees are a detriment and prejudicial to creditors.

8.    Debtor should anticipate that if employment is confirmed by the Court, the UST intends to object to the application for approval of fees that appear not to be for the benefit of the estate and the creditors.

WHEREFORE, based on the foregoing, the Acting United States Trustee respectfully requests the Court amend its Order to deny Debtor's Motion to Employ J D Haas.

**James L Snyder**
Acting United States trustee
Region 12

By:/s/ L. Ashley Zubal
**L. Ashley Zubal**
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Ph:(515)323-2269/Fax: 284-4986
Ashley.Zubal@usdoj.gov

2

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that copies of this document were served on the parties listed below by electronic mail or first-class mail, postage prepaid, on October 24, 2019:

Parties receiving electronic service via CM/ECF

- **Larry S. Eide**    eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com
- **Laura Michelle Hyer**    lhyer@bradleyriley.com, dmoses@bradleyriley.com;Docket@bradleyriley.com
- **Donald H. Molstad**    judylaw308@yahoo.com
- **Judith O'Donohoe**    charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com
- **Joseph E. Schmall**    jschmall@bradleyriley.com, cclark@bradleyriley.com;docket@bradleyriley.com
- **Christine B. Skilton**    cbs.csslaw@butler-bremer.com
- **Bradley David Sloter**    brads@nsslaw.net
- **Charles McQuillen Thomson**    cthomson@doall.com
- **Brandon James Gray**    Brandon.gray@ag.iowa.gov
- **JD Hass**    jdhaas@jdhaas.com
- **United States Trustee**    USTPRegion12.CR.ECF@usdoj.gov

**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

*/s/ Jennifer L. Cline*
Jennifer L. Cline
Paralegal Specialist

3

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| | CHAPTER 11 |
| In Re: | Bankruptcy No. |
| | |
| McQuillen Place Company, LLC | 19–00507 |
| | |
| Debtor(s) | |

## NOTICE SETTING HEARING
## ON APPLICATION FOR APPROVAL OF EMPLOYMENT OF ATTORNEY (DOC. 65)
## AND OBJECTION THERETO (DOC. 70)

TO:

Charles McQuillen Thomson, Attorney for Debtor(s)

United States Trustee

Donald Molstad, Attorney for Debtor
JD Haas, Attorney for Debtor
Allen O. Pederson, Attorney for Creditor Committee

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

**_November 15, 2019 at 02:30 PM_**

**NOTE: PLEASE USE THE FOLLOWING INSTRUCTIONS FOR THE PHONE CONFERENCE**
1. Call the toll free number: 1–888–684–8852
2. Enter Participant Access Code: 7148063
3. Enter the Participant Security Code: 9507
4. After the security code is entered, you will be connected into the conference
5. Please identify yourself after you have joined the conference

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Danielle Cripe*

Date: October 25, 2019

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | CASE NO. 19-00507M |
| McQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | UNITED STATES TRUSTEE'S |
| Debtor. | ) | MOTION TO CONVERT OR DISMISS |
| | ) | CHAPTER 11 CASE UNDER 11 U.S.C. § 1112(b) |

The Acting United States Trustee ("UST"), through the undersigned Trial Attorney, hereby moves

the court to convert or dismiss this case.  In support of his Motion, the UST alleges as follows:

1.   The UST has standing to bring this Motion pursuant to 11 U.S.C. § 307 and 28 U.S.C. § 586.

This matter is a core-proceeding arising under 28 U.S.C. § 157(b)(2)(A).  This Court has jurisdiction

pursuant to 28 U.S.C. §1334.

2.   Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 25, 2019.

3.   Debtor's primary asset consists of one piece of historical real estate, referred to as the

"McQuillen Place," located in downtown Charles City, Iowa ("the Property").  At the initial debtor

interview and meeting of creditors, Debtor's principal, Charles Thomsen, described the intended

purpose of the property will be for mixed commercial and residential use.  Debtor's owners consist of

Mr. Thomsen (60%) and James Gray (40%).  Mr. Thomsen has been the only active principal participant

of Debtor in this case.

4.   The effort to rehabilitate the Property, which began in 2014, has remained at a standstill since

the fall of 2017.  Debtor scheduled that value of the Property on its Schedules in the amount of

$500,000.00.  Debtor scheduled secured debt owed to primary creditor, First Security Bank & Trust

Company ("the Bank") in excess of $6.8 million.  Accordingly, Debtor has no equity in the Property.

5.   The Property remains unfinished and vacant.  Prior to the commencement of the case and

1

post-filing, the Bank notified Debtor of increasing structural damage to the Property.  Upon information and belief, no construction has resumed since the filing of the case, including to address continued deterioration of the Property.

6.    Debtor generates virtually little to no income.  Prior to filing, Debtor purchased a local dry cleaning business that was intended to serve as an amenity to future residents of the Property.  Upon review of the Monthly Operating Reports ("MORs"), Debtor's monthly revenue and disbursements average less than $4,000.00.  The revenue that is generated by Debtor, through the dry cleaning business, is obtained from an affiliated business of Debtor by providing laundry and dry cleaning services to that entity and Mr. Thomsen personally.  The affiliated business is owned by Mr. Thomsen.

7.    Mr. Thomsen is an attorney.  Mr. Thomsen appeared without Debtor's counsel at the meeting of creditors held on June 14, 2019, after Mr. Molstad was approved to represent Debtor in this case.  Mr. Thomsen personally paid Mr. Molstad's retainer.  During the meeting Mr. Thomsen acknowledged that the only chance of proposing a successful plan of reorganization would be to find an interested party to secure financing to complete construction of the Property.  Mr. Thomsen insisted during the meeting that a third party was interested and that financing could be secured within a two week period.  Over four months have passed with Debtor having to seek at least one extension of the exclusivity period.  Prior to filing, Debtor spent significant time unsuccessfully attempting to secure financing to complete construction to no avail.

8.    Debtor represented at the meeting of creditors that the only other assets of Debtor consisted of counterclaims against the Bank and other state and Federal agencies involved in or related to the funding surrounding the McQuillen Place project.  The UST is informed, believes, and thereon alleges that Mr. Thomsen reached out to and "shopped" those claims to various attorneys and firms in hopes

2

that one would come forward to represented the unsecured creditor committee and pursue such claims.

No attorney or firm has sought to be employed as committee counsel in this case. Debtor presents no

evidence and provides insufficient information in the Disclosure Statement and Plan to suggest that such

claims are viable. In pending state litigation, Mr. Thomsen asserted many of the same counterclaims

against the Bank in his individual capacity and will be adjudicated in that forum.

9.   The UST is informed, believes, and thereon alleges that Debtor's monthly disbursements are

not accurately reflected on the MORs. Post-filing it has been necessary for Debtor to periodically renew

and insurance coverage on the Property. These costs exceed $1,000.00 per month and are not reflected

on the reports. Upon information and belief Mr. Thomsen is paying these costs in a personal capacity.

Debtor has not sought Court approval to obtain unsecured loans. In any event, the payments should be

disclosed on the reports.

10. The UST is informed, believes, and thereon alleges that insurance on the Property is set to

expire on October 31, 2019. A cancellation notice was issued upon Debtor on 10/17/19. Upon

information and belief the estate does not have the funds available on hand to pay for ongoing coverage.

11. At the time of filing Debtor owed outstanding property taxes in excess of $250,000.00. Post-

filing, another $108,431 plus penalty became due at the end of September, 2019. Debtor has failed to

keep post-petition tax obligations current. Based on the MORs there is no capital to pay these amounts.

12. Debtor filed an application to employ Mr. Molstad as its Debtor-in-possession counsel on

May 6, 2019. Since filing, Mr. Mostad has not sought payment of any interim attorney fees. The

Disclosure Statement estimates attorney fees at $10,600. Based on the MORs there is no capital or

revenue available to pay professional fees.

13. Based on the foregoing, it is apparent Debtor is administratively insolvent.

3

14. Debtor filed an initial Disclosure Statement and Plan on October 4, 2019 (docs. 56 & 57). Upon review, the UST believes Debtor's Disclosure Statements severely lacks adequate information and the Plan is not confirmable.

15. On October 22, 2019, Debtor sought to employ J D Hass as attorney for Debtor regarding general litigation at an average fee rate of $225/hr.  The application is deficient in several respects as addressed in the UST's objection to the application to employ.  It is not clear from the application what litigation Debtor is referring to or why such representation is necessary or how it is beneficial to the estate.  Given the decline of the estate, inability to reorganized, and inability to compensate proposed counsel, employment of counsel is not appropriate under the circumstances.

### Argument

16. This Motion is brought pursuant to 11 U.S.C. § 1112(b)(1).  Section 1112(b)(1) provides that the Court may treat this Motion as a motion to convert or dismiss if the Court finds one or the other remedy to be in the best interest of the creditors and the estate.  The following provisions are applicable to this case:

    a.  1112(b)(4)(A):  the substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

    b.  1112(b)(4)(B):  gross mismanagement of the estate;

    c.  1112(b)(4)(I):  failure to timely pay taxes owed after the date of the order for relief.

17. The Court's discretion to dismiss or convert a Chapter 11 case is limited if cause is established. *See Gilroy v. Ameriquest Mortg. Co.* (*In re Gilroy*), 2008 Bankr.Lexis 3968, 2008 WL 4531982 (1st Cir. BAP 2008); *AmeriCERT, Inc. v. Straight Through Processing, Inc.* (*In re AmeriCERT, Inc.*), 360 B.R. 398, 401 (Bankr. D. N.H. 2007) ("Prior to its amendment, the statute provided that a court 'may' dismiss

4

the case upon finding cause, but amended section 1112(b) provides that a court 'shall' dismiss if cause is found, absent unusual circumstances.").

18. The initial burden is on the movant to argue and present evidence by a preponderance of the evidence to prove its position that there is cause for either conversion or dismissal of the Chapter 11 case. *See* Alan N. Resnick & Henry J. Sommer, *7 Collier on Bankruptcy* ¶ 1112.04[4] (16th ed. 2011). "Thus, until the movant carries this burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." *Id.* However, once the movant establishes "cause", the burden shifts to the debtor to demonstrate by evidence the "unusual circumstances" that establish that dismissal or conversion to Chapter 7 is not in the best interests of the creditors and the estate. *Id.* at ¶ 1112.05[1].

## I.    Continuing Loss and Inability to Reorganize

19. Among the other listed factors supporting conversion or dismissal is 1112(b)(4)(A)'s continuing loss or diminution of the estate in the absence of a reasonable likelihood of reorganization. The analysis under § 1112(b)(4)(A) contemplates a "two-fold" inquiry into whether the estate has decreased in value and if there is a reasonably likelihood of rehabilitation. *In re v. Cos.*, 274 B.R. 721, 725–26 (Bankr. N.D. Ohio 2002). Because the statute is written in the conjunctive, both requirements must be satisfied. *In re BH S & B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D. N.Y. 2010).

20. With respect to the first prong, the focus is on "whether post-petition, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values". *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 713–14 (Bankr. D. Md. 2011); see also *In re Westgate Props., Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (requiring proof that the debtor "continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief."); *Nester v. Gateway Access*

5

*Solutions, Inc.* (*In re Gateway Access Solutions, Inc.*), 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007)

("Negative cash flow and an inability to pay current expenses as they come due can satisfy the continuing

loss or diminution of the estate standard for the purposes of § 1112(b).").

21.  The loss may be substantial or continuing; it need not be both. 7 *Collier on Bankruptcy* ¶

1112.04[6][a][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014)("By the use of the word

"substantial" in section 1112(b)(4)(A), Congress has indicated that a loss need not be continuing in order

to satisfy the first prong of this enumerated cause").  If the loss is sufficiently large given the financial

circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of

creditors, the loss is substantial.  *Id*.  Cause can be shown by demonstrating that the debtor suffered or has

continued to experience a negative cash flow or declining asset values following the order for relief.  *In

re Paterno*, 511 B.R. 62, 66 (Bankr. M.D. N.C. 2014).  "Negative cash flow alone can be sufficient cause

to dismiss or convert under § 1112(b)." *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009) (citing

*Loop Corp. v. United States Trustee*, 379 F.3d 511, 515–16 (8th Cir. 2004)).

22. Debtor's financial condition continues to decline.  MORs reflect Debtor is operating at a loss.

The McQuillen Place generates zero income.  The incidental acquired laundry business produces just

enough revenue to cover its own overhead.  As stated earlier, Debtor omits from its MORs insurance

payments on the Property that are paid out of pocket by Mr. Thomsen.  It appears Debtors cannot meet

operational expenses without the injection of cash from outside sources.  Debtor does not have the capital

available to pay insurance premiums due on 10/31/19.  Debtor is not able to pay the outstanding post-

petition property taxes.  The bank is requesting relief from stay or some payment sufficient for adequate

protection.  It is clear from the reports Debtor does not have the capacity to even provide assurance to the

Bank.  Finally, there is nothing to suggest Debtor is able to cover the administrative expenses as they continue to accrue, let alone funds available to pay newly proposed counsel J D Haas.

23. With respect to the second prong of § 1112(b)(4)(A), that prong provides that "[t]he issue of rehabilitation for purposes of §1112(b)(4)(A) 'is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort.'" *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009) (citations omitted); see also *In re Basil St. Partners, LLC*, 477 B.R. 846, 862 (M.D. Fla. 2012).  "[R]ehabilitation does not necessarily denote reorganization, which could involve liquidation.  Instead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" *Westgate Props., Ltd*., 432 B.R. at 723 (quoting *V Cos*., 274 B.R. at 725); see also *Landmark Atl. Hess Farm, LLC*, 448 B.R. at 714–15 ("[R]ehabilitation is not synonymous with reorganization and the determination is not whether a debtor can confirm a plan, but whether the debtor has sufficient business prospects."); *BH S & B Holdings, LLC*, 439 B.R. at 347 ("In this context, rehabilitation means to put back in good condition and reestablish on a sound basis.").  See also, *Santa Fe Minerals, Inc. v. BEPCO, L.P*., 386 B.R. 548, 552 (Bankr. D. Del. 2008) (rehabilitation means restoration of a business' viability; liquidation is not rehabilitation).  Further, to meet the standard required for "reasonable reorganization", a plan for rehabilitation under Chapter 11 must be based on more than speculative data.  *In re Schriock Constr. Inc.*, 167 B.R. 569, 576 (Bankr. D. N.D. 1994).

24. Debtor must secure financing from a third party in order to successfully reorganize.  It has not done so.  The dilemma to obtain funding was not one that occurred on the eve of filing and thus necessitated an emergency filing.  Rather, Debtor was unsuccessful seeking financing to complete construction of the McQuillen Place for a considerable amount of time prior to filing.  The current

7

scheduled value of the Property ($500,000.00) is a fraction of the secured debt owed against it ($6.8+ million).

25. Debtor's Plan calls for the sale of the McQuillen Place development to a new entity, MPC2, LLC, to complete construction on the Property. Despite the seemingly unsurmountable debt compared to asset value, Debtor proposes to cram down the debt of the Bank. The Bank does not consent to its treatment under the Plan.

26. Debtor further relies heavily on its ability to obtain recovery under its purported claims as a primary return to creditors. Debtor does not believe litigation on its claims will be completed prior to year 2024. Debtor gives no basis for the value assigned to the asserted claims. Mr. Thomsen's self-interest in Debtor and lack of any committee counsel interest to pursue such claims lend doubt to their viability.

27. In order for MPC2 to complete construction of the Property, the Plan calls for the ability of MPC2 to enter into a "Construction Financing Agreement." Yet the Plan and Disclosure Statement are devoid of any explanation of Debtor or MPC2's ability to secure financing, if at all. Debtor fails to attach a proposed sale agreement. Debtor does not explain what MPC2 is, only that it is a newly formed entity. As addressed in the Bank's Motion to Dismiss, the Iowa Secretary of State shows no listing for MCP2, LLC. The Iowa Secretary of State lists an entity by the name of MCP2 Development, LLC and formed by Debtor's principal, Charles McQuillen Thomsen, on April 24, 2019.

28. As Exhibit E to the Plan affirms there is currently no executed sale agreement or even a proposed sale agreement. The "Description of Sale Agreement" under Exhibit E states "MPC2 will be comprised of parties…." Debtor does not identify the members or principals of MPC2. Nowhere is the amount of the sale identified or how sale proceeds shall be administered under the Plan. Likewise, Debtor

8

fails to attach any referenced financing agreement. There is no evidence to suggest that financing is even an option, which has been the crux of the problem in this case all along.

29. At this point, any sale agreement or proposed financing is fiction. The Debtor is essentially in the same position it was at the time of filing, with increased debt obligations, and cannot establish feasibility. It follows then that Debtor cannot in good faith propose to pay administrative and other claims due in full on the Effective date. Simply stated, Debtor cannot seek confirmation under the present circumstances.

30. The lack of information regarding MCP2 in the Disclosure Statement and Plan and representations by Mr. Thomsen, who formed the entity, regarding the proposed sale and financing raise serious concerns with respect to conflict of interest and the proposal of the Plan in good faith. "Reorganization plans have to be proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3). Good faith generally means that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re LJBV, LTD,* 544 B.R. 401, 406 (Bankr. N.D. Ill. 2016).

## II.    Failure to Pay Post-Petition Tax and Gross Mismanagement

31. Under Section 1112(b)(4)(I), cause to dismiss exists where Debtor fails to timely pay tax obligations as they come due after the date of the bankruptcy filing. Debtor currently owes outstanding property taxes in excess of $106,000.00. As set forth above, Debtor cannot establish under the proposed Plan any ability to meet this obligation on any Effective date.

32. The inability of the estate to pay operational costs such as taxes and insurance, and inability to pay administrative expenses such as attorney fees, are indicative of gross mismanagement of the estate. As the Bank detailed, in addition to the inability to complete construction, the Property continues to

9

deteriorate and sustain ongoing damage, unaddressed by Debtor.  Debtor's failure to preserve the estate

constitutes gross mismanagement.

WHEREFORE, based on the foregoing, the Acting United States Trustee respectfully requests the

Court dismiss or convert Debtor's chapter 11 bankruptcy, case no. 19-00507.

**James L Snyder**
Acting United States trustee
Region 12

By:/s/ L. Ashley Zubal
**L. Ashley Zubal**
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Ph:(515)323-2269/Fax: 284-4986
Ashley.Zubal@usdoj.gov

10

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that copies of this document were served on the parties listed below by

electronic mail or first-class mail, postage prepaid, on October 25, 2019:

Parties receiving electronic service via CM/ECF

- **Larry S. Eide**    eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com
- **Laura Michelle Hyer**    lhyer@bradleyriley.com,
  dmoses@bradleyriley.com;Docket@bradleyriley.com
- **Donald H. Molstad**    judylaw308@yahoo.com
- **Judith O'Donohoe**    charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com
- **Joseph E. Schmall**    jschmall@bradleyriley.com,
  cclark@bradleyriley.com;docket@bradleyriley.com
- **Christine B. Skilton**    cbs.csslaw@butler-bremer.com
- **Bradley David Sloter**    brads@nsslaw.net
- **Charles McQuillen Thomson**    cthomson@doall.com
- **Brandon James Gray** Brandon.gray@ag.iowa.gov
- **JD Haas**  jdhaas@jdhaas.com
- **United States Trustee**    USTPRegion12.CR.ECF@usdoj.gov

**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658


*/s/ Jennifer L. Cline*
Jennifer L. Cline
Paralegal Specialist

11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

In re:

McQUILLEN PLACE COMPANY, LLC,

                Debtor.

Chapter 11

Case No. 19-507M

---

## MOTION TO SHORTEN BAR DATE TO OBJECT TO UNITED STATE'S TRUSTEE'S MOTION TO CONVERT OR DISMISS CHAPTER 11 CASE FROM 21 DAYS TO 19 DAYS

---

COME NOW the Acting United States Trustee "UST", through the undersigned Trial Attorney, and hereby respectfully moves the Court to shorten the bar date to object to (Doc. 72) from 21 days to 19 days stating the following:

1. First Security Bank & Trust Company filed their Motion to convert of dismiss Debtors "Motion" (Doc. 61) on October 17, 2019.

2. The Motion was noticed to all creditors and parties in interest on October 23, 2019 with a 21 day bar date for objections to said Motion due by November 13, 2019. Hearing on the Motion is set for November 14, 2019 in Mason City.

WHEREFORE, the UST respectfully requests that the Court enter an order shortening the bar date for objections to the UST's Motion to Convert or Dismiss from 21 days to 19 days to allow for its motion to be heard at the November 14, 2019 hearing on First Security Bank & Trust Company's Motion, and for such additional or alternative relief as is just under the circumstances.

Dated this 25th day of October 2019.

1

**James L Snyder**
Acting United States trustee
Region 12

By:/s/ L. Ashley Zubal
**L. Ashley Zubal**
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Ph:(515)323-2269/Fax: 284-4986
Ashley.Zubal@usdoj.gov

2

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that copies of this document were served on the parties listed below

by electronic mail or first-class mail, postage prepaid, on October 25, 2019:

Parties receiving electronic service via CM/ECF

- **Larry S. Eide**    eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com
- **Laura Michelle Hyer**    lhyer@bradleyriley.com, dmoses@bradleyriley.com;Docket@bradleyriley.com
- **Donald H. Molstad**    judylaw308@yahoo.com
- **Judith O'Donohoe**    charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com
- **Joseph E. Schmall**    jschmall@bradleyriley.com, cclark@bradleyriley.com;docket@bradleyriley.com
- **Christine B. Skilton**    cbs.csslaw@butler-bremer.com
- **Bradley David Sloter**    brads@nsslaw.net
- **Charles McQuillen Thomson**    cthomson@doall.com
- **Brandon James Gray** Brandon.gray@ag.iowa.gov
- **JD Haas**  jdhaas@jdhaas.com
- **United States Trustee**    USTPRegion12.CR.ECF@usdoj.gov

    **Allen O. Pederson**
    412 Sample Street
    Nashua, IA 50658


                                    */s/ Jennifer L. Cline*
                                    Jennifer L. Cline
                                    Paralegal Specialist

3

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:                          )     CHAPTER 11
                                )     CASE NO. 19-507M
McQUILLEN PLACE COMPANY, LLC,   )
                                )
                                )
                    Debtor.     )

ORDER GRANTING UNITED STATES TRUSTEE'S
MOTION TO SHORTEN BAR DATE TO OBJECT TO MOTION TO
CONVERT TO OR DISMISS FROM 21 DAYS TO 19 DAYS


The matter before the court is the United States Trustee's
Motion to Shorten Notice of its Motion to Convert or Dismiss.
The court has considered the motion filed by the United States
Trustee (doc. 73) and finds that good cause has been shown to
grant the Motion.

THEREFORE, IT IS ORDERED that the bar date for filing
objections to the United States Trustee's Motion to Convert or
Dismiss is shortened from 21 days to 19.

Dated and entered:
October 25, 2019

_____
United States Bankruptcy
Judge


Prepared by:
Office of U.S. Trustee

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| McQUILLEN PLACE COMPANY, LLC. | ) | Case No. 19-00507M |
| | ) | |
| | ) | |
| Debtors. | ) | |

**NOTICE OF UNITED STATES TRUSTEE'S MOTION**
**TO CONVERT TO CHAPTER 7 OR DISMISS**

**NOTICE OF BAR DATE FOR OBJECTIONS**

**NOTICE OF HEARING ON MOTION TO CONVERT OR DISMISS**

TO ALL CREDITORS AND PARTIES IN INTEREST:

NOTICE IS HEREBY GIVEN that the enclosed motion to convert or dismiss debtor was filed on behalf of the United States Trustee on October 25, 2019.

NOTICE IS FURTHER GIVEN that objections to the motion, if any, shall be filed with the Clerk of Bankruptcy Court, with copies to the United States Trustee and debtors' attorney (mailing addresses below) by no later than **November 13, 2019**.

NOTICE IS FURTHER GIVEN that a hearing will be held on the United States Trustee's Motion To Convert on **November 14, 2019 at 10:00** am in the Courtroom at the Webster County Courthouse, 701 Central Avenue, Fort Dodge, Iowa.

Mailing addresses:

Clerk's Office
United States Bankruptcy Court
Northern District of Iowa
320 6th Street, Room 126
Federal Building
Sioux City, IA   51101

Office of United States Trustee
Attn: L. Ashley Zubal
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108

Attorneys for Debtor:
Donald H. Molstad
701 Pierce Street, Ste 305
Sioux City IA   51101

J.D. Haas
J.D. Haas & Associates PLLC
1120 E 80th St Ste 200
Minneapolis MN   55420

Dated this 25th day of October, 2019.

James L. Snyder
Acting United States Trustee
Region 12

By: */s/ L. Ashley Zubal*
By:/s/ L. Ashley Zubal
L. Ashley Zubal
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Ph:(515)323-2269
Ashley.Zubal@usdoj.gov

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
|  | CHAPTER 11 |
| In Re: | Bankruptcy No. |
|  |  |
| McQuillen Place Company, LLC | 19–00507 |
|  |  |
| Debtor(s) |  |

## NOTICE RESETTING HEARING
## ON APPLICATION FOR APPROVAL OF EMPLOYMENT OF ATTORNEY (DOC. 65)
## AND OBJECTION THERETO (DOC. 70)

TO:

Charles McQuillen Thomson, Attorney for Debtor(s)

United States Trustee

Donald Molstad, Attorney for Debtor
JD Haas, Attorney for Debtor
Allen O. Pederson, Attorney for Creditor Committee

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

*November 1, 2019 at 03:30 PM*

**NOTE: PLEASE USE THE FOLLOWING INSTRUCTIONS FOR THE PHONE CONFERENCE**
1. Call the toll free number: 18886848852
2. Enter Participant Access Code: 7148063
3. Enter the Participant Security Code: 9507
4. After the security code is entered, you will be connected into the conference
5. Please identify yourself after you have joined the conference

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Danielle Cripe*

Date: October 28, 2019

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

McQuillen.c379

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC.,       CHAPTER 11
                                     BANKRUPTCY NO. 19-000507

          Debtor.                 RESISTANCE TO MOTION TO
                                     CONVERT OR DISMISS FILED BY
                                     FIRST SECURITY BANK & TRUST
                                     COMPANY

COMES NOW the Debtor and in support of its Resistance to Motion to Convert or Dismiss states to the Court as follows:

1. That Paragraph One is admitted.

2. That Paragraph Two is admitted.

3. That Paragraph Three is admitted.

4. That Paragraph Four is admitted that the property is a duplex and is under construction but there was no deception in the description.

5. That Paragraph Five is denied.

6. That Paragraph Six is admitted.

7. That Paragraph Seven is admitted.

8. That Paragraph Eight is denied.

9. That Paragraph Nine is denied.

10. That Paragraph Ten is denied.

11. That Paragraph Eleven is admitted.

12. That Paragraph Twelve is admitted.

13. That Paragraph Thirteen is admitted.

14. That Paragraph Fourteen is admitted.

15. That Paragraph Fifteen is admitted.

16. That Paragraph Sixteen is denied.

17. That Paragraph Seventeen is denied for lack of information.

18. That Paragraph Eighteen is denied.

19. That Paragraph Nineteen is denied.

20. That Paragraph Twenty is denied.

21. That paragraph Twenty-one is admitted.

22. That Paragraph Twenty-two is admitted.

23. That Paragraph Twenty-three is admitted.

24. That Paragraph Twenty-four is admitted.

25. That Paragraph Twenty-five is admitted.

26. That Paragraph Twenty-six is admitted.

27. That Paragraph Twenty-seven is admitted.

28. That Paragraph Twenty-eight is admitted.

29. That Paragraph Twenty-nine is admitted.

30. That Paragraph Thirty is admitted.

31. That Paragraph Thirty-one is admitted.

32. That Paragraph Thirty-two is admitted.

33. That Paragraph Thirty-three is denied.

34. That Paragraph Thirty-four is denied.

35. That Paragraph Thirty-five is denied.

36. That Paragraph Thirty-six is denied.

37. That Paragraph Thirty-seven is admitted.

38.  That Paragraph Thirty-eight is denied.

39. That Paragraph Thirty-nine is denied.

40. That Paragraph Forty is denied.

41. That Paragraph Forty-one is denied.

42. That Paragraph Forty-two is denied.

43. That Paragraph Forty-three is denied.

WHEREFORE, the undersigned prays that the Court deny the relief requested and for such other and further relief as the Court deems equitable in the premises.

/s/ Donald H. Molstad
Donald H. Molstad (3755)
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR DEBTOR

CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the ___3___ day of October, 2019.

/s/ Donald H. Molstad
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Brandon J. Gray
Asst. Attorney General
Office of the Attorney General of Iowa
Revenue Division
1305 Walnut Street
Des Moines, IA 50319

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa | ) | Case No. 19-00507 |
| limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

RESISTANCE OF McQUILLEN PLACE COMPANY, LLC
TO UST'S OBJECTION TO DEBTOR'S APPLICATION TO EMPLOY COUNSEL

Now comes McQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company, debtor, and debtor-in-possession herein ("Debtor") by and through its attorneys, as and for the Resistance of McQuillen Place Company, LLC, to UST's Objection to Debtor's Application to Employ Counsel (this "Resistance"), respectfully states as follows:

1.  The Debtor acknowledges the point of the United States Trustee in asserting that the Application to Employ JD Haas (the "Application") as special counsel to the Debtor left a number of issues related to the proposed engagement of attorney Haas as ambiguous, at least within the four corners of the Application itself.

2.  The purpose of the engagement of Mr. Haas is to assist the Debtor in litigating two important and valuable adversary proceedings which are described at length in the draft Plan and Disclosure Statement filed by the Debtor earlier this month.  One adversary proceeding will be asserted to seek the equitable subordination of the mortgage lien of First Security Bank & Trust Company.  The other adversary proceeding will seek damages against certain of the directors of the First Security Bank & Trust Company for tortuous interference with the Debtor's contractual rights.  If successful, the Debtor will recover in excess of $7,000,000 in damages (or extinguished liens) from the various defendants in the adversary proceedings.

3.  Mr. Haas has agreed to accept fees  for his services in advancing the Debtor's claims through a combination of a contingency fee arrangement combined with a reduced hourly rate, which is to be funded by a retainer advanced by an equity holder of the Debtor.

1

4. Because of the circumstances of Mr. Haas' engagement, the retention of this professional will not materially diminish the Debtor's estate, and may, in fact, vastly increase the pool of funds available to pay creditors and reorganize the Debtor.

WHEREFORE, the undersigned prays that the Court deny the relief requested and for such other and further relief as the Court deems equitable in the premises.

/s/ Donald H. Molstad
Donald H. Molstad (3755)
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR DEBTOR

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the 31st day of October, 2019.

/s/ Donald H. Molstad
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Brandon J. Gray
Asst. Attorney General
Office of the Attorney General of Iowa
Revenue Division
1305 Walnut Street
Des Moines, IA 50319

McQuillen.c380

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC.,       CHAPTER 11
                                           BANKRUPTCY NO. 19-000507

          Debtor.                     RESISTANCE TO MOTION TO
                                           CONVERT OR DISMISS  FILED BY
                                           U.S. TRUSTEE

---

COMES NOW the Debtor and in support of its Resistance to the U.S. Trustee's Motion to Convert or Dismiss states to the Court as follows:

1. That Paragraph One is admitted.

2. That Paragraph Two is admitted.

3. That Paragraph Three is admitted.

4. That Paragraph Four is admitted

5. That Paragraph Five is denied.

6. That Paragraph Six is admitted.

7. That Paragraph Seven is admitted except to the extent that the debtor is working with a potential lender/buyer and there are no problems there.

8. That Paragraph Eight is denied.

9. That Paragraph Nine is denied.  There is insurance and is being paid by Mr. Thomson.

10. That Paragraph Ten is admitted that there are no funds available but that the debtor will obtain those by Mr. Thomson.

11. That Paragraph Eleven is admitted.

12. That Paragraph Twelve is denied.

13. That Paragraph Thirteen is denied.

14. That Paragraph Fourteen is admitted that the Debtor filed an Initial Disclosure Statement and Plan but denies that the Disclosure Statement lacks adequate information and the Plan is not confirmable.

15. That Paragraph Fifteen is admitted that the Debtor filed the Application to Employ but the fees are being by Mr. Thomson personally.

16. That Paragraph Sixteen is admitted that is what the Statue states.

17. That Paragraph Seventeen is neither admitted or denied for the reason it is part of an argument rather than a motion.

18. That Paragraph Eighteen is neither admitted or denied for the reason it is part of an argument rather than a motion.

19. That Paragraph Nineteen is neither admitted or denied for the reason it is part of an argument rather than a motion.

20. That Paragraph Twenty is neither admitted or denied for the reason it is part of an argument rather than a motion.

21. That paragraph Twenty-one is neither admitted or denied for the reason it is part of an argument rather than a motion.

22. That Paragraph Twenty-two is denied.

23. That Paragraph Twenty-three is neither admitted or denied for the reason it is part of an argument rather than a motion.

24. That Paragraph Twenty-four is denied.

25. That Paragraph Twenty-five is denied.

26.  That Paragraph Twenty-six is denied.

27. That Paragraph Twenty-seven is denied.

28. That Paragraph Twenty-eight is admitted.

29. That Paragraph Twenty-nine is denied.

30. That Paragraph Thirty is denied.

31. That Paragraph Thirty-one is denied.

32. That Paragraph Thirty-two is denied.

WHEREFORE, the undersigned prays that the Court deny the relief requested

and for such other and further relief as the Court deems equitable in the premises.

/s/ Donald H. Molstad
Donald H. Molstad (3755)
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR DEBTOR

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the 1st day of November, 2019.

/s/ Donald H. Molstad
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Brandon J. Gray
Asst. Attorney General
Office of the Attorney General of Iowa
Revenue Division
1305 Walnut Street
Des Moines, IA 50319

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | CASE NO. 19-00507M |
| McQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | UST'S OBJECTION TO DEBTOR'S |
| Debtor. | ) | DISCLOSURE STATEMENT AND PLAN |

The Acting United States Trustee ("UST"), through the undersigned Trial Attorney, hereby raises the following objections to Debtors' Disclosure Statement and Plan:

1.  Debtor filed its Disclosure Statement and Plan on October 4, 2019. (docs. 56 & 57).

**Factual Background**

2.  Debtor's primary asset consists of one piece of historical real estate, referred to as the "McQuillen Place," located in downtown Charles City, Iowa ("the Property"). At the initial debtor interview and meeting of creditors, Debtor's principal, Charles Thomsen, described the intended purpose of the property will be for mixed commercial and residential use. Debtor's owners consist of Mr. Thomsen (60%) and James Gray (40%). Mr. Thomsen has been the only active principal participant of Debtor in this case.

3.  The effort to rehabilitate the Property, which began in 2014, has remained at a standstill since the fall of 2017. Debtor scheduled that value of the Property on its Schedules in the amount of $500,000.00. Debtor scheduled secured debt owed to primary creditor, First Security Bank & Trust Company ("the Bank") in excess of $6.8 million. Accordingly, Debtor has no equity in the Property.

4.  The Property remains unfinished and vacant. Prior to the commencement of the case and post-filing, the Bank notified Debtor of increasing structural damage to the Property. Upon

1

information and belief, no construction has resumed since the filing of the case, including to
address continued deterioration of the Property.

5.    Debtor generates virtually little to no income.  Upon review of the Monthly Operating
Reports ("MORs"), Debtor's monthly revenue and disbursements average less than $4,000.00.
The revenue that is generated by Debtor, through the dry cleaning business, is obtained from an
affiliated business of Debtor by providing laundry and dry cleaning services to that entity and
Mr. Thomsen personally.  The affiliated business is owned by Mr. Thomsen.

6.    During the meeting of creditors Mr. Thomsen acknowledged that the only chance of
proposing a successful plan of reorganization would be to find an interested party to secure
financing to complete construction of the Property.  Mr. Thomsen insisted during the meeting
that a third party was interested and that financing could be secured within a two week period.
Over four months have passed with Debtor having to seek at least one extension of the
exclusivity period.  Prior to filing, Debtor spent significant time unsuccessfully attempting to
secure financing to complete construction to no avail.

7.    Debtor represented at the meeting of creditors that the only other assets of Debtor
consisted of counterclaims against the Bank and other state and Federal agencies involved in or
related to the funding surrounding the McQuillen Place project.  The UST is informed, believes,
and thereon alleges that Mr. Thomsen reached out to and "shopped" those claims to various
attorneys and firms in hopes that one would come forward to represented the unsecured creditor
committee and pursue such claims.  No attorney or firm has sought to be employed as committee
counsel in this case.  In pending state litigation Mr. Thomsen asserted many of the same
counterclaims against the Bank in his individual capacity that will be adjudicated in that forum.

2

## Argument

8. "Adequate information" is defined in 11 U.S.C. § 1125(a)(1) to mean:

> . . . information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records…. that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

9. In the Eighth Circuit the requirements for providing "adequate information" is governed by *In re Dakota Rail, Inc.,* 104 B.R. 138 (Bankr. D. Minn. 1989). *Dakota Rail* sets forth the information which, depending on the complexity of the case, must be included in a disclosure statement. *Dakota Rail* further holds that in a complex case the disclosure statement must provide more detailed information in each of the applicable categories.

10. Debtors' Plan is deficient for failing to provide or adequately address the following information required under *Dakota Rail*:

    a.   Debtor does not adequately address how it plans administrative fees and other claims entitled to payment in full on the Effective Date. The UST asserts, as more specifically set forth in his Motion to Dismiss or Convert, the Debtor is administratively insolvent;

    b.   Debtor does not adequately explain the nature, parties, and value of its asserted claims against various parties and for which it bases plan feasibility;

    c.   Debtor does not adequately explain Debtor's principal, Mr. Thomsen's insider relationship with the proposed purchaser of the McQuillen Place development, MPC2, LLC;

    d.   Debtor does not provide adequate information or supporting documentation with

3

respect to any agreed sale between Debtor and MPCA, LLC, or the terms of any financing.

11. The UST put Debtor to meet its burden of proof under 11 U.S.C. § 1129(a)(11) in order for the Court to approve its Plan. Debtor must secure financing from a third party in order to successfully reorganize. It has not done so. Debtor's Plan calls for the sale of the McQuillen Place development to a new entity, MPC2, LLC, to complete construction on the Property. Despite the seemingly unsurmountable debt compared to asset value, Debtor proposes to cram down the debt of the Bank. The Bank does not consent to its treatment under the Plan.

12. In order for MPC2 to complete construction of the Property, the Plan calls for the ability of MPC2 to enter into a "Construction Financing Agreement." Yet the Plan and Disclosure Statement are devoid of any explanation of Debtor or MPC2's ability to secure financing, if at all. Debtor fails to attach a proposed sale agreement. Debtor does not explain what MPC2 is, only that it is a newly formed entity. As addressed in the Bank's Motion to Dismiss, the Iowa Secretary of State shows no listing for MCP2, LLC. The Iowa Secretary of State lists an entity by the name of MCP2 Development, LLC and formed by Debtor's principal, Charles McQuillen Thomsen, on April 24, 2019.

13. As Exhibit E to the Plan affirms there is currently no executed sale agreement or even a proposed sale agreement. The "Description of Sale Agreement" under Exhibit E states "MPC2 will be comprised of parties…." Debtor does not identify the members or principals of MPC2. Nowhere is the amount of the sale identified or how sale proceeds shall be administered under the Plan. Likewise, Debtor fails to attach any referenced financing agreement. There is no evidence

4

to suggest that financing is even an option, which has been the crux of the problem in this case all along.

14.  Debtor further relies heavily on its ability to obtain recovery under its purported claims as a primary return to creditors.  Debtor does not believe litigation on its claims will be completed prior to year 2024.  Debtor gives no basis for the value assigned to the asserted claims.  Mr. Thomsen's self-interest in Debtor and lack of any committee counsel interest to pursue such claims lend doubt to their viability.

15. At this point, any sale agreement or proposed financing is fiction.  The Debtor is essentially in the same position it was at the time of filing, with increased debt obligations, and cannot establish feasibility.  It follows then that Debtor cannot in good faith propose to pay administrative and other claims due in full on the Effective date.  Debtor cannot seek confirmation under the present circumstances.

16. The lack of information regarding MCP2 in the Disclosure Statement and Plan and representations by Mr. Thomsen, who formed the entity, regarding the proposed sale and financing raise serious concerns with respect to the proposal of the Plan in good faith. "Reorganization plans have to be proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3).  Good faith generally means that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re LJBV, LTD,* 544 B.R. 401, 406 (Bankr. N.D. Ill. 2016).

17. Debtor currently owes outstanding property taxes in excess of $106,000.00.  Debtor cannot establish under the proposed Plan any ability to meet this obligation on any Effective date.

5

WHEREFORE, for the reasons set forth herein, the Acting United States Trustee respectfully requests the Court deny approval of Debtor's Plan and Disclosure Statement.

**James L Snyder**
Acting United States trustee
Region 12

By:/s/ L. Ashley Zubal
**L. Ashley Zubal**
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Ph:(515)323-2269/Fax: 284-4986
Ashley.Zubal@usdoj.gov

6

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that copies of this document were served on the parties listed below

by electronic mail or first-class mail, postage prepaid, on November 1, 2019:

Parties receiving electronic service via CM/ECF

- **Larry S. Eide**    eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com
- **Laura Michelle Hyer**    lhyer@bradleyriley.com,
  dmoses@bradleyriley.com;Docket@bradleyriley.com
- **Donald H. Molstad**    judylaw308@yahoo.com
- **Judith O'Donohoe**    charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com
- **Joseph E. Schmall**    jschmall@bradleyriley.com,
  cclark@bradleyriley.com;docket@bradleyriley.com
- **Christine B. Skilton**    cbs.csslaw@butler-bremer.com
- **Bradley David Sloter**    brads@nsslaw.net
- **Charles McQuillen Thomson**    cthomson@doall.com
- **Brandon James Gray**    Brandon.gray@ag.iowa.gov
- **JD Haas**    jdhaas@jdhaas.com
- **United States Trustee**    USTPRegion12.CR.ECF@usdoj.gov

**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

*/s/ Jennifer L. Cline*
Jennifer L. Cline
Paralegal Specialist

7

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:                                                    CHAPTER 11
                                                          CASE NO. 19-00507M
McQUILLEN PLACE COMPANY, LLC,

                    Debtor(s).                            **OBJECTIONS TO DISCLOSURE
                                                          STATEMENT**
_____

COMES NOW, First Security Bank & Trust Company (hereinafter called "First Security Bank"), through its undersigned counsel, and objects to the Disclosure Statement filed on October 4, 2019 (Doc. No. __), and respectfully states:

1.      The Debtor's Plan was filed on October 4, 2019 (Doc. No. __). First Security Bank believes that the Plan is not confirmable.

2.      The Plan proposes a sale of the real estate to a new entity, MPC2, LLC, which is stated to be an Iowa limited liability company. A search of the Iowa Secretary of State website conducted on November 1, 2019, does not show an entity by this name to exist.

3.      A similar search shows the existence of an Iowa limited liability company known as MPC2 Development, LLC, which is shown to be an entity organized on April 24, 2019, with the organizer and Iowa registered agent being Charles M. Thomson, the President and principal of the Debtor McQuillen Place Company, LLC (hereinafter called the "Debtor"), and a home address of 25 East Delaware, Suite 209, Chicago, Illinois 60611.

4.      The Iowa Secretary of State website shows that the Debtor's home office is also located at 25 East Delaware, Suite 209, Chicago, Illinois 60611.

5.    Exhibit A to the Plan is a form of Unsecured Distribution Note and it shows the obligor of the Note to be "MPC2, LLC, an Iowa limited liability company", an entity that does not currently exist.

6.    The foregoing leads First Security Bank to believe or suspect that the Debtor proposes to sell the real estate to an owner of the Debtor, or an affiliate of the Debtor.

7.    More information is required in the Disclosure Statement regarding the proposed sale, the identity of the proposed buyer and its owners, officers, employees, and managers, its assets and liabilities, and its ability to pay the purchase price.

8.    The sale proposed may be a violation of the absolute priority rule in that one or more owners of the Debtor may be retaining or acquiring an interest in the Debtor of a lessor priority without the payment in full of all senior priority creditors.

9.    Article II, Paragraph A of the Plan does not include an estimate of the Debtor's attorney's fees. Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 1: Administrative Claims and estimates that the Debtor's attorney's fees will be roughly $10,600. The Debtor recently sought to employ J.D. Haas as an attorney for the Debtor. The Plan and Disclosure Statement do not state whether the compensation to be paid to J.D. Haas is a part of the estimated fees.

10.    Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 2: Priority Claims. There is no statement whether any such claims exist to enable a creditor to determine whether the Plan is feasible.

11.    Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 3: Priority Tax Claims. There is no statement whether any such claims exist to enable a creditor to determine whether the Plan is feasible.

- 2 -

12.     Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 4: Tax Claim of Floyd County, Iowa. There is no statement whether any such claims exist and no estimate of the amount of any such claims to enable a creditor to determine whether the Plan is feasible.

13.     Further, said Article III, Paragraph C of the Disclosure Statement states that the "Undisputed Class 4 Claims will be paid in full . . . however, that certain of the Class 4 Claims may be disputed and/or paid under protest." the Plan and the Disclosure Statement contain no estimate of the amount of the Undisputed Class 4 Claims, or the amount of the disputed or "paid under protest" Class 4 Claims to enable a creditor to determine whether the Plan is feasible.

14.     Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 5: Secured Claim Asserted by First Security Bank. There is not statement as to the amount of such claim or the manner and timing of the resolution or determination of the "disputes between the parties" to enable a creditor to determine whether the Plan is feasible.

15.     Further, said Article III, Paragraph C of the Disclosure Statement describes a process (use of the Claim Determination Escrow) that denies, or potentially denies, First Security Bank of the value of its claim and which unfairly discriminates against First Security Bank, or other unsecured creditors of the Debtor. No adequate explanation of the differentiation in treatment of similarly situated unsecured claims is provided to enable a creditor to determine whether plan does not unfairly discriminate against any creditor, or violates the absolute priority rule.

- 3 -

16.     Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 7: Claims of Steve and Sheri Dralle. The provision states that the Dralle Claims shall receive not only a "Pro-Rata Share of the Unsecured Claims Distribution" but an additional sum. No adequate explanation of the differentiation in treatment of similarly situated unsecured claims is provided to enable a creditor to determine whether plan does not unfairly discriminate against any creditor, or violates the absolute priority rule.

17.     Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 8: Claims of Non-Insider Creditors Who Have Asserted Priority in Distribution Pursuant to Mechanics Liens. The provision includes treatment of the claim of Shindler Elevator Company. First Security Bank asserts that the mechanic's lien asserted by Shindler Elevator Company is junior in priority to the claim of First Security Bank and that both claims rely upon the same real estate for collateral. The Plan and Disclosure Statement include payment to Shindler Elevator Company for an amount that would be a violation of the absolute priority rule. No adequate explanation is provided in the Disclosure Statement.

18.     Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 9: Claims of Non-Insider, Building Industry and Construction Unsecured Creditors Designated at (sic) Essential Vendors for Plan of Reorganization. Neither the plan nor the Disclosure Statement state which unsecured creditors fall within this class of claims. The Disclosure Statement further states that the determination of the identity of such claimants is made by MPC2, a non-existing entity, the identity of which is unknown and not provided in the Plan or Disclosure Statement. No adequate explanation

- 4 -

of the identity of such claimants, the amount of such claims and the method of inclusion in, or exclusion from, such Class is provided to enable a creditor to determine whether plan does not unfairly discriminate against any creditor, or violates the absolute priority rule.

19.   Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 10: Claims of General, Non-Insider Building Industry and Construction Unsecured Creditors. The Plan and the Disclosure Statement propose a distribution to these claims that is different from the Class 11: General Unsecured Claims. No adequate explanation of the identity of such claimants, the amount of such claims and the method of inclusion in, or exclusion from, such Class is provided to enable a creditor to determine whether plan does not unfairly discriminate against any creditor, or violates the absolute priority rule.

20.   Further, Article III, Paragraph C of the Disclosure Statement states that the ""Allowed amount of the Class 11 Claims is $172,536.69" however there has been no claim recommendations submitted by the Debtor or any other party in this case, and no determination by the Court of the allowed amount of any claim.

21.   Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 11: General Unsecured Claims. The provision states that the ""Allowed amount of the Class 12 Claims is $22,111.34" however there has been no claim recommendations submitted by the Debtor or any other party in this case, and no determination by the Court of the allowed amount of any claim.

22.   Article III, Paragraph C of the Disclosure Statement includes a description of the treatment of Class 12: Pre-petition Claims of Insiders. The Plan and the Disclosure

- 5 -

Statement provide for the payment to members of this class in violation, or potential violation of the absolute priority rule.

23.    Article IV, Paragraph A, describes a transfer of ownership to MPC2, a non-existing entity, the identity of which is unknown and not provided in the Plan or Disclosure Statement. More information is required in the Disclosure Statement regarding the proposed sale, the identity of the proposed buyer and its owners, officers, employees, and managers, its assets and liabilities, and its ability to pay the purchase price.

24.    The Plan and Article IV, Paragraph A, describe a transfer of certain Causes of Action to a Litigation Trust for the benefit of creditors. First Security Bank believes that the transfer of certain of any such Causes of Action against First Security Bank to violate it statutory and common law rights of setoff against its claim for the purposes of determining the portion of its claim that should be allowed as an unsecured claim.

25.    Further, Article IV, Paragraph A does not contain an exhaustive list of the Causes of Action proposed to be transferred to the Litigation Trust sufficient to enable a creditor to adequately assess the provisions of the Plan and to intelligently vote for or against the Plan.

26.    Further, Article IV, Paragraph A presumes that the construction of the McQuillen Place Development and a final determination of the Causes of Action are intrinsically related or dependent. First Security Bank believes that the completiion of construction of the second and third floors of the proposed development can be completed in approximately 90 days. The Debtor does not adequately explain why no, or no substantial, construction activities have occurred on the development for nearly two (2) years. First Security Bank believes that the reason for such delay is the unwillingness of

- 6 -

the Debtor and its principals to dispose of the development to a third party with the financial capacity to complete the construction. The Debtor now proposes to transfer real estate to MPC2, a non-existing entity, the identity of which is unknown and not provided in the Plan or Disclosure Statement.

27.    Further, Article IV, Paragraph A provides that the Debtor "act as Litigation Trustee for the purpose of administering the Litigation Trust, pursing (sic) the Litigation". This is all despite the Debtor performing absolutely no discovery related to such claims for nearly two (2) years. In fact, the Debtor proposes in its Plan to file new claims. First Security Bank believes that the Debtor is administratively insolvent and lacks the financial ability and expertise to perform such activities. The Disclosure Statement should contain additional information to enable a creditor to adequately assess the provisions of the Plan and to intelligently vote for or against the Plan.

28.    Article IV, Paragraph C describes the sale of the McQuillen Place Building Assets to MPC2, a non-existing entity, the identity of which is unknown and not provided in the Plan or Disclosure Statement. Further, Article IV, Paragraph C provides that MPC2 shall complete construction, and that the Confirmation Order should order that "MPC2 shall be authorized and directed to execute the Construction Financing Agreement . . . ." First Security Bank believes that this language makes it unambiguous that the MPC2 is an alter ego of the Debtor and that the Plan is not a final resolution of the rights of the parties. The Plan and the Disclosure Statement do not adequately explain why the Court should enter any order directing MPC2 to do or perform any act, other than the approval of the sales agreement.

- 7 -

29.     Further, Article IV, Paragraph C does not explain what happens to the project once it is completed.

30.     Article IV, Paragraph C must be amended to provide clarifying and additional information.

31.     The liquidation analysis attached as Exhibit A does not seem to be consistent with the statements and provisions Disclosure Statement.

WHEREFORE, for the reasons set forth herein, First Security Bank & Trust Company respectfully requests the Court deny approval of the Debtor's Disclosure Statement, and order appropriate amendments thereto to be filed with a short but reasonable time period.

/s/ Larry S. Eide
Larry S. Eide (AT0002317)
PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA  50402-1588
Telephone: (641) 423-4264
Facsimile: (641) 423-3145
Email: eide@pappajohnlaw.com

## CERTIFICATE OF SERVICE

The undersigned, Larry S. Eide, certifies that on November 1, 2019, he served a copy of the foregoing document on the United States Trustee, Debtor(s), attorney for Debtor(s) and other parties having requested notice pursuant to Rule 2002 electronically on all parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing, and by ordinary United States mail, postage prepaid, addressed as follows on all other parties:

James L. Snyder
Acting United States Trustee
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2101

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Room 793
Des Moines, IA 50309-2108

- 8 -

Donald H. Molstad
Molstad Law Firm
701 Pierce Street, Suite 305
Sioux City, IA 51101

Charles M. Thomson
Law Offices of Charles M. Thomson
1110 N. Grand Ave, Suite 300
Charles City, IA 50616

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
PO Box 307
Charles City, IA 50616-0307

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Allen O. Pederson
Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kevin E. Keiffer
Mills, Inc.
1906 Gilbert Street
Charles City, IA 50616

Tom Brock, President
T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
PO Box 39
Nashua, IA 50658-0039

Joseph E. Schmall
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

Laura M. Hyer
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

Brandon J. Gray
Assistant Attorney General
Office of the Attorney General
Revenue Division
1305 Walnut Street
Des Moines, IA 50319

/s/ Larry S. Eide
Larry S. Eide (AT0002317)

- 9 -

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| MCQUILLEN PLACE COMPANY, LLC., | ) |
| | ) Case No. 19-00507 |
| Debtor. | ) |
| | ) CEDAR RAPIDS BANK AND TRUST |
| | ) COMPANY'S OBJECTION TO |
| | ) DISCLOSURE STATEMENT |
| | ) |

COMES NOW Cedar Rapids Bank and Trust Company as an interested party ("CRBT"), and for its Objection to the Debtor's Disclosure Statement (Docket No. 57) states:

## JURISDICTION

1.      This Court has jurisdiction over this case and this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

## INTRODUCTION

2.      This Chapter 11 case was filed on April 25, 2019.  The Debtor's exclusive right to file a disclosure statement and plan of reorganization under 11 U.S.C. §1121(b) was extended to October 4, 2019 by Order entered on September 13, 2019 (Docket No. 51).

3.      On October 4, 2019, the Debtor filed a Plan and Disclosure Statement (Docket No. 57), along with a Notice setting November 1, 2019 as the bar date for filing objections to the Disclosure Statement (Docket No. 58).

4.      No bar date has been set for filing objections to the Plan, and no hearing date has been set on confirmation of the Plan.

{02725912.DOC}

## <u>OBJECTIONS TO DISCLOSURE STATEMENT</u>

5.    Pursuant to 11 U.S.C. § 1125(b), a written disclosure statement must be approved by the bankruptcy court as containing "adequate information."

6.    "Adequate information" is defined by 11 U.S.C. § 1125(a)(1) as:

"information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information;"

7.    CRBT asserts that the Debtor's Disclosure Statement fails to provide adequate information as required by 11 U.S.C. § 1125(a)(1) in the following respects:

a.    <u>Inadequate description of the events leading to the filing of Bankruptcy.</u>  The Disclosure Statement gives only a single sentence description of the events that led to the filing of the Chapter 11 Petition:  "In spring 2019, following a series of attempts (asserted by the Debtor to have been abusive and unfounded) by First Security Bank to place the building into a receivership, the Debtor commenced this Chapter 11 Case."  No details are given about:  i) the prolonged delays in construction of the McQuillen Place Development (the "Development"); ii) the role of Charles Thomson in the Development; iii) the pre-bankruptcy management and ownership structure of the Debtor; iv) the costs incurred and paid by the Debtor with respect to the Development prior to the bankruptcy filing; or vii) the Debtor's pre-bankruptcy debt and equity structure.

b.    <u>Inadequate discussion of the assets available and their value.</u>  According to the Debtor's September 2019 Monthly Report, the Debtor has total assets (excluding unknown accumulated depreciated and claims against various parties) of $545,910.55.  Almost all of this is the land, building and fixtures of McQuillen Place Development.  No explanation is given regarding how the value of these assets was determined.

c.    <u>Inadequate information about the sale of Debtor's primary asset.</u>  The Disclosure Statement includes a short "Plan Overview" that says the Plan calls for a sale of the

Debtor's primary asset, McQuillen Place Development, to a new entity identified as MPC2. No information is provided in the Disclosure Statement about MPC2, but the Plan states that MPC2, LLC is a newly formed entity. No further information is provided about MPC2, LLC in either the Plan or Disclosure Statement. However, a Certificate of Organization for an entity known as MPC2 Development, LLC was filed with the Iowa Secretary of State on April 24, 2019 by Charles McQuillen Thomson. It's not clear whether MPC2 Development, LLC is the entity that will purchase McQuillen Place Development.

   d.   <u>Inadequate description of the Debtor and significant events during the Chapter 11 case</u>. The Disclosure Statement contains inadequate information about the Debtor's activities in the six months since the case was filed. There is virtually no information regarding:  i) the current condition of the Development; ii) the nature and cost of the labor and materials needed to complete the Development; iii) what steps, if any, have been taken to secure financing or capital to complete the Development; iv) the current owners/members of Debtor; v) the current manager(s) of Debtor; or vi) the Debtor's tax status.

   e.   <u>Inadequate Liquidation Analysis</u>. The "Liquidation Analysis" attached to the Disclosure Statement as Exhibit A shows a liquidation result of $5,200 for unsecured creditors, and a Plan result between $265,976 to $7,365,976 for unsecured creditors. The Plan result is based on the sale of Debtor's real estate for $265,976, and the sale of lawsuits for anywhere between $0 and $7,100,000. The Debtor states that the sum of $7,100,000 "is an estimate based on total diminution in building value, but does not include other areas of possible recovery, such as lost profits, punitive damages (limited in Iowa), etc." According to the Debtor, the original completed value of the McQuillen Place Development was estimated to be $7,200,000. No information is provided concerning how such value was determined or how the construction loans obtained by the Debtor impact the value. Further, no information is provided concerning the impact on value of the Debtor's failure to complete construction of McQuillen Place Development in a timely manner. The Debtor's estimate of recovery from the Litigation and statement that the Litigation "may (and likely will) take several, perhaps up to five, years" is unsupported.

   f.   <u>Inadequate Information Regarding Counsel for Litigation</u>. On October 22, 2019, the Debtor filed an Application for Approval of Employment of Attorney ("Application") "to represent and assist the debtor with general litigation." The Application seeks to employ J.D. Haas of J.D. Haas and Associates, PLLC at an hourly rate of $250, with associate attorneys at $200 per hour and paralegals at $125 per hour. The US Trustee filed an Objection to the Application on October 24, 2019, and the Debtor filed a Resistance to the US Trustee's Objection on October 31, 2019. In its Resistance the Debtor states that Mr. Haas has agreed to accept fees for his services in advancing the Debtor's claims in two adversary proceedings described in the Disclosure Statement through a combination of a contingency fee arrangement combined with a reduced hourly

rate, which is to be funded by a retainer advanced by an equity holder of the Debtor.  The Disclosure Statement contains no information about the employment of Mr. Haas, the fee arrangement for Mr. Haas, or the advancement of a retainer by an equity holder of the Debtor.

g.   <u>Incorrect Monthly Reports</u>.  The September 2019 monthly report includes a Cash Receipts and Disbursements Statement that shows an ending cash balance of $1,590.16 at the end of September, but a Total Post-Petition ending cash balance of $23,512.56.  These two numbers should be the same.  In addition, the Net Cash Flow is $16,520.21 minus $20,777.82, which is -$4,257.61 rather than -$4,254.51 as shown on the September report.  The same type of inadequate or incorrect information appears on the Debtor's previous monthly reports.  In addition, the Monthly Operating Report (Schedule of Receipts and Disbursements) shows a different ending balance for the current month ($1,590.16) and the Cumulative Petition to Date ($1,629.67).  As noted in item (c) at the bottom of the Report, these two amounts will always be the same if the form is prepared correctly.

h.   <u>Inadequate Monthly Reports</u>.  The Debtor's September 2019 monthly report, like all previous monthly reports, does not include any expense or accrual for real estate taxes on the McQuillen Place Development, or even list such taxes as a liability on the comparative balance sheet.  In addition, according to the United States Trustee's Motion to Convert or Dismiss Chapter 11 case filed on October 25, 2019 (Doc. 72), the U.S. Trustee believes the actual costs for maintaining insurance coverage on the McQuillen Place Development have not been properly disclosed on the Debtor's monthly reports.

i.   <u>Inadequate information regarding administrative expenses</u>.  The Disclosure Statement estimates the Debtor's attorney fees at $10,600.00.  All administrative claims are to be paid in full on the Effective Date, but the Debtor does not have enough money on hand to pay such claims.  The Debtor has operated at a net loss since the case was filed and does not generate enough income to pay such claims.  The Disclosure Statement offers no details on the source of funds to pay administrative claims.

j.   <u>Inadequate information regarding tax consequences</u>.  The Disclosure Statement does not include any discussion of the tax consequences of the Plan to the Debtor or its former, and future, members.

k.   <u>Inadequate information regarding the Debtor's management and ownership structure</u>.  The Disclosure Statement does not discuss the existing management structure of the Debtor, or adequately explain if, how or why any of the current members are going to retain an ownership interest in the reorganized Debtor.

{02725912.DOC}

8.    The Disclosure Statement cannot be approved by the Court because it fails to provide adequate information that would allow interested parties to make an informed judgment about the Plan.

WHEREFORE, Cedar Rapids Bank and Trust Company respectfully requests that the Court refuse to approve the Debtor's Disclosure Statement until such time as it is amended to include adequate information as required by 11 U.S.C. § 1125(a)(1).

Respectfully submitted by:        */s/ Joseph E. Schmall*
JOSEPH E. SCHMALL (#LI0008403)
    Direct Dial: (319) 861-8729
    Email: jschmall@bradleyriley.com
LAURA M. HYER (#LI22185426)
    Direct Dial: (319) 861-8742
    Email: lhyer@bradleyriley.com
    of
BRADLEY & RILEY PC
2007 First Avenue SE
P.O. Box 2804
Cedar Rapids, IA  52406-2804
Phone: (319) 363-0101
Fax:    (319) 363-9824

***ATTORNEYS FOR CEDAR RAPIDS BANK & TRUST COMPANY***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies, under penalty of perjury, that on November 1, 2019, a true and correct copy of the forgoing document was served electronically on all persons who receive electronic notice through the Court's CM/ECF system, as well as upon the following persons by electronic noticing through the Court's CM/ECF system or by enclosing the same in an envelope with postage fully paid, addressed as indicated below and deposited in a United States Postal Depository:

U.S. Trustee's Office                    Donald H. Molstad
United States Federal Courthouse         Molstad Law Firm
111 7th Avenue SE, Box 17                701 Pierce Street, Suite 305
Cedar Rapids, Iowa 52401                 Sioux City, IA 51101

{02725912.DOC}

L. Ashley Zubal
U.S. Trustee
Federal Building
210 Walnut Street, Room 793
Des Moines, IA 50309-2108

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
P.O. Box 307
Charles City, IA 50616-0307
Allen O. Pederson
Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Tom Brock, President
T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

J.D. Haas
J.D. Haas & Associates PLLC
1120 E. 80th Street, Suite 200
Minneapolis, MN 55420

Charles M. Thomson
Law Offices of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, IA 50616

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616
Kevin E. Keiffer
Mills, Inc.
1906 Gilbert Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
P.O. Box 39
Nashua, IA 50658-0039

Brandon J. Gray
Assistant Attorney General
Office of Attorney General of Iowa
1305 Walnut Street
Des Moines, IA 50319

/s/ Janet Privratsky_

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

IN RE:                                        )
                                              )   Chapter 11
MCQUILLEN PLACE COMPANY, LLC,                 )
                                              )   Bankruptcy No.   19-00507
        Debtor.                               )

Date of Hearing:   November 1, 2019

APPEARANCES:

For Debtor:   Donald Molstad and Charles Thomson
For Parties-In-Interest: Larry Eide for First Security Bank & Trust; Joe Schmall for Cedar
        Rapids Bank & Trust; and Brandon Gray on behalf of Iowa Economic Development
        Authority
U.S. Trustee:   L. Ashley Zubal

NATURE OF PROCEEDING:          ____In Court     _X_ Telephonic

 Application to Employ J D Haas as Attorney _____

IT IS ORDERED THAT:

Final hearing on Debtor's Application to Employ J D Haas as Attorney will be heard on:

**November 14, 2019 at 10:00 a.m.**

in the Webster County Courthouse, 701 Central Avenue, Fort Dodge, Iowa.

Dated and Entered ___November 5, 2019_____

_____
Thad J. Collins, Bankruptcy Judge