# United States Bankruptcy Court
## Northern District of Iowa (Mason City)
## Bankruptcy Petition #: 19–00507

*Assigned to:* Thad J. Collins
Chapter 7
Previous chapter 11
Original chapter 11
Voluntary
Asset

*Date filed:* 04/25/2019
*Date converted:* 12/09/2019
*341 meeting:* 01/27/2020
*Deadline for filing claims:* 04/08/2020

| | |
|---|---|
| *Debtor*<br>**McQuillen Place Company, LLC**<br>1110 North Grand Ave., Suite 300<br>Charles City, IA 50616<br>FLOYD–IA<br>847–456–1911<br>Tax ID / EIN: 46–3987825<br>*aka* **Classic Cleaners**<br>*aka* **Classic Cleaners of Charles City** | represented by **J D Haas**<br>J D Haas & Associates, PLLC<br>1120 E. 80th St.<br>Suite 200<br>Bloomington, MN 55420<br>952–345–1025<br>Fax : 952–854–1665<br>Email: jdhaas@jdhaas.com<br><br>**Donald H. Molstad**<br>701 Pierce St., Ste. 305<br>Sioux City, IA 51101<br>712–255–8036<br>Email: judylaw308@yahoo.com<br><br>**Charles McQuillen Thomson**<br>Law Office of Charles M. Thomson<br>1110 North Grand Ave., Suite 300<br>Charles City, IA 50616<br>847–456–1911<br>Fax : 847–495–3488<br>Email: cthomson@doall.com |
| *Trustee*<br>**Charles L. Smith**<br>25 Main Place, Ste 200<br>P.O. Box 248<br>Council Bluffs, IA 51502–0248<br>712–325–9000 | represented by **Telpner Peterson Law Firm, LLP**<br>25 Main Place, Suite 200<br>Council Bluffs, IA 51503<br>712–325–9000 |
| *U.S. Trustee*<br>**United States Trustee**<br>United States Federal Courthouse<br>111 7th Avenue SE, Box 17<br>Cedar Rapids, IA 52401–2101<br>319–364–2211 | represented by **L Ashley Zubal**<br>U.S. Trustee<br>Federal Building<br>210 Walnut Street, Rm 793<br>Des Moines, IA 50309–2108<br>515–323–2269<br>Email: Ashley.zubal@usdoj.gov |
| *Cred. Comm. Chair*<br>**Allen O. Pederson**<br>412 Sample Street<br>Nashua, IA 50658 | |

| Filing Date | # | Docket Text |
|---|---|---|
| 11/06/2019 | 87 | Adversary case 19–09035. Complaint by McQuillen Place Company, LLC against First Security Bank Fee Amount $350 Fee PAID. (81 (Subordination of claim or interest)) (Haas, J D) (Entered: 11/06/2019) |
| 11/06/2019 | 88 | Adversary case 19–09036. Complaint by McQuillen Place Company, LLC against Jon Richard Herbrechts–meyer, Gene Hall, Kurt Herbrechts–meyer Fee Amount $350 Fee PAID. (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) (Haas, J D) (Entered: 11/06/2019) |
| 11/07/2019 | 89 | Exhibit List for November 14, 2019 Hearing Filed by U.S. Trustee United States Trustee (related document(s)77 Notice of Hearing). (Zubal, L) (Entered: 11/07/2019) |
| 11/12/2019 | 91 | Notice of Voluntary Dismissal Filed by McQuillen Place Company, LLC. (Molstad, Donald) (Entered: 11/12/2019) |
| 11/13/2019 | 92 | Hearing Set (related document 91 Notice of Voluntary Dismissal) Hearing scheduled for 11/13/2019 at 11:30 AM at Telephonic Hearing. (dcri) (Entered: 11/13/2019) |
| 11/14/2019 | 93 | Notice of Appearance and Request for Notice by Monica L Clark Filed by Interested Party City of Charles City, Iowa. (Clark, Monica) (Entered: 11/14/2019) |
| 11/14/2019 | 94 | Order Taking Matter Under Advisement Without Briefs. The Dismissal and Motion to Convert is taken under advisement. TEXT ONLY ORDER by Judge Thad J. Collins, Signed on 11/14/2019. (related document(s)61 Motion to Dismiss Case/Debtor(s), Motion to Convert Case to Chapter 7, 91 Notice of Voluntary Dismissal) Matter Under Advisement. (gjon) (Entered: 11/14/2019) |
| 11/18/2019 | 97 | Declaration re: *Statement of Equity Security Holders Concerning Proposal to Convert Case from Chapter 11 to Chapter 7* Filed by Equity Security Holder Charles Thomson (related document(s)61 Motion to Dismiss Case/Debtor(s), Motion to Convert Case to Chapter 7, 72 Motion to Convert Case to Chapter 7). (Thomson, Charles) (Entered: 11/18/2019) |
| 11/18/2019 | 98 | Declaration re: *Request for Corrections and Amplifications of the Record from the November 14, 2019 Hearing* Filed by Equity Security Holder Charles Thomson (related document(s)61 Motion to Dismiss Case/Debtor(s), Motion to Convert Case to Chapter 7, 72 Motion to Convert Case to Chapter 7). (Thomson, Charles) (Entered: 11/18/2019) |
| 11/19/2019 | 99 | Motion *to Strike Declaraions filed by Charles Thomson* Filed by First Security Bank & Trust Company (related document(s)97 Declaration, 98 Declaration). (Eide, Larry) (Entered: 11/19/2019) |
| 11/19/2019 | 100 | Hearing Set (related document(s)97 Declaration, 98 Declaration, 99 Motion) Hearing scheduled for 11/20/2019 at 11:00 AM by Telephonic Hearing. (dcri) (Entered: 11/19/2019) |
| 11/19/2019 | 101 | |

| | | | |
|---|---|---|---|
| | | | Reply to Motion *Resistance to Motion to Strike* Filed by Charles Thomson (related document(s)99 Motion). (Thomson, Charles) (Entered: 11/19/2019) |
| 11/20/2019 | | 102 | Proceeding Memo and Order Re: Declaration re: Statement of Equity Security Holders Concerning Proposal to Convert Case from Chapter 11 to Chapter 7, Declaration re: Request for Corrections and Amplification of the Record from the November 14, 2019 Hearing (related document(s)97 Declaration, 98 Declaration) (tsta) (Entered: 11/20/2019) |
| 11/20/2019 | | 103 | Order Denying Motion to Strike Declarations (Related Doc # 99) Dated and Entered on 11/20/2019. (tsta) (Entered: 11/20/2019) |
| 12/05/2019 | | 108 | Hearing for Ruling on Motion to Dismiss or Convert (related document(s) 94 Order Taking Matter Under Advisement – Text) Hearing scheduled for 12/6/2019 at 11:30 AM at Telephonic Hearing. (gjon) (Entered: 12/05/2019) |
| 12/09/2019 | | 109 | Opinion/Memorandum and Order Signed on 12/9/2019. (related document(s)61 Motion to Dismiss Case/Debtor(s), Motion to Convert Case to Chapter 7, 91 Notice of Voluntary Dismissal) (tsta) (Entered: 12/09/2019) |
| 12/09/2019 | | 110 | Order Granting Motion To Convert Case from Chapter 11 to Chapter 7 (Related Doc # 61) Dated and Entered on 12/9/2019. (tsta) (Entered: 12/09/2019) |
| 12/09/2019 | | 111 | Notice of Appointment of Trustee. (tsta) (Entered: 12/09/2019) |
| 12/09/2019 | | 112 | Meeting of Creditors Chapter 7 (No Asset) 341(a) meeting to be held on 1/27/2020 at 08:30 AM at Mason City 341 Meeting Room. Reaffirmation Agreement due by 3/27/2020. (tsta) (Entered: 12/09/2019) |
| 12/11/2019 | | 113 | Application to Employ Telpner Peterson Law Firm LLP as Attorney for Trustee Filed by United States Trustee (United States Trustee) (Entered: 12/11/2019) |
| 12/11/2019 | | 114 | United States Trustee's Recommendation Employment re: Trustee's Application for Employment of Professionals Filed by United States Trustee (related document(s)113 Application to Employ). (United States Trustee) (Entered: 12/11/2019) |
| 12/11/2019 | | 115 | Order Granting Application to Employ Telpner Peterson Law Firm, LLP as Attorney for Trustee Charles L. Smith (Related Doc # 113) Dated and Entered on 12/11/2019. (tsta) (Entered: 12/11/2019) |
| 12/24/2019 | | 120 | Motion to Amend re: Order on Motion to Convert Case From Chapter 11 to 7 Filed by Charles Thomson (related document(s)110 Order on Motion to Convert Case From Chapter 11 to 7). (Thomson, Charles) (Entered: 12/24/2019) |
| 01/17/2020 | | 123 | Motion to Shorten Time to Object to Report of Sale Filed by Charles L. Smith (Smith, Charles) (Entered: 01/17/2020) |
| 01/17/2020 | | 124 | Order Granting Motion to Shorten Time to Objection to Report of Sale and to Waive Rule 6004(g) Stay (Related Doc # 123) Dated and Entered on 1/17/2020. (nbec) (Entered: 01/17/2020) |

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company, | ) ) | Case No. 19-00507 Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Address: 1110 North Grand Ave., #300 Charles City, Iowa 50616 | ) ) ) | |
| | ) | |
| Employer's Tax Identification No.: 46-3987825 | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | Adv. Pro. No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| FIRST SECURITY BANK & TRUST CO., | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT OF McQUILLEN PLACE COMPANY, LLC
FOR EQUITABLE SUBORDINATION OF THE LIEN
OF FIRST SECURITY BANK & TRUST CO.

Now comes McQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company, debtor, debtor-in-possession, and plaintiff herein ("MPC," "Debtor" or "Plaintiff"), by and through its attorney, J D Haas & Associates, PLLC, as and for its Complaint of the Debtor for Equitable Subordination of the Lien of First Security Bank & Trust Co. (this "Complaint"), pursuant to 11 U.S.C. §510, Rule 7001 of the Federal Rules of Bankruptcy Procedure, and other applicable law, respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

2.      Venue for this Adversary Proceeding is proper in this Court pursuant to 28 U.S.C. Section 1409(a).

3.      This Adversary Proceeding and the causes of action herein constitute "core" proceedings within the meaning of 28 U.S.C. Section 157(b)(2)(A), (B), (K) and (0), and the Plaintiff consents to the Bankruptcy Court's entry of a final order.

4.      The statutory predicates for the claims brought in this Adversary Proceeding are 11 U.S.C. Section 510(c) and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

## OVERVIEW

5.      Bankruptcy law has long permitted the subordination of creditor's claims where the creditor in question has behaved inequitably.  This Court's equitable power to review the conduct of creditors allows the Court to look beyond the technical legal justifications offered for odious conduct by a creditor to see, instead, the injustice that strict adherence to loan documents would mean to the creditor body as a whole, the bankruptcy estate, and the debtor.

6.      In this case, First Security Bank & Trust Co. ("First Security Bank") and Cedar Rapids Bank & Trust Co. ("CRB&T") (First Security Bank and CRB&T are hereinafter referred to collectively as the "Bank Group") have engaged in a pattern of conduct which is odious, over-reaching and abhorrent to the values expressed in the Bankruptcy Code and the law generally. Justice would not be served by permitting this conduct to stand as a template to be used by aspiring unscrupulous and rapacious lenders in this jurisdiction.

2

7.    Specifically, the Debtor asserts that the Bank Group has engaged in the following inequitable behavior:

a.    The Bank Group exploited its market dominance and decades of personal friendships to obtain, impose and exercise an unreasonable level of control of the assets of the Debtor, Charles Thomson ("Charles Thomson"), Amelia Management LLC ("Amelia Management"), (Amelia Trust, the "Trust"), and Robert L. Thomson ("Robert Thomson") (the Debtor, Charles Thomson, Amelia Management, the Trust, and Robert Thomson are hereinafter referred to collectively as the "McQuillen Investors");

b.    The Bank Group has abused its power to impose its preferences (which were driven by public relations objectives rather than economic reality) on the Debtor, ultimately forcing the Debtor to seek protection under Chapter 11 of Title 11 of the United States Code;

c.    The Bank Group has breached its agreements with the Debtor by supplanting economically-based lending decisions with decisions based on personal pique and animus of individual directors toward the Debtor's operating personnel;

d.    The Bank Group wrongly used its position of power over the Debtor to control the Debtor's construction priorities and the Debtor's choices on key vendors;

e.    The Bank Group has abused its power and the legal process to convert, to itself, property to which it had no legal or equitable right, *i.e.*, the Debtor's development rights in McQuillen Place;

f.    Contrary to its obligations under its own loan documents, the Bank Group has refused to negotiate in good faith (or at all) with the Debtor or third parties recruited

3

by the Debtor, including a third-party which presented a letter of intent to the Bank Group offering to pay the full amount previously demanded by the Bank Group for its interests;

      g.     The Bank Group manipulated the trust and friendship of the McQuillen Investors to induce an elderly, infirm insider of McQuillen to settle with the Bank Group on terms that were irrational and wildly favorable to the Bank Group;

      h.     The Bank Group, frustrated at the Debtor's insistence on due process, resorted to the filing of deceptive (and arguably fraudulent) "emergency" motions before an Iowa court of law; these highly questionable filings directly precipitated the Debtor having to seek protection under Chapter 11 of Title 11 of the United States Code;

      i.     Prior to the financing transaction between the Bank Group and the McQuillen Investors, the Bank Group misrepresented to the McQuillen Investors the Bank Group's level of expertise in financings similar to that contemplated by the Debtor, the Debtor relied on such misrepresentations, and the Debtor later suffered catastrophic losses as a result of the lack of the Bank Group's expertise; and

      j.     CRB&T, the member of the Bank Group which had most egregiously misrepresented its lending expertise, subsequently (but tacitly and secretly) acknowledged its errors to its partner in malfeasance, First Security Bank, by transferring $437,499.21 to First Security Bank pursuant to a secret settlement agreement, yet the Bank Group has refused to provide any of the settlement proceeds to the Debtor, the real party injured by the malfeasance.

      8.     Through the actions described in the preceding paragraph, and through other actions, the Bank Group has caused significant economic injury to the creditors herein, the bankruptcy estate, and the Debtor. Moreover, these actions by the Bank Group, when taken as a

whole, show a systematic pattern of unethical overreach, malfeasance, and obnoxious misconduct meriting subordination of the Bank Group's liens.

## PARTIES AND BACKGROUND

9.    In July 2012, Amelia Management Amelia Management purchased several properties in Charles City from Growth Properties, LLC ("Growth Properties").

10.    Pursuant to the agreement with Growth Properties, Amelia also acquired an option to purchase several parcels (the "Growth Parcels") located at the southwest intersection of Clark and North Main streets in Charles City.

11.    The Growth Parcels had been vacant since a fire destroyed a previous structure in 1987.

12.    Shortly after the purchase, Charles M. Thomson, one of the owners of both Amelia and the Debtor, was contacted by personnel from the local economic development office ("Community Revitalization") to discuss the possibility of applying for an approximately $3 million forgivable loan (the "Forgivable Loan") through the Iowa Economic Development Authority (the "IEDA").

13.    The Forgivable Loan was part of a program of the Federal government to provide communities with damage from the 2008 floods with replacement housing for housing units lost in the floods.

14.    The Growth Parcels, together with several city-owned parcels in the same city block but immediately to the south, formed a noticeable and unappealing gap of vacant, undeveloped, desolate land in the center of Charles City's North Main Street business district.

15.    The fact that the Growth Parcels and the adjacent parcels (collectively, the "McQuillen Site") had been vacant for more than 20 years provided a prospective developer with

the opportunity to seek significant tax increment financing ("TIF") support for a development at the McQuillen Site.

16.      The personnel from Community Revitalization suggested that development of the McQuillen Site using the Forgivable Loan might both alleviate a shortage of housing in Charles City and eliminate a group of ungainly lots from the business district.

17.      The location of the McQuillen Site also qualified a development for state of Iowa development tax credits under the Enterprise Zone program (the "EZ Program"), which was also administered by the IEDA.

18.      With extensive assistance from personnel from the City of Charles City, Community Revitalization, Ron Fiscus of PlanScape Partners ("Ron Fiscus"), architecture and construction firm Cornice & Rose International ("C&R") and the North Iowa Area Council of Governments, Amelia Management submitted an application (the "Application") for the Forgivable Loan.

19.      The Application proposed a 33-unit, mixed-used development to occupy all of the vacant parcels at the McQuillen Site (the McQuillen Site, together with the improvements thereon, are hereinafter referred to as "McQuillen Place").

20.      On July 5, 2013, the IEDA announced that the McQuillen Place development had been awarded the Forgivable Loan.

21.      The IEDA Forgivable Loan program (the "IEDA Forgivable Loan Program") contained numerous requirements (the "IEDA Requirements") compliance with which was required for obtaining funds. One of the IEDA Requirements mandated a development to rely not only on the funds from Forgivable Loan for constructing the building in question, but to utilize a certain amount of additional capital to provide the required number of dwelling units.

22.     With the assistance of Ron Fiscus, McQuillen Place developed a financial framework to complete the development. This framework included use of the funds from the Forgivable Loan, the EZ Program, TIF benefits, certain in-kind contributions from the McQuillen Place equity owners, and funds to be borrowed from private banks in exchange for the Debtor granting a lender a first mortgage on McQuillen Place (the "Mortgage Loan").

23.     During 2013 and 2014, representatives of the Debtor contacted numerous financial institutions and investors in an effort to place the Mortgage Loan.

24.     By virtue of the IEDA commitment of approximately $3 million through a forgivable loan, plus more than $1.5 million in TIF incentives, the McQuillen Place development had a significant equity cushion that, in most locations, would have made location a mortgage lender relatively straightforward.

25.     In many places, a mortgage loan having the equity cushion provided by the Forgivable Loan and the TIF benefits granted to the Debtor would have been readily made, and often without a private lender demanding collateral beyond the development itself and the "equity cushion."

26.     However, due to (a) uncertainty associated with its location in the rural Midwest, and (b) its location within the area traditionally serviced, for lending purposes, by First Security Bank, all prospective lenders save First Security Bank declined to provide financing for the development.

27.     First Security Bank eventually agreed to consider providing financing under the Mortgage Loan, but only after agreeing with CRB&T to have CRB&T act as "lead bank" on the loan.

28.     According to personnel from CRB&T, CRB&T had acted as lender on numerous projects in the Cedar Rapids area which had, like the Debtor, depended on complex IEDA assistance, much of it in the form of forgivable loans.

29.     First Security Bank sought CRB&T's expertise in administering the construction draws of the Mortgage Loan and in handling the unusual (for most private bankers) government-provided development assistance (the "Government Assistance") involved in the McQuillen Place development.

30.     The Bank Group agreed to jointly fund the Mortgage Loan, with CRB&T acting as lead lender but owning a relatively small amount of the credit risk, and First Security Bank owning the vast majority of the credit risk, but not being the lead lender until construction (and, hence compliance with the majority of the federal and state development and lending regulations) was complete.  On information and belief, the amount of the risk owned by First Security Bank is approximately ninety percent.

<div align="center">

FIRST SECURITY BANK'S POWER WITHIN
THE CHARLES CITY LENDING MARKET

</div>

31.     The Debtor and the Bank Group eventually closed the Mortgage Loan on December 30, 2014 (the "Mortgage Loan Closing Date") under terms which gave the Bank Group substantial collateral beyond McQuillen Place and the Government Assistance.

32.     Section 553.4 of the Iowa Code provides, "A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market."

33.     Iowa Code Section 553.12 provides, *inter alia*, that

"a person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit to:

<div align="center">8</div>

"1.    Prevent or restrain conduct prohibited under this chapter and remove the conduct's effect by injunction, divestiture, divorcement, dissolution of domestic enterprises right to do business in this state, compelling the forfeiture or restraint of the issuance of a certificate of incorporation, permit to transact business, license, or franchise, or granting other equitable relief. [...]

"2.    Recover actual damages resulting from conduct prohibited under this chapter.

"3.    Recover, at the court's discretion, exemplary damages which do not exceed twice the actual damages awarded under subsection 2, from a person other than a city or county or legal entity created by a city or county, if:

"a. The trier of fact determines that the prohibited conduct is willful or flagrant; and,

"b. The person bringing suit is not the state.

"4.    Recover the necessary costs of bringing suit, including a reasonable attorney fee."

34.    As of June 30, 2017, First Security Bank had Charles City deposits of $150,109,000, which, according to the Federal Deposit Insurance Corporation, is 40.22% of the Charles City market.

35.    As of June 30, 2017, First Citizens Bank ("First Citizens") had Charles City deposits of $141,048,000, which, according to the Federal Deposit Insurance Corporation, is 37.79% of the Charles City market.

36.    First Security Bank and First Citizens have a combined market share in the Charles City market of 78.01%.

37.    The United States Department of Justice, in determining whether to take action against an alleged monopolist or businesses acting in restraint of trade under, *inter alia,* the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, uses the Herfindahl-Hirschman Index ("HHI"). The basic process for determining the HHI of a given market is calculating the sum of the squares of the banks' shares of deposits in a given market.

38.    The current Department of Justice guidelines separate HHIs into three categories:

    a.    Less than 1,000 is "not concentrated";

    b.    Greater and 1,000 but less than 1,800 is "moderately concentrated";

    c.    Greater than 1,800 is "highly concentrated."

39.    The HHI in the Charles City market using just the First Security Bank and First Citizens market shares is 3,045.7325. The HHI for all banks in the market is 3,356.178.

40.    The President and Chief Executive Officer of the First Security Bank is Kurt Herbrechtsmeyer.

41.    Kurt Herbrechtsmeyer is also "Chair" of the Iowa Bankers Association.

42.    Kurt Herbrechtsmeyer is a frequent critic of the "unfair" status of credit unions in Iowa, suggesting that they have an unfair tax advantage compared to private banks. On February 19, 2018, the newspaper with the largest circulation in Iowa published an article by Kurt Herbrechtsmeyer entitled "Credit Unions' Free Ride Hurts Iowa's Rural Communities." *See*, https://www.desmoinesregister.com/story/opinion/columnists/iowa-view/2018/02/19/credit-unions-free-ride-hurts-iowas-rural-communities/352224002/.

43.    The only credit union located in Charles City is the Family Community Credit Union, with deposits of approximately $16,500,000, or approximately 11% of First Security Bank's deposits just in the Charles City (zip code 50616) market. The parent of First Security Bank has deposits exceeding $433,000,000, or 26 times the deposits of the local credit union, which is alleged to unfairly compete against First Security Bank.

44.    Both First Security Bank and First Citizens have expanded in recent decades from their original locations in Charles City, expanding from two locations to 22 locations.

45.    First Security Bank now has 13 locations throughout north central Iowa.

46.    First Citizens now has 9 locations.

47.     Aside from their original locations in Charles City, First Security Bank does not have a location in any city or town in which First Citizens has a location, and vice versa.

48.     First Security Bank and First Citizens frequently purchase participations in each other's loans.

49.     First Security Bank frequently sells loan participations on favorable terms to other banks in Iowa, particularly banks in proximity to the Charles City area.

50.     Banks relying on income from favorably priced loan participations might be reluctant to engage in behavior which might decrease or eliminate the flow of future loan participations.

51.     At least one bank in the Charles City area is reluctant to open an office in the Charles City market out of fear of retribution by the First Security Bank.

## THE McQUILLEN PLACE
## COLLATERAL PACKAGE

52.     In the course of the negotiations for the Mortgage Loan between the Debtor and First Security Bank, representatives of First Security Bank repeatedly asked for additional collateral from the Debtor or affiliated parties.

53.     In addition to a first lien on McQuillen Place, First Security Bank demanded a personal guaranty by Charles Thomson and Amelia Management, secured by all real estate owned by Charles Thomson or Amelia Management. First Security Bank also demanded a lien on Charles Thomson's contingent interest in farm land near Cascade, Iowa, and his beneficial interest in a life insurance policy on the life of Charles Thomson's father, Robert L. Thomson ("Robert Thomson").

54.     Personnel from First Security Bank then indicated that "the board" was not satisfied with the collateral, and would not approve the Mortgage Loan without additional collateral in the form of a guaranty from Robert Thomson.

55.     On request of Charles Thomson, Robert Thomson consented to execute a guaranty in favor of First Security Bank for the Mortgage Loan.

56.     By the time the loan was finally closed (the "Mortgage Loan Closing") on Mortgage Loan Closing Date, the collateral (the "Initial Collateral") posted for the Mortgage Loan (of $3.8 million) included:

a.     the Debtor's rights in the $2.8 million from the Forgivable Loan;

b.     $800,000 in equity in properties owned by Amelia Management;

c.     $150,000 in equity in Charles Thomson's personal residence;

d.     $125,000 in Charles Thomson's beneficial interest in a life insurance policy on Robert Thomson;

e.     $250,000 in Charles Thomson's contingent interest in a farm near Cascade, Iowa;

f.     $900,000 in TIF benefits;

g.     $900,000 in a personal guaranty from Robert Thomson;

h.     $500,000 in EZ benefits; and

l.     not less than $100,000 in the value of the lots under McQuillen Place.

57.     Although each item in the collateral package had varying contingencies to collection (and some were rights not vested), the total amount of the face value of the collateral package was $6,520,000.

58.   The maximum loan-to-value ratio in the Charles City market is 80:100, meaning that a bank will not extend credit if the value of the collateral backing an $800,000 is less than $1,000,000.

59.   The loan-to-value (using the face value of the collateral) of the Initial Collateral was approximately 63:100.

60.   By the time the Mortgage Loan closed, the negotiated plan for the financing included a portion of the final loan to be purchased by First Citizens.

61.   First Security Bank, a member of the Bank Group and the majority owner of the Mortgage Loan, has established and maintains a duopoly in restraint of trade in the Charles City, Iowa, banking services market.

62.   This restraint of trade permitted the Bank Group to obtain terms from the Debtor on the Mortgage Loan which would not have been available to the Bank Group had market forces been permitted to operate.

63.   Each loan made by First Security Bank which has terms more favorable to First Security Bank than would be available to First Security Bank in a free market environment sustains and increases First Security Bank's market position in the Charles City market for banking services, and is, accordingly, a contract in furtherance of restraint of trade.

64.   In October 2017, for reasons explained below, the Debtor ceased construction activities on McQuillen Place.

65.   Between October 2017 and the date of the petition herein, the Debtor and related parties have offered numerous options and frameworks to the Bank Group in an attempt to restart construction and complete the building.

66.    At one point during these negotiations, a representative of the Bank Group suggested that a guarantor, Robert Thomson, should contribute (as an equity investor) cash to finish the construction, with the Bank Group agreeing to reduce the remaining obligations under the guaranty by one dollar for each dollar used in construction (hereafter, the "Dollar-for-Dollar Proposal").

67.    Subsequently, the Debtor, after negotiations with Robert Thomson, offered the Dollar-for-Dollar Proposal (with Robert Thomson investing $900,000 cash into the construction, through a controlled disbursement account to be held by the Bank Group.)

68.    The Bank Group rejected the Dollar-for-Dollar Proposal on February 13, 2017.

69.    The Debtor has been injured by this restraint of trade by (a) not being able to obtain the Mortgage Loan from a competing source, which likely would have demanded less collateral from the Debtor's affiliates; (b) not being able to refinance the Mortgage Loan with a competing source, which likely would have permitted the Debtor to use funds from Robert Thomson to complete construction of the building; and (c) not having a lender willing to negotiate in good faith, inasmuch as a reasonable lender would have permitted (indeed embraced) the Dollar-for-Dollar Proposal.

## FIRST SECURITY BANK'S CLOSE
## RELATIONSHIP TO THE McQUILLEN INVESTORS

70.    Charles Thomson has been a depositor at First Security since approximately 1965. Charles Thomson's current personal residential mortgage loan is from First Security.

71.    Every automobile purchased by Charles Thomson has been financed by First Security.

72.     Amelia Management acquired the properties from Growth Properties using a loan from the First Security.

69.     Robert Thomson has been a depositor at First Security since approximate 1953, is a former member of the Board of Directors of the First Security, and is currently an Emeritus Director.

73.     Robert Thomson has utilized investment advice of persons affiliated with the First Security, and Robert Thomson, from approximately 1970 to 2007, was a business partner with one of the First Security's principal equity security holders.

74.     Charles Thomson's mother, Janan M. Thomson, was a customer of First Security from approximately 1935 until her death in 1993.

75.     Charles Thomson's maternal grandparents, Charles Walsh McQuillen and Ellen Francis Bradley McQuillen, were customers of First Security (or its corporate predecessor(s)) from approximately 1914 to their deaths in 1945 and 1981, respectively.

76.     Each of Charles Thomson's three siblings has been or is a customer of First Security.

77.     The extensive interlocking financial and social connections between the members of the Thomson family and the First Security establish that a "confidential relationship" (as that term is used in Wine, J.C., *Lender Liability Under Iowa Law*, 39 Drake L. Rev., 645, 648-652 (1990)) exists between the First Security, as bank, and the Thomson family, as customers of the bank.

78.     First Security Bank, by virtue of its comparative size in the Charles City, Iowa, lending market, holds a huge advantage in bargaining power over a borrower such as the Debtor.

79.     First Security Bank's position in the market precludes borrowers such as the Debtor from obtaining loans where less collateral is demanded, or where a lower interest rate would be demanded.

80.     The Debtor (together with its affiliated parties) was compelled, as a condition to obtaining the Loan, to grant the Bank Group security interests in more collateral that would have been demanded by a similarly situated borrower in a lending market where robust competition among lenders prevailed.

81.     The Bank Group intentionally exploited First Security's market position and relationship to the Thomson family to obtain, for its own benefit and to the detriment of the Debtor, property interests which Bank Group would not have otherwise obtained.

82.     The compelled transfer of these property interests gave the Bank Group an undue and unconscionable advantage which has, as a proximate and foreseeable result, exposed the Debtor to undue financial harm.

83.     The provisions of the Mortgage Loan pursuant to which collateral was transferred to the Bank Group from the Debtor and the Affiliated Parties was unconscionable at the time the contract was made.

### THE BANK GROUP'S ALLEGED LENDING EXPERTISE

84.     The Bank Group represented to the Debtor that the Bank Group (i.e., CRB&T) had vast experience and expertise in transactions involving economic development assistance from the State of Iowa.

85.     The Bank Group knew that the Debtor was relying and would continue to rely on the Bank Group's expertise in in transactions involving economic development assistance from the State of Iowa.

86.     Throughout the negotiation of the Mortgage Loan and, following its closing, during its administration, the Bank Group, through CRB&T, repeatedly referenced its familiarity with various state economic development incentives involved in the financing of McQuillen Place.  The incentives so referenced included, but were not limited to, the IDEA Forgivable Loan Program and the EZ Program.

87.     Following Mortgage Loan Closing, construction progress on McQuillen Place was delayed by a number of factors, including a shortage of skilled tradespersons in the Charles City area, failures of subcontractors to adhere to deadlines, the refusal of a key vendor to work with MidAmerican Energy, and multiple changes in standards and design parameters imposed unilaterally by staff of MidAmerican Energy.

88.     The delays resulted in the parties to the Mortgage Loan agreeing to extend the term of the Mortgage Loan in order to complete construction of McQuillen Place.

89.     Preceding each renewal and extension of the Mortgage Loan, the Bank Group provided the Debtor with detailed guidance and recommendations on steps to take to maintain the project's compliance with the various state economic incentive programs.

90.     This proffering of guidance was consistent with the repeated assurances that CRB&T was intimately familiar with administration of loans in which state economic incentive programs were a key funding component.

91.     On September 19, 2013, the Debtor applied for assistance, in the form of development tax credits, from the IEDA under the EZ Program.

92.     On October 23, 2013, the Director of the IEDA signed a letter (the "EZ Award Letter") granting the Debtor's application for credits under the EZ Program.

93.    The application for assistance under the EZ program and the EZ Award Letter were provided by the Debtor to the Bank Group prior to the Mortgage Loan Closing.

94.    In July 2017, the Debtor was asked by CRB&T to make arrangements for the sale of the anticipated EZ credits (the "EZ Credits") as part of what was anticipated by the parties to the Mortgage Loan to be a final renewal and extension prior to completion of the building.

95.    In early August 2017, the Debtor was notified by the IEDA that the original issuance of the EZ Award Letter was to have been accompanied by a "contract" setting forth additional terms and conditions for the EZ Program beyond those referenced in the EZ Award Letter.

96.    One of the additional terms and conditions to have been set forth in the contract was a two-year expiration rule (the "Two-Year Rule"). The IEDA asserted that the Two-Year Rule was applicable to all EZ Programs in general and to the Debtor in particular, notwithstanding absence of notice of the Two-Year rule in the EZ Award Letter.

97.    On information and belief, the EZ Program has been a funding component of numerous loans and construction projects in which the Bank Group and its members have participated.

98.    The approximate amount face amount of the EZ Credits to which the Debtor would be entitled in the absence of the Two-Year Rule was $700,000. The approximate amount of net proceeds from the sale of such credits (the "EZ Benefits") would have been $500,000.

99.    The net increase in availability of funds (through an increase in the collateral package held by the Bank Group) would have been sufficient to obtain a certificate of occupancy for at least some of the residences at McQuillen Place.

100.    Obtaining a certificate of occupancy would have permitted the Debtor to use the cash flow from rented units to fund completion of the remaining units and to start the process of obtaining infusion of the TIF funds into the project.

101.    Following discovery of the Two-Year Rule by the Debtor, the Bank Group refused to extend any additional credit to the Debtor.

102.    The Bank Group knew, or should have known, about the Two-Year Rule.

103.    The Bank Group knew that the Debtor was relying on the EZ Benefits to provide funds for the construction of the building.

104.    The Bank Group had a duty to notify, *inter alia*, the Debtor about the Two-Year Rule prior to the Mortgage Loan Closing.

105.    The Bank Group never notified the Debtor about the Two-Year Rule.

106.    The Debtor has been injured and damaged as a result of the Bank Group's failure to notify the Debtor about the Two-Year Rule.

107.    The Bank Group had a responsibility to the Debtor to take due care to protect the Debtor's financial interest in the EZ Benefits.

108.    The Bank Group not only failed to take due care to protect the Debtor's financial interest in the EZ Benefits, the Bank Group failed to take any level of care to protect such interests.

109.    Any and all default(s) of the Debtor under the Mortgage Loan are the direct and proximate result of the Bank Group to exercise due care over collateral pledged to the Bank Group under the Mortgage Loan, viz. the EZ Credits.

110.    The Bank Group's failure constitutes unclean hands and bars the Bank Group from enforcing the provisions of the Mortgage Loan.

111.   The Bank Group knew, or should have known, that it either lacked detailed knowledge of economic development incentives programs in Iowa, or that it had no capacity to assist borrowers in any meaningful way in transactions involving economic development incentives in the State of Iowa.

112.   The Bank Group knew that the Debtor was relying on the Bank Group's representations of expertise in transactions involving economic development incentives in the State of Iowa.

113.   The Debtor relied to its detriment on the representations of the Bank Group concerning the Bank Group's expertise in transactions involving economic development incentives in the State of Iowa.

114.   Among other things, the Debtor would not have entered into the Mortgage Loan if it had been aware of the Bank Group's lack of expertise in or lack of meaningful capacity to administer transactions involving economic development incentives.

115.   The Mortgage Loan was, accordingly, obtained by fraud by the Bank Group.

116.   Four guarantors under the Mortgage Loan, Robert Thomson, Charles Thomson, Amelia Trust and Amelia Management (collectively, the "Guarantors"), have rights of subrogation against the Debtor by virtue of this action.

117.   The Debtor would not have sought or permitted the Guarantors to become involved with, much less guaranty, the Mortgage Loan had the Bank Group disclosed that it would not or could not protect or assist the Debtor in maintaining its interest in the EZ Credits.

118.   The Bank Group's failure to disclose such information to the Debtor resulted in an increase in the Debtor's exposure to subrogation claims, to the detriment of creditors.

MANIPULATION OF CLOSING DATES FOR FEES

119.   The Mortgage Loan Closing Date was set by the Bank Group.

120.   The sole discernable reason for the Mortgage Loan Closing Date was to permit the Bank Group to book income in 2014, rather than 2015.

121.   The Bank Group had a duty to the Debtor to act in good faith and to deal fairly.

122.   By selecting a closing date to accommodate only the interests of the Bank Group, rather than the interests of the Debtor, the Bank Group engaged in opportunistic and predatory behavior.

123.   The Debtor suffered economic injury as the proximate result of the Bank Group setting the closing date of the Mortgage Loan for the Mortgage Loan Closing Date.

FIRST SECURITY BANK SPREADS PRIVATE
INFORMATION (SOMETIMES, FALSE PRIVATE
INFORMATION) ABOUT THE McQUILLEN INVESTORS
TO VARIOUS THIRD PARTIES

124.   First   Security   Bank   publicly   states   in   its   "Privacy   Policy" (https://www.1stsecuritybank.com/assets/1436904169-Privacy-Policy.pdf) that it uses security measures to prevent disclosure of confidential information of its customers to the general public.

125.   First Security Bank publicly states that it maintains privacy rules which comply with all applicable Federal and state laws.

126.   First Security Bank's public representations regarding its privacy policy (the "Privacy Policy") constitute part of the contractual agreement between First Security Bank and its customers.

127.   The Debtor is a customer of First Security Bank.

128.    The Privacy Policy is part of the contract between First Security Bank and the Debtor.

129.    The provisions of 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq.* restrict the release of confidential customer information in possession of a bank to third parties.

130.    On information and belief, on March 7, 2014, a member of the board of directors (the "Board") of the First Security Bank told a third party (a bartender) that the McQuillen Place transaction was "dead as a doornail" because it had lost its financing. (The conversation described in this paragraph is hereinafter referred to as the "March Statement.")

131.    The March Statement was not true.

132.    The March Statement tended to impugn the business prospects of the Debtor.

133.    On information and belief, during the period between August 1, 2014 and September 5, 2014, one or more members of the Board spoke to members of the City Council of the City of Charles City, Iowa (the "City Council") and made certain statements (the "August Statements") concerning the McQuillen Place development.

134.    At the time of the August Statements, the City Council was considering a proposal by the Debtor for the City of Charles City to provide, *inter alia,* tax increment financing benefits to the proposed McQuillen Place development to make the development economically viable.

135.    On information and belief, the August Statements were extremely negative toward the proposed transaction, criticized the proposed transaction for relying on subsidies from the government, and suggested the long-term prospects for the financing of the project were poor.

136.    The August Statements tended to impugn the business prospects of the Debtor.

137.    On information and belief, during February 2018, a person employed by First Security Bank disclosed to a third party (a) details of an appraisal dated January 12, 2018, and (b)

specific details of positions taken by various parties during loan modification negotiations between the Debtor and First Security Bank during the first weeks of February, 2018 (the "February Statements").

138. The February Statements tended to impugn the business prospects of the Debtor.

139. The March Statement, the August Statements and the February Statements were presented to the recipients of the information as true and accurate depictions of the status and prospects of the Debtor and its interests.

140. The information contained in the March Statement, the August Statements, and the February Statements is confidential information the disclosure of which is prohibited by 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq.*, and, by reference, the Privacy Statement.

141. The utterance of the March Statement, the August Statements, and the February Statements is a breach of the contract between First Security Bank and the Debtor.

142. The content and context of the March Statement, the August Statements, and the February Statements indicates that the statements were made intentionally and were, moreover, made in a hostile manner and with the intention of injuring the business prospects of the Debtor.

143. The Debtor has been injured by the breach of contract described in the preceding paragraph.

144. First Security Bank had a duty to hold private and confidential information pertaining to the Debtor.

145. Personnel from First Security violated this duty by uttering the March Statement, the August Statements, and the February Statements.

146. The Debtor has been damaged by this breach of duty by First Security Bank.

23

147.   The Debtor is and was known to First Security Bank to be engaged in a business where good businesses character and conduct are essential to success and well as survival.

148.   The March Statement, the August Statements, and the February Statements were calculated by the persons uttering them to interfere with and diminish the reputation of the Debtor, including, but not limited to, the reputation of the Debtor for good business character and conduct.

<div align="center">

THE BANK GROUP HAS REPEATEDLY VIOLATED
ITS DUTY OF GOOD FAITH AND FAIR DEALING

</div>

149.   The Bank Group had (and has) a duty to negotiate with the Debtor in good faith.

150.   Part of the duty to negotiate in good faith is to consider and accept proposals in a manner consistent with that of a reasonable bank acting under similar circumstances.

151.   The minutes of various meetings of the First Security Bank board and board committees (attached hereto as Exhibit A) (the "Minutes") show that First Security Bank (i) has used criteria other than its obligations under the Loan Documents and economically rational analysis to arrive at positions vis a vis the Debtor, (ii) has attempted to impose the priorities of individual members of the First Security Bank board of directors on the Debtor, (iii) has attempted to interfere with the personnel choices of the Debtor, (iv) has wrongly attempted to control and obtain ownership of assets (specifically, the McQuillen Place development rights) which the Bank Group does not own and on which it does not have a perfected lien.

152.   According to the Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on September 14, 2017:

> *Dick Herbrechtsmeyer:*
>
> It is time to talk to Charlie [sic]. … Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it.

*Kurt Herbrechtsmeyer:*

Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. [....]

*Gene Hall:*

I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done.

153.    According to the Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on March 8, 2018:

*Kurt Herbrechtsmeyer:*

They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, the need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. [....]

The most is completing the windows. Windows on the first floor and completing the sidewalk. [W] are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff we have to be willing to take it on. [....] We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. [....]

*Dick Herbrechtsmeyer:*

[T]here may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio. [....]

*Gene Hall:*

I absolutely agree that if the bank finishes the project, [I] agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has.

*Dick Herbrechtsmeyer:*

I can assure you one thing, Directors will pay to have McQuillen removed. ][….]

*Kurt Herbrechtsmeyer:*

[….] The other prospect that pushed me across, other alternative was that we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this. From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. [….]

*Dick Herbrechtsmeyer:*

[….] PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both. [….]

*Gene Hall:*

Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

154.    The Debtor currently owns, and at all relevant times herein has owned, McQuillen Place and the business prospects, future income, going concern value, and economic advantages deriving from the collection of assets known as "McQuillen Place."

155.    The Debtor is, and at all relevant times herein has been, a for-profit limited liability company.

156.   The basic substance of the Mortgage Loan transaction was that the Bank Group would lend money and provide related financial accommodations to the Debtor to facilitate the construction of the McQuillen Place.

157.   As long as the Debtor owns the assets known as "McQuillen Place," First Security Bank owes McQuillen Place Company a duty of good faith and fair dealing with regard to the McQuillen Place assets and with regard to the Mortgage Loan.

158.   The Bank Group does not have a perfected lien on any of the personal property of the Debtor.

159.   The Bank Group has not filed a Uniform Commercial Code financing statement to perfect any lien on personal property of the Debtor.

160.   The right to develop McQuillen Place, the books and records of McQuillen Place, and the future business expectations of McQuillen Place are all personal property of the Debtor.

161.   A secured lender does not, by virtue of a security agreement or a mortgage, gain the right to seize the assets of a borrower outright simply because either (a) the officers of the lender become convinced they can operate the assets more efficiently than their borrower, or (b) become convinced that ownership of the assets might somehow burnish the lender's corporate image.

162.   Lenders continue to owe a duty of good faith and fair dealing to borrowers at all times during the creditor-debtor relationship.

163.   First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced they can operate McQuillen Place more profitably or efficiently than McQuillen Place Company.

164.    First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced their operation of McQuillen Place might burnish their corporate image.

165.    First Security Bank, Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall are, and at all relevant times herein have been, aware of the facts stated in the foregoing paragraphs 154 through 164.

166.    Notwithstanding their knowledge of the ownership of McQuillen Place, and notwithstanding their obligation, as directors, to cause First Security Bank to act in good faith in its contractual relationship with McQuillen Place Company, Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall concocted, supported and evangelized on behalf of a scheme for First Security Bank to seize control of McQuillen Place in order to, among other things, advance their own public relations agenda.

167.    The scheme was to make First Security Bank appear as "heroes" rather than "bad" bankers, because it would be the bankers of First Security Bank who "showed up" and finished construction by drawing on their own funds and obtaining additional funds from other banks through new, senior debt on the property.

168.    At no point since September 30, 2017, has First Security Bank offered to McQuillen Place or its principals any proposal (a) to advance additional funds for completion of construction of McQuillen Place, or (b) to permit new, senior financing from another institution to be used to complete construction of McQuillen Place.

169.    At no point in the Minutes do the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall (or any other participant in the meetings) suggest offering any proposal for a neutral

third-party agreeable to both the Debtor and the Bank Group to (a) obtain additional funds for completion of construction of McQuillen Place, or (b) obtain additional funds through new, senior financing from another institution.

170.     Although the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall knew that First Security Bank was able to advance additional funds to complete construction and/or accept subordination to a new senior lender, the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall only mentioned this as an option in the context of First Security Bank seizing the property and assuming the role of developer.

171.     The plan advocated by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall was intended to exclude any other person or entity from coming in as "heroes" to finish construction, because the "hero" role was to be reserved for First Security Bank.

172.     This reservation of the "hero" role for First Security Bank was recommended by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall without regard or consideration of the possibility that, in terms of net returns, some other arrangement might have actually been more beneficial for First Security Bank as an institution.

173.     The sole option promoted by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall involved the bank seizing control of the future business prospects of its borrower so that First Security Bank can exploit its borrower's assets for its own gain.

174.     The tenor of the comments of the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall indicates that they were motivated not by concern for the assets of First Security Bank, but by pique at one of McQuillen Place's principals, by the desire to inflate their own standing in the local community as "heroes," and by an inexplicable (and irrational) desire to change the nameplate on the building.

175.    Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall accordingly intentionally advocated cutting off negotiations immediately and commencing a legal action as quickly as possible.

176.    In so doing, the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall acted in bad faith, intentionally interfered with the contract between the Counterclaimants and First Security Bank, and caused damage to the Debtor.

177.    No reasonable bank, when offered cash by a guarantor to complete a building held as collateral by the bank, would refuse such an offer solely on the basis of requesting additional security from a guarantor.

178.    The reasonableness of the offer of the Debtor and its Affiliated Parties to contribute $900,000 to complete the construction of McQuillen Place, in exchange for a dollar-for-dollar reduction in guaranty obligations, is demonstrated by the fact that Gary Becker, of CRB&T, initially suggested the proposal.

179.    The Bank Group breached its duty of good faith and fair dealing by refusing the proposal.

180.    The Debtor has been injured by this breach of duty.

### CRB&T AND THE IEDA FUNDS

181.    In September 2017, funds from IEDA were deposited with CRB&T.

182.    Instead of making these funds available to the Debtor to permit further construction, CRB&T used these funds to pay accumulated interest on the Mortgage Loan.

183.    If these funds had been made available to the Debtor, the Debtor, through its vendors, could have completed sufficient work on McQuillen Place to obtain a temporary certificate of occupancy (the "TCO").

184.   If the Debtor had obtained the TCO, it would have been able to start renting units at McQuillen Place, and could have generated funds with which it could have finished the rest of the building.

185.   The hardship to the Debtor by offsetting these funds greatly outweighed the temporary benefit CRB&T obtained by offsetting interest charges.

186.   CRB&T had a duty to evaluate the relative harm to the parties from its actions and, in this case, to permit the Debtor to use the funds to pursue construction.

187.   CRB&T breached the duty described in the preceding paragraph.

188.   The Debtor has been injured by this breach of duty.

189.   In refusing reasonable offers by the Debtor and its Affiliated Parties to inject cash into the development to finish construction, the Bank Group is attempting to use continuing interest charges and default fees to run up the total amount of the debt.

190.   Since the Bank Group has numerous pieces of collateral, the effect of running up the debt will be to award the Bank Group a windfall.

191.   The Bank Group has a duty to avoid obtaining a windfall when its borrower, the Debtor, has presented a reasonable plan to make the Bank Group whole while avoiding a windfall.

192.   The Bank Group has breached the duty described in the preceding paragraph.

193.   The Debtor has been injured by this breach of duty.

### PAYMENT OF REAL ESTATE TAXES

194.   In late June 2018, the Bank Group elected to pay approximately $230,000 in real estate taxes on McQuillen Place.

195.   The Bank Group did not consult with the Debtor prior to making this payment.

196.    Prior to the Bank Group making this tax payment, the Debtor had informed the Bank Group that the Debtor was going to ask the taxing authority to abate the taxes in question.

197.    The taxes in question are based on an assessment of the building being completed and in service. Since the building, when the taxes were paid, had not yet completed and was not in service, the amount of the assessment (and thus of the taxes) should have been lower.

198.    By paying the taxes, the Bank Group has diminished, if not eliminated, the ability of the Debtor to seek abatement from the relevant taxing authority.

199.    The Bank Group had a duty to not expend funds on the Debtor's behalf in a manner that needlessly increased the Debtor's tax obligations.

200.    The Bank Group has breached the duty described in the preceding paragraph.

201.    The Debtor has been injured by this breach of duty.

Now, wherefore, the Debtor respectfully requests that this Court enter an order:

a.      subordinating all liens, claims and encumbrances of the Bank Group (or any of them) in any asset of the Debtor to a priority in distribution below that of all claim and interest holders in and of the Debtor, including, but not limited to, those of the unsecured creditors and the owners of the Debtor's equity;

b.      in the alternative, disallowing the claims of the Bank Group in the Chapter 11 case of the Debtor in their entirety; and/or

c.    granting the Debtor such other and further relief as may appear to the Court equitable and just under the circumstances.

Dated: November ⬡, 2019

Respectfully submitted,

By: _____
J D Haas
(IA ##AT0003014)
J D Haas & Associates, PLLC
1120 East 80th St., Suite 200
Bloomington, MN 55068

*Attorney for Plaintiff*

Exhibit A

Meeting Excerpts – Board Loan Committee – McQuillen

**7-17-2014**

Following review and discussion of the following lines of credit, the following were approved unanimously with actions indicated:

**McQuillen Place LLC**
Requested: Lending Limit and Total Serviced Debt $3,900,000
Robust Discussion held. Further information needed.
Motion by Gene A. Hall to table, second by Robert D. Noble.

**8-4-2014**

Motion was made by J.R. Herbrechtsmeyer and seconded by Kurt W. Herbrechtsmeyer, and unanimously voted to bring back to the table, McQuillen Place request.

Keith Starr presented the following additional information regarding the McQuillin Place:

7-2014 Projected Construction Cost
Supplemental Information regarding the apartments.
7-27-2014 Rent Report
7-27-2014 Rent Projection
7-27-2014 Square Feet of Building

No action was taken.

**8-8-2014**

Motion was made by J.R. Herbrechtsmeyer, seconded by Kurt W. Herbrechtsmeyer, and voted to approve (Boyd A. Campbell – Voting No), either of the following two loan options:

**Option 1**
**McQuillen Place**
Guarantor/Co-signers:  Charles M. Thomson, Robert Thomson
Contingent upon Charles City TIF loan.

Lending Limit          $1.95 million loan for 25 years, contingent upon the City
                       of Charles City approving an upfront TIF loan to
                       McQuillen Place for approximately $2 million to be repaid
                       over 15 years. Robert Thomson would continue to
                       guaranty $900,000 of this debt with $500,000 of that
                       guaranty being secured.
Total Line Commitment  $1.95 million

Exhibit A
Page 1

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in.  Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**Option 2**
**McQuillen Place**
Guarantor/Co-signers:  Charles Thomson, Robert Thomson

Lending Limit          $1.45 million loan for 25 years, contingent upon the City
                       of Charles City approving an upfront TIF loan to
                       McQuillen Place for approximately $2.5 million to be
                       repaid over 20 years. Robert Thomson would continue to
                       provide an unsecured guaranty of $400,000.
Total Line Commitment  $1.45 million

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in.  Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**9-15-2014**

Update was given on the McQuillen Place.  Negotiations are still taking place.  City has not yet committed to the up-front TIF loan.  Robust discussion was held.

**10-16-2014**

Email, verbal or phone response votes, which are attached as a parts of these minutes, were received from J.R. Herbrechtsmeyer, Kurt W. Herbrechtsmeyer, Boyd A. Campbell, Gene A. Hall and Robert D. Noble and the following was unanimously approved:

**McQuillen Place**

Lending Limit          $3,500,000.00
Total Serviced Debt    $3,500,000.00

Advisors Keith K. Eastman and Ronald McGregor submitted approvals.

**6-8-2015**

Mark Miller presented the following line reviews:

Page 2

is completed.  I believe that is an accurate statement that this can be done.  We will see how far along they are.  J.R. – The City Manager told a group that information last week, but had some caveats that needed to be done.  J.R. Herbrechtsmeyer – I move we approve where we are.  Loan Committee will be talking about the renewal once questions are answered.  Boyd A. Campbell, seconded, and unanimously approved:

**McQuillen Place Company LLC,**
**Guarantor/Co-signer:  Charles M. Thomson, Amelia Management LLC,**
**Robert L. Thomson ($900,000 limited guaranty).**
Board Approved Lending Limit        $3,500,000.00
Board Approved Total Serviced Debt  $3,500,000.00

**2-2-2017**

Gene – Any updates on the McQuillen place?  Dick – Mark has toured the place.  The elevator is built but we haven't delivered until MidAmerican gets in.  MidAmerican is getting easements from Ralph for the north end trench before McQuillen gets hooked up.

**4-21-2017**

McQuillen Place – Kurt W. Herbrechtsmeyer – I vented frustration at the "haste" that this project is going forward.  One other thing, is the argument for their pace, it is cheaper for them to keep their labor costs down than paying us interest.  This request is an extension until the end of June, and they need to get this thing done.  We will review the rate at that time.  Gene – If this is an extension through July 1, so they can finish this, I don't believe them.  Kurt – No, this won't get finished then.  If they are going to tell us, it is cheaper than to pay us interest, we can change that equation.  Gene – There is no cash flow and no leases are signed.  Kurt- The argument is, if we get an army in here to finish this up, we would have to pay premiums, and they need to do this to stay on budget.  I don't think they factored revenue into this.  Very frustrating.  We send the message now, this needs to get done, rate will change on July 1 and if they want to talk to a different lender they can, as the rate at that time will be 5.25%.  Mark – This is a participation that we purchased form Cedar Rapids Bank and Trust and we just got involved on the front end.  The biggest chunk is coming from FEMA, which Cedar Rapids Bank and Trust have had experience with this.  We thought it was better to have them involved to make sure things were done correctly.  In hind sight, their oversight has not been as good on this.  We see this daily, they come up infrequently to do inspections.  We went through there the last time with representatives from First Citizens and the City.  Their oversight has not been what we thought it to be.  Gene – Do we have any choice, what is the alternative?  Kurt – The rate adjusts.  We have not given them any indication we wouldn't, but truthfully, this is the time to tell them what is going to happen next time.  I have lost faith in Charlie to get this done.  I would like to make it clear to him we are done.  We want to see this get done and be a success, but he has to do everything he can to make that happen.  If he doesn't have a signed lease by now, we need to get his attention.  Mark – We have not increased our loan commitment, they are not coming in at this point in time asking for more money to get this done.  We did get information on other sources they have money to draw from.  It would be nice to know they could get this done for the amount of money they have left.  When done, it needs to generate income.  Boyd – We have 90% participation.  From the time this is going to be completed, we are going to have a time in between that this is going to be bad.  Mark – That is why we have the guarantees we have.  At this point, the biggest

Page 4

Meeting Excerpts – Board Loan Committee – McQuillen

McQuillen Place Company LLC, Guarantor/Co-signer:  Charles M. Thomson, Robert L. Thomson & Amelia Management LLC – Nothing new to report.  This line was approved in January.  Cedar Rapids stays involved until the building is up, then the commitment will be between First Security Bank, First Citizens and the City for a take-out commitment.  Cedar Rapids Bank and Trust was involved due to the significant amounts of grant money and they are overseeing the draws and overseeing the project going forward.  We have Bob Thomson's guarantee in place in the amount of $900 thousand to cover 2 years of payments for the end loan.  Discussion was held regarding tenants and disagreements between Dean and Charlie.  Mark advised that he is not aware of any tenants lined up at this point.  Motion was made by Gene A. Hall and seconded by Robert D. Noble, and unanimously approved:

**McQuillen Place Company LLC,**
**Guarantor/Co-signer:  Charles M. Thomson, Robert L. Thomson & Amelia**
**Management LLC**
Board Approved Lending Limit        $3,500,000.00
Board Approved Total Serviced Debt  $3,500,000.00

**6-9-2016**

McQuillen Place Company LLC, Guarantor/Co-signer:  Charles M. Thomson, Amelia Management LLC, Robert L. Thomson ($900,000 limited guaranty) – This line has a construction note that matures end of June.  There is a tour scheduled at 9:30 a.m. Monday, and a meeting with Gary Becker, the lead bank on this.  The reason they are the lead, is there are many grants involving FEMA and other entities that have had more experience with this.  We are going to be meeting on Monday with Charlie to get a tour of the building and hear what the plans are going forward.  Gene – This construction note matures June 30, and what happens if they come up here and take a look at this?  Mark M – We are going to have to make a decision.  They haven't used all their line of credit and monies are not all gone.  We have been matching up the progress in relationship to the project.  Bill H – Final note is contingent on completing the building.  Mark M – We need some updated financial information.  I can talk to Charlie directly, but I feel with them being the lead bank, most of this should be going through the lead bank.  We need updated financials, status reports in relation to where the work has been done and advances on LOC's.  If we had the loan maturing June 30, what time frame are we looking at for completion?  And lastly, what is the status of the first floor as far as tenants are concerned.  We think there is none, but have not had any confirmation from reliable sources.  Steve – The question I would ask, there was 6 vehicles on site that had workers, how can you finish a project with only 6 men on site?  Mark M – The only answer I have gotten, is that it is going to take longer, but we are spending less to get to the end.  Steve – When they are this far behind schedule, he will never get ahead.  Steve advised he would come out of retirement and finish the project, if needed.  Gene – I have a number of concerns with this.  He is so far behind schedule.  Steve – How will you get this done with one plumber and one electrician?  Dick – I learned there are 20 furnaces in town to put in.  Mark M – One of the things talked about, there is some discussion about being able to rent apartments in one part of that before the whole building

Exhibit A
Page 3

guarantor is Bob Thomson. Boyd – He stopped at $900 thousand. If we have a year of nothing in between, is he willing to step in and give us some more? What are we going to do here? Gene – My understanding is it needs to get built. Once built, whoever is the second owner can come in and do something with it. Boyd - If it doesn't get built? He needs an incentive to get this done and get to work on this, and needs to be over there and make sure they are working. Gene – What is the contract language regarding interest rate? Kurt – Default adds 2%. Mark – I would advocate, the right approach is get the extension done, have Gary Becker up here sometime in May, First Citizens, and Charlie, and do another tour and advise it doesn't look like it is going to get done, what is the plan? We did have a meeting in August last year, we were pretty harsh at that point in time, and we got some good dialogue and need to have this dialogue again. There is no signed lease yet. Gene – They are looking at other locations. Kurt – This one is not going to get ready. As we are getting to the finish line, June 30 might be a great opportunity, if there is progress on it and the end is in sight. Now if he doesn't have any leases, he has to put a date out there. Bob - Why does Charlie not feel this urgency to make this happen? Mark – The real issue they continue to bring up, they can't get enough labor, they thought they were going to import people from Chicago, for some reason, they have to have 2 forms of ID and the people don't. That is their argument. Last time they had 12 people working and there was no general contractor. For a while, they had Alex Heinz, they had sub-contractors doing things. Boyd – If we get this done, what is going to be our occupancy rate, do you think? That year after it is done and trying to fill it, cash flow is going to be absolutely bad, that is all on us. Mark – We are looking at the commitment letter from Citizens. Citizens had to have a year's reserve in payments, theirs is $900 thousand, City is $900 thousand and ours is $1.5 million. They have to have a reserve for one year's worth of payments set up, so they have the time to get that building filled. Gene – The dialogue has to be the rate is going way up July 1, so get it done or don't, the rate is still going up. Kurt – We want to create a sense of urgency to finish and get FEMA money. Mark – Cedar Rapids Bank and Trust said it is cheaper than paying a high price for getting a whole bunch of labor in there to get it finished and this was in August and they continue the same dialogue. Gary is not helping us with that participation. Diane – From his perspective, he is in Cedar Rapids and we are looking at it every day. Gene – Did Timko take over that board down there? Steve Crawford told me Timko was going to take over that board and this would help expedite this. Mark – I asked Gary for information and he sent back, well we just kind of trust them. Charlie said, every time we make a request, they know this. Gary was nonchalant. Mark-I told them we are not very happy about a third extension and the non-urgency of getting this completed. This matured March 31. We are looking at this physically every day and we are not happy about it. Gene – I think we have to extend it, but the message has to be loud and clear. Mark –I will line up a meeting with all potential parties involved with final financing and get Gary from Cedar Rapids Bank and Trust and do another tour. We are tired of it. We want it finished, get it done. Kurt- It is time to let Charlie know he needs to go find some help financially, he needs a little push back from somebody, that this might not end well. Mark –If we get another tour lined up, if any of you would like to be included, let me know. Boyd, Gene and Bob advised they would like to be involved in this. We will get a meeting lined up and invite you. Boyd- We need to show up. Mark-We want to have a sit down meeting and tour. Bob – When is the time to discuss rate? Mark-Cedar Rapids Bank and Trust has all their documents ready at 5.25%. I would like to stick with this but clearly communicate that come July 1, if this is not done, that rate is not anywhere close to where it needs to be. Gene A. Hall made motion, Boyd A. Campbell seconded, and it was unanimously

VOTED:      To approve the extension of the construction loan for:

McQuillen Place Company LLC

Exhibit A
Page 5

Charles M. Thomson/Amelia Management LLC/Amelia Trust/Robert Thomson ($900K)
$3,491,993.32 Line of Credit at 5.25% to June 30, 2017, with the provision that if the note is not paid by July 1, the rate defaults to the maximum, will not be extended, and the loan stays at the default rate

and

approve the loan policy exception – Term of construction longer than 12 months.

### 6-8-2017

Schedule of Customer Renewals – This was reviewed. Gene – Question on McQuillen, how did he take the interest rate we presented? Mark – There was interest rate discussion. We are trying to line up another tour this week. The elevator was installed, but they now have a problem with the doors. We asked about certificate of occupancy, he thought maybe he would have that by June 15. We did plant the seed that the interest rate would be higher and there might be some performance based prices factored into the rate, such as occupancy certificate and occupancy levels. Dick – Is our guarantor aware? Have we had a conversation with Bob, as it is about down to where he will have to subsidize some payments? Mark – Every year, he does a financial statement, this is listed as a contingency liability. As far as having a deep discussion with him, I have not. $900 thousand during construction loan will be $500 thousand once permanent financing. Dick – My fear is he may not be getting the whole story of the concerns and it might be time. I would be willing to be part of that discussion with Bob. Discussion held. Gene – All those properties Charlie has, there is no equity.

### 8-17-2017

J.R. Herbrechtsmeyer advised regarding McQuillen Place. Gene – Since he has everything for sale and even though there may or may not be any net worth there, whatever net worth there is, is supposed to be pledged to the bank. So, if he started piece mealing this off, how concerned are we that we get our share? Kurt – I have seen the Renaissance Revival package and it is $1.2 million or $1.4 million, if he finds someone to buy this. Gene – I don't think this would prohibit him to sell what he can when he can. Dick – The big chunk of the stuff he bought from Brian Crane, we have the first and the kids carried back a second. Brian owned the corner where McQuillen is at, which raises an issue I hadn't thought of, I hope there isn't a second with those folds and there was not a second mortgage ahead of that transfer into the new entity that is building McQuillen, because he bought that from Brian as part of the package. What he did, is add a little line of credit, made payments, but borrowed back on the LOC, which is secured on the first mortgage, so, all of a sudden his 5 years are up and has shown no progress with us. I gather Mark said no, we are not interested in doing this over. As far as net worth, any net worth he thinks he has is nothing, unless he has picked something up. Kurt – It is 12 residences – commercial properties. Dick – He may have improved the value of that property, he put in a lot of storage units back behind there, which you can't see from the street and claims he has them all full. Bill – Did he buy the Brick and Tile Building? Randy – No Jeff Tierney has that. Kurt – His own home is in this package, Mark Melrose is in 206 N Main, the North Grand, the duplex on Harvey, rental on Johnson 15th Ave, and

Exhibit A
Page 6

Riverside Drive, brick building next to the bar, Kellogg and Jackson street. Diane – Mark and I had a conversation with Gary Becker and we are trying to get the package together for the extension of the LOC. One of the things they asked us to do is a walk through because in the cash flow, they are talking about having occupancy as of September. They are closer to this, but that date will not happen. There were only 3-4 doors that were put on the apartments at this point. Dick – The area where he wanted to rent, the doors were done, the rest were not. All the plastering had to be done. Diane – They were going to put windows in yet this week. Kurt – They have to Sheetrock all the common areas. Diane – All major hallways have that and it is painted. They are making progress, but will not hit September 1. Gene – Did Dean Snyder take over that construction? I know he was asked to bid on it and finish it. He did bid. Diane – There were only a couple people working when we were there. Dick – It did not look like activity such as Dean Snyder would have. Gene – Even though he may have taken over, he may not be there yet. Kurt – He has leased one apartment to a school teacher. Robust discussion held. Diane – On Monday, Charlie wasn't here, we walked through with their construction manager. They have pavers now in the area between the two sides of the building. Have several doors on the outside of that area. What is done looks nice.

### 9-14-2017

McQuillen – Dick advised of several questions to start. Last time we toured, Charlie was told there were 3 apartments left to be sheet rocked and taped. Two days ago, the one in the corner still appeared to have sheet rock know leaning against the window. Mark – I will schedule a time to get there next week. Dick – The elevator was supposed to be inspected and he has not reported to you. Dick – Both things needs to be done. Mark – The elevator is not required. I think we are just waiting for the state to inspect. Mark – To summarize the request: The new pieces are the construction LOC that matured the end of June and has not been renewed. There is a different on interest rates, and it will be the same thing on both notes, at 6.25% with the lead bank, so net to us will be 6.0%, up from 5% from before. The floor on this loan is 5.75%, and net is 5.5%. There are 100 bp performance objectives on both these loans. When they get certificate of occupancy, the rate drops 50 bp, another 25 bp when the residential units are rented and another 25 bp when they have 3000 feet of retail space rented. They could drop the rate by getting certain things done. There is a second note, which we are not encouraging, for $422,900, we would have 90% of that, which is the request, same interest rate structure on this and the repayment source on the balance of the IEDA funds of about $200 thousand, then the balance will be enterprise tax credits they have to sell to repay that. CRBT would not advance on the LOC unless they had proof that credits will be sold to pay back loans. The total dollar amount proposed will potentially be the same for the second note. Dick – They presently are past due since June 30 and we had a kicker in there, are they paying interest monthly? Mark – The accrued interest on that has been paid fairly recently, but I need to check on that. It is at the default rate. Dick – I think that would be a tremendous incentive. Mark – From Charlie's perspective, not sure if he has given as much the reason it is at this point as the two banks involved. We had asked for detailed information regarding remaining construction costs, that is why we have the second note. Dick – Snyder came in and did this? Mark – No. Dick – So we have not seen Snyder's construction costs? Mark – No. Charlie had brought that up not that long ago and that he thought it would be wise to get a bid from someone else. 1 – What is that amount? and 2-How quickly can you get someone like that that is fairly busy to come in and do the project, but this might be quicker than the route they are taking right now. This is slightly encouraging, has there been someone actually looking at apartments. Dick – Not the most impressive realtor

Exhibit A
Page 7

showing it. It would be nice to see what Snyder says. Charlie seems to say what he needs to, to move on. Gene – What has been factual since the start of this? It was supposed to have been done 2 years ago. Mark M – Original construction maturity date was June 30, 2016, so we are over a year past that date and we have extended the construction loan four times. Gene – What happens if we don't approve the extension? Dick – Cedar Rapids could foreclose on it and we own 90% of that note and Citizens is willing to take $1 million when completed and the City has $1 million, so when completed we would have less than we do now. Mark – That is assuming that they will keep their end of the bargain. They have not indicated we are out, but we haven't really put them on the spot. As I think about the permanent financing commitment we had, we could easily say we are out, but that would be short sided on our part. Dick – We are out but we are already in for our commitment, we can't get out. Mark – It would take city and ours and others, based on performance of construction loan, if there are different things we would want to include in the end financing, we have every right to negotiate. For example, we have $900 thousand limited guaranty from Bob, with permanent financing to drop to 500 thousand. When we get to the point of permanent financing, we should revisit some of those terms, as they haven't met expectations on the construction loan. We could easily come back out on permanent financing but the bank's perspective, that would be a worst sided process but from the other banks perspective, might be more helpful to raise the bar in those types of things. That isn't what is on the table today, but when we get to that point when we are doing the permanent financing, those things are on the table to be revisited. Gene – if Dean Snyder does not get involved in this other than his estimate, are we confident for extending this for 5.5 months? Are they going to be done in 2.5 months if someone else does not get involved? Kurt – I would say not, probably next spring, if lucky. Mark – I think they will have certificate of occupancy at that time and maybe start renting apartments. One of the groups we have talked a little bit about that are different than some individuals renting an apartment. I believe there is some interest from Midas, Cambrex, Zoetis, that when they bring people into town to work for more than a day or week, they like to put them up in someplace better than the motels in town. They have expressed in each of those maybe having 1 or 2 apartments to have available. That is a pretty good start in getting some rented and cash flow. Dick – Are we wrong to say after 15 months of lip service, we want to see who the tenants are, name, contact information and have Mark from Chicago and obviously Cedar Rapids, we want to see what Snyder said it would take to get it done and what it would cost, and talk to Cedar Rapids and say you either get it done or else. It is time to talk to Charlie. There are only 3 not complete. Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it. Kurt – Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. I don't think he can complete it. Dick – He was hurt when he was asked if his guarantor was aware of this mess. Bob could have been off the hook if Cedar Rapids had not contacted to acknowledge another extension. If we approve this, I don't see we have a choice. We have more in it now if it gets done and we need to make sure it gets done before the middle of winter which may mean to fire current staff and get Snyder in there. Kurt – He doesn't demonstrate that he is paying any attention. Over and over again, he tells us we have this working, going to get things done, etc. We were there in May and he was going to get a certificate and they still don't even have the sheetrock in. He is disconnected from the project. Something June 1, something July 1, he needs to hear we don't have any confidence he is going to complete these things. Dick – Let's get a sit down with him. Cedar Rapids should be more than willing too. Kurt – Give him the message he may need to find another lender on this. Dick – Part of the problem with the public is they are not seeing anything on the first

Exhibit A
Page 8

level. His logic is, he has to get a good tenant there and then finish. Kurt – if he would have gotten apartments and occupancy 9 months ago, there would be no question. Dick – That is the minimal we have to do before we have to approve it? Gene – The thing is Charlie has no skin in the game, if he walks away tomorrow and declares bankruptcy, he is not losing anything. We need to get the project done so we can escape. Dick – We need to have a heart to heart talk with Bob Thomson make him aware of what we are doing to try to save his $900 thousand guarantee. Bob is also over 90.

Charlie did say he signed the deal for $7 thousand-$9 thousand to have the punch list done over the objection of his partner. Gene – I would approve this subject to the meeting such that all parties are apprised of what we are thinking. Discussion held. Mark – Cedar Rapids Bank, Charlie, maybe Bob Thomson in that same meeting. Ron M – Bob with his hearing problem, it is tough to know if he is going to absorb everything out of a meeting. Dick – he needs to be at the talks. Mark – We can try to get something lined up, mid-week next week. Dick – It is worth doing.

Gene – I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done. Dick – We can say if we are going to extend it, we want a week by week schedule of what you are going to get done with your people and if you don't do it, bring Snyder in to finish. Mark – We should have the document showing what it will take to complete it. I don't think we have the ability today to say you have to hire, but if they don't perform and we have an agreement then we would. We would have an attorney write this. Again, we are not the lead bank in this. Dick – Call Gary Becker. Kurt – Encourage him to hire someone to finish the project. Dick – I would Mike to see a Snyder punch list and ask if he had thoughts about hiring Snyder to finish.

Mark – If approved, subject to these things. We will have a meeting with Bob and get estimate from Snyder to finish, agreeable that they could provide an estimate of time table. Dick – He is supposed to have that. Diane – He did say he paid money to Dean Snyder to have it done. Dick – If we have a punch list. Robust Discussion held.

Motion was made by Gene A. Hall, seconded by Robert D. Noble, and unanimously

VOTED:      To approve the following:

McQuillen Place Company LLC

Extend Note #9300025611 in the amount of $3,872,602.92 (Construction Note) to 12/15/2017, with lead bank CRBT and CRBT 90% of the note. The second note is for $422,900 with CRBT as the lead bank on this note as well. FSBT would have 90% of this note as well and it would maturity on 12/15/2017. The Interest rate on both these notes is 6.75%. After lead bank takes .25% for servicing, the net to FSBT would be 6.5%. There are 3 different performance incentives on this note that could drop the interest rate 1.0% if completed with a floor interest rate of 5.75%.

Guarantor/Co-signer: Charles Thomson.

Exhibit A
Page 9

Robert Thomson ($900,000 guaranty)

All the above is subject to the meeting of all parties such that all parties are apprised of this.

Mark – Once a meeting is scheduled, make everyone aware to attend.

**12-22-2017**

Discussion regarding the proposal from Charles M. Thomson and Robert L. Thomson on the funding of the McQuillen project. Robert L. Thomson is willing to inject up to $500,000 cash into the project with the condition that his $900,000 guarantee during the construction phase being reduced by 0.50 for every dollar injected (total of $250,000).

Dick motioned to approve, Gene seconded and it was unanimously

VOTED:      To approve the following:

McQuillen Place Company, LLC
Reducing Robert L. Thomson's guarantee as mentioned above

Subject to the following conditions:
Cedar Rapids Bank & Trust Special Assets Group agreeing to the proposal
The City of Charles City agreeing with the proposal
Reviewing the appraisal that was ordered in November 2017
Cedar Rapids Bank & Trust drawing up an agreement with Charles M. Thomson and Robert L. Thomson documenting the expectations of each party.

**2-21-2018**

Boyd Campbell - Any update on McQuillen? Diane - We are waiting right now to have a meeting set up with the Cedar Rapids Bank, we have contracted an attorney out of Cedar Rapids that is going to spearhead our efforts that we have to do. We are going to have all the parties involved, bank, other bank, Charlie and Bob, as well as Bob's attorney. Dick – We decided it was time to have an attorney represent both banks. Bob feels this is a man who will move it along, looking for a resolution. Gene – Have they settled on a contractor to finish it up, and if so, how much? Dick - Bob has come in with his contractor. There are still some questions. The workout guy from Cedar Rapids Bank, on a scale of 1-100, he is 80-90, and the loan officer on the same sale of 1-100 is a 4, so we improved ourselves a great deal with this workout deal. He does this, moves things along. Psychologically, that Bob is jumping in to get a contractor that he has used in the cities, that means Bob is more committed than just the numbers he has seen, and he wants this done. It is nice to have someone in that family to understand timeliness is more important. We will know more after this meeting. This will be held in Cedar Falls/Waterloo office of the subsidiary bank of Cedar Rapids Bank. Diane - This hasn't been scheduled yet. Adding to Dick's comments, the original proposal that James and Charlie put together, put us at $428K to complete

Page 10

and the contractor that Bob is involved in, looked at everything. All totaled, it wasn't a lot different than what Charlie and James had put together, about $500K. There are still some outstanding items aside from that, accounts payable, interest and taxes. So, for Loan Loss Reserve, we used a total of $900K to complete the project, and that is a guestimate.

Kurt - So the objective will be to get information from others as to how to move forward. Also Bob's guaranty, whether used or not, it comes to us, making sure if capital is put in, it gets spent well. Charlie just seems to be paying attention to everything about this. Boyd - Is there a question about Bob's guaranty? Kurt - His guaranty is to us, not a cash infusion to the project, so technically, we can ask him for the $900k, he has to pay us. That puts us in the position, do we put it in the completion of the project or come up with Bob to put some money into this? That is what Bob had proposed, put $500K in, reducing the guaranty. We also want to see the $500K get spent well. Hopefully, we can get this thing moving forward. Dick - Didn't Bob's guy have a later completion date? Diane - Yes. Dick - There is very little to be done on the apartments. There are 2-3 apartments that didn't quite get drywall done, some repair, flooring in the hallway. There is still a thing on the first floor with the City we do steel structure with the drywall and fire. That is why they changed the goalpost on it and the City said no, you didn't understand the city code. I don't know that he and Charlie are on the same page. Kurt - James is the one that managed us to this point and spent all the money, rather than getting a good contractor. Dick - it doesn't look like it when you drive, by, but we have made good progress. Gene - $500K, is that to complete the entire project? Dick - Not the 1st floor. Original cash flow covered the debt. as you get cash flow on the second floor, you have cash flow to cover finishing the first floor. Kurt - If we can get Bob to commit money directly, he has some ownership and we need to keep him engaged. Boyd - When do you talk to Bob about this to get him moving forward? Dick - He had a CPA. You have $900K from Bob who has the moral to take care of it. Get the $500K, get a decent contractor and go. Cedar Rapids did not want to do that. Diane - When I talked to Dave from CR, when we have this meeting yet to be determined, that is going to be negotiation day, and it may very well be that we end up back at that, but he doesn't want to throw that out now and not have anywhere to go, that is why he is playing hardball. Kurt - Let's not give that up. Dick - I like what this guy is doing, he was calling Charlie every day, sent him a past due notice, what do you have to offer. Next day, he was calling again. He tells us his lawyer is the same sort of guy. Nothing we can talk about on the street. It is frustrating to hear conversations at Aromas. People are just looking for answers. Charlie needs to get it done.

Bob N - So, this meeting when will be when? Diane - Probably in the next 2 weeks. Bob - Diane and Dave are moving it along faster than we were. Diane - They have offered to get out. The big thing that I don't want them out, is we had a $500K government deal that went away and I sat here and listened to this man from CR, you contact so and so and he can get it done. We put CR bank into this because of their ability to handle those. I hope we never have to give there, but I feel the CR bank has a lot of stink on their fingers for $500K. Our State Senator got the economic development lawyers and they explained it was allocated but never funded. We were never told.

**3-8-2018**

McQuillen Place Updates – J. R. Herbrechtsmeyer –Credit Committee has been meeting on this, as well as loan committee. Michael had good input on this and then Mike had an idea of a possibility, so I thought this is one that we will be talking about at the Board of Director meeting, and want as many people to think this through. Kurt- Technically, we are still in negotiation, Diane met with Bob's attorney, his accountant, and where we are, basically Bob has taken a step back on the $600K, he said

Exhibit A
Page 11

$900K is his limit of exposure, which is really basically where we already are. We have Bob as a guarantor for $900K on construction, where we still are in that phase, with a verbal agreement to be a $500K guarantor on the permanent financing, giving us something to go back on while getting it leased out. So, first is to get it completed and second is operating. They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, they need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. What we talked about in Credit Committee, how would we approach that foreclosure and what are we willing to do. Mark Miller joined the meeting via teleconference. Their offer as of last Tuesday did not offer anything more than what we already have. Offer is not any better than if we took control and had someone manage and lease. Credit Committee - Take control or they come with a better offer, with the full realization we could end up with the property and some kind of, liquidating assets that we need to be aware of. Best thing for Charles City is to get control and put someone else in charge of it and it will take some of our capital but we will forego that $900K. We could find someone else to complete and manage and potentially get it sold.

Dick – A couple of things that were discussed. We now have a joint lawyer, single legal entity. so far, Charlie has shown up representing himself, other than when Judy O'Donahue was involved when the $500K went away. Cedar Rapids bank has offered to take us out and says you run it. I think they have enough egg on their face, they never paid fees up front to manage this. I sat in this room and listened to their lender say to Charles that the $500K tax credit is past due, but those are extended all the time. That $500k that never happened would have gone a long way toward us not being shut down for 90 days. Secondly, we asked the lawyer to look at the Federal and State money and what has been put into this thing and see what the obligation is, if we were to foreclose or if Charlie were to sell it to another entity. Do those requirements all stay in place or is there any draw back. Gene - How long do you think this will take? Dick - I think we have part of the answer. diane - The grant money, there is mortgage and second position, if we foreclosed, it would be the same as foreclosing on another entity. Diane - The IDED that the funds came from, but the NIACOG is administering the grant and that's why it's from Cerro Gordo County. Dick - That was my guess, but it is strange that the real estate in Floyd county will have a mortgage from Cerro Gordo. The question is still foggy, he has said over and over, he was required to have 1 more than half of those apartments and he was talking about subsidizing. Kurt - That is a second mortgage, but our understanding is, unless they want to buy us out, we have no obligation. Dick - that is why I wanted to be sure we had all those facts before we start. Kurt - City side - Dick - I hadn't gotten it through my head, Ralph is concerned the City is going to walk away from that, I don't think our City Manager is a bluffer, he wants it done, as they convinced the city to a TIF loan, and it must be completed, and if not, those that are in there, will need to move out. Kurt – The most is completing the windows. Windows on the first floor and completing the sidewalk. we are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying i'll put more money in, they may not, if they call our bluff, we have to be willing to take it on. No, Mark, it will not be your project. We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. Dick - One other part on the loans, I had written off that Citizens will have anything to do with it. The Citizens bank loan has the other half of the TIF, so if some entity owned by CVB, Ltd. owns this thing, there still could be TIF grant up front paid back over years and a loan to the City through First

Citizens and whoever owns it pays for it. In our credit meeting we discussed, if Citizens doesn't want to do it, there may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio.

Gene -I haven't had a chance to study all of this, I absolutely agree if the bank finishes the project, I agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. Dick - I can assure you one thing, Directors will pay to have McQuillen removed. It would be nice and I don't know how we get it, the list of people that want to rent, whether there is anyone or not. Gene -I can address this. Coincidentally, I had another conversation with a director yesterday that confirms there is a list of people waiting to rent those apartments. Dick - Will it be a list we can get our hands on? Gene - It is through Larry. Kurt - Obviously, we may realize we will hold this for a long time, we need to get it leased up. Quality of the construction in those apartments concerns me, cabinets, flooring, don't want to say when we are going to take it and put $1M into it and sell for a profit. Dick - There is no question, I would never live in this based on what we were saying. Floors were plywood with a little paint on it. Kurt - That is the environmental aspect they were required to meet. Not sure where this came in, maybe goes away with NIACOG. The other prospect that pushed me across, other alternative was we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this? From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. Mark - Have you had any conversations with Dean about that? Mark - I have not. Either he or Connie will work with us on it if they owned it. Dick - Is there a way if they would both work with us. PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both.

Michael came up with a discussion about an entity that might own this. Michael - During the financial crisis, we got a lot of land and properties back. In those cases, certain institutions that did not want to absorb, created an LLC, basically sold real estate to the holding company. In that instance, those asset qualities, OREO if long term, doesn't impact the bank's asset quality and no performance assets. The only time you would see it would be at the audit at the holding company level. You will need to talk with FDIC and the State to get the blessing to do that. I don't see why they wouldn't. What might have to happen, you might have to divvy up capital to get it finished. If the building was owned by the holding company, it would be divvied up by the holding company. Budget around long term issues. Regulators don't like banks holding OREO long term, as we are not real estate development companies. The other things, you mentioned the pharmacy, one big thing from what I have heard, they wanted a drive up that would be a change in plans and is additional capital if we want that anchor tenant. Charlie doesn't have that. When you start to build out the tenants, there is reduced rent, cash flow out of capitals or concessions on rent, all of which I don't know Charlie can absorb with his current situation. Last thing, I don't want to own this, but at the same time, even if we let Charlie and Bob finish it, I don't think apartments are going to cash flow, so we will still have a non performing asset, which will impact our books for eons, as this will not support any long term financing. We can work through this, but I struggle with giving Charlie the satisfaction of completing this as he has bungled it up and he is trying to get rid of the $500K. Michael - If we allow the $900K to go in, we are giving up our collateral. Kurt — And, we are giving up control. Michael - The appeal of some 50% reduction in whatever Bob was going

Exhibit A
Page 13

turned down. Kurt – Amelia Management is the 3 remaining living kids, but that brings Peter into this, you will get the family railed pretty quickly, and they are all affected by this. Charlie can't fight through this on his own, with Bob involved and everyone, it will be to table pretty quickly. Dick - The first foreclosure will be the farm over by the river, that is a farm that was Jan's and then the 4 kids, foreclose, then partition out. Kurt – They won't want that to happen, undivided 1/4, probably has no debt on it. Then have cousins that are forced to buy out 1/4 of a half. Mark M- Our mortgage on that is either $125k or $150k, what was negotiated as part of it. Our LTV on all those properties, we should be in a pretty strong first mortgage position, but every one of those were financed with seller financing, the equity beyond second is minimal that would be available for a 3rd mortgage that applies to the McQuillen loan. The other thing we have talked about all along, first thing Bob would have to do, is have him write his $900K check. But we speculate the attorney, with a limited guaranty, they are not going to write a $900K check on the front end, but wait to liquidate all, then determine if we are truly $900K. That is why we want to negotiate that up front in a voluntary settlement agreement. I don't think there is much equity in the Amelia properties, as most of those were purchased less than 5 years ago, so not a lot of equity.

Diane - I tossed that question to the attorney in Cedar Rapids, about waiting until all properties have been foreclosed on, before we would ask for the $900K, but the attorney said they can't dictate to us how we get the collateral, we can ask for it up front and we can get it up front. Mark - Bob has offered to write the check. Mark - He has offered. Is he still going to offer, once we start the foreclosure, it may change. If he doesn't, we may be a long way from getting a check. Dick - I would rather see the $600K and still have some guaranty on the cash flow. Mark - If Bob is using his contractors that he is using for Pancheros, I believe bob is committed to getting the building finished. Bob has the money. Charlie is not capable. If he puts $900K or $600K and we maintain some of that guaranty, I think we get all that back, then construction loan comes due, if they could get finished using Bob's better scenario for us. Kurt-I don't disagree with you, but I don't want to give up that guaranty. Mark – All we can commit to at this point in time, is the construction loans, when matured and the building is completed. If that is finished, Bob may say at that point in time, the cash flow is there. He won't say that today. Ultimately, this is Bob's legacy. He has a lot of respect for the bank. Dick - You make one comment, Bob's contractor at this point has not given us any concrete numbers. We or Cedar Rapids bank has never seen anything form Bob's contractor. Diane - Charlie had sent a document that shows where they said, you are short on this, need "X" amount of dollars or more, not itemized. Mark - This is something that I had mentioned to you already, we don't know Bob will step forward, we can speculate he will. The way I look at it is, he is kind of stepping/walking away right now regarding the $900K, he has already played his card. Dick - Is that why there has been nothing from Cedar Rapids Bank with Bob's contractor? Diane - They are considering Bob's contractor.

Gene - Hold their feet to the fire. Kurt - Michael is right, we have to sit down to the table and work something out. Dick - This is where Mr. Breitbach will have to give us some guidance. Kurt - I think we do want to force the issue and get to a resolution. Diane - Keep in mind, just getting through the construction is only part of this, then how is it going to turn out? Mark - Getting it completed, increases value and sale ability, maybe not at the levels we want to, but at a level to find a buyer. It is not saleable, as it is not finished. Even if you lost the guaranty completely, if it gets finished and we start getting apartments rented, it increases the value by the amount and maybe more, only reason we are considering this, it gets money up front and he has a contractor that can actually do the work. Kurt - I am only with you as long as there is a guaranty from Bob to the end and not having Charlie in control of this. Michael - One thing to consider, Steve did say that the TIF loans do not go anywhere, until the building is done. He is talking about sidewalks, the doors, when you start adding that up along with real

Exhibit A
Page 15

to put in. Dick - Steve Durrs said, made me feel better, the redo of the parking is still on the table, if that building gets completed, to add 88 spaces, with a timeframe of next summer. Kurt - But we have to have the building done by November, so they can put that in there. Dick - Steve Durrs is definitely on our team to get this done. He is not taking sides of one bank over another, simply City Administrator to compete and look good on main street. I am very encouraged after meeting with him. I keep hearing from Ralph, that Delaine was not okay with this going in. Kurt – Delaine's concern was Charlie, no cash, no back up. Michael - The other thing Steve mentioned was the TIF, the agreement has to be rewritten, it doesn't matter if it's to McQuillen LLC or to the bank, it needs to be rewritten anyway, if ownership has changed, the new owner would be written into this. Dick – There is no way we are going to lower our assessed value on it. The other thing I raised briefly is the $500K that went away, at some point, we are going to have to have our own lawyer, because when we start taking some charge offs, we feel we have reason to go after Cedar Rapids bank, they bungled. The notice to the State was sent out a long time ago and going back to the minutes when Cedar Rapids banker said to Charlie, you see so and so, that guy can get that extended, the state had gone away with that program by then and grabbed what little money they could for other projects. Cedar Rapids bank didn't have a clue. Boyd - How feasible is that is what they are saying on the $500K, going after the Cedar Rapids bank? Dick – One thing a good politician, our State Senator has tried to do what he could, got the Economic Development lawyers to sit down with us and explain why we weren't going to get it. No question that Waylon Brown made that happen. But Cedar Rapids bank has offered twice in the last 2-3 weeks, just take us out and you guys run it. They would be happy to write off the same percentage we do, as they are only in it 10%. Kurt - There will be an opportunity for them to take their haircut and walk away. Dick - I would like them to take the haircut and put the big fees back in. They should be as embarrassed as we are that this is not done. Gene - We almost have to be complicit as possible. Dick - We at least raise the issue and try to get them to come up with something other than just losing their percentage. Gene - Is Bob's reputation separate from Charlies? I think push came to shove, how much is that McQuillen place going to mean to Bob? Kurt - That is what we are trying to find out. Dick – At one point, they offered us $500K with $250K coming off the guaranty, that would commit Bob a whole lot more. The number got bigger. He is going to have to make that decision. Gene - Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

Dick - We have to pay the taxes. I don't think we have to get our interest paid. Cedar Rapids Bank wants this, but they may have to write this off, a lot less than what we would have to write off. Cedar Rapids Bank is not offering to make any concessions. I believe this man wants to get away from this as fast as possible and probably has some perimeters to work with. Gene, how long will it take to force the Thomson's to a decision and moving on? Kurt- We want to show them we are moving forward. In the meantime, the way we have proceeded in the last few years, once we say we are doing it, we do it. Dick - With Boyd on this call, we have 4 out of 9 directors present. When we say to Cedar Rapids bank, the Directors Loan Committee has to approve this. Is it all about Bob and are you really walking away from this and it not being called McQuillen Place? Kurt - We will liquidate all. Michael - On that point, that is the forced and bitter foreclosure process. I am throwing out there, in the best interest of that building on the corner of main, we may have to give some concessions to Charlie. He doesn't have any equity, we get all OREOS back, I know that the emotion and the involvement is there, but we have to make good decisions in trying to get possession of the building as soon as we can, whether voluntary or foreclosure, that should be on the table, otherwise, we will stare at this, pay legal fees, discuss at every board meeting and in 15 months when we finally get possession, just thinking long term. Dick and Kurt - Bob does not want this to happen. Dick - Another thing Michael brings to mind, Tommy gave a list of every loan we have with Charlie and what the collateral is, we know what Connie has them listed for, probably 80% more profit. I am told he actually has had an offer on his house, more than assessed, but

Page 14

estate requirements, I don't know if the $900K is enough. If we go the path using Bob and his contractor, he is going to have to put more than that into it. Diane - One thing Steve said, it can't just be a painted piece of plywood, it has to be windows. Kurt - They were not in that scope. Certificate of completion, not occupancy. Bob needs to be on the hook for all of that, that needs to be the agreement, if we are going that route, it has to be completed. Gene - There has to be a deadline on it. Diane - If Charlie is being in charge of it, we always know it won't happen. Dick - With Charlie involved, he still has his Chicago partner. He was so condescending to the City and to us. His enforcement has failed at the last 4 he has been involved in, he doesn't know. I don't think the guy in Chicago cares whether or not it gets completed. Bob needs to know Charlie's partner is a detriment. Diane - Steve would be the general contractor and be here 2 times a week, but he has a foreman who would be here every day. Michael - Is it still local contractors? Mike - From what I understood, I think it is still the people building it, but we just have someone overseeing it now. They are not just bringing in a construction crew to complete it. We now have someone overseeing it that knows, but you still have the same 4 guys constructing. Dick - Once Alex left and the clown running the thing, the drywall was incorrectly installed, that is where the big problem is. The architect says it's not a problem. Three more feet of 3 layers of drywall for fire protection to get the initial certificate. My initial thought is that foreman was there, it appeared they were doing everything right, but when they hired someone off the streets, that is when it went awry. Ron - If you don't go the foreclosure route to maintain control, will you have leverage enough to control it going forward? Dick - I suppose we could have a written agreement with the contractor and when they get behind, we could start the foreclosure process.

Michael - We have reserved $850K, that was for year-end audit current reserve on it. Dick - I put out, we are making a $1M profit this month that will go into AAA, I think that gets offset by McQuillen place. At the very least, $1M charge off before we are done with this project. Michael - It will lose value if the banks name gets placed on it. Kurt - That is why I think you lease the place up and market. Dick - I like the idea of an entity other than FSBT. Next step is to get back to the attorney representing the two banks. We will have to talk to the Board about it next week. Michael - What is the decision? They want to know if we want to move forward with foreclosure? Kurt - Offer is not good enough, moving forward with the foreclosure. I think we will hear back pretty quickly. Dick – The person from Cedar Rapids will have the paperwork ready and file. I am not sure 48 hours is enough for Bob T. Kurt- Communicate quickly. If they come back with something and we are considering it, we are going to have to deal with Cedar Rapids bank. Diane - I think they will say if you aren't foreclosing, we are out. Dick - Do we need to get legal counsel representing just us, to say if you are out, we will take you out on these, pay back fees. Mark - Is it in the file of what their fees are? It should be. Kurt - We need to find out what they have gotten. Dick - If the mortgage is in their name, they can thumb their nose and foreclose. Diane - I suppose they could. Up to this point, they have let us be the decision maker on where we go. Dick – I think it would be safe if they are going to do that, and ask if they have looked at their liability on the other things. Mark – I did mention that to David once, I am sure he has forgotten about that. Diane – What I had conveyed to Dave was Board Loan Committee meets today and at this meeting, is where the decision would be made. I was wrong and it needs to go to the Board of Directors.

Kurt - I am not convinced this committee needs to approve. Diane - It is either we are foreclosing or we are not. Kurt - I don't think there is anything in our policy that says this entity has to approve. Dick - I think if you tell them we are either foreclosing or let us know, Dave will give them 30 minutes and foreclose. I think we need to give them a reasonable time. Mark - I think a week is ample time. Diane - I counter that and say give them until Monday. Mark - The problem you have with that is, you don't have one person in and they are working with a new attorney. Michael - They got back within 24 hours

Page 15

with the previous. Diane - I don't think we should wait. Dick - How about Wednesday? Kurt - Rob is in a position to make this whole thing easy. We need him to decide whether he is willing to do this or not. Diane - That is why it shouldn't take a week to make a decision. I just think that is too long. Kurt – A couple days, communicate this. Diane - Give them until Monday. They have the weekend to figure it out. Gene - If I was going to lose over $1M, I would be making a decision real fast. Diane - They have had time to figure this out. Michael - If Diane is right, and Bob says, you have heard my offer and it could be today. Gene - If he doesn't, I would file foreclosure papers this afternoon. Kurt - Give due notice. Diane - I will tell Dave we are in agreement to go ahead with foreclosure, give until Monday to counter. Kurt- Do we want to say that? Diane – What I am saying, I tell Dave that, so he doesn't file the papers today, giving Bob the time. Kurt - All we tell Dave is that we understand there is a guarantor that can make this easy, give him the opportunity and then move forward. Michael - Dave can communicate we are going to file the papers on such and such and they then know the deadline.

### 6-21-2018

McQuillen – Mark M. - Negotiations with Cedar Rapids Bank and Trust - We are dealing with relationships and trying to resolve and get on the same page. Mediator with Thompson's and the attorney, we are trying to reschedule, as the Thomson's didn't want to meet without the mediator.

Discussions between the banks and Charlie have been evasive. First Security is more interested in resolving this than Cedar Rapids bank who has less incentive to push. We will threaten to sue Cedar Rapids Bank for damages for slow movement and lender liability. First Security Bank has a separate attorney. We have sent options and if they don't choose either, we will start the lawsuit. We think it is better to have one bank involved and making the decisions. Taxes are paid by First Security instead of Cedar Rapids bank who is the lead bank. Cedar Rapids Bank and Trust hasn't started foreclosure on any other properties. Cedar Rapids Bank and Trust never had the actual Enterprise Tax document to show approval with 2 options. 1) Cedar Rapids Bank and Trust has 10% of the loan and they offered to walk away from 5% of this. First Security Bank presented that Cedar Rapids Bank and Trust pay the bank $1 million and walk away, we don't file a suit. 2) Cedar Rapids Bank and Trust pay 80% of First Security Bank loan amount and real estate taxes and First Security no lawsuit.   We want to get moving toward a resolution.

### FSBT Board Meeting – McQuillen Excerpts.

### 4-16-2018
Progress on McQuillen place was discussed.

### 5-21-2018
J.R. Herbrechtsmeyer discussed information regarding McQuillen. Robust discussion was held.

### 8-20-2018
#### Credit
McQuillen Update – Kurt - We have reached an agreement with CRB&T and they are no longer in the equation. We obtained assignment documents and a $50,000 check. Dick - We have also obtained insurance on the building and Larry is pursuing foreclosure. Discussion held.

### 9-10-2018
Diane gave an update on McQuillen. Robust discussion was held.

### 10-15-2018
Diane gave an update on McQuillen. Robust discussion was held.

### Credit Committee Excerpts – McQuillen

### 4-21-2016
Purchased Loans Report – McQuillen, Mike F – Are we following up on what we need?  Mark M – We are getting reports, but I haven't gotten one recently.  Not much was done over the winter, but they are working on it now.

### 6-28-2016
Pipeline Report – McQuillen Place – unused and looks like it is going to sit there for a while. Dick – A more optimistic view – the City is saying they could have 12 apartments they could have ready in August, as the plumbing was roughed in. They have 12 on the south side, 2nd and 3rd floors. Mills Helmers has 20 some furnaces they are storing, the sheet rockers was ready to start on those 12. Mark – They are working inside. Dick – The City is not going to give them any ability to rent, they have to have at least the sheetrock on the walls. At the rate they were going, they could have roughed in all the fire suppression. It is conceivable those could have roughed in some on time. They talked about one lease and building sale at the end of the street that could put a damper on this and is spending some money there. A Bluhm truck was there this morning. We should tell Charlie Thomson we want another walk through to see the finishing on the inside. Mark – The LOC matured June 30, and we have a request going to Officer Loan Committee to extend this to December 1. They have to have certain things done prior to year-end to qualify for some of the grants for this. Robust discussion was held. Michael H – We should add our work outs to this report and add one more column for this. We have another $8 million to $15 million in loans that are still on the book. There are real dollars that are not on this report that are going to roll off.

### 10-10-2017
Diane – Dick had wanted to talk about McQuillen. Kurt – His concern is there might be some urgency with regard to maybe setting the expectation about Bob's involvement, his is a guaranty on the loan - which comes in to play when trying to collect. Obviously, it could be an infusion of capital too. Michael – My feeling is, based on what I know, we are on the hook until it is done, because the other participants don't step in until it is complete. My argument is, our goal is to get this done as fast as we can to reduce exposure. Kurt – Dick bought up things that need to be completed. I don't know where the City and Charlie are on that, to get certificate of occupancy. Dick's concern, is pouring concrete when the weather changes, but certainly something we want to be thinking about, is getting those things done and the certificate. The other thing going on, is Department of Economic Development at $700K. Charlie sent an email and asked to make contact there. Mark M – Dick said he talked to Waylon, who knows what their stance is on this, there is what we can do and what we can't do. Mark – Even if you had the money, who is going to do the work?  Kurt – What are the options, what should we be thinking of as priorities, can we inch something forward?  Mark M – Personally, what I think we need to do, we have the stuff from Dean Snyder construction, there is never going to be funding to support that, $2.5M plus and Charlie and James number was over $400K. Second request at Board Loan Committee was supposed to be covered by tax credits.  What we need to see, is: 1-You need to get accounts payable of all bills out there. We have one customer, Kamm Excavating that they still owe $7,000.  2-Then an itemized list of what it takes to get to the finish line and provide a timeline of when that finish is.  3-We will come over and do a checklist to follow up and see that you are following through.  With this

timeline, you will need to meet weekly.  4-Then we will figure out permanent financing at that time. We need to get it finished. The certificate of occupancy, we could depart this, but you still need to get stuff done and who is going to live in there if it is not done, they all need to be finished.  Kurt – Or enough to get people to move in. Michael – Where is Cedar Rapids Bank and Trust on this?  Mark M – Gary Becker, his rationalization, that I heard more than once and did not agree with, their approach was to keeping the cost low to get the project done. The interest cost was not hurting him. Now I would say, it and he has clearly moved on that point. Michael – Do we have any recourse on them in terms as to how they handled this?  We brought them in as experts in construction and development. Mark M – Weren't they overseeing the grants and the project, didn't they get the documentation that all of that was in place?  I thought they had this, but at it turns out, they didn't have it, we didn't have it, so there was a question about let's look at the participation agreement. We have 3-4 extension agreements and changes each time. I don't think there is going to be anything in the participation agreement but will come back to original plan. We are a participant and not the lead bank, we assume you have that and where is it. Charlie communicated that to me first.  Mike F – Has there been any question that Cedar Rapids bank is lead bank?  So lien waivers, making sure no money went out?  Mark M – How this enterprise tax credit got missed in this question, I don't have the answer to that.  I am not sure if we have any leverage here. In the short term, we are at mid-October, there are certain things that can only be done at a certain temperate level and soon to have those behind us.  Bob is the guarantor, but that doesn't mean he should have to write a check, but he has the ability to do that.  Come up with some money, get the project finished, can then reimburse once you get tax credit.  Mike F – What is total debt?  Mark - $3.8K and we are in the $3.3M range. Michael – Dean Snyder's was $2.5M to complete.  Mark – I think there could have been some coaching in that number. Show us your number and how you got to it to finish the project. Supposedly Cedar Rapids Bank had something to support. Mike F – What kind of documentation have they sent.  Diane – Sporadic.  Mark M – In discussion, a document was noted, but we had never received or have seen the document. The funding, available source, what had been spent, matching up to completion of the project, we haven't seen this. Mike F – Have we extended? Mark M – They have $100K left of IED grant. Mike F – Does anybody outside of our bank know we are concerned?  Does anybody know we think we might suffer a loss on this? Mike F - We are in a position to suffer a loss?  Michael – As it is now, if you want to have it completed, it would be discounted to finish it.  Kurt – To me, getting that $900K infused, it either has to go to the loan or be put on loan. Michel – I would have them pay down and re-borrow. Mark M – If you brought somebody else in that does these kinds of projects, what would it cost?  That is your back up plan if you had to hire someone to finish it? We asked and he went out and got an estimate. Mike F – We are in a position, if the lead bank hasn't shown signs of normal lending due diligence, it is just because they have a small piece of it, doesn't get them out.  I think I would probably find somebody in Des Moines and send them the shop list. Kurt – We could certainly have someone looking at this.  Mark – We need to set up a meeting again with Charlie and Cedar Rapids Bank in the room. They have breached the contract.  Mark – Let's get the building finished and then discuss this. Diane – What if we explore the participation agreement and whether or not they have been negligent.  Mike F – How many units have they made up here?  Have they constantly monitored the construction of the building?  Mark M – What they wanted to do, they had this Ron Fiscus, a financial guru, and they wanted to use him as an inspector, but he was someone that Charlie had hired to be part of this, and they deemed him unacceptable. They got somebody else. Michael – I would ask them for a complete imaged file. It is ours as much as theirs. That should include everything. Mike F – Did they earn loan fees? Mark M – They collected significant loan fees on the front end.  Mike

F – What have they done?  Michael – We hired you as an expert, if you can't do it... Mark M – Until this thing is done, you are in.  Diane – The other thing to talk about is, right now, it is 6, it should be a 6.  The other thing, how do you allocate for it, collateral analysis is not going to do anything.  Michael – if you are in construction and land development, you are advancing on a completed basis.  I don't know the answer to that, but what I don't know is, where did the funds come from?  Let's say it's not $2.7M or $400K, probably somewhere in between.  Mark M – That is what we need to get from them.  Michael – if you can get the completion and get First Citizens and the City to take their part.  Mike F – What is the time table, how long can this go on?  Mark M – We have had representation from Citizens there, when we toured and they have been part of the meetings, they could have easily said at any point in time, we are just out.  Michael – I think they understand there is some reputation on the line.  Kurt – I think there is, that is why we want to get to completion.  There is a lot of reputation risk.  Mark M – That is why we need to get to completion.  Kurt- We don't know how to reconcile Charlie and Dean's number.  They had a basis for asking, my gut tells me it is closer to their number.  Mark M – We have to get James and Charlie.  Diane – They have been asked twice to do that.  Mark M – Cedar Rapids indicated they had that information, I don't believe I have ever seen that.  Mike F – The City signs off on inspections?  Do they sign off?  Michael – When I did mine, they did.  Mike F – Snyder may be concerned, is everything up to code.  How would they know inheriting a project like this that they can trust everything that has been done?  Michael – My experience with the City, is, they put the gloves on and do everything.  Kurt – They were asking for over $400K.  Here is a question for you, if you could get Bob's at $900K, would you take the $400K in to get this done.  Permanent Financing is $1.5M.  Mark – Bob's was supposed to be knocked down.  Kurt – I want Bob's.  Mike – if we go the whole Course, Citizen's is just short of a million and the City's is short of a million.  Diane – The cash flow is at what occupancy?  Mark – If you had all the apartments rented, you would not need any retail.  Michael – I would be surprised if it got 50% leased up on the apartments.  Mark M – What we have heard all along is, that you have some of the employers in town that would like to have 1 or 2 of the apartments, Cambres, Zoetis, Mitas.  Kurt – I would think they would do this.  But you would still have to get your 50% low to moderate.  The sooner we get to that point, the better.  Diane – The obstacle I see is, who are we going to get to finish it.  Kurt – We need to work with them.  Diane – Couldn't we pursue this?  Michael – You need the whole file.  Mark M – Part of what we are requesting is, we want itemized accounts payable still outstanding, a list of improvements to get to the finish line.  We could easily say, give us what you have to this point and we would like to see the whole file as to expenditures, lien waivers, inspections, etc., because we should have that in our file.  Mike F – Any reports of any unpaid labor or bills?  Mark M – We have one – Kamm Excavating of $7K accounts receivable that hasn't been paid.  Mike F – That is the biggest concern.  Kurt – I remember when we were all sitting in this room, Dick asked it twice and he said no.  Mark M – I want to see an itemized list of accounts payable and what are they going to have to pay to get to the finish line.  If they don't have it on there, there may be others out there that concern me.  It would be nice to get the list to see if it isn't on there and that would concern me.  Michael – I think there is a couple things we could do internally, whether one of us or Tommy, look at our different options, how much did we put into it, look back at the initial plans to cash flow, are we going to have more in it, if it gets to us or Cedar Rapids, are we going to add more money to get it finished.  Do you end up with a property you can't lease?  I also don't want to wait 6 months and have not thought about those options.  Kurt – Quite frankly, if you can convince them that Bob's $900K goes in next, get it complete, but it just gets us closer to the end in sight.  I ranted at Charlie when they were in here a few weeks ago, as I wanted Bob to hear this.  If it was Charlie, that is where I would want to be.  Mike F – I have a feeling that there is

a Credit Committee that has been held recently that is very concerned?  Michael – Tell the lead bank to put the dollars in to finish this.  It was their obligation to see this through and they agreed to that dollar amount.  Kurt – We have to figure out what is the best course to get it completed.  Mike F – Holding the lead bank accountable is not a bad option.  Getting them to the table to participate in what it takes to conclude this.  Mark M – We would get their attention if we ask for a complete copy of their file.  Michael – Once second, before we push forward talking about getting more infusion of capital, at what point are we stepping on the lead banks toes and opening up to a liability.  I want to make sure we are not having any meetings without them.  Mark M – We are not.  From a course of action perspective, what we need to do is go through Cedar Rapids Bank and Trust first and have them contact Charles and James and tell them we are available.  I think we need to let them be the lead bank, these are the things we should be getting.  Michael – Since we are at the end of the financing, my stance is until we have a plan, we are not taking any more exposure on.  Kurt – We certainly want Cedar Rapids Bank and Trust on our side pushing.  If they are sitting in the room and we think the $900K is what is necessary and CR sits quietly, that is not as good if we are all on the same page.  Charlie is also pretty smart and if he starts doing the math, he may say, here are the keys.  Mike F – Their story was, here are the keys buy us out.  I can't trust someone who does that.  Michael – They went out.  I want to see the whole file.  Someone has mismanaged it.  I don't know why they ever took it on.  Mike F – They put in a high growth bank, saw the low income, someone can do this.  Michael – It seemed like a good deal with all the state funding.

**10-20-2017**

Diane – I think we just wanted to touch base on McQuillen before next week.  Different conversations have been going on about what the plan is for Monday.  Mark – I understand the CR Bank & Trust banker is going to be here.  Dick – Should we be having a conversation without the borrower with them, so that we are all a united front of what we are expecting from Charlie and James.  Mark M – We should be letting CR Bank & Trust to lead the meeting.  We told them what we wanted to see on the agenda.  They tweaked it and are adding a few things.  They have our items on there, they need to lead the meeting.  Dick – Is the city involved?  Mark – They are not coming to this one.  Dick – We are being honest with the city as to what we are, as they have the potential of loaning a million dollars on this project.  Mark – if the city stays in and if Citizens would stay in, we take our $3M down to $1.5M, but a lot less dollars we are looking at.  Honestly, if we get to that point, if it is finished, we have the opportunity to negotiate terms with the guarantors.  Bob is going to be guaranteeing $900K.  I have already planted the seed in Charlie's mind, that when the construction is done, the terms on the permanent financing will probably be up for debate.  Dick – We are not going to have much leverage at that date.  They have none of their own money other than Bob's $900K.  Mark – What they do?  It will cost us a ton of money to get anything out of that, it is better than not having it.  Mike F – Are they not doing any work at all?  Dick – There are as many as 4 people showing up there on the job, it is pretty limited.  Diane – One of the things they are supposed to be bringing to the meeting is their timeline.  What if they don't bring us anything?  Dick – That is where we have to be set with the CR bank.  We need to move next door and talk with Gary.  We need to go in and talk about foreclosure.  We already have the city ahead of us on taxes.  Michael – I don't know if I would put Bobs CD on the table, I would rather have CR Bank take it and finish it out.  If they boggled it up along the way and didn't get it completed under the costs that were initially disclosed, I would hold that back in our cap until we have to.  Dick – The $900K is actually a guarantee on their loan.

**11-14-2017**

Diane – McQuillen – We had a meeting which I will send to Kurt and Dick.  We are meeting tomorrow with Charlie and Gary Becker is coming.  Mark M – I met with Bob, not relating to this, I had an extension for him to sign on his son Steve's note.  Bob Thomson brought up that he is fully behind getting that building built, we are talking $400K at this time, and if takes more than that, he will provide the funds.  We need to get that building finished.  A week ago, he said that he was working with his accountant to figure out what the transaction between him and McQuillen would be.  Tomorrow there is a meeting here with the Iowa Department of economic development, where Charlie is hoping to bend their ear and get his tax credits back.  They need to fund this gap and get the building finished.  Diane – Michael, you talked to Greg and Randy and they are suggesting we get a new appraisal.  Michael – They said given the size of that and the value of the building as it is now or the value to someone from a collateral standpoint, there is no income generating from it, there is going to have to be some type of valuation set up.  It is sub-standard.  It is not a Charles City appraiser that is going to do this.  In order for them to sign off on the allowance and say it is adequate, you have a building supporting a loan.  Dick – Let's ask Gary tomorrow if he is getting a new appraisal on this for their reserve.  Their initial recommendation is to put it back to Cedar Rapids, they do more of this, that they would know more than that to evaluate a cost to complete and a cost as is.  I hope that the reserve in time can reverse itself.  Even if we get the building completed, we have a competed building with no income, and it is probably not going to be sufficient to set up an amortize basis, it may be interest only basis, to help get leasing going.  All things we are going to have to decide as we move along with this.  They said the timing is bad.  They come in and have to audit allowance and sign off that our reserves are adequate.  What do we have for allocation?  Michael - $100K.  Diane – What is our allocation for next month?  Mark – One of the thing, he would ask Bob to submit his $900K first, take off the top, then the farm and another $150K.  I think I would start at those things from the top and then work from there to look at an allocation.  Michael – Obviously we are in a position to where we know Bob's financial status, clearly we know Bob is most likely pretty good for the money, so I think you can consider that.  So, whether it is the collateral you have, say around $900K, some farm, you have to factor in your cost to get all that and I don't know how much extra value that adds, you can probably consider all that, but again, as you are getting closer to year end, those are things we need to ask them about.  Cedar Rapids Bank and Trust provided us with an appraisal, to get one in the time frame, you would almost have to go back to the individual that did the initial appraisal.  That same appraiser may be able to come back.  Dick – He did it based on plans and now he can walk through it and look at their projections and what it would cost to finish.  Mark M – That would be Cedar Rapids Bank and Trust.  Michael – I want that conversation and see where it goes.  Dick – I would assume that we don't have to point out to Gary that if he were to get that $900K check, we are at least going to prorate that.  Mark – At this point in time, I think it makes more sense for Bob, and I think he is on board with this, to put money in to get the project finished.  Michael – Bear in mind, that doesn't mean we are out of the woods, we still have a non-performing asset on the building at that point.  The city did a new list of things they were going to do.

**1-11-2018**

Capitalization of Interest – No Report.  Diane - On McQuillen, we were supposed to set the appraisal yesterday.  I sent an email and told them I would be contacting the appraiser.

**7-10-2018**

---

Robust discussion held regarding McQuillen.

**8-14-2018**

McQuillen Place, LLC
- Mark updated the group on the following:
  - We received the signed agreement and the $50K check from CRBT
  - Still waiting for the original documents from CRBT, of which the assignments need to be recorded.
  - Question was asked if there was proof of insurance.  Discussion held on where things stand.
  - Set up weekly phone conferences with Larry Eide to ensure things keep moving.
- Action item: Diane will follow up on getting the proof of insurance.
- Action item: Diane will contact Larry weekly to updates.

Bob Thompson
- Mark updated the group on the following:
  - Mark met with Bob last week.  Bob wants to get this done as quickly as possible but wants Mark to speak with his attorney.
  - Bob may need to borrow some of the money in order to pay the $900K guarantee.
    - Discussion held on who the lender should be for this loan.
    - If we are the lender, Mark stated the only way we would do this is if we take Bob's stock in KGib, Unlimited Spirit and probably an assignment of the remaining $500K life insurance policy.
- Action item: Mark will get loan closed with Bob by the end of August to collect on our guarantee.

Accounting issues related to McQuillen note
- Michael spoke with Eide Bailey on how to account for the $50K we received from CRBT.  This will be booked to the Discount on Loans Purchased GL account (similar to the Wessels settlement).
- The McQuillen loan balance was grossed up to include the CRBT ending principal balance.
- Action item: Michael will oversee that the entry runs correctly and the McQuillen balance in Precision is updated.

**9-11-2018**
The committee reviewed the following reports:
- Ag Commercial QC report
- Adjustable Rate Pricing Audit
- Flood Determination Exceptions
- ALLL changes
- IA State past due averages
- Past Due vs State averages
  - Next month will do with and without McQuillen included
- Monthly extensions
- Potential non-accruals

Exhibit A
Page 21

Exhibit A
Page 23

Page 22

Page 24

- Monthly single pay loans
- Monthly credit rating updates
- Action item: Past Due report will be completed with and without McQuillen totals.

**11-29-2018**

Discussion items – Diane - I saw an email sent today from Larry.  What Kurt suggested is a group get together, get answers prior to meeting with Larry.  A question I have on here, what would we be willing to take as a payoff if offered one?  Mike F - Did Ralph ever come up with his buyer in Cedar Falls?  He didn't end up talking to him.  They are not interested in it if Charlie is involved.  Maybe this is a discussion for board and holding company. Mark - I think this is a moot point.  Just keep moving forward.  Why would we want to wonder what it would take?  Kurt- If they did, we want to respond quickly.  From a negotiating standpoint, I wouldn't accept it.  If they did make us an offer for $2.5 million, I wouldn't immediately say yes, probably counter at $2.5 keeping Bob's $900 thousand guaranty.  Mike F - So many moving parts, real estate taxes are due again in March, insurance is paid quarterly.  Is the building heated now?  To me, some of the ordinary every day quarterly and semiannual things are going to change our number.  Are we going to continue to pay taxes?  Mark – We are not paying any more until we get to Sheriff's sale in June.  September is not paid and we will probably be faced with March taxes.  Kurt - I am trying for more; the costs keep piling up.  Mike F - What have we written off so far?  Kurt -We have allocated $850 thousand.  The month of December, should we consider a write down?  Michael - Greg will be here.  Mike - Bill will say for the benefit of the shareholders, charge some of this off.  At some point in time, our overall book value, we need to get down to reasonable to accept an offer.  Michael - That is what I think part of this discussion leads us to, if we are going to take $2.5 million, we need to do document what it is.  Robust discussion held.  Kurt-To Mark's comment, if they had $2.5 million that they were willing to spend on this, they would have shown some sign of life, they are not showing it. Collect or write us a check.  Discussion held.  Mike F - Any contact with IADA?  Michael - No.  Foreclosure discussion held.  TIFF discussion held. Mark - There is a limited window for the IADA, end of next year, where they have to have the new buyer in.  They want it completed by end of 2019.

Exhibit A
Page 25

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re ) | |
| ) | |
| MCQUILLEN PLACE COMPANY, LLC, an ) | Case No. 19-00507 |
| Iowa limited liability company, ) | Chapter 11 |
| ) ) | |
| Debtor. ) | |
| ) | |
| Address: ) | |
| 1110 North Grand Ave., #300 ) | |
| Charles City, Iowa 50616 ) | |
| ) | |
| Employer's Tax Identification No.: 46-3987825 ) | |
| ) | |
| MCQUILLEN PLACE COMPANY, LLC, ) | |
| ) | Adv. Pro. No. _____ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JON RICHARD ("DICK") HERBRECHTS- ) | |
| MEYER, GENE A. HALL, AND KURT ) | |
| HERBRECHTSMEYER, ) | |
| ) | |
| Defendants. ) | |

COMPLAINT AGAINST CERTAIN DIRECTORS
OF FIRST SECURITY BANK & TRUST COMPANY
FOR TORTUOUS INTERFERENCE
WITH CONTRACT AND OTHER RELIEF

Now comes McQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company,

debtor, debtor-in-possession, and plaintiff herein ("MPC," "Debtor" or "Plaintiff"), by and through

its attorney, J D Haas & Associates, PLLC, as and for its Complaint Against Certain Directors of

First Security Bank & Trust Company for Tortuous Interference with Contract and Other Relief

(this "Complaint") respectfully states as follows:

1

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

2.      Venue for this Adversary Proceeding is proper in this Court pursuant to 28 U.S.C. Section 1409(a).

3.      This Adversary Proceeding and the causes of action herein constitute "related to" proceedings within the meaning of 28 U.S.C. § 157(c)(1) and (c)(2), and the Plaintiff consents to the Bankruptcy Court's entry of a final order.

## REFERENCE TO OTHER ACTIONS

4.      The allegations of paragraphs 1 through 201, inclusive, set forth on pages 1 through 27 of the "Complaint Of McQuillen Place Company, LLC for Equitable Subordination of the Lien Of First Security Bank & Trust Co." (collectively, the "Equitable Subordination Adversary Complaint") are, by this reference, restated and reasserted by Debtor as if set forth herein in their entirety, and capitalized terms not otherwise defined in this Petition shall have the meaning ascribed to them in the Equitable Subordination Adversary Complaint.

5.      On February 26, 2019, First Security Bank delivered to Debtor certain excerpts from minutes (the "Excerpted Minutes") of internal First Security Bank meetings involving First Security Bank employees, officers and directors.  The Excerpted Minutes are attached as Exhibit A.

6.      The Excerpted Minutes, among other things, (a) confirm many of the allegations set forth in the Equitable Subordination Adversary Complaint concerning the failure of the Bank Group to adhere to the standard of good faith and fair dealing with respect to the Mortgage Loan, McQuillen Place Company, and the Guarantors, (b) reveal that First Security Bank extracted a

monetary settlement from CRB&T for CRB&T's maladministration of, *inter alia*, the EZ Credits,

and (c) provide evidentiary support for the claims as set forth below against Kurt Herbrechtsmeyer,

Dick Herbrechtsmeyer, and Gene Hall (the "Director Defendants").

## BACKGROUND OF THE DIRECTOR DEFENDANTS
## AND THEIR OBLIGATIONS

7.     Jon Richard ("Dick") Herbrechtsmeyer ("Dick Herbrechtsmeyer") is, and at all

relevant times herein has been, an officer and director of First Security Bank.

8.     Gene A. Hall is, and at all relevant times herein has been, a director of First Security

Bank.

9.     Kurt Herbrechtsmeyer ("Kurt Herbrechtsmeyer") is, and at all relevant times herein

has been, President and director of First Security Bank.

10.     Corporate officers and directors enjoy a qualified privilege in Iowa pursuant to

which they are protected from personal liability for actions taken in their capacity as officers or

directors.

11.     This privilege is not absolute: A corporate officer or director may be held personally

liable if the officer or director fails to act in good faith to protect the interests of the corporation.

*Bump v. Stewart, Wimer & Bump, P.C.*, 336 N.W.2d 731, 738 (Iowa 1983), cited by *Jones v. Lake

Park Care Center, Inc.*, 569 N.W.2d 369, 376 (Iowa 1997).

12.     A corporate officer or director whose actions are not in good faith or are not in the

best interest of the corporation exceeds the scope of the qualified privilege and may be personally

liable in tort.

13.     The elements for a claim of intentional interference with a contract are: "(1)

plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant

intentionally and improperly interfered with the contract; (4) the interference caused the third party

not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Hunter v. Board of Trustees of Broadlawns Medical Center,* 481 N.W.2d 510, 518, cited by *Jones,* 569 N.W.2d at 377.

14.    In determining the impropriety of a putative intentional interference defendant's conduct, the finder of fact considers the following factors: "(a) the nature of the act or conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Jones*, 569 N.W.2d at 377.

15.    The questions of whether the officer or director has exceeded the qualified privilege, whether the elements of intentional interference with contract have been shown, and whether the putative intentional interference defendant has acted improperly are all questions of fact to be determined by the trier of fact. *Wolfe v. Graether*, 389 N.W.2d 643, 660 (Iowa 1986), and *Jones*, 569 N.W.2d at 376.

## COUNT ONE:
## INTENTIONAL INTERFERENCE WITH CONTRACT

16.    According to the Excerpted Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on September 14, 2017:

> *Dick Herbrechtsmeyer:*
>
> It is time to talk to Charlie [sic]. … Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it. *[Exhibit A, at 8]*
>
> *Kurt Herbrechtsmeyer:*

Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. [....] *[Id.]*

*Gene Hall:*

I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done. *[Exhibit A, at 9]*

17.     According to the Excerpted Minutes, the following colloquy (edited) took place at

a "Board Loan Committee" meeting on March 8, 2018:

*Kurt Herbrechtsmeyer:*

They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, the need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. [....]

The most is completing the windows. Windows on the first floor and completing the sidewalk. [W] are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff we have to be willing to take it on. [....] We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. [....] *[Exhibit A, at 12]*

*Dick Herbrechtsmeyer:*

[T]here may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio. [....] *[Exhibit A, at 13]*

*Gene Hall:*

I absolutely agree that if the bank finishes the project, [I] agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. *[Id.]*

*Dick Herbrechtsmeyer:*

I can assure you one thing, Directors will pay to have McQuillen removed. [....] *[Id.]*

*Kurt Herbrechtsmeyer:*

[....] The other prospect that pushed me across, other alternative was that we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this. From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. [....] *[Id.]*

*Dick Herbrechtsmeyer:*

[....] PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both. [....] *[Id.]*

*Gene Hall:*

Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better. *[Exhibit A, at 14]*

18.     McQuillen Place Company currently owns, and at all relevant times herein has owned, McQuillen Place and the business prospects, future income, going concern value, and economic advantages deriving from the collection of assets known as "McQuillen Place."

19.    Debtor is, and at all relevant times herein has been, a for-profit limited liability company.

20.    The basic substance of the Mortgage Loan transaction was that the Bank Group would lend money and provide related financial accommodations to Debtor to facilitate the construction of the McQuillen Place.

21.    As long as Debtor owns the assets known as "McQuillen Place," First Security Bank owes Debtor a duty of good faith and fair dealing with regard to the McQuillen Place assets and with regard to the Mortgage Loan.

22.    A secured lender does not, by virtue of a security agreement or a mortgage, gain the right to seize the assets of a borrower outright simply because either (a) the officers of the lender become convinced they can operate the assets more efficiently than their borrower, or (b) become convinced that ownership of the assets might somehow burnish the lender's corporate image.

23.    Lenders continue to owe a duty of good faith and fair dealing to borrowers at all times during the creditor-debtor relationship.

24.    First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced they can operate McQuillen Place more profitably or efficiently than Debtor.

25.    First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced their operation of McQuillen Place might burnish their corporate image.

7

26.    First Security Bank does not have a perfected lien on any of the personal property of the Debtor, including, but not limited to, the development rights for McQuillen Place.

27.    Neither First Security Bank nor its predecessor, CRB&T, filed a UCC-1 financing statement with respect to the Debtor.

28.    First Security Bank and the Director Defendants are, and at all relevant times herein have been, aware of the facts stated in the foregoing paragraphs 16 through 27.

29.    Notwithstanding their knowledge of the ownership of McQuillen Place, and notwithstanding their obligation, as directors, to cause First Security Bank to act in good faith in its contractual relationship with Debtor, the Director Defendants concocted, supported and evangelized on behalf of a scheme for First Security Bank to seize control of McQuillen Place in order to, among other things, advance their own public relations agenda.

30.    The scheme was to make First Security Bank appear as "heroes" rather than "bad" bankers, because it would be the bankers of First Security Bank who "showed up" and finished construction by drawing on their own funds and obtaining additional funds from other banks through new, senior debt on the property.

31.    At no point since September 30, 2017, has First Security Bank offered to McQuillen Place or its principals any proposal (a) to advance additional funds for completion of construction of McQuillen Place, or (b) to permit new, senior financing from another institution to be used to complete construction of McQuillen Place.

32.    At no point in the Excerpted Minutes do the Director Defendants (or any other participant in the meetings) suggest offering any proposal for a neutral third-party agreeable to both the Debtor and the Director Defendants to (a) obtain additional funds for completion of

construction of McQuillen Place, or (b) obtain additional funds through new, senior financing from another institution.

33.     Although the Director Defendants knew that First Security Bank was able to advance additional funds to complete construction and/or accept subordination to a new senior lender, the Director Defendants only mentioned this as an option in the context of First Security Bank seizing the property and assuming the role of developer.

34.     The plan advocated by the Director Defendants was intended to exclude any other person or entity from coming in as "heroes" to finish construction, because the "hero" role was to be reserved for First Security Bank.

35.     This reservation of the "hero" role for First Security Bank was recommended by the Director Defendants without regard for or consideration of the possibility that, in terms of net returns, some other arrangement might have actually been more beneficial for First Security Bank as an institution.

36.     The sole option promoted by the Director Defendants involved the bank seizing control of the future business prospects of its borrower so that First Security Bank can exploit its borrower's assets for its own gain.

37.     The tenor of the comments of the Director Defendants indicates that they were motivated not by concern for the assets of First Security Bank, but by pique at one of McQuillen Place's principals, by the desire to inflate their own standing in the local community as "heroes," and by an inexplicable (and irrational) desire to change the nameplate on the building.

38.     The Director Defendants accordingly intentionally advocated cutting off negotiations immediately and commencing a legal action as quickly as possible.

9

39.     In so doing, the Director Defendants acted in bad faith, intentionally interfered with the contract between the Counterclaimants and First Security Bank, and caused damage to the Debtor.

Now, wherefore, Debtor demand judgment as follows:

A.     Against each of the Director Defendants and in favor of the Debtor for the amount of damages sustained by the Debtor as a result of Director Defendants' intentional interference with Third-Party Plaintiff's contract with First Security Bank;

B.     Granting appropriate equitable relief to remedy the Director Defendants' breaches of fiduciary duties and bad faith conduct;

C.     Awarding to Debtor the costs and disbursements of the action, including reasonable attorney fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## COUNT TWO – MALICIOUS INTERFERENCE
## WITH BUSINESS ADVANTAGE

40.     Paragraphs 1 through 39 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

41.     Director Defendants, in urging First Security Bank to seek control of McQuillen Place through the vehicle of foreclosure, acted with malice toward Debtor.

42.     Director Defendants knew, or should have known, that their actions with respect to Mortgage Loan would cause injury to Debtor, specifically with regard to the financial affairs of Debtor.

43.     The Director Defendants' actions in urging First Security Bank to seek control of McQuillen Place were wrongful.

Now, wherefore, Debtor demand judgment as follows:

A.     Against each of the Director Defendants and in favor of the Debtor for the amount of damages sustained by the Debtor as a result of Director Defendants' malicious interference with Third-Party Plaintiff's business prospects;

B.     Granting appropriate equitable relief to remedy the Director Defendants' malicious conduct;

C.     Awarding to Debtor the costs and disbursements of the action, including reasonable attorney fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and

proper.

**Jury trial demanded on all counts.**

Dated: November 6 , 2019

Respectfully submitted,

By: _____
J D Haas
(IA # #AT0003014)
J D Haas & Associates, PLLC
1120 East 80th St., Suite 200
Bloomington, MN 55068

*Attorney for Plaintiff*

12

Exhibit A

Meeting Excerpts – Board Loan Committee – McQuillen

**7-17-2014**

Following review and discussion of the following lines of credit, the following were approved unanimously with actions indicated:

**McQuillen Place LLC**
Requested: Lending Limit and Total Serviced Debt $3,900,000
Robust Discussion held.  Further information needed.
Motion by Gene A. Hall to table, second by Robert D. Noble

**8-4-2014**

Motion was made by J.R. Herbrechtsmeyer and seconded by Kurt W. Herbrechtsmeyer, and unanimously voted to bring back to the table, McQuillen Place request.

Keith Starr presented the following additional information regarding the McQuillin Place:

7-2014 Projected Construction Cost
Supplemental Information regarding the apartments.
7-27-2014 Rent Report
7-27-2014 Rent Projection
7-27-2014 Square Feet of Building

No action was taken.

**8-8-2014**

Motion was made by J.R. Herbrechtsmeyer, seconded by Kurt W. Herbrechtsmeyer, and voted to approve (Boyd A. Campbell – Voting No), either of the following two loan options:

**Option 1**
**McQuillen Place**
**Guarantor/Co-signers:  Charles M. Thomson, Robert Thomson**
**Contingent upon Charles City TIF loan.**

| | |
|---|---|
| Lending Limit | $1.95 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2 million to be repaid over 15 years.  Robert Thomson would continue to guaranty $900,000 of this debt with $500,000 of that guaranty being secured. |
| Total Line Commitment | $1.95 million |

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in.  Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**Option 2**
**McQuillen Place**
**Guarantor/Co-signers:  Charles Thomson, Robert Thomson**

| | |
|---|---|
| Lending Limit | $1.45 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2.5 million to be repaid over 20 years.  Robert Thomson would continue to provide an unsecured guaranty of $400,000. |
| Total Line Commitment | $1.45 million |

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in.  Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**9-15-2014**

Update was given on the McQuillen Place.  Negotiations are still taking place.  City has not yet committed to the up-front TIF.  Robust discussion was held.

**10-16-2014**

Email, verbal or phone response votes, which are attached as a parts of these minutes, were received from J.R. Herbrechtsmeyer, Kurt W. Herbrechtsmeyer, Boyd A. Campbell, Gene A. Hall and Robert D. Noble and the following was unanimously approved:

**McQuillen Place**

| | |
|---|---|
| Lending Limit | $3,500,000.00 |
| Total Serviced Debt | $3,500,000.00 |

Advisors Keith K. Eastman and Ronald McGregor submitted approvals.

**6-8-2015**

**Mark Miller presented the following line reviews:**

McQuillen Place Company LLC, Guarantor/Co-signer:  Charles M. Thomson, Robert L. Thomson & Amelia Management LLC – Nothing new to report.  This line was approved in January.  Cedar Rapids stays involved until the building is up, then the commitment will be between First Security Bank, First Citizens and the City for a take-out commitment.  Cedar Rapids Bank and Trust was involved due to the significant amounts of grant money and they are overseeing the draws and overseeing the project going forward.  We have Bob Thomson's guarantee in place in the amount of $900 thousand to cover 2 years of payments for the end loan.  Discussion was held regarding tenants and disagreements between Dean and Charlie.  Mark advised that he is not aware of any tenants lined up at this point.  Motion was made by Gene A. Hall and seconded by Robert D. Noble, and unanimously approved:

**McQuillen Place Company LLC,**
**Guarantor/Co-signer:  Charles M. Thomson, Robert L. Thomson & Amelia Management LLC**

| | |
|---|---|
| Board Approved Lending Limit | $3,500,000.00 |
| Board Approved Total Serviced Debt | $3,500,000.00 |

**6-9-2016**

McQuillen Place Company LLC, Guarantor/Co-signer:  Charles M. Thomson, Amelia Management LLC, Robert L. Thomson ($900,000 limited guaranty) – This line has a construction note that matures end of June.  There is a tour scheduled at 9:30 a.m. Monday, and a meeting with Gary Becker, the lead bank on this.  The reason they are the lead, is there are many grants involving FEMA and other entities that have had more experience with this.  We are going to be meeting on Monday with Charlie to get a tour of the building and hear what the plans are going forward.  Gene – This construction note matures June 30, and what happens if they come up here and take a look at this?  Mark M – We are going to have to make a decision.  They haven't used all their line of credit and monies are not all gone.  We have been matching up the progress in relationship to the project.  Bill H – Final note is contingent on completing the building.  Mark M – We need some updated financial information.  I can talk to Charlie directly, but I feel with them being the lead bank, most of this should be going through the lead bank.  We need updated financials, status reports in relation to where the work has been done and advances on LOC's.  If we had the loan maturing June 30, what time frame are we looking at for completion?  And lastly, what is the status of the first floor as far as tenants are concerned.  We think there is none, but have not had any confirmation from reliable sources.  Steve – The question I would ask, there was 6 vehicles on site that had workers, how can you finish a project with only 6 men on site?  Mark M – The only answer I have gotten, is that it is going to take longer, but we are spending less yet on the project.  Steve – When they are this far behind schedule, he will never get ahead.  Steve advised he would come out of retirement and finish the project, if needed.  Gene – I have a number of concerns with this.  He is so far behind schedule, a year behind.  Steve – How will you get this done with one plumber and one electrician?  Dick – I learned there are 20 furnaces in town to put in.  Mark M – One of the things talked about, there is some discussion about being able to rent apartments in one part of that before the whole building

is completed.  I believe that is an accurate statement that this can be done.  We will see how far along they are.  J.R. – The City Manager told a group that information last week, but had some caveats that needed to be done.  J.R. Herbrechtsmeyer – I move we approve where we are.  Loan Committee will be talking about the renewal once questions are answered.  Boyd A. Campbell, seconded, and unanimously approved:

**McQuillen Place Company LLC,**
**Guarantor/Co-signer:  Charles M. Thomson, Amelia Management LLC, Robert L. Thomson ($900,000 limited guaranty).**

| | |
|---|---|
| Board Approved Lending Limit | $3,500,000.00 |
| Board Approved Total Serviced Debt | $3,500,000.00 |

**2-2-2017**

Gene – Any updates on the McQuillen place?  Dick – Mark has toured the place.  The elevator is built but won't be delivered until MidAmerican gets in.  MidAmerican is getting easements from Ralph for the north end trench before McQuillen gets hooked up.

**4-21-2017**

McQuillen Place – Kurt W. Herbrechtsmeyer – I vented frustration at the "haste" that this project is going forward.  One other thing, is the argument for their pace, it is cheaper for them to keep their labor costs down than paying us interest.  This request is an extension until the end of June, and they need to get this thing done.  We will review the rate at that time.  Gene – If this is an extension through July 1, so they can finish this, I don't believe them.  Kurt – No, this won't get finished then.  If they are going to tell us, it is cheaper than to pay us interest, we can change that equation.  Gene – There is no cash flow and no leases are signed.  Kurt- the argument is, if we get an army in here to finish this up, we would have to pay premiums, and they need to do this to stay on budget.  I don't think they factored revenue into this.  Very frustrating.  We send the message now, this needs to get done, rate will change on July 1 and if they want to talk to a different lender they can, as the rate at that time will be 5.25%.  Mark – This is a participation that we purchased from Cedar Rapids Bank and Trust and we got involved on the front end.  The biggest chunk is coming from FEMA, which Cedar Rapids Bank and Trust have had experience with this.  We thought it was better to have them involved to make sure things were done correctly.  In hind sight, their oversight has not been as good on this.  We see this daily, they come up infrequently to do inspections.  We went through there the last time with representatives from First Citizens and the City.  Their oversight has not been as good on this.  Their oversight has not been what we thought it to be.  Gene – Do we have any choice, what is the alternative?  Kurt – The rate adjusts.  We have not given them any indication we wouldn't, but truthfully, this is the time to tell them what is going to happen next time.  I have lost faith in Charlie to get this done.  I would like to make it clear to him we are done.  We want to see this get done and be a success, but he has to do everything he can to make that happen.  If he doesn't have a signed lease by now, we need to get his attention.  Mark – We have not increased our loan commitment, they are not coming in at this point in time asking for more money to get this done.  We did get information on other sources they have money to draw from.  It would be nice to know they could get this done for the amount of money they have left.  When done, it needs to generate income.  Boyd – We have 90% participation.  From the time this is going to be completed, we are going to have a time in between that this is going to be paid.  Mark – That is why we have the guarantees we have.  At this point, the biggest

58

guarantor is Bob Thomson. Boyd – He stopped at $900 thousand. If we have a year of nothing in between, is he willing to step in and give us some more? What are we going to do here? Gene – My understanding is it needs to get built. Once built, whoever is the second owner can come in and do something with it. Boyd - if it doesn't get built? He needs an incentive to get this done and get to work on this, and needs to be over there and make sure they are working. Gene – What is the contract language regarding interest rate? Kurt – Default adds 2%. Mark – I would advocate, the right approach is get the extension done, have Gary Becker up here sometime in May, First Citizens, and Charlie, and do another tour and advise it doesn't look like it is going to get done, what is the plan? We did have a meeting in August last year, we were pretty harsh at that point in time, and we got some good dialogue and need to have this dialogue again. There is no signed lease yet. Gene – They are looking at other locations. Kurt – This one is not going to get ready. As we are getting to the finish line, June 30 might be a great opportunity, if there is progress on it and the end is in sight. Now if he doesn't have any leases, he has to put a date out there. Bob - Why does Charlie not feel this urgency to make this happen? Mark – The real issue they continue to bring up, they can't get enough labor, they thought they were going to import people from Chicago, for some reason, they have to have 2 forms of ID and the people don't. That is their argument. Last time they had 12 people working and there was no general contractor. For a while, they had Alex Heinz, they had sub-contractors doing things. Boyd – If we don't know, what is going to be our occupancy rate, do you think? That year after it is done and trying to fill it, cash flow is going to be absolutely bad, that is all on us. Mark – We are looking at the commitment letter from Citizens. Citizens had to have a year's reserve in payments, theirs is $900 thousand, City is $900 thousand and ours is $1.5 million. They have to have a reserve for one year's worth of payments set up, so they have the time to get that building filled. Gene – The dialogue has to be the rate is going way up July 1, so get it done or don't, the rate is still going up. Kurt – We want to create a sense of urgency to finish and get FEMA money. Mark – Cedar Rapids Bank and Trust said it is cheaper than paying a high price for getting a whole bunch of labor in there to get it finished and this was in August and they continue the same dialogue. Gary is not helping us with that participation. Diane – From his perspective, he is in Cedar Rapids and we are looking at it every day. Gene – Did Timko take over that board down there? Steve Crawford told me Timko was going to take over that board and this would help expedite this. Mark – I asked Gary for information and he sent back, well we just kind of trust them. Charlie said, every time we make a request, they know this. Gary was nonchalant. Mark-I told them we are not very happy about a third extension and the non-urgency of getting this completed. This matured March 31. We are looking at this physically every day and we are not happy about it. Gene – I think we have to extend it, but the message has to be loud and clear. Mark –I will line up a meeting with all potential parties involved with final financing and get Gary from Cedar Rapids Bank and Trust and do another tour. We are tired of it. We want it finished, get it done. Kurt- It is time to let Charlie know he needs to go find some help financially, he needs a little push back from somebody, that this might not end well. Mark –If we get another four lined up, if any of you would like to be included, let me know. Boyd, Gene and Bob advised they would like to be involved in this. We will get a meeting lined up and invite you. Boyd- We need to show up. Mark-We want to have a sit down meeting and tour. Bob – When is the time to discuss rate? Mark-Cedar Rapids Bank and Trust has all their documents ready at 5.25%. I would like to stick with this but clearly communicate that come July 1, if this is not done, that rate is not anywhere close to where it needs to be. Gene A. Hall made motion, Boyd A. Campbell seconded, and it was unanimously

VOTED:      To approve the extension of the construction loan for:

McQuillen Place Company LLC

---

**Charles M. Thomson/Amelia Management LLC/Amelia Trust/Robert Thomson ($900k)**
$3,491,993.32 Line of Credit is 5.25% to June 30, 2017, with the provision that if the note is not paid by July 1, the rate defaults to the maximum, will not be extended, and the loan stays at the default rate

and

approve the loan policy exception – Term of construction longer than 12 months.

**6-8-2017**

Schedule of Customer Renewals – This was reviewed. Gene – Question on McQuillen, how did he take the interest rate we presented? Mark – There was interest rate discussion. We are trying to line up another tour this week. The elevator was installed, but they now have a problem with the doors. We asked about certificate of occupancy, he thought maybe he would have that by June 15. We did plant the seed that the interest rate would be higher and there might be some performance based pieces factored into the rate, such as occupancy certificate and occupancy levels. Dick – Is our guarantor aware? Have we had a conversation with Bob, as it is about down to where he will have to subsidize some payments? Mark – Every year, he does a financial statement, this is listed as a contingency liability. As far as having a deep discussion with him, I have not. $900 thousand during construction loan will be $500 thousand once permanent financing. Dick – My fear is he may not be getting the whole story of the concerns and it might be time. I would be willing to be part of that discussion with Bob. Discussion held. Gene – All those properties Charlie has, there is no equity.

**8-17-2017**

J.R. Herbrechtsmeyer advised regarding McQuillen Place. Gene – Since he has everything for sale and even though there may or may not be any net worth there, whatever net worth there is, is supposed to be pledged to the bank. So, if he started piece meaning this off, how concerned are we that we get our share? Kurt – I have seen the Renaissance Revival package and it is $1.2 million or $1.4 million, if he finds someone to buy this. Gene – I don't think this would prohibit him to sell what he can when he can. Dick – The big chunk of the stuff he bought from Brian Crane, we have the first and the kids carried back a second. Brian owned the corner where McQuillen is at, which raises an issue I hadn't thought of, I hope there isn't a second with those folds and there was not a second mortgage ahead of that transfer into the new entity that is building McQuillen, because he bought that from Brian as part of the package. What he did, is add a little line of credit, made payments, but borrowed back on the LOC, which is secured on the first mortgage, so, all of a sudden his 5 years are up and has shown no progress with us. I gather Mark said no, we are still interested in doing this over. As far as net worth, any net worth he thinks he has is nothing, unless he has picked something up. Kurt – It is 12 residences – commercial properties. Dick – He may have improved the value of that property, he put in a lot of storage units back behind there, which you can't see from the street and claims he has them all full. Bill – Did he buy the Brick and Tile Building? Randy – No Jeff Tierney has that. Kurt – His own home is in this package, Mark Melrose is in 206 N Main, the North Grand, the duplex on Harvey, rental on Johnson 15th Ave, and

---

Riverside Drive, brick building next to the bar, Kellogg and Jackson street. Diane – Mark and I had a conversation with Gary Becker and we are trying to get the package together for the extension of the LOC. One of the things they asked us to do is a walk through because in the cash flow, they are talking about having occupancy as of September. They are closer to this, but that date will not happen. There were only 3-4 doors that were put on the apartments at this point. Dick – The area where he wanted to rent, the doors were done, the rest were not. All the plastering had to be done. Diane – They went going to put windows in yet this week. Kurt – They have to Sheetrock all the common areas. Diane – All major hallways have that and it is painted. They are making progress, but will not hit September 1. Gene – Did Dean Snyder take over that construction? I know he was asked to bid on it and finish it. He did bid. Diane – There were only a couple people working when we were there. Dick – It did not look like activity such as Dean Snyder would have. Gene – Even though he may have taken over, he may not be there yet. Kurt – He has leased one apartment to a school teacher. Robust discussion held. Diane - On Monday, Charlie wasn't here, we walked through with their construction manager. They have pavers now in the area between the two sides of the building. Have several doors on the outside of that area. What is done looks nice.

**9-14-2017**

McQuillen – Dick advised of several questions to start. Last time we toured, Charlie was told there were 3 apartments left to be sheet rocked and taped. Two days ago, the one in the corner still appeared to have sheet rock know leaning against the window. Mark – I will schedule a time to get there next week. Dick – The elevator was supposed to be inspected and he has not reported to you. Dick – Both things needs to be done. Mark – The elevator is not required. I think we are just waiting for the state to inspect. Mark – To summarize the request: The new pieces are the construction LOC that matured the end of June and has not been renewed. There is a different on interest rates, and it will be the same thing on both notes, at 6.25% with the lead bank, so net to us will be 6.0%, up from 5% from before. The floor on this loan is 5.75%, and net is 5.5%. There are 100 bp performance objectives on both these loans. When they get certificate of occupancy, the rate drops 50 bp, another 25 bp when the residential units are rented and another 25 bp when they have 3000 feet of retail space rented. They could drop the rate by getting certain things done. There is a second note, while on our rent are not encouraging, for $422,900, we would have 90% of that, which is the request, same interest rate structure on this and the repayment source on the balance of the IEDA funds of about $200 thousand, then the balance will be enterprise tax credits they have to sell to repay that. CRBT would not advance on the LOC unless they had proof that credits will be sold to pay back loans. The total dollar amount proposed will potentially be the same for the second note. Dick – They presently are past due since June 30 and we had a kicker in there, are they paying interest monthly? Mark – The accrued interest on that has been paid fairly recently, but I need to check on that. It is at the default rate. Dick – I think that would be a tremendous incentive. Mark – From Charlie's perspective, not sure if he has been as much the reason it is at this point as the two banks involved. We had asked for detailed information regarding remaining construction costs, that is why we have the second note. Dick – Snyder came in and did this? Mark – No. Dick – So we have not seen Snyder's construction costs? Mark – No. Charlie had brought that up not that long ago and that he thought it would be wise to get a bid from someone else. 1 – What is that amount? and 2-How quickly can you get someone like that that is fairly busy to come in and do the project, but this might be quicker than the route they are taking right now. This is slightly encouraging, has there been someone actually looking at apartments. Dick – Not the most impressive realtor

showing it. It would be nice to see what Snyder says. Charlie seems to say what he needs to, to move on. Gene – What has been factual since the start of this? It was supposed to have been done 2 years ago. Mark M – Original construction maturity date was June 30, 2016, so we are over a year past that date and we have extended the construction loan four times. Gene – What happens if we don't approve the extension? Dick – Cedar Rapids could foreclose on it and we own 90% of that note and Citizens is willing to take $1 million when completed and the City has $1 million, so when completed we would have less than we do now. Kurt – That is assuming that they will keep their end of the bargain. They have not indicated we are out, but we haven't really put them on the spot. As I think about the permanent financing commitment we had, we could easily say we are out, but that would be short sided on our part. Dick – We are out but we are already in for our commitment, we can't get out. Mark – It would take city and ours and others, based on performance of construction loan, if there are different things we would want to include in the end financing, we have every right to negotiate. For example, have $900 thousand limited guaranty from Bob, with permanent financing to drop to 500 thousand. When we get to the point of permanent financing, we should revisit some of those terms, as they haven't met expectations on the construction loan. We could easily come back out on permanent financing but the bank's perspective, that would be a worst sided process but from the other banks perspective, might be more helpful to raise the bar in those types of things. That isn't what is on the table today, but when we get to that point when we are doing the permanent financing, those things are on the table to be revisited. Gene – If Dean Snyder does not get involved in this other than his estimate, are we confident for extending this for 5.5 months? Are they going to be done in 2.5 months if someone else does not get involved? Kurt – I would say not, probably next spring, if truly. Mark – I think they will have certificate of occupancy at that time and maybe start renting apartments. One of the groups we have talked a little bit about that are different than some individuals renting an apartment. I believe there is some interest from Midas, Cambrex, Zoetis, that when they bring people into town to work for more than a day or week, they like to put them up in someplace better than the motels in town. They have expressed in each of those maybe having 1 or 2 apartments to have available. That is a pretty good start in getting some rented and cash flow. Dick – Are we wrong to say after 15 months of lip service, we want to see who the tenants are, name, contact information and have Mark from Chicago and obviously Cedar Rapids, we want to see what Snyder said it would take to get it done and what it would cost, and talk to Cedar Rapids and say you either get it done or else. It is time to talk to Charlie. There are only 3 not complete. Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it. Kurt – Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. I don't think he can complete it. Dick – He was hurt when he was asked if his guarantor was aware of this mess. Bob could have been off the hook if Cedar Rapids had not contacted to acknowledge another extension. If we approve this, I don't see we have a choice. We have more in it now if it gets done and we need to make sure it gets done before the middle of winter which may mean to fire current staff and get Snyder in there. Kurt – He doesn't demonstrate that he is paying any attention. Over and over again, he tells us we have this working, going to get things done, etc. We were there in May and he was going to get a certificate and they still don't even have the sheetrock in. He is disconnected from the project. Something June 1, something July 1, he needs to hear we don't have any confidence he is going to complete these things. Dick – Let's get a sit down with him. Cedar Rapids should be more than willing too. Kurt – Give him the message he may need to find another lender on this. Dick – Part of the problem with the public is they are not seeing anything on the first

level. His logic is, he has to get a good tenant there and then finish. Kurt – If he would have gotten apartments and occupancy 9 months ago, there would be no question. Dick – That is the minimal we have to do before we have to approve it? Gene – The thing is Charlie has no skin in the game, if he walks away tomorrow and declares bankruptcy, he is not losing anything. We need to get the project done so we can escape. Dick – We need to have a heart to heart talk with Bob Thomson make him aware of what we are doing to try to save his $900 thousand guarantee. Bob is also over 90.

Charlie did say he signed the deal for $7 thousand-$9 thousand to have the punch list done over the objection of his partner. Gene – I would approve this subject to the meeting such that all parties are apprised of what we are thinking. Discussion held. Mark – Cedar Rapids Bank, Charlie, maybe Bob Thomson in that same meeting. Ron M – Bob with his hearing problem, it is tough to know if he is going to absorb everything out of a meeting. Dick – He needs to be at the talks. Mark – We can try to get something lined up, mid-week next week. Dick – It is worth doing.

Gene – I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done. Dick – We can say if we are going to extend it, we want a week by week schedule of what you are going to get done with your people and if you don't do it, bring Snyder in to finish. Mark – We should have the document showing what it will take to complete it. I don't think we have the ability today to say you have to hire, but if they don't perform and we have an agreement then we would. We would have an attorney write this. Again, we are not the lead bank in this. Dick – Call Gary Becker. Kurt – Encourage him to hire someone to finish the project. Dick – I would Mike to see a Snyder punch list and ask if he had thoughts about hiring Snyder to finish.

Mark – If approved, subject to these things. We will have a meeting with Bob and get estimate from Snyder to finish, agreeable that they could provide an estimate of time table. Dick – He is supposed to have that. Diane – He did say he paid money to Dean Snyder to have it done. Dick – If we have a punch list. Robust Discussion held.

Motion was made by Gene A. Hall, seconded by Robert D. Noble, and unanimously

VOTED:       To approve the following:

McQuillen Place Company LLC

Extend Note #930002561 in the amount of $3,872,602.92 (Construction Note) to 12/15/2017, with lead bank CRBT and FSBT 90% of the note. The second note is for $422,900 with CRBT as the lead bank on this note as well. FSBT would have 90% of this note as well and it would maturity on 12/15/2017. The interest rate on both these notes is 6.75%. After lead bank takes .25% for servicing, the net to FSBT would be 6.5%. There are 3 different performance incentives on this note that could drop the interest rate 1.0% if completed with a floor interest rate of 5.75%.

Guarantor/Co-signer: Charles Thomson.

Exhibit A
Page 9

Robert Thomson ($900,000 guaranty)

All the above is subject to the meeting of all parties such that all parties are apprised of this.

Mark – Once a meeting is scheduled, make everyone aware to attend.

**12-22-2017**

Discussion regarding the proposal from Charles M. Thomson and Robert L. Thomson on the funding of the McQuillen project. Robert L. Thomson is willing to inject up to $500,000 cash into the project with the condition that his $900,000 guarantee during the construction phase being reduced by 0.50 for every dollar injected (total of $250,000).

Dick motioned to approve, Gene seconded and it was unanimously

VOTED:       To approve the following:

McQuillen Place Company, LLC

Reducing Robert L. Thomson's guarantee as mentioned above

Subject to the following conditions:
Cedar Rapids Bank & Trust Special Assets group agreeing to the proposal
The City of Charles City agreeing with the proposal
Reviewing the appraisal that was ordered in November 2017
Cedar Rapids Bank & Trust drawing up an agreement with Charles M.
Thomson and Robert L. Thomson documenting the expectations of each
party.

**2-21-2018**

Boyd Campbell - Any update on McQuillen? Diane - We are waiting right now to have a meeting set up with the Cedar Rapids Bank, we have contracted an attorney out of Cedar Rapids that is going to spearhead our efforts that we have to do. We are going to have all the parties involved, bank, other bank, Charlie and Bob, as well as Bob's attorney. Dick – We decided it was time to have an attorney represent both banks. Bob feels this is a man who will move it along, looking for a resolution. Gene – Have they settled on a contractor to finish it up, and if so, how much? Dick - Bob has come in with his contractor. There are still some questions. The workout guy from Cedar Rapids Bank, on a scale of 1-100, he is 80-90, and the loan officer on the same sale of 1-100 is a 4, so we improved ourselves a great deal with this workout deal. He does this, moves things along. Psychologically, that Bob is jumping in to get a contractor that he has used in the cities, that means Bob is more committed than just the numbers he has seen, and he wants this done. It is nice to have someone in that family to understand timeliness is more important. We will know more after this meeting. This will be held in Cedar Falls/Waterloo office of the subsidiary bank of Cedar Rapids Bank. Diane - This hasn't been scheduled yet. Adding to Dick's comments, the original proposal that James and Charlie put together, put us at $428K to complete

Page 10

and the contractor that Bob is involved in, looked at everything. All totaled, it wasn't a lot different than what Charlie and James had put together, about $500K. There are still some outstanding items aside from that, accounts payable, interest and taxes. So, for Loan Loss Reserve, we used a total of $900K to complete the project, and that is a guestimate.

Kurt - So the objective will be to get information from them as to how to move forward. Also Bob's guaranty, whether used or not, it comes to us, making sure if capital is put in, it gets spent well. Charlie just seems to be paying attention to everything about this. Boyd - Is there a question about Bob's guaranty? Kurt - His guaranty is to us, not a cash infusion to the project, so technically, we can ask him for the $900k, he has to pay us. That puts us in the position, do we put it in the completion of the project or come up with Bob to put some money into this? That is what Bob had proposed, put $500K in, reducing the guaranty. We also want to see the $500K get spent well. Hopefully, we can get this thing moving forward. Dick - Didn't Bob's guy have a near completion date? Diane - Yes. Dick - There is very little to be done on the apartments. There are 2-3 apartments that didn't quite get drywall done, some repair, flooring in the hallway. There is still a thing on the first floor with the City on steel structure with the drywall and fire. That is why they changed the goalpost on it and the City said no, you didn't understand the city code. I don't know that he and Charlie are on the same page. Kurt - James is the one that managed us to this point and spent all the money, rather than getting a good contractor. Dick - It doesn't look like it when you drive by, but we have made good progress. Gene - $500K is that to complete the entire project? Dick - Not the 1st floor. Original cash flow covered the debt. as you get cash flow on the second floor, you have cash flow to cover finishing the first floor. Kurt - If we can get Bob to commit money directly, he has some ownership and we need to keep him engaged. Boyd - When do you talk to Bob about this to get him moving forward? Dick - He had a CPA. You have $900K from Bob who has the moral to take care of it. Get the $500K, get a decent contractor and go. Cedar Rapids did not want to do that. Diane - When I talked to Dave from CR, when we have this meeting set to be determined, that is going to be negotiation day, and it may very well be that we end up back at that, but he doesn't want to throw that out now and not have anywhere to go, that is why he is playing hardball. Kurt - Let's not give that up. Dick - I like what this guy is doing, he was calling Charlie every day, sent him a past due notice, what do you have to offer. Next day, he was calling James. He tells us his lawyer is the same sort of guy. Nothing we can talk about on the street. It is frustrating to hear conversations at Aromas. People are just looking for answers. Charlie needs to get it done.

Bob N - So, this meeting will be when? Diane - Probably in the next 2 weeks. Bob - Diane and Dave are moving it along faster than we were. Diane - They have offered to get out. The big thing that I don't want them out, is we had a $500K government deal that went away and I sat here and listened to this man from CR, you contact so and so and he can get it done. We put CR bank into this because of their ability to handle those. I hope we never have to go there, but I feel the CR bank has a lot of stink on their fingers for $500K. Our State Senator got the economic development lawyers and they explained it was allocated but never funded. We were never told.

**3-8-2018**

McQuillen Place Updates – J. R. Herbrechtsmeyer -Credit Committee has been meeting on this, as well as loan committee. Michael had good input on this and then Mike had an idea of a possibility, so I thought this is one that we will be talking about at the Board of Director meeting, and want as many people to think this through. Kurt- Technically, we are still in negotiation, Diane met with Bob's attorney, his accountant, and where we are, basically Bob has taken a step back on the $600K, he said

Exhibit A
Page 11

$900K is his limit of exposure, which is really basically where we are already are. We have Bob as a guarantor for $900K on construction, where we still are in that phase, with a verbal agreement to be a $500K guarantor on the permanent financing, giving us something to go back on while getting it leased out. So, first is to get it completed and second is operating. They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, they need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. What we talked about in Credit Committee, how would we approach that foreclosure and what are we willing to do. Mark Miller joined the meeting via teleconference. Their offer as of last Tuesday did not offer anything more than what we already have. Offer is not any better than if we took control and had someone manage and lease. Credit Committee - Take control or they come with a better offer, with the full realization we could end up with the property and some fallout, liquidating assets that we need to be aware of. Best thing for Charles City is to get control and put someone else in charge of it and it will take some of our capital but we will have Bob's $900K. We could find someone else to complete and manage and potentially get it sold.

Dick – A couple of things that were discussed. We now have a joint lawyer, one legal entity. so far, Charlie has shown up representing himself, other than when Judy O'Donahue was involved when the $500K went away. Cedar Rapids bank has offered to take us out and you guys run it. I think they have enough egg on their face, they were paid fees up front to manage this. I sat in this room and listened to their lender say to Charles that the $500K tax credit is past due, but those are extended all the time. That $500k that never happened would have gone a long way toward us not being shut down for 90 days. secondly, we asked the lawyer to look for the answer. Diane - The grant money, there has been put into this thing and see what the obligation is, if we were to foreclose or if Charlie were to sell it to another entity. Do those requirements all stay in place or is there any draw back. Gene - How long do you think this will take? Dick - I think we have part of the answer. Diane - The grant money, there is mortgage and second position, if we foreclosed, it would be the same as foreclosing on another entity. Diane - The IDED that the funds came from, but the NIACOG is administering the grant and that's why it's from Cerro Gordo County. Dick - That was my guess, but it is strange that the real estate in Floyd county will have a mortgage from Cerro Gordo. The question is still foggy, he has laid over and over, he was required to have 1 more than half of those apartments and he was talking about subsidizing. Kurt - That is a second mortgage, but our understanding is, unless they want to buy us out, we have no obligation. Dick - that is why I wanted to be sure we had all those facts before we start. Kurt - City side - Dick - I hadn't gotten it through my head, Ralph is concerned the City is going to walk away from that, I don't think our City Manager is a bluffer, he wants it done, also Charlie swore to sell it to a TIF loan, and it must be completed, and if not, those that are in there, will need to move out. Kurt – The most is completing the windows. Mistaken on the first floor and completing the sidewalk. we are quitting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff, we have to be willing to take it on. No, Mark, it will not be your project. We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. Dick - One other part on the loans, I had written off that Citizens will have anything to do with it. The Citizens bank loan has the other half of the TIF, so if something comes owned by CVB, Ltd. owns this thing, there still could be TIF grant up front paid back over years and a loan to the City through First

Page 12

Citizens and whoever owns it pays for it. In our credit meeting we discussed, if Citizens doesn't want to do it, there may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio.

Gene -I haven't had a chance to study all of this, I absolutely agree if the bank finishes the project, I agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. Dick - I can assure you one thing, Directors will pay to have McQuillen removed. It would be nice and I don't know how we get it, the list of people that want to rent, whether there is anyone or not. Gene -I can address this. Coincidentally, I had another conversation with a director yesterday that confirms there is a list of people waiting to rent those apartments. Dick - Will it be a list we can get our hands on? Gene - It is through Larry. Kurt - Obviously, we may realize we will hold this for a long time, we need to get it leased up. Quality of the construction in those apartments concerns me, cabinets, flooring, don't want to say we are going to take it and put $1M into it and sell for a profit. Dick - There is no question, I would never live in this based on what we were saying. Floors were plywood with a little paint on it. Kurt - That is the environmental aspect they were required to meet. Not sure where this came in, maybe goes away with NIACOG. The other prospect that pushed me across, other alternative was we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this? From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. Mark - Have you had any conversations with Dean about that? Mark - I have not. Either he or Connie will work with us on it if they owned it. Dick - Is there a way if they would both work with us. PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both.

Michael came up with a discussion about an entity that might own this. Michael - During the financial crisis, we got a lot of land and properties back. In those cases, certain institutions that did not want to absorb, created an LLC, basically sold real estate to the holding company. In that instance, those asset qualities, OREO if long term, doesn't impact the bank's asset quality and no performance assets. The only time you would see it would be at the audit at the holding company level. You will need to talk with FDIC and the State to get the blessing to do that. I don't see why they wouldn't. What might have to happen, you might have to divvy up capital to get it finished. If the building was owned by the holding company, it would be divvied up by the holding company. Budget around long term issues. Regulators don't like banks holding OREO long term, as we are not real estate development companies. The other things, you mentioned the pharmacy, one big thing from what I have heard, they wanted a drive up-that would be a change in plans and is additional capital if we want that anchor tenant. Charlie doesn't have that. When you start to build out the tenants, there is reduced rent, cash flow out of capitals or concessions on rent, all of which I don't know Charlie can absorb with his current situation. Last thing, I don't want to own this, but at the same time, even if we let Charlie and Bob finish it, I don't think apartments are going to cash flow, so we will still have a non performing asset, which will impact our books for eons, as this will not support any long term financing. We can work through this, but I struggle with giving Charlie the satisfaction of completing this as he has bungled it up and he is trying to get rid of the $500K. Michael - If we allow the $900K to go in, we are giving up our collateral. Kurt – And, we are giving up control. Michael - The appeal of some 50% reduction in whatever Bob was going

to put in. Dick - Steve Durrs said, made me feel better, the redo of the parking is still on the table, if that building gets completed, to add 88 spaces, with a timeframe of next summer. Kurt - But we have to have the building done by November, so they can put that in there. Dick - Steve Durrs is definitely on our team to get this done. He is not taking sides of one bank over another, simply City Administrator to compete and look good on main street. I am very encouraged after meeting with him. I keep hearing from Ralph, that Delaine was not okay with this going in. Kurt – Delaine's concern was Charlie, no cash, no back up. Michael - The other thing Steve mentioned was the TIF, the agreement has to be rewritten, it doesn't matter if it's to McQuillen LLC or to the bank, it needs to be rewritten anyway, if ownership has changed, the new owner would be written into this. Dick – There is no way we are going to lower our assessed value on it. The other thing I raised briefly is the $500K that went away, at some point, we are going to have to have our own lawyer, because when we start taking some charge offs, we feel we have reason to go after Cedar Rapids bank, they bungled. The notice to the State was sent out a long time ago and going back to the minutes when Cedar Rapids banker said to Charlie, you see so and so, that guy can get that extended, the state had gone away with that program by then and grabbed what little money they could for other projects. Cedar Rapids bank didn't have a clue. Boyd - How feasible is that is what they are saying on the $500K, going after the Cedar Rapids bank? Dick – One, being a good politician, our State Senator has tried to do what he could, got the Economic Development lawyers to sit down with us and explain why we weren't going to get it. No question that Waylon Brown made that happen. But Cedar Rapids bank has offered twice in the last 2-3 weeks, just take us out and you guys run it. They would be happy to write off the same percentage we do, as they are only in it 10%. Kurt - There will be an opportunity for them to take their haircut and walk away. Dick - I would like them to take the haircut and put the big fees back in. They should be as embarrassed as we are that this is not done. Gene - We almost have to be complicit as possible. Dick - We at least raise the issue and try to get them to come up with something other than just losing their percentage. Gene - Is Bob's reputation separate from Charlies? I think if push came to shove, how much is that McQuillen place going to mean to Bob? Kurt - That is what we are trying to find out. Dick - At one point, they offered us $500K with $250K coming off the guaranty, that would commit Bob a whole lot more. The number got bigger. He is going to have to make that decision. Gene - Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

Dick - We have to pay the taxes. I don't think we have to get our interest paid. Cedar Rapids Bank wants this, but they may have to write this off, a lot less than what we would have to write off. Cedar Rapids Bank is not offering to make any concessions. I believe this man wants to get away from this as fast as possible and probably has some perimeters to work with. Gene, how long will it take to force the Thomson's to a decision and moving on? Kurt- We want to show them we are moving forward. In the meantime, the way we have proceeded in the last few years, once we say we are doing it, we do it. Dick - With Boyd on this call, we have 4 out of 9 directors present. When we say to Cedar Rapids bank, the Directors Loan Committee has to approve this. It is all about Bob and are you really walking away from this and it not being called McQuillen Place? Kurt - We will liquidate all. Michael - On that point, that is the forced and bitter foreclosure process. I am throwing out there, in the best interest of that building on the corner of main, we may have to give some concessions to Charlie. He doesn't have any equity, we get all OREOS back, I know that the emotion and the involvement is there, but we have to make good decisions in trying to get possession of the building as soon as we can, whether voluntary or foreclosure, that should be on the table, otherwise, we will stare at this, pay legal fees, discuss at every board meeting and in 15 months when we finally get possession, just thinking long term. Dick and Kurt - Bob does not want this to happen. Dick - Another thing Michael brings to mind, Tommy gave a list of every loan we have with Charlie and what the collateral is, we know what Connie has them listed for, probably 80% more profit. I am told he actually has had an offer on his house, more than assessed, but

turned down. Kurt – Amelia Management is the 3 remaining living kids, but that brings Peter into this, you will get the family rallied pretty quickly, and they are all affected by this. Charlie can't fight through this on his own, with Bob involved and everyone, it will be to table pretty quickly. Dick - The first foreclosure will be the farm over by the river, that is a farm that was Jan's and then the 4 kids, foreclose, then partition out. Kurt – They won't want that to happen, undivided 1/4, probably has no debt on it. Then have cousins that are forced to buy out 1/4 of a half. Mark M- Our mortgage on that is either $125k or $150k, what was negotiated as part of it. Our LTV on all those properties, we should be in a pretty strong first mortgage position, but every one of those were financed with seller financing, the equity beyond second is minimal that would be available for a 3rd mortgage that applies to the McQuillen loan. The other thing we have talked about all along, first thing Bob would have to do, is have him write his $900K check. But we speculate the attorney, with a limited guaranty, they are not going to write a $900K check on the front end, but wait to liquidate all, then determine if we are truly $900K. That is why we want to negotiate that up front in a voluntary settlement agreement. I don't think there is much equity in the Amelia properties, as most of those were purchased less than 5 years ago, so not a lot of equity.

Diane - I tossed that question to the attorney in Cedar Rapids, about waiting until all properties were foreclosed on, before we would ask for the $900K, but the attorney said they can't dictate to us how we get the collateral, we can ask for it up front and we can get it up front. Dick - Bob has offered to write the check. Mark - He has offered. Is he still going to offer, once we start the foreclosure, it may change. If he doesn't, we may be a long way from getting a check. Dick - I would rather see the $600K and still have some guaranty on the cash flow. Mark - If Bob is using his contractors that he is using for Pancheros, I believe bob is committed to getting the building finished. Bob has the money. Charlie is not capable. If he puts $900K or $600K and we maintain some of that guaranty, I think we get all that back, then construction loan comes due, if they could get finished using Bob's better scenario for us. Kurt-I don't disagree with you, but I don't want to give up that guaranty. Mark – All we can commit to at this point in time, is the construction loans, when matured and the building is completed. If that is finished, Bob may say at that point in time, the cash flow is there. He won't say that today. Ultimately, this is Bob's legacy. He has a lot of respect for the bank. Dick - You make one comment, Bob's contractor at this point has not given us any concrete numbers. We or Cedar Rapids bank has never seen anything form Bob's contractor. Diane - Charlie had sent a document that shows where they said, you are short on this, need "X" amount of dollars or more, not totaled. Mark - This is something that I had mentioned to you already, we don't know Bob will step forward, we can speculate he will. The way I look at it is, he is kind of stepping/walking away right now regarding the $900K, he has already played his card. Dick - Is that why there has been nothing from Cedar Rapids Bank with Bob's contractor? Diane - They are considering Bob's contractor.

Gene - Hold their feet to the fire. Kurt - Michael is right, we have to sit down to the table and work something out. Dick - This is where Mr. Breitbach will have to give us some guidance. Kurt - I think we do want to force the issue and get to a resolution. Diane - Keep in mind, just getting through the construction is only part of this, then how is it going to turn out? Mark - Getting it completed, increases value and sale ability, maybe not at the levels we want to, but at a level to find a buyer. It is not saleable, as it is not finished. Even if you lost the guaranty completely, if it gets finished and we start getting apartments rented, it increases the value by the amount and maybe more, only reason we are considering this, it gets money up front and he has a contractor that can actually do the work. Kurt - I am only with you as long as there is a guaranty from Bob to the end and not having Charlie in control of this. Michael - One thing to consider, Steve did say that the TIF loans do not go anywhere, until the building is done. He is talking about sidewalks, the doors, when you start adding that up along with real

estate requirements, I don't know if the $900K is enough. If we go the path using Bob and his contractor, he is going to have to put more than that into it. Diane - One thing Steve said, it can't just be a painted piece of plywood, it has to be windows. Kurt - They were not in that scope. Certificate of completion, not occupancy. Bob needs to be on the hook for all of that, that needs to be the agreement, if we are going that route, it has to be completed. Gene - There has to be a deadline on it. Diane - If Charlie is being in charge of it, we already know it won't happen. Dick - With Charlie involved, he still has his Chicago partner. He was so condescending to the City and to us. His enforcement has failed at the last 4 he has been involved in, he doesn't know. I don't think the guy in Chicago cares whether or not it gets completed. Bob needs to know Charlie's partner is a detriment. Diane - Steve would be the general contractor and be here 2 times a week, but he has a foreman who would be here every day. Michael - Is it still local contractors? Mike - From what I understood, I think it is still the people building it, but we just have someone overseeing it now. They are not just bringing in a construction crew to complete it. We now have someone overseeing it that knows, but you still have the same 4 guys constructing. Dick - Once Alex left and the clown running the thing, the drywall was incorrectly installed, that is where the big problem is. The architect says it's not a problem. Three more feet of 3 layers of drywall for fire protection to get the initial certificate. He implied when that foreman was there, it appeared they were doing everything right, but when they hired someone off the streets, that is when it went awry. Ron - If you don't go the foreclosure route to maintain control, will you have leverage enough to control it going forward? Dick - I suppose we could have a written agreement with the contractor and when they get behind, we could start the foreclosure process.

Michael - We have reserved $850K, that was for year-end audit current reserve on it. Dick - I put out, we are making a $1M profit this month that will go into AAA, I think that gets offset by McQuillen place. At the very least, $1M charge off before we are done with this project. Michael - It will lose value if the banks name gets placed on it. Kurt - That is why I think you lease the place up and market. Dick - I like the idea of an entity other than FSBT. Next step is to get back to the attorney representing the two banks. We will have to talk to the Board about it next week. Michael - What is the decision? They want to know if we want to move forward with foreclosure? Kurt - Offer is not good enough, moving forward with the foreclosure. I think we will hear back pretty quickly. Dick – The person from Cedar Rapids will have the paperwork ready and file. I am not sure 48 hours is enough for Bob T. Kurt- Communicate quickly. If they come back with something and we are considering it, we are going to have to deal with Cedar Rapids bank. Diane - I think they will say if you aren't foreclosing, we are out. Dick - Do we need to get legal counsel representing just us, to say if you are out, we will take you out on these, pay back fees. Mark - Is it in the file of what their fees are? It should be. Kurt - We need to find out what they have gotten. Dick - If the mortgage is in their name, they can thumb their nose and foreclose. Diane - I suppose they could. Up to this point, they have let us be the decision maker on where we go. Dick – I think it would be safe if they are going to do that, and ask if they have looked at their liability on the other things. Mark – I did mention that to David once, I am sure he has forgotten about that. Diane – What I had conveyed to Dave was Board Loan Committee meets today and at this meeting, is where the decision would be made. I was wrong and it needs to go to the Board of Directors.

Kurt - I am not convinced this committee needs to approve. Diane - It is either we are foreclosing or we are not. Kurt - I don't think there is anything in our policy that says this entity has to approve. Dick - I think if you tell them we are either foreclosing or let us know, Dave will give them 30 minutes and foreclose. I think we need to give them a reasonable time. Mark - I think a week is ample time. Diane - I counter that and say give them until Monday. Mark - The problem you have with that is, you don't have one person in and they are working with a new attorney. Michael - They got back within 24 hours

with the previous.  Diane - I don't think we should wait.  Dick - How about Wednesday?  Kurt - Bob is in a position to make this whole thing easy.  We need him to decide whether he is willing to do this or not.  Diane - That is why it shouldn't take a week to make a decision.  I just think that is too long.  Kurt – A couple days, communicate this.  Diane - Give them until Monday.  They have the weekend to figure it out.  Gene - If I was going to lose over $1M, I would be making a decision real fast.  Diane - They have had time to figure this out.  Michael - if Diane is right, and Bob says, you have heard my offer and it could be today.  Gene - if he doesn't, I would file foreclosure papers this afternoon.  Kurt I- Give due notice.  Diane - I will tell Dave we are in agreement to go ahead with foreclosure, give until Monday to counter.  Kurt- Do we want to say that?  Diane – What I am saying, I tell Dave that, so he doesn't file the papers today, giving Bob the time.  Kurt - All we tell Dave Is that we understand there is a guarantor that can make this easy, give him the opportunity and then move forward.  Michael - Dave can communicate we are going to file the papers on such and such and they then know the deadline.

### 6-21-2018

McQuillen – Mark M. - Negotiations with Cedar Rapids Bank and Trust - We are dealing with relationships and trying to resolve and get on the same page.  Mediator with Thompson's and the attorney, we are trying to reschedule, as the Thomson's didn't want to meet without the mediator.

Discussions between the banks and Charlie have been evasive.  First Security is more interested in resolving this than Cedar Rapids bank who has less incentive to push.  We will threaten to sue Cedar Rapids Bank for damages for slow movement and lender liability.  First Security Bank has a separate attorney.  We have sent options and if they don't choose either, we will start the lawsuit.  We think it is better to have one bank involved and making the decisions.  Taxes are paid by First Security instead of Cedar Rapids bank who is the lead bank.  Cedar Rapids Bank and Trust hasn't started foreclosures on any other properties.  Cedar Rapids Bank and Trust never had the actual Enterprise Tax document to show approval with 2 options.  1) Cedar Rapids Bank and Trust has 10% of the loan and they offered to walk away from 5% of this.  First Security Bank presented that Cedar Rapids Bank and Trust pay the bank $1 million and walk away, we don't file a suit.  2) Cedar Rapids Bank and Trust pay 80% of First Security Bank loan amount and real estate taxes and First Security no lawsuit.  We want to get moving toward a resolution.

---

FSBT Board Meeting – McQuillen Excerpts:

### 4-16-2018
Progress on McQuillen place was discussed.

### 5-21-2018
J.R. Herbrechtsmeyer discussed information regarding McQuillen.  Robust discussion was held.

### 8-20-2018
#### Credit
McQuillen Update – Kurt - We have reached an agreement with CRB&T and they are no longer in the equation.  We obtained assignment documents and a $50,000 check.  Dick - We have also obtained insurance on the building and Larry is pursuing foreclosure.  Discussion held.

### 9-10-2018
Diane gave an update on McQuillen.  Robust discussion was held.

### 10-15-2018
Diane gave an update on McQuillen.  Robust discussion was held.

---

Credit Committee Excerpts – McQuillen

### 4-21-2016
Purchased Loans Report – McQuillen, Mike F – Are we following up on what we need?  Mark M – We are getting reports, but I haven't gotten one recently.  Not much was done over the winter, but they are working on it now.

### 6-28-2016
Pipeline Report – McQuillen Place – unused and looks like it is going to sit there for a while.  Dick – A more optimistic view – the City is saying they could have 12 apartments they could have ready in August, as the plumbing was roughed in.  They have 12 on the south side, 2nd and 3rd floors.  Mills Helmers has 20 some furnaces they are storing, the sheet rockers was ready to start on those 12.  Mark – They are working inside.  Dick – The City is not going to give them any ability to rent, they have to have at least the sheetrock on the walls.  At the rate they were going, they could have roughed in all the fire suppression.  It is conceivable those could have been ready on time.  They talked about one lease and building sale at the end of the street that could put a damper on this and it spending some money there.  A Bluhm truck was there this morning.  We should tell Charlie Thorman some word another walk through to save the finishing on the inside.  Mark – The LOC matured June 30, and we have a request going to Officer Loan Committee to extend this to December 1.  They have to have certain things done prior to year-end to qualify for some of the grants for this.  Robust discussion was held.  Michael H – We should add our work outs to this report and add one more column for this.  We have another $8 million to $15 million in loans that are still on the book.  There are real dollars that are not on this report that are going to roll off.

### 10-10-2017
Diane – Dick had wanted to talk about McQuillen.  Kurt – His concern is there might be some urgency with regard to maybe setting the expectation about Bob's involvement, his is a guaranty on the loan which comes in to play when trying to collect.  Obviously, it could be an infusion of capital too.  Michael – My feeling is, based on what I know, we are on the hook until it is done, because the other participants don't step in until it is complete.  My argument is, our goal is to get this done as fast as we can to reduce exposure.  Kurt – Dick bought up things that need to be completed.  I don't know where the City and Charlie are on that, to get certificate of occupancy.  Dick's concern, is pouring concrete when the weather changes, but certainly something we want to be thinking about, is getting those things done and the certificate.  The other thing going on, is Department of Economic Development at $700K.  Charlie sent an email and asked to make contact there.  Mark M – Dick said he talked to Waylon, who knows what their stance is on this, there is what we can do and what we can't do.  Mark – Even if you had the money, what is going to do the work?  Kurt – What are the options, what should we be thinking of as priorities, can we inch something forward?  Mark M – Personally, and I think we need to do this, we have the stuff from Dean Snyder construction, there is never going to be funding to support that, $2.5M plus and Charlie and James number was over $400K.  Second request at Board Loan Committee was supposed to be covered by tax credits.  What we need to see, is: 1-You need to get accounts payable of all bills out there.  We have one customer, Kamm Excavating that they still owe $7,000.  2-Then an itemized list of what it takes to get to the finish line and provide a timeline of when that finish is.  3-We will come over and do a checklist to follow up and see that you are following through.  With this

---

timeline, you will need to meet weekly.  4-Then we will figure out permanent financing at that time.  We need to get it finished.  The certificate of occupancy, we could depart this, but you still need to get stuff done and who is going to live in there if it is not done, they all need to be finished.  Kurt – Or enough to get people to move in.  Michael – Where is Cedar Rapids Bank and Trust on this?  Mark M – Gary Becker, his rationalization, that I heard more than once and did not agree with, their approach was to keeping the cost low to get the project done.  The entire project was not hurting him.  Now I would say, it and he has clearly moved on that point.  Michael – Do we have any recourse on them in terms as to how they handled this?  We brought them in as experts in construction and development.  Mark M – Weren't they overseeing the grants and the project, didn't they get the documentation that all of that was in place?  I thought they had this, but at it turns out, they didn't have it, we didn't have it, so there was a question about let's look at the participation agreement.  We have 3-4 extension agreements and changes each time.  I don't think there is going to be anything in the participation agreement but will come back to original plan.  We are a participant and not the lead bank, we assume you have that and where is it.  Charlie communicated that to me first.  Mike F – Has there been any question that Cedar Rapids bank is lead bank?  So lien waivers, making sure no money went out?  Mark M – How this enterprise tax credit got missed in this question, I don't have the answer to that.  I am not sure if we have any leverage there.  In the short term, we are at mid-October, there are certain things that can only be done at a certain temperate level and soon to have those behind us.  Bob is the guarantor, but that doesn't mean he should have to write a check, but he has the ability to do that.  Come up with some money, get the project finished, can then reimburse once you get tax credit.  Mike F – What is total debt?  Mark – $3.8K and we are in the $3.3M range.  Michael – Dean Snyder's was $2.5M to complete.  Mark – I think there could have been some coaching in that number.  Show us your number and how you got to it to finish the project.  Supposedly Cedar Rapids Bank had something to support.  Mike F – What kind of documentation have they sent.  Diane – Sporadic.  Mark M – In discussion, a document was noted, but we had never received or have seen the document.  The funding, available source, what had been spent, matching up to completion of the project, we haven't seen this.  Mike F – Have we extended?  Mark M – They have $100K left of IED grant.  Mike F – Does anybody outside of our bank know we are concerned?  Does anybody know we think we might suffer a loss on this?  Mike F - We are in a position to suffer a loss?  Michael – As it is now, if you want to have it completed, it would be discounted to finish it.  Kurt – To me, getting that $800K infused, it either has to go to the loan or be put on loan.  Michael – I would have them pay down and re-borrow.  Mark M – If you brought somebody else in that does these kinds of projects, what would it cost?  That is your back up plan if you had to hire someone to finish it?  We asked and he went out and got an estimate.  Mike F – We are in a position, if the lead bank hasn't shown signs of normal lending due diligence, it is just because they have a small piece of it, doesn't get them out.  I think I would probably find somebody in Des Moines and send them the shop list.  Kurt – We could certainly have someone looking at that.  Mark – We need to set up a meeting again with Charlie and Cedar Rapids Bank in the room.  They have breached the contract.  Mark – Let's get the building finished and then discuss this.  Diane – What if we explore the participation agreement and whether or not they have been negligent.  Mike F – How many visits have they made up here?  Have they constantly monitored the construction of the building?  Mark M – What they wanted to do, they had this Ron Fiscus, a financial guru, and they wanted to use him as an inspector, but he was someone that Charlie had hired to be part of this, and they deemed him unacceptable.  They got somebody else.  Michael – I would ask them for a complete imaged file.  It is ours as much as theirs.  That should include everything.  Mike F – Did they earn loan fees?  Mark M – They collected significant loan fees on the front end.  Mike

F – What have they done? Michael – We hired you as an expert, if you can't do it.... Mark M – Until this thing is done, you are in. Diane – The other thing to talk about is, right now, it is a 5, it should be a 6. The other thing, how do you allocate for it, collateral analysis is not going to do anything. Michael – If you are in construction and land development, you are advancing on a completed basis. I don't know the answer to that, but what I don't know is, where did the funds come from? Let's say it's not $2.7M or $400K, probably somewhere in between. Mark M – That is what we need to get from them. Michael – If you can get the completion and get First Citizens and the City to take their part. Mike F – What is the time table, how long can this go on? Mark M – We have had representation from Citizens there, when we toured and they have been part of the meetings, they could have easily said at any point in time, we are just out. Michael – I think they understand there is some reputation on the line. Kurt – I think there is, that is why we want to get to completion. There is a lot of reputation risk. Mark M – That is why we need to get to completion. Kurt- We don't know how to reconcile Charlie and Dean's number. They had a basis for asking, my gut tells me it is closer to their number. Mark M – We have to get James and Charlie. Diane – They have been asked twice to do that. Mark M – Cedar Rapids indicated they had that information, I don't believe I have ever seen that. Mike F – The City signs off on inspections? Do they sign off? Michael – When I did mine, they did. Mike F – Snyder may be concerned, is everything up to code. How would they know inheriting a project like this that they can trust everything that has been done? Michael – My experience with the City, is they put the gloves on and do everything. Kurt – They were asking for over $400K. Here is a question for you, if you could get Bob's $900K, would you throw the $400K in to get this done. Permanent Financing is $1.5M. Mark – Bob's was supposed to be knocked off. Kurt – I want Bob's. Mike – If we go the whole course, Citizen's is just short of a million and the City's is short of a million. Diane – The cash flow is at what occupancy? Mark – If you had all the apartments rented, you would not need any retail. Michael – I would be surprised if it got 50% leased up on the apartments. Mark M – What we have heard all along is, that you have some of the employers in town that would like to have 1 or 2 of the apartments, Cambrex, Zoetis, Mittas. Kurt – I would think they would do this. But you would still have to get your 50% low to moderate. The sooner we get to that point, the better. Diane – The obstacle I see is, who are we going to get to finish it. Kurt – Who best to work with them. Diane – Couldn't we pursue this? Michael – You need the whole file. Mark M – Part of what we are requesting is, we want itemized accounts payable still outstanding, a list of improvements to get to the finish line. We could easily say, give us what you have to this point and we would like to see the whole file as to expenditures, lien waivers, inspections, etc., because we should have that in our file. Mike F – Any reports of any unpaid labor or bills? Mark M – We have one – Kamm Excavating of $7K accounts receivable that hasn't been paid. Mike F – That is my biggest concern. Kurt – I remember when we were all sitting in this room, Dick asked it twice and he said no. Mark M – I want to see an itemized list of accounts payable and what are you going to have to pay to get to the finish line. If they don't have it on there, then they may be others out there that concern me. It would be nice to get the list to see if it isn't on there and that would concern me. Michael – I think there is a couple things we could do internally, whether one of you or Tommy, look at our different options, how much did we put into it, look back at the initial plans to cash flow, are we going to have more in it, if it gets to us or Cedar Rapids, are we going to add more money to get it finished. Do you end up with a property you can't lease? I also don't want to wait 6 months and have not thought about those options. Kurt – Quite frankly, if you can convince them that Bob's $900K goes in next, get it complete, that at least gets us closer to the end in sight. I ranted at Charlie when they were in here a few weeks ago, as I wanted Bob to hear this. If I was Charlie, that is where I would want to be. Mike F – I have a feeling that there is

a credit Committee that has been held recently that is very concerned? Michael – Tell the lead bank to put the dollars in to finish this. It was their obligation to see this through and they agreed to that dollar amount. Kurt – We have to figure out what is the best course to get it completed. Mike F – Holding the lead bank accountable is not a bad option. Getting them to the table to participate in what it takes to conclude this. Mark M – We would get their attention if we ask for a complete copy of their file. Michael – One second, before we push forward talking about getting more infusion of capital, at what point are we stepping on the lead banks toes and opening up to a liability. I want to make sure we are not having any meetings without them. Mark M – We are not. From a course of action perspective, what we need to do is go through Cedar Rapids Bank and Trust first and have them contact Charlie and James and tell them we are available. I think we need to let them be the lead bank, these are the things we should be getting. Michael – Since we are at the end of the financing, my stance is until we have a plan, we are not taking any more exposure on. Kurt – We certainly want Cedar Rapids Bank and Trust on our side pushing. If they are sitting in the room and we think the $900K is what is necessary and CR sits quietly, that is not as good if we are all on the same page. Charlie is also pretty smart and if he starts doing the math, he may say, here are the keys. Mike F – Their story was, here are the keys buy us out. I can't trust someone who does that. Michael – They want out. I want to see the whole file. Someone has mismanaged it. I don't know why they ever took it on. Mike F – They are a very high growth bank, saw the fee income, someone can do this. Michael – it seemed like a good deal with all the state funding.

**10-20-2017**
Diane – I think we just wanted to touch base on McQuillen before next week. Different conversations have been going on about what the plan is for Monday. Marx – I understand the CR Bank & Trust banker is going to be here. Dick – Should we be having a conversation without the borrower with them, so that we are all a united front of what we are expecting from Charlie and James. Mark M – We should be letting CR Bank & Trust to lead the meeting. We told them what we wanted to see on the agenda. They tweaked it and are adding a few things. They have our items on there, they need to lead the meeting. Dick – Is the city involved? Mark – They are not running this. Dick – We need to be honest with the city as to what we are, as they have the potential of loaning a million dollars on this project. Mark – If the city stays in and if Citizens would stay in, we take our $3M down to $1.5M, but a lot less dollars we are looking at. Honestly, if we get to that point, if it is finished, we have the opportunity to negotiate terms with the guarantors. Bob is going to be guaranteeing $900K. I have already planted the seed in Charlie's mind, that when the construction is done, the terms on the permanent financing will probably be up for debate. Dick – We are not going to have much leverage at that date. They have none of their own money other than Bob's $400K. Mark – We have a farm. Dick – It will cost us a ton of money to get anything out of that, it is better than not having it. Mike F – Are they not doing any work at all? Dick – There are as many as 4 people showing up there on the job, it is pretty limited. Diane – One of the things they are supposed to be bringing to the meeting is their timeline. What if they don't bring us anything? Dick – That is where we have to be set with the CR bank. We need to move next door and talk with Gary. We need to go in and talk about foreclosure. We already have the city ahead of us on taxes. Michael – I don't know if I would put Bobs CD on the table, I would rather have CR Bank take it and finish it out. If they boogied it up along the way and didn't get it completed under the costs that were initially disclosed, I would hold that back in our cap until we have to. Dick – The $900K is actually a guarantee on their loan.

**11-14-2017**
Diane – McQuillen – We had a meeting which I will send to Kurt and Dick. We are meeting tomorrow with Charlie and Gary Becker is coming. Mark M – I met with Bob, not relating to this, I had an extension for him to sign on his son Steve's note. Bob Thomson brought up that he is fully behind getting that building built, we are talking $400K at this time, and if takes more than that, he will provide the funds. We need to get that building finished. A week ago, he said that he was working with his accountant to figure out what the transaction between him and McQuillen would be. Tomorrow there is a meeting here with the Iowa Department of economic development, where Charlie is hoping to bend their ear and get his tax credits back. They need to fund this gap and get the building finished. Diane – Michael, you talked to Greg and Randy and they are suggesting we get a new appraisal. Michael – They said given the size of that and the value of the building as it is now or the value to someone from a collateral standpoint, there is no income generating from it, there is going to have to be some type of valuation set up. It is sub-standard. It is not a Charles City appraiser that is going to do this. In order for them to sign off on the allowance and say it is adequate, you have a building supporting a loan. Dick – Let's ask Gary tomorrow if he is getting a new appraisal on this for their reserve. Their initial recommendation is to put it back to Cedar Rapids, they do more of this, that they would know better how to evaluate a cost to complete and a cost as is. I hope that the reserve in time can reverse itself. Even if we get the building completed, we have a competed building with no income, and it is probably not going to be sufficient to set up an amortize basis, it may be interest only basis, to help get leasing going. All things we are going to have to decide as we move along with this. They said the timing is bad. They come in and have to audit allowance and sign off that our reserves are adequate. What do we have for allocation? Michael – $100K. Diane – What is our allocation for next month? Mark – One of the thing, he would ask Bob to submit his $900K first, take off the top, then the farm and another $150K. I think I would start at those things from the top and then work from there to look at an allocation. Michael – Obviously we are in a position to where we know Bob's financial status, clearly we know Bob is most likely pretty good for the money, so I think you can consider that. So, whether it is the collateral you have, say around $900K, some farm, you have to factor in your cost to get all that and I don't know how much extra value that adds, you can probably consider all that, but again, as you are getting closer to year end, those are things we need to ask them about. Cedar Rapids Bank and Trust provided us with an appraisal, to get one in the time frame, you would almost have to go back to the individual that did the initial appraisal. That same appraiser may be able to come back. Dick – He did it based on plans and now he can walk through it and look at their projections and what it would cost to finish. Mark M – That would be Cedar Rapids Bank and Trust. Michael – Start the conversation and see where it goes. Dick – I would assume that we don't have to point out to Gary that if he were to get that $900K check, we are at least going to prorate that. Mark – At this point in time, I think it makes more sense for Bob, and I think he is on board with this, to put money in to get the project finished. Michael – Bear in mind, that doesn't mean we are out of the woods, we still have a non-performing asset on the building at that point. The city did a new list of what they have to have.

**1-11-2018**
Capitalization of Interest – No Report. Diane – On McQuillen, we were supposed to see the appraisal yesterday. I sent an email and told them I would be contacting the appraiser.

**7-10-2018**

Robust discussion held regarding McQuillen.

**8-14-2018**
McQuillen Place, LLC
- Mark updated the group on the following:
  - We received the signed agreement and the $50K check from CRBT
  - Still waiting for the original documents from CRBT, of which the assignments need to be recorded.
  - Question was asked if there was proof of Insurance. Discussion held on where things stand.
  - Set up weekly phone conferences with Larry Eide to ensure things keep moving.
- Action item: Diane will follow up on getting the proof of insurance.
- Action item: Diane will contact Larry weekly to updates.

Bob Thompson
- Mark updated the group on the following:
  - Mark met with Bob last week. Bob wants to get this done as quickly as possible but wants Mark to speak with his attorney.
  - Bob may need to borrow some of the money in order to pay the $900K guarantee.
    - Discussion held on who the lender should be for this loan.
    - If we are the lender, Mark stated the only way we would do this is if we take Bob's stock in KSB, Unlimited Spirit and probably an assignment of the remaining $500K life insurance policy.
- Action item: Mark will get loan closed with Bob by the end of August to collect on our guarantee.

Accounting issues related to McQuillen note
- Michael spoke with Eide Bailey on how to account for the $50K we received from CRBT. This will be booked to the Discount on Loans Purchased GL account (similar to the Wessels settlement).
- The McQuillen loan balance was grossed up to include the CRBT ending principal balance.
- Action item: Michael will oversee that the entry runs correctly and the McQuillen balance in Precision is updated.

**9-11-2018**
The committee reviewed the following reports:
- Ag Commercial QC report
- Adjustable Rate Pricing Audit
- Flood Determination Exceptions
- ALLL changes
- IA State past due averages
- Past Due vs State averages
  - Next month will do with and without McQuillen included
- Monthly extensions
- Potential non-accruals

- Monthly single pay loans
- Monthly credit rating updates
- Action item: Past Due report will be completed with and without McQuillen totals.

**11-29-2018**

Discussion Items – Diane - I saw an email sent today from Larry. What Kurt suggested is a group get together, get answers prior to meeting with Larry. A question I have on here, what would we be willing to take as a payoff if offered one? Mike F - Did Ralph ever come up with his buyer in Cedar Falls? He didn't end up talking to him. They are not interested in it if Charlie is involved. Maybe this is a discussion for board and holding company. Mark - I think this is a moot point. Just keep moving forward. Why would we want to wonder what it would take? Kurt- If they did, we want to respond quickly. From a negotiating standpoint, I wouldn't accept it. If they did make us an offer for $2.5 million, I wouldn't immediately say yes, probably counter at $2.5 keeping Bob's $900 thousand guaranty. Mike F - So many moving parts, real estate taxes are due again in March, insurance is paid quarterly. Is the building heated now? To me, some of the ordinary every day quarterly and semiannual things are going to change our number. Are we going to continue to pay taxes? Mark – We are not paying any more until we get to Sheriff's sale in June. September is not paid and we will probably be faced with March taxes. Kurt - I am trying for more; the costs keep piling up. Mike F - What have we written off so far? Kurt -We have allocated $850 thousand. The month of December, should we consider a write down? Michael - Greg will be here. Mike - Bill will say for the benefit of the shareholders, charge some of this off. At some point in time, our overall book value, we need to get down to reasonable to accept an offer. Michael - That is what I think part of this discussion leads us to, if we are going to take $2.5 million, we need to do document what it is. Robust discussion held. Kurt-To Mark's comment, if they had $2.5 million that they were willing to spend on this, they would have shown some sign of life, they are not showing it. Collect or write us a check. Discussion held. Mike F - Any contact with IADA? Michael - No. Foreclosure discussion held. TIFF discussion held. Mark - There is a limited window for the IADA, end of next year, where they have to have the new buyer in. They want it completed by end of 2019.

Exhibit A
Page 25

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, | ) | Bankruptcy No. 19-00507M |
| | ) | |
| Debtor. | ) | |

**UNITED STATES TRUSTEE'S WITNESS & EXHIBIT LIST
IN SUPPORT OF MOTION TO CONVERT OR DISMISS PURSUANT TO 11 U.S.C. § 1112**

The Acting United States Trustee ("UST") for Region 12, through the undersigned Trial Attorney, submits the following list of Witnesses and Exhibits to be introduced at the November 14, 2019 hearing on the UST's Motion to Convert or Dismiss:

**United States Trustee's Witnesses**

1. Charles McQuillen Thomsen, principal of the Debtor

2. Additional witnesses: The UST reserves the right to call any witness:

    a.  listed or called by any other party;

    b.  necessary for rebuttal to witness testimony or other evidence offered by any party;

    c.  necessary to refute or respond to unanticipated testimony or evidence offered by any party;

    d.  necessary to lay foundation for the authentication or admission of an exhibit; and,

    e.  necessary for impeachment.

**United States Trustee's Exhibits**

| EX. ID | EXHIBIT DESCRIPTION |
|---|---|
| **UST-A** | Debtor's Monthly Operating Report for April and May 2019 |
| **UST-B** | Debtor's Monthly Operating Report for June 2019 |
| **UST-C** | Debtor's Monthly Operating Report for July 2019 |
| **UST-D** | Debtor's Monthly Operating Report for August 2019 |
| **UST-E** | Debtor's Monthly Operating Report for September 2019 |

1

| **UST-F** | Floyd County Assessor Page – Outstanding Taxes |
| **UST-G** | Debtor's First Disclosure Statement and Plan |

Additional Exhibits - The UST reserves the right to file a Supplemental Exhibit list to incorporate any additional documents or exhibits received after the filing of this document or introduced by any other party. The UST further reserves the right to submit additional exhibits at the time of the hearing for purposes of challenging the credibility of any witness or exhibit offered by Debtor.

**James L. Snyder**
Acting United States Trustee
Region 12

By:/s/ L. Ashley Zubal
**L. Ashley Zubal**
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Ph: (515) 323-2269 / Fax: 284-4986
Ashley.Zubal@usdoj.gov

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 7th day of November 2019, a copy of the foregoing document was filed with the Clerk of Court for the United States Bankruptcy Court for the Northern District of Iowa using the CM/ECF system and served electronically on those participants that receive service through the CM/ECF System. The undersigned further certifies the foregoing document was sent to persons or representatives via electronic mail or U.S. Mail postage pre-paid as set forth below.

- **Larry S. Eide**    eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com
- **Laura Michelle Hyer**    lhyer@bradleyriley.com,
  dmoses@bradleyriley.com;Docket@bradleyriley.com
- **Donald H. Molstad**    judylaw308@yahoo.com
- **Judith O'Donohoe**    charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com
- **Joseph E. Schmall**    jschmall@bradleyriley.com, cclark@bradleyriley.com;docket@bradleyriley.com
- **Christine B. Skilton**    cbs.csslaw@butler-bremer.com
- **Bradley David Sloter**    brads@nsslaw.net
- **Charles McQuillen Thomson**    cthomson@doall.com
- **Brandon James Gray**    Brandon.gray@ag.iowa.gov
- **JD Haas**    jdhaas@jdhaas.com
- **United States Trustee**    USTPRegion12.CR.ECF@usdoj.gov

**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

/s/ Jennifer L. Cline
Paralegal Specialist

3

McQuillen.c388

<div style="text-align:center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

</div>

IN RE:

McQUILLEN PLACE COMPANY, LLC.,     CHAPTER 11
                                      BANKRUPTCY NO.  19-000507

          Debtor.                    DISMISSAL

---

COMES NOW the undersigned and hereby dismisses the Debtor's Chapter 11 bankruptcy.

/s/ Donald H. Molstad
Donald H. Molstad (3755)
Molstad Law Firm
701 Pierce St., Ste. 305
Sioux City, IA 51101
(712) 255-8036
ATTORNEY FOR DEBTOR

CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that true copies of the foregoing document were served upon on all parties as required by either electronic filing or by enclosing the same in an envelope addressed to each person at his respective address as disclosed by the pleadings of record herein, with first class postage fully paid and by depositing said envelope in the United States Post Office Depository in Sioux City, Iowa.

All those receiving the foregoing service are listed hereinafter with the address at which he or they were served and such service was made on the ___ day of November, 2019.

/s/ Donald H. Molstad
Donald H. Molstad (3755)

COPY TO:

Office of U.S. Trustee
U.S. Federal Courthouse
111 7th Ave. SE, Box 17
Cedar Rapids, IA 52401-2101

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Allen O. Pederson
c/o Pederson Plumbing
412 Sample Street
Nashua, IA 50658

Kelvin E. Keiffer, President
c/o Mills, Inc.
1906 Gilbert Street
Charles City, IA 60616

Tom Brock, President
c/o T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Judith O'Donohue
Elwood, O'Donohue, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Brandon J. Gray
Asst. Attorney General
Office of the Attorney General of Iowa
Revenue Division
1305 Walnut Street
Des Moines, IA 50319

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

CHAPTER 11

In Re:                                              Bankruptcy No.

McQuillen Place Company, LLC                        19–00507

Debtor(s)

## NOTICE SETTING TELEPHONIC HEARING
## ON DEBTOR'S NOTICE OF DISMISSAL (DOC. 91)

TO:
Charles McQuillen Thomson, Attorney for Debtor(s)

United States Trustee
JD Haas, Attorney for Debtor
Donald Molstad, Attorney for Debtor
Larry Eide, Attorney for Creditor
Joe Schmall, Attorney for Interested Party
Brandon Gray, Attorney for Iowa Economic Development
Bradley Sloter, Attorney for Interested Party
Christine Skilton, Attorney for Creditor
Laura Hyer, Attorney for Interested Party
Judith O'Donohue, Attorney for Creditor

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

### *November 13, 2019 at 11:30 AM*

**NOTE: PLEASE USE THE FOLLOWING INSTRUCTIONS FOR THE PHONE CONFERENCE**
1. Call the toll free number: 1–888–684–8852
2. Enter Participant Access Code: 7148063
3. Enter the Participant Security Code: 0507
4. After the security code is entered, you will be connected into the conference
5. Please identify yourself after you have joined the conference

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Danielle Cripe*

Date: November 13, 2019                     Deputy Clerk
                                            United States Bankruptcy Court
                                            Northern District of Iowa

111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | Case No. 19-00507 |
| | ) | Chapter 11 |
| McQUILLEN PLACE COMPANY, LLC, | ) | Hon. Thad J. Collins |
| | ) | |
| Debtor. | ) | **NOTICE OF APPEARANCE** |
| | ) | **AND REQUEST FOR SERVICE** |
| | ) | **OF NOTICES AND PLEADINGS** |
| | ) | |

The undersigned, Monica Clark, of the law firm of Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, Minnesota 55402, hereby enters an appearance on behalf of the City of Charles City, Iowa.

Pursuant to Bankruptcy Rules 2002(g) and 9010(b), the undersigned hereby requests that all notices given or required to be given in this case and all papers served or required to be served in this case be given and served upon the undersigned at the office address set forth below.

This Notice of Appearance and Request for Service of Notices and Pleadings shall not be deemed to be and is not a waiver of the rights of the City of Charles City, Iowa (i) to have final orders in non-core matters entered only after de novo review by the district court; (ii) to have trial by jury in any proceeding; or (iii) to have the district court withdraw the reference.

Date: _November 14, 2019_

/s/ Monica Clark
Monica Clark, AT0013338
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55402
Tel: (612) 340-2600; Fax: (612) 340-2643
Email: clark.monica@dorsey.com

**ATTORNEYS FOR THE CITY OF
CHARLES CITY, IOWA**

4846-2260-0365\1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 14, 2019, a true and correct copy of the foregoing document was served electronically on all persons who receive electronic notice through the Court's CM/ECF system.

<div align="center">/s/ Monica Clark _____</div>

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

STATEMENT OF EQUITY SECURITY HOLDERS
CONCERNING PROPOSAL TO CONVERT
CASE FROM CHAPTER 11 TO CHAPTER 7

NOW COME Charles M. Thomson and James Gray (the "Equity Security Holders"),
through their counsel, and as and for their "Statement of Equity Security Holders Concerning
Proposal to Convert Case from Chapter 11 to Chapter 7" (this "Statement"), respectfully state as
follows:

**Purpose of this Statement.**

1.      During the November, 14, 2019, telephonic hearing (the "November 14 Hearing"),
it became apparent to the Equity Security Holders that they possessed important information
concerning the details of the assets of the Debtor which should, in the interest of justice and fairness
to all parties (especially the unsecured creditors) be brought to the attention of the Court prior to
any ruling on whether to convert this case to a case under Chapter 7 of the Code.

2.      Some of this information concerns correcting points offered as "facts" by counsel
to First Security Bank & Trust Co. ("First Security Bank"), but which are incorrect, stated
deceptively or irrelevant to the analysis of the merits of Chapter 7 versus Chapter 11.  These points
of correction are contained in the "Request for Corrections and Amplifications of the Record from

1

the November 14, 2019 Hearing" (the "Request") proposed for filing simultaneously with this Statement.

3.      Other facts and data points -- those which are contained in this Statement -- were omitted from the November 14 Hearing entirely.  Most of these facts related to the nature of the assets of the Debtor, the potential for repayment to creditors of the Debtor, and the complexity of the Debtor's original financing arrangements and subsequent legal actions.  The Equity Security Holders believe that without this information, a grave injustice may be done to the unsecured creditors of the Debtor and, in the process, damage may be done to the public reputation of the bankruptcy system.

### Assets of the Debtor

4.      The Equity Security Holders believe that the Debtor's assets, upon its Chapter 11 filing and presently, can be summarized as falling into six categories:

        A.      Its interest in the McQuillen Place real estate development in Charles City ("McQuillen Place");

        B.      The Debtor's interest in a series of lender liability claims against First Security Bank, including a claim for equitable subordination;

        C.      The Debtor's claim against First Security Bank for accepting (without crediting to the Debtor's account) a $400,000 to $500,000 settlement from the original lead lender on the McQuillen financing;

        D.      The Debtor's interest in claims against three individual directors of First Security Bank for tortuous interference with contract and related causes of action;

        E.      The Debtor's interest in claims against the Iowa Economic Development Authority; and

        F.      The Debtor's interest in a retail dry cleaning operation.

5.      The Equity Security Holders believe (a) these assets have radically different values in a Chapter 11 case than they do in a Chapter 7 case, and (b) a decision to convert this case to Chapter 7 should take these differences into account, particularly since they imply radically different outcomes for the creditors of the estate.

**McQuillen Place's Asset Value and Reorganized Value.**

6.      In a Chapter 11 case, the Equity Security Holders believe the value of McQuillen Place as of the date of the Chapter 11 filing is somewhere between $500,000 and zero -- possibly negative.  This valuation is driven by a combination of the future rental value of the residential units when completed, the cost to complete the rental units, the costs to operate the building when completed, the real estate taxes imposed on the building, and the laws of algebra.  The Equity Security Holders believe the following are useful data points:

A.      McQuillen Place is currently configured for 33 residential units.

B.      The average unit rental rate had originally been estimated to be $850 per month, but (given the change to the building's reputation in the market and the recent loss of 513[1] jobs in the Charles City market) a rate of $750 per month is likely more prudent and appropriate.

C.      A rent roll of 33 units renting at $750 per month, with a 95% occupancy rate, will yield $282,150 in gross rent per year.

D.      The current estimates of the cost to complete the 33 units range from approximately $700,000 to $2.98 million.

E.      The 2018 real estate taxes are set at $216,862.

F.      The after-real-estate-tax rental income available to pay financing for acquiring the building, completing construction and operating the building would be $65,288 per year.

---

[1] Simply Essentials LLC, a chicken processor, recently closed its operations in Charles City, resulting in the loss of 513 jobs.  *See,*  https://wcfcourier.com/business/local/jobs-lost-with-closing-of-charles-city-processing-plant-in/article_d43417f4-0637-505c-bb61-c3e52e6c821d.html.

G.   The most that could be borrowed from a conventional lender on a real estate asset (assuming a lender could be found) on a 20-year note, with 80 percent debt-coverage ratio, at 5.25 percent interest with yearly payments equaling $65,288 (the available cash flow, per the preceding subparagraph) is $637,322.09, which assumes that the owner of the building not only does not take a profit, but is able to operate the asset (including purchasing insurance) at a cost of $0 per year.

H.   Thus, the building can be argued to be worth $0, or less than zero, since it cannot, under the present circumstances, generate enough revenue to fund the cost of completion.

7.      Notwithstanding these data points, the Equity Security Holders believe that McQuillen Place has significant value -- enough to not only pay for completion of the building, but to pay unsecured creditors in full -- if the asset is properly reorganized, if new debt or equity is provided by a third party, and if the Debtor renegotiates its Development Agreement with the City of Charles City (the "City") to address the real estate tax component of the building's operating expenses.

8.      The Equity Security Holders believe that during the several weeks preceding the November 14 Hearing, representatives of the Debtor met with representatives of the City to discuss possible amendments to the Development Agreement.  These were informal discussions and not binding on the City; the purpose of the discussions was to determine if a satisfactory revision to the Development was even possible, given the expectations and requirements of the parties.  The Equity Security Holders believe that an agreement acceptable to the City and to the Debtor can be reached and incorporated into a Plan of Reorganization.

9.      In addition, the Equity Security Holders believe that the Debtor has been working since July with an investor group ("Group 1") which is interested in providing funds sufficient to complete construction of McQuillen Place.  The Equity Security Holders believe that Group 1 is

4

amenable to the revisions to the Development Agreement which have been discussed informally with City. Before continuing with formal, binding agreements with the various parties, Group 1[2] is waiting for completion of a previously negotiated financing agreement involving unrelated assets. Group 1, incidentally, had approached First Security Bank concerning financing, but was informed that a loan involving McQuillen Place was impossible in the absence of settlement of the outstanding litigation between First Security Bank and McQuillen Place (and its various affiliates).[3]

### The Value of the Litigation.

10.    The Equity Security Holders believe that the "value" of the ongoing litigation referenced above in items B through E in Paragraph 4 is difficult to assign, but the aggregate damages are not: One of the defendants, or a combination of them, has caused not less than $7 million in damages to the Debtor[4]. Thus, in the event that one or more of the tortfeasors are held liable on any one of (in the aggregate) dozens of counts alleged in the various claims and counterclaims of the Debtor, the total recovery available to the estate[5] will very likely be in the range of $7 million.

---

[2] Group 1 consists of Monte and David Allan. They have provided a signed statement which is attached to this Statement as Exhibit A.

[3] The Equity Security Holders believe that the Debtor informed Group 1 that the litigation with First Security Bank and related parties was probably not likely to be settled easily. The Equity Security Holders believe that Group 1 and the Debtor agree that the goal should be to separate the completion of McQuillen Place from the ongoing litigation so that McQuillen Place can be placed into operation as soon as possible.

[4] The aggregate damages calculation (unlike many aspects of the *McQuillen* litigation) is fairly straightforward: The building when completed was to have a value (per appraisals) of more than $7.2 million, and the development currently has a value that ranges from $500,000 to, perhaps, a negative value (the cost of demolition).

[5] The Equity Security Holders believe that the current value of the dry-cleaning operation (which was acquired as a future tenant amenity for McQuillen Place) is *de minimis*.

**Realizing on the Assets of the Debtor for the Benefit of Creditors.**

11.      The Equity Security Holders believe that the Debtor's rights in these multi-million-dollar causes of action, combined with the Debtor's right to the value inherent in McQuillen Place *when completed* belong, in the first instance, to the unsecured creditors of the Debtor. The Equity Security Holders believe that these assets, if properly administered and reorganized, have a value far in excess of the amount of the claims of the unsecured creditors and may create the opportunity of that rarest of Chapter 11 events: payment in full to creditors with a possible remainder dividend.

12.      However, the Equity Security Holders believe that for the assets of the Debtor to be properly administered and reorganized (and, indeed, for any funds to be available to creditors of the Debtor), at least three conditions precedent must be fulfilled:

> **Condition Precedent No. 1.**: The Debtor must obtain financing adequate to complete McQuillen Place so that it can start generating rental income;
>
> and
>
> **Condition Precedent No. 2.**: The operating expenses of McQuillen Place (particularly, the treatment of real estate taxes under the Development Agreement) must be modified to justify and sustain the additional investment McQuillen Place requires;
>
> and
>
> **Condition Precedent No. 3.**: The Debtor and its related parties must find a mechanism to litigate successfully its various claims, especially those against First Security Bank & Trust Co. and related parties.

13.      The Equity Security Holders believe that the Debtor, at long last, is on the cusp[6] of fulfilling Condition Precedent No. 1.[7]

---

[6] The Equity Security Holders concede that the Debtor has been in similar positions in the past, but the Equity Security Holders also note that the Debtor has never been able to obtain a document similar to Exhibit A prior to the date of this Statement.

[7] In addition to Group 1, the Equity Security Holders believe that the Debtor has continued discussions with three investor groups from Chicago and one from New York. One of the Chicago groups ("Group 2"), to their credit,

6

14.    The Equity Security Holders believe that Condition Precedent No. 2 is obtainable once Condition Precedent No. 1 is fulfilled, and the City, the Debtor and the party providing the financing can negotiate binding agreements.

15.    The Equity Security Holders believe that the Debtor has largely fulfilled Condition Precedent No. 3 recently when it retained JD Haas & Associates, PLLC, of Minneapolis, to represent the Debtor in the ongoing actions against First Security Bank and several of its directors. Mr. Haas is a highly regarded, experienced litigator with sophistication in financial litigation in general and lender liability litigation in particular.  He is both aggressive and sufficiently removed geographically from small-town-Iowa legal practice to be disinterested financially and socially. Critically, he has agreed to undertake the litigation using a blended contingency/hourly rate, which represents both a belief in the soundness of the Debtor's legal position and an agreement by which litigation costs case be funded by the Equity Security Holders over the long-term.

**The Debtor's Strategy Prior to the November 14 Hearing.**

16.    At all times during the pendency of this Chapter 11 case, the Equity Security Holders believe that the Debtor has fully realized that a reorganization permitting completion of McQuillen Place would be extremely difficult in the absence of a binding commitment from an outside lender or investor.  Accordingly, when the two motions to convert or dismiss were filed, the Equity Security Holders believe that the Debtor (while believing most of the arguments asserted in the motions were either specious or easily refuted) elected to attempt to save this Court

---

continue to have active interest in investing in the Debtor notwithstanding the almost incomprehensibly unprofessional and abrupt reception they received from First Security Bank when they attempted on two separate occasions to orchestrate a "global settlement" between and among Group 2, the Debtor, the Equity Security Holders, and First Security Bank.  One participant in the truncated negotiation described the conduct of First Security Bank as "unlike anything [he] had ever seen from a bank in [his] career."

and all the litigants the time and expense of a hearing to establish a "fact" with which the Debtor

agreed, *i.e.*, no funding implies no building completion.

**Likely Treatment of the Litigation in Chapter 7.**

17.     During the November 14 Hearing, First Security Bank's counsel made a comment

about "buying" the pending litigation from the Chapter 7 trustee.   Although there was no

elaboration on this point, in light of the discussion of the value and attributes of the Debtor's rights

in the litigation, the Equity Security Holders note that it is appears highly unlikely that First

Security Bank would be willing to pay an amount approximating what the Equity Security Holders

view as the value of this litigation to the Debtor.

18.     Since every dollar not realized by the Debtor on the litigation is a dollar out of the

pockets of the unsecured creditors, this appears to the Equity Security Holders to be an urgent

issue which must be addressed if the Court is considering converting this case to Chapter 7.

19.     Counsel for First Security Bank also suggested some type of unspecified "carve

out" for the operation of a Chapter 7, but was not precise in how this would work.   However, the

Equity Security Holders note that, since part of the litigation involves a good faith effort by the

Debtor to equitably subordinate the liens of First Security Bank, such a "carve out" may, in fact,

end up being a "donation" of funds otherwise belonging to unsecured creditors and not First

Security Bank.   As parties in interest in the disposition of what may turn out to be property in

which First Security Bank's *once had* a security interest, the Equity Security Holders would be

inclined to object to any such carve out.   This objection would be based on both First Security

Bank's lack of authority over the collateral being "carved" and on the basis that the use of the

"carved out" asset violates the business judgment rule.   Specifically, any proposed Section 363

8

sale under a Chapter 7 case of the Debtor's assets would likely injure the interests of unsecured creditors, rather than advance them.

20.    The Equity Security Holders would similarly be inclined to object to the "sale" of the Debtor's claims against First Security Bank, its affiliates, or any defendant in any actions initiated or which may be initiated by the Debtor in the event that the "sale" amount were significantly discounted from the actual losses suffered by the Debtor. The Equity Security Holders believe there is no possible justification for the Debtor, a trustee, or the unsecured creditors to accept a fire sale price on valuable claims in litigation merely because First Security Bank has maneuvered a case into Chapter 7.

21.    The Equity Security Holders believe that the likely outcome, should a Chapter 7 trustee attempt to settle or "sell" the litigation claims of the Debtor at anything less than fair value, would be, in effect, two trials of the merits of the litigation.  The trustee, to justify any proposed sale or settlement, would be forced, through the objection process, to evaluate thoroughly and independently the claims in the litigation, then submit the results for approval or rejection by this Court.  In addition to incurring significant (and largely duplicative) legal fees, the trustee would face legal exposure if the trustee's recommendation or analysis of "sale" or settlement were found to be flawed, and the trustee would face further legal exposure for having needlessly alerted all the tortfeasor defendants in advance to the plaintiffs'[8] legal strategies.

---

[8] Although this Statement, in referring to "litigation," discusses almost exclusively the Debtor's interest in various causes of action, the Equity Security Holders believe this Court should be aware that there are other *McQuillen*-related claims pending against First Security Bank from non-Debtor parties.  These claims include, thus far, 16 counts filed by Amelia Management, LLC against First Security Bank in *First Security Bank v. McQuillen Place Co., LLC,* Case No. EQCV031170; 16 counts filed by Amelia Trust against First Security Bank in *First Security Bank v. McQuillen Place Co., LLC,* Case No. EQCV031170; 16 counts filed by Charles M. Thomson against First Security Bank in *First Security Bank v. McQuillen Place Co., LLC,* Case No. EQCV031170; 18 counts against First Security Bank filed by Amelia Management, LLC in *First Security Bank v. Amelia Management, LLC,* Case No. EQCV031407; 18 counts against First Security Bank filed by Charles M. Thomson in *First Security Bank v. Amelia Management, LLC,* Case No. EQCV031407; 18 counts against First Security Bank filed by Umbrella Realty, LLC in *First Security Bank v. Umbrella Realty, LLC,* Case No. EQCV031404; 18 counts against First Security Bank filed by Charles M. Thomson in *First Security Bank v. Umbrella Realty, LLC,* Case No. EQCV031404; 18 counts against First Security Bank filed

22.     The Equity Security Holders respectfully submit that the most likely outcome on the Debtor's claims in litigation from converting this case to Chapter 7 would be abandonment of the claims -- but only after a long and expensive period of analysis.  Since the claims of the Debtor would be renewed once abandoned, and since First Security Bank has previously stated that it would not facilitate disposition of McQuillen Place in the absence of settlement of the various claims against it, the "relatively quick" resumption of construction on McQuillen Place through conversion to a Chapter 7 appears to the Equity Security Holders to be Pyrrhic, especially as it pertains to the unsecured creditors.

**Recommendation of the Equity Security Holders.**

23.     In light of the foregoing, the Equity Security Holders believe that the best possible outcome for this case is dismissal, followed by negotiation, followed by a refiling with a funded Plan of Reorganization.  A conversion to Chapter 7 would serve no party's interest, with the possible exception of First Security Bank and its fellow tortfeasors.  Conversion to Chapter 7 would, in the view of the Equity Security Holders, likely serve only to delay resumption of construction on McQuillen Place, and might, under certain circumstances, lead to a situation where the building's negative cash flow, unintentionally made permanent by an unfortunate trip through Chapter 7, could result in demolition of a nearly complete structure.

24.     Finally, the Equity Security Holders would like to note that they find First Security Bank's newly discovered concern for the housing needs of Charles City to be highly disingenuous.

---

by Amelia Management, LLC in *First Security Bank v. Amelia Management, LLC*, Case No. EQCV031406; 18 counts against First Security Bank filed by Charles M. Thomson in *First Security Bank v. Amelia Management, LLC*, Case No. EQCV031406; 18 counts against First Security Bank filed by Amelia Management, LLC in *First Security Bank v. Amelia Management, LLC*, Case No. EQCV031405; and 18 counts against First Security Bank filed by Charles M. Thomson in *First Security Bank v. Amelia Management*, LLC, Case No. EQCV031405. In addition, the Equity Security Holders advise this Court that they have personal knowledge that each of the defendants in EQV031404 through EQV031407 plan to commence two-count complaints against three directors of First Security Bank, *i.e.*, Jon R. ("Dick") Herbrechtsmeyer, Kurt Herbrechtsmeyer, and Gene Hall.

10

If First Security Bank were so concerned with bringing McQuillen Place's 33 units into service, First Security Bank would have availed itself of any one of literally dozens of opportunities[9] to negotiate a reasonable settlement with the Debtor and its related parties. It has not. This latest maneuver by First Security Bank to convert this case to a likely disaster of a Chapter 7 case tends to confirm, if anything, that the true motive of the bank is exactly as alleged by the Debtor in

<center>[concluded on following page]</center>

---

[9] Here is a partial list of the instances when First Security Bank, given the opportunity to enable completion of McQuillen Place by settling the various disputes in good faith and on reasonable terms, opted instead for more delay and acrimony: (a) In August 2017, Gary Becker of Cedar Rapids Bank & Trust Co. suggested that a guarantor of the McQuillen financing be asked to contribute funds toward completion of building, and that for every dollar so contributed, the guaranty would be reduced. Subsequently, apparently because of an objection from First Security Bank, Mr. Becker (using the memorable phrase "My bad") said such an arrangement would be unacceptable; (b) In early 2018, the same guarantor offered to voluntarily contribute $900,000 cash to the project, on the condition that his limited $900,000 guaranty be discharged. This offer (which the Equity Security Holders believe to have been both sufficient to complete McQuillen Place and extremely favorable to the lender), was rejected angrily by a bank representative who also told the guarantor's representative to "shut up" during the meeting. (4) When, in October 2018, a Chicago investor offered, in writing, to accept (albeit conditionally) the First Security Bank's July 5, 2018, offer to sell the McQuillen Place note, First Security Bank dismissed both the offer and the offeror as unworthy of their consideration, refusing even to negotiate on the offer or inquire further as to whether a transaction was possible. (5) In January 2019, First Security Bank, under the guise of an offer to settle the litigation, "offered" to take back virtually all its collateral at a discount to fair value, abjuring only that collateral which the Debtor (in discovery) later learned the bank secretly deemed worthless. (6) In March 2019, when the Debtor attempted, in earnest, to negotiate a settlement with the primary banker at First Security Bank, bank's counsel invoked Iowa R. Prof. Cond. 32:4.2(a) (which had been previously waived) to preclude any further direct negotiation between the banker and a principal of the Debtor (an attorney). (7) On June 12, 2019, First Security Bank's counsel, when called by a principal of the Debtor to see if the report that the bank was interested in discussing settlement were true, disavowed any knowledge of such a statement. (8) On August 23, 2019, when a principal of the Debtor inquired (following a statement by First Security Bank that it would be prepared to file its own plan) about the possibility of a joint plan with the bank, the bank's counsel stated that the bank's plan would involve surrendering McQuillen Place to the bank.

<center>11</center>

*McQuillen Place Co., LLC v. Jon Richard ("Dick") Herbrechtsmeyer, et al.*, Adv. Proc. No. 19-09036:  Contrary to their obligations of good faith and fair dealing toward the Debtor under the various financing contracts, the directors of  First Security Bank want to displace the Debtor's management, seize the Debtor's real estate for next to nothing, and convert to themselves the Debtor's development rights; their motive is not to honor their contracts or even to complete the project expeditiously, but to reap some sort of "public relations windfall" that enables them to parade around Charles City posing as the "heroes" who finished the big local project.  (*See*, comments of Gene Hall and Kurt Herbrechtsmeyer, defendants in Adv. Proc. No. 19-09036, at Board of Directors' Meeting March 8, 2018, *quoted in* Adversary Proceeding Complaint at 5, ¶17).

Respectfully submitted,

All of the Equity Security Holders of the Debtor

 /s/ Charles Thomson
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

12

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa | ) | Case No. 19-00507 |
| limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| Address: | ) | |
| 1110 North Grand Ave., #300 | ) | |
| Charles City, Iowa 50616 | ) | |
| | ) | |

STATEMENT OF MONTE ALLAN ON
BEHALF OF MONTE ALLAN AND DAVID ALLAN

1.      My name is Monte Allan.  I am making this statement on my own behalf and on

behalf of my brother, David Allan.

2.      Since July 2019, my brother and I have been examining the possibility of acquiring

and completing the development in Charles City known as "McQuillen Place."

3.      We have inspected the building thoroughly, and have engaged in extensive

negotiations with representatives of McQuillen Place.

4.      We have previously been involved in a variety of successful businesses, including

manufacturing and construction.

5.      We have the financial ability to purchase McQuillen Place and complete

construction of the building.

6.      While our original plan was to use First Security Bank & Trust Co. of Charles City

to provide financing to acquire and finish McQuillen Place, our discussions with personnel from

First Security Bank led us to believe that such a financing could only occur if all of the litigation

between McQuillen Place (and its affiliates) and First Security Bank (and its affiliates) were settled

1

first.  Since the litigation does not look to us like it will be settled anytime soon, and since we want to get construction started on completing the building as soon as possible, we are going to look to other financing resources to complete the McQuillen transaction.

7.      We are waiting on another financing transaction, which has been in process for many months, to close before we negotiate the final, binding agreements on McQuillen Place.

8.      We believe this other transaction will close in the next several weeks.

9.      We do not support the idea of converting this case to a liquidation under Chapter 7.

10.      We would prefer that the existing case be dismissed, then we will work with the personnel from McQuillen Place to finalize a transaction. When the details have been finalized, we will work with McQuillen Place on refiling a Chapter 11 case, if necessary, to resolve outstanding issues.

11.      Charles Thomson from McQuillen Place has requested this statement and prepared it for me.  However, the statements in this document are true and correct, and reflect my opinions and those of my brother in this matter.

Monte Allan

2

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

In re                                          )
                                               )
MCQUILLEN PLACE COMPANY, LLC, an               )          Case No. 19-00507
Iowa limited liability company,                )          Chapter 11
                                               )
          Debtor.                              )          Hon. Thad J. Collins
                                               )
Address:                                       )
1110 North Grand Ave., #300                    )
Charles City, Iowa 50616                       )
                                               )

REQUEST FOR CORRECTIONS AND AMPLIFICATIONS
OF THE RECORD FROM THE NOVEMBER 14, 2019 HEARING

NOW COME Charles M. Thomson and James Gray (the "Equity Security Holders"),
through their counsel, and as and for their "Request for Corrections and Amplifications of the
Record from the November 14, 2019 Hearing" (this "Request"), respectfully state as follows:

**Purpose of this Request.**

1.        During the November, 14, 2019, telephonic hearing (the "November 14, Hearing"),
it became apparent to the Equity Security Holders that they possessed important information
concerning the details of the assets of the Debtor which should, in the interest of justice and fairness
to all parties (especially the unsecured creditors) be brought to the attention of the Court prior to
any ruling on whether to convert this case to a case under Chapter 7 of the Code.

2.        Some of this information concerns correcting points offered as "facts" by counsel
to First Security Bank, but which are incorrect, stated deceptively or irrelevant to the analysis of
the merits of Chapter 7 versus Chapter 11.  These points of correction are contained in this Request.

3.        Other facts and data points were omitted from the November 14 Hearing entirely.
Most of these facts related to the nature of the assets of the Debtor, the potential for repayment to

1

creditors of the Debtor, and the complexity of the Debtor's original financing arrangements and subsequent legal actions. This information is set forth in the "Statement of Equity Security Holders Concerning Proposal to Convert Case from Chapter 11 to Chapter 7" (the "Statement") proposed for filing simultaneously with this document. The Equity Security Holders believe that without this information, a grave injustice may be done to the unsecured creditors of the Debtor and, in the process, damage may be done to the public reputation of the bankruptcy system.

### Specific Requests for Correction or Amplification

**1.      Assertion of "fact" by counsel for First Security Bank:**

Construction began in 2014.

**Requested Correction or Amplification:**

A ground breaking was held in 2014. Actual construction began in earnest in 2015.

**2.      Assertion of "fact" by counsel for First Security Bank:**

The shortfall in government assistance was from the refusal of the IEDA to disburse $1 million in funds from the forgivable loan.

**Requested Correction or Amplification:**

The shortfall was from the refusal of the IEDA to provide tax credits under the Enterprise Zone program. The tax credits had a gross value of approximate $700,000. The Debtor had planned to sell the credits on the secondary market, which would have yielded net funds of approximately $560,000.

**3.      Assertion of "fact" by counsel for First Security Bank:**

The refusal of the IEDA to provide the subsidy in question resulted from the Debtor's failure to sign a contract with the IEDA concerning the subsidy in question.

**Requested Correction or Amplification:**

2

The articulated rationale of the IEDA for refusing to provide the previously promised subsidy was the passage of more than two years from the date of the award to substantial completion of the development.   The subsidy was awarded in 2013 through an award letter that referenced a "contract" that would be sent by the IEDA after the award letter.   The contract was not sent by the IEDA until many years later -- specifically, in 2017, when the Debtor inquired about obtaining the credits.   The contract contained the two-year provision.   Since construction did not begin in earnest until 2015, the two-year deadline in the contract expired during the early stages of construction.

**4.       Assertion of "fact" by counsel for First Security Bank:**

The foreclosure action on McQuillen Place was filed after the July 2018 mediation.

**Requested Correction or Amplification:**

The foreclosure action was filed in March 2018, prior to the July 2018 mediation.

**5.       Assertion of "fact" by counsel for First Security Bank:**

As a result of the July 2018 mediation, First Security Bank proposed a sale of the McQuillen loan with an October 2018 deadline, with which the Debtor did not comply.

**Requested Correction or Amplification:**

A third-party investment group from Chicago attempted to accept (conditionally) the First Security Bank offer in writing prior to the deadline.   First Security Bank refused to engage in discussions with the Chicago group, and dismissed them as unworthy of First Security Bank's attention.

**6.       Assertion of "fact" by counsel for First Security Bank:**

The Debtor failed to timely pay the most recent installment of the insurance premium on McQuillen Place, paying the installment on October 31 after the cancellation deadline had passed.

**Requested Correction or Amplification:**

Charles Thomson, a principal of the Debtor, paid the installment prior to the deadline on October 29, 2019, at "4:47:47 PM" and received confirmation no. 613507500. See Exhibit A. Coverage never lapsed.

**7.     Assertion of "fact" by counsel for First Security Bank:**

The Debtor's Plan of Reorganization references "MPC2, LLC" as the successor entity to the Debtor. MPC2, LLC does not exist, but "MPC2 Development, LLC" does exist and was created by Charles M. Thomson, a principal of the Debtor.

**Requested Correction or Amplification:**

The reference to "MPC2, LLC" in the Plan was a simple typographical error. It should have been "MPC2 Development, LLC." Charles M. Thomson created the entity because someone had to do so. It was not created with some nefarious purpose or dark motive. (The Debtor clearly stated in the Plan, in Exhibit B, that any equity ownership by existing equity security holders in the new entity would have to be pursuant to the contribution of new value.) In addition, the typographical error and the name of the successor entity have nothing whatsoever to do with whether the case should be converted to Chapter 7 or should be dismissed.

**8.     Assertion of "fact" by counsel for First Security Bank:**

First Security Bank will obtain title to McQuillen Place following conclusion of the foreclosure litigation and the passage of the redemption period.

**Requested Correction or Amplification:**

This assumes that First Security Bank will prevail on its foreclosure claim, that the Debtor will not prevail on any of the 16 counterclaims presently pending against First Security Bank in the foreclosure action, that the Debtor will not prevail on any of additional causes of action filed

4

against First Security Bank, and that the Debtor does not prevail on its Complaint for Equitable

Subordination against First Security Bank.

**9.      Assertion of "fact" by counsel for First Security Bank:**

First Security Bank will agree to a "carve out" from its collateral to permit a sale under 11 U.S.C.

§363.

**Requested Correction or Amplification:**

The Debtor disputes the validity, priority and extent of the lien of First Security Bank.  In addition,

a "carve-out" from First Security Bank's alleged collateral does not provide actual funds to a

trustee.  Only a successful sale would provide such funds.  The Debtor disputes whether a

successful sale under 11 U.S.C. §363 can occur if this case is converted to a case under Chapter 7.

**10.      Assertion of "fact" by counsel for First Security Bank:**

The Debtor is delinquent on more than $300,000 in real estate tax payments.

**Requested Correction or Amplification:**

The tax bills referenced by First Security Bank were never intended to be paid finally and in full.

They were intended to be part of a Tax Increment Financing ("TIF") transaction pursuant to which

the Debtor was to pay the stated amount of the real estate taxes then receive most of the funds back

as a rebate.  The rebate was to be used to finance the outstanding indebtedness of the Debtor from

the construction.  The Debtor was prevented from completing the apartment prior to the tax bills

coming due, so the Debtor was unable to use rents as anticipated to satisfy the tax obligations.  The

delay in completing the apartments was due, in no small measure, to the refusal of First Security

Bank to accept the proposed contribution of $900,000 from a guarantor of the building's debt to

finish construction.  Thus, in complaining about delinquent tax payments, First Security Bank is

complaining about a delinquency it caused.  The refusal of First Security Bank to accept the

$900,000 contribution is argued by the Debtor in the District Court litigation to have been in bad faith.

**11.    Assertion of "fact" by counsel for First Security Bank:**

First Security Bank paid taxes before the building was "sold at tax sale."

**Requested Correction or Amplification:**

This action by First Security Bank is also the subject of litigation.  Under Iowa law, the "sale" of real estate at tax sale is subject to redemption and, arguably, more fairly characterized as a "sale" of the right to collect taxes.  In any event, First Security Bank did not pay the tax payment "under protest" and did not consult the Debtor before issuing the payment.  The payment amount is based on an unreasonable assessment level (for a completed building, rather than for the actual building value as an uncompleted structure during the applicable tax period).  Finally, under Iowa Code §445.60, there was a colorable cause of action to seek return of erroneously paid taxes.  The bank permitted the statute to run on this claim, even though a principal of the Debtor, prior to the deadline, alerted the bank's counsel to the statute.

Respectfully submitted,

All of the Equity Security Holders of the Debtor

 /s/ Charles Thomson
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

6

# Exhibit A

**Thomson, Charles**

| | |
|---|---|
| **From:** | cinfin@paymentus.com |
| **Sent:** | Tuesday, October 29, 2019 3:48 PM |
| **To:** | Thomson, Charles |
| **Subject:** | The Cincinnati Insurance Companies Online Payment Confirmation |

Please do not reply to this email, as we are not able to respond to messages sent to this address.

Dear Policyholder,

We are pleased to confirm your payment with Cincinnati Insurance Companies. Below is a summary of your payment transaction.

Payments receiving a confirmation number before 3:00 pm Eastern Time are applied the same business day. Payments confirmed after 3:00 pm Eastern Time are applied the next business day. Next business day is defined as Monday - Friday except bank holidays.

Payments received and processed after the due date may be subject to a late fee.

If you have any questions on this payment, please contact Policyholder Services at 888-242-0888.

Thank you for your continued relationship with Cincinnati Insurance Companies.

| | |
|---|---|
| Confirmation Number: | **613507500** |
| Payment Date: | **Oct 29, 2019, 4:47:47 PM** |
| Payment Amount: | **$3,732.00** |
| | |
| Payment Status: | **ACCEPTED** |

**Contact Information**

| | |
|---|---|
| Billing Address Zip/Postal Code | **50616** |
| Account holder email: | **cthomson@doall.com** |

**Account Information**

| | |
|---|---|
| Policy type: | **Business** |
| Account number | **1000370525** |
| Payment method: | **Credit Card** |
| Date due: | **Oct 12, 2019** |

**Payment Method Information**

| | |
|---|---|
| Card Type: | **Discover** |
| Card Number: | **\*\*\*\*\*\*\*\*\*\*\*\*5778** |
| Card Holder Name: | **Charles M Thomson** |

1

# Exhibit A

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC,

Debtor(s).

CHAPTER 11
CASE NO. 19-00507M

**MOTION TO STRIKE
DECLARATIONS BY CHARLES
THOMSON (DOC. NOS. 97 AND
98)**

———————

COMES NOW, First Security Bank & Trust Company (hereinafter called "First Security Bank"), through its undersigned counsel, and moves to strike the Declarations filed by Charles Thomson as Doc. Nos. 97 and 98), and in support thereof state:

1.    The Debtor is represented by Donald Molstad.

2.    The Debtor requested the hearing on the Motion to Convert or Dismiss be held telephonically, and the undersigned agreed to such hearing after conversing with the attorney for the Debtor who agreed that both parties would be provided with "leeway" in the arguments to be presented telephonically.

3.    Charles Thomson is an Iowa licensed lawyer and is presumed to be a member of the bar of this Court.

4.    Charles Thomson has not applied for and has not been approved as counsel for the Debtor in this case.

5.    At the conclusion of the arguments on the Motion, the undersigned and Mr. Molstad both declined to file briefs in this matter.

6.    The Declarations by Mr. Thomson are efforts to expand the record that was presented and closed in the telephonic hearing, and/or to brief the matter on which the Debtor previously declined to brief.

7.      The Declarations should be stricken from the docket in this case.

WHEREFORE, First Security Bank & Trust Company respectfully requests the Court

strike the Declarations filed by Charles Thomson as Doc. Nos. 97 and 98, and grant such

other and further relief as is just and equitable.

/s/ Larry S. Eide
Larry S. Eide (AT0002317)
PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA  50402-1588
Telephone: (641) 423-4264
Facsimile: (641) 423-3145
Email: eide@pappajohnlaw.com

CERTIFICATE OF SERVICE

The undersigned, Larry S. Eide, certifies that on November 19, 2019, he served a copy of the foregoing document on the United States Trustee, Debtor(s), attorney for Debtor(s) and other parties having requested notice pursuant to Rule 2002 electronically on all parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing, and by ordinary United States mail, postage prepaid, addressed as follows on all other parties:

James L. Snyder
Acting United States Trustee
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2101

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Room 793
Des Moines, IA 50309-2108

Donald H. Molstad
Molstad Law Firm
701 Pierce Street, Suite 305
Sioux City, IA 51101

Charles M. Thomson

Law Offices of Charles M. Thomson
1110 N. Grand Ave, Suite 300
Charles City, IA 50616

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
PO Box 307
Charles City, IA 50616-0307

Brad Sloter
Noah Smith & Schuknecht PLC
200 North Johnson Street
Charles City, IA 50616

Allen O. Pederson
Pederson Plumbing
412 Sample Street
Nashua, IA 50658

- 2 -

Kevin E. Keiffer
Mills, Inc.
1906 Gilbert Street
Charles City, IA 50616

Tom Brock, President
T-J Service, Inc.
221 N. Main Street
Charles City, IA 50616

Christine B. Skilton
Cronin, Skilton & Skilton, P.L.L.C.
PO Box 39
Nashua, IA 50658-0039

Joseph E. Schmall
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

Laura M. Hyer
Bradley & Riley PC
PO Box 2804
Cedar Rapids, IA 52406-2804

Brandon J. Gray
Assistant Attorney General
Office of the Attorney General
Revenue Division
1305 Walnut Street
Des Moines, IA 50319


 /s/ Larry S. Eide
Larry S. Eide (AT0002317)

- 3 -

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| | CHAPTER 11 |
| In Re: | Bankruptcy No. |
| | |
| McQuillen Place Company, LLC | 19–00507 |
| | |
| Debtor(s) | |

## NOTICE SETTING TELEPHONIC HEARING
## ON MOTION TO STRIKE DECLARATIONS (DOC. 99)

TO:
Charles McQuillen Thomson, Attorney for Debtor(s)

United States Trustee

JD Haas, Attorney for Debtor
Donald Molstad, Attorney for Debtor
Larry Eide, Attorney for Creditor
Joe Schmall, Attorney for Interested Party
Brandon Gray, Attorney for Iowa Economic Development
Bradley Sloter, Attorney for Interested Party
Christine Skilton, Attorney for Creditor
Laura Hyer, Attorney for Interested Party
Judith O'Donohue, Attorney for Creditor

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

*November 20, 2019 at 11:00 AM*

**NOTE: PLEASE USE THE FOLLOWING INSTRUCTIONS FOR THE PHONE CONFERENCE**
1. Call the toll free number: 18886848852
2. Enter Participant Access Code: 7148063
3. Enter the Participant Security Code: 0507
4. After the security code is entered, you will be connected into the conference
5. Please identify yourself after you have joined the conference

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Danielle Cripe*

Date: November 19, 2019

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15

Cedar Rapids, IA 52401–2101

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

RESISTANCE OF EQUITY SECURITY HOLDERS
TO MOTION TO STRIKE

NOW COME Charles M. Thomson and James Gray (the "Equity Security Holders"),
through their counsel, and as and for their "Resistance of Equity Security Holders to Motion to
Strike" (this "Resistance") respectfully state as follows:

1.      On November 19, 2019, First Security Bank & Trust Company ("First Security
Bank") moved to strike two documents, the "Request for Corrections and Amplifications of the
Record from the November 14, 2019 Hearing" (the "Request") and the "Statement of Equity
Security Holders Concerning Proposal to Convert Case from Chapter 11 to Chapter 7" (the
"Statement") filed on November 18, 2019.

2.      First Security Bank appears to advance two theories on why the Request and the
Statement should be stricken.

3.      First, the bank notes, correctly, that Charles M. Thomson, one of the Equity
Security Holders, is an attorney but does not represent the Debtor before this Court.  This assertion
is not remarkable in the least:  Both the Request and the Statement very clearly state they were
filed on behalf of the Equity Security Holders.

1

4.      In addition, First Security Bank does not seem to question (nor can they, under applicable law) whether the Equity Security Holders are "parties in interest" under 11 U.S.C. §1109(b)[1] and as such have a right to be heard.

5.      First Security Bank also notes, correctly, that Mr. Don Molstad represents the Debtor in this case and did not file the Request or the Statement.  Since the Request and Statement were not filed on behalf of the Debtor, this strikes the Equity Security Holders as normal, correct and unremarkable.

6.      This, such as it is, appears to be the bank's first argument on why the Request and the Statement should be stricken.

7.      The Equity Security Holders view this as more a *non-sequitur* than an argument. The Equity Security Holders are at a loss to understand the argument that, because they are Equity Security Holders and represented by an attorney who is also an Equity Security Holder, they should somehow be denied a right _expressly_ granted them under the Bankruptcy Code (and very likely under Article III itself).  *Accord*, *see generally* In re Citizens Loan & Thrift Co., 7 B.R. 88, 91, 3 Collier Bankr.Cas.2d 132, 6 Bankr.Ct.Dec. 1199 (Bankr. N.D. Ia. 1988), and *AI International Holdings (BVI) Ltd. v. MUFG Union Bank, N.A* (*In re Weinstein Company Holdings, LLC*) 595 B.R. 455, 464-466 (Bankr. Del. 2018).

8.      Second, the bank argues that (a) the Equity Security Holders were on the telephone call when the Court inquired about further briefing, (b) the Equity Security Holders did not at that time state a desire to submit additional materials, (c) the Court's inquiry functioned as "speak-now-or-forever-hold-your-peace" bar date for all litigants on the topics discussed, and (d) the

---

[1] The applicable section reads "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, **_an equity security holder_**, or any indenture trustee, may raise and appear and be heard on any issue in a case under this chapter." 11 U.S.C. §1109(b)(emphasis supplied).

Equity Security Holders should accordingly be barred from filing the Request and the Statement because of the bar date imposed by the Court.

9.      The Equity Security Holders admit, of course, that they were on the telephone call and heard the Court's inquiry.  However, their interpretation of the nature of the Court's inquiry was very different from the interpretation advanced by First Security Bank.

10.      The Equity Security Holders took the Court's inquiry to be in the nature of a scheduling question, *i.e.*, in effect: "Should the Court be expecting further filings on this matter -- and thereby wait until everything has arrived before assessing the merits of the question -- or should the Court consider everything submitted, and feel free to start preparing and order or opinion without fear that a new set of filings might imply massive revisions?"

11.      The Equity Security Holders apologize to the Court if they misunderstood the inquiry.  Further, the Equity Security Holders now see that, given the ambiguity now evident in the fact that First Security Bank has one view of the discussion, and the Equity Security Holders another, the Equity Security Holders should have made further inquiry of the Court on the topic. The Equity Security Holders apologize for this oversight.

12.      In the event that the Court did indeed intend the end-of-hearing colloquy to operate as the establishment of a "bar date" to further submissions, the Equity Security Holders, if informed this was in fact the case, will prepare and file with the Court a motion to amend the November 14 order to permit the filing of the Request and the Statement.  The Equity Security Holders believe such motion and amendment are permitted under Fed. R. Civ. P. 52(b), 59, or 60, and Fed. R. Bankr. P. 7052, 9023, and 9024.  In addition, the Equity Security Holders believe that, given the contents of the Request and the Statement, the Court has authority to amend the November 14 order under 11 U.S.C. §105(a).

13.     In the Request and the Statement, the Equity Security Holders attempted to inform the Court and all parties in interest in the case of important facts and circumstances which were either not evident from or described in the statements of First Security Bank's counsel during the November 14 hearing.

14.     With due respect to First Security Bank and its counsel, and while simultaneously disclaiming any pretenses to omniscience on any level, it was evident from the presentation of First Security Bank at the November 14 hearing that there are aspects of the McQuillen Place financing which were not (to be polite) fresh in recollection of the bank's counsel.  This was particularly true for the details of the tax increment financing agreements and their implication for the value of real estate in Chapter 7, Chapter 11 and outside of chapter altogether.  The Equity Security Holders believe these financing details are critically important to all creditors of the estate.

15.     Finally, the Equity Security Holders note that First Security Bank has not objected to the content of the Request or Statement as being untrue or misleading.  The Equity Security Holders hope reflects First Security Bank's acceptance of the accuracy of the statements in both documents.  If, however, First Security Bank has any objection to the matter asserted in the documents, the Equity Security Holders would both welcome the bank's filing a responsive statement and support the statement's inclusion in the record.  If some point or part of the Request or Statement is inaccurate or misleading (although the Equity Security Holders are not presently aware of any such passage), the Equity Security Holders welcome the criticism of their adversary and the opportunity to either correct an inadvertent mis-statement or allow this Court to weigh the merits of the disputed points.

16.     The Equity Security Holders believe the interests of the creditors, the estate and the bankruptcy process itself are best served if more, rather than less, information is available to the Court during its deliberative process.

Respectfully submitted,

All of the Equity Security Holders of the Debtor

 /s/ Charles Thomson
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

5

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### PROCEEDING MEMO AND ORDER

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | Bankruptcy No. 19-00507 |
| Debtor. | ) | |

Date of Hearing:  November 20, 2019

APPEARANCES:

For Debtor: Donald Molstad
For Parties-In-Interest: Charles Thomson and James Gray as Equity Security Holders; Larry Eide for
    for First Security Bank & Trust; Brandon Gray for Iowa Economic Development Authority;
    and Joseph Schmall for Cedar Rapids Bank & Trust
U.S. Trustee:  Ashley Zubal

NATURE OF PROCEEDING:      _____In Court   _X_Telephonic

1. Declaration re: Statement of Equity Security Holders Concerning Proposal to Convert Case from
   Chapter 11 to Chapter 7
2. Declaration re: Request for Corrections and Amplifications of the Record from the November 14,
   2019 Hearing

IT IS ORDERED THAT:

As stated on the record, the Court will consider the Declarations above for ruling on the Notice of
Dismissal or Conversion.   The Court will issue the ruling 15 days from the date the Declarations were
filed.

Dated and Entered _____
                November 20, 2019

_____
Thad J. Collins, Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

IN RE:                                    )
                                          )   Chapter 11
MCQUILLEN PLACE COMPANY, LLC,   )
                                          )   Bankruptcy No. 19-00507
        Debtor.                           )

Date of Hearing:   November 20, 2019

APPEARANCES:

For Debtor: Donald Molstad
For Parties-In-Interest: Charles Thomson and James Gray as Equity Security Holders; Larry Eide for
        for First Security Bank & Trust; Brandon Gray for Iowa Economic Development Authority;
        and Joseph Schmall for Cedar Rapids Bank & Trust
U.S. Trustee:   Ashley Zubal

NATURE OF PROCEEDING:        ____In Court    _X_Telephonic

Motion to Strike Declarations by Charles Thomson

IT IS ORDERED THAT:

First Security Bank & Trust Company's Motion to Strike Declarations is DENIED.

Dated and Entered    November 20, 2019

_____
Thad J. Collins, Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|                                  |                    |
|----------------------------------|--------------------|
|                                  | CHAPTER 11         |
| In Re:                           | Bankruptcy No.     |
|                                  |                    |
| McQuillen Place Company, LLC     | 19–00507           |
|                                  |                    |
| Debtor(s)                        |                    |

## NOTICE Hearing for Ruling on
## Motion to Dismiss or Convert

TO:

Charles McQuillen Thomson, Attorney for Debtor(s)                    847–456–1911

United States Trustee

Donald Molstad, Attorney for Debtor
Monica Clark, Attorney for City of Charles City, Iowa
Larry Eide, Attorney for First Security Bank & Trust Company
Joseph Schmall, Attorney for Cedar Rapids Bank & Trust Company
J D Haas, Attorney for Debtor
L. Ashley Zubal, U.S. Trustee

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

**December 6, 2019 at**
**11:30 AM**

*IS TO INITIATE THE TELEPHONE CALL.* Parties should be ready and available to accept said call. The telephone number for Chambers is 319–286–2230.

**NOTE: PLEASE USE THE FOLLOWING INSTRUCTIONS FOR THE PHONE CONFERENCE**
1. Call the toll free number: 18886848852
2. Enter Participant Access Code: 7148063
3. Enter the Participant Security Code: 0507
4. After the security code is entered, you will be connected into the conference
5. Please identify yourself after you have joined the conference

*NOTE:* THIS HEARING WILL BE DIGITALLY RECORDED.

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Gail Jones*

Date: December 5, 2019

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:                                      )
                                            )   Chapter 11
MCQUILLEN PLACE COMPANY, LLC,               )
                                            )   Bankruptcy No. 19-00507M
        Debtor.                             )

## MEMORANDUM AND ORDER

The Motion to Convert came on for telephonic hearings on November 14,
and 21, 2019. Days before the first hearing, Debtor filed a Motion to Dismiss the
Chapter 11 case. Don Molstad appeared for the Debtor, McQuillen Place
Company, LLC ("Debtor"). Charles Thomsen appeared as principal of the Debtor.
Larry Eide appeared for Creditor, First Security and Trust Company ("First
Security). Joseph Schmall appeared for interested party, CRBT and Trust
Company ("CRBT"). Brandon Gray appeared for the Iowa Economic
Development Authority ("IEDA"). Ashley Zubal appeared for the United States
Trustee ("US Trustee"). First Security originally filed the Motion to Dismiss or
Convert and now requests the Court to convert the case from Chapter 11 to
Chapter 7. The IEDA and CRBT join First Security in asking the Court to Convert
the case to Chapter 7. The US Trustee takes no stance as to the Motion to Dismiss
or the Motion to Convert. Monica Clark appeared for interested party, the City of
Charles City, and also takes no stance on the motions. This is a core proceeding
under 28 U.S.C. § 157(b)(2)(A).

## STATEMENT OF THE CASE

First Security, Iowa Economic Development Authority, and CRBT argue there is continuing loss and diminution to the estate and an absence of a reasonable likelihood of rehabilitation under 11 U.S.C. § 1112(b)(1). They also argue other equitable considerations warrant conversion including an unreasonable delay prejudicial to creditors under 11 U.S.C. § 1112(b)(3). They believe dismissing the case would be detrimental to all parties involved. Debtor urges the Court to dismiss the case to allow for a foreclosure sale. The US Trustee and City of Charles City are neutral parties and do not have a preference as to conversion versus dismissal. After carefully considering this case, the Court concludes it should be converted from Chapter 11 to Chapter 7.

## BACKGROUND AND FINDINGS OF FACT

Debtor, McQuillen Place Company, LLC, filed a Chapter 11 petition on April 25, 2019. The Debtor's primary asset is real property in Floyd County, Iowa, locally known as 123 N. Main Street, Charles City, Floyd County, Iowa. The property is known as McQuillen Place Condominiums, or Condominium Unit A and Condominium Unit B of McQuillen Place Condominiums ("Property"). Charles Thomsen, Debtor's principal, states the property is intended to be for commercial and residential use. The owners of McQuillen Place Company, LLC are Mr. Thomsen (60%) and James Gray (40%).

2

When discussions on the project started in 2013-2014, Thomsen sought a loan from First Security; however, the bank declined due to his inexperience with the type of project.  He then sought other financing through other lenders throughout the United States and chose CRBT.  CRBT learned that First Security had an interest in the project succeeding, for various reasons including it being beneficial for their city.  CRBT asked First Security if it would participate in the loan.  First Security agreed to participate, and CRBT was the "lead bank"— meaning it was the actual mortgage holder.  CRBT made the loan, reported the mortgage and made all the advances on the loan.

First Security eventually grew concerned with the progress of the construction and sought more control.  CRBT agreed to assign the loan to First Security.  In July 2018, after First Security took over the loan, it held a mediation with Debtor.  They reached an agreement on a new payment plan for the first mortgage.

First Security is now the holder of a claim against Debtor which is secured by a Construction Mortgage and a Promissory Note dated December 31, 2014.  First Security filed a proof of claim in this bankruptcy case for $4,030,746.28.  The promissory note is delinquent and accrues interest at 11.75 % per annum.  The Promissory Note and Mortgage had been filed at the Office of the Recorder in Floyd County, Iowa, on January 5, 2015.

3

In 2014, a groundbreaking was held for the building, but construction did not start until 2015.  Construction eventually came to a halt in July 2017 with the project at 90 percent completion.  First Security has noted many construction delays before the stoppage.  It will take around 90 more days to finish the project.

Before bankruptcy, the mortgage payments fell behind, and First Security filed a mortgage foreclosure action filed in the Iowa District Court for Floyd County in March 2018. (Case No. EQCV031170).   Several other parties were joined as defendants to the mortgage foreclosure largely based on guarantees under the Note.  In the mortgage foreclosure action, Debtor has filed numerous counterclaims.  Many of these claims are against First Security and CRBT.  The property has not been touched since the April 2019 bankruptcy filing.  First Security has notified Debtor of the structural damage to the property and its continued deterioration.

On its Schedules, Debtor listed the Property as has a value of $500,000, and the secured debt owed to primary creditor, First Security & Trust Company in excess of $6.8 million.  First Security and the US Trustee assert Debtor has no equity in the property.  The Property is listed as a duplex housing 33 units; however, the Property remains under construction and remains unfinished and unoccupied.  The intent is to have the second and third floors of the property house apartments with commercial real estate on the first floor.

4

Debtor now argues the project was not completed for several different reasons. Debtor blames IEDA's refusal to provide tax credits it promised under the Enterprise Zone Program. The tax credits had a gross value around $700,000. Debtor had planned to sell the tax credits and believed they will yield net funds of $560,000. Debtor also blames First Security for this loss. Meanwhile, First Security argues Debtor did not correctly sign its contract with the IEDA and did not finish the project in the required two-year time frame. Debtor's administrative appeal to the IEDA was unsuccessful. Debtor eventually sued the IEDA in Floyd County, Iowa.

According to the US Trustee and First Security, during the meeting of the creditors in this case, Thomsen acknowledged the only way to have a successful plan of reorganization would be to find a party to secure financing to complete construction. Thomsen insisted a third-party financer was interested, and the money would be secured in a two-week time frame. Months passed and Debtor sought multiple extensions of the exclusivity period. However, the financing was never secured.

First Security points out that in June 2018, it had to advance payment of the real estate taxes that had accrued a penalty of $236,446 in order to prevent a tax sale. First Security claims the real estate taxes against the Property became delinquent and were not paid prior to October 1, 2018. First Security remains

5

unpaid with penalties reaching over $300,000 accruing at the rate of 1.5% per

month.

Debtor disagrees with First Security's assertions about the tax bills. Debtor

claims they were never intended to be paid in full. Debtor notes it intended to be a

part of a tax increment financing transaction in which Debtor would pay a smaller

tax payment and then would be paid most of the funds back as a rebate. According

to Debtor, the rebate was intended to be used for financing the indebtedness from

the construction. Debtor claims it was prevented from completing the building

before the tax bills became due resulting in the Debtor being unable to use

projected rent income to satisfy the tax obligations. Debtor also blames First

Security's refusal to accept a $900,000 offer from a guarantor of the building's

debt as a reason the construction was unfinished and resulted in the delinquent tax

obligations. First Security denies any fault.

Debtor also failed to fix the sidewalks in front of the property. The City of

Charles City had to replace the sidewalks and assess the cost against the real estate

of $48,475. Overall, Debtor has not paid any real estate taxes nor assessments

since March 2017. Debtor also has a negative history of insurance payments on

the project. First Security has had to advance installments on the insurance.

Debtor currently has little or no capital to put into the project. According to

the First Security and the US Trustee, Debtor generates very little income through

6

a dry-cleaning business it intended to serve as an amenity for residents of the Property. The income is a mere $4,000 a month or less. The affiliated business is owned by Thomsen. First Security asserts Debtor has no equity in the Property and Debtor has not offered it any adequate protection. It has also been pointed out that payments on taxes and insurance are not being accurately reflected on the MORs. Thomsen is apparently paying some of the costs in a personal capacity. Based on the monthly operating reports, Debtor has no capital to pay taxes, insurance, or attorney's fees.

On July 2, 2019, First Security filed a Motion for Relief from Stay, and on July 9, 2019, Debtor filed an objection. The parties negotiated about a possible plan filing and the Court deferred ruling on lifting the stay. On October 4, 2019, Debtor filed a Chapter 11 plan and disclosure statement. First Security and the US Trustee filed objections to the plan and disclosure statement. CRBT filed an objection to the disclosure statement.

On October 17, 2019, First Security filed a Motion to Dismiss or Convert to Chapter 7. The US Trustee also filed a Motion to Convert Case to Chapter 7 on October 25, 2019.

First Security also now points out that Debtor listed a buyer in its disclosure statement that does not exist. First Security has located a company with a similar name, MPC2 Development, LLC. It turns out it was created in April 2019 by

7

Thomsen.  Both banks and the US Trustee have expressed concerns about the LLC for many reasons—including that it does not have a source of funds or ability to purchase the property.

On November 6, 2019, Debtor filed an adversary case, no. 19-09035 against First Security seeking subordination of its claim or interest.  That same day, Debtor also filed an adversary case no. 19-09036 against First Security Directors: Jon Richard Herbrechts-Meyer, Gene Hall, and Kurt Herbrechts-Meyer for tortious interference with contract and other relief.

The final hearing on the Motion to Convert or Dismiss was scheduled for November 14, 2019 at the Webster County Courthouse in Fort Dodge, Iowa.  On November 12, 2019, Debtor filed a voluntary dismissal of the Chapter 11 bankruptcy.  The parties elected to not have an in-court evidentiary hearing.  A telephonic hearing was held on November 14, 2019, where the parties elected to assert their arguments.  A second telephonic hearing on related matters was held a week later.

## CONCLUSIONS OF LAW AND ANALYSIS

There is no argument that the case should stay in Chapter 11.  All parties either want to convert the case to Chapter 7 or dismiss the case.  First Security, CRBT, and the IEDA argue it is in the best interest of the creditors and all parties to convert to Chapter 7 and dispose of the property by a sale under 11 U.S.C.

8

§ 363.  Debtor disputes the priority, validity, and extent of the lien of First Security.  Debtor asserts that First Security does not propose any plan that would allow funds for trustee to get the property to a sale in Chapter 7.  Debtor argues only a successful sale would provide such funds.  Debtor also asserts unsecured creditors would be unfairly disadvantaged by a § 363 sale.  Furthermore, if the case is converted, Debtor doubts any of the necessary compromises needed for a successful sale can be reached.

Conversion or dismissal of a Chapter 11 case is governed by 11. U.S.C. § 1112(b)(1).

The Bankruptcy Code provides:

[O]n request of a party in interest, and after notice and a hearing, **the court shall convert a case under this chapter to a case under chapter 7** or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, **for cause** unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

(2) **The court may not convert a case** under this chapter to a case under chapter 7 or dismiss a case under this chapter **if the court finds and specifically identifies unusual circumstances** establishing that converting or dismissing the case is not in the best interests of creditors and the estate, **and** the debtor or any other party in interest establishes that—

(A) **there is a reasonable likelihood that a plan will be confirmed** within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) **the grounds for converting** or dismissing the case **include an act**

9

> **or omission of the debtor** other than under paragraph (4)(A)—
>
> (i) for which there exists a **reasonable justification** for the act or omission; and
>
> (ii) that **will be cured** within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b) (emphasis added). "Thus, if the Court finds 'cause' then the burden shifts to the objecting party to show 'unusual circumstances' such that conversion or dismissal is not in creditors' best interest, along with other facts." In re Keener, Bankr. No. 14-1169, 2017 WL 5054313, at *4 (Bankr. N.D. Iowa Nov. 2, 2017).

Debtor disputes only whether there is cause to convert and argues the beter approach would be for the court to dismiss. If there is "cause" to convert the case, then the Court must convert the case:

> Prior to the 2005 amendments to the Bankruptcy Code, most courts held that a bankruptcy court has broad discretion under § 1112(b) to either dismiss a case or convert it from Chapter 11 to Chapter 7. **Following BAPCPA's 2005 amendments to the Bankruptcy Code, section 1112(b)(1) is no longer permissive, but instead mandates conversion or dismissal if the movant establishes exclusive cause**, and no unusual circumstances establish that conversion or dismissal is not in the best interest of creditors.

Id. at *4 (internal quotation marks omitted) (emphasis added) (quoting In re Miell, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009). "Although conversion is mandatory if courts find 'cause,' courts enjoy wide latitude in determining whether cause

exists in a bankruptcy case." Id. (internal quotation marks omitted) (collecting cases).

## A.  Movant's Burden of Establishing "Cause" for Conversion

"The initial burden lies with the movants to establish a cause for conversion" under § 1112(b)(1).  Miell, 419 B.R. at 366.  The Bankruptcy Code sets out a list of "causes" to convert under § 1112(b)(4).  "Negative cash flow alone can be sufficient cause to dismiss or convert under § 1112(b)." In re Miell, 419 B.R. at 366 (citing Loop Corp. v. United States Trustee, 379 F.3d 511, 515–16 (8th Cir. 2004)).

First Security has argued three grounds for "cause" under § 1112(b)(4) including:

(A)    Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B)    Gross mismanagement of affairs of debtor;

(I)     Failure to timely pay taxes;

11 U.S.C. § 1112(b)(4).

"The statutory list of 'causes' is not exhaustive.  A court may consider other factors and equitable considerations in making the decision on conversion." In re Keener, 2017 WL 5054313, at *4 (internal quotation marks omitted) (quoting In re Keeley & Grabanski Land P'ship, 460 B.R. 520, 536 (Bankr. D.N.D. 2011)).

11

1.  **Substantial or Continuing Loss to or Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation – Section 1112(b)(4)(A)**

Section 1112(b)(4) calls for a "two-fold" inquiry into whether the estate has decreased in its value and if there is a reasonable likelihood of rehabilitation.  In re v. Cos., 274 B.R. 721, 725–26 (Bankr. N.D. Ohio 2002).  "If the moving parties establish both of those elements, the exceptions to mandatory conversion in § 1112(b)(2) do not apply." In re Keeley & Grabanski Land P'ship, 460 B.R. 520, 539 (Bankr. D.N.D. 2011).  One element of the (b)(2) exception is that the cause resulting in mandatory conversion is "other than under paragraph (4)(A)."  Thus, if movants can establish cause under § 1112(b)(4)(A), the only way Debtor can avoid conversion is to show unusual circumstances showing the requested conversion is not in the best interest of creditors or the estate. 11 U.S.C. § 1112(b)(1); See In re Keeley & Grabanski Land P'ship, 460 B.R. 520 at 539.  After thorough review, the Court concludes movants have established both a substantial and continuing diminution or loss to the estate and the absence of a reasonable likelihood of rehabilitation.

Debtor's monthly operating reports show little to no income.  What little income Debtor receives comes from the dry-cleaning business that Debtor's principal owns.  The US Trustee and First Security have both noted the income is a mere $4,000 a month or less.  Meanwhile, real estate taxes, insurance, attorney's

fees, and bankruptcy fees continue to increase.  Debtor has little to no income, and

liabilities are swiftly increasing.  This demonstrates a "substantial and continuing

loss or diminution of the estate."  See In re ARS Analytical, LLC, 433 B.R. 848,

862 (Bankr.D.N.M.2010) (holding continuing loss and diminution shown where

projected future revenue zero and administrative expenses growing).  Therefore,

movants have met their burden on that element.

> This Court also finds there is no reasonable likelihood of rehabilitation.

Debtor does not dispute the fact that it is behind on insurance payments and real

estate taxes.  Debtor argues only that those problems can be resolved in state court

proceedings, and after a state court judgment.  Debtor noted its plan to use rent

income from the property to pay for the taxes.  The building, however, is

unfinished, and the taxes are substantially accruing.  Debtor also stated, Charles

City was willing to negotiate to temporarily decrease the payments for the real

estate taxes.  However, no agreement has been made.  First Security has had to

advance several payments for insurance and taxes to prevent further detrimental

consequences.  Charles City put in new sidewalks on the property resulting in

$48,475 being assessed against the property which also has no prospect of being

repaid.

> Many of Debtor's arguments rely on favorable outcome of pending litigation

that's expected to last for years.  Debtor is also relying on the income expected

<center>13</center>

when the project is finished. The Court views Debtor's arguments based on too much speculation. See In re Original IFPC Shareholders, Inc., 317 B.R. 738, 742–43 (Bankr.N.D.Ill. 2004) (noting in a traditional chapter 11 case whether the debtor has a "reasonable likelihood of rehabilitation," would not turn on the anticipated future outcome of a single lawsuit). The Court, after carefully and thoroughly reviewing this matter, concludes that movants have established a substantial and continuing diminution or loss to the estate and the absence of a reasonable likelihood of rehabilitation of Debtor. Therefore, the Court concludes movants have established "cause" under § 1112(b)(4)(A), to convert this case.

2. **Gross Mismanagement of the Affairs of Debtor – Section 1112(b)(4)(B) and Failure to Timely Pay Taxes– Section 1112(b)(4)(I)**

Movants also have alleged "cause" to convert based on gross mismanagement of the affairs of Debtor. 11 U.S.C. § 1112(b)(4)(B). To prove this element, movants need to prove that Debtor engaged in gross mismanagement of the estate after the case was filed. See In re Keeley & Grabanski Land P'ship, 460 B.R. at 541.

Debtor's inability to pay costs for taxes and insurance, the inability to pay for attorney's fees and other administrative costs and inability to supply any capital to the project all prove gross mismanagement of the estate. Debtor is not only unable to pay expenses but is also unable to complete the building's construction. This causes the property to further deteriorate and sustain damage. There are

14

already missing windows and holes in the plywood causing the inside of the

building to be exposed to the outside elements and animals.  Another winter is

beginning, and Debtor's continued failure to preserve the estate constitutes gross

mismanagement under § 1112(b)(4)(B).

In regards to the specifics of § 1112(b)(4)(I), Debtor currently owes

outstanding property taxes in excess of $300,000.   First Security noted that real

estate taxes continue to accrue at around $18,000 to $20,000 per month.  Debtor

does not dispute that taxes have been unpaid since the commencement of this case.

Debtor has mentioned reasons as to why the taxes have not been paid and blames

fault on First Security.  Debtor, however, still cannot establish any ability to meet

this obligation.  Therefore, Debtor's failure to meet tax obligations further

demonstrates cause for conversion under § 1112(b)(4)(I).

## B. Conversion is in the Best Interest of Creditors and the Estate

All parties agree that cause exists to either convert or dismiss this Chapter 11

case.  This Court has determined there is "cause" to convert or dismiss this case

under 11 U.S.C. § 1112(b)(4).  No creditor has resisted conversion.  In fact, the

creditors taking positions on the issue have all come down very strongly on the

side of conversion.  None of the creditors believe it is in their best interests to

dismiss the case.  Debtor disagrees, arguing unsecured creditors would be harmed

by converting to Chapter 7.

15

Under the Bankruptcy Code, the only criteria when considering between dismissal or conversion of a chapter 11 case-–upon a finding of cause-–is whether conversion or dismissal in the "best interest of creditors and the estate." In re Sandia Resorts, Inc., 562 B.R. 490, 495 (Bankr. D.N.M. 2016) (citing Lakefront Investors LLC v. Clarkson, 484 B.R. 72, 82 (D. Md. 2012) (noting that "the Bankruptcy Code does not identify factors ... to consider when determining the remedy in the 'best interests of creditors and the estate'). When considering the best interests of the creditors, this Court will consider the practical impact of conversion on all parties.  See In re Sandia Resorts, Inc., 562 B.R. at 495.

"The plain meaning of § 1112(b) allows the bankruptcy court to convert a debtor's voluntary Chapter 11 case when it is in the best interest of creditors and the estate, even if the debtor opposes conversion and favors dismissal." Camden Ordnance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.), 245 B.R. 794, 803 (E.D. Pa. 2000). One bankruptcy court noted:

> Once a debtor submits to the jurisdiction of the bankruptcy court and avails itself of bankruptcy protections, the debtor must comply with the Bankruptcy Code. One of those rules is § 1112(b), allowing a bankruptcy court to convert a voluntary Chapter 11 case, even if a debtor wants the case dismissed. [The Debtor] was not compelled to seek protection in bankruptcy and thus, following the statutory framework of the Bankruptcy Code is a fair and necessary requirement for a debtor seeking the benefits of bankruptcy.

16

In re Francis, No. BAP MB 18-012, 2019 WL 1265316, at *6 (citing In re Camden

Ordnance Mfg. Co. of Ark., Inc., 245 B.R. at 805).

While the Bankruptcy Code does not define "best interests" for purposes of

the § 1112(b)(1) inquiry, courts often consider the following factors:

> (1) whether some creditors received preferential payments, and whether
> equality of distribution would be better served by conversion rather
> than dismissal, (2) whether there would be a loss of rights granted in
> the case if it were dismissed rather than converted, (3) whether the
> debtor would simply file a further case upon dismissal, (4) the ability
> of the trustee in a chapter 7 case to reach assets for the benefit of
> creditors, (5) in assessing the interest of the estate, whether conversion
> or dismissal of the estate would maximize the estate's value as an
> economic enterprise, (6) whether any remaining issues would be better
> resolved outside the bankruptcy forum, (7) whether the estate consists
> of a "single asset," (8) whether the debtor had engaged in misconduct
> and whether creditors are in need of a chapter 7 case to protect their
> interests, (9) whether a plan has been confirmed and whether any
> property remains in the estate to be administered, and (10) whether the
> appointment of a trustee is desirable to supervise the estate and address
> possible environment and safety concerns.

In re Francis, No. BAP MB 18-012, 2019 WL 1265316, at *5 (B.A.P. 1st Cir. Mar.

14, 2019) (citing In re Andover Covered Bridge, LLC, 553 B.R. at 178 (quoting In

re Costa Bonita Beach Resort, Inc., 513 B.R. at 200-01).

There are three additional factors to the best interest of creditors analysis

including:

> (11) The prospect of payment of any unpaid secured claims,
> chapter 11 administrative claims, priority claims and nonpriority
> unsecured claims in a converted chapter 7 case or after dismissal; (12)
> Whether conversion to chapter 7 would result in bankruptcy powers and
> procedures being used to benefit secured creditors without providing a

17

material benefit to other creditors; and (13) Any other prejudice to
parties in interest resulting from conversion or dismissal.

In re Sandia Resorts, Inc., 562 B.R. at 496.

The Court will also consider preferences of parties in interest including the
US Trustee. Although, the US Trustee took no stance on whether conversion or
dismissal is preferred, parties in interest: CRBT and the IEDA expressed a strong
preference for conversion.

When considering the best interests of all the parties, this Court concludes
converting this Chapter 11 case to Chapter 7 is in the best interest of the estate and
its creditors. Several factors listed above point toward conversion
including: "whether any remaining issues would be better resolved outside the
bankruptcy forum"; "the ability of the trustee in a chapter 7 case to reach assets
for the benefits of creditors"; "the prospect of payment of any unpaid secured
claims, chapter 11 administrative claims, priority claims and nonpriority unsecured
claims in a converted chapter 7 case"; "whether conversion to chapter 7 would
result in bankruptcy powers and procedures being used to benefit secured creditors
without providing a material benefit to other creditors"; and "any other prejudice to
parties in interest resulting from conversion or dismissal."

This Court also believes the analysis from In re Aurora Memory Care, LLC,
589 B.R. 631, 643 (Bankr. N.D. Ill. 2018), is particularly well-suited for this case.
In that case, many of the factors listed above appear neutral or inapplicable, and

18

the Court decided to use a general principle test. Id. The Court

concluded, "creditors are generally best served by the course of action that results

in the largest number of them being paid the largest amount of money in the

*shortest* amount of time." Id. see also In re Rey, No. 04B22548, 2006 WL

2457435, at *9 (Bankr. N.D. Ill. Aug. 21, 2006). This consideration strongly

favors conversion.

First Security pointed out that Debtor's claims in state court against First

Security, First Security's officers, and CRBT likely will not be resolved until at

least 2022. If the sale of the real estate does not occur under Chapter 7,

construction of the property would be delayed until the litigation is complete. Not

only is this a major delay for all parties, but it is also a detriment to the City of

Charles City. All parties agree this housing is important and needed by the City.

First Security believes there would be many buyers for the building if the case is

converted to Chapter 7. A § 363 sale and resuming construction would happen

much quicker than if the case is dismissed.

Converting the case to Chapter 7 would mean the project would likely be

finished 2 years sooner than if the case is dismissed. If the foreclosure sale

proceeds, all other claims would need to be solved before judgement of the

foreclosure could be granted. Foreclosure sale would not be complete until after

the 1-year redemption period which would lead to a judgment entered in December

2020, a deed not issued to a buyer until 2021.  Only then could construction

resume and thus the project would not be completed until, at best, June 2022.  If

the case is converted to Chapter 7, a sale under 11 U.S.C. § 363 could happen more

quickly—and potentially have the project completed in 2020.

First Security states it will "carve-out" from its collateral to allow funds for a

sale under 11 U.S.C. § 363.  Debtor disputes the priority, validity, and extent of the

lien of First Security.  Debtor asserts the bank's plan does not provide any actual

funds to the trustee, and only a successful sale would provide such funds.

Furthermore, Debtor argues unsecured creditors would be unfairly disadvantaged

by a § 363 sale.

Conversion will allow the trustee to sell claims in the bankruptcy.  The

Court understands that there are other defendants in the litigation that have asserted

claims against First Security and CRBT; however, the building could still be sold

and completed.  First Security is willing to help find a buyer.  First Security

believes there are 5-10 people that would be interested in buying the property–

making it a prompt sale.

Debtor also has its doubts of a compromise for a successful sale under 11

U.S.C. § 363.  During the hearing, Debtor stated, the bank is being "overly

optimistic" by saying the project could be done in 6 months or less.  Debtor

believes that a sale under 11 U.S.C. § 363 would be a battle, and that it would be

20

difficult to receive consent from lenders, guarantors, trustee, and mechanic lien holders.  Debtor does not believe they will be able to come to an agreement; therefore, not resolving the timing issue that movants assert.  Debtor believes the sale will take away rights from others especially redemption rights.  Furthermore, Debtor argues converting to Chapter 7 would allow First Security and CRBT to get away with past misconduct.

The Court understands Debtor's concerns and factors them into the analysis. Yet, when weighing all the factors on the best interest of all the parties, this Court finds conversion to Chapter 7 would be in the best interest of all parties.  Creditors likely will be paid money more quickly and there will likely be a decrease in costs and fees likely making the value of the estate greater.  The Court is not allowing the banks to get away with misconduct.  Debtor is still free to pursue its remedies in this forum or in state court.  The Court agrees with First Security's argument that this project needs to be sold as soon as possible and selling it under 11 U.S.C. § 363 is the best option for all parties in this case.  The longer the property sits empty, the more expenses accrue, and the longer the city is without the housing.

Also, it should be noted that none of the secured or unsecured creditors have supported a dismissal instead of conversion, nor has a creditor opposed conversion. Creditors are often best at judging what is in their best interests, and when the

creditors agree, "the court should accommodate to their desire." 7 L. King, *et al.,* eds., *Collier on Bankruptcy* ¶ 1112.04[6] at 1112–57 (15th ed. rev.2006).

Many of Debtor's arguments are based on speculation, and do not explain why conversion would not be in the best interest of the creditors. The Court agrees with First Security that the property is deteriorating and waiting to fix the project until 2022 while expenses accrue would negatively impact the estate. The Court agrees with movants that a sale in bankruptcy under 11 U.S.C. § 363 would be more efficient for all parties. It is also likely the estate and its creditors will benefit from having a Chapter 7 trustee evaluate the claims and sell them based on the best interest of the estate and creditors. The Court agrees the property should be sold under Chapter 7. Therefore, creditors' interests are better served by conversion than by dismissal.

## CONCLUSION

For all the reasons stated above, the Court concludes (1) that there is "cause" to convert under § 1112(b), and (2) that conversion is in the best interests of creditors and the estate. First Security's motion joined by the IEDA and CRBT to convert this case from Chapter 11 to Chapter 7 shall be granted.

**WHEREFORE**, Debtor's Motion to Dismiss is DENIED.

22

**WHEREFORE**, First Security's Motion to Convert this Chapter 11 Case to

a Chapter 7 Case is GRANTED.

Dated and Entered:

December 9, 2019

_____

THAD J. COLLINS
BANKRUPTCY JUDGE

23

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

IN RE:                                    )
                                          )  Chapter 11
MCQUILLEN PLACE COMPANY, LLC,             )
                                          )  Bankruptcy No. 19-00507M
        Debtor.                           )

## MEMORANDUM AND ORDER

The Motion to Convert came on for telephonic hearings on November 14,

and 21, 2019.  Days before the first hearing, Debtor filed a Motion to Dismiss the

Chapter 11 case.  Don Molstad appeared for the Debtor, McQuillen Place

Company, LLC ("Debtor").  Charles Thomsen appeared as principal of the Debtor.

Larry Eide appeared for Creditor, First Security and Trust Company ("First

Security).  Joseph Schmall appeared for interested party, CRBT and Trust

Company ("CRBT").  Brandon Gray appeared for the Iowa Economic

Development Authority ("IEDA").  Ashley Zubal appeared for the United States

Trustee ("US Trustee").  First Security originally filed the Motion to Dismiss or

Convert and now requests the Court to convert the case from Chapter 11 to

Chapter 7.  The IEDA and CRBT join First Security in asking the Court to Convert

the case to Chapter 7.  The US Trustee takes no stance as to the Motion to Dismiss

or the Motion to Convert.  Monica Clark appeared for interested party, the City of

Charles City, and also takes no stance on the motions.  This is a core proceeding

under 28 U.S.C. § 157(b)(2)(A).

## STATEMENT OF THE CASE

First Security, Iowa Economic Development Authority, and CRBT argue there is continuing loss and diminution to the estate and an absence of a reasonable likelihood of rehabilitation under 11 U.S.C. § 1112(b)(1). They also argue other equitable considerations warrant conversion including an unreasonable delay prejudicial to creditors under 11 U.S.C. § 1112(b)(3). They believe dismissing the case would be detrimental to all parties involved. Debtor urges the Court to dismiss the case to allow for a foreclosure sale. The US Trustee and City of Charles City are neutral parties and do not have a preference as to conversion versus dismissal. After carefully considering this case, the Court concludes it should be converted from Chapter 11 to Chapter 7.

## BACKGROUND AND FINDINGS OF FACT

Debtor, McQuillen Place Company, LLC, filed a Chapter 11 petition on April 25, 2019. The Debtor's primary asset is real property in Floyd County, Iowa, locally known as 123 N. Main Street, Charles City, Floyd County, Iowa. The property is known as McQuillen Place Condominiums, or Condominium Unit A and Condominium Unit B of McQuillen Place Condominiums ("Property"). Charles Thomsen, Debtor's principal, states the property is intended to be for commercial and residential use. The owners of McQuillen Place Company, LLC are Mr. Thomsen (60%) and James Gray (40%).

2

When discussions on the project started in 2013-2014, Thomsen sought a loan from First Security; however, the bank declined due to his inexperience with the type of project.  He then sought other financing through other lenders throughout the United States and chose CRBT.  CRBT learned that First Security had an interest in the project succeeding, for various reasons including it being beneficial for their city.  CRBT asked First Security if it would participate in the loan.  First Security agreed to participate, and CRBT was the "lead bank"—meaning it was the actual mortgage holder.  CRBT made the loan, reported the mortgage and made all the advances on the loan.

First Security eventually grew concerned with the progress of the construction and sought more control.  CRBT agreed to assign the loan to First Security.  In July 2018, after First Security took over the loan, it held a mediation with Debtor.  They reached an agreement on a new payment plan for the first mortgage.

First Security is now the holder of a claim against Debtor which is secured by a Construction Mortgage and a Promissory Note dated December 31, 2014.  First Security filed a proof of claim in this bankruptcy case for $4,030,746.28.  The promissory note is delinquent and accrues interest at 11.75 % per annum.  The Promissory Note and Mortgage had been filed at the Office of the Recorder in Floyd County, Iowa, on January 5, 2015.

3

In 2014, a groundbreaking was held for the building, but construction did not start until 2015.  Construction eventually came to a halt in July 2017 with the project at 90 percent completion.  First Security has noted many construction delays before the stoppage.  It will take around 90 more days to finish the project.

Before bankruptcy, the mortgage payments fell behind, and First Security filed a mortgage foreclosure action filed in the Iowa District Court for Floyd County in March 2018. (Case No. EQCV031170).   Several other parties were joined as defendants to the mortgage foreclosure largely based on guarantees under the Note.  In the mortgage foreclosure action, Debtor has filed numerous counterclaims.  Many of these claims are against First Security and CRBT.  The property has not been touched since the April 2019 bankruptcy filing.  First Security has notified Debtor of the structural damage to the property and its continued deterioration.

On its Schedules, Debtor listed the Property as has a value of $500,000, and the secured debt owed to primary creditor, First Security & Trust Company in excess of $6.8 million.  First Security and the US Trustee assert Debtor has no equity in the property.  The Property is listed as a duplex housing 33 units; however, the Property remains under construction and remains unfinished and unoccupied.  The intent is to have the second and third floors of the property house apartments with commercial real estate on the first floor.

4

Debtor now argues the project was not completed for several different reasons.  Debtor blames IEDA's refusal to provide tax credits it promised under the Enterprise Zone Program.  The tax credits had a gross value around $700,000.  Debtor had planned to sell the tax credits and believed they will yield net funds of $560,000.  Debtor also blames First Security for this loss.  Meanwhile, First Security argues Debtor did not correctly sign its contract with the IEDA and did not finish the project in the required two-year time frame.  Debtor's administrative appeal to the IEDA was unsuccessful.  Debtor eventually sued the IEDA in Floyd County, Iowa.

According to the US Trustee and First Security, during the meeting of the creditors in this case, Thomsen acknowledged the only way to have a successful plan of reorganization would be to find a party to secure financing to complete construction.  Thomsen insisted a third-party financer was interested, and the money would be secured in a two-week time frame.  Months passed and Debtor sought multiple extensions of the exclusivity period.  However, the financing was never secured.

First Security points out that in June 2018, it had to advance payment of the real estate taxes that had accrued a penalty of $236,446 in order to prevent a tax sale.  First Security claims the real estate taxes against the Property became delinquent and were not paid prior to October 1, 2018.  First Security remains

5

unpaid with penalties reaching over $300,000 accruing at the rate of 1.5% per month.

Debtor disagrees with First Security's assertions about the tax bills. Debtor claims they were never intended to be paid in full. Debtor notes it intended to be a part of a tax increment financing transaction in which Debtor would pay a smaller tax payment and then would be paid most of the funds back as a rebate. According to Debtor, the rebate was intended to be used for financing the indebtedness from the construction. Debtor claims it was prevented from completing the building before the tax bills became due resulting in the Debtor being unable to use projected rent income to satisfy the tax obligations. Debtor also blames First Security's refusal to accept a $900,000 offer from a guarantor of the building's debt as a reason the construction was unfinished and resulted in the delinquent tax obligations. First Security denies any fault.

Debtor also failed to fix the sidewalks in front of the property. The City of Charles City had to replace the sidewalks and assess the cost against the real estate of $48,475. Overall, Debtor has not paid any real estate taxes nor assessments since March 2017. Debtor also has a negative history of insurance payments on the project. First Security has had to advance installments on the insurance.

Debtor currently has little or no capital to put into the project. According to the First Security and the US Trustee, Debtor generates very little income through

6

a dry-cleaning business it intended to serve as an amenity for residents of the Property. The income is a mere $4,000 a month or less. The affiliated business is owned by Thomsen. First Security asserts Debtor has no equity in the Property and Debtor has not offered it any adequate protection. It has also been pointed out that payments on taxes and insurance are not being accurately reflected on the MORs. Thomsen is apparently paying some of the costs in a personal capacity. Based on the monthly operating reports, Debtor has no capital to pay taxes, insurance, or attorney's fees.

On July 2, 2019, First Security filed a Motion for Relief from Stay, and on July 9, 2019, Debtor filed an objection. The parties negotiated about a possible plan filing and the Court deferred ruling on lifting the stay. On October 4, 2019, Debtor filed a Chapter 11 plan and disclosure statement. First Security and the US Trustee filed objections to the plan and disclosure statement. CRBT filed an objection to the disclosure statement.

On October 17, 2019, First Security filed a Motion to Dismiss or Convert to Chapter 7. The US Trustee also filed a Motion to Convert Case to Chapter 7 on October 25, 2019.

First Security also now points out that Debtor listed a buyer in its disclosure statement that does not exist. First Security has located a company with a similar name, MPC2 Development, LLC. It turns out it was created in April 2019 by

7

Thomsen.  Both banks and the US Trustee have expressed concerns about the LLC

for many reasons—including that it does not have a source of funds or ability to

purchase the property.

On November 6, 2019, Debtor filed an adversary case, no. 19-09035 against

First Security seeking subordination of its claim or interest.  That same day, Debtor

also filed an adversary case no. 19-09036 against First Security Directors: Jon

Richard Herbrechts-Meyer, Gene Hall, and Kurt Herbrechts-Meyer for tortious

interference with contract and other relief.

The final hearing on the Motion to Convert or Dismiss was scheduled for

November 14, 2019 at the Webster County Courthouse in Fort Dodge, Iowa.  On

November 12, 2019, Debtor filed a voluntary dismissal of the Chapter 11

bankruptcy.  The parties elected to not have an in-court evidentiary hearing.   A

telephonic hearing was held on November 14, 2019, where the parties elected to

assert their arguments.  A second telephonic hearing on related matters was held a

week later.

## CONCLUSIONS OF LAW AND ANALYSIS

There is no argument that the case should stay in Chapter 11.  All parties

either want to convert the case to Chapter 7 or dismiss the case.  First Security,

CRBT, and the IEDA argue it is in the best interest of the creditors and all parties

to convert to Chapter 7 and dispose of the property by a sale under 11 U.S.C.

8

§ 363.  Debtor disputes the priority, validity, and extent of the lien of First

Security.  Debtor asserts that First Security does not propose any plan that would

allow funds for trustee to get the property to a sale in Chapter 7.  Debtor argues

only a successful sale would provide such funds.  Debtor also asserts unsecured

creditors would be unfairly disadvantaged by a § 363 sale.  Furthermore, if the case

is converted, Debtor doubts any of the necessary compromises needed for a

successful sale can be reached.

Conversion or dismissal of a Chapter 11 case is governed by 11. U.S.C.

§ 1112(b)(1).

The Bankruptcy Code provides:

[O]n request of a party in interest, and after notice and a hearing, **the court shall convert a case under this chapter to a case under chapter 7** or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, **for cause** unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

(2) **The court may not convert a case** under this chapter to a case under chapter 7 or dismiss a case under this chapter **if the court finds and specifically identifies unusual circumstances** establishing that converting or dismissing the case is not in the best interests of creditors and the estate, **and** the debtor or any other party in interest establishes that—

(A) **there is a reasonable likelihood that a plan will be confirmed** within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) **the grounds for converting** or dismissing the case **include an act**

9

**or omission of the debtor** other than under paragraph (4)(A)—

(i) for which there exists a **reasonable justification** for the act or omission; and

(ii) that **will be cured** within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b) (emphasis added). "Thus, if the Court finds 'cause' then the burden shifts to the objecting party to show 'unusual circumstances' such that conversion or dismissal is not in creditors' best interest, along with other facts." In re Keener, Bankr. No. 14-1169, 2017 WL 5054313, at *4 (Bankr. N.D. Iowa Nov. 2, 2017).

Debtor disputes only whether there is cause to convert and argues the beter approach would be for the court to dismiss. If there is "cause" to convert the case, then the Court must convert the case:

> Prior to the 2005 amendments to the Bankruptcy Code, most courts held that a bankruptcy court has broad discretion under § 1112(b) to either dismiss a case or convert it from Chapter 11 to Chapter 7. **Following BAPCPA's 2005 amendments to the Bankruptcy Code, section 1112(b)(1) is no longer permissive, but instead mandates conversion or dismissal if the movant establishes exclusive cause**, and no unusual circumstances establish that conversion or dismissal is not in the best interest of creditors.

Id. at *4 (internal quotation marks omitted) (emphasis added) (quoting In re Miell, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009). "Although conversion is mandatory if courts find 'cause,' courts enjoy wide latitude in determining whether cause

10

exists in a bankruptcy case." Id. (internal quotation marks omitted) (collecting cases).

## A. Movant's Burden of Establishing "Cause" for Conversion

"The initial burden lies with the movants to establish a cause for conversion" under § 1112(b)(1). Miell, 419 B.R. at 366. The Bankruptcy Code sets out a list of "causes" to convert under § 1112(b)(4). "Negative cash flow alone can be sufficient cause to dismiss or convert under § 1112(b)." In re Miell, 419 B.R. at 366 (citing Loop Corp. v. United States Trustee, 379 F.3d 511, 515–16 (8th Cir. 2004)).

First Security has argued three grounds for "cause" under § 1112(b)(4) including:

(A)    Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B)    Gross mismanagement of affairs of debtor;

(I)    Failure to timely pay taxes;

11 U.S.C. § 1112(b)(4).

"The statutory list of 'causes' is not exhaustive. A court may consider other factors and equitable considerations in making the decision on conversion." In re Keener, 2017 WL 5054313, at *4 (internal quotation marks omitted) (quoting In re Keeley & Grabanski Land P'ship, 460 B.R. 520, 536 (Bankr. D.N.D. 2011)).

11

1.  **Substantial or Continuing Loss to or Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation – Section 1112(b)(4)(A)**

Section 1112(b)(4) calls for a "two-fold" inquiry into whether the estate has decreased in its value and if there is a reasonable likelihood of rehabilitation.  In re v. Cos., 274 B.R. 721, 725–26 (Bankr. N.D. Ohio 2002).  "If the moving parties establish both of those elements, the exceptions to mandatory conversion in § 1112(b)(2) do not apply." In re Keeley & Grabanski Land P'ship, 460 B.R. 520, 539 (Bankr. D.N.D. 2011).  One element of the (b)(2) exception is that the cause resulting in mandatory conversion is "other than under paragraph (4)(A)."  Thus, if movants can establish cause under § 1112(b)(4)(A), the only way Debtor can avoid conversion is to show unusual circumstances showing the requested conversion is not in the best interest of creditors or the estate. 11 U.S.C. § 1112(b)(1); See In re Keeley & Grabanski Land P'ship, 460 B.R. 520 at 539.  After thorough review, the Court concludes movants have established both a substantial and continuing diminution or loss to the estate and the absence of a reasonable likelihood of rehabilitation.

Debtor's monthly operating reports show little to no income.  What little income Debtor receives comes from the dry-cleaning business that Debtor's principal owns.  The US Trustee and First Security have both noted the income is a mere $4,000 a month or less.  Meanwhile, real estate taxes, insurance, attorney's

12

fees, and bankruptcy fees continue to increase.  Debtor has little to no income, and liabilities are swiftly increasing.  This demonstrates a "substantial and continuing loss or diminution of the estate."  See In re ARS Analytical, LLC, 433 B.R. 848, 862 (Bankr.D.N.M.2010) (holding continuing loss and diminution shown where projected future revenue zero and administrative expenses growing).  Therefore, movants have met their burden on that element.

This Court also finds there is no reasonable likelihood of rehabilitation. Debtor does not dispute the fact that it is behind on insurance payments and real estate taxes.  Debtor argues only that those problems can be resolved in state court proceedings, and after a state court judgment.  Debtor noted its plan to use rent income from the property to pay for the taxes.  The building, however, is unfinished, and the taxes are substantially accruing.  Debtor also stated, Charles City was willing to negotiate to temporarily decrease the payments for the real estate taxes.  However, no agreement has been made.  First Security has had to advance several payments for insurance and taxes to prevent further detrimental consequences.  Charles City put in new sidewalks on the property resulting in $48,475 being assessed against the property which also has no prospect of being repaid.

Many of Debtor's arguments rely on favorable outcome of pending litigation that's expected to last for years.  Debtor is also relying on the income expected

13

when the project is finished.  The Court views Debtor's arguments based on too

much speculation.  See In re Original IFPC Shareholders, Inc., 317 B.R. 738, 742–

43 (Bankr.N.D.Ill. 2004) (noting in a traditional chapter 11 case whether the debtor

has a "reasonable likelihood of rehabilitation," would not turn on the anticipated

future outcome of a single lawsuit).  The Court, after carefully and thoroughly

reviewing this matter, concludes that movants have established a substantial and

continuing diminution or loss to the estate and the absence of a reasonable

likelihood of rehabilitation of Debtor.  Therefore, the Court concludes movants

have established "cause" under § 1112(b)(4)(A), to convert this case.

## 2. Gross Mismanagement of the Affairs of Debtor – Section 1112(b)(4)(B) and Failure to Timely Pay Taxes– Section 1112(b)(4)(I)

Movants also have alleged "cause" to convert based on gross

mismanagement of the affairs of Debtor.  11 U.S.C. § 1112(b)(4)(B).  To prove

this element, movants need to prove that Debtor engaged in gross mismanagement

of the estate after the case was filed. See In re Keeley & Grabanski Land P'ship,

460 B.R. at 541.

Debtor's inability to pay costs for taxes and insurance, the inability to pay

for attorney's fees and other administrative costs and inability to supply any capital

to the project all prove gross mismanagement of the estate.  Debtor is not only

unable to pay expenses but is also unable to complete the building's construction.

This causes the property to further deteriorate and sustain damage.  There are

14

already missing windows and holes in the plywood causing the inside of the

building to be exposed to the outside elements and animals.  Another winter is

beginning, and Debtor's continued failure to preserve the estate constitutes gross

mismanagement under § 1112(b)(4)(B).

In regards to the specifics of § 1112(b)(4)(I), Debtor currently owes

outstanding property taxes in excess of $300,000.   First Security noted that real

estate taxes continue to accrue at around $18,000 to $20,000 per month.  Debtor

does not dispute that taxes have been unpaid since the commencement of this case.

Debtor has mentioned reasons as to why the taxes have not been paid and blames

fault on First Security.  Debtor, however, still cannot establish any ability to meet

this obligation.  Therefore, Debtor's failure to meet tax obligations further

demonstrates cause for conversion under § 1112(b)(4)(I).

## B. Conversion is in the Best Interest of Creditors and the Estate

All parties agree that cause exists to either convert or dismiss this Chapter 11

case.  This Court has determined there is "cause" to convert or dismiss this case

under 11 U.S.C. § 1112(b)(4).  No creditor has resisted conversion.  In fact, the

creditors taking positions on the issue have all come down very strongly on the

side of conversion.  None of the creditors believe it is in their best interests to

dismiss the case.  Debtor disagrees, arguing unsecured creditors would be harmed

by converting to Chapter 7.

15

Under the Bankruptcy Code, the only criteria when considering between dismissal or conversion of a chapter 11 case-–upon a finding of cause-–is whether conversion or dismissal in the "best interest of creditors and the estate." In re Sandia Resorts, Inc., 562 B.R. 490, 495 (Bankr. D.N.M. 2016) (citing Lakefront Investors LLC v. Clarkson, 484 B.R. 72, 82 (D. Md. 2012) (noting that "the Bankruptcy Code does not identify factors ... to consider when determining the remedy in the 'best interests of creditors and the estate'). When considering the best interests of the creditors, this Court will consider the practical impact of conversion on all parties.  See In re Sandia Resorts, Inc., 562 B.R. at 495.

"The plain meaning of § 1112(b) allows the bankruptcy court to convert a debtor's voluntary Chapter 11 case when it is in the best interest of creditors and the estate, even if the debtor opposes conversion and favors dismissal." Camden Ordnance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.), 245 B.R. 794, 803 (E.D. Pa. 2000). One bankruptcy court noted:

> Once a debtor submits to the jurisdiction of the bankruptcy court and avails itself of bankruptcy protections, the debtor must comply with the Bankruptcy Code. One of those rules is § 1112(b), allowing a bankruptcy court to convert a voluntary Chapter 11 case, even if a debtor wants the case dismissed. [The Debtor] was not compelled to seek protection in bankruptcy and thus, following the statutory framework of the Bankruptcy Code is a fair and necessary requirement for a debtor seeking the benefits of bankruptcy.

16

In re Francis, No. BAP MB 18-012, 2019 WL 1265316, at *6 (citing In re Camden

Ordnance Mfg. Co. of Ark., Inc., 245 B.R. at 805).

While the Bankruptcy Code does not define "best interests" for purposes of

the § 1112(b)(1) inquiry, courts often consider the following factors:

> (1) whether some creditors received preferential payments, and whether
> equality of distribution would be better served by conversion rather
> than dismissal, (2) whether there would be a loss of rights granted in
> the case if it were dismissed rather than converted, (3) whether the
> debtor would simply file a further case upon dismissal, (4) the ability
> of the trustee in a chapter 7 case to reach assets for the benefit of
> creditors, (5) in assessing the interest of the estate, whether conversion
> or dismissal of the estate would maximize the estate's value as an
> economic enterprise, (6) whether any remaining issues would be better
> resolved outside the bankruptcy forum, (7) whether the estate consists
> of a "single asset," (8) whether the debtor had engaged in misconduct
> and whether creditors are in need of a chapter 7 case to protect their
> interests, (9) whether a plan has been confirmed and whether any
> property remains in the estate to be administered, and (10) whether the
> appointment of a trustee is desirable to supervise the estate and address
> possible environment and safety concerns.

In re Francis, No. BAP MB 18-012, 2019 WL 1265316, at *5 (B.A.P. 1st Cir. Mar.

14, 2019) (citing In re Andover Covered Bridge, LLC, 553 B.R. at 178 (quoting In

re Costa Bonita Beach Resort, Inc., 513 B.R. at 200-01).

There are three additional factors to the best interest of creditors analysis

including:

> (11) The prospect of payment of any unpaid secured claims,
> chapter 11 administrative claims, priority claims and nonpriority
> unsecured claims in a converted chapter 7 case or after dismissal; (12)
> Whether conversion to chapter 7 would result in bankruptcy powers and
> procedures being used to benefit secured creditors without providing a

17

material benefit to other creditors; and (13) Any other prejudice to parties in interest resulting from conversion or dismissal.

In re Sandia Resorts, Inc., 562 B.R. at 496.

The Court will also consider preferences of parties in interest including the US Trustee. Although, the US Trustee took no stance on whether conversion or dismissal is preferred, parties in interest: CRBT and the IEDA expressed a strong preference for conversion.

When considering the best interests of all the parties, this Court concludes converting this Chapter 11 case to Chapter 7 is in the best interest of the estate and its creditors. Several factors listed above point toward conversion including: "whether any remaining issues would be better resolved outside the bankruptcy forum"; "the ability of the trustee in a chapter 7 case to reach assets for the benefits of creditors"; "the prospect of payment of any unpaid secured claims, chapter 11 administrative claims, priority claims and nonpriority unsecured claims in a converted chapter 7 case"; "whether conversion to chapter 7 would result in bankruptcy powers and procedures being used to benefit secured creditors without providing a material benefit to other creditors"; and "any other prejudice to parties in interest resulting from conversion or dismissal."

This Court also believes the analysis from In re Aurora Memory Care, LLC, 589 B.R. 631, 643 (Bankr. N.D. Ill. 2018), is particularly well-suited for this case. In that case, many of the factors listed above appear neutral or inapplicable, and

18

the Court decided to use a general principle test.  Id.  The Court

concluded, "creditors are generally best served by the course of action that results

in the largest number of them being paid the largest amount of money in the

*shortest* amount of time." Id. see also In re Rey, No. 04B22548, 2006 WL

2457435, at *9 (Bankr. N.D. Ill. Aug. 21, 2006).  This consideration strongly

favors conversion.

First Security pointed out that Debtor's claims in state court against First

Security, First Security's officers, and CRBT likely will not be resolved until at

least 2022.  If the sale of the real estate does not occur under Chapter 7,

construction of the property would be delayed until the litigation is complete.  Not

only is this a major delay for all parties, but it is also a detriment to the City of

Charles City.  All parties agree this housing is important and needed by the City.

First Security believes there would be many buyers for the building if the case is

converted to Chapter 7.  A § 363 sale and resuming construction would happen

much quicker than if the case is dismissed.

Converting the case to Chapter 7 would mean the project would likely be

finished 2 years sooner than if the case is dismissed.  If the foreclosure sale

proceeds, all other claims would need to be solved before judgement of the

foreclosure could be granted.  Foreclosure sale would not be complete until after

the 1-year redemption period which would lead to a judgment entered in December

2020, a deed not issued to a buyer until 2021.  Only then could construction

resume and thus the project would not be completed until, at best, June 2022.  If

the case is converted to Chapter 7, a sale under 11 U.S.C. § 363 could happen more

quickly—and potentially have the project completed in 2020.

First Security states it will "carve-out" from its collateral to allow funds for a

sale under 11 U.S.C. § 363.  Debtor disputes the priority, validity, and extent of the

lien of First Security.  Debtor asserts the bank's plan does not provide any actual

funds to the trustee, and only a successful sale would provide such funds.

Furthermore, Debtor argues unsecured creditors would be unfairly disadvantaged

by a § 363 sale.

Conversion will allow the trustee to sell claims in the bankruptcy.  The

Court understands that there are other defendants in the litigation that have asserted

claims against First Security and CRBT; however, the building could still be sold

and completed.  First Security is willing to help find a buyer.  First Security

believes there are 5-10 people that would be interested in buying the property–

making it a prompt sale.

Debtor also has its doubts of a compromise for a successful sale under 11

U.S.C. § 363.  During the hearing, Debtor stated, the bank is being "overly

optimistic" by saying the project could be done in 6 months or less.  Debtor

believes that a sale under 11 U.S.C. § 363 would be a battle, and that it would be

20

difficult to receive consent from lenders, guarantors, trustee, and mechanic lien holders. Debtor does not believe they will be able to come to an agreement; therefore, not resolving the timing issue that movants assert. Debtor believes the sale will take away rights from others especially redemption rights. Furthermore, Debtor argues converting to Chapter 7 would allow First Security and CRBT to get away with past misconduct.

The Court understands Debtor's concerns and factors them into the analysis. Yet, when weighing all the factors on the best interest of all the parties, this Court finds conversion to Chapter 7 would be in the best interest of all parties. Creditors likely will be paid money more quickly and there will likely be a decrease in costs and fees likely making the value of the estate greater. The Court is not allowing the banks to get away with misconduct. Debtor is still free to pursue its remedies in this forum or in state court. The Court agrees with First Security's argument that this project needs to be sold as soon as possible and selling it under 11 U.S.C. § 363 is the best option for all parties in this case. The longer the property sits empty, the more expenses accrue, and the longer the city is without the housing.

Also, it should be noted that none of the secured or unsecured creditors have supported a dismissal instead of conversion, nor has a creditor opposed conversion. Creditors are often best at judging what is in their best interests, and when the

21

creditors agree, "the court should accommodate to their desire." 7 L. King, *et al.,* eds., *Collier on Bankruptcy* ¶ 1112.04[6] at 1112–57 (15th ed. rev.2006).

Many of Debtor's arguments are based on speculation, and do not explain why conversion would not be in the best interest of the creditors. The Court agrees with First Security that the property is deteriorating and waiting to fix the project until 2022 while expenses accrue would negatively impact the estate. The Court agrees with movants that a sale in bankruptcy under 11 U.S.C. § 363 would be more efficient for all parties. It is also likely the estate and its creditors will benefit from having a Chapter 7 trustee evaluate the claims and sell them based on the best interest of the estate and creditors. The Court agrees the property should be sold under Chapter 7. Therefore, creditors' interests are better served by conversion than by dismissal.

## CONCLUSION

For all the reasons stated above, the Court concludes (1) that there is "cause" to convert under § 1112(b), and (2) that conversion is in the best interests of creditors and the estate. First Security's motion joined by the IEDA and CRBT to convert this case from Chapter 11 to Chapter 7 shall be granted.

**WHEREFORE**, Debtor's Motion to Dismiss is DENIED.

22

**WHEREFORE**, First Security's Motion to Convert this Chapter 11 Case to a Chapter 7 Case is GRANTED.

Dated and Entered:

December 9, 2019

_____
THAD J. COLLINS
BANKRUPTCY JUDGE

23

**UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF IOWA**

320 Sixth Street Rm 126
Sioux City, IA 51101

In Re a Petition for Relief under chapter 7 of Title 11, U.S. Code, filed by or against the below−named Debtor(s) on :

DEBTOR :  McQuillen Place Company, LLC
1110 North Grand Ave., Suite 300
Charles City, IA 50616

CASE NO. 19−00507

---

*APPOINTMENT OF INTERIM TRUSTEE*
*AND APPROVAL OF STANDING BOND*

---

NOTICE IS HEREBY GIVEN THAT:

1. The following interim trustee is hereby appointed, and the trustee's standing bond is fixed under the general blanket bond heretofore approved.

Charles L. Smith

25 Main Place, Ste 200
P.O. Box 248
Council Bluffs, IA 51502−0248

2. If the trustee rejects this appointment, the court and U.S. Trustee's office must be notified within 7 days of receipt of this appointment. Otherwise, the trustee will be deemed to have accepted the appointment.

3. The undersigned deputy clerk certifies that on this date a copy of this notice was served on the above−named trustee, debtor(s), attorney for debtor(s), and U.S. Trustee.

JAMES L. SNYDER
U. S. TRUSTEE Region 12

Dated: December 9, 2019 tsta

---

REJECTION

I, Charles L. Smith, hereby reject appointment as Trustee.

Dated: This _____ day of _____, 20 _____.

_____

Charles L. Smith

| Information to identify the case: | | | |
|---|---|---|---|
| Debtor | **McQuillen Place Company, LLC** | EIN: 46–3987825 | |
| | Name | | |
| United States Bankruptcy Court  Northern District of Iowa | | Date case filed in chapter:  11  4/25/19 | |
| Case number:  19–00507 | | Date case converted to chapter:  7  12/9/19 | |

Official Form B309C (For Corporations or Partnerships)

**Notice of Chapter 7 Bankruptcy Case –– No Proof of Claim Deadline**                                    12/17

**For the debtor listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered. This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from debtors by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees. To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at   www.pacer.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**NOTICE IS GIVEN** that during the course of administration, the Chapter 7 trustee may sell, abandon, or otherwise dispose of property, including the compromise or settlement of controversies, by filing a report of such intended action with the Clerk, with a copy served upon the U.S. Trustee, debtor(s), debtor(s) counsel, and those creditors and equity security holders who have requested notice pursuant to Rule 2002 of the Bankruptcy Rules. Any party requesting a notice pursuant to Rule 2002 must file a request with the Clerk of the Bankruptcy Court specifically referring to Rule 2002 and shall serve a copy of that request for notice upon debtor(s) counsel, trustee, and U.S. Trustee, at the addresses set forth in this notice. Any party objecting to such action by the trustee shall file such objection with the Clerk of Bankruptcy Court, serving a copy on the moving party, trustee, U.S. Trustee, debtor(s) and debtor(s) counsel within 21 days after the filing of such report.  **Do not file this notice with any proof of claim or other filing in the case.**

| | | |
|---|---|---|
| **1. Debtor's full name** | McQuillen Place Company, LLC | |
| **2. All other names used in the last 8 years** | aka Classic Cleaners, aka Classic Cleaners of Charles City | |
| **3. Address** | 1110 North Grand Ave., Suite 300 Charles City, IA 50616 | |
| **4. Debtor's attorney** Name and address | Charles McQuillen Thomson Law Office of Charles M. Thomson 1110 North Grand Ave., Suite 300 Charles City, IA 50616 | Phone: 847–456–1911 Email: cthomson@doall.com |
| **5. Bankruptcy trustee** Name and address | Charles L. Smith 25 Main Place, Ste 200 P.O. Box 248 Council Bluffs, IA 51502–0248 | Phone: 712–325–9000 Email: trustee@telpnerlaw.com |
| **6. Bankruptcy clerk's office** Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at www.pacer.gov. | 320 Sixth Street Rm 126 Sioux City, IA 51101 | Hours open: Monday–Friday, 8:00 am to 4:30 pm CT  Phone: (712) 233–3939 www.ianb.uscourts.gov  Date: 12/9/19 |
| **7. Meeting of creditors** The debtor's representative must attend the meeting to be questioned under oath. Creditors may attend, but are not required to do so. | **January 27, 2020 at 08:30 AM**  The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. | Location:  **2nd Floor Court Room, US Post Office, Mason City, IA 50401** |
| **8. Proof of claim** Please do not file a proof of claim unless you receive a notice to do so. | No property appears to be available to pay creditors. Therefore, please do not file a proof of claim now. If it later appears that assets are available to pay creditors, the clerk will send you another notice telling you that you may file a proof of claim and stating the deadline. | |
| **9. Creditors with a foreign address** | If you are a creditor receiving a notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. | |
| **Appointment of Trustee** | The trustee named in line 5 of this notice is the interim trustee appointed by the U.S. Trustee to serve under general blanket bond. | |

IA-21
(Revised 06/98)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE                                    )    CHAPTER 7
                                         )    CASE NO.  19-00507
MCQUILLEN PLACE COMPANY, LLC,            )
                                         )    APPLICATION FOR APPROVAL OF
        Debtor.                          )    EMPLOYMENT OF A PROFESSIONAL
                                         )    (ATTORNEY) ON BEHALF OF THE
                                         )    ESTATE
                                         )

1.      Applicant is the Trustee in this case.

2.      Applicant believes that the employment of a professional is necessary to represent or assist Trustee in carrying out the Trustee's duties as follows:

To render the Trustee legal advice with respect to the investigation of the actions of the Debtor; the recovery, collection and sale of assets of the estate, and the filing of possible objections to claims, if applicable, and such other services as may be necessary in order for the Trustee to carry out his duties herein.

3.      Telpner Peterson Law Firm, LLP, 25 Main Place, Suite 200, Council Bluffs, IA 51503, Telephone: (712) 325-9000 is qualified by reason of practice and experience to render such representation or assistance to the estate as outlined above.

4.      The compensation will be as follows:

The normal hourly rate charged for services performed by attorneys and legal assistants; plus reimbursement of out-of-pocket expenses, all to be submitted to the Court prior to approval of the Court before payment.

5.      The applicant has disclosed to the undersigned that they have the following connections with the Debtor, creditors, the United States Trustee for Region 12 or any employee of the United States Trustee, or any other parties-in-interest:

Charles L. Smith, the Trustee in this matter is the managing partner of Telpner Peterson Law Firm, LLP.

Nicole Hughes is a partner at Telpner Peterson Law Firm, LLP.

( 1 )

WHEREFORE, applicant prays that the Court approve such employment by the Trustee.

/s/ Charles L. Smith
Charles L. Smith, Trustee AT0007415
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-mail:  csmith@telpnerlaw.com

RULE 2014(a) VERIFICATION

I, Charles L. Smith, of Telpner Peterson Law Firm, LLP, named in the foregoing

Report, declare under penalty of perjury that the foregoing is true and correct according

to the best of my knowledge and belief.

Dated:  12/10/19

/s/ Charles L. Smith
Charles L. Smith, Trustee  AT0007415
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-mail:  csmith@telpnerlaw.com

( 2 )

## RULE 2014(a) VERIFICATION

I, Nicole Hughes, of Telpner Peterson Law Firm, LLP, named in the foregoing

Report, declare under penalty of perjury that the foregoing is true and correct according

to the best of my knowledge and belief.

/s/ Nicole Hughes
Nicole Hughes  AT0002263
TELPNER PETERSON LAW FIRM, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-Mail: nhughes@telpnerlaw.com

## RECOMMENDATION OF THE UNITED STATES TRUSTEE

Based on the Application made by the trustee, I recommend that the

professional employment applied for by the trustee be approved for the purpose

indicated in the application.

Dated:  12/11/19

United States Trustee, Region 12

By: /s/ Janet G. Reasoner

( 3 )

<u>ORDER</u>

Upon the foregoing Application and Recommendation and for cause shown, and pursuant to the provisions of Title 11, United States Code, §327, it is

ORDERED, the professional employment applied for is hereby APPROVED subject to the limitations provided for by Title 11, United States Code, §328.

Dated this _____ day of _____, 2019.

_____
UNITED STATES BANKRUPTCY JUDGE

( 4 )

IA-21
(Revised 06/98)

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE | ) CHAPTER 7 |
| | ) CASE NO.  19-00507 |
| MCQUILLEN PLACE COMPANY, LLC, | ) |
| | ) APPLICATION FOR APPROVAL OF |
| Debtor. | ) EMPLOYMENT OF A PROFESSIONAL |
| | ) (ATTORNEY) ON BEHALF OF THE |
| | ) ESTATE |
| | ) |

1.     Applicant is the Trustee in this case.

2.     Applicant believes that the employment of a professional is necessary to represent or assist Trustee in carrying out the Trustee's duties as follows:

To render the Trustee legal advice with respect to the investigation of the actions of the Debtor; the recovery, collection and sale of assets of the estate, and the filing of possible objections to claims, if applicable, and such other services as may be necessary in order for the Trustee to carry out his duties herein.

3.     Telpner Peterson Law Firm, LLP, 25 Main Place, Suite 200, Council Bluffs, IA 51503, Telephone: (712) 325-9000 is qualified by reason of practice and experience to render such representation or assistance to the estate as outlined above.

4.     The compensation will be as follows:

The normal hourly rate charged for services performed by attorneys and legal assistants; plus reimbursement of out-of-pocket expenses, all to be submitted to the Court prior to approval of the Court before payment.

5.     The applicant has disclosed to the undersigned that they have the following connections with the Debtor, creditors, the United States Trustee for Region 12 or any employee of the United States Trustee, or any other parties-in-interest:

Charles L. Smith, the Trustee in this matter is the managing partner of Telpner Peterson Law Firm, LLP.

Nicole Hughes is a partner at Telpner Peterson Law Firm, LLP.

( 1 )

WHEREFORE, applicant prays that the Court approve such employment by the Trustee.

/s/ Charles L. Smith
Charles L. Smith, Trustee AT0007415
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-mail:  csmith@telpnerlaw.com

RULE 2014(a) VERIFICATION

I, Charles L. Smith, of Telpner Peterson Law Firm, LLP, named in the foregoing

Report, declare under penalty of perjury that the foregoing is true and correct according

to the best of my knowledge and belief.

Dated:  12/10/19            /s/ Charles L. Smith
Charles L. Smith, Trustee  AT0007415
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-mail:  csmith@telpnerlaw.com

( 2 )

RULE 2014(a) VERIFICATION

I, Nicole Hughes, of Telpner Peterson Law Firm, LLP, named in the foregoing

Report, declare under penalty of perjury that the foregoing is true and correct according

to the best of my knowledge and belief.

/s/ Nicole Hughes
Nicole Hughes  AT0002263
TELPNER PETERSON LAW FIRM, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-Mail: nhughes@telpnerlaw.com

RECOMMENDATION OF THE UNITED STATES TRUSTEE

Based on the Application made by the trustee, I recommend that the

professional employment applied for by the trustee be approved for the purpose

indicated in the application.

Dated:  12/11/19                    United States Trustee, Region 12

By:  /s/ Janet G. Reasoner

( 3 )

<u>ORDER</u>

Upon the foregoing Application and Recommendation and for cause shown, and pursuant to the provisions of Title 11, United States Code, §327, it is

ORDERED, the professional employment applied for is hereby APPROVED subject to the limitations provided for by Title 11, United States Code, §328.

Dated this _____ day of _____, 2019.

_____
UNITED STATES BANKRUPTCY JUDGE

( 4 )

IA-21
(Revised 06/98)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE | ) | CHAPTER 7 |
| | ) | CASE NO.  19-00507 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | APPLICATION FOR APPROVAL OF |
| Debtor. | ) | EMPLOYMENT OF A PROFESSIONAL |
| | ) | (ATTORNEY) ON BEHALF OF THE |
| | ) | ESTATE |
| | ) | |

1.      Applicant is the Trustee in this case.

2.      Applicant believes that the employment of a professional is necessary to represent or assist Trustee in carrying out the Trustee's duties as follows:

To render the Trustee legal advice with respect to the investigation of the actions of the Debtor; the recovery, collection and sale of assets of the estate, and the filing of possible objections to claims, if applicable, and such other services as may be necessary in order for the Trustee to carry out his duties herein.

3.      Telpner Peterson Law Firm, LLP, 25 Main Place, Suite 200, Council Bluffs, IA 51503, Telephone: (712) 325-9000 is qualified by reason of practice and experience to render such representation or assistance to the estate as outlined above.

4.      The compensation will be as follows:

The normal hourly rate charged for services performed by attorneys and legal assistants; plus reimbursement of out-of-pocket expenses, all to be submitted to the Court prior to approval of the Court before payment.

5.      The applicant has disclosed to the undersigned that they have the following connections with the Debtor, creditors, the United States Trustee for Region 12 or any employee of the United States Trustee, or any other parties-in-interest:

Charles L. Smith, the Trustee in this matter is the managing partner of Telpner Peterson Law Firm, LLP.

Nicole Hughes is a partner at Telpner Peterson Law Firm, LLP.

( 1 )

WHEREFORE, applicant prays that the Court approve such employment by the Trustee.

/s/ Charles L. Smith
Charles L. Smith, Trustee AT0007415
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-mail:  csmith@telpnerlaw.com

RULE 2014(a) VERIFICATION

I, Charles L. Smith, of Telpner Peterson Law Firm, LLP, named in the foregoing

Report, declare under penalty of perjury that the foregoing is true and correct according

to the best of my knowledge and belief.

Dated:  12/10/19              /s/ Charles L. Smith
Charles L. Smith, Trustee  AT0007415
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-mail:  csmith@telpnerlaw.com

( 2 )

## RULE 2014(a) VERIFICATION

I, Nicole Hughes, of Telpner Peterson Law Firm, LLP, named in the foregoing

Report, declare under penalty of perjury that the foregoing is true and correct according

to the best of my knowledge and belief.

/s/ Nicole Hughes
Nicole Hughes  AT0002263
TELPNER PETERSON LAW FIRM, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
E-Mail: nhughes@telpnerlaw.com

## RECOMMENDATION OF THE UNITED STATES TRUSTEE

Based on the Application made by the trustee, I recommend that the

professional employment applied for by the trustee be approved for the purpose

indicated in the application.

Dated: 12/11/19

United States Trustee, Region 12

By: /s/ Janet G. Reasoner

( 3 )

ORDER

Upon the foregoing Application and Recommendation and for cause shown, and

pursuant to the provisions of Title 11, United States Code, §327, it is

ORDERED, the professional employment applied for is hereby APPROVED subject

to the limitations provided for by Title 11, United States Code, §328.

Dated and Entered:

December 11, 2019

_____

UNITED STATES BANKRUPTCY JUDGE

( 4 )

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

MOTION OF EQUITY SECURITY HOLDERS TO AMEND JUDGMENT

NOW COME Charles M. Thomson and James Gray (the "Equity Security Holders"), through their counsel, and as and for their "Motion of Equity Security Holders to Amend Judgment" (this "Motion") respectfully state as follows:

1.      On December 9, 2019, following motions from First Security Bank & Trust Company ("First Security Bank") and the United States Trustee ("Trustee"), the filing of a variety of pleadings, and two telephonic hearings, this Court issued a "Memorandum and Order" (the "Order") converting this case to a case under Chapter 7 of Title 11 of the United States Code.

2.      The Order, apparently relying on a variety of statements made by counsel in their pleadings, contains what the Equity Security Holders believe to be material misstatements of fact which, if left unchallenged, may (a) materially prejudice the Equity Security Holders in future litigation or proceedings, and/or (b) cause unnecessary confusion to parties in interest (including, but not limited to, the Equity Security Holders) in future litigation or proceedings.

3.      Both Federal Rule of Bankruptcy Procedure 9023 and 9024 permit this Court to amend the Order as requested in this Motion.

1

4.      The specific points (set forth in the sequence in which they arise in the Order) the

Equity Security Holders request this Court to address include the following:

a.      The last name of the principal of the Debtor should be spelled "Thomson" rather than the "Thomsen" spelling used throughout the Order. (Order at 1, first paragraph, line 4, *et seq*.  *See* Affidavit of Charles Thomson [the "Thomson Affidavit," attached as Exhibit A], at paragraph 1).

b.      The reason stated by First Security for initially not being interested in the McQuillen financing was First Security's lack of experience in administering financings involving significant state economic development assistance, rather than Thomson's experience.  (Order at 3, first paragraph, lines 2 and 3.  *See* Thomson Affidavit at paragraph 2).

c.      As a result of the mediation referenced in the second sentence of the second paragraph on page 3 of the Order, First Security offered to sell its loan under certain circumstances.  First Security and the Debtor did not "reach… an agreement on a new payment plan for the first mortgage."  (*See* Thomson Affidavit at paragraph 3).

d.      The last sentence of the second paragraph on page 4 of the Order reads, "First Security has notified Debtor of the structural damage to the property and its continued deterioration."  Similarly, on page 14 of the Order, beginning with the third sentence, the Order reads, "This causes the property to further deteriorate and sustain damage.  There are already missing windows and holes in the plywood causing the inside of the building to be exposed to the outside elements and animals.  Another winter is beginning, and Debtor's continued failure to preserve the estate constitutes gross mismanagement under § 1112(b)(4)(B)."

These statements, apparently based on statements in pleadings by counsel for First Security, are not factually correct.  As stated in the Thomson Affidavit (paragraphs 4 through 8) and the Affidavit of Ryan Boehmer (attached hereto as Exhibit B, the "Boehmer Affidavit"), the following facts reflect the condition of the property:

i.      There is no open window, boarded-up window or other penetration allowing the interior of any of the apartments to be exposed to precipitation or the elements.

ii.      The apartment section of the building is water-tight, regularly inspected, and heated during the winter months.

iii.      Regular inspection of the apartment section of the building (including a thorough inspection by a pest-management professional) have revealed zero activity by rodents, vermin, insects or similar creatures.  Consequently, no

2

damage whatsoever from such creatures has been observed or credibly alleged.

iv.    There has never been a credible allegation of any structural damage to the building from exposure to the elements or otherwise.

v.    When construction ceased, some of the roof penetrations had not been finished. The state of these penetrations permitted a small amount of water to enter the apartment area of the property, which in turn caused some cosmetic damage. Although not necessary to protect the structure of the property, Debtor's management had the penetrations sealed anyway, largely to prevent the cosmetic damage from becoming an issue in the ongoing litigation.

vii.    The "broken window" referenced by First Security is actually a missing plastic panel in a skylight over an open-air arcade. The missing panel is barely visible from ground level outside the perimeter of the building. Apart from use of a drone or similar device, the missing panel can only be readily viewed from across the Cedar River. Since the skylight in question is over an open-air arcade, all the panels in the skylight could be removed without imperiling the structural integrity of the property. The entire area beneath the skylight is conditioned as an exterior space, able to withstand the extremes of Iowa's climate.

viii.    The missing skylight panel had been blown loose once before in a thunderstorm. It was subsequently recovered and put back into place. The second time it was blown loose, it went missing. The cost of replacement is estimated at under $100. Since (x) the missing panel is strictly a cosmetic issue, and a largely minor one at that, and (y) an inspection of the metal surrounding that panel should be conducted by a qualified professional prior to replacement of the panel to determine why that panel, of all the panels in the skylight, has had issues, Debtor's management had not made replacement of the panel a priority.

ix.    The building is locked, and electronic surveillance security is in place. To protect the asset, Debtor's management restricted the number and frequency of visitors to the site; personnel from the Debtor accompanied virtually all visitors to the site since construction ceased in 2017. No one from Debtor's management is aware of Mr. Larry Eide (First Security's counsel) ever being inside the building. The Equity Security Holders accordingly challenge whether any statement by Mr. Eide on the condition of the interior of the building could have been made from personal knowledge.

e.    In describing the 341 meeting in this case, the second sentence of the second paragraph on page 5 of the Order states, "Thomsen [sic] insisted a third-party financer was interested, and the money would be secured in a two-week time

3

frame."  As set forth in the Thomson Affidavit at paragraph 9, this statement, apparently based on the recollection of counsel for the U.S. Trustee, is not factually correct. Thomson stated that he hoped to have confirmation of the financing within the two-week period, not that funds would be available.

f.   The third sentence of the second paragraph on page 5 of the Order states, "Months passed and Debtor sought multiple extensions of the exclusivity period."  This is not correct.  The Debtor sought (and was granted) just one extension of the exclusivity period.

g.   The third and fourth sentences of the second full paragraph on page 6 of the Order state, "Debtor also has a negative history of insurance payments on the project. First Security has had to advance installments on the insurance."  The Equity Security Holders respectfully assert that these sentences do not reflect two facts which have been placed before the Court:

   i.   During the pendency of the Chapter 11 case, the Debtor always paid the insurance premiums prior to any cancellation of the Debtor's coverage; and

   ii.   As a consequence, any payments made by First Security were not necessary to prevent coverage from lapsing.

h.   The second full sentence on page 7 of the Order states, "The affiliated business is owned by Thomsen [sic]."  It appears from the context of this sentence that the referenced "affiliated business" is the dry-cleaning business known as "Classic Cleaners."  This business is owned by the Debtor itself, not by the Debtor's principal.  Similarly, the second sentence of the second paragraph on page 12 of the Order reads, "What little income Debtor receives comes from the dry-cleaning business that Debtor's principal owns."  Again, this business is, in fact, owned by the Debtor itself.

i.   The last names of the directors named in Adv. Pro. No. 19-09036 should be spelled "Herbrechtsmeyer" rather than the "Herbrechts-Meyer" spelling used in the Order. (*See* Order, first full paragraph on page 8, second sentence.)

NOW, WHEREFORE, the Equity Security Holders respectfully request that this Court enter an order amending the Order to:

a.   correct the spelling of the Debtor's principal's last name to "Thomson";

4

b.      reflect that First Security's original reason for declining involvement in the McQuillen financing was due to First Security's lack of experience in financings involving significant state economic development incentives;

c.      reflect that the result of the July 5, 2018 mediation was an offer by First Security to settle the litigation according to certain terms, rather than an agreement on a payment plan on the mortgage;

d.      reflect the fact that no structural deterioration occurred at the property between the cessation of construction and December 9, 2019, or, in the alternative, to eliminate entirely from the Order any discussion of the condition of the property;

e.      reflect that the principal of the Debtor indicated at the 341 meeting that he hoped to hear about securing funds within two weeks of the 341 meeting, rather than representing that he expected to secure funds within two weeks;

f.      reflect that the Debtor obtained a single extension of the exclusivity period;

g.      reflect that the Debtor maintained insurance coverage for the Debtor's assets throughout the pendency of the Debtor's chapter 11 case;

h.      reflect the fact that the Debtor owns the dry-cleaning business in question;

i.      correct the spelling of the last name of referenced directors to "Herbrechtsmeyer" from "Herbrechts-Meyer"; and

5

j.      granting the Equity Security Holders such other and further relief as the

Court deems just under the circumstances.

Respectfully submitted,

All of the Equity Security Holders of the Debtor

  /s/ Charles Thomson_____
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

6

EXHIBIT A
AFFIDAVIT OF CHARLES M. THOMSON

The undersigned, Charles M. Thomson, an adult resident in Floyd County, Iowa, under the penalty of perjury, having personal knowledge of the facts set forth below, solemnly states as follows:

1.      My last name is spelled "Thomson."

2.      The reason stated by First Security for initially not being interested in the McQuillen financing was *First Security's* lack of experience in administering financings involving significant state economic development assistance.  As stated in the Equitable Subordination Complaint (Adv. Pro. No. 19-09035) in paragraphs 26 through 29, this concern of First Security was later obviated by the agreement of Cedar Rapids Bank & Trust Company (which claimed to have this expertise) to act as "lead" lender.

3.      The outcome of the July 5, 2018, mediation was an offer by First Security to sell its interest in the loan to McQuillen Place Company, LLC under certain circumstances.  First Security and McQuillen Place Company, LLC did not "reach… an agreement on a new payment plan for the first mortgage."

4.      There is no open window, boarded-up window or other penetration allowing the interior of any of the apartments to be exposed to precipitation or the elements. The apartment section of the building is water-tight, regularly inspected, and heated during the winter months.

5.      In May 2019, I asked a professional exterminator to examine McQuillen Place for evidence of animals, vermin, etc.  I personally walked him through the entire building.  He found nothing to indicate the presence of any vermin, rodents, etc.

6.      The "broken window" referenced by First Security is actually a missing plastic panel in a skylight over an open-air arcade.  The missing panel is barely visible from ground level outside the perimeter of the building.  Apart from use of a drone or similar device, the missing panel can only be readily viewed from across the Cedar River.  Since the skylight in question is over an open-air arcade, all the panels in the skylight could be removed without imperiling the structural integrity of the property.  The entire area beneath the skylight is conditioned as an exterior space, able to withstand the extremes of Iowa's climate.

7.      The missing skylight panel had been blown loose once before in a thunderstorm.  It was subsequently recovered and put back into place.  The second time it was blown loose, it went missing.  The cost of replacement is estimated at under $100.

8.      The building is locked, and electronic surveillance security is in place.  I do not recall ever seeing Larry Eide go through the building, although I have been on numerous walk-throughs with personnel from First Security.

7

9.      At the 341 meeting for the Debtor, I tried to make it very plain that financing was not yet in place, but that I hoped to hear (and get something in writing) within two weeks of the 341 meeting.  I have attempted to get a copy of the recording of the meeting to confirm this, but I have not yet obtained it.  It is possible that I misspoke, but I specifically remember wanting to make clear that while the Debtor had received verbal promises of financing, the Debtor had not obtained a written financing commitment.

Further, affiant sayeth naught.

_____/s/ Charles M. Thomson_____

Charles M. Thomson

8

EXHIBIT B
AFFIDAVIT OF RYAN BOEHMER

The undersigned, Ryan Boehmer, an adult resident in Floyd County, Iowa, under the penalty of perjury, having personal knowledge of the facts set forth below, solemnly state as follows:

1.    Since fall 2017, at the direction of Charles M. Thomson, I have regularly and frequently performed various tasks at McQuillen Place, 123 North Main, Charles City, Iowa 50616.   Among these tasks have been inspecting the building thoroughly for any signs of deterioration or trouble, making sure the heaters were functioning during cold spells, showing people through the building, and similar tasks.

2.    In the period I have been checking on the building, I have paid particular attention to the windows of the apartment areas of the building.  I have made a point of going into the building after the heavy rains in the area to make sure the building is dry and that no storm damage has occurred.

3.    None of the windows in the apartment section are broken or missing (although there is one interior pane of glass which was broken in 2016, but it does not result in air or rain being able to enter the building, since the exterior glass remains intact).

4.    I've never seen any animals in the building or any evidence of animals in the building.  There is no food in the building, so there is nothing to draw animals inside.

5.    I have not detected any deterioration or change in the building which would suggest that the structure has been compromised in any way.  I have not seen anything going on in the building which would, if permitted to continue unabated, result in structural damage.

6.    I am experienced in construction and have worked for many years in various construction trades.  I have assisted my father, a former fire fighter who is an authority on construction, safety codes and the Charles City Code, in various construction projects, including, but not limited to, building houses and small commercial structures.

7.    The apartment section of the building is water-tight.  The commercial section of the building has a sand floor (except for the perimeter), and is protected from deterioration by plywood affixed to the exterior.  The plywood is weathering, but it is intended to do so.  The plywood protects the materials and finished construction within the plywood perimeter from exposure to the elements and theft.

8.    For a while after construction stopped, small amounts of water would drip into the building after a rainstorm.  These drips (measurable in tablespoons and perhaps mason jars) causes some cosmetic damage by, for example, creating a water stain on a piece of drywall near the ceiling.

9

9. These roof penetrations were subsequently sealed, so now there is no water penetration.

10. There is a missing plastic panel in a skylight over the building's open-air arcade. The missing panel is barely visible from ground level outside the perimeter of the building. Apart from use of a drone or similar device, the missing panel can only be readily viewed from across the Cedar River. Since the skylight in question is over an open-air arcade, all the panels in the skylight could be removed without imperiling the structural integrity of the property. The entire area beneath the skylight is conditioned as an exterior space, able to withstand the extremes of Iowa's climate.

11. The missing skylight panel had been blown loose once before in a thunderstorm. It was subsequently recovered and put back into place. The second time it was blown loose, it went missing.

12. The building is locked. The number and frequency of visitors to the site is restricted. Generally, no one is permitted in the building without someone from the Debtor accompanying them. I don't remember anyone named "Larry Eide" ever coming into the building.

Further, affiant sayeth naught.

       /s/ Ryan Boehmer
       _____
       Ryan Boehmer

10

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE                                        )    CASE NO.  19-00507
                                             )
MCQUILLEN PLACE COMPANY, LLC.,   )    MOTION TO SHORTEN TIME TO OBJECT
                                             )    TO REPORT OF SALE (RE CLASSIC
        Debtor.                              )    CLEANERS) AND TO WAIVE RULE
                                             )    6004(g) STAY

COMES NOW Charles L. Smith, Chapter 7 Trustee, and respectfully moves the Court to shorten the time to object to a report of sale to be filed and to waive the ten (10) day stay of Bankruptcy rule 6004(g), and in support thereof states:

1.      On April 25, 2019 (the "Petition Date") McQuillen Place, LLC (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  This case was converted to a Chapter 7 on December 9, 2019.

2.      On December 9, 2019, the Bankruptcy Court appointed the undersigned as Trustee in this matter.

3.      Included among the assets of this estate are the assets of Classic Cleaners including, but not limited to, all equipment, inventory, uncollected accounts receivable and a 2002 Ford Windstar.

4.      Classic Cleaners is holding the dry cleaning for numerous customers and the customers are being denied the opportunity to retrieve their own property.

5.      Trustee respectfully requests the Court to shorten the time to object to the Report of Sale to be filed relating to the sale of Classic Cleaners so that objections must be filed within ten (10) days of service of the notice.

6.      Trustee requests that the Court authorize the sale to be completed immediately after the expiration of the notice period provided that no objections are filed and that the ten (10) day stay of Bankruptcy Rule 6004(g) not apply.

WHEREFORE, Trustee prays for an Order from the Court granting this Motion to Shorten Time to Report of Sale; and for such other and further relief as is just.

Date: January 17, 2020.                    /s/ Charles L. Smith_____
                                           Charles L. Smith, Trustee AT0007415
                                           Telpner Peterson Law Firm, LLP
                                           25 Main Place, Suite 200
                                           Council Bluffs, IA  51503
                                           Telephone:  (712) 325-9000
                                           Facsimile:  (712) 328-1946
                                           E-mail:  csmith@telpnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury, that a copy of this document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing and by first class mail on the 17th day of January, 2020 to the following non CM/ECF participants:

Charles Thomson
1110 North Grand Ave., Suite 300
Charles City, IA  50616


                                           /s/ Cathy Templeton_____

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE | ) | CHAPTER 7 |
| | ) | CASE NO. 19-00507 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | ORDER GRANTING MOTION TO |
| Debtors. | ) | SHORTEN TIME TOOBJECTION TO |
| | ) | REPORT OF SALE AD TO WAIVE |
| | ) | RULE 6004(g) STAY |

NOW this matter comes before the Court on the Motion of the Trustee to shorten the time to object to a report of sale to be filed and to waive the Rule 6004(g) stay.  The Court having examined the Motion and being otherwise fully advised, FINDS that said Motion should be granted

ORDERED AND ENTERED    January 17, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

This order was prepared by:
Charles L. Smith, Trustee