# United States Bankruptcy Court
## Northern District of Iowa (Mason City)
## Bankruptcy Petition #: 19–00507

|  |  |
|---|---|
| *Assigned to:* Thad J. Collins | *Date filed:* 04/25/2019 |
| Chapter 7 | *Date converted:* 12/09/2019 |
| Previous chapter 11 | *341 meeting:* 01/27/2020 |
| Original chapter 11 | *Deadline for filing claims:* 04/08/2020 |
| Voluntary | |
| Asset | |

**Debtor**
**McQuillen Place Company, LLC**
1110 North Grand Ave., Suite 300
Charles City, IA 50616
FLOYD–IA
847–456–1911
Tax ID / EIN: 46–3987825
*aka* **Classic Cleaners**
*aka* **Classic Cleaners of Charles City**

represented by **J D Haas**
J D Haas & Associates, PLLC
1120 E. 80th St.
Suite 200
Bloomington, MN 55420
952–345–1025
Fax : 952–854–1665
Email: jdhaas@jdhaas.com

**Donald H. Molstad**
701 Pierce St., Ste. 305
Sioux City, IA 51101
712–255–8036
Email: judylaw308@yahoo.com

**Charles McQuillen Thomson**
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616
847–456–1911
Fax : 847–495–3488
Email: cthomson@doall.com

**Trustee**
**Charles L. Smith**
25 Main Place, Ste 200
P.O. Box 248
Council Bluffs, IA 51502–0248
712–325–9000

represented by **Telpner Peterson Law Firm, LLP**
25 Main Place, Suite 200
Council Bluffs, IA 51503
712–325–9000

**U.S. Trustee**
**United States Trustee**
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401–2101
319–364–2211

represented by **L Ashley Zubal**
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309–2108
515–323–2269
Email: Ashley.zubal@usdoj.gov

**Cred. Comm. Chair**
**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

| Filing Date | # | Docket Text |
|---|---|---|
| 01/17/2020 | 125 | Trustee's Notice and Report of Sale – Objections Due: 10 days *after the filing of this report*. Filed by Charles L. Smith. Objections due by 1/27/2020. (Smith, Charles) (Entered: 01/17/2020) |
| 01/29/2020 | 127 | Order Approving Report of Sale Signed on 1/29/2020. (tsta) (Entered: 01/29/2020) |
| 02/11/2020 | 129 | Hearing Set (related document(s)120 Motion to Amend) Hearing scheduled for 2/14/2020 at 01:30 PM by Telephonic Hearing. (dcri) (Entered: 02/11/2020) |
| 03/20/2020 | 131 | Notice of Appearance and Request for Notice by Eric W. Lam Filed by Creditor First Security Bank & Trust Company. (Lam, Eric) (Entered: 03/20/2020) |
| 03/20/2020 | 132 | Notice of Appearance and Request for Notice by Eric J. Langston Filed by Creditor First Security Bank & Trust Company. (Langston, Eric) (Entered: 03/20/2020) |
| 03/23/2020 | 133 | Motion to Shorten Time to Bar Date Notice re Motion to Sell Filed by Charles L. Smith (Smith, Charles) (Entered: 03/23/2020) |
| 03/23/2020 | 134 | Motion For Sale of Property Under Section 363 (b) – Real Estate and personal property free and clear of liens. Filed by Charles L. Smith (Smith, Charles) (Entered: 03/23/2020) |
| 03/24/2020 | 135 | Objection to Motion to Extend/Shorten Time Filed by Charles Thomson (related document(s)133 Motion to Extend/Shorten Time). (Thomson, Charles) (Entered: 03/24/2020) |
| 03/24/2020 | 136 | Support Document re: Sell/Sale of Property *Proposed Order* Filed by Trustee Charles L. Smith (related document(s)134 Sell/Sale of Property). (Smith, Charles) (Entered: 03/24/2020) |
| 03/24/2020 | 137 | Hearing Set (related document(s)133 Motion to Extend/Shorten Time) Hearing scheduled for 3/25/2020 at 03:00 PM by Telephonic Hearing. (dcri) (Entered: 03/24/2020) |
| 03/25/2020 | 138 | Brief *Memorandum re Trustee's Motion to Shorten Objection Period* Filed by Creditor First Security Bank & Trust Company (related document(s)133 Motion to Extend/Shorten Time). (Lam, Eric) (Entered: 03/25/2020) |
| 03/26/2020 | 139 | Order Granting Motion to Shorten Time To File Objections to Motion to Sell (Related Doc # 133) Date Shortened to: 10 Days. Dated and Entered on 3/26/2020. (tsta) (Entered: 03/26/2020) |
| 03/26/2020 | 140 | Order Set Hearing Signed on 3/26/2020. (related document(s)134 Sell/Sale of Property) Hearing scheduled for 4/8/2020 at 10:00 AM at Telephonic Hearing. (tsta) (Entered: 03/26/2020) |
| 03/26/2020 | 142 | Certificate of Service re: Order on Motion to Extend Time Filed by Trustee Charles L. Smith (related document(s)139 Order on Motion to |

| | | | |
|---|---|---|---|
| | | | Extend Time). (Smith, Charles) (Entered: 03/26/2020) |
| 03/27/2020 | | <u>143</u> | Affidavit re: Sell/Sale of Property Filed by Trustee Charles L. Smith (related document(s)<u>134</u> Sell/Sale of Property). (Smith, Charles) (Entered: 03/27/2020) |
| 04/06/2020 | | <u>146</u> | Exhibit List for April 8, 2020 Hearing Filed by Creditor First Security Bank & Trust Company (related document(s)<u>134</u> Sell/Sale of Property). (Lam, Eric) (Entered: 04/06/2020) |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE | ) | CHAPTER 7 |
| | ) | CASE NO. 19-00507 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | REPORT OF SALE OF PROPERTY |
| Debtor. | ) | UNDER $3,000 |

      The undersigned trustee of the estate of the Debtor(s) named above, upon the expiration of ten (10) days after the filing of this Report with the Clerk of Court, or as soon thereafter as the transaction may be completed, and subject to objection under Local Bankruptcy Rule 6004-1(b), will sell the following property of the estate:

      To the following purchaser:  Charles Thomson, 1110 North Grand Ave., Suite 300, Charles City, IA  50616.

      For the following considerations: Two Thousand dollars ($2,000.00) due within 15 days of the approval of this sale. If the purchase price is not timely received, the Trustee has the right to cancel and/or rescind this sale, at his sole option, upon written notice mailed to the purchaser, or to seek collection from the purchaser of the purchase price. Until the purchase price is paid in full, the property sought to be sold shall remain property of the estate.

      Pursuant to Local Bankruptcy Rule 6004-1(b), parties upon whom a copy of this report is served have ten (10) days after the filing of this report with the Clerk of Court to object to the Trustee's proposed action. If no timely objections are filed, the proposed action will be deemed approved without further Court Order.

      I certify that on this date as copy of this Report was served either electronically or by United States mail on the United States Trustee, Debtor(s), Debtor(s) counsel and all creditors or other parties-in-interest who have filed a request for notice pursuant to Local Bankruptcy Rule 2002-1(b) as required by Local Bankruptcy Rule 6004-1(f) per the service list below.

DATED:  January 17, 2020

                         Respectfully submitted,


                         /s/ Charles L. Smith
                         Charles L. Smith, Trustee AT0007415
                         Telpner Peterson Law Firm, LLP
                         25 Main Place, Suite 200
                         Council Bluffs, IA  51503
                         Telephone:  (712) 325-9000
                         Facsimile:  (712) 328-1946
                         E-mail:  csmith@telpnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury, that a copy of this document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing and by first class mail on the 17th day of January, 2020 to the following non CM/ECF participants:

Charles Thomson
1110 North Grand Ave., Suite 300
Charles City, IA  50616


/s/ Cathy Templeton

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE | ) | CHAPTER 7 |
| | ) | CASE NO. 19-00507 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | ORDER GRANTING REPORT OF SALE |
| Debtors. | ) | |
| | ) | |
| | ) | |

NOW this matter comes before the Court on the Motion of the Trustee to grant Report of Sale. The Court having examined the Motion and being otherwise fully advised, FINDS that said Report of Sale should be granted

DATED AND ENTERED

January 29, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

This order was prepared by:
Charles L. Smith, Trustee

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| In Re: | CHAPTER 7<br>Bankruptcy No. |
| McQuillen Place Company, LLC | 19–00507 |
| Debtor(s) | |

## NOTICE SETTING TELEPHONIC HEARING
## ON MOTION FOR EQUITY SECURITY HOLDERS TO AMEND JUDGMENT (DOC. 120)

TO:
Charles McQuillen Thomson, Attorney for Debtor(s)
Charles L. Smith, Trustee
United States Trustee
JD Haas, Attorney for Debtor
Donald Molstad, Attorney for Debtor
Larry Eide, Attorney for First Security Bank & Trust Company
Monica Clark and Bradley Sloter, Attorneys for City of Charles City, Iowa
Brandon Gray, Attorney for Iowa Economic Development Authority
Joseph Schmall and Laura Hyer, Attorneys for Cedar Rapids Bank & Trust Company

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

### *February 14, 2020 at 01:30 PM*

**NOTE: PLEASE USE THE FOLLOWING INSTRUCTIONS FOR THE TELEPHONE HEARING**
1. Call the toll free number: 1–888–684–8852
2. Enter Participant Access Code: 7148063
3. Enter the Participant Security Code: 0507
4. After the security code is entered, you will be connected into the conference
5. Please identify yourself after you have joined the conference

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Danielle Cripe*

Date: February 11, 2020

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS** |

Pursuant to F.R.B.P. 9010(b), please take notice that Eric W. Lam of Simmons Perrine Moyer Bergman PLC is appearing for the following party in the above-captioned bankruptcy case: First Security Bank & Trust Company.

This party is a creditor of the Debtor and is a party in interest in this case. Pursuant to F.R.B.P. 2002 and 9007, the undersigned, on behalf of First Security Bank & Trust Company, hereby requests that all notices given or required to be given in this case and all papers served or required to be served, including Notices of Abandonment, in this case be given to and served upon the undersigned at the office address and telephone number set forth below.

Please take further notice that the foregoing request includes the notices and papers referred to in the rules specified above and also includes, without limitation, notices of any orders, applications, complaints, demands, hearings, motions, petitions, pleadings, or requests, any other documents brought before this Court in this case, whether formal or informal, whether written or oral, and whether transmitted or conveyed by mail, delivery, telephone, telegraph, telex, facsimile, or otherwise.

This Notice of Appearance and Request for Notices shall not be deemed to be and is not a waiver of the rights of First Security Bank & Trust Company, and is not to be construed as a waiver of any right (i) to have final orders in non-core matters entered only after de novo review by the district court; (ii) to have trial by jury in any proceeding; (iii) to have the district court withdraw the reference; or (iv) any other right, claim, action, setoff, or recoupment to which First Security Bank & Trust Company may be entitled, all of which right, claim, action, setoff, or recoupment are reserved.

/s/ Eric W. Lam

Eric W. Lam, AT0004416
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
ATTORNEY FOR FIRST SECURITY BANK &
TRUST COMPANY

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 20th day of March 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Kelly Carmichael

Larry S. Eide
Charles Thomson
Charles L. Smith
Monica L. Clark
Brandon Gray
J D Haas
Laura Hyer
Donald H. Molstad
Judith O'Donohoe
Joseph E. Schmall
Christine B. Skilton
Bradley Sloter
L. Ashley Zubal
Dan Childers (via e-mail)

First Security – McQuillen/Pldgs/Drafts/Appearance by EWL.032020.1314.ewl

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**NOTICE OF APPEARANCE AND**<br>**REQUEST FOR SERVICE OF PAPERS** |

Pursuant to F.R.B.P. 9010(b), please take notice that Eric J. Langston of Simmons Perrine Moyer Bergman PLC is appearing for the following party in the above-captioned bankruptcy case: First Security Bank & Trust Company.

This party is a creditor of the Debtor and is a party in interest in this case. Pursuant to F.R.B.P. 2002 and 9007, the undersigned, on behalf of First Security Bank & Trust Company, hereby requests that all notices given or required to be given in this case and all papers served or required to be served, including Notices of Abandonment, in this case be given to and served upon the undersigned at the office address and telephone number set forth below.

Please take further notice that the foregoing request includes the notices and papers referred to in the rules specified above and also includes, without limitation, notices of any orders, applications, complaints, demands, hearings, motions, petitions, pleadings, or requests, any other documents brought before this Court in this case, whether formal or informal, whether written or oral, and whether transmitted or conveyed by mail, delivery, telephone, telegraph, telex, facsimile, or otherwise.

This Notice of Appearance and Request for Notices shall not be deemed to be and is not a waiver of the rights of First Security Bank & Trust Company, and is not to be construed as a waiver of any right (i) to have final orders in non-core matters entered only after de novo review by the district court; (ii) to have trial by jury in any proceeding; (iii) to have the district court withdraw the reference; or (iv) any other right, claim, action, setoff, or recoupment to which First Security Bank & Trust Company may be entitled, all of which right, claim, action, setoff, or recoupment are reserved.

/s/ *Eric J. Langston*

Eric J. Langston, AT0014001
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elangston@spmblaw.com
ATTORNEY FOR FIRST SECURITY BANK &
TRUST COMPANY

**Certificate of Service**

The undersigned certifies, under penalty of perjury, that on this 20th day of March 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Kelly Carmichael

Larry S. Eide
Charles Thomson
Charles L. Smith
Monica L. Clark
Brandon Gray
J D Haas
Laura Hyer
Donald H. Molstad
Judith O'Donohoe
Joseph E. Schmall
Christine B. Skilton
Bradley Sloter
L. Ashley Zubal
Dan Childers (via e-mail)

First Security – McQuillen/Pldgs/Drafts/Appearance by EJL.032020.1311.ejl

- 2 -

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC,

         Debtor.

CHAPTER 7
CASE NO. 19-00507

MOTION TO SHORTEN TIME TO
FILE OBJECTIONS TO MOTION
TO SELL AND FOR OTHER
RELIEF (11 U.S.C. §§363(b) and
(f)), TO PRESCRIBE NOTICE,
AND TO SET HEARING ON
OBJECTIONS

_____

COMES NOW Chapter 7 Trustee Charles L. Smith and moves for an Order from this Court granting this Motion, and in support thereof respectively states:

1.      On April 25, 2019, McQuillen Place Company, LLC ("Debtor") filed a voluntary Chapter 11 Petition with this Court.

2.      On December 9, 2019, this Court entered an Order converting the Chapter 11 case to one under Chapter 7.

3.      Charles L. Smith ("Trustee") has been appointed to administer this Chapter 7 case.

4.      In the course of his administration, the Trustee has been in communication with various creditors and stakeholders.

5.      Among the assets being administered by the Trustee is a certain real estate (the "Real Estate") upon which lies a partially-completed building that is owned by the Debtor, as well as certain items of personal property (the "Personal Property") located therein or associated therewith.

6.      The Trustee has issued an invitation to various interested parties to bid on the on the Real Estate and the Personal Property.

7.      The Trustee received two bids for the Real Estate and the Personal Property.

8.      The Trustee has concluded that one offer is the highest and best offer. As a result, the Trustee has executed a Purchase Agreement and the Trustee intends to file a Motion to Sell and For Other Relief (11 U.S.C. §§ 363(b) and (f)) seeking approval of the Purchase Agreement and the sale of the Real Estate and the Personal Property free and clear of liens and encumbrances.

9.      The real estate taxes against the Real Estate are delinquent and they accrue at the rate of approximately $18,000 per month so that time is of the essence.

10.     The Trustee and the proposed purchaser desire to expedite the approval of the sale of the Real Estate and Personal Property.

11.     The Trustee desires and requests an Order of this Court shortening the time to object to said Motion in order to obtain approval of the sale of the Real Estate and the Personal Property as promptly as possible.

12.     The Trustee is prepared to promptly mail notice of said Motion to all creditors and parties in interest as shown on the matrix of creditors.

WHEREFORE, the Trustee Charles L. Smith prays the Court for an Order shortening the time to file objections to Trustee's Motion to Sell and For Other Relief (11 U.S.C. §§ 363(b) and (f)), and prescribing notice thereof.  The Trustee further prays for such other and further relief as the Court deems just and equitable in the premises.

- 2 -

/s/ Charles L. Smith
Charles L. Smith, Chapter 7 Trustee
25 Main Place, Suite 200
Council Bluffs, IA 51503
Telephone: (712) 325-9000
Email: csmith@telpnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies under penalties of perjury, that on March 23, 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Charles L. Smith
Charles L. Smith, Trustee

- 3 -

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| McQuillen Place Company, LLC, | ) | Case No. 19-507 |
| Debtor. | ) | |

---

### TRUSTEE'S MOTION TO SELL AND FOR OTHER RELIEF
### (11 U.S.C. §§363(b) and (f))

COMES NOW Chapter 7 Trustee Charles L. Smith and moves for an Order from this Court granting this Motion, and in support thereof respectively states:

1.     On April 25, 2019, McQuillen Place Company, LLC. ("Debtor" or "MPC") filed a voluntary Chapter 11 Petition with this Court.

2.     On Dec. 9, 2019, this Court entered an Order converting the Chapter 11 case filed by the Debtor to one under Chapter 7.

3.     The Office of the United States Trustee subsequently appointed Charles L. Smith ("Trustee") to administer this Chapter 7 case.

4.     In the course of his administration, the Trustee has been in communication with various creditors and stakeholders.

5.     Among the assets being administered by the Trustee is certain real estate (the "Real Estate") upon which lies a partially-completed building (the "Building") that is owned by the Debtor, as well as certain items of personal property located therein or associated therewith (the "Personal Property").

6.     With respect to the Real Estate and Building, the Trustee is credibly informed First Security Bank & Trust Company ("Bank" or "Purchaser") asserts a validly perfected

1

mortgage against the Real Estate and Building (the "Mortgage"). The Trustee further reasonably believes no one claims a superior interest in the Real Estate and Building, other than the Bank's assertion of a mortgage lien and whatever, if any, mechanic or similar statutory liens, that may include liens on account of real estate tax, are asserted by other parties in interest. The Trustee is further cognizant that based on the Mortgage the Bank has commenced a Foreclosure Petition in State Court, and certain counterclaims have been pled. The Foreclosure Petition was and still is pending in State Court, and no Decree has been enrolled.

7.      With respect to the Personal Property, even if some or all of the Personal Property became fixtures (which would then be subject to the Bank's mortgage), no one has filed any U.C.C. financing statement. As such, the Personal Property is likely free and clear of perfected consensual liens.

8.      However, the Trustee is also cognizant that Cornice & Rose International, LLC (which, *inter alia*, served as the Debtor's architect ("C & R")) (and perhaps other entities that are owned or partially owned by the Debtor's principal, *e.g.* Hildreth & Co., LC) asserts some interest or claim or right against some of all of the personal property in question. For example, C & R may claim it actually "owns" some or all of the personal property located in and scattered in various areas of the Debtor's building, and C & R may also claim it is the licensor of certain drawings that might have been used by the Debtor or others in the process of erecting the Building. In any event, at a minimum bearing in mind the Debtor is at least in possession of some of the  Personal Property (*e.g.* the items that are located on the Debtor's premises), and the Debtor is or was at least a licensee of some of the drawings, pursuant to 11 U.S.C. §541 the Debtor and therefore this estate had and have

2

either a legal or equitable (or both) interest in all of the Personal Property, albeit admittedly

and possibly subject to whatever, if any, claim, right, title, or interest that may eventually be

validly proven by C & R or other entities claiming a claim, right, title, or interest thereto.

9.      The Trustee has issued an invitation to various interested parties to bid on the

Real Estate and the Personal Property. Two bids were received by the March 9, 2020

deadline imposed by the Trustee. In examining the two bids, the Trustee has concluded the

bid submitted by the Bank is the highest and best offer. As a result, the Trustee has executed

a Purchase Agreement, a copy of which is attached hereto as Exhibit 101 and is by this

reference incorporated herein as if set forth verbatim.

10.      Briefly and generally, the Purchase Agreement provides for the Trustee to sell

the Real Estate and Building, as well as the Personal Property, for a total cash gross cash

price of $1,100,000. Any and all lien, claim, title, interest, and right asserted by the Bank or

C & R or any party in interest will attach to the gross proceeds, in whatever order of priority

that existed as of the initial Chapter 11 filing date, EXCEPT the sum of $150,000 cash will

be released from the gross proceeds allocated to the Real Estate and Building, and such sum

shall be free and clear of any and all claim, lien, title, interest, and right, and the Trustee and

the estate may use such sum for any and all purposes, pursuant to the provisions of Title 11,

including but not limited to the payment of administrative claims and expenses and, if

available, to the payment of various non-administrative claims (such as general unsecured

claims).

11.      More specifically, with respect to the Real Estate and Building, because no

one disputes the Debtor owns the Real Estate in fee simple absolute, subject only to the

Bank's Mortgage and whatever, if any, other validly perfected lien or encumbrance, the

Trustee seeks permission from this Court to effectuate the sale pursuant to 11 U.S.C.

§363(b). All such Mortgage and lien and encumbrance and any and all right, title, claim,

interest, and lien of any and all parties in interest will attach to the gross proceeds from the

sale, minus the cash sum of $ 150,000, in the same order of priority as it existed as of the

time of the original Chapter 11 filing, and will be held by the Trustee, subject to further

Order from this Court. If, for example, eventually the Bank successfully proves to this Court

that the Bank has a superior lien in such gross proceeds (minus $150,000), the money will

then be paid to the Bank in partial satisfaction of its Proofs of Claim filed in this Court. And

*if* somehow there is a bona fide dispute as to the Bank's lien or the Debtor's (and the

estate's) ownership of the Real Estate and Building, the Trustee alternatively seeks

permission from this Court to sell the Real Estate and Building, pursuant to 11 U.S.C.

§363(f)(4).

12. With respect to the Personal Property, the Trustee posits there is a bona fide

dispute between and among various interested parties as to the respective and relative lien,

claim, title, and interest in and to the Personal Property. For example, the Debtor at a

minimum had or has a possessory right and interest or the right of a licensee, whereas other

interested parties (such as C & R) assert an "ownership" or licensor claim or interest. The

Trustee has attempted to discover the full extent of C & R *et al.*'s claims or interest, but C &

R's counsel merely referred the Trustee to certain provisions of the United States Code

without otherwise fully and completely sharing with the Trustee all documents and

information concerning the alleged claim of "ownership." Therefore, with respect to the

Personal Property, the Trustee seeks permission from this Court to sell to the Bank the

Personal Property for the sum of $25,000, pursuant to 11 U.S.C. §363(f)(4), *viz.*, this Court

4

is authorized to sell property of the estate that is subject to "bona fide dispute." If C & R or others eventually prove to this Court that they indeed enjoy superior title, right, claim, or interest to the Personal Property, the proceeds from the sale attributable to the value of the Personal Property will be paid to such parties. Pending resolution of the bona fide dispute, the gross proceeds of the sale attributable to the Personal Property will be held by the Trustee, subject to further Order from this Court, and any and all right, title, claim, lien, or interest of any and all parties in interest will attach to such proceeds, in the same order of priority as it existed as of the time of the original Chapter 11 filing.

13.    To consummate the sale, the Trustee will execute a Court Officer's Deed, with respect to the Real Estate and Building, and a Bill of Sale with respect to the Personal Property. The Purchaser will be granted title, pursuant to this Court's Order approving this Motion, to all the Real Estate and Building and the Personal Property, free and clear of any and all claims (including but not limited to any and all environmental claims or successor liability claims), liens, interests, title, right, and encumbrances. Otherwise, the sale is "As is Where Is."

14.    The Trustee submits the sale proposed in this Motion is in the best interest of the estate, of the creditors, and of the community. This is so because such a sale will generate much-needed "free and clear" cash to enable the Trustee to administer this case, and will hopefully enable the Purchaser to complete the building project, to the betterment of the community and the public interest. The Trustee further submits the Purchase Agreement was negotiated at arm's length and in good faith and with assistance and advise from counsel.

15.    Any Order approving this Motion should also provide the 14-day stay period in F.R.B.P. 6004(h) is inapplicable. Such a provision will enable an expeditious closing, and will minimize administrative claim (such as utility bills, real estate taxes etc.) that will be incurred and inflicted against the estate. A form of a proposed Order is appended hereto.

WHEREFORE, the Trustee respectfully prays this Court on such notice and hearing as it may direct enter and enroll an Order granting the relief requested by the Trustee in this Motion, and for such other relief as may be just and proper under the premises.

/s/ Charles L. Smith
Charles L. Smith, Chapter 7 Trustee
25 Main Place, Suite 200
Council Bluffs IA 51503
712-325-9000

**Certificate of Service**

The undersigned certifies, under penalty of perjury, that on this 23rd day of March 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Cathy Templeton

Larry Eide
Don Molstad
Christine Skilton
Eric Lam
Charles Thomson
Joe Schmall
Laura Heyer
Judith O'Donohue
Brandon Gray
Brad Sloter

6

L Ashley Zubal
Monica Clark
J D Hass
Dan Childers

<u>Declaration</u>[1]

     I, Charles L. Smith, in my sole capacity as Chapter 7 Trustee in this case, do hereby declare under penalty of perjury under 28 U.S.C. §1746 that the facts stated in this Motion are true and correct.

                      <u>/s/ Charles L. Smith</u>
                      Charles L. Smith, Chapter 7 Trustee

---

[1] Pursuant to F.R.B.P. 9017 and F.R.C.P. 43(c), to the extent evidence is necessary to consider this Motion, the Court is authorized to consider the Motion based on affidavits. The Trustee's Declaration is submitted so as to comply with F.R.C.P. 43(c).

7

**PURCHASE AGREEMENT**

THIS PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the 20th day of March, 2020 by and between Chapter 7 Trustee Charles L. Smith, solely in his capacity as Trustee of the Bankruptcy Case ("Seller") and First Security Bank & Trust Company having an address at 809 Clark Street, Charles City, Iowa ("Purchaser") ("Purchaser" and "Seller" are for ease of reference "Parties").

**Recitals**

A.    On April 25, 2019, McQuillen Place Company, LLC ("Debtor") filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Iowa (the "Bankruptcy Court") bearing Case No. 19-507 (the "Bankruptcy Case"); on December 9, 2019, the Bankruptcy Court entered an order converting the Bankruptcy Case to Chapter 7; and the Office of the United States Trustee appointed Charles L. Smith to administer the Bankruptcy Case.

B.    In connection with the Bankruptcy Case, Seller has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Seller, at the price and upon the terms and conditions set forth in this Agreement, (a) that certain parcel of land commonly known as McQuillen Place, and more particularly described on Exhibit A (the "Land"), (b) the buildings, improvements, and structures located upon the Land (the "Improvements"), (c) all other easements and rights appurtenant to the Land, if any (the "Appurtenant Rights"), and (d) all right, title and interest of Seller, if any, in and to the fixtures owned by Seller and attached or appurtenant to the Property, as well as certain items of personal property described on Exhibit A1 (the "Personal Property" and, together with the Land, the Appurtenant Rights, the Improvements, and the Personal Property, collectively, the "Property").

C.    As a result of the pendency of the Bankruptcy Case, Bankruptcy Court approval of this Agreement is required, subject to all terms and conditions set forth herein. In the event the Bankruptcy Court not approve this Agreement, this Agreement shall terminate, and no party hereto shall have any further obligations hereunder, except as otherwise provided herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto hereby agree as follows:

1.    Purchase and Sale. Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Property.

2.    Purchase Price. The purchase price (the "Purchase Price") for the Property shall be the sum of US$1,100,000.00, of which US$1,075,000.00 shall be allocated to be the price for the purchase and sale of the Land, Improvements, and Appurtenance Rights, and separately US$25,000 shall be allocated to be the price for the purchase and sale of the Personal Property.

1

**EXHIBIT**

tabbies

101

(a)    Payment of Purchase Price. Ten percent of the Purchase Price shall be paid to Seller by Purchaser within seven days after the execution of this Agreement, and the balance of the Purchase Price shall be paid to Seller by Purchaser within seven days of the later of (a) the entry of a Sale Order by the Bankruptcy Court or (b) the execution and tender and delivery of the Deed (as defined herein) and Bill of Sale (as defined herein) and similar documents, except the Parties may mutually in writing agree to a different time. If this Agreement is not timely and fully consummated in any form or fashion, then the aforementioned 10% paid by Purchaser to Seller shall be fully refunded to the Purchaser from the Seller forthwith, and Purchaser shall have no obligation to the Seller with respect to the Purchase Price.

4.3    Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the performance and observance by Seller of all material covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date, (ii) the Bankruptcy Court shall have entered a final and non-appealable order approving this Agreement and the sale of the Property to Purchaser pursuant to the Bankruptcy Code, in form and substance satisfactory to Purchaser and its counsel (the "Sale Order"), and (iii) the fulfillment on or before the Closing Date of these and all other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any of which may be waived by Purchaser in its sole discretion.

4.4    Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the Bankruptcy Court shall have entered the Sale Order, (ii) the performance and observance by Purchaser of all material covenants and agreements of this Agreement to be performed or observed by Purchaser prior to or on the Closing Date, and (iii) the fulfillment on or before the Closing Date of these and all other conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in its sole discretion.

4.5    Bankruptcy Conditions. By no later than July 10, 2020, or such other earlier or later date mutually agreed to between the parties (the "Sale Order Approval Deadline"), the Bankruptcy Court shall have entered the Sale Order in a form reasonably acceptable to the Purchaser and Seller that, without limitation, shall (i) include a finding that the Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (ii) provide that the Purchaser is obtaining the Property free and clear of any lien, claim, title, right, or interest, except as otherwise provided for in the Agreement; and (iii) contain such form and substance reasonably satisfactory to Purchaser and its counsel.

4.6    Carve Out and Disposition of Purchase Price. From the Purchase Price the Seller shall retain for the sole benefit of and usage in the Bankruptcy Case, free and clear of any and all claim or lien of the Purchaser, the sum of US$150,000, which sum may be used by the Seller for any and all purposes, subject to the provisions of Title 11 and further Orders from the Bankruptcy Court. Subject to the allocation aforementioned between the Land etc. vis-à-vis the Personal Property, the balance of the Purchase Price shall be held by the Seller, pending further Orders from the Bankruptcy Court, and shall not be disbursed or released

2

except as may be directed or allowed by Orders from the Bankruptcy Court, all subject to and pursuant to notice and hearing.

5.    Closing. Subject to the satisfaction or waiver of all conditions precedent with respect to each party's obligation, the closing (the "Closing") of the sale and purchase contemplated herein shall occur at the offices of Attorney Larry Eide in Mason City, IA (or such other location to which the Parties may mutually agree), on or before April 17, 2020, unless otherwise mutually agreed to by the Parties.

5.1    Seller Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by Seller, as appropriate:

(a)    a court officer deed (the "Deed") in the form shown in Exhibit B;

(b)    a certification of non-foreign status in the form shown in Exhibit C;

(c)    all existing surveys, blueprints, drawings, operating manuals, plans and specifications for or with respect to the Property or any part thereof, to the extent the same are in Seller's possession;

(d)    all keys to the Improvements, to the extent the same are in Seller's possession;

(e)    such further instruments as may be necessary to record the Deed;

(f)    [intentionally left blank]

(g)    a bill of sale as to any personal property included in the sale (the "Bill of Sale") in the form shown in Exhibit D;

(h)    a copy of the Sale Order;

(i)    possession of the Property free of all leases, tenancies, occupancies, service contracts, other executory contracts;

(j)    to the extent in Seller's possession, originals of any and all condominium conversion documents, plans, estimated budgets and other related documents and Seller agrees to cooperate with Purchaser after the closing in connection with substituting Purchaser as the sponsor under the condominium documents and in connection with Purchaser's acquisition of the Property, provided such cooperation shall be at no cost to Seller;

(k)    such further instruments as may be necessary to consummate the transaction.

5.2    Purchaser Deliveries. At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following items executed and acknowledged by Purchaser, as appropriate:

3

   (a)  payment of the Purchase Price to be made in accordance with this Agreement and

   (b)  such further instruments as may be necessary to consummate the transaction.

   5.3  <u>Closing Costs</u>. Each Party shall bear its own costs associated with Closing.

   5.4  <u>Other Purchaser Costs</u>. Purchaser shall be solely responsible for the payment of the following, incurred since and including April 25, 2019, through the Closing Date (except Purchaser is entitled to seek allowance and payment of all such costs, not to exceed $25,000.00, in the Bankruptcy Case, upon and subject to notice and hearing):

   (a)  All real estate taxes, water charges, sewer rents, vault charges and other assessments due with respect to the Property, as well as any and all insurance premiums and security and similar costs and expenses relating to the Property and

   (b)  All utilities, including telephone, steam, electricity and gas and similar services and materials.

  6.  <u>Representations, Warranties and Covenants; "As Is" Sale</u>.

   6.1  <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Purchaser that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

   (a)  This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the Sale Order. Seller has taken all necessary action to authorize and approve the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, subject to the Sale Order.

   (b)  [Reserved].

   (c)  Seller is not a "foreign person" as defined in Section 1445 of the Code.

   (d)  Seller has no knowledge of any proposed takings, condemnation or eminent domain proceeding or threat with respect to the Property.

   (e)  The foregoing representations and warranties shall survive the Closing.

   6.2  [Reserved].

   6.3  **General disclaimer. Except as specifically set forth in this Agreement and Exhibits, the sale of the Property is and will be made on an "as is," "where is," and "with all faults" basis, without any representation and warranty of any kind or nature, express, implied or otherwise, including any representation or warranty concerning title**

4

**to the Property, the construction of the Improvements, the physical condition of the Property (including the condition of the soil or the Improvements), the environmental condition of the Property (including the presence or absence of hazardous substances on or affecting the Property), the compliance of the Property with applicable laws and regulations (including zoning and building codes or the status of development or use rights respecting the Property), the present and future zoning applicable to the Property, the financial condition of the Property or any other representation or warranty respecting any income, expenses, charges, liens or encumbrances, rights or claims on, affecting or pertaining to the Property or any part thereof.**

6.4    <u>Representations and Warranties of Purchaser</u>. Purchaser represents and warrants to Seller that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

(a)    The Purchaser is duly organized, validly existing and in good standing under the laws of the state of its formation.

(b)    The Purchaser has all necessary power and authority to enter into this Agreement and has taken all action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other proceedings on the part of the Purchaser are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Purchaser and is a valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms.

(c)    No consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of this Agreement or any agreement ancillary to this Agreement and the consummation of the transactions contemplated hereby or thereby.

(d)    On the Closing Date, the Purchaser will have cash on hand sufficient to deliver the Purchase Price to the Seller.

(e)    The representations and warranties of Purchaser shall survive the Closing.

7.    <u>Remedies For Default</u>.

7.1    <u>**Seller Defaults**</u>**. If the transaction herein provided shall not be closed by reason of Seller's default under this Agreement, then Purchaser shall have, as its exclusive remedies, the right to either (a) terminate this Agreement or (b) specifically enforce this Agreement (but no other action, for damages or otherwise, shall be permitted).**

7.2    **Purchaser defaults. If the transaction herein provided shall not be closed by reason of Purchaser's default under this Agreement, then Seller shall have, as its exclusive remedies, the right to either (a) terminate this Agreement or (b) specifically enforce this Agreement (but no other action, for damages or otherwise, shall be permitted).**

8.    Termination.

8.1    This Agreement may be terminated by mutual written consent of the Purchaser and the Seller at any time, subject to any necessary or appropriate order of or approval from the Bankruptcy Court.

8.2    This Agreement shall also terminate if the Sale Order is not entered.

9.    Miscellaneous.

9.1    Exhibits; Schedules; Entire Agreement; Modification. All exhibits and schedules attached and referred to in this Agreement are hereby incorporated herein as if fully set forth in (and shall be deemed to be a part of) this Agreement. This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes any prior agreements between the parties hereto respecting such matters. This Agreement may not be modified or amended except by written agreement signed by both parties.

9.2    Business Days. Whenever any action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or by a particular date) that ends (or occurs) on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day. As used herein, the term "Business Day" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in the State of Iowa are not required or authorized to be closed for business.

9.3    Interpretation. Section headings shall not be used in construing this Agreement. Each party acknowledges that such party and its counsel, after negotiation and consultation, have reviewed and revised this Agreement. As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to wit, that ambiguities in this Agreement should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto. Whenever the words "including," "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner. The word "any" does not preclude "all" and vice versa. Terms in singular or plural shall be read interchangeably.  The word "or" is inclusive.  Except as otherwise indicated, all Exhibit, Schedules and Section references in this Agreement shall be deemed to refer to the Exhibits, Schedules and Sections in this Agreement.

9.4    Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Iowa, without giving effect to principles of conflicts of law, and, where applicable, the U.S. Bankruptcy Code.

6

9.5  <u>Assignments; Successors and Assigns</u>. Purchaser may assign or transfer its rights or obligations under this Agreement without the prior written consent of the Seller. In the event of an assignment or transfer, the transferee shall assume in writing all of the transferor's obligations and shall succeed to the rights and benefits and remedies hereunder.

9.6  <u>Notices</u>. All notices, requests or other communications that may be or are required to be given, served or sent by either party hereto to the other shall be deemed to have been properly given, if in writing and shall be deemed received (a) upon delivery, if delivered in person or by facsimile transmission, with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery), (b) one (1) Business Day after having been deposited for next day overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the United States Postal Office and sent by registered or certified mail, postage paid, return receipt requested, and in each case, addressed as follows:

To Seller:

Charles L. Smith, Chapter 7 Trustee
25 Main Place, Suite 200
Council Bluffs, Iowa 51503
(712) 325-9000

To Purchaser:

First Security Bank & Trust Company
809 Clark Street
P.O. Box 577
Charles City, Iowa 50616-0577
(641) 257-1232

9.7  <u>Third Parties</u>. Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement upon any other person other than the parties hereto and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third parties any right of subrogation or action over or against any party to this Agreement. Except as set forth below, this Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

9.8  <u>Legal Costs</u>. The Parties agree that they shall pay directly any legal costs that they have incurred on their own behalf in the preparation of this Agreement, all deed and other agreements pertaining to this transaction, and that such legal costs shall not be part of the Closing costs.

9.9  <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, including counterparts transmitted by e-mail or facsimile, each of which shall

7

be deemed an original. When counterparts, e-mail, or facsimile copies have been executed by all parties, they shall have the same effect as if the signatures to each counterpart or copy were upon the same documents, and e-mail and facsimile counterparts shall be deemed valid as originals.

9.10 <u>Effectiveness</u>. In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each party hereto.

9.11 <u>No Implied Waivers</u>. No failure or delay of either party in the exercise of any right or remedy given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified in this Agreement for exercise of such right or remedy has expired) shall constitute a waiver of any other or further right or remedy, nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy. No waiver by either party of any breach hereunder or failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.

9.12 <u>Discharge of Seller's Obligations</u>. Except as otherwise expressly provided in this Agreement, Purchaser's acceptance of the Deed and Bill of Sale shall be deemed a discharge of all of the obligations of Seller hereunder that are required to be performed at or prior to Closing and all of Seller's covenants and agreements (except express representations and warranties) in this Agreement shall merge in the documents and agreements executed at the Closing and shall not survive the Closing, except and to the extent that, pursuant to the express provisions of this Agreement, any of such covenants or agreements are to survive the Closing.

9.13 <u>Unenforceability</u>. If any portion of any provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, then such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and such provisions shall be limited and construed as if such invalid, illegal or unenforceable provision or portion thereof were not contained herein, unless doing so would materially and adversely affect a party or the benefits that such party is entitled to receive under this Agreement.

**9.14 <u>Waiver of Trial by Jury and Attorney's Fees and Expense</u>. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. IN ANY SUCH TRIAL OR ACTION OR PROCEEDING ETC., THE PREVIALING PARTY SHALL BE ENTITLED TO BE PAID FROM THE OTHER PARTY ANY AND ALL REASONABLE COSTS AND EXPENSES INCURRED, INCLUDING REASONABLE ATTORNEY'S FEES AND EXPENESE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.**

9.15 <u>[Reserved]</u>.

8

12.20  <u>Forum</u>. Any dispute that arises under or relates to this Agreement (whether arising under contract, tort, at law or in equity) shall be resolved in the Bankruptcy Court.

12.21 [intentionally left blank]

[*Remainder of Page Intentionally Left Blank*]

9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

By: Charles L. Smith
Capacity: Chapter 7 Trustee

PURCHASER:

**First Security Bank & Trust Company,**

By: Mark G. Miller
Title: Executive Vice-President

10

## EXHIBIT A

### Legal Description

Real estate locally known as 107 - 109 and 123 Main Street, Charles City, Floyd County, Iowa, and which is legally described, to wit:
LOT ONE (1), BLOCK TWENTY ONE (21), EXCEPT THE NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF, OF THE ORIGINAL PLAT OF ST. CHARLES, NOW A PART OF CHARLES CITY, IOWA, OTHERWISE DESCRIBED AS: LOT ONE (1) OF THE IRREGULAR SURVEY OF BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES. NOW A PART OF CHARLES CITY, IOWA, EXCEPT THE NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF;
AND
THE NORTH ONE HALF (N ½) OF THE WEST FORTY FEET (W 40') OF THE BRICK WALL BETWEEN LOTS ONE (1) AND TWO (2), BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY, IOWA;
AND
CHARLES CITY DISASTER REDEVELOPMENT PROJECT IOWA R 36(C) PARCEL NO. R 24 (P 10), MORE PARTICULARLY DESCRIBED AS: THE NORTHWESTERLY 22.00 FEET OF LOT ONE (1), BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS THE CITY OF CHARLES CITY, FLOYD COUNTY, IOWA.
(LOCALLY DESCRIBED AS 123 N. MAIN STREET, CHARLES CITY, IOWA 50616 PARCEL NO. 110146700500)
AND
LOT TWO (2), BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY, IOWA.


LOT THREE OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE OF THE ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES CITY.
LOT 4 OF THE SUB-DIVISION OF LOTS 3 AND 4 OF BLOCK 21 OF THE ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES CITY, IOWA.
LOT FIVE (5) OF THE IRREGULAR SURVEY OF BLOCK NO. TWENTYONE (21) OF THE ORIGINAL PLAT OF ST. CHARLES (NOW INCORPORATED AS CHARLES CITY) ACCORDING TO THE SUBDIVISION OF SAID BLOCK TWENTY-ONE (21).

<u>EXHIBIT A1</u>

# McQuillen Place Building Inventory

**REVISED 12 FEBRUARY 2020**

C&R = Items CLAIMED by

Cornice & Rose Intl

5530: Outside building materials

5532: Stair tower floor finish boxes

5533: ladder C&R

5534: Assorted tools **c&R**

5535: Pallet of Delta boxes, plumbing fixtures

5536-37: Assorted building products

5538-39: Exterior building products C&R

5540: Traffic cones C&R

5541: Exterior Building products

5542-43: JLG Lift 3394RT Serial #: 0200137425 C&R

5544: Table Saw C&R

5545: Exterior building materials

**5546-47:** Pallet of smoke detectors/paint/air purifier **C&R**

5548-49: Assorted tools/refrigerator hose/safety equipment/air compressor C&R

5550-51: Assorted vent grilles/lights/Clark welder C&R

5552: Jigsaw/shop vac/cement mixer C&R

5553-54: Window Hardware/Carpet squares

5555-56: Assorted tools/Exterior building products/printer C&R

**5557:** Box of miscellaneous **c&R**

5558: Pallet fork for Skid Loader C&R

5559: Plastic conduit

5560-64: Pallet of Air Conditioning units

5565: Door frame

5566-67: 6 Fire rated doorframe

5568: Exterior buildings products

5569: Building materials

5570: Exterior building products C&R

5571: Outside brick pavers 5572: Two pallets of shingles

5573: Deere CT322 Skid Load on tracks Serial #:
     T0322TA115342

5574: Pallet of Plywood

5575-76: Landscaping cloth-black

5578-79: Assorted wires and cables

5580: Pallet of lumber

5581: Pallet of lumber

5582: Two gas cans C&R

5583: Landry washing machine Serial #:9707/002301 5584:
     Lumber

5585: Landry Drier Serial #: 1301007714

5586: Dry wall

5587: Plastic conduit

5589-90: Window screens

5591: Plywood/fire rated steel door frames

5592: JLG 1930ES lift Serial #: 0200163717 C&R

5593-95: Mini split unit/battery charger/grout/ polycrete C&R

5596-01: Counter tops-assorted colors

5602: Assorted tools

5603: Conduit in metal and plastic

5604: Brick

5605-13: Assorted electrical equipment

5614: Air compressor Serial #:SN130310850340307 C&R

5616: Three boxes of mail boxes

5617: PVC black piping/hand rails

5618: Scaffolding plank C&R

5619-20: Door hardware

5621: Propane tank

5622: Assorted duct work

5623: Lumber/plumbing supplies/sink (12 pieces of the lumber is Osha Stamped)
C&R 5624: Sonotube/struts/job box C&R

5625: Assorted building material/conduit/two space heaters C&R 5626: Scaffolding/
four space heaters C&R

5627: Window scaffolding/temporary lights/safety equipment/assorted supplies C&R
5628: Job box C&R

5629: Fuel can/exterior supplies/tarps/sprinkler system parts/plumbing parts C&R

5630-34: Apt 201

5635-42: Apt 217

5643-52: Apt 202

5653-62: Apt 216

5663-70: Apt 203

5671-77: Apt 215

5678-81: Apt 214

5682-87: Apt 204

5688-97: Apt 205

5698-5701: Apt 213

5072-03: Apt 212

5704-22: Apt 211

5723: Industrial fan C&R

5724-25: Apt 210

5726-27: Apt 209

5728-29: Apt 208

5730-47: Apt 207 C&R 5744 TOOLS & 5745 CART

5748-49: Apt 206

**5750:** Torpedo heater **c&R**

5751-56: Apt 306

5757-63: Apt 307 C&R 5759 SCAFFOLD 5761 LADDER

<u>EXHIBIT B</u>

**COURT OFFICER DEED**
**Recorder's Cover Sheet**

**Preparer Information:** (name, address and phone number)
_____

**Taxpayer Information:**  (name and complete address)
_____

**Return Document To:**  (name and complete address)
_____

**Grantor:**

**Grantee:**

**Legal Description:**  See Next Page

**Document or instrument number of previously recorded documents:**



# COURT OFFICER DEED

Matter name: _____

now pending in the _____ Court. Case No. _____

      Pursuant to the authority and power vested in the undersigned, and in consideration of _____ Dollar(s) and other valuable consideration, the undersigned, in the representative capacity designated below, hereby Convey(s) to _____ the following described real estate in _____ County, Iowa:

      Words and phrases herein, including acknowledgement hereof, shall be construed as in the singular or plural number, and as masculine, feminine or neutral gender, according to the context.

Dated: _____.

By: _____    _____
                             Title

By: _____    _____
                             Title

As _____ *in the above entitled estate or cause.

As _____ *in the above entitled estate or cause.

*Executor, Administrator, Guardian, Conservator, Trustee, Referee, Commissioner, or Receiver

STATE OF IOWA, COUNTY OF _____

This record was acknowledged before me on _____, by _____
_____.

                                    _____
                                    Signature of Notary Public

## EXHIBIT C

## CERTIFICATION OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Chapter 7 Trustee Charles L. Smith (the "Affiant"), the Affiant hereby certifies the following that:

1. Affiant is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. The U.S. Federal Identification Number of the Affiant is 46-3987825 ; and

3. Affiant is not a disregarded entity as defined in Internal Revenue Regulations §1.1445.2(b)(2)(iii); and

4. The address of Affiant is: 25 Main Place, Suite 200, Council Bluffs, Iowa 51503.

Affiant understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that the undersigned has examined this certification and to the best of his knowledge and belief it is true, correct and complete.

Dated: [ _____ ], 20__.

By: _Charles L. Smith_____
Capacity: _Chapter 7 Trustee_____

## EXHIBIT D

## BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Assignment") is executed as of the _____ day of _____, 20__ by Chapter 7 Trustee Charles L. Smith ("Assignor") in favor of First Security Bank & Trust Company ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Personal Property (as such term is described in that certain Purchase Agreement dated as of _____ between Assignor and Assignee).

WHEREAS, in addition to the sale of Personal Property, Assignor also will assign, transfer, set over and deliver to Assignee all of Assignor's rights, if any, in and for all other items of personal property, whether or not affixed or attached to, or placed or situated upon, the Property, and any incidental rights and appurtenances relating thereto, all as described in Exhibit A1 appended hereto, and also in ¶¶ A and B *infra* (collectively, the "Assigned Properties"):

A.      To the extent assignable without third party consents or any cost or expense to Assignor, all of Assignor's right, title and interest in and to all use, occupancy, building and operating permits, licenses, approvals, documents, instruments, if any, issued from time to time with respect to the Property or the Assigned Properties; *provided*, *however*, if any such assignment may be made at an additional cost or expense, Assignor shall assign all of Assignor's right, title and interest therein if and to the extent Assignee shall pay such additional cost or expense; and

B.      All of Assignor's right, title and interest in and to all existing and assignable guaranties and warranties (express or implied), if any, issued in connection with the construction, alteration and repair of the Property or the purchase, installation and the repair of the Assigned Properties.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Assignor hereby assigns, transfers, sets over and delivers to Assignee, its successors and assigns, all of Assignor's right, title and interest, if any, in and to the Assigned Properties.

2.      This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

3.      This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and

effective when all parties hereto have executed and delivered at least one counterpart.

4.      The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

_____
Name: Charles L. Smith
Capacity: Chapter 7 Trustee

ASSIGNEE:

First Security Bank & Trust Company,

_____
By: _____
Its: _____

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

In re                                          )
                                               )
MCQUILLEN PLACE COMPANY, LLC, an               )          Case No. 19-00507
Iowa limited liability company,                )          Chapter 7
                                               )
        Debtor.                                )          Hon. Thad J. Collins
                                               )
                                               )

RESISTANCE OF EQUITY SECURITY HOLDERS TO TRUSTEE'S
MOTION TO SHORTEN TIME
**(Telephonic hearing requested)**

NOW COME Charles M. Thomson and James Gray (the "Equity Security Holders"),

through their counsel, and as and for their "Resistance of Equity Security Holders to Trustee's

Motion to Shorten Time" (this "Resistance") respectfully state as follows:

1.      In his Motion, the Trustee recites a number of steps he claims he took prior to asking

this Court to shorten and restrict statutorily mandated notice requirements for the sale of the

Debtor's largest asset.

2.      The reason, presumably, for these recitals is to suggest to the Court that some level

of due process has been followed by the Trustee.

3.      There are, however, a number of due process issues presented by the Trustee's

Motion.  These include:

        a.      The "bid" procedures advanced by the Trustee requested expressions of

interest conforming to a very specific set of parameters.  (A copy of the bid solicitation is

attached as Exhibit A).  However, the provisions in the "bid" that was embraced by the

Trustee are wildly contrary to the parameters of the bid solicitation.  None of the Trustee's

1

filings disclose to the creditor body or to other interested parties the reason for this significant disparity. Similarly, the filings of the Trustee do not disclose the rationale for following a bid procedure which had not been approved in advance by (or even submitted to) this Court.

      b.      The "bid" embraced by the Trustee is from First Security Bank & Trust Co. -- the very same bank which stated, in its argument for the appointment of a trustee in this case, that it would not bid on the property. The filings of the Trustee do not provide any notice to creditors or other interested parties who may have relied on the bank's representations to the Court that such representations turned out to be -- to put it mildly -- "inoperative."

      c.      The Trustee's filings completely ignore the issue that the alleged lien of the bank has been challenged in an equitable subordination adversary proceeding currently pending before this Court. Since this issue is ignored in the Trustee's filings, creditors and other parties in interest will, if the Trustee's motion is granted, have less opportunity to inquire as to the consequences for creditors if the Trustee's sale motion is granted and the bank's lien is subordinated.

      d.      The filings of the Trustee do not disclose to the creditor body the fact that bids were directed to a third party which was not authorized to perform any such function by this Court.

      e.      The filings by the Trustee do not disclose to the creditor body (or to parties who may be interested in submitting competing offers to that of the bank) whether any public solicitation of bids (such as advertisements) were made, or the consequences for the

2

creditor body if, due to a lack of advertising for bids, the Trustee's sale is not approved or is later overturned.

      f.     The filings of the Trustee do not disclose to the creditor body or to other potentially interested parties that the accrual of taxes, relied upon by the Trustee as justification for shortened notice, is itself a controversial topic.  Specifically, the Trustee does not disclose that the local taxing authorities, in recent filings, admitted that the previous assessment on the building was between two and three times the actual value of the building, thus suggesting that the $18,000 figure cited by the Trustee might be subject to challenge.  In any event, the accrual of taxes cannot, in and of itself, be offered as a justification for shortening notice: since taxes accrue in virtually every real estate case, if tax accrual justifies shortening time in virtually every case, the drafters of the Rules should have set standard notice requirements at zero.

      g.     Neither the "bid" procedures issued by the Trustee nor the filings submitted by the Trustee give any hint as to the standards used or parameters imposed by the Trustee in deciding which bid would be embraced and which bid would be rejected.

      h.     Nothing in the filings of the Trustee discloses to the creditor body or to potentially interested parties (or, for that matter, to the Court), that the Trustee negotiated at length with the successful "bidder" but would not return a telephone call to (let alone negotiate with) the competing bidder.

3.     The Trustee's Motion does not state any actual "cause" justifying restricting notice in this case.

4.     Failure to follow strictly the notice provisions of the Bankruptcy Code and the Bankruptcy Rules could result in multiple challenges to any attempted sale of the building by the

Trustee or any order purporting to confirm such a sale. This is particularly true in a situation where the procedures have been as unusual as those employed thus far in this case, and where the substantive property rights of unsecured creditors, at least one other secured party, copyright holders, and the equity security holders of the Debtor will be irrevocably impacted by shortened notice periods.

5.      Undoubtedly, some of the arguments expressed in this Resistance can also be addressed in the context of objections to the proposed sale itself. However, these issues raise significant due process concerns which can only be addressed by the Court requiring, at a minimum, the notice periods provided in the Bankruptcy Rules.

6.      If anything, the notice requirements and objection periods in this matter should be expanded, since the recent State of Emergency declared by the Federal and state governments have obliged citizens to conduct business away from their regular offices, thus making all forms of communication more time consuming and less reliable. For example, attorneys working from their residences as a result of "shelter-in-place" directives are having postal mail delayed by at least one day -- sometimes several -- depending on the speed and efficiency of the parties arranging the mail forwarding.

NOW, WHEREFORE, the Equity Security Holders respectfully request that this Court enter an order:

(a)     setting this matter for telephonic hearing;

(b)     denying the Trustee's Motion for restricted notice periods; and

4

(c)    granting the Equity Security Holders such other and further relief as may be just and equitable under the circumstances.

Respectfully submitted,

All of the Equity Security Holders of the Debtor

  /s/ Charles Thomson
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

**Telpner Peterson Law Firm, LLP**

CHARLES _____ MAIN PLACE, SUITE 200
JACK E. RUESCH
WALTER P. THOMAS          P.O. BOX 248
NICOLE HUGHES
THOMAS C. DORWART, Associate     COUNCIL BLUFFS, IOWA
JOHN A. FLATEN, Associate
MAYNARD S. TELPNER, Retired      51502-0248
RICHARD W. PETERSON (1925-2010)

TELEPHONE:
712-325-9000
FACSIMILE:
712-328-1946
www.telpnerlaw.com
email@telpnerlaw.com

Licensed in Iowa and Nebraska

February 3, 2020

Developers with interest
in the completion of
123 N. Main Street
Charles City, IA

RE: Request for Proposals to Acquire and Complete the Housing/Commercial Space
Project Located at **123 N. Main Street, Charles City, IA**

To Whom It May Concern:

The enclosed materials shall provide the basis for application by any qualified developer
interested in submitting a competitive proposal for the ownership, completion, and
maintenance of the structure on and parcel located at 123 N. Main Street in Charles
City, IA.

The property is currently an asset of the Chapter 7 Bankruptcy of McQuillen Place
Company, LLC (hereinafter called "McQuillen Place"), pending in the United States
Bankruptcy Court for the Northern District of Iowa as Case No. 19-00507. The Chapter
7 Trustee is Charles L. Smith. Mr. Smith seeks offers for the purchase of the real estate
and related personal property.

The State of Iowa seeks a qualified developer to acquire, finish, and maintain the
property. Mr. Smith, in coordination with parties with an interest in the completion of this
project, has developed the enclosed proposal materials.

The primary purpose of the request for proposals is to locate a purchaser for the real
estate and related personal property to acquire the property through a competitive
bidding process, who will thereafter develop the property to completion.

The State of Iowa, through the Iowa Economic Development Association, Iowa
Economic Development Authority (IEDA) has set aside a maximum of $1,000,000 of
Community Development Block Grant Disaster Recovery (DR) assistance for the
completion of the residential units in the building. DR assistance is contingent upon the
developer's agreement to the terms of affordability associated with this funding, which
include a requirement that 51% of the residential units must be leased to income
qualified persons of low-to-moderate income at a cost to lease or rent that is no higher
than the applicable rent limits. In addition to the terms of affordability, all federal
regulations will apply to the construction project, including but not limited to: Federal
Labor Standards Davis Bacon Wages, environmental review, and federal contract
provisions. Any developer interested in utilizing DR should contact Ann Schmid, IEDA's
Disaster Recovery Team Leader at 515-348-6202 or Ann.Schmid@iowaeda.com or

Exhibit A to RESISTANCE OF EQUITY
SECURITY HOLDERS TO
TRUSTEE'S MOTION TO
Page 1

Developers Letter
February 7, 2020
Page 2

coordinate with Myrtle Nelson of the North Iowa Area Council of Governments, which will act as a project administrator for an IEDA award.  Mrs. Nelson's contact information: mnelson@niacog.org or 641-423-0491, Extension 16.

Developers will be required to provide an acquisition bid (which will be paid to the Bankruptcy Trustee), an estimate of the cost to complete construction of the residential units in the building, an estimate of the cost to complete construction of the first floor commercial units in the building, and will be responsible for ensuring occupancy of all units. Factors that will be used in selecting the successful proposal will include the acquisition bid amount, the construction estimates, and the developer's qualifications.

The mortgage holder, First Security Bank & Trust Company, Charles City, Iowa, is obtaining an "as is" assessment of the property's value.  The valuation should be completed and available by February 15, 2020.

The property is currently subject to a minimum assessment agreement that was executed by McQuillen Place as the part of an anticipated tax increment financing proposal that has not been complied with or funded. The property will be reassessed by the Floyd County, Iowa Assessor as of January 1, 2020, which will affect future real estate tax liabilities.

Developers are encouraged to seek the best available valuation data by contacting the County Assessor and/or Mark Miller at First Security Bank & Trust Company, 809 Clark Street, Charles City, Iowa, telephone (641) 228-1232.

The Bankruptcy Trustee proposes to sell of the Bankruptcy Estate's right, title and interest in the real estate and related personal property free and clear of liens and encumbrances. The purchaser of the real estate will receive a court officer's deed from the Bankruptcy Estate. The Bankruptcy Trustee reserves the right to reject all offers. Outstanding real estate taxes will be paid by the Bankruptcy Estate.

There is currently located on the real estate, a quantity of appliances and construction materials. It is presently anticipated that all of the personal property will be included as a part of the sale by the Bankruptcy Trustee. However, the identification of the personal property to be included as a part of the sale is being developed and interested purchasers must continue to consult with the Bankruptcy Trustee and any publicly available web-based postings for additional information.

A mechanic's lien has been filed by Schindler Elevator Corporation and the property will be sold free and clear of that mechanic's lien. However, the purchaser of the real estate must be prepared to complete the installation of the elevator installed in the real estate and to assure its availability to tenants of the property.

Completion of this project will significantly enhance Charles City's downtown and provide the City with much needed housing units.  Therefore, the City is prepared to

Exhibit A to RESISTANCE OF EQUITY
SECURITY HOLDERS TO
TRUSTEE'S MOTION TO
Page 2

Developers Letter
February 7, 2020
Page 3


incent development through tax increment financing. All developers interested in City of
Charles City incentives must coordinate directly with the Steven T. Diers, City
Administrator, City of Charles City at 641-257-6300 or
steven.diers@cityofcharlescity.org.   Additionally, this parcel is located within a current
Opportunity Zone (census tract: 19067480400), which may allow for added investment.

Please complete the enclosed documents and submit the executed application along
with all support documentation to the following address prior to **4:00pm on Monday,
March 9, 2020**. Questions regarding the application and the application process should
be directed to Ms. Schmid: 515-348-6202 or ann.schmid@iowaeda.com

**Submit Applications To:**
Ann H. Schmid
Iowa Economic Development Authority
1963 Bell Avenue
Des Moines, IA 50315


Sincerely,

*Charles L. Smith*

Charles L. Smith
Chapter 7 Trustee
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
(712) 325-9000


Exhibit A to RESISTANCE OF EQUITY
SECURITY HOLDERS TO
TRUSTEE'S MOTION TO
Page 3

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

Chapter 7
#19 507

Debtor.

-------------------------------------------------------------------

**ORDER AUTHORIZING APPROVING SALE
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
AND PROVIDING RELATED RELIEF**

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company (together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement ("Agreement") appended to the Motion of certain real estate (as described more fully in the Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal property (as described more fully in the Agreement, the "Personal Property" and, together with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the transactions ("Transactions") contemplated in the Agreement; and the Trustee having provided adequate and timely notice to all creditors and parties in interest of the Motion, it appearing that the Purchaser submitted the highest and best offer to purchase the Property; and a Sale Hearing having been held on _____, 2020; and based upon the record of the Sale Hearing and the facts set forth in the Motion as affirmed by the Trustee's Affidavit; and it appearing that due, good, sufficient and timely notice of the relief sought and granted in this order has been given and that no other or further notice need be given; at

1

which time all interested parties were offered an opportunity to be heard with respect to the

Motion; and the Court having had an opportunity to consider all responses and objections to

the Motion; and it appearing that the relief requested in the Motion is in the best interests of

this Estate, its creditors and other parties-in-interest; and after due deliberation and good

cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]

A.    **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion

under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue

of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates.** The statutory predicates for the relief sought in the Motion

are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C.    **Notice.** As evidenced by the certificates of service filed with this Court and

based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely,

adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions

contemplated by the Agreement and this Order (the "Transactions"), has been provided in

accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or

further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances; and (iv) no other or further notice of the Motion or the Sale

Hearing or the Transactions, is or shall be required.

D.    **Opportunity to Object.** A reasonable opportunity to object and to be heard

with respect to the Motion and the relief requested therein has been given, in light of the

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

2

circumstances, to all interested persons and entities, including the following: (a) the U.S.

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or

claim on the Property; (c) all entities known to have expressed an interest in acquiring the

Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its

counsel; and (f) all other parties who have filed notices of appearance and demands for

service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion.

All objections to the sale of the Property are overruled or resolved by this Order.

     E.    **Sale in Best Interests.** Good and sufficient reasons for approval of the

Agreement and the Transactions exist, as described in the Motion, and the relief requested in

the Motion is in the best interests of the estate, its creditors and other parties in interest.

     F.    **Business Justification.** The Trustee has demonstrated both (i) good, sufficient

and sound business purposes and justifications and (ii) compelling circumstances for the

Transactions other than in the ordinary course of business under Bankruptcy Code section

363(b) in that, among other things, the immediate consummation of the Transactions with

the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an

order approving the Agreement and all the provisions thereof is a necessary condition

precedent to the Purchaser consummating the Transactions.

     G.    **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered

into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length

bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined

in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the

Purchaser has engaged in any conduct that would cause or permit the Agreement to be

avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a

collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

H.     **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I.     **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other  interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J.     **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K.     **Free and Clear.** The Debtor is either the sole and lawful owner of the

Property or there is a bona fide dispute as to ownership. The transfer of the Property to the Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.    The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.    The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

5

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

N.    **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

O.    **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

6

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1.    **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.    **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4.    **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to attach to

7

the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

5.      **Valid Transfer.** As of the Closing Date and except as otherwise provided herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

6.      **General Assignment.** On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement.

7.      **No Successor Liability.** Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or

responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or

shareholders, or the Property, having any liability whatsoever with respect to or be required

to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates,

members, or shareholders, or the Property, having any liability or responsibility to the

Estate, except as is expressly set forth in the Agreement, including, but not limited to,

liabilities on account of any taxes or other government fees, contributions or surcharges

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Property prior to the Closing Date.

       8.    **Binding Effect of Order.** This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of

title in or to any of the Property.

       9.    **Binding on Successors.** The terms and provisions of the Agreement

and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of

(whether known or unknown) and holders of equity interests in the Debtor, the Purchaser

and their respective affiliates, successors and assigns, and any affected third parties,

including, but not limited to, and all persons asserting Interests in the Property. This Order

and the Agreement shall inure to the benefit of the Purchaser and its respective successors and assigns.

10.    **Bankruptcy Code Section 363(n).** The consideration provided by the Purchaser for the Property under the Agreement is fair and reasonable. Based on the disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not aware of any facts that would support an argument for avoidance of the Transactions.

11.    **Good Faith.** The Transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions with the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

12.    **Fair Consideration.** The consideration provided by the Purchaser to the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

13.    **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

10

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if

necessary, any and all disputes concerning or relating in any way to the Transactions; and (e)

protect the Purchaser against any Interests in the Debtor or the Property of any kind or

nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain

exclusive jurisdiction with respect to issues or disputes in connection with this Order and the

relief provided herein, including without limitation to protect the Trustee and Purchaser

from interference with the Sale, and to resolve any disputes related to the Sale, the

Agreement or the implementation thereof.

14.     **Surrender of Possession.** All entities that are presently, or on the

Closing Date may be, in possession of some or all of the Property in which the Debtor holds

an interest hereby are directed to surrender possession of the Property either to (a) the

Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15.     **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the

Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear,

any and all valid and perfected Interests in Property of the Debtor shall attach to any

proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the

order of priority, and with the same validity, force and effect that they now have against the

Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no

proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the

express consent of the party or parties asserting an Interest therein or further order of the

Court after notice (to all parties who have asserted an Interest in such proceeds) and a

hearing, consistent with the requirements of the Bankruptcy Code.

16.     **Non-material Modifications.** The Agreement and any related

agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the estate.

17.    **Failure to Specify Provisions.** The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

18.    **Stay of Order.** Pursuant to Bankruptcy Rule 6004(h), this Order shall not be stayed and shall be and is immediately effective. Time is of the essence in closing the Transactions referenced herein, and the Debtor and the Purchaser intend to close the Transactions as soon as practicable. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot. If any further stay is desired, any requests for a stay and any controversy over the extent of a bond that is necessary to protect the estate from delay in the sale shall be made to the appropriate tribunal.

Dated: _____, 2020


_____
Hon. Thad J. Collins
Chief Judge

*ORDER PREPARED BY:*

Charles L. Smith
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
|  | CHAPTER 7 |
| In Re: | Bankruptcy No. |
| McQuillen Place Company, LLC | 19–00507 |
| Debtor(s) |  |

## NOTICE SETTING TELEPHONIC HEARING
## ON THE CHAPTER 7 TRUSTEE'S MOTION TO SHORTEN TIME TO FILE
## OBJECTIONS TO MOTION TO SELL AND FOR OTHER RELIEF

TO:

| | |
|---|---|
| Charles McQuillen Thomson, Attorney for Debtor(s) | 847–456–1911 |
| Charles L. Smith, Trustee | 712–325–9000 |
| United States Trustee | |
| Donald Molstad, Attorney for Debtors | 952–345–1025 |
| JD Haas, Attorney for Debtors | 712–255–8036 |

NOTICE IS HEREBY GIVEN the above matter(s) will come before the Court on:

### *March 25, 2020 at 03:00 PM*

***TRUSTEE CHARLES SMITH IS TO INITIATE THE TELEPHONE CALL.*** Parties should be ready and available to accept said call. The telephone number for Chambers is 319–286–2230.

***NOTE:*** THIS HEARING WILL BE DIGITALLY RECORDED.

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Danielle Cripe*

Date: March 24, 2020

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**MEMORANDUM[1] re TRUSTEE'S<br>MOTION TO SHORTEN OBJECTION<br>PERIOD** |

COMES NOW First Security Bank & Trust Company ("Bank") and in support of Trustee Charles L. Smith's Motion to Shorten Time (Dkt #133) respectfully submits the following Memorandum:

The Trustee's underlying Motion to Sell was filed pursuant to 11 U.S.C. §363 (Dkt #134). With respect to a §363 Sale Motion, F.R.B.P. 6004(a) and 2002(a)(2) generally require a 21-day objection period, "unless the Court for cause shown … shortens the time." *See also* F.R.B.P. 9006(c)(1) and (2) (authorizing reduction of the Rule 2002(a)(2) period). The Trustee seeks to reduce the 21-day period to 10 days. Among the factors on which the Trustee relies as bases for shortening the objection period include the accrual of real estate taxes at $18,000.00 per month, the accrual of water, sewer, and utility charges, and the parties' desire to close the sale expeditiously so as to provide funds for the Trustee to administer the estate.

The Court should exercise its discretion and grant the Trustee's request because the Trustee is merely seeking a reduction to 10 days and courts have shortened the Rule 2002 objection period to less than 10 days. *See In re Borders Group, Inc.*, 453 B.R. 477, 485 (Bankr. S.D.N.Y. 2011) (shortening the period to 5 days) *and In re Pacific Cargo, Services, LLC*, 2013

---

[1] By filing this Memorandum, the Bank is not waiving and is instead reserving any other argument, right, theory, remedy, and contention with respect to any issue that may come before the Court.

1

WL 5299545, at *9 (Bankr. D. Oregon) (9/18/2013) (Dunn, J.) (shortening the period to 9 days). Indeed, if the party complaining about the shortened notice cannot show what it would have done had the entire 21-day period been afforded it, then the complaint is without merit. *In re Glinz*, 66 B.R. 88, 91 (D.N.D. 1986) ("There is no showing that the attorney could have made any arguments with 20 days' notice by mail that he could not have made with the actual notice he received at the hearing").

Like the objector in *In re Glinz*, the objector here had ample actual notice of the Trustee's intent to sell. Specifically, the Trustee issued his Invitation for Bids circa February 3, 2020. *See* Objection (Dkt #135), at PDF pp. 6 *et seq*. The objector Charles Thomson had been working with a bidder to generate a bid in response to the Trustee's Invitation got Bids. *See* March 9, 2020 Bid from Binstock Development, LLC, at p. 5 fn. 3 ("Charles Thomson … has assisted [Binstock] with the preparation of documents and other matters") (PDF attached). In the Invitation for Bids, the Trustee specifically forecast he wished to eventually sell the real estate and the personal property free and clear of liens. *See* Objection (Dkt #135), at PDF p. 7. In sum, the objector had actual knowledge, since circa February 3, 2020 (*i.e.* almost ***fifty days*** ago), that the Trustee would be seeking a sale free and clear. Additionally, the equity holder "assisted … with the preparation of documents and other matters" supportive of the competing bidder.

Also like the objector in *In re Glinz*, the objector here failed to identify how he would be able to lodge substantive objections only if the full 21-day objection period were to have been afforded to the objector. A reduction to 10 days in light of other caselaw permitting reduction to 5 days or 9 days is not unreasonable. Last but not least, even though the objecting equity owner asserts the tax assessment might be reversed by the County, the

undisputed fact is as of now the real estate taxes are accruing at $18,000.00 monthly, as alleged by the Trustee, and also other expenses such as utilities, water, sewage, insurance, and other costs are accruing. *See* Trustee Sale Motion (Dkt #134) at ¶15. The ticking clock only adds fuel to the "cash burn rate." Indeed, this Court has already concluded there has been substantial and continuing diminution or loss to the estate, and insurance and real estate tax obligations have been delinquent. *In re McQuillen Place Co., LLC*, 609 B.R. 823, 830 (Bankr. N.D. Iowa 2019). As such, shortening time under these circumstances is appropriate.

The Court should overrule the objecting equity owners' assertions and grant the Trustee's request to shorten time.

/s/ Eric W. Lam
Eric W. Lam, AT0004416
Eric J. Langston, AT0014001
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
ATTORNEYS FOR FIRST SECURITY BANK &
TRUST COMPANY

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 25th day of March 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Kelly Carmichael

Larry S. Eide
Charles Thomson
Charles L. Smith
Monica L. Clark
Brandon Gray
J D Haas

- 3 -

Laura Hyer and Joe Schmall
Donald H. Molstad
Judith O'Donohoe
Christine B. Skilton
Bradley Sloter
L. Ashley Zubal
Dan Childers (via e-mail)

# BINSTOCK DEVELOPMENT, LLC

15246 Lake Dr. NE
Columbus, MN 55025
sbinstock@trinity-contracting com
651-398-2081

March 9, 2020

By hand delivery

Ms. Ann H  Schmid
Iowa Economic Development Authority
1963 Bell Avenue
Des Moines, IA 50315

> Re·    Request for Proposals to Acquire and Complete the Housing/Commercial Space
> Project Located at 123 North Main Street, Charles City, Iowa (the "Project")

Dear Ms. Schmid

I am writing on behalf of my firm, Binstock Development, LLC ("BDL," "we," or "us") to submit an application to submit "a competitive proposal for the ownership, completion and maintenance of the structure on and parcel located at 123 N. Main Street in Charles City, IA," as described in your letter dated February 3, 2020 (the "Letter")

In reviewing Letter, it appears that you, the Iowa Economic Development Authority ("IEDA"), and the trustee have, by leaving a number of the proposal terms open, desired to solicit a variety of different perspectives and options for completion of the Project.  Accordingly, we are submitting our proposal in a format which, we believe, will provide you with several different options from which to choose.

As you may be aware, I have followed the Project closely, have conducted several thorough inspections of the Project, have met with the original developers on multiple occasions, and had (prior to the filing of the bankruptcy case) discussed a number of options for acquiring the Project with representatives of First Security Bank & Trust Co  As such, I believe I have as complete an understanding of the Project and its intricacies as any independent third-party can have.

With this as background, our basic proposal (and the proposal upon which all the variations and options are based) is to acquire the Project (free and clear) for the highest reasonable transfer to the Project possible, which we believe to be Five Million Seven Hundred Forty-One Thousand Eight Hundred Fifty-One ($5,741,851.00), which we propose to transfer to the Trustee (per your Letter and per this Proposal), provided all of the Optimal Redevelopment Conditions (discussed below) are present.  In addition, as is also discussed below, we are interested, willing and able to

1

acquire the Project if not all of the Optimal Redevelopment Conditions are present, but the amount of the cash consideration to the Trustee would be lower than the amount otherwise available

Here are what we view as the Optimal Redevelopment Conditions:

1.  The Project is sold to us free and clear of all liens, claims, encumbrances, etc , pursuant to a final order entered by the Bankruptcy Court;

2.  The IEDA and BDL reach an agreement by which the entire $1 million in CBDG funds are made available to complete redevelopment of the entire Project (i e., all three floors),

3.  A replacement tax increment financing development agreement (a "Revised TIF Agreement") is agreed to by BDL and the City of Charles City which provides (a) a "back-end" TIF benefit to BDL, (b) a benefit which is in the form of the maximum rebate of taxes for the duration of the agreement, (c) the benefit is spread over 18 years, (d) the agreement is otherwise largely identical in the substance to the original TIF agreement with the original developer; and (e) the assessment of the Project does not exceed the amounts as set forth in the estimate of Steve Diers (see attached email text);

4.  The cost of the completion of the interior spaces of floors two and three remains within my original estimate of approximately $600,000,

5   The first floor is built-out as nineteen (19) studio residential units wrapped by commercial space on Main and Clark Streets; these units would be either rented through an AirBNB-type platform (which we believe would bring them into compliance with existing local zoning permitting hotel units on the first floor of buildings in the area) or rented using conventional residential leases (following appropriate local zoning compliance actions);

6   The cost to complete the interior of the first floor and the exterior of the building does not exceed $858,375;

7.  The City of Charles City does not materially change the prerequisites for issuance of a Certificate of Occupancy set forth on the attached email from the City;

8   The City of Charles City commits to issuing a Certificate of Occupancy within seven days after completion of tasks by BDL and the City prior to entry of the Order and incorporated in the Order,

9.  A period of not less than 45 days elapses between entry of the Order and commencement of work;

2

10     BDL is able to obtain appropriate licensure to use the Project's building designs, all of which are subject to copyright held by Cornice & Rose International, L.L C. from Illinois[1].

BDL is ready, willing and able to submit a competitive bid, complete construction, lease-up the residential units and the commercial space, and operate the completed Project, under (among others) any of the following six options or scenarios (each, an "Option")[2]

| OPTION ONE: | All of the Optimal Redevelopment Conditions are met |
|---|---|
| OPTION TWO. | All of the Optimal Redevelopment Conditions are met except that the Project does not contain any residential units on the first floor, but the full amount of the CBDG funds referenced in the Letter are made available to the Project |
| OPTION THREE· | All of the Optimal Redevelopment Conditions are met except that the Project does not contain any residential units on the first floor, and less than the full amount of the CBDG funds referenced in the Letter are made available to the Project. |
| OPTION FOUR | All of the Optimal Redevelopment Conditions are met, but less than the full amount of the CBDG funds referenced in the Letter are made available to the Project |
| OPTION FIVE | All of the Optimal Redevelopment Conditions are met, but none of the CBDG funds referenced in the Letter are made available to the Project |
| OPTION SIX | The scenarios described in any of Options One, Two, Three, Four or Five is selected as the conditions for completion of the Project, but the Revised TIF Agreement materially departs from the terms described above. |

As mentioned, the bid amount discussed in the fourth paragraph of this application is based on Option One. Since adoption of any of the other Options imply different cash flows for the completed Project, the amount of the bid would be different. BDL's goal in any bid would remain the same, however: To submit a bid to the Trustee that would represent the highest dollar amount possible while reserving reasonable funds for the proper completion and sustainable operation of the Project

---

[1] BDL has reached an agreement in principle for an exclusive license of this copyright from Cornice & Rose International, L L C

[2] Out of an abundance of caution, we would like to state that BDL is assuming, for purposes of all the proposals and options discussed in this application, that the various conditions (such as unit affordability, Davis-Bacon rules, and federal contract conditions) will apply to all dwelling units for which DR funds are used  BDL's application and cost estimates are based on anticipated full compliance with these conditions

3

The Proposal Checklist referenced in your Letter requests a "Rent Calculation Worksheet" and notes that the form was enclosed  Per the request, this completed form is attached with this proposal.  However, BDL believes somewhat lower rents would be appropriate in order to prepare conservative budgets and pro forma calculations. Accordingly, the lower rent estimates are reflected in the attached pro forma cash projections.

The Proposed Checklist referenced in your Letter also requests "Documentation of acceptance by the local government and documentation of any local tax increment financing or abatement incentive."  The understanding of BDL is that the local jurisdiction has not reached an agreement with any party as to the tax increment incentives which will be available to the Project. However, the local city administrator has issued guidance concerning the parameters of TIF assistance by email.  A copy of this email is attached

Related to this issue, there appears to be some tension between the statement in the Letter that the trustee will pay the past due tax obligations and the specimen sources and uses table attached to the Letter which appears to indicate that the past due tax obligations will be paid by the entity which completes development of the Project  In addition, as provided in Iowa law and as, on information and belief, asserted at various points during the bankruptcy case, an open issue exists as to whether the amount claimed for back taxes by the local jurisdiction should be reduced to reflect the corrected assessment level  Recognizing that this matter must be resolved (either by payment by some party or reduction in the tax obligation), BDL has reflected a reduction in the tax obligation in the pro forma, with the caveat that if the tax obligations are not reduced, the pro forma and sources and uses statement will require appropriate correction.  BDL's believes its proposal is viable either with or without the reduction in the tax obligation.

The Proposal Checklist referenced in your Letter requests a "Cover letter from the developer submitting application to the trustee, stating their understanding of the circumstances and the process for acquisition."  Please deem this paragraph as (a) directed to the trustee, and (b) confirmation that BDL understands the background and circumstances of this matter as well as the procedures imposed by the Bankruptcy Code for the sale of property by a trustee.

The Proposal Checklist referenced in your Letter also requests "Statements of Qualifications from the Applicant Owner/Developer and the named General Contractor / Construction Manager  Qualifications must include examples of past completed multifamily housing projects with references.  BDL hereby submits, separately from this application but included in the application packet, my resume.  As sole owner of all the ownership units of BDL, I propose my company, BDL, as "Applicant Owner/Developer and the named General Contractor / Construction Manager "  I believe my previous experience involving many different properties, including multifamily, over many years meets the Letter's qualification requirement.  I will be personally involved in completion, leasing-up and operation of the Project if BDL's application is accepted.  If you require me to submit additional completed projects for your background files, please contact me as I have not included a fair number of projects on my resume due to space considerations and due to the fact that I prepared the list being submitted to you some time ago

4

The Proposal Checklist referenced in your Letter also requests a "List of known development team members showing roles and responsibilities and contact information. List to include owner/developer, general contractor, known sub-contractors, architect, engineer, HERS rater, etc." Here is the information responsive[3] to this Checklist item:

| | |
|---|---|
| Owner: | BDL |
| Developer: | BDL |
| General Contractor: | Trinity Contract (same contact information as BDL) |
| Known Sub-Contractors: | Probably similar to those referenced in previous Trinity bids. |
| Architect (initial): | Cornice & Rose International, L.L.C. |
| | |
| Public Finance: | PlanScape Partners. Rfiscus@planscapepartners.com |

This letter and the accompanying materials are intended by BDL to comply fully with the requirements stated in your Letter dated February 3, 2020. However, given the limited amount of time available between the date of your Letter and the due date for this application's submission, as well as a number of general and open terms and conditions referenced in the Letter[4], we realize that it may be possible that we have omitted some materials your office needs or that we have provided information and ideas in a format which is not in harmony with your office's expectations. If this is the case, BDL requests that you immediately notify us and permit us to supplement this application. BDL would be happy to submit supplemental information to comply with your office's needs and expectations.

Notwithstanding the foregoing legalese, I am personally excited to submit this application, which I very much hope proves to be successful. I think this Project has great potential, and I look forward to working with the IEDA and the trustee to bring the Project to fruition.

Sincerely yours,

BINSTOCK DEVELOPMENT, LLC, an Illinois limited liability company

By:

Name: Steve M. Binstock
Title: Sole owner and managing member

Attachments

---

[3] In the interest of full disclosure, Charles Thomson, although not currently holding any post identified in the "List of known development team members," has assisted BDL with the preparation of documents and other matters.

[4] Given the open nature of the Letter and the process involving the Project generally, BDL, on its own behalf and that of all others involved with BDL, would like to reserve the right to question, challenge, object to or request clarification of all of the various stated and unstated conditions set forth by the IEDA, the trustee, or any other party in this matter.

5

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQUILLEN PLACE COMPANY, LLC,

Debtor.

CHAPTER 7
CASE NO. 19-00507

ORDER (1) GRANTING
MOTION TO SHORTEN TIME
TO FILE OBJECTIONS TO
MOTION TO SELL AND FOR
OTHER RELIEF (11 U.S.C.
§§363(b) and (f);
(2) PRESCRIBING NOTICE
THEREOF, AND (3) SETTING
HEARING ON OBJECTIONS

_____

NOW, this matter comes before the Court upon the Motion to Shorten Time to File Objections to Motion to Sell and for Other Relief (11 U.S.C. §§363(b) and (f)), to Prescribe Notice, and to Set Hearing on Objections.

The Court FINDS that a resistance to said Motion was filed on March 24, 2020, by the equity security holders Charles M. Thomson and James Gray, and that a telephonic hearing on said Motion and Resistance was held on March 25, 2020, with Trustee Charles L. Smith, Charles M. Thomson, James Gray, Eric W. Lam, Eric Langston, Brandon Gray and Rita Gray participating.

Having heard the arguments of all parties, the Court FINDS that the Trustee's Motion to Shorten Time should be granted.

IT IS THEREFORE ORDERED that the time for filing objections to the Motion to Sell and for Other Relief (11 U.S.C. §§363(b) and (f)) is shortened to ten (10) days and that objections thereto must be filed and served no later than April 6, 2020.

IT IS FURTHER ORDERED that a hearing on the Motion to Sell and for Other Relief (11 U.S.C. §§363(b) and (f)) shall come on before this Court **telephonically on April 8, 2020, at 10:00 o'clock A.M.**

IT IS FURTHER ORDERED that the Trustee shall arrange the telephone call, and any party filing an Objection to said Motion must provide the Trustee with his or her email address and telephone number no later than noon on April 7, 2020 (the Trustee will provide call-in information by email).

IT IS FURTHER ORDERED that notice of the Motion to Sell and for Other Relief (11 U.S.C. §§363(b) and (f)), of the bar date for objections, and the hearing on said Motion and objections, if any, shall be given by the Trustee by mailing notice thereof to all creditors and parties in interest no later than March 26, 2020.

AND, IT IS SO ORDERED.

DATED AND ENTERED

March 26, 2020

_____
Thad J. Collins, Bankruptcy Judge

This order was prepared and electronically submitted by:
Charles L. Smith, Trustee
25 Main Place, Suite 200
Council Bluffs, IA 51503
Telephone: 712-325-9000

- 2 -

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| | CASE NO. 19-00507 |
| McQUILLEN PLACE COMPANY, LLC, | |
| | ORDER (1) GRANTING |
| Debtor. | MOTION TO SHORTEN TIME |
| | TO FILE OBJECTIONS TO |
| | MOTION TO SELL AND FOR |
| | OTHER RELIEF (11 U.S.C. |
| | §§363(b) and (f); |
| | (2) PRESCRIBING NOTICE |
| | THEREOF, AND (3) SETTING |
| | HEARING ON OBJECTIONS |

NOW, this matter comes before the Court upon the Motion to Shorten Time to File Objections to Motion to Sell and for Other Relief (11 U.S.C. §§363(b) and (f)), to Prescribe Notice, and to Set Hearing on Objections.

The Court FINDS that a resistance to said Motion was filed on March 24, 2020, by the equity security holders Charles M. Thomson and James Gray, and that a telephonic hearing on said Motion and Resistance was held on March 25, 2020, with Trustee Charles L. Smith, Charles M. Thomson, James Gray, Eric W. Lam, Eric Langston, Brandon Gray and Rita Gray participating.

Having heard the arguments of all parties, the Court FINDS that the Trustee's Motion to Shorten Time should be granted.

IT IS THEREFORE ORDERED that the time for filing objections to the Motion to Sell and for Other Relief (11 U.S.C. §§363(b) and (f)) is shortened to ten (10) days and that objections thereto must be filed and served no later than April 6, 2020.

IT IS FURTHER ORDERED that a hearing on the Motion to Sell and for Other

Relief (11 U.S.C. §§363(b) and (f)) shall come on before this Court **telephonically on**

**April 8, 2020, at 10:00 o'clock A.M.**

IT IS FURTHER ORDERED that the Trustee shall arrange the telephone call,

and any party filing an Objection to said Motion must provide the Trustee with his or her

email address and telephone number no later than noon on April 7, 2020 (the Trustee

will provide call-in information by email).

IT IS FURTHER ORDERED that notice of the Motion to Sell and for Other Relief

(11 U.S.C. §§363(b) and (f)), of the bar date for objections, and the hearing on said

Motion and objections, if any, shall be given by the Trustee by mailing notice thereof to

all creditors and parties in interest no later than March 26, 2020.

AND, IT IS SO ORDERED.

DATED AND ENTERED

March 26, 2020

_____

Thad J. Collins, Bankruptcy Judge

This order was prepared and electronically submitted by:
Charles L. Smith, Trustee
25 Main Place, Suite 200
Council Bluffs, IA 51503
Telephone: 712-325-9000

- 2 -

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE: MCQUILLEN PLACE COMPANY, LLC

CASE NO: 19-00507

**DECLARATION OF MAILING
CERTIFICATE OF SERVICE**
Chapter: 7

On 3/26/2020, I did cause a copy of the following documents, described below,

Order Re Motion to Shorten Time

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice.com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R. Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 3/26/2020

/s/ Charles L. Smith
Charles L. Smith  AT0007415
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
712 325 9000

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

IN RE: MCQUILLEN PLACE COMPANY, LLC

CASE NO: 19-00507

**CERTIFICATE OF SERVICE
DECLARATION OF MAILING**

Chapter: 7

On 3/26/2020, a copy of the following documents, described below,

Order Re Motion to Shorten Time

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document (s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 3/26/2020

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Charles L. Smith
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA 51503

PARTIES DESIGNATED "EXCLUDE" WERE NOT SERVED VIA FIRST CLASS MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF" WERE SERVED BY RECEIPT OF ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

CASE INFO
  LABEL MATRIX FOR LOCAL NOTICING
08624
CASE 19-00507
NORTHERN DISTRICT OF IOWA
MASON CITY
THU MAR 26 14-42-53 CDT 2020

AMELIA MANAGEMENT LLC
1110 N GRAND AVENUE STE 300
CHARLES CITY IA 50616-2139

AMELIA TRUST
CO CHARLES M THOMSON TRUSTEE
1110 NORTH GRAND AVE SUITE 300
CHARLES CITY IA 50616-2139

AMELIA TRUST
CO JUDITH M ODONOHOE
PO BOX 307
116 N MAIN STREET
CHARLES CITY IA 50616-2015

ATLAS PAINTING
911 SYCAMORE STREET
WATERLOO IA 50703-4815

BRP BRUENING
900 MONTGOMERY STREET
DECORAH IA 52101-2343

BERGAN KDV
PO BOX 2100
WATERLOO IA 50704-2100

BLUHMS CEDAR VALLEY ELECTRIC
409 SOUTH JOHNSON STREET
CHARLES CITY IA 50616-2621

BLUHMS CEDAR VALLEY ELECTRIC
PO BOX 287
FLOYD IA 50435-0287

CEDAR RAPIDS BANK  TRUST COMPANY
500 FIRST AVENUE NE
PO BOX 789
CEDAR RAPIDS IA 52406-0789

CEDAR RAPIDS BANK  TRUST COMPANY
CO JOSEPH E SCHMALL
PO BOX 2804
CEDAR RAPIDS IA 52406-2804

CEDAR RAPIDS BANK  TRUST COMPANY
CO LAURA M HYER
PO BOX 2804
CEDAR RAPIDS IA 52406-2804

CERRO GORDO COUNTY IOWA
CARLYLE D DALEN
ASST COUNTY ATTY
220 N WASHINGTON AVE
MASON CITY IA 50401-3220

CHARLES M THOMSON
1110 N GRAND AVE SUITE 300
CHARLES CITY IA 50616-2139

CINCINNATI INSURANCE
POST OFFICE BOX 145496
CINCINNATI OH 45250-5496

CITY OF CHARLES CITY IA
CO BRAD SLOTER
200 NORTH JOHNSON STREET
CHARLES CITY IA 50616

CITY OF CHARLES CITY IOWA
105 MILWAUKEE MALL
SUITE 2
CHARLES CITY IA 50616-2280

CITY OF CHARLES CITY IOWA
CO MONICA CLARK
50 SOUTH SIXTH STREET SUITE 1500
MINNEAPOLIS MN 55402

MONICA L CLARK
DORSEY  WHITNEY LLP
500 SOUTH SIXTH STREET SUITE 1500
MINNEAPOLIS MN 55415-1532

CORNICE  ROSE INTERNATIONAL LLC
804 ROBERTS ROAD
BARRINGTON IL 60010-1142

CORNICE  ROSE INTERNATIONAL LLC
804 ROBERTS ROAD
TOWER LAKES
BARRINGTON IL 60010-1142

CORNICE  ROSE INTL LTD
804 W ROBERTS ROAD
BARRINGTON IL 60010-1142

CUSTOM AIR
BRETT PAYTON
10443 OSAGE RD
WATERLOO IA 50703-9349

DAY RETTIG MARTIN PC
150 1ST ST NE  SUITE 415
CEDAR RAPIDS IA 52401-1110

DAY RETTIG MARTIN PC
150 1ST ST NE  SUITE 415
PO BOX 2877
CEDAR RAPIDS IA 52406-2877

DEAN SNYDER CONSTRUCTION
913 N 14TH STREET
CLEAR LAKE IA 50428-2138

DEAN SNYDER CONSTRUCTION CO
PO BOX 181
913 N 14TH STREET
CLEAR LAKE IA 50428-2138

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA FIRST CLASS U.S. MAIL THE
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF" WERE SERVED VIA ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

CEDAR VALLEY STEEL INC
280 50TH AVE SW
CEDAR RAPIDS IA 52404-4933

DONALD H MOLSTAD
505 6TH ST SUITE 308
SIOUX CITY IA 51101-1201

LARRY S EIDE
103 EAST STATE STREET SUITE 800
PO BOX 1588
MASON CITY IA 50402-1588

ELWOOD LAW FIRM
116 N MAIN STREET
CHARLES CITY IA 50616-2015

ELWOOD LAW FIRM
CO JUDITH ODONOHOE
116 NORTH MAIN STREET
PO BOX 307
CHARLES CITY IA 50616

ELWOOD ODONOHOE BRAUN WHITE
116 N MAIN ST PO BOX 307
CHARLES CITY IA 50616-0307

FIRST SECURITY BANK TRUST COMPANY
809 CLARK STREET
CHARLES CITY IA 50616-2208

FIRST SECURITY BANK TRUST COMPANY
809 CLARK STREET
PO BOX 577
CHARLES CITY IA 50616-0507

FIRST SECURITY BANK TRUST COMPANY
CO ERIC J LANGSTON
115 THIRD STREET SE SUITE 1200
CEDAR RAPIDS IA 52401

FIRST SECURITY BANK TRUST COMPANY
CO ERIC W LAM
115 THIRD STREET SE SUITE 1200
CEDAR RAPIDS IA 52401

FIRST SECURITY BANK TRUST COMPANY
CO LARRY S EIDE
PAPPAJOHN SHRIVER EIDE NIELSEN PC
103 EAST STATE STREET SUITE 800
PO BOX 1588
MASON CITY IA 50402-1588

FLOYD COUNTY TREASURER
101 SOUTH MAIN STREET STE 303
CHARLES CITY IA 50616-2792

BRANDON JAMES GRAY
IOWA ATTORNEY GENERALS OFFICE
1305 WALNUT
DES MOINES IA 50319-0109

J D HAAS
J D HAAS ASSOCIATES PLLC
1120 E 80TH ST
SUITE 200
BLOOMINGTON MN 55420-1407

HAWKEYE ALARM
16 COMMERCIAL STREET
WATERLOO IA 50701-1310

HILDRETH CO LLC
1110 N GRAND AVE SUITE 300
CHARLES CITY IA 50616-2139

LAURA MICHELLE HYER
BRADLEY RILEY PC
PO BOX 2804
CEDAR RAPIDS IA 52406-2804

IL SWITCHBOARD
125 WEST LAURA DRIVE
ADDISON IL 60101-5178

INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA PA 19101-7346

IOWA ECONOMIC DEVELOPMENT AUTHORITY
200 E GRAND AVENUE
DES MOINES IA 50309-1834

IOWA ECONOMIC DEVELOPMENT AUTHORITY
OFFICE OF THE ATTORNEY GENERAL OF IOWA
ATTN- BANKRUPTCY UNIT
1305 E WALNUT STREET
DES MOINES IA 50319-0109

JED CONSTRUCTION
102 GRAND STREET
ELMA IA 50628-8189

JENDRO SANITATION
108 PROSPECT LANE
CHARLES CITY IA 50616

JUDITH MACK ODONOHOE
P O BOX 307
116 N MAIN ST
CHARLES CITY IA 50616-2015

KAMM EXCAVATING CORP
1301 HILDRETH STREET
CHARLES CITY IA 50616-3663

L ASHLEY ZUBAL
TRIAL ATTORNEY
US TRUSTEE
FEDERAL BUILDING
210 WALNUT STREET RM 793
DES MOINES IA 50309-2108

ERIC W LAM
115 THIRD STREET SE SUITE 1200
CEDAR RAPIDS IA 52401-1222

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA FIRST CLASS MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF SERVICE" WERE SENT A RECEIPT OF ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

ERIC J LANGSTON
SIMMONS PERRINE MOYER BERGMAN PLC
115 THIRD STREET SE
SUITE 1200
IOWA
CEDAR RAPIDS IA 52401-1222

LARRY STEVEN EIDE
103 E STATE ST SUITE 800
PO BOX 1588
MASON CITY IA 50402-1588

LAURA MICHELLE HYER
P O BOX 2804
2007 1ST AVE S E
CEDAR RAPIDS IA 52402-6344

MAS
41W195 RAILROAD STREET
PINGREE GROVE IL 60140-8980

DEBTOR
MCQUILLEN PLACE COMPANY LLC
1110 NORTH GRAND AVE SUITE 300
CHARLES CITY IA 50616-2139

MEDIACOM
1 MEDIACOM WAY
MEDIACOM PARK
NEW YORK NY 10918-4810

MICK GAGE PLUMBING  HEATING
511 WEST MILWAUKEE STREET
NEW HAMPTON IA 50659-1105

MID AMERICAN ENERGY
666 GRAND AVE
DES MOINES IA 50309-2580

MIDWEST ENGINEERING
8236 W 51ST STREET
SIOUX FALLS SD 57106-7861

MIDWEST FIRE SPRINKLER
2001 DE WOLF STREET
DES MOINES IA 50316-2761

MILLS INC
1906 GILBERT ST
CHARLES CITY IA 50616-9171

DONALD H MOLSTAD
701 PIERCE ST STE 305
SIOUX CITY IA 51101-1037

JUDITH ODONOHOE
ELWOOD ODONOHOE BRAUN  WHITE LLP
116 NORTH MAIN STREET
PO BOX 307
CHARLES CITY IA 50616-0307

OHARAS SON ROOFING CORPORATION
3306 N KNOX AVENUE
CHICAGO IL 60641-4434

ALLEN O PEDERSON
412 SAMPLE STREET
NASHUA IA 50658-9696

PEDERSON PLUMBING
412 SAMPLE STREET
CHARLES CITY IA 50616

PEDERSON PLUMBING
ALLEN O PEDERSON
412 SAMPLE STREET
NASHUA IA 50658-9696

PHILLIPS MODERN AG
2153 S LINN AVE
NEW HAMPTON IA 50659-9414

PLANSCAPE PARTNERS
1200 NICOLLET AVE
SUITE 706
MINNEAPOLIS MN 55403-2409

PREMIER CLEANERS
816 FIRST AVENUE N
FORT DODGE IA 50501-3906

RANDALL EUGENE NIELSEN
P O BOX 1588
103 E STATE ST SUITE 800
MASON CITY IA 50401-3334

ROBERT CARDELL GAINER
505 5TH AVE SUITE 835
DES MOINES IA 50309-2317

SCHINDLER ELEVATOR CORPORATION
1530 TIMBERWOLF DRIVE
HOLLAND OH 43528-9161

SCHINDLER ELEVATOR CORPORATION
20 WHIPPANY RD
MORRISTOWN NJ 07960-4524

SCHINDLER ELEVATOR CORPORATION
CO NCS 729 MINER RD
HIGHLAND HTS OH 44143-2117

JOSEPH E SCHMALL
2007 FIRST AVENUE SE
PO BOX 2804
CEDAR RAPIDS IA 52406-2804

SHERRI DRALLE
1308 GRANDVIEW AVE
WAVERLY IA 50677-1038

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA FIRST CLASS U.S. MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF" WERE SERVED BY ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

CHRISTINE B SKILTON
205 BRASHER STREET
PO BOX 39
NASHUA IA 50658-0039

BRADLEY DAVID SLOTER
NOAH SMITH  SCHUKNECHT PLC
200 NORTH JOHNSON ST
CHARLES CITY IA 50616-1939

CHARLES L SMITH
25 MAIN PLACE STE 200
PO BOX 248
COUNCIL BLUFFS IA 51502-0248

T J SERVICE INC
221 N MAIN ST
CHARLES CITY IA 50616-2016

T J SERVICE INC
TOM BROCK PRESIDENT
221 NORTH MAIN STREET
CHARLES CITY IA 50616-2016

T J SERVICE INC
CO CHRISTINE B SKILTON
205 BRASHER STREET PO BOX 39
NASHUA IA 50658-0039

TELPNER PETERSON LAW FIRM LLP
25 MAIN PLACE SUITE 200
COUNCIL BLUFFS IA 51503-0790

CHARLES THOMSON
1110 NORTH GRAND 300
CHARLES CITY IA 50616-2139

CHARLES MCQUILLEN THOMSON
LAW OFFICE OF CHARLES M THOMSON
1110 NORTH GRAND AVE SUITE 300
CHARLES CITY IA 50616-2139

~~EXCLUDE~~
~~US TRUSTEE~~
~~111 7TH AVE SE BOX 17~~
~~CEDAR RAPIDS IA 52401-2103~~

~~EXCLUDE~~
~~US TRUSTEE~~
~~210 WALNUT STREET ROOM 793~~
~~DES MOINES IA 50309-2106~~

~~EXCLUDE~~
~~UNITED STATES TRUSTEE~~
~~UNITED STATES FEDERAL COURTHOUSE~~
~~111 7TH AVENUE SE BOX 17~~
~~CEDAR RAPIDS IA 52401-2103~~

UNRUH INSULATION
2633 450 ST
STACYVILLE IA 50476-7549

VANMETER
850 32ND AVE SW
CEDAR RAPIDS IA 52404-3913

VERNON P SQUIRES
P O BOX 2804
2007 1ST AVE S E
CEDAR RAPIDS IA 52402-6344

L ASHLEY ZUBAL
US TRUSTEE
FEDERAL BUILDING
210 WALNUT STREET RM 793
DES MOINES IA 50309-2106

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**Declaration of Ann Schmid** |

I, Ann Schmid, hereby declare under penalty of perjury, that the following is true and correct, pursuant to 28 U.S.C. §1746:

1. I am the Disaster Recovery Team Leader, Historic Preservation Specialist at the Iowa Economic Development Authority (the "*IEDA*"). The IEDA administers the Community Development Block Grant-Disaster Recovery ("*CDBG-DR*") program that was federally funded in response to the Midwest 2008 flooding. Pursuant to an application for CDBG-DR funding by Charles Thomson (the "*Owner*") and the Cerro Gordo County Board of Supervisors, IEDA awarded $2,940,000.00 in CDBG-DR funding for a certain project located at 123 N. Main St, Charles City, Iowa ("*McQuillen Place*"). I am familiar with McQuillen place based upon my personal knowledge and my review of relevant information.

2. After the ground breaking for McQuillen Place in October 2014, IEDA monitored the project and provided quarterly status updated to the relevant federal regulator that noted slow progress. After the construction lien lender foreclosed its mortgage, IEDA met on site to discuss the status of McQuillen Place and the project's financial situation with the Owner, James Gray (the "*Architect*"), representative from the city, the grant administrator and the local lender, but not the primary lender. The primary lender was not present because, despite IEDA directing the Owner to include the lenders in the meeting, the Owner had not in fact invited either of the lenders. Shortly thereafter, IEDA had a teleconference with the lenders to discuss McQuillen place and stress that IEDA remained committed to working with the relevant stakeholders to enable successful completion of the project, which could include IEDA's assistance with finding another developer to complete the project.

3. After this Court appointed Charles L. Smith as the Chapter 7 trustee (the "*Trustee*"), IEDA contacted the Trustee to discuss McQuillen Place. IEDA determined that if the Trustee sold McQuillen Place to a new owner, and that new owner completed the projected within certain terms, then IEDA could document satisfactory completion of the project and potentially allow that new owner access to $1,000,000 of new CDBG-DR funding to complete the project as an enticement to bid on McQuillen Place. IEDA had to reallocate funding from other projects to make the additional CDBG-DR funding available to McQuillen Place.

4. The IEDA is committed to the fair, open and successful expenditure of CDBG-DR funds. To facilitate an active and competitive bidding process for the Trustee to sell McQuillen place, IEDA worked closely with the Trustee, customized the application documents for the additional CDBG-DR funding, created a link for shared application documents, and emailed the information to over two dozen developers.

5. As with many federal funds, CDBG-DR funds may be expended only if certain conditions are met. One primary requirement is for supporting financial documentation regarding the sources and uses of funds. Another significant requirements is that the funds be used for residential and not commercial purposes. While IEDA determined the eligibility of applications for the additional CDBG-DR funding in connection with bids for the purchase of McQuillen Place, IEDA took no position and made no recommendation with regards to which bid was the highest and best bid or with regards to how ultimate ownership of the project should be decided.

6. There were two bids received. The bid from First Security Bank of Charles City ("*First Security Bid*") did not include an application for CDBG-DR funding, which foreclosed a finding of eligibility. The bid from Binstock Development, LLC ("*Binstock Bid*") did include an application for the additional CDBG-DR funding, but the application was significantly deficient. The Binstock Bid did not have supporting financial documentation regarding the sources and uses of funds. Uniquely, the Binstock Bid was submitted with proposed conditions that IEDA would impose upon the developer. However, the proposed conditions did not comport with IEDA's ability and authority to use and award CDBG-DR funds. As such, the Binstock Bid was also not eligible for the additional CDBG-DR funding.

7. IEDA informed the Trustee that neither the First Security Bid nor the Binstock Bid was eligible for any of the additional CDBG-DR funding. IEDA defers to the Trustee regarding the selection of which bid constitutes the highest and best offer and with regards to how ownership of McQuillen Place should ultimately be decided. The decision is solely the Trustee's to make, as to which bid to accept and to present to the Court.

8. Appended here are a Memo I sent to Trustee Smith circa March 26, 2020, a Summary of the two bids sent to Trustee Smith, and an earlier Memo that contained some additional details of the history of IEDA's involvement. These materials were prepared by me or pursuant to my direction, based on my personal knowledge of the situation, and sets out my office's activities and were based on matters I had observed and were reported pursuant to my official duties.

Dated this 27ᵗʰ day of March , 2020

Ann Schmid

# MEMO

March 26, 2020

To:    Trustee Charles L. Smith
From: Ann Schmid, Iowa Economic Development Authority – Community Development – Disaster Recovery
Team Leader

RE:    McQuillen Place Multi-Family Housing, Charles City, Iowa – Proposal Process

In March 2013, Charles Thomson and the Cerro Gordo County Board of Supervisors applied to the Iowa Economic Development Authority (IEDA) for Federal Community Development Block Grant Disaster Recovery (CDBG-DR) funding for the production of new housing units in a project known as McQuillen Place, located at 123 N. Main Street in Charles City, IA.

Through a series of events (documented on the attached Memo to Justice David Baker dated 07/03/2018) the IEDA continued to monitor this project with Mr. Thomson, Cerro Gordo County, and the lending entities on this project, including participating in an all-day mediation on July 6, 2018 in Charles City.  At that time, the IEDA was no longer approving draws on this project, but the project had already drawn down $2,837,100 of the original $2,940,000 awarded to this project. Leaving $102,900 undrawn.

In December 2019, the IEDA was informed that Charles L. Smith had been appointed Chapter 7 Bankruptcy Trustee. The IEDA reached out to Mr. Smith.  The IEDA pursued the opinion that if ownership could be transferred through this process, and the future owner could complete the project within the terms of the federal assistance, IEDA could document satisfactory completion of the project under the federal program.

On January 27, 2020, The IEDA participated in the 341 Creditor's Meeting in Mason City, IA, lead by the appointed Bankruptcy Trustee, Mr. Charles L. Smith.  That same day, all interested parties toured the incomplete structure located at 123 N. Main Street, and conducted an initial meeting with the Trustee to discuss a process to seek proposals for the disbursement of the property.

The IEDA saw this disbursement proposal process to be two-fold:
1) Provide the Trustee a mechanism to receive competitive bids for the Acquisition of Real Property and the Personal Property located within the structure, and

2) Allow developers the opportunity to apply for an additional $1,000,000 of Federal CDBG-DR funds to complete the project.

The IEDA modified application documents that are typically used for competitive rounds of CDBG-DR funding and streamlined the proposal process by auto-populating some fields of the application process, as this process would be limited to the single project site. While IEDA worked closely with the Trustee, it was always understood that the final disposition of the property was the sole discretion of the Trustee.  IEDA would evaluate applications for CDBG-DR funding based on State program guidelines and federal program requirements only.  IEDA would advise the Trustee as to which (if any) of the applicants would be eligible for the CDBG-DR funds, and ultimately if an eligible developer was selected by the Trustee, they would, as such, be awarded the CDBG-DR funds (as ownership of the property is necessary to utilize the CDBG-DR funding).

On February 10, 2020, the IEDA created a link for shared application documents and emailed it to all interested parties (City, Bank, Trustee) along with the following developers:

brentdahlstrom@gmail.com ;                          drb@barkerapartments.com;
maryg@gronenproperties.com;                        kylegalloway@barkercompanies.com ;

jim@hobarthistoricrestoration.com ;
tim@ctdevelopmentiowa.com;
sle@aspectinc.net;
jenny.clayton@seldin.com;
phyllisp@seldin.com;
jhassman@cvpadvisors.com;
markholtkamp@yahoo.com;
caleb@pyramidpropertygroup.com ;
vincent.king@fbfs.com;
flevy@newburyliving.com;
sam@chihousing.com;

tj@blackbirdinvest.com;
justin@blackbirdinvest.com;
TroyH@HansenRES.com;
AndyV@HansenRES.com;
jesse.frey@hubbellrealty.com;
wanderson@sherman-associates.com
xanddrew@msn.com
cthomson@doall.com
james.gray@corniceandrose.com
m.miller@1stsecuritybank.com

The link included a cover letter from the Trustee, all application documents, and the instruction that the link could be disseminated publicly by any interested party.

Prior to proposals being received, IEDA fielded multiple phone calls and emails.  IEDA answered general questions and directed developers to other sources of information such as the City or the County Assessor. All inquiries were treated equally and promptly.

March 9, 2020 – Proposals were due to IEDA.  Two proposals were received: 1)Binstock Development LLC, 2) First Security Bank of Charles City.

March 12, 2020 – IEDA met in person with the Trustee and the City to go over the received proposals.  IEDA informed all parties that neither of the two proposals qualified for CDBG-DR funding (See IEDA's Proposal Summary).  It was agreed upon that IEDA's decline letters would be sent after the Trustee made final determination on the disposition of the property, so as not to create any false understanding of the process. As of the date of this memo those decline letters are being finalized by IEDA and will be sent shortly.

IEDA provided technical assistance by providing the Trustee with a summary of the CDBG-DR applications and IEDA's funding determinations; however, the final determination for disposition remained with the Trustee.

**Summary of Bids 123 N. Main Street, Charles City, IA:**

The Iowa Economic Development Authority is providing the following summary of the solicitation for proposals for 123 N. Main Street, Charles City, IA to the Chapter 7 Bankruptcy Trustee for applicability of the use of Federal CDBG-DR funding and General Technical Assistance.

## First Security Bank of Charles City:

**Acquisition Bid Amount:** $1,100,000
**CDBG-DR Funds Request:** $0.00
**CBDG-DR Funds Eligible:** $0.00

First Security Bank submitted a letter for bid submittal, including only the acquisition of the parcel and personal property. No IEDA application, Sources and Uses of funds, or project scope of work were included. As such, No CDBG-DR funds were requested from IEDA, therefore no CDBG-DR funds are able to be awarded at this time.

Should the trustee move forward this this award, further application documentation would be required for any future application for CDBG-DR Funds.

## Binstock Development, LLC (BDL):

**Acquisition Bid Amount:** $470,000 (this is the cumulative total of the *Building Acquisition Bid Amount* and the *Personal Items Acquisition Bid Amount* per the Sources and Uses of Funds form).
**CDBG-DR Funds Requested:** $1,000,000
**CDBG-DR Funds Eligible:** $0.00

BDL Submitted a full application for CDBG-DR funds, however the following deficiencies in the application do not allow IEDA to make an award for the requested $1,000,000. *lent use for comme*

Summary of IEDA Application Deficiencies including but not limited to the following:

| Area of Application | Issue | Remedy |
|---|---|---|
| Sources and Uses of Funds: | Sources: Owner Contribution – type, rate, term, debt service details missing | Update form and additional documentation required to show named lender, commitment of funds, and all relevant terms. |
| Sources and Uses of Funds | Sources: Reduction of Back Taxes – needs explanation | Documentation as to how this is a "Use of Funds" is required. |
| Sources and Uses of Funds: | Sources: Use of Copywrite | Documentation as to how this is a "Use of Funds" is required. |
| Sources and Uses of Funds: | Uses: Must complete third column – how are the Sources of funds separated out by Use? | Update form |
| Financial Commitments | No Documentation was provided. | Financial commitment documents including terms for construction and permanent financing, account statement and balances, and written commitment of all funding sources. |
| City Support | No signature or statement of support specific to this development team | Resolution of support and/or City signature on IEDA application required. |
| Development Team | All development team members must be documented including but not limited to Owner, Developer, General Contractor, sub-contractors, architect, engineer, HERS rater, etc. | A more detailed development team should be provided, including all sub-contractors. |

Should the Trustee move forward with this award, substantial modifications to the application, including but not limited to those noted above, would be required prior to IEDA's ability to award CDBG-DR Funding.



IOWA ECONOMIC DEVELOPMENT AUTHORITY

200 East Grand Avenue | Des Moines, Iowa 50309 USA | Phone: 515.348.6200

iowaeconomicdevelopment.com

# MEMO

**July 3, 2018**

**To:** Justice David Baker
**From:** Ann Schmid, Iowa Economic Development Authority – Community Development – Disaster Recovery

**RE:** McQuillen Place Multi-Family Housing, Charles City, Iowa

As a result of the 2008 Iowa Floods, the State of Iowa received just under one billion dollars of disaster recovery funding from the Federal Department of Housing and Urban Development (HUD). To disburse funds efficiently, the Iowa Economic Development Authority (IEDA) developed a "Super County" system, selecting a large county in each affected region and entering into a single DR-CDBG contract with that county to expend disaster recovery funds within the larger multi-county geographic area. Applications for funding for projects were submitted to IEDA, which made awards through Super Counties and each Super County acted as a pass-through of funds to the project's developer.

As it pertains to the McQuillen Place project in Charles City, the following events may be relevant to the pending litigation and mediation:

March 2009 – IEDA executed Contract 08-DRH-202 with Cerro Gordo County to provide funding assistance to 20 flood affected counties, including Floyd County.

March 1, 2013 – Charles Thomson and the Cerro Gordo County Board of Supervisors applied for disaster recovery funding for McQuillen Place.

July 5, 2013 – IEDA awarded disaster recovery funding to Cerro Gordo County for 2 projects including the McQuillen Place project in Charles City.

July 2013 – The Cerro Gordo County Board of Supervisors approved and signed Amendment 11 to Contract 08-DRH-202 pertaining to an award of $2,940,000 to McQuillen Place in Charles City.

November 6, 2013 – IEDA issued the project "Release of Funds" indicating that environmental compliance was completed, and that project commencement was approved.

October 2014 – IEDA attended the official Ground-Breaking Ceremony for McQuillen Place

January 1, 2015 – Cerro Gordo County filed the Restrictions Agreement required under HUD rules and a mortgage on the property in the amount of the DR-CDBG investment. IEDA acknowledges that the mortgage held by Cedar Rapids Bank and Trust (CRB&T) is in the primary position.

2015 – 2018 – IEDA continued to monitor the project and provided quarterly project status updates to HUD describing slow progress.

March 16, 2018 – Charles Thomson contacted IEDA to disclose that the bank holding the construction lien intended to foreclose on the 1st position mortgage. Mr. Thomson stated that he believed there was a path to a resolution and that it would not lead to foreclosure, but he would keep IEDA up to date on any further developments. IEDA later learned that, in fact CRB&T had filed the foreclosure action and attempted service by issuing the petition on Mr. Thomson, which we understand he has disputed. The petition was also served on Cerro Gordo County, and its county attorney has filed an answer.

Page 1 of 2

Governor Kim Reynolds   |   Lt. Governor Adam Gregg   |   Director Debi V. Durham

May 9, 2018 – IEDA requested that Mr. Thomson schedule an on-site meeting with the banks, IEDA, and the City to ascertain the status of the project and discuss the financial situation.

May 24, 2018 – IEDA staff met on site with owner Charles Thomson, architect James Gray, City of Charles City representatives and the grant administrator.  Representatives of the banks were not present. IEDA ascertained that Mr. Thomson had not invited representatives of the banks to the meeting. After multiple requests, two representatives from the local bank, First Security, arrived, but CRB&T representatives were not available for the meeting.

The group toured the project site, then proceeded to Charles City City Hall to meet and discuss the project.  Since the primary lender was not present, the conversation was limited to the owner indicating his intent to maintain ownership and seek additional funding to finish the project. IEDA stressed the necessity to complete the project within the timeframe remaining for the disaster recovery grants. IEDA is currently working with HUD on a closeout plan for the disaster recovery funds, and anticipates all projects completed and closed by the end of 2019.  No decisions or determinations were made at the meeting, and IEDA reiterated that it was necessary to discuss the situation with the primary lender.

May 31, 2018 – Cedar Rapids Bank and Trust initiated a conference call with IEDA, representatives of First Security, and both banks' attorneys to discuss McQuillen Place. During this discussion, IEDA learned that Cedar Rapids Bank and Trust had filed for foreclosure 2 ½ months previously. IEDA reiterated its intention to continue to work with the owner, the city, Cerro Gordo County, the banks and other interested parties to move forward with efforts to complete the project. IEDA described successful efforts in a similar situation to find another developer to complete the project and offered to provide the same assistance to Mr. Thomson and the banks

While unrelated to the foreclosure action, there may still be a dispute between Mr. Thomson and IEDA regarding a state program, the Housing Enterprise Zone Program (HEZ).  The Legislature rescinded statutory authority for the HEZ program in 2014.  Before the repeal, IEDA notified Mr. Thomson that IEDA intended to make an award to him under the HEZ program for the McQuillan Place project.  However, an award is not final until a contract has been executed, and Mr. Thomson did not execute the contract that IEDA sent to him.  Furthermore, under Iowa Code, a developer was not eligible for the program unless the project was completed within two years from the time the developer commenced construction.  As set out in documentation provided to IEDA by Mr. Thomson, construction was commenced in 2014.  Therefore, Mr. Thomson is not eligible for HEZ funding because construction has not been completed some four years after it was commenced.  Mr. Thomson has stated that he intends to file suit against IEDA in connection with the HEZ notice of intent to award.

IEDA is committed to the fair, open and successful expenditure of federal Disaster Recovery Funding.  These funds are dedicated to the production of new affordable housing units and IEDA is committed to the successful completion of this project and the lease-up to income qualified tenants. As of this date, the project has drawn down $2,837,100, leaving $102,900 in undrawn funds. IEDA is amenable to amending the 2nd position mortgage to enable Cerro Gordo County to assign the mortgage to the City of Charles City to localize the contract. If all parties agree, this change would then allow IEDA to close the Cerro Gordo contract and enter a new contract with the City of Charles City to provide remaining undrawn funds and possibly provide additional qualified funds to complete the project. All of this is, of course, contingent on keeping the 2nd position mortgage and Restrictions Agreement in place with any transferee.

The failure to comply with the successful completion of the project and the associated Restrictions Agreement, would constitute default by Cerro Gordo County. In accordance with Article 9 of Contract 08-DRH-202, IEDA would issue a written Notice of Default to the County providing for a 15-day opportunity to cure, provided that cure is possible and feasible.  If the County is unable to provide a remedy, HUD regulations provide for repayment of the full amount of the funds disbursed for this project.

Page 2 of 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**EXHIBIT LIST** |

COMES NOW First Security Bank & Trust Company ("Bank"), by and through its counsel, and with respect to the hearing to be held concerning the Trustee's Sale Motion (Dkt #134) hereby respectfully submits the following Exhibits:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| AA | Trustee Sale Motion (Dkt #134) |
| BB | Supplement to Trustee Sale Motion (Dkt #136) (Proposed Order) |
| CC | Trustee Smith February 3, 2020 invitation for bids |
| DD | Binstock Development, LLC Bid |
| EE | Bank Bid |
| FF | Supplemental Affidavit from Trustee Smith |
| GG | Affidavit from Iowa Economic Development Authority |
| HH | Electronic and hard mail exchanges between Trustee and Mr. Gray |

_____/s/ Eric W. Lam_____
Eric W. Lam, AT0004416
Eric J. Langston, AT0014001
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
ATTORNEYS FOR FIRST SECURITY BANK &
TRUST COMPANY

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 6th day of April, 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Kelly Carmichael

Larry S. Eide
Charles Thomson
Charles L. Smith
Monica L. Clark
Brandon Gray
J D Haas
Laura Hyer and Joe Schmall
Donald H. Molstad
Judith O'Donohoe
Christine B. Skilton
Bradley Sloter
L. Ashley Zubal
Jim Gray (via e-mail)

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF IOWA

| In re: | ) | Chapter 7 |
|---|---|---|
| McQuillen Place Company, LLC, | ) | Case No. 19-507 |
| Debtor. | ) | |

### TRUSTEE'S MOTION TO SELL AND FOR OTHER RELIEF
### (11 U.S.C. §§363(b) and (f))

COMES NOW Chapter 7 Trustee Charles L. Smith and moves for an Order from this Court granting this Motion, and in support thereof respectively states:

1.      On April 25, 2019, McQuillen Place Company, LLC. ("Debtor" or "MPC") filed a voluntary Chapter 11 Petition with this Court.

2.      On Dec. 9, 2019, this Court entered an Order converting the Chapter 11 case filed by the Debtor to one under Chapter 7.

3.      The Office of the United States Trustee subsequently appointed Charles L. Smith ("Trustee") to administer this Chapter 7 case.

4.      In the course of his administration, the Trustee has been in communication with various creditors and stakeholders.

5.      Among the assets being administered by the Trustee is certain real estate (the "Real Estate") upon which lies a partially-completed building (the "Building") that is owned by the Debtor, as well as certain items of personal property located therein or associated therewith (the "Personal Property").

6.      With respect to the Real Estate and Building, the Trustee is credibly informed First Security Bank & Trust Company ("Bank" or "Purchaser") asserts a validly perfected

1

mortgage against the Real Estate and Building (the "Mortgage"). The Trustee further reasonably believes no one claims a superior interest in the Real Estate and Building, other than the Bank's assertion of a mortgage lien and whatever, if any, mechanic or similar statutory liens, that may include liens on account of real estate tax, are asserted by other parties in interest. The Trustee is further cognizant that based on the Mortgage the Bank has commenced a Foreclosure Petition in State Court, and certain counterclaims have been pled. The Foreclosure Petition was and still is pending in State Court, and no Decree has been enrolled.

7.      With respect to the Personal Property, even if some or all of the Personal Property became fixtures (which would then be subject to the Bank's mortgage), no one has filed any U.C.C. financing statement. As such, the Personal Property is likely free and clear of perfected consensual liens.

8.      However, the Trustee is also cognizant that Cornice & Rose International, LLC (which, *inter alia*, served as the Debtor's architect ("C & R")) (and perhaps other entities that are owned or partially owned by the Debtor's principal, *e.g.* Hildreth & Co., LC) asserts some interest or claim or right against some of all of the personal property in question. For example, C & R may claim it actually "owns" some or all of the personal property located in and scattered in various areas of the Debtor's building, and C & R may also claim it is the licensor of certain drawings that might have been used by the Debtor or others in the process of erecting the Building. In any event, at a minimum bearing in mind the Debtor is at least in possession of some of the  Personal Property (*e.g.* the items that are located on the Debtor's premises), and the Debtor is or was at least a licensee of some of the drawings, pursuant to 11 U.S.C. §541 the Debtor and therefore this estate had and have

2

either a legal or equitable (or both) interest in all of the Personal Property, albeit admittedly

and possibly subject to whatever, if any, claim, right, title, or interest that may eventually be

validly proven by C & R or other entities claiming a claim, right, title, or interest thereto.

9.      The Trustee has issued an invitation to various interested parties to bid on the

Real Estate and the Personal Property. Two bids were received by the March 9, 2020

deadline imposed by the Trustee. In examining the two bids, the Trustee has concluded the

bid submitted by the Bank is the highest and best offer. As a result, the Trustee has executed

a Purchase Agreement, a copy of which is attached hereto as Exhibit 101 and is by this

reference incorporated herein as if set forth verbatim.

10.     Briefly and generally, the Purchase Agreement provides for the Trustee to sell

the Real Estate and Building, as well as the Personal Property, for a total cash gross cash

price of $1,100,000. Any and all lien, claim, title, interest, and right asserted by the Bank or

C & R or any party in interest will attach to the gross proceeds, in whatever order of priority

that existed as of the initial Chapter 11 filing date, EXCEPT the sum of $150,000 cash will

be released from the gross proceeds allocated to the Real Estate and Building, and such sum

shall be free and clear of any and all claim, lien, title, interest, and right, and the Trustee and

the estate may use such sum for any and all purposes, pursuant to the provisions of Title 11,

including but not limited to the payment of administrative claims and expenses and, if

available, to the payment of various non-administrative claims (such as general unsecured

claims).

11.     More specifically, with respect to the Real Estate and Building, because no

one disputes the Debtor owns the Real Estate in fee simple absolute, subject only to the

Bank's Mortgage and whatever, if any, other validly perfected lien or encumbrance, the

Trustee seeks permission from this Court to effectuate the sale pursuant to 11 U.S.C.

§363(b). All such Mortgage and lien and encumbrance and any and all right, title, claim,

interest, and lien of any and all parties in interest will attach to the gross proceeds from the

sale, minus the cash sum of $ 150,000, in the same order of priority as it existed as of the

time of the original Chapter 11 filing, and will be held by the Trustee, subject to further

Order from this Court. If, for example, eventually the Bank successfully proves to this Court

that the Bank has a superior lien in such gross proceeds (minus $150,000), the money will

then be paid to the Bank in partial satisfaction of its Proofs of Claim filed in this Court. And

*if* somehow there is a bona fide dispute as to the Bank's lien or the Debtor's (and the

estate's) ownership of the Real Estate and Building, the Trustee alternatively seeks

permission from this Court to sell the Real Estate and Building, pursuant to 11 U.S.C.

§363(f)(4).

      12.     With respect to the Personal Property, the Trustee posits there is a bona fide

dispute between and among various interested parties as to the respective and relative lien,

claim, title, and interest in and to the Personal Property. For example, the Debtor at a

minimum had or has a possessory right and interest or the right of a licensee, whereas other

interested parties (such as C & R) assert an "ownership" or licensor claim or interest. The

Trustee has attempted to discover the full extent of C & R *et al.*'s claims or interest, but C &

R's counsel merely referred the Trustee to certain provisions of the United States Code

without otherwise fully and completely sharing with the Trustee all documents and

information concerning the alleged claim of "ownership." Therefore, with respect to the

Personal Property, the Trustee seeks permission from this Court to sell to the Bank the

Personal Property for the sum of $25,000, pursuant to 11 U.S.C. §363(f)(4), *viz.*, this Court

is authorized to sell property of the estate that is subject to "bona fide dispute." If C & R or

others eventually prove to this Court that they indeed enjoy superior title, right, claim, or

interest to the Personal Property, the proceeds from the sale attributable to the value of the

Personal Property will be paid to such parties. Pending resolution of the bona fide dispute,

the gross proceeds of the sale attributable to the Personal Property will be held by the

Trustee, subject to further Order from this Court, and any and all right, title, claim, lien, or

interest of any and all parties in interest will attach to such proceeds, in the same order of

priority as it existed as of the time of the original Chapter 11 filing.

    13.    To consummate the sale, the Trustee will execute a Court Officer's Deed,

with respect to the Real Estate and Building, and a Bill of Sale with respect to the Personal

Property. The Purchaser will be granted title, pursuant to this Court's Order approving this

Motion, to all the Real Estate and Building and the Personal Property, free and clear of any

and all claims (including but not limited to any and all environmental claims or successor

liability claims), liens, interests, title, right, and encumbrances. Otherwise, the sale is "As is

Where Is."

    14.    The Trustee submits the sale proposed in this Motion is in the best interest of

the estate, of the creditors, and of the community. This is so because such a sale will

generate much-needed "free and clear" cash to enable the Trustee to administer this case,

and will hopefully enable the Purchaser to complete the building project, to the betterment

of the community and the public interest. The Trustee further submits the Purchase

Agreement was negotiated at arm's length and in good faith and with assistance and advise

from counsel.

15.     Any Order approving this Motion should also provide the 14-day stay period in F.R.B.P. 6004(h) is inapplicable. Such a provision will enable an expeditious closing, and will minimize administrative claim (such as utility bills, real estate taxes etc.) that will be incurred and inflicted against the estate. A form of a proposed Order is appended hereto.

WHEREFORE, the Trustee respectfully prays this Court on such notice and hearing as it may direct enter and enroll an Order granting the relief requested by the Trustee in this Motion, and for such other relief as may be just and proper under the premises.


/s/ Charles L. Smith
Charles L. Smith, Chapter 7 Trustee
25 Main Place, Suite 200
Council Bluffs IA 51503
712-325-9000

### Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 23rd day of March 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.


/s/ Cathy Templeton


Larry Eide
Don Molstad
Christine Skilton
Eric Lam
Charles Thomson
Joe Schmall
Laura Heyer
Judith O'Donohue
Brandon Gray
Brad Sloter

6

L Ashley Zubal
Monica Clark
J D Hass
Dan Childers

<u>Declaration</u>[1]

    I, Charles L. Smith, in my sole capacity as Chapter 7 Trustee in this case, do hereby declare under penalty of perjury under 28 U.S.C. §1746 that the facts stated in this Motion are true and correct.

                   /s/ Charles L. Smith
                   Charles L. Smith, Chapter 7 Trustee

---

[1] Pursuant to F.R.B.P. 9017 and F.R.C.P. 43(c), to the extent evidence is necessary to consider this Motion, the Court is authorized to consider the Motion based on affidavits. The Trustee's Declaration is submitted so as to comply with F.R.C.P. 43(c).

7

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the 20th day of March, 2020 by and between Chapter 7 Trustee Charles L. Smith, solely in his capacity as Trustee of the Bankruptcy Case ("Seller") and First Security Bank & Trust Company having an address at 809 Clark Street, Charles City, Iowa ("Purchaser") ("Purchaser" and "Seller" are for ease of reference "Parties").

### Recitals

A.      On April 25, 2019, McQuillen Place Company, LLC ("Debtor") filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Iowa (the "Bankruptcy Court") bearing Case No. 19-507 (the "Bankruptcy Case"); on December 9, 2019, the Bankruptcy Court entered an order converting the Bankruptcy Case to Chapter 7; and the Office of the United States Trustee appointed Charles L. Smith to administer the Bankruptcy Case.

B.      In connection with the Bankruptcy Case, Seller has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Seller, at the price and upon the terms and conditions set forth in this Agreement, (a) that certain parcel of land commonly known as McQuillen Place, and more particularly described on Exhibit A (the "Land"), (b) the buildings, improvements, and structures located upon the Land (the "Improvements"), (c) all other easements and rights appurtenant to the Land, if any (the "Appurtenant Rights"), and (d) all right, title and interest of Seller, if any, in and to the fixtures owned by Seller and attached or appurtenant to the Property, as well as certain items of personal property described on Exhibit A1 (the "Personal Property" and, together with the Land, the Appurtenant Rights, the Improvements, and the Personal Property, collectively, the "Property").

C.      As a result of the pendency of the Bankruptcy Case, Bankruptcy Court approval of this Agreement is required, subject to all terms and conditions set forth herein. In the event the Bankruptcy Court not approve this Agreement, this Agreement shall terminate, and no party hereto shall have any further obligations hereunder, except as otherwise provided herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto hereby agree as follows:

1.      Purchase and Sale. Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Property.

2.      Purchase Price. The purchase price (the "Purchase Price") for the Property shall be the sum of US$1,100,000.00, of which US$1,075,000.00 shall be allocated to be the price for the purchase and sale of the Land, Improvements, and Appurtenance Rights, and separately US$25,000 shall be allocated to be the price for the purchase and sale of the Personal Property.

1

EXHIBIT

101

(a)    <u>Payment of Purchase Price</u>. Ten percent of the Purchase Price shall be paid to Seller by Purchaser within seven days after the execution of this Agreement, and the balance of the Purchase Price shall be paid to Seller by Purchaser within seven days of the later of (a) the entry of a Sale Order by the Bankruptcy Court or (b) the execution and tender and delivery of the Deed (as defined herein) and Bill of Sale (as defined herein) and similar documents, except the Parties may mutually in writing agree to a different time. If this Agreement is not timely and fully consummated in any form or fashion, then the aforementioned 10% paid by Purchaser to Seller shall be fully refunded to the Purchaser from the Seller forthwith, and Purchaser shall have no obligation to the Seller with respect to the Purchase Price.

4.3    <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the performance and observance by Seller of all material covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date, (ii) the Bankruptcy Court shall have entered a final and non-appealable order approving this Agreement and the sale of the Property to Purchaser pursuant to the Bankruptcy Code, in form and substance satisfactory to Purchaser and its counsel (the "<u>Sale Order</u>"), and (iii) the fulfillment on or before the Closing Date of these and all other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any of which may be waived by Purchaser in its sole discretion.

4.4    <u>Conditions Precedent to Obligations of Seller</u>. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the Bankruptcy Court shall have entered the Sale Order, (ii) the performance and observance by Purchaser of all material covenants and agreements of this Agreement to be performed or observed by Purchaser prior to or on the Closing Date, and (iii) the fulfillment on or before the Closing Date of these and all other conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in its sole discretion.

4.5    <u>Bankruptcy Conditions</u>. By no later than July  10, 2020, or such other earlier or later date mutually agreed to between the parties (the "<u>Sale Order Approval Deadline</u>"), the Bankruptcy Court shall have entered the Sale Order in a form reasonably acceptable to the Purchaser and Seller that, without limitation, shall (i) include a finding that the Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (ii) provide that the Purchaser is obtaining the Property free and clear of any lien, claim, title, right, or interest, except as otherwise provided for in the Agreement; and (iii) contain such form and substance reasonably satisfactory to Purchaser and its counsel.

4.6    <u>Carve Out and Disposition of Purchase Price</u>. From the Purchase Price the Seller shall retain for the sole benefit of and usage in the Bankruptcy Case, free and clear of any and all claim or lien of the Purchaser, the sum of US$150,000, which sum may be used by the Seller for any and all purposes, subject to the provisions of Title 11 and further Orders from the Bankruptcy Court. Subject to the allocation aforementioned between the Land etc. vis-à-vis the Personal Property, the balance of the Purchase Price shall be held by the Seller, pending further Orders from the Bankruptcy Court, and shall not be disbursed or released

2

except as may be directed or allowed by Orders from the Bankruptcy Court, all subject to and pursuant to notice and hearing.

5.     <u>Closing</u>. Subject to the satisfaction or waiver of all conditions precedent with respect to each party's obligation, the closing (the "<u>Closing</u>") of the sale and purchase contemplated herein shall occur at the offices of Attorney Larry Eide in Mason City, IA (or such other location to which the Parties may mutually agree), on or before April 17, 2020, unless otherwise mutually agreed to by the Parties.

5.1     <u>Seller Deliveries</u>. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by Seller, as appropriate:

(a)     a court officer deed (the "<u>Deed</u>") in the form shown in <u>Exhibit B</u>;

(b)     a certification of non-foreign status in the form shown in <u>Exhibit C</u>;

(c)     all existing surveys, blueprints, drawings, operating manuals, plans and specifications for or with respect to the Property or any part thereof, to the extent the same are in Seller's possession;

(d)     all keys to the Improvements, to the extent the same are in Seller's possession;

(e)     such further instruments as may be necessary to record the Deed;

(f)     [intentionally left blank]

(g)     a bill of sale as to any personal property included in the sale (the "<u>Bill of Sale</u>") in the form shown in <u>Exhibit D</u>;

(h)     a copy of the Sale Order;

(i)     possession of the Property free of all leases, tenancies, occupancies, service contracts, other executory contracts;

(j)     to the extent in Seller's possession, originals of any and all condominium conversion documents, plans, estimated budgets and other related documents and Seller agrees to cooperate with Purchaser after the closing in connection with substituting Purchaser as the sponsor under the condominium documents and in connection with Purchaser's acquisition of the Property, provided such cooperation shall be at no cost to Seller;

(k)     such further instruments as may be necessary to consummate the transaction.

5.2     <u>Purchaser Deliveries</u>. At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following items executed and acknowledged by Purchaser, as appropriate:

3

(a)    payment of the Purchase Price to be made in accordance with this Agreement and

(b)    such further instruments as may be necessary to consummate the transaction.

5.3    <u>Closing Costs</u>. Each Party shall bear its own costs associated with Closing.

5.4    <u>Other Purchaser Costs</u>. Purchaser shall be solely responsible for the payment of the following, incurred since and including April 25, 2019, through the Closing Date (except Purchaser is entitled to seek allowance and payment of all such costs, not to exceed $25,000.00, in the Bankruptcy Case, upon and subject to notice and hearing):

(a)    All real estate taxes, water charges, sewer rents, vault charges and other assessments due with respect to the Property, as well as any and all insurance premiums and security and similar costs and expenses relating to the Property and

(b)    All utilities, including telephone, steam, electricity and gas and similar services and materials.

6.    <u>Representations, Warranties and Covenants; "As Is" Sale</u>.

6.1    <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Purchaser that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

(a)    This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the Sale Order. Seller has taken all necessary action to authorize and approve the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, subject to the Sale Order.

(b)    [Reserved].

(c)    Seller is not a "foreign person" as defined in Section 1445 of the Code.

(d)    Seller has no knowledge of any proposed takings, condemnation or eminent domain proceeding or threat with respect to the Property.

(e)    The foregoing representations and warranties shall survive the Closing.

6.2    [Reserved].

6.3    **General disclaimer. Except as specifically set forth in this Agreement and Exhibits, the sale of the Property is and will be made on an "as is," "where is," and "with all faults" basis, without any representation and warranty of any kind or nature, express, implied or otherwise, including any representation or warranty concerning title**

4

to the Property, the construction of the Improvements, the physical condition of the Property (including the condition of the soil or the Improvements), the environmental condition of the Property (including the presence or absence of hazardous substances on or affecting the Property), the compliance of the Property with applicable laws and regulations (including zoning and building codes or the status of development or use rights respecting the Property), the present and future zoning applicable to the Property, the financial condition of the Property or any other representation or warranty respecting any income, expenses, charges, liens or encumbrances, rights or claims on, affecting or pertaining to the Property or any part thereof.

6.4     <u>Representations and Warranties of Purchaser</u>. Purchaser represents and warrants to Seller that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

(a)     The Purchaser is duly organized, validly existing and in good standing under the laws of the state of its formation.

(b)     The Purchaser has all necessary power and authority to enter into this Agreement and has taken all action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other proceedings on the part of the Purchaser are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Purchaser and is a valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms.

(c)     No consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of this Agreement or any agreement ancillary to this Agreement and the consummation of the transactions contemplated hereby or thereby.

(d)     On the Closing Date, the Purchaser will have cash on hand sufficient to deliver the Purchase Price to the Seller.

(e)     The representations and warranties of Purchaser shall survive the Closing.

7.     <u>Remedies For Default</u>.

7.1     **<u>Seller Defaults</u>. If the transaction herein provided shall not be closed by reason of Seller's default under this Agreement, then Purchaser shall have, as its exclusive remedies, the right to either (a) terminate this Agreement or (b) specifically enforce this Agreement (but no other action, for damages or otherwise, shall be permitted).**

5

7.2    **Purchaser defaults. If the transaction herein provided shall not be closed by reason of Purchaser's default under this Agreement, then Seller shall have, as its exclusive remedies, the right to either (a) terminate this Agreement or (b) specifically enforce this Agreement (but no other action, for damages or otherwise, shall be permitted).**

8.    Termination.

8.1    This Agreement may be terminated by mutual written consent of the Purchaser and the Seller at any time, subject to any necessary or appropriate order of or approval from the Bankruptcy Court.

8.2    This Agreement shall also terminate if the Sale Order is not entered.

9.    Miscellaneous.

9.1    Exhibits; Schedules; Entire Agreement; Modification. All exhibits and schedules attached and referred to in this Agreement are hereby incorporated herein as if fully set forth in (and shall be deemed to be a part of) this Agreement. This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes any prior agreements between the parties hereto respecting such matters. This Agreement may not be modified or amended except by written agreement signed by both parties.

9.2    Business Days. Whenever any action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or by a particular date) that ends (or occurs) on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day. As used herein, the term "Business Day" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in the State of Iowa are not required or authorized to be closed for business.

9.3    Interpretation. Section headings shall not be used in construing this Agreement. Each party acknowledges that such party and its counsel, after negotiation and consultation, have reviewed and revised this Agreement. As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to wit, that ambiguities in this Agreement should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto. Whenever the words "including," "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner. The word "any" does not preclude "all" and vice versa. Terms in singular or plural shall be read interchangeably.  The word "or" is inclusive.  Except as otherwise indicated, all Exhibit, Schedules and Section references in this Agreement shall be deemed to refer to the Exhibits, Schedules and Sections in this Agreement.

9.4    Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Iowa, without giving effect to principles of conflicts of law, and, where applicable, the U.S. Bankruptcy Code.

6

9.5    <u>Assignments; Successors and Assigns</u>. Purchaser may assign or transfer its rights or obligations under this Agreement without the prior written consent of the Seller. In the event of an assignment or transfer, the transferee shall assume in writing all of the transferor's obligations and shall succeed to the rights and benefits and remedies hereunder.

9.6    <u>Notices</u>. All notices, requests or other communications that may be or are required to be given, served or sent by either party hereto to the other shall be deemed to have been properly given, if in writing and shall be deemed received (a) upon delivery, if delivered in person or by facsimile transmission, with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery), (b) one (1) Business Day after having been deposited for next day overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the United States Postal Office and sent by registered or certified mail, postage paid, return receipt requested, and in each case, addressed as follows:

> To Seller:
>
> Charles L. Smith, Chapter 7 Trustee
> 25 Main Place, Suite 200
> Council Bluffs, Iowa 51503
> (712) 325-9000
>
> To Purchaser:
>
> First Security Bank & Trust Company
> 809 Clark Street
> P.O. Box 577
> Charles City, Iowa 50616-0577
> (641) 257-1232

9.7    <u>Third Parties</u>. Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement upon any other person other than the parties hereto and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third parties any right of subrogation or action over or against any party to this Agreement. Except as set forth below, this Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

9.8    <u>Legal Costs</u>. The Parties agree that they shall pay directly any legal costs that they have incurred on their own behalf in the preparation of this Agreement, all deed and other agreements pertaining to this transaction, and that such legal costs shall not be part of the Closing costs.

9.9    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, including counterparts transmitted by e-mail or facsimile, each of which shall

be deemed an original. When counterparts, e-mail, or facsimile copies have been executed by all parties, they shall have the same effect as if the signatures to each counterpart or copy were upon the same documents, and e-mail and facsimile counterparts shall be deemed valid as originals.

9.10    Effectiveness. In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each party hereto.

9.11    No Implied Waivers. No failure or delay of either party in the exercise of any right or remedy given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified in this Agreement for exercise of such right or remedy has expired) shall constitute a waiver of any other or further right or remedy, nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy. No waiver by either party of any breach hereunder or failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.

9.12    Discharge of Seller's Obligations. Except as otherwise expressly provided in this Agreement, Purchaser's acceptance of the Deed and Bill of Sale shall be deemed a discharge of all of the obligations of Seller hereunder that are required to be performed at or prior to Closing and all of Seller's covenants and agreements (except express representations and warranties) in this Agreement shall merge in the documents and agreements executed at the Closing and shall not survive the Closing, except and to the extent that, pursuant to the express provisions of this Agreement, any of such covenants or agreements are to survive the Closing.

9.13    Unenforceability. If any portion of any provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, then such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and such provisions shall be limited and construed as if such invalid, illegal or unenforceable provision or portion thereof were not contained herein, unless doing so would materially and adversely affect a party or the benefits that such party is entitled to receive under this Agreement.

9.14    **Waiver of Trial by Jury and Attorney's Fees and Expense. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. IN ANY SUCH TRIAL OR ACTION OR PROCEEDING ETC., THE PREVIALING PARTY SHALL BE ENTITLED TO BE PAID FROM THE OTHER PARTY ANY AND ALL REASONABLE COSTS AND EXPENSES INCURRED, INCLUDING REASONABLE ATTORNEY'S FEES AND EXPENESE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.**

9.15    [Reserved].

8

12.20 <u>Forum</u>. Any dispute that arises under or relates to this Agreement (whether arising under contract, tort, at law or in equity) shall be resolved in the Bankruptcy Court.

12.21 [intentionally left blank]

[*Remainder of Page Intentionally Left Blank*]

9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:


By: _Charles L. Smith_
Capacity: _Chapter 7 Trustee_


PURCHASER:

**First Security Bank & Trust Company,**


By: _Mark G. Miller_
Title: _Executive Vice-President_

10

## EXHIBIT A

### Legal Description

Real estate locally known as 107 - 109 and 123 Main Street, Charles City, Floyd
County, Iowa, and which is legally described, to wit:
LOT ONE (1), BLOCK TWENTY ONE (21), EXCEPT THE
NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF, OF THE
ORIGINAL PLAT OF ST. CHARLES, NOW A PART OF CHARLES CITY,
IOWA, OTHERWISE DESCRIBED AS: LOT ONE (1) OF THE IRREGULAR
SURVEY OF BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST.
CHARLES. NOW A PART OF CHARLES CITY, IOWA, EXCEPT THE
NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF;
AND
THE NORTH ONE HALF (N ½) OF THE WEST FORTY FEET (W 40') OF
THE BRICK WALL BETWEEN LOTS ONE (1) AND TWO (2), BLOCK
TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW
INCORPORATED AS A PART OF CHARLES CITY, IOWA;
AND
CHARLES CITY DISASTER REDEVELOPMENT PROJECT IOWA R 36(C)
PARCEL NO. R 24 (P 10), MORE PARTICULARLY DESCRIBED AS: THE
NORTHWESTERLY 22.00 FEET OF LOT ONE (1), BLOCK TWENTY ONE
(21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS THE
CITY OF CHARLES CITY, FLOYD COUNTY, IOWA.
(LOCALLY DESCRIBED AS 123 N. MAIN STREET, CHARLES CITY, IOWA
50616 PARCEL NO. 110146700500)
AND
LOT TWO (2), BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST.
CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY,
IOWA.


LOT THREE OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE OF
THE ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS
CHARLES CITY.
LOT 4 OF THE SUB-DIVISION OF LOTS 3 AND 4 OF BLOCK 21 OF THE
ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES
CITY, IOWA.
LOT FIVE (5) OF THE IRREGULAR SURVEY OF BLOCK NO. TWENTYONE
(21) OF THE ORIGINAL PLAT OF ST. CHARLES (NOW
INCORPORATED AS CHARLES CITY) ACCORDING TO THE SUBDIVISION
OF SAID BLOCK TWENTY-ONE (21).

# EXHIBIT A1

## McQuillen Place Building Inventory

**REVISED 12 FEBRUARY 2020**

C&R = Items CLAIMED
by

Cornice & Rose Intl

5530: Outside building materials

5532: Stair tower floor finish boxes

5533: ladder C&R

5534: Assorted tools **c&R**

5535: Pallet of Delta boxes, plumbing fixtures

5536-37: Assorted building products

5538-39: Exterior building products C&R

5540: Traffic cones C&R

5541: Exterior Building products

5542-43: JLG Lift 3394RT Serial #: 0200137425 C&R

5544: Table Saw C&R

5545: Exterior building materials

**5546-47:** Pallet of smoke detectors/paint/air purifier **C&R**

5548-49: Assorted tools/refrigerator hose/safety equipment/air compressor C&R

5550-51: Assorted vent grilles/lights/Clark welder C&R

5552: Jigsaw/shop vac/cement mixer C&R

5553-54: Window Hardware/Carpet squares

5555-56: Assorted tools/Exterior building products/printer C&R

**5557:** Box of miscellaneous **c&R**

5558: Pallet fork for Skid Loader C&R

5559: Plastic conduit

5560-64: Pallet of Air Conditioning units

5565: Door frame

5566-67: 6 Fire rated doorframe

5568: Exterior buildings products

5569: Building materials

5570: Exterior building products C&R

5571: Outside brick pavers 5572: Two pallets of shingles

5573: Deere CT322 Skid Load on tracks Serial #:
T0322TA115342

5574: Pallet of Plywood

5575-76: Landscaping cloth-black

5578-79: Assorted wires and cables

5580: Pallet of lumber

5581: Pallet of lumber

5582: Two gas cans C&R

5583: Landry washing machine Serial #:9707/002301 5584:
Lumber

5585: Landry Drier Serial #: 1301007714

5586: Dry wall

5587: Plastic conduit

5589-90: Window screens

5591: Plywood/fire rated steel door frames

5592: JLG 1930ES lift Serial #: 0200163717 C&R

5593-95: Mini split unit/battery charger/grout/ polycrete C&R

5596-01: Counter tops-assorted colors

5602: Assorted tools

5603: Conduit in metal and plastic

5604: Brick

5605-13: Assorted electrical equipment

5614: Air compressor Serial #:SN130310850340307 C&R

5616: Three boxes of mail boxes

5617: PVC black piping/hand rails

5618: Scaffolding plank C&R

5619-20: Door hardware

5621: Propane tank

5622: Assorted duct work

5623: Lumber/plumbing supplies/sink (12 pieces of the lumber is Osha Stamped)
C&R 5624: Sonotube/struts/job box C&R

5625: Assorted building material/conduit/two space heaters C&R 5626: Scaffolding/
four space heaters C&R

5627: Window scaffolding/temporary lights/safety equipment/assorted supplies C&R
5628: Job box C&R

5629: Fuel can/exterior supplies/tarps/sprinkler system parts/plumbing parts C&R

5630-34: Apt 201

5635-42: Apt 217

5643-52: Apt 202

5653-62: Apt 216

5663-70: Apt 203

5671-77: Apt 215

5678-81: Apt 214

5682-87: Apt 204

5688-97: Apt 205

5698-5701: Apt 213

5072-03: Apt 212

5704-22: Apt 211

5723: Industrial fan C&R

5724-25: Apt 210

5726-27: Apt 209

5728-29: Apt 208

5730-47: Apt 207 C&R 5744 TOOLS & 5745 CART

5748-49: Apt 206

**5750:** Torpedo heater **c&R**

5751-56: Apt 306

5757-63: Apt 307 C&R 5759 SCAFFOLD 5761 LADDER

EXHIBIT B

**COURT OFFICER DEED**
**Recorder's Cover Sheet**

**Preparer Information:** (name, address and phone number)
_____

**Taxpayer Information:**  (name and complete address)
_____

**Return Document To:**  (name and complete address)
_____

**Grantor:**

**Grantee:**

**Legal Description:**  See Next Page

**Document or instrument number of previously recorded documents:**



# COURT OFFICER DEED

Matter name: _____

now pending in the _____ Court. Case No. _____

      Pursuant to the authority and power vested in the undersigned, and in consideration of _____ Dollar(s) and other valuable consideration, the undersigned, in the representative capacity designated below, hereby Convey(s) to _____ the following described real estate in _____ County, Iowa:

      Words and phrases herein, including acknowledgement hereof, shall be construed as in the singular or plural number, and as masculine, feminine or neutral gender, according to the context.

Dated: _____.

By: _____     _____
                          Title

By: _____     _____
                          Title

As _____ *in the above entitled estate or cause.

As _____ *in the above entitled estate or cause.

*Executor, Administrator, Guardian, Conservator, Trustee, Referee, Commissioner, or Receiver

STATE OF IOWA, COUNTY OF _____

This record was acknowledged before me on _____, by _____
_____.

_____
Signature of Notary Public

## <u>EXHIBIT C</u>

**CERTIFICATION OF NON-FOREIGN STATUS**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Chapter 7 Trustee Charles L. Smith (the "<u>Affiant</u>"), the Affiant hereby certifies the following that:

1.  Affiant is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.  The U.S. Federal Identification Number of the Affiant is 46-3987825 ; and

3.  Affiant is not a disregarded entity as defined in Internal Revenue Regulations §1.1445.2(b)(2)(iii); and

4.  The address of Affiant is: 25 Main Place, Suite 200, Council Bluffs, Iowa 51503.

Affiant understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that the undersigned has examined this certification and to the best of his knowledge and belief it is true, correct and complete.

Dated: [ _____ ], 20__.

By:  Charles L. Smith
Capacity:  Chapter 7 Trustee

EXHIBIT D

BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Assignment") is executed as of the _____ day of _____, 20__ by Chapter 7 Trustee Charles L. Smith ("Assignor") in favor of First Security Bank & Trust Company ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Personal Property (as such term is described in that certain Purchase Agreement dated as of _____ between Assignor and Assignee).

WHEREAS, in addition to the sale of Personal Property, Assignor also will assign, transfer, set over and deliver to Assignee all of Assignor's rights, if any, in and for all other items of personal property, whether or not affixed or attached to, or placed or situated upon, the Property, and any incidental rights and appurtenances relating thereto, all as described in Exhibit A1 appended hereto, and also in ¶¶ A and B *infra* (collectively, the "Assigned Properties"):

A.     To the extent assignable without third party consents or any cost or expense to Assignor, all of Assignor's right, title and interest in and to all use, occupancy, building and operating permits, licenses, approvals, documents, instruments, if any, issued from time to time with respect to the Property or the Assigned Properties; *provided*, *however*, if any such assignment may be made at an additional cost or expense, Assignor shall assign all of Assignor's right, title and interest therein if and to the extent Assignee shall pay such additional cost or expense; and

B.     All of Assignor's right, title and interest in and to all existing and assignable guaranties and warranties (express or implied), if any, issued in connection with the construction, alteration and repair of the Property or the purchase, installation and the repair of the Assigned Properties.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Assignor hereby assigns, transfers, sets over and delivers to Assignee, its successors and assigns, all of Assignor's right, title and interest, if any, in and to the Assigned Properties.

2.     This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

3.     This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and

effective when all parties hereto have executed and delivered at least one counterpart.

4.    The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

_____

Name: _Charles L. Smith_____

Capacity: _Chapter 7 Trustee_____

ASSIGNEE:

First Security Bank & Trust Company,

_____

By: _____

Its: _____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

Chapter 7
#19 507

Debtor.

------------------------------------------------------------------

**ORDER AUTHORIZING APPROVING SALE
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
AND PROVIDING RELATED RELIEF**

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an
order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and
Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),
approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company
(together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement
("Agreement") appended to the Motion of certain real estate (as described more fully in the
Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal
property (as described more fully in the Agreement, the "Personal Property" and, together
with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the
transactions ("Transactions") contemplated in the Agreement; and the Trustee having
provided adequate and timely notice to all creditors and parties in interest of the Motion, it
appearing that the Purchaser submitted the highest and best offer to purchase the Property;
and a Sale Hearing having been held on _____, 2020; and based upon the
record of the Sale Hearing and the facts set forth in the Motion as affirmed by the Trustee's
Affidavit; and it appearing that due, good, sufficient and timely notice of the relief sought
and granted in this order has been given and that no other or further notice need be given; at

1

which time all interested parties were offered an opportunity to be heard with respect to the

Motion; and the Court having had an opportunity to consider all responses and objections to

the Motion; and it appearing that the relief requested in the Motion is in the best interests of

this Estate, its creditors and other parties-in-interest; and after due deliberation and good

cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]

A.  **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion

under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue

of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.  **Statutory Predicates.** The statutory predicates for the relief sought in the Motion

are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C.  **Notice.** As evidenced by the certificates of service filed with this Court and

based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely,

adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions

contemplated by the Agreement and this Order (the "Transactions"), has been provided in

accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or

further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances; and (iv) no other or further notice of the Motion or the Sale

Hearing or the Transactions, is or shall be required.

D.  **Opportunity to Object.** A reasonable opportunity to object and to be heard

with respect to the Motion and the relief requested therein has been given, in light of the

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

2

circumstances, to all interested persons and entities, including the following: (a) the U.S.

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or

claim on the Property; (c) all entities known to have expressed an interest in acquiring the

Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its

counsel; and (f) all other parties who have filed notices of appearance and demands for

service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion.

All objections to the sale of the Property are overruled or resolved by this Order.

E.    **Sale in Best Interests.** Good and sufficient reasons for approval of the

Agreement and the Transactions exist, as described in the Motion, and the relief requested in

the Motion is in the best interests of the estate, its creditors and other parties in interest.

F.    **Business Justification.** The Trustee has demonstrated both (i) good, sufficient

and sound business purposes and justifications and (ii) compelling circumstances for the

Transactions other than in the ordinary course of business under Bankruptcy Code section

363(b) in that, among other things, the immediate consummation of the Transactions with

the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an

order approving the Agreement and all the provisions thereof is a necessary condition

precedent to the Purchaser consummating the Transactions.

G.    **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered

into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length

bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined

in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the

Purchaser has engaged in any conduct that would cause or permit the Agreement to be

avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a

3

collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

H.     **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I.     **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other  interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J.     **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K.     **Free and Clear.** The Debtor is either the sole and lawful owner of the

Property or there is a bona fide dispute as to ownership. The transfer of the Property to the Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.    The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.    The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

5

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

  N. **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

  O. **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

6

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1. **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2. **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4. **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to attach to

the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

5.        **Valid Transfer.** As of the Closing Date and except as otherwise provided herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

6.        **General Assignment.** On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement.

7.        **No Successor Liability.** Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

8

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or

responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or

shareholders, or the Property, having any liability whatsoever with respect to or be required

to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates,

members, or shareholders, or the Property, having any liability or responsibility to the

Estate, except as is expressly set forth in the Agreement, including, but not limited to,

liabilities on account of any taxes or other government fees, contributions or surcharges

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Property prior to the Closing Date.

8.    **Binding Effect of Order.** This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of

title in or to any of the Property.

9.    **Binding on Successors.** The terms and provisions of the Agreement

and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of

(whether known or unknown) and holders of equity interests in the Debtor, the Purchaser

and their respective affiliates, successors and assigns, and any affected third parties,

including, but not limited to, and all persons asserting Interests in the Property. This Order

and the Agreement shall inure to the benefit of the Purchaser and its respective successors

and assigns.

10.     **Bankruptcy Code Section 363(n).** The consideration provided by the

Purchaser for the Property under the Agreement is fair and reasonable. Based on the

disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not

aware of any facts that would support an argument for avoidance of the Transactions.

11.     **Good Faith.** The Transactions contemplated by the Agreement are

undertaken by the Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of

the authorization provided herein to consummate the Transactions shall not affect the

validity of the Transactions with the Purchaser, unless such authorization is duly stayed

pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled

to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

12.     **Fair Consideration.** The consideration provided by the Purchaser to

the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code.

13.     **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to

its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret,

implement, and enforce the terms and provisions of this Order and the Agreement, all

amendments thereto and any waivers and consents thereunder and each of the agreements

executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a)

compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price

to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

10

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if

necessary, any and all disputes concerning or relating in any way to the Transactions; and (e)

protect the Purchaser against any Interests in the Debtor or the Property of any kind or

nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain

exclusive jurisdiction with respect to issues or disputes in connection with this Order and the

relief provided herein, including without limitation to protect the Trustee and Purchaser

from interference with the Sale, and to resolve any disputes related to the Sale, the

Agreement or the implementation thereof.

14. **Surrender of Possession.** All entities that are presently, or on the

Closing Date may be, in possession of some or all of the Property in which the Debtor holds

an interest hereby are directed to surrender possession of the Property either to (a) the

Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15. **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the

Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear,

any and all valid and perfected Interests in Property of the Debtor shall attach to any

proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the

order of priority, and with the same validity, force and effect that they now have against the

Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no

proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the

express consent of the party or parties asserting an Interest therein or further order of the

Court after notice (to all parties who have asserted an Interest in such proceeds) and a

hearing, consistent with the requirements of the Bankruptcy Code.

16. **Non-material Modifications.** The Agreement and any related

11

agreements, documents or other instruments may be modified, amended or supplemented by

the parties thereto, in a writing signed by such parties, and in accordance with the terms

thereof, without further order of the Court, provided that any such modification, amendment

or supplement does not have a material adverse effect on the estate.

17.     **Failure to Specify Provisions.** The failure specifically to include any

particular provisions of the Agreement in this Order shall not diminish or impair the

effectiveness of such provisions, it being the intent of the Court that the Agreement be

authorized and approved in its entirety; provided, however, that this Order shall govern if

there is any inconsistency between the Agreement (including all ancillary documents

executed in connection therewith) and this Order. Likewise, all of the provisions of this

Order are non-severable and mutually dependent.

18.     **Stay of Order.** Pursuant to Bankruptcy Rule 6004(h), this Order shall

not be stayed and shall be and is immediately effective. Time is of the essence in closing the

Transactions referenced herein, and the Debtor and the Purchaser intend to close the

Transactions as soon as practicable. Any party objecting to this Order must exercise due

diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

If any further stay is desired, any requests for a stay and any controversy over the extent of a

bond that is necessary to protect the estate from delay in the sale shall be made to the

appropriate tribunal.

Dated: _____, 2020


_____
Hon. Thad J. Collins
Chief Judge


*ORDER PREPARED BY:*

12

Charles L. Smith
Chapter 7 Trustee

13

CHARLES T. PETERSON, 25 MAIN PLACE, SUITE 200
JACK E. RUESCH
WALTER P. THOMAS
NICOLE HUGHES
THOMAS C. DORWART, ASSOCIATE
JOHN A. FLATEN, ASSOCIATE
MAYNARD S. TELPNER, RETIRED
RICHARD W. PETERSON (1925-2010)

P.O. Box 248

COUNCIL BLUFFS, IOWA

51502-0248

TELEPHONE:
712-325-9000
FACSIMILE:
712-328-1946
www.telpnerlaw.com
email@telpnerlaw.com

Licensed in Iowa and Nebraska

**Telpner Peterson
Law Firm, LLP**

February 3, 2020

Developers with interest
in the completion of
123 N. Main Street
Charles City, IA

RE: Request for Proposals to Acquire and Complete the Housing/Commercial Space
Project Located at **123 N. Main Street, Charles City, IA**

To Whom It May Concern:

The enclosed materials shall provide the basis for application by any qualified developer
interested in submitting a competitive proposal for the ownership, completion, and
maintenance of the structure on and parcel located at 123 N. Main Street in Charles
City, IA.

The property is currently an asset of the Chapter 7 Bankruptcy of McQuillen Place
Company, LLC (hereinafter called "McQuillen Place"), pending in the United States
Bankruptcy Court for the Northern District of Iowa as Case No. 19-00507. The Chapter
7 Trustee is Charles L. Smith. Mr. Smith seeks offers for the purchase of the real estate
and related personal property.

The State of Iowa seeks a qualified developer to acquire, finish, and maintain the
property. Mr. Smith, in coordination with parties with an interest in the completion of this
project, has developed the enclosed proposal materials.

The primary purpose of the request for proposals is to locate a purchaser for the real
estate and related personal property to acquire the property through a competitive
bidding process, who will thereafter develop the property to completion.

The State of Iowa, through the Iowa Economic Development Association, Iowa
Economic Development Authority (IEDA) has set aside a maximum of $1,000,000 of
Community Development Block Grant Disaster Recovery (DR) assistance for the
completion of the residential units in the building. DR assistance is contingent upon the
developer's agreement to the terms of affordability associated with this funding, which
include a requirement that 51% of the residential units must be leased to income
qualified persons of low-to-moderate income at a cost to lease or rent that is no higher
than the applicable rent limits. In addition to the terms of affordability, all federal
regulations will apply to the construction project, including but not limited to: Federal
Labor Standards Davis Bacon Wages, environmental review, and federal contract
provisions. Any developer interested in utilizing DR should contact Ann Schmid, IEDA's
Disaster Recovery Team Leader at 515-348-6202 or Ann.Schmid@iowaeda.com or

Exhibit A to RESISTANCE OF EQUITY
SECURITY HOLDERS TO
TRUSTEE'S MOTION TO
SHORTEN TIME
Page 1

Developers Letter
February 7, 2020
Page 2

coordinate with Myrtle Nelson of the North Iowa Area Council of Governments, which
will act as a project administrator for an IEDA award.  Mrs. Nelson's contact information:
mnelson@niacog.org or 641-423-0491, Extension 16.

Developers will be required to provide an acquisition bid (which will be paid to the
Bankruptcy Trustee), an estimate of the cost to complete construction of the residential
units in the building, an estimate of the cost to complete construction of the first floor
commercial units in the building, and will be responsible for ensuring occupancy of all
units. Factors that will be used in selecting the successful proposal will include the
acquisition bid amount, the construction estimates, and the developer's qualifications.

The mortgage holder, First Security Bank & Trust Company, Charles City, Iowa, is
obtaining an "as is" assessment of the property's value.  The valuation should be
completed and available by February 15, 2020.

The property is currently subject to a minimum assessment agreement that was
executed by McQuillen Place as the part of an anticipated tax increment financing
proposal that has not been complied with or funded. The property will be reassessed by
the Floyd County, Iowa Assessor as of January 1, 2020, which will affect future real
estate tax liabilities.

Developers are encouraged to seek the best available valuation data by contacting the
County Assessor and/or Mark Miller at First Security Bank & Trust Company, 809 Clark
Street, Charles City, Iowa, telephone (641) 228-1232.

The Bankruptcy Trustee proposes to sell of the Bankruptcy Estate's right, title and
interest in the real estate and related personal property free and clear of liens and
encumbrances. The purchaser of the real estate will receive a court officer's deed from
the Bankruptcy Estate. The Bankruptcy Trustee reserves the right to reject all offers.
Outstanding real estate taxes will be paid by the Bankruptcy Estate.

There is currently located on the real estate, a quantity of appliances and construction
materials. It is presently anticipated that all of the personal property will be included as a
part of the sale by the Bankruptcy Trustee. However, the identification of the personal
property to be included as a part of the sale is being developed and interested
purchasers must continue to consult with the Bankruptcy Trustee and any publicly
available web-based postings for additional information.

A mechanic's lien has been filed by Schindler Elevator Corporation and the property will
be sold free and clear of that mechanic's lien. However, the purchaser of the real estate
must be prepared to complete the installation of the elevator installed in the real estate
and to assure its availability to tenants of the property.

Completion of this project will significantly enhance Charles City's downtown and
provide the City with much needed housing units.  Therefore, the City is prepared to

Exhibit A to RESISTANCE OF EQUITY
SECURITY HOLDERS TO
TRUSTEE'S MOTION TO
SHORTEN TIME
Page 2

137

Developers Letter
February 7, 2020
Page 3


incent development through tax increment financing. All developers interested in City of
Charles City incentives must coordinate directly with the Steven T. Diers, City
Administrator, City of Charles City at 641-257-6300 or
steven.diers@cityofcharlescity.org.   Additionally, this parcel is located within a current
Opportunity Zone (census tract: 19067480400), which may allow for added investment.

Please complete the enclosed documents and submit the executed application along
with all support documentation to the following address prior to **4:00pm on Monday,
March 9, 2020**. Questions regarding the application and the application process should
be directed to Ms. Schmid: 515-348-6202 or ann.schmid@iowaeda.com

**Submit Applications To:**
Ann H. Schmid
Iowa Economic Development Authority
1963 Bell Avenue
Des Moines, IA 50315

Sincerely,

*Charles L. Smith*

Charles L. Smith
Chapter 7 Trustee
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
(712) 325-9000

Exhibit A to RESISTANCE OF EQUITY
SECURITY HOLDERS TO
TRUSTEE'S MOTION TO
SHORTEN TIME
Page 3

# CHRISTIAN EDWARDS
print + graphics

2700 Bell Avenue | Des Moines, IA 50321

| From: | Recipient: |
|-------|-----------|
| **Binstock Development, LLC**<br>15246 Lake Dr. NE<br>Columbus, MN 55025<br>sbinstock@trinity-contracting.com<br>651-398-2081 | **Ann Schmid**<br>**Disaster Recovery Team Leader**<br>**Historic Preservation Specialist**<br>**Iowa Economic Development Authority**<br>1963 Bell Avenue, Suite 200<br>Des Moines, IA 50315 |

| Delivery date:<br>March 09, 2020 | Delivered by Signature: | Received by Signature: |
|---|---|---|
| Delivery Time:<br>15:03 | Delivered by Printed Name:<br>John B. Brunner | Received by Printed Name: |

| PACKAGE CONTENTS | PACKAGING DETAILS | QUANTITY | COMPLETE | COMMENTS |
|---|---|---|---|---|
| PRINTED DOCUMENTS 22 PAGES | 10 X 13 ENVELOPE | 1 | YES | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT DD**

139

# BINSTOCK DEVELOPMENT, LLC

15246 Lake Dr. NE
Columbus, MN 55025
sbinstock@trinity-contracting com
651-398-2081

March 9, 2020

By hand delivery

Ms. Ann H Schmid
Iowa Economic Development Authority
1963 Bell Avenue
Des Moines, IA 50315

> Re:   Request for Proposals to Acquire and Complete the Housing/Commercial Space
> Project Located at 123 North Main Street, Charles City, Iowa (the "Project")

Dear Ms. Schmid

I am writing on behalf of my firm, Binstock Development, LLC ("BDL," "we," or "us") to submit an application to submit "a competitive proposal for the ownership, completion and maintenance of the structure on and parcel located at 123 N. Main Street in Charles City, IA," as described in your letter dated February 3, 2020 (the "Letter")

In reviewing Letter, it appears that you, the Iowa Economic Development Authority ("IEDA"), and the trustee have, by leaving a number of the proposal terms open, desired to solicit a variety of different perspectives and options for completion of the Project. Accordingly, we are submitting our proposal in a format which, we believe, will provide you with several different options from which to choose.

As you may be aware, I have followed the Project closely, have conducted several thorough inspections of the Project, have met with the original developers on multiple occasions, and had (prior to the filing of the bankruptcy case) discussed a number of options for acquiring the Project with representatives of First Security Bank & Trust Co   As such, I believe I have as complete an understanding of the Project and its intricacies as any independent third-party can have.

With this as background, our basic proposal (and the proposal upon which all the variations and options are based) is to acquire the Project (free and clear) for the highest reasonable transfer to the Project possible, which we believe to be Five Million Seven Hundred Forty-One Thousand Eight Hundred Fifty-One ($5,741,851.00), which we propose to transfer to the Trustee (per your Letter and per this Proposal), provided all of the Optimal Redevelopment Conditions (discussed below) are present.  In addition, as is also discussed below, we are interested, willing and able to

1

acquire the Project if not all of the Optimal Redevelopment Conditions are present, but the amount of the cash consideration to the Trustee would be lower than the amount otherwise available

Here are what we view as the Optimal Redevelopment Conditions:

1.  The Project is sold to us free and clear of all liens, claims, encumbrances, etc , pursuant to a final order entered by the Bankruptcy Court;

2.  The IEDA and BDL reach an agreement by which the entire $1 million in CBDG funds are made available to complete redevelopment of the entire Project (i e., all three floors),

3.  A replacement tax increment financing development agreement (a "Revised TIF Agreement") is agreed to by BDL and the City of Charles City which provides (a) a "back-end" TIF benefit to BDL, (b) a benefit which is in the form of the maximum rebate of taxes for the duration of the agreement, (c) the benefit is spread over 18 years, (d) the agreement is otherwise largely identical in the substance to the original TIF agreement with the original developer; and (e) the assessment of the Project does not exceed the amounts as set forth in the estimate of Steve Diers (see attached email text);

4.  The cost of the completion of the interior spaces of floors two and three remains within my original estimate of approximately $600,000,

5   The first floor is built-out as nineteen (19) studio residential units wrapped by commercial space on Main and Clark Streets; these units would be either rented through an AirBNB-type platform (which we believe would bring them into compliance with existing local zoning permitting hotel units on the first floor of buildings in the area) or rented using conventional residential leases (following appropriate local zoning compliance actions);

6   The cost to complete the interior of the first floor and the exterior of the building does not exceed $858,375;

7.  The City of Charles City does not materially change the prerequisites for issuance of a Certificate of Occupancy set forth on the attached email from the City;

8   The City of Charles City commits to issuing a Certificate of Occupancy within seven days after completion of tasks by BDL and the City prior to entry of the Order and incorporated in the Order,

9.  A period of not less than 45 days elapses between entry of the Order and commencement of work;

10    BDL is able to obtain appropriate licensure to use the Project's building designs, all of which are subject to copyright held by Cornice & Rose International, L.L.C. from Illinois[1].

BDL is ready, willing and able to submit a competitive bid, complete construction, lease-up the residential units and the commercial space, and operate the completed Project, under (among others) any of the following six options or scenarios (each, an "Option")[2]

OPTION ONE:         All of the Optimal Redevelopment Conditions are met

OPTION TWO:         All of the Optimal Redevelopment Conditions are met except that the Project does not contain any residential units on the first floor, but the full amount of the CBDG funds referenced in the Letter are made available to the Project

OPTION THREE:       All of the Optimal Redevelopment Conditions are met except that the Project does not contain any residential units on the first floor, and less than the full amount of the CBDG funds referenced in the Letter are made available to the Project.

OPTION FOUR         All of the Optimal Redevelopment Conditions are met, but less than the full amount of the CBDG funds referenced in the Letter are made available to the Project

OPTION FIVE         All of the Optimal Redevelopment Conditions are met, but none of the CBDG funds referenced in the Letter are made available to the Project

OPTION SIX          The scenarios described in any of Options One, Two, Three, Four or Five is selected as the conditions for completion of the Project, but the Revised TIF Agreement materially departs from the terms described above.

As mentioned, the bid amount discussed in the fourth paragraph of this application is based on Option One. Since adoption of any of the other Options imply different cash flows for the completed Project, the amount of the bid would be different. BDL's goal in any bid would remain the same, however: To submit a bid to the Trustee that would represent the highest dollar amount possible while reserving reasonable funds for the proper completion and sustainable operation of the Project

---

[1] BDL has reached an agreement in principle for an exclusive license of this copyright from Cornice & Rose International, L L C

[2] Out of an abundance of caution, we would like to state that BDL is assuming, for purposes of all the proposals and options discussed in this application, that the various conditions (such as unit affordability, Davis-Bacon rules, and federal contract conditions) will apply to all dwelling units for which DR funds are used  BDL's application and cost estimates are based on anticipated full compliance with these conditions

3

The Proposal Checklist referenced in your Letter requests a "Rent Calculation Worksheet" and notes that the form was enclosed  Per the request, this completed form is attached with this proposal.  However, BDL believes somewhat lower rents would be appropriate in order to prepare conservative budgets and pro forma calculations. Accordingly, the lower rent estimates are reflected in the attached pro forma cash projections.

The Proposed Checklist referenced in your Letter also requests "Documentation of acceptance by the local government and documentation of any local tax increment financing or abatement incentive."  The understanding of BDL is that the local jurisdiction has not reached an agreement with any party as to the tax increment incentives which will be available to the Project. However, the local city administrator has issued guidance concerning the parameters of TIF assistance by email.  A copy of this email is attached

Related to this issue, there appears to be some tension between the statement in the Letter that the trustee will pay the past due tax obligations and the specimen sources and uses table attached to the Letter which appears to indicate that the past due tax obligations will be paid by the entity which completes development of the Project  In addition, as provided in Iowa law and as, on information and belief, asserted at various points during the bankruptcy case, an open issue exists as to whether the amount claimed for back taxes by the local jurisdiction should be reduced to reflect the corrected assessment level  Recognizing that this matter must be resolved (either by payment by some party or reduction in the tax obligation), BDL has reflected a reduction in the tax obligation in the pro forma, with the caveat that if the tax obligations are not reduced, the pro forma and sources and uses statement will require appropriate correction.  BDL's believes its proposal is viable either with or without the reduction in the tax obligation.

The Proposal Checklist referenced in your Letter requests a "Cover letter from the developer submitting application to the trustee, stating their understanding of the circumstances and the process for acquisition."  Please deem this paragraph as (a) directed to the trustee, and (b) confirmation that BDL understands the background and circumstances of this matter as well as the procedures imposed by the Bankruptcy Code for the sale of property by a trustee.

The Proposal Checklist referenced in your Letter also requests "Statements of Qualifications from the Applicant Owner/Developer and the named General Contractor / Construction Manager  Qualifications must include examples of past completed multifamily housing projects with references.  BDL hereby submits, separately from this application but included in the application packet, my resume.  As sole owner of all the ownership units of BDL, I propose my company, BDL, as "Applicant Owner/Developer and the named General Contractor / Construction Manager "  I believe my previous experience involving many different properties, including multifamily, over many years meets the Letter's qualification requirement.  I will be personally involved in completion, leasing-up and operation of the Project if BDL's application is accepted.  If you require me to submit additional completed projects for your background files, please contact me as I have not included a fair number of projects on my resume due to space considerations and due to the fact that I prepared the list being submitted to you some time ago

4

The Proposal Checklist referenced in your Letter also requests a "List of known development team members showing roles and responsibilities and contact information. List to include owner/developer, general contractor, known sub-contractors, architect, engineer, HERS rater, etc." Here is the information responsive[3] to this Checklist item:

| | |
|---|---|
| Owner: | BDL |
| Developer: | BDL |
| General Contractor: | Trinity Contract (same contact information as BDL) |
| Known Sub-Contractors: | Probably similar to those referenced in previous Trinity bids. |
| Architect (initial): | Cornice & Rose International, L.L.C. |
| | |
| Public Finance: | PlanScape Partners. Rfiscus@planscapepartners.com |

This letter and the accompanying materials are intended by BDL to comply fully with the requirements stated in your Letter dated February 3, 2020. However, given the limited amount of time available between the date of your Letter and the due date for this application's submission, as well as a number of general and open terms and conditions referenced in the Letter[4], we realize that it may be possible that we have omitted some materials your office needs or that we have provided information and ideas in a format which is not in harmony with your office's expectations. If this is the case, BDL requests that you immediately notify us and permit us to supplement this application. BDL would be happy to submit supplemental information to comply with your office's needs and expectations.

Notwithstanding the foregoing legalese, I am personally excited to submit this application, which I very much hope proves to be successful. I think this Project has great potential, and I look forward to working with the IEDA and the trustee to bring the Project to fruition.

Sincerely yours,

BINSTOCK DEVELOPMENT, LLC, an Illinois limited liability company

By: _[signature]_

Name: Steve M. Binstock
Title: Sole owner and managing member

Attachments

---

[3] In the interest of full disclosure, Charles Thomson, although not currently holding any post identified in the "List of known development team members," has assisted BDL with the preparation of documents and other matters.
[4] Given the open nature of the Letter and the process involving the Project generally, BDL, on its own behalf and that of all others involved with BDL, would like to reserve the right to question, challenge, object to or request clarification of all of the various stated and unstated conditions set forth by the IEDA, the trustee, or any other party in this matter.

# BINSTOCK DEVELOPMENT, LLC

March 9, 2020

**SCOPE OF WORK:**

Project Located at 123 North Main Street, Charles City, Iowa (the "Project")

Scope of work to include all work required for the certificate of occupancy for the building.

Please see the attached Trinity Contracting Cost Estimate of March 4th, 2020 and the specific notes included on the document.  This includes all work addressing any code deficiencies.

Additionally, this scope of work includes all items referenced in the City Of Charles City – Code Enforcement letter prepared by Paul Hughes from the inspection conducted on January 27th, 2020. (Please see the attached letter.)

The timeline for the second floor, third floor and exterior surfaces of the building to be complete, and a certificate of occupancy received, is estimated to be six months.  The six-month time frame will commence from the date that work is allowed to restart on site. The interior of the main floor will be completed, including all code required work to a "white box" level of finish (which will not include the final concrete slab floor due to the future plumbing locations) prior to the certificate of occupancy being received.

End of document.

## S O U R C E S   and   U S E S   of   F U N D S

| Project: | 123 N. Main Street Charles City, IA |
|---|---|
| Developer | Binstock Development, LLC |

Use this document to provide all anticipated sources of funds for the completion of 123 N. Main Street, and break-out how those funds will be used on the project. All sources must be supported by documentation: owner's debt must be documented by written commitment from lender with terms (amount, rate and length of loan), cash must be documented with account statements with current balances, city TIF must be documented by a resolution of the City Council, or written statement from the City, IEDA funds are documented by submitting the completed and signed application for CDBG funds

| S O U R C E S of F U N D S | $ Amount | Type Loan/Grant | Rate | Term (yrs.) | Amort. (yrs.) | Debt Service | Security |
|---|---|---|---|---|---|---|---|
| IA ECONOMIC DEVELOP. AUTHORITY (IEDA) CDBG Housing Development (Max Request $1,000,000) CDBG Administration (2% of IEDA award amount) | $1,000,000 | | | | | | |
| OWNER/DEVELOPER CONTRIBUTION Cash Other Asset | $1,700,000 | | | | | | |
| CONVENTIONAL DEBT Provider | $0 | | | | | | |
| CITY CONTRIBUTION City TIF | $0 | | | | | | |
| OTHER CONTRIBUTION Other (Specify) Reduction of Back Taxes approximately | $525,000 | | | | | | |
| Other (Specify) Use of Copyright | $2,516,851 | | | | | | |
| T O T A L SOURCES* | $5,741,851 | | | | | | |

| U S E S   of   F U N D S | $ Amount | SOURCES of FUNDS—MANDATORY |
|---|---|---|
| Building Acquisition Bid Amount (this is a competitive bid price to acquire the property) | $450,000 | |
| Personal Items Acquisition Bid Amount (this is a competitive bid price to acquire the personal property located within the building) | $20,000 | |
| Residential Construction (this is a construction estimate to complete the residential housing units in the project) | $596,625 | |
| First Floor / Commercial Construction (this is a construction estimate to complete the commercial portion of the project) | $858,375 | Not CDBG eligible |
| Back Taxes owed approximately | $525,000 | Not CDBG eligible - private funds only |
| Existing Mechanical Liens approximately | $75,000 | Not CDBG eligible - private funds only |
| Contingency (must be < 10%) (Not Eligible CDBG ) | $150,000 | Not CDBG eligible - private funds only |
| Architect & Engineering | $50,000 | |
| Financing Costs | $280,000 | |
| Fees and Charges | $25,000 | |
| Legal & Accounting | $25,000 | |
| Owner/Developer Fee (12% or less) | $150,000 | |
| Admin (to match the CDBG amount above) | $20,000 | CDBG |
| Other (Specify) Use of Copyright | $2,516,851 | |
| T O T A L USES* | $5,741,851 | |

*Total Sources of Funds MUST equal Total Uses of Funds

## 15-YEAR CASH FLOW PROFORMA

**Bostick Dev., LLC  123 N. Main Street Charles City, IA**

Exhibit 4h-Proforma, Page 1

| Item | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | | | | | | | | | |
| Rental Income | | | | | | | | | | | | | | | |
| Other Income (Specify) | | | | | | | | | | | | | | | |
| Other Income (Specify) | | | | | | | | | | | | | | | |
| **Operating Expenses:** | | | | | | | | | | | | | | | |
| Accounting and Auditing | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| On-site Manager Salaries | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 |
| Property Mgmt fee | | | | | | | | | | | | | | | |
| Electric and Gas | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Water and Sewer | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Trash Removal | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Advertising | | | | | | | | | | | | | | | |
| Maintenance payroll | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| Repairs and Maintenance | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Elevator | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Exterior Maintenance | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Grounds Maintenance | | | | | | | | | | | | | | | |
| Snow Removal | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Real Estate Taxes | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Insurance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Supportive Services | | | | | | | | | | | | | | | |
| Other (Specify) | | | | | | | | | | | | | | | |
| Other (Specify) | | | | | | | | | | | | | | | |
| Adjustments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Operating Expenses** | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 | 265,786 |
| Operating Expense Ratio | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% | 36% |
| Reserve replacement funds | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Adjusted N.O.I. | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 | 264,786 |
| 1st Mortgage Debt Service | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 | 119,256 |
| Other Subordinate Loans | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Total Debt | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 | 144,256 |
| Net Debt cash flow | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 | 120,530 |
| **Debt Service Ratio (1st Mort.)** | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 | 2.22 |
| **Debt Service Ratio: Total** | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 | 1.84 |

*Enter all years manually*
*Enter all years, as applicable, manually as a negative number*

# BINSTOCK DEVELOPMENT, LLC

## Financial Commitment Documents

BDL has located two unrelated parties (both Chicago-area investors) who are ready, willing and able to provide acquisition and construction financing to BDL for this transaction.

Due to privacy concerns, and the concern by both parties that their liquidity not be disclosed prior to any auction, they have both expressed a willingness to discuss and disclose their financial wherewithal with a third-party representative acceptable to both them and the trustee.

1





MCQUILLEN PLACE
123 NORTH MAIN STREET
CHARLES CITY, IOWA



# MCQUILLEN PLACE

123 NORTH MAIN STREET
CHARLES CITY, IOWA

*Conrac & Rae*
INTERNATIONAL

## RENT CALCULATION WORKSHEET

This worksheet must be completed and submitted with the Multi-Family (Rental) Unit production – New Construction – 123 N. Main Street, Charles City, IA.

Using the HOME 2019 (https://onecpd.info/resource-library/home-rent-limits/)program rents, record in the table below the 65% Rent for the county or metropolitan statistical area (MSA) for each of the unit sizes (efficiency, 1-bedroom, 2-bedroom, 3-bedroom, 4-bedroom) proposed. This rent limit must take into consideration any tenant paid utilities.

| MAXIMUM RENTS for LMI assisted units | Efficiency | 1-bedroom | 2-bedroom | 3-bedroom | 4-bedroom |
|---|---|---|---|---|---|
| | | | | | |
| 65% Rent | $788 | $845 | $1016 | $1165 | $1280 |
| | | | | | |

Record in the table below the actual rents you will charge by entering the Gross Rent (rent + utility allowance for tenant-paid utilities) to be charged for the proposed project for each of the unit sizes. Gross rents cannot exceed the rents recorded as 65% rents above. If the proposed project has different rents for the same size of unit (market rate), use both boxes for the unit size.  Record the utility allowance for each unit size (utility allowances are available from the local housing authority).  Subtract the utility allowance from the gross rent to determine the Net Rent.

The table has been auto populated based on the original project's anticipated utility use, bedroom sizes, and the maximum rents possible – if you will charge less than the maximum please change the numbers.  If you will change tenant utilities, for example the following utility allowances have the tenants paying water and sewer, if you will include water and sewer in the rent, those do not need to be included in the utility allowance, and can be adjusted accordingly.

| PROJECT RENTS | Efficiency | | 1-bedroom | | 2-bedroom | | 3-bedroom | | 4-bedroom | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Market Rate | LMI Assisted Rate | Market Rate | LMI Assisted Rate | Market Rate | LMI Assisted Rate | Market Rate | LMI Assisted Rate | Market Rate | LMI Assisted Rate |
| Gross Rents | | 788 | | 845 | | 1016 | | 1165 | | |
| - Utility Allowance (electric, gas, sewer) | | -80 | | -110 | | -139 | | -166 | | |
| = Net Rents | | 708 | | 735 | | 877 | | 999 | | |

### Answer the following questions.

1.  What source was used to determine the utility allowance for tenant-paid utilities? (Please attach source documentation).

    Tenant - Furnished Utilities Effective 08/1/2019 for Rowhouse/townhouse

2.  What is the effective date of the HOME rents recorded in the tables above?  Are rents for the county or metropolitan statistical area?

    Floyd County 65% HOME 2019

3.  Do all LMI assisted units have gross rents (net rents + utility allowance) at or below the 65% rent limit?

4.  Will any utilities be provided by the owner and included in the tenant's monthly rent? If so, which utilities.

5.  What rents (Gross, Net, other) are used in your proforma?  Provide a breakout of the rental income used in the proforma including rents per unit size for the first year.
    For example:
    12 months x $500 (1 bedroom Net Rent – no utilities included) x 10 units = $60,000.
    12 months x $700 (2 bedroom Net Rent – no utilities included) x 10 units = $84,000.
    Proforma Rental Income Year 1 = $144,000.

| | |
|---|---|
| **From:** | steven.diers@cityofcharlescity.org |
| **Sent:** | Friday, February 28, 2020 5:27 PM |
| **To:** | Steve Diers |
| **Cc:** | Mayor Dean Andrews |
| **Subject:** | 123 N. Main Street/ McQuillen Place - Estimated Property Tax Calculations |
| **Attachments:** | 123 N. Main Street McQuillen Place - Property Tax Estimates based on $4.9M assessed valuation  2.28.20.pdf |

Good evening everyone,

Attached is the spreadsheet on McQuillen Place and what I've tried to estimate for potential property tax collection and therefore tax incentive that can be generated by the property.  It is based on the Floyd County Assessor's completed building assessment at $4.9 Million.  As I mentioned on the phone City would be interested in providing tax rebate based around a 90% rebate over 10 years.  That being said we will review and consider proposals.

Other items:

- Parking – Once the McQuillen place project is complete, the City will review the impacts on parking in the adjacent parking lot and based on need will close the street behind McQuillen and redevelop the area to allow additional parking.
- McQuillen Place is located with a federal "Opportunity Zone" and should be eligible for those investment tax benefits.
- Housing needs assessment in 2019 showed a less than 1% Vacancy Rate in Charles City.  Less than 5% is considered "full occupancy".  This report is available upon request
- Charles city also lacks quality new dwelling units
- We feel that McQuillen Place is the "jumpstart" for our downtown.  Get people living downtown with walking distance access to shopping and to drive demand for more businesses to locate withing the downtown
- City is on the doorstep of launching our "fiber to the home" project, which will run fiberoptic to every home and business in the City, and will be operated as a municipal utility.  Expected to be completed in the Summer of 2021

If you have any questions please email or give me a call.

Sincerely,
Steve



Steven T. Diers, ICMA-CM
City Administrator
City of Charles City, pop. 7652
105 Milwaukee Mall
Charles City, IA 50616
Ph: 641-257-6300
Fax: 641-257-6331
Steven.diers@cityofcharlescity.org
www.cityofcharlescity.org



City of Charles City





**City of Charles City - Code Enforcement**
McQuillen Place Inspection Report
Inspection conducted on January 27, 2020.

**Remaining issues that need to be completed prior to issuance of Occupancy Permit:**
*(This is not an exclusive list of items that may need to be addressed at the 123 N Main
McQuillen Place property to obtain occupancy )*

- **Main floor commercial area:**
  - o Fire separation protection between the first floor commercial area ceiling and
    walls of the second floor residential area needs to meet two hour protection
  - o Additional walls that are two and one hour rated protection have not been
    constructed. They need to be covered or constructed around the trash dumpster,
    west wall garage, stairway and future elevator  Each supporting column needs
    fire protection and each ceiling penetration needs the firestopping provision that
    was stated on the plans
  - o Partition walls separating the tenant spaces do not need to be constructed prior
    to final inspection.
- **Tenant Rooms:**
  - o For room occupancy all tenant rooms must be 100% complete and move-in
    ready
- **Exterior of structure:**
  - o The exterior coverings need to be repaired and finished so that it prevents water
    intrusion
    - ▪ The south wall between the two property owners and the penthouse need
      the final protection on the exterior.
    - ▪ Exterior coatings need to be finished and water tight to the windows or any
      exterior protrusions
    - ▪ Major cracks need to be repaired
  - o Exterior appearance to be completed with windows and have a pleasant outward
    appearance
- **Common Areas**
  - o Elevator - The elevator needs to receive final state approval and working
    properly.
  - o Sidewalk/Approach - A paved sidewalk to the entrances shall be installed for
    tenants and their guests  The entrances shall be handicap accessible
  - o Fire Alarm and fire suppression systems need to be tested and working properly

Respectfully Submitted.

Paul Hughes
Building Official

# McQuillen Place - 123 N. Main Street Charles City, IA

## $4.9M Estimated Assessed Value upon completion

2.28.20

| | Start Date | | Estimates | | | | | | | | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Building will be condominiumized - assuming: 45% Commercial = $2,156,000 & 55% Multi-Residential = $2,744,000 | Assumes 100% completion by December 31, 2020 | | Year 2 and beyond assumes 0.5% annual increase in assessed values | | | | | | | | |
| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | |
| | | FY2023 | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 | FY2030 | FY2031 | FY2032 | |
| Base Value | (Multi Res=$19,130/Comm =$15,030) | $ 34,160 | $ 34,160 | $ 34,160 | $ 34,160 | $ 34,160 | $ 34,160 | $ 34,160 | $ 34,160 | $ 34,160 | $ 34,160 | |
| Comm Value- Incremental | | $2,140,970 | $2,140,970 | $2,140,970 | $2,140,970 | $2,140,970 | $2,140,970 | $2,140,970 | $2,140,970 | $2,140,970 | $2,140,970 | |
| Multi-Res- Incremental | | $2,724,870 | $2,738,494 | $2,752,187 | $2,765,948 | $2,779,777 | $2,793,676 | $2,807,645 | $2,821,683 | $2,835,791 | $2,849,970 | |
| Total Incremental Assessed Value | | $4,865,840 | $4,879,464 | $4,893,157 | $4,906,918 | $4,920,747 | $4,934,646 | $4,948,615 | $4,962,653 | $4,976,761 | $4,990,940 | |
| Industrial/Commercial Rollback | | | | | | | | | | | | |
| rolled back Commercial increment | | 0.9000 | 0.9000 | 0.9000 | 0.9000 | 0.9000 | 0.9000 | 0.9000 | 0.9000 | 0.9000 | 0.9000 | |
| rolled back portion of base value | | $1,926,873 | $1,926,873 | $1,926,873 | $1,926,873 | $1,926,873 | $1,926,873 | $1,926,873 | $1,926,873 | $1,926,873 | $1,926,873 | |
| | | $13,527 | $13,527 | $13,527 | $13,527 | $13,527 | $13,527 | $13,527 | $13,527 | $13,527 | $13,527 | |
| Multi-Residential Rollback | | | | | | | | | | | | |
| rolled back Multi-residential increment | | 0.6575 | 0.6000 | 0.3625 | 0.5500 | 0.5500 | 0.5500 | 0.5500 | 0.5500 | 0.5500 | 0.5500 | |
| rolled back portion of base value | | $1,737,805 | $1,643,097 | $1,548,105 | $1,521,271 | $1,528,878 | $1,536,522 | $1,544,205 | $1,551,926 | $1,559,685 | $1,567,484 | |
| | | $12,195 | $12,195 | $12,195 | $12,195 | $12,195 | $12,195 | $12,195 | $12,195 | $12,195 | $12,195 | |
| Consolidated Levy Rate - FY20 based | | $37.40110 | $37.40110 | $37.40110 | $37.40110 | $37.40110 | $37.40110 | $37.40110 | $37.40110 | $37.40110 | $37.40110 | |
| Total Property Taxes Due | | $137,999 | $134,483 | $130,930 | $129,926 | $130,211 | $130,497 | $130,784 | $131,073 | $131,363 | $131,655 | $1,318,921 |
| Total Incremental Value after rollback | | $3,663,978 | $3,569,970 | $3,474,978 | $3,448,144 | $3,455,751 | $3,463,395 | $3,471,078 | $3,478,799 | $3,486,558 | $3,494,357 | |
| Capturable Levy Rate (Consolidated levy minus Debt Service levies) - FY20 based | | $33.49967 | $33.49967 | $33.49967 | $33.49967 | $33.49967 | $33.49967 | $33.49967 | $33.49967 | $33.49967 | $33.49967 | |
| TOTAL Incremental Tax Dollars Generated - 100% | | $122,742 | $119,593 | $116,411 | $115,512 | $115,767 | $116,023 | $116,280 | $116,539 | $116,799 | $117,060 | $1,172,723 |
| Net new property taxes collected (100% rebate) | | $15,257 | $14,890 | $14,519 | $14,415 | $14,444 | $14,474 | $14,504 | $14,534 | $14,565 | $14,595 | $146,198 |
| TOTAL Incremental Tax Dollars Generated - 90% rebate | | $110,468 | $107,634 | $104,770 | $103,961 | $104,190 | $104,420 | $104,652 | $104,885 | $105,119 | $105,354 | $1,055,451 |
| Net new property taxes collected (90% rebate) | | $27,531.00 | $26,849.31 | $26,160.49 | $25,965.91 | $26,021.06 | $26,076.50 | $26,132.21 | $26,188.20 | $26,244.46 | $26,301.01 | $263,470 |

# STEVE M. BINSTOCK

**McQuillen Place Goals:**

- Collaborate with multiple disciplines and provide construction management and field oversight to implement the process that achieves the highest level of quality and safety while ensuring project completion in the most cost effective and timely method on the owners' behalf.

## PROFESSIONAL PROFILE:

- Successfully managed or supervised 60 commercial projects totaling over 70 million dollars in the healthcare, gaming, hospitality, retail, fitness, office and multi-family housing sectors of the market.
- Committed to achieving positive and lasting relationships with clients and the entire project team.
- LEED Accredited Professional with 19 years of construction management and supervision experience.

## WORK EXPERIENCE:

### Self Employed, 2009 - Present
### Trinity Commercial Contracting, Maplewood, MN

- Supervise, manage and handle day to day activities on multiple commercial tenant improvement projects as well as some ground up construction and residential fire restoration.
- Built trusted long-term relationships with multiple subcontractors and business owners as well as architects and engineers.
- Execute all bids, contracts, schedules and daily communication with all subcontractors.
- Consistently deliver every project on time and budget.

### Kraus-Anderson Construction, Minneapolis, MN
**On Site Project Manager,** April 2001 – July 2009; Includes CG Schmidt and RJM

- Responsible for schematic to DD estimates, schedules, instructions to bidders, bid analysis, subcontractor negotiations, procure long lead items and obtain all required permitting.
- Managed day to day activities including; leading project meetings, material procurement, quality control, scheduling, contract execution and distribution, submittals, RFI's, change logs and change estimates, budget control, project status and forecasting updates.
- Oversee building occupancy, commissioning and final close-out of the project.

### R.A. Morton, St. Cloud, MN
**Superintendent/ Project Manager**, 1998 – 2001

- Supervised and scheduled overall and daily activities with sub-contractors to complete project on time while maintaining quality & safety standards.  Scheduled all special inspections.
- Checked all shop drawings against field dimensions to ensure quality control.
- Estimated projects and handled document control during construction and close-out.

## Community Involvement and Education

| | | |
|---|---|---|
| Community School of Excellence | Board Member | St. Paul, MN |
| Augustana College 1993-98 | BA, Business Administration | Sioux Falls, SD |
| AGC Milwaukee, 2007 | OSHA 30 | Milwaukee, WI |

sbinstock@trinity-contracting.com
ph#: 651-398-2081
Case 6:20-cv-02041-CJW-KEM   Document 12-5   Filed 07/07/20   Page 157 of 175

157

# STEVE M. BINSTOCK ‖

**R.A. Morton** (March 1998 – March 2001)                                                      **St. Cloud, MN**

**Superintendent/ PM** - Supervised and scheduled daily activities with sub-contractors.
- *Health Partners Dental* - New 5,300sf steel structure, (Coon Rapids, MN)
- *CSI, Sports* - New 16,000sf Metal Building to warehouse goods, (Waite Park, MN)
- *Arlington Community Center* - New 17,000sf Wood truss, steel framed bldg (MN)
- *Royal Tire* - New 18,500sf Metal building, (St. Cloud, MN)
- *Holiday Inn Express/Embers* - Four story wood framed structure and panelized Embers restaurant, (St. Croix, WI)
- *Jones Harrison Residence* - Renovation of the existing senior living facility while in operation, (Minneapolis, MN)

**Kraus-Anderson Construction Co.** (April 2001-July 2005)                                **Minneapolis, MN**

**On Site Project Manager** - Manage the overall and day-to-day requirements of the projects on site.
- *Northern Quest Casino* – New 18,500sf 2 story steel addition completed in a stunning 4 months, $4.8 Million (Airway Heights, WA.)
- *Oneida Hotel & Conference Center* – New 34,000 sf steel conference center addition and 114 room pre-cast hotel structure $18 Million (Green Bay, WI.)
- *Nimiipuu Health Facility* – New 42,700sf 2 story steel structure medical facility, $6.2 Million (Nez Perce Tribe, Lapwai, ID.)
- *Midtown Lofts* - New wood framed 72 unit for sale urban housing project, $11 Million (Minneapolis, MN.)
- *Living Works Lodge* - New 6,100sf wood framed residence for people with limited disabilities, $730,000 (Plymouth, MN)

**C.G. Schmidt** (March 2007 – September 2007)                                              **Milwaukee, WI**

- Project Manager – Oversee all aspects of the construction process for the exterior skin and site work and specific tenant build out.
- *Wheaton Franciscan Healthcare Center* - Estimated and proposed initial DD GMP budget that was within 3.8% of final GMP on a $4.1 million, 38,778sf build out. Overall project was $61 million dollars.

**RJM Construction** (September 2007 – November 2008)                                    **Plymouth, MN**

- Project Manager – Increased average profit margin by 6% and managed self performed labor.
- *Ford & Harrison, LLP* – $115,000, 3,400 sf remodel.
- *Olson* - $378,000, 6,500 sf remodel.
- *YMCA* - $160,000, 2,200 sf remodel.
- *UoM Blegan Hall* - $470,000, 4,800 sf remodel.
- *HCBA / VLN* - $630,000, 11,000 sf remodel.
- *IDS Roof Chiller Replacement* - $272,000, "General Construction Only"
- *Twin City Orthopedics* - $545,000, 6,800 sf interior build out.
- *RJM Parking Lot* - $293,000 Asphalt lot with 49 parking stalls
- *Surgical Specialists* - $212,000, 3,200 sf remodel

**Trinity Commercial Contracting** (2009 – Present)                                        **Maplewood, MN**

- *Jackson Medical* – Interior tenant improvement, Bloomington, MN
- *ALTR Fitness* – 4,800sf Interior tenant improvement, Minneapolis, MN
- **(16)** Individually owned **Anytime Fitness Clubs** – MN, WI and SD
- *(3) Golden Corral* – Interior and exterior tenant improvement, Maple Grove, Coon Rapids, and Maplewood, MN
- *(5) Club Pilates* – Interior tenant improvement, Plymouth, Savage, Minnetonka, Maple Grove, White Bear, MN
- *Papa Murphy's* – Interior tenant improvement, Brooklyn Park, MN
- *Pancheros Mexican Grill* – Interior tenant build out, Fridley, MN
- *Pancheros Mexican Grill* – Interior tenant build out, Rochester, MN
- *Pancheros Mexican Grill* – Interior renovation, Golden Valley, MN
- *Safe Harbor Financial* - Interior tenant improvement, White Bear, MN
- *Title Boxing* - Interior tenant improvement, Minneapolis, MN
- *Title Boxing* – Interior tenant improvement, Coon Rapids, MN
- *Title Boxing* - Interior tenant improvement, Woodbury, MN
- *Title Boxing* - Interior/exterior building improvement, Arden Hills, MN
- *Platinum Dance Studio* - Interior tenant improvement, Edina, MN
- *(2) Chiroway Chiropractic Centers* – interior tenant improvements, St. Paul & Plymouth, MN
- *Plaza at Oxboro* – Façade updates and demising walls
- *Big Frog of Bloomington* - interior tenant improvement
- *Big Frog of Plymouth* - interior tenant improvement
- *Big Frog of Woodbury* interior tenant improvement
- *Presbyterian Homes* - Canopy demo and rebuild
- *Twin City Orthopedics* – Interior restoration – Burnsville, MN
- *Bell Auto* – Interior and exterior skin complete renovation, Princeton, MN
- *Great Harvest Bread Co.* – Interior tenant improvement, Stillwater, MN

sbinstock@trinity-contracting.com
ph# 651-398-2081
Case 6:20-cv-02041-CJW-KEM    Document 12-5    Filed 07/07/20    Page 158 of 175

158

|  | **Application for Disaster CDBG Funds**<br>**for**<br>**123 N. Main Street Charles City, IA** |  |
| --- | --- | --- |

**INSTRUCTIONS:** If the developer identifies IEDA's Disaster CDBG funds as a source of funds for the completion fo 123 N. Main Street, Charles City, IA, the developer must use this form to document their application for CDBG-DR funds.

Complete all information requested on this application to the best of your ability. Please use ink, and print legibly. Page 3 of this application must be signed by the City of Charles City inorder to be considered a valid application. Interested developrs should work with North Iowa Area Council of Governments (NIACOG) if they need assistance in completing this application.

Please note this is a mixed-use commercial and residential project. Federal Prevailing Wages and compliance with Davis Bacon laws apply on all work; however the CDBG-DR incentive is only eligible for reimbursement of costs associated with the completion of the residential units.

## CDBG Contract Recipient

Name of IEDA Disaster Recovery Recipient submitting this proposal: ___City of Charles City___
(please specify disaster recipient county or city only, not grant administrator, COG or developer)

Contact person name and contact information:
(contact can be city, county, grant administrator or COG)

Qualifying Category:   Replacing Units Lost ☐   Impact on Area Recovery ⊗

## Rental Applicant / Owner Information

Binstock Development, LLC  (BDL)
_____
Name of Developer / LLC

For-Profit  X          *Non-Profit

_____Binstock_____          _____Steve_____          _____
Last Name (Individual Owner or CEO)          First Name          MI

_____
Tax ID Number

_____651-398-2081_____          _____651-398-2081_____          _____
Contact Telephone #          Cell #          Alternate Telephone #

sbinstock@trinity-contracting.com
_____
E-mail Address

1833 Nebraska Avenue East
_____
Current Mailing Address 1

_____St. Paul_____          _____          __MN__          _____55119_____
City          County          State          Zip Code

*If the applicant is a non-profit organization, submit documentation indicating non-profit status.

1

## General Contractor / Construction Manager

SAME AS ABOVE
Name of General Contractor Firm

Last Name (Individual Owner or CEO)                    First Name                    MI

PENDING                                                $
Iowa Contractor Registration #                         Amount of Construction Contract

Contact Telephone #                    Cell #                    Alternate Telephone #

E-mail Address

Current Mailing Address 1

City                    County                    State                    Zip Code

Experience with Federal Labor Standards and Davis Bacon Wages and Compliance   YES ☐ X   NO ☐

## Section I                            Proposed Rental Property To Be Constructed

123 N  Main Street                    Charles City                    IA            50616
Street Address                        City                        State        Zip Code

Legal description(s) (if lengthy—attach)   ST CHAS UND1/2 INT BRICK WALL LOT 1 BLOCK 21 & P-10 of Charles City IA

Number of buildings in project __1__  Total number of rental units in project___33____ Total number of LMI units in project_____
                                                                                        (at least 17 units)

Number of rental units by bedroom size(s)
(indicate the total number of units for this building by size, then indicate which of those units will be LMI as CDBG Disaster Assisted Units – 51%  As this
project is partially constructed, the original room breakdown is provided, new developers may choose to modify the project)

| ORIGINAL LAYOUT | | NOTE ANY CHANGES TO PROJECT LAYOUT | |
|---|---|---|---|
| Efficiency _5___ | CDBG Disaster Assisted Units _3__ | Efficiency _____ | CDBG Disaster Assisted Units _____ |
| 1-Bedroom _8___ | CDBG Disaster Assisted Units _4__ | 1-Bedroom_____ | CDBG Disaster Assisted Units _____ |
| 2-Bedroom 18___ | CDBG Disaster Assisted Units _9__ | 2-Bedroom _____ | CDBG Disaster Assisted Units _____ |
| 3-Bedroom _2__ | CDBG Disaster Assisted Units _1__ | 3-Bedroom_____ | CDBG Disaster Assisted Units _____ |
| 4-Bedroom _____ | CDBG Disaster Assisted Units _____ | 4-Bedroom_____ | CDBG Disaster Assisted Units _____ |

Number units  to be ADA Accessible___6__

Building Type     Describe_____  new construction in-fill

Building Codes applicable to this project

| Income Targeting | # of Units | % of Total |
|---|---|---|
| At/below 80% (assisted units) | _____ | _____ |
| Market-Rate/Other | _____ | _____ |
| TOTAL | _____ | _____ |

**PROVIDE ADDITIONAL DOCUMENTATION AS SHOWN ON APPLICATION CHECKLIST**

2

| **Section II** | **Signature Page** |

**Disclosures:**

- This application serves as the initial point of entry to the Multi-family (Rental) Unit Production – New Construction Program – Round 6   Additional information and documentation may be required to determine eligibility
- Authorized representatives of the Multi-family (Rental) Unit Production – New Construction Program – Round 6 shall have the right to inspect the proposed Rental project at any time, **from the date of application through completion and to the end of the period of affordability**, upon giving due notice to the owner and occupant(s)
- The information requested in this application is legally required to determine if you qualify for participation in the Multi-family (Rental) Unit Production – New Construction Program – Round 6   Use of data obtained is limited to that necessary for the administration and management of this program by Iowa Economic Development Authority personnel, those under contract with Iowa Economic Development Authority, and other governmental agencies when authorized by the Iowa Economic Development Authority or its recipient
- Assistance shall be in the form of a forgivable loan
- As a condition of receiving Multi-family (Rental) Unit Production – New Construction – Round 6 assistance, if your project is 12 or more units, you must execute and consent to the recording of a 10-year forgivable (forgiven in full at the end of the 10-year compliance period), non-receding loan documents and the agreement for covenants and restrictions against the assisted property   If your project is less than 12 units, you must execute and consent to the recording of a 5-year forgivable (forgiven in full at the end of the 5-year compliance period), non-receding loan documents and the agreement for covenants and restrictions against the assisted property   If the Disaster-affected Rental Property is sold, or title is transferred or conveyed before the maturity date of the forgivable, non-receding loan has been reached, then the entire amount of assistance shall be due and payable

**Certifications:**

- Any person or entity, who obtains funds through false representation, is guilty of theft and may be prosecuted and sentenced accordingly
- I/We certify that the statements contained in this application are true, accurate, and complete to the best of my/our knowledge and belief

**Signatures:** Eventual owner of record of the Rental Property must sign this application

By signing this application, the undersigned acknowledge(s) that any financial assistance received through the Multi-family (Rental) Unit Production – New Construction Program – Round 6 shall be in the form of a forgivable, non-receding loan, which loan may be secured by the recorded forgivable loan documents   The forgivable, non-receding loan shall be due and payable in full upon the sale or transfer of the assisted property

| Binstock Development, LLC | |
| By  /s/ Steve M  Binstock | 3-9-20 |
| Borrower (Developer/Applicant of Rental Property) Signature | Date |

| | |
| Joint Applicant Signature | Date |

We certify that we have reviewed this application (worked with the rental applicant on the final details of the proposal, revising as necessary) and given our approval of this project

| | |
| CDBG Disaster Recovery Recipient (Local Government – County or City only) | Date |

3


**FIRST SECURITY**

809 Clark Street
P.O. Box 577
Charles City, IA 50616
1stsecuritybank.com

March 9, 2020

Charles L. Smith, Chapter 7 Trustee
25 Main Place, Suite 200
Council Bluffs, IA 51503

RE: Proposal to Acquire and Complete the Housing/Commercial Space Project Located at 123 N. Main Street, Charles City, IA.

Mr. Smith:
First Security Bank & Trust Company would like to submit a bid for this proposal of $1,100,000 for the purchase of the real estate and related personal property.

If First Security Bank & Trust Company were the high bidder, our primary intention would be to acknowledge that we do not have the capacity to complete this project. We will actively pursue a buyer that will comply with all procurement requirements specified in this bid proposal checklist. We would make a new buyer aware that the State of Iowa, through the IEDA has set aside a maximum of $1,000,000 of Community Development Block Grant Disaster Recovery (DR) assistance for the completion of the residential units in the building. DR assistance is contingent upon the developer's agreement to the terms of affordability associated with this funding, which include a requirement that 51% of the residential units must be leased to income qualified persons of low-to-moderate income at a cost to lease or rent that is no higher than the applicable rent limits. In addition to the terms of affordability, all federal regulations will apply to the construction project, including but not limited to: Federal Labor Standards Davis Bacon Wages, environmental review, and federal contract provisions.

We would also make a new developer aware there may be tax increment financing incentives available, but they would need to coordinate that directly with Steve Diers, City Administrator of Charles City.

Additionally, we would inform a new developer this parcel is located within a current Opportunity Zone (Census tract: 19067480400), which may allow for added investment.

If First Security Bank & Trust Company was not able to obtain a new developer for this project, we would work with the IEDA & the City of Charles City to complete this project & would solicit competitive bids with qualified contractors.

Sincerely,

Mark G. Miller
Executive Vice-President


EQUAL HOUSING
LENDER

Member FDIC          Visit us at: www.1stsecuritybank.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| INRE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**Declaration of Trustee** |

I, Charles L. Smith, in my sole capacity as Trustee, do hereby declare under penalty of perjury, that the following are true and correct, pursuant to 28 U.S.C. §1746:

1.  The factual recitations contained in the Pre-Hearing Memorandum/Brief filed by First Security Bank & Trust Company ("Bank").

2.  On December 9, 2019, I was appointed Trustee in the above bankruptcy proceeding. I immediately took steps to ensure that there was insurance on the property and that the utilities would be kept on. Initially, I allowed Charles Thomson ("Thomson") to retain the keys to the property but ultimately had the locks changed and had copies of the keys available at the office of the Charles City, City Administrator.

3.  On December 10, 2019 (the date after my appointment as Trustee), I reached out to the officials of the Iowa Economic Development Authority ("State"). In my discussions with the State officials, I learned that although the initial State funds for the project had been nearly exhausted, the State would agree to invest an additional $1 million into the project.

4.  On December 16, 2019, I began settlement discussions with the Bank's attorney regarding a "carve out" on the sale of the building. These discussions continued and were never definitely agreed to until the execution of the Purchase Agreement. Since the Bank had a $4 million mortgage against the property, I wanted its cooperation on the sale procedure so as to avoid any objection by the Bank to a proposed sale.

5.  I also requested that the Bank keep the utility bills current and pay for snow removal and security. In view of the freezing temperatures, I requested that someone go through the building each day to make sure that the heat was still on so as to avoid having any pipes freeze.

6.  I conducted the 341 Meeting of Creditors in Mason City on January 27, 2020. At that time, I explained that it was my intention to have potential bidders for the property channel their inquiries through the State. The State would assemble materials to be sent to potential bidders along with a bid deadline.

7.  At the conclusion of the 341 meeting, I toured the building along with officials from the State, Bank, City, Thomson, James Gray and the local newspaper. At that time, I encouraged Thomson to compete for a bid on the project and advised him that I had been contacted by five or six other individuals.

8.      After the tour of the building, I prevailed upon the City Administrator to hold the keys to the property so that they would be available to potential bidders. Since Thomson was a potential bidder, I did not want him present when third parties were touring the building as potential bidders. In fact, State officials, in my presence, told him that he could not do that and remain a potential bidder under the rules and regulations that the State must abide by.

9.      On January 30, 2020, I provided to the State the contact information for the five individuals who had contacted me in regard to their interest to bid on the project. Thereafter, I began working with the State on a proposed cover letter from me for the bid and the Application Checklist, Sources and Uses of Funds, Rent Calculations and other requirement for potential bidders to receive State funds.

10.      On February 3, 2020, the bid letter was sent to the five individuals who had contacted me, along with approximately twenty other potential developers whom the State knew had a interest in the project. The bid letter requested that the bids be submitted by March 9, 2020 and showed how potential bidders could apply for the $1 million in State funds.

11.      There were only two bids submitted – one by the Bank and the other by Binstock Development, LLC ("Binstock").

12.      I met with State and City officials in Des Moines on March 12, 2020. Neither bidder was allowed to participate in this meeting. During this meeting, it became evident that neither bid complied with the State's requirement to receive State funding. The Bank did not request State funding. Binstock did not comply with the State requirements so as to qualify for State funding.

13.      In view of the above, I analyzed the two bids – neither of which was going to get any State money. In analyzing the two bids, it became clear to me that the Bank's bid was the best. It provided $1,075,000 for the building and $25,000 for the personal property. Binstock's bid provided $450,000 for the building and $20,000 for the personal property.

14.      I then entered into negotiations with the attorneys for the Bank which resulted in the Purchase Agreement of March 20, 2020. Under this Purchase Agreement the Bank agreed to a "carve out" of $150,000.

15.      To the best of my recollection, I promptly responded to each and every letter, email or phone call from Thomson.

16.      I have been a Bankruptcy Trustee since 1976. Further, I believe that both the price and process for the proposed sale are in the best interest of the bankruptcy estate.

Dated this ⟨6⟩ day of April, 2020

_Charles L. Smith_ _____
Charles L. Smith, Chapter 7 Trustee

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | Chapter 7 Bankruptcy<br>Case No. 19-00507 |
| MCQUILLEN PLACE COMPANY, LLC, | |
| Debtor. | **Declaration of Ann Schmid** |

I, Ann Schmid, hereby declare under penalty of perjury, that the following is true and correct, pursuant to 28 U.S.C. §1746:

1. I am the Disaster Recovery Team Leader, Historic Preservation Specialist at the Iowa Economic Development Authority (the "*IEDA*"). The IEDA administers the Community Development Block Grant-Disaster Recovery ("*CDBG-DR*") program that was federally funded in response to the Midwest 2008 flooding. Pursuant to an application for CDBG-DR funding by Charles Thomson (the "*Owner*") and the Cerro Gordo County Board of Supervisors, IEDA awarded $2,940,000.00 in CDBG-DR funding for a certain project located at 123 N. Main St, Charles City, Iowa ("*McQuillen Place*"). I am familiar with McQuillen place based upon my personal knowledge and my review of relevant information.

2. After the ground breaking for McQuillen Place in October 2014, IEDA monitored the project and provided quarterly status updated to the relevant federal regulator that noted slow progress. After the construction lien lender foreclosed its mortgage, IEDA met on site to discuss the status of McQuillen Place and the project's financial situation with the Owner, James Gray (the "*Architect*"), representative from the city, the grant administrator and the local lender, but not the primary lender. The primary lender was not present because, despite IEDA directing the Owner to include the lenders in the meeting, the Owner had not in fact invited either of the lenders. Shortly thereafter, IEDA had a teleconference with the lenders to discuss McQuillen place and stress that IEDA remained committed to working with the relevant stakeholders to enable successful completion of the project, which could include IEDA's assistance with finding another developer to complete the project.

3. After this Court appointed Charles L. Smith as the Chapter 7 trustee (the "*Trustee*"), IEDA contacted the Trustee to discuss McQuillen Place. IEDA determined that if the Trustee sold McQuillen Place to a new owner, and that new owner completed the projected within certain terms, then IEDA could document satisfactory completion of the project and potentially allow that new owner access to $1,000,000 of new CDBG-DR funding to complete the project as an enticement to bid on McQuillen Place. IEDA had to reallocate funding from other projects to make the additional CDBG-DR funding available to McQuillen Place.

4. The IEDA is committed to the fair, open and successful expenditure of CDBG-DR funds. To facilitate an active and competitive bidding process for the Trustee to sell McQuillen place, IEDA worked closely with the Trustee, customized the application documents for the additional CDBG-DR funding, created a link for shared application documents, and emailed the information to over two dozen developers.

5.   As with many federal funds, CDBG-DR funds may be expended only if certain conditions are met.  One primary requirement is for supporting financial documentation regarding the sources and uses of funds.  Another significant requirements is that the funds be used for residential and not commercial purposes.  While IEDA determined the eligibility of applications for the additional CDBG-DR funding in connection with bids for the purchase of McQuillen Place, IEDA took no position and made no recommendation with regards to which bid was the highest and best bid or with regards to how ultimate ownership of the project should be decided.

6.   There were two bids received.  The bid from First Security Bank of Charles City ("*First Security Bid*") did not include an application for CDBG-DR funding, which foreclosed a finding of eligibility.  The bid from Binstock Development, LLC ("*Binstock Bid*") did include an application for the additional CDBG-DR funding, but the application was significantly deficient.  The Binstock Bid did not have supporting financial documentation regarding the sources and uses of funds.  Uniquely, the Binstock Bid was submitted with proposed conditions that IEDA would impose upon the developer.  However, the proposed conditions did not comport with IEDA's ability and authority to use and award CDBG-DR funds.  As such, the Binstock Bid was also not eligible for the additional CDBG-DR funding.

7.   IEDA informed the Trustee that neither the First Security Bid nor the Binstock Bid was eligible for any of the additional CDBG-DR funding.  IEDA defers to the Trustee regarding the selection of which bid constitutes the highest and best offer and with regards to how ownership of McQuillen Place should ultimately be decided. The decision is solely the Trustee's to make, as to which bid to accept and to present to the Court.

8.   Appended here are a Memo I sent to Trustee Smith circa March 26, 2020, a Summary of the two bids sent to Trustee Smith, and an earlier Memo that contained some additional details of the history of IEDA's involvement. These materials were prepared by me or pursuant to my direction, based on my personal knowledge of the situation, and sets out my office's activities and were based on matters I had observed and were reported pursuant to my official duties.

Dated this 27ᵗʰ day of March , 2020

Ann Schmid

# MEMO

**March 26, 2020**

**To:**   Trustee Charles L. Smith
**From:** Ann Schmid, Iowa Economic Development Authority – Community Development – Disaster Recovery
Team Leader

**RE:**   McQuillen Place Multi-Family Housing, Charles City, Iowa – Proposal Process

In March 2013, Charles Thomson and the Cerro Gordo County Board of Supervisors applied to the Iowa Economic Development Authority (IEDA) for Federal Community Development Block Grant Disaster Recovery (CDBG-DR) funding for the production of new housing units in a project known as McQuillen Place, located at 123 N. Main Street in Charles City, IA.

Through a series of events (documented on the attached Memo to Justice David Baker dated 07/03/2018) the IEDA continued to monitor this project with Mr. Thomson, Cerro Gordo County, and the lending entities on this project, including participating in an all-day mediation on July 6, 2018 in Charles City.  At that time, the IEDA was no longer approving draws on this project, but the project had already drawn down $2,837,100 of the original $2,940,000 awarded to this project. Leaving $102,900 undrawn.

In December 2019, the IEDA was informed that Charles L. Smith had been appointed Chapter 7 Bankruptcy Trustee. The IEDA reached out to Mr. Smith.  The IEDA pursued the opinion that if ownership could be transferred through this process, and the future owner could complete the project within the terms of the federal assistance, IEDA could document satisfactory completion of the project under the federal program.

On January 27, 2020, The IEDA participated in the 341 Creditor's Meeting in Mason City, IA, lead by the appointed Bankruptcy Trustee, Mr. Charles L. Smith.  That same day, all interested parties toured the incomplete structure located at 123 N. Main Street, and conducted an initial meeting with the Trustee to discuss a process to seek proposals for the disbursement of the property.

The IEDA saw this disbursement proposal process to be two-fold:
1) Provide the Trustee a mechanism to receive competitive bids for the Acquisition of Real Property and the Personal Property located within the structure, and

2) Allow developers the opportunity to apply for an additional $1,000,000 of Federal CDBG-DR funds to complete the project.

The IEDA modified application documents that are typically used for competitive rounds of CDBG-DR funding and streamlined the proposal process by auto-populating some fields of the application process, as this process would be limited to the single project site. While IEDA worked closely with the Trustee, it was always understood that the final disposition of the property was the sole discretion of the Trustee.  IEDA would evaluate applications for CDBG-DR funding based on State program guidelines and federal program requirements only.  IEDA would advise the Trustee as to which (if any) of the applicants would be eligible for the CDBG-DR funds, and ultimately if an eligible developer was selected by the Trustee, they would, as such, be awarded the CDBG-DR funds (as ownership of the property is necessary to utilize the CDBG-DR funding).

On February 10, 2020, the IEDA created a link for shared application documents and emailed it to all interested parties (City, Bank, Trustee) along with the following developers:

brentdahlstrom@gmail.com ;                          drb@barkerapartments.com;
maryg@gronenproperties.com;                        kylegalloway@barkercompanies.com ;

jim@hobarthistoricrestoration.com ;
tim@ctdevelopmentiowa.com;
sle@aspectinc.net;
jenny.clayton@seldin.com;
phyllisp@seldin.com;
jhassman@cvpadvisors.com;
markholtkamp@yahoo.com;
caleb@pyramidpropertygroup.com ;
vincent.king@fbfs.com;
flevy@newburyliving.com;
sam@chihousing.com;

tj@blackbirdinvest.com;
justin@blackbirdinvest.com;
TroyH@HansenRES.com;
AndyV@HansenRES.com;
jesse.frey@hubbellrealty.com;
wanderson@sherman-associates.com
xanddrew@msn.com
cthomson@doall.com
james.gray@corniceandrose.com
m.miller@1stsecuritybank.com

The link included a cover letter from the Trustee, all application documents, and the instruction that the link could be disseminated publicly by any interested party.

Prior to proposals being received, IEDA fielded multiple phone calls and emails. IEDA answered general questions and directed developers to other sources of information such as the City or the County Assessor. All inquiries were treated equally and promptly.

March 9, 2020 – Proposals were due to IEDA. Two proposals were received: 1)Binstock Development LLC, 2) First Security Bank of Charles City.

March 12, 2020 – IEDA met in person with the Trustee and the City to go over the received proposals. IEDA informed all parties that neither of the two proposals qualified for CDBG-DR funding (See IEDA's Proposal Summary). It was agreed upon that IEDA's decline letters would be sent after the Trustee made final determination on the disposition of the property, so as not to create any false understanding of the process. As of the date of this memo those decline letters are being finalized by IEDA and will be sent shortly.

IEDA provided technical assistance by providing the Trustee with a summary of the CDBG-DR applications and IEDA's funding determinations; however, the final determination for disposition remained with the Trustee.

## Summary of Bids 123 N. Main Street, Charles City, IA:

The Iowa Economic Development Authority is providing the following summary of the solicitation for proposals for 123 N. Main Street, Charles City, IA to the Chapter 7 Bankruptcy Trustee for applicability of the use of Federal CDBG-DR funding and General Technical Assistance.

### First Security Bank of Charles City:

**Acquisition Bid Amount:** $1,100,000
**CDBG-DR Funds Request:** $0.00
**CBDG-DR Funds Eligible:** $0.00

First Security Bank submitted a letter for bid submittal, including only the acquisition of the parcel and personal property. No IEDA application, Sources and Uses of funds, or project scope of work were included. As such, No CDBG-DR funds were requested from IEDA, therefore no CDBG-DR funds are able to be awarded at this time.

Should the trustee move forward this this award, further application documentation would be required for any future application for CDBG-DR Funds.

### Binstock Development, LLC (BDL):

**Acquisition Bid Amount:** $470,000 (this is the cumulative total of the *Building Acquisition Bid Amount* and the *Personal Items Acquisition Bid Amount* per the Sources and Uses of Funds form).
**CDBG-DR Funds Requested:** $1,000,000
**CDBG-DR Funds Eligible:** $0.00

BDL Submitted a full application for CDBG-DR funds, however the following deficiencies in the application do not allow IEDA to make an award for the requested $1,000,000. *lent use for commer*

Summary of IEDA Application Deficiencies including but not limited to the following:

| Area of Application | Issue | Remedy |
|---|---|---|
| Sources and Uses of Funds: | Sources: Owner Contribution – type, rate, term, debt service details missing | Update form and additional documentation required to show named lender, commitment of funds, and all relevant terms. |
| Sources and Uses of Funds | Sources: Reduction of Back Taxes – needs explanation | Documentation as to how this is a "Use of Funds" is required. |
| Sources and Uses of Funds: | Sources: Use of Copywrite | Documentation as to how this is a "Use of Funds" is required. |
| Sources and Uses of Funds: | Uses: Must complete third column – how are the Sources of funds separated out by Use? | Update form |
| Financial Commitments | No Documentation was provided. | Financial commitment documents including terms for construction and permanent financing, account statement and balances, and written commitment of all funding sources. |
| City Support | No signature or statement of support specific to this development team | Resolution of support and/or City signature on IEDA application required. |
| Development Team | All development team members must be documented including but not limited to Owner, Developer, General Contractor, sub-contractors, architect, engineer, HERS rater, etc. | A more detailed development team should be provided, including all sub-contractors. |

Should the Trustee move forward with this award, substantial modifications to the application, including but not limited to those noted above, would be required prior to IEDA's ability to award CDBG-DR Funding.



IOWA ECONOMIC DEVELOPMENT AUTHORITY
200 East Grand Avenue | Des Moines, Iowa 50309 USA | Phone: 515.348.6200
iowaeconomicdevelopment.com

# MEMO

**July 3, 2018**

**To:**   Justice David Baker
**From:** Ann Schmid, Iowa Economic Development Authority – Community Development – Disaster Recovery

**RE:**   McQuillen Place Multi-Family Housing, Charles City, Iowa

As a result of the 2008 Iowa Floods, the State of Iowa received just under one billion dollars of disaster recovery funding from the Federal Department of Housing and Urban Development (HUD). To disburse funds efficiently, the Iowa Economic Development Authority (IEDA) developed a "Super County" system, selecting a large county in each affected region and entering into a single DR-CDBG contract with that county to expend disaster recovery funds within the larger multi-county geographic area. Applications for funding for projects were submitted to IEDA, which made awards through Super Counties and each Super County acted as a pass-through of funds to the project's developer.

As it pertains to the McQuillen Place project in Charles City, the following events may be relevant to the pending litigation and mediation:

March 2009 – IEDA executed Contract 08-DRH-202 with Cerro Gordo County to provide funding assistance to 20 flood affected counties, including Floyd County.

March 1, 2013 – Charles Thomson and the Cerro Gordo County Board of Supervisors applied for disaster recovery funding for McQuillen Place.

July 5, 2013 – IEDA awarded disaster recovery funding to Cerro Gordo County for 2 projects including the McQuillen Place project in Charles City.

July 2013 – The Cerro Gordo County Board of Supervisors approved and signed Amendment 11 to Contract 08-DRH-202 pertaining to an award of $2,940,000 to McQuillen Place in Charles City.

November 6, 2013 – IEDA issued the project "Release of Funds" indicating that environmental compliance was completed, and that project commencement was approved.

October 2014 – IEDA attended the official Ground-Breaking Ceremony for McQuillen Place

January 1, 2015 – Cerro Gordo County filed the Restrictions Agreement required under HUD rules and a mortgage on the property in the amount of the DR-CDBG investment.  IEDA acknowledges that the mortgage held by Cedar Rapids Bank and Trust (CRB&T) is in the primary position.

2015 – 2018 – IEDA continued to monitor the project and provided quarterly project status updates to HUD describing slow progress.

March 16, 2018 – Charles Thomson contacted IEDA to disclose that the bank holding the construction lien intended to foreclose on the 1st position mortgage. Mr. Thomson stated that he believed there was a path to a resolution and that it would not come to foreclosure, but he would keep IEDA up to date on any further developments.  IEDA later learned that, in fact CRB&T had filed the foreclosure action and attempted service by issuing the petition on Mr. Thomson, which we understand he has disputed.  The petition was also served on Cerro Gordo County, and its county attorney has filed an answer.

Governor Kim Reynolds      |      Lt. Governor Adam Gregg      |      Director Debi V. Durham

Page 1 of 2

May 9, 2018 – IEDA requested that Mr. Thomson schedule an on-site meeting with the banks, IEDA, and the City to ascertain the status of the project and discuss the financial situation.

May 24, 2018 – IEDA staff met on site with owner Charles Thomson, architect James Gray, City of Charles City representatives and the grant administrator.  Representatives of the banks were not present. IEDA ascertained that Mr. Thomson had not invited representatives of the banks to the meeting. After multiple requests, two representatives from the local bank, First Security, arrived, but CRB&T representatives were not available for the meeting.

The group toured the project site, then proceeded to Charles City City Hall to meet and discuss the project.  Since the primary lender was not present, the conversation was limited to the owner indicating his intent to maintain ownership and seek additional funding to finish the project. IEDA stressed the necessity to complete the project within the timeframe remaining for the disaster recovery grants. IEDA is currently working with HUD on a closeout plan for the disaster recovery funds, and anticipates all projects completed and closed by the end of 2019.  No decisions or determinations were made at the meeting, and IEDA reiterated that it was necessary to discuss the situation with the primary lender.

May 31, 2018 – Cedar Rapids Bank and Trust initiated a conference call with IEDA, representatives of First Security, and both banks' attorneys to discuss McQuillen Place. During this discussion, IEDA learned that Cedar Rapids Bank and Trust had filed for foreclosure 2 ½ months previously. IEDA reiterated its intention to continue to work with the owner, the city, Cerro Gordo County, the banks and other interested parties to move forward with efforts to complete the project. IEDA described successful efforts in a similar situation to find another developer to complete the project and offered to provide the same assistance to Mr. Thomson and the banks

While unrelated to the foreclosure action, there may still be a dispute between Mr. Thomson and IEDA regarding a state program, the Housing Enterprise Zone Program (HEZ).  The Legislature rescinded statutory authority for the HEZ program in 2014.  Before the repeal, IEDA notified Mr. Thomson that IEDA intended to make an award to him under the HEZ program for the McQuillan Place project.  However, an award is not final until a contract has been executed, and Mr. Thomson did not execute the contract that IEDA sent to him.  Furthermore, under Iowa Code, a developer was not eligible for the program unless the project was completed within two years from the time the developer commenced construction.  As set out in documentation provided to IEDA by Mr. Thomson, construction was commenced in 2014.  Therefore, Mr. Thomson is not eligible for HEZ funding because construction has not been completed some four years after it was commenced.  Mr. Thomson has stated that he intends to file suit against IEDA in connection with the HEZ notice of intent to award.

IEDA is committed to the fair, open and successful expenditure of federal Disaster Recovery Funding.  These funds are dedicated to the production of new affordable housing units and IEDA is committed to the successful completion of this project and the lease-up to income qualified tenants. As of this date, the project has drawn down $2,837,100, leaving $102,900 in undrawn funds. IEDA is amenable to amending the 2nd position mortgage to enable Cerro Gordo County to assign the mortgage to the City of Charles City to localize the contract. If all parties agree, this change would then allow IEDA to close the Cerro Gordo contract and enter a new contract with the City of Charles City to provide remaining undrawn funds and possibly provide additional qualified funds to complete the project. All of this is, of course, contingent on keeping the 2nd position mortgage and Restrictions Agreement in place with any transferee.

The failure to comply with the successful completion of the project and the associated Restrictions Agreement, would constitute default by Cerro Gordo County. In accordance with Article 9 of Contract 08-DRH-202, IEDA would issue a written Notice of Default to the County providing for a 15-day opportunity to cure, provided that cure is possible and feasible.  If the County is unable to provide a remedy, HUD regulations provide for repayment of the full amount of the funds disbursed for this project.

| | |
|---|---|
| **From:** | Charles L. Smith |
| **To:** | Larry Eide; Rita Grimm; Ann Schmid; Steven Diers |
| **Cc:** | Cathy Templeton |
| **Subject:** | FW: Cornice & Rose Equipment and Tools at McQuillen Place |
| **Date:** | Friday, February 28, 2020 11:11:43 AM |
| **Attachments:** | MP C&R 12Feb2020 Inventory List.pdf |

**From:** Charles L. Smith
**Sent:** Friday, February 28, 2020 11:08 AM
**To:** James Gray
**Cc:** Cathy Templeton
**Subject:** RE: Cornice & Rose Equipment and Tools at McQuillen Place

James,

While you may have a claim to the tools/equipment, the building materials, appliances, lumber and other personal property belongs to the bankruptcy estate. If you have documentation to support your claim to these items, please provide it to me immediately.

Thank you.

Chuck

**From:** James Gray <james.gray@corniceandrose.com>
**Sent:** Thursday, February 27, 2020 4:25 PM
**To:** Charles L. Smith <csmith@telpnerlaw.com>
**Cc:** Charles Thomson <cthomson@doall.com>; Donald Molstad <mlawfirm@yahoo.com>
**Subject:** Re: Cornice & Rose Equipment and Tools at McQuillen Place

Dear Mr. Smith,

Good afternoon.

Please find attached an annotated list dated 12 February 2020, of the Cornice & Rose equipment and tools at McQuillen Place.

Thank you,

James

James A. Gray
Managing Director
Cornice & Rose International, LLC
804 Roberts Road
Barrington, IL 60010
Tel (847) 487-9487
Mobile (847) 525-2323
james.gray@corniceandrose.com
CorniceandRose.com

On Feb 13, 2020, at 2:19 PM, James Gray <james.gray@corniceandrose.com> wrote:

Dear Mr. Smith,

Good afternoon.

Please find attached a letter addressing the Cornice & Rose equipment and tools at McQuillen Place.

Thank you,

James

James A. Gray
Managing Director
Cornice & Rose International, LLC
804 Roberts Road

Barrington, IL 60010
Tel (847) 487-9487
Mobile (847) 525-2323
james.gray@corniceandrose.com
CorniceandRose.com

**Telpner Peterson
Law Firm, LLP**

CHARLES L. SMITH
JACK E. RUESCH
WALTER P. THOMAS
NICOLE HUGHES
JOHN A. FLATEN, ASSOCIATE
MAYNARD S. TELPNER, RETIRED
RICHARD W. PETERSON (1925-2010)

MAIN PLACE, SUITE 200

P.O. Box 248

COUNCIL BLUFFS, IOWA

51502-0248

TELEPHONE:
712-325-9000
FACSIMILE:
712-328-1946
www.telpnerlaw.com
email@telpnerlaw.com

Licensed in Iowa and Nebraska

March 5, 2020

**VIA US MAIL and EMAIL:  jconley@zarleylaw.com**
Joshua J. Conley
Zarley Law
400 Locust St., Suite 200
Des Moines, IA  50309

> RE:  McQuillen Place Company, LLC, Bankruptcy No. 19-000507 / Cornice &
> Rose International, LLC

Dear Mr. Conley:

James Gray of Cornice & Rose had provided me with a copy of your letter of March 4, 2020.

You may already be aware that the principal asset of the Debtor is located at 123 Main Street in Charles City, Iowa and consists of a partially completed commercial and residential real estate project.

I have been appointed as the Chapter 7 Bankruptcy Trustee in the matter. I am in the process of attempting to sell the property. Thus, I need clarification from you as to what you are actually contending in your letter, to wit:

1. What are the "architectural works" that you are referring to in your letter?
2. If those include architectural work that was used to construct the building thus far, are you contending that I would be prohibited from transferring the building to a third party?
3. Since the "drawings and plans" may have been used in the partial construction, are you contending that they constitute a "physical structure embodying their copyrighted work"?

I would ask that you provide a response as soon as possible since the bid deadline for the sale of the property is March 9, 2020 at 4:00 p.m.  The bids are being sent to the Iowa Economic Development Authority.

Sincerely,

Charles L. Smith
csmith@telpnerlaw.com

CLS/ct



jconley@zarleylaw.com

March 9, 2020

**VIA EMAIL ONLY**
email@telpnerlaw.com

Charles L. Smith
Telpner Peterson Law Firm, LLP
25 Main Place
Suite 200
Council Bluffs, Iowa 51502

> Re:    McQuillen Place Company, LLC, Bankruptcy No. 19-000507 / Cornice & Rose
> International, LLC

Dear Mr. Smith:

I am writing in response to your letter of March 5, 2020 regarding the above-referenced matter.

To clarify, 17 U.S.C. § 102 indicates that copyright protections exist in original works fixed in any tangible medium from which they can be perceived, reproduced, or otherwise communicated. Section 102 specifies that works include pictorial, graphic, and sculptural works, as well as architectural works.  Pursuant to 17 U.S.C. § 101, an architectural works is defined as:

> [T]he design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

In light of the above, any original works licensed to McQuillen Place that conform to these definitions are protected by Cornice & Rose's copyright.  Note that McQuillen Place's license has been revoked and transfer or assignment of McQuillen Place's rights in the copyright works is prohibited by the agreement between the parties.  Prior to making the sale of McQuillen Place's assets, consent and clearance from Cornice & Rose is advised.

Please note that this letter is sent as a professional courtesy and I will not be able to address this matter further.

Best Regards,

Joshua J. Conley

JJC/