# United States Bankruptcy Court
## Northern District of Iowa (Mason City)
## Bankruptcy Petition #: 19–00507

*Assigned to:* Thad J. Collins
Chapter 7
Previous chapter 11
Original chapter 11
Voluntary
Asset

*Date filed:* 04/25/2019
*Date converted:* 12/09/2019
*341 meeting:* 01/27/2020
*Deadline for filing claims:* 04/08/2020

---

*Debtor*
**McQuillen Place Company, LLC**
1110 North Grand Ave., Suite 300
Charles City, IA 50616
FLOYD–IA
847–456–1911
Tax ID / EIN: 46–3987825
*aka* **Classic Cleaners**
*aka* **Classic Cleaners of Charles City**

represented by **J D Haas**
J D Haas & Associates, PLLC
1120 E. 80th St.
Suite 200
Bloomington, MN 55420
952–345–1025
Fax : 952–854–1665
Email: jdhaas@jdhaas.com

**Donald H. Molstad**
701 Pierce St., Ste. 305
Sioux City, IA 51101
712–255–8036
Email: judylaw308@yahoo.com

**Charles McQuillen Thomson**
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616
847–456–1911
Fax : 847–495–3488
Email: cthomson@doall.com

*Trustee*
**Charles L. Smith**
25 Main Place, Ste 200
P.O. Box 248
Council Bluffs, IA 51502–0248
712–325–9000

represented by **Telpner Peterson Law Firm, LLP**
25 Main Place, Suite 200
Council Bluffs, IA 51503
712–325–9000

*U.S. Trustee*
**United States Trustee**
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401–2101
319–364–2211

represented by **L Ashley Zubal**
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309–2108
515–323–2269
Email: Ashley.zubal@usdoj.gov

*Cred. Comm. Chair*
**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 04/07/2020 | | 147 | Objection to Sell/Sale of Property Filed by Charles Thomson (related document(s)134 Sell/Sale of Property). (Thomson, Charles) (Entered: 04/07/2020) |
| 04/07/2020 | | 148 | Notice of Appearance and Request for Notice by Bradley R. Kruse Filed by Creditor Cornice & Rose International, LLC. (Kruse, Bradley) (Entered: 04/07/2020) |
| 04/07/2020 | | 149 | Objection re: Sell/Sale of Property Filed by Creditor Cornice & Rose International, LLC (related document(s)134 Sell/Sale of Property). (Kruse, Bradley) (Entered: 04/07/2020) |
| 04/07/2020 | | 150 | Motion *to Strike Objection* Filed by First Security Bank & Trust Company (related document(s)147 Objection). (Lam, Eric) (Entered: 04/07/2020) |
| 04/07/2020 | | 151 | Brief *(Pre−Hearing)* Filed by Creditor First Security Bank & Trust Company (related document(s)134 Sell/Sale of Property). (Lam, Eric) (Entered: 04/07/2020) |
| 04/08/2020 | | 152 | Joinder in Objection Filed by Creditor Cornice & Rose International, LLC (related document(s)147 Objection). (Kruse, Bradley) (Entered: 04/08/2020) |
| 04/08/2020 | | 153 | Support Document re: Objection to Document *Supplement to Objection* Filed by Creditor Cornice & Rose International, LLC (related document(s)149 Objection to Document). (Kruse, Bradley) (Entered: 04/08/2020) |
| 04/09/2020 | | 154 | Order Authorizing Approving Sale Pursuant to Section 363 of the Bankruptcy Code and Providing Related Relief (Related Doc # 134) Dated and Entered on 4/9/2020. (tsta) (Entered: 04/09/2020) |
| 04/23/2020 | | 155 | Motion to Reconsider 154 Filed by Cornice & Rose International, LLC (Kruse, Bradley) Modified on 4/24/2020 (tsta). (Entered: 04/23/2020) |
| 04/23/2020 | | 156 | Motion to Reconsider re: Order Regarding Motion For Sale of Property Filed by Charles Thomson (related document(s)154 Order Regarding Motion For Sale of Property). (Thomson, Charles) (Entered: 04/23/2020) |
| 04/23/2020 | | 157 | Motion *for Partial Withdrawal of the Reference* Filed by Cornice & Rose International, LLC (related document(s)154 Order Regarding Motion For Sale of Property). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D) (Kruse, Bradley) (Entered: 04/23/2020) |
| 04/23/2020 | | 158 | Motion To Stay re: Motion Filed by Cornice & Rose International, LLC (related document(s)157 Motion). (Attachments: # 1 Exhibit A) (Kruse, Bradley) (Entered: 04/23/2020) |

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

OBJECTION OF EQUITY SECURITY HOLDERS TO TRUSTEE'S
MOTION TO SELL

NOW COME Charles M. Thomson and James Gray (the "Equity Security Holders"), through their counsel, and as and for their "Objection of Equity Security Holders to Trustee's Motion to Sell" (this "Objection") respectfully state as follows:

1. On March 23, 2020, the Trustee filed a "Motion to Motion For Sale of Property Under Section 363" (the "Motion") pursuant to which he seeks, *inter alia*, to sell the principal asset of the estate, certain real and property located at 123 North Main, Charles City, Iowa (the "Property") to First Security Bank & Trust Co. ("First Security") for $1.1 million.

2. The Equity Security Holders, who are also general unsecured creditors and administrative claimants under 11 U.S.C. 503(b)(1)(A) in this case, object to the proposed sale on the following grounds (each of which is described more specifically in paragraphs 4 through 56 hereof):

    a.   the "bidding" process was fatally flawed;

    b.   the efforts of the Trustee to market the Property were so meager as to violate the business judgment rule;

1

c.   First Security should not be permitted to tell the Court (and others) that it would

not bid on the Property, have the Court (and others) rely on that representation, then

bid on the Property;

d.   Having a 363 sale move forward in the midst of a National Emergency is contrary

to the public policy expressed in both the Bankruptcy Code and Governor

Reynold's directives;

e.   The Trustee in this case has been curiously close to and reliant on the proposed

bidder, meriting additional scrutiny of the Court; and

f.   Other persons wish to present competing, higher bids on the Property, but have

been precluded from doing so due to the breakneck speed for approval sought by

the Trustee.

3.   In addition to the Equity Security Holders, unsecured creditor Steve Binstock

wishes to join in this Objection.

## A.   The Flawed Bidding Process.

4.   Shortly after the January 27, 2020, §341 meeting, the Trustee elected to delegate

the job of seeking "bidders"[1] to the Iowa Economic Development Authority ("IEDA").

5.   The IEDA's 2017 failure to honor its 2013 commitment to provide Enterprise Zone

tax credits to the Debtor started the chain of events which (together with the actions of First

Security) precipitated the Debtor seeking protection under Chapter 11 of Title 11 of the United

States Code (the "Bankruptcy Code").

---

[1] The term "bidders" is in quotation marks because, as explained below, the solicitation was for "proposals" rather
than for actual "bids."

2

6.  On February 10, 2020, following consultation with the IEDA and First Security, the Trustee signed a letter (attached as Exhibit A) (the "RFP") seeking "proposals" from parties interested in completing construction on McQuillen Place under a set of detailed conditions.

7.  The conditions included:

a.  Agreeing to apply federal "affordability" regulations to the 33 units on the second and third floors of the building;

b.  Requiring detailed pro-forma and build-out projections;

c.  Requiring completion of detailed projections concerning cost-to-complete the building, including the first floor;

d.  Agreeing to Davis-Bacon wage regulation for completion of the 33 units on the second and third floors;

e.  A statement of the "bidder's" qualifications as a developer.

8.  On February 10, 2020, the RFP was distributed by IEDA staff via email to various parties which had expressed an interest in "bidding" on the Property.  Despite having expressed interest on multiple occasions to the IEDA and the Trustee, the Equity Security Holders were not included in the February 10, 2020 distribution[2].

9.  Two bids were submitted.  Only one -- that of Binstock Development, LLC ("BDL")[3] -- even attempted to comply with the complex requirements of RFP.  The IEDA staff decided neither bid complied with the RFP's requirements.

---

[2] The Equity Security Holders only became aware of the RFP later, when Charles M. Thomson, one of the Equity Security Holders and an objecting party, contacted the Trustee by telephone to inquire about the status of the sale of the Property.

[3] Charles M. Thomson, one of the Equity Security Holders and an objecting party, assisted BDL with its proposal.

3

10.     Rather than contact BDL to request a revised bid or to correct errors or omissions in its proposal, the Trustee elected to negotiate with First Security.  This negotiation led to the Motion presently before the Court.

11.     The sale described in the Motion, however, is dramatically different from the sale that was contemplated in the RFP.

12.     Rather than seeking to impose the restrictions described in paragraph 7, the Motion is for a straightforward 363 sale, free and clear not just of liens, but of the IEDA's regulatory aegis as well.

13.     The sale described in the Motion is a radically different business proposition than that described in the RFP.  The sale described in the Motion is far more attractive for a prospective developer.  *See* Affidavit of Steve Binstock, attached hereto as Exhibit B, at ¶ 3-6.  However, only First Security was permitted by the Trustee to "bid" on this proposal.

14.     The first that many of the recipients of the initial RFP heard of these new, far more advantageous terms was an email from one of the Equity Security Holders on April 3, 2020.  See Affidavit of Charles Thomson, attached hereto as Exhibit C, at ¶ 2.

15.     In effect, the only notice to competing prospective buyers of these new terms was the email described in paragraph 14.

16.     The effect of this novel 363 procedure has been significant chilling of bidding.  See Affidavit of  Steve Binstock, at ¶ 3-6.

> **B.     The efforts of the Trustee to market the Property were so
>            meager as to violate the business judgment rule.**

17.     On information and belief, the sale in the Motion was not advertised in any publication or on any website.

4

18.     Craigslist.com, Facebook.com, Zillow.com all offer free listings for real estate for sale.  On information and belief, no listing for the Property was placed by the Trustee on any of these sites.

19.     On information and belief, the Property was not listed with any realtor in Charles City.

20.     Parson's Realty, a well-known Charles City commercial realtor, was unaware of unaware of any advertising or similar promotion for the Property's sale.  See Affidavit of Connie Parson, attached hereto as Exhibit D, at ¶ 9.

21.     Apparently, the Trustee was not aware of the number of potential developers contacted by the IEDA until shortly prior to the filing of the Motion.  See attached Exhibit E.

22.     The failure to utilize any marketing tool other than a list developed by the IEDA may not have produced the highest return to the estate.  *See*, Affidavit of Connie Parson, at ¶ 7; Affidavit of Steve Binstock, at ¶ 7.

**C.     First Security should not be permitted to tell the Court (and others) that it would not bid on the Property, have the Court (and others) rely on that representation, then bid on the Property.**

23.     During the hearing on First Security's Motion to Convert this case from Chapter 11 to Chapter 11, one of the arguments advanced by counsel for First Security was that "The bank's not going to be the buyer.  It will be a third-party buyer." (*See*, Recording of November 14, 2019 hearing, at 27:09).

24.     Counsel for First Security repeated this assertion during the January 27, 2020, Section 341 meeting, and later during the tour of the Property (also on January 27, 2020) as justification for why First Security, but not the Equity Security Holders, should be permitted to

5

formulate the RFP with the IEDA.  See, Affidavit of James Gray, attached hereto as Exhibit F, at ¶ 2.

25.     The "third-party buyer" argument was a key component of First Security's argument for conversion of the case to Chapter 7, rather than dismissal as requested by the Debtor.

26.     This change of position, which is not explained by the Trustee or First Security, is remarkably consistent with sentiments expressed by members of the Board of Directors of First Security in 2018, when they voted to foreclose on the Property as a means of seizing the development for their own purposes.[4]  *See*, generally, 16 counts filed by Amelia Management, LLC against First Security Bank in *First Security Bank v. McQuillen Place Co., LLC,* Case No. EQCV031170 and others[5].

---

[4] From the Board minutes of March 8, 2018:

[*Board member Gene Hall:*]

> I absolutely agree that if the bank finishes the project, [I] agree it will be a public relations windfall for the bank.  I don't think anyone has any faith in Charlie right now.  If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. ….

[*Board member J. Richard Herbrechtsmeyer:*]

> I can assure you one thing, Directors will pay to have McQuillen removed. [….]

> [….] PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it.  We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both.  [….]

[*Board member Hall:*]

> Charlie can't finish it and Charlie can't run it.  I think it would be a public relations windfall and the sooner the better.

[5] See also: 16 counts filed by Amelia Trust against First Security Bank in *First Security Bank v. McQuillen Place Co., LLC*, Case No. EQCV031170; 16 counts filed by Charles M. Thomson against First Security Bank in *First Security Bank v. McQuillen Place Co., LLC*, Case No. EQCV031170; 18 counts against First Security Bank filed by Amelia Management, LLC in *First Security Bank v. Amelia Management, LLC*, Case No. EQCV031407; 18 counts against First Security Bank filed by Charles M. Thomson in *First Security Bank v. Amelia Management, LLC*, Case No. EQCV031407; 18 counts against First Security Bank filed by Umbrella Realty, LLC in *First Security Bank v. Umbrella Realty, LLC*, Case No. EQCV031404; 18 counts against First Security Bank filed by Charles M. Thomson in *First Security Bank v. Umbrella Realty, LLC*, Case No. EQCV031404; 18 counts against First Security Bank filed

27.     First Security's change of position on whether it would bid on the Property or not

creates, at a minimum, an appearance of impropriety which should not be sanctioned by this Court

by granting approval of the Motion.

### D.     Having a §363 sale move forward in the midst of a National Emergency is contrary to the public policy expressed in both the Bankruptcy Code and Governor Reynold's directives.

28.     One of the long-standing public policy objectives of the Bankruptcy Code has been

the maximization of assets of the debtor for the benefit of creditors. *See*, *In re Big Rivers Electric*

*Corp.*, 233 B.R. 726, 734 (Bankr.W.D.Ky.1998), and cases cited therein.

29.     Concomitantly, one of the tools of the Bankruptcy Code for maximizing assets is

the orderly liquidation of assets. *Lynd v. Ries (In re Genmar Holdings, Inc.)*, 490 B.R. 833, 836

(B.A.P. 8th Cir.2013), citing *In re Lang*, 398 B.R. 1, 4 (Bankr. N.D. Iowa 2008).

30.     A "fire sale" -- the desperate sale of goods into a market swamped with sellers -- is

one of the evils long sought be avoided by applying the tools of the Bankruptcy Code. *See, e.g.,*

*Salven v. Munday (In re Kemmer), 265 B.R. 224, 235 (Bankr.E.D.Cal.2001), and* Lynn M. LoPucki

and Joseph W. Doherty*, Bankruptcy Fire Sales*, 106 Mich. L. Rev. 1, 37 (2007) (in the context of

corporate asset liquidations).

31.     The United States generally and Iowa in particular are in the midst of

unprecedented social and economic turmoil as the result of a virus pandemic.

---

by Amelia Management, LLC in *First Security Bank v. Amelia Management, LLC*, Case No. EQCV031406; 18 counts
against First Security Bank filed by Charles M. Thomson in *First Security Bank v. Amelia Management, LLC*, Case
No. EQCV031406; 18 counts against First Security Bank filed by Amelia Management, LLC in *First Security Bank
v. Amelia Management, LLC*, Case No. EQCV031405; and 18 counts against First Security Bank filed by Charles M.
Thomson in *First Security Bank v. Amelia Management, LLC*, Case No. EQCV031405.

32.    One of the consequences of the turmoil has been disruption of the credit markets to the point of paralysis.  *See,* Affidavit of Connie Parson, at  ¶ 10; Affidavit of Steven Binstock, at ¶ 8, Affidavit of Gray at ¶3.

33.    Certain asset classes are in free-fall, as buyers are reluctant to make purchases given the uncertainty of future market conditions.  See, Affidavit of Steven Binstock, at ¶ 8.

34.    In response to the situation, Kim Reynolds, Governor of Iowa, has directed a cessation of foreclosures, to wit:

> *Pursuant to Iowa Code §§ 29C.6(6) and 135.144(3), and in conjunction with the Iowa Department of Public Health, I temporarily suspend the regulatory provisions of Iowa Code chapters 646, 654, 655A, and 656 allowing for the commencement of foreclosure proceedings, or the prosecution of ongoing foreclosure proceedings, on residential, commercial, and agricultural real property located in the state of Iowa. Suspension of these provisions shall apply during the duration of this Proclamation or any future extension of this suspension.*
>
> A.    *Nothing in this section shall be construed as relieving any individual of their obligation to make mortgage payments, or to comply with any other obligation that an individual may have under a mortgage.*
>
> B.    *The Iowa Division of Banking and the Iowa Division of Credit Unions are hereby directed to immediately engage with banks, credit unions, mortgage bankers, and mortgage services to identify any tools, means, or methods that could be used to relieve Iowans from the threat of foreclosure.*

*Proclamation of Disaster Emergency*, Kimberly K. Reynolds, Governor of Iowa, March 22, 2020, Section 2 (attached hereto as Exhibit G).

35.    A sale under 11 U.S.C. 363 is in many respects a Federal form of a foreclosure sale.

36.    The same policy concerns identified in the Governor's proclamation apply to all foreclosure sales at this moment, whether they are under state or Federal auspices.

8

37.     The economic uncertainty caused by the epidemic has reduced the willingness of potential bidders to make competing offers for the Property.  See, Affidavit at Binstock, at ¶8.

38.     The policy considerations which prompted the issuance of the Proclamation justify this Court withholding any ruling on the Motion until the earlier of the abatement of the crisis in the credit markets or April 30, 2020 (the current expiry of the National Emergency declared by President Trump).

### E.     The Trustee in this case has been curiously close to and reliant on the proposed bidder, meriting additional scrutiny of the Court.

39.     Counsel for First Security was copied on the initial contact between the United States Trustee's office and the Trustee. See Exhibit H.

40.     Counsel for First Security has been regularly copied or bcc'd on nearly all matters pertaining to this case which have come to the attention of the Trustee.  See, e.g., Exhibit I.

41.     Neither the Equity Security Holders nor other creditors have enjoyed such regular email intimacy with the Trustee.

42.     The Trustee sought counsel from First Security prior to selling assets of the estate in which First Security did not have any even alleged security interest.  See Exhibit J.

43.     Counsel for First Security provided the Trustee with a template used in the disposition of these unrelated assets.  See Exhibit K.

44.     First Security's counsel was closely involved with the Trustee in the writing and distribution of the RFP.  See Exhibit L.

45.     First Security's regular maintenance staff was chosen by the Trustee to oversee the Property, notwithstanding the request of the Equity Security Holders for a neutral party to fill that role. See Exhibit M.

46.    The Trustee sought advice from First Security on the value of the Property, then later omitted the email in which this advice was sought from its production of documents to the Equity Security Holders.  See Exhibit N.

47.    The Motion and most of the documents related to the Motion were drafted by counsel for First Security Bank. See Exhibit O.

48.    Counsel for the Equity Security Holders repeated asked the Trustee for an opportunity to negotiate with the Trustee concerning the sale of the Property.  See, Affidavit of Charles Thomson, at ¶ 3.

49.    When counsel for the Equity Security Holders left a message for the Trustee to repeat the request, rather than a returned telephone call, counsel for the Equity Security Holders received the following email message (Exhibit P):

> Mr. Thomson,
> I hope to have a final decision made on the bid selection process within the next week. In the interim, I have nothing further to report.
> Charles Smith

50.    The next business day, the Trustee filed the Motion.

10

**F.     Other persons wish to present competing,**
**higher bids on the Property, but have been precluded**
**from doing so due to the breakneck speed**
**for approval sought by the Trustee.**

51.     At least three persons contacted by the Equity Security Holders have expressed a desire to submit bids for higher dollar amounts, but are unable to do so due to the short amount of time permitted them under the schedule of the Trustee's Motion.  See, Affidavit of Thomson, at ¶ 3.

52.     One of these persons, BDL, was a "bidder" when proposals were being solicited for completion of the Property.

53.     Another party ("Person A"), who contacted the Equity Security Holders on Saturday, April 4, 2020, evaluated materials sent by the Equity Security Holders over the weekend.  However, late Sunday, Person A decided to pass.  Person A thought acquisition of the Property at a price higher than that named by First Security would be of interest, but declined to examine the opportunity further because of the short deadline.  This person asked to remain unnamed so as to "not offend" persons involved with the Property.

54.     Another individual ("Person B") contacted the Equity Security Holders on Monday, April 6, 2020.  Person B said the idea was "intriguing" but declined to pursue due diligence because of the short time frame and the National Emergency.

55.     Neither Person A nor Person B were aware of the changed terms offered to First Security.  Both indicated that the change in terms made the Property more attractive.

56.     It is clear from the responses to a relatively low-key marketing effort (a short email), that significant purchaser interest exists for achieving a better return for creditors than that proposed in the Motion.

Case 6:20-cv-02041-CJW-KEM   Document 12-6   Filed 07/07/20   Page 13 of 207

NOW, WHEREFORE, the Equity Security Holders respectfully request that this Court enter an order:

(a)     denying the Trustee's Motion; and

(b)     granting the Equity Security Holders such other and further relief as may be just and equitable under the circumstances.

Respectfully submitted,

All of the Equity Security Holders of the Debtor

  /s/ Charles Thomson_____
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

12

Exhibit List

Exhibit A --      Letter Of Smith
Exhibit B --      Affidavit/Declaration Of Binstock
Exhibit C --      Affidavit/Declaration Of Charles Thomson
Exhibit D --      Affidavit Of Connie Parson
Exhibit E --      Email Of Trustee Regarding RFP Recipients
Exhibit F --      Affidavit/Declaration of James Gray
Exhibit G --      Proclamation Of Governor Reynolds
Exhibit H --      Initial Email After Conversion
Exhibit I --      Email Bcc Regarding Keys
Exhibit J --      Email On Cleaners Price
Exhibit K --      Email On Cleaners Sale
Exhibit L --      Email On RFP
Exhibit M --      Letter Regarding Building Supervisor
Exhibit N --      Email Regarding Price Of Property
Exhibit O --      Email Regarding Drafting Documents
Exhibit P --      Email Response To Telephone Call

13

**EXHIBIT A --        LETTER OF SMITH**

CHARLES L. SMITH          25 MAIN PLACE, SUITE 200          TELEPHONE:
JACK E. RUESCH                                              712-325-9000
WALTER P. THOMAS          P.O. BOX 248                      FACSIMILE:
NICOLE HUGHES                                               712-328-1946
THOMAS C. DORWART, ASSOCIATE   COUNCIL BLUFFS, IOWA          www.telpnerlaw.com
JOHN A. FLATEN, ASSOCIATE                                   email@telpnerlaw.com
MAYNARD S. TELPNER, RETIRED    51502-0248
RICHARD W. PETERSON (1925-2010)                            Licensed in Iowa and Nebraska

**Telpner Peterson**
**Law Firm, LLP**

February 3, 2020

Developers with interest
in the completion of
123 N. Main Street
Charles City, IA

RE: Request for Proposals to Acquire and Complete the Housing/Commercial Space
Project Located at **123 N. Main Street, Charles City, IA**

To Whom It May Concern:

The enclosed materials shall provide the basis for application by any qualified developer
interested in submitting a competitive proposal for the ownership, completion, and
maintenance of the structure on and parcel located at 123 N. Main Street in Charles
City, IA.

The property is currently an asset of the Chapter 7 Bankruptcy of McQuillen Place
Company, LLC (hereinafter called "McQuillen Place"), pending in the United States
Bankruptcy Court for the Northern District of Iowa as Case No. 19-00507. The Chapter
7 Trustee is Charles L. Smith. Mr. Smith seeks offers for the purchase of the real estate
and related personal property.

The State of Iowa seeks a qualified developer to acquire, finish, and maintain the
property. Mr. Smith, in coordination with parties with an interest in the completion of this
project, has developed the enclosed proposal materials.

The primary purpose of the request for proposals is to locate a purchaser for the real
estate and related personal property to acquire the property through a competitive
bidding process, who will thereafter develop the property to completion.

The State of Iowa, through the Iowa Economic Development Association, Iowa
Economic Development Authority (IEDA) has set aside a maximum of $1,000,000 of
Community Development Block Grant Disaster Recovery (DR) assistance for the
completion of the residential units in the building.  DR assistance is contingent upon the
developer's agreement to the terms of affordability associated with this funding, which
include a requirement that 51% of the residential units must be leased to income
qualified persons of low-to-moderate income at a cost to lease or rent that is no higher
than the applicable rent limits.  In addition to the terms of affordability, all federal
regulations will apply to the construction project, including but not limited to: Federal
Labor Standards Davis Bacon Wages, environmental review, and federal contract
provisions.  Any developer interested in utilizing DR should contact Ann Schmid, IEDA's
Disaster Recovery Team Leader at 515-348-6202 or Ann.Schmid@iowaeda.com or

Developers Letter
February 7, 2020
Page 2

coordinate with Myrtle Nelson of the North Iowa Area Council of Governments, which will act as a project administrator for an IEDA award.  Mrs. Nelson's contact information: mnelson@niacog.org or 641-423-0491, Extension 16.

Developers will be required to provide an acquisition bid (which will be paid to the Bankruptcy Trustee), an estimate of the cost to complete construction of the residential units in the building, an estimate of the cost to complete construction of the first floor commercial units in the building, and will be responsible for ensuring occupancy of all units. Factors that will be used in selecting the successful proposal will include the acquisition bid amount, the construction estimates, and the developer's qualifications.

The mortgage holder, First Security Bank & Trust Company, Charles City, Iowa, is obtaining an "as is" assessment of the property's value.  The valuation should be completed and available by February 15, 2020.

The property is currently subject to a minimum assessment agreement that was executed by McQuillen Place as the part of an anticipated tax increment financing proposal that has not been complied with or funded. The property will be reassessed by the Floyd County, Iowa Assessor as of January 1, 2020, which will affect future real estate tax liabilities.

Developers are encouraged to seek the best available valuation data by contacting the County Assessor and/or Mark Miller at First Security Bank & Trust Company, 809 Clark Street, Charles City, Iowa, telephone (641) 228-1232.

The Bankruptcy Trustee proposes to sell of the Bankruptcy Estate's right, title and interest in the real estate and related personal property free and clear of liens and encumbrances. The purchaser of the real estate will receive a court officer's deed from the Bankruptcy Estate. The Bankruptcy Trustee reserves the right to reject all offers. Outstanding real estate taxes will be paid by the Bankruptcy Estate.

There is currently located on the real estate, a quantity of appliances and construction materials. It is presently anticipated that all of the personal property will be included as a part of the sale by the Bankruptcy Trustee. However, the identification of the personal property to be included as a part of the sale is being developed and interested purchasers must continue to consult with the Bankruptcy Trustee and any publicly available web-based postings for additional information.

A mechanic's lien has been filed by Schindler Elevator Corporation and the property will be sold free and clear of that mechanic's lien. However, the purchaser of the real estate must be prepared to complete the installation of the elevator installed in the real estate and to assure its availability to tenants of the property.

Completion of this project will significantly enhance Charles City's downtown and provide the City with much needed housing units.  Therefore, the City is prepared to

Developers Letter
February 7, 2020
Page 3

incent development through tax increment financing. All developers interested in City of
Charles City incentives must coordinate directly with the Steven T. Diers, City
Administrator, City of Charles City at 641-257-6300 or
steven.diers@cityofcharlescity.org.   Additionally, this parcel is located within a current
Opportunity Zone (census tract: 19067480400), which may allow for added investment.

Please complete the enclosed documents and submit the executed application along
with all support documentation to the following address prior to **4:00pm on Monday,
March 9, 2020**. Questions regarding the application and the application process should
be directed to Ms. Schmid: 515-348-6202 or ann.schmid@iowaeda.com

**Submit Applications To:**
Ann H. Schmid
Iowa Economic Development Authority
1963 Bell Avenue
Des Moines, IA 50315

Sincerely,

Charles L. Smith

Charles L. Smith
Chapter 7 Trustee
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51503
(712) 325-9000

**EXHIBIT B --**          **AFFIDAVIT/DECLARATION OF BINSTOCK**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

In re ) 
)
MCQUILLEN PLACE COMPANY, LLC, an )   Case No. 19-00507
Iowa limited liability company, )   Chapter 7
)
Debtor. )   Hon. Thad J. Collins
)
)

## AFFIDAVIT OF STEVE BINSTOCK

I, Steve Binstock, being duly sworn, under oath, hereby declare under penalty of perjury, that the following is true and correct, pursuant to 28 U.S.C. §1746:

1. I am owner of Binstock Development, LLC ("BDL") and Trinity Commercial Contracting.

2. I am familiar with the letter (the "RFP") dated February 10, 2020 (and Feb. 7, 2020) signed by Charles L. Smith, Trustee (the "Trustee") in In re McQuillen Place Company, LLC, Case No 19-00207 (the "Bankruptcy Case"). In response to the RFP, I submitted, through BDL, a proposal to acquire and complete certain real property located at 123 N. Main Street, Charles City, Iowa (the "Property").

3. The RFP required assembling a variety of documents, estimates, projections and similar information, and, to fulfill the stated requirements of the IEDA, the developer would need to comply with significant, detailed regulations even after completion of construction. Among these restrictions were rent and income controls on approximately one-half of the dwelling units.

4. A sale free and clear of the restrictions and regulations stated in the RFP would have been a far more attractive business proposition. In my opinion, the value of the property would have increased (and the dollar amount of my proposed bid would have increased) had the Property been offered without the restrictions stated in the RFP.

5. I was unaware that the Property was to be offered (let alone sold) to First Security Bank free and clear of the RFP's restrictions prior to being notified of this by Charles M. Thomson after the Trustee had filed a motion (the "Motion") for permission for such a sale.

6. The sale described in the Motion is a radically different business proposition than that described in the RFP. The sale described in the Motion is far more attractive for a prospective developer. I believe the failure of the Trustee to let prospective bidders know that he was willing to sell the Property free and clear of the regulations stated in the RFP chilled the bidding on the Property.

7. I am familiar with techniques used to sell and market real property. If the goal is to sell real property for the highest price, the seller should spread information about the offered property as widely as possible. If cost is a concern, there are many free or low-cost mechanisms to spread information about a property being offered for sale. Free mechanisms include listing a property on Craigslist, Facebook or Zillow, or calling local realtors to let them know the property is being offered. A "for sale" sign at the property is inexpensive and is often a good mechanism

1

for generating interest and sellers.  In my opinion, it is important to follow up on all sales leads multiple times, because a person who seems unenthusiastic at first often will warm to a property after a few friendly telephone calls or similar reminders.   In my opinion, a one-time email mailing to a limited list of leads is a poor way to market real property, if the goal is to sell the property at the highest possible price.  In my opinion, the failure to utilize any marketing tool other than a one-time mailing to an email list developed by the IEDA does not constitute a commercially reasonable effort to sell a multifamily real estate development in rural Iowa.

8.      As the owner of a business closely related to the real estate and finance markets, I closely monitor developments in the marketplace.  I am familiar with the effect that the National Emergency arising from the virus epidemic has had on both markets.  One of the consequences of the turmoil has been disruption of the credit markets to the point of paralysis. Certain asset classes are in free-fall, as buyers are reluctant to make purchases given the uncertainty of future market conditions.  In my opinion, the economic uncertainty caused by the epidemic has reduced the willingness of potential bidders to make competing offers for the Property.

Further affiant saith naught.

Steven Binstock

2

**EXHIBIT C --        AFFIDAVIT/DECLARATION OF CHARLES THOMSON**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

AFFIDAVIT OF CHARLES THOMSON

I, Charles M. Thomson, being duly sworn, under oath, hereby declare under penalty of perjury, that the following is true and correct, pursuant to 28 U.S.C. §1746:

     1.      On Friday, April 3, 2020, I sent an email to recipients of the RFP (as that term is used in the Objection).  I obtained the addresses from the Ann Schmid affidavit.  The text of the email is attached on the next page.

     2.      I received a number of responses.  No person responding had been aware of the change in terms from the RFP to the proposed sale to First Security Bank.  One person responding pursued the matter, looking at pro formas and other information until Sunday night, when that person decided to "pass" on the opportunity, due to lack of time to examine the matter.  Another person called and expressed similar reluctance to pursue the transaction, due to both the lack of time and the epidemic.  One of the persons who called said it sounded like the owners of the Debtor were "getting hosed" by the secured lender.

     3.      In telephone calls to the Trustee and in person at the January 2020 creditors' meeting, I asked the Trustee for the opportunity to negotiate with him and the bank to reach an amicable resolution of all disputes.


Further affiant saith naught.

                          __/s/_Charles Thomson_____
                          Charles Thomson

text of email:

Hi,

I'm writing because you were shown as someone who had been interested in acquiring McQuillen Place (the 33-unit apartment building in Charles City).

I wondered if you were aware that the building is now proposed to be sold under _very different conditions_ than were previously described.  Instead of requiring the purchaser to redevelop, the building is to be sold "as-is, where-is" for $1.1 million, free and clear of all liens, claims, etc.

Might you be interested in the building under these revised terms?

The reason I ask is that I was a part of the original development team, and I want to make sure the building brings a fair price.

If you're interested in further details, or want to discuss this, please either send me an email response, or give me a call on my cell phone (847-456-1911).

Sincerely,

Charley Thomson
Charles City
847-456-1911 (cell)

2

**EXHIBIT D --            AFFIDAVIT OF CONNIE PARSON**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

AFFIDAVIT OF CONNIE PARSON

I, Connie Parson, being duly sworn, under oath, hereby declare under penalty of perjury, that the following is true and correct, pursuant to 28 U.S.C. §1746:

1.      I am a Licensed Real Estate Broker in the State of Iowa.  I am a member of the National, State and Local Boards of Realtors.  I am familiar with the real estate market in Charles City, Iowa.  I have been a realtor in Charles City since 1978.

2.      I am particularly familiar with commercial realty in Charles City and Iowa generally.  I am familiar with best practices in the marketing of multifamily buildings and with distressed real estate.

3.      By "best practices," I refer to the techniques which have, over time, proven most effective in obtaining the highest price for real property.

4.      Standard practice, and a component of best practices, for marketing a multifamily building or distressed real estate would involve, at a minimum:

a.      making the general public aware of the offered property through advertising in the local newspaper, various free and paid internet sites (such as Facebook, Twitter, Craigslist, Zillow), the MLS, Realtor.com, and related media;

b.      alerting, through one mechanism or another, local realtors to the property being offered and listing the property on the regional MLS site;

c.      preparing some type of document (such as a brochure or a flyer) showing basic information about the building;

d.      contacting known interested parties and persons known to have an interest in acquiring real property of the type being offered.

5.      If cost is a consideration, the bare minimum that would qualify as standard practice would be, in my opinion, utilizing free media such as Craigslist, Facebook, Zillow and related social media.

6.      I have reviewed the letter of Charles L. Smith dated February 3 (and February 7), 2020, addressed to "Developers with interest in the completion of 123 N. Main Street, Charles City, IA" (the "Smith Letter").

7.      In my opinion the Smith Letter would only be an effective tool as solicitation for the developers it was mailed to.  I was not aware that the subject property was listed for sale with any realtor or that it was promoted or advertised in any of the above stated normal commercial

1

marketing procedures. A mass marketing effort to not only developers and builders but also to conventional and non-conventional investors may have produced higher bids for this property.

       8.    I am familiar with the Property.

       9.    I was not approached to represent the trustee in the sale of the Property. I am not aware of any advertisement by the trustee attempting to sell the Property. I was contacted by several persons interested in purchasing the Property; I did not have information from the trustee to give them, but I gave them some old information I had.

     10.    In my profession, it is necessary for me to keep informed about the state of the economy and, in particular, the state of credit markets. Due to the National Emergency related to the virus epidemic, credit markets are in a state of turmoil. All processing times at banks and government financial offices are dramatically increased. Short turn-around on loan requests is nearly impossible.

Further affiant saith naught.

_____
Connie Parson

Signed and subscribed before me this _____ day of April, 2020, by Connie Parson, first duly sworn and personally known to me.

_____
Notary public

CATHERINE E. GROESBECK
Commission Number 146921
My Commission Expires

2

**EXHIBIT E --**          **EMAIL OF TRUSTEE REGARDING RFP RECIPIENTS**

**From:** Ann Schmid <Ann.Schmid@IowaEDA.com>
**Sent:** Thursday, March 26, 2020 2:48 PM
**To:** Charles L. Smith <csmith@telpnerlaw.com>; Cathy Templeton <ctempleton@telpnerlaw.com>; Kris Franks <kfranks@telpnerlaw.com>
**Cc:** Rita Grimm <Rita.Grimm@IowaEDA.com>; Tim Waddell <Tim.Waddell@IowaEDA.com>; Leslie Leager <Leslie.Leager@IowaEDA.com>
**Subject:** Follow up from our call today

Chuck,

Attached please find three documents:

1) Memo pertaining to the proposal process
2) IEDA's Proposal Summary for CDBG-DR Funding
3) Memo prepared in 2018 for Mediation (to give further context to the situation).

Please forward these documents on to the attorneys as necessary. If additional information regarding this project is need, please don't hesitate to reach out to our office.


Memo to Charles L Smith RE Proposal P


Summary of Proposals.pdf


IEDA Memo RE McQuillen Place.pdf

**From:** Charles L. Smith <csmith@telpnerlaw.com>
**Sent:** Thursday, March 26, 2020 3:16 PM
**To:** Ann Schmid <Ann.Schmid@IowaEDA.com>; Cathy Templeton <ctempleton@telpnerlaw.com>; Kris Franks <kfranks@telpnerlaw.com>
**Cc:** Rita Grimm <Rita.Grimm@IowaEDA.com>; Tim Waddell <Tim.Waddell@IowaEDA.com>; Leslie Leager <Leslie.Leager@IowaEDA.com>
**Subject:** RE: Follow up from our call today

Thank you Ann. This is very helpful.

**From:** Charles L. Smith <csmith@telpnerlaw.com>
**Sent:** Thursday, March 26, 2020 3:22 PM
**To:** Larry S. Eide <eide@pappajohnlaw.com>; Eric Lam (elam@simmonsperrine.com) <elam@simmonsperrine.com>; Eric Langston <elangston@spmblaw.com>
**Cc:** Kris Franks <kfranks@telpnerlaw.com>; Cathy Templeton <ctempleton@telpnerlaw.com>
**Subject:** FW: Follow up from our call today

This is very helpful. I am pleased to see that the bid information went out to 2 dozen developers.
Chuck

**From:** Charles L. Smith <csmith@telpnerlaw.com>
**Sent:** Thursday, March 26, 2020 3:22 PM
**To:** Larry S. Eide <eide@pappajohnlaw.com>; Eric Lam (elam@simmonsperrine.com) <elam@simmonsperrine.com>; Eric Langston <elangston@spmblaw.com>
**Cc:** Kris Franks <kfranks@telpnerlaw.com>; Cathy Templeton <ctempleton@telpnerlaw.com>
**Subject:** FW: Follow up from our call today

This is very helpful. I am pleased to see that the bid information went out to 2 dozen developers.
Chuck

**From:** Eric Langston <elangston@spmblaw.com>
**Sent:** Thursday, March 26, 2020 6:44 PM
**To:** Charles L. Smith <csmith@telpnerlaw.com>; Larry S. Eide <eide@pappajohnlaw.com>; Eric Lam

**EXHIBIT F --**         **AFFIDAVIT/DECLARATION OF JAMES GRAY**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

AFFIDAVIT OF JAMES GRAY

I, James Gray, being duly sworn, under oath, hereby declare under penalty of perjury, that the following is true and correct, pursuant to 28 U.S.C. §1746:

1.       I am the principal of Cornice Rose International, Inc. ("C&R"). Both C&R and I are creditors in In re McQuillen Place Company, LLC, Case No. 19-00507 (the "Bankruptcy Case"). I am also an equity security holder of the debtor in the Bankruptcy Case.

2.       I was present at the Section 341 meeting of creditors (the "Meeting") held January 27, 2020, in the Bankruptcy Case. Both during the Meeting and later, during a tour of 123 North Main Street in Charles City, Iowa (the "Property"), I heard a representative of First Security Bank & Trust Co. state very plainly that the bank was not going to bid on the Property. I particularly remember the instance of this statement during the tour, since it was offered by the representative for the bank as a reason why they should be permitted to meet with the trustee and representatives of the Iowa Economic Development Authority to determine how the Property should be offered for sale.

3.       Since much of my business is related to both real estate and financing, I carefully monitor the conditions in the real estate market and the money markets each day. I am familiar with the reaction of these markets to the National Emergency related to the viral epidemic. Real estate markets are extremely unsettled, with many prospective buyers delaying purchases, and many lenders declining to advance funds until conditions become less chaotic.

Further affiant saith naught.

_____
James A. Gray

1

**EXHIBIT G --**        **PROCLAMATION OF GOVERNOR REYNOLDS**



## State of Iowa

### Executive Department

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF IOWA

## PROCLAMATION OF DISASTER EMERGENCY

**WHEREAS**, the World Health Organization has reported an outbreak of thousands of cases of Novel Coronavirus 2019 (COVID-19) in multiple countries, causing illness and deaths; and

**WHEREAS**, on January 31, 2020, the United States Department of Health and Human Services declared a national public health emergency; and

**WHEREAS**, on March 9, 2020, a Proclamation of Disaster Emergency was issued to coordinate the State of Iowa's response to this outbreak and such disaster continues to exist; and

**WHEREAS**, on March 11, 2020 the World Health Organization declared the COVID-19 outbreak a global pandemic; and

**WHEREAS**, on March 13, 2020, President Donald J. Trump issued a proclamation declaring that the COVID-19 outbreak in the United States constitutes a national emergency; and

**WHEREAS**, on March 17, 2020, a Proclamation of Public Health Disaster Emergency was issued to provide additional needed resources and measures to respond to this disaster, and such public health disaster continues to exist; and

**WHEREAS,** the risk of transmission of COVID-19 may be substantially reduced by community containment strategies that may include temporarily closing certain public establishments; and

**WHEREAS**, the Department of Housing and Urban Development and the Federal Housing Finance Authority are taking action to temporarily suspend foreclosures and evictions within their jurisdiction; and strict compliance with the regulatory provisions of Iowa Code chapters 646, 654, 655A, and 656 allowing for the commencement and prosecution of foreclosure proceedings under certain circumstances would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and reduction of foreclosures will help prevent the transmission of infectious disease and help ensure that cases of COVID-19 are controlled and treated; and

**WHEREAS**, strict compliance with the provision of Iowa law regarding initial licensure for the practice of medicine and surgery, osteopathic medicine and surgery, nursing, respiratory care, and practice as a physician assistant would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state.

**WHEREAS**, strict compliance with the provisions of Iowa law which prohibit the practice of pharmacy with an inactive or lapsed license or a pharmacy technician who has not been able to be certified because of a closed testing location would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state.

**WHEREAS**, strict compliance with the provisions of Iowa law requiring in-person continuing education as a condition of professional license renewal or impose continuing education deadlines or requirements that are unable to be satisfied due to this Disaster

Emergency would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state and reduction in the need for in-person continuing education will help prevent the transmission of infectious disease and help ensure that cases of COVID-19 are controlled and treated; and

WHEREAS, strict compliance with the provisions of Iowa law requiring renewal of a processional license upon its expiration during this public health disaster would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa law requiring completion of clinical, practical, or internship experience as a condition of obtaining professional licensure to be a school administrator, mental health counselor, independent social worker, psychologist, pharmacist, or speech pathologist or audiologist would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa law requiring the completion of background checks for initial applicants as a condition of obtaining professional licensure would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state and reduction in the need for fingerprinting by local law enforcement will help prevent the transmission of infectious disease and help ensure that cases of COVID-19 are controlled and treated; and

WHEREAS, strict compliance with the provisions of Iowa law setting an application expiration date and deadline for taking certain examinations to be licensed as a professional engineer or land surveyor would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa law establishing examination deadlines for appraisers would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa law establishing an 18-month examination deadline as a condition for initial licensure for prospective certified public accountant would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa law requiring an applicant for a nursing license to complete an examination within ninety-one days of board authorization would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa law requiring an applicant for a pharmacist license to complete all components in Iowa within a period of one year from the date the candidate passed the initial component would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa Code § 206.5(2)(a) solely as it applies to commercial applicators, public applicators, and private applicators who were certified applicators as of December 31, 2019, would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa Admin. Code r. 645-280.2 and 645-31.18, requiring out-of-state marital, family therapy, and mental health counselors, or social workers who provide services by telephone or other electronic means to individuals in the State of Iowa to be licensed in Iowa would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa Code § 9B.6 requiring personal appearance for notarial acts would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

WHEREAS, strict compliance with the provisions of Iowa Code §§ 144B.3, 633.279, and 633B.105 requiring personal presence for certain acts would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

**WHEREAS**, strict compliance with the provisions Iowa Admin. Code r. 281-21.31 requiring instructional courses for drinking drivers to be delivered in person rather than online would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state; and

**WHEREAS**, strict compliance with the provisions of Iowa Admin. Code r. 661-221.3, that require an unattended fueling dispenser to provide a public phone would prevent, hinder, or delay necessary action in coping with this disaster in all counties of our state.

**NOW THEREFORE, I, KIMBERLY K. REYNOLDS**, Governor of the State of Iowa, by the power and authority vested in me by the Iowa Constitution, Art. IV, §§ 1, 8 and Iowa Code §§ 29C.6(1), 135.140(6), and 135.144 do hereby proclaim a **STATE OF PUBLIC HEALTH DISASTER EMERGENCY** continues to exist throughout the entire state of Iowa and do hereby **ORDER** and **DIRECT** the following:

### ADDITIONAL CLOSURES OF CERTAIN ESTABLISHMENTS

**SECTION ONE.** Pursuant to Iowa Code § 135.144 (3), and in conjunction with the Iowa Department of Public Health, unless otherwise modified by subsequent proclamation or order of the Iowa Department of Public Health, I hereby order that effective 10:00 p.m., March 22, 2020, and continuing until 11:59 p.m. on March 31, 2020:

    A. **Salons**, including all establishments providing the services of cosmetology, electrology, esthetics, nail technology, manicuring, and pedicuring, all as defined in - Iowa Code § 157.1.

    B. **Medical spas**, as defined in Iowa Admin Code § 653-13.8(1).

    C. **Barbershops**, as defined Iowa Code § 158.1.

    D. **Tattoo establishments**, as regulated by Iowa Code § 135.37.

    E. **Tanning facilities**, as defined by Iowa Code § 136D.2(5).

    F. **Massage therapy establishments**, where an individual is practicing massage therapy as defined by Iowa Code § 152C.1(3).

    G. **Swimming pools** and spas, wading pools, water slides, wave pools, spray pads, and bath houses, as defined in Iowa Code § 135I.1, if the pool did not already close under the previous order as an aquatic center.

### SUSPENSION OF FORECLOSURES

**SECTION TWO.** Pursuant to Iowa Code §§ 29C.6(6) and 135.144(3), and in conjunction with the Iowa Department of Public Health, I temporarily suspend the regulatory provisions of Iowa Code chapters 646, 654, 655A, and 656 allowing for the commencement of foreclosure proceedings, or the prosecution of ongoing foreclosure proceedings, on residential, commercial, and agricultural real property located in the state of Iowa. Suspension of these provisions shall apply during the duration of this Proclamation or any future extension of this suspension.

    A. Nothing in this section shall be construed as relieving any individual of their obligation to make mortgage payments, or to comply with any other obligation that an individual may have under a mortgage.

    B. The Iowa Division of Banking and the Iowa Division of Credit Unions are hereby directed to immediately engage with banks, credit unions, mortgage bankers, and mortgage services to identify any tools, means, or methods that could be used to relieve Iowans from the threat of foreclosure.

## PROFESSIONAL LICENSING RELIEF

**SECTION THREE.** Pursuant to Iowa Code § 29C.6(6) and Iowa Code § 135.144(3), and in conjunction with the Iowa Department of Public Health, I temporarily suspend the regulatory provisions of Iowa Code chapters §§ 147.2, 148.3, 148.5, 148C.3, 152.7, 152B.7A, and any other implementing administrative rules to the extent they prohibit the practice of medicine and surgery, osteopathic medicine and surgery, nursing, respiratory care, and practice as a physician assistant for an individual who has not yet obtained an initial license, if the licensing board determines that the individual has completed sufficient education and should be granted an emergency license to practice in accordance with any guidance issued by the board. I hereby direct all regulatory agencies or boards governed by these provisions to provide additional guidance to licensees regarding the effect of these suspensions.

**SECTION FOUR.** Pursuant to Iowa Code § 29C.6(6) and Iowa Code § 135.144(3), and in conjunction with the Iowa Department of Public Health, I temporarily suspend the regulatory provisions of Iowa Code § 47.10 and Iowa Admin. Code r. 657-2.3, 2.11(2), 3.5(1), and any other implementing administrative rules which prohibit the practice of pharmacy by a pharmacist licensee whose license is inactive or lapsed, or by a pharmacy technician trainee who is unable to become nationally certified due to closed testing locations. Suspension of these provisions is limited to pharmacist licenses which have lapsed or expired within the five (5) years prior to this Proclamation, and is limited to pharmacy technician trainees whose trainee registration expires between March 18, 2020, and May 31, 2020, and who are unable to sit for the examination due to closed testing locations, and is solely for the duration of this Proclamation.

**SECTION FIVE.** Pursuant to Iowa Code § 29C.6(6) and Iowa Code § 135.144(3), and in conjunction with the Iowa Department of Public Health, I temporarily suspend the regulatory provisions of Iowa Code chapters 80A, 88A, 88B, 89, 89A, 90A, 91C, 99D, 99F, 100C, 100D, 101A, 103, 105, 124, 126, 135, 136B, 136C, 147, 147A, 147B, 148, 148A, 148B, 148C, 148E, 148F, 149, 151, 152, 152A, 152B, 152C, 152D, 153, 154, 154A, 154B, 154C, 154D, 154E, 154F, 155, 155A, 156, 157, 158, 159, 169, 192, 206, 272, 272C, 321, 441, 455B, 459B, 481A, 502, 522B, 535B, 542, 542B, 543B, 543D, 544A, 544B, 544C, and any provisions of the Iowa Administrative Code implementing those chapters, to the extent they impose requirements for in-person continuing education as a condition of professional license renewal or impose continuing education deadlines or requirements that are unable to be satisfied due to this Disaster Emergency. Suspension of these provisions shall extend through the duration of this Proclamation and any future extension of this suspension. I hereby direct all regulatory agencies or boards governed by these provisions to provide additional guidance to licensees regarding the effect of these suspensions.

**SECTION SIX.** Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Code chapters 80A, 88A, 88B, 89, 89A, 90A, 91C, 99D, 99F, 100C, 100D, 101A, 103, 105, 124, 126, 135, 136B, 136C, 147, 147A, 147B, 148, 148A, 148B, 148C, 148E, 148F, 149, 151, 152, 152A, 152B, 152C, 152D, 153, 154, 154A, 154B, 154C, 154D, 154E, 154F, 155, 155A, 156, 157, 158, 159, 169, 192, 272, 272C, 321, 441, 455B, 459B, 481A, 502, 522B, 535B, 542, 542B, 543B, 543D, 544A, 544B, 544C, and any provisions of the Iowa Administrative Code implementing those chapters, to the extent they set an expiration date or renewal requirement for a professional license that expires during the duration of this Proclamation. Suspension of these provisions shall extend through the duration of this Proclamation and any future extension of this suspension. I hereby direct all regulatory agencies or boards governed by these provisions to provide additional guidance to licensees regarding the effect of these suspensions.

**SECTION SEVEN.** Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Admin. Code r 281-79.16(4)(a), 645-31.6(2)(b)(12), 645-280.6(3), 645-240.6(2), 657-4.3, 645-300.3(4)(b)(2), 300.6(3)(a), and 300.6(3)(d), requiring the completion of clinical, practical, or internship experience as a condition of obtaining professional licensure to be a school administrator, mental health counselor, independent social worker, psychologist, pharmacist, or speech pathologist or audiologist. Suspension of these provisions shall extend through the duration of this Proclamation and any future extension of this suspension. I hereby direct all regulatory agencies or boards governed by these provisions to provide additional guidance to licensees regarding the effect of these suspensions.

**SECTION EIGHT.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa  Code §§ 272.2(17), 272C.3(1)(a), 543B.15(9), and 543D.22, and any provisions of the Iowa Administrative Code implementing those provisions, which require the completion of background checks for initial applicants as a condition of obtaining professional licensure. Suspension of these provisions shall apply during the duration of this Proclamation and any future extension of this suspension. I hereby direct all regulatory agencies or boards governed by these provisions to, upon the expiration of this Disaster Emergency, conduct background checks for those applicants and take any necessary action resulting from completion of those checks, up to and including revocation of licensure.

**SECTION NINE.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Code § 542B.13 and Iowa Admin. Code r. 193C-3.1(1) and 193C-3.2, setting an application expiration date and deadline for taking certain examinations to be licensed as a professional engineer or land surveyor.

**SECTION TEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Code § 543D.8 and Iowa Admin. Code r 193F-3.2, 193F-5.3, and 193F-6.3 and any other implementing administrative rules establishing examination deadlines as a condition of initial licensure for appraisers.

**SECTION ELEVEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Code § 542.5 and Iowa Admin. Code r 193A-3.6(1) and any other implementing administrative rules establishing an 18-month examination deadline as a condition for initial licensure for prospective certified public accountants.

**SECTION TWELVE.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Admin. Code r. 655-3.4(4) requiring an applicant for a nursing license to complete an examination within ninety-one days of board authorization.

**SECTION THIRTEEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Admin. Code r. 657-2.4(2) requiring an applicant for a pharmacist license to complete all components in Iowa within a period of one year from the date the candidate passed the initial component.

**SECTION FOURTEEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Code § 206.5(2)(a) solely as it applies to commercial applicators, public applicators, and private applicators who were certified applicators as of December 31, 2019.

**SECTION FIFTEEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Admin. Code r. 645-280.2 and 645-31.18, to the extent that they require out-of-state marital, family therapy, and mental health counselors, or social workers who provide services by telephone or other electronic means to individuals in the State of Iowa to be licensed in Iowa.

## REMOTE NOTARIZATION AND WITNESSING

**SECTION SIXTEEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the personal appearance requirement in Iowa Code § 9B.6, but only to the extent that the notarial act complies with the requirements of section 6 of 2019 Iowa Acts chapter 44 (Senate File 475) and any additional guidance provided by the Iowa Secretary of State regarding approved communication technology.

**SECTION SEVENTEEN.**  Pursuant to Iowa Code § 29C.6(6) and Iowa Code § 135.144(3), and in conjunction with the Iowa Department of Public Health, I temporarily suspend the regulatory provisions of Iowa Code §§ 144B.3, 633.279, and 633B.105, to the extent that they require the physical presence of a testator, settlor, principal, witness, or other person, if the person is present in a manner in which the witness or other person can see and hear the acts by electronic means, such as video conference, Skype, Facetime, Zoom, or other means, whether or not recorded.

## OTHER REGULATORY RELIEF

**SECTION EIGHTEEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Admin. Code r. 281-21.31 to the extent it requires instructional courses for drinking drivers to be delivered in person rather than online.

**SECTION NINETEEN.**  Pursuant to Iowa Code § 29C.6(6), I temporarily suspend the regulatory provisions of Iowa Admin. Code r. 661-221.3, that require an unattended fueling dispenser to provide a public phone.

## IMPLEMENTATION AND INTERPRETATION

**SECTION TWENTY.**  The Iowa Department of Public Safety, Iowa Department of Public Health, Iowa Department of Education, Iowa Department of Homeland Security and Emergency Management, Iowa Department of Transportation, and other participating state agencies are hereby directed to monitor the operation and implementation of this proclamation to assure the public's health and safety.

**SECTION TWENTY-ONE.**  Nothing contained in this declaration shall be construed as an exemption from any other portion of the Iowa Code or Iowa Administrative Code not specifically identified in this proclamation.

**SECTION TWENTY-TWO.**  The provisions of this proclamation shall be effective immediately, unless otherwise noted. This proclamation shall not be construed to otherwise modify the proclamations issued on March 17, 2020 or March 19, 2020. This state of public health disaster emergency shall continue to expire on April 16, 2020, at 11:59 p.m., unless sooner terminated or extended in writing by me.



**IN TESTIMONY WHEREOF**, I HAVE
HEREUNTO SUBSCRIBED MY NAME AND
CAUSED THE GREAT SEAL OF THE STATE
OF IOWA TO BE AFFIXED AT DES MOINES,
IOWA THIS 27 DAY OF MARCH IN THE
YEAR OF OUR LORD TWO THOUSAND
TWENTY.

KIMBERLY K. REYNOLDS
GOVERNOR

**ATTEST:**

PAUL D. PATE
SECRETARY OF STATE

**EXHIBIT H --**        **INITIAL EMAIL AFTER CONVERSION**

**Larry Eide**

| | |
|---|---|
| **From:** | Larry S. Eide <eide@pappajohnlaw.com> |
| **Sent:** | Friday, December 06, 2019 2:09 PM |
| **To:** | 'Cline, Jennifer (USTP)'; 'csmith@telpnerlaw.com' |
| **Cc:** | 'Reasoner, Janet (USTP)'; 'Zubal, Ashley (USTP)' |
| **Subject:** | RE: McQuillen Place 19-507M |

Debtor is an LLC. I represent bank that has mortgage on principal asset, an uncompleted building in downtown Charles City. Debtor has filed numerous counterclaims to the pre-petition foreclosure action. Bank believes that all are without merit. Bank is willing to purchase the counterclaims.

Bank also believes that the project has value and that there are buyers. Bank is willing to assist in locating a buyer and would be willing to permit a portion of the sales proceeds to go to the unsecured creditors.

Bank will be the largest unsecured creditor so we would need to discuss.

Another member is a Chicago architect. He claims a large unpaid bill. The bank would likely dispute that is another issue.

Debtor's principal (Charles Thomson) is an Iowa licensed lawyer whose office is in Chicago. He has a home in Charles City.

Debtor owns other LLC, which also guaranteed the debt. Debtor also guaranteed. Those counterclaims are not estate property and those claims will continue.


**From:** Cline, Jennifer (USTP) <Jennifer.L.Cline@usdoj.gov>
**Sent:** Friday, December 06, 2019 1:28 PM
**To:** 'csmith@telpnerlaw.com' <csmith@telpnerlaw.com>
**Cc:** eide@pappajohnlaw.com; Reasoner, Janet (USTP) <Janet.G.Reasoner@usdoj.gov>; Zubal, Ashley (USTP) <Ashley.Zubal@usdoj.gov>
**Subject:** McQuillen Place 19-507M

Chuck,

Larry Eide called to tell me that the court will be entering an order to convert this chapter 11 to chapter 7 on Monday. This is a Mason City case. Larry is the bank's attorney and Dave is retiring so he won't want to take it. Would you be willing to serve as chapter 7 trustee? Please feel free to talk to Larry Eide about the case and let me know. Thank you.

SBT-1



*Jennifer Cline*
Paralegal Specialist
Office of U.S. Trustee
319-364-2211 ext 226

**SBT-2**

**Larry Eide**

| | |
|---|---|
| **From:** | Larry S. Eide <eide@pappajohnlaw.com> |
| **Sent:** | Tuesday, December 10, 2019 10:54 AM |
| **To:** | Charles L. Smith (csmith@telpnerlaw.com) |
| **Subject:** | McQuillen |
| **Attachments:** | 112 Notice of Chapter 7 case.pdf; 111 Notice of appointment of trustee.pdf; 109 Memorandum and Order.pdf |

Welcome. I present First Security Bank. The bank filed a mortgage foreclosure action against the Charles City property. On the day of a hearing for appointment of receiver this case was filed.

LLC principal owner is Charles Thomson, an Iowa licensed lawyer who practices in Chicago. The other owner is James Gray. He is the architect of the project.

Construction halted in late 2017 when the debtor ran out of money.

The bank will advance any funds required for heat, insurance, etc. at your request.

The bank will buy the counterclaims asserted against it in the foreclosure action.

Cedar Rapids Bank & Trust is represented by Joe Schmall. CRBT was the original mortgage holder (FSB was a 90% participant in the loan and later CRBT gave up its 10% to FSB). Debtor filed CC against CRBT. I believe that CRBT will buy the CC.

The bank will assist in locating a buyer for the real estate and will allow some of the proceeds to be retained by the debtor.

The bank will likely be a substantial unsecured creditor in the case.

The debtor operates a dry cleaning business on property rented by the debtor. The landlord is Amelia Management Company LLC, an LLC also owned by Charles Thomson. I do not believe that any dry cleaning is done at the property and that it is a drop off location only. The bank has filed a foreclosure action against that LLC and will seek a receiver.

What more do you want to know?

1

**EXHIBIT I --**        **EMAIL BCC REGARDING KEYS**

## Larry Eide

| | |
|---|---|
| **From:** | Charles L. Smith <csmith@telpnerlaw.com> |
| **Sent:** | Tuesday, December 24, 2019 1:29 PM |
| **To:** | eide@pappajohnlaw.com |
| **Subject:** | RE: McQuillen adversaries |

Larry,
I haven't had time to review the adversaries yet. But don't worry I won't file a motion for default without first alerting you.
Chuck

 **Telpner Peterson Law Firm, LLP**

Charles L. Smith
Attorney at Law
25 Main Place, Suite 200
P.O. Box 248
Council Bluffs, IA 51502-0248
Telephone: (712) 325-9000
Facsimile: (712) 328-1946
Email: csmith@telpnerlaw.com
Website: www.telpnerlaw.com

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

**From:** Larry S. Eide [mailto:eide@pappajohnlaw.com]
**Sent:** Tuesday, December 24, 2019 9:33 AM
**To:** Charles L. Smith
**Subject:** McQuillen adversaries

Shortly before the hearing on the motion to convert or dismiss, the debtor filed 2 adversaries, one against the bank and the other against 3 directors. I do not believe that they were ever served and there are no proofs of service on the dockets. If not served they will be dismissed. I do not want to appear so as to preserve the cases. Adv No. 19-9036 v. directors and 19-9035 v. bank. Please do not default the defendants. I will answer if you desire.

 TPBT-503

## Larry Eide

| | |
|---|---|
| **From:** | Charles L. Smith <csmith@telpnerlaw.com> |
| **Sent:** | Friday, January 31, 2020 2:48 PM |
| **To:** | Larry S. Eide |
| **Subject:** | FW: McQuillen |

**From:** Charles L. Smith
**Sent:** Friday, January 31, 2020 2:47 PM
**To:** cthomson@doall.com
**Cc:** Donald Molstad (mlawfirm@yahoo.com) <mlawfirm@yahoo.com>; steven.diers@cityofcharlescity.org; Cathy Templeton <ctempleton@telpnerlaw.com>
**Subject:** McQuillen

Mr. Thomson,
I need access to a mechanical room by the north stairwell. It has a fairly expensive lock. Please give a copy of that key to the City Administrator.
Thank you.

 **Telpner Peterson Law Firm, LLP**

Charles L. Smith
Attorney at Law
25 Main Place, Suite 200
P.O. Box 248
Council Bluffs, IA 51502-0248
Telephone: (712) 325-9000
Facsimile: (712) 328-1946
Email: csmith@telpnerlaw.com
Website: www.telpnerlaw.com

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

 SBT-538

## Larry Eide

| | |
|---|---|
| **From:** | Cathy Templeton <ctempleton@telpnerlaw.com> |
| **Sent:** | Thursday, January 30, 2020 1:39 PM |
| **To:** | ann.schmid@iowaeda.com |
| **Cc:** | Charles L. Smith; Kris Franks; Larry S. Eide (eide@pappajohnlaw.com) |
| **Subject:** | McQuillen Place, Bankruptcy No. 19-00507 |
| **Attachments:** | 013020 Schmid Ltr.pdf |

Please see attached letter from Charles Smith, Trustee.

 Telpner Peterson
Law Firm, LLP

Cathy Templeton
Legal Assistant
25 Main Place, Suite 200
Council Bluffs, IA  51503
Telephone:  (712) 325-9000
Facsimile:  (712) 328-1946
Email:  ctempleton@telpnerlaw.com
Website:  www.telpnerlaw.com

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

USBT-539



**Telpner Peterson Law Firm, LLP**

CHARLES L. SMITH
JACK E. RUESCH
WALTER P. THOMAS
NICOLE HUGHES
THOMAS C. DORWART, Associate
MAYNARD S. TELPNER, Retired
RICHARD W. PETERSON (1925-2010)

25 MAIN PLACE, SUITE 200

P.O. BOX 248

COUNCIL BLUFFS, IOWA

51502-0248

TELEPHONE:
712-325-9000
FACSIMILE:
712-328-1946
www.telpnerlaw.com
email@telpnerlaw.com

Licensed in Iowa and Nebraska

January 30, 2020

**VIA EMAIL:** ann.schmid@iowaeda.com
Ann Schmid
Iowa Economic Development Authority
200 East Grand Avenue
Des Moines, IA 50309

RE: McQuillen Place, Bankruptcy No. 19-00507

Dear Ann:

Listed below are the five individuals who had contacted me in regard to their interest in McQuillen Place.

Galeb Pritzler, 515-306-7512
Jeff Tierney, 641-425-7317
Brent Dawson, 319-505-3609
Jeff Hassman, 319-610-7492, jhassman@cvpadvisors.com
Mark Holtkamp, 319-594-1062

Please let them know that they should be in contact with your office.

Sincerely,

Charles L. Smith
csmith@telpnerlaw.com

CLS/ct
cc: Larry Eide (via email)

49

ISBT-540

**Larry Eide**

| | |
|---|---|
| **From:** | Charles L. Smith <csmith@telpnerlaw.com> |
| **Sent:** | Friday, January 31, 2020 3:08 PM |
| **To:** | Larry S. Eide |
| **Subject:** | FW: McQuillen |

**From:** Charles L. Smith
**Sent:** Friday, January 31, 2020 3:07 PM
**To:** Thomson, Charles <cthomson@doall.com>
**Cc:** Donald Molstad (mlawfirm@yahoo.com) <mlawfirm@yahoo.com>; steven.diers@cityofcharlescity.org; Cathy
Templeton <ctempleton@telpnerlaw.com>
**Subject:** RE: McQuillen

No, it's the room where the main water comes in. Steve Diers may not have a copy of the master key or the one for this
specific room. So I would ask that you get one to him.
Thanks.

**From:** Thomson, Charles <cthomson@doall.com>
**Sent:** Friday, January 31, 2020 2:59 PM
**To:** Charles L. Smith <csmith@telpnerlaw.com>
**Cc:** Donald Molstad (mlawfirm@yahoo.com) <mlawfirm@yahoo.com>; steven.diers@cityofcharlescity.org; Cathy
Templeton <ctempleton@telpnerlaw.com>
**Subject:** RE: McQuillen

The master key I showed you on Monday should work on that. Is it not working?

Also, I thought that room was open. Is this the room with the electrical panels?

-- Charles Thomson

**From:** Charles L. Smith <csmith@telpnerlaw.com>
**Sent:** Friday, January 31, 2020 2:47 PM
**To:** Thomson, Charles <cthomson@doall.com>
**Cc:** Donald Molstad (mlawfirm@yahoo.com) <mlawfirm@yahoo.com>; steven.diers@cityofcharlescity.org; Cathy
Templeton <ctempleton@telpnerlaw.com>
**Subject:** McQuillen

Mr. Thomson,
I need access to a mechanical room by the north stairwell. It has a fairly expensive lock. Please give a copy of that key to
the City Administrator.
Thank you.

SBT-541

 Telpner Peterson
Law Firm, LLP

Charles L. Smith
Attorney at Law
25 Main Place, Suite 200
P.O. Box 248
Council Bluffs, IA 51502-0248
Telephone: (712) 325-9000
Facsimile: (712) 328-1946
Email: csmith@telpnerlaw.com
Website: www.telpnerlaw.com

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

## Larry Eide

| | |
|---|---|
| **From:** | Larry S. Eide <eide@pappajohnlaw.com> |
| **Sent:** | Friday, January 31, 2020 3:30 PM |
| **To:** | 'Charles L. Smith' |
| **Subject:** | RE: McQuillen |
| **Attachments:** | Proposal Cover Letter-LSE revisions.docx |

See attached

**From:** Charles L. Smith <csmith@telpnerlaw.com>
**Sent:** Friday, January 31, 2020 3:08 PM
**To:** Larry S. Eide <eide@pappajohnlaw.com>
**Subject:** FW: McQuillen

**From:** Charles L. Smith
**Sent:** Friday, January 31, 2020 3:07 PM
**To:** Thomson, Charles <cthomson@doall.com>
**Cc:** Donald Molstad (mlawfirm@yahoo.com) <mlawfirm@yahoo.com>; steven.diers@cityofcharlescity.org; Cathy
Templeton <ctempleton@telpnerlaw.com>
**Subject:** RE: McQuillen

No, it's the room where the main water comes in. Steve Diers may not have a copy of the master key or the one for this
specific room. So I would ask that you get one to him.
Thanks.

**From:** Thomson, Charles <cthomson@doall.com>
**Sent:** Friday, January 31, 2020 2:59 PM
**To:** Charles L. Smith <csmith@telpnerlaw.com>
**Cc:** Donald Molstad (mlawfirm@yahoo.com) <mlawfirm@yahoo.com>; steven.diers@cityofcharlescity.org; Cathy
Templeton <ctempleton@telpnerlaw.com>
**Subject:** RE: McQuillen

The master key I showed you on Monday should work on that. Is it not working?

Also, I thought that room was open. Is this the room with the electrical panels?

-- Charles Thomson

**From:** Charles L. Smith <csmith@telpnerlaw.com>
**Sent:** Friday, January 31, 2020 2:47 PM
**To:** Thomson, Charles <cthomson@doall.com>
**Cc:** Donald Molstad (mlawfirm@yahoo.com) <mlawfirm@yahoo.com>; steven.diers@cityofcharlescity.org; Cathy
Templeton <ctempleton@telpnerlaw.com>
**Subject:** McQuillen

Mr. Thomson,

1

**EXHIBIT J --**          **EMAIL ON CLEANERS PRICE**

To: Charles L. Smith <csmith@telpnerlaw.com>
Subject: RE: McQuillen Place Bankruptcy
See the attached email that I sent yesterday to Don and Charles (he has authorized direct contact with him which I have declined up to that email).
From: Charles L. Smith <csmith@telpnerlaw.com>
Sent: Wednesday, January 08, 2020 1:39 PM
To: Thomson, Charles <cthomson@doall.com>; Kris Franks <kfranks@telpnerlaw.com>
Cc: mlawfirm@yahoo.com; 'eide@pappajohnlaw.com' <eide@pappajohnlaw.com>; Cathy Templeton <ctempleton@telpnerlaw.com>
Subject: RE: McQuillen Place Bankruptcy
Mr. Thomson, yes you have my permission to accommodate Mrs. Vickers.
Don, please contact me so that we can further discuss the offer and counter-offer on the cleaners. What is your best estimate as to the value of the accounts receivables?

**1/10/20, Larry Eide:** He now agrees that the cleaners could be sold to Charley for $750 – lock, stock and barrel. We tried to get Molstad on the line and he is supposed to call us back. If Charley isn't interested in buying it, the Chamber would monitor the distribution of the clothing. If they needed to hire someone, the bank would make a contribution in that amount to the Chamber. Larry understands that I don't want to do $2,000 worth of sales tax accounting to sell the rest.

On the building, he would offer a $125,000 carve-out plus more if it sold. He would like to have the State send its top 5 list to us. Deb Durham was in Charles City recently and met with the banker and wants to see it done. Ann Schmidt will be called by Larry and then he will get back to me. He would like to have the State give me their top 5 list.

I told Larry that I would like to have the bank involved so that I am not excepting an offer that they would object to.

The Bank thinks that they will have their appraisal done in 30 days.

From: Thomson, Charles <cthomson@doall.com>
Sent: Friday, January 10, 2020 2:47 PM
To: Charles L. Smith <csmith@telpnerlaw.com>; Kris Franks <kfranks@telpnerlaw.com>
Cc: mlawfirm@yahoo.com; 'eide@pappajohnlaw.com' <eide@pappajohnlaw.com>; Cathy Templeton <ctempleton@telpnerlaw.com>
Subject: RE: McQuillen Place Bankruptcy
The total of the accounts receivable at the date of conversion was 860.11 (that's not applying checks received by the Trustee since the conversion).
The total of the apparel on the rack is approximately $1690.76 (not counting checks received since conversion and based on a quick tape from a 10-key).

From: Charles L. Smith <csmith@telpnerlaw.com>
Sent: Friday, January 10, 2020 3:02 PM
To: Thomson, Charles <cthomson@doall.com>; Kris Franks <kfranks@telpnerlaw.com>
Cc: mlawfirm@yahoo.com; 'eide@pappajohnlaw.com' <eide@pappajohnlaw.com>; Cathy Templeton

25

**EXHIBIT K --          EMAIL ON CLEANERS SALE**

**Larry Eide**

| | |
|---|---|
| **From:** | Larry S. Eide <eide@pappajohnlaw.com> |
| **Sent:** | Friday, January 17, 2020 11:05 AM |
| **To:** | Charles L. Smith (csmith@telpnerlaw.com) |
| **Subject:** | Motion to sell, motion to shorten time |
| **Attachments:** | aaaCR bankruptcy orders.msg; Motion to shorten.wpd; Motion to shorten-order.wpd; Motion to shorten-order.pdf; Motion to shorten.pdf; IA-15, Report of sale under $3,000.wpd; IA-15, Report of sale under $3,000.pdf; IA-16, Report of sale over $3,000.pdf; IA-16, Report of sale over $3,000.wpd; IA-16, Report of sale over $3,000-SHORTENED.pdf; IA-16, Report of sale over $3,000-SHORTENED.wpd |

Attached are forms in WordPerfect and pdf

I would file the motion to shorten time as soon as possible and then call the clerk and ask for Danielle and ask that she get the motion and order to the judge ASAP

The order goes to the scheduling clerk and US trustee employee Jennifer Cline (see attached).

After you get the time shortened, you file the attached Report of Sale. Under the local rules because the sale is less than $3,000 it is required only to go the debtor and the US trustee and the Rule 2002 parties. If you want to notice to the matrix, there is another form (sale greater than $3,000) to which you attach a matrix.

Up to you but for a sale to an insider you might want notice to the matrix.

I can help, will review documents, and help file.

You will want to modify the form to advise of the shortened time to object and the waiver of the 10 day stay. I have done this on one of the attached forms.

Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 E. State Street, Suite 800 (zip code 50401)
PO Box 1588
Mason City, IA 50402-1588

Telephone: (641) 423-4264
Facsimile: (641) 423-3145
email: eide@pappajohnlaw.com

NOTICE: This email (including all attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, and it may contain confidential, privileged information intended only for the intended recipient. If you are not the intended recipient, you are notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. If you are not the intended recipient, please do not read, copy, forward or disseminate. If you received

1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:                                    CHAPTER 7
                                          CASE NO. 05-01663M
BRIAN P. BROWN,

            Debtor(s).                    MOTION TO SHORTEN TIME TO
                                          OBJECT TO REPORT OF SALE
                                          (RE SNOWMOBILE) AND TO
                                          WAIVE RULE 6004(g) STAY

COMES NOW the Trustee and respectfully moves the Court to shorten the time to

object to a report of sale to be filed and to waive the ten (10) day stay of Bankruptcy Rule

6004(g), and in support thereof, states:

        1.      This case was commenced on April 4, 2005.

        2.      Movant is the duly appointed and qualified Chapter 7 Trustee herein.

        3.      Included among the assets of this estate is a 2003 Skidoo snowmobile.

        4.      The Trustee has advertised the snowmobile for sale for one (1) week in a

newspaper of general circulation in the Cerro Gordo County, Iowa area.

        5.      The Trustee has received numerous telephone calls in response to the

advertisement, and he has received numerous offers to purchase the snowmobile.

        6.      The Trustee intends to conduct an in person and/or telephone auction with

all remaining interested parties this weekend.

        7.      The Trustee is aware that several of the interested parties are concerned

about the delay in possession that would result from a 20 day notice period followed by a

10 day stay of the sale under Bankruptcy Rule 6004(g).

        8.      The snowmobiling season is short and the prospective purchasers desire to

complete the purchase as soon as possible or to purchase another snowmobile.

TBT-22

9.     The Trustee believes that a 30 day delay in the completion of a sale of the snowmobile may substantially decrease the sales price.

10.    The Trustee requests this Court to shorten the time to object to the report of sale to be filed relating to the sale of the snowmobile so that objections must be filed within fifteen (15) days of service of the notice.

11.    The Trustee requests that the Court authorize the sale to be completed immediately after the expiration of the notice period provided that no objections are filed and that the ten (10) day stay of Bankruptcy Rule 6004(g) not apply.

WHEREFORE, the Trustee prays the Court for an Order granting this Motion to Shorten Time to Report of Sale. The Trustee further prays for such other and further relief as the Court deems just and equitable in the premises.

_/s/ Larry S. Eide_____
Larry S. Eide (PIN 000001380)
PAPPAJOHN, SHRIVER, EIDE & NICHOLAS P.C.
103 E. State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588
Telephone: (641) 423-4264
Facsimile: (641) 423-3145
Email: eide@pappajohnlaw.com

## CERTIFICATION OF SERVICE

The undersigned, Larry S. Eide, certifies that on January 17, 2020, he served a copy of the foregoing document on the United States Trustee, Debtors, attorney for Debtor, the other parties having requested notice pursuant to Rule 2002, either electronically or by ordinary United States mail, postage prepaid, addressed as follows:

Habbo G. Fokkena
United States Trustee
225 - 2nd Street SE, Suite 400
Cedar Rapids, IA  52401

Kristy B. Arzberger
Arzberger Law Office
1531 South Monroe
Mason City, IA 50401

- 2 -

 TBT-23

Brian P. Brown
309 South 1st Street
Thornton, IA 50479

     /s/ Larry S. Eide
     Larry S. Eide (PIN 000001380)

- 3 -

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

RICHARD VAN HEIDEN
VICTORIA VAN HEIDEN,

Debtor(s).

CHAPTER 7
CASE NO. 17-00582M

ORDER GRANTING MOTION TO
SHORTEN TIME TO OBJECT TO
REPORT OF SALE AND TO
WAIVE RULE 6004(g) STAY

NOW this matter comes before the Court on the Motion of the Trustee to shorten

the time to object to a report of sale to be filed and to waive the Rule 6004(g) stay. The

Court having examined the Motion and being otherwise fully advised, FINDS that said

Motion should be granted.

ORDERED AND ENTERED

_____
Thad J. Collins, Bankruptcy Judge

This order was prepared by:
Larry S. Eide, Trustee

**EXHIBIT L --          EMAIL ON RFP**

**2/6/20, Vince King (1-319-850-3315):**  CLS exchanged voice mail messages and told him to contact Ann Schmid.

**From:** steven.diers@cityofcharlescity.org <steven.diers@cityofcharlescity.org>
**Sent:** Thursday, February 6, 2020 10:24 AM
**To:** 'Ann Schmid' <Ann.Schmid@IowaEDA.com>; Charles L. Smith <csmith@telpnerlaw.com>
**Cc:** 'Rita Grimm' <Rita.Grimm@IowaEDA.com>; 'Larry S. Eide' <eide@pappajohnlaw.com>; 'Myrtle Nelson' <mnelson@niacog.org>; 'Leslie Leager' <Leslie.Leager@IowaEDA.com>; 'Tim Waddell' <Tim.Waddell@IowaEDA.com>
**Subject:** RE: 123 N. Main Street Charles City, IA
All,
The bank appraiser just stopped in to city hall to get keys to the building.  He's heading over there now to take a look.

**2/6/20, Kelly Reardon (1-563-336-4437):**  She was just letting me know that the bill has been paid in full and that they won't be shutting off the utilities.  I gave her my office number in the event that she ever needed to contact me.

**From:** Larry Eide <eide@pappajohnlaw.com>
**Sent:** Thursday, February 6, 2020 4:50 PM
**To:** Ann Schmid <Ann.Schmid@IowaEDA.com>; Charles L. Smith <csmith@telpnerlaw.com>
**Cc:** steven.diers@cityofcharlescity.org; Rita Grimm <Rita.Grimm@IowaEDA.com>; Larry Eide <eide@pappajohnlaw.com>; Myrtle Nelson <mnelson@niacog.org>; Leslie Leager <Leslie.Leager@IowaEDA.com>; Tim Waddell <Tim.Waddell@IowaEDA.com>
**Subject:** RE: 123 N. Main Street Charles City, IA
Revised letter.



Proposal Cover
Letter-LSE revisions.

**2/7/20, Ann Schmid:**  She is going to add a paragraph about the opportunity zone.  She will then send it to me.  I will print off a copy of it on our office letterhead, sign it, scan it and send it back to her.

Part of the grant application has a section on uses of the funds.  That is where they would show how much they are bidding on the personal property.

She is working remotely today.  So the letter actually will not go out until Monday, 2/10/20.

 **From:** Ann Schmid <Ann.Schmid@IowaEDA.com>
**Sent:** Friday, February 7, 2020 9:52 AM
**To:** Rita Grimm <Rita.Grimm@IowaEDA.com>; Larry Eide <eide@pappajohnlaw.com>; Charles L. Smith <csmith@telpnerlaw.com>
**Cc:** steven.diers@cityofcharlescity.org; Myrtle Nelson <mnelson@niacog.org>; Leslie Leager <Leslie.Leager@IowaEDA.com>; Tim Waddell <Tim.Waddell@IowaEDA.com>
**Subject:** RE: 123 N. Main Street Charles City, IA

**EXHIBIT M --        LETTER REGARDING BUILDING SUPERVISOR**

# Charles McQuillen Thomson

Attorney at Law*
1110 North Grand Avenue, Suite 300
Charles City, Iowa 50616
(847) 456-1911
Fax: 847-495-3488
Email: cthomson@dgall.com

*Licensed in Illinois and Iowa

January 30, 2020

*Via email*

Charles L. Smith, Trustee
Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA  51502-0248

      Re:    *In re McQuillen Place Co., LLC*, Case No. 19-00507 (the "Debtor")

Dear Trustee Smith:

As I indicated in my email to you earlier today, I was very concerned to learn that you have engaged the services of Brian Young as monitor for McQuillen Place.

I have personal knowledge that Mr. Young has done extensive work for First Security Bank & Trust Company in the past.  His late father, Dick Young, added the second story to the present First Security building, and I believe the Young family has had significant involvement with First Security Bank since that time.  From the description given in the email, I would not be surprised to learn it was Brian Young who, at the direction of First Security Bank, cut the locks to McQuillen Place in order to repair an allegedly open door.

While we were at the building on Monday, Ryan Boehmer stated to you that no door on the arcade had blown open at McQuillen Place in more than two years.  The only difference between the day the arcade doors were found open and the preceding two years was that, on the day the doors were found open, First Security Bank had gained access to the building.  I suspect that someone (quite possibly Mr. Young) from the bank had been wandering through the building and neglected to block the doors closed against the wind.

I acknowledge that there is a significant level of acrimony between the parties.  I submit that this fact -- not unheard of in bankruptcy cases -- makes the goals of neutrality and disinterestedness all the more critical in this case.  Even assuming the best intentions on the part of Mr. Young, he would undoubtedly be in a difficult spot if asked to testify or take some other action at odds with the interests of First Security Bank.  Mr. Young, in taking any action contrary to the interests of First Security Bank, would be putting at risk what I believe to be a significant business relationship.

For this reason, I respectfully suggest that some other person or company be found to fill the role envisioned for Mr. Young.

Also, in light of your comments about preferring that I not be present for any tours of McQuillen by potential bidders, I believe that, in the interest of even-handedness, we should extend this rule to other similarly situated parties.  Specifically, if I am to be excluded from these walk-throughs, representatives of First Security Bank and the Iowa Economic Development Authority should also be excluded.

Finally, in the interest of transparency and even-handedness, I think that access to the building by all persons not directly engaged by the Court should be handled through an Agreed Order, signed by the parties, and submitted to the Court for its approval.  I believe a neutral third party should maintain a log of all persons going in or out of the property.  There is a significant opportunity for mischief (such as last week's "open-door" incident), and plenty of motive for finger-pointing on all sides.

Sincerely,

/s/ Charles M. Thomson

Charles M. Thomson

cc:    Don Molstad, Esq. (via email)

**EXHIBIT N --**          **EMAIL REGARDING PRICE OF PROPERTY**

## Larry Eide

| | |
|---|---|
| **From:** | Charles L. Smith <csmith@telpnerlaw.com> |
| **Sent:** | Sunday, December 22, 2019 3:31 PM |
| **To:** | eide@pappajohnlaw.com |
| **Subject:** | RE: Trustee offer - appraisal |

Larry,
In view of the appraisal, what would you or the bank think should be the asking price?
Chuck

 **Telpner Peterson
Law Firm, LLP**

Charles L. Smith
Attorney at Law
25 Main Place, Suite 200
P.O. Box 248
Council Bluffs, IA 51502-0248
Telephone: (712) 325-9000
Facsimile: (712) 328-1946
Email: csmith@telpnerlaw.com
Website: www.telpnerlaw.com

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

**From:** Larry S. Eide [mailto:eide@pappajohnlaw.com]
**Sent:** Sunday, December 22, 2019 2:59 PM
**To:** Charles L. Smith
**Cc:** Diane Wolfe; Mark Miller
**Subject:** FW: Trustee offer - appraisal

This is a December 2017 appraisal with a date of June 1, 2018, then presumed to be the completion date. It is 179 pages. The most relevant pages are 1-33, 43, 73-94 and 115-118. The value summary is found at page 117. The final value is $1,880,000.

Pages 8-32 are pictures of the projects and construction defects.

I will also send you the 2014 pre-construction appraisal. It is not quite as long and is completed by the same appraiser. The value summary is found at page 109 and it is similar.

ISBT-500

**EXHIBIT O --       EMAIL REGARDING DRAFTING DOCUMENTS**



CHARLES L. SMITH
JACK E. RUESCH
WALTER P. THOMAS
NICOLE HUGHES
JOHN A. FLATEN, Associate
MAYNARD S. TELPNER, Retired
RICHARD W. PETERSON (1925-2010)

**Telpner Peterson Law Firm, LLP**

25 MAIN PLACE, SUITE 200
P.O. BOX 248
COUNCIL BLUFFS, IOWA
51502-0248

TELEPHONE:
712-325-9000
FACSIMILE:
712-328-1946
www.telpnerlaw.com
email@telpnerlaw.com

Licensed in Iowa and Nebraska

March 24, 2020

**VIA EMAIL:** eide@pappajohnlaw.com
Larry Eide
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402

   RE: McQuillen Place, Bankruptcy No. 19-00507

Dear Larry:

   Attached is a copy of the Summary of Bids that was prepared by Ann Schmid of IEDA. It compares the bank's bid to that of Binstock Development. This summary outlines the reason why the State was not going to fund the Binstock project.

   I have also attached a copy of the Binstock bid.

   I think that it would be advisable if we were to have a conference call with you, Eric and the State officials to address any argument that Binstock's bid was better than that of the bank.

   I just read the resistance filed by Mr. Thomson. Do you think that the equity security holders have standing to challenge the sale?

       Sincerely,

       Charles L. Smith
       csmith@telpnerlaw.com

CLS/ct
Att.
cc: Eric Lam (via email, w/Att.)

 DSBT-398

## Larry Eide

| | |
|---|---|
| **From:** | Charles L. Smith <csmith@telpnerlaw.com> |
| **Sent:** | Tuesday, March 17, 2020 2:46 PM |
| **To:** | Larry Eide |
| **Subject:** | FW: StratagyES Voice Message From 8474561911 <71270308> |
| **Attachments:** | 00006640.wav |

Charles Thomson wants me to call him. Is Eric Lam going to be assisting you?

**From:** 8474561911 <toshibavm@gmail.com>
**Sent:** Tuesday, March 17, 2020 2:38 PM
**To:** Charles L. Smith <csmith@telpnerlaw.com>
**Subject:** StratagyES Voice Message From 8474561911 <71270308>

## Larry Eide

| | |
|---|---|
| **From:** | Eric Lam <elam@simmonsperrine.com> |
| **Sent:** | Wednesday, March 18, 2020 9:35 AM |
| **To:** | Charles L. Smith |
| **Cc:** | Larry Eide; Eric Langston |
| **Subject:** | McQuillen Place |

Good Morning, Chuck. Hope this email finds you well, and y'all are safe

Larry and 1st Security have asked us to work on this case. My colleague Eric Langston (email in cc column) are the two bankr lawyers on this file (so you have the Eric & Eric Show)

I understand you and Larry have been in communication, re some sort of Sale

My goal is to circulate to you hopefully on or before Friday March 20 2020 **DRAFTS** of

1. Motion to Sell
2. Order and
3. Purchase Agreement

I posit the Motion has to be filed by you as Trustee, pursuant to 363(b) and 363(f)(4). Hence my approach

Ideally, the Motion can then be noticed, hopefully with an expedited/shortened bar date, so a phone hearing can be held week of Mar 30 (Judge has just set something for me to occur April 2, on the phone, in an unrelated matter; hence I know they are operating, as best they can, under the circumstances)

Let me know if this procedure is OK with you

ALSO, since I am new to this file, may I ask

A. I don't see any Ch 7 schedules and SoFA. So I guess we are dealing with the Schedules filed early in the Ch 11, correct?
B. In those Schedules, I don't see any license agreement listed on the Schedule of Executory Contracts. I know C & R via Zarley firm assets some sort of licensor rights. But Schedule B 62 says the Debtor 'OWNS' certain licenses. Clear as mud? The germane observation is I take it you as Trustee have NOT assumed ANY contract, lease, or licenses, am I correct, plz?
C. What happened at the Feb 14 (how lovely) hearing on Charlie's Motion to Amend the conversion order? I don't see a ruling yet. What was your sense of what Judge Collins might do?
D. Schedules show insolvency (even if one to include the $4,000,0000 counterclaim). Ergo there is nothing for the equity holders. So, what standing do equity holders have? Put another way, of course Charlie and Gray will object to anything and everthing. But they have no standing, do they?

Thanks again, and we look forward to working with you

And do stay safe and be health

SBT-486

## Larry Eide

| | |
|---|---|
| **From:** | Charles L. Smith <csmith@telpnerlaw.com> |
| **Sent:** | Sunday, December 22, 2019 3:31 PM |
| **To:** | eide@pappajohnlaw.com |
| **Subject:** | RE: Trustee offer - appraisal |

Larry,
In view of the appraisal, what would you or the bank think should be the asking price?
Chuck

 **Telpner Peterson Law Firm, LLP**

Charles L. Smith
Attorney at Law
25 Main Place, Suite 200
P.O. Box 248
Council Bluffs, IA 51502-0248
Telephone: (712) 325-9000
Facsimile: (712) 328-1946
Email: csmith@telpnerlaw.com
Website: www.telpnerlaw.com

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

**From:** Larry S. Eide [mailto:eide@pappajohnlaw.com]
**Sent:** Sunday, December 22, 2019 2:59 PM
**To:** Charles L. Smith
**Cc:** Diane Wolfe; Mark Miller
**Subject:** FW: Trustee offer - appraisal

This is a December 2017 appraisal with a date of June 1, 2018, then presumed to be the completion date. It is 179 pages. The most relevant pages are 1-33, 43, 73-94 and 115-118. The value summary is found at page 117. The final value is $1,880,000.

Pages 8-32 are pictures of the projects and construction defects.

I will also send you the 2014 pre-construction appraisal. It is not quite as long and is completed by the same appraiser. The value summary is found at page 109 and it is similar.

Depending on the ability of the buyer to negotiate with the state and the city/county, a buyer needs to pay the costs to complete construction (estimated by one contractor at $900,000 to $1,000,000, and at issue of certificate of occupancy could get $1,000,000 from the city, and ??? from the state.

These appraisals were obtained by the entity so I believe that you own them so you should be able to circulate them. With these appraisals, I am not certain that another appraisal is necessary. Please review and advise.

**From:** Diane E. Wolfe <dwolfe@1stsecuritybank.com>
**Sent:** Thursday, December 19, 2019 10:03 AM
**To:** Mark Miller <mmiller@1stsecuritybank.com>; eide@pappajohnlaw.com
**Subject:** RE: Trustee offer - appraisal

I'm using Mimecast to share large files with you. Please see the attached instructions.

Larry
Here is the second appraisal that was completed on McQuillen. I will send the first appraisal in a separate email since they are so large.

Diane

**From:** Larry S. Eide <eide@pappajohnlaw.com>
**Sent:** Wednesday, December 18, 2019 2:16 PM
**To:** Diane E. Wolfe <dwolfe@1stsecuritybank.com>; Mark Miller <mmiller@1stsecuritybank.com>
**Subject:** Trustee offer - appraisal

I had a long conversation with the trustee. I gave him the long history. I offered $75,000 and suggested a division of $60,000 for real estate and $15,000 for claims. He believed that this was in the ballpark.

He said that he has 4 or 5 calls from buyers. He believes he does not know enough to intelligently discuss possible sale. He would appreciate a sales package. I told him the buyers ought to be sophisticated buyers and ought to know what they need. I suggested that he refer to IEDA and the City. He believes he needs an appraisal. I suggest that we locate Charley's appraisal and consider asking them for an update. It the existing appraisal to me first. It sounds like there may be one as an early projection (the package to you or to CRBT) and then one of the real estate as built (Jan 12, 2018). I stressed to him that RE taxes accrue at $18,000 per month plus heat.

Charley suggested that his handyman enter the property to monitor heat until Chuck gets someone. I agreed with Chuck.

Chuck let Charley in to get the 4H jacket and choir robs. I told him $750 was too cheap but not our biggest concern so to do the best he can to get more. Chamber of Commerce had contacted him.

Who is the alternative to Dean Stewart. Chuck has spoken with Dean just once.

ISBT-502

**EXHIBIT P --**      **EMAIL RESPONSE TO TELEPHONE CALL**

## Thomson, Charles

| | |
|---|---|
| **From:** | Charles L. Smith <csmith@telpnerlaw.com> |
| **Sent:** | Wednesday, March 18, 2020 9:11 AM |
| **To:** | Thomson, Charles |
| **Cc:** | Cathy Templeton |
| **Subject:** | McQuillen Place |

Mr. Thomson,
I hope to have a final decision made on the bid selection process within the next week. In the interim, I have nothing further to report.
Charles Smith



Charles L. Smith
Attorney at Law
25 Main Place, Suite 200
P.O. Box 248
Council Bluffs, IA  51502-0248
Telephone:  (712) 325-9000
Facsimile: (712) 328-1946
Email:  csmith@telpnerlaw.com
Website:  www.telpnerlaw.com

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message. Thank you.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 7 |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC | ) | Case No. 19-00507 |
| | ) | |
| Debtor. | ) | Honorable Thad J. Collins |
| | ) | |
| | ) | |
| | ) | **NOTICE OF APPEARANCE AND** |
| | ) | **REQUEST FOR SERVICE OF** |
| _____ | ) | **NOTICES AND DOCUMENTS** |

PLEASE TAKE NOTICE THAT Bradley R. Kruse of the law firm Dickinson, Mackaman, Tyler & Hagen, P.C., hereby enters his appearance pursuant to Rule 9010 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on behalf of Cornice & Rose International, LLC, and requests, pursuant to Bankruptcy Rules 2002 and 9007, and sections 102 and 342 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. as amended, that all notices given or required to be given, and all papers, pleadings or documents filed, served, or required to be served in this case, be given and served upon Cornice & Rose International, LLC, electronically through CM/ECF or otherwise, at the following address:

Bradley R. Kruse
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309
bkruse@dickinsonlaw.com

PLEASE TAKE FURTHER NOTICE that this request includes not only the notices and papers referred to above, but also, without limitation, orders and notices of any application, motion, petition, pleading, request, complaint, or demand, that (1) affects or seeks to affect in any way rights or interests of any creditor or party in interest in this case with respect to (a) the debtor, (b) property of the debtors' estate, or proceeds thereof, in which the debtor may claim an interest, or

(c) property or proceeds thereof in the possession, custody, or control of other(s) that the debtor

may seek to use; or (2) requires or seeks to require any act, delivery of any property, payments, or

other conduct by Cornice & Rose International, LLC.

Respectfully submitted this 7th day of April, 2020.

/s/ Bradley R. Kruse
Bradley R. Kruse IS9999179
DICKINSON, MACKAMAN, TYLER & HAGEN, P.C.
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
Telephone: (515) 244-2600
bkruse@dickinsonlaw.com

ATTORNEYS FOR CORNICE & ROSE
INTERNATIONAL, LLC

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through
CM/ECF as listed on CM/ECF's notice of electronic filing dated this 7th day of April, 2020.

/s/ Tiffany Roosa
Tiffany Roosa

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

|  |  |
|---|---|
| In re:<br><br>MCQUILLEN PLACE COMPANY, LLC<br><br>Debtor. | Chapter 7<br><br>Case No.  19-00507<br><br>Honorable Thad J. Collins<br><br>**OBJECTION TO MOTION FOR SALE OF PROPERTY UNDER SECTION 363(B)** |

COMES NOW, Cornice & Rose International, LLC, a creditor and party in interest ("Cornice & Rose"), by and through its undersigned counsel, Bradley R. Kruse and the law firm Dickinson, Mackaman, Tyler & Hagen, P.C., and for its *Objection to Motion for Sale of Property Under Section 363(b)* respectfully represents:

1.      On March 23, 2020, the Chapter 7 Trustee filed a Motion for Sale of Property Under Section 363(b) [Docket No. 134] (the "Motion"), whereby the Trustee seeks to sell certain real property owned by the Debtor (the "Property") free and clear of liens, claims and encumbrances.

2.      Prior to the Debtor's bankruptcy filing, Cornice & Rose performed extensive architectural services with respect to the development and construction of the Property.  As a result of such services, Cornice & Rose has mechanics lien rights and intellectual property rights with respect to the Property.  As to the latter, Cornice & Rose holds copyrights in the structural improvements contained on the Property.

3.      Additionally, Cornice & Rose has filed a claim in this bankruptcy for an amount in excess of $2,500,000 for the unpaid portion of its invoices to the Debtor.

4.      Cornice & Rose objects to the Trustee's Motion because the proposed sale price proposed by the Trustee is far less than the value of the Property.

5.      Cornice & Rose further objects to the Trustee Motion because the proposed sale will unjustly and inappropriately hinder Cornice & Rose's mechanics' lien rights and intellectual property rights with respect to the Property.

WHEREFORE, Cornice & Rose prays that the Court enter an Order: a) denying the Trustee's Motion; and b) granting Cornice & Rose such other and further relief as the Court deems just and proper in the premises.

Dated:  April 7, 2020                     Respectfully submitted,

By:    /s/ Bradley R. Kruse
Bradley R. Kruse, Esq.
DICKINSON MACKAMAN TYLER & HAGEN
699 Walnut Street, Suite 1600
Des Moines, IA 50309
Telephone: (515)246-4505
Facsimile: (515)244-2600
e-mail: bkruse@dickinsonlaw.com

COUNSEL FOR CORNICE & ROSE
INTERNATIONAL, LLC

2

## CERTIFICATE OF SERVICE

I, Tiffany Roosa, hereby certify that on April 7, 2020, a true and correct copy of the foregoing Motion, was served via the Court's CM/ECF system.

*/s/ Tiffany Roosa*

3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**MOTION[1] TO STRIKE OBJECTION** |

COMES NOW First Security Bank & Trust Company ("Bank"), by and through its counsel, and in support of this Motion respectfully states:

Currently pending before this Court is Trustee Smith's Motion to Sell (Dkt #134). Notice of the Trustee's sale motion was given to all creditors and parties in interest. The Debtor's two equity holders, *viz.* Charles M. Thomson and James Gray, objected. *See* Objection (Dkt #147).

I.    Equity Owners' Objection

The Schedules[2] filed by the Debtor circa May 10, 2019 (Dkt #20) were sworn to under oath by the Debtor's "owner" Charles M. Thomson, *i.e.* one of the two objecting equity holders herein. Accepting the Schedule Summary at face value, the Schedules show total assets of $8,548,127, compared to liabilities of $10,406,662, *i.e.* the Debtor's liabilities exceed its assets. As such, the Debtor is insolvent. The equity holders therefore will receive no dividend in this proceeding. *Cf.* 11 U.S.C. §726(a)(6) (only after payment of all claims, including interest, will any surplus be paid to the debtor). Judge Colloton clearly held when a debtor could not show a "reasonable possibility of a surplus," the debtor lacked standing

---

[1] By filing this Motion, the Bank does not waive and instead does reserve and preserve any and all argument, remedy, theory, right, and title.

[2] This Court may take judicial notice of Schedules filed in a bankruptcy case. *In re Gervich*, 570 F.2d 247, 253 (8th Cir. 1978).

to object to the trustee's compromise motion. *In re Peoples*, 764 F.3d 817, 820 (8th Cir. 2014) (estate has no surplus to distribute to the debtor, ergo she was "not a person aggrieved" and she lacks standing). In the case at bar, based on the objecting equity holder's own sworn statement, there will never be enough money to pay all creditors in full. As a result, the equity holders will never receive any dividend. Like the debtor in *Peoples*, the equity holders therefore have no pecuniary interest in this case, and they have no standing. Their objections should therefore be summarily stricken, overruled, and denied.

## II.    Gray Objection

Gray personally has not filed a Proof of Claim.[3] This Court has held an entity who has no claim against the estate has no standing to object to a trustee's sale motion. *In re LeBlanc Inc.*, 299 B.R. 546, 551 (Bankr. N.D. Iowa 2003) (entity that has no claim and is thusly not a creditor had no standing to object to a trustee's sale motion); *cf. In re Gannon Center for Community Health*, 2008 WL 276548, at *1 (Bankr. N.D. Iowa 1/29/08) (Kilburg, J.) (debtor's former employee who did not file proof of claim had no standing to object to request for administrative claim allowance). Gray has no standing. His objection therefore should be stricken, overruled, and denied.

WHEREFORE, the Bank respectfully prays this Court enter and enroll an Order striking, overruling, and denying the Objection filed at Dkt #147 , and for such other relief as may be just and proper under the premises.

---

[3] Likewise, this Court is authorized to take judicial notice of the Claims Docket. *E.g. In re Senior Cottages of America, LLC*, 320 B.R. 895, 903 (Bankr. D. Minn. 2005) ("the court can take judicial notice of the status of its own claims register"); *see In re Baird*, 2005 WL 612863, at *3 (Bankr. N.D. Iowa 3/10/05) (Edmonds, J.) ("I take judicial notice that 18 claims have been filed").

_____/s/ E Lam_____
Eric W. Lam, AT0004416
Eric J. Langston, AT0014001
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
ATTORNEYS FOR FIRST SECURITY BANK &
TRUST COMPANY

### Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 7th day of April, 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

_____/s/ K Carmichael_____

Larry S. Eide
Charles Thomson
Charles L. Smith
Monica L. Clark
Brandon Gray
J D Haas
Laura Hyer and Joe Schmall
Donald H. Molstad
Judith O'Donohoe
Christine B. Skilton
Bradley Sloter
L. Ashley Zubal
Brad Kruse
Rita Grimm (by email)

First Security – McQuillen/Pldgs/Drafts/Mtn to Strike.040720.1313.ewl

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**PRE-HEARING BRIEF**[1] |

COMES NOW First Security Bank & Trust Company ("Bank"), and in support of

the Trustee's Motion to Sell (Dkt #134) respectfully submits the following Pre-Hearing

Memorandum and Brief[2]:

## I.      GOVERNING LEGAL PRINCIPLES

The seminal decision from the 8th Circuit dealing with §363 sales is *In re Food Barn*

*Stores, Inc.*, 107 F.3d 558 (8th Cir.1997). Its holding is best summarized by 8th Circuit B.A.P.

Judge Schermer in *In re Farmland Industries, Inc.*, 289 B.R. 122, 126 (Bankr. App. 8th Cir.

2003) as follows:

> A bankruptcy court has considerable discretion in approving assets sales and
> is granted ample latitude to strike a balance between fairness, finality,
> integrity, and maximization of assets. The court must consider the bidders'
> reasonable expectations to encourage confidence in the process. Finality and
> regularity are important because they encourage interested parties to sincerely
> extend their best and highest offers. On the other hand, the court must be
> mindful of the interests of unsecured creditors and the goal of maximizing the
> value of the bankruptcy estate. Prior to entry of an order confirming a sale,
> the court has broad discretion to conduct sales in the manner it deems most
> appropriate (citations omitted).

---

[1] By filing this Brief the Bank is reserving and preserving and is not waiving any and all other argument, theory, right, title, and interest.

[2] The Bank and the Trustee have filed several exhibits on April 6, 2020, and all those exhibits and affidavits are by this reference incorporated herein as if set forth verbatim, including Bank Exh. FF, which is a Declaration by the Trustee supporting the factual recitations contained in this Brief.

1

These general principles have consistently been applied in subsequent B.A.P opinions as well as decisions from this Court. For example, in *In re Meill*, 441 B.R. 610 (Bankr. App. 8th Cir. 2010), the Court observed:

> The Creditor suggests that by selling so many properties during the Debtor's bankruptcy case, the Trustee unfairly flooded the market, driving down the price for the Property. But the market value of the Property was the price that the market would bear at the time. The Trustee marketed the Property and did not receive an offer to purchase it for a price greater than the $225,000 offer. *The fact that the sale price is less than the appraised value of the Property does not render it unreasonable.* Moreover, approval of the sale allows the benefits to accrue to the estate as a whole, rather than to the Creditor alone.

*Id.* at 615. In *In re Schminke*, 2005 WL 2674975 (Bankr. N.D. Iowa 10/12/05) (Kilburg, C.J.), this Court considered a Chapter 7 Trustee's report of sale, on an expedited basis, of a 2003 camper. The Trustee proposed to sell the camper at $11,500, even though the NADA wholesale value was $12,650 and the retail value was $17,010. *Id.* at *1. Of course citing to and relying on *Food Barn*, this Court held:

> Clearly, the offered price is less than would be ideal. However, in any sale made under distressed conditions, the offer is often less than would be obtained in a truly arms-length transaction…. Because of the requirement of court approval in a bankruptcy context, the delay involved in possession may also have an adverse impact on the sale price….
>
> It is always possible that, with unlimited time and willingness to wait for a more favorable market, a better price could be obtained. However, waiting for a more appealing sale price involves cost and time. Trustees are under pressure to administer these cases in a expeditious manner. It is unreasonable to anticipate that a Trustee can wait substantial time in order to hope to obtain a somewhat better price. Even if Trustee were to store this camper throughout the winter, there is no assurance that a more favorable price could be obtained. The additional costs incurred in the meantime would further reduce the amount available for unsecured creditors.

*Id.* at *2. This Court then approved the sale. Similarly, in *In re CRI Inc.*, 2006 WL 2999988 (Bankr. N.D. Iowa 9/13/06) (Kilburg, C.J.), the trustee sought to sell the debtor's membership interest in a separate wholly-owned subsidiary. The attorney for the debtor,

2

which was then defunct, objected to the sale of account receivables, etc., as he "believes these are valuable assets of the bankruptcy estate." *Id.* at *1. This Court granted the Trustee's motion, because "the evidence shows Trustee was diligent in efforts to market the property. She received no other offers.… There is no indication of bad faith on the part of Trustee or of the purchaser…. Considering the type of assets being sold and possible difficulties with clearing title, the amount offered is fair and reasonable." *Id.* at *2.

In the context of §363 Sale Motions, an example of a trustee's "good faith" is the generation of funds for the estate. *In re Equity Management Systems*, 149 B.R. 120, 125 (Bankr. S.D. Iowa 1993) ("Trustee has demonstrated good faith by proposing a disposition of assets which generates more funds for the estate"); *accord In re Yuska*, 2017 WL 6506326, at *2 (Bankr. N.D. Iowa 12/19/17) (Collins, C.J.) (trustee demonstrated "good faith' by selling property, because the sale will "provide needed cash to pay claims"). In *In re Miell*, 2020 WL 889886, at * 1 (Bankr. N.D. Iowa 3/10/2020) (Kilburg, C.J.), a mortgagee/bank proposed to purchase from the bankruptcy trustee various parcels of real estate pledged to the bank, and the bank would pay a $100,000 surcharge to the estate. This Court approved the sale and found the trustee acted in good faith, because "the estate can benefit from the $100,000 surcharge." *Id.* at *3.

## II.   PRE-MOTION EFFORTS

Before filing his Motion, the Trustee issued an invitation/notice on February 3, 2020. *See* Bank Exhibit CC. The Trustee also coordinated with the Iowa Economic Development Authority ("IEDA"), in light of the potential availability of $1,000,000 of funding from the IEDA. The Trustee set a bid deadline of March 9, 2020. Two bids were received by the Trustee, *viz.* the bid from the Bank, *see* Bank Exhibit EE, and a bid from

Binstock Development, LLC ("Binstock"). *See* Bank Exhibit DD. The Trustee then

personally met with IEDA officials in Des Moines circa March 12, 2020. Thereafter, the

Trustee determined even though neither the Bank's bid nor Binstock's bid complied with all

the terms of the Trustee's February 3 bid invitation, the Bank's bid offered more to the

Bankruptcy Estate than the Binstock bid. The Trustee therefore worked with the Bank and

eventually executed a Purchase Agreement, a copy of which is attached to the Trustee's Sale

Motion. *See* Bank Exhibit AA.

More germane and relevant are the role and efforts by IEDA to solicit bids for the

property, all of which are detailed in the affidavit from IEDA's disaster recovery team

leader/historic preservation specialist, accompanied by memoranda and summary. *See* Bank

Exhibit GG. Briefly, after this case was converted from a Chapter 11 proceeding to one

under Chapter 7, IEDA "reached out to Mr. Smith," and "participated in the 341 creditor's

meeting in Mason City." On that day, "all interested parties toured the incomplete structure

… and conducted an initial meeting with the Trustee to discuss a process to seek proposals

for the disbursement of the property." Eventually, on February 10, 2020, the IEDA created

a link for shared application materials and e-mailed it to the City of Charles City, the Bank,

the Trustee, as well as approximately 24 developers. The link included a cover letter from

the Trustee, all application documents, and instruction that the link will be disseminated

publicly by any interested parties. Meanwhile, IEDA fielded multiple phone calls and e-

mails, and IEDA answered general questions and directed developers to other sources of

information such as the City or the County Assessor. All inquiries were treated equally and

promptly. Eventually, the Trustee met with IEDA personnel in Des Moines on March 12,

2020. The IEDA also developed a side-by-side comparison of the Bank's bid and the

4

Trustee's bid. Last but not least, a history of IEDA's involvement with the property, dating

back to March 2009, is reflected in a July 3, 2018 memo from IEDA. *See* Bank Exhibit GG.

Simply put, the Trustee's effort combined with IEDA's endeavors constitute more than a

reasonable effort to market the property, under the circumstances.

### III.   OBJECTIONS ARE WITHOUT MERIT[3]

A. Binstock's Bid

The Bank's bid injects $150,000 into the Bankruptcy Estate. Binstock's offer injects

$0 into the Bankruptcy Estate. Given the familiar principle that benefit to the Estate and its

creditors is one of the most important factors in the sale consideration calculus, the Bank's

bid is superior to Binstock's bid.

Even if[4] somehow Binstock can convince this Court that Binstock's bid confers more

money to the Estate,

> The court is not forced to reject the proposed sale merely because there is a
> greater offer. In this case, the greater offer is $25,000.00 more than the price
> proposed by [purchaser]. There may be good reasons for approving a lower
> bid. In this case, accepting the offer of [objecting counter bidder] would delay
> closing. The value to the trustee of closing sooner on the [purchaser's] offer
> detracts from [the] incremental offer of $25,000.00. … Moreover,
> despite…optimism, there are still unresolved contingencies to [objecting
> counter bidder's] obligation to close. In the court's view, [the objecting
> counter bidder's] offer is not enough greater than [purchaser's] to warrant
> rejection of the pending proposal.

*In re LeBlanc, Inc.*, 299 B.R. 546, 552 (Bankr. N.D. Iowa 2003). In the case at bar, Binstock's

proposal is contingent on multiple events and conditions, such as:

---

[3] The Bank has also filed a Motion to Strike, and that Motion is by this reference incorporated herein as if set forth
verbatim. The arguments contained in this Brief are in addition to, but not in lieu of, the contentions raised in the
Motion to Strike. In the event the Motion to Strike is granted, then there is no need to address the equity holders'
objections. Conversely, if the Motion to Strike is denied as moot or on its merits, then the Bank submits the equity
holders' objections nonetheless have no merit and should be rejected.
[4] Notably the Bank bid a gross amount of $1,100,000.00, whereas Binstock bid only $470,000. *See* Bank Exh. GG,
at PDF p. 5 (Comparison between Bank's bid and Binstock's bid).

5

i.      Binstock and IEDA "reach an agreement by which the entire $1,000,000 … funds are made available …."

ii.     A replacement tax increment financing development agreement is agreed to by Binstock and the City of Charles City.

iii.    The cost of completion of the interior spaces to be "within … original estimate of approximately $600,000."

iv.     The first floor is built-out as 19 studio residential units wrapped by commercial space.

v.      The cost to complete the interior of the first floor and the exterior of the building does not exceed $858,375.

vi.     The City of Charles City does not materially change the prerequisites for issuance of a certificate of occupancy.

vii.    The City of Charles City commits to issuing a certificate of occupancy within seven days of the completion of tasks by Binstock.

viii.   A period of not less than 45 days elapses between entry of an order and commencement of work.

ix.     Binstock is able to obtain appropriate licensure to use the project's building designs, all of which is subject to copyright held by Cornice & Rose International, L.L.C.

*See* Bank Exhibit DD (Binstock bid at pp. 2-3, ¶¶1-10). In contrast, other than traditional closing terms and conditions familiar to Iowa practitioners, the Purchase Agreement between the Bank and the Trustee will lead to prompt closing and tender of the purchase price to the Trustee, <u>without</u> any of the myriad of conditions imposed by the Binstock's bid. In sum, like *LeBlanc*, even if Binstock's bid somehow generates a slightly greater monetary value to the Estate, considerations such as the ability of the Estate to close sooner than the Binstock multi-condition bid "distract[] from [their] incremental offer." *LeBlanc*, 299 B.R. at 552. The Trustee appropriately rejected Binstock's bid. Any objection relying on Binstock's bid should likewise be rejected.

6

B. Equity Owners' Objection

During the telephonic hearing held before this Court circa March 26, 2020, concerning the equity owners' objection to the Trustee's Motion to Shorten Time, Mr. Thomson urged he was most concerned with the interests of the creditors. But other than Cornice & Rose's ("C & R") Objection[5] (Dkt #149) voicing mechanic lien and copyright issues, ___no other creditor objected___ to the Trustee's Sale Motion. In any event, Mr. Thomson does not purport to represent the general creditor body in this Estate. And it is questionable if he may assert the rights of others. *Cf. Iowa Civil Liberties Union v. Critelli*, 244 N.W.2d 564, 567 (Iowa 1976) (litigants barred by principle of *jus tertii* and lack standing to raise the rights of others). To the extent Mr. Thomson asserts a concrete bid procedure should have been pre-approved by this Court, nothing in §363 so requires, *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("no section under the Bankruptcy Code … requires the Court to establish bid procedures"), and indeed "the court has broad discretion to conduct sales in the manner it deems most appropriate." *In re Farmland Industries, Inc.*, 289 B.R. at 126. Lastly, to the extent Mr. Thomson asserts a higher price should or could have been obtained, Mr. Thomson was free to bid higher but chose not to, and in any event as this Court observed in *Schminke*, "in any sale made under distressed conditions, the offer is often less than would be obtained in a truly arms-length transaction," 2005 WL 2674975, at * 2, and even if "with unlimited time and willingness to wait for a more favorable market, a better price could be obtained, … waiting for a more appealing sale price involves cost and time. Trustees are under pressure to administer these cases in a expeditious manner. It is unreasonable to anticipate that a Trustee can wait a substantial time in order to hope to

---

[5] C & R is apparently owned by James Gray, *i.e* the Debtor's other equity holder. In any event, the Bank posits C & R's objection can be resolved and dealt with. *See* § V *infra*.

7

obtain a somewhat better price." *Id.* In the case at bar, the original Chapter 11 proceeding

was filed in April 2019, *i.e.* one year has elapsed since the bankruptcy filing. Yet other than

the Trustee's Sale Motion and the offers procured in that context, no other viable offer has

surfaced[6]. *See In re McQuillen Place Company, LLC*, 609 B.R. 823, 827 (Bankr. N.D. Iowa

2019) ("Months passed [but] … financing was never secured"). Meanwhile, costs and

expenses are accruing, such as real estate taxes at $18,000 per month, and accruing costs

and expenses such as utility, security, etc[7]. The time has come to allow the Trustee to

liquidate the estate's assets. The objections should be overruled.

## IV.    BONA FIDE DISPUTE

With respect to the personal property, the Trustee's Sale Motion relies on, *inter alia*,

11 U.S.C. §363(f)(4), which authorizes this Court to permit a trustee to sell property of the

estate "free and clear of any interest in such property of an entity other than the estate … if

… such interest is in bona fide dispute." In *In re Gaylord Grain L.L.C.*, 306 B.R. 624 (Bankr.

App. 8th Cir. 2004), the 8th Circuit B.A.P. discussed §363(f)(4) and held:

> The term "bona fide dispute" is not defined in…§363(f)(4). However, many
> courts…have stated that courts must determine "whether there is an objective
> basis for either a factual or legal dispute as to the validity of the debt." Clearly
> this standard does not require the court to resolve the underlying dispute, just
> to determine its existence. Courts utilizing this definition have held the parties

---

[6] Even if one were to consider the equity owners' substantive contention that they somehow could bring more value to the Estate, their proposal assumes <u>at least</u> three conditions must be satisfied, *viz.* they "believe [they can] … pay unsecured creditors in full … <u>if</u> the asset is properly reorganized, <u>if</u> new debt or equity is provided by a third party, and <u>if</u> the Debtor renegotiates its Development Agreement with the City of Charles City." Equity Holders' Statement (Dkt #97 11/18/19) at ¶7 (emphasis supplied); *see id*. ¶12 ("for the assets of the Debtor to be properly administered and reorganized … at least three conditions precedent must be fulfilled ….").

[7] The objecting equity holders assert more time is needed to market the property. But their objection did not address the continuing cost accruals. Even if, but not conceding, a high price might have been obtained, there is no evidence in this record re how many dollars might be obtained vis-à-vis the continuing accrual of costs and expenses. Put another way, even if the objecting equity holders' arguments might be sound in concept (and the Bank does not so concede), there is no record evidence of the quantity of the potential benefit. And even if somehow a few more dollars could be generated if more time were invested into the process, this Court's decisions such as *Schminke* leads to the conclusion that the proper measuring stick is the general overall best interest of the estate and its creditors, and a Trustee's sale effort should generally be approved and sustained. The Bank submits the objecting equity holders' arguments are unavailing.

8

to an evidentiary standard and evidence must be provided to show factual
grounds that there is an "objective basis" for the dispute.

*Id.* at 627. Therefore, pursuant to §363(f)(4), a trustee may sell free and clear of a lien "if [a

trustee] can show … an objective basis for avoiding the liens, and thus establish a bona fide

dispute." *Id.* at 628; *accord In re TLFO, LLC*, 572 B.R. 391,436-37 (Bankr. S.D. Fla. 2016).

With respect to the personal property sought to be sold by the Trustee, Bank Exhibit HH

demonstrates, at a minimum, the Trustee and Jim Gray/C & R were discussing Gray/C &

R's claim as to ownership of certain items of personal property. Indeed, the Trustee sought

documentation from Gray/C & R, but has received nothing. With respect to copyright

issues, the only response the Trustee received was a letter from C & R's attorney, referring

the Trustee to Title 17 of the United States Code. *See* Bank Exhibit HH (March 9 letter from

Zarley to Smith). Given this record, the "bona fide dispute" requirement is easily satisfied

*viz.* objectively there is a factual and legal dispute between and among the parties. Of course,

the Trustee's Sale Motion also provided that Gray/C & R's rights, if any, to the personal

property will attach to the sale proceeds attributable to the Personal Property. Gray/C & R

are thusly adequately protected, within the meaning of §363(e).[8] Last but not least, to the

extent C & R posits a higher price may be obtained, C & R is free to bid.

With respect to the real estate, the Bank has filed several Proofs of Claim (#4, as

amended, as well as #23), to which were attached, *inter alia*, the Bank's mortgage. To the

extent somehow the Bank's claim or mortgage is unenforceable, defective, or subject to

---

[8] 11 U.S.C. §363(p)(2) places the burden on a claimant to prove the validity, priority, or extent of its interest in the
property. To that end, C & R filed two Proofs of Claim: PoC #7 (asserting an *un*-secured claim) and PoC #20
(asserting a secured claim), but neither Proof of Claim had appended to it any contract, termination notice, license
agreement, documents, security agreement, U.C.C. financing statement, etc. In fact, the Trustee is not aware of any
U.C.C. filing against the personal property being sold. In contrast, the Bank's Proofs of Claim (#4, as amended, and
#23) had attached to them the Bank's mortgage instrument, promissory notes, etc.

9

counterclaims, the presence of counterclaim and defenses again illustrates there is a "bona fide dispute" as to the Bank's claim and mortgage[9]. Indeed, even though the Trustee's Sale Motion, with respect to the real estate, relies primarily on §363(b), the Trustee's Sale Motion also specifically referred to §363(f)(4), with respect to the sale of the real estate. *See* Trustee Sale Motion at ¶11, p. 4 (Bank Exhibit AA). In sum, the Bank submits the Trustee's Sale Motion should be approved, pursuant to §363(f)(4) and §363(b).

## V.      C & R/MECHANIC LIEN/COPYRIGHT ISSUES

To the extent, if at all, there is any concern from C & R as to its copyright claims, the Trustee and the Bank propose the eventual Order[10] from this Court approving the Sale Motion contain the following additional language:

> So long as the new owner or its architect or agents do not use the Plans or Drawings in which Cornice & Rose International, LLC claims a copyright, the new owner may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, including claims of copyright infringement. The new owner may not use C & R's Plans or Drawings without first making arrangements satisfactory to C & R for their use. Nothing contained herein shall preclude future claims of copyright infringement resulting from the improper or unauthorized use of the Plans or Drawings by any new owner or third parties.

The Bank submits such additional language will adequately protect C & R. Lastly, with respect to whatever, if any, mechanic lien rights enjoyed by C & R, the Sale Motion and the Proposed Order provide for attachment of all valid liens to the sale proceeds. C & R is adequately protected by the lien attachment provision.

## VI.      CONCLUSION

Ultimately, in considering a trustee's motion to sell, "the proper standard to use … is

---

[9] Of course the Bank does not concede any of the counterclaims and defenses etc. At most, and viewed in the light most favorable to the counterclaimants, the Bank posits, solely for purposes of the Trustee's Sale Motion and for no other purpose, there exists a "bona fide dispute" within the meaning of §363(f)(4).
[10] A Proposed Order was filed by the Trustee. *See* Bank Exh. BB.

10

the business judgment test. It is the standard which has been adopted by the vast majority of courts." *In re Diplomat Constr., Inc.*, 481 B.R. 215, 218 (Bankr. N.D. Ga. 2012) ("the business judgment test is the prevailing rubric to evaluate the proposed transaction under §363(b)"); *accord In re M & S Grading, Inc.*, 541 F.3d 859, 867 (8th Cir. 2008) (trustee acted properly so long as trustee uses "sound business judgment"). The Bank submits the record contains more than ample evidence to satisfy the "business judgment" and "good faith" standards. The Bank therefore respectfully prays this Court approve the Trustee's Sale Motion and enroll the Proposed Order, with the additional language to protect C & R's copyrights concerns.

/s/ E Lam

Eric W. Lam, AT0004416
Eric J. Langston, AT0014001
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
ATTORNEYS FOR FIRST SECURITY BANK &
TRUST COMPANY

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 7th day of April, 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ K Carmichael

Larry S. Eide; Charles Thomson; Charles L. Smith; Monica L. Clark; Brandon Gray; J D Haas; Laura Hyer and Joe Schmall; Donald H. Molstad; Judith O'Donohoe; Christine B. Skilton; Bradley Sloter; L. Ashley Zubal; Brad Kruse; Rita Grimm (by email)

First Security – McQuillen/Pldgs/Drafts/Pre-Hearing Brief.040720.1532.ewl.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No.  19-00507 |
| MCQUILLEN PLACE COMPANY, LLC | Honorable Thad J. Collins |
| Debtor. | **JOINDER TO OBJECTION OF EQUITY SECURITY HOLDERS TO TRUSTEE'S MOTION TO SELL** |

COMES NOW, Cornice & Rose International, LLC, a creditor and party in interest ("Cornice & Rose"), by and through its undersigned counsel, Bradley R. Kruse and the law firm Dickinson, Mackaman, Tyler & Hagen, P.C., and for its *Joinder to Objection of Equity Security Holders to Trustee's Motion to Sell* respectfully represents:

In addition to the Objection to Motion for Sale of Property [Docket No. 149] filed by Cornice & Rose, Cornice & Rose hereby joins and adopts the objection of Equity Security Holders to Trustee's Motion to Sell [Docket No. 147] and hereby incorporates said objection of the Equity Security Holders as if fully set forth herein.

WHEREFORE, Cornice & Rose prays that the Court enter an Order: a) denying the Trustee's Motion; and b) granting Cornice & Rose such other and further relief as the Court deems just and proper in the premises.

Dated:  April 8, 2020                    Respectfully submitted,


                                         By: ___/s/ Bradley R. Kruse_____
                                         Bradley R. Kruse, Esq.
                                         DICKINSON MACKAMAN TYLER & HAGEN
                                         699 Walnut Street, Suite 1600
                                         Des Moines, IA 50309
                                         Telephone: (515)246-4505
                                         Facsimile: (515)244-2600
                                         e-mail: bkruse@dickinsonlaw.com

                                         COUNSEL FOR CORNICE & ROSE
                                         INTERNATIONAL, LLC




## **CERTIFICATE OF SERVICE**

I, Tiffany Roosa, hereby certify that on April 8, 2020, a true and correct copy of the

foregoing Motion, was served via the Court's CM/ECF system.

                                         */s/ Tiffany Roosa*_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re: | Chapter 7 |
| | Case No.  19-00507 |
| MCQUILLEN PLACE COMPANY, LLC | Honorable Thad J. Collins |
| Debtor. | **SUPPLEMENT TO OBJECTION TO MOTION FOR SALE OF PROPERTY UNDER SECTION 363(b)** |

COMES NOW, Cornice & Rose International, LLC, a creditor and party in interest ("C&R"), by and through its undersigned counsel, Bradley R. Kruse and the law firm Dickinson, Mackaman, Tyler & Hagen, P.C., and for its Supplement to Objection to Motion for Sale of Property Under Section 363(b) [Docket No. 149], and respectfully states as follows:

1.     Pursuant to 17 U.S.C. §§ 101 and 102, the copyright owned by C&R with respect to the McQuillen Place Company, LLC building located at 123 Main Street, Charles City, Iowa (the "Property"), extends to all the distinctive, custom-designed components of the architectural work of the building project.  This includes, but is not limited to:

    a.   the electrical and plumbing systems;

    b.   the physical appearance of the building (including, but not limited to, the distinctive clock tower, the cornices, the exterior decorative elements, the location of various types of surfaces -- e.g. brick vs. natural stone vs. synthetic stucco sprayed coating, etc., the size of apartments, the location of doorways, the height of apartment units, the height of hallways, the width of hallways, the location of bathrooms, etc.);

    c.   the placement and design of stairways (including, but not limited to, the custom design of the steps, their width, the materials chosen for their construction, etc.);

    d.   the placement of all HVAC components;

    e.   the structural elements (including, but not limited to, the innovative use of trusses and steel framing, the composition of the stairtowers, etc.);

    f.   the custom configuration of the apartment units within the building; and

    g.   the custom-designed configuration of the specialized handicap-accessible units within the building (including the custom-designed location of bathrooms, hot water service, kitchen facilities, etc.).

2.    Under the copyright owned by C&R, no person attempting to purchase real estate interests from the Trustee has any right to use these architectural elements. No person may make use of any of the foregoing custom design features at the Property building without violating the copyright held by C&R. Any person attempting to use these features without a license from C&R is liable to C&R for copyright infringement. The Debtor does not have a license to use these features. Therefore, the Trustee cannot convey a license to use these features to any party, in particular the purchaser identified in the Trustee's Motion to Sell.

3.    C&R expressly rejects any attempt to sell any "license" or "possessory claim" in its copyright through the mechanism of a bankruptcy sale under 11 USC 363. First, the Trustee has no authority to sell that which he does not own. Again, the Trustee does not own any copyright or intellectual property with respect to the building, nor does the Trustee have a license to use any of the intellectual property, specifically C&R's copyrighted works with respect to the Property. Second, the Trustee does not possess any rights in C&R's copyright. Third, even if the Trustee or some other party were to assert that they had some right in a copyrighted work, C&R is entitled to a full and fair determination of the value of such an interest (should it actually exist).

4.    The very brief notice C&R has had of the Trustee's intentions in this matter has been insufficient to present C&R's views as to the value of the copyright. Placing a value on a

copyright or a license of a copyright is very fact intensive, often requiring the testimony of

experts in the field.  It certainly requires more than ten days, particularly during a National

Emergency that has shut down much of the United States.

5.      Fourth, if the Trustee is, indeed, intent on attempting to "take" the copyright (or

any portion thereof) of C&R in the Property, C&R is entitled to due process under the "takings"

clause of the Fifth Amendment to the United States Constitution and Section 18 of Article I of

the Iowa Constitution. C&R has been afforded no such due process.  However, C&R disputes

that the Trustee, even under the Bankruptcy Code, has the authority to "take" C&R's copyright

protections.

6.      Given the extent of C&R's copyright, which extends to the structure,

configuration, components, and systems of the Property, the occupancy and use by any third

party of the Property without a license to use C&R's copyrighted works, necessarily constitutes a

violation of C&R's copyright.  The language in the draft order at paragraph 19 proposed by the

Trustee in the afternoon of April 8, 2020, following the hearing on the Trustee's Motion to Sell,

fails to acknowledge this crucial point.  In particular, the language in the first sentence of

paragraph 19 of the Trustee's proposed draft order impermissibly, and without authority, seeks to

terminate and waive C&R's copyright in the building, by allowing the purchaser to use and

occupy the Property "free and clear of existing and future claims of C&R, including claims of

copyright infringement."  The Trustee simply has no authority to thwart C&R's copyright in

such a way, and the Trustee's proposed language effectively grants the purchaser the right to use

C&R's copyrighted works with respect to the Property, despite the fact that the Trustee has no

ability or right to convey such a license to the purchaser.

WHEREFORE, Cornice & Rose International, LLC respectfully requests that the Court: a) deny the Trustee's Motion to Sell or, b) in the alternative, if the Court is inclined to grant the Trustee's Motion to Sell, that the Court's order approving the sale preserve C&R's copyright in and to the Property without waiving any of C&R's rights with respect to its copyright, including but not limited to, C&R's right to bring a copyright infringement action against the purchaser for the purchaser's use and occupancy of the Property; and c) grant C&R such other and further relief as the Court deems equitable and just.

Dated:  April 8, 2020                    Respectfully submitted,

                                         By:  /s/ Bradley R. Kruse
                                              Bradley R. Kruse, Esq.
                                              DICKINSON MACKAMAN TYLER & HAGEN
                                              699 Walnut Street, Suite 1600
                                              Des Moines, IA 50309
                                              Telephone: (515)246-4505
                                              Facsimile: (515)244-2600
                                              e-mail: bkruse@dickinsonlaw.com

                                              COUNSEL FOR CORNICE & ROSE
                                              INTERNATIONAL, LLC

## CERTIFICATE OF SERVICE

I, Tiffany Roosa, hereby certify that on April 8, 2020, a true and correct copy of the foregoing Motion, was served via the Court's CM/ECF system.

                                         /s/ Tiffany Roosa

4

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

Chapter 7
#19 507

Debtor.

-------------------------------------------------------------------

**ORDER AUTHORIZING APPROVING SALE
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
AND PROVIDING RELATED RELIEF**

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company (together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement ("Agreement") appended to the Motion of certain real estate (as described more fully in the Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal property (as described more fully in the Agreement, the "Personal Property" and, together with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the transactions ("Transactions") contemplated in the Agreement; and the Trustee having provided adequate and timely notice to all creditors and parties in interest of the Motion, it appearing that the Purchaser submitted the highest and best offer to purchase the Property; and a Sale Hearing having been held on April 8, 2020; and based upon the record of the Sale Hearing and the facts set forth in the Motion as affirmed by the Trustee's Affidavit; and it appearing that due, good, sufficient and timely notice of the relief sought and granted in this order has been given and that no other or further notice need be given; at which time all

1

interested parties were offered an opportunity to be heard with respect to the Motion; and the

Court having had an opportunity to consider all responses and objections to the Motion; and

it appearing that the relief requested in the Motion is in the best interests of this Estate, its

creditors and other parties-in-interest; and after due deliberation and good cause appearing

therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]

A.     **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion

under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue

of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.     **Statutory Predicates.** The statutory predicates for the relief sought in the Motion

are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C.     **Notice.** As evidenced by the certificates of service filed with this Court and

based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely,

adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions

contemplated by the Agreement and this Order (the "Transactions"), has been provided in

accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or

further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances; and (iv) no other or further notice of the Motion or the Sale

Hearing or the Transactions, is or shall be required.

D.     **Opportunity to Object.** A reasonable opportunity to object and to be heard

with respect to the Motion and the relief requested therein has been given, in light of the

circumstances, to all interested persons and entities, including the following: (a) the U.S.

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

2

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or claim on the Property; (c) all entities known to have expressed an interest in acquiring the Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its counsel; and (f) all other parties who have filed notices of appearance and demands for service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion. All objections to the sale of the Property are overruled or resolved by this Order.

E. **Sale in Best Interests.** Good and sufficient reasons for approval of the Agreement and the Transactions exist, as described in the Motion, and the relief requested in the Motion is in the best interests of the estate, its creditors and other parties in interest.

F. **Business Justification.** The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Transactions other than in the ordinary course of business under Bankruptcy Code section 363(b) in that, among other things, the immediate consummation of the Transactions with the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an order approving the Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser consummating the Transactions.

G. **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any

3

agreement among bidders.

H.    **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I.    **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other  interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J.    **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K.    **Free and Clear.** The Debtor is either the sole and lawful owner of the Property or there is a bona fide dispute as to ownership. The transfer of the Property to the

Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.    The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.    The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

5

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

N.     **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

O.     **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

6

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1.     **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.     **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.     **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4.     **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to

7

attach to the proceeds ultimately attributable to the Property against or in which such
Interests are asserted, subject to the terms of such Interests, with the same validity, force
and effect, and in the same order of priority, which such Interests now have against the
Property or their proceeds.

5.      **Valid Transfer.** As of the Closing Date and except as otherwise provided
herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property
to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all
Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds
ultimately attributable to the property against or in which such Interests are asserted, subject
to the terms of such Interests, with the same validity, force and effect, and in the same order
of priority, which such Interests now have against the Property or their proceeds.

6.      **General Assignment.** On the Closing Date, this Order shall be construed
as and shall constitute for any and all purposes a full and complete general assignment,
conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and
every federal, state, and local governmental agency or department is hereby directed to
accept any and all documents and instruments necessary and appropriate to consummate the
Transactions contemplated by the Agreement.

7.      **No Successor Liability.** Neither the Purchaser nor its affiliates,
successors or assigns shall be deemed, as a result of any action taken in connection with the
purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or
otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a
continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The
transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

8

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or

responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or

shareholders, or the Property, having any liability whatsoever with respect to or be required

to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates,

members, or shareholders, or the Property, having any liability or responsibility to the

Estate, except as is expressly set forth in the Agreement, including, but not limited to,

liabilities on account of any taxes or other government fees, contributions or surcharges

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Property prior to the Closing Date.

8.      **Binding Effect of Order.** This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of

title in or to any of the Property.

9.      **Binding on Successors.** The terms and provisions of the Agreement

and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of

(whether known or unknown) and holders of equity interests in the Debtor, the Purchaser

and their respective affiliates, successors and assigns, and any affected third parties,

including, but not limited to, and all persons asserting Interests in the Property. This Order

and the Agreement shall inure to the benefit of the Purchaser and its respective successors and assigns.

10. **Bankruptcy Code Section 363(n).** The consideration provided by the Purchaser for the Property under the Agreement is fair and reasonable. Based on the disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not aware of any facts that would support an argument for avoidance of the Transactions.

11. **Good Faith.** The Transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions with the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

12. **Fair Consideration.** The consideration provided by the Purchaser to the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

13. **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if

necessary, any and all disputes concerning or relating in any way to the Transactions; and (e)

protect the Purchaser against any Interests in the Debtor or the Property of any kind or

nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain

exclusive jurisdiction with respect to issues or disputes in connection with this Order and the

relief provided herein, including without limitation to protect the Trustee and Purchaser

from interference with the Sale, and to resolve any disputes related to the Sale, the

Agreement or the implementation thereof.

14.     **Surrender of Possession.** All entities that are presently, or on the

Closing Date may be, in possession of some or all of the Property in which the Debtor holds

an interest hereby are directed to surrender possession of the Property either to (a) the

Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15.     **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the

Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear,

any and all valid and perfected Interests in Property of the Debtor shall attach to any

proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the

order of priority, and with the same validity, force and effect that they now have against the

Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no

proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the

express consent of the party or parties asserting an Interest therein or further order of the

Court after notice (to all parties who have asserted an Interest in such proceeds) and a

hearing, consistent with the requirements of the Bankruptcy Code.

16.   **Non-material Modifications.** The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the estate.

17.   **Failure to Specify Provisions.** The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

18.   **Stay of Order.** Bankruptcy Rule 6004(h) applies to this Order

19.   **Copyright:** So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement

resulting from the improper or unauthorized use of the C & R Intellectual Property by the

Purchaser, or its assignee, or any third parties.

Dated and Entered:

April 9, 2020

_____

Hon. Thad J. Collins
Chief Judge

*ORDER PREPARED BY:*
Charles L. Smith
Chapter 7 Trustee

1stSecMcQ.Bankr.Pleading.Draft.OrderreSale.040820.1139.ejl.redlined

13

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

**MOTION OF CORNICE & ROSE INTERNATIONAL, LLC,
FOR RECONSIDERATION OF ORDER
DATED APRIL 9, 2020**

NOW COMES Cornice & Rose International, LLC, an Illinois limited liability company

("C&R"), through its counsel, and as and for its "Motion for Reconsideration of Order Dated April

10, 2020" (this "Motion") respectfully state as follows:

1.     On March 23, 2020, the Trustee filed a "Motion For Sale of Property Under Section

363" (the "Sale Motion") pursuant to which he seeks, *inter alia*, to sell the principal asset of the

estate, certain real and property located at 123 North Main, Charles City, Iowa (the "Property") to

First Security Bank & Trust Co. ("First Security") for $1.1 million.  On April 8, 2020, this Court

held a telephonic hearing (the "Hearing"), during which the Court considered the Sale Motion and

several objections thereto, including objections filed by C&R.

2.     On April 9, 2020, this Court entered an Order [Docket No. 154] (the "Order")

which, *inter alia*, granted the Sale Motion.  The Order is stayed by operation of Bankruptcy Rule

6004(h).  Since this Motion being filed prior to April 24, 2020, this Motion is permitted by, and

the Court is authorized to provide the relief requested under, either Federal Rule of Bankruptcy

Procedure 9023 or 9024.  See discussion in *Keener v. Super Wings Int'l, Ltd.* (*In re Jody L. Keener*)

1

Bankr. Case No. 14-01169, Adversary No. 14-09061, 2015 WL 5118691, at *2-*3, esp. fn. 1 (Bankr. N.D. Iowa Aug. 28, 2015).

3.     As the designer of the uncompleted building that was being constructed on the Property, C&R is its "author" and therefore owner of the architectural works copyright on that building.  Under the Copyright Act, an "architectural work" is defined as "the design of a building as embodied in any tangible medium of expression, <u>including a building</u>, architectural plans, or drawings."  17 U.S.C. § 101 (definition of "architectural work"; emphasis added).  Under the Architectural Works Copyright Protection Act of 1990, "architectural works" are protected under the Copyright Act.  *See* 17 U.S.C. § 102(8).

4.     As the owner of the copyrights in the architectural works at issue, C&R has the exclusive rights to that design provided by the Copyright Act.  *See* 17 U.S.C. § 106.  Violation of those exclusive rights constitutes copyright infringement.  17 U.S.C. 17 U.S.C. § 501(a).   The unauthorized construction of a building covered by an architectural works copyright (or any sale or rental of it) is thus illegal and subjects the violator to the panoply of remedies provided by the Copyright Act.  *See, e.g.*, *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 729 (8th Cir. 2006) (AWCPA case).  For instance, each sale – not just the initial infringing sale – of a building constructed in violation of an architectural works copyright constitutes a fresh violation of the copyright owner's rights.  As one court has explained:

> Further, because the constructed homes constitute infringing copies of the Plaintiffs copyrighted works, they cannot be lawfully resold without the Plaintiffs permission. Under 17 U.S.C. § 106(3), a copyrighted article may be sold only by the owner of the copyright. Any sale by another party without the owner's permission constitutes an act of infringement. The only exception to this rule exists under 17 U.S.C. § 109(a), which permits the resale of a copyrighted article by a buyer who received a valid *non-infringing* copy of the work. This is known as the "first sale" doctrine. An *infringing* copy, therefore, does not fit within the "first sale" doctrine embodied in 17 U.S.C. § 109(a) and cannot be resold without the resale causing an additional act of infringement. The homeowners, the Nickols and

2

Kellers, own houses that are infringing copies. Thus, without express permission by the Plaintiff, any sale of the houses by them or by any subsequent owner will constitute an act of infringement for which the copyright owner could bring suit.

*Palmetto Builders & Designers v. Unireal*, 342 F.Supp.2d 468, 473 (D.S.C. 2004).

5.    The Sale Motion contained no reference to the issue of C&R's architectural works copyright. When C&R raised the issue of the copyright and the likelihood that further construction of the building or any subsequent sale or rentals of it would infringe C&R's copyright, counsel for the Trustee and First Security indicated at the Hearing that the Property was being sold "as is" and that C&R would retain its rights to enforce its copyright. Following the Hearing counsel for the Trustee and First Security drafted the Order, and simply inserted some language in the Order which they believed addressed the issue of C&R's copyright. The Order states (at ¶4):

> *the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.*

and (at ¶19):

> *So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement resulting from the improper or unauthorized use of the C & R Intellectual Property by the Purchaser, or its assignee, or any third parties.*

6.    The foregoing text (the "Text") in the Order is contrary to the provisions of Title 17, attempts to authorize actions far beyond the authority of Title 11, violates the property rights of C&R, and is inadequate as a resolution to the problem of C&R's intellectual property rights in

3

the building being constructed on the Property.  Indeed, inclusion of the Text in the Order required

this Court to interpret and rule on both Title 11 and other laws of the United States regulating

organizations or activities affecting interstate commerce (specifically, Title 17).  Such relief –

which was not sought in the Motion, but was added *ad hoc* to the Order at the last minute by

counsel for the Trustee and First Security – means that this matter is subject to a mandatory

withdrawal of the reference under 28 U.S.C. § 157.

7.     Specifically, the Text purports to, *inter alia*, authorize the following, each of which

is prohibited under Title 17 and/or Title 11:

a.     authorize completion of construction of the building (in violation of C&R's

exclusive right of reproduction);

b.     authorize the creation of derivative works (in violation of C&R's exclusive rights

to so);

c.     authorize the sale of an unauthorized copy or derivative of C&R's architectural

work (in violation of C&R's exclusive right to vend);

d.     enjoin lawful enforcement actions for copyright infringement in the courts of the

United States under Title 17; and

e.     purports to grant a forced license of C&R's copyright, despite the fact that neither

the Bankruptcy Code nor the Copyright Act authorize such relief, and the Supreme Court declined

to allow such forced licenses absent specific legislative authorization.  *See generally* PATRY, W.,

PATRY ON COPYRIGHTS § 10.86 (West 2020) detailing the history of *Sony Corp. of America v.*

*Universal City Studios, Inc.***,** 104 S.Ct. 774 (1984) based on the Justices draft opinions and

correspondence).

4

8.      The Text and the issues described in paragraph 7 above constitute errors of law that must be corrected.  None of these issues presented in paragraph 7 above was raised in the Sale Motion or directly addressed during the Hearing.

9.      In the context of the Motion, these matters all "require[] consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).  Accordingly, C&R will be moving in the United States District Court for the Northern District of Iowa for withdrawal of the reference within the next 24 hours.

WHEREFORE, C&R respectfully request that this Court enter an Order:

(a)      setting this matter for hearing;

(b)      withdrawing the Order pending resolution of the matters raised in this Motion; and

(c)      granting C&R such other and further relief as may be just and equitable under the circumstances.

Respectfully submitted,

CORNICE & ROSE INTERNATIONAL, LLC

/s/Bradley R. Kruse
Bradley R. Kruse AT0004483
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
direct:(515)246-4505
fax: (515)246-4550
email: bkruse@dickinsonlaw.com

**CERTIFICATE OF SERVICE**

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated this 23rd day of April, 2020.

/s/ Antoinette Watson

5

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

In re                                )

                                    )

MCQUILLEN PLACE COMPANY, LLC, an     )        Case No. 19-00507

Iowa limited liability company,          )        Chapter 7

                                    )

         Debtor.              )        Hon. Thad J. Collins

                                    )

                                    )

MOTION FOR RECONSIDERATION OF ORDER

NOW COME James Gray and Charles Thomson, creditors, administrative claimants, and equity security holders (the "Movants"), through their counsel, and as and for their "Motion for Reconsideration of Order" (this "Motion") respectfully state as follows:

1.      On March 23, 2020, the Trustee filed a "Motion to Motion For Sale of Property Under Section 363" (the "Sale Motion") pursuant to which he sought, *inter alia*, to sell the principal asset of the estate, certain real and property located at 123 North Main, Charles City, Iowa (the "Property") to First Security Bank & Trust Co. ("First Security") for $1.1 million.  On April 8, 2020, this Court held a telephonic hearing (the "Telephonic Hearing"), during which the Court considered the Sale Motion and several objections thereto, including objections filed by the Movants.

2.      On April 9, 2020, this Court entered an Order (the "Order") which, *inter alia*, granted the Sale Motion.  The Order is stayed by operation of Bankruptcy Rule 6004(h).

3.      Two serious matters merit the Court revisiting, under either Bankruptcy Rule 9023 or 9024, the provisions of the Order:

      A.      Counsel for Movants, during the Telephonic Hearing, requested an opportunity to cross-examine the Trustee in connection with the affidavits

1

presented to support the Sale Motion; the Court did not address the request during the hearing, and the Order's silence on the issue creates a due-process-based impediment to consummation of the Order's sale provisions; and

B.      The provisions of the Order, as drafted, appear to be diametrically at odds with the provisions of Title 17.

### I.      The Issue of the Request to Cross-Examine the Trustee

4.      During the Telephonic Hearing, counsel for Movants specifically requested an opportunity to examine the Trustee, under oath, concerning, *inter alia*, the Trustee's failure to use even free advertising media to solicit bids for the Property. The Court did not rule on the request during the hearing, and the Order is silent on the issue.

5.      Affidavits, which are actually hearsay evidence, are frequently permitted as evidence under the Bankruptcy Rules and Federal Rules in the absence of objection. However, as indicated in 8 Norton Bankr. L. & Prac. 3d § 164:2[1], and as is recognized implicitly in Local Rule 3012-1(e) (requiring an appraiser to be available for cross-examination in the event of objection to this affidavit), admission of an affidavit is subject to the ability of opposing counsel being able to cross-examine the affiant as to the truth of the matter asserted in the affidavit.

---

[1] "Some courts have adopted procedures whereby direct evidence is introduced by means of affidavit, with the witness required to be available for cross-examination. It has been held that such a procedure violates Fed. R. Civ. P. 43(a), as adopted by Fed. R. Bankr. P. 9017,10 and no valid legal basis supports this policy in the context of a trial on the merits over the objection of a party. [] The affidavit constitutes inadmissible hearsay, and Fed. R. Civ. P. 43(a) requires testimony.[] A more difficult issue arises in the bankruptcy context where substantive rights may be finally determined by motion. Fed. R. Civ. P. 43(e) permits a motion to be supported by affidavit when based on facts not appearing in the record. [] In the absence of an objection, an affidavit may be sufficient; [] but where an objection is raised, and the motion presents issues of fact and seeks a final judgment, the matter is in essence a trial strongly favoring the testimony of witnesses taken in open court. The need for both the plaintiff and defendant to have access to the declarant cannot be overemphasized." (Citations and footnotes omitted.)

2

6.      The right to confrontation is a critical component of due process -- so much so that it is enshrined, in the criminal context, in the Constitution.  Where, as here, the request by an objector to a proposed sale has specifically requested to exercise this right, failure to permit the cross-examination together with omitting any ruling on the request creates a gap in due process which can later be argued to be an infirmity in the title taken by any buyer under the Order.  In the absence of an ability to cross-examine the Trustee, the affidavit of the Trustee is inadmissible hearsay, and there is no evidentiary support in the record to justify the entry of the Order.  This is error.

8.      Movants continue to demand the right to cross-examine the Trustee for the reasons stated during the Telephonic Hearing, and assert that such cross-examination must be permitted before the Order can be lawfully entered.

## II.      The Copyright Issue

9.      Cornice & Rose International, LLC ("C&R"), has asserted its rights under an architectural copyright in all aspects of the design and creation of the Property.  During the Telephonic Hearing, and in his drafting of the Order, counsel for First Security insisted that the copyright issue would be resolved through insertion of certain paragraphs of the Order.

10.     As is indicated in separate filings by C&R, however, the Order as crafted creates a number of conflicts with C&R's rights under Title 17.

11.     Movants believe it serves no one's interests to have intricate, potentially expensive unresolved copyright issues blocking completion of the Property.

12.     Accordingly, Movants join in the Motion for Reconsideration submitted by C&R (the "C&R Motion").

NOW, WHEREFORE, the Movants respectfully request that this Court enter an order:

(a)      setting this matter for hearing;

(b)      granting the Motion and permitting cross-examination of the Trustee as requested;

(c)      granting the C&R Motion; and

(d)      granting the Movants such other and further relief as may be just and equitable

under the circumstances.

Respectfully submitted,

James Gray and Charles Thomson

  /s/ Charles Thomson_____
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | District Case No. _____ |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | (Bankruptcy Case No. 19-00507) |
| Iowa limited liability company, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**MOTION OF CORNICE & ROSE INTERNATIONAL, LLC,
FOR PARTIAL WITHDRAWAL OF THE REFERENCE**

NOW COMES Cornice & Rose International, LLC, an Illinois limited liability company ("C&R"), through its counsel, and as and for its "Motion of Cornice & Rose International, LLC, for Partial Withdrawal of the Reference" (this "Motion") respectfully state as follows:

1.      On April 24, 2019, McQuillen Place Company, LLC, an Iowa limited liability company (the "Debtor") filed a petition for protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      On December 9, 2019, the Bankruptcy Court entered an order converting the case to Chapter 7 of the Bankruptcy Code.  Charles L. Smith (the "Trustee") was appointed trustee.

3.      On March 23, 2020, the Trustee filed a "Motion For Sale of Property Under Section 363" [Docket No. 134] (the "Sale Motion") pursuant to which he seeks, *inter alia*, to sell the principal asset of the estate, certain real and property located at 123 North Main, Charles City, Iowa (the "Property") to First Security Bank & Trust Co. (the "Bank").  A copy of the Sale Motion is attached hereto as Exhibit A.

1

4.      On April 8, 2020, the Bankruptcy Court held a telephonic hearing (the "Hearing"), during which the Bankruptcy Court considered the Sale Motion and several objections thereto, including objections filed by C&R.

5.      On April 9, 2020, the Bankruptcy Court entered an Order  granting the Sale Motion [Docket No. 154] (the "Order").  A copy of the Order is attached hereto as Exhibit B.  The Order was stayed for 14 days pursuant to Bankruptcy Rule 6004(h).  C&R has moved in the Bankruptcy Court for reconsideration of the Order (*see* Motion for Reconsideration, attached hereto as Exhibit C).

6.      As the designer of the uncompleted building that was being constructed on the Property, C&R is its "author" and therefore owner of the architectural works copyright on that building.  Under the Copyright Act, an "architectural work" is defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings."  17 U.S.C. § 101 (definition of "architectural work"; emphasis added).  Under the Architectural Works Copyright Protection Act of 1990, "architectural works" are protected under the Copyright Act.  *See* 17 U.S.C. § 102(8).

7.      As the owner of the copyrights in the architectural works at issue, C&R has the exclusive rights to that design provided by the Copyright Act.  *See* 17 U.S.C. § 106.  Violation of those exclusive rights constitutes copyright infringement.  17 U.S.C. 17 U.S.C. § 501(a).   The unauthorized construction of a building covered by an architectural works copyright (or any sale or rental of it) is thus illegal and subjects the violator to the panoply of remedies provided by the Copyright Act.  *See, e.g.*, *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 729 (8th Cir. 2006) (AWCPA case).  For instance, each sale – not just the initial infringing sale – of a building

2

constructed in violation of an architectural works copyright constitutes a fresh violation of the copyright owner's rights.  As one court has explained:

> Further, because the constructed homes constitute infringing copies of the Plaintiffs copyrighted works, they cannot be lawfully resold without the Plaintiffs permission. Under 17 U.S.C. § 106(3), a copyrighted article may be sold only by the owner of the copyright. Any sale by another party without the owner's permission constitutes an act of infringement. The only exception to this rule exists under 17 U.S.C. § 109(a), which permits the resale of a copyrighted article by a buyer who received a valid *non-infringing* copy of the work. This is known as the "first sale" doctrine. An *infringing* copy, therefore, does not fit within the "first sale" doctrine embodied in 17 U.S.C. § 109(a) and cannot be resold without the resale causing an additional act of infringement. The homeowners, the Nickols and Kellers, own houses that are infringing copies. Thus, without express permission by the Plaintiff, any sale of the houses by them or by any subsequent owner will constitute an act of infringement for which the copyright owner could bring suit.

*Palmetto Builders & Designers v. Unreal*, 342 F.Supp.2d 468, 473 (D.S.C. 2004).

8.     Notwithstanding C&R's copyright, and notwithstanding C&R's insistence that the parties to the sale comply with Title 17, the Order, which the parties to the sale drafted and submitted to the Bankruptcy Court for signature, runs afoul of several significant tenets of copyright law and of a number of provisions of Title 17.

9.     As a result of the conflict between the text of the Order and the provisions of Title 17, otherwise plainly enforceable substantive rights of C&R in and to its intellectual property may be extinguished or subjected to needless legal controversy.

10.     Pursuant to the general referral of bankruptcy matters from the Article III Federal district courts to the bankruptcy courts under 28 U.S.C. §157, bankruptcy courts can "hear" and determine a certain category of cases -- such as confirmation of plans of reorganization or determination of allowance of claims against a debtor --  which are core to these courts' general bankruptcy function.  However, this grant of referred jurisdiction reserved to the district courts other cases regarded by Congress as being outside the conventional purview of bankruptcy.

11.     Some of these matters, such as controversies involving CERCLA, involve legal determinations for which hearing in the district court is mandatory.  These are the cases described in 28 U.S.C. § 157(d).  *See*, *S. Pac. Transp. Co. v. Voluntary Purchasing Group, Inc*., 252 B.R. 373, 385 (E.D. Tex. 2000).  *See also, In re Bennett*, 2011 WL 5546955 (Bankr.W.D.Tex. Oct. 7, 2011) and *Burger King Corp. v. B-K of Kansas, Inc.*, No. CIV. A. 86-2294-V, 1991 WL 49926, at *2 (D. Kan. Mar. 21, 1991) (noting that reference had been withdrawn), *aff'd sub nom. In re B-K of Kansas, Inc.*, 21 F.3d 1120 (10th Cir. 1994).

12.     United States copyright law is a prime example of Federal law "regulating organizations or activities affecting interstate commerce" as referenced in 28 U.S.C. § 157(d).  *See In re Nat'l Gypsum Co.*, 145 B.R. 539, 541 (N.D. Tex. 1992).

13.     The policy concerns long associated with this mandatory withdrawal of the reference include the preference of having district courts, rather than bankruptcy courts, making difficult determinations on complex non-bankruptcy Federal statutes [*see*, *In re Isbell Records, Inc.*, "Report and Recommendation" at ¶¶45-46 (Bankr. E.D. Tex. Mar. 29, 2007) (attached hereto as Exhibit D)], particularly in cases of first impression, or (as here) resolving apparent conflicts between bankruptcy and non-bankruptcy law.  These policy concerns are particularly acute in matters of copyright.  *See, generally,* discussion in  *Eli Global, LLC v. Univ. Directories, LLC*, 532 B.R. 249, 251-253 (M.D.N.C. 2015).

14.     The Order entered by the Bankruptcy Court in this case is a good illustration of the problems 28 U.S.C. § 157(d) sought to have resolved at the district court level.  After C&R pointed out that the sale of the building would likely result in infringement of raised C&R's copyright, counsel for the Trustee and the Bank after the Hearing simply inserted some language in the Order which they believed addressed the issue.  The Order states (at ¶4):

4

> *the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.*

and (at ¶19):

> *So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement resulting from the improper or unauthorized use of the C & R Intellectual Property by the Purchaser, or its assignee, or any third parties.*

15.     The foregoing text (the "Text") in the Order, which was drafted by the Trustee and counsel to the Bank, is contrary to the provisions of Title 17, attempts to authorize actions beyond the authority of the Bankruptcy Court, violates the property rights of C&R, and is inadequate as a resolution to the problem of C&R's intellectual property rights in the building being constructed on the Property.  Indeed, inclusion of the Text in the Order required the Bankruptcy Court to interpret and rule on both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce (specifically, Title 17).  Such relief – which was not sought in the Motion, but was added *ad hoc* to the Order at the last minute by the Trustee and counsel to the Bank – means that this matter is subject to a mandatory withdrawal of the reference under 28 U.S.C. § 157.

16.     Specifically, the Text purports to, *inter alia*, authorize the following, each of which is prohibited under Title 17 and/or Title 11:

5

a.      authorize completion of construction of the building (in violation of C&R's exclusive right of reproduction);

b.      authorize the creation of derivative works (in violation of C&R's exclusive rights to do so);

c.      authorize the sale of an unauthorized copy or derivative of C&R's architectural work (in violation of C&R's exclusive right to vend);

d.      enjoin lawful enforcement actions for copyright infringement in the courts of the United States under Title 17; and

e.      grant a forced license of C&R's copyright, despite the fact that neither the Bankruptcy Code nor the Copyright Act authorize such relief, and the Supreme Court declined to allow such forced licenses absent specific legislative authorization.  *See generally* PATRY, W., PATRY ON COPYRIGHTS § 10.86 (West 2020) detailing the history of *Sony Corp. of America v. Universal City Studios, Inc.*, 104 S.Ct. 774 (1984) based on the Justices draft opinions and correspondence).

17.      In essence, the Order, if followed, would create one set of copyright laws applicable when a party connected to the copyright had made a trip through bankruptcy jurisdiction, and another, different set of copyright laws for the rest of the copyright holders in the United States.

18.      Such an unacceptable result is precisely why 28 U.S.C. § 157(d) was crafted the way it was, and why this Court should partially[1] withdraw the reference of these issues from the Bankruptcy Court.

---

[1] This Motion seeks withdrawal of the reference from the Bankruptcy Court only with respect to those matters pertaining to the proposed sale of the Property since these are the only issues in which adjudication of rights under Title 17 are required.  Withdrawal of the reference of the bankruptcy case generally is not requested.

WHEREFORE, C&R respectfully requests that this Court enter an order:

(a)      setting this matter for hearing;

(b)      withdrawing the reference from the Bankruptcy Court of those matters arising from or related to the contemplated sale of the Property; and

(c)      granting C&R such other and further relief as may be just and equitable under the circumstances.

Respectfully submitted,

CORNICE & ROSE INTERNATIONAL, LLC

/s/Bradley R. Kruse
Bradley R. Kruse AT0004483
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
direct:(515)246-4505
fax: (515)246-4550
email: bkruse@dickinsonlaw.com

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated this 23rd day of April, 2020.

/s/ Tiffany Roosa

7

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| McQuillen Place Company, LLC, | ) | Case No. 19-507 |
| Debtor. | ) | |

## TRUSTEE'S MOTION TO SELL AND FOR OTHER RELIEF
### (11 U.S.C. §§363(b) and (f))

COMES NOW Chapter 7 Trustee Charles L. Smith and moves for an Order from this Court granting this Motion, and in support thereof respectively states:

1.      On April 25, 2019, McQuillen Place Company, LLC. ("Debtor" or "MPC") filed a voluntary Chapter 11 Petition with this Court.

2.      On Dec. 9, 2019, this Court entered an Order converting the Chapter 11 case filed by the Debtor to one under Chapter 7.

3.      The Office of the United States Trustee subsequently appointed Charles L. Smith ("Trustee") to administer this Chapter 7 case.

4.      In the course of his administration, the Trustee has been in communication with various creditors and stakeholders.

5.      Among the assets being administered by the Trustee is certain real estate (the "Real Estate") upon which lies a partially-completed building (the "Building") that is owned by the Debtor, as well as certain items of personal property located therein or associated therewith (the "Personal Property").

6.      With respect to the Real Estate and Building, the Trustee is credibly informed First Security Bank & Trust Company ("Bank" or "Purchaser") asserts a validly perfected

1

EXHIBIT

A

131

mortgage against the Real Estate and Building (the "Mortgage"). The Trustee further reasonably believes no one claims a superior interest in the Real Estate and Building, other than the Bank's assertion of a mortgage lien and whatever, if any, mechanic or similar statutory liens, that may include liens on account of real estate tax, are asserted by other parties in interest. The Trustee is further cognizant that based on the Mortgage the Bank has commenced a Foreclosure Petition in State Court, and certain counterclaims have been pled. The Foreclosure Petition was and still is pending in State Court, and no Decree has been enrolled.

7.     With respect to the Personal Property, even if some or all of the Personal Property became fixtures (which would then be subject to the Bank's mortgage), no one has filed any U.C.C. financing statement. As such, the Personal Property is likely free and clear of perfected consensual liens.

8.     However, the Trustee is also cognizant that Cornice & Rose International, LLC (which, *inter alia*, served as the Debtor's architect ("C & R")) (and perhaps other entities that are owned or partially owned by the Debtor's principal, *e.g.* Hildreth & Co., LC) asserts some interest or claim or right against some of all of the personal property in question. For example, C & R may claim it actually "owns" some or all of the personal property located in and scattered in various areas of the Debtor's building, and C & R may also claim it is the licensor of certain drawings that might have been used by the Debtor or others in the process of erecting the Building. In any event, at a minimum bearing in mind the Debtor is at least in possession of some of the Personal Property (*e.g.* the items that are located on the Debtor's premises), and the Debtor is or was at least a licensee of some of the drawings, pursuant to 11 U.S.C. §541 the Debtor and therefore this estate had and have

2

either a legal or equitable (or both) interest in all of the Personal Property, albeit admittedly

and possibly subject to whatever, if any, claim, right, title, or interest that may eventually be

validly proven by C & R or other entities claiming a claim, right, title, or interest thereto.

9.      The Trustee has issued an invitation to various interested parties to bid on the

Real Estate and the Personal Property. Two bids were received by the March 9, 2020

deadline imposed by the Trustee. In examining the two bids, the Trustee has concluded the

bid submitted by the Bank is the highest and best offer. As a result, the Trustee has executed

a Purchase Agreement, a copy of which is attached hereto as Exhibit 101 and is by this

reference incorporated herein as if set forth verbatim.

10.      Briefly and generally, the Purchase Agreement provides for the Trustee to sell

the Real Estate and Building, as well as the Personal Property, for a total cash gross cash

price of $1,100,000. Any and all lien, claim, title, interest, and right asserted by the Bank or

C & R or any party in interest will attach to the gross proceeds, in whatever order of priority

that existed as of the initial Chapter 11 filing date, EXCEPT the sum of $150,000 cash will

be released from the gross proceeds allocated to the Real Estate and Building, and such sum

shall be free and clear of any and all claim, lien, title, interest, and right, and the Trustee and

the estate may use such sum for any and all purposes, pursuant to the provisions of Title 11,

including but not limited to the payment of administrative claims and expenses and, if

available, to the payment of various non-administrative claims (such as general unsecured

claims).

11.      More specifically, with respect to the Real Estate and Building, because no

one disputes the Debtor owns the Real Estate in fee simple absolute, subject only to the

Bank's Mortgage and whatever, if any, other validly perfected lien or encumbrance, the

3

Trustee seeks permission from this Court to effectuate the sale pursuant to 11 U.S.C. §363(b). All such Mortgage and lien and encumbrance and any and all right, title, claim, interest, and lien of any and all parties in interest will attach to the gross proceeds from the sale, minus the cash sum of $ 150,000, in the same order of priority as it existed as of the time of the original Chapter 11 filing, and will be held by the Trustee, subject to further Order from this Court. If, for example, eventually the Bank successfully proves to this Court that the Bank has a superior lien in such gross proceeds (minus $150,000), the money will then be paid to the Bank in partial satisfaction of its Proofs of Claim filed in this Court. And *if* somehow there is a bona fide dispute as to the Bank's lien or the Debtor's (and the estate's) ownership of the Real Estate and Building, the Trustee alternatively seeks permission from this Court to sell the Real Estate and Building, pursuant to 11 U.S.C. §363(f)(4).

12.     With respect to the Personal Property, the Trustee posits there is a bona fide dispute between and among various interested parties as to the respective and relative lien, claim, title, and interest in and to the Personal Property. For example, the Debtor at a minimum had or has a possessory right and interest or the right of a licensee, whereas other interested parties (such as C & R) assert an "ownership" or licensor claim or interest. The Trustee has attempted to discover the full extent of C & R *et al.*'s claims or interest, but C & R's counsel merely referred the Trustee to certain provisions of the United States Code without otherwise fully and completely sharing with the Trustee all documents and information concerning the alleged claim of "ownership." Therefore, with respect to the Personal Property, the Trustee seeks permission from this Court to sell to the Bank the Personal Property for the sum of $25,000, pursuant to 11 U.S.C. §363(f)(4), *viz.*, this Court

4

is authorized to sell property of the estate that is subject to "bona fide dispute." If C & R or others eventually prove to this Court that they indeed enjoy superior title, right, claim, or interest to the Personal Property, the proceeds from the sale attributable to the value of the Personal Property will be paid to such parties. Pending resolution of the bona fide dispute, the gross proceeds of the sale attributable to the Personal Property will be held by the Trustee, subject to further Order from this Court, and any and all right, title, claim, lien, or interest of any and all parties in interest will attach to such proceeds, in the same order of priority as it existed as of the time of the original Chapter 11 filing.

13. To consummate the sale, the Trustee will execute a Court Officer's Deed, with respect to the Real Estate and Building, and a Bill of Sale with respect to the Personal Property. The Purchaser will be granted title, pursuant to this Court's Order approving this Motion, to all the Real Estate and Building and the Personal Property, free and clear of any and all claims (including but not limited to any and all environmental claims or successor liability claims), liens, interests, title, right, and encumbrances. Otherwise, the sale is "As is Where Is."

14. The Trustee submits the sale proposed in this Motion is in the best interest of the estate, of the creditors, and of the community. This is so because such a sale will generate much-needed "free and clear" cash to enable the Trustee to administer this case, and will hopefully enable the Purchaser to complete the building project, to the betterment of the community and the public interest. The Trustee further submits the Purchase Agreement was negotiated at arm's length and in good faith and with assistance and advise from counsel.

15.     Any Order approving this Motion should also provide the 14-day stay period in F.R.B.P. 6004(h) is inapplicable. Such a provision will enable an expeditious closing, and will minimize administrative claim (such as utility bills, real estate taxes etc.) that will be incurred and inflicted against the estate. A form of a proposed Order is appended hereto.

WHEREFORE, the Trustee respectfully prays this Court on such notice and hearing as it may direct enter and enroll an Order granting the relief requested by the Trustee in this Motion, and for such other relief as may be just and proper under the premises.

/s/ Charles L. Smith
Charles L. Smith, Chapter 7 Trustee
25 Main Place, Suite 200
Council Bluffs IA 51503
712-325-9000

**Certificate of Service**

The undersigned certifies, under penalty of perjury, that on this 23rd day of March 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Cathy Templeton

Larry Eide
Don Molstad
Christine Skilton
Eric Lam
Charles Thomson
Joe Schmall
Laura Heyer
Judith O'Donohue
Brandon Gray
Brad Sloter

6

L Ashley Zubal
Monica Clark
J D Hass
Dan Childers

<u>Declaration</u>[1]

    I, Charles L. Smith, in my sole capacity as Chapter 7 Trustee in this case, do hereby declare under penalty of perjury under 28 U.S.C. §1746 that the facts stated in this Motion are true and correct.

        /s/ Charles L. Smith
        Charles L. Smith, Chapter 7 Trustee

---

[1] Pursuant to F.R.B.P. 9017 and F.R.C.P. 43(c), to the extent evidence is necessary to consider this Motion, the Court is authorized to consider the Motion based on affidavits. The Trustee's Declaration is submitted so as to comply with F.R.C.P. 43(c).

7

PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the 20th day of March, 2020 by and between Chapter 7 Trustee Charles L. Smith, solely in his capacity as Trustee of the Bankruptcy Case ("Seller") and First Security Bank & Trust Company having an address at 809 Clark Street, Charles City, Iowa ("Purchaser") ("Purchaser" and "Seller" are for ease of reference "Parties").

Recitals

A.      On April 25, 2019, McQuillen Place Company, LLC ("Debtor") filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Iowa (the "Bankruptcy Court") bearing Case No. 19-507 (the "Bankruptcy Case"); on December 9, 2019, the Bankruptcy Court entered an order converting the Bankruptcy Case to Chapter 7; and the Office of the United States Trustee appointed Charles L. Smith to administer the Bankruptcy Case.

B.      In connection with the Bankruptcy Case, Seller has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Seller, at the price and upon the terms and conditions set forth in this Agreement, (a) that certain parcel of land commonly known as McQuillen Place, and more particularly described on Exhibit A (the "Land"), (b) the buildings, improvements, and structures located upon the Land (the "Improvements"), (c) all other easements and rights appurtenant to the Land, if any (the "Appurtenant Rights"), and (d) all right, title and interest of Seller, if any, in and to the fixtures owned by Seller and attached or appurtenant to the Property, as well as certain items of personal property described on Exhibit A1 (the "Personal Property" and, together with the Land, the Appurtenant Rights, the Improvements, and the Personal Property, collectively, the "Property").

C.      As a result of the pendency of the Bankruptcy Case, Bankruptcy Court approval of this Agreement is required, subject to all terms and conditions set forth herein. In the event the Bankruptcy Court not approve this Agreement, this Agreement shall terminate, and no party hereto shall have any further obligations hereunder, except as otherwise provided herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto hereby agree as follows:

1.      Purchase and Sale. Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Property.

2.      Purchase Price. The purchase price (the "Purchase Price") for the Property shall be the sum of US$1,100,000.00, of which US$1,075,000.00 shall be allocated to be the price for the purchase and sale of the Land, Improvements, and Appurtenance Rights, and separately US$25,000 shall be allocated to be the price for the purchase and sale of the Personal Property.

1

EXHIBIT

101

138

(a)    <u>Payment of Purchase Price</u>. Ten percent of the Purchase Price shall be paid to Seller by Purchaser within seven days after the execution of this Agreement, and the balance of the Purchase Price shall be paid to Seller by Purchaser within seven days of the later of (a) the entry of a Sale Order by the Bankruptcy Court or (b) the execution and tender and delivery of the Deed (as defined herein) and Bill of Sale (as defined herein) and similar documents, except the Parties may mutually in writing agree to a different time. If this Agreement is not timely and fully consummated in any form or fashion, then the aforementioned 10% paid by Purchaser to Seller shall be fully refunded to the Purchaser from the Seller forthwith, and Purchaser shall have no obligation to the Seller with respect to the Purchase Price.

4.3    <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the performance and observance by Seller of all material covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date, (ii) the Bankruptcy Court shall have entered a final and non-appealable order approving this Agreement and the sale of the Property to Purchaser pursuant to the Bankruptcy Code, in form and substance satisfactory to Purchaser and its counsel (the "<u>Sale Order</u>"), and (iii) the fulfillment on or before the Closing Date of these and all other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any of which may be waived by Purchaser in its sole discretion.

4.4    <u>Conditions Precedent to Obligations of Seller</u>. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the Bankruptcy Court shall have entered the Sale Order, (ii) the performance and observance by Purchaser of all material covenants and agreements of this Agreement to be performed or observed by Purchaser prior to or on the Closing Date, and (iii) the fulfillment on or before the Closing Date of these and all other conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in its sole discretion.

4.5    <u>Bankruptcy Conditions</u>. By no later than July 10, 2020, or such other earlier or later date mutually agreed to between the parties (the "<u>Sale Order Approval Deadline</u>"), the Bankruptcy Court shall have entered the Sale Order in a form reasonably acceptable to the Purchaser and Seller that, without limitation, shall (i) include a finding that the Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (ii) provide that the Purchaser is obtaining the Property free and clear of any lien, claim, title, right, or interest, except as otherwise provided for in the Agreement; and (iii) contain such form and substance reasonably satisfactory to Purchaser and its counsel.

4.6    <u>Carve Out and Disposition of Purchase Price</u>. From the Purchase Price the Seller shall retain for the sole benefit of and usage in the Bankruptcy Case, free and clear of any and all claim or lien of the Purchaser, the sum of US$150,000, which sum may be used by the Seller for any and all purposes, subject to the provisions of Title 11 and further Orders from the Bankruptcy Court. Subject to the allocation aforementioned between the Land etc. vis-à-vis the Personal Property, the balance of the Purchase Price shall be held by the Seller, pending further Orders from the Bankruptcy Court, and shall not be disbursed or released

2

except as may be directed or allowed by Orders from the Bankruptcy Court, all subject to and pursuant to notice and hearing.

5. <u>Closing</u>. Subject to the satisfaction or waiver of all conditions precedent with respect to each party's obligation, the closing (the "<u>Closing</u>") of the sale and purchase contemplated herein shall occur at the offices of Attorney Larry Eide in Mason City, IA (or such other location to which the Parties may mutually agree), on or before April 17, 2020, unless otherwise mutually agreed to by the Parties.

5.1 <u>Seller Deliveries</u>. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by Seller, as appropriate:

(a) a court officer deed (the "<u>Deed</u>") in the form shown in <u>Exhibit B</u>;

(b) a certification of non-foreign status in the form shown in <u>Exhibit C</u>;

(c) all existing surveys, blueprints, drawings, operating manuals, plans and specifications for or with respect to the Property or any part thereof, to the extent the same are in Seller's possession;

(d) all keys to the Improvements, to the extent the same are in Seller's possession;

(e) such further instruments as may be necessary to record the Deed;

(f) [intentionally left blank]

(g) a bill of sale as to any personal property included in the sale (the "<u>Bill of Sale</u>") in the form shown in <u>Exhibit D</u>;

(h) a copy of the Sale Order;

(i) possession of the Property free of all leases, tenancies, occupancies, service contracts, other executory contracts;

(j) to the extent in Seller's possession, originals of any and all condominium conversion documents, plans, estimated budgets and other related documents and Seller agrees to cooperate with Purchaser after the closing in connection with substituting Purchaser as the sponsor under the condominium documents and in connection with Purchaser's acquisition of the Property, provided such cooperation shall be at no cost to Seller;

(k) such further instruments as may be necessary to consummate the transaction.

5.2 <u>Purchaser Deliveries</u>. At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following items executed and acknowledged by Purchaser, as appropriate:

3

(a)     payment of the Purchase Price to be made in accordance with this Agreement and

(b)     such further instruments as may be necessary to consummate the transaction.

5.3     <u>Closing Costs</u>. Each Party shall bear its own costs associated with Closing.

5.4     <u>Other Purchaser Costs</u>. Purchaser shall be solely responsible for the payment of the following, incurred since and including April 25, 2019, through the Closing Date (except Purchaser is entitled to seek allowance and payment of all such costs, not to exceed $25,000.00, in the Bankruptcy Case, upon and subject to notice and hearing):

(a)     All real estate taxes, water charges, sewer rents, vault charges and other assessments due with respect to the Property, as well as any and all insurance premiums and security and similar costs and expenses relating to the Property and

(b)     All utilities, including telephone, steam, electricity and gas and similar services and materials.

6.     <u>Representations, Warranties and Covenants; "As Is" Sale</u>.

6.1     <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Purchaser that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

(a)     This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the Sale Order. Seller has taken all necessary action to authorize and approve the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, subject to the Sale Order.

(b)     [Reserved].

(c)     Seller is not a "foreign person" as defined in Section 1445 of the Code.

(d)     Seller has no knowledge of any proposed takings, condemnation or eminent domain proceeding or threat with respect to the Property.

(e)     The foregoing representations and warranties shall survive the Closing.

6.2     [Reserved].

6.3     **General disclaimer. Except as specifically set forth in this Agreement and Exhibits, the sale of the Property is and will be made on an "as is," "where is," and "with all faults" basis, without any representation and warranty of any kind or nature, express, implied or otherwise, including any representation or warranty concerning title**

4

to the Property, the construction of the Improvements, the physical condition of the Property (including the condition of the soil or the Improvements), the environmental condition of the Property (including the presence or absence of hazardous substances on or affecting the Property), the compliance of the Property with applicable laws and regulations (including zoning and building codes or the status of development or use rights respecting the Property), the present and future zoning applicable to the Property, the financial condition of the Property or any other representation or warranty respecting any income, expenses, charges, liens or encumbrances, rights or claims on, affecting or pertaining to the Property or any part thereof.

      6.4   <u>Representations and Warranties of Purchaser</u>. Purchaser represents and warrants to Seller that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

      (a)   The Purchaser is duly organized, validly existing and in good standing under the laws of the state of its formation.

      (b)   The Purchaser has all necessary power and authority to enter into this Agreement and has taken all action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other proceedings on the part of the Purchaser are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Purchaser and is a valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms.

      (c)   No consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of this Agreement or any agreement ancillary to this Agreement and the consummation of the transactions contemplated hereby or thereby.

      (d)   On the Closing Date, the Purchaser will have cash on hand sufficient to deliver the Purchase Price to the Seller.

      (e)   The representations and warranties of Purchaser shall survive the Closing.

      7.   <u>Remedies For Default</u>.

      7.1   **<u>Seller Defaults</u>. If the transaction herein provided shall not be closed by reason of Seller's default under this Agreement, then Purchaser shall have, as its exclusive remedies, the right to either (a) terminate this Agreement or (b) specifically enforce this Agreement (but no other action, for damages or otherwise, shall be permitted).**

5

7.2 **Purchaser defaults. If the transaction herein provided shall not be closed by reason of Purchaser's default under this Agreement, then Seller shall have, as its exclusive remedies, the right to either (a) terminate this Agreement or (b) specifically enforce this Agreement (but no other action, for damages or otherwise, shall be permitted).**

8. Termination.

8.1    This Agreement may be terminated by mutual written consent of the Purchaser and the Seller at any time, subject to any necessary or appropriate order of or approval from the Bankruptcy Court.

8.2    This Agreement shall also terminate if the Sale Order is not entered.

9. Miscellaneous.

9.1    Exhibits; Schedules; Entire Agreement; Modification. All exhibits and schedules attached and referred to in this Agreement are hereby incorporated herein as if fully set forth in (and shall be deemed to be a part of) this Agreement. This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes any prior agreements between the parties hereto respecting such matters. This Agreement may not be modified or amended except by written agreement signed by both parties.

9.2    Business Days. Whenever any action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or by a particular date) that ends (or occurs) on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day. As used herein, the term "Business Day" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in the State of Iowa are not required or authorized to be closed for business.

9.3    Interpretation. Section headings shall not be used in construing this Agreement. Each party acknowledges that such party and its counsel, after negotiation and consultation, have reviewed and revised this Agreement. As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to wit, that ambiguities in this Agreement should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto. Whenever the words "including," "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner. The word "any" does not preclude "all" and vice versa. Terms in singular or plural shall be read interchangeably. The word "or" is inclusive. Except as otherwise indicated, all Exhibit, Schedules and Section references in this Agreement shall be deemed to refer to the Exhibits, Schedules and Sections in this Agreement.

9.4    Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Iowa, without giving effect to principles of conflicts of law, and, where applicable, the U.S. Bankruptcy Code.

6

9.5    <u>Assignments; Successors and Assigns</u>. Purchaser may assign or transfer its rights or obligations under this Agreement without the prior written consent of the Seller. In the event of an assignment or transfer, the transferee shall assume in writing all of the transferor's obligations and shall succeed to the rights and benefits and remedies hereunder.

9.6    <u>Notices</u>. All notices, requests or other communications that may be or are required to be given, served or sent by either party hereto to the other shall be deemed to have been properly given, if in writing and shall be deemed received (a) upon delivery, if delivered in person or by facsimile transmission, with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery), (b) one (1) Business Day after having been deposited for next day overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the United States Postal Office and sent by registered or certified mail, postage paid, return receipt requested, and in each case, addressed as follows:

> To Seller:
>
> Charles L. Smith, Chapter 7 Trustee
> 25 Main Place, Suite 200
> Council Bluffs, Iowa 51503
> (712) 325-9000
>
> To Purchaser:
>
> First Security Bank & Trust Company
> 809 Clark Street
> P.O. Box 577
> Charles City, Iowa 50616-0577
> (641) 257-1232

9.7    <u>Third Parties</u>. Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement upon any other person other than the parties hereto and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third parties any right of subrogation or action over or against any party to this Agreement. Except as set forth below, this Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

9.8    <u>Legal Costs</u>. The Parties agree that they shall pay directly any legal costs that they have incurred on their own behalf in the preparation of this Agreement, all deed and other agreements pertaining to this transaction, and that such legal costs shall not be part of the Closing costs.

9.9    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, including counterparts transmitted by e-mail or facsimile, each of which shall

7

be deemed an original. When counterparts, e-mail, or facsimile copies have been executed by all parties, they shall have the same effect as if the signatures to each counterpart or copy were upon the same documents, and e-mail and facsimile counterparts shall be deemed valid as originals.

9.10    <u>Effectiveness</u>. In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each party hereto.

9.11    <u>No Implied Waivers</u>. No failure or delay of either party in the exercise of any right or remedy given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified in this Agreement for exercise of such right or remedy has expired) shall constitute a waiver of any other or further right or remedy, nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy. No waiver by either party of any breach hereunder or failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.

9.12    <u>Discharge of Seller's Obligations</u>. Except as otherwise expressly provided in this Agreement, Purchaser's acceptance of the Deed and Bill of Sale shall be deemed a discharge of all of the obligations of Seller hereunder that are required to be performed at or prior to Closing and all of Seller's covenants and agreements (except express representations and warranties) in this Agreement shall merge in the documents and agreements executed at the Closing and shall not survive the Closing, except and to the extent that, pursuant to the express provisions of this Agreement, any of such covenants or agreements are to survive the Closing.

9.13    <u>Unenforceability</u>. If any portion of any provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, then such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and such provisions shall be limited and construed as if such invalid, illegal or unenforceable provision or portion thereof were not contained herein, unless doing so would materially and adversely affect a party or the benefits that such party is entitled to receive under this Agreement.

9.14    **<u>Waiver of Trial by Jury and Attorney's Fees and Expense</u>. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. IN ANY SUCH TRIAL OR ACTION OR PROCEEDING ETC., THE PREVIALING PARTY SHALL BE ENTITLED TO BE PAID FROM THE OTHER PARTY ANY AND ALL REASONABLE COSTS AND EXPENSES INCURRED, INCLUDING REASONABLE ATTORNEY'S FEES AND EXPENESE. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.**

9.15    <u>[Reserved]</u>.

8

12.20 <u>Forum</u>. Any dispute that arises under or relates to this Agreement (whether arising under contract, tort, at law or in equity) shall be resolved in the Bankruptcy Court.

12.21 [intentionally left blank]

*[Remainder of Page Intentionally Left Blank]*

9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

By: _Charles L. Smith_
Capacity: _Chapter 7 Trustee_

PURCHASER:

**First Security Bank & Trust Company,**

By: _Mark G. Miller_
Title: _Executive Vice-President_

10

## EXHIBIT A

### Legal Description

Real estate locally known as 107 - 109 and 123 Main Street, Charles City, Floyd County, Iowa, and which is legally described, to wit:

LOT ONE (1), BLOCK TWENTY ONE (21), EXCEPT THE NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF, OF THE ORIGINAL PLAT OF ST. CHARLES, NOW A PART OF CHARLES CITY, IOWA, OTHERWISE DESCRIBED AS: LOT ONE (1) OF THE IRREGULAR SURVEY OF BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES. NOW A PART OF CHARLES CITY, IOWA, EXCEPT THE NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF;
AND

THE NORTH ONE HALF (N ½) OF THE WEST FORTY FEET (W 40') OF THE BRICK WALL BETWEEN LOTS ONE (1) AND TWO (2), BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY, IOWA;
AND

CHARLES CITY DISASTER REDEVELOPMENT PROJECT IOWA R 36(C) PARCEL NO. R 24 (P 10), MORE PARTICULARLY DESCRIBED AS: THE NORTHWESTERLY 22.00 FEET OF LOT ONE (1), BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS THE CITY OF CHARLES CITY, FLOYD COUNTY, IOWA.
(LOCALLY DESCRIBED AS 123 N. MAIN STREET, CHARLES CITY, IOWA 50616 PARCEL NO. 110146700500)
AND

LOT TWO (2), BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY, IOWA.


LOT THREE OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE OF THE ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES CITY.
LOT 4 OF THE SUB-DIVISION OF LOTS 3 AND 4 OF BLOCK 21 OF THE ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES CITY, IOWA.
LOT FIVE (5) OF THE IRREGULAR SURVEY OF BLOCK NO. TWENTYONE (21) OF THE ORIGINAL PLAT OF ST. CHARLES (NOW INCORPORATED AS CHARLES CITY) ACCORDING TO THE SUBDIVISION OF SAID BLOCK TWENTY-ONE (21).

EXHIBIT A1

# McQuillen Place Building Inventory

**REVISED 12 FEBRUARY 2020**

C&R = Items CLAIMED by

5530: Outside building materials

Cornice & Rose Intl

5532: Stair tower floor finish boxes

5533: ladder C&R

5534: Assorted tools **c&R**

5535: Pallet of Delta boxes, plumbing fixtures

5536-37: Assorted building products

5538-39: Exterior building products C&R

5540: Traffic cones C&R

5541: Exterior Building products

5542-43: JLG Lift 3394RT Serial #: 0200137425 C&R

5544: Table Saw C&R

5545: Exterior building materials

**5546-47:** Pallet of smoke detectors/paint/air purifier **C&R**

5548-49: Assorted tools/refrigerator hose/safety equipment/air compressor C&R

5550-51: Assorted vent grilles/lights/Clark welder C&R

5552: Jigsaw/shop vac/cement mixer C&R

5553-54: Window Hardware/Carpet squares

5555-56: Assorted tools/Exterior building products/printer C&R

**5557:** Box of miscellaneous **c&R**

5558: Pallet fork for Skid Loader C&R

5559: Plastic conduit

5560-64: Pallet of Air Conditioning units

5565: Door frame

5566-67: 6 Fire rated doorframe

5568: Exterior buildings products

5569: Building materials

5570: Exterior building products C&R

5571: Outside brick pavers 5572: Two pallets of shingles

5573: Deere CT322 Skid Load on tracks Serial #:
T0322TA115342

5574: Pallet of Plywood

5575-76: Landscaping cloth-black

5578-79: Assorted wires and cables

5580: Pallet of lumber

5581: Pallet of lumber

5582: Two gas cans C&R

5583: Landry washing machine Serial #:9707/002301 5584:
Lumber

5585: Landry Drier Serial #: 1301007714

5586: Dry wall

5587: Plastic conduit

5589-90: Window screens

5591: Plywood/fire rated steel door frames

5592: JLG 1930ES lift Serial #: 0200163717 C&R

5593-95: Mini split unit/battery charger/grout/ polycrete C&R

5596-01: Counter tops-assorted colors

5602: Assorted tools

5603: Conduit in metal and plastic

5604: Brick

5605-13: Assorted electrical equipment

5614: Air compressor Serial #:SN130310850340307 C&R

5616: Three boxes of mail boxes

5617: PVC black piping/hand rails

5618: Scaffolding plank C&R

5619-20: Door hardware

5621: Propane tank

5622: Assorted duct work

5623: Lumber/plumbing supplies/sink (12 pieces of the lumber is Osha Stamped)
C&R 5624: Sonotube/struts/job box C&R

5625: Assorted building material/conduit/two space heaters C&R 5626: Scaffolding/
four space heaters C&R

5627: Window scaffolding/temporary lights/safety equipment/assorted supplies C&R
5628: Job box C&R

5629: Fuel can/exterior supplies/tarps/sprinkler system parts/plumbing parts C&R

5630-34: Apt 201

5635-42: Apt 217

5643-52: Apt 202

5653-62: Apt 216

5663-70: Apt 203

5671-77: Apt 215

5678-81: Apt 214

5682-87: Apt 204

5688-97: Apt 205

5698-5701: Apt 213

5072-03: Apt 212

5704-22: Apt 211

5723: Industrial fan C&R

5724-25: Apt 210

5726-27: Apt 209

5728-29: Apt 208

5730-47: Apt 207 C&R 5744 TOOLS & 5745 CART

5748-49: Apt 206

**5750:** Torpedo heater **c&R**

5751-56: Apt 306

5757-63: Apt 307 C&R 5759 SCAFFOLD 5761 LADDER

EXHIBIT B

**COURT OFFICER DEED**
**Recorder's Cover Sheet**

**Preparer Information:** (name, address and phone number)
_____

**Taxpayer Information:**  (name and complete address)
_____

**Return Document To:**  (name and complete address)
_____

**Grantor:**

**Grantee:**

**Legal Description:**  See Next Page

**Document or instrument number of previously recorded documents:**



# COURT OFFICER DEED

Matter name: _____

now pending in the _____ Court. Case No. _____

     Pursuant to the authority and power vested in the undersigned, and in consideration of _____ Dollar(s) and other valuable consideration, the undersigned, in the representative capacity designated below, hereby Convey(s) to _____ the following described real estate in _____ County, Iowa:

     Words and phrases herein, including acknowledgement hereof, shall be construed as in the singular or plural number, and as masculine, feminine or neutral gender, according to the context.

Dated: _____.

By: _____    _____
                  Title

By: _____    _____
                  Title

As _____ *in the above entitled estate or cause.

As _____ *in the above entitled estate or cause.

*Executor, Administrator, Guardian, Conservator, Trustee, Referee, Commissioner, or Receiver

STATE OF IOWA, COUNTY OF _____

This record was acknowledged before me on _____, by _____

_____.

_____
Signature of Notary Public

**EXHIBIT C**

**CERTIFICATION OF NON-FOREIGN STATUS**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Chapter 7 Trustee Charles L. Smith (the "Affiant"), the Affiant hereby certifies the following that:

1.  Affiant is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.  The U.S. Federal Identification Number of the Affiant is 46-3987825 ; and

3.  Affiant is not a disregarded entity as defined in Internal Revenue Regulations §1.1445.2(b)(2)(iii); and

4.  The address of Affiant is: 25 Main Place, Suite 200, Council Bluffs, Iowa 51503.

Affiant understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that the undersigned has examined this certification and to the best of his knowledge and belief it is true, correct and complete.

Dated: [ _____ ], 20__.


By: _Charles L. Smith_____
Capacity: _Chapter 7 Trustee_____

EXHIBIT D

BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Assignments is executed as of the _____ day of _____, 20__ by Chapter 7 Trustee Charles L. Smith ("Assignor") in favor of First Security Bank & Trust Company ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Personal Property (as such term is described in that certain Purchase Agreement dated as of _____ between Assignor and Assignee).

WHEREAS, in addition to the sale of Personal Property, Assignor also will assign, transfer, set over and deliver to Assignee all of Assignor's rights, if any, in and for all other items of personal property, whether or not affixed or attached to, or placed or situated upon, the Property, and any incidental rights and appurtenances relating thereto, all as described in Exhibit A1 appended hereto, and also in ¶¶ A and B *infra* (collectively, the "Assigned Properties"):

    A.    To the extent assignable without third party consents or any cost or expense to Assignor, all of Assignor's right, title and interest in and to all use, occupancy, building and operating permits, licenses, approvals, documents, instruments, if any, issued from time to time with respect to the Property or the Assigned Properties; *provided*, *however*, if any such assignment may be made at an additional cost or expense, Assignor shall assign all of Assignor's right, title and interest therein if and to the extent Assignee shall pay such additional cost or expense; and

    B.    All of Assignor's right, title and interest in and to all existing and assignable guaranties and warranties (express or implied), if any, issued in connection with the construction, alteration and repair of the Property or the purchase, installation and the repair of the Assigned Properties.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

    1.    Assignor hereby assigns, transfers, sets over and delivers to Assignee, its successors and assigns, all of Assignor's right, title and interest, if any, in and to the Assigned Properties.

    2.    This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

    3.    This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and

effective when all parties hereto have executed and delivered at least one counterpart.

4.   The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

_____

Name:  Charles L. Smith

Capacity:  Chapter 7 Trustee

ASSIGNEE:

First Security Bank & Trust Company,

_____

By: _____

Its: _____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

                    Debtor.

 -----------------------------------------------------------------

Chapter 7
#19 507

### ORDER AUTHORIZING APPROVING SALE
### PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
### AND PROVIDING RELATED RELIEF

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an

order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and

Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company

(together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement

("Agreement") appended to the Motion of certain real estate (as described more fully in the

Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal

property (as described more fully in the Agreement, the "Personal Property" and, together

with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the

transactions ("Transactions") contemplated in the Agreement; and the Trustee having

provided adequate and timely notice to all creditors and parties in interest of the Motion, it

appearing that the Purchaser submitted the highest and best offer to purchase the Property;

and a Sale Hearing having been held on April 8, 2020; and based upon the record of the Sale

Hearing and the facts set forth in the Motion as affirmed by the Trustee's Affidavit; and it

appearing that due, good, sufficient and timely notice of the relief sought and granted in this

order has been given and that no other or further notice need be given; at which time all

1

EXHIBIT

B

interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having had an opportunity to consider all responses and objections to the Motion; and it appearing that the relief requested in the Motion is in the best interests of this Estate, its creditors and other parties-in-interest; and after due deliberation and good cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]

A. **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B. **Statutory Predicates.** The statutory predicates for the relief sought in the Motion are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C. **Notice.** As evidenced by the certificates of service filed with this Court and based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely, adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions contemplated by the Agreement and this Order (the "Transactions"), has been provided in accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances; and (iv) no other or further notice of the Motion or the Sale Hearing or the Transactions, is or shall be required.

D. **Opportunity to Object.** A reasonable opportunity to object and to be heard with respect to the Motion and the relief requested therein has been given, in light of the circumstances, to all interested persons and entities, including the following: (a) the U.S.

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or claim on the Property; (c) all entities known to have expressed an interest in acquiring the Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its counsel; and (f) all other parties who have filed notices of appearance and demands for service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion. All objections to the sale of the Property are overruled or resolved by this Order.

E. **Sale in Best Interests.** Good and sufficient reasons for approval of the Agreement and the Transactions exist, as described in the Motion, and the relief requested in the Motion is in the best interests of the estate, its creditors and other parties in interest.

F. **Business Justification.** The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Transactions other than in the ordinary course of business under Bankruptcy Code section 363(b) in that, among other things, the immediate consummation of the Transactions with the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an order approving the Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser consummating the Transactions.

G. **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any

3

agreement among bidders.

H.    **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I.    **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other  interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J.    **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K.    **Free and Clear.** The Debtor is either the sole and lawful owner of the Property or there is a bona fide dispute as to ownership. The transfer of the Property to the

4

Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.      The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.      The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

5

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

N. **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

O. **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

6

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1. **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2. **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4. **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to

7

attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

5. **Valid Transfer.** As of the Closing Date and except as otherwise provided herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

6. **General Assignment.** On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement.

7. **No Successor Liability.** Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

8

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or shareholders, or the Property, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or responsibility to the Estate, except as is expressly set forth in the Agreement, including, but not limited to, liabilities on account of any taxes or other government fees, contributions or surcharges arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Property prior to the Closing Date.

8. **Binding Effect of Order.** This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property.

9. **Binding on Successors.** The terms and provisions of the Agreement and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of (whether known or unknown) and holders of equity interests in the Debtor, the Purchaser and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, and all persons asserting Interests in the Property. This Order

9

and the Agreement shall inure to the benefit of the Purchaser and its respective successors

and assigns.

      10.    **Bankruptcy Code Section 363(n).** The consideration provided by the

Purchaser for the Property under the Agreement is fair and reasonable. Based on the

disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not

aware of any facts that would support an argument for avoidance of the Transactions.

      11.    **Good Faith.** The Transactions contemplated by the Agreement are

undertaken by the Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of

the authorization provided herein to consummate the Transactions shall not affect the

validity of the Transactions with the Purchaser, unless such authorization is duly stayed

pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled

to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

      12.    **Fair Consideration.** The consideration provided by the Purchaser to

the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code.

      13.    **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to

its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret,

implement, and enforce the terms and provisions of this Order and the Agreement, all

amendments thereto and any waivers and consents thereunder and each of the agreements

executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a)

compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price

to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions; and (e) protect the Purchaser against any Interests in the Debtor or the Property of any kind or nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain exclusive jurisdiction with respect to issues or disputes in connection with this Order and the relief provided herein, including without limitation to protect the Trustee and Purchaser from interference with the Sale, and to resolve any disputes related to the Sale, the Agreement or the implementation thereof.

14. **Surrender of Possession.** All entities that are presently, or on the Closing Date may be, in possession of some or all of the Property in which the Debtor holds an interest hereby are directed to surrender possession of the Property either to (a) the Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15. **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear, any and all valid and perfected Interests in Property of the Debtor shall attach to any proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the order of priority, and with the same validity, force and effect that they now have against the Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the express consent of the party or parties asserting an Interest therein or further order of the Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

11

16.     **Non-material Modifications.** The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the estate.

17.     **Failure to Specify Provisions.** The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

18.     **Stay of Order.** Bankruptcy Rule 6004(h) applies to this Order

19.     **Copyright:** So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement

12

resulting from the improper or unauthorized use of the C & R Intellectual Property by the

Purchaser, or its assignee, or any third parties.

      Dated and Entered:

April 9, 2020

                                            _____
                                            Hon. Thad J. Collins
                                            Chief Judge

*ORDER PREPARED BY:*
Charles L. Smith
Chapter 7 Trustee

1stSecMcQ.Bankr.Pleading.Draft.OrderreSale.040820.1139.ejl.redlined

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

**MOTION OF CORNICE & ROSE INTERNATIONAL, LLC,**
**FOR RECONSIDERATION OF ORDER**
**DATED APRIL 9, 2020**

NOW COMES Cornice & Rose International, LLC, an Illinois limited liability company

("C&R"), through its counsel, and as and for its "Motion for Reconsideration of Order Dated April

10, 2020" (this "Motion") respectfully state as follows:

1. On March 23, 2020, the Trustee filed a "Motion For Sale of Property Under Section

363" (the "Sale Motion") pursuant to which he seeks, *inter alia*, to sell the principal asset of the

estate, certain real and property located at 123 North Main, Charles City, Iowa (the "Property") to

First Security Bank & Trust Co. ("First Security") for $1.1 million. On April 8, 2020, this Court

held a telephonic hearing (the "Hearing"), during which the Court considered the Sale Motion and

several objections thereto, including objections filed by C&R.

2. On April 9, 2020, this Court entered an Order [Docket No. 154] (the "Order")

which, *inter alia*, granted the Sale Motion. The Order is stayed by operation of Bankruptcy Rule

6004(h). Since this Motion being filed prior to April 24, 2020, this Motion is permitted by, and

the Court is authorized to provide the relief requested under, either Federal Rule of Bankruptcy

Procedure 9023 or 9024. See discussion in *Keener v. Super Wings Int'l, Ltd.* (*In re Jody L. Keener*)

1

EXHIBIT
C

Bankr. Case No. 14-01169, Adversary No. 14-09061, 2015 WL 5118691, at *2-*3, esp. fn. 1

(Bankr. N.D. Iowa Aug. 28, 2015).

3. As the designer of the uncompleted building that was being constructed on the

Property, C&R is its "author" and therefore owner of the architectural works copyright on that

building. Under the Copyright Act, an "architectural work" is defined as "the design of a building

as embodied in any tangible medium of expression, including a building, architectural plans, or

drawings." 17 U.S.C. § 101 (definition of "architectural work"; emphasis added). Under the

Architectural Works Copyright Protection Act of 1990, "architectural works" are protected under

the Copyright Act. *See* 17 U.S.C. § 102(8).

4. As the owner of the copyrights in the architectural works at issue, C&R has the

exclusive rights to that design provided by the Copyright Act. *See* 17 U.S.C. § 106. Violation of

those exclusive rights constitutes copyright infringement. 17 U.S.C. 17 U.S.C. § 501(a). The

unauthorized construction of a building covered by an architectural works copyright (or any sale

or rental of it) is thus illegal and subjects the violator to the panoply of remedies provided by the

Copyright Act. *See, e.g.*, *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 729 (8th Cir. 2006)

(AWCPA case). For instance, each sale – not just the initial infringing sale – of a building

constructed in violation of an architectural works copyright constitutes a fresh violation of the

copyright owner's rights. As one court has explained:

> Further, because the constructed homes constitute infringing copies of the
> Plaintiffs copyrighted works, they cannot be lawfully resold without the Plaintiffs
> permission. Under 17 U.S.C. § 106(3), a copyrighted article may be sold only by
> the owner of the copyright. Any sale by another party without the owner's
> permission constitutes an act of infringement. The only exception to this rule exists
> under 17 U.S.C. § 109(a), which permits the resale of a copyrighted article by a
> buyer who received a valid *non-infringing* copy of the work. This is known as the
> "first sale" doctrine. An *infringing* copy, therefore, does not fit within the "first
> sale" doctrine embodied in 17 U.S.C. § 109(a) and cannot be resold without the
> resale causing an additional act of infringement. The homeowners, the Nickols and

2

Kellers, own houses that are infringing copies. Thus, without express permission by the Plaintiff, any sale of the houses by them or by any subsequent owner will constitute an act of infringement for which the copyright owner could bring suit.

*Palmetto Builders & Designers v. Unireal*, 342 F.Supp.2d 468, 473 (D.S.C. 2004).

5.     The Sale Motion contained no reference to the issue of C&R's architectural works copyright.  When C&R raised the issue of the copyright and the likelihood that further construction of the building or any subsequent sale or rentals of it would infringe C&R's copyright, counsel for the Trustee and First Security indicated at the Hearing that the Property was being sold "as is" and that C&R would retain its rights to enforce its copyright.  Following the Hearing counsel for the Trustee and First Security drafted the Order, and simply inserted some language in the Order which they believed addressed the issue of C&R's copyright.  The Order states (at ¶4):

> *the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.*

and (at ¶19):

> *So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of any and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement resulting from the improper or unauthorized use of the C & R Intellectual Property by the Purchaser, or its assignee, or any third parties.*

6.     The foregoing text (the "Text") in the Order is contrary to the provisions of Title 17, attempts to authorize actions far beyond the authority of Title 11, violates the property rights of C&R, and is inadequate as a resolution to the problem of C&R's intellectual property rights in

3

the building being constructed on the Property. Indeed, inclusion of the Text in the Order required this Court to interpret and rule on both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce (specifically, Title 17). Such relief – which was not sought in the Motion, but was added *ad hoc* to the Order at the last minute by counsel for the Trustee and First Security – means that this matter is subject to a mandatory withdrawal of the reference under 28 U.S.C. § 157.

7. Specifically, the Text purports to, *inter alia*, authorize the following, each of which is prohibited under Title 17 and/or Title 11:

a. authorize completion of construction of the building (in violation of C&R's exclusive right of reproduction);

b. authorize the creation of derivative works (in violation of C&R's exclusive rights to so);

c. authorize the sale of an unauthorized copy or derivative of C&R's architectural work (in violation of C&R's exclusive right to vend);

d. enjoin lawful enforcement actions for copyright infringement in the courts of the United States under Title 17; and

e. purports to grant a forced license of C&R's copyright, despite the fact that neither the Bankruptcy Code nor the Copyright Act authorize such relief, and the Supreme Court declined to allow such forced licenses absent specific legislative authorization. *See generally* PATRY, W., PATRY ON COPYRIGHTS § 10.86 (West 2020) detailing the history of *Sony Corp. of America v. Universal City Studios, Inc.*, 104 S.Ct. 774 (1984) based on the Justices draft opinions and correspondence).

4

8. The Text and the issues described in paragraph 7 above constitute errors of law that must be corrected. None of these issues presented in paragraph 7 above was raised in the Sale Motion or directly addressed during the Hearing.

9. In the context of the Motion, these matters all "require[] consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). Accordingly, C&R will be moving in the United States District Court for the Northern District of Iowa for withdrawal of the reference within the next 24 hours.

WHEREFORE, C&R respectfully request that this Court enter an Order:

(a) setting this matter for hearing;

(b) withdrawing the Order pending resolution of the matters raised in this Motion; and

(c) granting C&R such other and further relief as may be just and equitable under the circumstances.

Respectfully submitted,

CORNICE & ROSE INTERNATIONAL, LLC

/s/Bradley R. Kruse
Bradley R. Kruse AT0004483
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
direct:(515)246-4505
fax: (515)246-4550
email: bkruse@dickinsonlaw.com

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated this 23rd day of April, 2020.

/s/ Antoinette Watson

5

# EOD
03/29/2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 97-41243** |
| **ISBELL RECORDS, INC.,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |
| ――――――――――――――― | § | |
| | § | |
| **ALVERTIS ISBELL d/b/a ALVERT** | § | |
| **MUSIC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | **Adversary No. 04-4242** |
| | § | |
| **DM RECORDS, INC.,** | § | |
| | § | |
| Defendants. | § | |

A True Copy I Certify
Jeanne Henderson, Clerk
U.S. Bankruptcy Court
By *Lori Carter*
Deputy

## REPORT AND RECOMMENDATION

Alvertis Isbell ("Isbell") initiated this copyright infringement action against DM Records, Inc. ("DM Records") by filing a complaint in the United States District Court for the Northern District of Texas (the "Northern District Court"). On June 4, 2004, the Northern District Court entered a MEMORANDUM ORDER transferring venue to the United States District Court for the Eastern District of Texas (the "Eastern District Court"). Pursuant to an order entered on August 4, 2004, the Eastern District Court referred the dispute to this Court. This Court, having considered the evidence and arguments of counsel in connection with the DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT [Adv. Docket No. 63], and for the reasons discussed below, finds that DM Records has overstated and misstated the relevance of the Bankruptcy Code and this Court's prior orders to the parties' dispute. This

REPORT AND RECOMMENDATION

EXHIBIT

D

Page 1 of 19

Court, therefore, recommends that the Eastern District Court *sua sponte* withdraw its referral of the parties' copyright infringement action to this Court.

## I. BACKGROUND

1.      Isbell, who does business as Alvert Music and is known as "Al Bell," is in the business of publishing and otherwise commercially exploiting musical composition copyrights. Isbell asserts that he owns copyrights in certain compositions, namely "Whoomp! There It Is!" and "Dazzey Duks," (the "Subject Compositions"). Isbell further claims that DM Records has unlawfully exploited the copyrights in these Compositions. DM Records contends that it owns the Subject Compositions and the associated sound recordings of those compositions (the "Subject Recordings"). The Northern District Court transferred the dispute to the Eastern District Court, and the Eastern District Court referred the dispute to this Court, because DM Records claims that it purchased the Subject Compositions and Subject Recordings from Isbell Records, Inc., d/b/a Bellmark Records ("Bellmark") pursuant to a bankruptcy sale approved by this Court on September 8, 1999.

### A. Bellmark's Bankruptcy Case

2.      Isbell founded Bellmark and served as its President and Chief Executive Officer. Bellmark was a music and record company. On April 18, 1997, Bellmark filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Codes (the "Bankruptcy Code"), commencing Bankruptcy Case No. 97-41243 in this Court.

3.      According to motions filed in this Court, Bellmark filed for bankruptcy on the eve of the trial of a lawsuit brought by Bellmark's largest creditor, Independent National Distributors, Inc. ("INDI"), in the 162nd Judicial District Court for the State of Texas. INDI asserted, among other things, fraudulent transfer and *alter ego* claims against Bellmark.

**REPORT AND RECOMMENDATION**                                    **Page 2 of 19**

4.      On January 7, 1998, the Court converted the Chapter 11 proceeding to a liquidation case under Chapter 7 of the Bankruptcy Code.  The Court subsequently appointed an independent trustee (the "Chapter 7 Trustee") to liquidate and administer the assets of the Bellmark bankruptcy estate.  *See* ORDER OF CONVERSION TO CHAPTER 7 [Docket No. 109]. Following his appointment, the Chapter 7 Trustee sought and obtained approval from this Court to license the copyrights in the Subject Recordings.[1]  Bellmark's ownership of the Subject Recordings was undisputed by Isbell or by any other party.

5.      The Chapter 7 Trustee received an offer from DM Records to purchase Bellmark's assets.  On June 18, 1999, the Chapter 7 Trustee filed a MOTION TO APPROVE SALE OF ASSETS FREE AND CLEAR OF LIENS AND FOR ORDER AUTHORIZING AND APPROVING AUCTION BIDDING PROCEDURE [Docket No. 171] (the "Sale Motion"), seeking the Court's approval the sale.  The Sale Motion did not contain a specific description or list of the assets the Chapter 7 Trustee proposed to sell.  In the Sale Motion, the Chapter 7 Trustee stated that he was seeking to sell only Bellmark's interest in certain assets and that he had made no representation or warranty to DM Records regarding Bellmark's interest in any particular asset.

6.      Following a hearing on September 8, 1999, this Court entered an order [Docket No. 201] (the "Sale Order") approving the sale of Bellmark's assets to DM Records for $166,000 pursuant to the terms and conditions of a separate Asset Purchase Agreement. The Sale Order incorporates the definitions of terms contained in the Chapter 7 Trustee's Motion.  The Sale Order expressly provides, in pertinent part, that "the sale of the Purchased Assets is made 'as is, where is' without any representation or warranties concerning the Estate's right, title or interest

---

[1] DM Records asserts that the Chapter 7 Trustee also exploited the Subject Compositions.  In its briefing relating to the pending Motion to Dismiss, DM Records relies on several letters executed by the Chapter 7 Trustee to support this assertion.  The letters request clearance to use the Subject Recordings (among other recordings) in various musical compilations.

**REPORT AND RECOMMENDATION**                                                    **Page 3 of 19**

if any, in such assets ...." The Sale Order further states that "only the [e]state's interest in the Purchased Assets is being conveyed, and the sale shall not include the interest of any co-owner, owner of any copyright interest, or royalty interest holder who owns an interest in such assets or is entitled to royalties from the future use, sale or marketing of such assets."

7.      DM Records and the Chapter 7 Trustee, as the representative of the Bellmark bankruptcy estate, executed the Asset Purchase Agreement prior to the entry of the Sale Order. The Chapter 7 Trustee introduced a copy of the executed Asset Purchase Agreement, including all referenced exhibits, into evidence at the hearing on September 8, 1999.  The exhibits consisted of: (a) a master tape inventory, which included the Subject Recordings; and (b) a master licensing agreements list, which included the Subject Recordings.

8.      The Asset Purchase Agreement defines the assets sold to DM Records very broadly.  In particular, Paragraph 1.1 of the Asset Purchase Agreement defines the "Property" transferred to DM Records as all property of the Debtor.  The exhibits to the Asset Purchase Agreement, which are incorporated in the definition of "property," include the Subject Recordings and (according to DM Records) the Subject Compositions.

9.      Paragraph 2.1 of the Asset Purchase Agreement states that DM Records is purchasing "all of the Estate's rights, title and interests in and to the Property."  Paragraph 2.4 states that the Chapter 7 Trustee made no representations as to Bellmark's property and that DM Records had an opportunity to investigate the property and all related matters.  Additionally, Paragraph 6.3 states "[a]ny dispute or controversy in connection with the performance or terms of this Agreement . . . shall be brought in the Bankruptcy Court, which shall have exclusive jurisdiction to resolve any such dispute or controversy."

10.     On or about October 4, 1999, the Chapter 7 Trustee and DM Records executed the

**REPORT AND RECOMMENDATION**                                              **Page 4 of 19**

necessary documentation to transfer ownership of the assets purchased by DM Records. The Bill of Sale states that the Chapter 7 Trustee is selling "100% of worldwide rights or whatever right title and interest Seller has, to the master recordings as hereinafter defined – See Attached Exhibit "A" ...." The Chapter 7 Trustee also executed a Copyright Assignment wherein he conveyed Bellmark's interest in certain master recordings and associated license agreements.

11. On June 20, 2001, the Chapter 7 Trustee filed his SUPPLEMENTAL FINAL REPORT AND ACCOUNT [Docket No. 367] indicating that liquidation of the Bellmark bankruptcy estate and disbursement of the proceeds to creditors was complete. On July 20, 2001, the Court closed Bellmark's bankruptcy case.

## B. District Court Litigation

12. On July 3, 2002, approximately one year after Bellmark's bankruptcy case was closed, Isbell filed his COMPLAINT against DM Records in the Northern District Court, commencing Civil Case No. 3-02-CV-1408-G.

13. In the Complaint, Isbell asserts that he owns the Subject Compositions through written agreements with the authors of such compositions, namely the 1992 TMR / Bellmark Agreement and the 1993 Tag Team / Bellmark Agreement (collectively, the "Bellmark Agreements"). Isbell seeks a declaratory judgment as to ownership of the Subject Compositions under 17 U.S.C. §§ 101, et seq., the Copyright Revision Act and the Bellmark Agreements. Isbell also seeks damages for copyright infringement and demands a jury trial.

14. On September 10, 2002, DM Records filed its MOTION TO DISMISS, asserting that the Northern District Court lacked subject matter and personal jurisdiction [Adv. Docket No. 6]. On October 23, 2003, DM Records amended its motion to dismiss in the Northern District Court (the "Amended Motion") [Adv. Docket No. 31]. The Amended Motion included objections to

Case 6:20-cv-02041-CJW-KEM   Document 12-6   Filed 07/07/20   Page 182 of 207

the Northern District Court's personal jurisdiction over DM Records. DM Records also requested, as an alternative to dismissal, a change of venue to the United States District Court for the Middle District of Tennessee.

15. On November 13, 2003, Isbell filed his response in opposition to DM Record's Amended Motion [Adv. Docket No. 37]. Isbell asserted that the Compositions belonged to Alvert Music, rather than Bellmark, and were never assets of the Bellmark bankruptcy estate. Having never been assets of the Bellmark bankruptcy estate, Isbell asserted that the Subject Compositions could not have been administered, transferred or conveyed in connection with the Bellmark bankruptcy case, including the sale to DM Records.

16. On June 4, 2004, after additional briefing from the parties, the Northern District Court entered its MEMORANDUM ORDER denying the relief requested in the Amended Motion [Adv. Docket No. 49]. The Northern District Court held that Isbell had made a proper *prima facie* showing of personal and subject matter jurisdiction with respect to the Northern District Court. The Northern District Court also found that venue was proper but transferred the matter to the Eastern District Court, because some of the underlying events took place in the Bankruptcy Court for the Eastern District of Texas. The Northern District Court stated that "DM's grounds for asserting ownership over the Subject Compositions arise from the bankruptcy proceeding" and "there are significant questions about the extent to which, if at all, the Asset Purchase Agreement covering assets owned by Bellmark governs this action." MEMORANDUM ORDER at p. 36.

17. In the Eastern District Court, the matter was assigned Civil Case No. 4:04-CV-190. On July 20, 2004, DM Records filed its MOTION TO TRANSFER VENUE to this Court, the United States Bankruptcy Court for the Eastern District of Texas (Sherman Division) [Adv.

Case 6:20-cv-02041-CJW-KEM   Document 12-6   Filed 07/07/20   Page 183 of 207

Docket No. 56] (the "Referral Motion").[2]

18.     The Referral Motion asserted that resolution of this matter required interpretation and/or enforcement of the sale proceeding and the Sale Order, but made no averments as to this Court's subject matter jurisdiction or inability to enter final judgments in matters where a right to a jury trial has been properly invoked. Accordingly, the issue of this Court's jurisdiction over the matter was not before the Eastern District Court. Isbell filed no response or opposition to the Referral Motion.

19.     On August 19, 2004, the Eastern District Court entered its order referring the matter to this Court where the matter was assigned Adversary Proceeding No. 04-4242 in the above-mentioned bankruptcy case of Bellmark [Adv. Docket No. 58].

### C. The Adversary Case in the Bankruptcy Court

20.     On October 25, 2004, DM Records filed the instant Motion to Dismiss. DM Records argues, among other things, that the Sale Order is *res judicata* as to DM Records' ownership of the Subject Compositions. Isbell opposes the Motion to Dismiss. The parties have submitted extensive briefing to the Court.

21.     On October 17, 2005, after the Eastern District Court referred the parties' dispute to this Court, Isbell filed a JURY DEMAND in the instant adversary proceeding [Adv. Docket No. 121]. Although DM Records had not objected to the jury demand contained in Isbell's Complaint, DM Records filed an opposition to the demand filed by Isbell in this Court on November 7, 2005. [Adv. Docket No. 126].

22.     The Court conducted a hearing on the Motion to Dismiss and the Jury Demand on January 10, 2006. At that hearing, the Court questioned its subject matter jurisdiction over the

---

[2] The appropriate procedural mechanism is not a motion to transfer venue, but a request to refer the case to this Court.

**REPORT AND RECOMMENDATION**                                    **Page 7 of 19**

parties' dispute. The Court also questioned its ability to enter a final order regarding the Motion to Dismiss.

23.    On February 15, 2006, DM Records submitted a SUPPLEMENTAL BRIEF ON JURISDICTIONAL ISSUES [Adv. Docket No. 141], arguing that the Asset Purchase Agreement grants this Court exclusive jurisdiction over the parties' dispute. DM Records also argues that the ownership of the Subject Compositions is a "core" matter over which this Court has jurisdiction pursuant to 28 U.S.C. §157(b)(2)(A) and (E).

24.    On February 17, 2006, Isbell submitted a Memorandum of Law Regarding Lack of Subject Matter Jurisdiction [Adv. Docket No. 142], arguing that this Court lacks subject matter jurisdiction over the parties' dispute.

## II. ANALYSIS

### A. The Bankruptcy Court's Jurisdiction

25.    The first issue to consider in resolving this matter is that of this Court's subject matter jurisdiction over the parties' copyright dispute. The Court raised this issue for the first time at the hearing on January 10, 2006.[3]

26.    "Federal courts are courts of limited jurisdiction, and bankruptcy courts are no exception. Their jurisdiction is wholly 'grounded in and limited by statute.'" *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)). The issue of subject matter jurisdiction in a Title 11 bankruptcy proceeding technically involves an analysis of the jurisdiction of the district court. As applicable to litigation brought within the confines of a bankruptcy case, 28 U.S.C. §1334(b) provides, in

REPORT AND RECOMMENDATION                                    Page 8 of 19

relevant part, that:

> (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11.

(Emphasis added.)  If a matter falls within one of those three distinct categories, thereby giving the district court subject matter jurisdiction over that matter, then the district court may thereafter refer the matter to a bankruptcy court for that district under 28 U.S.C. §157(a).  Thus, subject matter jurisdiction exists both on the district and bankruptcy court levels if the proceeding falls within one of the three prescribed categories listed in 28 U.S.C. §1334(b).  *See generally Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995).

27.     A proceeding "arises under" Title 11 if the proceeding is created or determined by a statutory provision of Title 11.  A proceeding "arises in" a case under Title 11 if, by its very nature, it could arise only in the context of a bankruptcy case or, in other words, it is a proceeding which would have no practical existence outside of the bankruptcy context, such as a bankruptcy administrative matter.  Finally, a proceeding is "related to" a case under Title 11 if its outcome could conceivably have an effect on a bankruptcy estate.  *See, e.g., In re Harnischfeger Indus., Inc.*, 246 B.R. 421, 432-33 (Bankr. N.D. Ala. 2000).

28.     The parameters of the subject matter jurisdiction possessed by a bankruptcy court, as a unit of the district court, under the "related to" jurisdiction of §1334(b) have been frequently addressed.  A matter is "related to" a bankruptcy case if "the outcome could conceivably have any effect on the estate being administered in bankruptcy."  *In re Wood*, 825 F.2d 90, 93 (5th

---

[3] The Northern District Court's Memorandum Order contains some discussion of the convenience of the Eastern District Court and, by reference, this Court in the context of a motion to transfer venue.  The Northern District Court's discussion suggests that if the Asset Purchase Agreement governs the parties' dispute, then this Court is the most appropriate forum.  As discussed below, however, the Asset Purchase Agreement, the related Sale Order, and the Bankruptcy Code do not govern the parties' dispute.

**REPORT AND RECOMMENDATION**                                    **Page 9 of 19**

Cir. 1987). In later affirming and clarifying that standard, the Fifth Circuit stated that an action is "related to" a bankruptcy case if "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and ... in any way impacts the handling and administration of the bankrupt estate." *Walker*, 51 F.3d 562, 569 (5th Cir. 1995) (emphasis added).

### 1. The Asset Purchase Agreement

29.     In this case, DM Records asserts that this Court retained exclusive jurisdiction over the subject matter of the Complaint by virtue of a provision contained in the Asset Purchase Agreement. Particularly, DM Records references section 6.3 of the Asset Purchase Agreement which provides that "[a]ny dispute or controversy in connection with the performance or terms of this [Asset Purchase] Agreement, including enforcement of the remedies provided herein in the event of a default, shall be brought in the Bankruptcy Court which shall have exclusive jurisdiction to resolve any such dispute or controversy." Notwithstanding this argument, DM Records fails to point to any dispute regarding a term of the Asset Purchase Agreement, any party's failure to comply with the Asset Purchase Agreement, or the applicability of any remedies provided therein.

30.     The terms of the Asset Purchase Agreement are clear and unambiguous. As set forth in Section 2.1 of the Asset Purchase Agreement, the Chapter 7 Trustee, as the representative of Bellmark's estate, transferred all of the estate's interest in certain assets. Paragraph 2.4 states that the Chapter 7 Trustee made no representations or warranties regarding the interest of Bellmark's estate in any particular asset.

31.     There is no question that the Chapter 7 Trustee, as the representative of Bellmark's estate, fully performed his obligations under the Asset Purchase Agreement. The

**REPORT AND RECOMMENDATION**                                    **Page 10 of 19**

Chapter 7 Trustee executed the documents necessary to transfer Bellmark's interest in certain assets to DM Records. Thus, the current dispute – whether Bellmark owned the Subject Compositions when it filed for bankruptcy protection –is not governed by the terms of the Asset Purchase Agreement.

### 2. The Sale Order

32.   DM Records also attempts to portray the parties' copyright dispute as involving "core" bankruptcy matters -- namely, the interpretation and enforcement of this Court's Sale Order and the identification of property of Bellmark's estate. With respect to the Sale Order, DM Records argues that the Court incorporated and approved the Asset Purchase Agreement in the Sale Order. Since the Asset Purchase Agreement included a detailed list of the assets the Chapter 7 Trustee proposed to transfer to DM Records, DM Records argues that this Court has jurisdiction over the parties' copyright dispute. DM Records argues, in essence, that the Court intended the Sale Order to quiet title to the Subject Compositions.

33.   However, the Sale Order does not expressly incorporate the Asset Purchase Agreement. Instead, the Sale Order adopts the definitions of terms set forth in the Chapter 7 Trustee's Sale Motion. The Sale Order provides that the sale of "Purchased Assets" (as defined in the Sale Motion) to DM Records was made "'as is, where is' without any representation or warranties concerning the Estate's right, title or interest, if any, in such assets."

34.   Even if the Court could somehow construe the Sale Order as adopting the terms of Asset Purchase Agreement, the definition of the transferred "property" set forth in the Asset Purchase Agreement does not specifically mention any composition copyright. Rather, the definition of "property" in the Asset Purchase Agreement simply refers to all of Bellmark's assets. The definition includes, without limitation, copyrights and licenses in certain sound

---

**REPORT AND RECOMMENDATION**                                         **Page 11 of 19**

recordings listed in Exhibit "A" to the Asset Purchase Agreement.

35.    In the context of the Sale Motion, the Court was not required to and did not determine whether particular assets were property of Bellmark's estate prior to approving a proposed sale of the assets. The Chapter 7 Trustee proposed to sell only the estate's interest in certain property, whatever that interest might be. The Chapter 7 Trustee made no warranties as to Bellmark's right, title and interest in any particular asset in the Sale Motion or the Asset Purchase Agreement, and Court made no findings as to Bellmark's ownership of any particular asset in the Sale Order. The fact that DM Records is now faced with a challenge to its ownership of some of the assets it believed it purchased from Bellmark's estate is a predicable hazard of any "as is, where is" sale without representations or warranties as to title. The parties' dispute regarding ownership of the Subject Compositions does not implicate the terms of the Sale Order or the Asset Purchase Agreement.

### 3. Property of Bellmark's Estate

36.    Section 363 of the Bankruptcy Code only allows a trustee to sell property of the bankruptcy estate. Thus, if the Subject Compositions were not "property of the estate" within the meaning of 11 U.S.C. §541(a) at the time of Bellmark's bankruptcy filing, then the Subject Compositions could not have been transferred by the Chapter 7 Trustee to DM Records pursuant to the Asset Purchase Agreement and Sale Order. Although this appears, superficially, to be an issue over which this Court has some expertise, the determination of whether an asset is "property of the estate" depends upon non-bankruptcy law.

37.    Section 541 of the Bankruptcy Code provides in pertinent part that the commencement of a bankruptcy case --

    creates an estate. Such estate is comprised of all the following property, wherever
    located and by whomever held:

**REPORT AND RECOMMENDATION**                                    **Page 12 of 19**

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case ....

11 U.S.C. §541(a)(1). This broad provision encompasses causes of action that belong to the debtor, as well as the debtor's intellectual property, such as interests in patents, trademarks and copyrights. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 367; S. Rep. No. 989, 95th Cong., 2d Sess. 82, U.S. Code Cong. & Admin. News 1978, p. 5787; *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204-05 (1983); *In re S.I. Acquisition, Inc.,* 817 F.2d 1142 (5th Cir. 1987). However, the threshold issue of whether property belonged to a debtor prior to bankruptcy and became part of the debtor's bankruptcy estate must be resolved by reference to state law. *See, e.g., In re Farmers Markets, Inc.,* 792 F.2d 1400, 1402 (9th Cir. 1986); *Esselen Associates, Inc. v. Crysen/Montenay Energy Co.,* 102 B.R. 25, 28 (S.D.N.Y. 1989). As the Supreme Court has explained, "[p]roperty interests are created and defined by state law," and "there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *See Butner v. United States,* 440 U.S. 48, 55 (1979).

  38. While a bankruptcy case is open and pending, the determination of whether an asset is "property of the estate" within the meaning of §541 is a "core" proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. 157(b)(A) and (O). Such a determination obviously concerns the administration and liquidation of the bankruptcy estate. In this case, however, the Court has closed Bellmark's case, and Bellmark's bankruptcy estate no longer exists. *See* 11 U.S.C. §554(c); *Bass v. Denney, (In re Bass),* 171 F.3d 1016, 1022 (5th Cir. 1999). The determination of whether the Subject Compositions were Bellmark's property when it filed a bankruptcy petition is no longer a "core" matter over which this Court has jurisdiction.

  39. The parties' dispute regarding ownership of the Subject Compositions does not

**REPORT AND RECOMMENDATION**        **Page 13 of 19**

"arise under" Title 11, since the dispute was not created by and will not be determined by a statutory provision of Title 11. The parties' dispute also does not "arise in" a case under Title 11 since copyright infringement suits arise outside of the bankruptcy context. Further, there is no longer any estate to be "related to." *Id.* at 1021.

40.     The Court has not previously determined whether the Debtor owned the Subject Compositions, because the sale of the Debtor's assets was without representations or warranties as to title. This Court's orders do not govern the parties' present dispute. The ownership of the Subject Compositions will not be decided by any provision of the Bankruptcy Code, and the outcome of the dispute will have no effect on Bellmark's estate or creditors. The Court, therefore, concludes that it does not have subject matter jurisdiction to determine Bellmark's ownership of the Subject Compositions pursuant to 28 U.S.C. §1334(b). The parties' dispute should return to the Eastern District Court for resolution.

### B. Withdrawal of the Reference to the Bankruptcy Court

41.     Even if the Court were somehow to conclude that it has jurisdiction to resolve the parties' copyright dispute pursuant to 28 U.S.C. §1334(b), "cause" exists to withdraw the reference of the parties' dispute from this Court pursuant to 28 U.S.C. §157(d).

42.     As noted *supra*, 28 U.S.C. §157(a) provides:

> Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

Accordingly, pursuant to a general order entered on August 6, 1984, the Eastern District Court has referred all cases under Title 11, or proceedings arising under Title 11, or proceedings arising in or related to cases under Title 11 to this Court for consideration and resolution.

43.     In order to avoid the constitutional problems discussed in *Northern Pipeline*

**REPORT AND RECOMMENDATION**                                    **Page 14 of 19**

*Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982), the U.S. Congress limited the jurisdiction of bankruptcy courts by distinguishing between "core" and "non-core" proceedings.[4] With respect to core proceedings referred to the bankruptcy court pursuant to 28 U.S.C. §157(a), §157(b) provides that this Court has jurisdiction to fully adjudicate the matter. However, with respect to non-core proceedings, §157(c) provides that the Eastern District Court is the final arbiter.

44. In addition to the limits placed on this Court's authority to finally adjudicate non-core matters, §157(d) of Title 28 provides for the withdrawal of any reference to the bankruptcy court under certain circumstances. Section 157(d) states in relevant part: "[t]he district court may withdraw ... any case or proceeding referred under this section, on its own motion ... for cause shown." Section 157(d) further states: "the district court shall, on timely motion of a party, withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." *See also In re Moody*, 64 B.R. 594 (Bankr. S.D. Tex. 1986) (recommending withdrawal of the reference *sua sponte*).

45. This provision reflects Congress' view that the jurisdiction of bankruptcy courts courts should be limited to areas within the realm of their expertise. *Southern Pac. Transp. Co. v. Voluntary Purchasing Groups*, 252 B.R. 373 (E.D. Tex. 2000). With respect to a timely motion by a party seeking withdrawal of the reference to the bankruptcy court, withdrawal is required when "substantial and material consideration" of a federal statute other than the

---

[4] A non-exclusive list of "core" proceedings is set forth in 28 U.S.C. § 157(b). In general, core proceedings are those matters that arise under title 11 or arise in a case under title 11, or those matters that could arise only in the context of a bankruptcy case. Non-core proceedings are those matters that are otherwise related to the bankruptcy estate or that could conceivably have an effect on a bankruptcy estate. *See In re Wood*, 825 F.2d at 93; *In re Walker*, 51 F.3d at 569 (5th Cir.1995).

REPORT AND RECOMMENDATION                                    Page 15 of 19

Bankruptcy Code is necessary to the resolution of a case or proceeding. *Id.* Likewise, whether a proceeding is a "core proceeding" is relevant to a determination of whether "cause" exists to *sua sponte* withdraw the reference. *See Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 998-99 (5th Cir. 1985). Other factors relevant to the determination of whether "cause" exists include (i) the effect of withdrawal of the reference on judicial efficiency; (ii) uniformity in bankruptcy administration; (iii) reduction in forum shopping; (iv) fostering the economical use of the debtors' and creditors' resources; (v) expediting the bankruptcy process; and (vi) whether there is a jury demand. *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 998-99 (5th Cir. 1985).

46.     In this case, reference to state contract law and/or federal copyright law, not the Bankruptcy Code or any substantive rights or provisions therein, will resolve the parties' dispute. This Court has no particular expertise in determining copyright claims. Further, a final judgment in this proceeding will not affect Bellmark, Bellmark's creditors, the administration of Bellmark's bankruptcy estate (which no longer exists), or any prior order of this Court. In short, a successful outcome will not generate additional funds for Bellmark's creditors, and a negative outcome will not impose any additional liabilities on Bellmark's bankruptcy estate.

47.     Additionally, the Complaint, as originally filed in the Northern District Court, contains a jury demand. DM Records raised no objection to Isbell's jury demand during the three years this matter was pending before the Northern District Court and the Eastern District Court. Nonetheless, DM Records now argues that Isbell has submitted to the equity jurisdiction of this Court "by invoking the aid of the bankruptcy court." RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JURY DEMAND at p. 6 [Adv. Docket No. 126].

48.     Whether a party is entitled to a jury trial is governed by the Seventh Amendment

REPORT AND RECOMMENDATION                                              Page 16 of 19

of the United States Constitution, which provides, in relevant part: "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Supreme Court, in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), formulated a two-prong test for determining if a litigant has a Seventh Amendment right to a jury trial. The trial court must first compare the action to those brought in the courts of England prior to the merger of courts of law and courts of equity and then "examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* at 41.

49.    In this case, the Complaint seeks a declaratory judgment regarding Isbell's ownership of the Subject Compositions under the Bellmark Agreements and damages for copyright infringement or conversion of property. Ownership and/or title disputes, copyright infringement litigation, and conversion actions all involve legal issues triable by a jury. *See, e.g., Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998) (discussing a right to jury trial under the Copyright Act); *Ross v. Bernhard*, 396 U.S. 531, 533 (1970) (discussing actions for conversion of personal property); *Whitehead v. Shattuck*, 138 U.S. 146, 151 (1891) (discussing ownership and title disputes). Accordingly, the Court concludes that, unless a waiver has occurred, Isbell appears to have a Seventh Amendment right to a jury trial on the claims asserted in the Complaint.

50.    With respect to whether Isbell has waived his Seventh Amendment right to a jury trial by submitting to this Court's jurisdiction, Bellmark is the entity that filed for protection under the Bankruptcy Code, and Bellmark was the debtor-in-possession prior to the conversion of the case to Chapter 7 and the appointment of the Chapter 7 Trustee.[5] Isbell is not Bellmark.

---

[5] In its briefing before the Northern District Court, DM Records incorrectly stated that Isbell "acted as debtor in possession of the Bellmark estate." [Adv. Docket No. 43.] The term "debtor in possession" means the "debtor" (*i.e.*, the person or entity that filed for relief under the Bankruptcy Code) or a person selected by the bankruptcy court to serve as a trustee in the case. *See* 11 U.S.C. §§100(13) and 1101(1). While Isbell may have signed the

**REPORT AND RECOMMENDATION**                                        **Page 17 of 19**

Although Isbell was alleged to be the *alter ego* of Bellmark in connection with the conversion of Bellmark's Chapter 11 proceeding to a Chapter 7 case, this Court never determined that Isbell was, in fact, Bellmark's *alter ego*.

51.    DM Records also argues that Isbell submitted to the jurisdiction of this Court and waived his right to a jury trial by filing a proof of claim in Bellmark's bankruptcy case. Again, DM Records overlooks the relevance and relationship of the bankruptcy proceedings to the pending copyright dispute. While Isbell may have waived his right to a jury trial with respect to the claims asserted in his proof of claim, DM Records has not alleged or provided any evidence that the proof of claim allegedly filed by Isbell in Bellmark's bankruptcy case bears any relation to the claims asserted in his Complaint. *See, e.g. Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

52.    The Supreme Court has consistently held that courts should "indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393 (1937); *see also, Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510-11 (1959). In this case, for the foregoing reasons, the Court finds and concludes that Isbell appears to have properly invoked his right to a jury trial upon the commencement of this action in the Northern District Court and, further, that Isbell does not appear to have waived such right.

53.    Under 28 U.S.C. §157(e), if the right to a jury trial applies in a proceeding, the bankruptcy court may only conduct a jury trial "if specially designated to exercise such jurisdiction by the district court and with the express consent of the parties." 28 U.S.C. §157(e). No such designation to conduct jury trials exists in the Eastern District of Texas, and Isbell has not consented to a jury trial before this Court. Accordingly, the Court's apparent inability to

---

bankruptcy petition for Bellmark as Bellmark's President and Chief Executive Officer, Isbell was neither the debtor nor the debtor-in-possession.

conduct a jury trial in this matter constitutes "cause" for withdrawal of the reference of this adversary proceeding.

## III. CONCLUSION

54.     Pursuant to 28 USC §157(a), the Eastern District Court has generally referred all cases under Title 11 and all proceedings "arising under" Title 11 or "arising in" or "related to" a case under Title 11 to the bankruptcy judges for the Eastern District of Texas.  The Eastern District Court is authorized by 28 USC §157(d) to withdraw the reference as to any case or controversy "for cause shown."  *See* FED. R. BANKR. P. 5011(a) and 9033; *see generally* 1 NORTON BANKR. L. & PRAC. 2d § 8:1 (discussing mandatory and permissive withdrawal from bankruptcy court to district court).  In this case, in light of the non-core nature of this proceeding, its lack of any substantive relationship with Bellmark's bankruptcy, and the pending jury demand, the Court does not have jurisdiction over this dispute and withdrawal of the reference, if not mandatory, is at least permissive.  For the foregoing reasons, this Court recommends that the Eastern District Court *sua sponte* withdraw the reference of this adversary proceeding pursuant to 28 U.S.C. §157(d).

Signed on 3/29/2007

*Brenda T. Rhoades*     SR

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Bankruptcy Case No. 19-00507 |
| Iowa limited liability company, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**MOTION OF CORNICE & ROSE INTERNATIONAL, LLC,
FOR STAY PENDING DETERMINATION
OF PARTIAL WITHDRAWAL OF THE REFERENCE**

NOW COMES Cornice & Rose International, LLC, an Illinois limited liability company ("C&R"), through its counsel, and as and for its "Motion of Cornice & Rose International, LLC, for Stay Pending Determination on Request for Partial Withdrawal of the Reference" (this "Motion") respectfully states as follows:

1.      On April 23, 2020, C&R filed its "Motion of Cornice & Rose International, LLC, for Partial Withdrawal of the Reference" (the "Withdrawal Motion") in the United States District Court for the Northern District of Iowa.  A copy of the Withdrawal Motion is attached hereto as Exhibit A.

2.      C&R respectfully requests that this Court stay all matters related to the issues discussed in the Withdrawal Motion, including, but not limited to, the proposed sale of certain real property located at 123 N. Main Street, Charles City, Iowa (the "Property"), pending the resolution of the Withdrawal Motion in the District Court.

3.      The factors to be considered in determination of a motion for a stay pending resolution of a motion in the district court for withdrawal of the reference include the following:

1

(1)    [whether the party seeking withdrawal of the reference] is likely to

prevail on the merits of the withdrawal motion;

(2)    [whether the party seeking withdrawal of the reference] is likely to

suffer irreparable harm if the motion is denied;

(3)    [whether other parties] will not be harmed by a stay; and

(4)    [whether] the public interest will be served by granting a stay."

*F.D.I.C. v. Imperial Capital Bancorp, Inc.*, 2011 WL 5600542, at *1 (S.D.Cal. Nov. 17, 2011),

cited by *In re City of Detroit, Mich.,* 498 B.R. 776, 780 (Bankr. E.D. Mich. 2013).

4.    All four of these factors favor granting a stay in this situation.

5.    First, for the reasons stated in the Withdrawal Motion, C&R is likely to prevail in its request for withdrawal of the reference.  The determinations sought to be withdrawn to the District Court fall squarely within the mandatory withdrawal statute, and C&R has complied with the other requirements for withdrawal.

6.    Second, also for the reasons stated in the Withdrawal Motion, C&R will suffer significant, irreparable harm if the sale proceeds.  C&R's rights in valuable property (its copyrights) will, if the proposed sale is consummated under the current legal regime, be clouded and subject to years of litigation pitting Title 17 rights against Title 11 jurisdictional issues.

7.    Third, the other parties in interest will not be harmed by the stay, and will actually benefit from the clarity that a stay would provide.  The parties to the proposed sale of the Property, in the absence of a stay, could consummate a sale that would result in years of litigation against the Trustee, the proposed buyer of the Property, and the estate itself.

8.    Finally, the public interest (including, but not limited to, the interest of the creditors of the estate) will be served by staying the proposed sale.  Creditors will benefit by minimizing

2

legal expenses to the estate.  The public generally will be served by judicial economy being obtained and by having a single, conclusive result reached in a difficult area of copyright law.  If the proposed sale is not stayed, and the sale is consummated, the very real risk of subsequent infringement actions against the purchasers, any contractor, any subsequent purchaser, and any potential tenant of the Property could easily render the Property useless and uninhabitable.  The Property, such as it is, would likely sit idle while infringement cases work their way through various courts. Instead of getting the partially finished structure completed and available for tenants -- which was stated as one of the Trustee's goals in selling the Property -- the local community would have a prominently located incomplete building for the indefinite future.

WHEREFORE, C&R respectfully requests that this Court enter an order:

(a)     setting this matter for hearing;

(b)     staying the proposed sale of the Property pending resolution of the Withdrawal Motion; and

(c)     granting C&R such other and further relief as may be just and equitable under the circumstances.

Respectfully submitted,

CORNICE & ROSE INTERNATIONAL, LLC

/s/Bradley R. Kruse
Bradley R. Kruse AT0004483
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
direct:(515)246-4505
fax: (515)246-4550
email: bkruse@dickinsonlaw.com

3

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated this 23rd day of April, 2020.

/s/ Tiffany Roosa

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | District Case No. _____ |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | (Bankruptcy Case No. 19-00507) |
| Iowa limited liability company, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**MOTION OF CORNICE & ROSE INTERNATIONAL, LLC,
FOR PARTIAL WITHDRAWAL OF THE REFERENCE**

NOW COMES Cornice & Rose International, LLC, an Illinois limited liability company

("C&R"), through its counsel, and as and for its "Motion of Cornice & Rose International, LLC,

for Partial Withdrawal of the Reference" (this "Motion") respectfully state as follows:

1. On April 24, 2019, McQuillen Place Company, LLC, an Iowa limited liability

company (the "Debtor") filed a petition for protection under Chapter 11 of Title 11 of the United

States Code (the "Bankruptcy Code").

2. On December 9, 2019, the Bankruptcy Court entered an order converting the case

to Chapter 7 of the Bankruptcy Code. Charles L. Smith (the "Trustee") was appointed trustee.

3. On March 23, 2020, the Trustee filed a "Motion For Sale of Property Under Section

363" [Docket No. 134] (the "Sale Motion") pursuant to which he seeks, *inter alia*, to sell the

principal asset of the estate, certain real and property located at 123 North Main, Charles City,

Iowa (the "Property") to First Security Bank & Trust Co. (the "Bank"). A copy of the Sale Motion

is attached hereto as Exhibit A.

**EXHIBIT**

**A**

1

4.       On April 8, 2020, the Bankruptcy Court held a telephonic hearing (the "Hearing"), during which the Bankruptcy Court considered the Sale Motion and several objections thereto, including objections filed by C&R.

5.       On April 9, 2020, the Bankruptcy Court entered an Order granting the Sale Motion [Docket No. 154] (the "Order"). A copy of the Order is attached hereto as Exhibit B. The Order was stayed for 14 days pursuant to Bankruptcy Rule 6004(h). C&R has moved in the Bankruptcy Court for reconsideration of the Order (*see* Motion for Reconsideration, attached hereto as Exhibit C).

6.       As the designer of the uncompleted building that was being constructed on the Property, C&R is its "author" and therefore owner of the architectural works copyright on that building. Under the Copyright Act, an "architectural work" is defined as "the design of a building as embodied in any tangible medium of expression, <u>including a building</u>, architectural plans, or drawings." 17 U.S.C. § 101 (definition of "architectural work"; emphasis added). Under the Architectural Works Copyright Protection Act of 1990, "architectural works" are protected under the Copyright Act. *See* 17 U.S.C. § 102(8).

7.       As the owner of the copyrights in the architectural works at issue, C&R has the exclusive rights to that design provided by the Copyright Act. *See* 17 U.S.C. § 106. Violation of those exclusive rights constitutes copyright infringement. 17 U.S.C. 17 U.S.C. § 501(a). The unauthorized construction of a building covered by an architectural works copyright (or any sale or rental of it) is thus illegal and subjects the violator to the panoply of remedies provided by the Copyright Act. *See, e.g.*, *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 729 (8th Cir. 2006) (AWCPA case). For instance, each sale – not just the initial infringing sale – of a building

2

constructed in violation of an architectural works copyright constitutes a fresh violation of the copyright owner's rights.  As one court has explained:

> Further, because the constructed homes constitute infringing copies of the Plaintiffs copyrighted works, they cannot be lawfully resold without the Plaintiffs permission. Under 17 U.S.C. § 106(3), a copyrighted article may be sold only by the owner of the copyright. Any sale by another party without the owner's permission constitutes an act of infringement. The only exception to this rule exists under 17 U.S.C. § 109(a), which permits the resale of a copyrighted article by a buyer who received a valid *non-infringing* copy of the work. This is known as the "first sale" doctrine. An *infringing* copy, therefore, does not fit within the "first sale" doctrine embodied in 17 U.S.C. § 109(a) and cannot be resold without the resale causing an additional act of infringement. The homeowners, the Nickols and Kellers, own houses that are infringing copies. Thus, without express permission by the Plaintiff, any sale of the houses by them or by any subsequent owner will constitute an act of infringement for which the copyright owner could bring suit.

*Palmetto Builders & Designers v. Unreal*, 342 F.Supp.2d 468, 473 (D.S.C. 2004).

8.      Notwithstanding C&R's copyright, and notwithstanding C&R's insistence that the parties to the sale comply with Title 17, the Order, which the parties to the sale drafted and submitted to the Bankruptcy Court for signature, runs afoul of several significant tenets of copyright law and of a number of provisions of Title 17.

9.      As a result of the conflict between the text of the Order and the provisions of Title 17, otherwise plainly enforceable substantive rights of C&R in and to its intellectual property may be extinguished or subjected to needless legal controversy.

10.     Pursuant to the general referral of bankruptcy matters from the Article III Federal district courts to the bankruptcy courts under 28 U.S.C. §157, bankruptcy courts can "hear" and determine a certain category of cases -- such as confirmation of plans of reorganization or determination of allowance of claims against a debtor --  which are core to these courts' general bankruptcy function.  However, this grant of referred jurisdiction reserved to the district courts other cases regarded by Congress as being outside the conventional purview of bankruptcy.

3

11.     Some of these matters, such as controversies involving CERCLA, involve legal determinations for which hearing in the district court is mandatory.  These are the cases described in 28 U.S.C. § 157(d).  *See*, *S. Pac. Transp. Co. v. Voluntary Purchasing Group, Inc*., 252 B.R. 373, 385 (E.D. Tex. 2000).  *See also, In re Bennett*, 2011 WL 5546955 (Bankr.W.D.Tex. Oct. 7, 2011) and *Burger King Corp. v. B-K of Kansas, Inc.*, No. CIV. A. 86-2294-V, 1991 WL 49926, at *2 (D. Kan. Mar. 21, 1991) (noting that reference had been withdrawn), *aff'd sub nom. In re B-K of Kansas, Inc.*, 21 F.3d 1120 (10th Cir. 1994).

12.     United States copyright law is a prime example of Federal law "regulating organizations or activities affecting interstate commerce" as referenced in 28 U.S.C. § 157(d).  *See In re Nat'l Gypsum Co.*, 145 B.R. 539, 541 (N.D. Tex. 1992).

13.     The policy concerns long associated with this mandatory withdrawal of the reference include the preference of having district courts, rather than bankruptcy courts, making difficult determinations on complex non-bankruptcy Federal statutes [*see*, *In re Isbell Records, Inc.*, "Report and Recommendation" at ¶¶45-46 (Bankr. E.D. Tex. Mar. 29, 2007) (attached hereto as Exhibit D)], particularly in cases of first impression, or (as here) resolving apparent conflicts between bankruptcy and non-bankruptcy law.  These policy concerns are particularly acute in matters of copyright.  *See, generally,* discussion in *Eli Global, LLC v. Univ. Directories, LLC*, 532 B.R. 249, 251-253 (M.D.N.C. 2015).

14.     The Order entered by the Bankruptcy Court in this case is a good illustration of the problems 28 U.S.C. § 157(d) sought to have resolved at the district court level.  After C&R pointed out that the sale of the building would likely result in infringement of raised C&R's copyright, counsel for the Trustee and the Bank after the Hearing simply inserted some language in the Order which they believed addressed the issue.  The Order states (at ¶4):

4

*the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.*

and (at ¶19):

*So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement resulting from the improper or unauthorized use of the C & R Intellectual Property by the Purchaser, or its assignee, or any third parties.*

15.     The foregoing text (the "Text") in the Order, which was drafted by the Trustee and counsel to the Bank, is contrary to the provisions of Title 17, attempts to authorize actions beyond the authority of the Bankruptcy Court, violates the property rights of C&R, and is inadequate as a resolution to the problem of C&R's intellectual property rights in the building being constructed on the Property.  Indeed, inclusion of the Text in the Order required the Bankruptcy Court to interpret and rule on both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce (specifically, Title 17).  Such relief – which was not sought in the Motion, but was added *ad hoc* to the Order at the last minute by the Trustee and counsel to the Bank – means that this matter is subject to a mandatory withdrawal of the reference under 28 U.S.C. § 157.

16.     Specifically, the Text purports to, *inter alia*, authorize the following, each of which is prohibited under Title 17 and/or Title 11:

5

      a.     authorize completion of construction of the building (in violation of C&R's exclusive right of reproduction);

      b.     authorize the creation of derivative works (in violation of C&R's exclusive rights to do so);

      c.     authorize the sale of an unauthorized copy or derivative of C&R's architectural work (in violation of C&R's exclusive right to vend);

      d.     enjoin lawful enforcement actions for copyright infringement in the courts of the United States under Title 17; and

      e.     grant a forced license of C&R's copyright, despite the fact that neither the Bankruptcy Code nor the Copyright Act authorize such relief, and the Supreme Court declined to allow such forced licenses absent specific legislative authorization.  *See generally* PATRY, W., PATRY ON COPYRIGHTS § 10.86 (West 2020) detailing the history of *Sony Corp. of America v. Universal City Studios, Inc.*, 104 S.Ct. 774 (1984) based on the Justices draft opinions and correspondence).

17.    In essence, the Order, if followed, would create one set of copyright laws applicable when a party connected to the copyright had made a trip through bankruptcy jurisdiction, and another, different set of copyright laws for the rest of the copyright holders in the United States.

18.    Such an unacceptable result is precisely why 28 U.S.C. § 157(d) was crafted the way it was, and why this Court should partially[1] withdraw the reference of these issues from the Bankruptcy Court.

---

[1] This Motion seeks withdrawal of the reference from the Bankruptcy Court only with respect to those matters pertaining to the proposed sale of the Property since these are the only issues in which adjudication of rights under Title 17 are required.  Withdrawal of the reference of the bankruptcy case generally is not requested.

6

WHEREFORE, C&R respectfully requests that this Court enter an order:

(a)     setting this matter for hearing;

(b)     withdrawing the reference from the Bankruptcy Court of those matters arising from

or related to the contemplated sale of the Property; and

(c)     granting C&R such other and further relief as may be just and equitable under the

circumstances.

Respectfully submitted,

CORNICE & ROSE INTERNATIONAL, LLC

/s/Bradley R. Kruse
Bradley R. Kruse AT0004483
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
direct:(515)246-4505
fax: (515)246-4550
email: bkruse@dickinsonlaw.com

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated this 23rd day of April, 2020.

/s/ Tiffany Roosa

7