# United States Bankruptcy Court
## Northern District of Iowa (Mason City)
## Bankruptcy Petition #: 19–00507

*Assigned to:* Thad J. Collins
Chapter 7
Previous chapter 11
Original chapter 11
Voluntary
Asset

| | |
|---|---|
| *Date filed:* | 04/25/2019 |
| *Date converted:* | 12/09/2019 |
| *341 meeting:* | 01/27/2020 |
| *Deadline for filing claims:* | 04/08/2020 |

---

*Debtor*
**McQuillen Place Company, LLC**
1110 North Grand Ave., Suite 300
Charles City, IA 50616
FLOYD–IA
847–456–1911
Tax ID / EIN: 46–3987825
*aka* **Classic Cleaners**
*aka* **Classic Cleaners of Charles City**

represented by **J D Haas**
J D Haas & Associates, PLLC
1120 E. 80th St.
Suite 200
Bloomington, MN 55420
952–345–1025
Fax : 952–854–1665
Email: jdhaas@jdhaas.com

**Donald H. Molstad**
701 Pierce St., Ste. 305
Sioux City, IA 51101
712–255–8036
Email: judylaw308@yahoo.com

**Charles McQuillen Thomson**
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616
847–456–1911
Fax : 847–495–3488
Email: cthomson@doall.com

---

*Trustee*
**Charles L. Smith**
25 Main Place, Ste 200
P.O. Box 248
Council Bluffs, IA 51502–0248
712–325–9000

represented by **Telpner Peterson Law Firm, LLP**
25 Main Place, Suite 200
Council Bluffs, IA 51503
712–325–9000

---

*U.S. Trustee*
**United States Trustee**
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401–2101
319–364–2211

represented by **L Ashley Zubal**
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309–2108
515–323–2269
Email: Ashley.zubal@usdoj.gov

---

*Cred. Comm. Chair*
**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

| Filing Date | # | Docket Text |
|---|---|---|
| 05/08/2020 | 177 | Objection to Claim # 4,23 by Claimant First Security Bank & Trust Co. with request for valuation of security. Filed by Charles Thomson (Thomson, Charles) (Entered: 05/08/2020) |
| 05/15/2020 | 179 | Joinder in Objection Filed by Creditor First Security Bank & Trust Company (related document(s)167 Objection). (Eide, Larry) (Entered: 05/15/2020) |
| 05/15/2020 | 180 | Proceeding Memo and Order. (related document(s)155 Motion to Reconsider, 156 Motion to Reconsider, 157 Motion, 158 Motion To Stay) (jmei) (Entered: 05/15/2020) |
| 05/25/2020 | 182 | Letter of Good Standing from the attorneys bar association. Filed by Creditor Cornice & Rose International, LLC. (Bonham, Louis) (Entered: 05/25/2020) |
| 05/29/2020 | 183 | Notice of Appeal and Statement of Election to BAP. *180* Fee Amount $298. Service on: Charles L. Smith, First Security Bank & Trust Co., Four Keys, LLC, Charles M. Thomson, James Gray, City of Charles City, IA, Cornice & Rose International, Inc. Filed by Cornice & Rose International, LLC (related document(s)154 Order Regarding Motion For Sale of Property) (Attachments: # 1 Doc 154 # 2 Doc 180) (Kruse, Bradley) (Entered: 05/29/2020) |
| 05/29/2020 | 184 | Notice of Appeal and Statement of Election to BAP. Fee Amount $298. Service on: Filed by James Gray (related document(s)154 Order Regarding Motion For Sale of Property) (Thomson, Charles) (Entered: 05/29/2020) |
| 06/01/2020 | 185 | Certificate of Service re: BAP Appeal and Certificate of Transmission to Appellate Court (Fee Paid) With Attached: Notice of Appeal and Statement of Election to BAP. *180* Fee Amount $298 Service on: Bradley R. Kruse and Louis K. Bonham, Attorneys for Cornice & Rose International, LLC, Charles L. Smith, Trustee, Larry S. Eide, Randy Nielsen, Eric Lam, Eric Langston, Attorneys for First Security State Bank, Eric Lam, Eric Langston, Attorneys for Four Keys, LLC, Charles McQuillen Thomson, Attorney for Charles Thomson and James Gray, Monica Clark, Attorney for City of Charles City, IA Date Served: 6/1/2020 (related document(s)183 Notice of Appeal and Statement of Election) (nbec) (Entered: 06/01/2020) |
| 06/01/2020 | 186 | Certificate of Service re: BAP Appeal and Certificate of Transmission to Appellate Court (Fee Paid) With Attached: Notice of Appeal and Statement of Election to BAP. Fee Amount $298. Service on: Charles L. Smith, Trustee, Larry S. Eide, Randy Nielsen, Eric Lam, Eric Langston, Attorneys for First Security State Bank, Eric Lam, Eric Langston, Attorneys for Four Keys, LLC, Monica Clark, Attorney for City of Charles City, IA, Bradley R. Kruse and Louis K. Bonham, Attorneys for Cornice & Rose International, LLC Date Served: 6/1/2020 (related document(s)184 Notice of Appeal and Statement of Election) (nbec) (Entered: 06/01/2020) |
| 06/02/2020 | 187 | Acknowledgment Received from BAP Appeal filed on June 1, 2020 Case No. 20–6012 (related document(s)183 Notice of Appeal and Statement of Election) (nbec) (Entered: 06/02/2020) |

| | | | |
|---|---|---|---|
| 06/02/2020 | | <u>188</u> | Acknowledgment Received from BAP Appeal filed on June 1, 2020 Case No. 20–6013 (related document(s)<u>184</u> Notice of Appeal and Statement of Election) (nbec) (Entered: 06/02/2020) |
| 06/02/2020 | | <u>189</u> | BAP's Briefing Schedule re: BAP Case # 20–6012 (related document(s)<u>183</u> Notice of Appeal and Statement of Election) (nbec) (Entered: 06/02/2020) |
| 06/02/2020 | | <u>190</u> | BAP's Briefing Schedule re: BAP Case # 20–6013 (related document(s)<u>184</u> Notice of Appeal and Statement of Election) (nbec) (Entered: 06/02/2020) |
| 06/11/2020 | | 193 | Request (by email) for Transcript Received from Exceptional Reporting on 6/11/20. Received confirmation email on 6/11/20. (dcri) (Entered: 06/11/2020) |

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Thad J. Collins |
| | ) | |
| | ) | |

NOTICE PURSUANT TO LOCAL RULE 3007:
CLAIMANT MUST FILE AND SERVE A RESPONSE TO THIS OBJECTION
WITHIN 21 DAYS OF SERVICE OF THE OBJECTION, OR THE
OBJECTION MAY BE SUSTAINED WITHOUT FURTHER NOTICE OR
HEARING.

OBJECTION OF CERTAIN CREDITORS TO CLAIMS
OF FIRST SECURITY BANK & TRUST CO.

NOW COME Charles M. Thomson and James Gray (the "Objecting Parties"), through

their counsel, and as and for their "Objection of Certain Creditors to Claims of First Security Bank

& Trust Co." (this "Objection") respectfully state as follows:

1.      The Objecting Parties are general unsecured creditors, administrative creditors and

equity security holders in the Debtor.

2.      On July 3, 2019, First Security Bank & Trust Co. ("Claimant") filed Claim No. 4[1]

in the amount of $4,030,746.28.  A copy of this claim ("Claim 4") is attached as Exhibit A.

---

[1] Claimant had filed a claim on July 2, 2019, but amended it the next day with what was designated on the Claims
Docket as Claim 4-2.  It is this latter claim, as amended, which is addressed in this Objection.

1

3.      On March 18, 2020, Claimant filed Claim No. 23 in the amount of $4,030,746.28.
A copy of this claim ("Claim 23") is attached as Exhibit B.  Claim 4 and Claim 23 are hereinafter
referred to collectively as the "Claims."

4.      Claimant asserts a security interest in certain real property[2] (the "Real Estate") of
the Debtor.  On November 6, 2019, the Debtor filed a complaint (the " Equitable Subordination
Complaint") to commence an adversary proceeding against Claimant seeking to, *inter alia*,
subordinate Claimant's alleged security interest in the Real Estate. A copy of the Equitable
Subordination Complaint is attached as Exhibit C.

5.      Prior to the commencement of the Debtor's case under Title 11 of the United States
Code, the Debtor had been involved in litigation with Claimant in Iowa District Court for Floyd
County, Iowa (the "Iowa District Court Case").  On September 10, 2018, the Debtor filed a
counterclaim (the "Counterclaim") in the Iowa District Court Case.  A copy of the Counterclaim
is attached as Exhibit D.

6.      The information, facts, allegations and points of law contained in the Equitable
Subordination Complaint and the Counterclaim support disallowance of the Claims in their
entirety.  In addition, to the extent that any portion of the Claims were not to be disallowed, the
Equitable Subordination Complaint and the Counterclaim would support subordination of such
surviving remnant of the Claims to be subordinated in priority to all general unsecured claims and
to the equity security holders' interests in this case.

7.      The Objecting Parties hereby request that the Court disallow the Claims in their
entirety on the bases stated in the foregoing paragraph and, in the event and to the extent the Claims

---

[2] This real property, commonly known as "123 North Main Street, Charles City, Iowa" has recently been the subject
of a motion to sell under 11 U.S.C. 363 by the trustee ("Trustee"), who was appointed when this case was converted
from Chapter 11 to Chapter 7 in December 2019.

2

are not disallowed as requested, the Objecting Parties request that the Court subordinate the priority of the Claims in distribution in the case to a position below that of unsecured creditors and equity security holders.

8.      As independent inquiries about (and possible objections[3] to) the Claims, the Objecting Parties note that (a) the Claims do not contain detailed support (or any support, other than an amount) for the $25,000 asserted by Claimant as a §507 priority in paragraph 12 of Claim 23, and (b) the calculations of Claimant of the asserted amount of its Claims do not appear to tie (at least in any obvious fashion) to the amounts stated by Claimant in its online account statements. A copy of such online account statement is attached hereto as Exhibit E.

NOW, WHEREFORE, the Objecting Parties respectfully request that this Court enter an order:

(a)      disallowing and/or subordinating the Claims in their entirety; and

(b)      granting the Objecting Parties such other and further relief as may be just and equitable under the circumstances.

Respectfully submitted,

JAMES A. GRAY and CHARLES M. THOMSON, creditors, administrative claimants, and equity security holders of the Debtor

  /s/ Charles Thomson_____
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

---

[3] The Objecting Parties hereby reserve their right to amend this Objection to include objections to the Claims based on these issues.

# EXHIBIT A

| Fill in this information to identify your case: |
|---|

| Debtor | **McQuillen Place Company, LLC** |
|---|---|
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF IOWA |
| Case number (if known) | **19-00507** |

## Official Form 410
## Proof of Claim

<div align="right">4/19</div>

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

**First Security Bank & Trust Company**
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

■ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? *(if different)* |
|---|---|
| **First Security Bank & Trust Company**<br>**809 Clark Street**<br>**PO Box 577**<br>**Charles City, IA 50616-0507**<br>Name, Number, Street, City, State & Zip Code | **First Security Bank & Trust Company**<br>**809 Clark Street**<br>**PO Box 577**<br>**Charles City, IA 50616-0507**<br>Name, Number, Street, City, State & Zip Code |
| Contact phone      **641-228-2343** | Contact phone      **641-228-2343** |
| Contact email _____ | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**

☐ No
■ Yes.  Claim number on court claims registry (if known) _____**4**_____      Filed on _____**July 2, 2019**_____

**5. Do you know if anyone else has filed a proof of claim for this claim?**

■ No
☐ Yes.  Who made the earlier filing? _____

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7. How much is the claim?**

$ ___4,030,746.28___   Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

___Promissory note secured by real estate mortgage - see attached___

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:   **See attached statement**

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ ___500,000.00___

**Amount of claim that is secured:** $ ___500,000.00___

**Amount of claim that is unsecured:** $ ___3,530,746.28___   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) ___0___ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition:** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes.  Identify the property: _____

Official Form 410

**Proof of Claim**

page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ■ No | | |
|---|---|---|---|
| | ☐ Yes. *Check one:* | | |

| | | | |
|---|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ | _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ | _____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier.11 U.S.C. § 507(a)(4). | $ | _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ | _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ | _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ | _____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

■ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    __**July  3, 2019**_____
                        MM/ DD / YYYY

__**/s/ /s/ Larry S. Eide**_____
        Signature

**Print the name of the person who is completing and signing this claim:**

| Name | **/s/ Larry S. Eide** |
|---|---|
| Title | **Attorney** |
| Company | **Pappajohn, Shriver, Eide & Nielsen P.C.** |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | **Attn: Larry S. Eide** <br> **PO Box 1588** <br> **Mason City, IA 50402-1588** |
| | Number, Street, City, State and Zip Code |
| Contact phone | **641-423-4264**    Email   **eide@pappajohnlaw.com** |



**CEDAR RAPIDS BANK & TRUST**

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,880,000.00 | 12-31-2014 | 06-30-2016 | | | | 709 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * * " has been omitted due to text length limitations.

| | | |
|---|---|---|
| **Borrower:** | MCQUILLEN PLACE COMPANY, LLC<br>1110 N GRAND AVE STE 300<br>CHARLES CITY, IA 50616 | **Lender:** CEDAR RAPIDS BANK AND TRUST COMPANY<br>500 1ST AVENUE NE STE 100<br>CEDAR RAPIDS, IA 52401 |

**Principal Amount: $3,880,000.00**                                      **Date of Note: December 31, 2014**

**PROMISE TO PAY.** MCQUILLEN PLACE COMPANY, LLC ("Borrower") promises to pay to CEDAR RAPIDS BANK AND TRUST COMPANY ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million Eight Hundred Eighty Thousand & 00/100 Dollars ($3,880,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 30, 2016. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 31, 2015, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime as published in The Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index, adjusted if necessary for any minimum and maximum rate limitations described in this Note, resulting in an initial rate of 5.250% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Cedar Rapids Bank and Trust Company, 500 1st Avenue NE Ste 100, P.O. Box 789 Cedar Rapids, IA 52406-0789.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate

# PROMISSORY NOTE
## (Continued)

**Loan No:** [REDACTED]                                                                 **Page 2**

reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including without limitation all attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Iowa without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Iowa.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Linn County, State of Iowa.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by Real Estate Mortgage dated 12/31/2014 for property located at 123; and 107-109 North Main Street, Charles City, Iowa

Real Estate Mortgage dated 12/31/2014 for farm land located in Dubuque County, Iowa, granted by the Janan M. Thomson Family Trust

Guaranty dated 12/31/2014 from Charles M. Thomson, secured by, Real Estate Mortgage dated 12/31/2014 for property located at 501 Spriggs Street, Charles City, Iowa and Assignment of Life Insurance Policy #040-001543324 from Farm Bureau Life Insurance Company dated 10/17/2014.

Guaranty dated 12/31/2014 from Amelia Management, LLC, secured by, Real Estate Mortgage dated 12/31/2014 for the following properties:
704 Cedar Street, Charles City, Iowa
206 N Main Street, Charles City, Iowa
208 N Manin Street, Charles City, Iowa
505 Kellogg Avenue, Charles City, Iowa
2652 Harvey Street, Charles City, Iowa
1110 N Grand Avenue, Charles City, Iowa

Guaranty dated 12/31/2014 from Robert L. Thomson.

Guaranty dated 12/31/2014 from Amelia Trust

Assignment of Charles Thomson's one-quarter interest of Life Insurance Policy #BU112337 from United of Omaha Life Insurance Company, upon the life of Robert Thomson, dated 12/31/2014.

Construction Loan Agreement dated 12/31/2014

Assigment of Contracts, Ageements, Licenses and Permits dated 12/31/2014

**LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**PURPOSE OF LOAN.** The purpose of this loan is for: Purchase and rehabilitate property located in Charles City, Iowa.

**SHARING CUSTOMER INFORMATION WITH AFFILIATES.** Borrower acknowledges and agrees that Lender may share Borrower's financial information with any affiliate of QCR Holdings, Inc. Lender agrees that it will require those affiliates to maintain the privacy of such information.

**COUNTERPART.** This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: Cedar Rapids Bank and Trust Company 500 1st Avenue NE Ste 100, P.O. Box 789 Cedar Rapids, IA 52406-0789.

```
** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **

TIME RECEIVED                    REMOTE CSID          DURATION    PAGES    STATUS
December 31, 2014 10:23:57 AM CST                     41          1        Received
```

## PROMISSORY NOTE

**(Continued)**

Loan No: ▮▮▮▮▮▮                                                              Page 3

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.

**BORROWER:**

MCQUILLEN PLACE COMPANY, LLC

By: _____
    CHARLES M THOMSON, Member of MCQUILLEN
    PLACE COMPANY, LLC

AMELIA TRUST, Member of MCQUILLEN PLACE COMPANY, LLC

By: _____
    CHARLES M THOMSON, Trustee of AMELA TRUST

**LENDER:**

CEDAR RAPIDS BANK AND TRUST COMPANY

X _____
    Gary M Backer, Senior Vice President

LaserPro, Ver. 14.4.1.034 Copr. D+H USA Corporation 1997, 2014. All Rights Reserved. - IA WCFI\LPL\CFILPL\D20.FC TR-8887 PR-5



# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,880,000.00 | 06-30-2016 | 12-01-2016 | | | | 709 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MCQUILLEN PLACE COMPANY, LLC
1110 N GRAND AVE STE 300
CHARLES CITY, IA 50616

**Lender:** CEDAR RAPIDS BANK AND TRUST COMPANY
500 1ST AVENUE NE STE 100
CEDAR RAPIDS, IA 52401

**Principal Amount: $3,880,000.00**                                        **Date of Agreement: June 30, 2016**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** Promissory Note dated 12/31/14 in the original amount of $3,880,000.00 with an original maturity date of 06/30/16 and all amendments thereafter.

**DESCRIPTION OF CHANGE IN TERMS.** Extend the maturity date, extend payment schedule.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 1, 2016. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning July 31, 2016, with all subsequent interest payments to be due on the last day of each month after that.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime as published in The Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. **The index currently is 3.500% per annum.** Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.250% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**COUNTERPART.** This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

**PURPOSE OF LOAN.** The purpose of this loan is for: Original purpose was to Purchase and rehabilitate property at 123 North Main Street, Charles City, IA

E-FILED 2018 MAR 14 3:06 PM FLOYD - CLERK OF DISTRICT COURT

Amended Petition Page 516/45

**CHANGE IN TERMS AGREEMENT**
**(Continued)**

Loan No: ████████                                                          Page 2

---

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE
VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS CHANGE IN TERMS AGREEMENT AND ALL OTHER DOCUMENTS
RELATING TO THIS DEBT.

BORROWER:

MCQUILLEN PLACE COMPANY, LLC

By: _____
   CHARLES M THOMSON, Member of MCQUILLEN
   PLACE COMPANY, LLC

AMELIA TRUST, Member of MCQUILLEN PLACE COMPANY, LLC

By: _____
   CHARLES M THOMSON, Trustee of AMELIA TRUST

LENDER:

CEDAR RAPIDS BANK AND TRUST COMPANY

X _____
   Gary M Becker, Senior Vice President

LaserPro, Ver. 18.1.10.003 Copr. D+H USA Corporation 1997, 2018 All Rights Reserved. - IA E:\Apps\LaserPro\CR\TIC\FIL\PL\D20C.FC TR-12282 PR-8



CEDAR
RAPIDS
BANK &
TRUST

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,472,136.45 | 12-01-2016 | 03-31-2017 | | | | 709 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " **** " has been omitted due to text length limitations.

**Borrower:** MCQUILLEN PLACE COMPANY, LLC
1110 N GRAND AVE STE 300
CHARLES CITY, IA 50616

**Lender:** CEDAR RAPIDS BANK AND TRUST COMPANY
500 1ST AVENUE NE STE 100
CEDAR RAPIDS, IA 52401

**Principal Amount: $3,472,136.45**                    **Date of Agreement: December 1, 2016**

DESCRIPTION OF EXISTING INDEBTEDNESS. Promissory Note dated 12/31/2014 in the original amount of $3,880,000.00 with an original maturity date of 6/30/2016 and all amendments thereafter.

DESCRIPTION OF CHANGE IN TERMS. Extend the maturity date, extend the interest rate and extend the payment schedule.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on March 31, 2017. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning December 31, 2016, with all subsequent interest payments to be due on the last day of each month after that.

VARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime as published in The Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.500% per annum. Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.250% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

COUNTERPART. This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

PURPOSE OF LOAN. The purpose of this loan is for: Original purpose was to purchase and rehabilitate property at 123 N Main St, Charles City, IA.

**CHANGE IN TERMS AGREEMENT**
**(Continued)**

Loan No:

═══════════════════════════════════════════════

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS CHANGE IN TERMS AGREEMENT AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.

BORROWER:

MCQUILLEN PLACE COMPANY, LLC

By: _____
CHARLES M THOMSON, Member of MCQUILLEN
PLACE COMPANY, LLC

AMELIA TRUST, Member of MCQUILLEN PLACE COMPANY, LLC

By: _____
CHARLES M THOMSON, Trustee of AMELIA TRUST

LENDER:

CEDAR RAPIDS BANK AND TRUST COMPANY

X _____
Gary M Becker, Senior Vice President

LaserPro, Ver. 16.3.10.005 Copr. D+H USA Corporation 1997, 2016. All Rights Reserved. - IA E:\Apps\LaserPro\CFI\TICR\PL\D20C.FC TR-12900 PR-9



## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,880,000.00 | 03-31-2017 | 06-30-2017 | | | MCQUILPC00 | 709 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing ***** has been omitted due to text length limitations.

**Borrower:** MCQUILLEN PLACE COMPANY, LLC
1110 N GRAND AVE #300
CHARLES CITY, IA 50616-2139

**Lender:** Cedar Rapids Bank and Trust Company
500 1st Avenue NE Suite 100
Cedar Rapids, IA 52401

**Principal Amount: $3,880,000.00**                     **Date of Agreement: March 31, 2017**

DESCRIPTION OF EXISTING INDEBTEDNESS. Promissory Note dated 12/31/2014 in the amount of $3,880,000.00 with an original maturity date of 06/30/2016 and all amendments thereafter.

DESCRIPTION OF CHANGE IN TERMS. Extending the maturity date and payment schedule. Rate will remain at Prime + 1.00% with a 5.250% floor.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 30, 2017. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning April 30, 2017, with all subsequent interest payments to be due on the last day of each month after that.

VARIABLE INTEREST RATE. The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal as published in the Wall Street Journal (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 4.000% per annum. Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.000 percentage point over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.250% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this loan be less than 5.250% per annum or more than the maximum rate allowed by applicable law.

INTEREST CALCULATION METHOD. Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

NOTE COUNTERPART. This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

PURPOSE OF LOAN. The purpose of this loan is for: Original purpose was to purchase and rehabilitate property at 123 N Main St, Charles City, IA.

SHARING CUSTOMER INFORMATION WITH AFFILIATES. Borrower acknowledges and agrees that Lender may share Borrower's financial information with any affiliate of QCR Holdings, Inc. Lender agrees that it will require those affiliates to maintain the privacy of such information.

| Loan No: ▮▮▮▮▮▮▮ | | Page 2 |

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS CHANGE IN TERMS AGREEMENT AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.

**BORROWER:**

MCQUILLEN PLACE COMPANY, LLC

By: _____
CHARLES M THOMSON, Member of MCQUILLEN
PLACE COMPANY, LLC

AMELIA TRUST, Member of MCQUILLEN PLACE COMPANY, LLC

By: _____
CHARLES M THOMSON, Trustee of AMELIA TRUST

**LENDER:**

CEDAR RAPIDS BANK AND TRUST COMPANY

X _____
Gary M Becker, Senior Vice President

LaserPro, Ver. 16.4.0.017 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - IA E:\Appal\LaserPro\OCR\HACR\LFI\D2CC.FC TR-777 PR-9



| Loan No: [REDACTED] | **CHANGE IN TERMS AGREEMENT**<br>(Continued) | Page 2 |
|---|---|---|

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS CHANGE IN TERMS AGREEMENT AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.

BORROWER:

MCQUILLEN PLACE COMPANY, LLC

By: _____
    CHARLES M THOMSON, Member of MCQUILLEN
    PLACE COMPANY, LLC

AMELIA TRUST, Member of MCQUILLEN PLACE COMPANY, LLC

By: _____
    CHARLES M THOMSON, Trustee of AMELIA TRUST

LENDER:

CEDAR RAPIDS BANK AND TRUST COMPANY

X_____
    Gary M Becker, Senior Vice President

LaserPro, Ver. 17.2.10.027 Copr. D + H USA Corporation 1997, 2017. All Rights Reserved. - IA E:\Apps\LaserPro\QCE\MCPALA\D20C.FC TR-2148 PR-3

Instr. Number: 2015 0014
BK: 2015 PG: 0014
Recorded: 1/5/2015 at 2:33:21.0 PM
pages 16
Fee Amount: $82.00
Revenue Tax:
Deborah K. Roberts RECORDER
Floyd County, Iowa

---

**FOR RECORDER'S USE ONLY**

Prepared By: LESA AMENT, CEDAR RAPIDS BANK AND TRUST COMPANY, 500 1ST AVENUE NE STE 100, CEDAR RAPIDS, IA 52401, (319) 862-2728

RECORDATION REQUESTED BY:
 CEDAR RAPIDS BANK AND TRUST COMPANY, 500 1ST AVENUE NE STE 100, CEDAR RAPIDS, IA 52401

WHEN RECORDED MAIL TO:
 CEDAR RAPIDS BANK AND TRUST COMPANY, 500 1ST AVENUE NE STE 100, CEDAR RAPIDS, IA 52401



## CONSTRUCTION MORTGAGE

**NOTICE:** This Mortgage secures credit in the amount of $3,880,000.00. Loans and advances up to this amount, together with interest, are senior to indebtedness to other creditors under subsequently recorded or filed mortgages and liens.

The names of all Grantors (sometimes "Grantor") can be found on page 1 of this Mortgage. The names of all Grantees (sometimes "Lender") can be found on page 1 of this Mortgage. The property address can be found on page 2 of this Mortgage. The legal description can be found on page 2 of this Mortgage.

THIS MORTGAGE dated December 31, 2014, is made and executed between MCQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company (referred to below as "Grantor") and CEDAR RAPIDS BANK AND TRUST COMPANY, whose address is 500 1ST AVENUE NE STE 100, CEDAR RAPIDS, IA 52401 (referred to below as "Lender").

GRANT OF MORTGAGE. For valuable consideration, Grantor mortgages and conveys to Lender and grants to Lender a security interest in all of Grantor's right, title, and interest in and to the following

**MORTGAGE**
**(Continued)**

Loan No:  Page 2

described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; rents and profits; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in FLOYD County, State of Iowa:

> See EXHIBIT A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

The Real Property or its address is commonly known as 123; AND 107-109 MAIN ST, CHARLES CITY, IA 50616.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents. The lien on the rents granted in this Mortgage shall be effective from the date of the Mortgage and not just in the event of default.

**FUTURE ADVANCES.** In addition to the Note, this Mortgage secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Mortgage secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS ALSO GIVEN TO SECURE ANY AND ALL OF GRANTOR'S OBLIGATIONS UNDER THAT CERTAIN CONSTRUCTION LOAN AGREEMENT BETWEEN GRANTOR AND LENDER OF EVEN DATE HEREWITH. ANY EVENT OF DEFAULT UNDER THE CONSTRUCTION LOAN AGREEMENT, OR ANY OF THE RELATED DOCUMENTS REFERRED TO THEREIN, SHALL ALSO BE AN EVENT OF DEFAULT UNDER THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

**CONSTRUCTION MORTGAGE.** This Mortgage secures an obligation incurred for the construction of an improvement on land, and is a "construction mortgage" within the meaning of Section 554.9334 of the Iowa Uniform Commercial Code. This Mortgage also secures loans or advancements made directly to finance work or improvements upon the real estate described herein, and is a "construction mortgage lien" within the meaning of Section 572.18 of the Iowa Code.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions: None of the collateral for the Indebtedness constitutes, and none of the funds represented by the Indebtedness will be used to purchase: (1) Agricultural products or property used for an agricultural purpose as defined in Iowa Code Section 535.13; (2) Agricultural land as defined in Iowa Code Section 9H1 (2) or 175.2 (1); or (3) Property used for an agricultural purpose as defined in Iowa Code Section 570.A.1 (2). Grantor represents and warrants that: (1) There are not now and will not be any wells situated on the Property; (2) There are not now and will not be any solid waste disposal sites on the Property; (3) There are not now and there will not be any hazardous wastes on the Property; (4) There are not now

**MORTGAGE**
**(Continued)**

Loan No: [REDACTED]

Page 3

---

and there will not be any underground storage tanks on the Property.

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real

## MORTGAGE
## (Continued)

Loan No: ▓▓▓▓▓▓▓                                                      Page 4

---

Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**CONSTRUCTION LOAN.** The Improvements shall be completed no later than the maturity date of the Note (or such earlier date as Lender may reasonably establish) and Grantor shall pay in full all costs and expenses in connection with the work. Lender will disburse loan proceeds under such terms and conditions as Lender may deem reasonably necessary to insure that the interest created by this Mortgage shall have priority over all possible liens, including those of material suppliers and workmen. Lender may require, among other things, that disbursement requests be supported by receipted bills, expense affidavits, waivers of liens, construction progress reports, and such other documentation as Lender may reasonably request.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Iowa law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen

# MORTGAGE
### (Continued)

Loan No: [REDACTED]

Page 5

---

(15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any

**MORTGAGE**
**(Continued)**

Loan No: ████████                                                                    Page 6

proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender, and (c) the liens granted hereby are not the type of lien referred to in Chapter 575 of the Iowa Code Supplement, as now enacted or hereafter modified, amended or replaced. Grantor, for itself and all persons claiming by, through or under Grantor, agrees that it claims no lien or right to a lien of the type contemplated by Chapter 575 or any other chapter of the Code of Iowa and further waives all notices and rights pursuant to said law with respect to the liens hereby granted, and represents and warrants that it is the sole party entitled to do so and agrees to indemnify, defend, and hold harmless Lender from any loss, damage, and costs, including reasonable attorneys' fees, threatened or suffered by Lender arising either directly or indirectly as a result of any claim of the applicability of said law to the liens hereby granted.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under

**MORTGAGE**
**(Continued)**

this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

Compliance With Laws. Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

Survival of Representations and Warranties. All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

CONDEMNATION. The following provisions relating to condemnation proceedings are a part of this Mortgage:

Proceedings. If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

Application of Net Proceeds. If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES. The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

Current Taxes, Fees and Charges. Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

Taxes. The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

Subsequent Taxes. If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

i

**MORTGAGE**
**(Continued)**

Loan No: ████████                                          Page 8

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Fixture Filing.** From the date of its recording, this Mortgage shall be effective as a financing statement filed as a fixture filing with respect to the Personal Property and for this purpose, the name and address of the debtor is the name and address of Grantor as set forth on the first page of this Mortgage and the name and address of the secured party is the name and address of Lender as set forth on the first page of this Mortgage.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness, including without limitation all future advances, when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security

Loan No:

interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of

# MORTGAGE
## (Continued)

any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Right to Cure.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving all required notices of default and after passage of any grace period, to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Grantor would be required to pay without notice, except as may be expressly required by applicable law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Foreclosure.** Lender may exercise the right to non-judicial foreclosure pursuant to Iowa Code Section 654.18 and Chapter 655A as now enacted or hereafter modified, amended or replaced.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

## MORTGAGE
### (Continued)

Loan No: [redacted]　　　　　　　　　　　　　　　　　　　　　　　　Page 11

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.　　This paragraph is subject to any rights of Grantor, under Iowa law, to remain in possession of the Property during a redemption period.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Shortened Redemption.** Grantor hereby agrees that, in the event of foreclosure of this Mortgage, Lender may, at Lender's sole option, elect to reduce the period of redemption pursuant to Iowa Code Sections 628.26, 628.27, or 628.28, or any other Iowa Code Section, to such time as may be then applicable and provided by law.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually

delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**COUNTERPART.** This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law. This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Iowa without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Iowa.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Linn County, State of Iowa.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision

## MORTGAGE
## (Continued)

Loan No: ▮▮▮▮▮▮▮▮        Page 13

illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Release of Rights of Dower, Homestead and Distributive Share.** Each of the undersigned hereby relinquishes all rights of dower, homestead and distributive share in and to the Property and waives all rights of exemption as to any of the Property. If a Grantor is not an owner of the Property, that Grantor executes this Mortgage for the sole purpose of relinquishing and waiving such rights.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means MCQUILLEN PLACE COMPANY, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means MCQUILLEN PLACE COMPANY, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or

**MORTGAGE**
**(Continued)**

Loan No: [redacted]                                                           Page 14

---

all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest and late fees, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Mortgage, together with all interest thereon.

**Lender.** The word "Lender" means CEDAR RAPIDS BANK AND TRUST COMPANY, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated December 31, 2014, in the original principal amount of $3,880,000.00 from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

<table>
<tr><td>Loan No:</td><td>███████</td></tr>
</table>

**MORTGAGE**
**(Continued)**

Page 15

---

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.**

**GRANTOR ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS MORTGAGE AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.**

**GRANTOR:**

**MCQUILLEN PLACE COMPANY, LLC**

By: _[signature]_

CHARLES M THOMSON, Member of MCQUILLEN PLACE COMPANY, LLC

**AMELIA TRUST**, Member of MCQUILLEN PLACE COMPANY, LLC

By: _[signature]_

CHARLES M THOMSON, Trustee of AMELIA TRUST

---

**LIMITED LIABILITY COMPANY ACKNOWLEDGMENT**

STATE OF ___Iowa___ )
 ) SS
COUNTY OF ___Floyd___ )

This record was acknowledged before me on ___12/31___, 20 _14_ by CHARLES M THOMSON, Member of MCQUILLEN PLACE COMPANY, LLC and CHARLES M THOMSON, Trustee of AMELIA TRUST, Member of MCQUILLEN PLACE COMPANY, LLC.

_[notary stamp:]_ Lori A. Koresh
Commission Number 220995
MY COMMISSION EXPIRES
2-16-2017

_[signature]_
Notary Public in and for the State of ___Iowa___

My commission expires ___2/16/2017___

---

LaserPro, Ver. 14.4.0.024  Copr. D+H USA Corporation 1997, 2014.  All Rights Reserved.   - IA
W:\CRBT\CFI\LPL\G03.FC TR-9869 PR-3

EXHIBIT A

LOT ONE (1), BLOCK TWENTY ONE (21), EXCEPT THE NORTHWESTERLY TWENTY
TWO FEET (NWLY 22') THEREOF, OF THE ORIGINAL PLAT OF ST. CHARLES, NOW
A PART OF CHARLES CITY, IOWA, OTHERWISE DESCRIBED AS: LOT ONE (1) OF
THE IRREGULAR SURVEY OF BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST.
CHARLES. NOW A PART OF CHARLES CITY, IOWA, EXCEPT THE
NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF;
AND
THE NORTH ONE HALF (N ½) OF THE WEST FORTY FEET (W 40') OF THE BRICK
WALL BETWEEN LOTS ONE (1) AND TWO (2), BLOCK TWENTY ONE (21), ORIGINAL
PLAT OF ST. CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY,
IOWA;
AND
CHARLES CITY DISASTER REDEVELOPMENT PROJECT IOWA R 36(C) PARCEL NO.
R 24 (P 10), MORE PARTICULARLY DESCRIBED AS: THE NORTHWESTERLY 22.00
FEET OF LOT ONE (1), BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES,
NOW INCORPORATED AS THE CITY OF CHARLES CITY, FLOYD COUNTY, IOWA.
(LOCALLY DESCRIBED AS 123 N. MAIN STREET, CHARLES CITY, IOWA 50616
PARCEL NO. 110146700500)


AND


LOT TWO (2), BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW
INCORPORATED AS A PART OF CHARLES CITY. IOWA.
LOT THREE OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE OF THE
ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES CITY,
IOWA.
LOT 4 OF THE SUB-DIVISION OF LOTS 3 AND 4 OF BLOCK 21 OF THE ORIGINAL
PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES CITY, IOWA.
LOT FIVE (5) OF THE IRREGULAR SURVEY OF BLOCK NO. TWENTY-ONE (21) OF
THE ORIGINAL PLAT OF ST. CHARLES (NOW INCORPORATED AS CHARLES CITY)
ACCORDING TO THE SUB-DIVISION OF SAID BLOCK TWENTY-ONE (21).



CEDAR RAPIDS BANK & TRUST

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer 709 | Initials |
|---|---|---|---|---|---|---|---|
| References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** MCQUILLEN PLACE COMPANY, LLC
1110 N GRAND AVE STE 300
CHARLES CITY, IA 50616

**Lender:** CEDAR RAPIDS BANK AND TRUST COMPANY
500 1ST AVENUE NE STE 100
CEDAR RAPIDS, IA 52401

**Guarantor:** CHARLES M THOMSON
501 SPRIGGS ST
CHARLES CITY , IA 50616

---

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties,

# COMMERCIAL GUARANTY
## (Continued)

Loan No: ▮▮▮▮▮▮▮▮            Page 2

endorsers, or other guarantors on any terms or in any manner Lender may choose;  (E)  to determine how, when and what application of payments and credits shall be made on the Indebtedness;  (F)  to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine;  (G)  to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and  (H)  to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.**  Guarantor represents and warrants to Lender that  (A)  no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty;  (B)  this Guaranty is executed at Borrower's request and not at the request of Lender;  (C)  Guarantor has full power, right and authority to enter into this Guaranty;  (D)  the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor;  (E)  Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein;  (F)  upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided;  (G)  no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition;  (H)  no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened;  (I)  Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and  (J)  Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition.  Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of  its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.**  Guarantor agrees to furnish Lender with the following:

**Tax Returns.**  As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by Guarantor.

**Additional Requirements.  Annual Statements.**  As soon as available , but in not event no less than every 12 months, a current personal financial statement prepared by Guarantor in a form acceptable to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.**  Except as prohibited by applicable law, Guarantor waives any right to require Lender  (A)  to continue lending money or to extend other credit to Borrower;  (B)  to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations;  (C)  to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor;  (D)  to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person;  (E)  to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code;  (F)  to pursue any other remedy within Lender's power; or  (G)  to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of  (A)  any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale;  (B)  any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness;  (C)  any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness;  (D)  any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness;  (E)  any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or  (F)  any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness.  If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.**  Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law.  If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**COLLATERAL.**  This Guaranty is secured by Real Estate Mortgage dated 12/31/2014 for property located at 501 Spriggs Street, Charles City, Iowa, and

Assignment of Life Insurance Policy #040-001543324,  dated 10/17/2014.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in those accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.**  Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent.  Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower.  In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to

## COMMERCIAL GUARANTY
### (Continued)

| Loan No: ▇▇▇▇▇▇▇ | | Page 3 |
|---|---|---|

the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Iowa without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Linn County, State of Iowa.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**COUNTERPART.** This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means MCQUILLEN PLACE COMPANY, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: ████████                                                            Page 4

---

GAAP. The word "GAAP" means generally accepted accounting principles.

Guarantor. The word "Guarantor" means everyone signing this Guaranty, including without limitation CHARLES M THOMSON, and in each case, any signor's successors and assigns.

Guaranty. The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means CEDAR RAPIDS BANK AND TRUST COMPANY, its successors and assigns.

Note. The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness. ,

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED DECEMBER 31, 2014.

GUARANTOR ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS COMMERCIAL GUARANTY AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.

GUARANTOR:

X_____
**CHARLES M THOMSON**

---

LaserPro, Ver. 14.4.0.034 Copr. D+H USA Corporation 1997, 2014. All Rights Reserved. - IA W:\CXE\CFI\LPL\E3.FC T3-8363 PR-3



**CEDAR
RAPIDS
BANK &
TRUST**

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | | | | | | 709 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MCQUILLEN PLACE COMPANY, LLC
1110 N GRAND AVE STE 300
CHARLES CITY, IA 50616

**Lender:** CEDAR RAPIDS BANK AND TRUST COMPANY
500 1ST AVENUE NE STE 100
CEDAR RAPIDS, IA 52401

**Guarantor:** AMELIA TRUST
1110 N GRAND STE 300
CHARLES CITY, IA 50616

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties,

<div align="center">

**COMMERCIAL GUARANTY**
**(Continued)**

</div>

| Loan No: | | Page 2 |

endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such further actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

## COMMERCIAL GUARANTY
### (Continued)

| Loan No: | | Page 3 |
|---|---|---|

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Iowa without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Linn County, State of Iowa.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**COUNTERPART.** This agreement may be executed in counterparts, each of which shall be deemed as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means MCQUILLEN PLACE COMPANY, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation AMELIA TRUST, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means CEDAR RAPIDS BANK AND TRUST COMPANY, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments,

| Loan No: ▮▮▮▮▮ | **COMMERCIAL GUARANTY**<br>(Continued) | Page 4 |
|---|---|---|

agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED DECEMBER 31, 2014.**

**GUARANTOR ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS COMMERCIAL GUARANTY AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.**

**GUARANTOR:**

**AMELIA TRUST**

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
      **CHARLES M THOMSON, Trustee of AMELIA TRUST**

LaserPro, Ver. 14.4.0.224  Copr. D+H USA Corporation 1997, 2014.  All Rights Reserved.  - IA  WIN/CFI/LPL/E20.FC  TR-9663  PR-3



CEDAR RAPIDS BANK & TRUST

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer 709 | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MCQUILLEN PLACE COMPANY, LLC
1110 N GRAND AVE STE 300
CHARLES CITY, IA 50616

**Guarantor:** AMELIA MANAGEMENT, LLC
1110 N GRAND AVE STE 300
CHARLES CITY, IA 50616

**Lender:** CEDAR RAPIDS BANK AND TRUST COMPANY
500 1ST AVENUE NE STE 100
CEDAR RAPIDS, IA 52401

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties,

## COMMERCIAL GUARANTY
(Continued)

| Loan No: ■■■■■■■ | | Page 2 |

endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**COLLATERAL.** This Guaranty is secured by Real Estate Morgage dated 12/31/2014 for property located at 704 Cedar St., Charles City, Iowa

Real Estate Morgage dated 12/31/2014 for property located at 206 N Main St., Charles City, Iowa

Real Estate Morgage dated 12/31/2014 for property located at 208 N Main St., Charles City, Iowa

Real Estate Morgage dated 12/31/2014 for property located at 505 Kellogg Ave., Charles City, Iowa

Real Estate Morgage dated 12/31/2014 for property located at 2652 Hervey St., Charles City, Iowa

Real Estate Morgage dated 12/31/2014 for propety located at 1110 N Grand Ave., Charles City, Iowa.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of

## COMMERCIAL GUARANTY
### (Continued)

| Loan No: | | Page 3 |
|---|---|---|

Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Iowa without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Linn County, State of Iowa.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**COUNTERPART.** This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means MCQUILLEN PLACE COMPANY, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation AMELIA MANAGEMENT, LLC, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

| | COMMERCIAL GUARANTY | |
|---|---|---|
| Loan No: ████████ | (Continued) | Page 4 |

Indebtedness. The word "Indebtedness" means Borrower's Indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means CEDAR RAPIDS BANK AND TRUST COMPANY, its successors and assigns.

Note. The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED DECEMBER 31, 2014.

GUARANTOR ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS COMMERCIAL GUARANTY AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.

GUARANTOR:

AMELIA MANAGEMENT, LLC

By: _____
CHARLES M THOMSON, Member of AMELIA
MANAGEMENT, LLC

AMELIA TRUST, Member of AMELIA MANAGEMENT, LLC

By: _____
CHARLES M THOMSON, Trustee of AMELIA TRUST

LaserPro, Ver. 14.4.0.024 Copr. D + H USA Corporation 1997, 2014. All Rights Reserved. - IA W:\CFI\LPL\E3.FC TR-9869 PR-3



**CEDAR RAPIDS BANK & TRUST**

## COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call/Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-----------|---------|---------|----------|
|           |           |          |         |           |         | 709     |          |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MCQUILLEN PLACE COMPANY, LLC
1110 N GRAND AVE STE 300
CHARLES CITY, IA 50616

**Lender:** CEDAR RAPIDS BANK AND TRUST COMPANY
500 1ST AVENUE NE STE 100
CEDAR RAPIDS, IA 52401

**Guarantor:** ROBERT L THOMSON
401 SPRIGGS ST
CHARLES CITY, IA 50616

---

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of Guarantor's Share of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**GUARANTOR'S SHARE OF THE INDEBTEDNESS.** The words "Guarantor's Share of the Indebtedness" as used in this Guaranty mean an amount not to exceed Nine Hundred Thousand & 00/100 Dollars ($900,000.00) of all the principal amount, interest thereon to the extent not prohibited by law, and all collection costs, expenses and attorneys' fees whether or not there is a lawsuit, and if there is a lawsuit, any fees and costs for trial and appeals.

Guarantor's Share of the Indebtedness will only be reduced by sums actually paid by Guarantor under this Guaranty, but will not be reduced by sums from any other source including, but not limited to, sums realized from any collateral securing the Indebtedness or this Guaranty, or payments by anyone other than Guarantor, or reductions by operation of law, judicial order or equitable principles. Lender has the sole and absolute discretion to determine how sums shall be applied among guaranties of the Indebtedness.

The above limitation on liability is not a restriction on the amount of the Note of Borrower to Lender either in the aggregate or at any one time.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE GUARANTOR'S SHARE OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON A CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or at such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a

**COMMERCIAL GUARANTY**
(Continued)

| Loan No: | | Page 2 |

termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Guarantor's Share of the Indebtedness remains unpaid and even though the Guarantor's Share of the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by Guarantor.

**Additional Requirements.** Annual Statements. As soon as available , but in not event no less than every 12 months, a current personal financial statement prepared by Guarantor in a form acceptable to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be

**COMMERCIAL GUARANTY**
(Continued)

Loan No: ████████████          Page 3

prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Iowa without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Linn County, State of Iowa.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**COUNTERPART.** This agreement may be executed in counterparts, each of which shall be deemed an original as against any party whose signature appears on such counterpart, and all of which together shall constitute one and the same instrument. Facsimiles, photocopies or other electronic reproductions or copies of original signatures are deemed as legally enforceable as the originals thereof.

| Loan No: | **COMMERCIAL GUARANTY**<br>(Continued) | Page 4 |

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means MCQUILLEN PLACE COMPANY, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation ROBERT L THOMSON, and in each case, any signer's successors and assigns.

**Guarantor's Share of the Indebtedness.** The words "Guarantor's Share of the Indebtedness" mean Guarantor's Indebtedness to Lender as more particularly described in this Guaranty.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means CEDAR RAPIDS BANK AND TRUST COMPANY, its successors and assigns.

**Note.** The word "Note" means the promissory note dated December 31, 2014, in the original principal amount of $3,880,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED DECEMBER 31, 2014.

GUARANTOR ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS COMMERCIAL GUARANTY AND ALL OTHER DOCUMENTS RELATING TO THIS DEBT.

**GUARANTOR:**

X
ROBERT L THOMSON

LaserPro, Ver. 14.4.0.024 Copr. D+H USA Corporation 1997, 2014. All Rights Reserved. - IA WCMSTRCFRLPL\E20.FC TR-5153 PR-3



phone: 319.862.2728 | www.crbt.com
Member FDIC

## NOTICE OF DEFAULT

January 11, 2018

McQuillen Place Company, LLC, Borrower
Attn: Charles M. Thomson, Member
1110 N. Grand Avenue, Ste. 300
Charles City, IA. 50616

Charles M. Thomson, Guarantor
501 Spriggs Street
Charles City, IA. 50616

Robert L. Thomson, Guarantor
401 Spriggs Street
Charles City, IA. 50616

Amelia Management, LLC, Guarantor
Attn: Charles M. Thomson, Member
1110 N. Grand Avenue, Ste. 300
Charles City, IA. 50616

Amelia Trust, Guarantor
Attn: Charles M. Thomson, Trustee
1110 N. Grand Avenue, Ste. 300
Charles City, IA. 50616

Re:            Loan Number █████████

Said Note is now in default under the terms and conditions thereof. Specifically, said default is
the result of failure to pay sums due under the Note upon the Maturity date of December 15,
2017. The outstanding principal balance is $3,879,992.13. This amount does not include
accrued interest, any accrued and outstanding late fees, default interest, and any other costs of
collection incurred by Cedar Rapids Bank and Trust Company ("CRBT") now, or in the future, per
the terms and conditions contained in the Note. You have a right to correct this default on, or
before, **January 31, 2018**, by paying CRBT the entire unpaid indebtedness, as well as fees
accrued. Acceptance by CRBT of a partial payment (that is, a payment other than the entire
amount indicated above) does not waive any of its rights under the Note, or this Notice.

## People you can bank on.®

Acceptance of partial payment shall not be deemed or considered, and shall not constitute, satisfaction or cure of the default described herein.

If you do not correct this default by the date stated above, CRBT may exercise its rights against you under the law, and under the terms of the Note and all Guarantees.

If you have any questions, write or telephone Cedar Rapids Bank and Trust Company, 500 1st Avenue NE, Ste. 100, Cedar Rapids, IA 52401, or, call me at (319) 743-7017.

David V. Castelluccio
Vice President, Special Assets

Cc: Diane Wolfe, Vice President and Chief Credit Officer, 1st Security Bank - via e-mail
dwolfe@1stsecuritybank.com

Member FDIC

People you can bank on.®

IN THE IOWA DISTRICT COURT FOR FLOYD COUNTY

| | | |
|---|---|---|
| CEDAR RAPIDS BANK AND TRUST COMPANY, | ) ) ) | |
| Plaintiff, | ) | Case No.  EQCV 031170 |
| v. | ) ) | Amended and Substituted |
| MCQUILLEN PLACE COMPANY, LLC, CHARLES M. THOMSON, ROBERT L. THOMSON, AMELIA MANAGEMENT, LLC, AMELIA TRUST, CERRO GORDO COUNTY, IOWA, and SCHINDLER ELEVATOR CORPORATION, | ) ) ) ) ) ) ) | **PETITION TO FORECLOSE MORTGAGE WITHOUT REDEMPTION** |
| Defendants. | ) ) | |

## NOTICE

THE PLAINTIFF HAS ELECTED FORECLOSURE WITHOUT REDEMPTION. THIS MEANS THAT THE SALE OF THE MORTGAGED PROPERTY WILL OCCUR PROMPTLY AFTER ENTRY OF JUDGMENT UNLESS YOU FILE WITH THE COURT A WRITTEN DEMAND TO DELAY THE SALE.  IF YOU FILE A WRITTEN DEMAND, THE SALE WILL BE DELAYED UNTIL TWELVE MONTHS (or SIX MONTHS if the petition includes a waiver of deficiency judgment) FROM ENTRY OF JUDGMENT IF THE MORTGAGED PROPERTY IS YOUR RESIDENCE AND IS A ONE-FAMILY OR TWO-FAMILY DWELLING OR UNTIL TWO MONTHS FROM ENTRY OF JUDGMENT IF THE MORTGAGED PROPERTY IS NOT YOUR RESIDENCE OR IS YOUR RESIDENCE BUT NOT A ONE-FAMILY OR TWO-FAMILY DWELLING.  YOU WILL HAVE NO RIGHT OF REDEMPTION AFTER THE SALE.   THE PURCHASER AT THE SALE WILL BE ENTITLED TO IMMEDIATE POSSESSION OF THE MORTGAGED PROPERTY.   YOU MAY PURCHASE AT THE SALE.

IF YOU DO NOT FILE A WRITTEN DEMAND TO DELAY THE SALE AND IF THE MORTGAGED PROPERTY IS YOUR RESIDENCE AND IS A ONE-FAMILY OR TWO-FAMILY DWELLING, THEN A DEFICIENCY JUDGMENT WILL NOT BE ENTERED AGAINST YOU.  IF YOU DO FILE A WRITTEN DEMAND TO DELAY THE SALE, THEN A DEFICIENCY JUDGMENT MAY BE ENTERED AGAINST YOU IF THE PROCEEDS FROM THE SALE OF THE MORTGAGED PROPERTY ARE INSUFFICIENT TO SATISFY THE AMOUNT OF THE MORTGAGE DEBT AND COSTS.

IF THE MORTGAGED PROPERTY IS NOT YOUR RESIDENCE OR IS NOT A ONE-FAMILY OR TWO-FAMILY DWELLING, THEN A DEFICIENCY JUDGMENT

**MAY BE ENTERED AGAINST YOU WHETHER OR NOT YOU FILE A WRITTEN DEMAND TO DELAY THE SALE.**

Plaintiff, Cedar Rapids Bank and Trust Company (hereinafter "CRBT"), for its cause of action against Defendants, respectfully states:

1.     CRBT is a state bank organized and existing under the laws of the State of Iowa, with its principal place of business in Cedar Rapids, Linn County, Iowa.

2.     Defendant, McQuillen Place Company, LLC ("McQuillen") is an Iowa limited liability company with its principal place of business in Charles City, Floyd County, Iowa.

3.     Defendant, Charles M. Thomson is an individual resident of Charles City, Floyd County, Iowa.

4.     Defendant, Robert L. Thomson is an individual resident of Charles City, Floyd County, Iowa.

5.     Defendant, Amelia Management, LLC ("Amelia Management"), is an Iowa limited liability company with its principal place of business in Charles City, Floyd County, Iowa.

6.     Defendant, Amelia Trust, is a trust organized and existing under the laws of the State of Iowa, and pursuant to the Amelia Trust Declaration and Agreement dated April 20, 2012. Charles M. Thomson serves as the Trustee of the Amelia Trust.

7.     McQuillen is the record titleholder of the following described real property situated in Floyd County, Iowa, to wit:

**LOTS ONE, TWO, THREE, FOUR AND FIVE (1, 2, 3, 4 AND 5) OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED IN AND AS A PART**

Case 19-00507 Claim 42 Part 1 Filed 05/08/20 Desc Main
E-FILED 2018 MAY 03 11:52 AM FLOYD - CLERK OF DISTRICT COURT
Case 19-00507 Doc 177 Filed 05/08/20 Entered 05/08/20 14:36:01 Desc Main
Document Petition Page 3 of 9 55 of 152
Amended & Substituted
Page 3 of 152

**OF CHARLES CITY, IOWA** (also known as McQuillen Place Condominiums, or Condominium Unit A and Condominium Unit B of McQuillen Place Condominiums, hereinafter "McQuillen Property").

8.      Upon information and belief, Defendant Schindler Elevator Corporation is a Delaware corporation with its principal place of business in Morristown, New Jersey.

9.      On or about December 31, 2014, McQuillen executed and delivered a Promissory Note to CRBT ("Note"), in the original principal sum of Three Million Eight Hundred Eighty Thousand and No/100 Dollars ($3,880,000.00), bearing interest at the initial variable rate of 5.25% per annum, and originally payable at maturity on June 30, 2016.  A true and correct copy of Note 1 is attached hereto as "Exhibit 1" and is incorporated by reference as though fully set forth herein.

10.      The Note was amended by Change in Terms Agreements dated June 30, 2016, December 1, 2016, March 31, 2017 and June 30, 2017, respectively (collectively "Amendments").  Under the terms of the Amendments the Note currently bears interest at the variable rate of 6.75% per annum, and matured on December 15, 2017.  Copies of the Amendments are attached hereto as "Exhibit 2."

11.      To secure the indebtedness evidenced by the Note, McQuillen, on December 31, 2014, executed and delivered a Construction Mortgage ("Mortgage") to CRBT, which was filed on January 5, 2015, in Book 2015 at Page 0014 of the records of the Floyd County, Iowa Recorder.  The Mortgage mortgages and conveys the McQuillen Property in favor of CRBT as security for the Note and the indebtedness evidenced thereby.  A true and correct copy of the Mortgage is attached hereto as "Exhibit 3" and incorporated by reference as though fully set forth herein.

Case 19-00507 Claim 4-2 Part 2 Filed 05/08/20 Desc Amended & Substituted
E-FILED 2018 MAY 02 11:52 AM FLOYD - CLERK OF DISTRICT COURT
Petition    Page 46 of 152

Case 19-00507-CJW Doc 477 Filed 05/08/20 Entered 05/08/20 14:36:01 Desc Main
Document    Page 46 of 152

12.     To further secure the indebtedness evidenced by the Note, Charles M. Thomson executed and delivered to CRBT an unlimited Commercial Guaranty dated December 31, 2014 ("Charles Thomson Guaranty"), by the terms of which he personally guaranteed all of McQuillen's obligations under the Note and Mortgage.  A true and correct copy of the Charles Thomson Guaranty is attached hereto as "Exhibit 4" and incorporated by reference as though fully set forth herein.

13.     To further secure the indebtedness evidenced by the Note, the Amelia Trust executed and delivered to CRBT an unlimited Commercial Guaranty dated December 31, 2014 ("Amelia Trust Guaranty"), by the terms of which the Amelia Trust guaranteed all of McQuillen's obligations under the Note and Mortgage.  A true and correct copy of the Amelia Trust Guaranty is attached hereto as "Exhibit 5" and incorporated by reference as though fully set forth herein.

14.     To further secure the indebtedness evidenced by the Note, Amelia Management executed and delivered to CRBT an unlimited Commercial Guaranty dated December 31, 2014 ("Amelia Management Guaranty"), by the terms of which Amelia Management guaranteed all of McQuillen's obligations under the Note and Mortgage.  A true and correct copy of the Amelia Management Guaranty is attached hereto as "Exhibit 6" and incorporated by reference as though fully set forth herein.

15.     To further secure the indebtedness evidenced by the Note, Robert L. Thomson executed and delivered to CRBT a limited Commercial Guaranty dated December 31, 2014 ("Robert Thomson Guaranty"), by the terms of which he personally guaranteed $900,000.00 of McQuillen's obligations under the Note and Mortgage.  A true and correct copy

{02434664.DOC}                          4

of the Robert Thomson Guaranty is attached hereto as "Exhibit 7" and incorporated by reference as though fully set forth herein.

16. The Note and Mortgage provide that if any payment is not made on the date it is due, the Note will be in default.

17. The Note matured according to its terms on December 15, 2017, and McQuillen has failed to pay the balance owed under the Note. CRBT gave McQuillen, Robert L. Thomson, Charles M. Thomson, Amelia Trust and Amelia Management a Notice of Default, true and correct copies of which are attached hereto as "Exhibit 8" and incorporated by reference as if fully set forth herein.

18. The default under the Note and Mortgage has not been cured and the indebtedness under the terms of the Note and the Mortgage has not been paid to CRBT.

19. CRBT is the owner and holder of the Note and Mortgage, and as of March 12, 2018, there is due and payable to CRBT the principal balance of $3,879,992.13, plus accrued interest in the amount of $99,128.41, late charges of $385,188.33, plus accruing interest on the principal balance at the rate of 11.75% per annum from March 12, 2018 forward.

20. The Mortgage provides that McQuillen is obligated to pay all real estate taxes, special assessments, and fire and hazard insurance premiums with respect to the McQuillen Property. CRBT has been forced to advance or may advance payments for real estate taxes and insurance premiums, and is entitled to recover the same with interest at the rate of 11.75% per annum.

{02434664.DOC}                                          5

21.    CRBT has paid or may pay for lien searches or continuations of the abstract of title, and is entitled under the terms of the Mortgage to recover the same with interest at the rate of 11.75% per annum.

22.    The Note and Mortgage provide that in the event of default, suit, and foreclosure, the holder's attorney's fees and other expenses of litigation, shall be paid by McQuillen.  CRBT's attorneys are filing an affidavit for such fees, as is required by statute, contemporaneously with the filing of this Petition.  CRBT asks for such attorney's fees as it may recover under the Note and Mortgage and applicable statutes.

23.    The Note provides that upon default, the interest rate increases by 5% per annum.  CRBT is entitled to interest on its judgment at the contract rate of 11.75% per annum. *See* Iowa Code §§ 535.2(1), 668.13(2).

24.    CRBT is the owner and holder of the Note and Mortgage.

25.    CRBT does **not** waive its right to a deficiency judgment, but requests foreclosure of the Mortgage without redemption pursuant to Iowa Code sections 654.20 through 654.26.  The Property is not the residence of McQuillen, Amelia Trust, Amelia Management, Charles M. Thomson or Robert L. Thomson, and is not a one-family or two-family dwelling.

26.    CRBT is credibly informed and believes that Cerro Gordo County, Iowa claims to have some lien, claim, right, title or interest in the McQuillen Property by virtue of a Forgivable Mortgage dated July 5, 2013 and filed on January 15, 2015 in Book 2015 at Page 0100 of the records of the Floyd County, Iowa Recorder.  CRBT believes, and therefore alleges, that any interest that Cerro Gordo County, Iowa may have under such Mortgage is junior and inferior to CRBT's Mortgage, and that CRBT's Mortgage creates a lien, claim and interest in the

{02434664.DOC}                                        6

McQuillen Property that is superior to any of the asserted claims and interests of Cerro Gordo County, Iowa and the other Defendants, or anyone claiming by, through or under any of the Defendants.

27. CRBT is credibly informed and believes that Schindler Elevator Corporation claims or may claim to have some lien, claim, right, title or interest in the McQuillen Property by virtue of a Mechanic's Lien in the amount of $53,829.00, filed on December 22, 2017, as MNLR #014429-0 with the Iowa Secretary of State's Mechanic's Notice and Lien Registry. CRBT believes, and therefore alleges, that any interest that Schindler Elevator Corporation may have under such Mechanic's Lien is junior and inferior to CRBT's Mortgage, and that CRBT's Mortgage creates a lien, claim and interest in the McQuillen Property that is superior to any of the asserted claims and interests of Schindler Elevator Corporation and the other Defendants, or anyone claiming by, through or under any of the Defendants.

WHEREFORE, Plaintiff Cedar Rapids Bank and Trust Company prays for judgment in personam against Defendants, McQuillen Place Company, LLC, Charles M. Thomson, Robert L. Thomson, Amelia Management, LLC and Amelia Trust, jointly and severally, **_provided_** that the personal judgment against Defendant Robert L. Thomson shall not exceed the sum of $900,000.00, and for judgment in rem against the McQuillen Property and all of the Defendants, with said judgment being for the principal amount of $3,879,992.13, plus accrued interest in the amount of $99,128.41, late charges of $385,188.33, plus accruing interest on the principal balance at the rate of 11.75% per annum from March 12, 2018 forward, plus the costs and expenses incurred in enforcing the Note and Mortgage including the costs of this action

{02434664.DOC}                                    7

and reasonable attorney's fees for Plaintiff's attorneys, plus any real estate taxes, special

assessments, and fire and hazard insurance premiums and abstracting fees advanced or incurred

by Plaintiff; and for interest on said judgment at the rate of 11.75% per annum from the date of

filing the Petition herein.

Plaintiff further prays for judgment and decree

(a)     establishing Plaintiff's Mortgage as superior to all other liens upon the McQuillen Property;

(b)     foreclosing Plaintiff's Mortgage for the full amount of the aforesaid judgment, interest and costs;

(c)     establishing that Plaintiff's first and superior lien in the McQuillen Property dates from the date of execution of said Mortgage; and

(d)     foreclosing Plaintiff's Mortgage against the Defendants.

Plaintiff further prays

(a)     that the Court find that Plaintiff is entitled to foreclosure without redemption as provided in Iowa Code section 654.20 through 654.26;

(b)     that the judgment decree forever bar and stop each and every Defendant from having or asserting any right, title, lien, interest or claim in or to the McQuillen Property;

(c)     that a Special Execution issue from this Court directing the sale of said McQuillen Property or so much thereof as may be necessary to satisfy said judgment, interests, expenses, and costs; and

d)     that a Sheriff's Deed should issue conveying the absolute title to the McQuillen Property against Defendants, and all persons claiming by, through, or under them with a Writ of Possession then issuing forthwith to put the Grantee of said Sheriff's Deed in immediate possession of the McQuillen Property.

Cedar Rapids Bank and Trust Company further prays for general execution to

issue against the Defendants, McQuillen Place Company, LLC, Charles M. Thomson, Robert L.

{02434664.DOC}                              8

Thomson, Amelia Management, LLC and Amelia Trust, jointly and severally, (***provided*** that

such execution against Defendant Robert L. Thomson shall not exceed the sum of $900,000.00),

if the McQuillen Property is insufficient or unavailable to satisfy the judgment and costs; and for

all other and further relief the Court deems just and equitable.

Cedar Rapids Bank and Trust Company further prays for all other and further

relief the Court deems just and equitable.

/s/ Joseph E. Schmall
Joseph E. Schmall (AT0007023)
BRADLEY & RILEY PC
2007 First Avenue SE
PO Box 2804
Cedar Rapids, IA 52406-2804
Phone: (319) 363-0101
Fax: (319) 363-9824
Email: jschmall@bradleyriley.com

*ATTORNEY FOR CEDAR RAPIDS BANK AND
TRUST COMPANY*

## STATEMENT ATTACHED
## TO
## PROOF OF CLAIM
## McQUILLEN PLACE COMPANY, LLC
## CASE NO. 19-00507

First Security Bank & Trust Company ("Claimant") files this proof of claim. The claim is based upon a promissory note dated December 31, 2014, executed by the Debtor and originally given to Cedar Rapids Bank & Trust Company ("CRBT"). The promissory note was subsequently assigned to Claimant by CRBT.

The promissory note is primarily secured by a mortgage against real estate locally known as 107 - 109 and 123 Main Street, Charles City, Floyd County, Iowa, and which is legally described, to wit:

> LOT ONE (1), BLOCK TWENTY ONE (21), EXCEPT THE NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF, OF THE ORIGINAL PLAT OF ST. CHARLES, NOW A PART OF CHARLES CITY, IOWA, OTHERWISE DESCRIBED AS: LOT ONE (1) OF THE IRREGULAR SURVEY OF BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES. NOW A PART OF CHARLES CITY, IOWA, EXCEPT THE NORTHWESTERLY TWENTY TWO FEET (NWLY 22') THEREOF;
>
> AND
>
> THE NORTH ONE HALF (N ½) OF THE WEST FORTY FEET (W 40') OF THE BRICK WALL BETWEEN LOTS ONE (1) AND TWO (2), BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY, IOWA;
>
> AND
>
> CHARLES CITY DISASTER REDEVELOPMENT PROJECT IOWA R 36(C) PARCEL NO. R 24 (P 10), MORE PARTICULARLY DESCRIBED AS: THE NORTHWESTERLY 22.00 FEET OF LOT ONE (1), BLOCK TWENTY ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS THE CITY OF CHARLES CITY, FLOYD COUNTY, IOWA.
>
> (LOCALLY DESCRIBED AS 123 N. MAIN STREET, CHARLES CITY, IOWA 50616 PARCEL NO. 110146700500)
>
> AND
>
> LOT TWO (2), BLOCK TWENTY-ONE (21), ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS A PART OF CHARLES CITY, IOWA.

LOT THREE OF THE IRREGULAR SURVEY OF BLOCK TWENTY-ONE OF
THE ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS
CHARLES CITY.

LOT 4 OF THE SUB-DIVISION OF LOTS 3 AND 4 OF BLOCK 21 OF THE
ORIGINAL PLAT OF ST. CHARLES, NOW INCORPORATED AS CHARLES
CITY, IOWA.

LOT FIVE (5) OF THE IRREGULAR SURVEY OF BLOCK NO. TWENTY-
ONE (21) OF THE ORIGINAL PLAT OF ST. CHARLES (NOW
INCORPORATED AS CHARLES CITY) ACCORDING TO THE SUB-
DIVISION OF SAID BLOCK TWENTY-ONE (21).

Prior to the commencement of this case, Claimant filed a mortgage foreclosure
action against the Debtor seeking to foreclose the mortgage. A copy of the mortgage
foreclosure petition and all attachments are attached hereto. Also attached is a copy of the
Assignment and Assumption Agreement whereby CRBT assigned the promissory note and
all security documents to Claimant.

Claimant is not certain of the value of the above-described real estate. The Debtor
has valued the real estate at $500,000.00 in Schedule A/B. Claimant believes that the real
estate may have a greater value but Claimant adopts the Debtor's value for the purposes
of this proof of claim. At such time as Claimant has better knowledge of the value of the
above-described real estate, Clamant will file an amended proof of claim.

The above-described real estate is subject to unpaid real estate taxes that were
delinquent at the commencement of the case in the aggregate amount of $225,282.00.
The installment of real estate taxes that became delinquent on October 1, 2018, was
unpaid in the amount of $106,265.00 plus penalty through April 2019 in the amount
$11,158.00 (aggregating $117,423.00). The installment of real estate taxes that became
delinquent on April 1, 2019, was unpaid in the amount of $106,265.00 plus penalty through
April 2019 in the amount $1,594.00 (aggregating $107,859.00).

The amount due Claimant is calculated as follows:

| | |
|---|---|
| Promissory note principal balance | $3,646,790.49 |
| Real estate tax advance on 6/12/2018 | 236,446.00 |
| Interest on promissory note balance to 4/25/2019 | 138,528.08 |
| Interest on real estate tax advance to 4/25/2019 | 8,981.71 |
| **Total balance due as of 4/25/19** | **$4,030,746.28** |

- 2 -

The Claimant received a payment in the amount of $900,000.00 from guarantor Robert Thomson on December 28, 2018. This payment was applied as follows:

| | |
|---|---|
| Interest due as of December 28, 2018 | $281,610.03 |
| Accrued late charges as of commencement of foreclosure action and unpaid as of December 28, 2018 | 385,188.33 |
| Principal | 233,201.64 |
| Total payment received | $900,000.00 |

In addition to the foregoing sum, Claimant is entitled to attorney's fees which have not yet been determined.

The principal owner of the Debtor, Charles Thomson, has personally guaranteed the promissory note. The promissory note is also secured by mortgages against real estate owned by Charles Thomson, Amelia Management, LLC, Umbrella Realty, LLC and Janan M. Thomson Family Trust. Since these parcels of real estate are not owned by the Debtor, no value is assigned to them in this proof of claim.

- 3 -

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement ("Agreement") is made this 5ᵗʰ day of July, 2018, by and between CEDAR RAPIDS BANK AND TRUST COMPANY ("CRBT") and FIRST SECURITY BANK AND TRUST COMPANY ("FSB").

Pursuant to the Settlement Agreement and Mutual Release dated July 5, 2018, CRBT hereby assigns to FSB, and FSB hereby accepts from CRBT and assumes all of CRBT's obligations under the following Loan Documents and Foreclosure Action effective as of the date of this Agreement:

**I.     McQuillen Place Company, LLC Loan Documents**

1. Promissory Note for $3,880,000 dated December 31, 2014.
2. Change in Terms Agreements dated June 30, 2016, December 1, 2016, March 31, 2017 and June 30, 2017.
3. Construction Mortgage dated December 31, 2014, recorded on January 5, 2015 as Instrument Number 2015 0014 in the office of the Floyd County, Iowa Recorder.
4. Construction Loan Agreement dated December 31, 2014.
5. Commercial Guaranty of Charles M. Thomson (unlimited) dated December 31, 2014, along with the following to secure the Guaranty:

   a.      Mortgage of $240,000 dated December 31, 2014, recorded on January 8, 2015 as Instrument Number 2015 0044 on property at 501 Spriggs Street, Charles City, Iowa;

   b.      Assignment of Life Insurance Policy as Collateral dated October 17, 2014; Farm Bureau Policy No. 040-001543324 in the amount of $2,000,000.00 on Charles M. Thomson; and

   c.      Assignment of Life Insurance Policy as Collateral dated December 31, 2014; Mutual of Omaha Policy No. BU1123372 in the amount of $125,000.00 on Robert Thomson- limited to Charles M. Thomson's portion of the $125,000;
6. Commercial Guaranty of Amelia Trust (unlimited) dated December 31, 2014.
7. Commercial Guaranty of Amelia Management, LLC (unlimited) dated December 31, 2014, along with the following to secure the Guaranty:

   a.      Mortgage of $135,000 dated December 31, 2014, recorded on January 9, 2015 as Instrument Number 2015 0048 on property at 206 N. Main Street, Charles City, Iowa;

   b.      Mortgage of $125,000 dated December 31, 2014, recorded on January 9, 2015 as Instrument Number 2015 0047 on property at 208 N. Main Street, Charles City, Iowa;

{02465565.DOC}

    c.     Mortgage of $115,000 dated December 31, 2014, recorded on January 9, 2015 as Instrument Number 2015 0049 on property at 505 Kellogg Avenue, Charles City, Iowa;

    d.     Mortgage of $95,000 dated December 31, 2014, recorded on January 8, 2015 as Instrument Number 2015 0045 on property at 2652 Harvey Street, Charles City, Iowa;

    e.     Mortgage of $250,000 dated December 31, 2014, recorded on January 9, 2015 as Instrument Number 2015 0050 on property at 1110 N. Grand Avenue, Charles City, Iowa; and

    f.     Mortgage of $40,000 dated December 31, 2014, recorded on January 8, 2015 as Instrument Number 2015 0046 on property at 704 Cedar Street, Charles City, Iowa.

8. Commercial Guaranty of Robert L. Thomson (Limited to $900,000) dated December 31, 2014.

9. Mortgage of $150,000 from Janan M. Thomson Family Trust dated December 31, 2014, recorded on January 14, 2015 as Instrument Number 201500000498 on an undivided 1/8 interest in the "Walsh Farm" in Dubuque County, Iowa, containing 200 acres more or less.

10. Assignment of Contracts, Agreements, Licenses and Permits dated December 31, 2014.

11. Trust Certificate from Amelia Trust dated December 31, 2014, along with copy of April 20, 2012 Amelia Trust Declaration and Agreement.

12. Certificate of Amelia Trust as Member of McQuillen Place Company, LLC dated December 31, 2014.

13. Limited Liability Company Resolution to Grant Collateral/Guarantee from Amelia Management, LLC dated December 31, 2014.

14. Notices of Final Agreement dated December 31, 2014, June 30, 2016, December 1, 2016, March 31, 2017 and June 30, 2016.

15. Copy of Petition for Appointment of Co-Trustees of Trust established under the Last Will and Testament of Janan M. Thomson, along with copy of Will and Order Appointing Co-Trustees.

## II.    Foreclosure Action

1. All of CRBT's right, title, and interest, in and to the legal action seeking foreclosure of the Promissory Note and Construction Mortgage referenced above, commenced by the filing on March 14, 2018 of a Petition in Equity to Foreclose Mortgage Without Redemption that is currently pending in the Iowa District Court for Floyd County under case number EQCV 031170, including but not limited to all claims, causes of actions, rights of relief and other remedies asserted or requested therein as well as all claims, causes of actions, rights of relief and other remedies related to or which could

{02465565.DOC}

be premised on facts alleged in or on facts which otherwise relate to the substance of such litigation;

The parties acknowledge that this assumption is limited by the provisions of Paragraph 5 of the Settlement Agreement (i.e. that FSB shall have no obligation to indemnify CRBT for any claims made against CRBT by anyone else with respect to the Loan and/or the Foreclosure Action).

CEDAR RAPIDS BANK AND TRUST
COMPANY

By: _Patricia L. Ellison_
Patricia L. Ellison, EVP/CCO

FIRST SECURITY BANK AND TRUST
COMPANY

By: _____
Kurt Herbrechtsmeyer, President

{02465565.DOC}

IN THE IOWA DISTRICT COURT FOR FLOYD COUNTY

CEDAR RAPIDS BANK AND TRUST )
COMPANY, )
 )
        Plaintiff, )   Case No.   EQCV 031170
     v. )
 )
MCQUILLEN PLACE COMPANY, LLC, )
CHARLES M. THOMSON, ROBERT L. )   ORDER GRANTING PLAINTIFF'S
THOMSON, AMELIA MANAGEMENT, )   MOTION TO SUBSTITUTE PARTY
LLC, AMELIA TRUST, CERRO GORDO )   PLAINTIFF
COUNTY, IOWA, and SCHINDLER )
ELEVATOR CORPORATION, )
 )
        Defendants. )

     Plaintiff's Motion to Substitute Party Plaintiff came before the undersigned for consideration.  No party resists.  Having reviewed the Motion and the Court file, and being apprised in the particulars, the Court FINDS and CONCLUDES that the Motion should be, and it is hereby, GRANTED for the reasons set forth therein.

     IT IS THEREFORE ORDERED that First Security Bank and Trust Company is hereby substituted as Plaintiff in this matter.

     Captions on filings made after this order shall show First Security Bank and Trust Company as the Plaintiff.

{02465550.DOCX}



State of Iowa Courts

**Type:**                OTHER ORDER

**Case Number**        **Case Title**
EQCV031170             (CDW)CEDAR RAPIDS BANK AND TRUST VS MCQUILLEN
                       PLACE ET AL

So Ordered

Colleen Weiland, District Court Judge,
Second Judicial District of Iowa

Electronically signed on 2018-08-27 08:01:45    page 2 of 2

**EXHIBIT B**

| Fill in this information to identify the case: |
| --- |
| Debtor 1  McQuillen Place Company, LLC |
| Debtor 2 (Spouse, if filing) |
| United States Bankruptcy Court for the:  Northern District of Iowa |
| Case number  19-00507 |

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

First Security Bank & Trust Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

First Security Bank & Trust Company
Name

809 Clark Street, PO Box 577
Number        Street

Charles City              IA            50616
City                    State           ZIP Code

Contact phone  641-228-4533

Contact email _____

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number        Street

_____
City             State            ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM  /  DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $_____ 4,030,746.28    **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Promissory note secured by mortgage-see Claim No. 4

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**    See Claim No. 4

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____ 500,000.00

**Amount of the claim that is secured:**    $_____ 500,000.00

**Amount of the claim that is unsecured:**  $_____ 3,530,746.28  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No | |
| | ☑ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(_1_) that applies. | $_____25,000.00 |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

| **Part 3:** | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   03/18/2020
　　　　　　　　　　MM / DD / YYYY

/s/ Larry S. Eide
Signature

Print the name of the person who is completing and signing this claim:

| Name | Larry S. Eide | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Attorney | | |
| Company | Pappajohn, Shriver, Eide & Nielsen P.C. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 103 E. State Street, Suite 800, PO Box 1588 | | |
| | Number        Street | | |
| | Mason City | IA | 50402 |
| | City | State | ZIP Code |
| Contact phone | 641-423-4264 | Email | eide@pappajohnlaw.com |

Official Form 410　　　　　　　　　　　　　**Proof of Claim**　　　　　　　　　　　　　page 3

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an Iowa | ) | Case No. 19-00507 |
| limited liability company, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Address: | ) | |
| 1110 North Grand Ave., #300 | ) | |
| Charles City, Iowa 50616 | ) | |
| | ) | |
| Employer's Tax Identification No.: 46-3987825 | ) | |
| | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | Adv. Pro. No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| FIRST SECURITY BANK & TRUST CO., | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT OF McQUILLEN PLACE COMPANY, LLC
FOR EQUITABLE SUBORDINATION OF THE LIEN
OF FIRST SECURITY BANK & TRUST CO.

Now comes McQUILLEN PLACE COMPANY, LLC, an Iowa limited liability company,

debtor, debtor-in-possession, and plaintiff herein ("MPC," "Debtor" or "Plaintiff"), by and through

its attorney, J D Haas & Associates, PLLC, as and for its Complaint of the Debtor for Equitable

Subordination of the Lien of First Security Bank & Trust Co. (this "Complaint"), pursuant to 11

U.S.C. §510, Rule 7001 of the Federal Rules of Bankruptcy Procedure, and other applicable law,

respectfully states as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

2.     Venue for this Adversary Proceeding is proper in this Court pursuant to 28 U.S.C. Section 1409(a).

3.     This Adversary Proceeding and the causes of action herein constitute "core" proceedings within the meaning of 28 U.S.C. Section 157(b)(2)(A), (B), (K) and (0), and the Plaintiff consents to the Bankruptcy Court's entry of a final order.

4.     The statutory predicates for the claims brought in this Adversary Proceeding are 11 U.S.C. Section 510(c) and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

## OVERVIEW

5.     Bankruptcy law has long permitted the subordination of creditor's claims where the creditor in question has behaved inequitably. This Court's equitable power to review the conduct of creditors allows the Court to look beyond the technical legal justifications offered for odious conduct by a creditor to see, instead, the injustice that strict adherence to loan documents would mean to the creditor body as a whole, the bankruptcy estate, and the debtor.

6.     In this case, First Security Bank & Trust Co. ("First Security Bank") and Cedar Rapids Bank & Trust Co. ("CRB&T") (First Security Bank and CRB&T are hereinafter referred to collectively as the "Bank Group") have engaged in a pattern of conduct which is odious, over-reaching and abhorrent to the values expressed in the Bankruptcy Code and the law generally. Justice would not be served by permitting this conduct to stand as a template to be used by aspiring unscrupulous and rapacious lenders in this jurisdiction.

2

7.     Specifically, the Debtor asserts that the Bank Group has engaged in the following inequitable behavior:

a.     The Bank Group exploited its market dominance and decades of personal friendships to obtain, impose and exercise an unreasonable level of control of the assets of the Debtor, Charles Thomson ("Charles Thomson"), Amelia Management LLC ("Amelia Management"), (Amelia Trust, the "Trust"), and Robert L. Thomson ("Robert Thomson") (the Debtor, Charles Thomson, Amelia Management, the Trust, and Robert Thomson are hereinafter referred to collectively as the "McQuillen Investors");

b.     The Bank Group has abused its power to impose its preferences (which were driven by public relations objectives rather than economic reality) on the Debtor, ultimately forcing the Debtor to seek protection under Chapter 11 of Title 11 of the United States Code;

c.     The Bank Group has breached its agreements with the Debtor by supplanting economically-based lending decisions with decisions based on personal pique and animus of individual directors toward the Debtor's operating personnel;

d.     The Bank Group wrongly used its position of power over the Debtor to control the Debtor's construction priorities and the Debtor's choices on key vendors;

e.     The Bank Group has abused its power and the legal process to convert, to itself, property to which it had no legal or equitable right, *i.e.*, the Debtor's development rights in McQuillen Place;

f.     Contrary to its obligations under its own loan documents, the Bank Group has refused to negotiate in good faith (or at all) with the Debtor or third parties recruited

3

by the Debtor, including a third-party which presented a letter of intent to the Bank Group offering to pay the full amount previously demanded by the Bank Group for its interests;

      g.     The Bank Group manipulated the trust and friendship of the McQuillen Investors to induce an elderly, infirm insider of McQuillen to settle with the Bank Group on terms that were irrational and wildly favorable to the Bank Group;

      h.     The Bank Group, frustrated at the Debtor's insistence on due process, resorted to the filing of deceptive (and arguably fraudulent) "emergency" motions before an Iowa court of law; these highly questionable filings directly precipitated the Debtor having to seek protection under Chapter 11 of Title 11 of the United States Code;

      i.     Prior to the financing transaction between the Bank Group and the McQuillen Investors, the Bank Group misrepresented to the McQuillen Investors the Bank Group's level of expertise in financings similar to that contemplated by the Debtor, the Debtor relied on such misrepresentations, and the Debtor later suffered catastrophic losses as a result of the lack of the Bank Group's expertise; and

      j.     CRB&T, the member of the Bank Group which had most egregiously misrepresented its lending expertise, subsequently (but tacitly and secretly) acknowledged its errors to its partner in malfeasance, First Security Bank, by transferring $437,499.21 to First Security Bank pursuant to a secret settlement agreement, yet the Bank Group has refused to provide any of the settlement proceeds to the Debtor, the real party injured by the malfeasance.

      8.     Through the actions described in the preceding paragraph, and through other actions, the Bank Group has caused significant economic injury to the creditors herein, the bankruptcy estate, and the Debtor. Moreover, these actions by the Bank Group, when taken as a

4

whole, show a systematic pattern of unethical overreach, malfeasance, and obnoxious misconduct meriting subordination of the Bank Group's liens.

## PARTIES AND BACKGROUND

9. In July 2012, Amelia Management Amelia Management purchased several properties in Charles City from Growth Properties, LLC ("Growth Properties").

10. Pursuant to the agreement with Growth Properties, Amelia also acquired an option to purchase several parcels (the "Growth Parcels") located at the southwest intersection of Clark and North Main streets in Charles City.

11. The Growth Parcels had been vacant since a fire destroyed a previous structure in 1987.

12. Shortly after the purchase, Charles M. Thomson, one of the owners of both Amelia and the Debtor, was contacted by personnel from the local economic development office ("Community Revitalization") to discuss the possibility of applying for an approximately $3 million forgivable loan (the "Forgivable Loan") through the Iowa Economic Development Authority (the "IEDA").

13. The Forgivable Loan was part of a program of the Federal government to provide communities with damage from the 2008 floods with replacement housing for housing units lost in the floods.

14. The Growth Parcels, together with several city-owned parcels in the same city block but immediately to the south, formed a noticeable and unappealing gap of vacant, undeveloped, desolate land in the center of Charles City's North Main Street business district.

15. The fact that the Growth Parcels and the adjacent parcels (collectively, the "McQuillen Site") had been vacant for more than 20 years provided a prospective developer with

5

the opportunity to seek significant tax increment financing ("TIF") support for a development at the McQuillen Site.

16.    The personnel from Community Revitalization suggested that development of the McQuillen Site using the Forgivable Loan might both alleviate a shortage of housing in Charles City and eliminate a group of ungainly lots from the business district.

17.    The location of the McQuillen Site also qualified a development for state of Iowa development tax credits under the Enterprise Zone program (the "EZ Program"), which was also administered by the IEDA.

18.    With extensive assistance from personnel from the City of Charles City, Community Revitalization, Ron Fiscus of PlanScape Partners ("Ron Fiscus"), architecture and construction firm Cornice & Rose International ("C&R") and the North Iowa Area Council of Governments, Amelia Management submitted an application (the "Application") for the Forgivable Loan.

19.    The Application proposed a 33-unit, mixed-used development to occupy all of the vacant parcels at the McQuillen Site (the McQuillen Site, together with the improvements thereon, are hereinafter referred to as "McQuillen Place").

20.    On July 5, 2013, the IEDA announced that the McQuillen Place development had been awarded the Forgivable Loan.

21.    The IEDA Forgivable Loan program (the "IEDA Forgivable Loan Program") contained numerous requirements (the "IEDA Requirements") compliance with which was required for obtaining funds. One of the IEDA Requirements mandated a development to rely not only on the funds from Forgivable Loan for constructing the building in question, but to utilize a certain amount of additional capital to provide the required number of dwelling units.

6

22. With the assistance of Ron Fiscus, McQuillen Place developed a financial framework to complete the development. This framework included use of the funds from the Forgivable Loan, the EZ Program, TIF benefits, certain in-kind contributions from the McQuillen Place equity owners, and funds to be borrowed from private banks in exchange for the Debtor granting a lender a first mortgage on McQuillen Place (the "Mortgage Loan").

23. During 2013 and 2014, representatives of the Debtor contacted numerous financial institutions and investors in an effort to place the Mortgage Loan.

24. By virtue of the IEDA commitment of approximately $3 million through a forgivable loan, plus more than $1.5 million in TIF incentives, the McQuillen Place development had a significant equity cushion that, in most locations, would have made location a mortgage lender relatively straightforward.

25. In many places, a mortgage loan having the equity cushion provided by the Forgivable Loan and the TIF benefits granted to the Debtor would have been readily made, and often without a private lender demanding collateral beyond the development itself and the "equity cushion."

26. However, due to (a) uncertainty associated with its location in the rural Midwest, and (b) its location within the area traditionally serviced, for lending purposes, by First Security Bank, all prospective lenders save First Security Bank declined to provide financing for the development.

27. First Security Bank eventually agreed to consider providing financing under the Mortgage Loan, but only after agreeing with CRB&T to have CRB&T act as "lead bank" on the loan.

7

28.     According to personnel from CRB&T, CRB&T had acted as lender on numerous projects in the Cedar Rapids area which had, like the Debtor, depended on complex IEDA assistance, much of it in the form of forgivable loans.

29.     First Security Bank sought CRB&T's expertise in administering the construction draws of the Mortgage Loan and in handling the unusual (for most private bankers) government-provided development assistance (the "Government Assistance") involved in the McQuillen Place development.

30.     The Bank Group agreed to jointly fund the Mortgage Loan, with CRB&T acting as lead lender but owning a relatively small amount of the credit risk, and First Security Bank owning the vast majority of the credit risk, but not being the lead lender until construction (and, hence compliance with the majority of the federal and state development and lending regulations) was complete. On information and belief, the amount of the risk owned by First Security Bank is approximately ninety percent.

<div align="center">FIRST SECURITY BANK'S POWER WITHIN<br>THE CHARLES CITY LENDING MARKET</div>

31.     The Debtor and the Bank Group eventually closed the Mortgage Loan on December 30, 2014 (the "Mortgage Loan Closing Date") under terms which gave the Bank Group substantial collateral beyond McQuillen Place and the Government Assistance.

32.     Section 553.4 of the Iowa Code provides, "A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market."

33.     Iowa Code Section 553.12 provides, *inter alia*, that

"a person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit to:

<div align="center">8</div>

"1.     Prevent or restrain conduct prohibited under this chapter and
        remove the conduct's effect by injunction, divestiture,
        divorcement, dissolution of domestic enterprises right to do
        business in this state, compelling the forfeiture or restraint of
        the issuance of a certificate of incorporation, permit to
        transact business, license, or franchise, or granting other
        equitable relief. [...]

"2.     Recover actual damages resulting from conduct prohibited
        under this chapter.

"3.     Recover, at the court's discretion, exemplary damages which
        do not exceed twice the actual damages awarded under
        subsection 2, from a person other than a city or county or
        legal entity created by a city or county, if:
        "a. The trier of fact determines that the prohibited conduct is
              willful or flagrant; and,
        "b. The person bringing suit is not the state.

"4.     Recover the necessary costs of bringing suit, including a
        reasonable attorney fee."

34.    As of June 30, 2017, First Security Bank had Charles City deposits of
$150,109,000, which, according to the Federal Deposit Insurance Corporation, is 40.22% of the
Charles City market.

35.    As of June 30, 2017, First Citizens Bank ("First Citizens") had Charles City
deposits of $141,048,000, which, according to the Federal Deposit Insurance Corporation, is
37.79% of the Charles City market.

36.    First Security Bank and First Citizens have a combined market share in the Charles
City market of 78.01%.

37.    The United States Department of Justice, in determining whether to take action
against an alleged monopolist or businesses acting in restraint of trade under, *inter alia,* the
Sherman Antitrust Act, 15 U.S.C. §§ 1–7, uses the Herfindahl-Hirschman Index ("HHI"). The
basic process for determining the HHI of a given market is calculating the sum of the squares of
the banks' shares of deposits in a given market.

38.    The current Department of Justice guidelines separate HHIs into three categories:

9

       a.     Less than 1,000 is "not concentrated";

       b.     Greater and 1,000 but less than 1,800 is "moderately concentrated";

       c.     Greater than 1,800 is "highly concentrated."

39.     The HHI in the Charles City market using just the First Security Bank and First Citizens market shares is 3,045.7325. The HHI for all banks in the market is 3,356.178.

40.     The President and Chief Executive Officer of the First Security Bank is Kurt Herbrechtsmeyer.

41.     Kurt Herbrechtsmeyer is also "Chair" of the Iowa Bankers Association.

42.     Kurt Herbrechtsmeyer is a frequent critic of the "unfair" status of credit unions in Iowa, suggesting that they have an unfair tax advantage compared to private banks. On February 19, 2018, the newspaper with the largest circulation in Iowa published an article by Kurt Herbrechtsmeyer entitled "Credit Unions' Free Ride Hurts Iowa's Rural Communities." *See*, https://www.desmoinesregister.com/story/opinion/columnists/iowa-view/2018/02/19/credit-unions-free-ride-hurts-iowas-rural-communities/352224002/.

43.     The only credit union located in Charles City is the Family Community Credit Union, with deposits of approximately $16,500,000, or approximately 11% of First Security Bank's deposits just in the Charles City (zip code 50616) market. The parent of First Security Bank has deposits exceeding $433,000,000, or 26 times the deposits of the local credit union, which is alleged to unfairly compete against First Security Bank.

44.     Both First Security Bank and First Citizens have expanded in recent decades from their original locations in Charles City, expanding from two locations to 22 locations.

45.     First Security Bank now has 13 locations throughout north central Iowa.

46.     First Citizens now has 9 locations.

10

47.     Aside from their original locations in Charles City, First Security Bank does not have a location in any city or town in which First Citizens has a location, and vice versa.

48.     First Security Bank and First Citizens frequently purchase participations in each other's loans.

49.     First Security Bank frequently sells loan participations on favorable terms to other banks in Iowa, particularly banks in proximity to the Charles City area.

50.     Banks relying on income from favorably priced loan participations might be reluctant to engage in behavior which might decrease or eliminate the flow of future loan participations.

51.     At least one bank in the Charles City area is reluctant to open an office in the Charles City market out of fear of retribution by the First Security Bank.

THE McQUILLEN PLACE
COLLATERAL PACKAGE

52.     In the course of the negotiations for the Mortgage Loan between the Debtor and First Security Bank, representatives of First Security Bank repeatedly asked for additional collateral from the Debtor or affiliated parties.

53.     In addition to a first lien on McQuillen Place, First Security Bank demanded a personal guaranty by Charles Thomson and Amelia Management, secured by all real estate owned by Charles Thomson or Amelia Management. First Security Bank also demanded a lien on Charles Thomson's contingent interest in farm land near Cascade, Iowa, and his beneficial interest in a life insurance policy on the life of Charles Thomson's father, Robert L. Thomson ("Robert Thomson").

11

88

54. Personnel from First Security Bank then indicated that "the board" was not satisfied with the collateral, and would not approve the Mortgage Loan without additional collateral in the form of a guaranty from Robert Thomson.

55. On request of Charles Thomson, Robert Thomson consented to execute a guaranty in favor of First Security Bank for the Mortgage Loan.

56. By the time the loan was finally closed (the "Mortgage Loan Closing") on Mortgage Loan Closing Date, the collateral (the "Initial Collateral") posted for the Mortgage Loan (of $3.8 million) included:

a. the Debtor's rights in the $2.8 million from the Forgivable Loan;

b. $800,000 in equity in properties owned by Amelia Management;

c. $150,000 in equity in Charles Thomson's personal residence;

d. $125,000 in Charles Thomson's beneficial interest in a life insurance policy on Robert Thomson;

e. $250,000 in Charles Thomson's contingent interest in a farm near Cascade, Iowa;

f. $900,000 in TIF benefits;

g. $900,000 in a personal guaranty from Robert Thomson;

h. $500,000 in EZ benefits; and

l. not less than $100,000 in the value of the lots under McQuillen Place.

57. Although each item in the collateral package had varying contingencies to collection (and some were rights not vested), the total amount of the face value of the collateral package was $6,520,000.

58.     The maximum loan-to-value ratio in the Charles City market is 80:100, meaning that a bank will not extend credit if the value of the collateral backing an $800,000 is less than $1,000,000.

59.     The loan-to-value (using the face value of the collateral) of the Initial Collateral was approximately 63:100.

60.     By the time the Mortgage Loan closed, the negotiated plan for the financing included a portion of the final loan to be purchased by First Citizens.

61.     First Security Bank, a member of the Bank Group and the majority owner of the Mortgage Loan, has established and maintains a duopoly in restraint of trade in the Charles City, Iowa, banking services market.

62.     This restraint of trade permitted the Bank Group to obtain terms from the Debtor on the Mortgage Loan which would not have been available to the Bank Group had market forces been permitted to operate.

63.     Each loan made by First Security Bank which has terms more favorable to First Security Bank than would be available to First Security Bank in a free market environment sustains and increases First Security Bank's market position in the Charles City market for banking services, and is, accordingly, a contract in furtherance of restraint of trade.

64.     In October 2017, for reasons explained below, the Debtor ceased construction activities on McQuillen Place.

65.     Between October 2017 and the date of the petition herein, the Debtor and related parties have offered numerous options and frameworks to the Bank Group in an attempt to restart construction and complete the building.

66.     At one point during these negotiations, a representative of the Bank Group suggested that a guarantor, Robert Thomson, should contribute (as an equity investor) cash to finish the construction, with the Bank Group agreeing to reduce the remaining obligations under the guaranty by one dollar for each dollar used in construction (hereafter, the "Dollar-for-Dollar Proposal").

67.     Subsequently, the Debtor, after negotiations with Robert Thomson, offered the Dollar-for-Dollar Proposal (with Robert Thomson investing $900,000 cash into the construction, through a controlled disbursement account to be held by the Bank Group.)

68.     The Bank Group rejected the Dollar-for-Dollar Proposal on February 13, 2017.

69.     The Debtor has been injured by this restraint of trade by (a) not being able to obtain the Mortgage Loan from a competing source, which likely would have demanded less collateral from the Debtor's affiliates; (b) not being able to refinance the Mortgage Loan with a competing source, which likely would have permitted the Debtor to use funds from Robert Thomson to complete construction of the building; and (c) not having a lender willing to negotiate in good faith, inasmuch as a reasonable lender would have permitted (indeed embraced) the Dollar-for-Dollar Proposal.

<div align="center">

FIRST SECURITY BANK'S CLOSE
RELATIONSHIP TO THE McQUILLEN INVESTORS

</div>

70.     Charles Thomson has been a depositor at First Security since approximately 1965. Charles Thomson's current personal residential mortgage loan is from First Security.

71.     Every automobile purchased by Charles Thomson has been financed by First Security.

72.    Amelia Management acquired the properties from Growth Properties using a loan from the First Security.

69.    Robert Thomson has been a depositor at First Security since approximate 1953, is a former member of the Board of Directors of the First Security, and is currently an Emeritus Director.

73.    Robert Thomson has utilized investment advice of persons affiliated with the First Security, and Robert Thomson, from approximately 1970 to 2007, was a business partner with one of the First Security's principal equity security holders.

74.    Charles Thomson's mother, Janan M. Thomson, was a customer of First Security from approximately 1935 until her death in 1993.

75.    Charles Thomson's maternal grandparents, Charles Walsh McQuillen and Ellen Francis Bradley McQuillen, were customers of First Security (or its corporate predecessor(s)) from approximately 1914 to their deaths in 1945 and 1981, respectively.

76.    Each of Charles Thomson's three siblings has been or is a customer of First Security.

77.    The extensive interlocking financial and social connections between the members of the Thomson family and the First Security establish that a "confidential relationship" (as that term is used in Wine, J.C., *Lender Liability Under Iowa Law*, 39 Drake L. Rev., 645, 648-652 (1990)) exists between the First Security, as bank, and the Thomson family, as customers of the bank.

78.    First Security Bank, by virtue of its comparative size in the Charles City, Iowa, lending market, holds a huge advantage in bargaining power over a borrower such as the Debtor.

79.     First Security Bank's position in the market precludes borrowers such as the Debtor from obtaining loans where less collateral is demanded, or where a lower interest rate would be demanded.

80.     The Debtor (together with its affiliated parties) was compelled, as a condition to obtaining the Loan, to grant the Bank Group security interests in more collateral that would have been demanded by a similarly situated borrower in a lending market where robust competition among lenders prevailed.

81.     The Bank Group intentionally exploited First Security's market position and relationship to the Thomson family to obtain, for its own benefit and to the detriment of the Debtor, property interests which Bank Group would not have otherwise obtained.

82.     The compelled transfer of these property interests gave the Bank Group an undue and unconscionable advantage which has, as a proximate and foreseeable result, exposed the Debtor to undue financial harm.

83.     The provisions of the Mortgage Loan pursuant to which collateral was transferred to the Bank Group from the Debtor and the Affiliated Parties was unconscionable at the time the contract was made.

<div align="center">THE BANK GROUP'S ALLEGED LENDING EXPERTISE</div>

84.     The Bank Group represented to the Debtor that the Bank Group (i.e., CRB&T) had vast experience and expertise in transactions involving economic development assistance from the State of Iowa.

85.     The Bank Group knew that the Debtor was relying and would continue to rely on the Bank Group's expertise in in transactions involving economic development assistance from the State of Iowa.

86.     Throughout the negotiation of the Mortgage Loan and, following its closing, during its administration, the Bank Group, through CRB&T, repeatedly referenced its familiarity with various state economic development incentives involved in the financing of McQuillen Place. The incentives so referenced included, but were not limited to, the IDEA Forgivable Loan Program and the EZ Program.

87.     Following Mortgage Loan Closing, construction progress on McQuillen Place was delayed by a number of factors, including a shortage of skilled tradespersons in the Charles City area, failures of subcontractors to adhere to deadlines, the refusal of a key vendor to work with MidAmerican Energy, and multiple changes in standards and design parameters imposed unilaterally by staff of MidAmerican Energy.

88.     The delays resulted in the parties to the Mortgage Loan agreeing to extend the term of the Mortgage Loan in order to complete construction of McQuillen Place.

89.     Preceding each renewal and extension of the Mortgage Loan, the Bank Group provided the Debtor with detailed guidance and recommendations on steps to take to maintain the project's compliance with the various state economic incentive programs.

90.     This proffering of guidance was consistent with the repeated assurances that CRB&T was intimately familiar with administration of loans in which state economic incentive programs were a key funding component.

91.     On September 19, 2013, the Debtor applied for assistance, in the form of development tax credits, from the IEDA under the EZ Program.

92.     On October 23, 2013, the Director of the IEDA signed a letter (the "EZ Award Letter") granting the Debtor's application for credits under the EZ Program.

17

93.     The application for assistance under the EZ program and the EZ Award Letter were provided by the Debtor to the Bank Group prior to the Mortgage Loan Closing.

94.     In July 2017, the Debtor was asked by CRB&T to make arrangements for the sale of the anticipated EZ credits (the "EZ Credits") as part of what was anticipated by the parties to the Mortgage Loan to be a final renewal and extension prior to completion of the building.

95.     In early August 2017, the Debtor was notified by the IEDA that the original issuance of the EZ Award Letter was to have been accompanied by a "contract" setting forth additional terms and conditions for the EZ Program beyond those referenced in the EZ Award Letter.

96.     One of the additional terms and conditions to have been set forth in the contract was a two-year expiration rule (the "Two-Year Rule"). The IEDA asserted that the Two-Year Rule was applicable to all EZ Programs in general and to the Debtor in particular, notwithstanding absence of notice of the Two-Year rule in the EZ Award Letter.

97.     On information and belief, the EZ Program has been a funding component of numerous loans and construction projects in which the Bank Group and its members have participated.

98.     The approximate amount face amount of the EZ Credits to which the Debtor would be entitled in the absence of the Two-Year Rule was $700,000. The approximate amount of net proceeds from the sale of such credits (the "EZ Benefits") would have been $500,000.

99.     The net increase in availability of funds (through an increase in the collateral package held by the Bank Group) would have been sufficient to obtain a certificate of occupancy for at least some of the residences at McQuillen Place.

100.    Obtaining a certificate of occupancy would have permitted the Debtor to use the cash flow from rented units to fund completion of the remaining units and to start the process of obtaining infusion of the TIF funds into the project.

101.    Following discovery of the Two-Year Rule by the Debtor, the Bank Group refused to extend any additional credit to the Debtor.

102.    The Bank Group knew, or should have known, about the Two-Year Rule.

103.    The Bank Group knew that the Debtor was relying on the EZ Benefits to provide funds for the construction of the building.

104.    The Bank Group had a duty to notify, *inter alia*, the Debtor about the Two-Year Rule prior to the Mortgage Loan Closing.

105.    The Bank Group never notified the Debtor about the Two-Year Rule.

106.    The Debtor has been injured and damaged as a result of the Bank Group's failure to notify the Debtor about the Two-Year Rule.

107.    The Bank Group had a responsibility to the Debtor to take due care to protect the Debtor's financial interest in the EZ Benefits.

108.    The Bank Group not only failed to take due care to protect the Debtor's financial interest in the EZ Benefits, the Bank Group failed to take any level of care to protect such interests.

109.    Any and all default(s) of the Debtor under the Mortgage Loan are the direct and proximate result of the Bank Group to exercise due care over collateral pledged to the Bank Group under the Mortgage Loan, viz. the EZ Credits.

110.    The Bank Group's failure constitutes unclean hands and bars the Bank Group from enforcing the provisions of the Mortgage Loan.

19

111.    The Bank Group knew, or should have known, that it either lacked detailed knowledge of economic development incentives programs in Iowa, or that it had no capacity to assist borrowers in any meaningful way in transactions involving economic development incentives in the State of Iowa.

112.    The Bank Group knew that the Debtor was relying on the Bank Group's representations of expertise in transactions involving economic development incentives in the State of Iowa.

113.    The Debtor relied to its detriment on the representations of the Bank Group concerning the Bank Group's expertise in transactions involving economic development incentives in the State of Iowa.

114.    Among other things, the Debtor would not have entered into the Mortgage Loan if it had been aware of the Bank Group's lack of expertise in or lack of meaningful capacity to administer transactions involving economic development incentives.

115.    The Mortgage Loan was, accordingly, obtained by fraud by the Bank Group.

116.    Four guarantors under the Mortgage Loan, Robert Thomson, Charles Thomson, Amelia Trust and Amelia Management (collectively, the "Guarantors"), have rights of subrogation against the Debtor by virtue of this action.

117.    The Debtor would not have sought or permitted the Guarantors to become involved with, much less guaranty, the Mortgage Loan had the Bank Group disclosed that it would not or could not protect or assist the Debtor in maintaining its interest in the EZ Credits.

118.    The Bank Group's failure to disclose such information to the Debtor resulted in an increase in the Debtor's exposure to subrogation claims, to the detriment of creditors.

20

## MANIPULATION OF CLOSING DATES FOR FEES

119.    The Mortgage Loan Closing Date was set by the Bank Group.

120.    The sole discernable reason for the Mortgage Loan Closing Date was to permit the Bank Group to book income in 2014, rather than 2015.

121.    The Bank Group had a duty to the Debtor to act in good faith and to deal fairly.

122.    By selecting a closing date to accommodate only the interests of the Bank Group, rather than the interests of the Debtor, the Bank Group engaged in opportunistic and predatory behavior.

123.    The Debtor suffered economic injury as the proximate result of the Bank Group setting the closing date of the Mortgage Loan for the Mortgage Loan Closing Date.

### FIRST SECURITY BANK SPREADS PRIVATE INFORMATION (SOMETIMES, FALSE PRIVATE INFORMATION) ABOUT THE McQUILLEN INVESTORS TO VARIOUS THIRD PARTIES

124.    First   Security   Bank   publicly   states   in   its   "Privacy   Policy" (https://www.1stsecuritybank.com/assets/1436904169-Privacy-Policy.pdf) that it uses security measures to prevent disclosure of confidential information of its customers to the general public.

125.    First Security Bank publicly states that it maintains privacy rules which comply with all applicable Federal and state laws.

126.    First Security Bank's public representations regarding its privacy policy (the "Privacy Policy") constitute part of the contractual agreement between First Security Bank and its customers.

127.    The Debtor is a customer of First Security Bank.

128.    The Privacy Policy is part of the contract between First Security Bank and the
Debtor.

129.    The provisions of 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq*. restrict the
release of confidential customer information in possession of a bank to third parties.

130.    On information and belief, on March 7, 2014, a member of the board of directors
(the "Board") of the First Security Bank told a third party (a bartender) that the McQuillen Place
transaction was "dead as a doornail" because it had lost its financing. (The conversation described
in this paragraph is hereinafter referred to as the "March Statement.")

131.    The March Statement was not true.

132.    The March Statement tended to impugn the business prospects of the Debtor.

133.    On information and belief, during the period between August 1, 2014 and
September 5, 2014, one or more members of the Board spoke to members of the City Council of
the City of Charles City, Iowa (the "City Council") and made certain statements (the "August
Statements") concerning the McQuillen Place development.

134.    At the time of the August Statements, the City Council was considering a proposal
by the Debtor for the City of Charles City to provide, *inter alia,* tax increment financing benefits
to the proposed McQuillen Place development to make the development economically viable.

135.    On information and belief, the August Statements were extremely negative toward
the proposed transaction, criticized the proposed transaction for relying on subsidies from the
government, and suggested the long-term prospects for the financing of the project were poor.

136.    The August Statements tended to impugn the business prospects of the Debtor.

137.    On information and belief, during February 2018, a person employed by First
Security Bank disclosed to a third party (a) details of an appraisal dated January 12, 2018, and (b)

22

specific details of positions taken by various parties during loan modification negotiations between the Debtor and First Security Bank during the first weeks of February, 2018 (the "February Statements").

138.    The February Statements tended to impugn the business prospects of the Debtor.

139.    The March Statement, the August Statements and the February Statements were presented to the recipients of the information as true and accurate depictions of the status and prospects of the Debtor and its interests.

140.    The information contained in the March Statement, the August Statements, and the February Statements is confidential information the disclosure of which is prohibited by 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq.*, and, by reference, the Privacy Statement.

141.    The utterance of the March Statement, the August Statements, and the February Statements is a breach of the contract between First Security Bank and the Debtor.

142.    The content and context of the March Statement, the August Statements, and the February Statements indicates that the statements were made intentionally and were, moreover, made in a hostile manner and with the intention of injuring the business prospects of the Debtor.

143.    The Debtor has been injured by the breach of contract described in the preceding paragraph.

144.    First Security Bank had a duty to hold private and confidential information pertaining to the Debtor.

145.    Personnel from First Security violated this duty by uttering the March Statement, the August Statements, and the February Statements.

146.    The Debtor has been damaged by this breach of duty by First Security Bank.

147. The Debtor is and was known to First Security Bank to be engaged in a business where good businesses character and conduct are essential to success and well as survival.

148. The March Statement, the August Statements, and the February Statements were calculated by the persons uttering them to interfere with and diminish the reputation of the Debtor, including, but not limited to, the reputation of the Debtor for good business character and conduct.

## THE BANK GROUP HAS REPEATEDLY VIOLATED
## ITS DUTY OF GOOD FAITH AND FAIR DEALING

149. The Bank Group had (and has) a duty to negotiate with the Debtor in good faith.

150. Part of the duty to negotiate in good faith is to consider and accept proposals in a manner consistent with that of a reasonable bank acting under similar circumstances.

151. The minutes of various meetings of the First Security Bank board and board committees (attached hereto as Exhibit A) (the "Minutes") show that First Security Bank (i) has used criteria other than its obligations under the Loan Documents and economically rational analysis to arrive at positions vis a vis the Debtor, (ii) has attempted to impose the priorities of individual members of the First Security Bank board of directors on the Debtor, (iii) has attempted to interfere with the personnel choices of the Debtor, (iv) has wrongly attempted to control and obtain ownership of assets (specifically, the McQuillen Place development rights) which the Bank Group does not own and on which it does not have a perfected lien.

152. According to the Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on September 14, 2017:

> *Dick Herbrechtsmeyer:*
>
> It is time to talk to Charlie [sic]. … Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it.

24

*Kurt Herbrechtsmeyer:*

Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. [….]

*Gene Hall:*

I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done.

153. According to the Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on March 8, 2018:

*Kurt Herbrechtsmeyer:*

They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, the need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. [….]

The most is completing the windows. Windows on the first floor and completing the sidewalk. [W] are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff we have to be willing to take it on. [….] We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. [….]

*Dick Herbrechtsmeyer:*

[T]here may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio. [….]

*Gene Hall:*

I absolutely agree that if the bank finishes the project, [I] agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has.

*Dick Herbrechtsmeyer:*

I can assure you one thing, Directors will pay to have McQuillen removed. ][....]

*Kurt Herbrechtsmeyer:*

[....] The other prospect that pushed me across, other alternative was that we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this. From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. [....]

*Dick Herbrechtsmeyer:*

[....] PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both. [....]

*Gene Hall:*

Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

154.    The Debtor currently owns, and at all relevant times herein has owned, McQuillen

Place and the business prospects, future income, going concern value, and economic advantages

deriving from the collection of assets known as "McQuillen Place."

155.    The Debtor is, and at all relevant times herein has been, a for-profit limited liability

company.

156. The basic substance of the Mortgage Loan transaction was that the Bank Group would lend money and provide related financial accommodations to the Debtor to facilitate the construction of the McQuillen Place.

157. As long as the Debtor owns the assets known as "McQuillen Place," First Security Bank owes McQuillen Place Company a duty of good faith and fair dealing with regard to the McQuillen Place assets and with regard to the Mortgage Loan.

158. The Bank Group does not have a perfected lien on any of the personal property of the Debtor.

159. The Bank Group has not filed a Uniform Commercial Code financing statement to perfect any lien on personal property of the Debtor.

160. The right to develop McQuillen Place, the books and records of McQuillen Place, and the future business expectations of McQuillen Place are all personal property of the Debtor.

161. A secured lender does not, by virtue of a security agreement or a mortgage, gain the right to seize the assets of a borrower outright simply because either (a) the officers of the lender become convinced they can operate the assets more efficiently than their borrower, or (b) become convinced that ownership of the assets might somehow burnish the lender's corporate image.

162. Lenders continue to owe a duty of good faith and fair dealing to borrowers at all times during the creditor-debtor relationship.

163. First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced they can operate McQuillen Place more profitably or efficiently than McQuillen Place Company.

27

164. First Security Bank did not and does not, by virtue of the Mortgage Loan or any other agreement, own the right to seize McQuillen Place and operate it merely because officials at First Security Bank become convinced their operation of McQuillen Place might burnish their corporate image.

165. First Security Bank, Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall are, and at all relevant times herein have been, aware of the facts stated in the foregoing paragraphs 154 through 164.

166. Notwithstanding their knowledge of the ownership of McQuillen Place, and notwithstanding their obligation, as directors, to cause First Security Bank to act in good faith in its contractual relationship with McQuillen Place Company, Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall concocted, supported and evangelized on behalf of a scheme for First Security Bank to seize control of McQuillen Place in order to, among other things, advance their own public relations agenda.

167. The scheme was to make First Security Bank appear as "heroes" rather than "bad" bankers, because it would be the bankers of First Security Bank who "showed up" and finished construction by drawing on their own funds and obtaining additional funds from other banks through new, senior debt on the property.

168. At no point since September 30, 2017, has First Security Bank offered to McQuillen Place or its principals any proposal (a) to advance additional funds for completion of construction of McQuillen Place, or (b) to permit new, senior financing from another institution to be used to complete construction of McQuillen Place.

169. At no point in the Minutes do the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall (or any other participant in the meetings) suggest offering any proposal for a neutral

third-party agreeable to both the Debtor and the Bank Group to (a) obtain additional funds for completion of construction of McQuillen Place, or (b) obtain additional funds through new, senior financing from another institution.

170. Although the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall knew that First Security Bank was able to advance additional funds to complete construction and/or accept subordination to a new senior lender, the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall only mentioned this as an option in the context of First Security Bank seizing the property and assuming the role of developer.

171. The plan advocated by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall was intended to exclude any other person or entity from coming in as "heroes" to finish construction, because the "hero" role was to be reserved for First Security Bank.

172. This reservation of the "hero" role for First Security Bank was recommended by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall without regard or consideration of the possibility that, in terms of net returns, some other arrangement might have actually been more beneficial for First Security Bank as an institution.

173. The sole option promoted by the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall involved the bank seizing control of the future business prospects of its borrower so that First Security Bank can exploit its borrower's assets for its own gain.

174. The tenor of the comments of the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall indicates that they were motivated not by concern for the assets of First Security Bank, but by pique at one of McQuillen Place's principals, by the desire to inflate their own standing in the local community as "heroes," and by an inexplicable (and irrational) desire to change the nameplate on the building.

175.   Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall accordingly intentionally advocated cutting off negotiations immediately and commencing a legal action as quickly as possible.

176.   In so doing, the Kurt Herbrechtsmeyer, Dick Herbrechtsmeyer, and Gene Hall acted in bad faith, intentionally interfered with the contract between the Counterclaimants and First Security Bank, and caused damage to the Debtor.

177.   No reasonable bank, when offered cash by a guarantor to complete a building held as collateral by the bank, would refuse such an offer solely on the basis of requesting additional security from a guarantor.

178.   The reasonableness of the offer of the Debtor and its Affiliated Parties to contribute $900,000 to complete the construction of McQuillen Place, in exchange for a dollar-for-dollar reduction in guaranty obligations, is demonstrated by the fact that Gary Becker, of CRB&T, initially suggested the proposal.

179.   The Bank Group breached its duty of good faith and fair dealing by refusing the proposal.

180.   The Debtor has been injured by this breach of duty.

CRB&T AND THE IEDA FUNDS

181.   In September 2017, funds from IEDA were deposited with CRB&T.

182.   Instead of making these funds available to the Debtor to permit further construction, CRB&T used these funds to pay accumulated interest on the Mortgage Loan.

183.   If these funds had been made available to the Debtor, the Debtor, through its vendors, could have completed sufficient work on McQuillen Place to obtain a temporary certificate of occupancy (the "TCO").

184. If the Debtor had obtained the TCO, it would have been able to start renting units at McQuillen Place, and could have generated funds with which it could have finished the rest of the building.

185. The hardship to the Debtor by offsetting these funds greatly outweighed the temporary benefit CRB&T obtained by offsetting interest charges.

186. CRB&T had a duty to evaluate the relative harm to the parties from its actions and, in this case, to permit the Debtor to use the funds to pursue construction.

187. CRB&T breached the duty described in the preceding paragraph.

188. The Debtor has been injured by this breach of duty.

189. In refusing reasonable offers by the Debtor and its Affiliated Parties to inject cash into the development to finish construction, the Bank Group is attempting to use continuing interest charges and default fees to run up the total amount of the debt.

190. Since the Bank Group has numerous pieces of collateral, the effect of running up the debt will be to award the Bank Group a windfall.

191. The Bank Group has a duty to avoid obtaining a windfall when its borrower, the Debtor, has presented a reasonable plan to make the Bank Group whole while avoiding a windfall.

192. The Bank Group has breached the duty described in the preceding paragraph.

193. The Debtor has been injured by this breach of duty.

### PAYMENT OF REAL ESTATE TAXES

194. In late June 2018, the Bank Group elected to pay approximately $230,000 in real estate taxes on McQuillen Place.

195. The Bank Group did not consult with the Debtor prior to making this payment.

31

196.   Prior to the Bank Group making this tax payment, the Debtor had informed the Bank Group that the Debtor was going to ask the taxing authority to abate the taxes in question.

197.   The taxes in question are based on an assessment of the building being completed and in service. Since the building, when the taxes were paid, had not yet completed and was not in service, the amount of the assessment (and thus of the taxes) should have been lower.

198.   By paying the taxes, the Bank Group has diminished, if not eliminated, the ability of the Debtor to seek abatement from the relevant taxing authority.

199.   The Bank Group had a duty to not expend funds on the Debtor's behalf in a manner that needlessly increased the Debtor's tax obligations.

200.   The Bank Group has breached the duty described in the preceding paragraph.

201.   The Debtor has been injured by this breach of duty.

Now, wherefore, the Debtor respectfully requests that this Court enter an order:

a.   subordinating all liens, claims and encumbrances of the Bank Group (or any of them) in any asset of the Debtor to a priority in distribution below that of all claim and interest holders in and of the Debtor, including, but not limited to, those of the unsecured creditors and the owners of the Debtor's equity;

b.   in the alternative, disallowing the claims of the Bank Group in the Chapter 11 case of the Debtor in their entirety; and/or

32

c. granting the Debtor such other and further relief as may appear to the Court equitable and just under the circumstances.

Dated: November ___, 2019

Respectfully submitted,

By: _____
J D Haas
(IA #AT0003014)
J D Haas & Associates, PLLC
1120 East 80th St., Suite 200
Bloomington, MN 55068

*Attorney for Plaintiff*

33

Exhibit A

Meeting Excerpts – Board Loan Committee – McQuillen

**7-17-2014**

Following review and discussion of the following lines of credit, the following were approved unanimously with actions indicated:

**McQuillen Place LLC**
Requested: Lending Limit and Total Serviced Debt $3,900,000
Robust Discussion held. Further information needed.
Motion by Gene A. Hall to table, second by Robert D. Noble

**8-4-2014**

Motion was made by J.R. Herbrechtsmeyer and seconded by Kurt W. Herbrechtsmeyer, and unanimously voted to bring back to the table, McQuillen Place request.

Keith Starr presented the following additional information regarding the McQuillin Place:

7-2014 Projected Construction Cost
Supplemental Information regarding the apartments.
7-27-2014 Rent Report
7-27-2014 Rent Projection
7-27-2014 Square Feet of Building

No action was taken.

**8-8-2014**

Motion was made by J.R. Herbrechtsmeyer, seconded by Kurt W. Herbrechtsmeyer, and voted to approve (Boyd A. Campbell – Voting No), either of the following two loan options:

**Option 1**
**McQuillen Place**
**Guarantor/Co-signers: Charles M. Thomson, Robert Thomson**
**Contingent upon Charles City TIF loan.**

Lending Limit | $1.95 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2 million to be repaid over 15 years. Robert Thomson would continue to guaranty $900,000 of this debt with $500,000 of that guaranty being secured.

Total Line Commitment | $1.95 million

Charlie Thomson would guaranty all of the debt providing mortgages on all real estate properties that he owns individually or has an ownership interest in. Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**Option 2**
**McQuillen Place**
**Guarantor/Co-signers: Charles Thomson, Robert Thomson**

Lending Limit | $1.45 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2.5 million to be repaid over 20 years. Robert Thomson would continue to provide an unsecured guaranty of $400,000.

Total Line Commitment | $1.45 million

Charlie Thomson would guaranty all of the debt providing mortgages on all real estate properties that he owns individually or has an ownership interest in. Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**9-15-2014**

Update was given on the McQuillen Place. Negotiations are still taking place. City has not yet committed to the up-front TIF loan. Robust discussion was held.

**10-16-2014**

Email, verbal or phone response votes, which are attached as a parts of these minutes, were received from J.R. Herbrechtsmeyer, Kurt W. Herbrechtsmeyer, Boyd A. Campbell, Gene A. Hall and Robert D. Noble and the following was unanimously approved:

**McQuillen Place**

Lending Limit | $3,500,000.00
Total Serviced Debt | $3,500,000.00

Advisors Keith K. Eastman and Ronald McGregor submitted approvals.

**6-8-2015**

**Mark Miller presented the following line reviews:**

McQuillen Place Company LLC, Guarantor/Co-signer: Charles M. Thomson, Robert L. Thomson & Amelia Management LLC – Nothing new to report. This line was approved in January. Cedar Rapids stays involved until the building is up, then the commitment will be between First Security Bank, First Citizens and the City for a take-out commitment. Cedar Rapids Bank and Trust was involved due to the significant amounts of grant money and they are overseeing the draws and overseeing the project going forward. We have Bob Thomson's guarantee in place in the amount of $900 thousand to cover 2 years of payments for the end loan. Discussion was held regarding tenants and disagreements between Dean and Charlie. Mark advised that he is not aware of any tenants lined up at this point. Motion was made by Gene A. Hall and seconded by Robert D. Noble, and unanimously approved:

McQuillen Place Company LLC,
Guarantor/Co-signer: Charles M. Thomson, Robert L. Thomson & Amelia Management LLC
Board Approved Lending Limit | $3,500,000.00
Board Approved Total Serviced Debt | $3,500,000.00

**6-9-2016**

McQuillen Place Company LLC, Guarantor/Co-signer: Charles M. Thomson, Amelia Management LLC, Robert L. Thomson ($900,000 limited guaranty) – This line has a construction note that matures end of June. There is a tour scheduled at 9:30 a.m. Monday, and a meeting with Gary Becker, the lead bank on this. The reason they are the lead, is there are many grants involving FEMA and other entities that have had more experience with this. We are going to be meeting on Monday with Charlie to get a tour of the building and hear what the plans are going forward. Gene – This construction note matures June 30, and what happens if they come up here and take a look at this? Mark M – We are going to have to make a decision. They haven't used all their line of credit and monies are not all gone. We have been matching up the progress in relationship to the project. Bill H – Final note is contingent on completing the building. Mark M – We need some updated financial information. I can talk to Charlie directly, but I feel with them being the lead bank, most of this should be going through the lead bank. We need updated financials, status reports in relation to where the work has been done and advances on LOC's. If we had the loan maturing June 30, what time frame are we looking at for completion? And lastly, what is the status of the first floor as far as tenants are concerned. We think there is none, but have not had any confirmation from reliable sources. Steve – The question I would ask, there was 6 vehicles on site that had workers, how can you finish a project with only 6 men on site? Mark M – The only answer I have gotten, is that it is going to take longer, but we are spending less to get to the end. Steve – When they are this far behind schedule, he will never get ahead. Steve advised he would come out of retirement and finish the project, if needed. Gene – I have a number of concerns with this. He is so far behind schedule, a year behind. Steve – How will you get this done with one plumber and one electrician? Dick – I learned there are 20 furnaces in town to put in. Mark M – One of the things talked about, there is some discussion about being able to rent apartments in one part of that before the whole building

is completed. I believe that is an accurate statement that this can be done. We will see how far along they are. J.R. – The City Manager told a group that information last week, but had some caveats that needed to be done. J.R. Herbrechtsmeyer – I move we approve where we are. Loan Committee will be talking about the renewal once questions are answered. Boyd A. Campbell, seconded, and unanimously approved:

McQuillen Place Company LLC,
Guarantor/Co-signer: Charles M. Thomson, Amelia Management LLC, Robert L. Thomson ($900,000 limited guaranty).
Board Approved Lending Limit | $3,500,000.00
Board Approved Total Serviced Debt | $3,500,000.00

**2-2-2017**

Gene – Any updates on the McQuillen place? Dick – Mark has toured the place. The elevator is built but won't be delivered until MidAmerican gets in. MidAmerican is getting easements from Ralph for the north end trench before McQuillen gets hooked up.

**4-21-2017**

McQuillen Place – Kurt W. Herbrechtsmeyer – I vented frustration at the "haste" that this project is going forward. One other thing, is the argument for their pace, it is cheaper for them to keep their labor costs down than paying us interest. This request is an extension until the end of June, and they need to get this thing done. We will review the rate at that time. Gene – If this is an extension through July 1, so they can finish this, I don't believe them. Kurt – No, this won't get finished then. If they are going to tell us, it is cheaper than to pay us interest, we can change that equation. Gene – There is no cash flow and no leases are signed. Kurt- The argument is, if we get an army in here to finish this up, we would have to pay premiums, and they need to do this to stay on budget. I don't think they factored revenue into this. Very frustrating. We send the message now, this needs to get done, rate will change on July 1 and if they want to talk to a different lender they can, as the rate at that time will be 5.25%. Mark – This is a participation that we purchased form Cedar Rapids Bank and Trust and Trust have had experience with this. We thought it was better to have them involved to make sure things were done correctly. In hind sight, their oversight has not been as good on this. We see this daily, they come up infrequently to do inspections. We went through there the last time with representatives from First Citizens and the City. Their oversight has not been what we thought it to be. Gene – Do we have any choice, what is the alternative? Kurt – The rate adjusts. We have not given them any indication we wouldn't, but truthfully, this is the time to tell them what is going to happen next time. I have lost faith in Charlie to get this done. I would like to make it clear to him we are done. We want to see this get done and be a success, but he has to do everything he can to make that happen. If he doesn't have a signed lease by now, we need to get his attention. Mark – We have not increased our loan commitment, they are not coming in at this point in time asking for more money to get this done. We did get information on other sources they have money to draw from. It would be nice to know how they could get this done for the amount of money they have left. When done, it needs to generate income. Boyd – We have 90% participation. From the time this is going to be completed, we are going to have a time in between that this is going to be bad. Mark – That is why we have the guarantees we have. At this point, the biggest

guarantor is Bob Thomson. Boyd – He stopped at $900 thousand. If we have a year of nothing in between, is he willing to step in and give us some more? What are we going to do here? Gene – My understanding is it needs to get built. Once built, whoever is the second owner can come in and do something with it. Boyd - If it doesn't get built? He needs an incentive to get this done and get to work on this, and needs to be over there and make sure they are working. Gene – What is the contract language regarding interest rate? Kurt – Default adds 2%. Mark – I would advocate, the right approach is get the extension done, have Gary Becker up here sometime in May, First Citizens, and Charlie, and do another tour and advise it doesn't look like it is going to get done, what is the plan? We did have a meeting in August last year, we were pretty harsh at that point in time, and we got some good dialogue and need to have this dialogue again. There is no signed lease yet. Gene – They are looking at other locations. Kurt – This one is not going to get ready. As we are getting to the finish line, June 30 might be a great opportunity, if there is progress on it and the end is in sight. Now if he doesn't have any leases, he has to put a date out there. Bob - Why does Charlie not feel this urgency to make this happen? Mark – The real issue they continue to bring up, they can't get enough labor, they thought they were going to import people from Chicago, for some reason, they have to have 2 forms of ID and the people don't. That is their argument. Last time they had 12 people working and there was no general contractor. For a while, they had Alex Heinz, they had sub-contractors doing things. Boyd – If we get this done, what is going to be our occupancy rate, do you think? That year after it is done and trying to fill it, cash flow is going to be absolutely bad, that is all on us. Mark – We are looking at the commitment letter from Citizens. Citizens had to have a year's reserve in payments, theirs is $900 thousand, City is $900 thousand and ours is $1.5 million. They have to have a reserve for one year's worth of payments set up, so they have the time to get that building filled. Gene – The dialogue has to be the rate is going way up July 1, so get it done or don't, the rate is still going up. Kurt – We want to create a sense of urgency to finish and get FEMA money. Mark – Cedar Rapids bank and Trust said it is cheaper than paying a high price for getting a whole bunch of labor in there to get it finished and this was in August and they continue the same dialogue. Gary is not helping us with that participation. Diane – From his perspective, he is in Cedar Rapids and we are looking at it every day. Gene – Did Timko take over that board down there? Steve Crawford told me Timko was going to take over that board and this would help expedite this. Mark – I asked Gary for information and he sent back, well we just kind of trust them. Charlie said, every time we make a request, they know this. Gary was nonchalant. Mark-I told them we are not very happy about a third extension and the non-urgency of getting this completed. This matured March 31. We are looking at this physically every day and we are not happy about it. Gene – I think we have to extend it, but the message has to be loud and clear. Mark –I will line up a meeting with all potential parties involved with final financing and get Gary from Cedar Rapids Bank and Trust and do another tour. We are tired of it. We want it finished, get it done. Kurt- It is time to let Charlie know he needs to go find some help financially, he needs a little push back from somebody, that this might not end well. Mark –If we get another tour lined up, if any of you would like to be included, let me know. Boyd, Gene and Bob advised they would like to be involved in this. We will get a meeting lined up and invite you. Boyd- We need to show up. Mark-We want to have a sit down meeting and tour. Bob – When is the time to discuss rate? Mark-Cedar Rapids Bank and Trust has all their documents ready at 5.25%. I would like to stick with this but clearly communicate that come July 1, if this is not done, that rate is not anywhere close to where it needs to be. Gene A. Hall made motion, Boyd A. Campbell seconded, and it was unanimously

VOTED:   To approve the extension of the construction loan for:

McQuillen Place Company LLC

Exhibit A
Page 5

**Charles M. Thomson/Amelia Management LLC/Amelia Trust/Robert Thomson ($900k)**

$3,491,993.32 Line of Credit at 5.25% to June 30, 2017, with the provision that if the note is not paid by July 1, the rate defaults to the maximum, will not be extended, and the loan stays at the default rate

and

approve the loan policy exception – Term of construction longer than 12 months.

**6-8-2017**

Schedule of Customer Renewals – This was reviewed. Gene – Question on McQuillen, how did he take the interest rate we presented? Mark – There was interest rate discussion. We are trying to line up another tour this week. The elevator was installed, but they now have a problem with the doors. We asked about certificate of occupancy, he thought maybe he would have that by June 15. We did plant the seed that the interest rate would be higher and there might be some performance based pieces factored into the rate, such as occupancy certificate and occupancy levels. Dick – Is our guarantor aware? Have we had a conversation with Bob, as it is about down to where he will have to subsidize some payments? Mark – Every year, he does a financial statement, this is listed as a contingency liability. As far as having a deep discussion with him, I have not. $900 thousand during construction loan will be $500 thousand once permanent financing. Dick – My fear is he may not be getting the whole story of the concerns and it might be time. I would be willing to be part of that discussion with Bob. Discussion held. Gene – All those properties Charlie has, there is no equity.

**8-17-2017**

J.R. Herbrechtsmeyer advised regarding McQuillen Place. Gene – Since he has everything for sale and even though there may or may not be any net worth there, whatever net worth there is, is supposed to be pledged to the bank. So, if he started piece mealing this off, how concerned are we that we get our share? Kurt – I have seen the Renaissance Revival package and it is $1.2 million or $1.4 million, if he finds someone to buy this. Gene – I don't think this would prohibit him to sell what he can when he can. Dick – The big chunk of the stuff he bought from Brian Crane, we have the first and the kids carried back a second. Brian owned the corner where McQuillen is at, which raises an issue I hadn't thought of. I hope there isn't a second with those folds and there was not a second mortgage ahead of that transfer into the new entity that is building McQuillen, because he bought that from Brian as part of the package. What he did, is add a little line of credit, made payments, but borrowed back on the LOC which is secured on the first mortgage, so, all of a sudden his 5 years are up and has shown no progress with us. I gather Mark said no, we are not interested in doing this over. As far as net worth, any net worth he thinks he has is nothing, unless he has picked something up. Kurt – It is 12 residences – commercial properties. Dick – He may have improved the value of that property, he put in a lot of storage units back behind there, which you can't see from the street and claims he has them all full. Bill – Did he buy the Brick and Tile Building? Randy – No Jeff Tierney has that. Kurt – His own home is in this package, Mark Meinroe is in 206 N Main, the North Grand, the duplex on Harvey, rental on Johnson 15th Ave, and

Page 6

---

Riverside Drive, brick building next to the bar, Kellogg and Jackson street. Diane – Mark and I had a conversation with Gary Becker and we are trying to get the package together for the extension of the LOC. One of the things they asked us to do is a walk through because in the cash flow, they are talking about having occupancy as of September. They are closer to this, but that date will not happen. There were only 3-4 doors that were put on the apartments at this point. Dick – The area where he wanted to rent, the doors were done, the rest were not. All the plastering had to be done. Diane – They were going to put windows in yet this week. Kurt – They have to Sheetrock all the common areas. Diane – All major hallways have that and it is painted. They are making progress, but will not hit September 1. Gene – Did Dean Snyder take over that construction? I know he was asked to bid on it and finish it. He did bid. Diane – There were only a couple people working when we were there. Dick – It did not look like activity such as Dean Snyder would have. Gene – Even though he may have taken over, he may not be there yet. Kurt – He has leased one apartment to a school teacher. Robust discussion held. Diane – On Monday, Charlie wasn't here, we walked through with their construction manager. They have pavers now in the area between the two sides of the building. Have several doors on the outside of that area. What is done looks nice.

**9-14-2017**

McQuillen – Dick advised of several questions to start. Last time we toured, Charlie was told there were 3 apartments left to be sheet rocked and taped. Two days ago, the one in the corner still appeared to have sheet rock know leaning against the window. Mark – I will schedule a time to get there next week. Dick – The elevator was supposed to be inspected and he has not reported to you. Dick – Both things needs to be done. Mark – The elevator is not required. I think we are just waiting for the state to inspect. Mark – To summarize the request: The new pieces are the construction LOC that matured the end of June and has not been renewed. There is a different on interest rates, and it will be the same thing on both notes, at 6.25% with the lead bank, so net to us will be 6.0%, up from 5% from before. The floor on this loan is 5.75%, and net is 5.5%. There are 100 bp performance objectives on both these loans. When they get certificate of occupancy, the rate drops 50 bp, another 25 bp when the residential units are rented and another 25 bp when they have 3000 feet of retail space rented. They could drop the rate by getting certain things done. There is a second note, which we are not encouraging, for $422,900, we would have 90% of that, which is the request, same interest rate structure on this and the repayment source on the balance of the IEDA funds of about $200 thousand, then the balance will be enterprise tax credits they have to sell to repay that. CRBT would not advance on the LOC unless they had proof that credits will be sold to pay back loans. The total dollar amount proposed will potentially be the same for the second note. Dick – They presently are past due since June 30 and we had a kicker in there, are they paying interest monthly? Mark – The accrued interest on that has been paid fairly recently, but I need to check on that. It is at the default rate. Dick – I think that would be a tremendous incentive. Mark – From Charlie's perspective, not sure if he has been as much the reason it is at this point as the two banks involved. We had asked for detailed information regarding remaining construction costs, that is why we have the second note. Dick – Snyder came in and did this? Mark – No. Dick – So we have not seen Snyder's construction costs? Mark – No. Charlie had brought that up not that long ago and that he thought it would be wise to get a bid from someone else. 1 – What is that amount? and 2 -How quickly can you get someone like that that is fairly busy to come in and do the project, but this might be quicker than the route they are taking right now. This is slightly encouraging, has there been someone actually looking at apartments. Dick – Not the most impressive realtor

Exhibit A
Page 7

---

showing it. It would be nice to see what Snyder says. Charlie seems to say what he needs to, to move on. Gene – What has been factual since the start of this? It was supposed to have been done 2 years ago. Mark M – Original construction maturity date was June 30, 2016, so we are over a year past that date and we have extended the construction loan four times. Gene – What happens if we don't approve the extension? Dick – Cedar Rapids could foreclose on it and we own 90% of that note and Citizens is willing to take $1 million when completed and the City has $3 million, so when completed we would have less than we do now. Mark – That is assuming that they will keep their end of the bargain. They have not indicated we are out, but we haven't really put them on the spot. As I think about the permanent financing commitment we had, we could easily say we are out, but that would be short sided on our part. Dick – We are out but we are already in for our commitment, we can't get out. Mark – It would take city and ours and others, based on performance of construction loan, if there are different things we would want to include in the end financing, we have every right to negotiate. For example, have $900 thousand limited guaranty from Bob, with permanent financing to drop to 500 thousand. When we get to the point of permanent financing, we should revisit some of those terms, as they haven't met expectations on the construction loan. We could easily come back out on permanent financing but the bank's perspective, that would be a worst sided process but from the other banks perspective, might be more helpful to raise the bar in those types of things. That isn't what is on the table today, but when we get to that point when we are doing the permanent financing, those things are on the table to be revisited. Gene – If Dean Snyder does not get involved in this other than his estimate, are we confident for extending this for 5.5 months? Are they going to be done in 2.5 months if someone else does not get involved? Kurt – I would say not, probably next spring, if lucky. Mark – I think they will have certificate of occupancy at that time and maybe start renting apartments. One of the groups we have talked a little bit about that are different than some individuals renting an apartment. I believe there is some interest from Midas, Cambrex, Zoetis, that when they bring people into town to work for more than a day or week, they like to put them up in someplace better than the motels in town. They have expressed in each of those maybe having 1 or 2 apartments to have available. That is a pretty good start in getting some rented and cash flow. Dick – Are we wrong to say after 15 months of lip service, we want to see who the tenants are, name, contact information and have Mark from Chicago and obviously Cedar Rapids, we want to see what Snyder said it would take to get it done and what it would cost, and talk to Cedar Rapids and say you either get it done or else. It is time to talk to Charlie. There are only 3 not complete. Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it. Kurt – Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. I don't think he can complete it. Dick – He was hurt when he was asked if his guarantor was aware of this mess. Bob could have been off the hook if Cedar Rapids had not contacted to acknowledge another extension. If we approve this, I don't see we have a choice. We have more in it now if it gets done and we need to make sure it gets done before the middle of winter which may mean to fire current staff and get Snyder in there. Kurt – He doesn't demonstrate that he is paying any attention. Over and over again, he tells us we have this working, going to get things done, etc. We were there in May and he was going to get a certificate and they still don't even have the sheetrock in. He is disconnected from the project. Something June 1, something July 1, he needs to hear we don't have any confidence he is going to complete these things. Dick – Let's get a sit down with him. Cedar Rapids should be more than willing too. Kurt – Give him the message he may need to find another lender on this. Dick – Part of the problem with the public is they are not seeing anything on the first

Page 9

level. His logic is, he has to get a good tenant there and then finish. Kurt – If he would have gotten apartments and occupancy 9 months ago, there would be no question. Dick – That is the minimal we have to do before we have to approve it? Gene – The thing is Charlie has no skin in the game, if he walks away tomorrow and declares bankruptcy, he is not losing anything. We need to get the project done so we can escape. Dick – We need to have a heart to heart talk with Bob Thomson make him aware of what we are doing to try to save his $900 thousand guarantee. Bob is also over 90.

Charlie did say he signed the deal for $7 thousand-$9 thousand to have the punch list done over the objection of his partner. Gene – I would approve this subject to the meeting such that all parties are apprised of what we are thinking. Discussion held. Mark – Cedar Rapids Bank, Charlie, maybe Bob Thomson in that same meeting. Ron M – Bob with his hearing problem, it is tough to know if he is going to absorb everything out of a meeting. Dick – He needs to be at the talks. Mark – We can try to get something lined up, mid-week next week. Dick – It is worth doing.

Gene – I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done. Dick – We can say if we are going to extend it, we want a week by week schedule of what you are going to get done with your people and if you don't do it, bring Snyder in to finish. Mark – We should have the document showing what it will take to complete it. I don't think we have the ability today to say you have to hire, but if they don't perform and we have an agreement then we would. We would have an attorney write this. Again, we are not the lead bank in this. Dick – Call Gary Becker. Kurt – Encourage him to hire someone to finish the project. Dick – I would like to see a Snyder punch list and ask if he had thoughts about hiring Snyder to finish.

Mark – If approved, subject to these things. We will have a meeting with Bob and get estimate from Snyder to finish, agreeable that they could provide an estimate of time table. Dick – He is supposed to have that. Diane – He did say he paid money to Dean Snyder to have it done. Dick – If we have a punch list. Robust Discussion held.

Motion was made by Gene A. Hall, seconded by Robert D. Noble, and unanimously

VOTED:        To approve the following:

McQuillen Place Company LLC

Extend Note #9300025611 in the amount of $3,872,602.92 (Construction Note) to 12/15/2017, with lead bank CRBT and FSBT 90% of the note. The second note is for $422,900 with CRBT as the lead bank on this note as well. FSBT would have 90% of this note as well and it would mature on 12/15/2017. The interest rate on both these notes is 6.75%. After lead bank takes .25% for servicing, the net to FSBT would be 6.5%. There are 3 different performance incentives on this note that could drop the interest rate 1.0% if completed with a floor interest rate of 5.75%.

Guarantor/Co-signer: Charles Thomson

Exhibit A
Page 9

Robert Thomson ($900,000 guaranty)

All the above is subject to the meeting of all parties such that all parties are apprised of this.

Mark – Once a meeting is scheduled, make everyone aware to attend.

**12-22-2017**

Discussion regarding the proposal from Charles M. Thomson and Robert L. Thomson on the funding of the McQuillen project. Robert L. Thomson is willing to inject up to $500,000 cash into the project with the condition that his $900,000 guarantee during the construction phase being reduced by 0.50 for every dollar injected (total of $250,000).

Dick motioned to approve, Gene seconded and it was unanimously

VOTED:        To approve the following:

McQuillen Place Company, LLC
Reducing Robert L. Thomson's guarantee as mentioned above

Subject to the following conditions:
Cedar Rapids Bank & Trust Special Assets group agreeing to the proposal
The City of Charles City agreeing with the proposal
Reviewing the appraisal that was ordered in November 2017
Cedar Rapids Bank & Trust drawing up an agreement with Charles M. Thomson and Robert L. Thomson documenting the expectations of each party.

**2-21-2018**

Boyd Campbell - Any update on McQuillen? Diane - We are waiting right now to have a meeting set up with the Cedar Rapids Bank, we have contracted an attorney out of Cedar Rapids that is going to spearhead our efforts that we have to do. We are going to have all the parties involved, bank, other bank, Charlie and Bob, as well as Bob's attorney. Dick – We decided it was time to have an attorney represent both banks. Bob feels this is a man who will move it along, looking for a resolution. Gene – Have they settled on a contractor to finish it up, and if so, how much? Dick - Bob has come in with his contractor. There are still some questions. The workout guy from Cedar Rapids Bank, on a scale of 1-100, he is 80-90, and the loan officer on the same sale of 1-100 is a 4, so we improved ourselves a great deal with this workout deal. He does this, moves things along. Psychologically, that Bob is jumping in to get a contractor that he has used in the cities, that means Bob is more committed than just the numbers he has seen, and he wants this done. It is nice to have someone in that family to understand timeliness is more important. We will know more after this meeting. This will be held in Cedar Falls/Waterloo office of the subsidiary bank of Cedar Rapids Bank. Diane - This hasn't been scheduled yet. Adding to Dick's comments, the original proposal that James and Charlie put together, put us at $428K to complete

Page 10

and the contractor that Bob is involved in, looked at everything. All totaled, it wasn't a lot different than what Charlie and James had put together, about $500K. There are still some outstanding items aside from that, accounts payable, interest and taxes. So, for Loan Loss Reserve, we used a total of $900K to complete the project, and that is a guestimate.

Kurt - So the objective will be to get information from them as to how to move forward. Also Bob's guaranty, whether used or not, it comes to us, making sure if capital is put in, it gets spent well. Charlie just seems to be paying attention to everything about this. Boyd - Is there a question about Bob's guaranty? Kurt - His guaranty is to us, not a cash infusion to the project, so technically, we can ask him for the $900k, he has to pay us. That puts us in the position, do we put it in the completion of the project or come up with Bob to put some money into this? That is what Bob had proposed, put $500K in, reducing the guaranty. We also want to see the $500K get spent well. Hopefully, we can get this thing moving forward. Dick - Didn't Bob's guy have a later completion date? Diane - Yes. Dick - There is very little to be done on the apartments. There are 2-3 apartments that didn't quite get drywall done, some repair, flooring in the hallway. There is still a thing on the first floor with the City on steel structure with the drywall and fire. That is why they changed the goalpost on it and the City said no, you didn't understand the city code. I don't know that he and Charlie are on the same page. Kurt - James is the one that managed us to this point and spent all the money, rather than getting a good contractor. Dick - It doesn't look like it when you drive, by, but we have made good progress. Gene - $500K, is that to complete the entire project? Dick - Not the 1st floor. Original cash flow covered the debt. as you get cash flow on the second floor, you have cash flow to cover finishing the first floor. Kurt - If we can get Bob to commit money directly, he has some ownership and we need to keep him engaged. Boyd - When do you talk to Bob about this to get him moving forward? Dick - He had a CPA. You have $900K from Bob who has the moral to take care of it. Get the $500K, get a decent contractor and go. Cedar Rapids did not want to do that. Diane - When I talked to Dave from CR, when we have this meeting yet to be determined, that is going to be negotiation day, and it may very well be that we end up back at that, but he doesn't want to throw that out now and not have anywhere to go, that is why he is playing hardball. Kurt - Let's not give that up. Dick - I like what this guy is doing, he was calling Charlie every day, sent him a past due notice, what do you have to offer. Next day, he was calling again. He tells us his lawyer is the same sort of guy. Nothing we can talk about on the street. It is frustrating to hear conversations at Aromas. People are just looking for answers. Charlie needs to get it done.

Bob N - So, this meeting will be when? Diane - Probably in the next 2 weeks. Bob - Diane and Dave are moving it along faster than we were. Diane - They have offered to get out. The big thing that I don't want them out, is we had a $500K government deal that went away and I sat here and listened to this man from CR, you contact so and so and he can get it done. We put CR bank into this because of their ability to handle those. I hope we never have to go there, but I feel the CR bank has a lot of stink on their fingers for $500K. Our State Senator got the economic development lawyers and they explained it was allocated but never funded. We were never told.

**3-8-2018**

McQuillen Place Updates – J. R. Herbrechtsmeyer -Credit Committee has been meeting on this, as well as loan committee. Michael had good input on this and then Mike had an idea of a possibility, so I thought this is one that we will be talking about at the Board of Director meeting, and want as many people to think this through. Kurt- Technically, we are still in negotiation, Diane met with Bob's attorney, his accountant, and where we are, basically Bob has taken a step back on the $600K, he said

Exhibit A
Page 11

$900K is his limit of exposure, which is really basically where we already are. We have Bob as a guarantor for $900K on construction, where we still are in that phase, with a verbal agreement to be a $500K guarantor on the permanent financing, giving us something to go back on while getting it leased out. So, first is to get it completed and second is operating. They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, they need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. What we talked about in Credit Committee, how would we approach that foreclosure and what are we willing to do. Mark Miller joined the meeting via teleconference. Their offer as of last Tuesday did not offer anything more than what we already have. Offer is not any better than if we took control and had someone manage and lease. Credit Committee - Take control or they come with a better offer, with the full realization we could end up with the property and some fallout, liquidating assets that we need to be aware of. Best thing for Charles City is to get control and put someone else in charge of it and it will take some of our capital but we will have Bob's $900K. We could find someone else to complete and manage and potentially get it sold.

Dick – A couple of things that were discussed. We now have a joint lawyer, one legal entity. so far, Charlie has shown up representing himself, other than when Judy O'Donahue was involved when the $500K went away. Cedar Rapids bank has offered to take us out and you guys run it. I think they have enough egg on their face, they were paid fees up front to manage this. I sat in this room and listened to their lender say to Charles that the $500K tax credit is past due, but those are extended all the time. That $500k that never happened would have gone a long way toward us not being shut down for 50 days. Secondly, we asked the lawyer to look at the Federal and State money and what has been put into this thing and see what the obligation is, if we were to foreclose or if Charlie were to sell it to another entity. Do those requirements all stay in place or is there any draw back. Gene - How long do you think this will take? Dick - I think we have part of the answer. Diane - The grant money, there is mortgage and second position, if we foreclosed, it would be the same as foreclosing on another entity. Diane - The IDED that the funds came from, but the NIACOG is administering the grant and that's why it's from Cerro Gordo County. Dick - That was my guess, but it is strange that the real estate in Floyd county will have a mortgage from Cerro Gordo. The question is still foggy, he has said over and over, he was required to have 1 more than half of those apartments and he was talking about subsidizing. Kurt - That is a second mortgage, but our understanding is, unless they want to buy us out, we have no obligation. Dick - that is why I wanted to be sure we had all those facts before we start. Kurt –City side - Dick - I hadn't gotten it through my head, Ralph is concerned the City is going to walk away from that, I don't think our City Manager is a bluffer, he wants it done, as they convinced the city to a TIF loan, and it must be completed, and if not, those that are in there, will need to move out. Kurt – The most is completing the windows. Windows on the first floor and completing the sidewalk. we are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff, we have to be willing to take it on. No, Mark, it will not be your project. We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. Dick - One other part on the loans, I had written off that Citizens will have anything to do with it. The Citizens bank loan has the other half of the TIF, so if some entity owned by CVB, Ltd. owns this thing, there still could be TIF grant up front paid back over years and a loan to the City through First

Citizens and whoever owns it pays for it. In our credit meeting we discussed, if Citizens doesn't want to do it, there may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two Til things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio.

Gene -I haven't had a chance to study all of this, I absolutely agree if the bank finishes the project, I agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. Dick - I can assure you one thing, Directors will pay to have McQuillen removed. It would be nice and I don't know how we get it, the list of people that want to rent, whether there is anyone or not. Gene -I can address this. Coincidentally, I had another conversation with a director yesterday that confirms there is a list of people waiting to rent those apartments. Dick - Will it be a list we can get our hands on? Gene - It is through Larry. Kurt - Obviously, we may realize we will hold this for a long time, we need to get it leased up. Quality of the construction in those apartments concerns me, cabinets, flooring, don't want to say we are going to take it and put $1M into it and sell for a profit. Dick - There is no question, I would never live in this based on what we were saying. Floors were plywood with a little paint on it. Kurt - That is the environmental aspect they were required to meet. Not sure where this came in, maybe goes away with NIACOG. The other prospect that pushed me across, other alternative was we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this? From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. Mark - Have you had any conversations with Dean about this? Mark - I have not. Either he or Connie will work with us on it if they owned it. Dick - Is there a way if they would both work with us. PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both.

Michael came up with a discussion about an entity that might own this. Michael - During the financial crisis, we got a lot of land and properties back. In those cases, certain institutions that did not want to absorb, created an LLC, basically sold real estate to the holding company. In that instance, those asset qualities, OREO if long term, doesn't impact the bank's asset quality and no performance assets. The only time you would see it would be at the audit at the holding company level. You will need to talk with FDIC and the State to get the blessing to do that. I don't see why they wouldn't. What might have to happen, you might have to divvy up capital to get it finished. If the building was owned by the holding company, it would be divvied up by the holding company. Budget around long term issues. Regulators don't like banks holding OREO long term, as we are not real estate development companies. The other things, you mentioned the pharmacy, one big thing from what I have heard, they wanted a drive up that would be a change in plans and is additional capital if we want that anchor tenant. Charlie doesn't have that. When you start to build out the tenants, there is reduced rent, cash flow out of capitals or concessions on rent, all of which I don't know Charlie can absorb with his current situation. Last thing, I don't want to own this, but at the same time, even if we let Charlie get this thing finished, I don't think apartments are going to cash flow, so we will still have a non performing asset, which will impact our books for eons, as this will not support any long term financing. We can work through this, but I struggle with giving Charlie the satisfaction of completing this as he has bungled it so and he is trying to get rid of the $500K. Michael - If we allow the $900K to go in, we are giving up our collateral. Kurt - And, we are giving up control. Michael - The appeal of some 50% reduction in whatever Bob was going

to put in. Dick - Steve Durrs said, make me feel better, the redo of the parking is still on the table, if that building gets completed, to add 88 spaces, with a timeframe of next summer. Kurt - But we have to have the building done by November, so they can put that in there. Dick - Steve Durrs is definitely on our team to get this done. He is not taking sides of one bank over another, simply City Administrator to compete and look good on main street. I am very encouraged after meeting with him. I keep hearing from Kurt, that Delaine was not okay with this going in. Kurt - Delaine's concern was Charlie, no oath, no back up. Michael - The other thing Steve mentioned was the TIF, the agreement has to be rewritten, it doesn't matter if it's to McQuillen LLC or to the bank, it needs to be rewritten anyway, if ownership has changed, the new owner would be written into this. Dick - There is no way we are going to lower our assessed value on it. The other thing I raised briefly is the $500K that went away, at some point, we are going to have to have our own lawyer, because when we start taking some charge offs, we feel we have reason to go after Cedar Rapids bank, they bungled. The notice to the State was sent out a long time ago and going back to the minutes when Cedar Rapids banker said to Charlie, you see so and so, that guy can get that extended, the state had gone away with that program by then and grabbed what little money they could for other projects. Cedar Rapids bank didn't have a clue. Boyd - How feasible is that is what they are saying on the $500K, going after the Cedar Rapids bank? Dick - One, being a good politician, our State Senator has tried to do what he could, got the Economic Development lawyers to sit down with us and explain why we weren't going to get it. No question that Waylon Brown made that happen. But Cedar Rapids bank has offered twice in the last 2-3 weeks, just take us out and you guys run it. They would be happy to write off the same percentage we do, as they are only in it 10%. Kurt - There will be an opportunity for them to take their haircut and walk away. Dick - I would like them to take the haircut and put the big fees back in. They should be as embarrassed as we are that this is not done. Gene - We almost have to be complicit as possible. Dick - We at least raise the issue and try to get them to come up with something other than just losing their percentage. Gene - Is Bob's reputation separate from Charles? I think if push came to shove, how much is that McQuillen place going to mean to Bob? Kurt - That is what we are trying to find out. Dick - At one point, they offered us $500K with $250K coming off the guaranty, that would commit Bob a whole lot more. The number got bigger. He is going to have to make that decision. Gene - Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

Dick - We have to pay the taxes. I don't think we have to get our interest paid. Cedar Rapids Bank wants this, but they may have to write this off, a lot less than what we would have to write off. Cedar Rapids Bank is not offering to make any concessions. I believe this man wants to get away from this as fast as possible and probably has some perimeters to work with. Gene, how long will it take to force the Thomson's to a decision and moving on? Kurt - We want to show them we are moving forward. In the meantime, the way we have proceeded in the last few years, once we say we are doing it, we do it. Dick - With Boyd on this call, we have 4 out of 9 directors present. When we say to Cedar Rapids bank, the Directors Loan Committee has to approve this. It is all about Bob and are you really walking away from this and it not being called McQuillen Place? Kurt - We will liquidate all. Michael - On that point, that is the forced and bitter foreclosure process. I am throwing out there, in the best interest of that building on the corner of main, we may have to give some concessions to Charlie. He doesn't have any equity, we get all OREOS back, I know that the emotion and the involvement is there, but we have to make good decisions in trying to get possession of the building as soon as we can, whether voluntary or foreclosure, that should be on the table, otherwise, we will stare at this, pay legal fees, discuss at every board meeting and in 15 months when we finally get possession, just thinking long term. Dick and Kurt - Bob does not want this to happen. Dick - Another thing Michael brings to mind, Tommy gave a list of every loan we have with Charlie and what the collateral is, we know what Connie has them listed for, probably 80% more profit. I am told he actually has had an offer on his house, more than assessed, but

turned down. Kurt - Amelia Management is the 3 remaining living kids, but that brings Peter into this, you will get the family rallied pretty quickly, and they are all affected by this. Charlie can't fight through this on his own, with Bob involved and everyone, it will be to table pretty quickly. Dick - The first foreclosure will be the form over by the river, that is a farm that was Jan's and then the 4 kids, foreclose, then partition out. Kurt – They won't want that to happen, undivided 1/4, probably has no debt on it. Then have cousins that are forced to buy out 1/4 of a half. Mark M- Our mortgage on that is either $125k or $150k, what was negotiated as part of it. Our LTV on all those properties, we should be in a pretty strong first mortgage position, but every one of those were financed with seller financing, the equity beyond second is minimal that would be available for a 3rd mortgage that applies to the McQuillen loan. The other thing we have talked about all along, first thing Bob would have to do, is have him write his $900K check. But we speculate the attorney, with a limited guaranty, they are not going to write a $900K check on the front end, but wait to liquidate all, then determine if we are truly $900K. That is why we want to negotiate that up front in a voluntary settlement agreement. I don't think there is much equity in the Amelia properties, as most of those were purchased less than 5 years ago, so not a lot of equity.

Diane - I tossed that question to the attorney in Cedar Rapids, about waiting until all properties were foreclosed on, before we would ask for the $900K, but the attorney said they can't dictate to us how we get the collateral, we can ask for it up front and we can get it up front. Dick - Bob has offered to write the check. Mark - He has offered. Is he still going to offer, once we start the foreclosure, it may change. If he doesn't, we may be a long way from getting a check. Dick - I would rather see the $600K and still have some guaranty on the cash flow. Mark - If Bob is using his contractors that he is using for Pancheros, I believe bob is committed to getting the building finished. Bob has the money. Charlie is not capable. If he puts $900K or $600K and we maintain some of that guaranty, I think we get all that back, then construction loan comes due, if they could get finished using Bob's better scenario for us. Kurt-I don't disagree with you, but I don't want to give up that guaranty. Mark – All we can commit to at this point in time, is the construction loans, when matured and the building is completed. If that is finished, Bob may say at that point in time, the cash flow is there. He won't say that today. Ultimately, this is Bob's legacy. He has a lot of respect for the bank. Dick - You make one comment, Bob's contractor at this point has not given us any concrete numbers. We or Cedar Rapids bank has never seen anything form Bob's contractor. Diane - Charlie had sent a document that shows where they said, you are short on this, need "X" amount of dollars or more, not totaled. Mark - This is something that I had mentioned to you already, we don't know Bob will step forward, we can speculate he will. The way I look at it is, he is kind of stepping/walking away right now regarding the $900K, he has already played his card. Dick - Is that why there has been nothing from Cedar Rapids Bank with Bob's contractor? Diane - They are considering Bob's contractor.

Gene - Hold their feet to the fire. Kurt - Michael is right, we have to sit down to the table and work something out. Dick - This is where Mr. Breitbach will have to give us some guidance. Kurt - I think we do want to force the issue and get to a resolution. Diane - Keep in mind, just getting through the construction is only part of this, then how is it going to turn out? Mark - Getting it completed, increases value and sale ability, maybe not at the levels we want to, but at a level to find a buyer. It is not saleable, as it is not finished. Even if you lost the guaranty completely, if it gets finished and we start getting apartments rented, it increases the value by the amount and maybe more, only reason we are considering this, it gets money up front and he has a contractor that can actually do the work. Kurt - I am only with you as long as there is a guaranty from Bob to the end and not having Charlie in control of this. Michael - One thing to consider, Steve did say that the TIF loans do not go anywhere, until the building is done. He is talking about sidewalks, the doors, when you start adding that up along with real

estate requirements, I don't know if the $900k is enough. If we go the path using Bob and his contractor, he is going to have to put more than that into it. Diane - One thing Steve said, it can't just be a painted piece of plywood, it has to be windows. Kurt - They were not in that scope. Certificate of completion, not occupancy. Bob needs to be on the hook for all of that, that needs to be in the agreement, if we are going that route, it has to be completed. Gene - There has to be a deadline on it. Diane - if Charlie is being in charge of it, who gives how it won't happen. Dick - With Charlie involved, he still has his Chicago partner. He was so condescending to the City and to us. His enforcement has failed at the last 4 he has been involved in, he doesn't know. I don't think the guy in Chicago cares whether or not it gets completed. Bob needs to know Charlie's partner is a detriment. Diane - Steve would be the general contractor and be here 2 times a week, but he has a foreman who would be here every day. Michael - Is it still local contractors? Mike - From what I understood, I think it is still the people building it, but we just have someone overseeing it now. They are not just bringing in a construction crew to complete it. We now have someone overseeing it that knows, but you still have the same 4 guys constructing. Dick - Once Alex left and the clown running the thing, the drywall was incorrectly installed, that is where the big problem is. The architect says it's not a problem. Three more feet of 3 layers of drywall for fire protection to get the initial certificate. He implied when that foreman was there, it appeared they were doing everything right, but when they hired someone off the streets, that is when it went awry. Ron - If you don't go the foreclosure route to maintain control, will you have leverage enough to control it going forward? Dick - I suppose we could have a written agreement with the contractor and when they get behind, we could start the foreclosure process.

Michael - We have reserved $850K, that was for year-end audit current reserve on it. Dick - I put out, we are making a $1M profit this month that will go into AAA, I think that gets offset by McQuillen place. At the very least, $1M charge off before we are done with this project. Michael - It will lose value if the banks name gets placed on it. Kurt - That is why I think you lease the place up and market. Dick - I like the idea of an entity other than FSBT. Next step is to get back to the attorney representing the two banks. We will have to talk to the Board about it next week. Michael - What is the decision? They want to know if we want to move forward with foreclosure? Kurt - Offer is not good enough, moving forward with the foreclosure. I think we will hear back pretty quickly. Dick – The person from Cedar Rapids will have the paperwork ready and file. I am not sure 48 hours is enough for Bob T. Kurt-Communicate quickly. If they come back with something and we are considering it, we are going to have to deal with Cedar Rapids bank. Diane - I think they will say if you aren't foreclosing, we are out. Dick - Do we need to get legal counsel representing just us, to say if you are out, we will take you out on these, pay back fees. Mark - Is it in the file of what their fees are? It should be. Kurt - We need to find out what they have gotten. Dick - If the mortgage is in their name, they can thumb their nose and foreclose. Diane - I suppose they could. Up to this point, they have let us be the decision maker on where we go. Dick – I think it would be safe if they are going to do that, and ask if they have looked at their liability on the other things. Mark – I did mention that to David once, I am sure he has forgotten about that. Diane – What I had conveyed to Dave was Board Loan Committee meets today and at this meeting, is where the decision would be made. I was wrong and it needs to go to the Board of Directors.

Kurt - I am not convinced this committee needs to approve. Diane - It is either we are foreclosing or we are not. Kurt - I don't think there is anything in our policy that says this entity has to approve. Dick - I think if you tell them we are either foreclosing or let us know, Dave will give them 30 minutes and foreclose. I think we need to give them a reasonable time. Mark - I think a week is ample time. Diane - I counter that and say give them until Monday. Mark - The problem you have with that is, you don't have one person in and they are working with a new attorney. Michael - They got back within 24 hours

with the previous. Diane - I don't think we should wait. Dick - How about Wednesday? Kurt - Bob is in a position to make this whole thing easy. We need him to decide whether he is willing to do this or not. Diane - That is why it shouldn't take a week to make a decision. I just think that is too long. Kurt – A couple days, communicate this. Diane - Give them until Monday. They have the weekend to figure it out. Gene - If I was going to lose over $1M, I would be making a decision real fast. Diane - They have had time to figure this out. Michael - If Diane is right, and Bob says, you have heard my offer and it could be today. Gene - If he doesn't, I would file foreclosure papers this afternoon. Kurt - Give due notice. Diane - I will tell Dave we are in agreement to go ahead with foreclosure, give until Monday to counter. Kurt- Do we want to say that? Diane – What I am saying, I tell Dave that, so he doesn't file the papers today, giving Bob the time. Kurt - All we tell Dave is that we understand there is a guarantor that can make this easy, give him the opportunity and then move forward. Michael - Dave can communicate we are going to file the papers on such and such and they then know the deadline.

## 6-21-2018

McQuillen – Mark M. - Negotiations with Cedar Rapids Bank and Trust - We are dealing with relationships and trying to resolve and get on the same page. Mediator with Thompson's and the attorney, we are trying to reschedule, as the Thomson's didn't want to meet without the mediator.

Discussions between the banks and Charlie have been evasive. First Security is more interested in resolving this than Cedar Rapids bank who has less incentive to push. We will threaten to sue Cedar Rapids Bank for damages for slow movement and lender liability. First Security Bank has a separate attorney. We have sent options and if they don't choose either, we will start the lawsuit. We think it is better to have one bank involved and making the decisions. Taxes are paid by First Security instead of Cedar Rapids bank who is the lead bank. Cedar Rapids Bank and Trust hasn't started foreclosure on any other properties. Cedar Rapids Bank and Trust never had the actual Enterprise Tax document to show approval with 2 options. 1) Cedar Rapids Bank and Trust has 10% of the loan and they offered to walk away from 5% of this. First Security Bank presented that Cedar Rapids Bank and Trust pay the bank $1 million and walk away, we don't file a suit. 2) Cedar Rapids Bank and Trust pay 80% of First Security Bank loan amount and real estate taxes and First Security no lawsuit. We want to get moving toward a resolution.

FSBT Board Meeting – McQuillen Excerpts.

## 4-16-2018
Progress on McQuillen place was discussed.

## 5-21-2018
J.R. Herbrechtsmeyer discussed information regarding McQuillen. Robust discussion was held.

## 8-20-2018
**Credit**
McQuillen Update – Kurt - We have reached an agreement with CRB&T and they are no longer in the equation. We obtained assignment documents and a $50,000 check. Dick - We have also obtained insurance on the building and Larry is pursuing foreclosure. Discussion held.

## 9-10-2018
Diane gave an update on McQuillen. Robust discussion was held.

## 10-15-2018
Diane gave an update on McQuillen. Robust discussion was held.

Credit Committee Excerpts – McQuillen

## 4-21-2016
Purchased Loans Report – McQuillen, Mike F – Are we following up on what we need? Mark M – We are getting reports, but I haven't gotten one recently. Not much was done over the winter, but they are working on it now.

## 5-26-2016
Pipeline Report – McQuillen Place – unused and looks like it is going to sit there for a while. Dick – A more optimistic view – the City is saying they could have 12 apartments they could have ready in August, as the plumbing was roughed in. They have 12 on the south side, 2nd and 3rd floors. Mills Helmers has 20 some furnaces they are storing, the sheet rockers was ready to start on those 12. Mark – They are working inside. Dick – The City is not going to give them any ability to rent, they have to have at least the sheetrock on the walls. At the rate they were going, they could have roughed in all the fire suppression. It is conceivable those could have been ready on time. They talked about one lease and building safe at the end of the street that could put a damper on this and is spending some money there. A Bluhm truck was there this morning. We should tell Charlie Thomson we want another walk through to see the finishing on the inside. Mark – The LOC matured June 30, and we have a request going to Officer Loan Committee to extend this to December 1. They have to have certain things done prior to year-end to qualify for some of the grants for this. Robust discussion was held. Michael H – We should add our work outs to this report and add one more column for this. We have another $8 million to $16 million in loans that are still on the book. There are real dollars that are not on this report that are going to roll off.

## 10-19-2017
Diane – Dick had wanted to talk about McQuillen. Kurt – His concern is there might be some urgency with regard to maybe setting the expectation about Bob's involvement, his is a guaranty on the loan which comes in to play when trying to collect. Obviously, it could be an infusion of capital too. Michael – My feeling is, based on what I know, we are on the hook until it is done, because the other participants don't step in until it is complete. My argument is, our goal is to get this done as fast as we can to reduce exposure. Kurt – Dick bought up things that need to be completed. I don't know where the City and Charlie are on that, to get certificate of occupancy. Dick's concern, is pouring concrete when the weather changes, but certainly something we want to be thinking about, is getting those things done and the certificate. The other thing going on, is Department of Economic Development at $700K. Charlie sent an email and asked to make contact there. Mark M – Dick said he talked to Waylon, who knows what their stance is on this, there is what we can do and what we can't do. Mark – Even if you had the money, who is going to do the work? Kurt – What are the options, what should we be thinking of as priorities, can we inch something forward? Mark M – Personally, what I think we need to do, we have the stuff from Dean Snyder construction, there is never going to be funding to support that, $2.5M plus and Charlie and James number was over $400K. Second request at Board Loan Committee was supposed to be covered by tax credits. What we need to see, is: 1-You need to get accounts payable of all bills out there. We have one customer, Kamm Excavating that they still owe $7,000. 2-Then an itemized list of what it takes to get to the finish line and provide a timeline of when that finish is. 3-We will come over and do a checklist to follow up and see that you are following through. With this

timeline, you will need to meet weekly. 4-Then we will figure out permanent financing at that time. We need to get it finished. The certificate of occupancy, we could depart this, but you still need to get stuff done and who is going to live in there if it is not done, they all need to be finished. Kurt – Or enough to get people to move in. Michael – Where is Cedar Rapids Bank and Trust on this? Mark M – Gary Becker, his rationalization, that I heard more than once and did not agree with, their approach was to keeping the cost low to get the project done. The interest cost was not hurting him. Now I would say, it and he has clearly moved on that point. Michael – Do we have any recourse on them in terms as to how they handled this? We brought them in as experts in construction and development. Mark M – Weren't they overseeing the grants and the project, didn't they get the documentation that all of that was in place? I thought they had this, but all it turns out, they didn't have it, we didn't have it, so there was a question about let's look at the participation agreement. We have 3-4 extension agreements and changes each time. I don't think there is going to be anything in the participation agreement but will come back to original plan. We are a participant and not the lead bank, we assume you have that and where is it. Charlie communicated that to me first. Mike F – Has there been any question that Cedar Rapids bank is lead bank? So lien waivers, making sure no money went out? Mark M – How this enterprise tax credit got missed in this question, I don't have the answer to that. I am not sure if we have any leverage there. In the short term, we are at mid-October, there are certain things that can only be done at a certain temperate level and soon to have those behind us. Bob is the guarantor, but that doesn't mean he should have to write a check, but he has the ability to do that. Come up with some money, get the project finished, can then reimburse once you get tax credit. Mike F – What is total debt? Mark - $3.8K and we are in the $3.3M range. Michael – Dean Snyder's was $2.5M to complete. Mark – I think there could have been some coaching in that number. Show us your number and how you got to it to finish the project. Supposedly Cedar Rapids Bank had something to support. Mike F – What kind of documentation have they sent. Diane – Sporadic. Mark M – In discussion, a document was noted, but we had never received or have seen the document. The funding, available source, what had been spent, matching up to completion of the project, we haven't seen this. Mike F – Have we extended? Mark M – They have $100K left of IED grant. Mike F - Does anybody outside of our bank know we are concerned? Does anybody know we think we might suffer a loss on this? Mike F - We are in a position to suffer a loss? Michael – As it is now, if you want to have it completed, it would be discounted to finish it. Kurt – To me, getting that $900K infused, it either has to go to the loan or be put on loan. Michel – I would have them pay down and re-borrow. Mark M – If you brought somebody else in that does these kinds of projects, what would it cost? That is your back up plan if you had to hire someone to finish it? We asked and he went out and got an estimate. Mike F – We are in a position, if the lead bank hasn't shown signs of normal lending due diligence, it is just because they have a small piece of it, doesn't get them out. I think I would probably find somebody in Des Moines and send them the shop list. Kurt – We could certainly have someone looking at that. Mark – We need to set up a meeting again with Charlie and Cedar Rapids Bank in the room. They have breached the contract. Mark – Let's get the building finished and then discuss this. Diane – What if we explore the participation agreement and whether or not they have been negligent. Mike F – How many visits have they made up here? Have they constantly monitored the construction of the building? Mark M – What they wanted to do, they had this Ron Fiscus, a financial guru, and they wanted to use him as an inspector, but he was someone that Charlie had hired to be part of this, and they deemed him unacceptable. They got somebody else. Michael – I would ask them for a complete imaged file. It is ours as much as theirs. That should include everything. Mike F – Did they earn loan fees? Mark M – They collected significant loan fees on the front end. Mike

F – What have they done? Michael – We hired you as an expert. If you can't do it... Mark M – Until this thing is done, you are in. Diane – The other thing to talk about is, right now, it is a 5, it should be a 6. The other thing, how do you allocate for it, collateral analysis is not going to do anything. Michael – If you are in construction and land development, you are advancing on a completed basis. I don't know the answer to that, but what I don't know is, where did the funds come from? Let's say it's not $2.7M or $400K, probably somewhere in between. Mark M – That is what we need to get from them, Michael – if you can get the completion and get First Citizens and the City to take their part. Mike F – What is the time table, how long can this go on? Mark M – We have had representation from Citizens there, when we toured and they have been part of the meetings, they could have easily said at any point in time, we are just out. Michael – I think they understand there is some reputation on the line. Kurt – I think there it, that is why we want to get to completion. There is a lot of reputation risk. Mark M – That is why we need to get to completion. Kurt- We don't know how to reconcile Charlie and Dean's number. They had a basis for asking, my gut tells me it is closer to their number. Mark M – We have to get James and Charlie. Diane – They have been asked twice to do that. Mark M – Cedar Rapids indicated they had that information, I don't believe I have ever seen that. Mike F – The City signs off on inspections? Do they sign off? Michael – When I did mine, they did. Mike F – Snyder may be concerned, is everything up to code. How would they know inheriting a project like this that they can trust everything that has been done? Michael – My experience with the City, is, they put the gloves on and do everything. Kurt – They were asking for over $400K. Here is a question for you, if you could get Bob's $900K, would you have the $400K in to get this done. Permanent Financing is $1.5M. Mark – Bob's was supposed to be knocked down. Kurt – I want Bob's. Mike – If we go the whole course, Citizen's is just short of a million and the City's is short of a million. Michael – The cash flow is at what occupancy? Mark – If you had all the apartments rented, you would not need any retail. Michael – I would be surprised if it got 50% leased up on the apartments. Mark M – What we have heard all along is, that you have some of the employers in town that would like to have 1 or 2 of the apartments, Cambrex, Zoetis, Mitas. Kurt – I would think they would do this. But you would still have to get your 50% low to moderate. The sooner we get to that point, the better. Diane – The obstacle I see is, who are we going to get to finish it. Kurt – We need to work with them. Diane – Couldn't we pursue this? Michael – You need the whole file. Mark M – Part of what we are requesting is, we want itemized accounts payable still outstanding, a list of improvements to get to the finish line. We could easily say, give us what you have to this point and we would like to see the whole file as to expenditures, lien waivers, inspections, etc., because we should have that in our file. Mike F – Any reports of any unpaid labor or bills? Mark M – We have one – Kamm Excavating of $7K accounts receivable that hasn't been paid. Mike F – That is the biggest concern. Kurt – I remember when we were all sitting in this room, Dick asked it twice and he said no. Mark M – I want to see an itemized list of accounts payable and what are you going to pay to get to the finish line. If they don't have it on there, there may be others out there that concern me. It would be nice to get the list to see if it isn't on there and that would concern me. Michael – I think there is a couple things we could do internally, whether one of you or Tommy, look at our different options, how much did we put into it, look back at the initial plans to cash flow, are we going to have more in it, if it gets to us or Cedar Rapids, are we going to add more money to get it finished. Do you end up with a property you can't lease? I also don't want to wait 6 months and have not thought about those options. Kurt – Quite frankly, if you can convince them that Bob's $900K goes in next, get it complete, that at least gets us closer to the end in sight. I ranted at Charlie when they were in here a few weeks ago, as I wanted Bob to hear this. If I was Charlie, that is where I would want to be. Mike F – I have a feeling that there is

a Credit Committee that has been held recently that is very concerned? Michael – Tell the lead bank to put the dollars in to finish this. It was their obligation to see this through and they agreed to that dollar amount. Kurt – We have to figure out what is the best course to get it completed. Mike F – Holding the lead bank accountable is not a bad option. Getting them to the table to participate in what it takes to conclude this. Mark M – We would get their attention if we ask for a complete copy of their file. Michael – One second, before we push forward talking about getting more infusion of capital, at what point are we stepping on the lead banks toes and opening up to a liability. I want to make sure we are not having any meetings without them. Mark M – We are not. From a course of action perspective, what we need to do is go through Cedar Rapids Bank and Trust first and have them contact Charles and James and tell them we are available. I think we need to let them be the lead bank, these are the things we should be getting. Michael – Since we are at the end of the financing, my stance is until we have a plan, we are not taking any more exposure on. Kurt – We certainly want Cedar Rapids Bank and Trust on our side pushing. If they are sitting in the room and we think the $900K is what is necessary and CR sits quietly, that is not as good if we are all on the same page. Charlie is also pretty smart and if he starts doing the math, he may say, here are the keys. Mike F – Their story was, here are the keys buy us out. I can't trust someone who does that. Michael – They went out. I want to see the whole file. Someone has mismanaged it. I don't know why they ever took it on. Mike F – They are a very high growth bank, saw the fee income, someone can do this. Michael – It seemed like a good deal with all the state funding.

## 10-20-2017

Diane – I think we just wanted to touch base on McQuillen before next week. Different conversations have been going on about what the plan is for Monday. Mark – I understand the CR Bank & Trust banker is going to be here. Dick – Should we be having a conversation without the borrower with them, so that we are all a united front of what we are expecting from Charlie and James. Mark M – We should be letting CR Bank & Trust to lead the meeting. We told them what we wanted to see on the agenda. They tweaked it and are adding a few things. They have our items on there, they need to lead the meeting. Dick – is the city involved? Mark – They are not coming to this one. Dick – We need to be honest with the city as to what we are, as they have the potential of leaving a million dollars on this project. Mark – If the city stays in and if Citizens would stay in, we take our $3M down to $1.5M, but a lot less dollars we are looking at. Honestly, if we get to that point, if it is finished, we have the opportunity to negotiate terms with the guarantors. Bob is going to be guaranteeing $900K. I have already planted the seed in Charlie's mind, that when the construction is done, the terms on the permanent financing will probably be up for debate. Dick – We are not going to have much leverage at that date. They have none of their own money other than Bob's $900K. Mark – We have perfected it. It will cost us a ton of money to get anything out of that, it is better than not having it. Mike F – Are they not doing any work at all? Dick – There are as many as 4 people showing up there on the job, it is pretty limited. Diane – One of the things they are supposed to be bringing to the meeting is their timeline. What if they don't bring us anything? Dick – That is where we have to be set with the CR bank. We need to move next door and talk with Gary. We need to go in and talk about foreclosure. We already have the city ahead of us on taxes. Michael – I don't know if I would put Bobs CD on the table, I would rather have CR Bank take it and finish it out. If they boggled it up along the way and didn't get it completed under the costs that were initially disclosed, I would hold that back in our cap until we have to. Dick – The $900K is actually a guarantee on their loan.

## 11-14-2017

Diane – McQuillen – We had a meeting which I will send to Kurt and Dick. We are meeting tomorrow with Charlie and Gary Becker is coming. Mark M – I met with Bob, not relating to this, I had an extension for him to sign on his son Steve's note. Bob Thomson brought up that he is fully behind getting that building built, we are talking $400K at this time, and if takes more than that, he will provide the funds. We need to get that building finished. A week ago, he said that he was working with his accountant to figure out what the transaction between him and McQuillen would be. Tomorrow there is a meeting here with the Iowa Department of economic development, where Charlie is hoping to bend their ear and get his tax credits back. They need to fund this gap and get the building finished. Diane – Michael, you talked to Greg and Randy and they are suggesting we get a new appraisal. Michael – They said given the size of that and the value of the building as it is now or the value to someone from a collateral standpoint, there is no income generating from it, there is going to have to be some type of valuation set up. It is sub-standard. It is not a Charles City appraiser that is going to do this. In order for them to sign off on the allowance and say it is adequate, you have a building supporting a loan. Dick – Let's ask Gary tomorrow if he is getting a new appraisal on this for their reserve. Their initial recommendation is to put it back to Cedar Rapids, they do more of this, that they would know better how to evaluate a cost to complete and a cost as is. I hope that the reserve in time can reverse itself. Even if we get the building completed, we have a competed building with no income, and it is probably not going to be sufficient to set up an amortize basis, it may be interest only basis, to help get leasing going. All things we are going to have to decide as we move along with this. They said the timing is bad. They came in and have to audit allowance and sign off that our reserves are adequate. What do we have for allocation? Michael - $100K. Diane – What is our allocation for next month? Mark – One of the thing, he would ask Bob to submit his $900K first, take off the top, then the farm and another $150K. I think I would start at those things from the top and then work from there to look at an allocation. Michael – Obviously we are in a position to where we know Bob's financial status, clearly we know Bob is most likely pretty good for the money, so I think you can consider that. So, whether it is the collateral you have, say around $900K, some farm, you have to factor in your cost to get all that and I don't know how much extra value that adds, you can probably consider all that, but again, as you are getting closer to year end, those are things we need to ask them about. Cedar Rapids Bank and Trust provided us with an appraisal, to get one in the time frame, you would almost have to go back to the individual that did the initial appraisal. That same appraiser may be able to come back. Dick – He did it based on plans and now he can walk through it and look at their projections and what it would cost to finish. Mark M – That would be Cedar Rapids Bank and Trust. Michael – Start the conversation and see where it goes. Dick – I would assume that we don't have to point out to Gary this if he were to get that $900K check, we are at least going to prorate that. Mark – At this point in time, I think it makes more sense for Bob, and I think he is on board with this, to put money in to get the project finished. Michael – Bear in mind, that doesn't mean we are out of the woods, we still have a non-performing asset on the building at that point. The city did a new list of what they have to have.

## 1-11-2018

Capitalization of interest – No Report. Diane - On McQuillen, we were supposed to see the appraisal yesterday. I sent an email and told them I would be contacting the appraiser.

## 7-10-2018

Robust discussion held regarding McQuillen.

## 8-14-2018

McQuillen Place, LLC

- Mark updated the group on the following:
  - We received the signed agreement and the $50K check from CRBT
  - Still waiting for the original documents from CRBT, of which the assignments need to be recorded.
  - Question was asked if there was proof of insurance. Discussion held on where things stand.
  - Set up weekly phone conferences with Larry Eide to ensure things keep moving.
- Action item: Diane will follow up on getting the proof of insurance.
- Action item: Diane will contact Larry weekly to updates.

Bob Thompson

- Mark updated the group on the following:
  - Mark met with Bob last week. Bob wants to get this done as quickly as possible but wants Mark to speak with his attorney.
  - Bob may need to borrow some of the money in order to pay the $900K guarantee.
    - Discussion held on who the lender should be for this loan.
    - If we are the lender, Mark stated the only way we would do this is if we take Bob's stock in KGB, Unlimited Spirit and probably an assignment of the remaining $500K life insurance policy.
- Action item: Mark will get loan closed with Bob by the end of August to collect on our guarantee.

Accounting issues related to McQuillen note

- Michael spoke with Eide Bailey on how to account for the $50K we received from CRBT. This will be booked to the Discount on Loans Purchased GL account (similar to the Wessels settlement).
- The McQuillen loan balance was grossed up to include the CRBT ending principal balance.
- Action item: Michael will oversee that the entry runs correctly and the McQuillen balance in Precision is updated.

## 9-11-2018

The committee reviewed the following reports:
- Ag Commercial QC report
- Adjustable Rate Pricing Audit
- Flood Determination Exceptions
- ALLL changes
- IA State past due averages
- Past Due vs State averages
  - Next month will do with and without McQuillen included
- Monthly extensions
- Potential non-accruals

- Monthly single pay loans
- Monthly credit rating updates
- Action Item: Past Due report will be completed with and without McQuillen totals.

**11-29-2018**

Discussion Items – Diane - I saw an email sent today from Larry. What Kurt suggested is a group get together, get answers prior to meeting with Larry. A question I have on here, what would we be willing to take as a payoff if offered one? Mike F - Did Ralph ever come up with his buyer in Cedar Falls? He didn't end up talking to him. They are not interested in it if Charlie is involved. Maybe this is a discussion for board and holding company. Mark - I think this is a moot point. Just keep moving forward. Why would we want to wonder what it would take? Kurt- If they did, we want to respond quickly. From a negotiating standpoint, I wouldn't accept it. If they did make us an offer for $2.5 million, I wouldn't immediately say yes, probably counter at $2.5 keeping Bob's $900 thousand guaranty. Mike F - So many moving parts, real estate taxes are due again in March, insurance is paid quarterly. Is the building heated now? To me, some of the ordinary every day quarterly and semiannual things are going to change our number. Are we going to continue to pay taxes? Mark – We are not paying any more until we get to Sheriff's sale in June. September is not paid and we will probably be faced with March taxes. Kurt - I am trying for more; the costs keep piling up. Mike F - What have we written off so far? Kurt -We have allocated $850 thousand. The month of December, should we consider a write down? Michael - Greg will be here. Mike - Bill will say for the benefit of the shareholders, charge some of this off. At some point in time, our overall book value, we need to get down to reasonable to accept an offer. Michael - That is what I think part of this discussion leads us to, if we are going to take $2.5 million, we need to do document what it is. Robust discussion held. Kurt- To Mark's comment, if they had $2.5 million that they were willing to spend on this, they would have shown some sign of life, they are not showing it. Collect or write us a check. Discussion held. Mike F – Any contact with IADA? Michael - No. Foreclosure discussion held. TIFF discussion held. Mark - There is a limited window for the IADA, end of next year, where they have to have the new buyer in. They want it completed by end of 2019.

Exhibit A
Page 25

**EXHIBIT D**

IN THE IOWA DISTRICT COURT FOR FLOYD COUNTY

| | | |
|---|---|---|
| FIRST SECURITY BANKK AND TRUST COMPANY, | ) ) ) | Case No.: EQCV031170 |
| Substitute Plaintiff, | ) ) | ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF |
| v. | ) ) ) | McQUILLEN PLACE COMPANY, LLC, CHARLES M. THOMSON, AND AMELIA TRUST AND REQUEST |
| McQUILLEN PLACE COMPANY, LLC, CHARLES M. THOMSON, ROBERT L. THOMSON, AMELIA MANAGEMENT, LLC, AMELIA TRUST, and CERRO GORDO COUNTY, IOWA. | ) ) ) ) ) ) ) | FOR TRIAL BY JURY |
| Defendants. | ) ) | |

COMES NOW, the Defendant, McQuillen Place Company, LLC, Charles M. Thomson, an Amelia Trust, by and through their counsel, for their Answer and Counterclaims and Request for Trial By Jury," respectfully states as follows:

**ANSWER**

1.　　Admit upon information and belief and affirmatively state that First Security Bank & Trust Company has taken the position of the Cedar Rapids Bank & Trust and is now the substitute Plaintiff.

2.　　Admit.

3.　　Admit.

4.　　Admit.

5.　　Admit.

6.　　Admit.

7.　　Admit.

8.　　Admit upon information and belief, except to assert that provisions of the documents speak for themselves.

1

9.    Admit upon information and belief, except to assert that provisions of the documents speak for themselves.

10.    Admit upon information and belief, except to assert that provisions of the documents speak for themselves.

11.    Admit upon information and belief, except to assert that provisions of the documents speak for themselves.

12.    Admit upon information and belief, except to assert that provisions of the documents speak for themselves.

13.    Admit, except to assert that provisions of the documents speak for themselves.

14.    Admit upon information and belief, except to assert that provisions of the documents speak for themselves.

15.    Defendant neither asserts nor denies, asserting that the documents speak for themselves.

16.    Denied for lack of information.

17.    Denied for lack of information.

18.    Denied for lack of information.

19.    Denied for lack of information.

20.    Denied for lack of information.

21.    Denied for lack of information, except to assert that the documents referenced speak for themselves.

22.    Denied for lack of information, except to assert that the documents referenced speak for themselves.

23.    Denied for lack of information.

24.    As to the first sentence, Defendants assert it can neither admit nor deny the allegation, since it is purported to be a statement of position of the Plaintiff.  Defendants deny the remainder of the paragraph for lack of information.

25.    Denied for lack of information.

2

WHEREFORE, Defendants respectfully request that the Plaintiff's petition be dismissed with prejudice, that Defendants be awarded his costs and attorneys' fees, and for such other relief as the Court may deem just under the circumstances.

## JURY DEMAND

Defendants demand a trial by jury on all issues so triable in this matter.

## AFFIRMATIVE DEFENSES

1.  Plaintiff has failed to state a claim upon which relief can be granted.

2.  Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, consent, laches, unclean hands, unjust enrichment, unconscionability, want of consideration, and/or estoppel.

3.  Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate and/or minimize damages, if any.

4.  Plaintiff's claims are barred, in whole or in part, by the economic loss rule, as being contrary to public policy, as being in restraint of trade, under the doctrine of duress, by virtue of the use of contract(s) of adhesion, and/or by the Plaintiff's own conduct, and/or by the conduct of its agents, representatives, and consultants, including, but not limited to, failure of good faith and fair dealing and breach.

5.  Defendants hereby give notice that they intends to rely upon any other defenses as may become apparent or available during discovery proceedings in this case and reserves the right to amend their Answer to assert any such defenses.

## COUNTERCLAIMS

### Parties and Background

1.  In July 2012, Amelia Management LLC, an Iowa limited liability company and co-defendant herein ("Amelia Management") purchased several properties in Charles City from Growth Properties, LLC ("Growth Properties").

3

2.      Pursuant to the agreement with Growth Properties, Amelia also acquired an option to purchase several parcels (the "Growth Parcels") located at the southwest intersection of Clark and North Main streets in Charles City.

3.      The Growth Parcels had been vacant since a fire destroyed a previous structure in 1987.

4.      Shortly after the purchase, Charles Thomson, one of the owners of Amelia, and Co-Defendant herein, was contacted by personnel from the local economic development office ("Community Revitalization") to discuss the possibility of applying for an approximately $3 million forgivable loan (the "Forgivable Loan") through the Iowa Economic Development Authority (the "IEDA").

5.      The Forgivable Loan was part of a program of the Federal government to provide communities with damage from the 2008 floods with replacement housing for housing units lost in the floods.

6.      The Growth Parcels, together with several city-owned parcels in the same city block but immediately to the south, formed a noticeable and unappealing gap of vacant, undeveloped, desolate land in the center of Charles City's North Main Street business district.

7.      The fact that the Growth Parcels and the adjacent parcels (collectively, the "McQuillen Site") had been vacant for more than 20 years provided a prospective developer with the opportunity to seek significant tax increment financing ("TIF") support for a development at the McQuillen Site.

8.      The personnel from Community Revitalization suggested that development of the McQuillen site using the Forgivable Loan might both alleviate a shortage of housing in Charles City and eliminate a group of ungainly lots from the business district.

9.      The location of the McQuillen site also qualified as a development for state of Iowa development tax credits under the Enterprise Zone program (the "EZ Program"), which was also administered by the IEDA.

10.     With extensive assistance from personnel from the City of Charles City, Community Revitalization, Ron Fiscus of PlanScape Partners ("Ron Fiscus"), architecture and construction firm

4

Cornice & Rose International ("C&R") and the North Iowa Area Council of Governments, Amelia Management submitted an application (the "Application") for the Forgivable Loan.

11.     The Application proposed a 33-unit, mixed-used development to occupy all of the vacant parcels at the McQuillen site (the McQuillen site, together with the improvements thereon, are hereinafter referred to as "McQuillen Place").

12.     On July 5, 2013, the IEDA announced that the McQuillen Place development had been awarded the Forgivable Loan.

13.     The IEDA Forgivable Loan program (the "IEDA Forgivable Loan Program") contained numerous requirements (the "IEDA Requirements") compliance with which was required for obtaining funds.  One of the IEDA Requirements mandated a development to rely not only on the funds from Forgivable Loan for constructing the building in question, but to utilize a certain amount of additional capital to provide the required number of dwelling units.

14.     With the assistance of Ron Fiscus, McQuillen Place developed a financial framework to complete the development.  This framework included use of the funds from the Forgivable Loan, the EZ Program, TIF benefits, certain in-kind contributions from the McQuillen Place equity owners, and funds to be borrowed from private Bankks in exchange for McQuillen Place granting a lender a first mortgage on McQuillen Place (the "Mortgage Loan").

15.     During 2013 and 2014, representatives of McQuillen Place contacted numerous financial institutions and investors in an effort to place the Mortgage Loan.

16.     By virtue of the IEDA commitment of approximately $3 million through a forgivable loan, plus more than $1.5 million in TIF incentives, the McQuillen Place development had a significant equity cushion that, in most locations, would have made locating a mortgage lender relatively straightforward.

17.     In many places, a mortgage loan having the equity cushion provided by the Forgivable Loan and the TIF benefits granted to McQuillen Place would have been readily made, and often without a private lender demanding collateral beyond the development itself and the "equity cushion."

5

18.     However, due to (a) uncertainty associated with its location in the rural Midwest, and (b) its location within the area traditionally serviced, for lending purposes, by First Security Bank & Trust Company ("First Security Bank"), all prospective lenders save First Security Bank declined to provide financing for the development.

19.     First Security Bank eventually agreed to consider providing financing under the Mortgage Loan, but only after agreeing with Cedar Rapids Bank & Trust Co. ("CRB&T") to have CRB&T act as "lead Bank" on the loan.

20.     According to personnel from CRB&T, CRB&T had acted as lender on numerous projects in the Cedar Rapids area which had, like McQuillen Place, depended on complex IEDA assistance, much of it in the form of forgivable loans.

21.     First Security Bank sought CRB&T's expertise in administering the construction draws of the Mortgage Loan and in handling the unusual (for most private Bankers) government-provided development assistance (the "Government Assistance") involved in the McQuillen Place development.

22.     First Security Bank and CRB&T (collectively, the "Bank Group") agreed to jointly fund the Mortgage Loan, with CRB&T acting as lead lender but owning a relatively small amount of the credit risk, and First Security Bank owning the vast majority of the credit risk, but not being the lead lender until construction (and, hence compliance with the majority of the federal and state development and lending regulations) was complete.  On information and belief, the amount of the risk owned by First Security Bank is approximately ninety percent.

23.     McQuillen Place Company and First Security Bank eventually closed the Mortgage Loan on December 30, 2014 (the "Mortgage Loan Closing Date") under terms which gave First Security Bank substantial collateral beyond McQuillen Place and the Government Assistance.

## COUNT ONE -- RESTRAINT OF TRADE
## UNDER IOWA COMPETITION LAW

24.     Paragraphs 1 through 23 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

6

25.      Section 553.4 of the Iowa Code provides, "A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market."

26.      Iowa Code Section 553.12 provides, *inter alia*, that

"a person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit to:
"1.      Prevent or restrain conduct prohibited under this chapter and remove the conduct's effect by injunction, divestiture, divorcement, dissolution of domestic enterprises right to do business in this state, compelling the forfeiture or restraint of the issuance of a certificate of incorporation, permit to transact business, license, or franchise, or granting other equitable relief. [...]
"2.      Recover actual damages resulting from conduct prohibited under this chapter.
"3.      Recover, at the court's discretion, exemplary damages which do not exceed twice the actual damages awarded under subsection 2, from a person other than a city or county or legal entity created by a city or county, if:
       "a. The trier of fact determines that the prohibited conduct is willful or flagrant; and,
       "b. The person bringing suit is not the state.
4. Recover the necessary costs of bringing suit, including a reasonable attorney fee."

27.      As of June 30, 2017, First Security Bank had Charles City deposits of $150,109,000, which, according to the Federal Deposit Insurance Corporation, is 40.22% of the Charles City market.

28.      As of June 30, 2017, First Citizens Bank ("First Citizens") had Charles City deposits of $141,048,000, which, according to the Federal Deposit Insurance Corporation, is 37.79% of the Charles City market.

29.      First Security Bank and First Citizens have a combined market share in the Charles City market of 78.01%.

30.      The United States Department of Justice, in determining whether to take action against an alleged monopolist or businesses acting in restrain of trade under, *inter alia*, the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, uses the Herfindahl-Hirschman Index ("HHI"). The basic process for determining the HHI of a given market is calculating the sum of the squares of the Banks' shares of deposits in a given market.

31.      The current Department of Justice guidelines separate HHIs into three categories:

a.      Less than 1,000 is "not concentrated";

b.      Greater and 1,000 but less than 1,800 is "moderately concentrated";

c.      Greater than 1,800 is "highly concentrated."

32.     The HHI in the Charles City market using just the First Security Bankk and First Citizens market shares is 3,045.7325.  The HHI for all Banks in the market is 3,356.178.

33.     The President and Chief Executive Officer of the First Security Bankk is Kurt Herbrechtsmeyer.

34.     Kurt Herbrechtsmeyer is also "Chair" of the Iowa Bankers Association.

35.     Kurt Herbrechtsmeyer is a frequent critic of the "unfair" status of credit unions in Iowa, suggesting that they have an unfair tax advantage compared to private Banks.  On February 19, 2018, the newspaper with the largest circulation in Iowa published an article by Kurt Herbrechtsmeyer entitled "Credit Unions' Free Ride Hurts Iowa's Rural Communities."  See,

https://www.desmoinesregister.com/story/opinion/columnists/iowa-view/2018/02/19/credit-unions-free-ride-hurts-iowas-rural-communities/352224002/.

36.     The only credit union located in Charles City is the Family Community Credit Union, with deposits of approximately $16,500,000, or approximately 11% of First Security Bank's deposits just in the Charles City (zip code 50616) market.  The parent of First Security Bank has deposits exceeding $433,000,000, or 26 times the deposits of the local credit union, which is alleged to unfairly compete against First Security Bank.

37.     Both First Security Bank and First Citizens have expanded in recent decades from their original locations in Charles City, expanding from two locations to 22 locations.

38.     First Security Bank now has 13 locations throughout north central Iowa.

39.     First Citizens now has 9 locations.

40.     Aside from their original locations in Charles City, First Security Bankk does not have a location in any city or town in which First Citizens has a location, and vice versa.

8

41.     First Security Bank and First Citizens frequently purchase participations in each other's loans.

42.     First Security Bank frequently sells loan participations on favorable terms to other Banks in Iowa, particularly Banks in proximity to the Charles City area.

43.     Banks relying on income from favorably priced loan participations might be reluctant to engage in behavior which might decrease or eliminate the flow of future loan participations.

44.     At least one Bank in the Charles City area is reluctant to open an office in the Charles City market out of fear of retribution by the First Security Bank.

45.     In the course of the negotiations for the Mortgage Loan between McQuillen Place and First Security Bank, representatives of First Security Bank repeatedly asked for additional collateral from McQuillen Place or affiliated parties.

46.     In addition to a first lien on McQuillen Place, First Security Bank demanded a personal guaranty by Charles Thomson and Amelia Management, secured by all real estate owned by Charles Thomson or Amelia Management.  First Security Bank also demanded a lien on Charles Thomson's contingent interest in farm land near Cascade, Iowa, and his beneficial interest in a life insurance policy on the life of Charles Thomson's father, Robert L. Thomson ("Robert Thomson").

47.     Personnel from First Security Bank then indicated that "the board" was not satisfied with the collateral, and would not approve the Mortgage Loan without additional collateral in the form of a guaranty from Robert Thomson.

48.     On request of Charles Thomson, Robert Thomson consented to execute a guaranty in favor of First Security Bank for the Mortgage Loan.

49.     By the time the loan was finally closed (the "Mortgage Loan Closing") on Mortgage Loan Closing Date, the collateral (the "Initial Collateral") posted for the Mortgage Loan (of $3.8 million) included:

      a.     McQuillen's rights in the $2.8 million from the Forgivable Loan;
      b.     $800,000 in equity in properties owned by Amelia Management;
      c.     $150,000 in equity in Charles Thomson's personal residence;

9

      d.      $125,000 in Charles Thomson's beneficial interest in a life insurance policy on Robert Thomson;
      e.      $250,000 in Charles Thomson's contingent interest in a farm near Cascade, Iowa;
      f.      $900,000 in TIF benefits;
      g.      $900,000 in a personal guaranty from Robert Thomson;
      h.      $500,000 in EZ benefits; and
      l.      not less than $100,000 in the value of the lots under McQuillen Place.

50.     Although each item in the collateral package had varying contingencies to collection (and some were rights not vested), the total amount of the face value of the collateral package was $6,520,000.

51.     The minimum loan-to-value ratio in the Charles City market is 80:100, meaning that a Bank will not extend credit if the value of the collateral backing an $800,000 is less than $1,000,000.

52.     The loan-to-value (using the face value of the collateral) of the Initial Collateral was approximately 158:100.

53.     By the time the Mortgage Loan closed, the negotiated plan for the financing included a portion of the final loan to be purchased by First Citizens.

54.     First Security Bank, a member of First Security Bank and the majority owner of the Mortgage Loan, has established and maintains a duopoly in restraint of trade in the Charles City, Iowa, Banking services market.

55.     This restraint of trade permitted First Security Bank to obtain terms from McQuillen Place Company on the Mortgage Loan which would not have been available to First Security Bank had market forces been permitted to operate.

56.     Each loan made by First Security Bank which has terms more favorable to First Security Bank than would be available to First Security Bank in a free market environment sustains and increases First Security Bank's market position in the Charles City market for Banking services, and is, accordingly, a contract in furtherance of restraint of trade.

57.     In October 2017, for reasons explained below, McQuillen Place Company ceased construction activities on McQuillen Place.

10

58. Between October 2017 and the date of the petition herein, McQuillen Place Company and related parties have offered numerous options and frameworks to the First Security Bank & CRB&T in an attempt to restart construction and complete the building.

59. At one point during these negotiations, a representative of First Security Bank suggested that a guarantor, Robert Thomson, should contribute (as an equity investor) cash to finish the construction, with First Security Bank agreeing to reduce the remaining obligations under the guaranty by one dollar for each dollar used in construction (hereafter, the "Dollar-for-Dollar Proposal").

60. Subsequently, McQuillen Place Company, after negotiations with Robert Thomson, offered the Dollar-for-Dollar Proposal (with Robert Thomson investing $900,000 cash into the construction, through a controlled disbursement account to be held by the First Security Bank & CRB&T.)

61. The First Security Bank & CRB&T rejected the Dollar-for-Dollar Proposal on February 13, 2017.

62. McQuillen Place Company (and thereby Charles Thomson) has been injured by this restraint of trade by:

(a) not being able to obtain the Mortgage Loan from a competing source, which likely would have demanded less collateral from McQuillen Place Company's affiliates;

(b) not being able to refinance the Mortgage Loan with a competing source, which likely would have permitted McQuillen Place to use funds from Robert Thomson to complete construction of the building; and

(c) not having a lender willing to negotiate in good faith, inasmuch as a reasonable lender would have permitted (indeed embraced) the Dollar-for-Dollar Proposal.

WHEREFORE, Charles Thomson prays the Court enter judgment against the First Security Bank and in favor of McQuillen Place, Charles M. Thomson, and Amelia Trust and, further, enter an Order, as determined by the trier of fact:

11

(a)     invalidating the lien granted to the First Security Bank under the Mortgage Loan as being an invalid contract in restraint of trade;

(b)     granting Charles Thomson judgment for damages as referenced in this Count;

(c)     awarding Charles Thomson exemplary damages for the conduct described in this Count; and

(d)     awarding Charles Thomson reasonable attorney fees and costs in bringing and pursuing this Counterclaim; and

(e)     granting Charles Thomson such other and further relief as the Court finds just and equitable under the circumstances.

## COUNT TWO -- UNCONSCIONABILITY OF TRANSACTION
## DECLARATORY RELIEF

63.     Paragraphs 1 through 62 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

64.     Charles Thomson has been a depositor at First Security since approximately 1965. Charles Thomson's current personal residential mortgage loan is from First Security.

65.     Every automobile purchased by Charles Thomson has been financed by First Security.

66.     Amelia Management acquired the properties from Growth Properties using a loan from the First Security.

67.     Robert Thomson has been a depositor at First Security since approximate 1953, is a former member of the Board of Directors of the First Security, and is currently an Emeritus Director.

68.     Robert Thomson has utilized investment advice of persons affiliated with the First Security, and Robert Thomson, from approximately 1970 to 2007, was a business partner with one of the First Security's principal equity security holders.

69.     Charles Thomson's mother, Janan M. Thomson, was a customer of First Security from approximately 1935 until her death in 1993.

12

70.     Charles Thomson's maternal grandparents, Charles Walsh McQuillen and Ellen Francis Bradley McQuillen, were customers of First Security (or its corporate predecessor(s)) from approximately 1914 to their deaths in 1945 and 1981, respectively.

71.     Each of Charles Thomson's three siblings has been or is a customer of First Security.

72.     The extensive interlocking financial and social connections between the members of the Thomson family and the First Security establish that a "confidential relationship" (as that term is used in Wine, J.C., *Lender Liability Under Iowa Law*, 39 Drake L. Rev., 645, 648-652 (1990)) exists between the First Security, as Bank, and the Thomson family, as customers of the Bank.

73.     First Security Bank, by virtue of its comparative size in the Charles City, Iowa, lending market, holds a huge advantage in bargaining power over a borrower such as McQuillen Place Company.

74.     First Security Bank's position in the market precludes borrowers such as McQuillen Place Company from obtaining loans where less collateral is demanded, or where a lower interest rate would be demanded.

75.     Charles Thomson (together with his affiliated parties) was compelled, as a condition to obtaining the Loan, to grant First Security Bank security interests in more collateral that would have been demanded by a similarly situated borrower in a lending market where robust competition among lenders prevailed.

76.     First Security Bank intentionally exploited its market position and relationship to the Thomson family to obtain, for its own benefit and to the detriment of Charles Thomson, property interests which First Security Bank would not have otherwise obtained.

77.     The compelled transfer of these property interests gave the First Security Bankk an undue and unconscionable advantage which has, as a proximate and foreseeable result, exposed Charles Thomson to undue financial harm.

78.     The provisions of the Mortgage Loan pursuant to which collateral was transferred to First Security Bank from Charles Thomson and the Affiliated Parties was unconscionable at the time the contract was made.

13

79.     Charles Thomson, McQuillen Place Company, LLC and Amelia Management is entitled to, *inter alia*, an order of the Court declaring the Mortgage Loan contract unconscionable and unenforceable to the extent of such unconscionability in creation or result, together with, to be determined by the trier of fact:

(a)     Past and future pecuniary damages;

(b)     General damages;

(c)     Pre-judgment and post-judgment interest;

(d)     Attorney fees and costs; and

(e)     Exemplary damages against First Security Bank.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management pray the Court enter judgment against First Security Bankk and, further, enter an Order, to be determined by the trier of fact:

(a)     declaring the security interests granted to First Security Bank by Charles Thomson to have been granted pursuant to an invalid, unconscionable contract provision;

(b)     invalidating the liens granted to First Security Bank under the Mortgage Loan as being an unconscionable;

(c)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management judgment for damages as referenced in this Count;

(d)     awarding Charles Thomson, McQuillen Place Company, LLC and Amelia Management exemplary damages for the conduct described in this Count;

(e)     awarding Charles Thomson, McQuillen Place Company, LLC and Amelia Management reasonable attorney fees and costs in bringing and pursuing this Counterclaim; and

(f)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

**COUNT THREE -- BREACH OF DUTY OF GOOD FAITH
AND FAIR DEALING BY FAILING TO
NOTIFY McQUILLEN PLACE COMPANY**

14

## ABOUT THE TWO-YEAR RULE

80.     Paragraphs 1 through 79 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

81.     The First Security Bank represented to Charles Thomson that CRB&T had vast experience and expertise in transactions involving economic development assistance from the State of Iowa.

82.     First Security Bank knew that Charles Thomson, McQuillen Place Company, LLC and Amelia Management was relying and would continue to rely on First Security Bank's expertise in transactions involving economic development assistance from the State of Iowa.

83.     Throughout the negotiation of the Mortgage Loan and, following its closing, during its administration, First Security Bank, through CRB&T, repeatedly referenced its familiarity with various state economic development incentives involved in the financing of McQuillen Place.  The incentives so referenced included, but were not limited to, the IDEA Forgivable Loan Program and the EZ Program.

84.     Following Mortgage Loan Closing, construction progress on McQuillen Place was delayed by a number of factors, including a shortage of skilled tradespersons in the Charles City area, failures of subcontractors to adhere to deadlines, the refusal of a key vendor to work with MidAmerican Energy, and multiple changes in standards and design parameters imposed unilaterally by staff of MidAmerican Energy.

85.     The delays resulted in the parties to the Mortgage Loan agreeing to extend the term of the Mortgage Loan in order to complete construction of McQuillen Place.

86.     Preceding each renewal and extension of the Mortgage Loan, First Security Bank provided Charles Thomson, McQuillen Place Company, LLC and Amelia Management with detailed guidance and recommendations on steps to take to maintain the project's compliance with the various state economic incentive programs.

87.     This proffering of guidance was consistent with the repeated assurances that CRB&T was intimately familiar with administration of loans in which state economic incentive programs were a key funding component.

88.     On September 19, 2013, McQuillen Place Company applied for assistance, in the form of development tax credits, from the IEDA under the EZ Program.

89.     On October 23, 2013, the Director of the IEDA signed a letter (the "EZ Award Letter") granting the McQuillen Place Company application for credits under the EZ Program.

90.     The application for assistance under the EZ program and the EZ Award Letter were provided by McQuillen Place Company to First Security Bankk prior to the Mortgage Loan Closing.

91.     In July 2017, McQuillen Place Company was asked by First Security Bank to make arrangements for the sale of the anticipated EZ credits (the "EZ Credits") as part of what was anticipated by the parties to the Mortgage Loan to be a final renewal and extension prior to completion of the building.

92.     In early August 2017, McQuillen Place Company was notified by the IEDA that the original issuance of the EZ Award Letter was to have been accompanied by a "contract" setting forth additional terms and conditions for the EZ Program beyond those referenced in the EZ Award Letter.

93.     One of the additional terms and conditions to have been set forth in the contract was a two-year expiration rule (the "Two-Year Rule").  The IEDA asserted that the Two-Year Rule was applicable to all EZ Programs in general and to McQuillen Place in particular, notwithstanding absence of notice of the Two-Year rule in the EZ Award Letter.

94.     On information and belief, the EZ Program has been a funding component of numerous loans and construction projects in which First Security Bank and its members have participated.

95.     The approximate amount face amount of the EZ Credits to which McQuillen Place Company would be entitled in the absence of the Two-Year Rule is $700,000.  The approximate amount of net proceeds from the sale of such credits (the "EZ Benefits") is $500,000.

16

96.     The net increase in availability of funds (through an increase in the collateral package held by First Security Bank would have been sufficient to obtain a certificate of occupancy for at least some of the residences at McQuillen Place.

97.     Obtaining a certificate of occupancy would have permitted McQuillen Place Company to use the cash flow from rented units to fund completion of the remaining units and to start the process of obtaining infusion of the TIF funds into the project.

98.     Following discovery of the Two-Year Rule by McQuillen Place Company, First Security Bank refused to extend any additional credit to McQuillen Place Company.

99.     First Security Bank knew, or should have known, about the Two-Year Rule.

100.     First Security Bank Group knew that McQuillen Place Company was relying on the EZ Benefits to provide funds for the construction of the building.

101.     First Security Bank had a duty to notify, *inter alia*, McQuillen Place Company about the Two-Year Rule prior to the Mortgage Loan Closing.

102.     First Security Bank never notified McQuillen Place Company about the Two-Year Rule.

103.     Charles Thomson, McQuillen Place Company, LLC and Amelia Management have been injured and damaged as a result of First Security Bank's failure to notify McQuillen Place Company about the Two-Year Rule.

104.     Charles Thomson, McQuillen Place Company, LLC and Amelia Management are entitled to recover from First Security Bank damages sufficient to restore McQuillen Place Company to position McQuillen Place Company would have been in but for First Security Bank's failure to disclose information about the Two-Year Rule to McQuillen Place Company.

WHEREFORE, Charles Thomson prays the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order:

(a)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management judgment for damages to be determined by the trier of fact as referenced in this Count;

17

(b)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

<div align="center">

**COUNT FOUR -- IN THE ALTERNATIVE,**
**RESCISSION FOR MUTUAL MISTAKE**

</div>

105.     Paragraphs 1 through 104 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

106.     Each and all of the transactions entered into between First Security Bank and Charles Thomson, McQuillen Place Company, LLC and Amelia Management were, at best, a result of mutual mistake between First Security & CRB&T and Charles Thomson, McQuillen Place Company, LLC and Amelia Management including, but not limited to, the mistake that First Security Bank had some meaningful expertise in transactions involving economic development assistance from the State of Iowa, and that such expertise would inure to the benefit of Charles Thomson.

107.     The mutual mistake(s) were material to each and all of the transactions between Charles Thomson and First Security Bank, as well as to the transaction of the Mortgage Loan taken as a whole.

108.     As a result of the mutual mistakes, each and all of the transactions between Charles Thomson and First Security Bank, together with the Mortgage Loan taken as a whole, should be rescinded.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management prays the Court enter judgment holding

(a) the transactions between Charles Thomson, McQuillen Place Company, LLC and Amelia Management and First Security Bank, together with the Mortgage Loan taken as a whole, are rescinded, and that Charles Thomson and First Security Bank be restored to the same positions they would have had, had the referenced transactions never been entered into; and

(b) First Security Bank liable to Charles Thomson, McQuillen Place Company, LLC and Amelia Management for damages to be determined by the trier of fact, together with interest as provided by law, and the cost of this action.

<div align="center">18</div>

**COUNT FIVE -- BREACH OF CONTRACT -- (IN THE ALTERNATIVE)
FAILURE TO EXERCISE DUE CARE ON EZ CREDITS**

109.    Paragraphs 1 through 108 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

110.    First Security Bank had a responsibility to Charles Thomson, McQuillen Place Company, LLC and Amelia Management to take due care to protect McQuillen Place Company's financial interest in the EZ Benefits.

111.    First Security Bank not only failed to take due care to protect McQuillen Place Company's financial interest in the EZ Benefits, First Security Bank failed to take any level of care to protect such interests.

112.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management is entitled to recover from First Security Bank damages sufficient to restore Charles Thomson, McQuillen Place Company, LLC and Amelia Management to the position Charles Thomson, McQuillen Place Company, LLC and Amelia Management would have been in but for First Security Bank's failure to exercise due care in protecting Charles Thomson, McQuillen Place Company, LLC and Amelia Management's interest in the EZ Benefits.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management prays the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order:

(a)    granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management judgment for damages to be determined by the trier of fact as referenced in this Count;

(b)    granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

**COUNT SIX --  UNCLEAN HANDS -- EZ CREDIT ISSUE,
RESPONSIBILITY OF LENDER,
CAUSED THE DEFAULT COMPLAINED OF BY LENDER
(ASSERTED IN THE ALTERNATIVE)**

19

113.    Paragraphs 1 through 112 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

114.    Any and all default(s) of McQuillen Place Company under the Mortgage Loan are the direct and proximate result of First Security Bank to exercise due care over collateral pledged to First Security Bank under the Mortgage Loan, *viz.* the EZ Credits.

115.    First Security Bank's failure constitutes unclean hands and bars First Security Bank from enforcing the provisions of the Mortgage Loan.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management prays the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order:

(a)    holding that First Security Bank is estopped by the doctrine of unclean hands from seeking any relief sought in the Petition herein; and

(b)    granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

### COUNT SEVEN -- FRAUD -- FIRST SECURITY BANK KNEW OR SHOULD HAVE KNOWN THAT THEY LACKED KNOWLEDGE OF GOVERNMENT PROGRAMS, REPRESENTED THEY DID HAVE KNOWLEDGE OF GOVERNMENT PROGRAMS, BORROWERS RELIED TO THEIR DETRIMENT (IN THE ALTERNATIVE)

116.    Paragraphs 1 through 115 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

117.    First Security Bank knew, or should have known, that it either lacked detailed knowledge of economic development incentives programs in Iowa, or that it had no capacity to assist borrowers in any meaningful way in transactions involving economic development incentives in the State of Iowa.

118.    First Security Bank knew that Charles Thomson was relying on First Security Bank's representations of expertise in transactions involving economic development incentives in the State of Iowa.

20

119.    Charles Thomson relied to his detriment on the representations of First Security Bank concerning First Security Bank's expertise in transactions involving economic development incentives in the State of Iowa.

120.    Among other things, Charles Thomson would not have entered into the Mortgage Loan if it had been aware of First Security Bank's lack of expertise in or lack of meaningful capacity to administer transactions involving economic development incentives.

121.    The Mortgage Loan was, accordingly, obtained by fraud by First Security Bank.

122.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management is entitled to, *inter alia*, an order of the Court declaring the Mortgage Loan contract null and void by virtue of having been obtained by fraud, and granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management:

    (a)    Past and future pecuniary damages;

    (b)    General damages;

    (c)    Pre-judgment and post-judgment interest;

    (d)    Attorney fees and costs; and

    (e)    Exemplary damages against First Security Bank.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management prays the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

    (a)    declaring the Mortgage Loan null and void, *ab initio*, as having been obtained by fraud;

    (b)    declaring the security interests granted to First Security Bank by Charles Thomson, McQuillen Place Company, LLC and Amelia Management to be invalid;

    (c)    granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management judgment for damages as referenced in this Count;

21

(d)     awarding Charles Thomson, McQuillen Place Company, LLC and Amelia Management exemplary damages for the conduct described in this Count; and

(e)     awarding Charles Thomson, McQuillen Place Company, LLC and Amelia Management reasonable attorney fees and costs in bringing and pursuing this Counterclaim; and

(f)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

### COUNT EIGHT -- BREACH OF CONTRACT -- FAILURE TO WARN ON LACK OF KNOWLEDGE ON EZ CREDITS INDUCED BORROWERS TO OBTAIN GUARANTORS, WHICH BORROWER MAY NOW HAVE TO INDEMNIFY

123.    Paragraphs 1 through 122 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

124.    Four guarantors under the Mortgage Loan, Robert Thomson, Charles Thomson, Amelia Trust and Amelia Management (collectively, the "Guarantors"), have rights of against McQuillen Place Company by virtue of this action.

125.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management would not have guaranteed the Mortgage Loan had First Security Bank disclosed that it would not or could not protect or assist McQuillen Place Company in maintaining its interest in the EZ Credits.

126.    First Security Bank's failure to disclose such information to Charles Thomson, McQuillen Place Company, LLC and Amelia Management could cause him injury.

127.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management is entitled to be indemnified by First Security Bank for any loss arising from the loss of EZ Credits.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management prays the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

(a)      compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for any loss arising the loss of the EZ Credits; and

(b)      granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

### COUNT NINE -- BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY MANIPULATING TIMING OF CLOSING DATE

128.    Paragraphs 1 through 127 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

129.    The Mortgage Loan Closing Date was set by First Security Bank.

130.    The sole discernable reason for the Mortgage Loan Closing Date was to permit First Security Bank to book income in 2014, rather than 2015.

131.    First Security Bank had a duty to Charles Thomson, McQuillen Place Company, LLC and Amelia Management to act in good faith and to deal fairly.

132.    By selecting a closing date to accommodate only the interests of First Security Bank, rather than the interests of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, First Security Bank engaged in opportunistic and predatory behavior.

133.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management suffered economic injury as the proximate result of First Security Bank setting the closing date of the Mortgage Loan for the Mortgage Loan Closing Date.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management prays the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

23

(a)      compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from setting the closing date of the Mortgage Loan on the Mortgage Loan Closing Date; and

(b)      granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

## COUNT TEN -- BREACH OF CONTRACT BY DISCLOSING
## CONFIDENTIAL INFORMATION OF McQUILLEN PLACE COMPANY

134.    Paragraphs 1 through 133 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

135.    First Security Bank publicly states in its "Privacy Policy" (https://www.1stsecurityBankk.com/assets/1436904169-Privacy-Policy.pdf) that it uses security measures to prevent disclosure of confidential information of its customers to the general public.

136.    First Security Bank publicly states that it maintains privacy rules which comply with all applicable Federal and state laws.

137.    First Security Bank's public representations regarding its privacy policy (the "Privacy Policy") constitute part of the contractual agreement between First Security Bank and its customers.

138.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management is a customer of First Security Bank.

139.    The Privacy Policy is part of the contract between First Security Bank and Charles Thomson, McQuillen Place Company, LLC and Amelia Management.

140.    The provisions of 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq.* restrict the release of confidential customer information in possession of a Bank to third parties.

141.    On information and belief, on March 7, 2014, a member of the board of directors (the "Board") of the First Security Bank told a third party (a bartender) that the McQuillen Place transaction was "dead as a doornail" because it had lost its financing. (The conversation described in this paragraph is hereinafter referred to as the "March Statement.")

24

142. The March Statement was not true.

143. The March Statement tended to impugn the business prospects of McQuillen Place Company.

144. On information and belief, during the period between August 1, 2014 and September 5, 2014, one or more members of the Board spoke to members of the City Council of the City of Charles City, Iowa (the "City Council") and made certain statements (the "August Statements") concerning the McQuillen Place development.

145. At the time of the August Statements, the City Council was considering a proposal by McQuillen Place Company for the City of Charles City to provide, *inter alia*, tax increment financing benefits to the proposed McQuillen Place development to make the development economically viable.

146. On information and belief, the August Statements were extremely negative toward the proposed transaction, criticized the proposed transaction for relying on subsidies from the government, and suggested the long-term prospects for the financing of the project were poor.

147. The August Statements tended to impugn the business prospects of Charles Thomson, McQuillen Place Company, LLC and Amelia Management.

148. On information and belief, during February 2018, a person employed by First Security Bank disclosed to a third party (a) details of an appraisal dated January 12, 2018, and (b) specific details of positions taken by various parties during loan modification negotiations between Charles Thomson, McQuillen Place Company, LLC and Amelia Management and First Security Bank during the first weeks of February, 2018 (the "February Statements").

149. The February Statements tended to impugn the business prospects of Charles Thomson, McQuillen Place Company, LLC and Amelia Management.

150. The March Statement, the August Statements and the February Statements were presented to the recipients of the information as true and accurate depictions of the status and prospects of Charles Thomson, McQuillen Place Company, LLC and Amelia Management and his interests.

25

151.    The information contained in the March Statement, the August Statements, and the February Statements is confidential information the disclosure of which is prohibited by 15 U.S.C. §6801 *et seq.* and 12 U.S.C. §3401 *et seq.*, and, by reference, the Privacy Statement.

152.    The utterance of the March Statement, the August Statements, and the February Statements is a breach of the contract between First Security Bank and McQuillen Place.

153.    The content and context of the March Statement, the August Statements, and the February Statements indicates that the statements were made intentionally and were, moreover, made in a hostile manner and with the intention of injuring the business prospects of Charles Thomson, McQuillen Place Company, LLC and Amelia Management.

154.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management has been injured by the breach of contract described in the preceding paragraph.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management prays the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

(a)     compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from the breach of contract described in this count; and

(b)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

### COUNT ELEVEN -- BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY DISCLOSING CONFIDENTIAL INFORMATION OF McQUILLEN PLACE COMPANY

155.    Paragraphs 1 through 154 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

156.    First Security Bank had a duty to hold private and confidential information pertaining to Charles Thomson, McQuillen Place Company, LLC and Amelia Management.

26

157.    Personnel from First Security Bank violated this duty by uttering the March Statement, the August Statements, and the February Statements.

158.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management have been damaged by this breach of duty by First Security Bank.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management pray the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

(a)    compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from the breach of duty described in this count;

(b)    awarding Charles Thomson, McQuillen Place Company, LLC and Amelia Management exemplary damages as appropriate; and

(c)    granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

## COUNT TWELVE -- SLANDER

159.    Paragraphs 1 through 158 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

160.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management are and were known to First Security Bank to be engaged in a business where good business character and conduct are essential to success as well as survival.

161.    The March Statement, the August Statements, and the February Statements were calculated by the persons uttering them to interfere with and diminish the reputation of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, including, but not limited to, the reputation of Charles Thomson, McQuillen Place Company, LLC and Amelia Management for good business character and conduct.

27

162.    The March Statement, the August Statements, and the February Statements constitute both slander per se and per quod.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management pray the Court

(a)    enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management;

(b)    enjoin First Security Bank from making any further slanderous or libelous statements to third parties vis-a-vis Charles Thomson, McQuillen Place Company, LLC and Amelia Management;

(c)    enter an Order, to be determined by the trier of fact:

(1)    compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from the breach of duty described in this count;

(2)    awarding Charles Thomson, McQuillen Place Company, LLC and Amelia Management exemplary damages as appropriate; and

(3)    granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

### COUNT THIRTEEN -- BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY FAILING TO NEGOTIATE IN GOOD FAITH FOLLOWING SEPTEMBER 2017 ON ISSUE OF INJECTING $900K TO FINISH CONSTRUCTION

163.    Paragraphs 1 through 162 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

164.    First Security Bank had (and has) a duty to negotiate with Charles Thomson, McQuillen Place Company, LLC and Amelia Management in good faith.

165.    Part of the duty to negotiate in good faith is to consider and accept proposals in a manner consistent with that of a reasonable Bank acting under similar circumstances.

28

166.    No reasonable Bank, when offered cash by a guarantor to complete a building held as collateral by the Bank, would refuse such an offer solely on the basis of requesting additional security from a guarantor.

167.    The reasonableness of the offer of McQuillen Place Company and its Affiliated Parties to contribute $900,000 to complete the construction of McQuillen Place, in exchange for a dollar-for-dollar reduction in guaranty obligations, is demonstrated by the fact that Gary Becker of CRB&T initially suggested the proposal.

168.    First Security Bank breached its duty of good faith and fair dealing by refusing the proposal.

169.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management have been injured by this breach of duty.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management pray the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

(a)     compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from the breach of duty described in this count;

(b)     awarding Charles Thomson, McQuillen Place Company, LLC and Amelia Management exemplary damages as appropriate; and

(c)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

### COUNT FOURTEEN -- BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY OFFSETTING STATE FUNDS FOR INTEREST INSTEAD OF GETTING CERTIFICATE OF OCCUPANCY

170.    Paragraphs 1 through 169 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

29

171.     In September 2017, funds from IEDA were deposited with CRB&T.

172.     Instead of making these funds available to McQuillen Place Company to permit further construction, CRB&T and First Security Bank used these funds to pay accumulated interest on the Mortgage Loan.

173.     If these funds had been made available to McQuillen Place Company, McQuillen Place Company, through its vendors, could have completed sufficient work on McQuillen Place to obtain a temporary certificate of occupancy (the "TCO").

174.     If McQuillen Place Company had obtained the TCO, it would have been able to start renting units at McQuillen Place, and could have generated funds with which it could have finished the rest of the building.

175.     The hardship to McQuillen Place Company by offsetting these funds greatly outweighed the temporary benefit CRB&T and First Security Bank obtained by offsetting interest charges.

176.     CRB&T and First Security Bank had a duty to evaluate the relative harm to the parties from its actions and, in this case, to permit McQuillen Place Company to use the funds to pursue construction.

177.     CRB&T and First Security Bank breached the duty described in the preceding paragraph.

178.     Charles Thomson, McQuillen Place Company, LLC and Amelia Management have been injured by this breach of duty.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management pray the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

(a)      compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from the breach of duty described in this count; and

(b)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

### COUNT FIFTEEN -- BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY SEEKING A WINDFALL FROM A DEFAULT CAUSED BY LENDER

179.     Paragraphs 1 through 178 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

180.     In refusing reasonable offers by McQuillen Place Company and its Affiliated Parties to inject cash into the development to finish construction, First Security Bank is attempting to use continuing interest charges and default fees to run up the total amount of the debt.

181.     Since First Security Bank has numerous pieces of collateral, the effect of running up the debt will be to award First Security Bank a windfall.

182.     First Security Bank has a duty to avoid obtaining a windfall when its borrower, McQuillen Place Company, has presented a reasonable plan to make First Security Bank whole while avoiding a windfall.

183.     First Security Bank has breached the duty described in the preceding paragraph.

184.     Charles Thomson, McQuillen Place Company, LLC and Amelia Management have been injured by this breach of duty.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management pray the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

(a)     compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from the breach of duty described in this count; and

(b)     granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

31

### COUNT SIXTEEN -- BREACH OF DUTY OF GOOD FAITH
### AND FAIR DEALING BY PAYING
### CERTAIN DISPUTED REAL ESTATE TAXES

185.    Paragraphs 1 through 184 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

186.    In late June 2018, First Security Bank elected to pay approximately $230,000 in real estate taxes on McQuillen Place.

187.    First Security Bank did not consult with McQuillen Place Company prior to making this payment.

188.    Prior to First Security Bank making this tax payment, McQuillen Place Company had informed First Security Bank that McQuillen Place Company was going to ask the taxing authority to abate the taxes in question.

189.    The taxes in question are based on an assessment of the building being completed and in service.  Since the building, when the taxes were paid, had not yet completed and was not in service, the amount of the assessment (and thus of the taxes) should have been lower.

190.    By paying the taxes, First Security Bank has diminished, if not eliminated, the ability of McQuillen Place Company to seek abatement from the relevant taxing authority.

191.    First Security Bank had a duty to not expend funds on McQuillen Place Company's behalf in a manner that needlessly increased McQuillen Place Company's tax obligations.

192.    First Security Bank has breached the duty described in the preceding paragraph.

193.    Charles Thomson, McQuillen Place Company, LLC and Amelia Management have been injured by this breach of duty.

WHEREFORE, Charles Thomson, McQuillen Place Company, LLC and Amelia Management pray the Court enter judgment against First Security Bank and in favor of Charles Thomson, McQuillen Place Company, LLC and Amelia Management, and, further, enter an Order, to be determined by the trier of fact:

32

(a)    compelling First Security Bank to indemnify and hold harmless Charles Thomson, McQuillen Place Company, LLC and Amelia Management for all damages arising from the breach of duty described in this count; and

(b)    granting Charles Thomson, McQuillen Place Company, LLC and Amelia Management such other and further relief as the Court finds just and equitable under the circumstances.

Respectfully submitted,

Judith O'Donohoe, Esq.
Elwood, O'Donohoe, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616
641-228-8054 - office
641-228-8057 - fax
charlescity@elwoodlawfirm.com

STATE OF IOWA            )
                         ) ss:
COUNTY OF FLOYD          )

I, Charles M. Thomson, being first duly sworn on oath, state that I am the Defendant in the above-entitled matter; that I have requested the foregoing Answer, Affirmative Defenses & Counterclaim to be prepared; that I have read the same and know that the allegations and statements contained therein are true and correct as I verily believe.

Charles M. Thomson

Subscribed and sworn to before me, the undersigned Notary Public, by Charles M. Thomson this 10th day of September, 2018.

Notary Public In and For the State of Iowa



LISA BARTZ
Commission Number 746147
My Commission Expires
March 29 2019

33

**EXHIBIT E**

**AG/Comm RE Var – XXXXXX**

> ⚠ Your account is past due in the amount of $4,223,705.51.

## Transactions

📅 Scheduled    🕐 Pending    🟢 Posted

| | Date | Description | Amount | Balance |
|---|---|---|---|---|
| 🟢 | Dec 28, 2018 | Prin Pymnt - No Dt Show details | -900,000.00 | 3,211,438.13 |
| 🟢 | Aug 16, 2018 | Force Post Advance CRBT loan balance Show details | 387,499.21 | 4,111,438.13 |
| 🟢 | Jun 19, 2018 | Force Post Advance RE Taxes paid Show details | 236,446.00 | 3,723,938.92 |
| 🟢 | Jun 12, 2018 | Principal Payment EFF 06/11/2018 Show details | -4,500.00 | 3,487,492.92 |
| 🟢 | Dec 04, 2017 | Interest Payment Rev EFF 12/01/2017 Auto Rev XXXXX   how details | 19,545.46 | 3,491,992.92 |
| 🟢 | Dec 01, 2017 | Interest Payment EFF 11/30/2017 Show details | -19,545.46 | 3,491,992.92 |
| 🟢 | Oct 31, 2017 | Interest Payment EFF 10/30/2017 Show details | -19,209.98 | 3,491,992.92 |
| 🟢 | Oct 31, 2017 | Accrued Int Cr Adj ADJ to match lead bank tmh Show details | -335.48 | 3,491,992.92 |
| 🟢 | Oct 18, 2017 | Interest Payment EFF 09/29/2017 Show details | -8,729.69 | 3,491,992.92 |
| 🟢 | Oct 18, 2017 | Interest Payment EFF 09/29/2017 Show details | -4,361.27 | 3,491,992.92 |
| 🟢 | Oct 18, 2017 | Accrued Int Dr Adj ADJ TO MATCH LEAD BANK TMH Show details | 4.37 | 3,491,992.92 |
| 🟢 | Oct 18, 2017 | Accrued Int Dr Adj Eff Dt Demand Rt Chg Show details | 10,669.98 | 3,491,992.92 |
| 🟢 | Sep 29, 2017 | Int Pym-No Dt June, July, Aug interest Show details | -59,800.74 | 3,491,992.92 |
| 🟢 | Sep 29, 2017 | Accrued Int Cr Adj Eff Dt Extensi on Show details | -39,721.42 | 3,491,992.92 |
| 🟢 | Jul 03, 2017 | Force Post Advance EFF 06/30/2017 Show details | 96,652.72 | 3,491,992.92 |
| 🟢 | May 31, 2017 | Interest Payment EFF 05/30/2017 Show details | -13,310.19 | 3,395,340.20 |
| 🟢 | May 12, 2017 | Advance EFF 05/10/2017 Show details | 202,322.17 | 3,395,340.20 |
| 🟢 | May 03, 2017 | Accrued Int Cr Adj Eff Dt Demand Rt Chg Show details | -729.06 | 3,193,018.03 |
| 🟢 | May 02, 2017 | Interest Payment EFF 05/01/2017 Show details | -13,244.79 | 3,193,018.03 |
| 🟢 | May 01, 2017 | Force Post Advance Eff 04/27/2017 Show details | 14,268.59 | 3,193,018.03 |
| 🟢 | May 01, 2017 | Accrued Int Cr Adj Eff Dt Extensi on Show details | -5,474.51 | 3,178,749.44 |

| Date ▾ | Description ⇕ | Amount ⇕ | Balance |
|--------|-------------|---------:|--------:|
| ● Apr 28, 2017 | Interest Payment EFF 03/31/2017 Show details | -13,374.84 | 3,178,749.44 |
| ● Mar 09, 2017 | Advance EFF 03/08/2017 Show details | 280,297.26 | 3,178,749.44 |
| ● Mar 01, 2017 | Interest Payment EFF 02/28/2017 Show details | -11,761.21 | 2,898,452.18 |
| ● Mar 01, 2017 | Accrued Int Dr Adj adj to matc lead bank Show details | 489.45 | 2,898,452.18 |
| ● Feb 01, 2017 | Interest Payment EFF 01/31/2017 Show details | -11,390.12 | 2,898,452.18 |
| ● Feb 01, 2017 | Accrued Int Cr Adj adj to match lead bank ab Show details | -234.56 | 2,898,452.18 |
| ● Jan 30, 2017 | Advance EFF 01/27/2017 Show details | 1,800.00 | 2,898,452.18 |
| ● Jan 18, 2017 | Advance EFF 01/17/2017 Show details | 251,203.62 | 2,896,652.18 |
| ● Jan 04, 2017 | Interest Payment EFF 01/03/2017 Show details | -10,767.80 | 2,645,448.56 |
| ● Jan 04, 2017 | Accrued Int Cr Adj adj to match lead bank ab Show details | -254.90 | 2,645,448.56 |
| ● Jan 02, 2017 | Interest Payment EFF 12/30/2016 Auto Rev XXXX:  Show details | -9,809.68 | 2,645,448.56 |
| ● Jan 02, 2017 | Principal Pymt Rev EFF 12/30/2016 Auto Rev XXXX  Show details | 9,809.68 | 2,645,448.56 |
| ● Dec 30, 2016 | Principal Payment EFF 12/28/2016 Show details | -9,809.68 | 2,635,638.88 |
| ● Dec 30, 2016 | Accrued Int Cr Adj Eff Dt Extensi on Show details | -4,160.15 | 2,645,448.56 |
| ● Dec 07, 2016 | Force Post Advance EFF 12/06/2016 Show details | 367,070.11 | 2,645,448.56 |
| ● Nov 01, 2016 | Interest Payment EFF 10/31/2016 Show details | -9,625.43 | 2,278,378.45 |
| ● Oct 11, 2016 | Advance EFF 10/10/2016 Show details | 132,661.14 | 2,278,378.45 |
| ● Oct 03, 2016 | Interest Payment EFF 09/30/2016 Show details | -8,659.85 | 2,145,717.31 |
| ● Sep 07, 2016 | Advance EFF 09/06/2016 Show details | 336,766.30 | 2,145,717.31 |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| | CASE NO. 19-00507 |
| McQUILLEN PLACE COMPANY, LLC, | |
| | JOINDER IN RESISTANCE, |
| Debtor. | OBJECTION, AND RESPONSE |
| | OF FOUR KEYS, LLC (DOC. NO. |
| | 167) TO MOTION FOR |
| | WITHDRAWAL OF REFERENCE |

_____

COMES NOW First Security Bank & Trust Company and joins in the Resistance, Objection, and Response of Four Keys, LLC (Doc. No. 167) to the Motion for Withdrawal of Reference.

WHEREFORE, First Security Bank & Trust Company prays that the Court deny the Motion for Withdrawal of Reference, and grant such other and further relief as the Court deems just and equitable in the premises.

/s/ Larry S. Eide
_____
Larry S. Eide (AT0002317)
PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA  50402-1588
Telephone: (641) 423-4264
Facsimile: (641) 423-3145
Email: eide@pappajohnlaw.com

CERTIFICATE OF SERVICE

The undersigned certifies under penalties of perjury, that on March 23, 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Larry S. Eide
_____
Larry S. Eide

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| MCQUILLEN PLACE COMPANY, LLC, | ) | |
| | ) | Bankruptcy No. 19-00507 |
| Debtor. | ) | |

Date of Hearing:   May 8, 2020

APPEARANCES:

For Parties-In-Interest: Charles Thomson and James Gray for Equity Security Holders; Bradley Kruse
and Louise Bonham for Cornice & Rose International, LLC; Larry Eide for First Security Bank &
Trust Co.; and Eric Lam and Eric Langston for Four Keys, LLC
Case Trustee: Charles Smith

NATURE OF PROCEEDING:        ____In Court    _X_ Telephonic

1)   Motion to Reconsider (Doc. 155)
2)   Motion to Reconsider (Doc. 156)
3)   Motion for Partial Withdrawal of the Reference (Doc. 157)
4)   Motion to Stay (Doc. 158)

IT IS ORDERED THAT:

For the reasons stated in the Resistances and Joinders thereto and at the hearing on these matters, the
Motions to Reconsider and Motion to Stay are DENIED.   The Motion for Partial Withdrawal of the
Reference is also DENIED.

Dated and Entered   May 15, 2020

_____
Thad J. Collins, Bankruptcy Judge

# The Supreme Court of Texas

AUSTIN

CLERK'S OFFICE

**I, BLAKE HAWTHORNE,** Clerk of the Supreme Court of Texas, certify that the records of this office show that

**Louis Karl Bonham**

was duly admitted and licensed as an attorney and counselor at law by the Supreme Court of Texas on the 7th day of November, 1986.

I further certify that the records of this office show that, as of this date

**Louis Karl Bonham**

is presently enrolled with the State Bar of Texas as an active member in good standing.

**IN TESTIMONY WHEREOF** witness my signature and the seal of the Supreme Court of Texas at the City of Austin, this, the 13th day of May, 2020.

BLAKE HAWTHORNE, Clerk

Clerk, Supreme Court of Texas

No. 7425C.1

This certification expires thirty days from this date, unless sooner revoked or rendered invalid by operation of rule or law.

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

In re                                              )
                                                   )
MCQUILLEN PLACE COMPANY, LLC, an                   )          Case No. 19-00507
Iowa limited liability company,                    )          Chapter 7
                                                   )
             Debtor.                               )
                                                   )
                                                   )
             NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1:        Identify the appellant(s)**

1.      Name(s) of appellant(s):      Cornice & Rose International, Inc.

2.      Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject
of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (describe) _____

For appeals in a bankruptcy case and not in an adversary proceeding.
☐ Debtor
x Creditor
☐ Trustee
☐ Other (describe) _____

**Part 2:            Identify the subject of this appeal**

1.      Describe the judgment, order, or decree appealed from:

"Order Authorizing Approving Sale Pursuant to Section 363 of the Bankruptcy Code and
Providing Related Relief (Related Doc # 134) Dated and Entered on 4/9/2020. (tsta) (Entered:
04/09/2020)" (Docket #154)

"Proceeding Memo and Order. (related document(s)155 Motion to Reconsider, 156 Motion to
Reconsider, 157 Motion, 158 Motion To Stay) (jmei) (Entered: 05/15/2020)" (Docket #180)

2.      State the date on which the judgment, order, or decree was entered: April 9, 2020 and May
15, 2020

1

**Part 3:**          **Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: Charles L. Smith, Trustee          Attorney:          Telpner Peterson Law Firm, LLP
                                                                25 Main Place, Suite 200
                                                                Council Bluffs, IA 51503
                                                                Telephone: (712) 325-9000

2. Party: First Security Bank & Trust Co.    Attorney:          Larry S. Eide, Esq.
                                                                Pappajohn, Shriver, Eide
                                                                       & Nielsen PC
                                                                103 E State St # 800
                                                                Mason City, IA 50401
                                                                Telephone: (641) 423-4264

                                                                Randy Nielsen, Esq.
                                                                Pappajohn, Shriver, Eide
                                                                       & Nielsen PC
                                                                103 E State St # 800
                                                                Mason City, IA 50401
                                                                Telephone: (641) 423-4264

                                                                Eric Lam, Esq.
                                                                Simmons Perrine Moyer
                                                                       Bergman PLC
                                                                115 3rd Street SE, Suite 1200
                                                                Cedar Rapids, Iowa 52401-1266
                                                                Telephone: (319) 896-4018

                                                                Eric Langston, Esq.
                                                                Simmons Perrine Moyer
                                                                       Bergman PLC
                                                                115 3rd Street SE, Suite 1200
                                                                Cedar Rapids, Iowa 52401-1266
                                                                Telephone: (319) 896-4018

3.     Party: Four Keys, LLC                 Attorney:          Eric Lam, Esq.
                                                                Simmons Perrine Moyer
                                                                       Bergman PLC
                                                                115 3rd Street SE, Suite 1200
                                                                Cedar Rapids, Iowa 52401-1266
                                                                Telephone: (319) 896-4018

2

Eric Langston, Esq.
Simmons Perrine Moyer
Bergman PLC
115 3rd Street SE, Suite 1200
Cedar Rapids, Iowa 52401-1266
Telephone: (319) 896-4018

4.  Party: Charles M. Thomson    Attorney:    Charles M. Thomson, Esq.
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
Telephone: (847) 456-1911

5.  Party: James Gray    Attorney:    Charles M. Thomson, Esq.
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
Telephone: (847) 456-1911

6.  Party:  City of Charles City, IA    Attorney:    Monica Clark, Esq.
Dorsey & Whitney, LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402-1498
Telephone:  (612) 340-2600

**Part 4:**      **Optional election to have appeal heard by District Court** (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

    ☐ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

Appellant hereby reserves its right to elect under 28 U.S.C. §158(c)(1) at any time prior to the expiration of the

**Part 5: Sign below**

/s/ Bradley R. Kruse _____      Date: May 29, 2020 _____
Signature of attorney for appellant(s)

3

Name, address, and telephone number of attorney

Bradley R. Kruse
Dickinson Mackaman Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, IA  50309
(515) 246-4505 / bkruse@dickinsonlaw.com

4

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

                    Chapter 7
                    #19 507

           Debtor.

-------------------------------------------------------------------

**ORDER AUTHORIZING APPROVING SALE**
**PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE**
**AND PROVIDING RELATED RELIEF**

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an
order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and
Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),
approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company
(together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement
("Agreement") appended to the Motion of certain real estate (as described more fully in the
Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal
property (as described more fully in the Agreement, the "Personal Property" and, together
with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the
transactions ("Transactions") contemplated in the Agreement; and the Trustee having
provided adequate and timely notice to all creditors and parties in interest of the Motion, it
appearing that the Purchaser submitted the highest and best offer to purchase the Property;
and a Sale Hearing having been held on April 8, 2020; and based upon the record of the Sale
Hearing and the facts set forth in the Motion as affirmed by the Trustee's Affidavit; and it
appearing that due, good, sufficient and timely notice of the relief sought and granted in this
order has been given and that no other or further notice need be given; at which time all

1

interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having had an opportunity to consider all responses and objections to the Motion; and it appearing that the relief requested in the Motion is in the best interests of this Estate, its creditors and other parties-in-interest; and after due deliberation and good cause appearing therefor;

<p style="text-align:center">THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]</p>

A.    **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates.** The statutory predicates for the relief sought in the Motion are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C.    **Notice.** As evidenced by the certificates of service filed with this Court and based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely, adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions contemplated by the Agreement and this Order (the "Transactions"), has been provided in accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances; and (iv) no other or further notice of the Motion or the Sale Hearing or the Transactions, is or shall be required.

D.    **Opportunity to Object.** A reasonable opportunity to object and to be heard with respect to the Motion and the relief requested therein has been given, in light of the circumstances, to all interested persons and entities, including the following: (a) the U.S.

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

<p style="text-align:center">2</p>

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or claim on the Property; (c) all entities known to have expressed an interest in acquiring the Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its counsel; and (f) all other parties who have filed notices of appearance and demands for service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion. All objections to the sale of the Property are overruled or resolved by this Order.

E.      **Sale in Best Interests.** Good and sufficient reasons for approval of the Agreement and the Transactions exist, as described in the Motion, and the relief requested in the Motion is in the best interests of the estate, its creditors and other parties in interest.

F.      **Business Justification.** The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Transactions other than in the ordinary course of business under Bankruptcy Code section 363(b) in that, among other things, the immediate consummation of the Transactions with the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an order approving the Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser consummating the Transactions.

G.      **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any

3

agreement among bidders.

H. **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I. **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J. **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K. **Free and Clear.** The Debtor is either the sole and lawful owner of the Property or there is a bona fide dispute as to ownership. The transfer of the Property to the

Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.      The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.      The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

5

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

N.     **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

O.     **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1.      **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.      **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.      **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4.      **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to

7

attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

5.  **Valid Transfer.** As of the Closing Date and except as otherwise provided herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

6.  **General Assignment.** On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement.

7.  **No Successor Liability.** Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

8

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or

responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or

shareholders, or the Property, having any liability whatsoever with respect to or be required

to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates,

members, or shareholders, or the Property, having any liability or responsibility to the

Estate, except as is expressly set forth in the Agreement, including, but not limited to,

liabilities on account of any taxes or other government fees, contributions or surcharges

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Property prior to the Closing Date.

8.    **Binding Effect of Order.** This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of

title in or to any of the Property.

9.    **Binding on Successors.** The terms and provisions of the Agreement

and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of

(whether known or unknown) and holders of equity interests in the Debtor, the Purchaser

and their respective affiliates, successors and assigns, and any affected third parties,

including, but not limited to, and all persons asserting Interests in the Property. This Order

9

and the Agreement shall inure to the benefit of the Purchaser and its respective successors

and assigns.

       10.     **Bankruptcy Code Section 363(n).** The consideration provided by the

Purchaser for the Property under the Agreement is fair and reasonable. Based on the

disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not

aware of any facts that would support an argument for avoidance of the Transactions.

       11.     **Good Faith.** The Transactions contemplated by the Agreement are

undertaken by the Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of

the authorization provided herein to consummate the Transactions shall not affect the

validity of the Transactions with the Purchaser, unless such authorization is duly stayed

pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled

to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

       12.     **Fair Consideration.** The consideration provided by the Purchaser to

the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code.

       13.     **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to

its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret,

implement, and enforce the terms and provisions of this Order and the Agreement, all

amendments thereto and any waivers and consents thereunder and each of the agreements

executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a)

compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price

to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if

necessary, any and all disputes concerning or relating in any way to the Transactions; and (e)

protect the Purchaser against any Interests in the Debtor or the Property of any kind or

nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain

exclusive jurisdiction with respect to issues or disputes in connection with this Order and the

relief provided herein, including without limitation to protect the Trustee and Purchaser

from interference with the Sale, and to resolve any disputes related to the Sale, the

Agreement or the implementation thereof.

14. **Surrender of Possession.** All entities that are presently, or on the

Closing Date may be, in possession of some or all of the Property in which the Debtor holds

an interest hereby are directed to surrender possession of the Property either to (a) the

Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15. **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the

Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear,

any and all valid and perfected Interests in Property of the Debtor shall attach to any

proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the

order of priority, and with the same validity, force and effect that they now have against the

Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no

proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the

express consent of the party or parties asserting an Interest therein or further order of the

Court after notice (to all parties who have asserted an Interest in such proceeds) and a

hearing, consistent with the requirements of the Bankruptcy Code.

11

16. **Non-material Modifications.** The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the estate.

17. **Failure to Specify Provisions.** The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

18. **Stay of Order.** Bankruptcy Rule 6004(h) applies to this Order

19. **Copyright:** So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement

12

resulting from the improper or unauthorized use of the C & R Intellectual Property by the

Purchaser, or its assignee, or any third parties.

     Dated and Entered:

   April 9, 2020

                              Hon. Thad J. Collins
                              Chief Judge

*ORDER PREPARED BY:*
Charles L. Smith
Chapter 7 Trustee

1stSecMcQ.Bankr.Pleading.Draft.OrderreSale.040820.1139.ejl.redlined

13

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

IN RE:                                    )
                                          ) Chapter 7
MCQUILLEN PLACE COMPANY, LLC,             )
                                          ) Bankruptcy No. 19-00507
        Debtor.                           )

Date of Hearing:  May 8, 2020

APPEARANCES:

For Parties-In-Interest: Charles Thomson and James Gray for Equity Security Holders; Bradley Kruse
    and Louise Bonham for Cornice & Rose International, LLC; Larry Eide for First Security Bank &
    Trust Co.; and Eric Lam and Eric Langston for Four Keys, LLC
Case Trustee: Charles Smith

NATURE OF PROCEEDING:            ____In Court    X   Telephonic

1)  Motion to Reconsider (Doc. 155)
2)  Motion to Reconsider (Doc. 156)
3)  Motion for Partial Withdrawal of the Reference (Doc. 157)
4)  Motion to Stay (Doc. 158)

IT IS ORDERED THAT:

For the reasons stated in the Resistances and Joinders thereto and at the hearing on these matters, the
Motions to Reconsider and Motion to Stay are DENIED.   The Motion for Partial Withdrawal of the
Reference is also DENIED.

Dated and Entered   May 15, 2020

_____
Thad J. Collins, Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1:       Identify the appellant(s)**

1.       Name(s) of appellant(s):       James A. Gray and Charles M. Thomson

2.       Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject
of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (describe) _____

For appeals in a bankruptcy case and not in an adversary proceeding.
☐ Debtor
x Creditor
☐ Trustee
☐ Other (describe) _____

**Part 2:                Identify the subject of this appeal**

1.       Describe the judgment, order, or decree appealed from:

"Order Authorizing Approving Sale Pursuant to Section 363 of the Bankruptcy Code and
Providing Related Relief (Related Doc # 134) Dated and Entered on 4/9/2020. (tsta) (Entered:
04/09/2020)" (Docket #154)

"Proceeding Memo and Order. (related document(s)155 Motion to Reconsider, 156 Motion to
Reconsider, 157 Motion, 158 Motion To Stay) (jmei) (Entered: 05/15/2020)" (Docket #180)

2.       State the date on which the judgment, order, or decree was entered: April 9, 2020 and May
15, 2020

1

**Part 3:**        **Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| | | |
|---|---|---|
| 1. Party: Charles L. Smith, Trustee | Attorney: | Telpner Peterson Law Firm, LLP<br>25 Main Place, Suite 200<br>Council Bluffs, IA 51503<br>Telephone: (712) 325-9000 |
| 2. Party: First Security Bank & Trust Co. | Attorney: | Larry S. Eide, Esq.<br>Pappajohn, Shriver, Eide<br>        & Nielsen PC<br>103 E State St # 800<br>Mason City, IA 50401<br>Telephone: (641) 423-4264 |
| | | Randy Nielsen, Esq.<br>Pappajohn, Shriver, Eide<br>        & Nielsen PC<br>103 E State St # 800<br>Mason City, IA 50401<br>Telephone: (641) 423-4264 |
| | | Eric Lam, Esq.<br>Simmons Perrine Moyer<br>        Bergman PLC<br>115 3rd Street SE, Suite 1200<br>Cedar Rapids, Iowa 52401-1266<br>Telephone: (319) 896-4018 |
| | | Eric Langston, Esq.<br>Simmons Perrine Moyer<br>        Bergman PLC<br>115 3rd Street SE, Suite 1200<br>Cedar Rapids, Iowa 52401-1266<br>Telephone: (319) 896-4018 |
| 3.        Party: Four Keys, LLC | Attorney: | Eric Lam, Esq.<br>Simmons Perrine Moyer<br>        Bergman PLC<br>115 3rd Street SE, Suite 1200<br>Cedar Rapids, Iowa 52401-1266<br>Telephone: (319) 896-4018 |

2

|   |   | Eric Langston, Esq.<br>Simmons Perrine Moyer<br>Bergman PLC<br>115 3rd Street SE, Suite 1200<br>Cedar Rapids, Iowa 52401-1266<br>Telephone: (319) 896-4018 |
|---|---|---|
| 4. | 6. Party: City of Charles City, IA | Attorney: Monica Clark, Esq.<br>Dorsey & Whitney, LLP<br>50 South Sixth Street, Suite 1500<br>Minneapolis, MN 55402-1498<br>Telephone: (612) 340-2600 |
| 5. | Party: Cornice & Rose International, Inc. | Attorney:  Bradley R. Kruse, Esq.<br>Dickinson Mackaman Tyler &<br>Hagen, P.C.<br>699 Walnut Street, Suite 1600<br>Des Moines, IA 50309<br>(515) 246-4505 |
|   |   | Louis K. Bonham, Esq.<br>Osha Liang LLP<br>Two Houston Center<br>909 Fannin, Suite 3500<br>Houston, TX 77010<br>(512) 480-0667 |

**Part 4:       Optional election to have appeal heard by District Court** (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

3

**Part 5: Sign below**


____/s/ Charles M. Thomson_____          Date: _____5-29-2020_____
Signature of attorney for appellant(s)

Name, address, and telephone number of attorney

Charles M. Thomson, Esq.
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
Telephone: (847) 456-1911
cthomson@doall.com

4

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

Chapter 7
#19 507

       Debtor.
-------------------------------------------------------------------

**ORDER AUTHORIZING APPROVING SALE**
**PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE**
**AND PROVIDING RELATED RELIEF**

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an

order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and

Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company

(together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement

("Agreement") appended to the Motion of certain real estate (as described more fully in the

Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal

property (as described more fully in the Agreement, the "Personal Property" and, together

with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the

transactions ("Transactions") contemplated in the Agreement; and the Trustee having

provided adequate and timely notice to all creditors and parties in interest of the Motion, it

appearing that the Purchaser submitted the highest and best offer to purchase the Property;

and a Sale Hearing having been held on April 8, 2020; and based upon the record of the Sale

Hearing and the facts set forth in the Motion as affirmed by the Trustee's Affidavit; and it

appearing that due, good, sufficient and timely notice of the relief sought and granted in this

order has been given and that no other or further notice need be given; at which time all

1

interested parties were offered an opportunity to be heard with respect to the Motion; and the

Court having had an opportunity to consider all responses and objections to the Motion; and

it appearing that the relief requested in the Motion is in the best interests of this Estate, its

creditors and other parties-in-interest; and after due deliberation and good cause appearing

therefor;

<div align="center">THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]</div>

A.   **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion

under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue

of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.   **Statutory Predicates.** The statutory predicates for the relief sought in the Motion

are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C.   **Notice.** As evidenced by the certificates of service filed with this Court and

based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely,

adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions

contemplated by the Agreement and this Order (the "Transactions"), has been provided in

accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or

further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances; and (iv) no other or further notice of the Motion or the Sale

Hearing or the Transactions, is or shall be required.

D.   **Opportunity to Object.** A reasonable opportunity to object and to be heard

with respect to the Motion and the relief requested therein has been given, in light of the

circumstances, to all interested persons and entities, including the following: (a) the U.S.

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

<div align="center">2</div>

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or

claim on the Property; (c) all entities known to have expressed an interest in acquiring the

Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its

counsel; and (f) all other parties who have filed notices of appearance and demands for

service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion.

All objections to the sale of the Property are overruled or resolved by this Order.

E. **Sale in Best Interests.** Good and sufficient reasons for approval of the

Agreement and the Transactions exist, as described in the Motion, and the relief requested in

the Motion is in the best interests of the estate, its creditors and other parties in interest.

F. **Business Justification.** The Trustee has demonstrated both (i) good, sufficient

and sound business purposes and justifications and (ii) compelling circumstances for the

Transactions other than in the ordinary course of business under Bankruptcy Code section

363(b) in that, among other things, the immediate consummation of the Transactions with

the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an

order approving the Agreement and all the provisions thereof is a necessary condition

precedent to the Purchaser consummating the Transactions.

G. **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered

into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length

bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined

in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the

Purchaser has engaged in any conduct that would cause or permit the Agreement to be

avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a

collusive manner with any person and the purchase price was not controlled by any

3

agreement among bidders.

H.     **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I.     **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other  interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J.     **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K.     **Free and Clear.** The Debtor is either the sole and lawful owner of the Property or there is a bona fide dispute as to ownership. The transfer of the Property to the

Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.      The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.      The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

N.      **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

O.      **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

6

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1.      **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.      **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.      **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4.      **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to

7

attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

5.  **Valid Transfer.** As of the Closing Date and except as otherwise provided herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

6.  **General Assignment.** On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement.

7.  **No Successor Liability.** Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

8

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or

responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or

shareholders, or the Property, having any liability whatsoever with respect to or be required

to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates,

members, or shareholders, or the Property, having any liability or responsibility to the

Estate, except as is expressly set forth in the Agreement, including, but not limited to,

liabilities on account of any taxes or other government fees, contributions or surcharges

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Property prior to the Closing Date.

        8.    **Binding Effect of Order.** This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of

title in or to any of the Property.

        9.    **Binding on Successors.** The terms and provisions of the Agreement

and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of

(whether known or unknown) and holders of equity interests in the Debtor, the Purchaser

and their respective affiliates, successors and assigns, and any affected third parties,

including, but not limited to, and all persons asserting Interests in the Property. This Order

and the Agreement shall inure to the benefit of the Purchaser and its respective successors and assigns.

10.     **Bankruptcy Code Section 363(n).** The consideration provided by the Purchaser for the Property under the Agreement is fair and reasonable. Based on the disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not aware of any facts that would support an argument for avoidance of the Transactions.

11.     **Good Faith.** The Transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions with the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

12.     **Fair Consideration.** The consideration provided by the Purchaser to the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

13.     **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

10

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions; and (e) protect the Purchaser against any Interests in the Debtor or the Property of any kind or nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain exclusive jurisdiction with respect to issues or disputes in connection with this Order and the relief provided herein, including without limitation to protect the Trustee and Purchaser from interference with the Sale, and to resolve any disputes related to the Sale, the Agreement or the implementation thereof.

14.      **Surrender of Possession.** All entities that are presently, or on the Closing Date may be, in possession of some or all of the Property in which the Debtor holds an interest hereby are directed to surrender possession of the Property either to (a) the Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15.      **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear, any and all valid and perfected Interests in Property of the Debtor shall attach to any proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the order of priority, and with the same validity, force and effect that they now have against the Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the express consent of the party or parties asserting an Interest therein or further order of the Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

16.     **Non-material Modifications.** The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the estate.

17.     **Failure to Specify Provisions.** The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

18.     **Stay of Order.** Bankruptcy Rule 6004(h) applies to this Order

19.     **Copyright:** So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement

12

resulting from the improper or unauthorized use of the C & R Intellectual Property by the

Purchaser, or its assignee, or any third parties.

     Dated and Entered:

  April 9, 2020

<div style="text-align: right;">
Hon. Thad J. Collins<br>
Chief Judge
</div>

*ORDER PREPARED BY:*
Charles L. Smith
Chapter 7 Trustee

1stSecMcQ.Bankr.Pleading.Draft.OrderreSale.040820.1139.ejl.redlined

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

IN RE:                                          )
                                                )   Chapter 7
MCQUILLEN PLACE COMPANY, LLC,   )
                                                )   Bankruptcy No. 19-00507
      Debtor.                              )

Date of Hearing:   May 8, 2020

APPEARANCES:

For Parties-In-Interest: Charles Thomson and James Gray for Equity Security Holders; Bradley Kruse
    and Louise Bonham for Cornice & Rose International, LLC; Larry Eide for First Security Bank &
    Trust Co.; and Eric Lam and Eric Langston for Four Keys, LLC
Case Trustee: Charles Smith

NATURE OF PROCEEDING:          _____In Court    _X_ Telephonic

  1)   Motion to Reconsider (Doc. 155)
  2)   Motion to Reconsider (Doc. 156)
  3)   Motion for Partial Withdrawal of the Reference (Doc. 157)
  4)   Motion to Stay (Doc. 158)

IT IS ORDERED THAT:

For the reasons stated in the Resistances and Joinders thereto and at the hearing on these matters, the
Motions to Reconsider and Motion to Stay are DENIED.   The Motion for Partial Withdrawal of the
Reference is also DENIED.

Dated and Entered   __May 15, 2020_____

_____
Thad J. Collins, Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1:      Identify the appellant(s)**

1.      Name(s) of appellant(s):      Cornice & Rose International, Inc.

2.      Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (describe) _____

For appeals in a bankruptcy case and not in an adversary proceeding.
☐ Debtor
x Creditor
☐ Trustee
☐ Other (describe) _____

**Part 2:            Identify the subject of this appeal**

1.      Describe the judgment, order, or decree appealed from:

"Order Authorizing Approving Sale Pursuant to Section 363 of the Bankruptcy Code and Providing Related Relief (Related Doc # 134) Dated and Entered on 4/9/2020. (tsta) (Entered: 04/09/2020)" (Docket #154)

"Proceeding Memo and Order. (related document(s)155 Motion to Reconsider, 156 Motion to Reconsider, 157 Motion, 158 Motion To Stay) (jmei) (Entered: 05/15/2020)" (Docket #180)

2.      State the date on which the judgment, order, or decree was entered: April 9, 2020 and May 15, 2020

1

**Part 3:**           **Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: Charles L. Smith, Trustee      Attorney:      Telpner Peterson Law Firm, LLP
                                                                              25 Main Place, Suite 200
                                                                              Council Bluffs, IA 51503
                                                                              Telephone: (712) 325-9000

2. Party: First Security Bank & Trust Co.   Attorney:      Larry S. Eide, Esq.
                                                                              Pappajohn, Shriver, Eide
                                                                                    & Nielsen PC
                                                                              103 E State St # 800
                                                                              Mason City, IA 50401
                                                                              Telephone: (641) 423-4264

                                                                              Randy Nielsen, Esq.
                                                                              Pappajohn, Shriver, Eide
                                                                                    & Nielsen PC
                                                                              103 E State St # 800
                                                                              Mason City, IA 50401
                                                                              Telephone: (641) 423-4264

                                                                              Eric Lam, Esq.
                                                                              Simmons Perrine Moyer
                                                                                    Bergman PLC
                                                                              115 3rd Street SE, Suite 1200
                                                                              Cedar Rapids, Iowa 52401-1266
                                                                              Telephone: (319) 896-4018

                                                                              Eric Langston, Esq.
                                                                              Simmons Perrine Moyer
                                                                                    Bergman PLC
                                                                              115 3rd Street SE, Suite 1200
                                                                              Cedar Rapids, Iowa 52401-1266
                                                                              Telephone: (319) 896-4018

3.      Party: Four Keys, LLC            Attorney:      Eric Lam, Esq.
                                                                              Simmons Perrine Moyer
                                                                                    Bergman PLC
                                                                              115 3rd Street SE, Suite 1200
                                                                              Cedar Rapids, Iowa 52401-1266
                                                                              Telephone: (319) 896-4018

2

|  |  |  | Eric Langston, Esq.<br>Simmons Perrine Moyer<br>Bergman PLC<br>115 3rd Street SE, Suite 1200<br>Cedar Rapids, Iowa 52401-1266<br>Telephone: (319) 896-4018 |
|---|---|---|---|
| 4. | Party: Charles M. Thomson | Attorney: | Charles M. Thomson, Esq.<br>Law Office of Charles M. Thomson<br>1110 N. Grand Ave., Suite 300<br>Charles City, Iowa 50616<br>Telephone: (847) 456-1911 |
| 5. | Party: James Gray | Attorney: | Charles M. Thomson, Esq.<br>Law Office of Charles M. Thomson<br>1110 N. Grand Ave., Suite 300<br>Charles City, Iowa 50616<br>Telephone: (847) 456-1911 |
| 6. | Party: City of Charles City, IA | Attorney: | Monica Clark, Esq.<br>Dorsey & Whitney, LLP<br>50 South Sixth Street, Suite 1500<br>Minneapolis, MN 55402-1498<br>Telephone: (612) 340-2600 |

**Part 4:**       **Optional election to have appeal heard by District Court** (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

Appellant hereby reserves its right to elect under 28 U.S.C. §158(c)(1) at any time prior to the expiration of the

**Part 5: Sign below**

/s/ Bradley R. Kruse                              Date: May 29, 2020
Signature of attorney for appellant(s)

3

Name, address, and telephone number of attorney

Bradley R. Kruse
Dickinson Mackaman Tyler & Hagen, P.C.
699 Walnut Street, Suite 1600
Des Moines, IA  50309
(515) 246-4505 / bkruse@dickinsonlaw.com

4

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

Chapter 7
#19 507

Debtor.

-------------------------------------------------------------------

**ORDER AUTHORIZING APPROVING SALE
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
AND PROVIDING RELATED RELIEF**

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company (together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement ("Agreement") appended to the Motion of certain real estate (as described more fully in the Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal property (as described more fully in the Agreement, the "Personal Property" and, together with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the transactions ("Transactions") contemplated in the Agreement; and the Trustee having provided adequate and timely notice to all creditors and parties in interest of the Motion, it appearing that the Purchaser submitted the highest and best offer to purchase the Property; and a Sale Hearing having been held on April 8, 2020; and based upon the record of the Sale Hearing and the facts set forth in the Motion as affirmed by the Trustee's Affidavit; and it appearing that due, good, sufficient and timely notice of the relief sought and granted in this order has been given and that no other or further notice need be given; at which time all

1

interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having had an opportunity to consider all responses and objections to the Motion; and it appearing that the relief requested in the Motion is in the best interests of this Estate, its creditors and other parties-in-interest; and after due deliberation and good cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]

A.    **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates.** The statutory predicates for the relief sought in the Motion are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C.    **Notice.** As evidenced by the certificates of service filed with this Court and based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely, adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions contemplated by the Agreement and this Order (the "Transactions"), has been provided in accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances; and (iv) no other or further notice of the Motion or the Sale Hearing or the Transactions, is or shall be required.

D.    **Opportunity to Object.** A reasonable opportunity to object and to be heard with respect to the Motion and the relief requested therein has been given, in light of the circumstances, to all interested persons and entities, including the following: (a) the U.S.

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

2

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or claim on the Property; (c) all entities known to have expressed an interest in acquiring the Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its counsel; and (f) all other parties who have filed notices of appearance and demands for service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion. All objections to the sale of the Property are overruled or resolved by this Order.

E.     **Sale in Best Interests.** Good and sufficient reasons for approval of the Agreement and the Transactions exist, as described in the Motion, and the relief requested in the Motion is in the best interests of the estate, its creditors and other parties in interest.

F.     **Business Justification.** The Trustee has demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Transactions other than in the ordinary course of business under Bankruptcy Code section 363(b) in that, among other things, the immediate consummation of the Transactions with the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an order approving the Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser consummating the Transactions.

G.     **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any

3

agreement among bidders.

H.    **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I.    **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other  interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J.    **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K.    **Free and Clear.** The Debtor is either the sole and lawful owner of the Property or there is a bona fide dispute as to ownership. The transfer of the Property to the

Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.      The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.      The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

5

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

N.    **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

O.    **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

6

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1.     **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.     **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.     **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4.     **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to

7

attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

5.  **Valid Transfer.** As of the Closing Date and except as otherwise provided herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

6.  **General Assignment.** On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement.

7.  **No Successor Liability.** Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

8

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or

responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or

shareholders, or the Property, having any liability whatsoever with respect to or be required

to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates,

members, or shareholders, or the Property, having any liability or responsibility to the

Estate, except as is expressly set forth in the Agreement, including, but not limited to,

liabilities on account of any taxes or other government fees, contributions or surcharges

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Property prior to the Closing Date.

8.    **Binding Effect of Order.** This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of

title in or to any of the Property.

9.    **Binding on Successors.** The terms and provisions of the Agreement

and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of

(whether known or unknown) and holders of equity interests in the Debtor, the Purchaser

and their respective affiliates, successors and assigns, and any affected third parties,

including, but not limited to, and all persons asserting Interests in the Property. This Order

9

and the Agreement shall inure to the benefit of the Purchaser and its respective successors and assigns.

   10. **Bankruptcy Code Section 363(n).** The consideration provided by the Purchaser for the Property under the Agreement is fair and reasonable. Based on the disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not aware of any facts that would support an argument for avoidance of the Transactions.

   11. **Good Faith.** The Transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions with the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

   12. **Fair Consideration.** The consideration provided by the Purchaser to the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

   13. **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if

necessary, any and all disputes concerning or relating in any way to the Transactions; and (e)

protect the Purchaser against any Interests in the Debtor or the Property of any kind or

nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain

exclusive jurisdiction with respect to issues or disputes in connection with this Order and the

relief provided herein, including without limitation to protect the Trustee and Purchaser

from interference with the Sale, and to resolve any disputes related to the Sale, the

Agreement or the implementation thereof.

14. **Surrender of Possession.** All entities that are presently, or on the

Closing Date may be, in possession of some or all of the Property in which the Debtor holds

an interest hereby are directed to surrender possession of the Property either to (a) the

Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15. **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the

Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear,

any and all valid and perfected Interests in Property of the Debtor shall attach to any

proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the

order of priority, and with the same validity, force and effect that they now have against the

Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no

proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the

express consent of the party or parties asserting an Interest therein or further order of the

Court after notice (to all parties who have asserted an Interest in such proceeds) and a

hearing, consistent with the requirements of the Bankruptcy Code.

16.     **Non-material Modifications.** The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the estate.

17.     **Failure to Specify Provisions.** The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

18.     **Stay of Order.** Bankruptcy Rule 6004(h) applies to this Order

19.     **Copyright:** So long as the Purchaser, or its assignee, or its architect or agents do not use the Plans or Drawings or any work in which Cornice & Rose International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the Purchaser, or its assignee, may use and occupy the Property, develop the Property, and complete the existing interior and exterior of the Property, free and clear of existing and future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or its assignee, or its architect or agents may not use the C & R Intellectual Property without first making arrangements satisfactory to C & R for the use of the C & R Intellectual Property. Nothing contained herein shall preclude future claims of copyright infringement

12

resulting from the improper or unauthorized use of the C & R Intellectual Property by the

Purchaser, or its assignee, or any third parties.

      Dated and Entered:

   April 9, 2020

                                 _____
                                 Hon. Thad J. Collins
                                 Chief Judge

*ORDER PREPARED BY:*
Charles L. Smith
Chapter 7 Trustee

1stSecMcQ.Bankr.Pleading.Draft.OrderreSale.040820.1139.ejl.redlined

<div align="center">13</div>

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

IN RE:                                    )
                                          )   Chapter 7
MCQUILLEN PLACE COMPANY, LLC,   )
                                          )   Bankruptcy No. 19-00507
          Debtor.                    )

Date of Hearing:   May 8, 2020

APPEARANCES:

For Parties-In-Interest: Charles Thomson and James Gray for Equity Security Holders; Bradley Kruse
    and Louise Bonham for Cornice & Rose International, LLC; Larry Eide for First Security Bank &
    Trust Co.; and Eric Lam and Eric Langston for Four Keys, LLC
Case Trustee: Charles Smith

NATURE OF PROCEEDING:          ____In Court    X   Telephonic

1)   Motion to Reconsider (Doc. 155)
2)   Motion to Reconsider (Doc. 156)
3)   Motion for Partial Withdrawal of the Reference (Doc. 157)
4)   Motion to Stay (Doc. 158)

IT IS ORDERED THAT:

For the reasons stated in the Resistances and Joinders thereto and at the hearing on these matters, the
Motions to Reconsider and Motion to Stay are DENIED.   The Motion for Partial Withdrawal of the
Reference is also DENIED.

Dated and Entered   May 15, 2020

_____
Thad J. Collins, Bankruptcy Judge

crtsvapl

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| In Re: | CHAPTER 7<br>Bankruptcy No. |
| McQuillen Place Company, LLC | 19–00507 |
| Debtor(s) | |

## CERTIFICATE OF SERVICE
## RE: NOTICE OF APPEAL AND TRANSMISSION TO
## BANKRUPTCY APPELLATE PANEL (BAP)

The Notice of Appeal filed May 29, 2020 has been transmitted to BANKRUPTCY APPELLATE PANEL (BAP) .
(Fee Paid )

Notice is provided to the following parties by electronic means:

bonham@oshaliang.com

Monica L Clark on behalf of Interested Party City of Charles City, Iowa
clark.monica@dorsey.com, yokiel.maryjo@dorsey.com;monica−clark−4834@ecf.pacerpro.com

Larry S. Eide on behalf of Creditor First Security Bank & Trust Company
eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com

Larry S. Eide on behalf of Defendant First Security Bank
eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com

Brandon James Gray on behalf of Creditor Iowa Economic Development Authority
Brandon.gray@ag.iowa.gov, idr.bankruptcy@ag.iowa.gov

J D Haas on behalf of Debtor McQuillen Place Company, LLC
jdhaas@jdhaas.com

J D Haas on behalf of Plaintiff McQuillen Place Company, LLC
jdhaas@jdhaas.com

Laura Michelle Hyer on behalf of Interested Party Cedar Rapids Bank & Trust Company
lhyer@bradleyriley.com, chahn@bradleyriley.com;Docket@bradleyriley.com

Bradley R. Kruse on behalf of Creditor Cornice & Rose International, LLC
bkruse@dickinsonlaw.com, awatson@dickinsonlaw.com

Eric W. Lam on behalf of Creditor First Security Bank & Trust Company
ELam@simmonsperrine.com, tdomeyer@SPMBLAW.com,kcarmichael@SPMBLAW.com

Eric W. Lam on behalf of Interested Party Four Keys, LLC
ELam@simmonsperrine.com, tdomeyer@SPMBLAW.com,kcarmichael@SPMBLAW.com

Eric J. Langston on behalf of Creditor First Security Bank & Trust Company
elangston@spmblaw.com, wscheer@spmblaw.com

Eric J. Langston on behalf of Interested Party Four Keys, LLC
elangston@spmblaw.com, wscheer@spmblaw.com

Donald H. Molstad on behalf of Debtor McQuillen Place Company, LLC
judylaw308@yahoo.com

Judith O'Donohoe on behalf of Creditor Elwood Law Office
charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com

Joseph E. Schmall on behalf of Interested Party Cedar Rapids Bank & Trust Company
jschmall@bradleyriley.com, gbowers@bradleyriley.com;docket@bradleyriley.com

Christine B. Skilton on behalf of Creditor T–J Service, Inc.
cbs.csslaw@butler–bremer.com

Bradley David Sloter on behalf of Interested Party City of Charles City, Iowa
brads@nsslaw.net

Charles L. Smith
trustee@telpnerlaw.com, IA21@ecfcbis.com

Charles McQuillen Thomson on behalf of Debtor McQuillen Place Company, LLC
cthomson@doall.com

Charles McQuillen Thomson on behalf of Equity Security Holder Charles Thomson
cthomson@doall.com

United States Trustee
USTPRegion12.CR.ECF@usdoj.gov

L Ashley Zubal on behalf of U.S. Trustee United States Trustee
Ashley.zubal@usdoj.gov

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Nicole J. Becker*

Date: June 1, 2020

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101
319–286–2200

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MCQUILLEN PLACE COMPANY, LLC, an | ) | Case No. 19-00507 |
| Iowa limited liability company, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1:        Identify the appellant(s)**

1.        Name(s) of appellant(s):        James A. Gray and Charles M. Thomson

2.        Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (describe) _____

For appeals in a bankruptcy case and not in an adversary proceeding.
☐ Debtor
x Creditor
☐ Trustee
☐ Other (describe) _____

**Part 2:                Identify the subject of this appeal**

1.        Describe the judgment, order, or decree appealed from:

"Order Authorizing Approving Sale Pursuant to Section 363 of the Bankruptcy Code and Providing Related Relief (Related Doc # 134) Dated and Entered on 4/9/2020. (tsta) (Entered: 04/09/2020)" (Docket #154)

"Proceeding Memo and Order. (related document(s)155 Motion to Reconsider, 156 Motion to Reconsider, 157 Motion, 158 Motion To Stay) (jmei) (Entered: 05/15/2020)" (Docket #180)

2.        State the date on which the judgment, order, or decree was entered: April 9, 2020 and May 15, 2020

1

**Part 3:**          **Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: Charles L. Smith, Trustee          Attorney:          Telpner Peterson Law Firm, LLP
                                                                25 Main Place, Suite 200
                                                                Council Bluffs, IA 51503
                                                                Telephone: (712) 325-9000

2. Party: First Security Bank & Trust Co.    Attorney:          Larry S. Eide, Esq.
                                                                Pappajohn, Shriver, Eide
                                                                    & Nielsen PC
                                                                103 E State St # 800
                                                                Mason City, IA 50401
                                                                Telephone: (641) 423-4264

                                                                Randy Nielsen, Esq.
                                                                Pappajohn, Shriver, Eide
                                                                    & Nielsen PC
                                                                103 E State St # 800
                                                                Mason City, IA 50401
                                                                Telephone: (641) 423-4264

                                                                Eric Lam, Esq.
                                                                Simmons Perrine Moyer
                                                                    Bergman PLC
                                                                115 3rd Street SE, Suite 1200
                                                                Cedar Rapids, Iowa 52401-1266
                                                                Telephone: (319) 896-4018

                                                                Eric Langston, Esq.
                                                                Simmons Perrine Moyer
                                                                    Bergman PLC
                                                                115 3rd Street SE, Suite 1200
                                                                Cedar Rapids, Iowa 52401-1266
                                                                Telephone: (319) 896-4018

3.      Party: Four Keys, LLC                Attorney:          Eric Lam, Esq.
                                                                Simmons Perrine Moyer
                                                                    Bergman PLC
                                                                115 3rd Street SE, Suite 1200
                                                                Cedar Rapids, Iowa 52401-1266
                                                                Telephone: (319) 896-4018

Eric Langston, Esq.
Simmons Perrine Moyer
        Bergman PLC
115 3rd Street SE, Suite 1200
Cedar Rapids, Iowa 52401-1266
Telephone: (319) 896-4018

4.    6. Party: City of Charles City, IA            Attorney: Monica Clark, Esq.
                                                    Dorsey & Whitney, LLP
                                                    50 South Sixth Street, Suite 1500
                                                    Minneapolis, MN 55402-1498
                                                    Telephone: (612) 340-2600

5.    Party: Cornice & Rose International, Inc.     Attorney:  Bradley R. Kruse, Esq.
                                                    Dickinson    Mackaman    Tyler    &
                                                            Hagen, P.C.
                                                    699 Walnut Street, Suite 1600
                                                    Des Moines, IA 50309
                                                    (515) 246-4505

                                                    Louis K. Bonham, Esq.
                                                    Osha Liang LLP
                                                    Two Houston Center
                                                    909 Fannin, Suite 3500
                                                    Houston, TX 77010
                                                    (512) 480-0667

**Part 4:**        **Optional election to have appeal heard by District Court** (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

3

**Part 5: Sign below**

_____/s/ Charles M. Thomson_____          Date: _____5-29-2020_____
Signature of attorney for appellant(s)

Name, address, and telephone number of attorney

Charles M. Thomson, Esq.
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
Telephone: (847) 456-1911
cthomson@doall.com

4

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

McQuillen Place Company, LLC

                    Debtor.

Chapter 7
#19 507

-------------------------------------------------------------------

**ORDER AUTHORIZING APPROVING SALE
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
AND PROVIDING RELATED RELIEF**

Upon the Motion of Trustee Charles L. Smith in this Chapter 7 case for entry of an order pursuant to section 363 of Title 11, United States Code (the "Bankruptcy Code") and Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving (a) the proposed sale by the Trustee to First Security Bank & Trust Company (together with its permitted assigns, the "Purchaser") pursuant to a Purchase Agreement ("Agreement") appended to the Motion of certain real estate (as described more fully in the Agreement, the "Land," the "Improvements," and the "Appurtenant Rights") and personal property (as described more fully in the Agreement, the "Personal Property" and, together with the Land, Improvements, and Appurtenant Rights, the "Property") and (b) the transactions ("Transactions") contemplated in the Agreement; and the Trustee having provided adequate and timely notice to all creditors and parties in interest of the Motion, it appearing that the Purchaser submitted the highest and best offer to purchase the Property; and a Sale Hearing having been held on April 8, 2020; and based upon the record of the Sale Hearing and the facts set forth in the Motion as affirmed by the Trustee's Affidavit; and it appearing that due, good, sufficient and timely notice of the relief sought and granted in this order has been given and that no other or further notice need be given; at which time all

1

interested parties were offered an opportunity to be heard with respect to the Motion; and the

Court having had an opportunity to consider all responses and objections to the Motion; and

it appearing that the relief requested in the Motion is in the best interests of this Estate, its

creditors and other parties-in-interest; and after due deliberation and good cause appearing

therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[1]

A.      **Jurisdiction and Venue.** This Court has jurisdiction to consider this Motion

under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue

of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      **Statutory Predicates.** The statutory predicates for the relief sought in the Motion

are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

C.      **Notice.** As evidenced by the certificates of service filed with this Court and

based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely,

adequate and sufficient notice of the Motion and of the Sale Hearing and the transactions

contemplated by the Agreement and this Order (the "Transactions"), has been provided in

accordance with Bankruptcy Code and Bankruptcy Rules; (ii) it appearing that no other or

further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances; and (iv) no other or further notice of the Motion or the Sale

Hearing or the Transactions, is or shall be required.

D.      **Opportunity to Object.** A reasonable opportunity to object and to be heard

with respect to the Motion and the relief requested therein has been given, in light of the

circumstances, to all interested persons and entities, including the following: (a) the U.S.

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Bankruptcy Rule 7052.

2

Trustee; (b) all creditors of the Debtors, including all parties known to be asserting a lien or

claim on the Property; (c) all entities known to have expressed an interest in acquiring the

Property; (d) the Iowa State and United States taxing authorities; (e) the Purchaser and its

counsel; and (f) all other parties who have filed notices of appearance and demands for

service of papers in this case under Bankruptcy Rule 2002 as of the date of filing the Motion.

All objections to the sale of the Property are overruled or resolved by this Order.

E. **Sale in Best Interests.** Good and sufficient reasons for approval of the

Agreement and the Transactions exist, as described in the Motion, and the relief requested in

the Motion is in the best interests of the estate, its creditors and other parties in interest.

F. **Business Justification.** The Trustee has demonstrated both (i) good, sufficient

and sound business purposes and justifications and (ii) compelling circumstances for the

Transactions other than in the ordinary course of business under Bankruptcy Code section

363(b) in that, among other things, the immediate consummation of the Transactions with

the Purchaser is necessary and appropriate to maximize the value of the estate. Entry of an

order approving the Agreement and all the provisions thereof is a necessary condition

precedent to the Purchaser consummating the Transactions.

G. **Arm's-Length Sale.** The Agreement was negotiated, proposed and entered

into by the Debtor and the Purchaser without collusion, in good faith, and from arms-length

bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined

in Bankruptcy Code section 101(31). The record is devoid of any evidence the Debtor or the

Purchaser has engaged in any conduct that would cause or permit the Agreement to be

avoided under Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a

collusive manner with any person and the purchase price was not controlled by any

3

agreement among bidders.

H.    **Good Faith Purchaser.** The Purchaser is a good faith purchaser of the Property within the meaning of Bankruptcy Code section 363(m) and is therefore entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*, the Purchaser agreed to subject its bid to at least one other competing bid, and all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been sufficiently disclosed.

I.    **Highest and Best Offer.** The Trustee has considered at least one other bid and the opportunity to submit bids was given to other  interested parties to make a higher and better offer for the Property. The Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Trustee's business judgment.

J.    **Consideration.** The consideration to be paid by the Purchaser constitutes reasonably equivalent value or fair consideration. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Property for an amount that would give significantly better and greater economic value to the estate. Approval of the Motion and the Agreement and the consummation of the Transactions contemplated thereby are in the best interests of the estate, its creditors, and all other parties in interest.

K.    **Free and Clear.** The Debtor is either the sole and lawful owner of the Property or there is a bona fide dispute as to ownership. The transfer of the Property to the

<div align="center">4</div>

Purchaser under the Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided herein, vests or will vest the Purchaser with all right, title, and interest of the Debtor to the Property free and clear of all liens, claims, encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"). For the avoidance of doubt, other than the sum of $150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee pursuant to the Agreement, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds. For the avoidance of doubt, any and all lien, interest, or rights asserted against the Land, Improvements and Appurtenant Rights will only attach to the amount attributable to the sale of the Land, Improvements and Appurtenant Rights (viz. $1,075,000 - $150,000 = $925,000) and any and all lien, interest, or rights asserted against the Personal Property will attach to the $25,000 attributable to the sale of the Personal Property sale.

L.    The Purchaser will not consummate the Transactions unless the Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of the Purchaser or its affiliates, members or shareholders or the Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any encumbrance.

M.    The Debtor may sell the Property free and clear of any Interests of any kind or nature whatsoever because the standards set forth in section 363(f) or 363(b) of the

Bankruptcy Code have been satisfied. Each entity with an Interest in the Property to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transactions or is deemed to have consented to the Transactions or (ii) otherwise falls within the provisions of section 363(f)(4) of the Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

N.      **Not a Successor.** The Purchaser (a) is not a successor to the Debtor, (b) has not, de facto or otherwise, merged with or into the Debtor, (c) is not a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, and (d) is not holding itself out to the public as a continuation of the Debtor. The transfer of the Property to the Purchaser does not and will not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

O.      **Prompt Consummation.** The Transactions must be approved and consummated promptly in order to preserve the Property, to maximize the value of the Debtor's estate and to minimize the claims against the estate. Time is of the essence in

6

consummating the Transactions.

NOW, THEREFORE, IT IS ORDERED THAT:

1.      **Motion is Granted.** The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.      **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.      **Approval.** The Agreement and all of the terms and conditions thereto are hereby approved. The Trustee and the Purchaser and their respective officers and directors are hereby authorized and directed to: (a) execute the Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, provided that such additional documents do not materially change its terms; (b) consummate the Transactions in accordance with the terms and conditions of the Agreement and the instruments to the Agreement contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transactions as contemplated by the Agreement and this Order.

4.      **Free and Clear.** Except as otherwise specifically provided for in the Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363, the Trustee is authorized and directed to transfer the Property to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Property free and clear of all Interests of any kind or nature whatsoever, including but not limited to any existing claims based on copyright infringement, liens or encumbrances, with all such Interests to

7

attach to the proceeds ultimately attributable to the Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

5.      **Valid Transfer.** As of the Closing Date and except as otherwise provided herein, the Transactions effect a legal, valid, and enforceable sale and transfer of the Property to the Purchaser, and shall vest the Purchaser with title to such Property free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Property or their proceeds.

6.      **General Assignment.** On the Closing Date, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's and the Estate's interests in the Property. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement.

7.      **No Successor Liability.** Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. The transfer of the Property to the Purchaser under the Agreement shall not result in (i) the

8

Purchaser, its affiliates, members, or shareholders, or the Property, having any liability or

responsibility for any claim against the Debtor, (ii) the Purchaser, its affiliates, members, or

shareholders, or the Property, having any liability whatsoever with respect to or be required

to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any encumbrance, or (iii) the Purchaser, its affiliates,

members, or shareholders, or the Property, having any liability or responsibility to the

Estate, except as is expressly set forth in the Agreement, including, but not limited to,

liabilities on account of any taxes or other government fees, contributions or surcharges

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Property prior to the Closing Date.

      8.   **Binding Effect of Order.** This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract to accept, file, register or otherwise record or release any

documents or instruments, or who may be required to report or insure any title or state of

title in or to any of the Property.

      9.   **Binding on Successors.** The terms and provisions of the Agreement

and this Order shall be binding in all respects upon the Debtor, its estate, all creditors of

(whether known or unknown) and holders of equity interests in the Debtor, the Purchaser

and their respective affiliates, successors and assigns, and any affected third parties,

including, but not limited to, and all persons asserting Interests in the Property. This Order

9

and the Agreement shall inure to the benefit of the Purchaser and its respective successors
and assigns.

10.    **Bankruptcy Code Section 363(n).** The consideration provided by the
Purchaser for the Property under the Agreement is fair and reasonable. Based on the
disclosures made to the Court in the Motion and at the Sale Hearing, the Trustee is not
aware of any facts that would support an argument for avoidance of the Transactions.

11.    **Good Faith.** The Transactions contemplated by the Agreement are
undertaken by the Purchaser without collusion and in good faith, as that term is used in
Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of
the authorization provided herein to consummate the Transactions shall not affect the
validity of the Transactions with the Purchaser, unless such authorization is duly stayed
pending such appeal. The Purchaser is a good faith purchaser of the Property, and is entitled
to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

12.    **Fair Consideration.** The consideration provided by the Purchaser to
the Debtor pursuant to the Agreement for its purchase of the Property constitutes reasonably
equivalent value and fair consideration under the Bankruptcy Code.

13.    **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to
its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret,
implement, and enforce the terms and provisions of this Order and the Agreement, all
amendments thereto and any waivers and consents thereunder and each of the agreements
executed in connection therewith, including, but not limited to, retaining jurisdiction to: (a)
compel delivery of the Property to the Purchaser; (b) compel delivery of the Purchase Price
to the Trustee or performance of other obligations owed to the Trustee; (c) interpret,

10

implement and enforce the provisions of this Order and the Agreement; (d) to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions; and (e) protect the Purchaser against any Interests in the Debtor or the Property of any kind or nature whatsoever attaching to the proceeds of the Transactions. This Court shall retain exclusive jurisdiction with respect to issues or disputes in connection with this Order and the relief provided herein, including without limitation to protect the Trustee and Purchaser from interference with the Sale, and to resolve any disputes related to the Sale, the Agreement or the implementation thereof.

14.     **Surrender of Possession.** All entities that are presently, or on the Closing Date may be, in possession of some or all of the Property in which the Debtor holds an interest hereby are directed to surrender possession of the Property either to (a) the Trustee before the Closing Date or (b) to the Purchaser on the Closing Date.

15.     **Sale Proceeds.** Other than the sum of $ 150,000 (from the sale of the Land, Improvements and Appurtenant Rights) to be released to the Trustee free and clear, any and all valid and perfected Interests in Property of the Debtor shall attach to any proceeds of such Property immediately upon receipt of such proceeds by the Trustee in the order of priority, and with the same validity, force and effect that they now have against the Property, as provided in ¶K *supra*. Except as required by this Order or the Agreement, no proceeds subject to an asserted Interest shall be used or disbursed by the Trustee without the express consent of the party or parties asserting an Interest therein or further order of the Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

16.    **Non-material Modifications.** The Agreement and any related

agreements, documents or other instruments may be modified, amended or supplemented by

the parties thereto, in a writing signed by such parties, and in accordance with the terms

thereof, without further order of the Court, provided that any such modification, amendment

or supplement does not have a material adverse effect on the estate.

17.    **Failure to Specify Provisions.** The failure specifically to include any

particular provisions of the Agreement in this Order shall not diminish or impair the

effectiveness of such provisions, it being the intent of the Court that the Agreement be

authorized and approved in its entirety; provided, however, that this Order shall govern if

there is any inconsistency between the Agreement (including all ancillary documents

executed in connection therewith) and this Order. Likewise, all of the provisions of this

Order are non-severable and mutually dependent.

18.    **Stay of Order.** Bankruptcy Rule 6004(h) applies to this Order

19.    **Copyright:** So long as the Purchaser, or its assignee, or its architect or

agents do not use the Plans or Drawings or any work in which Cornice & Rose

International, LLC ("C & R") holds a valid copyright (the C & R Intellectual Property), the

Purchaser, or its assignee, may use and occupy the Property, develop the Property, and

complete the existing interior and exterior of the Property, free and clear of existing and

future claims of C & R, whether for copyright infringement or otherwise. The Purchaser, or

its assignee, or its architect or agents may not use the C & R Intellectual Property without

first making arrangements satisfactory to C & R for the use of the C & R Intellectual

Property. Nothing contained herein shall preclude future claims of copyright infringement

resulting from the improper or unauthorized use of the C & R Intellectual Property by the

Purchaser, or its assignee, or any third parties.

      Dated and Entered:

April 9, 2020

                                              Hon. Thad J. Collins
                                              Chief Judge

*ORDER PREPARED BY:*
Charles L. Smith
Chapter 7 Trustee

1stSecMcQ.Bankr.Pleading.Draft.OrderreSale.040820.1139.ejl.redlined

13

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
**PROCEEDING MEMO AND ORDER**

IN RE:                                      )
                                            )   Chapter 7
MCQUILLEN PLACE COMPANY, LLC,   )
                                            )   Bankruptcy No. 19-00507
     Debtor.                         )

Date of Hearing:   May 8, 2020

APPEARANCES:

For Parties-In-Interest: Charles Thomson and James Gray for Equity Security Holders; Bradley Kruse
   and Louise Bonham for Cornice & Rose International, LLC; Larry Eide for First Security Bank &
   Trust Co.; and Eric Lam and Eric Langston for Four Keys, LLC
Case Trustee: Charles Smith

NATURE OF PROCEEDING:          ____In Court     X   Telephonic

1)   Motion to Reconsider (Doc. 155)
2)   Motion to Reconsider (Doc. 156)
3)   Motion for Partial Withdrawal of the Reference (Doc. 157)
4)   Motion to Stay (Doc. 158)

IT IS ORDERED THAT:

For the reasons stated in the Resistances and Joinders thereto and at the hearing on these matters, the
Motions to Reconsider and Motion to Stay are DENIED.   The Motion for Partial Withdrawal of the
Reference is also DENIED.

Dated and Entered    May 15, 2020

_____
Thad J. Collins, Bankruptcy Judge

crtsvapl

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| | CHAPTER 7 |
| In Re: | Bankruptcy No. |
| | |
| McQuillen Place Company, LLC | 19–00507 |
| | |
| Debtor(s) | |

## CERTIFICATE OF SERVICE
## RE: NOTICE OF APPEAL AND TRANSMISSION TO
## BANKRUPTCY APPELLATE PANEL (BAP)

The Notice of Appeal filed May 29, 2020 has been transmitted to BANKRUPTCY APPELLATE PANEL (BAP) . (Fee Paid )

Notice is provided to the following parties by electronic means:

Louis Karl Bonham on behalf of Creditor Cornice & Rose International, LLC
bonham@oshaliang.com

Monica L Clark on behalf of Interested Party City of Charles City, Iowa
clark.monica@dorsey.com, yokiel.maryjo@dorsey.com;monica−clark−4834@ecf.pacerpro.com

Larry S. Eide on behalf of Creditor First Security Bank & Trust Company
eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com

Larry S. Eide on behalf of Defendant First Security Bank
eide@pappajohnlaw.com, eidelr79374@notify.bestcase.com

Brandon James Gray on behalf of Creditor Iowa Economic Development Authority
Brandon.gray@ag.iowa.gov, idr.bankruptcy@ag.iowa.gov

J D Haas on behalf of Debtor McQuillen Place Company, LLC
jdhaas@jdhaas.com

J D Haas on behalf of Plaintiff McQuillen Place Company, LLC
jdhaas@jdhaas.com

Laura Michelle Hyer on behalf of Interested Party Cedar Rapids Bank & Trust Company
lhyer@bradleyriley.com, chahn@bradleyriley.com;Docket@bradleyriley.com

Bradley R. Kruse on behalf of Creditor Cornice & Rose International, LLC
bkruse@dickinsonlaw.com, awatson@dickinsonlaw.com

Eric W. Lam on behalf of Creditor First Security Bank & Trust Company
ELam@simmonsperrine.com, tdomeyer@SPMBLAW.com,kcarmichael@SPMBLAW.com

Eric W. Lam on behalf of Interested Party Four Keys, LLC

ELam@simmonsperrine.com, tdomeyer@SPMBLAW.com,kcarmichael@SPMBLAW.com

Eric J. Langston on behalf of Creditor First Security Bank & Trust Company
elangston@spmblaw.com, wscheer@spmblaw.com

Eric J. Langston on behalf of Interested Party Four Keys, LLC
elangston@spmblaw.com, wscheer@spmblaw.com

Donald H. Molstad on behalf of Debtor McQuillen Place Company, LLC
judylaw308@yahoo.com

Judith O'Donohoe on behalf of Creditor Elwood Law Office
charlescity@elwoodlawfirm.com, lisabartz@elwoodlawfirm.com

Joseph E. Schmall on behalf of Interested Party Cedar Rapids Bank & Trust Company
jschmall@bradleyriley.com, gbowers@bradleyriley.com;docket@bradleyriley.com

Christine B. Skilton on behalf of Creditor T–J Service, Inc.
cbs.csslaw@butler–bremer.com

Bradley David Sloter on behalf of Interested Party City of Charles City, Iowa
brads@nsslaw.net

Charles L. Smith
trustee@telpnerlaw.com, IA21@ecfcbis.com

Charles McQuillen Thomson on behalf of Creditor James Gray
cthomson@doall.com

Charles McQuillen Thomson on behalf of Debtor McQuillen Place Company, LLC
cthomson@doall.com

Charles McQuillen Thomson on behalf of Equity Security Holder Charles Thomson
cthomson@doall.com

United States Trustee
USTPRegion12.CR.ECF@usdoj.gov

L Ashley Zubal on behalf of U.S. Trustee United States Trustee
Ashley.zubal@usdoj.gov

MEGAN R. WEISS
Clerk, Bankruptcy Court
by:

*Nicole J. Becker*

Date: June 1, 2020

Deputy Clerk
United States Bankruptcy Court
Northern District of Iowa
111 Seventh Avenue SE Box 15
Cedar Rapids, IA 52401–2101
319–286–2200

## Nicole Becker

| | |
|---|---|
| **From:** | ca08ml_cmecf_Notify@ca8.uscourts.gov |
| **Sent:** | Monday, June 1, 2020 3:15 PM |
| **To:** | IANBdb_Appeals |
| **Subject:** | 20-6012 Cornice & Rose International v. Charles L. Smith, et al "BAP Case Docketed" (19-00507) |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

<div align="center">

**Eighth Circuit Court of Appeals**

</div>

**Notice of Docket Activity**

The following transaction was filed on 06/01/2020

| | |
|---|---|
| **Case Name:** | Cornice & Rose International v. Charles L. Smith, et al |
| **Case Number:** | 20-6012 |
| **Document(s):** | Document(s) |

**Docket Text:**
Bankruptcy Appellate Panel Cases Docketed. [4918914] [20-6012, 20-6013] (CAH)

**Notice will be electronically mailed to:**

Ms. Monica Lynn Clark: clark.monica@dorsey.com
Mr. Larry Eide: eide@pappajohnlaw.com
Ms. Jean L. Hekel, District/Bankruptcy Clerk: APPEALS@IANB.uscourts.gov
Mr. Bradley Richard Kruse: bkruse@dickinsonlaw.com
Mr. Eric W. Lam: elam@simmonsperrine.com, kcarmichael@spmblaw.com, tdomeyer@spmblaw.com, slarson@spmblaw.com
Mr. Eric J. Langston: elangston@spmblaw.com, wscheer@spmblaw.com
Mr. Charles L. Smith: csmith@telpnerlaw.com
Mr. James L. Snyder: James.L.Snyder@usdoj.gov
Charles M. Thomson: cthomson@doall.com

**Notice will be mailed to:**

Mr. Randall E. Nielsen
PAPPAJOHN & SHRIVER
Suite 800
103 E. State Street
P.O. Box 1588
Mason City, IA 50401-0000

<div align="center">

1

</div>

The following document(s) are associated with this transaction:
**Document Description:** Docketing Letter
**Original Filename:** /opt/ACECF/live/forms/CindyHarrison_206012_4918914_BAP-GeneralDocketingLetters_375.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=06/01/2020] [FileNumber=4918914-0]
[5401d289ba05351b975827a1ba165148ba3bcb8567aba22c751b6bb27921e416b88cb939c78af1ac2a61389d2ba969367
6183c997421895548f97580accf2032]]
**Recipients:**

- Ms. Monica Lynn Clark
- Mr. Larry Eide
- Ms. Jean L. Hekel, District/Bankruptcy Clerk
- Mr. Bradley Richard Kruse
- Mr. Eric W. Lam
- Mr. Eric J. Langston
- Mr. Randall E. Nielsen
- Mr. Charles L. Smith
- Mr. James L. Snyder
- Charles M. Thomson

**Document Description:** Addresses of Case Participants
**Original Filename:** /opt/ACECF/live/forms/CindyHarrison_206012_4918914_PullAddresses_110.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=06/01/2020] [FileNumber=4918914-1]
[2c3040edc9ee0eedc9a0156560589d9f2d0a177b7b8189d743bf61c2ae1f98fb00bd83f77beaef760c7b7fefc9de245aff494
07b7be81698211d8b86b1f3809b]]
**Recipients:**

- Ms. Monica Lynn Clark
- Mr. Larry Eide
- Ms. Jean L. Hekel, District/Bankruptcy Clerk
- Mr. Bradley Richard Kruse
- Mr. Eric W. Lam
- Mr. Eric J. Langston
- Mr. Randall E. Nielsen
- Mr. Charles L. Smith
- Mr. James L. Snyder
- Charles M. Thomson

**Document Description:** Case Caption
**Original Filename:** /opt/ACECF/live/forms/CindyHarrison_206012_4918914_BAP-CaseCaption_383.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=06/01/2020] [FileNumber=4918914-2]
[3cd79b227226bfdfe0a7981e1e9462be74f96e55379d138c9f9b848bb3d5c9089548688015b3858311e3a0cf5e2b40a6d2
58f207d6db4a0639908c08f5f6fd67]]
**Recipients:**

- Ms. Monica Lynn Clark
- Mr. Larry Eide
- Ms. Jean L. Hekel, District/Bankruptcy Clerk
- Mr. Bradley Richard Kruse

- [Mr. Eric W. Lam](#)
- [Mr. Eric J. Langston](#)
- [Mr. Randall E. Nielsen](#)
- [Mr. Charles L. Smith](#)
- [Mr. James L. Snyder](#)
- [Charles M. Thomson](#)

## Nicole Becker

| | |
|---|---|
| **From:** | ca08ml_cmecf_Notify@ca8.uscourts.gov |
| **Sent:** | Monday, June 1, 2020 3:15 PM |
| **To:** | IANBdb_Appeals |
| **Subject:** | 20-6012 Cornice & Rose International v. Charles L. Smith, et al "BAP Case Docketed" (19-00507) |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

**Eighth Circuit Court of Appeals**

**Notice of Docket Activity**

The following transaction was filed on 06/01/2020

| | |
|---|---|
| **Case Name:** | Cornice & Rose International v. Charles L. Smith, et al |
| **Case Number:** | 20-6012 |
| **Document(s):** | Document(s) |

**Docket Text:**
Bankruptcy Appellate Panel Cases Docketed. [4918914] [20-6012, 20-6013] (CAH)

**Notice will be electronically mailed to:**

Ms. Monica Lynn Clark: clark.monica@dorsey.com
Mr. Larry Eide: eide@pappajohnlaw.com
Ms. Jean L. Hekel, District/Bankruptcy Clerk: APPEALS@IANB.uscourts.gov
Mr. Bradley Richard Kruse: bkruse@dickinsonlaw.com
Mr. Eric W. Lam: elam@simmonsperrine.com, kcarmichael@spmblaw.com, tdomeyer@spmblaw.com, slarson@spmblaw.com
Mr. Eric J. Langston: elangston@spmblaw.com, wscheer@spmblaw.com
Mr. Charles L. Smith: csmith@telpnerlaw.com
Mr. James L. Snyder: James.L.Snyder@usdoj.gov
Charles M. Thomson: cthomson@doall.com

**Notice will be mailed to:**

Mr. Randall E. Nielsen
PAPPAJOHN & SHRIVER
Suite 800
103 E. State Street
P.O. Box 1588
Mason City, IA 50401-0000

1

The following document(s) are associated with this transaction:
**Document Description:** Docketing Letter
**Original Filename:** /opt/ACECF/live/forms/CindyHarrison_206012_4918914_BAP-GeneralDocketingLetters_375.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=06/01/2020) [FileNumber=4918914-0]
[5401d289ba05351b975827a1ba165148ba3bcb8567aba22c751b6bb27921e416b88cb939c78af1ac2a61389d2ba969367
6183c997421895548f97580accf2032]]
**Recipients:**

- Ms. Monica Lynn Clark
- Mr. Larry Eide
- Ms. Jean L. Hekel, District/Bankruptcy Clerk
- Mr. Bradley Richard Kruse
- Mr. Eric W. Lam
- Mr. Eric J. Langston
- Mr. Randall E. Nielsen
- Mr. Charles L. Smith
- Mr. James L. Snyder
- Charles M. Thomson

**Document Description:** Addresses of Case Participants
**Original Filename:** /opt/ACECF/live/forms/CindyHarrison_206012_4918914_PullAddresses_110.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=06/01/2020) [FileNumber=4918914-1]
[2c3040edc9ee0eedc9a0156560589d9f2d0a177b7b8189d743bf61c2ae1f98fb00bd83f77beaef760c7b7fefc9de245aff494
07b7be81698211d8b86b1f3809b]]
**Recipients:**

- Ms. Monica Lynn Clark
- Mr. Larry Eide
- Ms. Jean L. Hekel, District/Bankruptcy Clerk
- Mr. Bradley Richard Kruse
- Mr. Eric W. Lam
- Mr. Eric J. Langston
- Mr. Randall E. Nielsen
- Mr. Charles L. Smith
- Mr. James L. Snyder
- Charles M. Thomson

**Document Description:** Case Caption
**Original Filename:** /opt/ACECF/live/forms/CindyHarrison_206012_4918914_BAP-CaseCaption_383.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1105112566 [Date=06/01/2020) [FileNumber=4918914-2]
[3cd79b227226bfdfe0a7981e1e9462be74f96e55379d138c9f9b848bb3d5c9089548688015b3858311e3a0cf5e2b40a6d2
58f207d6db4a0639908c08f5f6fd67]]
**Recipients:**

- Ms. Monica Lynn Clark
- Mr. Larry Eide
- Ms. Jean L. Hekel, District/Bankruptcy Clerk
- Mr. Bradley Richard Kruse

- Mr. Eric W. Lam
- Mr. Eric J. Langston
- Mr. Randall E. Nielsen
- Mr. Charles L. Smith
- Mr. James L. Snyder
- Charles M. Thomson

## U.S. BANKRUPTCY APPELLATE PANEL

FOR THE EIGHTH CIRCUIT

### APPEAL BRIEFING SCHEDULE

Appeal No.      20-6012    Cornice & Rose International v. Charles L. Smith, et al

               20-6013    Charles M. Thomson, et al v. Charles L. Smith, et al

Date:            June 01, 2020

These appeals have been consolidated for briefing and submission to the court.  This schedule has been established in conformity with Fed.R. Bankr.P. 8015 and 8016. Extensions of time will not be routinely granted.

### TRANSCRIPT REQUIREMENTS:

The transcript must be ordered <u>within fourteen days</u> of the filing of the notice of appeal. Counsel may not "buy time" to file a brief by failing to timely order a transcript. Failure of appellant to provide the transcript may result in the dismissal of the appeal.

### FILING DATES:

Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **07/01/2020**

Appellant Briefs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**07/31/2020**

Appellee Briefs. . . . . . . . . . . . . . . . . . . . . . . . . . . . .**30 days from service of Appellant Briefs**

Reply Briefs (optional) . . . . . . . . . . . . . . . . . . . . . . .**14 days from service of Appellee Briefs**

**U.S. BANKRUPTCY APPELLATE PANEL**

FOR THE EIGHTH CIRCUIT

### APPEAL BRIEFING SCHEDULE

Appeal No.    20-6012    Cornice & Rose International v. Charles L. Smith, et al

20-6013    Charles M. Thomson, et al v. Charles L. Smith, et al

Date:         June 01, 2020

These appeals have been consolidated for briefing and submission to the court.  This schedule has been established in conformity with Fed.R. Bankr.P. 8015 and 8016. Extensions of time will not be routinely granted.

### TRANSCRIPT REQUIREMENTS:

The transcript must be ordered <u>within fourteen days</u> of the filing of the notice of appeal. Counsel may not "buy time" to file a brief by failing to timely order a transcript. Failure of appellant to provide the transcript may result in the dismissal of the appeal.

### FILING DATES:

Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **07/01/2020**

Appellant Briefs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**07/31/2020**

Appellee Briefs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**30 days from service of Appellant Briefs**

Reply Briefs (optional) . . . . . . . . . . . . . . . . . . . . . . .**14 days from service of Appellee Briefs**