# United States Bankruptcy Court
## Northern District of Iowa (Mason City)
## Bankruptcy Petition #: 19–00507

*Assigned to:* Thad J. Collins
Chapter 7
Previous chapter 11
Original chapter 11
Voluntary
Asset

*Date filed:* 04/25/2019
*Date converted:* 12/09/2019
*341 meeting:* 01/27/2020
*Deadline for filing claims:* 04/08/2020

| | |
|---|---|
| *Debtor*<br>**McQuillen Place Company, LLC**<br>1110 North Grand Ave., Suite 300<br>Charles City, IA 50616<br>FLOYD–IA<br>847–456–1911<br>Tax ID / EIN: 46–3987825<br>*aka* **Classic Cleaners**<br>*aka* **Classic Cleaners of Charles City** | represented by **J D Haas**<br>J D Haas & Associates, PLLC<br>1120 E. 80th St.<br>Suite 200<br>Bloomington, MN 55420<br>952–345–1025<br>Fax : 952–854–1665<br>Email: jdhaas@jdhaas.com<br><br>**Donald H. Molstad**<br>701 Pierce St., Ste. 305<br>Sioux City, IA 51101<br>712–255–8036<br>Email: judylaw308@yahoo.com<br><br>**Charles McQuillen Thomson**<br>Law Office of Charles M. Thomson<br>1110 North Grand Ave., Suite 300<br>Charles City, IA 50616<br>847–456–1911<br>Fax : 847–495–3488<br>Email: cthomson@doall.com |
| *Trustee*<br>**Charles L. Smith**<br>25 Main Place, Ste 200<br>P.O. Box 248<br>Council Bluffs, IA 51502–0248<br>712–325–9000 | represented by **Telpner Peterson Law Firm, LLP**<br>25 Main Place, Suite 200<br>Council Bluffs, IA 51503<br>712–325–9000 |
| *U.S. Trustee*<br>**United States Trustee**<br>United States Federal Courthouse<br>111 7th Avenue SE, Box 17<br>Cedar Rapids, IA 52401–2101<br>319–364–2211 | represented by **L Ashley Zubal**<br>U.S. Trustee<br>Federal Building<br>210 Walnut Street, Rm 793<br>Des Moines, IA 50309–2108<br>515–323–2269<br>Email: Ashley.zubal@usdoj.gov |

*Cred. Comm. Chair*
**Allen O. Pederson**
412 Sample Street
Nashua, IA 50658

| Filing Date | # | Docket Text |
|---|---|---|
| 06/17/2020 | 197 | Transcript regarding Hearing Held on February 14, 2020 RE: Motion to Amend. Remote electronic access to the transcript is restricted until 9/15/2020. The transcript may be viewed at the Bankruptcy Court Clerk's Office. Please contact Transcriber Toni Hudson, Exceptional Reporting Services, Inc., 361–949–2988 to obtain a copy of this transcript . Notice of Intent to Request Redaction Deadline Due By 6/24/2020 Redaction Request Due By 7/8/2020 Redacted Transcript Submission Due By 7/20/2020 Transcript access will be restricted through 9/15/2020 (dcri) (Entered: 06/17/2020) |
| 06/17/2020 | 198 | Transcript regarding Hearing Held on March 25, 2020 RE: Motion to Extend/Shorten Time. Remote electronic access to the transcript is restricted until 9/15/2020. The transcript may be viewed at the Bankruptcy Court Clerk's Office. Please contact Transcriber Toni Hudson, Exceptional Reporting Services, Inc., 361–949–2988 to obtain a copy of this transcript . Notice of Intent to Request Redaction Deadline Due By 6/24/2020 Redaction Request Due By 7/8/2020 Redacted Transcript Submission Due By 7/20/2020 Transcript access will be restricted through 9/15/2020 (dcri) (Entered: 06/17/2020) |
| 06/17/2020 | 199 | Transcript regarding Hearing Held on April 8, 2020 RE: Motion for Sale/Motion to Sell Property. Remote electronic access to the transcript is restricted until 9/15/2020. The transcript may be viewed at the Bankruptcy Court Clerk's Office. Please contact Transcriber Toni Hudson, Exceptional Reporting Services, Inc., 361–949–2988 to obtain a copy of this transcript . Notice of Intent to Request Redaction Deadline Due By 6/24/2020 Redaction Request Due By 7/8/2020 Redacted Transcript Submission Due By 7/20/2020 Transcript access will be restricted through 9/15/2020 (dcri) (Entered: 06/17/2020) |
| 06/17/2020 | 200 | Transcript regarding Hearing Held on May 8, 2020 RE: Motions to Reconsider; Withdrawal of Reference; Motion to Stay. Remote electronic access to the transcript is restricted until 9/15/2020. The transcript may be viewed at the Bankruptcy Court Clerk's Office. Please contact Transcriber Toni Hudson, Exceptional Reporting Services, Inc., 361–949–2988 to obtain a copy of this transcript . Notice of Intent to Request Redaction Deadline Due By 6/24/2020 Redaction Request Due By 7/8/2020 Redacted Transcript Submission Due By 7/20/2020 Transcript access will be restricted through 9/15/2020 (dcri) (Entered: 06/17/2020) |
| 06/17/2020 | 201 | Transcript regarding Hearing Held on November 14, 2019 RE: Motion to Convert or Dismiss Case. Remote electronic access to the transcript is restricted until 9/15/2020. The transcript may be viewed at the Bankruptcy Court Clerk's Office. Please contact Transcriber Toni Hudson, Exceptional Reporting Services, Inc., 361–949–2988 to obtain a copy of this transcript . Notice of Intent to Request Redaction Deadline Due By 6/24/2020 Redaction Request Due By 7/8/2020 Redacted Transcript Submission Due By 7/20/2020 Transcript access will be restricted through 9/15/2020 (dcri) (Entered: 06/17/2020) |
| 06/17/2020 | 202 | Transcript regarding Hearing Held on December 6, 2019 RE: Ruling on Motion to Convert or Dismiss Case. Remote electronic access to the transcript is restricted until 9/15/2020. The transcript may be viewed at the Bankruptcy Court Clerk's Office. Please contact Transcriber Toni Hudson, Exceptional Reporting Services, Inc., 361–949–2988 to obtain a |

| | | | |
|---|---|---|---|
| | | | copy of this transcript . Notice of Intent to Request Redaction Deadline Due By 6/24/2020 Redaction Request Due By 7/8/2020 Redacted Transcript Submission Due By 7/20/2020 Transcript access will be restricted through 9/15/2020 (dcri) (Entered: 06/17/2020) |
| 06/18/2020 | | 203 | Notice of Filing of Transcript. Notice is hereby given that a transcript of the Motion to Amend hearing held on February 14, 2020 has been filed. A transcript on the Motion to Extend/Shorten Time hearing held March 25, 2020. A transcript on the Motion for Sale/Motion to Sell Property hearing held on April 8, 2020. A transcript on the Motions to Reconsider; Withdrawal of Reference; Motion to Stay hearing held on May 8, 2020. A transcript on the Motion to Convert or Dismiss Case hearing held on November 14, 2019. A transcript on the Motion to Convert or Dismiss Case hearing held on December 6, 2019. Pursuant to the new policy adopted by the Judicial Conference, transcripts are available for inspection only at the clerk's office or may be purchased from the transcriber for a 90 day period. (related document(s)197 Transcript) (nbec) Modified on 6/18/2020 (nbec). Related document(s) 198 Transcript, 199 Transcript, 200 Transcript, 201 Transcript, 202 Transcript. Modified on 6/18/2020 (nbec). (Entered: 06/18/2020) |
| 06/22/2020 | | 204 | Acknowledgment Received from USDC Appeal filed on June 17, 2020 Case No. 20–cv–002040–CJM–KEM (related document(s)183 Notice of Appeal and Statement of Election) (nbec) (Entered: 06/22/2020) |
| 06/22/2020 | | 205 | Acknowledgment Received from USDC Appeal filed on June 17, 2020 Case No.20–cv–02041–CJM–KEM (related document(s)184 Notice of Appeal and Statement of Election) (nbec) (Entered: 06/22/2020) |
| 06/24/2020 | | 206 | Motion *to Pay Real Estate Taxes, for Assignment, and for Other Relief* Filed by First Security Bank & Trust Company (Lam, Eric) (Entered: 06/24/2020) |
| 06/25/2020 | | 207 | Notice Setting Bar Date for Objections Re: Motion – *to Pay Real Estate Taxes, for Assignment, and for Other Relief* Filed by First Security Bank & Trust Company (related document(s)206 Motion). Objections due by 7/16/2020. (Lam, Eric) (Entered: 06/25/2020) |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
(MASON CITY)

| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  19-00507 |
| | ) | CHAPTER 7 |
| | ) | |
| McQUILLEN PLACE COMPANY, LLC, | ) | Cedar Rapids, Iowa |
| | ) | |
| | ) | Friday, February 14, 2020 |
| Debtor. | ) | |
| | ) | 1:34 p.m. to 1:58 p.m. |

TELEPHONIC HEARING RE: MOTION TO AMEND

BEFORE THE HONORABLE THAD J. COLLINS,
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:              (CONTINUED ON PAGE 2)

For Debtor:              DONALD H. MOLSTAD, ESQ.
                         701 Pierce St., Suite 305
                         Sioux City, IA 51101

                         CHARLES M. THOMSON, ESQ.
                         Law Office of Charles M. Thomson
                         1110 North Grand Ave., Suite 300
                         Charles City, IA 50616

For Cedar Rapids Bank    JOSEPH E. SCHMALL, ESQ.
& Trust:                 2007 First Avenue SE
                         P.O. Box 2804
                         Cedar Rapids, IA 52406

Court Reporter:          Recorded; FTR

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**          (CONTINUED)


First Security Bank          LARRY S. EIDE, ESQ.
& Trust Company:             103 East State St., Suite 800
                             P.O. Box 1588
                             Mason City, IA 50402


Iowa Economic                BRANDON J. GRAY, ESQ.
Development Authority:        Iowa Attorney General's Office
                             1305 Walnut
                             Des Moines, IA 50319


Trustee:                     CHARLES L. SMITH, ESQ.
                             25 Main Place, Suite 200
                             P.O. Box 248
                             Council Bluffs, IA 51502

1      **Cedar Rapids, Iowa; Friday, February 14, 2020; 1:34 p.m.**

2           **(Attorneys appearing telephonically)**

3                **(Call to Order)**

4      **THE COURT:** Good afternoon, everyone.

5      **MR. SPEAKER:** Good afternoon.

6      **MR. MOLSTAD:** Good afternoon.

7      **THE COURT:** All right. This is the case of McQuillen

8 Place Company, LLC; 19-507.

9      We're here on a motion of the equity security holders

10 to amend judgment.

11      I'm going to try to do a little roll call here and

12 make sure I got the right people on the phone.

13      Larry Eide?

14      **MR. EIDE:** Yes.

15      **THE COURT:** And remind me who you represent.

16      **MR. EIDE:** First Security Bank.

17      **THE COURT:** Okay. Is Joe Schmall on the phone?

18      **MR. SCHMALL:** Yes, your Honor, on behalf of Cedar

19 Rapids Bank & Trust Company.

20      **THE COURT:** Okay, Charles Thomson?

21      **MR. THOMSON:** Yes, your Honor, on behalf of the

22 equity and security holders.

23      **THE COURT:** Okay. And is J.D. Haas on as well?

24      No?

25      Okay. Brandon Gray?

4

1          **MR. GRAY:**  Good afternoon, your Honor.

2          **THE COURT:**  Brandon.

3          **MR. GRAY:**  I'm here for the Iowa Economic Development

4     Authority.

5          **THE COURT:**  Okay.  Is Chuck Smith on the phone?

6          **MR. SMITH:**  Yes, your Honor.

7          **THE COURT:**  Chuck Smith, Trustee.

8          And Don Molstad on by chance?

9          **MR. MOLSTAD:**  Yeah.

10         **THE COURT:**  All right.  So the reason I set this

11    conference is -- this motion of equity security holders to

12    amend judgment; I think what we did when this came in was to

13    wait to see if there was resistance.  And then we put it in the

14    to-do folder.  And someone came back in with it and said, "Hey,

15    is there resistance to this?"

16         So are we missing something here?  I guess Larry --

17    Larry or Joe, particularly Larry, would be the one that I would

18    think would resist.

19         Larry, is there reaction to this or you're just

20    listening?

21         **MR. EIDE:**  From a procedural standpoint, the Movant

22    recites that the two rules that he believes applies to the

23    Movants -- I guess it's plural -- to which -- or which would

24    authorize the Court to amend motion.

25         And the rules require that the motion seeking

1    amendment or change or modification to the order be filed

2    within 14 days after the entry of the order.

3            This motion was filed 15 days after the motion was

4    filed.

5            **THE COURT:**  Okay.

6            **MR. EIDE:**  I would also point out that both

7    Mr. Gray -- who is on this call -- and Charles Thomson -- who

8    is on this call -- were a participant in the hearing -- of the

9    phone hearing that resulted in the Court's order.

10           And I believe that that was the time for them to have

11   made their argument and statements regarding the facts and

12   evidence that they believed was important.

13           And by not speaking up at that time, they have waived

14   the opportunity to, what I consider to be, introduce additional

15   evidence at this time.  Because I believe that the changes

16   which they're asking for are not part of the record --

17           **THE COURT:**  Okay.

18           **MR. EIDE:**  -- in great part.

19           **THE COURT:**  Okay.  All right.  Anyone else line up

20   with Larry on that?

21           Joe, did you have a position one way or another?

22           **MR. SCHMALL:**  No, your Honor.  I don't have anything

23   to add to what Mr. Eide has already said.

24           **THE COURT:**  All right.  Chuck, did you have

25   anything -- Chuck Smith, do you have anything you'd like to add

1    on this?

2            **MR. SMITH:**  No, your Honor.

3            **THE COURT:**  Okay.  Don, did you want to weigh in on

4    this?

5            **MR. MOLSTAD:**  No.

6            **THE COURT:**  Okay.  So who is going to -- I guess,

7    Mr. Thomson, are you going to speak on behalf of the motion?

8            **MR. THOMSON:**  Yes, I am, your Honor.

9            **THE COURT:**  Just respond (indisc.).

10           **MR. THOMSON:**  On the 14 or 15-day count, I believe,

11   while, under the Federal Rules, we count after.  So it would be

12   the -- the 24th would be the operable -- operative date.

13           In any event, the (indisc.) to file.

14           The order, of course, was issued after everything was

15   in the record.  And I think that means entirely under the

16   authority of the Court to take into account errors that are

17   appearing in the -- in the final -- or in the order itself;

18   things like spellings, names.

19           As far as evidence that was presented, I don't think

20   evidence was presented on some of these issues.  It was

21   hearsay, and it was from Counsel.  The actual -- the only

22   actual evidence was coming from the two affidavits.

23           And, finally, if there was a resistance, it would

24   have been nice to have it in writing so that I could --

25   responded accordingly.

1          **THE COURT:**  All right.  Let's break this up.  I'm

2   getting some background noise.  I'm hearing a little bit of

3   typing, and some of the lawyers are a little muffled.

4          So just help me out by speaking loud and clear.

5          Mr. Thomson, let's go with, kind of, the nub of the

6   question I've got.  I don't think I'm going to get concerned

7   about 14 or 15 days.

8          But the two things that I think Mr. Eide's talking

9   about are what was agreed to before the hearing, and then what

10  happened at the hearing.

11         And let's talk about the first one first.  What

12  happened at the hearing?

13         Evidence was summarized by Mr. Eide, and there was

14  not a -- there's not a responsive summary.  Why wouldn't the

15  record just have been closed at that point in time?

16         **MR. THOMSON:**  Well, there actually is no evidence as

17  to structural issues on the building, for example, because the

18  only information -- it's not evidence -- that came on that is

19  hearsay from Mr. Eide, and he's not under oath.

20         Has Mr. Eide ever been to the building?

21         **MR. EIDE:**  I have not been in the building; I've been

22  by it many times.

23         **MR. THOMSON:**  Okay.  So I don't think Mr. Eide has

24  felt like the offering -- wow, that's bad.  I'm sorry, but

25  that's --

1           **THE COURT:**  Yeah, okay.  So if I -- well, there are

2    other things that you say were either introduced in the record

3    that had zero basis or that you think I got in there

4    erroneously?

5           **MR. THOMSON:**  I can barely hear you, your Honor.

6           **THE COURT:**  Okay.  I'll just try this again.  I'll

7    just pull the phone up a little closer.

8           All right.  So --

9           **MR. SPEAKER:**  Somebody has a hand-held phone.

10          **THE COURT:**  It sounds like there's typing going on in

11   the background.  It's kind of like, "clicky-clicky-click."

12          All right.  Let's try this.  Mr. Thomson, can you

13   hear me now?

14          **MS. SPEAKER:**  (Indisc.).

15          **THE COURT:**  What's that?

16          **MS. SPEAKER:**  We'll have to call back in.  This has a

17   lot of static on our line.

18          **MR. SPEAKER:**  I can't hear anything either, Judge.

19          **THE COURT:**  All right.  Let's try everybody getting

20   back onto the call and see if we can make it work, okay?

21          **MR. SPEAKER:**  Okay, thank you.

22       **(Reestablishing telephonic connections)**

23          **THE COURT:**  Okay, I still got some crackling on the

24   line.  Let's see if we pick up where we left off.

25          Mr. Thomson, can you hear me?

1          **MR. THOMSON:**  Yes, barely.

2          **THE COURT:**  Okay.  The question I had is, is there

3    anything in the record, besides the structural issues that you

4    think Mr. Eide added without any basis?

5          **MR. THOMSON:**  Yes.  I don't think he had any basis

6    for taking any statements about the structural issue.

7          **THE COURT:**  Other than the structural issues,

8    anything else had added that you think there's no basis?

9          Mr. Thomson?

10         **MR. THOMSON:**  Yes.  I'm -- well, obviously, the

11   spelling of my name.  But I don't think that came out of his --

12   his pleadings.

13         **THE COURT:**  All right.  And then what is the --

14         **MR. THOMSON:**  The vermin -- the reference to animals

15   going in and out was --

16         **THE COURT:**  All right.  What about --

17         **MR. THOMSON:**  (Indisc.) extension with the

18   exclusivity period.  That's in the record.

19         **THE COURT:**  All right.  What are we wrong about in

20   the opinion?

21         If I've stated something that's factually incorrect

22   or wrong, I don't mind fixing that.

23         What was I wrong on?

24         **MR. THOMSON:**  Well, the order says that, "Thomson

25   insisted a third-party financier was interested, and the money

10

1    would be secured in a two-week time frame."

2            That's just not true.

3            Where it says that, "Months passed and the Debtor

4    sought multiple extensions for the exclusivity period," that's

5    not true.

6            The statement, "The Debtor had a negative history of

7    insurance payments on the project," that's not true.

8            The evidence has been submitted to the Court on that

9    issue.

10           The spellings -- you need more spellings of names.

11           Then just backing up a little, on -- as stated, in

12   paragraph 4C of the motion, "Hearing the Debtor didn't reach on

13   a new payment plan."

14           **THE COURT:**  Okay.

15           **MR. THOMSON:**  And then --

16           **THE COURT:**  Mr. Eide, your res --

17           Go ahead, Mr. Thomson.  If you've got anymore, now is

18   the time to share it.

19           We'll get back to Mr. Eide.

20           **MR. THOMSON:**  Well, yes.  And the order dates first

21   paragraph, lines two and three, the -- and I was there.

22           I remember it.  The First Security gave for not being

23   interested in the financing was that they -- they were not

24   familiar with administering a financing involving the state

25   economic assistance.

11

1        **THE COURT:**  Okay.  All right, Mr. Eide, your response

2   to any of those -- any of those changes you can live with?  Any

3   of them you think you want to comment more on?

4        **MR. EIDE:**  I had a little bit of hard time hearing

5   Mr. Thomson.  But I'll address a couple of the issues.

6        I do believe that there's a missing window.  And I

7   discussed that missing window.  And I had seen pictures of that

8   missing window.

9        I had not physically been inside the property prior

10  to anyone from the bank.  But we had a drone that flew over the

11  (indisc.) and took pictures of it, which I had provided to

12  Mr. Thomson.

13        **MR. THOMSON:**  We're not disputing -- I'm sorry.

14        **THE COURT:**  Go ahead.

15        **MR. THOMSON:**  I beg your pardon, Mr. Eide.  I didn't

16  mean to (indisc.).

17        **MR. EIDE:**  There was a hole --

18        **THE COURT:**  Go ahead.

19        **MR. EIDE:**  -- outside of the -- of a panel of plywood

20  at the street level.  It was large.  It was four inches in

21  diameter.  I saw pictures of that prior to the hearing.

22        (Audio static).

23        **THE COURT:**  All right.  Larry, you're breaking up a

24  little bit.  Can you focus on the phone and to see if we can't

25  get the rest of this done.

12

1          **MR. EIDE:**  Sure.

2          **THE COURT:**  Anything else -- is there anything you

3    can live with of what he said?  Say I don't really care about

4    that.  Just the one --

5          **MR. EIDE:**  I want his name spelled correctly.

6          **THE COURT:**  All right.

7          **MR. EIDE:**  And there's a misspelling throughout the

8    order that should be corrected.

9          **MR. THOMSON:**  May I offer something that may solve

10   the dispute here?

11         **THE COURT:**  Yes.

12         **MR. THOMSON:**  We'll stipulate that there is a window

13   missing over the arcade.

14         The issue is the effect of that window.  Does it have

15   any effect on the structure?  You know, missing window.  Does

16   it have effect on the structure?

17         We say, "not, not."  It is --

18         **THE COURT:**  Okay.

19         **MR. THOMSON:**  -- definitely the -- it's a pane of,

20   like a plastic material that is missing over an area that is

21   supposed to be exposed to the elements anyway --

22         **THE COURT:**  Okay.

23         **MR. THOMSON:**  -- to the extent there's been any

24   discoloration or damage, it's cosmetic in our --

25         **THE COURT:**  Okay.  Let me get back to Mr. Eide here.

13

1          Mr. Eide, what about structural issues?  They think

2    that -- are we talking about just the windows and the window

3    and the, you know, four-inch hole in the ply board?

4          Or did you have -- or did you say something that I

5    took down in part of the opinion that deals with structural

6    issues that you're familiar with?

7          **MR. EIDE:**  Other than the window and the temporary

8    closures that have holes in them -- temporary window or opening

9    closing -- closures that had holes in them, I'm aware --

10   personally aware of no structural problems with the property.

11         That doesn't mean they don't exist.  But I'm not

12   aware of any structural problems.

13         **THE COURT:**  Okay.  So, Mr. Thomson, if we draft that

14   to be a little more specific about just the two types of issues

15   that Mr. Eide was detailing, does that satisfy your concerns

16   for this?

17         **MR. THOMSON:**  Yes.  As long as it just says that

18   there was a missing panel over the arcade with whatever effect

19   it has.

20         There -- I don't think there's any question that, if

21   a determined mouse wanted to get into the building, the mouse

22   could have.

23         It set there -- we've had it -- looked at it, and

24   there's no evidence of mice or vermin.  And the reason for that

25   is likely because there's no food to attract them.

14

1          But I think Mr. Eide and I are essentially saying the

2    same thing in a different way.

3          **THE COURT:**  Okay.  Well, what else do you want

4    corrected besides those two things that -- that we've been

5    focusing on; the plywood board and whatnot?

6          I mean, I guess I'll -- I'll go through this list

7    Mr. Eide put.

8          And, Mr. Eide, any response to this idea about --

9    that we wrote about third-party financiers, multiple extensions

10   of time for exclusivity, negative insurance history?

11         Do you have any comment on any of those issues,

12   Mr. Eide?

13         **MR. EIDE:**  Yes, I do.

14         The bank, on one occasion, was required to advance

15   premium of insurance prior to the expiration date in order that

16   that insurance (audio static).

17         It occurred again -- well, it occurred shortly before

18   the case was converted.

19         My understanding is that Mr. Thomson also made a

20   payment of that missing insurance payment.  And I learned this

21   later.

22         But, however -- again, this is outside of what I

23   argues before and what I've subsequently learned is that his

24   payment was made after the deadline for making that payment,

25   but couldn't be credited on the day that the insurance would

**EXCEPTIONAL REPORTING SERVICES, INC**

1    have lapsed had payment not been made, but for the payment made

2    by the bank.

3              I guess --

4              **THE COURT:**  Okay.  What about --

5              **MR. EIDE:**  -- I hesitate --

6              **THE COURT:**  Go ahead.

7              **MR. EIDE:**  I was just going to say, I -- you know, I

8    started out saying that I thought that he -- what (audio

9    static) was to do, was to add to what I perceive to be the

10   record.  And I hesitate to make those statements because that

11   wasn't part of the record.

12             This was to be an in-person hearing.  We had weather

13   issues; we had scheduled in Webster City.  And --

14             **THE COURT:**  Yeah, I remember.

15             **MR. EIDE:**  -- parties agreed -- parties jointly

16   agreed to (audio static) this with a loose structure by

17   telephone -- all party.

18             It was by agreement of the Debtor (audio problems)

19   Movants, First Security Bank.

20             I cannot say that if there were items with

21   Mr. Thomson or Mr. Gray, as equity security holders, wish to

22   add to the comments which I made, I believe the time for them

23   to have done so was back when this telephone hearing occurred.

24   Not today.

25             **THE COURT:**  I have a similar recollection about how

16

1    we set the hearing up.

2              Mr. Thomson, I'm going to let you comment, then I'll

3    hear from Mr. Gray, and we'll wrap this thing up.

4              Mr. Thomson --

5              **MR. THOMSON:**  Well, my recoll --

6              **THE COURT:**  -- any responses?

7              **MR. THOMSON:**  My recollection of the litigation, in

8    case law, under the rules, is that the Court has the authority

9    to do what is necessary to make sure that the orders of the

10   Court and the opinions of the Court are factually correct; such

11   as spelling the names of the parties correctly; making sure

12   that the -- that the docket entries are reflected correctly,

13   such as the exclusivity period.

14             As far as the insurance issue, so I -- and I don't

15   know that Mr. Eide will disagree with that.  But I think, as a

16   matter -- just getting -- getting the record right, we ought to

17   take some time to do that.

18             As far as the insurance payment -- and I believe I

19   submitted this to the Court.  My memory is little foggy now,

20   because the -- I know I made the payment and I know I had

21   confirmation -- written confirmation from the insurance company

22   that it was timely.  And it lapsed.

23             When there was one issue with the bank advancing an

24   insurance payment, but that was pre-petition.  I don't think

25   you can ascribe that to conduct of the Debtor.

```
 1              THE COURT:  Okay.  Mr. Gray, did you want to add

 2    anything to this?

 3              MR. GRAY:  No.  I don't have anything to add, your

 4    Honor.

 5              THE COURT:  All right.  I'll try to make the changes

 6    I think are necessary.  And I'll probably just put those in a

 7    separate document.  That's got to be read into the docket.

 8              These are always tricky as to how -- I'm not afraid

 9    to correct my stuff.  (Indisc.) stuff and have people try to

10    figure out what's in or out.  I may just issue an addendum to

11    correct this.

12              And the small ways that I'm going to do it -- which

13    is probably going to be the names spelling and just about

14    cleaning up some structural issues.

15              That's about where I'm probably going to end with

16    that, unless I see something else in there that I think really

17    needs cleaning up based on this hearing.

18              So we'll get something out quickly.  I apologize for

19    the confusion.  (Indisc.) and then just sort of setting it

20    aside, and then not following up.

21              So that's on us.  And I apologize on that end.  We'll

22    get something out quickly on this, and I appreciate everyone's

23    time.

24              Anything that absolutely has to be discussed before

25    we end this?
```

18

1          THE COURT:  Okay.  Thanks, everybody.

2          MR. SPEAKER:  Thank you.

3          MR. SPEAKER:  Have a nice day.

4       (Proceeding concluded at 1:58 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXCEPTIONAL REPORTING SERVICES, INC

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **June 16, 2020**

        **Signed**                                                          **Dated**


              *TONI HUDSON, TRANSCRIBER*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
(MASON CITY)


| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  19-00507 |
| | ) | CHAPTER 7 |
| | ) | |
| McQUILLEN PLACE COMPANY, LLC, | ) | Cedar Rapids, Iowa |
| | ) | |
| | ) | Wednesday, March 25, 2020 |
| Debtor. | ) | |
| | ) | 3:08 p.m. to 3:22 p.m. |


TELEPHONIC HEARING RE:

MOTION TO EXTEND/SHORTEN TIME


BEFORE THE HONORABLE THAD J. COLLINS,
UNITED STATES BANKRUPTCY JUDGE


<u>APPEARANCES</u>:              (CONTINUED ON PAGE 2)

For James Gray, et al:    CHARLES M. THOMSON, ESQ.
                          Law Office of Charles M. Thomson
                          1110 North Grand Ave., Suite 300
                          Charles City, IA 50616


For Trustee:              CHARLES L. SMITH, ESQ.
                          25 Main Place, Suite 200
                          P.O. Box 248
                          Council Bluffs, IA 51502


Court Reporter:           Recorded; FTR

Transcribed By:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**          (CONTINUED)


First Security Bank          LARRY S. EIDE, ESQ.
& Trust Company, et al.: 103 East State St., Suite 800
                             P.O. Box 1588
                             Mason City, IA 50402

                             ERIC J. LANGSTON, ESQ.
                             ERIC W. LAM, ESQ.
                             Simmons Perrine Moyer Bergman, PLC
                             115 Third Street SE, Suite 1200
                             Cedar Rapids, IA 52401

Iowa Economic                BRANDON J. GRAY, ESQ.
Development Authority:    RITA GRIMM, ESQ.
                             Iowa Attorney General's Office
                             1305 Walnut
                             Des Moines, IA 50319

1    **Cedar Rapids, Iowa; Wednesday, March 25, 2020; 3:08 p.m.**

2              **(Attorneys appearing telephonically)**

3                   **(Call to Order)**

4         **THE COURT:**  Okay.  We're here on the case of

5    McQuillen Place Company, LLC, 19-00507, motion to shorten time

6    and the resistance thereto for the bids and bid procedures.

7              Charles Smith appears for himself as Chapter 7

8    Trustee, and Charles Thomson appears for the movant.  Is that

9    correct?

10        **MR. SMITH:**  Yes, and your Honor, this is Chuck Smith,

11   and there are several other people on the line --

12        **THE COURT:**  All right.

13        **MR. SMITH:**  -- who wanted to participate in the call.

14        **THE COURT:**  Okay.  Let's see if we can't figure out

15   who that is.  Is Larry Eide?

16        **MR. EIDE:**  Yes, I'm on, Judge.

17        **THE COURT:**  Okay.  Let's see; someone from the Iowa

18   Economic Development?

19        **MS. GRIMM:**  Yes, this is Rita Grimm.  I'm Chief Legal

20   Counsel for Iowa Economic Development Authority.

21        **THE COURT:**  What was the last name again?

22        **MR. GRAY:**  And Judge, this is Brandon Gray with the

23   Iowa Attorney General's Office on behalf of the Iowa Economic

24   Development Authority.

25        **THE COURT:**  And I'm sorry.  What was the last name of

4

1    the person before you?  I'm sorry.

2              **MS. GRIMM:**  Grimm.  G-R-I-M-M.

3              **THE COURT:**  Okay.  Thank you.  All right.

4    Mr. Molstad, are you on the phone?  No Mr. Molstad.  So, who

5    else do I have on the phone?

6              **MR. LAM:**  Good afternoon, Judge, it's Eric Lam, also

7    for the bank, please.

8              **THE COURT:**  Okay.

9              **MR. LAM:**  Eric Langston is also appearing as well,

10   Judge.

11             **THE COURT:**  I'm sorry, who's that?  Speak up.

12             **MR. LANGSTON:**  Eric Langston, also with the bank.

13             **THE COURT:**  Okay.  Is that the whole team?

14             All right.  Mr. Smith, fire away.  Where do you think

15   this is and what do you think I ought to do with your motion

16   and the resistance?

17             **MR. SMITH:**  Well, thank you, your Honor.  Judge, I

18   know this is a property that you're familiar with.  It's a

19   partially completed building in Charles City, Iowa; has three

20   -- the ground level is targeted to be commercial.  The second

21   and third stories are for residential.  None of the commercial

22   has really been completed; the residential is partially

23   completed.

24             And there's also involved in the motion to sell is

25   some personal property that's in the building; some appliances,

**EXCEPTIONAL REPORTING SERVICES, INC**

5

1   building materials, and miscellaneous items.

2          This is a case in which I filed, or I sent out a

3   notice to several people who had expressed interest in the

4   property on February 3rd, a bid letter.  And I coordinated this

5   with the Iowa Economic Development Authority from the

6   standpoint of they still had the potential to come up with a

7   million dollars to put into the project, but they have certain

8   requirements that have to be met.  And we're going to do that.

9          So, the letter that I sent out, and I believe was put

10  as an attachment to Mr. Thomson's objection, sets forth kind of

11  the procedure for that, and it established a March 9th

12  deadline.  And we received two bids, and neither of which

13  complied with the State's requirement to get to access the

14  million dollars.

15         I met with the State officials on March 12th, and

16  that was the conclusion at that time and it being so today

17  until we ended up with the two bids.  One is the bank's, which

18  I think is the higher and better bid.  The other bid was that

19  of Binstock Development, which didn't comply with State

20  requirements, wasn't eligible for the funding, and was for a

21  lesser amount than that provided by the bank.

22         So, I concluded that the bank's was the best bid, met

23  with the bank's attorneys, and entered into a formal purchase

24  agreement, and then very soon thereafter filed the instant

25  motion to sell free and clear of liens.

1          The reason for the motion to shorten the time, Judge,

2     is that there is some real financial hemorrhaging that's taking

3     place in regard to the property.  The income taxes accrue at

4     the rate of up to $18,000 per month.  There are ongoing costs

5     of utilities, security, insurance, et cetera.  And that's

6     really the reason for the desire on my part and on the part of

7     the bank to have the time period shortened.  And Mr. Lam has,

8     on behalf of the bank, prepared a memorandum and brief in

9     support of the motion that I filed.

10          **THE COURT:**  Okay.  Thanks, Mr. Smith.  Mr. Lam?

11          **MR. LAM:**  Judge, I would just refer the Court to the

12    brief that I filed.  The bottom line, Judge, is this, if Mr.

13    Thomson can represent to the Court that he truly needs the

14    entire 21 days to file whatever objections he needs, I will be

15    the first one to concede, Judge, give those days

16    (indiscernible).

17          We all have other things on our minds.  You know,

18    this is not an urgent situation.  I would then, if he does need

19    the 21 days, you know, this is not urgent.

20          On the other hand, Judge, if Mr. Thomson's response,

21    which was filed at 8:00 a.m. the morning after Mr. Smith filed

22    his motion at 4:30 p.m. the afternoon before, is some sort of,

23    I don't know, tactic to cause more delays, then I would suggest

24    to the Court that Mr. Thomson's request be denied.

25          So, Judge, that's all I have.  Thank you very much.

1          **THE COURT:**  Okay.  Does anybody else want to be heard

2   in support of the Trustee's motion?

3          All right.  Mr. Thomson, what's your response to

4   this?

5          **MR. THOMSON:**  Your Honor, I would -- I agree that we

6   should have as much notice as possible on this because the

7   notice that went out in February was for a very different

8   proposed transaction than is proposed to the Court right now.

9   And my interest is in seeing as many potential bidders notified

10  of this as possible in the event that someone comes in with a

11  higher bid that would benefit all of the creditors, including

12  Sawyer Slade (phonetic) and myself.

13         As far as my time to respond, I certainly have had

14  notice of this.  I'm most concerned about other people,

15  especially in the current environment, and I'd also note in the

16  current environment, the capital markets are doing very strange

17  things.  So, people accessing capital and deciding whether to

18  invest, more time is probably better than less because it would

19  give them a chance to settle down.

20         This is not interposed for any purpose of delay.

21  It's interposed for what I think is a legitimate reason to get

22  the most out of this building for the creditors.

23         **THE COURT:**  Okay.  Mr. Smith, what's your response,

24  and then I'll ask Mr. Lam, too.  Go ahead, Mr. Smith.

25         **MR. SMITH:**  Well, your Honor, without getting into

8

1   great detail on the offer and acceptance, it does provide a

2   $150,000 carveout for the bankruptcy estate.  And that is

3   definitely something that would benefit the unsecured creditors

4   in the case.

5          And because the property is encumbered by mortgages

6   that I believe are approximately $4 million, the -- so, I don't

7   think from a practical standpoint that I could get a better bid

8   anywhere else.  While it, you know, we didn't get, you know,

9   other bids that could tap into the State's resources and offer

10  a higher and better bid than the bank, I think this is a

11  reasonable one, and I think it benefits the bankruptcy estate

12  and the unsecured creditors.

13          **THE COURT:**  Mr. Lam, your response.

14          **MR. LAM:**  Judge, the only other thing I'd like to add

15  is if the owner would entertain the request for shortened time,

16  I believe Mr. Smith's office can probably do the mailing

17  tomorrow.  We would want to (indiscernible) shortstop, which

18  literally means that the objections of April 6, and I would ask

19  that the Court waive the usual local rule on exhibits, and

20  simply direct and authorize the parties to also file exhibits

21  at the time of objection.

22          And last but not least, I believe that Bankruptcy

23  Rule 9017 and Federal Rule 43(c) allow the Court to take

24  evidence by affidavit.

25          Mr. Smith's motion is already accompanied by an

1    affidavit inside the declaration for 28 USC Section 1746.  So,

2    I would forecast for the Court that if we were going to have a,

3    you know, short period and a quick hearing, that we should try

4    to work together to produce exhibits timely, produce them

5    electronically, and do it by affidavits.

6          Thank you, Judge.

7          **MR. SMITH:**  Your Honor, this is Chuck Smith again.  I

8    believe that the better date in terms of after the mailing and

9    the notice would be April 9th if I'm not mistaken.

10          **THE COURT:**  Okay.  All right.  Mr. Thomson, I'll give

11    you the last word.

12          **MR. THOMSON:**  Yes, your Honor.  First of all, I

13    support the suggestion that we do this as much as possible by

14    affidavit, and that the rules be waived to accommodate the very

15    unusual circumstances we find ourselves in.

16          On the -- just two other points for the record.  One

17    is, I believe Mr. Smith said that the income taxes were

18    accruing, but he probably meant real estate taxes.

19          The other thing is that we're hopeful that the

20    greater the notice, the more likely it is that someone would

21    come forward.  And because the deal really is different than

22    what was proposed in February.

23          Also, this is the first I've heard of both bids not

24    complying, and I'd be interested in hearing why, and obviously

25    deal with that outside the hearing.

10

1      **THE COURT:**  Okay.  Thank you for the arguments.  I'm

2  going to go ahead and rule.  I'm going to go ahead and grant

3  the Chapter 7 Trustee's motion to shorten time on the terms and

4  conditions we've discussed here on the phone.

5      I'll take up the other issues as they come.  I'm very

6  willing to work with the parties on submission of affidavits in

7  lieu of live testimony.  I'm also going to hold in-court

8  hearings if that's what people want to do.

9      Anything further we need on this, Mr. Smith?

10      **MR. SMITH:**  No, your Honor.

11      **THE COURT:**  Mr. Lam?

12      **MR. LAM:**  Thank you, Judge.  I appreciate it.  Thank

13  you very much, Judge.

14      **THE COURT:**  Mr. Thomson, I believe that takes care of

15  everything for today.

16      **MR. THOMSON:**  Yes, thank you, your Honor.

17      **THE COURT:**  Okay.  Thanks everybody.

18      **(This proceeding was adjourned at 3:22 p.m.)**

19

20

21

22

23

24

25

11

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                              **June 16, 2020**

          **Signed**                                              **Dated**


                    *TONI HUDSON, TRANSCRIBER*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
(MASON CITY)

IN RE:                          )      CASE NO:  19-00507
                                )      CHAPTER 7
                                )
McQUILLEN PLACE COMPANY, LLC, )        Cedar Rapids, Iowa
                                )
                                )      Wednesday, April 8, 2020
          Debtor.               )
                                )      10:03 a.m. to 10:58 a.m.
_____)

TELEPHONIC MOTIONS HEARING RE:
MOTION FOR SALE/MOTION TO SELL PROPERTY

BEFORE THE HONORABLE THAD J. COLLINS,
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:              (CONTINUED ON PAGE 2)

For James Gray, et al:    CHARLES M. THOMSON, ESQ.
                          Law Office of Charles M. Thomson
                          1110 North Grand Ave., Suite 300
                          Charles City, IA 50616

For Trustee:              CHARLES L. SMITH, ESQ.
                          25 Main Place, Suite 200
                          P.O. Box 248
                          Council Bluffs, IA 51502

Court Reporter:           Recorded; FTR

Transcribed By:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**          (CONTINUED)


First Security Bank       ERIC W. LAM, ESQ.
& Trust Company, et al.:  Simmons Perrine Moyer Bergman, PLC
                          115 Third Street SE, Suite 1200
                          Cedar Rapids, IA 52401


Cornice & Rose:           BRADLEY R. KRUSE, ESQ.
                          699 Walnut St., Suite 1600
                          Des Moines, IA 50309


Iowa Economic             BRANDON J. GRAY, ESQ.
Development Authority:    RITA GRIMM, ESQ.
                          Iowa Attorney General's Office
                          1305 Walnut
                          Des Moines, IA 50319

3

1          **Cedar Rapids, Iowa; Wednesday, April 8, 2020; 10:03 a.m.**

2               **(Attorneys appear telephonically)**

3                    **(Call to Order)**

4          **THE COURT:**  Okay.  We are here this morning on the

5     case of McQuillen Place Company, LLC, 19-00507, motion for sale

6     of property under Section 363(b), motion to sell free and

7     clear, and objections thereto.

8               I've got Chuck Smith appearing as the Chapter 7

9     Trustee.

10              Charles Thomson.  Mr. Thomson, who are you

11    representing?

12         **MR. THOMSON:**  I'm representing the equity security

13    holders, creditors, and administrative claimants, James Gray

14    and Charles Thomson, myself.

15         **THE COURT:**  Okay.  I've got Eric Lam.  Mr. Lam,

16    you're representing the bank, correct?

17         **MR. LAM:**  Yes, Judge.  Good morning.  Thank you, yes.

18         **THE COURT:**  Brad Kruse, you're on, and remind me who

19    you're representing.

20         **MR. KRUSE:**  Good morning, Judge.  I'm representing

21    Cornice & Rose International, LLC.

22         **THE COURT:**  All right.  Brandon Gray appears for, I

23    want to say, the Iowa Department of Revenue, but that's wrong.

24    Mr. Gray, you're appearing for Economic Development, or

25    somebody.  Just give me the title of who that is.

1              **MR. GRAY:**  Yeah, thanks, Judge.  The Iowa Economic

2     Development Authority, and I'll note, Rita Grimm, Chief Legal

3     Counsel for the Iowa Economic Development Authority, is also

4     present this morning.

5              **THE COURT:**  Okay.  Anybody else that I've missed?

6     All right.  Very good.

7              It's the Trustee's motion to sell.  Let me hear from

8     Mr. Smith where he thinks things stand or whoever is speaking

9     for Mr. Smith.

10             **MR. SMITH:**  All right, your Honor.  Thank you.

11             Just by way of overview, the motion to sell

12    involves the sale of the building in Charles City, Iowa, for

13    $1.1 million to First Security Bank.

14             First Security Bank has a $4 million mortgage against

15    the property, which is for excess of the value of the property.

16    And I have been able to negotiate a carveout with the bank so

17    as to be able to make a meaningful distribution to unsecured

18    creditors.  The settlement negotiations with the bank

19    culminated in a carveout of $150,000.

20             And the motion to sell is one wherein the bank would

21    pay in -- they aren't doing a credit bid, but they would

22    actually pay in 1.1 million; 150,000 would come to me as

23    Trustee.  The rest would then be available, be in the pot, if

24    you will, for which claims can proceed against, and a later

25    determination can be made as to who's entitled to those funds.

1            Among the exhibits that the bank has presented to the

2  Court, there is one that is FF, and that is a declaration from

3  me as to what's transpired in the estate.

4            I was appointed on December 9th of 2019, immediately

5  made arrangements to make sure that there was insurance on the

6  property, the locks were changed, utilities were going to be

7  kept on; had a concern about the pipes freezing in Charles City

8  in December and January, and made arrangements wherein the bank

9  actually advanced the funds for the locks and the utilities and

10  other things so that the building would be stabilized because

11  aside from this building, there are very little -- there is

12  very little if any other money available in the bankruptcy

13  estate.

14            On the day after my appointment, I contacted the Iowa

15  Economic Development Authority in regard to whether they still

16  had money that could be advanced for this project.  They had

17  previously contributed substantial sums to the project, and it

18  was my understanding that about all of those funds had been

19  exhausted.

20            However, the State did assure me that they thought

21  they could obtain an additional up to $1 million to go into the

22  project.

23            So, with that thought in mind, when we conducted the

24  341 meeting in Mason City on January 27th, I, at the end of it,

25  told people that I was going to ask those who were interested

1    in bidding on the project that I would like to see their

2    interest channeled through the State, and then the State would

3    provide additional requirements that would be needed for an

4    applicant to obtain funding from the State to tap into this

5    additional $1 million.

6           After the 341 meeting, we went on a tour of the

7    building.  And we left Mason City, went over to Charles City,

8    and went on a tour of the building.  There were State officials

9    there, bank officials, City, Mr. Thomson, Mr. Gray, and the

10   local newspaper was also present, and we, at that time, I

11   encouraged Mr. Thomson to participate in the bidding process.

12          And on January 30th, I provided the State with the

13   names of people who had contacted me, and they also had some

14   others who had contacted them directly, for a proposed letter

15   that would be sent out along with sort of an application

16   checklist that the State had in terms of various forms that

17   needed to be completed in order to apply for the million

18   dollars.

19          The actual bid letter went out on February 3rd with a

20   deadline of March 9th.  There were only two bids that were

21   submitted.  Neither of the bids were -- actually complied with

22   the requirements that the State had in order to obtain the

23   funding.

24          So, the bid date was March 9th.  By March 12, I met

25   with the State officials and representatives of the City in

1  Des Moines at the offices of the Iowa Economic Development

2  Association.  And we analyzed the bids that had been submitted,

3  and neither one qualified for the State funding.  The bank, in

4  its bid, didn't request it, and Binstock, the other bidder, in

5  its bid didn't comply with the State requirements.

6          So, after that I concluded that of these two bids,

7  the one that was the best was the bank's, because it provided a

8  total of $1.1 million in new money, whereas the Binstock one

9  provided $470,000.  So, thereby I started negotiations with the

10  bank in regard to completing the purchase on the property, and

11  again negotiated the $150,000 carveout.

12          I think that that's -- the carveout that's available

13  today under this purchase agreement is an opportunity for the

14  estate, and I don't want to see the bankruptcy estate lose that

15  opportunity.  Otherwise, it's just confronted with just simply

16  being a no asset case.  There'd be no funds available for

17  payment to any unsecured creditors.

18          So, again, your Honor, that's the purpose of my

19  motion, and I would ask for Court approval.

20          **THE COURT:**  Thank you, Mr. Smith.  Let me try to give

21  some order to this as we -- as I see it.

22          Mr. Lam, you're aligned with Mr. Smith, I guess, and

23  then I'm not sure if the Iowa Department of Economic

24  Development is aligned, but I'll -- unless somebody tells me

25  otherwise, I'll go with Mr. Lam, and then I'll hear from either

8

1    Mr. Gray or Ms. Grimm.

2          **MR. LAM:**  Thank you, Judge.  This is Eric Lam.  I

3    only have two very brief points.

4          Number one, I read that the Thomson's filing,

5    Mr. Gray's affidavit, (indiscernible) affidavit, and maybe had

6    some good ideas.  However, ideas do not pay claims.  Money

7    does.

8          The deal that is proposed by Trustee Smith will get

9    the estate at least $150,000.  Now, I say "at least", and I

10   mean it.  The reason being, if Mr. Thomson is correct, that the

11   real estate tax is way too high, or if Mr. Thomson is correct

12   that the bank's lien is absolutely no good, then thereby all

13   $925,000 allocated to the real estate will be free and clear to

14   the estate if the bank's lien is no good or if the real estate

15   tax is substantially reduced.

16         The bottom line, Judge, is this deal produces money

17   for the estate.  No other deal or any other idea produced any

18   money to the estate.  And Mr. Thomson's schedules to which he

19   had sworn to listed 37 creditors, Schedule D, E and F.

20         At the most, Judge, three have objected.  That would

21   be Cornice & Rose, Mr. Gray, and Mr. Thomson.  By my math, 34

22   support the deal; that is 92 percent creditor support.

23         So, I believe that based on just those simple math

24   and simple facts, it is in the best interest of the estate.

25         The only other point I would make, Judge, is I know

**EXCEPTIONAL REPORTING SERVICES, INC**

1   there is some noise from Mr. Kruse and from Cornice & Rose

2   about some copyright issues and so on and so forth.

3          The Trustee has told everybody, and I'll ask him to

4   confirm again, that he is not selling any plan, any drawing.

5   The bank is not buying any plan, any drawing.  In fact, Exhibit

6   A1, which is the personal property list attached to the

7   purchase agreement, listed things such as smoke detectors, air

8   purifiers, compressions, table saws.  No one is selling, no one

9   is buying any copyright plans and drawing.

10          Last but not least, C & R, if it needs protection,

11   Judge; that's Page 10 of the pleading that I filed yesterday,

12   there's like three to four sentences that I would propose to

13   the Court, and mold in an order.  Those sentences say that the

14   new owner cannot use any plans and drawings without paying

15   Cornice & Rose, and it would say nothing in the sale order

16   precludes Cornice & Rose from asserting any future copyright

17   claims infringement.

18          I submit that that additional language will protect

19   whatever copyright concerns that Cornice & Rose may have.  Now,

20   I did not come up with this language.  I'm not that good.  This

21   came from Judge Gerber in a bankruptcy case in New York, and

22   this has been used in other cases to deal with such copyright

23   issues.

24          So, Judge, that's all I have, and I would ask the

25   Court to approve the sell motion.  And my other arguments are

10

1    contained in the brief that I filed at Docket 151.  Thank you,

2    Judge.

3         **THE COURT:**  All right.  Hang on a second, Mr. Lam.

4    I'm probably going to ask you another question, but I'm going

5    to go back to Mr. Smith and ask him the question first.

6         Mr. Smith, and I'm going to have everybody comment on

7    this because I know I'm going to hear about it.  What about

8    duty sale in the environment in which we live right now?

9         Is it appropriate or not appropriate, or relevant or

10   irrelevant to deal with this question of what we're doing with

11   bids, sales, and everything else in light of the COVID-19 virus

12   concerns?

13        Mr. Smith, give me your comments on that.

14        **MR. SMITH:**  Well, your Honor, on this specific sale,

15   it's really not an issue in that the bank doesn't need to

16   procure the funds from elsewhere.  It has the funds.

17        In terms of, even if we were in a different situation

18   globally and domestically here in the United States, if say

19   Party X came in and said, well, we think 1.1 is too low; we'll

20   give you $2.1 million.

21        Without the carveout, that brings to the estate

22   absolutely nothing, and so there's no, you know, we would have

23   lost $150,000.

24        So, I think if anything, one could argue it the other

25   way, that how would one come up with a much -- a better bid

**EXCEPTIONAL REPORTING SERVICES, INC**

11

1   than this without the carveout from the bank?  Otherwise,

2   there's nothing for the -- your creditors.

3          And I did also want to add, Judge, that it is correct

4   that I'm not selling any plans or drawings.

5          **THE COURT:**  Okay.  Very good.  Mr. Lam, same question

6   as asked.

7          **MR. LAM:**  Judge, none of us wants to (indiscernible)

8   in this situation.  This is a bad situation.  I would concede

9   that.  However, here are two points.

10         Number one, how do we know when we're going to come

11   out of this situation?  And if we do, how do we know that a

12   better deal is available over the rainbow, so to speak?

13         Most important, Judge, is again, maybe Mr. Thomson is

14   correct.  Somehow that, you know, investors in the real world,

15   you know, don't want to invest now; maybe they'd invest later.

16   But the bankruptcy Trustee is not an investor.  The bankruptcy

17   Trustee cannot afford to gamble.  What if at the end of this

18   episode, however long it takes, this deal evaporates?  Then

19   what?

20         The bankruptcy Trustee cannot afford to lose the

21   opportunity like Mr. Smith says.  Thank you, Judge.

22         **THE COURT:**  Mr. Lam, okay.  Who's speaking for the

23   Iowa Economic Development group?

24         **MR. GRAY:**  I'll talk on behalf of the Iowa Economic

25   Development Authority, your Honor.

1          **THE COURT:**  Okay.  Go ahead, Mr. Gray.

2          **MR. GRAY:**  Thank you.  The Iowa Economic Development

3    Authority is in favor of the Trustee's motion for sale.  And I

4    won't repeat what's already been said.  I think there are kind

5    of three main points.

6          One is the process that was used here was

7    appropriate.  It was consistent with similar processes that the

8    Economic Development Authority is involved in.  It was

9    extensive.

10         Second, as one of the creditors in this estate, the

11   Economic Development Authority is certainly in support of it

12   with respect to the carveout.  It looks like that is

13   essentially as favorable of a deal to the estate as the Trustee

14   would be able to secure.  I think the point that's already been

15   made so far of the sale price, or the idea that you could get a

16   higher sale price on this property, it would take a

17   substantially higher sale price to make any sort of meaningful

18   difference for any creditor in this estate other than the bank

19   likely.

20         And so, the actual sale price is less important than

21   the carveout, and certainly the carveout appears to be a

22   favorable deal for the other creditors.

23         And then finally, and this addresses the question I

24   think that you asked with respect to COVID-19 and the current

25   situation that we find the economy in.

1          This property, the community, the State, the

2     creditors, simply can't wait longer to get this property sold

3     and developed.  It's in the best interest of everyone that this

4     property be sold, that it doesn't sit in the estate; we wait

5     through a longer period of time on a sale, that is likely not

6     going to make any meaningful difference to the creditors and to

7     the estate.  And so, it's simply time to move forward to allow

8     this sale to happen and this property to be developed.

9          So, again, the Iowa Economic Development Authority is

10    strongly in favor of the Trustee's motion.

11          **THE COURT:**  Thank you, Mr. Gray.  So, next to

12    Mr. Thomson.

13          **MR. THOMSON:**  Good morning, your Honor.  Charles

14    Thomson on behalf of equity security holders, creditors, and

15    administrative claimants, Charles Thomson, myself, and James

16    Gray.

17          There are a lot of problems with this proposal, and

18    we urge that it be rejected and that the whole thing needs to

19    start over again.  There are big due process problems here.

20          That proposal that they referenced that the IEDA

21    worked on, they worked on it with the Trustee and the bank.

22    The bank had told you and had told everyone else that they

23    would not be bidding; they would not be acquiring this

24    property.

25          So, that proposal they created had a lot of bells and

14

1   whistles on it; a lot of restrictions from the government as

2   the affidavits attached to our objection state.  It was

3   actually a very unattractive proposal to an outside investor

4   because it required compliance with Davis-Bacon, with

5   affordable housing, there were rent controls on the units.

6        What is being proposed now is a very different deal.

7   It's a sale free and clear.  All of that stuff is stripped off.

8   So, and that was never offered, never publicized; as far as I

9   can tell, never advertised.  It was not sent to any of the

10  people who received the original proposal from the IEDA.  It

11  was just cooked up by the Trustee and the bank after the bid

12  deadline.

13       There were two bids submitted.  One by the bank even

14  though they said they wouldn't be bidding, and the other by

15  Binstock Development.  I helped Mr. Binstock put that bid

16  together.  Of course it didn't have a higher dollar amount in

17  it because it was bidding in the context of all of this

18  regulatory burden going with the property.

19       And I know, because I've spoken to them, there were a

20  number of other people who received that request for proposals

21  from the Trustee who would have been interested in bidding on

22  the building had they had some time to look at it, and had they

23  known that it was being sold free and clear rather than subject

24  to all of these restrictions.

25       So, you know, we have issue with the flawed bidding

1    process.  We have, you know, asked to proceed now at breakneck

2    speed so they get it confirmed.  This argument about the

3    carveout doesn't really work as far as I'm concerned because

4    under that theory, the bank could come in, offer $150,500; 500

5    for the building and 150,000 for the Trustee, and using the

6    Trustee's logic, that would still be a great deal for the

7    estate.

8           Well, it may be, but it's not a great deal for an

9    aggrieved party like myself.  I'm guarantor on that note.  If

10   only $500 comes in, or some amount that is not adequate to the

11   value of the building, the actual value of the building, I'm on

12   the hook for that.

13          Now, I've challenged the guarantees, and I think I'll

14   prevail, but the fact is that they're still out there.  So,

15   there's real money involved here, to me; real loss.  And if I

16   could address for a second the whole virus epidemic situation.

17          It's not just Charles Thomson who's urging caution

18   here.  It's the Governor of Iowa.  What is proposed here could

19   not happen in a State of Iowa court.  I think we all agree on

20   that; the department of banking would be asked about that.

21   They may be -- after the bank.  They may be violating, I think

22   they are violating, the letter or proclamation of the Governor,

23   which is attached, because this an effectively, a foreclosure.

24   And they're moving forward on it.

25          The credit markets are something else right now.  I

16

1   think everyone could agree to that and stipulate to it.  It

2   sounds like we're going to be coming out of it on April 30; I

3   don't know.  I agree with Mr. Lam.  It's very uncertain, but we

4   certainly should not be shortening timeframes, moving ahead

5   without live hearings, doing all sorts of extraordinary things

6   in order to move this along in the context of a very weird

7   credit market because it really slows bidding.  And that's in

8   our affidavits as well, your Honor.

9          Then finally, all of this raises the issue of the

10  closeness of all the parties in coming up with this initial

11  proposal, which was to sell an asset that wasn't as valuable as

12  what is being sold today.  It's an asset subject to a bunch of

13  restrictions.

14         They all came up with this; then in their opinion, no

15  one complied with that bid.  And then, without telling anyone,

16  without noticing to the creditors other than the notice that

17  went out on the sale, they negotiated with the bank, which had

18  said to you that they would not be bidding.  Everybody relied

19  on that.

20         The bank's whole theory on converting the case rather

21  than the permitting it to be dismissed was that there'd be all

22  these bidders, I think they said five or six, that would come

23  out and we'd have an open and fair sale and get the best and

24  highest value for the bidding.  And they said they'd be willing

25  to have a reasonable carveout for the Trustee.

17

1          Well, this very much didn't happen.  What it's turned

2    into is kind of an insider private sale, and there are a lot of

3    red flags.  I'd like to have, at a minimum, an opportunity to

4    examine the Trustee on the stand and find out why it was never

5    advertised.  It wasn't even on Craigslist as far as I could

6    tell.

7          The real estate community was not aware of this.  The

8    people, all they worked on was a list that they had of people

9    who had picked up the phone and called, or sent an email, as

10   far as I can tell, to contact them.  They didn't use Facebook,

11   they didn't use Twitter, as far as anything I can tell.

12         And so that's out there.  And I'd like to find out

13   why the process was like that, why do you have to hurry up and

14   do it during a national emergency.  I think the creditors would

15   be much better served by having a more regular process of

16   bidding.  It needn't take very long, but it would certainly

17   look a lot better to the creditors and the public at large

18   rather than having a rushed inside sale.

19         Then finally, on the copyright issue, with all due

20   respect to my colleague, I think there's a misunderstanding on

21   the extent of copyright protection here.  It extends to the

22   appearance of a building as well.

23         And I'm not representing Cornice & Rose on this

24   issue, and I'm not a copyright expert, but I view this as a

25   bigger problem than it's being -- than the Court is being led

1    to believe.

2            **THE COURT:**  All right.  Mr. Thomson, you keep saying

3    the bank said it wasn't going to bid and then it did.  Why is

4    that a big deal?  Why is it the fact that it said it wouldn't

5    bid and now is bidding some kind of red flag or problem?

6            **MR. THOMSON:**  Well, because in that proposal, the

7    bank was very much involved in drafting that proposal.  And the

8    proposal represented an asset that was burdened with a lot of

9    restrictions.  Yet the bank is buying not subject to the

10   proposal as drafted and sent out to potential bidders, but to a

11   better deal.  The bank is getting an insider better deal from

12   the Trustee.

13           **THE COURT:**  Okay.  Thank you, Mr. Thomson.

14   Mr. Kruse.  Mr. Kruse.

15           **MR. KRUSE:**  Yes, your Honor.

16           **THE COURT:**  Brad Kruse.

17           **MR. KRUSE:**  Sorry about that.  It was on mute.

18           I concur very strongly on behalf of my client,

19   Cornice & Rose, with Mr. Thomson's statements, have also filed

20   a joinder to his objections.  So, I won't repeat those things

21   here; maybe hit a couple of high points.

22           Let me address first of all the copyright issue which

23   I agree was not really presented accurately by some of the

24   other comments that were made earlier in this which had focused

25   on simply the plans and the drawing.

1          The copyright that's held by my client extends not

2    only to the drawings and plans, but to any physical structure

3    embodied in their copyrighted work.

4          So, that includes the electrical and plumbing

5    systems, the physical appearance of the building, the placement

6    design of the stairways, the placement of all HVAC components,

7    structural elements such as the use of trusses, steel framing,

8    composition of the stair towers, et cetera, the custom

9    configuration of the apartment units within the building, the

10   custom designed configuration of the specialized handicap

11   accessible units, et cetera, et cetera.

12         It's a much broader copyright than simply the plans

13   and drawings, such that, and I think we all agree that that

14   copyright was never licensed by my client to the debtor, and

15   therefore, Mr. Smith does not have the ability to convey or

16   transfer that copyright interest by my client.

17         The sale arguably would effectively do that.  And

18   simply saying that we would somehow have the ability to file a

19   copyright infringement suit with some reserved language with

20   respect to plans and drawings does not really come anywhere

21   near close to protecting my client's interest in that regard.

22         And so, the ability of the purchaser or any purchaser

23   to use the building, although they may be able to obtain legal

24   title to the real estate and the structure, by virtue of the

25   copyright possessed by my client, any purchaser is not going to

**EXCEPTIONAL REPORTING SERVICES, INC**

20

1    have the ability to effectively use the building because of

2    this -- because of the copyright.

3              I have not had the ability to look at the case that

4    Mr. Lam noted, but I'm not sure whether that's the same set of

5    circumstances here that that language that he referred to was

6    designed to address, but the significant problem, I would ask

7    that -- I'd like to have the ability to maybe supplement my

8    objection.  I just got into this case yesterday, but I'd be

9    happy to supplement my objection with more detailed references

10   to the copyright with statutory records and so forth as part of

11   this.

12             The other thing that I might note is that there

13   really hasn't been any evidence that's been presented today

14   that -- as to why this property couldn't be -- why we couldn't

15   just simply pull back a little bit, have this property

16   marketed, this is with a longer notice period with more of a

17   marketing effort, and certainly without the RFP requirements,

18   as to why that would cause any damage to the estate and so

19   forth.

20             I'm not suggesting that there was any particular

21   intent to do this, but the initial marketing with the RFP

22   requirements, sort of -- effectively has sort of, I think,

23   constituted kind of a bait and switch.  So, just to bolster

24   Mr. Thomson's point, there were only a couple of bids that were

25   received under the marketing that was done under the old RFP

1    proposal, with all the RFP requirements.  And so, those bids

2    were rejected.

3            As Mr. Thomson referenced in his objection, those RFP

4    requirements make it a lot less attractive.  If you don't have

5    those, and the bank is not -- the bank's bid is not subject to

6    those requirements, you'd probably have a lot more interest.

7    And you have a much more attractive situation because the RFP

8    requirements are not there.

9            **MR. THOMSON:**  Right.

10           **MR. KRUSE:**  And so, I don't know why we couldn't

11   simply -- why it wouldn't be appropriate to remarket this

12   property under the 353 sale without the RFP requirements.  It

13   should be -- that should be available to other people, and it

14   sounds like there may be, based on the documents that I've

15   read, there may be some other interest that's currently out

16   there.

17           So, that's basically my concern and again, I share

18   the concerns with Mr. Thomson about the breakneck pace that

19   he's on, we've got shortened notice, we're in the middle of a

20   pandemic, and this property really hasn't been effectively

21   marketed, certainly without the RFP requirements, and it may

22   produce a more robust offer and more robust sale process.

23   Thank you.

24           **THE COURT:**  Thank you, Mr. Kruse.  Mr. Smith, back to

25   you.  Mr. Thomson and Mr. Kruse are talking about a flawed

22

1    process, a bait and switch, and an insider deal, and all sorts

2    of requirements to discourage bidders that this appeared and

3    then, you know, the process that ended up with somebody buying

4    something that wasn't really set up to be bought the way the

5    original bid procedure set out.

6          So, Mr. Smith, you've been a Trustee a long time; why

7    don't you tell me why this isn't an insider or, you know,

8    cooked up, bait and switch thing.

9          **MR. SMITH:**  Well, your Honor, I'd be happy to.  In

10   virtually all of the cases where I'm bringing to the Court a

11   proposed sale, far more often than not there is no advertising.

12   It's the Trustee finds a deal that is going to generate, in his

13   or her view, a benefit to the estate, and the Trustee as a

14   liquidator needs to seize on that.  And again, I keep going

15   back to the $150,000 carveout because it's huge.

16         Say these gentlemen are correct and that we could

17   advertise and get somebody to bid $2 million for it.  If

18   there's no carveout, there's nothing for the creditors; for the

19   unsecured creditors.

20         And again, as Mr. Lam pointed out, there are only

21   three who have objected, and they're all on the phone today;

22   34 who did not.  And those are going to benefit, and none of

23   those claims that I'm aware of are ones that I intend to

24   challenge.  I think the three that are on the phone merit

25   further scrutiny when it comes that time for distribution, but

23

1   there will be no distribution if we don't have a carveout.

2           And again, and I think the reason that the bank is

3   probably motivated to do a carveout is that we have this

4   hemorrhaging of $18,000 per month in taxes as they're accruing

5   right now.

6           So, that's their incentive; they're giving me

7   $150,000 just to be generous.  It probably makes sense to sort

8   of stop the bleeding, get this sold.

9           And if one were to adopt the copyright argument,

10  which I might point out was brought to me at 10 minutes to

11  10:00 last night in an email from Mr. Gray; not Brandon Gray,

12  but James Gray, basically saying that nobody could ever use

13  this building without their -- because they designed the

14  plumbing systems so you can't sell it with the existing

15  plumbing systems.

16          Well, I'm not warranting that to the bank.  I'm

17  giving what is tantamount to a quitclaim deed.  It's a

18  Trustee's deed.  It doesn't have in it a warrant, title, and if

19  you encounter a problem with Cornice & Rose down the road on

20  the copyright, I'm not saying that I'm going to indemnify you

21  or warrant to you, bank, that you aren't going to have

22  problems.  Maybe they will.

23          But strictly from the perspective of the bankruptcy

24  estate and from its creditors, the $150,000 carveout is

25  something that's very meaningful, and it's available now, and I

24

1   don't see anything down the road to another creditor that would

2   generate more.

3             **THE COURT:**  Okay.  Thank you.

4             **MR. THOMSON:**  Your Honor, Charles Thomson.  May I

5   make --

6             **THE COURT:**  No.  Just hang on.  I'm going to do this

7   in an orderly way.  Let me keep with Mr. Smith for one second.

8             Mr. Smith, did you provide a proposed order to the

9   bank?  Remember if I've got a proposed order in the file.

10            **MR. SMITH:**  Yes, your Honor.

11            **THE COURT:**  Anything you'd want to do to alter that

12  proposed order based on today's conversation if I decided to

13  use it?

14            **MR. SMITH:**  No, I don't believe so, Judge; not from

15  my perspective.

16            **THE COURT:**  What about -- what about the copyright

17  language Mr. Lam talked about?

18            **MR. SMITH:**  Well, no, I would not object to that

19  either, Judge.  And again, it's one that I think I have seen

20  that language, and basically, as I read it, is saying, you

21  know, by entry of the order, the Court is not preventing

22  somebody from pursuing a new copyright claim against somebody

23  else down the road.

24            **THE COURT:**  Okay.  Thanks, Mr. Smith.

25            Mr. Lam, your response to essentially the same thing

1    I talked to Mr. Smith about; that you -- you were involved in

2    cooking up the bait and switch where you put all these barriers

3    to a sale in, and then at the end, you're buying something

4    without the barriers, and you're an insider with the Trustee

5    that has drafted a process that's cynically directed as giving

6    you something you didn't deserve?

7              **MR. LAM:**  Judge, I was involved, oh, maybe around

8    March 18th or thereabouts, and I agree with everything

9    Mr. Smith has said.

10             The bottom line is, like I said earlier, is not just

11   $150,000.  If Mr. Thomson is correct that the real estate tax

12   should be less, if the bank's mortgage was no good, that is a

13   much larger amount of money, whatever portion is left from the

14   925,000 allocated to real estate that could be available for

15   the estate.

16             The focus, Judge, is how will the creditors get paid?

17   Ideas, arguments, suggestions are great, but they pay no

18   creditors.

19             My last point, Judge, is the order is filed at Docket

20   Number 136.  It was filed on March 24, 2020, and as Mr. Smith

21   has agreed with the additional language I proposed in Page 10

22   of my brief filed yesterday, basically it says, look, if

23   Cornice & Rose thinks that, you know, it can sue, then they've

24   got these guys on a chain for whatever copyright infringement,

25   the entry of this sale order does not prejudice Cornice & Rose

26

1   from doing that.  I suggest that protects Cornice & Rose.

2          Thank you, Judge.

3          THE COURT:  Thank you, Mr. Lam.  Mr. Gray, did you

4   want to comment on any of the things that were raised by

5   Mr. Kruse or Mr. Thomson?

6          MR. GRAY:  Not in any detail, your Honor.  I would

7   note the discussion that there were all these additional

8   requirements, or that that somehow pushed away potential

9   bidders, those additional requirements were simply a door to

10  open up access to the potential for a million dollars from the

11  State.

12         The fact that those evidently didn't entice

13  additional bidders, I don't think works against either of the

14  two bids that occurred in this case, or suggests that the bid

15  wasn't fair.  They were traditional and consistent with the

16  sort of procedures that the Economic Development Authority is

17  involved in, and I don't think represents some sort of bait and

18  switch or anything that would be inconsistent with normal

19  practice.

20         THE COURT:  Okay.  Very good.  Thank you, Mr. Gray.

21  Mr. Thomson, go ahead.

22         MS. GRIMM:  Excuse me, this is Rita Grimm.

23         THE COURT:  Hold on.  Hold on.

24         MS. GRIMM:  This is Rita Grimm.  I wonder if I could

25  make a comment.

1          **THE COURT:**  Yeah, Ms. Grimm, go ahead.  Go ahead and

2    make your comment and then Mr. Thomson.  Go ahead.

3          **MS. GRIMM:**  Okay.  Just to build on the IEDA's

4    comment, IEDA has successfully used a similar process in other

5    similar situations where a project was failing because the

6    developer ran out of funding or whatever, and it has been a

7    successful process in the past.

8          It needs to be kept in mind it was made very clear

9    that the bid process was a two-pronged process.  Yes, there

10   were Davis-Bacon and other requirements.  Those were related to

11   Housing and Urban Development requirements.

12         The funding that would be used would come from

13   Community Development Block Grant Disaster Recovery funding,

14   and there are requirements that pertain to that, and those were

15   included in bid information.  But it was also made very clear

16   that that portion of the bid process was related to applying

17   with IEDA for that potential million dollars.

18         Then there was a second prong of the process that was

19   for the benefit of the bankruptcy Trustee.  There were bids --

20   as have been mentioned, there were issues with the Binstock

21   bid.  For example, it intended to use funds for the purposes of

22   developing the first floor, which is commercial space.

23         It's set in rule and everything that comes down from

24   HUD, the CDBG Disaster Recovery funding cannot be used for

25   commercial space.  It's used for housing.  And so, there were

1    issues with that bid.

2          Now, the bank didn't apply for CDBGDR bid.  It only

3    bid -- it only bid on the second prong that was for the benefit

4    of the Trustee to obtain bids for the property itself.

5          And I also want to add that there was information out

6    there.  Developers were contacted, the information was posted

7    on the City of Charles City website, and information was also

8    supplied on IEDA's website.

9          On the bait and switch, IEDA did not give special

10   treatment to the bank.  Once it became known that the bank was

11   going to bid, it was not included in any discussions regarding

12   the bid, and we gave no special treatment to the bid.  We

13   provided equal access to obtain information.

14         In fact, our CDBG team leader and I talked with James

15   Gray and responded to his questions regarding the bid that he

16   may have been interested in making.

17         On the timing issue, I can't speak for Governor

18   Reynolds and her proclamation regarding the epidemic, but the

19   State's interest in why IEDA is involved in this is because we

20   need to get that property finished.  It's been under

21   construction since 2014.  We need people.  We need -- and

22   people need places to live.  We're in a crisis now.  IEDA is

23   providing temporary assistance to keep doors open on

24   businesses.  We are already working on measures to assist with

25   economic recovery after the crisis has passed.

29

1          We think that the economy is going to come charging

2    back after this COVID-19 crisis has passed, and so time is of

3    the essence.  This property needs to be ready for development,

4    ready for construction as soon as possible so that we can get

5    this project finished.

6          That's all I've got.  Thank you.

7          **THE COURT:**  All right.  Thank you, Ms. Grimm.

8    Mr. Thomson, to you.

9          **MR. THOMSON:**  Yes.  First of all, since it was the --

10   the most recent argument that was discussed, on the specific

11   requirements of the RFP, the proposal sent out by the IEDA, not

12   applying to the bids globally, that's -- take a look at the

13   letter.  It's attached to the bank's exhibits, I believe.  It's

14   not at all clear.

15         Certainly it was not clear to the bidders, or the

16   potential bidders that I spoke to.  They thought those

17   restrictions applied to everything.  And I believe that's also

18   in the Binstock affidavit that we provided.

19         Then as far as the only three creditors appearing,

20   that's true of course, but I have spoken to a number of other

21   creditors who would have been interested in appearing if they

22   could afford it and, secondly, because one specific creditor

23   who wanted to file a joinder.  They felt that they did not have

24   enough time for their counsel to review the case, because it's

25   complicated, and come to a conclusion about signing off on the

30

1    joinder.  So, they elected to not do it.

2            But I don't think it's fair to say that the creditor

3    body is not following this and not interested in it.  It's a

4    matter of they just don't have the pecuniary interest that

5    James Gray and I happen to have; it's a large pecuniary

6    interest.

7            And then finally, I'd like to make a specific request

8    that I be permitted to examine the Trustee in open court about

9    this under oath, and find out why, among other things, find out

10   why there was no even free advertising, conventional free

11   advertising, utilized by the Trustee, and why it is that, as

12   far as I can tell, there was no follow-up with the bidders who

13   had submitted, or who had received the RFP on the changed

14   conditions.  And would they be interested in bidding and

15   offering a bid free and clear.

16           So, and then you had mentioned the order, your Honor.

17   I object to many things in the order as I think we all can

18   deduce.  The good faith, the on-point transaction, but in

19   particular, the paragraph dealing with 6004(h), I think that

20   should be stricken.  There is just a basic one sentence request

21   that if the Court should grant this motion that the 6004(h)

22   stay be eliminated.

23           I don't think cause has been shown for that.  It's a

24   two-week stay. It's -- more taxes are not going to accrue

25   before the end of the month to my knowledge, so that the 14-day

1    stay would end, what, the 22nd, 23rd?  So, I don't see any

2    reason why the stay shouldn't be imposed.

3            **THE COURT:**  Okay.  Mr. Kruse.

4            **MR. KRUSE:**  Yes, your Honor, I would concur with

5    Mr. Thomson's comments about the order as well, and

6    specifically with respect to the proposed language that

7    Mr. Lam suggested, and that was just referenced again moments

8    ago.

9            Again, that language is just not sufficient in large

10   part because it refers to plans and drawings.  That language

11   that's being suggested contemplates incorrectly that the only

12   copyright interest held by my client is simply in the plans and

13   drawings, and it doesn't take into consideration the statements

14   that I made earlier regarding the fact that the embodiment of

15   the copyright is for the full structural portion of the

16   building, configurations, components, and so forth.

17           So, that language that is suggested is simply

18   inaccurate to protect that copyright interest.

19           **THE COURT:**  Okay.  Thank you, Mr. Kruse.

20           Mr. Smith, this is your motion.  I'm going to give

21   you and Mr. Lam the last word.  Anything you want to mop up

22   before we proceed?

23           **MR. SMITH:**  Yes, your Honor.  Last Friday, I turned

24   over well over 150 pages of documents to Mr. Thomson basically

25   giving him access to all of the emails I had with everybody,

1   with Mr. Lam, with the State, with himself, in addition to

2   handwritten notes and copies of emails on which I had also made

3   some handwritten notes.  He wanted all of that.  I thought, you

4   know, there's nothing to hide here.

5          And even though a lot of it would have been work

6   product or other things where there could have been a privilege

7   asserted, I felt like, why not, so I just gave him everything

8   he wanted.  And so, I guess in terms of -- there is nothing

9   nefarious here where there's something done secretly.  It's all

10  above board.

11          And again, I think that it's a situation where the

12  bankruptcy estate will get $150,000 out of this deal.  I don't

13  see anything going forward that would assure me that that would

14  be available at a later date.

15          **THE COURT:**  All right.  Thanks, Mr. Smith.  Mr. Lam,

16  anything further from you?

17          **MR. LAM:**  Judge, I have three things.  Like Mr. Smith

18  said, last weekend, Mr. Eide and I both -- I should say

19  Mr. Eide (indiscernible) many, many, many pages.  On my count,

20  my emails were 225 pages that went to Mr. Thomson.  I don't

21  know how many Mr. Eide had that went to Mr. Thomson.

22          Number two, I will say, Judge, that if Mr. Thomson

23  does not like the 6004(h) language, I would concede that I

24  don't have enough in this record to be kept there.  So, I would

25  take out the 6004(h) 14-day stay language.  All right?

33

1          Number three, the last point, Judge, is with respect

2    to Mr. Kruse's concern, the proposed language I said is plans

3    or drawings.  Probably my fault since I'm not an architect.

4          What I would do, Judge, is I would say may not use

5    plans or drawings or anything else in which C & R has a valid

6    copyright point.

7          So, whatever it is, I don't know what it is.  It

8    could be plans, could be drawings, whatever they call it in

9    copyright law, embodiment or whatever.  Look, nobody is going

10   to use those without paying C & R, and the entry of this order

11   does not prejudice C & R from going after anybody who uses

12   plans and drawings and whatever else.

13         So, to the extent the Court entertains Mr. Smith's

14   motion, I will represent to the Court that I will change the

15   order to A, take out the 6004(h), you know, language, so

16   Mr. Thomson does have the benefit of the 14-day stay in

17   6004(h).

18         And number two, I will add to this paragraph on Page

19   10 of my brief, but in addition to say plans and drawings, I

20   would say, you know, whatever else that C & R may have a valid

21   copyright claim.

22         I believe, Judge, that should take care of it.  Thank

23   you, Judge.

24         **THE COURT:**  Anything --

25         **MR. SMITH:**  And your Honor, Chuck Smith again.  I

1    just have -- I have no objection to waiving the 14-day or the

2    stay issue.

3            **THE COURT:**  All right.  Thanks everybody for your

4    arguments today.  I have not looked at the proposed order; I

5    just noted it was in the file.

6            Mr. Lam is determined to provide some changes and get

7    a proposed order back to me.  As soon as I receive that, I'll

8    look it over and see if it comports with what we have today, I

9    intend to use the proposed order or something of that nature.

10            So, that's where I am today, but I am going to give

11    it one more look and see, and give it a little more thought.

12    So, when I get Mr. Lam's revised proposed order, I'll look at

13    that and then take a further look at the case, but that's where

14    I'm leaning very heavily right now.

15            Thanks everybody for your time today, and we're

16    finished.  Thanks.

17            **MR. SMITH:**  Thank you, Judge.

18        **(This proceeding was adjourned at 10:58 a.m.)**

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                          **June 16, 2020**

**Signed**                                                      **Dated**

*TONI HUDSON, TRANSCRIBER*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
(MASON CITY)


IN RE:                        )    CASE NO:  19-00507
                              )    CHAPTER 7
                              )
McQUILLEN PLACE COMPANY, LLC, )    Cedar Rapids, Iowa
                              )
                              )    Friday, May 8, 2020
            Debtor.           )
                              )    3:21 p.m. to 4:19 p.m.
_____)


TELEPHONIC MOTIONS HEARING RE:
MOTIONS TO RECONSIDER; WITHDRAWAL OF REFERENCE; MOTION TO STAY

BEFORE THE HONORABLE THAD J. COLLINS,
UNITED STATES BANKRUPTCY JUDGE


**APPEARANCES**:              (CONTINUED ON PAGE 2)

For James Gray, et al:   CHARLES M. THOMSON, ESQ.
                         Law Office of Charles M. Thomson
                         1110 North Grand Ave., Suite 300
                         Charles City, IA 50616

For Trustee:             CHARLES L. SMITH, ESQ.
                         25 Main Place, Suite 200
                         P.O. Box 248
                         Council Bluffs, IA 51502

Court Reporter:          Recorded; FTR

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**            (CONTINUED)


First Security Bank      LARRY S. EIDE, ESQ.
& Trust Company, et al.: 103 East State St., Suite 800
                         P.O. Box 1588
                         Mason City, IA 50402

                         ERIC J. LANGSTON, ESQ.
                         ERIC W. LAM, ESQ.
                         Simmons Perrine Moyer Bergman, PLC
                         115 Third Street SE, Suite 1200
                         Cedar Rapids, IA 52401

Cornice & Rose:          BRADLEY R. KRUSE, ESQ.
                         699 Walnut St., Suite 1600
                         Des Moines, IA 50309

                         LOUIS K. BONHAM, ESQ.
                         Osha Liang, LLP
                         909 Fannin St., Suite 3500
                         Houston, TX 77010

City of Charles City,    MONICA L. CLARK, ESQ.
IA:                      Dorsey & Whitney, LLP
                         500 S. Sixth St., Suite 1500
                         Minneapolis, MN 55402

Iowa Economic            BRANDON J. GRAY, ESQ.
Development Authority:   RITA GRIMM, ESQ.
                         Iowa Attorney General's Office
                         1305 Walnut
                         Des Moines, IA 50319

1          **Cedar Rapids, Iowa; Friday, May 8, 2020; 3:21 p.m.**

2              **(Attorneys appearing telephonically)**

3                      **Call to Order**

4          **THE COURT:**  Good afternoon, everyone.

5      **(All respond good afternoon)**

6          **THE COURT:**  Okay.  We are here this afternoon on the

7  case of *McQuillen Place Company, LLC*, 19-00507.

8          A whole series of Motions including Motions to

9  Reconsider, Withdrawal of Reference, Motions for Stay and

10  resistances thereto.

11          I've got Chuck Smith on as the Trustee.

12          Charles Thomson on for McQuillen Place, LLC.

13          Larry Eide for First Security Bank.

14          Brad Kruse for Cornice & Rose International.

15          Brandon James for the Iowa Economic Development

16  Authority.

17          Eric Langston for First Security Bank & Trust.

18          Eric Lam for First Security Bank & Trust.

19          Louis Bonham for Cornice & Rose.

20          And Monica Clark for the City of Charles City.

21          Anybody's appearance I have not noted that needs to

22  make an appearance?

23          **MS. GRIMM:**  This is Rita Grimm with Iowa Economic

24  Development Authority, but I will let Brandon Gray speak for

25  the State and IEDA.

4

1          **THE COURT:**  Okay.

2          **MR. LANGSTON:**  Good afternoon, your Honor.  This is

3  Eric Langston.

4          I believe Eric Lam and I are appearing for Four Keys,

5  I don't know the degree to which that distinction is going to

6  be material for you, but just for the record I wanted to flag

7  that.

8          **THE COURT:**  Okay, we'll note that Four Keys, LLC in

9  relation to or in addition to First Security Bank & Trust.

10          **MR. THOMSON:**  Your Honor, Charles Thomson.

11          I'm actually not appearing for McQuillen Place, I'm

12  appearing for the equity security holders and creditors, James

13  Gray and Charles Thomson and myself who are equity security

14  holders in McQuillen Place.

15          **THE COURT:**  Okay.  All right, any other corrections

16  or additions?

17          **(No audible response)**

18          **THE COURT:**  Okay.  Mr. Kruse, your Motions are listed

19  first.  I have taken a look at them.  I don't really understand

20  the copyright thing, so maybe just start at the beginning.

21          Was this building itself --

22          **MR. KRUSE:**  Your Honor --

23          **THE COURT:**  Hold on.  Hold on.  Was this building

24  itself an infringement of a previous copyright or what?  Let's

25  start with that.

5

1           Is this building built as an infringement of the

2    copyright, or was essentially taken from somebody without

3    payment?

4           **MR. KRUSE:**   Your Honor, I'm going to pass this over

5    to Louis Bonham and let him argue the Motions.  I can just say

6    that the building itself wasn't built as an infringement, it's

7    just that my client owns an architectural copyright and a --

8           **MR. BONHAM:**   If I may --

9           **THE COURT:**   Hold on.

10          **MR. BONHAM:**   Yeah.

11          **THE COURT:**   All right.

12          **MR. KRUSE:**   So I'm just going to turn it over to

13   Louis with the Court's permission and let him argue the

14   Motions.

15          If it becomes -- if there's any issues that come up

16   regarding what happened at the sale hearing prior to the time

17   that Louis was involved in the case, with the Court's

18   permission, I might need to chime in at that point, but I'm

19   going to basically let Louis argue the Motions that Cornice &

20   Rose have filed.

21          **THE COURT:**   Okay, Mr. Bonham, go ahead.

22          **MR. BONHAM:**   Thank you, your Honor.  Again, Louis

23   Bonham for Cornice & Rose.

24          Just so it can be directly aimed to your question,

25   Judge, yes.

6

1          The problem we have is that, again, Cornice & Rose

2   created the design of the building, that's the architectural

3   work as defined in Title 17.

4          However, under the contract that it had with the

5   Debtor the license for the use of it was conditioned on full,

6   complete and timely payment.  That has not occurred, that is

7   laid out in our Proof of Claim.  So for that reason there is no

8   license for the construction of the building and, therefore,

9   the building is, indeed, an infringing copy of the

10  architectural work.

11         And, again, to jump ahead a little bit, I know that

12  in Mr. Lam's Response that he filed he seems to indicate that

13  architectural copyrights only extend to the plans and so,

14  therefore, if you don't use the plans completion of a building

15  or sale of an infringing building, or creation of a derivative

16  of an infringing building is somehow not copyright

17  infringement.

18         That has not been the law since 1990.  Prior to the

19  enactment of the Architectural Works Copyright Protection Act

20  of 1990 that would have been the law, but that's why Congress

21  changed it.

22         And, again, to shorthand on this one we have cited

23  you to the Second Circuit's Opinion in *Schultz Design versus*

24  *Sard* in which they lay all this out in detail and indicate,

25  correctly, as this is the law in every circuit, that an

1    architectural work extends to the building itself.  It's in the

2    statute, it's what the law provides.  So as a result of this

3    (indisc.) --

4              **THE COURT:**  So wait, so you're saying -- let's stop

5    right there.

6              **MR. BONHAM:**  Sure.

7              **THE COURT:**  So you're saying any time there's

8    language in there that you recited that got to start in the

9    contract that says, you know, "the license is only effective

10   upon payment in full," any time there's that language and a

11   building is built, the architect is not paid in full, it can't

12   be sold without the architect's permission period?

13             **MR. BONHAM:**  Correct.

14             **THE COURT:**  Okay, that's news to me.  So, yeah, I'm

15   going to have to take a look at that.  So that's -- you've got

16   me if --

17             **MR. BONHAM:**  The case to, perhaps, look at there, and

18   I can give the Court the citations for it, but it would be --

19   excuse me, there is a Fifth Circuit case dealing with licenses

20   and conditions precedent and, of course, the law does not favor

21   conditions precedent, but if you have the correct language,

22   which the AIA Form B101 does, then, yes, the license is

23   conditioned on payment, and if you don't pay it's -- you never

24   -- the license never took hold.

25             And remember on this is that license is an

1    affirmative defense.  Cornice & Rose's responsibility in, if

2    there's, you know, an infringement case, is to prove that it

3    has a valid copyright which, since it's the one that did the

4    design, that's going to be a given, and that the Defendants

5    have used, you know, made a copy, they have in some way

6    infringed an exclusive right, that's all they have to prove.

7          If the Defendant then wants to then establish a

8    license that burden's on the Defendant to prove a license, not

9    on Cornice & Rose to disprove it.

10         **THE COURT:**  So what -- is this some kind of like

11   super, super, super security interest that it's got to top the

12   bank then, too, I mean, nobody can do anything?

13         **MR. BONHAM:**  Well, again, I wouldn't call it a

14   security interest, I would call it -- you know, it's what it

15   is, it's a copyright.

16         And, again, in my experience and I do pretty much

17   architectural copyright cases exclusively these days, most

18   sophisticated lenders deal with this issue by having, you know,

19   a provision where the architect signs, you know, an assignment

20   to the bank or a license to the bank that does it.  My

21   understanding is that was not done in this case.

22         In particular, when we made this known to the bank

23   prior to the sale hearing the way the bank purported to deal

24   with it was the insertion of the language that's in the Order

25   at Paragraph 19.  And, I'm sorry, your Honor, but that language

1    they led you into error.  The Bankruptcy Court cannot authorize

2    violations of Federal law.  It can't authorize the sale of

3    goods that infringe a patent.  It can't, as was colorfully

4    noted in a case, it can't authorize the Trustee to go into the

5    cocaine distribution business.  It can't purport to authorize

6    the sale of environmentally contaminated property free of

7    CERCLA liability, and it's the same thing here.

8          Unless and until there's a license to sell the copy

9    of the copyrighted work then the copyright holder's exclusive

10   right under 17 USC 106.1 applies -- excuse me, 106.3.

11         **THE COURT:**  Okay, so you're telling me --

12         **MR. BONHAM:**  -- applies in a violation of its

13   infringements.

14         **THE COURT:**  So you're telling me if you don't sign

15   off on it and everybody just walks away and says "Well, we

16   don't have the money to pay the architect in full, we're just

17   leaving it lay.  You don't have a security interest, you just

18   have like a stopping measure, whatever it is, that nobody can

19   do anything until you're paid in full?

20         **MR. BONHAM:**  Well, and, again, the contract for the

21   -- paying for the license, that's a contract between, in this

22   case Cornice & Rose and the Debtor.

23         Again, if a third party wants to come in they can't

24   force Cornice & Rose to give them a license, that's what the

25   Supreme Court noted in the *Sony* case.

1           You know, there's only a few types of forced licenses

2   under Title 17, usually for mechanicals, so that's what you get

3   for a music license, but there's not one for this.

4           Is this a harsh result?

5           Yes, it is, but this is why lenders have been, you

6   know, told for years, why they need to get this papered up

7   front, and in this instance the bank didn't do it.

8           **THE COURT:**  Yeah.  Okay.  That's going to require me

9   to take a look into that because I'm not going to say I'm

10  doubting what you say, I'll just say I've never heard of that.

11  It doesn't seem like this is a result that would ever be

12  intended, so if the bank just walks away, everybody just walks

13  away and the building just sits because you need to be paid in

14  full before anything can happen, so I just -- yeah, I'm just a

15  little thrown for a loop.  I've done a lot of constructions

16  cases in my day, too, and I've never encountered anything like

17  this, so --

18          And probably because, right, what you're saying,

19  maybe all of that language gets in there and you've got a --

20  you know, a case where that language maybe wasn't inserted by

21  the bank and a sign off wasn't executed.  I -- yeah, I'm just

22  -- not stunned, I'm just surprised.  I've been surprised

23  before, I've been wrong many times, but I don't worry about

24  being wrong, if I'm wrong I'm wrong, but I'm going to have to

25  take a look at that.

11

1          So you have heard my position on that.  Do you want

2    to say anything more to me about that?

3          MR. BONHAM:  I think you've captured it, your Honor.

4    I think that, again, under fairly well-established, you know,

5    Title 17 law, the unlicensed sale of a copy of an infringing

6    work is infringement per se and, again, in the architectural

7    context does that lead to harsh results?  Yes, it does.

8          Only you have the less -- that's what the law says.

9          THE COURT:  But do I have something in the bankruptcy

10   context?

11         MR. BONHAM:  In the bankruptcy context?  In what

12   respect?

13         THE COURT:  Well, that's where we are.  I mean --

14         MR. BONHAM:  Well, again, in the bankruptcy

15   context --

16         THE COURT:  Hold on.  Hold on.  Hold on.  Just to

17   say --

18         MR. BONHAM:  Sure.

19         THE COURT:  We're in a bankruptcy.  There's a whole

20   code about what courts can and can't do.  Judges are given, and

21   even Trustees are given rights that don't exist in a lot of

22   other contexts, so I'm just saying that this isn't an

23   architectural infringement case in my court.  There is no such

24   -- there is no case like that right here, at least that's what

25   we're not litigating, we're litigating a bankruptcy sale, and

1     so in the -- I'm asking you, do you have a case you can cite me

2     to that's -- makes your argument and says in a bankruptcy the

3     architect can assert this -- I'm not even sure what to call it,

4     it's not a secured creditor you say; we've got ability to sell

5     things free and clear.  I know what your position is, but I

6     just need it explained to me by either a bankruptcy judge or an

7     appellate court that's looked at a bankruptcy case to really

8     understand the interaction of things.

9             **MR. BONHAM:**  The question would be, your Honor, is

10    whether or not -- and the problem we have here is the language

11    in Section 19 of the Order that Mr. Lam inserted, that purports

12    to authorize future infringement, and I do not -- again, I

13    don't see anything in the Bankruptcy Code that authorizes, that

14    allows a court to authorize future violations of the law, but

15    that's what this Order does.

16            **THE COURT:**  So your answer is no, you don't have a

17    case?  That was the question.

18            **MR. BONHAM:**  Do I have a case that is directly on the

19    points that you have addressed?

20            Not as we speak here today.  I think there are

21    cases --

22            **THE COURT:**  Well, we're in Bankruptcy Court.  That's

23    why I'm saying it is a different -- it's a different setting.

24            Now I'm not going to belabor the point, I just --

25    it's more of a study.  So you're interfacing with a whole

13

1   different -- another animal here, and as a matter of

2   infringements or authorized, I don't have that language handy.

3   I had it earlier, but I don't recall it saying "all future

4   infringements are valid" or something like that, that's not

5   what it says, does it?

6           MR. BONHAM:  Well, it's Section 19, and I'll read you

7   the exact language.  What is says is that --

8           THE COURT:  Yeah, read me the language because I have

9   it somewhere, but it's -- it's in one of these things, but go

10  ahead, just read it to me.

11          MR. BONHAM:  Sure, this is Section -- it's on Page 12

12  of the Order, Section 19:

13          "Copyright.  So long as purchaser or its assignee or

14          its architect or agents, do not use the plans or

15          drawings or any work in which Cornice & Rose

16          International, LLC holds a valid copyright" --

17          And it's shorted as the "C&R Intellectual property."

18          "the purchaser or its assignee may use and occupy the

19          property, develop the property and complete the

20          interior and exterior of the property free and clear

21          of existing and future claims of C&R whether for

22          copyright infringement or otherwise."

23          Your Honor, I submit that is well beyond the scope of

24  what a Bankruptcy Court is empowered to do under Title 11.

25          Now, to the extent, as you say, this is something

14

1   that you have not seen, that is, you know, the interface

2   between Title 17 and Title 11, this is why we have suggested

3   that this matter is subject to mandatory withdrawal of the

4   reference because just as you don't have bankruptcy judges do

5   patent infringement analyses, where you do a Markman hearing

6   and you interpret whether the patent is valid, those get kicked

7   up to the District Court, or certain, you know, CERCLA-type

8   cases, the same kind of thing.  This is one where we submit

9   that once the bank's attorney inserted this, you know, very,

10  very unusual language that purports to authorize future

11  violations of the law, this is so beyond the pale that if

12  that's going to be -- if there's an argument that somehow Title

13  11 overrides the exclusive rights of Title 17 then that's

14  exactly why 157(d) requires a withdrawal of the reference.

15          As far as -- there's a -- in terms of the case I

16  think I can -- I'm going to have to look at it real quickly,

17  but I believe there are cases that indicate that the Trustee

18  cannot sell, you know, illegal copies.  It's not in the

19  architectural standpoint, it's usually when the Trustee has

20  inventory.

21          Let's say, for example, bootleg records.  If it's got

22  bootleg records the Trustee cannot be authorized to sell those

23  because they're illegal copies.

24          **THE COURT:**  Yeah, I get that.  This is not a bootleg

25  building.  I mean, it's not very helpful to say, you know, if

1   somebody --

2           That's why I asked the first question, was whether it

3   was some kind of, you know, that they built the building in

4   Charles City because they saw it in Detroit, and they loved it,

5   so they just came over and they just said "Hey, send somebody

6   up there, figure out that whole design and stuff, and have

7   somebody walk through it and we'll just have you design it up

8   and build it without attribution or without a payment to the

9   original architect on the other building."

10          I would understand that and that's why I started with

11  that question.

12          MR. BONHAM:  Yeah.  Well, again, that would certainly

13  be that kind, if you will, direct piracy.

14          THE COURT:  Right, bootlegging.  That's what we

15  talked about --

16          MR. BONHAM:  Yes, that would be copyright

17  infringement.

18          THE COURT:  That's not what we have here.

19          MR. BONHAM:  However -- however, copy -- well,

20  copyright infringement is not just that level of piracy;

21  copyright infringement also extends to any unlicensed use of

22  the work, and I can get you plenty of cases where, for example,

23  there's a contract between the architect and the build that

24  says "You may build this house once and only once.  If you want

25  to build it more, condition precedent, you must report and pay

16

1    for it."

2         The builder doesn't report and pay for it, builds 300

3    more houses, and then when the architect complains the builder

4    says "Well, okay, breach of contract, we'll pay you the reuse

5    fees."

6         And the courts say "No, those 299 houses were

7    constructed without authorization of the copyright holder, they

8    are infringing per se."

9         **THE COURT:**  Yeah, I know.

10        **MR. BONHAM:**  And -- which is, I can get you plenty of

11   cases for that.

12        **THE COURT:**  But I don't need cases for that, I need

13   cases for -- okay, I just -- I'm saying since 1990, when you

14   say the law changed --

15        **MR. BONHAM:**  Correct.

16        **THE COURT:**  -- I've got to believe there were

17   literally -- have literally been thousands and thousands, if

18   not tens of thousands of bankruptcy cases involving a property

19   that was built out where an architect wasn't paid, and I just

20   have trouble believing that nobody has spoken on the issue,

21   especially if it's profound enough that it would just stop a

22   bankruptcy sale in its tracks.

23        And the reason that you're getting pushback here is

24   that anymore most cases, even in a reorganization context,

25   usually deal with some kind of sale or transfer, you know,

1    maybe you get new money that comes in and just, you know, keeps

2    the going concern going exactly how it is with the same group,

3    but, boy, I just -- that's why I'm scratching my head, I would

4    think that somebody would have stumbled over this at some point

5    in time and have a case with a bankruptcy because that's just

6    how it would play out.  I would think that this would be a

7    routine situation where architects say "Oh, no, no, not paid in

8    full, you can't do anything.  Pay me first, pay me in full and

9    I'll go away."

10              So that's where I'm stuck, and it's on this first

11   use.  I don't need the serial cases, the bootlegs, the hundreds

12   of copies, we don't have anything like that here.  We've got a

13   first use that hasn't been paid in full, and then there's a

14   bankruptcy sale with authority for the Court to allow sales

15   free and clear of liens and interest.  So I don't know what

16   you've got and I don't know what the intersection is, that's

17   why I'm probing this so hard.

18              I'm not saying copyright law doesn't exist in my

19   court, I'm saying this is a new one to me.  If there is a

20   second building, a bootleg, a series of buildings, I totally

21   understand.

22              Here it's a first use, and Mr. Lam said in his works

23   -- his papers was that copyright deals with copies, and this is

24   an original and I'm kind of stuck there, so maybe that's --

25              **MR. BONHAM:**  The answer to that is that the building

**EXCEPTIONAL REPORTING SERVICES, INC**

18

1    -- the architectural design, you know, is the protected work.

2    The plans are one embodiment of the work.  The buildings are

3    another embodiment of the work.

4            **THE COURT:**  Sure, and I understand that.  I do

5    understand that part, just like my Detroit building thing.

6    Right?

7            You go up there and you look over a building, we

8    don't get any of your -- we don't take any of your designs, we

9    don't take any specifications, we don't get any paperwork, we

10   just send our team up there to go scrutinize that, figure it

11   out, design it exactly like it is back here and we'll just use

12   it, then the building would be the work.  But that's, again,

13   copying the building, it's not -- the originality part of it,

14   and I'm stuck on that, particularly in a bankruptcy case.  So I

15   don't want to belabor the point any further, I'm just trying to

16   drill down and make sure we understand each other as to what it

17   is that I'm stuck on, and maybe I'm stuck on something simple,

18   I don't think I am, but I really need to take a look at it.

19   And -- yeah, I'll just leave it at that.

20           So if you've got anything more on that point, go

21   ahead.  Or if there's additional points beyond that argument go

22   ahead.

23           **MR. BONHAM:**  I believe that, again, we could belabor

24   it, your Honor, but I think you understand the argument that we

25   are making.  Again, the main point, I would just reemphasize to

1    you is that use without a license is infringement per se,

2    that's black letter law, it doesn't have to be piracy.

3              **THE COURT:**  Yeah, if it's the original building -- I

4    just -- I don't know.  I don't know how that plays itself out,

5    I don't understand what position you would occupy.  I'm going

6    to have to look at it and I'll just have to rely on that.  You

7    don't have a case at hand; all right, I don't have an answer.

8    Maybe Mr. Lam's got something, maybe somebody else does, but I

9    understand the issue, but I just don't understand that that's

10   the law that has to be applied the way you're saying it does,

11   and I see a lot of problems with that; i.e., I need more

12   education so I got to look at it.

13             Okay, do you want to argue anything further;

14   otherwise, I'll kick it over to Mr. Lam to respond?

15             **MR. BONHAM:**  Not on the -- focusing on the

16   architectural issue, no, nothing further.

17             **THE COURT:**  Well, do you have another issue that you

18   wanted to focus on?

19             **MR. BONHAM:**  Well, again, there's the issue of

20   Withdrawal of the Reference, which we have raised, and I think

21   that the fact that the Court is indicating that this is a

22   difficult issue of the intersection of Title 17 and Title 11, I

23   would suggest that this is exactly why 157(d) exists.  That's

24   all that -- again, that's all that from C&R's perspective, for

25   our Motion to Reconsider, those are the important points.

20

1          I believe Mr. Thomson has some issues on the Motion

2     to Reconsider as well, but we'll take them in whatever order

3     you wish.

4          **THE COURT:**  Yeah, okay.  And just as a comment on

5     Withdrawal of Reference, I'll take that -- I'll brush up on

6     that a little bit, I know about it a little bit better.

7          I'm not so sure that your point about Withdrawal of

8     Reference is because District Judges, even District Judges with

9     a lot of moxie would say that they have a better handle on the

10    interface of bankruptcy law with another area of law, and that

11    they can get that straightened out better.

12         If we are dealing with a copyright infringement claim

13    that's more discrete, it was just about whether you have a

14    claim for copyright infringement and that was being litigated,

15    that might be a different animal, but whether the sale tied up

16    in this, I'm not so sure of the expertise or kind of intent of

17    Congress is to have bankruptcy-related sales be kicked into

18    other contexts because they have other parts of the law

19    involved, I'll look at that one, too.

20         All right, Mr. Thomson, do you want to give me your

21    arguments?

22         **MR. THOMSON:**  Yes, your Honor.  Mine are much closer

23    to what we're used to dealing with.

24         I just want to go over two points.  One was is in

25    pleadings the Four Keys and the Bank have raised whether or not

**EXCEPTIONAL REPORTING SERVICES, INC**

21

1   James Gray and myself have standing as equity security holders

2   to be objecting to the sale and entering pleadings.  I have two

3   points on that.

4          One, I believe the math in Mr. Lam's pleadings may be

5   a little off.  If you look at the claims of the Debtor there's

6   an Adversary proceeding in several of the insiders of First

7   Security Bank that the face amount of that claim is for 6

8   million dollars.

9          The Bank's claim has been objected to.

10         There is also the equitable subordination adversary

11   pending.  So if the Debtor prevails, if the Trustee has,

12   representing the Debtor, prevails on those there won't be a

13   distribution to the equity security holders.

14         In addition, both Mr. Gray and I are creditors in

15   administrative claims and I don't think they're suggesting that

16   as creditors we don't have standing, but I did want to toss

17   that out there.  We noted it in the pleadings, by the way, and

18   it just may be an oversight in the Bank's pleading.

19         We note that at Paragraph 2 in the objection to sale

20   that we were creditors and administrative claimants.

21         So the new point I want to focus on, your Honor,

22   however, is the problem, and the reason we filed the Motion for

23   Reconsideration which is we were never afforded an opportunity

24   to cross examine the Trustee on the Affidavit that he had

25   presented.

22

1          I think we have an unresolved hearsay problem there.

2          Yes, I did state on the hearing on the 25th on the

3    Motion to Shorten Time on the Trustee's post-sale that I was

4    very much in favor of doing as much by affidavit as possible.

5    I still stand by that.

6          However, I did use the words "as possible" and I

7    wasn't aware at the time of all of the voluntary discovery that

8    we received, and I think the parties were cooperating on that.

9    We received well over a thousand pages of discovery that needed

10   cleared or that, at least, from our perspective, but there was

11   inadequate efforts of marketing the building, and the -- so we

12   would like to examine, cross examine the Trustee on those

13   issues.

14          **THE COURT:**  What about Mr. Lam's point about, okay,

15   even if you're to assume that there was inadequate efforts to

16   market the building, what the next step would be and it's

17   likely or virtually certain there would be more realization for

18   the estate through these efforts?

19          **MR. THOMSON:**  Well, I think that goes to the business

20   judgment of the Trustee, and if the business judgment was

21   inadequate I think that answers the question whether the Order

22   could be entered.

23          **THE COURT:**  I didn't follow that.  It seems like you

24   just --

25          **MR. THOMSON:**  Well, doesn't there have to be a

23

1   finding that the business judgment of the Trustee in selling

2   the business is adequate and that this is a good faith

3   purchase?

4           **THE COURT:**  Okay.

5           **MR. THOMSON:**  Whether or not there's more money

6   coming in, if it's not a good faith purchase don't we have a

7   problem?

8           **THE COURT:**  Yeah.  I don't know the answer to that

9   off the top of my head.  I was going to say if it's not a good

10  faith purchase but, to me, it would show if it's not a good

11  faith purchase it was sold for less than there would be some

12  kind of less than reasonable value or fair value, or what value

13  could be realized.

14          I guess the thought is what's missing here maybe is,

15  okay, market it all you want.  Can you show any comparable

16  anywhere in this area of northeast Iowa or north central Iowa

17  that a commercial building of the same kind of thing with

18  similar settings in a similar-sized city sold for more?

19          I mean, to me there would -- I don't know, it seems

20  to be that that would be part of the equation, too, but maybe

21  not.

22          **MR. THOMSON:**  Well, my point is that we don't have

23  any evidence from the Trustee without having an opportunity to

24  cross examine the Trustee, all we have is an unsupported

25  affidavit which, if challenged, is inadmissible hearsay, and

24

1    the only way it can become admissible and become a part of a

2    good record in sustaining the Sale Order is if there's an

3    opportunity for cross examination.

4          **THE COURT:** So you're basically saying we needed to

5    have an evidentiary hearing is what you're saying?

6          **MR. THOMSON:** Yes. Yes, your Honor.

7          **THE COURT:** Okay. Yeah, that's a puzzling one for me

8    because I'm ready to do evidentiary hearings, but lawyers don't

9    want to do them because they have concerns or be around clients

10   and I'm not going to force people into a situation where they

11   feel like their health is put in great jeopardy, and I thought

12   that that's kind of the way we proceeded here, but I'll have to

13   go back and look at that.

14         **MR. THOMSON:** Absolutely, that would be my first

15   preference, your Honor, but I think you're -- the need for an

16   evidentiary hearing is clear in order to support the record

17   assuming that you'll reach the same result. I don't want to

18   pre-suppose that, but I don't think the result can be sustained

19   on appeal if we go that route without an evidentiary hearing.

20         **THE COURT:** Okay. All right, is that the end of your

21   arguments? I know you joined in the architectural arguments to

22   some extent, too, but is that the end of --

23         **MR. THOMSON:** Yes, it is, your Honor.

24         **THE COURT:** Okay.

25         **MR. THOMSON:** Thank you.

1          **THE COURT:**  All right.  Did anybody else join those

2     arguments on moving to Reconsider or Withdrawal of Reference?

3          I don't show that they did, but if you did speak up.

4      **(No audible response)**

5          **THE COURT:**  Okay.  Is it going to be Mr. Lam or Mr.

6     Langston is going to talk to me?

7          **MR. LAM:**  Judge, this is Eric Lam.

8          I really only have three points based on what has

9     been said in the last half hour or so.

10         Number 1, Mr. Bonham says, you know, there is no law

11    or whatever it is.  I'm sure your Honor will recall during the

12    April 8th hearing there was discussion about this Order and

13    Paragraph 19, you know, that Eric manufactured this from thin

14    air.

15         Well, then there's a case called *In Re:  Locust*

16    *Street Manager* from Judge Robert Gerber from the Southern

17    District of New York.

18         That case, your Honor, is setting (indisc.) six of my

19    (indisc.) at Docket 166.  That case is in Westlaw, it has the

20    Westlaw citation, your Honor, of 2010 Westlaw 4916390, 2010

21    Westlaw 4916390 from Judge Gerber and decided on February 23rd,

22    2020.

23         The language in Paragraph 19 of the Order, your

24    Honor, is an *6 of that published decision from Judge Gerber

25    from more than 10 years ago, and I read from *6 of that

26

1    Opinion:

2              "So long as the new owner do not use the plans the

3              new owner may use occupied property."

4              And then it says:

5              "Nothing contained herein shall preclude future

6              claims of copyright infringement" and so on.

7              That language is what I -- and I don't want to

8    concede this, I plagiarized from Judge Gerber, okay?

9              So to say that "Hey, this has never happened before"

10   is not quite right, it's been around for more than 10 years.

11   It is a published decision from Judge Gerber *In Re: Locust*

12   *Street Manager.*

13             Second point, I appreciate --

14             **THE COURT:**  Hold on, hold on, Mr. Lam.

15             Just so we're absolutely clear on this I think you

16   and I know the answer, but isn't Judge Gerber a bankruptcy

17   judge?

18             **MR. LAM:**  Yes.

19             **THE COURT:**  Okay, so it's from the Bankruptcy Court

20   from the Southern District of New York, it's not just the

21   Southern District of New York District Court, it's the

22   Bankruptcy Court and it deals with then a sale in the

23   bankruptcy context.

24             **MR. LAM:**  Bingo.

25             **THE COURT:**  All right, onto your next point.

27

1          **MR. LAM:**   Thank you, Judge.

2          My second point, your Honor, Mr. Bonham and I, and

3     also Mr. Kruse have had some healthy discussions, and I cited

4     in my papers, your Honor, a case, this is from the Fourth

5     Circuit called *Christopher Phelps*, it is at 492 F3d 532, 492

6     F3d 532.

7          Christopher Phelps was an architect.  Mr. Galloway

8     (phonetic) was driving around one day, he saw a house, he liked

9     it, knocked on the door and said "Hey, can I have your plan?"

10         And the lady says "Sure, but you can't build next

11    door."

12         Mr. Galloway says "Don't worry, I'm going to build

13    further down the block."

14         So he took the plans, he copied the plans, he built a

15    second house with those plans and the architect, Christopher

16    Phelps came in and say "Hey, hey, you can't do this, that is

17    infringement," a big lawsuit, all the way up to the Fourth

18    Circuit.

19         And at Page 544 of the Fourth's Second Opinion, it

20    started in 2007, that is 492 F3d at Page 544, the Fourth

21    Circuit in a 3 to 0 decision says, and I quote word-for-word:

22              "A sale of the house would not be a second copy, but

23              merely a transfer of the structure in which the

24              design was first copied."

25         That is the 3 to 0 decision from the Fourth Circuit.

28

1    It's been going on for, oh, my goodness, 13 years.  I looked

2    last night, this case has never been overruled, it is headnote

3    number 11.  We can go around and see how many courts have cited

4    to footnote 11.

5            Here's the most revealing point, your Honor.  Mr.

6    Bonham, who just made the arguments to you, was the lawyer who

7    represented the appellant in that case.

8            Well, the wonderful thing about Westlaw, your Honor,

9    is you can find briefs that were filed by, you know, folks.

10   Mr. Bonham filed his appeal brief, you know, at the Fourth

11   Circuit.  The appeal brief, your Honor, is on Westlaw, is 2005

12   Westlaw 4163710, 2005 Westlaw 4163710.

13           I would direct your attention, your Honor, to *Pages

14   13 to 16 of Mr. Bonham's brief.

15           What happened there was the District Court awarded

16   $20,000 in damages for the plan, and Mr. Bonham, on behalf of

17   his client, Christopher Phelps, also won an injunction making

18   exactly the same argument he's making here, which is "Hey,

19   that's a bad copy, you cannot sell."

20           The District Judge says "No, I'm not going to enter

21   an injunction because I hold under Fourth Circuit a sale of the

22   house would not be a second copy, but merely a transfer of the

23   structure in which the design was first copied."

24           Mr. Bonham's brief on the Fourth Circuit concluded

25   that the District Court committed error of law.

1          Well, nice argument, but the Fourth Circuit says

2     "Hum, not so."

3          I do not know why Mr. Bonham did not cite your Honor

4     to that Fourth Circuit decision in any of the papers filed in

5     this case.

6          Mr. Bonham and Mr. Kruse cited to another case called

7     *Palmetto*.  You will see in their papers, I believe it's a 2004-

8     2003 case, it was decided by the District Court in South

9     Carolina.  So I looked at the geography and I realized that

10    South Carolina is in the Fourth Circuit.  So Mr. Kruse and Mr.

11    Bonham would have you believe that the *Palmetto* case in the

12    District is the controlling law.

13         They did not, however, tell you about *Christopher*

14    *Phelps*; they did not tell you that Mr. Bonham represented the

15    appellant who lost in *Christopher Phelps*.  They did not tell

16    your Honor that *Christopher Phelps* is a law from the Fourth

17    Circuit for 13 years.

18         So when your Honor says, "Well, gee, you know why

19    there's no law?" blah, blah, blah, that's the reason why.  We

20    do have law.  The Order from -- at Paragraph 19 of the Order

21    that I sent to your Honor as I mentioned to your Honor joined

22    the April 8th hearing, I lifted it from Judge Gerber's opinion

23    which is published, it's been around for 10 years.

24         The last point I want to make, Judge, is as far as

25    Mr. Thomson's argument about cross examination, like he said, I

30

1    thought he agreed to it.  Okay, fine.

2          Let's assume that he can cross examine Mr. Smith, and

3    let's assume that Mr. Smith will say "Gee, I am the worst

4    trustee in the world, I'm the laziest person in the world,"

5    when I know Chuck, I know that to be true, okay, Judge?

6          And so there's no advertising whatsoever.

7          Well, we do have an affidavit from IEDA which is an

8    exhibit that I filed on April 6th.  That affidavit contains the

9    details of the efforts taken by IEDA, together with Mr. Smith,

10   on advertising the sale that they gave to what, 2,000 brokers,

11   whatever it is, there was a web link and so on and so forth,

12   and so even if we completely burn Mr. Smith's affidavit because

13   it is totally worthless and hearsay, and Mr. Smith is the

14   laziest person in the world, we do have evidence in this

15   record; namely, IEDA affidavit, to which no one can challenge

16   and no one has asked to cross examine the affiant who signed

17   the affidavit.

18         Last, but not least, your Honor, the Motion filed by

19   Mr. Smith back in late March, the 363 Motion, it was (indisc.)

20   declaration signed by Mr. Smith supporting all of the factual

21   allegations in that Motion.  No one has asked to strike the

22   Declaration.  No one, I guess people kind of forgot, that that

23   Motion was affirmed to by Mr. Smith under 28 USC 1746, so I

24   would submit that the hearsay issue is a red herring even if

25   used in a light most favorable to Mr. Thomson, which is they

1    completely burned that affidavit, there is much more than

2    enough evidence in this record such as an affidavit from IEDA,

3    such as the Motion filed by Mr. Smith who lists the steps to

4    which he gave Declaration to support the findings in the Order

5    that your Honor signed on April the 9th, and Paragraph 19 of

6    that Order is from Judge Gerber's published decision.

7             Judge, that's all I have.  Thank you very much.

8             **THE COURT:**  Thank you, Mr. Lam.

9             The Trustee joined in with Mr. Lam on that.

10            Mr. Smith, do you want to add to that argument?

11            **MR. SMITH:**  Your Honor, not really.  I think Mr. Lam

12   has set it out very clearly and I have nothing that would

13   benefit the Court by anything that I would have to add on it.

14            **THE COURT:**  Okay.  All right.  Somebody else joined

15   that.  Let's see, did -- Mr. Gray, did you join that or did you

16   take a position on any of this?

17            **MR. GRAY:**  Your Honor, I think you may be thinking of

18   the City of Charles City, a direct joinder.

19            **THE COURT:**  Yes.

20            **MR. GRAY:**  IEDA did not file a written joinder in the

21   case, but we would support the position of the Trustee and the

22   bank.

23            And not to belabor the point, but essentially IEDA

24   would say it's time and it's in everybody's best interests to

25   bring this to a close and get the development completed, and

1  that IEDA, you know, stands in a position ready and willing to

2  assist with that future development to the extent they can, but

3  time is of the essence.  The longer we wait, the more IEDA's

4  ability to help out and get this project completed is risked

5  going away.  So succinctly we would ask you to deny the

6  Motions.

7           **THE COURT:**  Okay.  Thank you, and you're right, Mr.

8  Gray, I was thinking about Ms. Clark.

9           Ms. Clark, do you want to weigh in on this issue?

10          **MS. CLARK:**  Yes, thank you, your Honor.

11          Just a copy of brief comments.  Your Honor, when you

12 decided to convert the bankruptcy case rather than dismiss it,

13 and that was back in December of last year, your Honor issued a

14 very comprehensive Memorandum and Order in which you made

15 findings, your Honor, that the project has been unfinished for

16 several years.

17          Your Honor, you also concluded, in connection with

18 your assessment of the best interests of creditors' test, that

19 those delays are detrimental to the City and its residents

20 because of the importance of housing.

21          The City agreed with those findings then, your Honor,

22 and it agrees with them now.  The City is concerned that any

23 kind of invalidation or suspension of the sale will only create

24 further delays, and for that reason, your Honor, ask that the

25 Motions be denied.

1          **THE COURT:**  Thank you, Ms. Clark.

2          Mr. Eide, did you have anything you wanted to add?

3          **MR. EIDE:**  I have nothing to add, your Honor.

4          **MR. SPEAKER:**  The Bank would ask that the Motions be

5      denied.

6          **THE COURT:**  Okay.  All right, and I think that now

7      takes us back to the final word from the Movants here.  So back

8      to Mr. Bonham --

9          **MR. BONHAM:**  Yes, your Honor.

10         **THE COURT:**  Go ahead.

11         **MR. BONHAM:**  I'll keep it brief.  With respect to the

12     *Locust Street* case what Mr. Lam does not tell the Court is that

13     that Order was stipulated to by the architect, and that was not

14     one where the architect objected; here we do.

15         Secondly, to the extent that that was ever the law,

16     it's been overruled by *Schultz*, that's when the Second Circuit

17     said in Schultz about the copyright, the architectural work

18     copyright extending to the building.  To the extent that he's

19     trying to say that that is not the law under *Locust Street*, I

20     would submit that's not.

21         With respect to *Phelps*, especially in his accusation

22     that I didn't cite it to the Court, I didn't cite you to

23     hundreds of other architectural copyright cases that we could

24     have.

25         With respect to the particular holding of *Phelps*,

34

1    that one was that when the judgment is satisfied then it will

2    be -- we will have been paid in full and, therefore, it's not a

3    first sale.

4            I still disagree with the Fourth Circuit on this, but

5    I would raise with the Court as to whether or not that holding

6    by the Fourth Circuit, which contradicts the Fifth Circuit's

7    holding in *American National Films versus Foreman*, has been

8    superseded by the Supreme Court's subsequent decision in

9    *Kirtsaeng versus John Wiley and Sons,* 133 Supreme Court 1362 at

10   1351 in which it basically says the first sale doctrine is what

11   it says it is.  If it's not a lawfully made copy every sale of

12   it is infringing" and, again, you can -- I think that the

13   Fourth Circuit was trying to reach a certain result; that's

14   contrary to what the Supreme Court -- I think that's contrary

15   to what the Supreme Court said subsequently in the *Kirtsaeng*

16   case.  It certainly is at odds with what other Circuits say

17   about the first sale doctrine and whether or not infringing

18   goods can be freely sold more than once.  The black letter law

19   answer is that they can't.

20           That's all that I have, your Honor.  Thank you.

21           **THE COURT:**  Okay, Mr. Thomson?

22           Actually, Mr. Thomson, let me stop you.  Let me go

23   back to Mr. Bonham.  Let me ask you this, Mr. Bonham.

24           **MR. BONHAM:**  Yes, sir.

25           **THE COURT:**  It seems to me since you're talking about

35

1  withdrawal of reference, and maybe you think that I don't get

2  it, which is entirely possible, wouldn't it be most

3  expeditious, instead of jumping through the other hoops, just

4  to say "I just say Motions to Reconsider denied."

5           Now you go ahead and appeal all of this up to the

6  District Court and get all straightened out with the decision

7  in there already instead of going backwards to try to figure

8  out more before we move forward, just say, you know, if I'm

9  wrong and the District Court needs to straighten me out, that's

10 part of the pyramid here that, you know, they're up above me

11 and they tell me what to do.  So what's wrong with that idea,

12 that we just say "You know, if I'm wrong let's get it up to the

13 District Court as soon as we can, you can appeal it right away

14 and brief that to the District Court just like you'd have to

15 anyway?"

16          **MR. BONHAM:**  Again, forgive me because I'm not -- I

17 don't practice in the Eighth Circuit.  Is there -- I thought

18 there was an Eighth Circuit Bankruptcy Appeal panel?

19          **THE COURT:**  Yeah, you get your choice, basically.

20 You can opt for the District Court.

21          I think the default mechanism is to go to that, but

22 all you have to do is say "I want to go to the District Court."

23          **MR. BONHAM:**  Well, again, with respect to a mandatory

24 Withdrawal of the Reference, again, I think that has to be

25 decided by the District Court in the first instance so,

1    again --

2            **THE COURT:**  So wouldn't that just make a lot of sense

3    just to say "Denied" and then you can say the reference should

4    have been withdrawn or whatever.  I don't think anybody has

5    asked the District Court to withdraw the reference, but that

6    would just put everything to the District Court, or at least on

7    track to go to the District Court.  Based on what you're saying

8    I would be surprised if you went to the BAP just because you

9    want to, you know, say that --

10           **MR. BONHAM:**  No, I'm just saying because I didn't

11   know if we had to go to the BAP because I don't believe that a

12   Motion to Withdraw the Reference goes to the BAP; I think that

13   has to be presented to the District Court in the first

14   instance.

15           My understanding is that it's filed in the Bankruptcy

16   Court because that's how the Clerk's office does, but that the

17   District Court is the one that actually rules on the Motion to

18   Withdraw the Reference because it's --

19       **(Voices overlapping)**

20           **THE COURT:**  Sure, because they gave the reference in

21   the first place.  I can't withdraw a District Court reference,

22   in my view, because the District Court made the reference,

23   that's --

24           **MR. BONHAM:**  That's correct.

25           **THE COURT:**  -- cut me off.

1          **MR. BONHAM:** That's correct, which is why we have --

2    I think our preferred method, which is why we filed the Motion

3    for Stay, is that this issue, you know, while we would prefer,

4    and we think that it is appropriate for the entire Order to be

5    vacated is beyond what the Court was empowered to do.

6          If the Court is not going to do that then we believe

7    that this is -- the first instance has to be that the District

8    Court has to rule on the Motion to Withdraw the Reference, and

9    that this Court should, therefore, stay any further action

10   until the District Court has done so.

11         **THE COURT:** What if I just go back, also, and just

12   say, you know, what -- Mr. Lam keeps trying to take

13   responsibility for Judge Gerber's language and if he put it in

14   there it says, I believe that any Order has to have my

15   signature on it so it's mine, and if I'm wrong and I put that

16   language in, what if I just said "Okay, let's just take that

17   language out?"

18         **MR. BONHAM:** Well, the problem on this is that we

19   have raised with -- because, again, we also found out that

20   right after we filed our Motion for Reconsideration, the Bank

21   and the Trustee, nevertheless, decided to go through with the

22   sale. And when I raised with the Trustee in a conversation

23   with Mr. Kruse, you know, "You were aware of our claim that

24   this would be an act of infringement?"

25         His response was "Well, I have been authorized to do

38

1    it by the Bankruptcy Judge so I don't think I've got any

2    problem."

3           So, again, you can take the language out, and if you

4    take the language out and make it very clear that, you know,

5    the Trustee is responsible for his actions and he doesn't have

6    any sort of immunity based on, you know, this Court giving it

7    to him, you know, then that might be something that could, you

8    know, be done, but again the whole point being is that if

9    there's been a sale of an infringing copy by a bankruptcy

10   trustee, which I do not believe they have the authority to do

11   so, or if they do they certainly are not immune from liability

12   for doing so, then that's going to create a problem.  I think

13   the simpler solution would be undo it all.

14          **THE COURT:**  Now, see, I think the simpler solution

15   would be just to say Motion to Reconsider denied and just let

16   you have it at the District Court because I don't know that

17   I'll be able to really settle this issue in my own mind any

18   time soon, and I don't see anything other than Judge Gerber's

19   opinion as a bankruptcy opinion.

20          And, again, tell me why that doesn't apply?  You said

21   the --

22          **MR. BONHAM:**  It's a consent decree.  It's something

23   that the architect agreed to, and if you read the *Locust Street*

24   Opinion it doesn't analyze architectural copyrights; it doesn't

25   analyze the first sale doctrine, it just simply plugs in this

1    language in which the parties agreed to.  And, again, if the

2    architect in that case said "Hey, look, I don't care if you

3    finish the building as long as you don't use the plans" well,

4    that's his call, but we don't.

5              **THE COURT:**  Yeah, and again that goes right back to

6    the first question is that if it's distinguished from that case

7    then what case?

8              I just -- I will bet my bottom dollar if the law is

9    what you say it is there's a case out there that says that.

10   I'm sure there will be some architect, especially early on

11   after 1990 that got that language into one of its contracts and

12   a bank didn't, you know, put language in its lending agreement

13   to make sure the architect signed over the rights or signed off

14   on it, that there's got to be some gotchas somewhere because

15   that seems like an awfully powerful tool to have just, you

16   know, flown under radar for all of these years.

17             **MR. BONHAM:**  Well, again, it is a very powerful tool,

18   your Honor.  I wouldn't say it flies under the radar because I

19   have -- you know, I have dealt with lots of lenders who didn't

20   have that language in there.

21             Did it result in published opinions?

22             No, it didn't, but does that change the fact that,

23   you know, the first sale doctrine and the fact that unlicensed

24   copy -- you know, sale of an unlicensed copy is infringement

25   per se.  You know, those are fundamental facts of life in, you

1   know, Title 17 land.

2          **THE COURT:**  Yeah, and I don't want to belabor this

3   point, but we're not in Title 17 land.

4          **MR. SMITH:**  Your Honor, this is Chuck Smith.

5          I just had one additional comment to make, and that's

6   that I wasn't involved in this case as it was going through the

7   reorganizational stage, but was --and was not appointed until

8   December 9th of 2019, but I don't know at what point was there

9   a violation of the license agreement?

10         And was there a Motion for Relief from Stay before

11  C&R (phonetic) effectively (indisc.) the payments and said,

12  well, since you've defaulted and now you owe everything and you

13  haven't paid it.  I guess -- and I haven't combed the record to

14  see this, but I guess that's one thing that I question is, you

15  know, can they, while Debtor is in possession, just say,

16  without getting permission from the Bankruptcy Court, we're

17  going to declare that that license that you have had is no

18  longer legit?

19         **THE COURT:**  Okay.  Would it surprise you to say I

20  don't know the answer to that.  Even if that's what the facts

21  are I just don't know.  I'm just -- and so that's why --

22         I'm going to do this.  I'm going to think about it

23  over the weekend and into Monday, and probably on Tuesday when

24  I come back in here, we're not going to be here on Monday, I

25  will just have a very short Order that either says, you know,

41

1    "We need to undo this and future Order will follow" or "I adopt

2    the arguments of the Trustee and Mr. Lam's client and the City,

3    and we're just going to go forward and take it up with the

4    District Court."

5           I just -- I think we do need to move it along, and I

6    think we do need to call up the questions, and the idea of a

7    Stay the same way.

8           I mean, if you're asking for a Stay I'm basically

9    saying -- and I don't think there's anything wrong and I don't

10   know that there's success on the merits but, again, the

11   District Court, if they're, like Mr. Bonham says, more of an

12   expert in copyright and can really straighten this out for us

13   then maybe they grant you the Stay right off the bat, say "Oh,

14   yeah, this is a big deal and architects have the very right Mr.

15   Bonham is saying they do."

16          So that's my thinking.  I guess everybody else, I've

17   let Mr. Smith jump in from the side, anybody else really feel

18   something burning they want to put before me before we wrap

19   this up?

20      **(No audible response)**

21      **THE COURT:**  Okay, everybody, I'll do my homework this

22   weekend and on Monday and we'll see where it stands.

23          Thank you everybody for your patience in getting onto

24   the call and for the arguments made, and we'll just see where

25   it leads me and I'll try to get something out quickly so we can

1   keep pressing this case forward.

2        Thanks everyone.

3        **MR. THOMSON:**  Your Honor, Charles Thomson.

4        I had myself muted, I'm sorry about that, just one

5   sentence.

6        **THE COURT:**  Yes, Mr. Thomson.  Yeah.

7        **MR. THOMSON:**  I just want to point out that -- to Mr.

8   Lam's point about the Affidavits and Declarations from the

9   IEDA, I think those are not really relevant to the evidentiary

10  support needed to support the Order, I think it has to be

11  evidence from the Trustee because it goes to good faith and his

12  business (indisc.).  And that's all I had, your Honor.

13       **THE COURT:**  Okay.  With that said, anything further?

14     **(No audible response)**

15       **THE COURT:**  All right, again, thanks everybody.  Try

16  to stay healthy out there and have a good weekend.  Bye bye.

17     **(This proceeding was adjourned at 4:19 p.m.)**

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.


_____                          **June 16, 2020**

             **Signed**                                        **Dated**




                        *TONI HUDSON, TRANSCRIBER*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
(MASON CITY)

| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  19-00507 |
| | ) | CHAPTER 7 |
| | ) | |
| McQUILLEN PLACE COMPANY, LLC, | ) | Cedar Rapids, Iowa |
| | ) | |
| | ) | Thursday, November 14, 2019 |
| Debtor. | ) | |
| | ) | 11:04 a.m. to 11:44 a.m. |

**TELEPHONIC HEARING RE MOTION TO CONVERT OR DISMISS CASE**

BEFORE THE HONORABLE THAD J. COLLINS,
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:            (CONTINUED ON PAGE 2)

| | |
|---|---|
| For Debtor: | DONALD H. MOLSTAD, ESQ.<br>701 Pierce St., Suite 305<br>Sioux City, IA 51101 |
| | CHARLES M. THOMSON, ESQ.<br>Law Office of Charles M. Thomson<br>1110 North Grand Ave., Suite 300<br>Charles City, IA 50616 |
| For Cedar Rapids Bank<br>& Trust: | JOSEPH E. SCHMALL, ESQ.<br>2007 First Avenue SE<br>P.O. Box 2804<br>Cedar Rapids, IA 52406 |
| Court Reporter: | Recorded; FTR |
| Transcribed By: | Exceptional Reporting Services, Inc.<br>P.O. Box 8365<br>Corpus Christi, TX 78468<br>361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**              (CONTINUED)


City of Charles City, IA  MONICA L. CLARK, ESQ.
                          Dorsey & Whitney, LLP
                          500 S. Sixth St., Suite 1500
                          Minneapolis, MN 55402


First Security Bank       LARRY S. EIDE, ESQ.
& Trust Company:          103 East State St., Suite 800
                          P.O. Box 1588
                          Mason City, IA 50402


Iowa Economic             BRANDON J. GRAY, ESQ.
Development Authority:    RITA GRIMM, ESQ.
                          Iowa Attorney General's Office
                          1305 Walnut
                          Des Moines, IA 50319


U.S. Trustee:             L. ASHLEY ZUBAL, ESQ.
                          Office of the U.S. Trustee
                          210 Walnut St., Room 793
                          Des Moines, IA 50309

3

1      **Cedar Rapids, Iowa; Thursday, November 14, 2019; 11:04 a.m.**

2                      **(Attorneys appearing telephonically)**

3                              **(Call to Order)**

4              **THE COURT:**  All right.  We're here on the case of

5      McQuillen Place Company, LLC; 19-507; currently in Chapter 11.

6              We were set for a hearing in Fort Dodge today because

7      we had a motion?

8              **MR. SPEAKER:**  Yes.

9              **THE COURT:**  Motion to dismissed voluntarily filed.

10     We decided to have a little pow-wow on that yesterday and

11     figure out what to do.

12             And we decided we're going to do this by telephone

13     today, primarily on the motion to convert arguments.

14             I'm going to tell you who I think I've got on the

15     phone.  And then we're going to give you some help if anybody

16     else is on the phone.

17             I've got Donald Molstad, J.D. Haas, and Charles

18     Thomson for the Debtor?

19             **MR. MOLSTAD:**  James Gray and Charles Thomson.

20             **THE COURT:**  What's that?

21             **MR. MOLSTAD:**  James Gray from the Debtor.  James Gray

22     from the Debtor; not J.D. Hass -- and Charles Thomson.

23             **THE COURT:**  All right.  I've got Larry Eide for which

24     bank?  Go ahead and remind me.

25             **MR. EIDE:**  First Security Bank.

4

1          **THE COURT:**  All right, Joe Schmall.  Joe, which bank

2     are you on for?

3               Is Joe Schmall on the phone?

4          **MR. SCHMALL:**  Oh, sorry, Judge.  Yeah.  Cedar Rapids

5     Bank & Trust Company, Judge.

6          **THE COURT:**  Okay.  I've got Ashley Zubal from the

7     Office of the U.S. Trustee.

8          **MS. ZUBAL:**  Present, your Honor.

9          **THE COURT:**  Monica Clark.  Monica, how are you

10    involved here?

11         **MS. CLARK:**  Good morning, your Honor.  We represent

12    City of Charles City.

13         **THE COURT:**  Okay.  All right, now, who else do I have

14    on the phone?

15         **MR. GRAY:**  Judge, this is Brandon Gray on behalf of

16    the Iowa Economic Development Authority.  And I have Rita Grimm

17    with me.

18         **MS. GRIMM:**  And I'm the COO and chief legal Counsel

19    at Economic Development Authority.

20         **THE COURT:**  Okay, very good.

21              Sorry about that, Brandon.

22              Anyone else?

23         **MR. GRAY:**  You're forgiven.

24         **THE COURT:**  Okay.  Don and I did some talking

25    yesterday to weigh Motion to Convert.

1        Who wants -- is it best to start with (indisc.)?  You

2  guys figure it out.

3        Larry?

4        **MR. EIDE:**  Yes, Judge, I'm willing to proceed.  I

5  have a rather lengthy, what I believe to be a recitation of

6  facts, that I would like to go through.

7        Also, these are taken from either the disclosure

8  statement that was filed by the Debtor on October 4, or from

9  counter-claims that have been filed by the Debtor either in

10  Floyd County Iowa State Court or in the two complaints that

11  were filed by the Debtor in Bankruptcy Court, also, from the

12  Motion to Convert or Dismiss that was filed by the bank and by

13  the United States Trustee.

14        The Debtor is the owner of some real estate in

15  downtown Charles City -- the -- and proposed a development of

16  that real estate in a mixed-use fashion.

17        The property is located on Main Street, in downtown

18  Charles City.  The plan -- development plan is for apartments

19  on the second and third floors, and commercial space on the

20  first floor.

21        Ground was broken on the project in late 2014.

22  That's nearly five years ago.  The Debtor encountered

23  construction delays and work was more than 90 percent complete

24  on the project in July of 2017; more than two years ago.

25        When the Debtor learned that a key subsidy that was

6

1    promised by the IEDA would not be forthcoming -- this subsidy

2    was the form of a forgivable loan that exceeds a million

3    dollars.

4              The Debtor points to First Security Bank as the loss

5    of this subsidy, which is a claim that First Security Bank

6    denies.  The bank believes that the loss of the subsidy was the

7    result of a couple different things.

8              First, the failure of the Debtor to have signed the

9    agreement with the IEDA; and, second, the failure of the Debtor

10   to have completed the project within the required two-year time

11   period.

12             The Debtor had appealed the denial of this subsidy to

13   the State of Iowa -- or with the State of Iowa, and was

14   unsuccessful.  And, ultimately, the Debtor sued the IEDA, in

15   Floyd County, for -- to have that subsidy granted.

16             The IEDA filed a Motion to Dismiss.  And that motion

17   was set for hearing when this bankruptcy was filed.

18             This project was developed, in thought process, in

19   2013, 2014.  Charles Thomson, who is a principal of the

20   Debtors, sought financing for the project from First Security

21   Bank.

22             The bank was very interested in seeing the project

23   proceed because the project would provide a need for

24   residential housing in Charles City.

25             Much of the financing for this project and for the

1    construction funds were to come from grants and forgivable

2    loans.  As the result of the project containing a minimum

3    number or percentage of affordable housing, First Security Bank

4    declined to make the loan because it lacked a history of

5    similar projects.

6            Charles Thomson had employed a number of

7    professionals on his behalf to assist him with obtaining the

8    financing.  And those professionals included an individual from

9    Clear Lake, Iowa, that had extensive commercial planning and

10   urban design background.

11           The Debtor, after First Security Bank declined

12   financing, sought financing from other lenders throughout the

13   Midwest.  First Security Bank was not involved in any of those

14   proceedings.

15           The Debtor ended up, finally, at Cedar Rapids Bank &

16   Trust.  And Cedar Rapids Bank & Trust was aware that First

17   Security Bank had an interest in seeing this project proceed,

18   and requested -- or asked First Security Bank, if it wished to

19   participate in the loan.

20           First Security Bank agreed to participate in that

21   loan.  But Cedar Rapids Bank was the lead bank, which meant

22   that Cedar Rapids Bank was the actual mortgage holder; was the

23   source of the funds as between Cedar Rapids Bank and the

24   Debtor.

25           Cedar Rapids Bank made the loan; recorded the

8

1    Debtor's mortgage to Cedar Rapids Bank as a first mortgage; and

2    then made all of the advances to the Debtor under the loan.

3           As a participate under the loan, First Security Bank

4    dealt only with Cedar Rapids Bank.  However, the Debtor was

5    aware that First Security Bank was a participant in the loan.

6           All of the dealings that the Debtor had regarding the

7    loan and advances were made -- were with Cedar Rapids Bank.

8           After the construction was halted, in late 2017,

9    First Security Bank was troubled, as were many others, with the

10   lack of progress on the project.

11          In 2018, First Security Bank and Cedar Rapids Bank

12   had discussions that resulted in Cedar Rapids Bank assigning

13   the loan and all of the security documents to First Security

14   Bank.  And Cedar Rapids Bank was then out of the project, at

15   least for the time being.

16          After First Security Bank took ownership of the loan,

17   there was a mediation that was held with the Debtor, and an

18   agreement was reached at that mediation.

19          This was in July of 2018.  It would have enabled the

20   Debtor to settle and compromise the first mortgage debt now

21   held -- or now, and then held by First Security Bank.

22          After First Security Bank did not receive the

23   required sum by the time agreed, First Security Bank commenced

24   a mortgage foreclosure action against the Debtor.  That was

25   commenced in Floyd County.

1              The Debtor answered that litigation and filed

2    numerous counterclaims against First Security Bank and others.

3    Ultimately, Cedar Rapids Bank was brought in as a Defendant by

4    the Debtor in that litigation.

5              First Security Bank requested the appointment of a

6    receiver for the project, and that motion was set for hearing

7    on April 26, 2019.  This Chapter 11 case was then filed on

8    April 24, 2019, just prior to that hearing.

9              In June of 2018 -- so nearly a year before that

10   bankruptcy filing -- the real estate of the Debtor was

11   scheduled for tax sale as the result of the failure of the

12   Debtor to have paid real estate taxes.

13             Only minutes before that sale was to commence, the

14   banks paid the taxes; an amount of about $236,000, in order to

15   prevent the property from being sold at tax sale.  Thereafter,

16   the taxes that were due in the fall of 2018 and the spring of

17   2019 also were unpaid.

18             When this bankruptcy was filed, in April of 2019,

19   there were those two installments of real estate taxes that

20   were unpaid.  And, of course, the bankruptcy filing prevented

21   the property from being offered again at tax sale, in June of

22   2019.

23             There are currently unpaid real estate taxes against

24   the property.  The installment that was delinquent, October 1

25   of 2018, is unpaid with interest of about -- well, with

10

1    interest, the total amount due is about $128,500.  The

2    installment that was delinquent, April 1 of 2019, is unpaid

3    with interest for approximately $119,000.

4          The installment that became delinquent, October 1 of

5    2019 -- that would have been -- became delinquent after the

6    commencement of this bankruptcy case -- is also unpaid.  And

7    that is unpaid for approximately $111,700.

8          So there's a total of unpaid real estate taxes

9    against this project of $359,300 -- approximate amount.

10          There's a part of the construction project -- the

11    sidewalks along Main Street and the side street that abuts the

12    project were torn up.  They remained torn up for a considerable

13    period of time.  And the City requested that the sidewalks be

14    replaced.

15          When they were not replaced by the Debtor, the City

16    went ahead and completed the replacement of those sidewalks and

17    had --

18          **THE COURT:**  Sorry.  You're fading out.

19          **MR. EIDE:**  Okay.  I'll speak more closely into the

20    phone.

21          The City replaced the sidewalks and assessed the cost

22    of that replacement against the real estate.  And there is now

23    due about 400 -- oh, excuse me -- $48,475 on that assessment.

24          So the Debtor hasn't paid any real estate taxes or

25    any assessments against this property since March of 2017.

1        The Debtors also had a poor history of payment for

2    insurance on this project.  On at least one occasion before the

3    bankruptcy was filed, the bank advanced an installment of

4    insurance.

5        At the end of October 2019, about two weeks ago, the

6    Debtor had an installment of insurance due.  The bank, as the

7    mortgage holder, receives notice of the insurance that is due,

8    and received a notice of cancellation of the insurance if

9    payment was not received.

10        The cancellation date and time was 12:01 a.m., on

11    October 31.  That is one minute after midnight, on October 31

12    of '19.

13        The bank communicated with the insurance broker and

14    was advised that payment had to be received on this installment

15    by 2:00 p.m., on October 30; the day before cancellation.

16        The bank understood the 2:00 p.m. to be 2:00 p.m.,

17    central -- or Central time.  At 2:15 p.m., Central time, the

18    bank called the insurance agent.  The installment of taxes had

19    not been paid.  And the bank advanced that payment.

20        The bank was advised at that time that the 2:00 p.m.

21    was really Eastern time; not Central time, but the bank -- or

22    the insurance agent and the insurance company accepted the

23    payment, even though it was about 15 minutes late.

24        That payment was made, of course, by the bank as an

25    advancement under the mortgage.  The payment was about $3,700.

12

1          The insurance agent has subsequently advised the bank

2    that Mr. Thomson has also paid that installment, but that

3    payment did not occur until October 31.  If the bank had not

4    advanced the payment on October 30, as I stated previously, the

5    insurance would have been cancelled.

6          The Debtor operates a dry cleaning business in

7    addition to owning this real estate project.  The bank --

8    excuse me -- the Debtor has filed monthly reports, although

9    there some inconsistencies in the monthly reports, the bank and

10   myself believe that those statements show that the dry cleaning

11   business is operating at a small loss.  If it's not a loss,

12   it's only a very minimal profit.

13         The U.S. Trustee does mention the lack of financial

14   success of the dry cleaning business in its Motion for

15   Conversion or Dismissal.

16         So now we're down to, with that background, why

17   convert this case, rather than dismiss it?

18         The Debtor, in its plan file -- that it filed, stated

19   that the property had a fair market value of not more than

20   $500,000.

21         The plan proposed the sale of the property to an Iowa

22   limited liability company that is not shown to exist, according

23   to the Iowa Secretary of State.  The plan does not state what

24   the purchase price would have been, although there's somewhat

25   of a formula that is stated.

1          The plan and disclosure statement do not state who

2    are the owners, managers, or owners of the limited liability

3    company to which the property was to be sold.

4          However, I have searched the records at the Iowa

5    Secretary of State office and have found an entity; a limited

6    liability company with a name similar to that, stated as the

7    buyer of the real estate, as set forth in the disclosure

8    statement in the plan.

9          That limited liability company was organized in April

10   of 2019 by Charles Thomson, who is the principal owner of the

11   Debtor.  Charles Thomson, Chicago, Illinois, address is listed

12   as the principle place of business of that limited liability

13   company, and Charles Thomson is listed as the registered agent.

14         The disclosure statement does not contain any

15   information on the source of funds or the ability of the

16   limited liability company to pay for the purchase price.

17         The plan proposes that the claims that the Debtor has

18   asserted against First Security Bank, Cedar Rapids Bank, and

19   numerous of the First Security Bank officers and directors, it

20   transferred to a litigation trust, which appears to be managed

21   by the Debtor.

22         The disclosure statement states that the litigation

23   may not be resolved until 2024, and that if the sale of the

24   real estate did not occur under the plan, the construction of

25   the project would be delayed until the litigation is completed.

14

1              All of that would likely occur if this case were

2      dismissed rather than converted.

3              There has been a study provided to the City of

4      Charles City that shows there's a significant need for

5      residential housing in Charles City.

6              First Security Bank believes that there are multiple

7      buyers for the project as it exists in its current state.

8              First Security Bank proposes that the case be

9      converted rather than dismissed; that the Trustee locate a

10     buyer.

11             First Security Bank will happily assist in locating a

12     buyer and sending that buyer to the Trustee to negotiate a

13     purchase.

14             First Security Bank is willing to allow a portion of

15     the sales proceeds to be retained by the Trustee for the

16     unsecured creditors.

17             First Security Bank is willing to negotiate with the

18     Trustee for the purchase of the claims asserted by the Debtor

19     against First Security Bank and its officers and directors; and

20     First Security Bank believes that Cedar Rapids Bank may be,

21     likewise, willing to negotiate regarding the purchase of the

22     claims against it, as made by the Debtor in counterclaims and

23     claims filed in the Floyd County foreclosure litigation.

24             If the case is dismissed, of course, the foreclosure

25     action continues.  There's substantial discovery that would be

1    required primarily consist -- with regard to the claims that

2    have been asserted by the Debtor, similar to those which are

3    set forth in the complaint that has been filed by the Debtor in

4    the Bankruptcy Court.

5              The trial in the foreclosure action is currently

6    scheduled for early fall, 2020.  During that time period -- so

7    from now until 2020, I would imagine that the real estate will

8    remain unfinished, so there won't be that housing that would be

9    provided available for the residents of Charles City.

10             During that time period, I would imagine that the

11   real estate taxes will continue to be unpaid.  And they accrue

12   against this property at approximately 18 to 20 thousand

13   dollars per month.

14             If a buyer is found for the real estate and the

15   claims of the -- asserted by the Debtor are purchased and sold

16   by the Trustee, administration of a Chapter 7 case should be

17   completed during 2020.  That would permit distribution to

18   unsecured creditors in 2020.

19             Otherwise, according to the disclosure statement, all

20   of that litigation continues until 2024.  And I presume that,

21   under the disclosure statement as filed, there would be no

22   distribution to any unsecured creditors.

23             I realize, in talking about the disclosure statement

24   of the plan, that the Debtor has requested the dismissal of the

25   case.

16

1          However, I bring those things up because I believe

2   that they indicate the timeline that would most likely exist if

3   this case were dismissed as opposed to being converted.

4          So with that, First Security Bank again requests that

5   this case be converted to Chapter 7, rather than being

6   dismissed.

7          **THE COURT:**  Okay.  So the end game in bankruptcy

8   would be, in your view, a 363 sale; have a Trustee go out and

9   look for the property -- you know, for buyers and work with you

10  and Charles City and whoever else might know perspective

11  buyers?

12         **MR. EIDE:**  That's correct.

13         **THE COURT:**  Do we have a Trustee in mind for this

14  case?  Maybe Ms. Zubal can throw something in there.

15         Ms. Zubal, is that something that's been discussed at

16  all?

17         **MS. ZUBAL:**  Your Honor, a specific Trustee has not

18  been discussed at this point in time.  I'm sure we could secure

19  a Trustee.  We may have to shop around a little bit, but I'm

20  sure we can make that happen.

21         **THE COURT:**  Okay.  Mr. Eide, two quick questions.

22         Why the sale in bankruptcy versus a foreclosure sale?

23  I didn't quite understand the need to keep it in bankruptcy for

24  a sale versus a foreclosure sale.

25         **MR. EIDE:**  Well, the Debtor, in its disclosure

1    statement, recites that there's a bunch of litigation.  And

2    it's on counterclaims, which have been asserted, by the Debtor,

3    against First Security Bank, Cedar Rapids Bank, and several

4    named individuals.

5         If the foreclosure proceeds, all of those claims will

6    need to be resolved before the -- a judgment of foreclosure

7    could be granted.

8         And so the sale from that foreclosure would not occur

9    until after the trial has been concluded or, at least, the

10   claim's resolved, either by dismissal or by Motion for Summary

11   Judgment.

12        There then would be a redemption period that exists

13   of a year, in all likelihood, which would then lead the

14   project -- if sale -- if the trial did occur in September of

15   2020, there would likely be a judgment entered and a

16   foreclosure sale that could occur in maybe December of 2020.

17        With a redemption period of one year, you'd be

18   looking at a deed issued to a buyer in December of 2021.  At

19   that time, the project would then -- would then be completed by

20   someone -- whoever is the buyer under the foreclosure sale.

21        So you'd likely look at about, you know, maybe June

22   of 2022 as being the date that -- that this project could be up

23   and running and occupied by tenants.

24        **THE COURT:**  Okay.  So the claims in bankruptcy, what

25   do you foresee there?  That the Trustee's going to sell those;

18

1    that the banks are going to negotiate settlement of loans

2    through the Trustee?

3              Is that what you have in mind?

4              **MR. EIDE:**  That's correct.

5              Now, it's unrelated to this bankruptcy case.  But

6    there are other Defendants to -- in the foreclosure action.

7              Most of those Defendants are either Charles Thomson

8    or his entities.  And they have asserted similar claims against

9    the First Security Bank and against Cedar Rapids Bank.

10             Of course, we realize that those can't be sold by a

11   Chapter 7 Trustee.  So some portion of that litigation is going

12   to have to continue anyway.

13             But at least the real estate -- this project could be

14   sold to a third party; could be completed, and there's -- you

15   know, I didn't say, but the construction time period is maybe

16   90 days, which has been told to me.

17             So there's a chance; there's a chance that this

18   project, by June of 2020, could be completed and occupancy

19   begin if we go through a Chapter -- if we convert to Chapter 7

20   and the Trustee is successful in selling the project to a

21   third-party buyer.

22             The bank's not going to be the buyer.  There's --

23   they'll be a third-party buyer.  We -- the bank officers

24   believe there -- there could be five or ten people out there or

25   entities out there interested.

19

1          I know that the Debtor has done its darnedest to go

2     out and find buyers.  The bank has been consulted by at least

3     one party that expressed an interest in buying the project.

4     But they never came and asked for a loan from the bank to

5     complete that purchase.

6          The bank is not in control of the property at this

7     point in time.  It would not be in control of the property if

8     the case was converted.  So it's not really the bank's job to

9     go find a buyer.

10         But in the interest of completing this project, the

11    bank could certainly make it known to the world that the

12    project is available.

13         I think the City can assist in that regard, in

14    finding a prospective -- or a buyer for this project.

15         What it does, is it completes the project probably

16    two years sooner than could be done, optimistically, through a

17    foreclosure process.

18         **THE COURT:**  Okay.  Thank you, Mr. Eide.

19         Well, who would it be next?  Let me -- Mr. Schmall --

20    I guess I'm thinking about Mr. Schmall; Mr. Clark on behalf of

21    the City; Iowa Economic Development at some point weighing in;

22    and then, of course, Ms. Zubal.

23         So I guess I'll just throw it to Mr. Schmall, unless

24    he thinks somebody else ought to talk next about whether

25    they're on board with Mr. Eide.

1        **MR. SCHMALL:**  Thank you, Judge.  That's fine.  On

2   behalf of Cedar Rapids Bank & Trust Company, we have not filed

3   a Motion to Convert or dismiss the case, like the U.S. Trustee

4   and First Security Bank has done.

5        But it would support a conversion for the reasons

6   that Mr. Eide has set forth.

7        And so that's really all I would have to add to this,

8   Judge.

9        **THE COURT:**  Okay.  Thank you, Mr. Schmall.

10       Mr. Gray, did you have anything you wanted to add on

11   this?

12       **MR. GRAY:**  Just briefly, your Honor.  IEDA would take

13   a position in support of conversion.  IEDA has experience and

14   the ability to help the Trustee in this case locate a buyer.

15       They obviously have the interest in getting this

16   property completed as soon as possible.

17       **THE COURT:**  Okay.  Ms. Clark?

18       **MS. CLARK:**  Your Honor, I have nothing to add.  Thank

19   you.

20       **THE COURT:**  Okay.  Ms. Zubal?

21       **MS. ZUBAL:**  Thank you, your Honor.  The U.S.T.

22   doesn't take a firm position on conversion versus dismissal in

23   this case, and would leave that to the discretion of the Court.

24       Our concern, certainly -- and we understand the

25   concerns of the bank and all of the parties and their interest

21

1    to get the property sold and the construction completed.

2            At first glance, it appears that, you know, this is

3    more appropriate to be determined and adjudicated in the State

4    Court foreclosure action.

5            However, if there's a proposal and an ability to

6    distribute some funds to unsecured creditors through a

7    conversion -- and it sounds like the parties are going to work

8    in tandem to find a buyer -- perhaps it is in the best interest

9    of all the parties for a conversion to take place.

10           Hopefully, the -- hopefully, we can get a Trustee on

11   board for that.

12           Thank you, your Honor.

13           **THE COURT:**  Okay.  Mr. Molstad, what's your response

14   to Mr. Eide and everyone else?

15           **MR. MOLSTAD:**  Well, first of all, I'm not sure that

16   the ability of the Trustee to get a 363 Motion in place is

17   easy, as it might -- talked about today.

18           They already -- you know, it's going to put -- be

19   concern of the lenders, in this case, without guarantors of

20   this loan.  And if we' reducing the amount of the collateral to

21   (indisc.) creditors to get the property sold to eliminate

22   the -- the redemption period and sell the property.

23           These are things that -- that none of the

24   shareholders or owners or guarantors would agree to or consent

25   to the 363 Motion.  So we're going to have a fight over the 363

1   Motion.

2          So I don't -- not sure that we're gaining a lot of

3   time.  Plus we're -- we're talking about taking a lot of rights

4   away from people in terms of redemption rights, in terms of

5   their -- their ability to bring actions to and recover damages

6   against the banks or shareholders for their conduct in the --

7   in how this project was handled.

8          I don't see any advantage at all of converting this

9   to Chapter 7.  Long term -- I think the idea that we're going

10  to get something resolved in six months I think is overly

11  optimistic at best.

12         THE COURT:  What about State Court, Mr. Molstad?  You

13  (indisc.).

14         MR. MOLSTAD:  I tried with the -- pardon?

15         THE COURT:  Mr. Molstad, do you agree with --

16         MR. MOLSTAD:  I tried to --

17         THE COURT:  -- Mr. Eide that --

18         Don, can you hear me?  This is Judge Collins.

19         MR. MOLSTAD:  Yeah, yeah.

20         THE COURT:  All right.  What about -- do you think

21  Larry's time table for State Court is accurate; meaning that he

22  doesn't think that --

23         MR. MOLSTAD:  I'm sorry.  I can't --

24         THE COURT:  -- he doesn't -- Larry doesn't think the

25  property would actually go through a sale or transfer a deed

1   for -- you know, basically said you pick up two years by being

2   in Bankruptcy Court versus State Court running its course and

3   all the litigation there.

4           It's going to push that thing out before it's all

5   settled up for another couple years.

6           What's your response to that?

7           MR. MOLSTAD:  Well, maybe; maybe it won't.  It could

8   be longer.

9           THE COURT:  All right.

10          MR. MOLSTAD:  I mean, I don't know that -- that

11  answer, Judge.  I mean, you've got -- you've got to have a

12  buyer; you have to have an agreement with the Trustee.

13          In essence, you have to have some kind of agreement

14  with the -- with the unsecureds and the mechanics lienholders

15  and the mechanics people who built this that haven't been paid.

16  As to what -- a carve-out position would be appropriate.

17          And I don't know that you're going to ever get that

18  done in that time period.  I think you're still looking at a

19  year no matter how things go.

20          THE COURT:  Okay.

21          MR. MOLSTAD:  Best case scenario.  Maybe closer to

22  two.

23          THE COURT:  All right.  I'm going to throw it back to

24  Mr. Eide.  What's your response to all this?

25          MR. EIDE:  This property is unfinished.  So all it

1  has is expense.  And the real estate taxes alone accrue at

2  about 18,000 to $20,000 a month.

3          So if it takes a year, there's another $240,000 --

4  220 to 240 thousand dollars in unpaid real estate taxes.

5          I think a 363 sale, by a Chapter 7 Trustee, can have

6  that approved much sooner than that.

7          **MR. MOLSTAD:**  Can I respond to that?

8          I think if the -- if this project were to move

9  forward -- there was an arrangement where the TIF would reduce

10  the taxes for a period of time, including up to two years taxes

11  have accrued.

12          However, we're just down to 20,000 a year, as I

13  understand it.

14          **THE COURT:**  Okay.  Larry, back to you.

15          **MR. EIDE:**  The bank has heard of that possibility.

16  However, I don't think that there's ever been a formal request

17  made to the City regarding that possibility.

18          And I don't know that the City -- or the County --

19  whichever it is that has to respond -- has had the opportunity

20  to even consider or to respond to any such request.

21          The real estate taxes against this property are the

22  result of a tax increment financing where there is a minimum

23  assessment agreed by the Debtor.  That was agreed to by the

24  Debtor before this project even started.

25          And the funds under the TIF have been received, so

25

1    they have to be repaid.  And it's those taxes that make that

2    repayment.

3           The City or County wouldn't have gotten involved in

4    the transaction if it weren't for the -- for the minimal

5    assessment agreement.

6           It now sounds like the Debtor either in bankruptcy --

7    because it's discussed in the disclosure statement -- or

8    outside of the bankruptcy.

9           If the case is dismissed, it's going to go back to

10   him and say, "Well, I didn't -- I agreed to that once, but I

11   don't agree to it now, and I want you to change it."

12          The loser, then, is the City or County that has to

13   repay those funds that they've already advanced under that TIF.

14          **THE COURT:**  Okay.  Monica, do you want in on this

15   now?  They're talking about the City a little bit.

16          **MS. CLARK:**  Your Honor, I am a newcomer to this file.

17          The City is not taking a position on conversion or

18   dismissal.  So I have nothing to add.

19          **THE COURT:**  Okay.

20          **MR. THOMSON:**  Your Honor, this is Charles Thomson.

21   I'm may have some relevant information on that.

22          **THE COURT:**  Well --

23          **MR. THOMSON:**  So I think --

24          **THE COURT:**  Hold on.  Is it all right -- does anybody

25   object to Mr. Thomson providing this information?

1          **MR. SPEAKER:**  I don't, no.

2          **THE COURT:**  Okay.  Go ahead, Mr. Thomson.

3          **MR. THOMSON:**  The TIF was never activated by the

4    City, so the money hasn't been actually advanced.

5          So we've been in discussion with the City.  They're

6    willing to redo the development agreement so that the project

7    can be completed.

8          And as far as taking care of the past due taxes, the

9    forecast that we had prepared (indisc.), who did all the

10   (indisc.) on this.  In addition to paying those taxes from the

11   reorganized Debtor, we were waiting for someone's money to show

12   up to finish the building and then the rents can pay those

13   taxes.

14         **THE COURT:**  Okay.  Thank you, Mr. Thomson.

15         Mr. Eide, giving you the last word on this motion, so

16   I'm going to throw it back to you for wrap up.

17         **MR. EIDE:**  The bank -- First Security Bank continues

18   to request conversion in this case rather than dismissal.

19         If the Court doesn't convert, First Security Bank

20   then supports a dismissal of the case.

21         **THE COURT:**  Okay.  So anyone feeling anymore briefing

22   needed or anything else?  Or we just get the clock running for

23   15 days for a decision?

24         Nobody wants to brief any further.  So the silence

25   will be interpreted by me as saying it's all ready for

```
 1   decision.  Anybody disagree?

 2             MR. MOLSTAD:  No.

 3             MR. EIDE:  First Security Bank does not disagree.

 4             THE COURT:  All right.  We'll take a little bit of a

 5   look at this; understanding we've got to get a quick decision

 6   out.  And we'll do that as quickly as we can, understanding

 7   that we've got 15 days to get it done.

 8             All right, everybody.  If there's nothing further, I

 9   appreciate everybody's time this morning.

10             MR. EIDE:  Thank you.

11             MR. MOLSTAD:  Thank you, Judge.

12             MR. SPEAKER:  Thanks, Judge.

13             MS. SPEAKER:  Thank you.

14         (Proceeding concluded at 11:44 a.m.)

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **June 16, 2020**

          **Signed**                                          **Dated**

### *TONI HUDSON, TRANSCRIBER*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA
(MASON CITY)

| | | |
|---|---|---|
| IN RE: | ) | CASE NO:  19-00507 |
| | ) | CHAPTER 7 |
| | ) | |
| McQUILLEN PLACE COMPANY, LLC, | ) | Cedar Rapids, Iowa |
| | ) | |
| | ) | Friday, December 6, 2019 |
| Debtor. | ) | |
| | ) | 11:38 a.m. to 11:43 a.m. |

TELEPHONIC HEARING RE:
RULING ON MOTION TO CONVERT OR DISMISS CASE

BEFORE THE HONORABLE THAD J. COLLINS,
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:            (CONTINUED ON PAGE 2)


For Debtor:            DONALD H. MOLSTAD, ESQ.
                       701 Pierce St., Suite 305
                       Sioux City, IA 51101

                       CHARLES M. THOMSON, ESQ.
                       Law Office of Charles M. Thomson
                       1110 North Grand Ave., Suite 300
                       Charles City, IA 50616

For Cedar Rapids Bank  JOSEPH E. SCHMALL, ESQ.
& Trust:               2007 First Avenue SE
                       P.O. Box 2804
                       Cedar Rapids, IA 52406


Court Reporter:        Recorded; FTR

Transcribed By:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**            (CONTINUED)


First Security Bank        LARRY S. EIDE, ESQ.
& Trust Company:           103 East State St., Suite 800
                           P.O. Box 1588
                           Mason City, IA 50402


Iowa Economic              BRANDON J. GRAY, ESQ.
Development Authority:      Iowa Attorney General's Office
                           1305 Walnut
                           Des Moines, IA 50319


U.S. Trustee:              L. ASHLEY ZUBAL, ESQ.
                           Office of the U.S. Trustee
                           210 Walnut St., Room 793
                           Des Moines, IA 50309

1       **Cedar Rapids, Iowa; Friday, December 6, 2019; 11:38 a.m.**

2              **(Attorneys appearing telephonically)**

3                    **(Call to Order)**

4              **THE COURT:**  Good morning, everybody.

5              **MR. SPEAKER:**  Morning.

6              **MR. SPEAKER:**  Morning, Judge.

7              **MS. SPEAKER:**  Morning.

8              **THE COURT:**  We are here on the case of McQuillen

9    Place Company, LLC; Chapter 7 bankruptcy; Number 19-507.

10             I called this status conference essentially today to

11   let you know what the ruling is going to be on the Motion to

12   Convert.  And essentially what I'm doing today is telling you

13   what the ruling is going to be and will be filed with a more

14   detailed description on Monday.

15             Let me get the appearances real quick.  This is who

16   I've got:

17             Donald Molstad, for Debtors, and with him, Charles

18   Thomson and James Gray; is that right?

19             **MR. MOLSTAD:**  Correct.

20             **THE COURT:**  All right.  We've got Larry Eide for

21   First Security Bank.

22             **MR. EIDE:**  Yes.

23             **THE COURT:**  Ashley Zubal for the office of U.S.

24   Trustee.

25             **MS. ZUBAL:**  Here.

4

1      **THE COURT:**  Brandon Gray for the Iowa Department of

2  Revenue.

3      **MR. GRAY:**  Your Honor, I'm here for the Iowa Economic

4  Development Authority.

5      **THE COURT:**  Oh, right.  I'm sorry.  I'm so used to

6  saying, "Department of Revenue."  Okay.

7      All right.  And we've got Joe Schmall.  And Joe is

8  Cedar Rapids Bank & Trust; is that right?

9      **MR. SCHMALL:**  That's correct, Judge.  Thank you.

10      **THE COURT:**  Okay.  Anybody else on the phone with us

11  today?

12      Okay.  Just a quick summary here.  The case was

13  argued a couple different times.  We had long arguments by

14  telephone, on November 14th, and we had some follow-up

15  discussion about what the record would include.

16      With intervening holidays, I just got off the road

17  last night from a journey to Independence, Mason City, and Fort

18  Dodge.  So I'm not sure whether we're at 15 days or beyond.  I

19  just know it's about that time.

20      I'm just going to provide you a ruling today, with a

21  longer, more-detailed ruling, as I said, to follow on Monday.

22      Here's the gist of the ruling:

23      Section 1112(b) governs this matter.  "Basically

24  provide that the Court shall" -- the word is now, "shall" --

25  "convert or dismiss the case, whichever is in the best interest

**EXCEPTIONAL REPORTING SERVICES, INC**

5

1    of the creditors in the estate, for cause."

2              That's the nub of this case.  The rest of the statute

3    talks about shifting the burden and unusual circumstances.

4    That has not been argued here.

5              In summary, this is an issue of cause to convert, and

6    essentially adopt the arguments Larry Eide made on behalf of

7    his client.

8              The list of causes, in Section 1112(b)(4) is not

9    exclusive.  We picked out a couple of those that were pretty

10   well established by the record.  And I think that those carried

11   the day.

12             So is there a continuing loss or diminution of the

13   estate; the failure to pay taxes; and a gross mismanagement of

14   affairs of Debtor.

15             I know that sounds harsh, but the case law governing

16   it makes the standard applicable here.

17             I've set out what I have considered to be the facts

18   in the ruling.  And I've considered the arguments of both sides

19   carefully, and then tried to explain what I think the law

20   provides.

21             In short, its mandatory shall convert or dismiss,

22   which is ever in the best interest of creditors in the estate.

23             I find that the creditors in the estate come down on

24   the side of cause to convert; not cause to dismiss.

25             So that's what the gist of it is.  So there will be a

6

1    conversion.  It will be effective Monday.  For punitive

2    purposes, I'll make sure that the ruling is -- note that it's

3    going to be effective as of Monday.

4         But because the timeline was running out, and I had

5    been out on the road, I figured I ought to let everyone know

6    that we haven't forgotten about you and we're trying to make it

7    within the deadline is imposed.

8         Any questions, concerns, or a need for clarification

9    before Monday?

10        Well, I appreciate all of you dropping what you had

11   this morning and getting on with me.

12        When I drive around the state and tried to think

13   about when was a good time to make a call, I never know for

14   sure.  So I just decided to set it up for today.  And I hope it

15   didn't inconvenience anybody too much.

16        But that's all I have.  And the ruling will be coming

17   on Monday.  And thanks for your time.

18        **MR. SPEAKER:**  Thank you.

19        **MR. SPEAKER:**  Thank you, Judge.

20        **MR. SPEAKER:**  Thanks, Judge.

21        **(Proceeding concluded at 11:43 a.m.)**

22

23

24

25

7

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **June 16, 2020**

               **Signed**                                        **Dated**


                    *TONI HUDSON, TRANSCRIBER*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| In Re: | CHAPTER 7 |
|  | Bankruptcy No. |
| McQuillen Place Company, LLC | 19–00507 |
| Debtor(s) |  |

## NOTICE OF FILING OF TRANSCRIPT
## AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

A transcript was filed on June 17, 2020. The following deadlines apply:

The parties have until June 24, 2020 to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *Statement of Redaction Submitted* is July 8, 2020.

If a Statement of Redaction Submitted has been filed, the redacted transcript is due by July 20, 2020.

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, on September 15, 2020, unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber or you may view the document at the clerk's office public terminal.

|  |  |
|---|---|
| Date: June 18, 2020 | MEGAN R. WEISS |
|  | Clerk, Bankruptcy Court |

```
MIME-Version:1.0
From:ndia.ecf.notification@iand.uscourts.gov
To:ndia.ecf.notification@iand.uscourts.gov
Bcc:
--Case Participants: Randall E Nielsen (nielsen@pappajohnlaw.com), Eric W Lam
(elam@simmonsperrine.com, kcarmichael@spmblaw.com, tdomeyer@spmblaw.com), Larry S Eide
(eide@pappajohnlaw.com), Bradley R Kruse (awatson@dickinsonlaw.com,
bkruse@dickinsonlaw.com), Eric Jay Langston (elangston@spmblaw.com), Charles L Smith
(csmith@telpnerlaw.com), Monica Clark (clark.monica@dorsey.com), US Bankruptcy Clerk-IAND
(appeals@ianb.uscourts.gov), Judge CJ Williams (cj_williams@iand.uscourts.gov,
graham_carl@iand.uscourts.gov, jackson_obrien@iand.uscourts.gov,
sali_vanweelden@iand.uscourts.gov), Chief Magistrate Judge Kelly K.E. Mahoney
(jami_gollhofer@iand.uscourts.gov, kelly_mahoney@iand.uscourts.gov)
--Non Case Participants:
--No Notice Sent:


Message-Id:<2266135@iand.uscourts.gov>
Subject:Activity in Case 6:20-cv-02040-CJW-KEM Cornice & Rose International, Inc v. Smith et
al Bankruptcy Appeal
Content-Type: text/html
```

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Northern District of Iowa

### Notice of Electronic Filing

The following transaction was entered on 6/17/2020 at 12:40 PM CDT and filed on 6/17/2020

| | |
|---|---|
| **Case Name:** | Cornice & Rose International, Inc v. Smith et al |
| **Case Number:** | 6:20-cv-02040-CJW-KEM |
| **Filer:** | Four Keys, LLC |
| | First Security Bank & Trust Co. |
| **Document Number:** | 1 |

**Docket Text:**
**NOTICE of Appeal from Bankruptcy Appellate Panel. Bankruptcy Appellate Panel case number 20-6012. File received. Election filed by Four Keys, LLC and First Security Bank & Trust Co. (pac)**

**6:20-cv-02040-CJW-KEM Notice has been electronically mailed to:**

Larry S Eide      eide@pappajohnlaw.com

Eric W Lam      elam@simmonsperrine.com, kcarmichael@spmblaw.com, tdomeyer@spmblaw.com

Randall E Nielsen       nielsen@pappajohnlaw.com

Charles L Smith      csmith@telpnerlaw.com

Bradley R Kruse      bkruse@dickinsonlaw.com, awatson@dickinsonlaw.com

Monica Clark      clark.monica@dorsey.com

Eric Jay Langston      elangston@spmblaw.com

US Bankruptcy Clerk-IAND      APPEALS@IANB.USCOURTS.GOV

**6:20-cv-02040-CJW-KEM Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=6/17/2020] [FileNumber=2266133-0
] [35ec988818650006970a015e36291da0bdf77341cffcf0c5256bf2e37198bc49e15
d1822e9b22464ac0571c2934b8552b3506a31589395f1c522cd0bc2167803]]

```
MIME-Version:1.0
From:ndia.ecf.notification@iand.uscourts.gov
To:ndia.ecf.notification@iand.uscourts.gov
Bcc:
--Case Participants: Monica Clark (clark.monica@dorsey.com), Larry S Eide
(eide@pappajohnlaw.com), Eric W Lam (elam@simmonsperrine.com, kcarmichael@spmblaw.com,
tdomeyer@spmblaw.com), Eric Jay Langston (elangston@spmblaw.com), Randall E Nielsen
(nielsen@pappajohnlaw.com), Charles L Smith (csmith@telpnerlaw.com), Charles McQuillen
Thomson (cthomson@doall.com), US Bankruptcy Clerk-IAND (appeals@ianb.uscourts.gov), Chief
Magistrate Judge Kelly K.E. Mahoney (jami_gollhofer@iand.uscourts.gov,
kelly_mahoney@iand.uscourts.gov), Judge CJ Williams (cj_williams@iand.uscourts.gov,
graham_carl@iand.uscourts.gov, jackson_obrien@iand.uscourts.gov,
sali_vanweelden@iand.uscourts.gov)
--Non Case Participants:
--No Notice Sent:


Message-Id:<2266140@iand.uscourts.gov>
Subject:Activity in Case 6:20-cv-02041-CJW-KEM Thomson et al v. Smith et al Bankruptcy
Appeal
```
Content-Type: text/html

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to
this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits
attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of
all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees
apply to all other users. To avoid later charges, download a copy of each document during this first
viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not
apply.**

### U.S. District Court

### Northern District of Iowa

#### Notice of Electronic Filing

The following transaction was entered on 6/17/2020 at 1:00 PM CDT and filed on 6/17/2020

| | |
|---|---|
| **Case Name:** | Thomson et al v. Smith et al |
| **Case Number:** | 6:20-cv-02041-CJW-KEM |
| **Filer:** | First Security Bank & Trust Co. |
| | Four Keys, LLC |
| **Document Number:** | 1 |

**Docket Text:**
**NOTICE of Appeal from Bankruptcy Appellate Panel. Bankruptcy Appellate Panel case number
20-6013. Bankruptcy Court case number 19-507. File received. Election by First Security Bank
& Trust Co and Four Keys, LLC. (pac)**

**6:20-cv-02041-CJW-KEM Notice has been electronically mailed to:**

Larry S Eide      eide@pappajohnlaw.com

Eric W Lam      elam@simmonsperrine.com, kcarmichael@spmblaw.com, tdomeyer@spmblaw.com

Randall E Nielsen      nielsen@pappajohnlaw.com

Charles L Smith      csmith@telpnerlaw.com

Charles McQuillen Thomson      cthomson@doall.com

Monica Clark      clark.monica@dorsey.com

Eric Jay Langston      elangston@spmblaw.com

US Bankruptcy Clerk-IAND      APPEALS@IANB.USCOURTS.GOV

**6:20-cv-02041-CJW-KEM Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=6/17/2020] [FileNumber=2266138-0
] [374a97dc9c5d34e168b9c7a14d602dd244e551a7b315ee2c937f18b41f574a2819e
7f8e40400c66885ee7beea927b4fb1524b74c3319d9068f78a7853f277d67]]

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**MOTION TO PAY<br>REAL ESTATE TAXES, FOR<br>ASSIGNMENT, AND FOR OTHER<br>RELIEF** |

COMES NOW First Security Bank & Trust Co. ("Bank"), a creditor and party in interest in this case, and in support of this Motion respectfully states:

1.      Pursuant to a Sale Order from this Court issued on April 9, 2020 (Dkt #154), Chapter 7 Trustee Charles Smith sold certain real estate of the Debtor. The Bank was the original Purchaser, and eventually the Bank assigned its right, title, and interest in the Purchase Agreement to Four Keys, LLC. The sale was then closed on April 24, 2020.

2.      As of the closing date of April 24, 2020, there were due and owing delinquent real estate taxes totaling at least $664,138.22, as follows:

Real estate taxes payable in fiscal year 2018 - 2019, delinquent with penalty through date of Closing: $260,354.00

Real estate taxes payable in current fiscal year 2019 - 2020 (installments delinquent October 1, 2019 and April 1, 2020) with penalty through date of closing: $226,621.00

Real estate taxes prorated from July 1, 2019 to date of closing ($216,862.00 X 299/366 = $117,163.22): $177,163.22

1

3. The Bank asserts it holds validly perfected mortgage(s) against the real estate that was sold, subject to (*i.e.* inferior to) the statutory liens in favor of Floyd County for the aforementioned delinquent real estate taxes.

4. The Court's Sale Order provided all valid liens will attach to the proceeds of the sale, and the Trustee may disburse the sale proceeds upon permission from this Court.

5. Additional interests and penalties are continuing to accrue with respect to the aforementioned delinquent real estate taxes.

6. The Bank is cognizant appeals are pending from this Court's Sale Order. However, even if somehow this Court's Sale Order were reversed, eventually at some point in time the real estate taxes will have to be paid, either by this Estate or by whosoever eventually acquires title to the real estate in question.

7. Similarly, the Bank is cognizant its asserted liens and claims are being challenged by Charles Thomson and James Gray, who are equity holders of the Debtor and who also have asserted claims against the Debtor. However, even if (but of course not conceding) the Bank's liens or claims are somehow invalid or subordinated, eventually someone will have to pay the delinquent real estate taxes, because the taxes constitute statutory liens superior to the Bank's claims and liens (even if, but not conceding, the Bank's claims and liens were held invalid or were subordinated). Indeed, clear title to the real estate in question cannot be delivered, until the delinquent real estate taxes have been paid and the County's statutory liens satisfied.

8. There is no valid business reason to allow the real estate taxes to continue to accrue interest and penalties. No one will benefit from continuing accrual. In contrast, each and every party in interest (including the appellants whose appeals from this Court's sale

order are now pending and those who are challenging the Bank's liens and claims) will

benefit from immediate payment of the real estate taxes. This is so because immediate

payment of the real estate taxes will stop accrual of interest and penalty. In contrast, if the

real estate taxes continue to accrue interest and penalty, the accrual of interest and penalty

will consume the limited resources and equity in this bankruptcy estate, to the detriment of

the various creditors and parties in interest in this case.

 9. Via this Motion the Bank seeks permission from the Court to allow the

disbursement, from the proceeds of the sale resulting from this Court's April 9 Sale Order,

all delinquent real estate taxes. Upon payment of the delinquent real estate taxes, the Bank

will be assigned, either via an Order from this Court or consensually from Floyd County,

any and all rights, claims, and liens of Floyd County with respect to the delinquent real

estate taxes, to the full extent of the position of Floyd County, including the County's senior

statutory lien position. Further, the Bank will be granted a first and primary secured lien and

allowed secured claim, to the extent of the Bank's payment herein, against the real estate. If

and when the aforementioned sale and the April 9 Sale Order are finally confirmed in its

entirely and if and when  the challenges to the Bank's liens and claims are completely

unsuccessful and barred and dismissed with prejudice, then and only then the assignment

and secured claim allowance will be deemed withdrawn.

 10. The Bank has consulted with the Trustee, and the Trustee consents to the relief

requested by the Bank in this Motion.

 WHEREFORE, the Bank respectfully prays this Court enter and enroll an Order

pursuant to 11 U.S.C. §§ 105, 361, 363, and 364 authorizing the disbursement, from the

proceeds of the aforementioned sale, the amount of at least $664,138.22 to the Floyd

3

County Treasurer, so as to pay in full any and all real estate taxes (together with interest and penalties) that have accrued and are accruing to date, and granting the assignment and allowance of the secured claim and lien, etc., all as prayed for in this Motion, and for such other relief as may be just and proper under the premises.



Eric W. Lam, AT0004416
Eric J. Langston, AT0014001
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
elangston@spmblaw.com
ATTORNEYS FOR FIRST SECURITY BANK
& TRUST CO.

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 24th day of June, 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

_____ /s/ E Lam _____

Larry S. Eide; Brad Kruse; Charles Thomson; Charles L. Smith; Monica L. Clark; Brandon Gray; J D Haas; Laura Hyer; Judith O'Donohoe; Christine B. Skilton; Bradley Sloter; L. Ashley Zubal; Rita Grimm (by email); Floyd County Attorney, % Floyd County Courthouse, 101 S Main, Charles City IA 50616

First Security – McQuillen/Pldgs/BA 19-00507 McQuillen - Drafts/Mtn to Pay Real Estate Taxes.062420.0755.ewl

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>MCQUILLEN PLACE COMPANY, LLC,<br><br>Debtor. | Chapter 7 Bankruptcy<br>Case No. 19-00507<br><br>**NOTICE re Motion to Pay Real Estate Taxes, for Assignment, and for Other Relief** |

      **NOTICE IS HEREBY GIVEN** that circa June 24, 2020, First Security Bank & Trust Co. filed a Motion to Pay Real Estate Taxes, for Assignment, and for Other Relief. The Motion seeks Court approval to pay certain real estate taxes, and also seeks an Order from the Court granting certain assignments and other relief. A copy of the Motion may be obtained from the undersigned or may be viewed at the Clerk of Court, U.S. Bankruptcy Court, Northern District of Iowa, 111 Seventh Ave. SE, 6th Floor, Cedar Rapids, IA 52401-2101. A copy of this *Notice* has been served upon all creditors and parties of interest as listed below.

      **NOTICE IS FURTHER GIVEN** any and all **objections** to the Motion must be filed on or before the **July 16, 2020**. The objection must be filed with the Clerk of Court, U.S. Bankruptcy Court, Northern District of Iowa, 111 Seventh Ave. SE, Box 15, Cedar Rapids, IA 52401-2101, and simultaneously a service copy must be sent to the Bank's counsel and Trustee Charles L. Smith, 25 Main Place #200 Council Bluffs IA 51503 and Office of U.S. Trustee, 111 Seventh Ave. SE, Box 17, Cedar Rapids, IA 52401-2101.

      **NOTICE IS FURTHER GIVEN** that timely-filed objections, if any, will be heard by the Court upon notice. If no objection is filed, the appropriate order will be entered.

/s/ E Lam
Eric W. Lam, AT0004416
Eric J. Langston, AT0014001
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
ATTORNEYS FOR FIRST SECURITY BANK &
TRUST COMPANY

1

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 25th day of June, 2020, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case, and also via ordinary U S Mail to the entities listed on the attached matrix.

/s/ Wendi C. Scheer

Larry S. Eide; Brad Kruse; Charles Thomson; Charles L. Smith; Monica L. Clark; Brandon Gray; J D Haas; Laura Hyer; Judith O'Donohoe; Christine B. Skilton; Bradley Sloter; L. Ashley Zubal; Rita Grimm (by email); Floyd County Attorney, c/o Floyd County Courthouse, 101 S Main, Charles City IA 50616

First Security – McQuillen/Pldgs/BA 19-00507 McQuillen - Drafts/NOTICEMtn to Pay Real Estate Taxes.062420.0327.wcs

Label Matrix for local noticing
0862-4
Case 19-00507
Northern District of Iowa
Mason City
Wed Jun 24 08:35:28 CDT 2020

Amelia Management, LLC
1110 N. Grand Avenue, Ste. 300
Charles City, IA 50616-2139

Amelia Trust
c/o Charles M. Thomson, Trustee
1110 North Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Amelia Trust
c/o Judith M. O'Donohoe
PO Box 307
116 N. Main Street
Charles City, IA 50616-2015

Atlas Painting
911 Sycamore Street
Waterloo, Iowa 50703-4815

BRP Bruening
900 Montgomery Street
Decorah, Iowa 52101-2343

Bergan KDV
P.O. Box 2100
Waterloo, IA 50704-2100

Bluhm's Cedar Valley Electric
409 South Johnson Street
Charles City, Iowa 50616-2621

Bluhm's Cedar Valley Electric
PO BOX 287
FLOYD, IA 50435-0287

Louis Karl Bonham
Osha Liang LLP
909 Fannin Street
Ste 3500
Houston, TX 77010-1034

Cedar Rapids Bank & Trust Company
500 First Avenue, NE
PO Box 789
Cedar Rapids, IA 52406-0789

Cedar Rapids Bank & Trust Company
c/o Joseph E. Schmall
PO Box 2804
Cedar Rapids, IA  52406-2804

Cedar Rapids Bank & Trust Company
c/o Laura M. Hyer
PO Box 2804
Cedar Rapids, IA  52406-2804

Cerro Gordo County, Iowa
Carlyle D Dalen
Asst. County Atty.
220 N. Washington Ave.
Mason City, Ia 50401-3220

Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139

Cincinnati Insurance
Post Office Box 145496
Cincinnati, OH 45250-5496

City of Charles City, IA
c/o Brad Sloter
200 North Johnson Street
Charles City, IA  50616

City of Charles City, Iowa
105 Milwaukee Mall
Suite 2
Charles City, IA 50616-2280

City of Charles City, Iowa
c/o Monica Clark
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402

Monica L Clark
Dorsey & Whitney LLP
500 South Sixth Street, Suite 1500
Minneapolis, MN 55415-1532

Cornice & Rose International, LLC
804 Roberts Road
Barrington, IL 60010-1142

Cornice & Rose International, LLC
804 Roberts Road
Tower Lakes
Barrington, IL 60010-1142

Cornice & Rose International, LLC
c/o Bradley R. Kruse
699 Walnut Street, Suite 1600
Des Moines, IA  50309

Cornice & Rose Intl Ltd.
804 W Roberts Road
Barrington, IL 60010-1142

Custom Air
Brett Payton
10443 Osage Rd
Waterloo, IA 50703-9349

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
Cedar Rapids, IA 52401-1110

Day Rettig Martin, P.C.
150 1st St NE - Suite 415
P.O. Box 2877
Cedar Rapids, IA 52406-2877

Dean Snyder Construction
913 N. 14th Street
Clear Lake, Iowa 50428-2138

Dean Snyder Construction Co.
P.O. BOX 181
913 N 14th Street
Clear Lake, IA 50428-2138

(p)CEDAR VALLEY STEEL INC
280 50TH AVE SW
CEDAR RAPIDS IA 52404-4933

Donald H Molstad
505 6th St , Suite 308
Sioux City, Ia 51101-1201

Larry S. Eide
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Elwood Law Firm
116 N. Main Street
Charles City, Iowa 50616-2015


Elwood Law Firm
c/o Judith O'Donohoe
116 North Main Street
PO Box 307
Charles City, IA  50616

Elwood, O'Donohoe, Braun & White
116 N. Main St., PO Box 307
Charles City IA 50616-0307

First Security Bank & Trust Company
809 Clark Street
Charles City, IA 50616-2208


First Security Bank & Trust Company
809 Clark Street
PO Box 577
Charles City, IA 50616-0507

First Security Bank & Trust Company
c/o Eric J. Langston
115 Third Street SE, Suite 1200
Cedar Rapids, IA  52401

First Security Bank & Trust Company
c/o Eric W. Lam
115 Third Street SE, Suite 1200
Cedar Rapids, IA  52401


First Security Bank & Trust Company
c/o Larry S. Eide
Pappajohn, Shriver, Eide & Nielsen P.C.
103 East State Street, Suite 800
PO Box 1588
Mason City, IA 50402-1588

Floyd County Treasurer
101 South Main Street Ste 303
Charles City, Iowa 50616-2792

Four Keys, LLC
c/o Eric J. Langston
115 Third Street SE, Suite 1200
Cedar Rapids, IA  52401


Four Keys, LLC
c/o Eric W. Lam
115 Third Street SE, Suite 1200
Cedar Rapids, IA  52401

Brandon James Gray
Iowa Attorney General's Office
1305 Walnut
Des Moines, IA 50319-0109

James Gray
804 Roberts Road
Tower Lakes, IL 60010-1142


J D Haas
J D Haas & Associates, PLLC
1120 E. 80th St.
Suite 200
Bloomington, MN 55420-1407

Hawkeye Alarm
16 Commercial Street
Waterloo, Iowa 50701-1310

Hildreth & Co., LLC
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616-2139


Laura Michelle Hyer
Bradley & Riley, PC
PO Box 2804
Cedar Rapids, IA 52406-2804

IL Switchboard
125 West Laura Drive
Addison, IL 60101-5178

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346


Iowa Economic Development Authority
200 E Grand Avenue
Des Moines, IA 50309-1834

Iowa Economic Development Authority
Office of the Attorney General of Iowa
ATTN:  Bankruptcy Unit
1305 E. Walnut Street
Des Moines, IA 50319-0109

James A Gray
James Gray
804 Roberts Road
Barrington, IL 60010-1142


Jed Construction
102 Grand Street
Elma, Iowa 50628-8189

Jendro Sanitation
108 Prospect Lane
Charles City, Iowa 50616

Judith Mack Odonohoe
P O Box 307
116 N Main St
Charles City, Ia 50616-2015


Kamm Excavating Corp
1301 Hildreth Street
Charles City, IA 50616-3663

Bradley R. Kruse
699 Walnut St., Ste. 1600
Des Moines
Des Moines, IA 50309-3944

L. Ashley Zubal
Trial Attorney
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines IA 50309-2108

Eric W. Lam
115 Third Street S.E. Suite 1200
Cedar Rapids, IA 52401-1222

Eric Langston
Simmons Perrine Moyer Bergman PLC
115 Third Street SE
Suite 1200
Iowa
Cedar Rapids, IA 52401-1222

Larry Steven Eide
103 E. State St., Suite 800
P.O. Box 1588
Mason City, IA 50402-1588

Laura Michelle Hyer
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

MAS
41W195 Railroad Street
Pingree Grove, IL 60140-8980

McQuillen Place Company, LLC
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

Mediacom
1 Mediacom Way
Mediacom Park
New York, NY 10918-4810

Mick Gage Plumbing & Heating
511 West Milwaukee Street
New Hampton, Iowa 50659-1105

Mid American Energy
666 Grand Ave.
Des Moines, Iowa 50309-2580

Midwest Engineering
8236 W. 51st Street
Sioux Falls, SD 57106-7861

Midwest Fire Sprinkler
2001 De Wolf Street
Des Moines, Iowa 50316-2761

(p)MILLS INC
1906 GILBERT ST
CHARLES CITY IA 50616-9171

Donald H. Molstad
701 Pierce St., Ste. 305
Sioux City, IA 51101-1037

Judith O'Donohoe
Elwood, O'Donohoe, Braun & White, LLP
116 North Main Street
P.O. Box 307
Charles City, IA 50616-0307

O'Hara's Son Roofing Corporation
3306 N. Knox Avenue
Chicago, IL 60641-4434

Allen O. Pederson
412 Sample Street
Nashua, IA 50658-9696

Pederson Plumbing
412 Sample Street
Charles City, IA 50616

Pederson Plumbing
Allen O. Pederson
412 Sample Street
Nashua, Iowa 50658-9696

Phillips Modern Ag
2153 S. Linn Ave.
New Hampton, Iowa 50659-9414

Planscape Partners
1200 Nicollet Ave.
Suite 706
Minneapolis, MN 55403-2409

Premier Cleaners
816 First Avenue N
Fort Dodge, IA 50501-3906

Randall Eugene Nielsen
P O Box 1588
103 E State St ,Suite 800
Mason City, IA 50401-3334

Robert Cardell Gainer
505 5th Ave Suite 835
Des Moines, IA 50309-2317

Schindler Elevator Corporation
1530 Timberwolf Drive
Holland, Ohio 43528-9161

Schindler Elevator Corporation
20 Whippany Rd
Morristown, NJ 07960-4524

Schindler Elevator Corporation
c/o NCS, 729 Miner Rd
Highland Hts, OH 44143-2117

Joseph E. Schmall
2007 First Avenue SE
PO Box 2804
Cedar Rapids, IA 52406-2804

Sherri Dralle
1308 Grandview Ave.
Waverly, IA 50677-1038

Christine B. Skilton
205 Brasher Street
P.O. Box 39
Nashua, IA 50658-0039

Bradley David Sloter
Noah Smith & Schuknecht PLC
200 North Johnson St.
Charles City, IA 50616-1939

Charles L. Smith
25 Main Place, Ste 200
P.O. Box 248
Council Bluffs, IA 51502-0248

T-J Service, Inc.
221 N. Main St.
Charles City, IA 50616-2016

T-J Service, Inc.
Tom Brock, President
221 North Main Street
Charles City, Iowa 50616-2016


T-J Service, Inc.
c/o Christine B. Skilton
205 Brasher Street, PO Box 39
Nashua, IA  50658-0039

Telpner Peterson Law Firm, LLP
25 Main Place, Suite 200
Council Bluffs, IA 51503-0790

Charles Thomson
1110 North Grand, #300
Charles City, Ia 50616-2139


Charles McQuillen Thomson
Law Office of Charles M. Thomson
1110 North Grand Ave., Suite 300
Charles City, IA 50616-2139

U.S. Trustee
111 7th Ave SE, Box 17
Cedar Rapids IA 52401-2103

U.S. Trustee
210 Walnut Street Room 793
Des Moines, IA 50309-2106


United States Trustee
United States Federal Courthouse
111 7th Avenue SE, Box 17
Cedar Rapids, IA 52401-2103

Unruh Insulation
2633 450 St.,
Stacyville, Iowa 50476-7549

VanMeter
850 32nd Ave. SW
Cedar Rapids, Iowa 52404-3913


Vernon P Squires
P O Box 2804
2007 1st Ave S E
Cedar Rapids, IA 52402-6344

L Ashley Zubal
U.S. Trustee
Federal Building
210 Walnut Street, Rm 793
Des Moines, IA 50309-2106



The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Design Build Structures
7518 Peosta Industrial Drive
Peosta, Iowa 52068

Mills, Inc.
Kelvin E. Keiffer, President
1906 Gilbert St.
Charles City, Iowa 50616



The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(u), IA

(u)Cornice & Rose International, LLC

(d)Cornice & Rose International, Ltd.
804 Roberts Road
Barrington, IL 60010-1142


(u)Elwood Law Office
116 N. Main St. PO Box 307
Charles City

(u)Four Keys, LLC

(u)Mills - Inc.

End of Label Matrix
Mailable recipients    103
Bypassed recipients      6
Total                  109